UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

            Plaintiff,

      -against-

UBS AMERICAS INC., UBS REAL ESTATE
SECURITIES INC., UBS SECURITIES,
LLC, MORTGAGE ASSET
SECURITIZATION TRANSACTIONS, INC.,
DAVID MARTIN, PER DYRVIK, HUGH
CORCORAN, and PETER SLAGOWITZ,

           Defendants.

---

___ CIV. ___ (___)

**COMPLAINT**

**JURY TRIAL DEMANDED**



# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ..................................................................................................1

PARTIES .....................................................................................................................5

JURISDICTION AND VENUE ....................................................................................7

FACTUAL ALLEGATIONS ........................................................................................8

I.      The Securitizations.............................................................................................8

      A.      Residential Mortgage-Backed Securitizations In General ......................8

      B.      The Securitizations At Issue In This Case ..............................................9

            1.      The MABS 2005-WF1 Securitization ......................................10

            2.      The MABS 2005-FRE1 Securitization ......................................10

            3.      The MABS 2005-HE2 Securitization ........................................11

            4.      The MARM 2005-8 Securitization ............................................11

            5.      The MARM 2006-2 Securitization ............................................12

            6.      The MARM 2006-OA1 Securitization ......................................12

            7.      The MABS 2006-FRE2 Securitization ......................................13

            8.      The MABS 2006-WMC2 Securitization ....................................13

            9.      The MABS 2006-WMC3 Securitization ....................................14

            10.     The MABS 2006-NC2 Securitization ........................................14

            11.     The MABS 2006-WMC4 Securitization ....................................14

            12.     The MABS 2006-NC3 Securitization ........................................15

            13.     The MARM 2007-1 Securitization ............................................15

            14.     The MABS 2007-WMC1 Securitization ....................................16

            15.     The MARM 2007-3 Securitization ............................................16

            16.     The MABS 2007-HE2 Securitization ........................................17

|  | C. | The Securitization Process | 17 |
|  |  | 1. | UBS Pools Mortgage Loans in Special Purpose Trusts | 17 |
|  |  | 2. | The Trusts Issue Securities Backed by the Loans | 18 |
| II. | | The Defendants' Participation in the Securitization Process | 22 |
|  | A. | The Role of Each of the Defendants | 22 |
|  |  | 1. | Defendant UBS Real Estate | 23 |
|  |  | 2. | Defendant MASTR | 24 |
|  |  | 3. | Defendant UBS Securities | 24 |
|  |  | 4. | Defendant UBS Americas | 26 |
|  |  | 5. | The Individual Defendants | 26 |
|  | B. | UBS's Failure To Conduct Proper Due Diligence | 28 |
| III. | | The Statements in the Prospectus Supplements | 29 |
|  | A. | Compliance With Underwriting Guidelines | 29 |
|  |  | 1. | The MABS 2005-WF1 Securitization | 30 |
|  |  | 2. | The MABS 2005-FRE1 Securitization | 32 |
|  |  | 3. | The MABS 2005-HE2 Securitization | 33 |
|  |  | 4. | The MARM 2005-8 Securitization | 37 |
|  |  | 5. | The MARM 2006-2 Securitization | 39 |
|  |  | 6. | The MARM 2006-OA1 Securitization | 41 |
|  |  | 7. | The MABS 2006-FRE2 Securitization | 43 |
|  |  | 8. | The MABS 2006-WMC2 Securitization | 44 |
|  |  | 9. | The MABS 2006-WMC3 Securitization | 46 |
|  |  | 10. | The MABS 2006-NC2 Securitization | 47 |
|  |  | 11. | The MABS 2006-WMC4 Securitization | 49 |
|  |  | 12. | The MABS 2006-NC3 Securitization | 51 |

|   |   | 13. | The MARM 2007-1 Securitization | 52 |
|   |   | 14. | The MABS 2007-WMC1 Securitization | 55 |
|   |   | 15. | The MARM 2007-3 Securitization | 57 |
|   |   | 16. | The MABS 2007-HE2 Securitization | 59 |
|   | B. |   | Statements Regarding Occupancy Status of Borrower | 63 |
|   | C. |   | Statements Regarding LTV Ratios | 65 |
| IV. |   |   | Falsity Of Statements in the Registration Statements and Prospectus Supplements | 66 |
|   | A. |   | Compliance With Underwriting Guidelines | 66 |
|   |   | 1. | Stated Income Was Not Reasonable | 68 |
|   |   | 2. | Inconsistent Stated Income on the Loan Applications | 69 |
|   |   | 3. | Evidence of Occupancy Misrepresentations | 70 |
|   |   | 4. | Debts Incorrectly Calculated; DTI Exceeded Guidelines | 71 |
|   |   | 5. | Credit Inquiries that Indicated Misrepresentation of Debt | 71 |
|   | B. |   | A Review of Loan Level Data Indicates That the Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Was Materially False | 72 |
|   |   | 1. | Owner Occupancy Data Was Materially False | 72 |
|   |   | 2. | LTV Data Was Materially False | 76 |
| V. |   |   | Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages | 81 |

FIRST CAUSE OF ACTION .................................................................................87

Violation of Section 11 of the Securities Act of 1933 ....................................87

SECOND CAUSE OF ACTION ...........................................................................90

Violation of Section 12(a)(2) of the Securities Act of 1933 ...........................90

THIRD CAUSE OF ACTION ...............................................................................93

Violation of Section 15 of the Securities Act of 1933 ....................................93

PRAYER FOR RELIEF ..................................................................................................96

JURY TRIAL DEMANDED...........................................................................................97

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against UBS Americas, Inc. ("UBS Americas"), UBS Real Estate Securities, Inc. ("UBS Real Estate"), UBS Securities, LLC ("UBS Securities"), Mortgage Asset Securitization Transactions, Inc. ("MASTR") (collectively, "UBS"), David Martin, Per Dyrvik, Hugh Corcoran, and Peter Slagowitz (the "Individual Defendants") (together with UBS, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.      This action arises out of securities law violations committed by Defendants in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs"). These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false statements and omissions.  Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans.  These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a et seq.

2.      Between September 28, 2005 and August 30, 2007, Fannie Mae and Freddie Mac purchased over $4.5 billion in residential mortgage-backed securities (the "GSE Certificates")

issued in connection with sixteen UBS-sponsored securitizations.[1]  The securitizations at issue are:

(i) MASTR Asset Backed Securities Trust 2005-WF1 ("MABS 2005-WF1");

(ii) MASTR Asset Backed Securities Trust 2005-FRE1 ("MABS 2005-FRE1");

(iii) MASTR Asset Backed Securities Trust 2005-HE2 ("MABS 2005-HE2");

(iv) MASTR Adjustable Rate Mortgages Trust 2005-8 ("MARM 2005-8");

(v) MASTR Adjustable Rate Mortgages Trust 2006-2 ("MARM 2006-2");

(vi) MASTR Adjustable Rate Mortgages Trust 2006-OA1 ("MARM 2006-OA1");

(vii) MASTR Asset Backed Securities Trust 2006-FRE2 ("MABS 2006-FRE2");

(viii) MASTR Asset Backed Securities 2006-WMC2 ("MABS 2006-WMC2");

(ix) MASTR Asset Backed Securities Trust 2006-WMC3 ("MABS 2006-WMC3");

(x) MASTR Asset Backed Securities Trust 2006-NC2 ("MABS 2006-NC2");

(xi) MASTR Asset Backed Securities 2006-WMC4 ("MABS 2006-WMC4");

(xii) MASTR Asset Backed Securities Trust 2006-NC3 ("MABS 2006-NC3");

(xiii) MASTR Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1");

(xiv) MASTR Asset Backed Securities Trust 2007-WMC1 ("MABS 2007-WMC1"):

(xv) MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-3"); and

(xvi) MASTR Asset Backed Securities Trust 2007-HE2 ("MABS 2007-HE2")

(collectively, the "Securitizations").

3.      The Certificates were offered for sale pursuant to one of two shelf registration statements (the "Registration Statements") filed by Defendant MASTR with the Securities and Exchange Commission (the "SEC").  The first Registration Statement was filed on December 16,

---

[1]  For purposes of this Complaint, the securities issued under the Registration Statements (as defined in paragraph 3 *infra*) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

2005, with amendments filed on February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006. The second Registration Statement was filed on May 6, 2005, with an amendment filed on June 2, 2005. The Registration Statements and amendments were signed by or on behalf of the Individual Defendants. For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement for that Securitization. The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the corresponding Prospectuses and Prospectus Supplements.[2]

4.      The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers of those underlying mortgage loans, and the origination and underwriting practices used to make and approve such loans. Such statements were material to a reasonable investor's decision to purchase the Certificates. Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices and had materially poorer credit quality than what was represented in the Registration Statements.

5.      For example, forensic review of several hundred loan files has revealed numerous instances in which there was a failure during the underwriting process to confirm the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan. Adherence to underwriting standards,

---

[2]   The term "Registration Statement," as used herein, incorporates the shelf registration statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

3

particularly on such key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

6.      The Prospectus Supplements also contained statistical summaries of the pools of mortgage loans in each Securitization, such as the percentages of loans secured by owner-occupied properties and information such as the number of loans with loan-to-value ratios within specified ranges.  However, these statistics were false and omitted material facts due to widespread falsification of borrowers' income and debt, inflated property values, and misrepresentations of other key characteristics of the mortgage loans.

7.      The Prospectus Supplements for each Securitization contained statements regarding the percentage of borrowers who would be occupying the properties securing the mortgages.  The percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  A loan level review of thousands of mortgages across the Securitizations reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.

8.      Defendants MASTR, UBS Securities, and the Individual Defendants are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market the Certificates to Fannie Mae and Freddie Mac.

9.      Defendants UBS Americas and UBS Real Estate are also responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue

4

of their direction and control over Defendants MASTR and UBS Securities. UBS Americas and UBS Real Estate directly participated in and exercised dominion and control over the business operations of UBS Securities and MASTR.

10.     Fannie Mae and Freddie Mac purchased over $4.5 billion of the Certificates pursuant to the Registration Statements filed with the SEC. These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate and underwrite such loans. As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

11.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

<div align="center">**PARTIES**</div>

12.     The Federal Housing Finance Agency is a federal agency located at 1700 G Street in Washington, D.C. FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA") to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac. 12 U.S.C. § 4617(b)(2).

13.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets. As part of this mission, Fannie Mae and Freddie Mac invested in

<div align="center">5</div>

residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

14.     Defendant UBS Americas, Inc. is incorporated in Delaware and has its principal place of business in Stamford, Connecticut.  UBS Americas has an office located at 1285 Avenue of the Americas in New York, New York.  UBS Americas is a wholly-owned direct subsidiary of UBS AG, and is a holding company for several of UBS AG's indirect operating subsidiaries located in the United States, including Defendants UBS Real Estate, UBS Securities, and MASTR.

15.     Defendant UBS Real Estate, Inc. is incorporated in Delaware with its principal place of business at 1285 Avenue of the Americas in New York, New York.  UBS Real Estate is engaged in a variety of capital markets-related activities, including purchases and sales of loan portfolios, sales of assets for inclusion in securitizations, and origination and acquisition of loans. UBS Real Estate acted as the sponsor and seller in the Securitizations.

16.     Defendant Mortgage Asset Securitization Transactions, Inc. is incorporated in Delaware as a wholly-owned, limited purpose, subsidiary of UBS Americas, and maintains its principal place of business at 1285 Avenue of the Americas in New York, New York.  MASTR is generally engaged in the business of acting as a depositor of one or more trust funds that may issue, cause to be issued, sell, and/or deliver bonds or other evidence of indebtedness or certificates of interest that are secured by, or represent an interest in, mortgage loans.  MASTR acted as the depositor in the Securitizations and is the Registrant under both Registration Statements.

17.     Defendant UBS Securities, LLC is a limited liability company incorporated in Delaware with its principal places of business at 677 Washington Boulevard, in Stamford,

6

Connecticut and 299 Park Avenue in New York, New York.  UBS Securities has two members,

UBS AG, Inc. and UBS Americas.  UBS Securities is a registered broker/dealer and, at all

relevant times, was one of the leading underwriters of mortgage and asset-backed securities in

the United States.  UBS Securities was the lead underwriter for all of the Securitizations.

18.     Defendant David Martin was the President and Chief Executive Officer of

Defendant MASTR.  Martin was also the Global Head of Residential Mortgage Backed

Securitizations and Asset Backed Securitizations for UBS.  Martin signed the Registration

Statements, and on information and belief, did so in New York.

19.     Defendant Per Dyrvik was the Managing Director and Principal Accounting and

Financial Officer of Defendant MASTR.  Dyrvik signed the Registration Statements, and on

information and belief, did so in New York.  In addition, Dyrvik is a Managing Director at UBS

AG.

20.     Defendant Hugh Corcoran was a Managing Director of Defendant MASTR.

Corcoran signed the Registration Statements, and on information and belief, did so in New York.

21.     Defendant Peter Slagowitz was a Managing Director of Defendant MASTR.

Slagowitz signed the Registration Statements, and on information and belief, did so in New

York.  Slagowitz was also a Managing Director and Head of Loan Conduits for UBS AG.

## JURISDICTION AND VENUE

22.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal

courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie

Mae and Freddie Mac.

23.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the

claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15

7

U.S.C. §§ 77k, 77l(a)(2), and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

24.     Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v. Many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements occurred in substantial part in the State of New York. Additionally, the GSE Certificates were actively marketed and sold from this State and several of the Defendants can be found and transact business in this District. Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

I.      **The Securitizations**

   A.      **Residential Mortgage-Backed Securitizations In General**

25.     Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets. In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

26.     The most common form of securitization of mortgage loans involves a sponsor or seller – the entity that acquires or originates the mortgage loans and initiates the securitization – and the creation of a trust, to which the sponsor directly or indirectly sells a portfolio of mortgage loans. In many instances, the transfer of assets to a trust "is a two-step process: the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

8

27.     Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one pool of loans, in which case the trust issues securities backed by different pools.  For example, a securitization may involve two pools of mortgages, with some securities backed primarily by the first pool, and others primarily by the second pool.  Investors in the securities acquire rights to the cash-flows from the designated mortgage pool, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

28.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage pools underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

29.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust funds and delivers payments due each month on the certificates to the investors.

### B.     The Securitizations At Issue In This Case

30.     This case involves the following sixteen securitizations, which were sponsored and structured by Defendant UBS Real Estate:  (i) MABS 2005-WF1, (ii) MABS 2005-FRE1,

(iii) MABS 2005-HE2,  (iv) MARM 2005-8, (v) MARM 2006-2, (vi) MARM 2006-OA1,
(vii) MABS 2006-FRE2, (viii) MABS 2006-WMC2, (ix) MABS 2006-WMC3, (x) MABS 2006-
NC2, (xi) MABS 2006-WMC4, (xii) MABS 2006-NC3, (xiii) MARM 2007-1, (xiv) MABS
2007-WMC1, (xv) MARM 2007-3, and (xvi) MABS 2007-HE2.

31.     Fannie Mae and/or Freddie Mac generally purchased those Certificates that were
represented in the related Prospectus Supplements as being backed by loan pools that contained
only loans that conformed to specified limits on original principal balance.  The loan pools
backing the GSE Certificates are referred to herein as "Supporting Loan Groups."  Specific
information regarding each of the sixteen Securitizations is set forth below:

### 1.     The MABS 2005-WF1 Securitization

32.     The MABS 2005-WF1 Securitization closed on or about September 28, 2005, and
involved the issuance of approximately $909 million in residential mortgage-backed securities
that were offered for sale pursuant to a Registration Statement.

33.     According to the Prospectus Supplement, the pool of loans in the MABS 2005-
WF1 Securitization consisted of first lien and second lien, fixed-rate and adjustable-rate
mortgage loans secured by first and second mortgages or deeds of trust on residential one- to
four-family properties.  These loans were divided into two loan groups, Loan Group I and Loan
Group II.  Loan Group I was a Supporting Loan Group.

34.     Wells Fargo Bank, N.A. originated the loans in the MABS 2005-WF1
Securitization.

### 2.     The MABS 2005-FRE1 Securitization

35.     The MABS 2005-FRE1 Securitization closed on or about November 29, 2005,
and involved the issuance of approximately $1.176 billion in residential mortgage-backed
securities that were offered for sale pursuant to a Registration Statement.

36.     According to the Prospectus Supplement, the pool of loans in the MABS 2005-FRE1 Securitization consisted of first lien and second lien, fixed-rate and adjustable-rate mortgage loans on residential one- to four-family properties.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

37.     Fremont Investment & Loan originated the loans in the MABS 2005-FRE1 Securitization.

### 3.     The MABS 2005-HE2 Securitization

38.     The MABS 2005-HE2 Securitization closed on or about September 30, 2005, and involved the issuance of approximately $529 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

39.     According to the Prospectus Supplement, the pool of loans in the MABS 2005-HE2 Securitization consisted of first lien and second lien, fixed-rate and adjustable-rate mortgage loans on residential one- to four-family properties.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

40.     MILA, Inc. and New Century Mortgage each originated more than 10 percent of the loans in the MABS 2005-HE2 Securitization.  Other originators each originated less than 10 percent of the loans in the Securitization.

### 4.     The MARM 2005-8 Securitization

41.     The MARM 2005-8 Securitization closed on or about December 29, 2005, and involved the issuance of approximately $755 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

42.     According to the Prospectus Supplement, the pool of loans in the MARM 2005-8 Securitization consisted of first lien adjustable-rate mortgage loans on residential one- to four-

11

family properties.  These loans were divided into three loan groups, Loan Group 1, Loan Group 2, and Loan Group 3.  Loan Group 2 and Loan Group 3 were Supporting Loan Groups.

43.     Countrywide Home Loans, Inc. originated over 58 percent of the loans in the MARM 2005-8 Securitization.  American Home Mortgage Corp. and First Horizon Home Loan Corporation were the next largest originators, followed by several other unnamed loan originators, each of whom originated less than 10 percent of the total principal balance of the total loan pool.

### 5.     The MARM 2006-2 Securitization

44.     The MARM 2006-2 Securitization closed on or about April 13, 2006, and involved the issuance of approximately $744 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

45.     According to the Prospectus Supplement, the pool of loans in the MARM 2006-2 Securitization consisted of first lien adjustable-rate mortgage loans on residential one- to four-family properties.  These loans were divided into five loan groups, Loan Group 1, Loan Group 2, Loan Group 3, Loan Group 4, and Loan Group 5.  Loan Group 2 was a Supporting Loan Group.

46.     Provident Funding Associates, L.P. originated over 68 percent of the loans in the MARM 2006-2 Securitization and Wells Fargo Bank, N.A. originated over 22 percent of the loans in the pool.

### 6.     The MARM 2006-OA1 Securitization

47.     The MARM 2006-OA1 Securitization closed on or about April 20, 2006, and involved the issuance of approximately $1.112 billion in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

48.     According to the Prospectus Supplement, the pool of loans in the MARM 2006-OA1 Securitization consisted of first lien adjustable-rate mortgage loans on residential one- to

four-family properties.  These loans were divided into four loan groups, Loan Group 1, Loan Group 2, Loan Group 3, and Loan Group 4.  Loan Group 2 was a Supporting Loan Group.

49.    American Home Mortgage Corp. originated over 95 percent of the loans in the MARM 2006-OA1 Securitization.

### 7.    The MABS 2006-FRE2 Securitization

50.    The MABS 2006-FRE2 Securitization closed on or about May 30, 2006, and involved the issuance of approximately $849 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

51.    According to the Prospectus Supplement, the pool of loans in the MABS 2006-FRE2 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

52.    Fremont Investment & Loan originated the loans in the MABS 2006-FRE2 Securitization.

### 8.    The MABS 2006-WMC2 Securitization

53.    The MABS 2006-WMC2 Securitization closed on or about June 29, 2006, and involved the issuance of approximately $745 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

54.    According to the Prospectus Supplement, the pool of loans in the MABS 2006-WMC2 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

55.    WMC Mortgage Corp. ("WMC") originated the loans in the MABS 2006-WMC2 Securitization.

### 9.    The MABS 2006-WMC3 Securitization

56.    The MABS 2006-WMC3 Securitization closed on or about September 28, 2006, and involved the issuance of approximately $891 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

57.    According to the Prospectus Supplement, the pool of loans in the MABS 2006-WMC3 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

58.    WMC originated the loans in the MABS 2006-WMC3 Securitization.

### 10.    The MABS 2006-NC2 Securitization

59.    The MABS 2006-NC2 Securitization closed on or about September 28, 2006, and involved the issuance of approximately $824 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

60.    According to the Prospectus Supplement, the pool of loans in the MABS 2006-NC2 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

61.    New Century Mortgage Corporation originated the loans in the MABS 2006-NC2 Securitization.

### 11.    The MABS 2006-WMC4 Securitization

62.    The MABS 2006-WMC4 Securitization closed on or about November 30, 2006, and involved the issuance of approximately $923 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

63.     According to the Prospectus Supplement, the pool of loans in the MABS 2006-WMC4 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

64.     WMC originated the loans in the MABS 2006-WMC4 Securitization.

### 12.     The MABS 2006-NC3 Securitization

65.     The MABS 2006-NC3 Securitization closed on or about December 28, 2006, and involved the issuance of approximately $999 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

66.     According to the Prospectus Supplement, the pool of loans in the MABS 2006-NC3 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans.  These loans were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

67.     New Century Mortgage Corporation originated the loans in the MABS 2006-NC3 Securitization.

### 13.     The MARM 2007-1 Securitization

68.     The MARM 2007-1 Securitization closed on or about January 16, 2007, and involved the issuance of approximately $2.088 billion in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

69.     According to the Prospectus Supplement, the pool of loans in the MARM 2007-1 Securitization consisted of first lien adjustable-rate mortgage loans on residential one- to four-family properties.  These loans were divided into four subgroups, Subgroup I-1, Subgroup I-2, Subgroup II-1, and Subgroup II-2.  Subgroup I-1 was a Supporting Loan Group.

70.     American Home Mortgage Corp. originated approximately 78 percent and IndyMac Bank originated approximately 16 percent of the Subgroup I-1 and I-2 mortgage loans in the MARM 2007-1 Securitization. IndyMac Bank originated all of the Subgroup II-1 and II-2 mortgage loans in the MARM 2007-1 Securitization.

### 14.   The MABS 2007-WMC1 Securitization

71.     The MABS 2007-WMC1 Securitization closed on or about February 27, 2007, and involved the issuance of approximately $947 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

72.     According to the Prospectus Supplement, the pool of loans in the MABS 2007-WMC1 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans that were divided into two loan groups, Loan Group I and Loan Group II. Loan Group I was a Supporting Loan Group.

73.     WMC originated the loans in the MABS 2007-WMC1 Securitization.

### 15.   The MARM 2007-3 Securitization

74.     The MARM 2007-3 Securitization closed on or about May 15, 2007, and involved the issuance of approximately $2.570 billion in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

75.     According to the Prospectus Supplement, the pool of loans in the MARM 2007-3 Securitization consisted of first lien adjustable-rate mortgage loans on residential one- to four-family properties. These loans were divided into four subgroups, Subgroup 1-1, Subgroup 1-2, Subgroup 2-1, and Subgroup 2-2. Subgroup 1-1 and Subgroup 2-1 were Supporting Loan Groups.

76.     Countrywide Home Loans, Inc. originated over 51 percent of the loans in the MARM 2007-3 Securitization, and IndyMac Bank, F.S.B. originated over 39 percent of the loans.

### 16.     The MABS 2007-HE2 Securitization

77.     The MABS 2007-HE2 Securitization closed on or about August 30, 2007, and involved the issuance of approximately $413 million in residential mortgage-backed securities that were offered for sale pursuant to a Registration Statement.

78.     According to the Prospectus Supplement, the pool of loans in the MABS 2007-HE2 Securitization consisted of first and second lien fixed-rate and adjustable-rate mortgage loans that were divided into two loan groups, Loan Group I and Loan Group II.  Loan Group I was a Supporting Loan Group.

79.     Option One Mortgage Corporation originated approximately 58 percent of the loans in the MABS 2007-HE2 Securitization, Fieldstone Mortgage Company originated approximately 35 percent.

### C.     The Securitization Process

### 1.     UBS Pools Mortgage Loans in Special Purpose Trusts

80.     Defendant UBS Real Estate purchased mortgage loans after they were originated, either directly from the originators or through affiliates of the originators.  UBS Real Estate then sold the mortgage loans to Defendant MASTR.  MASTR was a wholly-owned, limited-purpose financial subsidiary of UBS Americas.  MASTR's sole purpose was to act as a conduit through which loans acquired by UBS Real Estate could be securitized and sold to investors.

81.     For the MABS 2005-WF1, MABS 2005-HE2, MABS 2005-FRE1, MABS 2006-FRE2, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-WMC4, MABS 2006-NC2, MABS 2006-NC3, MABS 2007-WMC1, and MABS 2007-HE2 Securitizations, UBS Real

Estate sold the relevant mortgage loans to MASTR pursuant to an Assignment and Recognition Agreement that contained various representations and warranties regarding the mortgage loans.

82.     For the MARM 2005-8, MARM 2006-2, MARM 2006-OA1, MARM 2007-1, and MARM 2007-3 Securitizations, UBS Real Estate sold the relevant mortgage loans to MASTR pursuant to a Mortgage Loan Purchase Agreement that contained various representations and warranties regarding the mortgage loans.

83.     As part of each of the sixteen Securitizations, the trustee, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization. The trustee held the mortgage loans pursuant to the related PSA and issued Certificates backed by such loans.

### 2.     The Trusts Issue Securities Backed by the Loans

84.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans. The Certificates were then sold to investors like Fannie Mae and Freddie Mac. Each Certificate entitles its holder to a specified portion of the cash flows from the underlying mortgages. The level of risk inherent in the Certificates was a function of the capital structure of the related transaction, the credit quality of the underlying mortgages and the risk that the mortgages would become delinquent or default.

85.     The Certificates were issued pursuant to one of two Registration Statements. A Form S-3 Registration Statement was filed by MASTR with the SEC on or about December 16, 2005 under file number 333-130373. This Registration Statement was signed by (i) David Martin in his capacity as President and Chief Executive Officer of MASTR, (ii) Per Dyrvik, Managing Director, in his capacity as Principal Accounting and Financial Officer of MASTR,

(iii) Hugh Corcoran, Managing Director of MASTR, and (iv) Peter Slagowitz, Managing Director of MASTR.

86.     This Registration Statement was amended by four pre-effective amendments on Form S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 under file number 333-130373.  Each of these amendments was signed by David Martin in his capacity as President and Chief Executive Officer of MASTR.  In addition, Mr. Martin signed the February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 amendments on behalf of Hugh Corcoran, Per Dyrvik and Peter Slagowitz as their attorney-in-fact pursuant to power of attorney duly executed by such persons and previously filed.  The Prospectus Supplements associated with MARM 2006-2, MARM 2006-OA1, MABS 2006-FRE2, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-NC2, MABS 2006-WMC4, MABS 2006-NC3, MARM 2007-1, MABS 2007-WMC1, MARM 2007-3, and MABS 2007-HE2 were filed as part of this Registration Statement under file number 333-130373.

87.     On May 6, 2005, a Form S-3 Registration Statement was filed with the SEC under file number 333-124678.  This Registration Statement was amended by a pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005.  Each of these documents was signed by (i) David Martin in his capacity as President and Chief Executive Officer of MASTR, (ii) Per Dyrvik, Managing Director, in his capacity as Principal Accounting and Financial Officer of MASTR, (iii) Hugh Corcoran, Managing Director of MASTR, and (iv) Peter Slagowitz, Managing Director of MASTR.  The Prospectus Supplements associated with MABS 2005-WF1, MABS 2005-FRE1, MABS 2005-HE2, and MARM 2005-8 were filed as part of this Registration Statement under file number 333-124678.

19

88.     On September 28, 2005, the Prospectus Supplement for the MABS 2005-WF1 Securitization was filed with the SEC pursuant to Rule 424(b).  On October 17, 2005, the Form 8-K attaching the PSA for the MABS 2005-WF1 Securitization was filed with the SEC.

89.     On November 28, 2005, the Prospectus Supplement for the MABS 2005-FRE1 Securitization was filed with the SEC pursuant to Rule 424(b).  On December 14, 2005, the Form 8-K attaching the PSA for the MABS 2005-FRE1 Securitization was filed with the SEC.

90.     On September 29, 2005, the Prospectus Supplement for the MABS 2005-HE2 Securitization was filed with the SEC pursuant to Rule 424(b).  On October 19, 2005, the Form 8-K attaching the PSA for the MABS 2005-HE2 Securitization was filed with the SEC.

91.     On December 29, 2005, the Prospectus Supplement for the MARM 2005-8 Securitization was filed with the SEC pursuant to Rule 424(b).  On January 25, 2006, the Form 8-K attaching the PSA for the MARM 2005-8 Securitization was filed with the SEC.

92.     On April 14, 2006, the Prospectus Supplement for the MARM 2006-2 Securitization was filed with the SEC pursuant to Rule 424(b).  On April 28, 2006, the Form 8-K attaching the PSA for the MARM 2006-2 Securitization was filed with the SEC.

93.     On April 20, 2006, the Prospectus Supplement for the MARM 2006-OA1 Securitization was filed with the SEC pursuant to Rule 424(b).  On May 5, 2006, the Form 8-K attaching the PSA for the MARM 2006-OA1 Securitization was filed with the SEC.

94.     On May 30, 2006, the Prospectus Supplement for the MABS 2006-FRE2 Securitization was filed with the SEC pursuant to Rule 424(b).  On June 16, 2006, the Form 8-K attaching the PSA for the MABS 2006-FRE2 Securitization was filed with the SEC

95.     On June 27, 2006, the Prospectus Supplement for the MABS 2006-WMC2 Securitization was filed with the SEC pursuant to Rule 424(b).  On July 14, 2006, the Form 8-K attaching the PSA for the MABS 2006-WMC2 Securitization was filed with the SEC.

96.     On September 28, 2006, the Prospectus Supplement for the MABS 2006-WMC3 Securitization was filed with the SEC pursuant to Rule 424(b).  On October 16, 2006, the Form 8-K attaching the PSA for the MABS 2006-WMC3 Securitization was filed with the SEC.

97.     On September 28, 2006, the Prospectus Supplement for the MABS 2006-NC2 Securitization was filed with the SEC pursuant to Rule 424(b).  On October 17, 2006, the Form 8-K attaching the PSA for the MABS 2006-NC2 Securitization was filed with the SEC.

98.     On November 30, 2006, the Prospectus Supplement for the MABS 2006-WMC4 Securitization was filed with the SEC pursuant to Rule 424(b).  On January 31, 2007, the Form 8-K attaching the PSA for the MABS 2006-WMC4 Securitization was filed with the SEC.

99.     On December 28, 2006, the Prospectus Supplement for the MABS 2006-NC3 Securitization was filed with the SEC pursuant to Rule 424(b).  On February 9, 2007, the Form 8-K attaching the PSA for the MABS 2006-NC3 Securitization was filed with the SEC.

100.    On January 17, 2007, the Prospectus Supplement for the MARM 2007-1 Securitization was filed with the SEC pursuant to Rule 424(b).  On February 16, 2007, the Form 8-K attaching the PSA for the MARM 2007-1 Securitization was filed with the SEC.

101.    On February 28, 2007, the Prospectus Supplement for the MABS 2007-WMC1 Securitization was filed with the SEC pursuant to Rule 424(b).  On March 22, 2007, the Form 8-K attaching the PSA for the MABS 2007-WMC1 Securitization was filed with the SEC.

102.    On May 17, 2007, the Prospectus Supplement for the MARM 2007-3 Securitization was filed with the SEC pursuant to Rule 424(b).  On May 30, 2007, the Form 8-K attaching the PSA for the MARM 2007-3 Securitization was filed with the SEC.

103.    On August 31, 2007, the Prospectus Supplement for the MABS 2007-HE2 Securitization was filed with the SEC pursuant to Rule 424(b).  On September 17, 2007, the Form 8-K attaching the PSA for the MABS 2007-HE2 Securitization was filed with the SEC.

104.    The Prospectus Supplements for each Securitization describe the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide detailed statistics regarding the mortgage loans in the pool, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the geographic distribution of the loans, and the extent to which the loans were for purchase or refinance; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

105.    Defendant UBS Securities marketed and sold the Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.

## II.    The Defendants' Participation in the Securitization Process

### A.    The Role of Each of the Defendants

106.    Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to

the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

107.    The Defendants are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statements, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.    Defendant UBS Real Estate

108.    UBS Real Estate has been involved in the securitization of a variety of assets since 1983. During the 2003, 2004, 2005 and 2006 fiscal years, UBS Real Estate securitized approximately $26.6 billion, $26.03 billion, $18.1 billion, and $20.2 billion of residential mortgage loans, respectively.

109.    Defendant UBS Real Estate acted as the sponsor of the Securitizations. In that capacity, UBS Real Estate initiated the Securitizations, purchased the mortgage loans to be securitized, and determined the structure of the Securitizations. UBS Real Estate also selected MASTR as the special purpose vehicle that would be used to transfer the mortgage loans from UBS Real Estate to the trusts, and selected UBS Securities as the underwriter for the Securitizations. In its role as sponsor, UBS Real Estate knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

110.    Defendant UBS Real Estate also acted as the seller of the mortgage loans by conveying mortgage loans to Defendant MASTR pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement. In these agreements, UBS Real Estate

23

made certain representations and warranties to MASTR regarding the pool of loans collateralizing the Certificates. These representations and warranties were assigned by MASTR to the trustees for the benefit of the Certificateholders.

### 2.    Defendant MASTR

111.    Defendant MASTR has been engaged in the securitization of mortgage loans since its incorporation in 1987. It is a special purpose entity formed for the sole purposes of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

112.    MASTR was the depositor for each of the Securitizations. In its capacity as depositor, MASTR purchased the mortgage loans from UBS Real Estate pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable. MASTR then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts. MASTR was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.

113.    The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.    Defendant UBS Securities

114.    Defendant UBS Securities is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States. According to industry research for 2005, UBS Securities was ranked fifth in the market for underwriters of mortgage-backed securities in the United States.

24

115.   Defendant UBS Securities was the lead underwriter for the Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors.  UBS Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated and underwritten.

116.   Upon information and belief, as part of its responsibilities as underwriter, UBS Securities retained third-party due diligence firms to assess whether the underlying mortgage loans complied with the originators' stated underwriting guidelines.  Part of the due diligence firms' assessment included an evaluation of a sample of the loans underlying each securitization. Upon information and belief, the loans from which the sample was drawn were selected by UBS Securities, and any mortgage loans in the sample that did not comply with the underwriting guidelines were flagged by the due diligence firm and brought to the attention of UBS Securities.

117.   Upon information and belief, UBS Securities would then determine whether to include the non-compliant loans in the securitization.  If UBS Securities determined that the defects were material and could not be cured, it was supposed to remove any non-compliant loan from the pool of loans underlying the securitization.

118.   Upon information and belief, if a significant number of non-compliant loans were discovered, UBS Securities was supposed to select another sample from the pool for the due diligence firm to analyze or take other actions to ensure that non-compliant loans were not included in the securitization.  Upon information and belief, UBS frequently failed to select a second sample because that would delay the securitization process and increase the expenses associated with the securitization.

119.     Based on the information provided to it by the third-party due diligence firms, UBS Securities should have known that a substantial number of the mortgage loans did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements, and that the mortgage loans did not have the characteristics represented in those documents.

### 4.     Defendant UBS Americas

120.     UBS Americas employed its wholly-owned subsidiaries, UBS Real Estate, UBS Securities, and MASTR, in the key steps of the securitization process.  Unlike typical arms' length securitizations, the Securitizations here involved various UBS subsidiaries and affiliates at virtually each step in the chain – the sponsor was UBS Real Estate, the depositor was MASTR, and the lead underwriter was UBS Securities.

121.     As the sole corporate parent of UBS Securities and MASTR, UBS Americas had the practical ability to direct and control the actions of UBS Securities and MASTR related to the Securitizations, and in fact exercised such direction and control over the activities of UBS Real Estate, UBS Securities, and MASTR related to the issuance and sale of the Certificates.

122.     UBS Americas expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

### 5.     The Individual Defendants

123.     Defendant David Martin acted as the President and Chief Executive Officer of Defendant MASTR.  In that capacity, Martin signed the Registration Statement under file number 333-130373 dated December 16, 2005 and the related pre-effective amendments on Form S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006,

and April 4, 2006. Martin also signed the Registration Statement under file number 333-124678 dated May 6, 2005 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005.

124.   Defendant Per Dyrvik was the Director and Chief Financial Officer of Defendant MASTR. In that capacity, he signed the Registration Statement under file number 333-130373 dated December 16, 2005, and Defendant Martin signed the related pre-effective amendments on Form S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 on Dyrvik's behalf. Dyrvik further signed the Registration Statement under file number 333-124678 dated May 6, 2005, and Defendant Martin signed the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005 on Dyrvik's behalf.

125.   Defendant Hugh Corcoran was one of Defendant MASTR's Managing Directors. In that capacity, he signed the Registration Statement under file number 333-130373 dated December 16, 2005, and Defendant Martin signed the related pre-effective amendments on Form S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 on Corcoran's behalf. Corcoran further signed the Registration Statement under file number 333-124678 dated May 6, 2005, and Defendant Martin signed the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005 on Corcoran's behalf.

126.   Defendant Peter Slagowitz was one of Defendant MASTR's Managing Directors. In that capacity, he signed the Registration Statement under file number 333-130373 dated December 16, 2005, and Defendant Martin signed the related pre-effective amendments on Form S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and

April 4, 2006 on Slagowitz's behalf. Slagowitz further signed the Registration Statement under file number 333-124678 dated May 6, 2005, and Defendant Martin signed the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005 on Slagowitz's behalf.

### B.   UBS's Failure To Conduct Proper Due Diligence

127.   UBS failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the statements in the Registration Statements.

128.   Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence. For example, UBS Securities was paid a percentage of the total dollar amount of the offering upon completion of the Securitizations.

129.   Moreover, because none of the Defendants assumed the risk of the underlying mortgage loans becoming delinquent or otherwise defaulting, there was a significant incentive not to conduct full, complete, and meaningful due diligence of the statements in the Registration Statements relating to the underlying mortgage loans.

130.   By late 2007, various government regulators commenced investigations relating to UBS's involvement in the securitizations of residential mortgages, including the due diligence practices of UBS Securities.

131.   On December 24, 2007, Swiss regulators announced that the Swiss banking department charged with oversight of Swiss investment banks would be initiating a full investigation into how UBS Securities incurred massive losses in connection with the subprime

markets in the United States, resulting in it taking a $10 billion write-down in its mortgage backed investments.

132.    On January 30, 2008, UBS pre-announced its fourth-quarter 2007 and full-year 2007 results and disclosed an additional $4 billion in write-downs in positions related to the United States residential mortgage market.

133.    On or about March 13, 2008, after a seven-month investigation requested by the President of the United States, a working group led by the Secretary of Treasury and including the chairmen of the Federal Reserve Board, the SEC, and the Commodities Futures Trading Commission, issued a report finding: (i) a significant erosion of market discipline by those involved in the securitization process, including originators, underwriters, credit rating agencies, and global investors, related in part to failures to provide or obtain adequate risk disclosures; and that (ii) the turmoil in financial markets clearly was triggered by a dramatic weakening of underwriting standards for United States subprime mortgages.

134.    In April 2008, UBS AG, the ultimate corporate parent of UBS Americas, UBS Securities, UBS Real Estate, and MASTR, presented Swiss banking regulators with a report detailing the reasons for its massive losses related to the United States subprime mortgage market.  In that report, which was summarized in a shareholder report issued by UBS AG on April 21, 2008, UBS AG admitted that its losses in the U.S. subprime mortgage market were due to a litany of errors, including inadequate risk management and a focus on revenue growth, which contributed to the dangers in its substantial subprime portfolio.

**III.    The Statements in the Prospectus Supplements**

      **A.    Compliance With Underwriting Guidelines**

135.    The Prospectus Supplements for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related

29

Securitizations were to have been originated. These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.

136.    The statements made in the Prospectus Supplements, which, as discussed, formed part of the Registration Statements for each Securitization, were material to a reasonable investor's decision to invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, and thus a greater economic risk to an investor such as Fannie Mae or Freddie Mac.

### 1.    The MABS 2005-WF1 Securitization

137.    The Prospectus Supplement for the MABS 2005-WF1 Securitization contained several key statements with respect to the underwriting standards of Wells Fargo Bank, N.A., which originated the loans in the MABS 2005-WF1 Securitization.

138.    As a general matter, the Prospectus Supplement stated that "[t]he mortgage loans in the trust were originated in accordance with the originator's underwriting guidelines described herein."

139.    The Prospectus Supplement further stated that "[t]he underwriting guidelines used by Wells Fargo are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a Mortgage Loan is required to complete a detailed application."

140.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[t]he loan application elicits pertinent information about the applicant including, depending on the program, the applicant's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. With respect to

30

every applicant, a credit report summarizing the applicant's credit history with merchants and lenders is obtained.  Significant unfavorable credit information reported by the applicant or by a credit reporting agency is taken into account in the credit decision.  Loan applications are classified according to certain characteristics, including but not limited to: condition and location of the collateral, credit history of the applicant, ability to pay, loan-to-value ratio and general stability of the applicant in terms of employment history and time in residence."

141.    While the Prospectus Supplement states that Wells Fargo may evaluate loans on a "case-by-case basis," it emphasizes that there must be "compensating factors" for an exception: "Wells Fargo may make the determination that the prospective borrower warrants loan parameters beyond those shown above based upon the presence of acceptable compensating factors.  Examples of compensating factors include, but are not limited to, loan-to-value ratio, debt-to-income ratio, long-term stability of employment and/or residence, statistical credit scores, verified cash reserves or reduction in overall monthly expenses."

142.    Additionally, the Prospectus Supplement claimed that "Wells Fargo's underwriting of every Mortgage Loan submitted consists of not only a credit review, but also a separate appraisal conducted by (i) a third-party appraiser, (ii) an appraiser approved by Value Information Technology, Inc. ('Value I.T.'), an entity jointly owned by Wells Fargo and an unaffiliated third party, or (iii) Value I.T. itself.  Appraisals generally conform to current Fannie Mae and Freddie Mac secondary market requirements for residential property appraisals.  All appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the Mortgage Loan amount or the identity of the appraiser."

### 2.    The MABS 2005-FRE1 Securitization

143.    The Prospectus Supplement for the MABS 2005-FRE1 Securitization contained several key statements with respect to the underwriting standards of Fremont Investment & Loan, which originated the loans in the MABS 2005-FRE1 Securitization.

144.    The Prospectus Supplement specifically stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator generally in accordance with the underwriting criteria" described in the Prospectus Supplement.

145.    The Prospectus Supplement further explained that Fremont's "underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs [underwriting guidelines] assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment."

146.    The Prospectus Supplement further stated that "the originator requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility.  Credit Scores must be requested from each national credit repository."

147.    While the Prospectus Supplement stated that the originator might make exceptions, it emphasized that those exceptions would be based on "compensating factors." It further stated that "[c]ompensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."

148.    The Prospectus Supplement further stated that "[t]he originator conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by the originator's senior management.  Adverse findings are tracked monthly.  This review procedure allows the originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."

### 3.    The MABS 2005-HE2 Securitization

149.    The Prospectus Supplement for the MABS 2005-HE2 Securitization contained several key statements with respect to the underwriting standards of MILA, Inc. and New Century Mortgage, which each originated more than 10 percent of the loans in the MABS 2005-HE2 Securitization.

150.    The Prospectus Supplement specifically stated that "[t]he mortgage loans originated by MILA, Inc. were done so in accordance with the underwriting guidelines established by it."

151.    The Prospectus Supplement further explained that "[t]he MILA Underwriting Guidelines are primarily intended to assess the borrower's income stability, credit history, and capacity to repay the mortgage loan as well as to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan.  All of the mortgage

33

loans in the mortgage loan pool were also underwritten with a view toward the resale of the

mortgage loans in the secondary mortgage market.  While MILA's primary consideration in

underwriting a mortgage loan is the value of the mortgaged property, MILA also considers,

among other things, a mortgagor's credit history, repayment ability and debt to income ratio, as

well as the type and use of the mortgaged property."

152.    While the Prospectus Supplement noted that MILA might make "exceptions" to

its underwriting guidelines, it stated those exceptions would be "made where compensating

factors exist."

153.    The Prospectus Supplement further stated that "[e]ach applicant completes an

application which includes information with respect to the applicant's liabilities, income, credit

history, employment history and personal information.  The MILA Underwriting Guidelines

require a credit report on each applicant from an approved nationally recognized credit reporting

company.  The report typically contains information relating to matters such as credit history

with local and national merchants and lenders, installment debt payments and any record of

defaults, bankruptcies, repossessions or judgments.  Mortgaged properties that are to secure

mortgage loans are appraised by qualified independent appraisers.  These appraisers inspect and

appraise the subject property and verify that the property is in acceptable condition.  Following

each appraisal, the appraiser prepares a report which includes a market value analysis based on

recent sales of comparable homes in the area and, when deemed appropriate, replacement cost

analysis based on the current cost of constructing a similar home.  All appraisals are required to

conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal

Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie

Mae and Freddie Mac. The MILA Underwriting Guidelines require a review of the appraisal by a qualified employee of MILA or by an appraiser retained by MILA."

154.    Additionally, the Prospectus Supplement stated that "[t]he Mortgage Loans originated by MILA, Inc. were originated consistent with and generally conform to the MILA Underwriting Guidelines' full documentation and stated income documentation residential loan programs. Under each of the programs, MILA reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property."

155.    Moreover, the Prospectus Supplement stated MILA required "that the income of each applicant for a mortgage loan under the full documentation program be verified" and that all salaried applicants in any program had their salaries verified by telephone.

156.    The Prospectus Supplement further stated that "[t]he mortgage loans were originated or acquired by New Century [one of the originators of the loans] in accordance with the underwriting guidelines established by it."

157.    The Prospectus Supplement further stated that "[t]he underwriting guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the mortgage loans in the mortgage pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history,

repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property."

158.    While the Prospectus Supplement stated that New Century might make "exceptions to [its] underwriting guidelines," it emphasized that those exceptions would be based on "compensating factors."

159.    The Prospectus Supplement further stated that "[e]ach [New Century] applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The underwriting guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac. The underwriting guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century."

160.    The Prospectus Supplement further stated that "New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the

36

loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the underwriting guidelines that generally is equal to the interest rate on that loan."

161.    The Prospectus Supplement further stated that "[t]he underwriting guidelines require that the income of each applicant for a mortgage loan under the full and limited documentation programs be verified."

### 4.    The MARM 2005-8 Securitization

162.    The Prospectus Supplement for the MARM 2005-8 Securitization contained several key statements with respect to the underwriting standards of Countrywide Home Loans, Inc., which originated over 58 percent of the loans in the MARM 2005-8 Securitization, and American Home Mortgage Corp. and First Horizon Home Loan Corporation, the next largest originators.

163.    As a general matter, the Prospectus Supplement stated that "[t]he Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

164.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will

37

have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

165. The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

166. Additionally, the Prospectus Supplement stated that "[t]he adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with preestablished appraisal procedure standards for appraisals established by or acceptable to the originator."

167. With respect to the loans purchased from Countrywide Home Loans, the Prospectus Supplement additionally stated that they "have been originated or acquired by Countrywide in accordance with its credit, appraisal and underwriting standards." The Prospectus Supplement further stated that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

168. With respect to the specific data evaluated by Countrywide in connection with the purchase or origination of loans, the Prospectus Supplement stated that "[i]n assessing a

prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores" and that it evaluated whether "the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."

### 5.    The MARM 2006-2 Securitization

169.    The Prospectus Supplement for the MARM 2006-2 Securitization contained several key statements with respect to the underwriting standards of Provident Funding Associates, L.P., which originated over 68 percent of the loans in the MARM 2006-2 Securitization, and Wells Fargo Bank, N.A., which originated over 22 percent of the loans.

170.    The Prospectus Supplement stated that "[t]he Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

171.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

172.    The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original

lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

173.    Additionally, the Prospectus Supplement claimed that "[t]he adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with preestablished appraisal procedure standards for appraisals established by or acceptable to the originator."

174.    With respect to the loans purchased from Provident Lending Associates, LP, the Prospectus Supplement additionally stated that they "will have been originated or acquired by Provident in accordance with its credit, appraisal and underwriting standards."

175.    With respect to the specific data evaluated by Provident in connection with the purchase or origination of loans, the Prospectus Supplement stated that "[d]uring the origination period for these mortgage loans, Provident relied upon Residential Funding Corporation's AssetWise automated underwriting system.  This system reviews the borrower's credit history and takes into account factors such as loan purpose, Loan-to-Value, and Debt-to-Income Ratio to generate a credit analysis for the loan.  The approval engine generates a credit report for each borrower, which in turn is used in the approval and credit scoring of the loan.  All mortgage loans require a credit score that is based on a minimum of four credit lines, two-year credit history and a minimum of two credit (FICO) scores."

176.    With respect to the loans purchased from Wells Fargo Bank, N.A., the Prospectus Supplement additionally stated that they "will have been originated or acquired by Wells Fargo in accordance with its credit, appraisal and underwriting standards."  The Prospectus Supplement

further stated that "Wells Fargo's underwriting standards are applied by or on behalf of Wells Fargo to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."

### 6.    The MARM 2006-OA1 Securitization

177.    The Prospectus Supplement for the MARM 2006-OA1 Securitization contained several key statements with respect to the underwriting standards of American Home Mortgage Corp., which originated over 95 percent of the loans in the MARM 2006-OA1 Securitization.

178.    As a general matter, the Prospectus Supplement stated that "[t]he Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

179.    The Prospectus Supplement further stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

41

180.    The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

181.    The Prospectus Supplement further stated that the "adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. ...  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

182.    With respect to loans purchased from American Home Mortgage Corp., the Prospectus Supplement stated, "American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.

These standards are applied in accordance with applicable federal and state laws and regulations."

183.    The Prospectus Supplement stated that American Home Mortgage Corp. could grant exceptions to its underwriting guidelines but also stated that those exceptions would "be permitted where compensating factors are present."  The Prospectus Supplement added that "[i]n addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. …  When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan.  For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility."

### 7.    The MABS 2006-FRE2 Securitization

184.    The Prospectus Supplement for the MABS 2006-FRE2 Securitization contained several key statements with respect to the underwriting standards of Fremont Investment & Loan, which originated the loans in the MABS 2006-FRE2 Securitization.

185.    The Prospectus Supplement stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator generally in accordance with the underwriting criteria described in this section."

186.    The Prospectus Supplement further stated that these underwriting guidelines, known as the Scored Programs, "assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage loans in the mortgage pool were

43

underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market." The Prospectus Supplement stated that exceptions to the underwriting guidelines could be granted if there were "compensating factors," which could include "low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."

187.    The Prospectus Supplement further stated that Fremont, the originator of the loans, "conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision."

### 8.    The MABS 2006-WMC2 Securitization

188.    The Prospectus Supplement for the MABS 2006-WMC2 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2006-WMC2 Securitization.

189.    The Prospectus Supplement specifically stated that "[t]he mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC Mortgage Corp. after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."

190.    In addition, the Prospectus Supplement further explained that "[t]he Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the

44

mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

191.    While the Prospectus Supplement noted that "WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception," and that "[i]t is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions" it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

192.    The Prospectus Supplement further stated that "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

193.    Additionally, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the

mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice
and (2) an audit of such appraisal by a WMC Mortgage Corp.–approved appraiser or by WMC
Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit
may in certain circumstances consist of a second appraisal, a field review, a desk review or an
automated valuation model."

194.    Moreover, the Prospectus Supplement stated that WMC verified employment for
every loan applicant before approving a mortgage loan.  Indeed, the Prospectus Supplement
stated that even for loan applications accepted under its Stated Income and Stated Income
Verified Assets programs, WMC obtained "telephonic verification of employment."

**9.    The MABS 2006-WMC3 Securitization**

195.    The Prospectus Supplement for the MABS 2006-WMC3 Securitization contained
several key statements with respect to the underwriting standards of WMC, which originated the
loans in the MABS 2006-WMC3 Securitization.

196.    The Prospectus Supplement stated that the "mortgage loans have been either (i)
originated generally in accordance with the underwriting guidelines established by WMC
(collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC after re-underwriting the
mortgage loans generally in accordance with the Underwriting Guidelines."  The Prospectus
Supplement further stated that its "Underwriting Guidelines are primarily intended to (a)
determine that the borrower has the ability to repay the mortgage loan in accordance with its
terms and (b) determine that the related mortgaged property will provide sufficient value to
recover the investment if the borrower defaults."  The Prospectus Supplement noted that WMC
could make exceptions to its underwriting guidelines, but only where there were "compensating
factors," such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an

46

abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

197.    The Prospectus Supplement further stated that "[u]nder the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

### 10.    The MABS 2006-NC2 Securitization

198.    The Prospectus Supplement for the MABS 2006-NC2 Securitization contained several key statements with respect to the underwriting standards of New Century Mortgage Corporation, which originated the loans in the MABS 2006-NC2 Securitization.

199.    The Prospectus Supplement stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein," which are "primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage

47

market.  While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property."

200.    The Prospectus Supplement stated that exceptions to the underwriting guidelines could be made where there were "compensating factors," including "low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years.  An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more."

201.    Additionally, the Prospectus Supplement stated that, with respect to the loans originated or acquired by New Century, "[e]ach applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company.  The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

202.    Moreover, the Prospectus Supplement stated that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate,

48

replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator."

### 11.    The MABS 2006-WMC4 Securitization

203.    The Prospectus Supplement for the MABS 2006-WMC4 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2006-WMC4 Securitization.

204.    The Prospectus Supplement specifically stated that "[t]he mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."

205.    In addition, the Prospectus Supplement further explained that "[t]he Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

206.    While the Prospectus Supplement noted that "WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception," and that "[i]t is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions," it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors"

49

such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

207.    The Prospectus Supplement further stated that "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

208.    Additionally, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

209.    Moreover, the Prospectus Supplement stated that WMC verified employment for every loan applicant before approving a mortgage loan. Indeed, the Prospectus Supplements stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC obtained "telephonic verification of employment."

50

### 12.    The MABS 2006-NC3 Securitization

210.    The Prospectus Supplement for the MABS 2006-NC3 Securitization contained several key statements with respect to the underwriting standards of New Century Mortgage Corporation, which originated the loans in the MABS 2006-NC3 Securitization.

211.    The Prospectus Supplement stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein." The Prospectus Supplement further stated that, with respect to the loans originated or acquired by New Century, the "New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market. While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property."

212.    Additionally, the Prospectus Supplement stated that "[e]ach applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

213.    The Prospectus Supplement added that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers

inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator."

214.    The Prospectus Supplement further stated that New Century could make exceptions to its underwriting guidelines "if the application reflects compensating factors, such as: low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more."

### 13.    The MARM 2007-1 Securitization

215.    The Prospectus Supplement for the MARM 2007-1 Securitization contained several key statements with respect to the underwriting standards of American Home Mortgage Corp., which originated approximately 78 percent the Subgroup I-1 and I-2 mortgage loans in the MARM 2007-1 Securitization, and IndyMac Bank, which originated approximately 16 percent of the Subgroup I-1 and I-2 mortgage loans in the MARM 2007-1 Securitization.

216.    The Prospectus Supplement stated that the loans in the Securitization were originated "generally in accordance with the underwriting criteria described in this section." The

52

Prospectus Supplement further stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

217.    The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

218.    Additionally, the Prospectus Supplement stated that the "adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."

219.    With respect to the loans originated or acquired by American Home, the Prospectus Supplement stated that "American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." The Prospectus Supplement

further stated that "[i]n addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history."

220.    The Prospectus Supplement further stated that "[e]very [American Home] mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter."

221.    With respect to the loans originated or acquired by IndyMac, the Prospectus Supplement stated "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." The Prospectus Supplement further stated that "[t]o determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Professional Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer

programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount."

222.    The Prospectus Supplement stated that IndyMac allowed exceptions to its underwriting guidelines where "compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer."

### 14.    The MABS 2007-WMC1 Securitization

223.    The Prospectus Supplement for the MABS 2007-WMC1 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2007-WMC1 Securitization.

224.    The Prospectus Supplement specifically stated that "[t]he mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC or GE Money Bank after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."

225.    In addition, the Prospectus Supplement further explained that "[t]he Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

226.    While the Prospectus Supplement noted that "WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception," and that "[i]t is expected that a substantial number of the mortgage loans to be

included in the trust will represent such underwriting exceptions," it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

227.    The Prospectus Supplement further stated that "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

228.    Additionally, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

229.    Moreover, the Prospectus Supplement stated that WMC verified employment for every loan applicant before approving a mortgage loan. Indeed, the Prospectus Supplement

stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC obtained "telephonic verification of employment."

### 15.    The MARM 2007-3 Securitization

230.    The Prospectus Supplement for the MARM 2007-3 Securitization contained several key statements with respect to the underwriting standards of Countrywide Home Loans, Inc., which originated over 51 percent of the loans in the MARM 2007-3 Securitization, and IndyMac Bank, F.S.B., which originated over 39 percent of the loans in the pool.

231.    The Prospectus Supplement stated that "[t]he Loans have been purchased by the sponsor from an Originator which purchased the Loans from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Originator) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

232.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

233.    The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to

the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

234.    Additionally, the Prospectus Supplement claimed that "[t]he adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for appraisals established by or acceptable to the originator."

235.    With respect to the loans purchased from Countrywide Home Loans, the Prospectus Supplement additionally stated that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

236.    With respect to the specific data evaluated by Countrywide in connection with the purchase or origination of loans, the Prospectus Supplement stated that "[I]n assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores" and that it evaluated whether "the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."

237.    With respect to the loans purchased from IndyMac Bank, the Prospectus Supplement additionally stated that "[m]ortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines." The Prospectus Supplement further stated that "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral.

Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines."

238.   The Prospectus Supplement further explained that "[m]aximum loan-to-value and combined loan-to-value ratios and loan amounts are established [by Indy Mac] according to the occupancy type, loan purpose, property type, FICO credit score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions.  Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses."

### 16.   The MABS 2007-HE2 Securitization

239.   The Prospectus Supplement for the MABS 2007-HE2 Securitization contained several key statements with respect to the underwriting standards of Option One Mortgage Corporation, which originated approximately 58 percent of the loans in the MABS 2007-HE2 Securitization, and Fieldstone Mortgage Company, which originated approximately 35 percent.

240.   The Prospectus Supplement stated that the mortgage loans "were underwritten or re-underwritten by the originators generally in accordance with [the originators'] underwriting standards."

241.   With respect to the loans originated or acquired by Option One, the Prospectus Supplement stated that "[t]he Option One Underwriting Guidelines are primarily intended to

assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan. The mortgage loans were also generally underwritten with a view toward resale in the secondary market." The Prospectus Supplement further stated that "[e]ach [Option One] mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information."

242.    Additionally, the Prospectus Supplement stated that "[m]ortgaged properties that are to secure [Option One] mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."

243.    Moreover, the Prospectus Supplement stated that "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed."

244.    The Prospectus Supplement stated that Option One could make exceptions to its underwriting guidelines "if the application reflects certain compensating factors, among others: a

relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance. Upgrade points may also be earned if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more."

245. With respect to loans originated or acquired by the Fieldstone Mortgage Company ("FMC"), the Prospectus Supplement stated that the "Fieldstone Underwriting Guidelines generally have been designed to evaluate a prospective borrower's credit history and ability to repay the loan, as well as the value and adequacy of the related mortgaged property as collateral." The Prospectus Supplement further stated that "FMC's underwriting procedures have considered a combination of factors in deciding whether to approve a loan, including documentation of the borrower's income, mortgage and consumer credit payment history, credit score, property type and LTV. FMC's mortgage loan underwriting process involved an underwriter's analysis of the prospective borrower's ability to repay the loan according to its terms, the risk that the prospective borrower will not repay, the fees and rates charged, the value of the related mortgaged property as collateral, the benefit the loan is providing to the prospective borrower and the loan amount relative to its risk." The Prospectus Supplement further stated that the "Fieldstone Underwriting Guidelines also have included a review of the income of each applicant. FMC personnel have reviewed the loan applicant's source of income, calculated the amount of income from sources indicated on the loan application or similar

61

documentation and calculated debt-to-income ratios to determine the applicant's ability to repay the loan."

246.    Additionally, the Prospectus Supplement stated that "FMC required a full appraisal of each property to be pledged as collateral in connection with the origination of each loan. Appraisals generally were required to conform to the Uniform Standards of Professional Appraisal Practice and to be on forms acceptable to Freddie Mac and Fannie Mae. Appraisals were performed by licensed, third-party, fee-based appraisers and included inspection of the exterior and interior of the subject property and review and evaluation of neighborhood conditions, site and zoning status and the condition and value of improvements. FMC's appraisal review process required that each appraisal be validated (except in limited circumstances) by either a non-affiliated appraisal review firm or by one of FMC's qualified underwriters using additional data to evaluate the appraisal. In most cases, FMC utilized automated value measures to validate appraisals. FMC generally required that an appraisal be no more than 180 days old on the day the loan is funded."

247.    Moreover, the Prospectus Supplement stated that "FMC emphasizes quality control prior to origination. FMC's quality control department also reviews and conducts post-funding re-underwriting of approximately 10% of all mortgage loans that FMC originates. FMC generally selects loans for post-funding re-underwriting on a random basis (though FMC selects targeted samples of loans from time to time) and reports its findings to management and underwriting department managers on a regular basis. Underwriting changes and corrective actions are implemented from time to time as a result of analysis of the quality control data, performance trends and servicing issues."

248.    The Prospectus Supplement further stated that FMC considered "compensating factors that may be used to offset certain areas of weakness.  These compensating factors include credit scores, proposed reductions in the borrower's debt service expense, borrower assets, employment stability, number of years in residence and net disposable income.  FMC's underwriting process and the Fieldstone Underwriting Guidelines have required a thorough application review and documentation designed to maximize the value of the mortgage loans."

### B.    Statements Regarding Occupancy Status of Borrower

249.    The Prospectus Supplements contained pool-level information about the occupancy status of the borrowers of the loans in the Securitizations.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral pool by occupancy status, *e.g.*, into the categories:  (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization, based on the total number of loans in each group as stated in the Prospectus Supplements, are summarized on a percent basis below.

| Transaction | Primary or Owner Occupied | Second Home/Secondary | Investor |
|---|---|---|---|
| MABS 2005-WF1 | 96.85% | 0.51% | 2.64% |
| MABS 2005-FRE1 | 86.91% | 1.17% | 11.92% |
| MABS 2005-HE2 | 94.63% | 0.29% | 5.08% |
| MARM 2005-8 | 64.80% | 9.91% | 25.29% |
| MARM 2006-2 | 97.84% | 1.44% | 0.72% |
| MARM 2006-OA1 | 50.55% | 9.69% | 39.76% |
| MABS 2006-FRE2 | 91.14% | 0.69% | 8.17% |
| MABS 2006-WMC2 | 95.55% | 3.19% | 1.26% |
| MABS 2006-WMC3 | 94.27% | 5.00% | 0.73% |

| Transaction | Primary or Owner Occupied | Second Home/Secondary | Investor |
|---|---|---|---|
| MABS 2006-NC2 | 78.44% | 7.44% | 14.12% |
| MABS 2006-WMC4 | 91.38% | 7.24% | 1.38% |
| MABS 2006-NC3 | 87.36% | 4.68% | 7.96% |
| MARM 2007-1 | 51.68% | 10.77% | 37.55% |
| MABS 2007-WMC1 | 98.32% | 0.76% | 0.92% |
| MARM 2007-3 | 76.69% | 6.46% | 16.84% |
| MABS 2007-HE2 | 87.82% | 2.13% | 10.05% |

250.    The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates. Information about occupancy status (*i.e.*, whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securitization that it backs. Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral pool of a securitization that are not secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

251.    Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of the certificates. Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

## C.   Statements Regarding LTV Ratios

252.   The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

253.   The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan.  Accordingly, an accurate appraisal is essential to an accurate LTV.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

254.   The Prospectus Supplements for each Securitization also contained pool-level information about the LTV ratio for the underlying pool of loans as a whole.  For example, the Prospectus Supplements contained the following representations about the LTVs of the mortgage loans in the Supporting Loan Groups for each Securitization:

| Transaction | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
| --- | --- | --- |
| MABS 2005-WF1 | 56.13% | 0% |
| MABS 2005-FRE1 | 65.07% | 0% |
| MABS 2005-HE2 | 64.94% | 0% |
| MARM 2005-8 | 94.82% | 0% |
| MARM 2006-2 | 97.78% | 0% |
| MARM 2006-OA1 | 91.28% | 0% |
| MABS 2006-FRE2 | 61.59% | 0% |
| MABS 2006-WMC2 | 70.86% | 0% |
| MABS 2006-WMC3 | 70.00% | 0% |
| MABS 2006-NC2 | 61.99% | 0% |

| MABS 2006-WMC4 | 67.57% | 0% |
|----------------|--------|-----|
| MABS 2006-NC3  | 50.65% | 0% |
| MARM 2007-1    | 79.28% | 0% |
| MABS 2007-WMC1 | 70.76% | 0% |
| MARM 2007-3    | 86.03% | 0% |
| MABS 2007-HE2  | 53.86% | 0% |

255.    The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is likewise one of the most important measures of the risk of the certificates collateralized by mortgage loans.  This ratio is a strong indicator of the likelihood of default. The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

256.    Thus, a reasonable investor considers LTV important to the decision whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

**IV.    Falsity Of Statements in the Registration Statements and Prospectus Supplements**

**A.    Compliance With Underwriting Guidelines**

257.    The Registration Statements contained material misstatements and omissions regarding compliance with applicable underwriting guidelines.

66

258.    The originators of the underlying mortgage loans systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  Furthermore, Defendants failed to conduct adequate due diligence on the mortgage loan files and mortgaged properties prior to or during the securitization process.

259.    A forensic review of 966 randomly selected loans from the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations revealed that approximately 78 percent of the reviewed loans were not underwritten in accordance with the applicable underwriting guidelines.  The WMC underwriting guidelines that were breached were designed to assess the likelihood a borrower would be able to repay the loan.  The forensic review revealed breaches including the following types:

- failure to test the reasonableness of the borrower's stated income contributing to material misrepresentations of income;

- failure to investigate the submission from the same borrower of multiple loan applications showing increasing stated incomes, also contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject properties when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended for investment;

- failure to calculate properly the borrower's outstanding debt causing the debt-to-income ratio ("DTI") to exceed the maximum allowed under the underwriting guidelines; and

- failure to investigate properly information on the borrower's credit reports of potential misrepresentations of outstanding debt.

260.    The results of the review demonstrate that the disclosures in the Registration Statements, stating that the mortgage loans were underwritten in accordance with the applicable underwriting guidelines described in the Prospectus Supplements, were materially false. Moreover, although the Prospectus Supplements state that there may be compensating factors to warrant an exception to the applicable underwriting guidelines, none of the 966 loan files

evidenced any compensating factors that would justify or support such an exception. A 78 percent breach rate, in any event, could not possibly be explained by the proper application of any such exceptions.

261.    The following categories illustrate the types of breaches discussed above that pervade the loan pools for the Securitizations.

### 1.    Stated Income Was Not Reasonable

262.    Although no verification of income is required for stated income loans, the applicable underwriting guidelines require the underwriter to verify the employment listed by the borrower on the application and to assess whether the stated income is reasonable given the applicant's line of work. The applicable underwriting guidelines state that, although not verified, "the income disclosed on the application must be reasonable for the profession and experience level of the borrower" and that the underwriting of the loan shall "consider if the annualized income is sensible for the applicant's line of work. The stated income should be no more than 25% over the high median income." Furthermore, the applicable underwriting guidelines direct that "[t]o validate whether income stated is reasonable, use websites similar to www.salary.com" and references WMC's Quality Assurance Department's test, which directs that "[i]f the stated income is greater than 25% of the 75th percentile of income stated on www.salary.com, it would be considered unreasonable."

263.    The forensic review of the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations revealed numerous instances in which a borrower's stated income was unreasonable under these standards, and in which there is no indication that the underwriter tested the validity of those stated incomes as required by the applicable underwriting guidelines. Additionally, in many of these instances, it was confirmed through forensic review that these

borrowers did in fact misrepresent, and substantially overstate, their income on their mortgage applications.

264.    As a result of these repeated failures in the underwriting process, a significant number of mortgage loans were made on the basis of "stated incomes" that were patently unreasonable and that were never investigated or validated through proper underwriting. Indeed, had the loan underwriter performed a reasonableness test as required by the applicable underwriting guidelines, the unreasonableness of the borrower's stated income would have been evident. Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the reasonableness of the stated income were materially false and misleading.

### 2.    Inconsistent Stated Income on the Loan Applications

265.    Instances where multiple loan applications exist within a loan file that present inconsistent stated income amounts is an indication of potential fraud and should prompt a loan underwriter to investigate further and properly document the inconsistency. The forensic review of the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations revealed numerous instances in which a borrower had provided multiple applications and where the borrower's stated income increased between the initial loan application and the income used for approving the loan.

266.    In each of these instances, had the loan underwriter used the stated income from the initial application the borrower's DTI would have exceeded the applicable underwriting guidelines maximum. Additionally, in many of these instances, it was confirmed through forensic review that these borrowers did in fact misrepresent, and substantially overstate, their income on their mortgage applications.

### 3.   Evidence of Occupancy Misrepresentations

267.    The forensic review revealed numerous instances where the loan underwriters did not adequately question the borrower's intended occupancy of the subject property. A significant number of the loan files that were reviewed contained facts or circumstances that would have put a prudent loan underwriter on notice of potential occupancy misrepresentations. For instance, numerous loans were underwritten as "Owner Occupied," despite numerous indications in the loan forms, including representations by the borrowers themselves, that the subject properties were intended as second homes or investment properties.

268.    Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the borrowers' occupancy status were materially false and not subject to adequate underwriting. In particular, the Prospectus Supplements materially understated the proportion of loans secured by non-owner occupied properties. The lack of compliance with the underwriting process in this regard materially increased the credit risk of the loans and the portfolio as investment and second home properties generally have a higher rate of default and higher loss severities than an owner-occupied primary residence.

### 4.   Debts Incorrectly Calculated; DTI Exceeded Guidelines

269.   Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan.  The forensic review revealed numerous instances where the underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated.  When properly calculated, the borrower's actual DTI ratio exceeded the limits established by applicable underwriting guidelines.  The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

270.   In the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations, the applicable underwriting guidelines specified a maximum debt-to-income ratio of 55 percent, with the exception of stated income loans, for which it was 50 percent.  Of the 996 loans in the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations that were reviewed, 32 percent contained a debt-to-income ratio that exceeded the applicable underwriting guidelines for the product type.

### 5.   Credit Inquiries that Indicated Misrepresentation of Debt

271.   WMC's underwriting guidelines state that "WMC staff and partners involved in the underwriting process must conduct a review of the loan documents submitted for each loan" and further that the "credit report must [...] show all credit inquiries made over the last 90 days." The forensic review revealed numerous instances where the borrowers' credit reports contained multiple credit inquiries that should have put the loan underwriters on notice for potential misrepresentations of debt obligations to be included in the borrowers' DTI.

272.   In each of these instances there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities would have been discovered.

71

Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's "ability to produce timely payments."

> **B.     A Review of Loan Level Data Indicates That the Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Was Materially False**

273.     In addition to the forensic review, a review of loan-level data was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate. For each Securitization, the sample consisted of the greater of (i) one half of the loans in the Supporting Loan Group or (ii) the lesser of 1,000 loans and the number of loans in the Supporting Loan Group. By application of this rule, each sample consisted of at least 1,000 loans, except for MARM 2006-2, which had only 412 loans in the Supporting Loan Group. The sample data confirms, on a statistically-significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans across the Securitizations. The data review has further demonstrated that the data concerning owner occupancy and LTV were materially false and misleading.

> **1.     Owner Occupancy Data Was Materially False**

274.     The data review has revealed that the owner-occupancy statistics were materially false and inflated. In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties. To determine whether a given borrower actually occupied the property as claimed, several tests were conducted, such as whether the address was consistent with tax records, credit records, property records, and lien records. Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan. A significant number of the loans failed two or more of these tests,

indicating that the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading.

275.    For MABS 2005-WF1, the Prospectus Supplement stated that only 3.15 percent of the underlying properties by loan count[3] in the Supporting Loan Group were not owner-occupied.  But the data review revealed that 9.02 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 11.88 percent.

276.    For MABS 2005-FRE1, the Prospectus Supplement stated that only 13.09 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.  But the data review revealed that 12.91 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 24.31 percent.

277.    For MABS 2005-HE2, the Prospectus Supplement stated that 5.37 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.  But the data review revealed that 10.51 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 15.32 percent.

278.    For MARM 2005-8, the Prospectus Supplement stated that only 35.20 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.  But the data review revealed that 15.93 percent of the properties represented as owner-occupied

---

[3]  Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

in the sample showed strong indications that their owners in fact lived elsewhere, indicating that

the true percentage of non-owner occupied properties was 45.52 percent.

279.    For MARM 2006-2, the Prospectus Supplement stated that 2.16 percent of the

underlying properties by loan count in the Supporting Loan Group were not owner-occupied.

But the data review revealed that 11.88 percent of the properties represented as owner-occupied

in the sample showed strong indications that their owners in fact lived elsewhere, indicating that

the percentage of non-owner occupied properties was 13.79 percent.

280.    For MARM 2006-OA1, the Prospectus Supplement stated that 49.45 percent of

the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.

But the data review revealed that 15.57 percent of the properties represented as owner-occupied

in the sample showed strong indications that their owners in fact lived elsewhere, indicating that

the true percentage of non-owner occupied properties was 57.32 percent.

281.    For MABS 2006-FRE2, the Prospectus Supplement stated that 8.86 percent of the

underlying properties by loan count in the Supporting Loan Group were not owner-occupied.

But the data review revealed that 13.18 percent of the properties represented as owner-occupied

in the sample showed strong indications that their owners in fact lived elsewhere, indicating that

the percentage of non-owner occupied properties was 20.87 percent.

282.    For MABS 2006-WMC2, the Prospectus Supplement stated that 4.45 percent of

the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.

But the data review revealed that 13.27 percent of the properties represented as owner-occupied

in the sample showed strong indications that their owners in fact lived elsewhere, indicating that

the true percentage of non-owner occupied properties was 17.12 percent.

74

283.    For MABS 2006-WMC3, the Prospectus Supplement stated that 5.73 percent of underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 15.76 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 20.59 percent.

284.    For MABS 2006-NC2, the Prospectus Supplement stated that 21.56 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 13.19 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 31.91 percent.

285.    For MABS 2006-WMC4, the Prospectus Supplement stated that 8.62 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 11.10 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 18.76 percent.

286.    For MABS 2006-NC3, the Prospectus Supplement stated that 12.64 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 13.72 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 24.62 percent.

287.    For MARM 2007-1, the Prospectus Supplement stated that 48.32 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 17.38 percent of the properties represented as owner-occupied

75

in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 57.30 percent.

288.    For MABS 2007-WMC1, the Prospectus Supplement stated that 1.68 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 10.60 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating the true percentage of non-owner occupied properties was 12.11 percent.

289.    For MARM 2007-3, the Prospectus Supplement stated that 23.31 percent of the underlying properties by loan count in the Supporting Loan Subgroups were not owner-occupied. But the data review revealed that 16.19 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 35.72 percent.

290.    For MABS 2007-HE2, the Prospectus Supplement stated that 12.18 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that 10.83 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 21.70 percent.

## 2.    LTV Data Was Materially False

291.    The data review has further revealed that the LTVs disclosed in the Prospectus Supplements were materially false and understated as more specifically set out below. For each of the sampled loans, the underlying property was valued by an industry standard automated valuation model ("AVM"). AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing. AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable

76

properties. AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

292.     Applying the AVM to the available data for the properties securing the sampled loans shows that the appraised value given to such properties was significantly higher than the actual value of such properties. The result of this overstatement of property values is a material understatement of LTV. That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value. This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default. As stated in the Prospectus Supplement for MARM 2006-OA1, "[a] lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan."

293.     For MABS 2005-WF1, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 11.73 percent of the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 56.13 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 48.23 percent of the loans had LTVs at or below 80 percent.

294.     For MABS 2005-FRE1, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. The data review indicated that 12.74 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 65.07 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 46.21 percent of the loans had LTVs at or below 80 percent.

295.   For MABS 2005-HE2, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent.  In fact, 7.58 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent.  In addition, the Prospectus Supplement stated that 64.94 percent of the loans had LTVs at or below 80 percent.  The data review indicated that only 48.20 percent of the loans had LTVs at 80 percent or below.

296.   For MARM 2005-8, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent.  In fact, 6.03 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent.  In addition, the Prospectus Supplement stated that 94.82 percent of the loans had LTVs at or below 80 percent.  The data review indicated that only 62.08 percent of the loans had LTVs at or below 80 percent.

297.   For MARM 2006-2, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent.  In fact, 3.54 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent.  In addition, the Prospectus Supplement stated that 97.78 percent of the loans had LTVs at or below 80 percent.  The data review indicated that only 69.77 percent of the loans had LTVs at or below 80 percent.

298.   For MARM 2006-OA1, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent.  In fact, 8.85 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent.  In addition, the Prospectus Supplement stated that 91.28 percent of the loans had LTVs

78

at or below 80 percent. The data review indicated that only 57.26 percent of the loans had LTVs at or below 80 percent.

299.     For MABS 2006-FRE2, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 12.96 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 61.59 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 39.47 percent of the loans had LTVs at or below 80 percent.

300.     For MABS 2006-WMC2, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 11.16 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 70.86 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 50.10 percent of the loans had LTVs at or below 80 percent.

301.     For MABS 2006-WMC3, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 11.42 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 70.00 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 43.75 percent of the loans had LTVs at or below 80 percent.

302.     For MABS 2006-NC2, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 12.28 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above

100 percent. In addition, the Prospectus Supplement stated that 61.99 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 45.53 percent of the loans had LTVs at or below 80 percent.

303.    For MABS 2006-WMC4, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 13.61 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 67.57 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 45.18 percent of the loans had LTVs at or below 80 percent.

304.    For MABS 2006-NC3, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 18.94 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 50.65 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 38.69 percent of the loans had LTVs at or below 80 percent.

305.    For MARM 2007-1, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 21.54 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 79.28 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 40.10 percent of the loans had LTVs at or below 80 percent.

306.    For MABS 2007-WMC1, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 11.55 percent of the loans in the

sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 70.76 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 49.09 percent of the loans had LTVs at or below 80 percent.

307.    For MARM 2007-3, the Prospectus Supplement stated that no LTVs for the Supporting Loan Groups were above 100 percent. In fact, 13.88 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 86.03 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 47.86 percent of the loans had LTVs at or below 80 percent.

308.    For MABS 2007-HE2, the Prospectus Supplement stated that no LTVs for the Supporting Loan Group were above 100 percent. In fact, 17.51 percent of the loans in the sample of loans included in the data review, based on total principal balance, had LTVs above 100 percent. In addition, the Prospectus Supplement stated that 53.86 percent of the loans had LTVs at or below 80 percent. The data review indicated that only 39.71 percent of the loans had LTVs at or below 80 percent.

### V.    Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages

309.    In total, between September 28, 2005 and August 30, 2007, Fannie Mae and Freddie Mac purchased over $4.5 billion in residential mortgage-backed securities issued in connection with the UBS Securitizations.[4] All reductions of UPB since the dates of purchase are attributable to repayments or writedowns of principal.

---

[4]   Purchases and holdings of securities in this section are stated in terms of unpaid principal balance ("UPB") of the relevant securities. Purchase prices are stated in terms of

310.     With regard to the MABS 2005-WF1 Securitization, on or about September 28, 2005, Freddie Mac purchased from UBS Securities $304,942,000 of the A-1A tranche (CUSIP 57643LJR8) at a price of 100.00 percent.  As of March 31, 2011, Freddie Mac held $33,384,871 of the A-1A tranche.

311.     With regard to the MABS 2005-FRE1 Securitization, on or about November 29, 2005, Freddie Mac purchased from UBS Securities $407,426,000 of the A-1 tranche (CUSIP 57643LLV6) at a price of 100.00 percent.  As of March 31, 2011, Freddie Mac held $14,888,173 of the A-1 tranche.

312.     With regard to the MABS 2005-HE2 Securitization, on or about September 30, 2005, Freddie Mac purchased from UBS Securities $223,961,000 of the A-1 tranche (CUSIP 57643LKG0) at a price of 100.00 percent.  As of March 31, 2011, Freddie Mac held $21,412,414 of the A-1 tranche.

313.     With regard to the MARM 2005-8 Securitization, on or about December 21, 2005, Fannie Mae purchased from UBS Securities $425,594,000 of the 2-A-1 tranche (CUSIP 576433E69) at a price of 100.01 percent and on or about January 25, 2006, Fannie Mae purchased from UBS Securities $60,340,000 of the 3-A-1 tranche (CUSIP 576433E77) at a price of 100.88 percent.  As of March 31, 2011, Fannie Mae held $188,849,613 of the 2-A-1 tranche and $33,471,061 of the 3-A-1 tranche.

314.     With regard to the MARM 2006-2 Securitization, on or about March 16, 2006, Fannie Mae purchased from UBS Securities $60,000,000 of the 2-A-1 tranche (CUSIP 576438AC9) at a price of 98.88 percent.  On or about April 17, 2006, Freddie Mac purchased from UBS Securities $58,149,000 of the 2-A-1 tranche at a price of 98.81 percent.  As of March

percentage of UPB.  To date, Fannie Mae and Freddie Mac have not sold any of their holdings purchased as described in this section.

31, 2011, Fannie Mae held $27,438,496 of the 2-A-1 tranche and Freddie Mac held $26,592,018 of the 2-A-1 tranche.

315.    With regard to the MARM 2006-OA1 Securitization, on or about April 28, 2006, Freddie Mac purchased from UBS Securities $258,807,000 of the 2-A-1 tranche (CUSIP 576433G75) at a price of 102.33 percent. As of March 31, 2011, Freddie Mac held $115,064,048 of the 2-A-1 tranche.

316.    With regard to the MABS 2006-FRE2 Securitization, on or about May 30, 2006, Freddie Mac purchased from UBS Securities $195,110,000 of the A-1 tranche (CUSIP 57643GAA5) at a price of 100.00 percent. As of March 31, 2011, Freddie Mac held $39,505,085 of the A-1 tranche.

317.    With regard to the MABS 2006-WMC2 Securitization, on or about April 20, 2006, Fannie Mae purchased from UBS Securities $269,613,000 of the A-1 tranche (CUSIP 57644TAA6) at a price of 100.00 percent. As of March 31, 2011, Fannie Mae held $98,278,926 of the A-1 tranche.

318.    With regard to the MABS 2006-WMC3 Securitization, on or about September 28, 2006, Freddie Mac purchased from UBS Securities $142,810,000 of the A-1 tranche (CUSIP 55291KAA5) at a price of 100.00 percent. As of March 31, 2011, Freddie Mac held $67,323,899 of the A-1 tranche.

319.    With regard to the MABS 2006-NC2 Securitization, on or about September 28, 2006, Freddie Mac purchased from UBS Securities $161,350,000 of the A-1 tranche (CUSIP 55275BAA5) at a price of 100.00 percent. As of March 31, 2011, Freddie Mac held $58,493,957 of the A-1 tranche.

320.    With regard to the MABS 2006-WMC4 Securitization, on or about November 3, 2006, Fannie Mae purchased from UBS Securities $187,821,000 of the A-1 tranche (CUSIP 57645MAA0) at a price of 100.00 percent and $20,869,000 of the A-2 tranche (CUSIP 57645MAB8) at a price of 100.00 percent.  As of March 31, 2011, Fannie Mae held $102,185,798 of the A-1 tranche and $11,353,978 of the A-2 tranche.

321.    With regard to the MABS 2006-NC3 Securitization, on or about December 28, 2006, Freddie Mac purchased from UBS Securities $206,732,000 of the A-1 tranche (CUSIP 55275RAA0) at a price of 100.00 percent.  As of March 31, 2011, Freddie Mac held $97,387,868 of the A-1 tranche.

322.    With regard to the MARM 2007-1 Securitization, on or about January 16, 2007, Freddie Mac purchased from UBS Securities $386,287,000 of the I-1A tranche (CUSIP 576431AA8) at a price of 99.98 percent.  As of March 31, 2011, Freddie Mac held $238,302,406 of the I-1A tranche.

323.    With regard to the MABS 2007-WMC1 Securitization, on or about February 12, 2007, Fannie Mae purchased from UBS Securities $218,363,000 of the A-1 tranche (CUSIP 55275TAA6) at a price of 100.00 percent.  As of March 31, 2011, Fannie Mae held $137,316,760 of the A-1 tranche.

324.    With regard to the MARM 2007-3 Securitization, on or about May 4, 2007, Fannie Mae purchased from UBS Securities $309,106,000 of the 1-1A1 tranche (CUSIP 57645NAA8), $206,071,000 of the 1-1A2 tranche (CUSIP 57645NAB6), $116,046,000 of the 2-1A1 tranche (CUSIP 57645NAM2) and $77,364,000 of the 2-1A2 tranche (CUSIP 57645NAN0), all at a price of 100.00 percent.  As of March 31, 2011, Fannie Mae held

$210,055,820 of the 1-1A1 tranche, $136,155,396 of the 1-1A2 tranche, $78,985,886 of the 2-1A1 tranche and $51,650,945 of the 2-1A2 tranche.

325.    With regard to the MABS 2007-HE2 Securitization, on or about August 30, 2007, Freddie Mac purchased from UBS Securities $237,414,000 of the A-1 tranche (CUSIP 57646LAN3) at a price of 100.00 percent. As of March 31, 2011 Freddie Mac held $143,084,732 of the A-1 tranche.

326.    In making these investments, Fannie Mae and Freddie Mac relied upon the statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents. But for the misstatements and omissions in the Registration Statements, Fannie Mae and Freddie Mac would not have purchased the GSE Certificates.

327.    The GSE Certificates that Fannie Mae and Freddie Mac invested in were originally assigned credit ratings of AAA or the equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices contained in the Registration Statements. Since the issuance of the Certificates, the ratings agencies have dramatically downgraded their ratings to reflect the revelations regarding the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. The following chart details the extent of the downgrades.[5]

---

[5]    Applicable ratings are shown in sequential order separated by forward slashes: S&P/Moody's/Fitch/DBRS. A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

| Transaction | Tranche | Rating at Issuance (S&P/Moody's/Fitch/DBRS) | Rating at 5/3/2011 (S&P/Moody's/Fitch/DBRS) |
|---|---|---|---|
| MABS 2005-WF1 | A-1A | AAA/Aaa/AAA/- | AAA/Aa3/AA/- |
| MABS 2005-FRE1 | A-1 | AAA/Aaa/AAA/- | AAA/Aaa/AAA/- |
| MABS 2005-HE2 | A-1 | AAA/Aaa/-/- | AAA/A2/-/- |
| MARM 2005-8 | 2-A-1 | AAA/Aaa/-/AAA | CCC/Caa3/-/C |
| MARM 2005-8 | 3-A-1 | AAA/Aaa/-/AAA | CCC/Caa3/-/C |
| MARM 2006-2 | 2-A-1 | AAA/-/AAA/- | B-/-/CC/- |
| MARM 2006-OA1 | 2-A-1 | AAA/Aaa/-/- | D/Ca/-/- |
| MABS 2006-FRE2 | A-1 | AAA/Aaa/-/- | CCC/Caa3/-/- |
| MABS 2006-WMC2 | A-1 | AAA/Aaa/-/- | CCC/Ca/-/- |
| MABS 2006-WMC3 | A-1 | AAA/Aaa/-/- | CCC/Ca/-/- |
| MABS 2006-NC2 | A-1 | AAA/Aaa/AAA/- | B-/Ca/C/- |
| MABS 2006-WMC4 | A-1 | AAA/Aaa/-/- | CCC/Ca/-/- |
| MABS 2006-WMC4 | A-2 | AAA/Aaa/-/- | CCC/Ca/-/- |
| MABS 2006-NC3 | A-1 | AAA/Aaa/-/- | B-/Ca/-/- |
| MARM 2007-1 | I-1A | AAA/Aaa/-/- | D/Ca/-/- |
| MABS 2007-WMC1 | A-1 | AAA/Aaa/-/- | CCC/Ca/-/- |
| MARM 2007-3 | 1-1A1 | AAA/Aaa/-/- | CCC/Caa3/-/- |
| MARM 2007-3 | 1-1A2 | AAA/Aaa/-/- | AA+/Aa3/-/- |
| MARM 2007-3 | 2-1A1 | AAA/Aaa/-/- | CCC/Caa3/-/- |
| MARM 2007-3 | 2-1A2 | AAA/Aaa/-/- | AA+/Aa3/-/- |
| MABS 2007-HE2 | A-1 | AAA/Aaa/-/- | BBB/Caa3/-/- |

328.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the income stream from the GSE Certificates was therefore much lower than it would have been had the loans been underwritten as described in the Registration Statements.

329.    Fannie Mae's and Freddie Mac's losses on the GSE Certificates have been much greater than they would have been had the mortgage loans been as represented in the Registration Statements.

330.    UBS's misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the primary and proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of the GSE Certificates.

331.    UBS proximately caused hundreds of millions of dollars in damages to Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac calculate that they have already lost in excess of 20 percent of their entire investment of over $4.5 billion in the GSE Certificates.[6]

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against Defendants UBS Securities, MASTR, the Individual Defendants)

332.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

333.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements for the MABS 2005-WF1, MABS 2005-FRE1, MABS 2005-HE2,  MARM 2005-8, MARM 2006-2, MARM 2006-OA1, MABS 2006-FRE2, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-NC2, MABS 2006-WMC4, MABS 2006-NC3, MARM 2007-1, MABS 2007-WMC1, MARM 2007-3, and MABS 2007-HE2 Securitizations.

---

[6]  Calculations include realized and unrealized losses.

334. This claim is predicated upon Defendants UBS Securities, MASTR, and the Individual Defendants' strict liability for making false and materially misleading statements in the Registration Statements for the Securitizations.

335. Defendant MASTR is the registrant for the Securitizations and filed the Registration Statements. Defendant MASTR is liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

336. The Individual Defendants were officers and/or directors of Defendants MASTR at the time the Registration Statements were filed in connection with the Securitizations. In addition, they signed the Registration Statements and either signed or authorized another to sign on their behalf the amendments to those Registration Statements. As such, the Individual Defendants are liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

337. Defendant UBS Securities served as the lead underwriter of the Securitizations, and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As underwriter, Defendant UBS Securities participated in the offering and sale of the Certificates to the investing public pursuant to the Registration Statements.

338. At the time that they became effective, the Registration Statements contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statement.

339. The untrue statements of material facts and omissions of material fact in the Registration Statements are set forth above in Section IV and pertain to compliance with underwriting guidelines, occupancy status and loan-to-value ratios.

88

340.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements.  At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

341.    UBS Securities, MASTR, and the Individual Defendants owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

342.    UBS Securities, MASTR, and the Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  To the contrary, these Defendants in the exercise of reasonable care should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.

343.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

344.    The time period since May 20, 2009 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

345.    By reason of the conduct herein alleged, UBS Securities, MASTR, and the

Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION
### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against UBS Securities and MASTR)

346.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

347.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities

Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements in the MABS 2005-WF1, MABS

2005-FRE1, MABS 2005-HE2, MARM 2005-8, MARM 2006-2, MARM 2006-OA1, MABS

2006-FRE2, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-NC2, MABS 2006-

WMC4, MABS 2006-NC3, MARM 2007-1, MABS 2007-WMC1, MARM 2007-3, and MABS

2007-HE2 Securitizations.

348.    This claim is predicated upon UBS Securities and MASTR's negligence for

making false and materially misleading statements in the Prospectuses (as supplemented by the

Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the MABS

2005-WF1, MABS 2005-FRE1, MABS 2005-HE2, MARM 2005-8, MARM 2006-2, MARM

2006-OA1, MABS 2006-FRE2, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-NC2,

MABS 2006-WMC4, MABS 2006-NC3, MARM 2007-1, MABS 2007-WMC1, MARM 2007-3,

and MABS 2007-HE2 Securitizations.

349.    UBS Securities and MASTR are prominently identified in the Prospectuses, the

primary documents that they used to sell the GSE Certificates. MASTR transferred all rights,

title, and interest in the mortgage loans to the issuing trust. MASTR and UBS Securities offered

the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

350.   UBS Securities and MASTR offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, UBS Securities and MASTR reviewed and participated in drafting the Prospectuses.

351.   UBS Securities and MASTR successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  UBS Securities obtained substantial fees for its underwriting of these securities.

352.   UBS Securities and MASTR offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce, including communications between representatives of UBS Securities and MASTR in New York and representatives of Fannie Mae in the District of Columbia and Freddie Mac in McLean, Virginia.

353.   The Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

354.   The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

91

355.   Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates directly from UBS Securities and MASTR, pursuant to the false and misleading Prospectuses.

356.   UBS Securities and MASTR owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

357.   UBS Securities and MASTR failed to exercise such reasonable care.  To the contrary, these Defendants in the exercise of reasonable care should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.

358.   In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

359.   Fannie Mae and Freddie Mac acquired the GSE Certificates pursuant to the Prospectuses.

360.   Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

361.   The time period since May 20, 2009, is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, UBS Securities, UBS Real

Estate, and MASTR. In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933 (Against UBS Americas, UBS Real Estate and the Individual Defendants)

362. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

363. This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against UBS Americas, UBS Real Estate, and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

364. The Individual Defendants at all relevant times participated in the operation and management of MASTR and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of MASTR's business affairs. Defendant David Martin was the President and Chief Executive Officer of Defendant MASTR. Defendant Per Dyrvik was the Managing Director and Principal Accounting and Financial Officer of Defendant MASTR. Defendants Hugh Corcoran and Peter Slagowitz were Managing Directors of Defendant MASTR. Because of their positions of authority and control as senior officers and directors of MASTR, the Individual Defendants were able to, and in fact did, control the contents of the Registration Statements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

365. Defendant UBS Real Estate was the sponsor and seller for the Securitizations, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to

the offering of the GSE Certificates by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting MASTR as the special purpose vehicle, selling the mortgage loans that served as the collateral for the GSE Certificates to MASTR for subsequent transfer to the relevant trust, and selecting UBS Securities as underwriter for the Securitizations. In its role as sponsor, UBS Real Estate knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

366.  Defendant UBS Real Estate also acted as the seller of the mortgage loans in that it conveyed such mortgage loans to Defendant MASTR pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

367.  Defendant UBS Real Estate also controlled all aspects of the business of MASTR, as MASTR was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of UBS Real Estate overlapped with the officers and directors of MASTR. In addition, because of its position as the sponsor and seller, UBS Real Estate was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

368.  Defendant UBS Americas also controlled the business operations of MASTR and UBS Securities. Defendant UBS Americas is the corporate parent of UBS Real Estate, UBS Securities, and MASTR. As the sole corporate parent of UBS Securities and MASTR, UBS Americas had the practical ability to direct and control the actions of UBS Securities and

MASTR in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of UBS Securities and MASTR in connection with the issuance and sale of the Certificates.

369.    UBS Americas expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

370.    UBS Americas culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as MASTR and the issuing trusts to serve as conduits for the mortgage loans.

371.    UBS Americas, UBS Real Estate, and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of UBS Securities and MASTR at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

372.    Fannie Mae and Freddie Mac purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

373.    Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

374.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

375.    The time period since May 20, 2009, is tolled for statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

376.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.    Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

b.    The GSE's monetary losses, including lost principal and lost interest payments;

c.    Attorneys' fees and costs;

d.    Prejudgment interest at the maximum legal rate; and

e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

377.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a

trial by jury on all issues triable by jury.

DATED:   New York, New York
         July 27, 2011

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

By: _____
    Philippe Z. Selendy
    Adam M. Abensohn
    Manisha M. Sheth

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff FHFA*

97