UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FEDERAL HOUSING FINANCE AGENCY : 
AS CONSERVATOR FOR THE FEDERAL :
NATIONAL MORTGAGE ASSOCIATION :            11 CIV 5201 (DLC)
AND THE FEDERAL HOME LOAN :
MORTGAGE CORPORATION, :                    **ECF Case**
                             :
            Plaintiff, :                    **Electronically Filed**
                             :
           v. :
                             :
UBS AMERICAS INC., UBS REAL ESTATE :
SECURITIES INC., UBS SECURITIES, LLC, :
MORTGAGE ASSET SECURITIZATION :
TRANSACTIONS, INC., DAVID MARTIN, :
PER DYRVIK, HUGH CORCORAN, and :
PETER SLAGOWITZ, :
                             :
           Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Jay B. Kasner
Scott D. Musoff
Robert A. Fumerton
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

*Attorneys for Defendants UBS Americas
Inc., UBS Real Estate Securities Inc., UBS
Securities LLC, Mortgage Asset
Securitization Transactions, Inc., David
Martin, Per Dyrvik, Hugh Corcoran and
Peter Slagowitz*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 8

    A.    Plaintiff ...................................................................................................... 8

    B.    The Certificates at Issue ............................................................................ 9

    C.    Defendants' Alleged Role in the Securitizations ....................................... 9

    D.    Fannie Mae's and Freddie Mac's Purchases of the Certificates ............. 10

    E.    Fannie Mae – But Not Freddie Mac – Enters Into an Agreement
           Purporting to Toll the Statute of Limitations for Claims Relating to
           Certain of the Certificates ....................................................................... 10

    F.    Plaintiff Files Suit .................................................................................. 11

ARGUMENT ....................................................................................................................... 11

THE AMENDED COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY WITH
      PREJUDICE ............................................................................................................ 11

I.    Plaintiff's Claims Are Barred By the Applicable Statutes of Repose ................ 11

    A.    The Securities Act and Blue Sky Statutes of Repose Bar Plaintiff's Claims ......... 11

    B.    HERA Has No Application to Plaintiff's Claims .................................... 13

          1.    HERA Does Not Apply to Statutes of Repose ........................... 13

                    (a)    The Plain Text of Section 12 Demonstrates that HERA
                            Applies Only to Statutes of Limitations ........................ 13

                    (b)    HERA's Reference to Statutes of Limitations Cannot
                            Repeal By Implication the Securities Act's Statute of
                            Repose ........................................................................... 16

                    (c)    A Federal Statute Cannot Be Interpreted to Re-Write State
                            Substantive Law ........................................................... 17

          2.    Section 12 of HERA Does Not Apply to Federal Claims ........... 18

|  |  | (a) | Plaintiff's "Interpretation" of HERA Would Lead to Perverse Results................................................................19 |
|  |  | (b) | Any Ambiguity Must Be Resolved in Favor of Interpreting HERA as Consistent with Already-Existing Federal Law.............19 |
|  | C. | Fannie Mae's Tolling Agreement Does Not Save Its Claims .................20 |  |

II.    PLAINTIFF'S FEDERAL CLAIMS AND CLAIMS UNDER THE D.C. SECURITIES ACT ARE BARRED BY THE ONE-YEAR DISCOVERY PERIOD ........................................................................................22

     A.    Fannie Mae and Freddie Mac Have Already Admitted They Were On Notice of the Misrepresentations and Omissions About Which They Complain.........................................................................25

     B.    Fannie Mae and Freddie Mac Were on Notice of Their Claims Based on Lawsuits and Extensive Media Coverage Involving the Originators ..................28

        1.    IndyMac Bank ("IndyMac") .......................................................29

        2.    AHM ............................................................................30

        3.    Fremont Investment & Loan ("Fremont") ...................................30

        4.    New Century Mortgage ("New Century") ..................................31

        5.    MILA, Inc. ("MILA") ...........................................................32

        6.    WMC Mortgage Corp. ("WMC")..............................................33

        7.    Argent Mortgage Company ("Argent") ......................................33

        8.    Option One Mortgage Corporation ("Option One") .................34

III.    FHFA LACKS STANDING TO BRING THIS ACTION .................................34

     A.    The Provision Under Which James Lockhart  Assumed Office, 12 U.S.C. § 4512(b)(5), Is Unconstitutional................................................35

     B.    FHFA Lacks Authority to Prosecute this Lawsuit Because Edward DeMarco's Actions in Filing this Lawsuit were Invalid ......................36

IV.    PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT ..............................................................38

     A.    Standard for Liability Under the Securities Act ...................................38

B.     The Amended Complaint Does Not Allege Any Untrue Statement or Actionable Omission ...................................................................................38

       1.     LTV Ratios Are Non-Actionable Statements of Opinion.........................39

       2.     Plaintiff Fails to Allege That Statements About Owner Occupancy Were False When Made.......................................................................41

       3.     Plaintiff Fails To Allege False Statements or Omissions Regarding Underwriting Standards ...........................................................................42

             (a)     The Offering Materials Sufficiently Disclosed the Potential for Non-Compliance with Underwriting Standards......................42

             (b)     Plaintiff Fails to Allege that Defendants had a Duty to Disclose Any Purported Omissions Regarding Exceptions...........44

V.     PLAINTIFF FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION.................................................................................46

VI.     PLAINTIFF FAILS TO ALLEGE CONTROL PERSON LIABILITY...........................48

CONCLUSION..........................................................................................................49

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Allstate Insurance. Co. v. Countrywide Financial Corp.*,
   No. 2:11-CV-05236, 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011)...........................24, 28

*Amusement Indus., Inc. v. Stern*,
   693 F. Supp. 2d 327 (S.D.N.Y. 2010)................................................................................46

*Amusement Indus., Inc. v. Stern*,
   786 F. Supp. 2d 758 (S.D.N.Y. 2011)........................................................................46, 47

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)......................................................................................................11

*Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Mgmt. Inc.*,
   915 N.Y.S. 2d 7 (1st Dep't 2010)......................................................................................45

*Atocha Ltd. Partnership v. Witness Tree, LLC*,
   No. 180921, 2004 WL 1665009 (Va. Cir. Ct. July 16, 2004)............................................45

*In re Barclays Bank PLC Securities Litigation*,
   No. 09 Civ.1989 (PAC), 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ...........................11, 12

*In re Beacon Associates Litigation*,
   2010 WL 3895582 (S.D.N.Y. Oct. 5, 2010).....................................................................45

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................11

*Bilello v. JPMorgan Chase Retirement Plan*,
   649 F. Supp. 2d 142 (S.D.N.Y. 2009)...............................................................................14

*Boata v. Pfizer, Inc.*,
   No. 10 Civ. 4390 (DLC), 2010 WL 4878872 (S.D.N.Y. Dec. 1, 2010)............................11

*Bombardier Capital Inc. v. Naske Air GMBH*,
   No. 02 CV 10176 (DLC), 2003 WL 22137989 (S.D.N.Y. Sept. 17, 2003).......................46

*Buckley v. Valeo*,
   424 U.S. 1 (1976)...............................................................................................................35

*Burlington Northern & Santa Fe Railway Co. v. Poole Chemical Co.*,
   419 F.3d 355 (5th Cir. 2005) .............................................................................................15

*Castellano v. Young & Rubicam*,
   257 F.3d 171 (2d Cir. 2001)..........................................................................................45, 46

*Caviness v. Derand Resources Corp.*,
    983 F.2d 1295 (4th Cir. 1993) ..............................................................12, 15

*In re Chaus Sec. Litigation*,
    801 F. Supp. 1257 (S.D.N.Y. 1992)........................................................22, 23

*CMMF, LLC v. J.P. Morgan Investment Management Inc.*,
    915 N.Y.S.2d 2 (1st Dep't 2010)...................................................................46

*In re Commercial Financial Services, Inc.*,
    294 B.R. 164 (Bankr. N.D. Okla. 2003) .......................................................22

*Cosmos Import & Export Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    No. 96 CIV. 6224 (DLC), 1997 WL 328068 (S.D.N.Y. June 16, 1997)..........23

*Cromer Fin. Ltd.* v. *Berger*,
    No. 00 Civ. 2498, 2001 WL 1112548  (S.D.N.Y. Sept. 19, 2001)...................46

*DeMaria v. Andersen*,
    153 F.Supp.2d 300 (S.D.N.Y. 2001) .............................................................45

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993)............................................................................48

*Dotson v. Griesa*,
    398 F.3d 156 (2d Cir. 2005)..........................................................................19

*Dunn v. Borta*,
    369 F.3d 421 (4th Cir. 2004) ........................................................................38

*Dupont v. New Jersey State Police*,
    No. 08 Civ. 10220 (DLC), 2009 WL 2486052 (S.D.N.Y. Aug. 14, 2009) ......11

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938)........................................................................................17

*In re Exxon Mobil Corp. Securities Litigation*,
    500 F.3d 189 (3d Cir. 2007)..........................................................................16

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011)..........................................................6, 38, 39, 40

*In re Fannie Mae 2008 Securities Litigation*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010).........................................................1, 44

*Footbridge Ltd. Trust v. Countrywide Financial Corp.*,
    770 F. Supp. 2d 618 (S.D.N.Y. 2011).................................................12, 21, 23

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)........40, 41, 43, 44

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)..............................................................45

*Good Samaritan Hospital v. Shalala*,
    508 U.S. 402 (1993)......................................................................................14

*GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*,
    580 F. Supp. 2d 321 (S.D.N.Y. 2008)............................................................23

*Hite v. Leeds Weld Equity Partners, IV, LP*,
    429 F. Supp. 2d 110 (D.D.C. 2006)....................................................13, 39, 45

*I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991)..........................................................................38

*In re IndyMac Mortgage-Backed Securities Litigation*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)............................................................39

*In re IndyMac Mortgage-Backed Securities Litigation*,
    No. 09 Civ. 4583 (LAK), 2011 WL 2508254 (S.D.N.Y. June 21, 2011)...............4, 22, 23

*In re Integrated Resources Real Estate Ltd. Partnerships Securities Litigation*,
    815 F. Supp. 620 (S.D.N.Y. 1993)..........................................................22, 30

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011)............................................................46

*Jackson v. Broadcast Music, Inc.*,
    No. 04 CV 5948, 2006 WL 250524 (S.D.N.Y. Feb. 1, 2006) ..........................24

*Kimmell v. Schaefer*,
    89 N.Y.2d 257 (1996)....................................................................................47

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991)......................................................................................21

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
    No. 10 Civ. 7549 (WHP), 2011 WL 4495034 (S.D.N.Y. Sept. 28, 2011) .............7, 44, 47

*Laub v. Faessel*,
    297 A.D.2d 28 (1st Dep't 2002)....................................................................48

*Lazard Freres & Co. v. Protective Life Insurance Co.*,
    108 F.3d 1531 (2d Cir. 1997)........................................................................46

*LC Capital Partners, LP v. Frontier Insurance Group*,
    318 F.3d 148 (2d Cir. 2003)................................................................24

*In re Lehman Bros. Mortgage-Backed Securities Litigation*,
    650 F.3d 167 (2d Cir. 2011).........................................................38, 44

*In re Lehman Bros. Securities & ERISA Litigation*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010)................................................47

*In re Lehman Bros. Securities & ERISA Litigation*,
    No. 09 MD 02017 (LAK), 2011 WL 1453790 (S.D.N.Y. Apr. 13, 2011) .................14, 22

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)................................................................48

*Lenz v. Associated Inns & Restaurants Co. of America*,
    833 F. Supp. 362 (S.D.N.Y. 1993).....................................................23

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    594 F.3d 383 (5th Cir. 2010) ............................................................44

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    597 F.3d 84 (2d Cir. 2010).........................................................12, 14

*Marshall v. Milberg LLP*,
    No. 07 Civ. 6950, 2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009)....................24

*MBIA Insurance Co. v. Residential Funding Co.*,
    No. 603552/08, 2009 WL 5178337 (Sup. Ct. N.Y. Cnty Dec. 22, 2009)........47

*MBIA Insurance Co. v. GMAC Mortgage LLC*,
    30 Misc. 3d 856 (Sup. Ct. NY Cnty 2010) ................................47, 48

*McCann v. Hy-Vee, Inc.*,
    No. 11-1459, 2011 WL 5924414 (7th Cir. Nov. 22, 2011) ............................15

*Merck & Co. v. Reynolds*,
    130 S. Ct. 1784 (2010)................................................................23

*Meridian Horizon Fund LP v. Tremont Grp. Holdings, Inc.*,
    2010 WL 1257567 (S.D.N.Y. Mar. 31, 2010) ................................46

*Mid State Horticultural Co. v. Pennsylvania R. Co.*,
    320 U.S. 356 (1943).............................................................4, 21

*MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*,
    701 F. Supp. 2d 518 (S.D.N.Y. 2010)................................................18

*In re Morgan Stanley Mortgage Pass-Through Certificates Litigation*,
No. 09 Civ. 2137 (LTS), 2010 WL 3239430 (S.D.N.Y, Aug. 17, 2010) .........................26

*In re Morgan Stanley Information Fund Securities Litigation*,
592 F.3d 347 (2d Cir. 2010)...................................................................................45

*Morton v. Mancari*,
417 U.S. 535 (1974)...........................................................................................3, 16

*National Association of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007)...........................................................................................3, 16

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d
288 (S.D.N.Y. 2010)........................................................................................45, 48

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
No. 08 Civ. 5653 (PAC), 2010 WL 1473288 (S.D.N.Y. 2010)..................................39

*New Jersey Carpenters Health Fund v. Novastar Mortgage, Inc.*,
No. 08 Civ. 5310 (DAB), 2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) .....................44

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ........................45

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
720 F. Supp. 2d 254 (S.D.N.Y. 2010)......................................................................45

*Nghiem v. United States Department of Veterans Affairs*,
451 F. Supp. 2d 599 (S.D.N.Y. 2006).......................................................................19

*In re NovaGold Resources Inc. Securities Litigation*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009).......................................................................23

*Olympic Federal Savings & Loan Association v. Director, Office of Thrift
Supervision*, 732 F. Supp. 1183 (D.D.C. 1990) .............................................5, 35, 36, 37

*In re Outboard Marine Corp.*,
299 B.R. 488 (Bankr. N.D. Ill. 2003) .......................................................................22

*P. Stolz Family Patrnership, L.P. v. Daum*,
166 F. Supp. 2d 871 (S.D.N.Y. 2001).....................................................................7, 49

*P. Stolz Family Partnership L.P. v Daum*,
355 F.3d 92 (2d Cir. 2004)...................................................................................12, 15

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................................................................38, 44

*Phillips v. Kidder, Peabody & Co.,*
  933 F. Supp. 303 (S.D.N.Y. 1996).................................................................30

*Resolution Trust Corp. v. Olson,*
  768 F. Supp. 283 (D. Ariz. 1991) ......................................................3, 15, 17

*In re Salomon Analyst Level 3 Litigation,*
  373 F. Supp. 2d 248 (S.D.N.Y. 2005)..............................................................41

*SEI Hawaiian Cogenerators, Inc. v. ABB Hawaiian Cogeneration, Inc.,* No. 95-
  00048-ACK (D. Haw. June 30, 1995) ..............................................................22

*Shah v. Meeker,*
  435 F.3d 244 (2d Cir. 2006)..........................................................................24

*Staehr v. Hartford Financial Services Group, Inc.,*
  547 F.3d 406 (2d Cir. 2008)......................................................................24, 28

*Stichting Pensionenfonds ABP v. Countrywide Financial Corp.,*
  No. 10-CV-07275 MRP (MANx), 2011 WL 3558173 (C.D. Cal. Aug. 9,
  2011) .....................................................................................................5, 28

*Stone & Webster Engineering Corp. v. Duquesne Light Co.,*
  79 F. Supp. 2d 1 (D. Mass. 2000) ..................................................................22

*Stutman v. Chem. Bank,*
  95 N.Y.2d 24 (2000) .....................................................................................48

*Tab Partnership v. Grantland Financial Corp.,*
  866 F. Supp. 807 (S.D.N.Y. 1994)..................................................................23

*Thompson v. Metropolitan Life Insurance Co.,*
  149 F. Supp. 2d 38 (S.D.N.Y. 2001)...............................................................23

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
  692 F. Supp. 2d 387 (S.D.N.Y. 2010).....................................................39, 41, 44

*United States v. California,*
  932 F.2d 1346 (9th Cir. 1991) .......................................................................18

*United States v. Harpootlian,*
  24 F.2d 646 (2d Cir. 1928)............................................................................18

*United States v. Hartford Accident & Indemnity Co.,*
  460 F.2d 17 (9th Cir. 1972) ...........................................................................17

*United States v. Ron Pair Enterprises, Inc.,*
  489 U.S. 235 (1989).......................................................................................14

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) ...................................................................................6, 39

*Wallace v. Buttar,*
    239 F. Supp. 2d 388 (S.D.N.Y. 2003) ................................................................49

*Wilson v. Merrill Lynch & Co.,*
    No. 10-1528-cv, 2011 WL 5515958 (2d Cir. Nov. 14, 2011) ..................7, 8, 43

*Wolfson v. Moskowitz,*
    No. 08 Civ. 8796 (DLC), 2009 WL 1515674 (S.D.N.Y. June 1, 2009) ...........11

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,*
    328 F. App'x 695 (2d Cir. 2009) ......................................................................19

*In re WorldCom, Inc., Securities Litigation,*
    2004 WL 1097786 (S.D.N.Y. May 18, 2004) ...................................................49

*In re WorldCom, Inc. Securities Litigation,*
    2005 WL 638268 (S.D.N.Y. 2005) ...................................................................49

*In re Worldcom, Inc. Securities Litigation,*
    No. 02 Civ. 3288 (DLC), 2004 WL 1435356 (S.D.N.Y. June 28, 2004) .........12

*Zirkin v. Quanta Capital Holdings Ltd.,*
    No. 07 Civ. 851(RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ...............42

## Statutes and Rules

U.S. Const. art. II, § 2, cl. 2 .........................................................................5, 35

5 U.S.C. § 3345(a) ...............................................................................................37

5 U.S.C. § 3346(b)(1) .............................................................................................5

12 U.S.C. § 1462a ................................................................................................35

12 U.S.C. § 4512(b)(5) ...................................................................................35, 36

12 U.S.C. § 4617 ............................................................................................ *passim*

15 U.S.C. § 77k(a) ................................................................................................38

15 U.S.C. § 77*l*(a)(2) ............................................................................................38

15 U.S.C. § 77m ........................................................................................12, 16, 22

28 U.S.C. § 2415 ..................................................................................................17

17 C.F.R. § 229.1111(a)(3) (2011) ................................................................45

D.C. Code § 31-5601.02(b) (2009)................................................11, 12, 13

Va. Code Ann. § 13.1-522(D) (West 2007).........................................11, 12

**Other Authorities**

2A C. Sands, SUTHERLAND STATUTORY CONSTRUCTION § 53.01 (4th ed. 1984
    Revision)................................................................................16

Defendants UBS Americas Inc., UBS Real Estate Securities Inc., UBS Securities LLC, Mortgage Asset Securitization Transactions, Inc. ("UBS Defendants"), David Martin, Per Dyrvik, Hugh Corcoran and Peter Slagowitz ("Individual Defendants," and with the UBS Defendants, "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the amended complaint ("Amended Complaint")[1] filed by Plaintiff Federal Housing Finance Agency ("FHFA"), acting as conservator for The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac").

## PRELIMINARY STATEMENT

This action represents a belated attempt by Fannie Mae and Freddie Mac, the two largest and most sophisticated issuers and purchasers of residential mortgage-backed securities ("RMBS"), to shift the blame for losses they purportedly suffered as a result of the nationwide housing crisis in which they played a critical role.  As government-sponsored entities ("GSEs") specifically chartered by Congress to provide liquidity, stability and affordability to the U.S. housing and mortgage markets, Fannie Mae and Freddie Mac purchased nearly one-third of all private-label RMBS issued between 2004 and 2008 and also *issued* billions of dollars of their own RMBS using loans underwritten by many of the very same loan originators ("Originators") identified in the Amended Complaint whose underwriting guidelines they now claim were misrepresented by Defendants.  Fannie Mae and Freddie Mac thus "played a critical role in developing and sustaining the secondary mortgage market," and were "at the center of the U.S. market and one of its main driving forces."[2]

Unfortunately for Fannie Mae and Freddie Mac, their attempt to deflect

---

[1]  A true and correct copy of the Amended Complaint is attached as Exhibit A to the Declaration of Jay B. Kasner dated December 2, 2011, exhibits to which are cited herein as "Ex. "

[2]  *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 392 (S.D.N.Y. 2010) (Crotty, J.).

1

responsibility for their role in propping up the subprime mortgage market comes too late.  The Amended Complaint parrots the allegations of a torrent of lawsuits filed in the wake of the nationwide housing crisis, including RMBS suits involving the exact same securities at issue here that have been pending for years in this Court and throughout the country.  Yet, Plaintiff FHFA,[3] as conservator for Fannie Mae and Freddie Mac, inexplicably sat on its claims until July 2011 – nearly <u>four years</u> after the last purchase (and over six years after the first purchase) of the RMBS certificates (the "Certificates") at issue.  On their face, Plaintiff's claims are time-barred under the applicable statutes of repose.[4]

Faced with these statutes of repose, Plaintiff attempts to re-write Section 12 of the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617, to save the timeliness of its stale claims.  Specifically, Plaintiff contends that this action is timely because it was "brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac."  (AC ¶ 327.)  Under the plain terms of the statute, HERA has no application to Plaintiff's claims for at least the following reasons:

**<u>HERA Does Not Apply to Statutes of Repose</u>**

On its face, Section 12 of HERA applies only to procedural statutes of <u>limitations</u> – not substantive statutes of <u>repose</u>, which represent "absolute" bars that "extinguish[] a plaintiff's cause of action after the passage of a fixed period of time."  In interpreting the materially identical provision of the Financial Institutions Recovery, Reform and Enforcement

---

[3] FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617, to oversee Fannie Mae and Freddie Mac.  (AC ¶ 12.)  FHFA placed them into conservatorship on September 6, 2008, citing their "series of ill-advised and poorly executed decisions and other serious misjudgments."  (Ex. B at 1, Letter from FHFA to Freddie Mac (Sept. 4, 2008).)

[4] Specifically, Plaintiff's claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, *l*(a)(2), o, and Virginia and D.C. statutory law are time-barred under the Securities Act's and D.C. Securities Act's three-year statutes of repose, 15 U.S.C. § 77m; D.C. Code § 31-5606.05(f) (2009), and the Virginia Securities Act's two-year statute of repose, Va. Code Ann. § 13.1-522(D) (West 2007).

Act ("FIRREA") – on which Section 12 of HERA was modeled – at least one federal court has explicitly held that the very same statutory language at issue here does not modify "substantive statutes of repose."  *Resolution Trust Corp. v. Olson*, 768 F. Supp. 283, 285 (D. Ariz. 1991).

Plaintiff's "interpretation" of HERA is also foreclosed by binding precedent holding that a federal statute may not "repeal by implication" another federal statute – in this case, the three-year statute of repose contained in Section 13 of the Securities Act – unless the later statute "expressly contradict[s] the original act."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 646 (2007).  HERA's reference to statutes of <u>limitations</u> cannot repeal by implication the Securities Act's statute of <u>repose</u> because "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

## HERA Does Not Apply to Federal Claims

HERA cannot save any of Plaintiff's federal claims from dismissal for the separate and independent reason that it applies only to state law – not federal law – claims.  Indeed, its plain text provides that the statute of limitations shall be the longer of three years from the date of conservatorship or "<u>the</u> period applicable under <u>State</u> law."  Because Plaintiff's claims under the Securities Act have no "period applicable under State law," this provision cannot apply.  Courts have repeatedly rejected any construction of statutes referencing only "state law" to include "federal law," and applying HERA to federal claims would have the perverse result of <u>shortening</u> the limitations period under certain federal statutes.

## Fannie Mae's Tolling Agreement Does Not Save Plaintiff's Claims

Plaintiff also attempts to invoke a tolling agreement entered into between Fannie

Mae and certain Defendants on May 20, 2009.  (Ex. C, the "Tolling Agreement").)  As a threshold matter, the Tolling Agreement has no application to any of the Certificates purchased by Freddie Mac, which never entered into any tolling agreement with any of the Defendants. Even as to Fannie Mae, the Agreement only purports to toll the statute of limitations "to the extent allowable under contract or law" for some (six), but not all, of the Certificates purchased by Fannie Mae.  In any event, as a matter of controlling authority, this Tolling Agreement cannot save any of Plaintiff's claims from being barred by the applicable statutes of repose.  The Supreme Court has held that statutes of repose "are absolute and invariable by any act of the parties," and thus cannot be waived by private agreement.  *Mid State Horticultural Co. v. Pa. R. Co.*, 320 U.S. 356, 359 (1943).  Indeed, numerous courts in this District have held that the Securities Act's three-year statute of repose is subject only to "legislatively created exceptions," and not "any other form of tolling."  *See, e.g.*, *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09 Civ. 4583 (LAK), 2011 WL 2508254, at *2 (S.D.N.Y. June 21, 2011) (Kaplan, J.).

**Plaintiff's Claims Are Also Barred**
**By the Applicable One-Year Statutes of Limitations**

Even if HERA applied to Plaintiff's claims (which it does not), Plaintiff's federal and D.C. Securities Act claims are still barred by the applicable one-year statutes of limitations because Fannie Mae and Freddie Mac were admittedly on inquiry notice of their claims prior to September 6, 2007 – one year before they were placed in conservatorship.  Indeed, while Plaintiff alleges that the Originators failed to originate loans in accordance with stated guidelines, on August 2, 2007, Freddie Mac leveled similar allegations against American Home Mortgage ("AHM"), one of the Originators identified in the Amended Complaint.  (*See infra* at p. 25.)

Further, there were myriad other "storm warnings" in the form of lawsuits and news articles concerning virtually all of the other Originators, each of which, standing alone, put

4

Fannie Mae and Freddie Mac on inquiry notice of their claims.  In *Stichting Pensioenfonds ABP v. Countrywide Financial Corp.*, No. 10-CV-07275 MRP (MANx), 2011 WL 3558173 (C.D. Cal. Aug. 9, 2011), the court relied on an August 2007 lawsuit against Countrywide Home Loans ("Countrywide"), another one of the Originators at issue here, in holding that plaintiff there was on inquiry notice of its securities fraud claims "by 2007."  *Id.* at *11.  If the Countrywide-related complaints were sufficient to put a reasonable plaintiff on notice of its fraud claims based on Countrywide's failure to adhere to its underwriting standards, *a fortiori*, they were sufficient to put a highly sophisticated party such as Fannie Mae or Freddie Mac on notice of its non-fraud based claims concerning Countrywide's underwriting practices.  (*See infra* at p. 28.)

## Plaintiff Lacks Standing to Bring this Action

Even if Plaintiff's claims were timely (and they are not), FHFA lacks standing to prosecute this action because Congress' appointment of FHFA's original Acting Director, James Lockhart, was unconstitutional under the Appointments Clause.  U.S. Const. art. II, § 2, cl. 2 (requiring the President to appoint officers with the advice and consent of the Senate); *Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183 (D.D.C. 1990). Because Lockhart had no authority to act, his placement of Fannie Mae and Freddie Mac into conservatorship was invalid and FHFA lacks standing to sue on their behalf.  Moreover, FHFA also lacks authority to prosecute this action because FHFA's current Acting Director, Edward DeMarco, was not validly appointed under either HERA or the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3346(b)(1).  (*See infra* at pp. 34-37.)

## Plaintiff Fails to Allege an Actionable Misstatement or Omission

In any event, none of the alleged misrepresentations by Defendants, who did not originate any of the loans backing the challenged Certificates, is actionable under Sections 11

and 12 of the Securities Act or the applicable state statutes.  As a threshold matter, in the offering

materials for their own RMBS using loans underwritten by many of the same Originators

identified in the Amended Complaint, Fannie Mae and Freddie Mac made disclosures

substantially similar to those they challenge here.  Having securitized loans from the Originators,

Fannie Mae and Freddie Mac had access to the same information regarding the Originators as

did Defendants and to the extent they allege misrepresentations regarding the underwriting

practices for the loans underlying the Certificates, they were on notice of these industry-wide

practices because they participated in those practices themselves.  (*See infra* at pp. 8-9.)

Moreover, Plaintiff's allegations concerning statements in the Defendants' offering

materials ("Offering Materials") regarding loan-to-value ("LTV") ratios[5] – and the appraisal

information upon which they are based – fail as a matter of law because such statements are non-

actionable opinions.  Confirming the legion of courts that have dismissed materially identical

allegations, the Second Circuit recently held that opinions are non-actionable unless they are

alleged to be "both false and not honestly believed when they were made." *Fait v. Regions Fin.

Corp.*, 655 F.3d 105, 113 (2d Cir. 2011); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S.

1083, 1095-96 (1991).  Plaintiff's failure to allege that any of the statements in the Offering

Materials concerning LTV ratios were both false and not honestly believed when made mandates

dismissal.  (*See infra* at pp. 39-41.)

Similarly, Plaintiff's claims regarding owner occupancy data[6] fail as a matter of

law because Plaintiff cannot allege that any such statements were false when made.  The

---

[5]  An LTV ratio is the ratio of the balance of the mortgage loan to the appraised value of the mortgaged property
when the loan is made.

[6]  Owner occupancy data refers to the information reported by the borrower concerning whether, at the time of
origination, the borrower intends to occupy the property securing the loan or use the property as a second home or
investment property.

Offering Materials explicitly disclosed that owner occupancy was determined <u>at the time of origination</u> and based on <u>representations by the borrower</u>.  Rather than allege that the disclosed information was an inaccurate representation of the data received from the borrowers – or even that the underlying owner occupancy data was false at the time of origination – Plaintiff purports to conduct an *ex post* review to show that owner occupancy rates "months after the loan closed" differed from those disclosed in the Offering Materials.  (AC ¶ 248.)  Plaintiff's failure to challenge the accuracy of the representations of the data received from the borrowers and allege the falsity of the data at the time of origination is fatal to its claims.  (*See infra* at pp. 41-42.)

Finally, Plaintiff's allegations that approximately one-third of the loans backing the Certificates did not comply with stated underwriting standards do nothing to establish a misstatement because the Offering Materials expressly disclosed that such standards were only "generally" applied and that a "substantial number" of the loans were underwritten outside of the stated guidelines.  (*See infra* at pp. 42-43.)[7]

## Plaintiff Fails to Allege Negligent Misrepresentation

Plaintiff's common law negligent misrepresentation claim should also be dismissed because Plaintiff cannot allege the requisite "special relationship" between Plaintiff and Defendants.  Under New York law, which applies to this claim, courts routinely dismiss negligent misrepresentation claims where, as here, they are "based on arm's-length transactions between sophisticated counterparties."  *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, No. 10 Civ. 7549 (WHP), 2011 WL 4495034, at *7 (S.D.N.Y. Sept. 28, 2011) (Pauley, J.).

---

[7]  Plaintiff's "tack-on" control person claims under federal and state law fail because Plaintiff has not alleged a primary violation under these statutes, *Wilson v. Merrill Lynch & Co.*, No. 10-1528-cv, 2011 WL 5515958, at *16 (2d Cir. Nov. 14, 2011), and fails adequately to allege control.  *See P. Stolz Family P'ship, L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001), *aff'd in part, rev'd in part on other grounds*, 355 F.3d 92 (2d Cir. 2004).

## STATEMENT OF FACTS[8]

### A.    Plaintiff

Plaintiff FHFA brings this action as conservator for Fannie Mae and Freddie Mac. (AC ¶ 12.)  Fannie Mae and Freddie Mac are shareholder-owned, GSEs chartered by Congress to provide liquidity, stability and affordability to the housing markets.  (Ex. D at 1, Fannie Mae 2010 10-K; Ex. E at 2, Freddie Mac 2010 10-K.)  Their former regulator described them as "the dominant firms in U.S. housing finance markets."  (Ex. F at 10, Office of Fed. Hous. Enter. Oversight, Systemic Risk: Fannie Mae, Freddie Mac and the Role of OFHEO (2003).)

As part of their mission, both Fannie Mae and Freddie Mac worked for years with lenders – including the Originators of the loans underlying the Certificates – to purchase and securitize mortgage loans for sale to the public.  (Ex. D at 8; Ex. E at 10.)  In light of this mission, "[r]esidential mortgages in the United States are the only asset class in which [they are] permitted to invest."  (Ex. G at 6, Transcript of the testimony of Franklin D. Raines, former chief executive officer of Fannie Mae, Congressional Hearing (Dec. 9, 2008).)  In 2007, Fannie Mae and Freddie Mac held in their own portfolios $2.1 trillion and $1.4 trillion of RMBS, respectively.  (Ex. H at 111, 128, Federal Housing Finance Agency, Report to Congress (2008).)  Fannie Mae and Freddie Mac also securitized their own RMBS using loans underwritten by many of the same Originators identified in the Amended Complaint,[9] and issued offering materials containing disclosures substantially similar to those about which they complain here.

---

[8]  The facts set forth herein are drawn from the factual allegations of the Amended Complaint, "together with those 'documents . . . incorporated in it by reference' and 'matters of which judicial notice may be taken.'"  *Wilson*, 2011 WL 5515958, at *1 (citation omitted).

[9]  For example, from 2005 to 2007, Fannie Mae issued more than 13,000 securitizations where Countrywide was the originator.  *See* FannieMae, Prospectus Supplement Retrieval System, http://fapt.efanniemae.com/eprosupp2/Content.jsp (click "Advanced Search," set date range, select relevant seller, then click "Search") (last visited Dec. 2, 2011).

For example, in a 2006 Prospectus for RMBS it issued, Fannie Mae stated:

- [A]ppraisals or other valuation methods are merely estimates of the mortgaged property values," (Ex. I at B-6, Fannie Mae Single-Family MBS Pros. (January 1, 2006));

- [A]ctual occupancy of the properties as of the issue date has not been verified," *id.* at B-7;

- information in offering documents is "reported to us by lenders" and investors "should make their own conclusions regarding the data," *id.* at B-5;

- originators were "reducing the amount of documentation required to refinance and easing their underwriting standards," *id.* at 11; and

- [V]arious lenders . . . have instituted . . . liberalized fee structures and underwriting guidelines," *id.* at 27.[10]

## B.   The Certificates at Issue

Fannie Mae and Freddie Mac invested in RMBS by purchasing the Certificates, which entitle the holder to the cash flows from a defined pool of residential mortgage loans.  (*Id.* ¶ 30.)  The Certificates are divided into "tranches" bearing different risk profiles and credit ratings based on the priority of cash payments generated by the underlying loans.  (*Id.* ¶¶ 242-45.) Each of the Certificates is backed by a specific pool of loans, which have been assigned to an issuing trust unique to each offering.  (*Id.* ¶¶ 7, 35, 47.)  Each pool of loans was originated by one or more of at least 13 different Originators.

## C.   Defendants' Alleged Role in the Securitizations

Plaintiff alleges that Defendant UBS Real Estate acted as the "sponsor" for each of the Certificates, which purchased loans from the Originators and then transferred them to Defendant MASTR.  (*Id.* ¶¶ 16, 46-47.)  According to Plaintiff, Defendant MASTR, as

---

[10]  Likewise, a 2007 Freddie Mac Offering Circular stated that "we generally do not independently verify the accuracy of the seller's representations and warranties," which covered matters including "[t]he accuracy of the information provided by the borrower," "[t]he accuracy and completeness of any third party reports prepared by qualified professionals, such as property appraisal."  (Ex. J at 22-23, Freddie Mac Mortgage Participation Certificates Offering Circular (Mar. 19, 2007) (emphasis added).)

"depositor," "serve[d] as a conduit through which loans acquired by UBS Real Estate could be securitized."  (*Id.* ¶¶ 17, 36.)  Defendant UBS Securities allegedly served as the lead underwriter for all of the Certificates.  (*Id.* ¶ 3.)  Each of the Certificates was issued pursuant to one of seven shelf registration statements (the "Registration Statements") filed with the Securities and Exchange Commission.  (*Id.* ¶ 3.)  The Individual Defendants are alleged to have signed  two of the Registration Statements in New York.  (*Id.* ¶¶ 3, 21-24.)  In addition, each securitization was sold pursuant to a prospectus ("Prospectus"), a prospectus supplement ("Prospectus Supplement") and supporting documents, all of which were disclosed.

**D.      Fannie Mae's and Freddie Mac's Purchases of the Certificates**

Plaintiff alleges that between September 28, 2005 and August 30, 2007, Fannie Mae or Freddie Mac purchased 22 separate Certificates for a total of $6.4 billion of notional principal value.  (*Id.* ¶¶ 2, 308-09.)  Appendix A sets forth the dates of these purchases, the party making the purchase and the Originators for each of these Certificates, as alleged by Plaintiff.

**E.      Fannie Mae – But Not Freddie Mac – Enters Into an Agreement Purporting
to Toll the Statute of Limitations for Claims Relating to Certain of the Certificates**

On May 20, 2009, Fannie Mae, MASTR, UBS Securities and UBS Real Estate entered into an agreement (Ex. C) purporting to toll the statute of limitations for claims relating to six of the Certificates allegedly purchased by Fannie Mae.[11]  The Tolling Agreement, to which Freddie was not a party, provided that, "*to the extent allowable under contract or law*," the parties agreed not to raise "any defense based on the running of any statute of limitations or on laches or other principle of timeliness that may apply during the Tolling Period."  (*Id.* § 2 (emphasis added).)  The Tolling Agreement expressly provided that it could not "revive or

---

[11]  The Tolling Agreement purports to apply to the following six Certificates:  (i) MARM 2005-8; (ii) MARM 2006-2; (iii) MABS 2006-WMC2; (iv) MABS 2006-WMC4; (v) MARM 2007-3; and (vi) MABS 2007-WMC1.

extend the time for filing any claim that has lapsed prior to [May 20, 2009]."  (*Id.* at § 3.)  As

demonstrated below, for two of the six Certificates to which it purportedly applied, the

applicable statutes of repose already had expired prior to May 20, 2009.  (*See infra* at note 23.)

## F.    Plaintiff Files Suit

On July 27, 2011, nearly four years after Fannie Mae or Freddie Mac purchased

the last Certificate at issue – and several years after both were on notice of their claims – Plaintiff

commenced this action.  On September 2, 2011, Plaintiff filed the Amended Complaint.[12]

## ARGUMENT[13]

### THE AMENDED COMPLAINT SHOULD BE
### DISMISSED IN ITS ENTIRETY WITH PREJUDICE

## I.    PLAINTIFF'S CLAIMS ARE BARRED
## BY THE APPLICABLE STATUTES OF REPOSE

### A.    The Securities Act and Blue Sky Statutes of Repose Bar Plaintiff's Claims

The Amended Complaint asserts violations of Sections 11 and 12(a)(2) of the

Securities Act.  Section 13 of the Securities Act provides, in relevant part, that "[i]n no event

---

[12]  The Amended Complaint asserts claims under:  (i) Section 11 of the Securities Act; (ii) Section 12(a)(2) of the Securities Act; (iii) Section 15 of the Securities Act; (iv) Section 13.1-522(A)(ii) of the Virginia Securities Act; (v) Section 13.1-522(c) of the Virginia Securities Act; (vi) Section 31-5606.05(a)(1)(B) of the D.C. Securities Act; and (vii) Section 31-5606.05(c) of the D.C. Securities Act.  Plaintiff also asserts a claim for negligent misrepresentation against UBS Securities and MASTR. Plaintiff alleges that Defendants made material misstatements and omissions concerning (1) the LTV ratios of the loans, (2) the owner-occupancy status of the subject properties, and (3) compliance with the underwriting practices of the Originators.  (*Id.* ¶¶ 71, 73, 78.)

[13]  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Boata v. Pfizer, Inc.*, No. 10 Civ. 4390 (DLC), 2010 WL 4878872, at *2 (S.D.N.Y. Dec. 1, 2010) (Cote, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Dupont v. New Jersey State Police*, No. 08 Civ. 10220 (DLC), 2009 WL 2486052, at *3 (S.D.N.Y. Aug. 14, 2009) (Cote, J.).  Rather, the factual allegations must be sufficient to move the claims "'across the line from conceivable to plausible.'"  *Wolfson v. Moskowitz*, No. 08 Civ. 8796 (DLC), 2009 WL 1515674, at *4 (S.D.N.Y. June 1, 2009) (Cote, J.) (quoting *Twombly*, 550 U.S. at 570).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ.1989 (PAC), 2011 WL 31548, at *4 (S.D.N.Y. Jan. 5, 2011) (Crotty, J.) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  In *Twombly*, the Supreme Court stressed the "practical significance" of these requirements in securities cases, where there is a risk that a plaintiff is permitted to proceed with "'a largely groundless claim' [and] 'be allowed to take up the time of a number of other people, with the right to do so representing *an in terrorem* increment of the settlement value.'"  550 U.S. at 558 (citations omitted).

shall any such action be brought to enforce a liability created under [Section 11 or Section 12(a)(1)] more than three years after the security was bona fide offered to the public, or under [Section 12(a)(2)] more than three years after the sale."  15 U.S.C. § 77m (emphasis added).[14]  *P. Stolz Family P'ship L.P. v Daum*, 355 F.3d 92, 102 (2d Cir. 2004) (describing Section 13 as a statute of repose).  In contrast to statutes of limitations, which "bear on the availability of remedies . . . statutes of repose affect the availability of the underlying right:  That right is no longer available on the expiration of the specified period of time."  *Id.* at 102; *accord Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 (2d Cir. 2010).[15]

Like the Securities Act, both the Virginia and D.C. Securities Acts also contain substantive statutes of repose.  Specifically, Section 13.1-522(D) of the Virginia Securities Act, upon which Freddie Mac's claims are based (AC ¶¶ 364, 382), provides that "[n]o suit shall be maintained to enforce any liability created under this section unless brought within two years after the transaction upon which it is based."  *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1305-06 (4th Cir. 1993).  The Fourth Circuit has expressly held that this provision constitutes an "absolute cut-off" for claims brought more than two years after the challenged transaction and thus constitutes a substantive statute of repose as opposed to a procedural statute of limitations.  *Id.* at 1306 ("[W]e conclude from the plain meaning of the statute that the Virginia legislature intended to provide unqualifiedly that a claim must be brought within two years 'after the transaction upon which it is based'").  Similarly, Section 31-5606.05 of the D.C. Securities Act,

---

[14]  For securities issued pursuant to shelf registration statements filed before December 1, 2005, the "offering" date is the effective date of the shelf registration statement.  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 1435356, at *3 (S.D.N.Y. June 28, 2004) (Cote, J.).  For shelf registration statements filed after December 1, 2005, the trigger date became the date of the relevant prospectus supplement.  *Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 623 (S.D.N.Y. 2011) (Castel, J.) (citing 17 C.F.R. §§ 230.430B(f)(2), (f)(4) (2011)).

[15]  "Section 15 claims 'are derivative of the other claims and thus subject to the same time limitation.'" *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *6 (internal quotation omitted).

12

upon which Fannie Mae's claims are based (AC ¶¶ 397, 415), tracks Section 13 of the Securities

Act and requires claims to be brought within a one year discovery period but no later than "three

years after the contract of sale or purchase."  D.C. Code § 31-5606.05(f) (2009).[16]

Here, the last of the Certificates at issue in the Amended Complaint was

purchased on <u>August 30, 2007</u>.  (AC ¶¶ 308-309.)  Accordingly, applying that date as the outside

date for each applicable statute of repose, *all* of Plaintiff's claims were extinguished no later than

<u>August 30, 2010</u> – nearly one full year before the original complaint was filed on July 27, 2011.

**B.    <u>HERA Has No Application to Plaintiff's Claims</u>**

Plaintiff erroneously contends that this action is timely under Section 12 of HERA

because it was "brought within three years of the date that FHFA was appointed as Conservator

of Fannie Mae and Freddie Mac."  (AC ¶¶ 327, 348, 362, 380, 395, 413, 427, 443.)  As

demonstrated below, HERA has no application to Plaintiff's federal or state securities claims for

several separate and independent reasons.

**1.    <u>HERA Does Not Apply to Statutes of Repose</u>**

**(a)    The Plain Text of Section 12 Demonstrates
that HERA Applies Only to Statutes of Limitations**

Section 12 of HERA provides, in relevant part, that:

[T]he applicable <u>statute of limitations</u> with regard to any action brought by the
Agency as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6-year period beginning on the date on which the claim accrues; or

(II) the period applicable under State Law; and

(ii) in the case of any tort claim, the longer of—

---

[16]  Given the D.C. Seurities Act's substantial similarities to the federal securities laws, case law interpreting the 1933
Act is persuasive.  *See Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006).

(I) the 3-year period beginning on the date on which the claim accrues; or

(II) the period applicable under State Law.

12 U.S.C. § 4617(b)(12)(A) (emphasis added).[17]

On its face, this provision applies only to procedural statutes of <u>limitations</u> – not

substantive statutes of <u>repose</u> such as those contained in the Securities Act and the D.C. and

Virginia Securities Acts.  It is well-established that "[t]he starting point in interpreting a statute is

its language, for '[i]f the intent of Congress is clear, that is the end of the matter.'" *Good*

*Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) (citation omitted).  Where, as here, the

statutory language is unambiguous, the Court's "'sole function . . . is to enforce it according to its

terms.'"  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *accord Bilello v.*

*JPMorgan Chase Ret. Plan*, 649 F. Supp. 2d 142, 169 (S.D.N.Y. 2009) (Cote, J.).

Here, the absence of any reference to substantive "statutes of repose" in Section

12 of HERA is fatal to Plaintiff's effort to invoke this provision.  Statutes of limitations are

"fundamentally different" from statutes of repose.  *In re Lehman Bros. Sec. & ERISA Litig.*, No.

09 MD 02017 (LAK), 2011 WL 1453790, at *3 (S.D.N.Y. Apr. 13, 2011) (Kaplan, J.).  As the

Second Circuit recently explained, "a statute of limitations creates an affirmative defense where

plaintiff failed to bring suit within a specified period of time after his cause of action accrued,

often subject to tolling principles.  By contrast, a statute of repose <u>extinguishes</u> a plaintiff's cause

of action after the passage of a fixed period of time."  *Ma*, 597 F.3d at 88 n.4 (emphasis in

original).  Indeed, statutes of repose function to bar causes of action "from ever arising . . . .  The

injured party [injured after the repose period has passed] literally has [n]o cause of action.  The

harm that has been done is *damnum absque injuria* – a wrong for which the law affords no

---

[17] HERA defines the date on which a claim accrues as the later of "(i) the date of the appointment of the Agency as conservator or receiver; or (ii) the date on which the cause of action accrues."  12 U.S.C. § 4617(b)(12)(B).

redress." *P. Stolz*, 355 F.3d at 103; *accord McCann v. Hy-Vee, Inc.*, No. 11-1459, 2011 WL 5924414, at *4-5 (7th Cir. Nov. 22, 2011) (Posner, J.) ("[A]s opposed to a statute of limitations, which begins running upon the accrual of some claim and permits equitable exceptions, . . . a statute of repose . . . 'serves as an unyielding and absolute barrier' to a cause of action, regardless of whether that cause has accrued.")

As Plaintiff has itself acknowledged, the language of HERA and FIRREA is "nearly identical" and thus the two statutes are "close analogs."[18]  As such, the court's ruling in *Resolution Trust Corp. v. Olson*, 768 F. Supp. 283 (D. Ariz. 1991), is particularly instructive.  In interpreting the materially identical provision of FIRREA,[19] the court explicitly held that the exact same statutory language at issue here, which refers only to statutes of <u>limitations</u>, cannot be read to apply to statutes of <u>repose</u> as well.  *Id.* at 285 (holding that FIRREA did not modify "substantive statutes of repose"); *see also Burlington Northern & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 362 (5th Cir. 2005) ("Literally, § 9658 states that it only preempts state law when the applicable state statute of limitations 'provides a commencement date which is earlier than the [FRCD]' – no mention of peremptory statutes or statutes of repose . . . . Section 16.012, however, is not a statute of limitations; it is a statute of repose, and the differences between statutes of limitations and statutes of repose are substantive, not merely semantic.").[20]

---

[18]  FHFA's Opp. to Motion to Stay Discovery, *Federal Housing Finance Agency v. Credit Suisse Holdings (USA), Inc.*, No. 11-cv-6200 (DLC), Docket Entry 24, at 13 n.6 (S.D.N.Y. Nov. 23, 2011); *see also* Ex. K at 21 n.21, Defendant Federal Housing Finance Agency's Motion to Dismiss and Incorporated Brief, at n.21, *Harris v. Federal National Mortgage Association*, No. 11-CV-01244-RWS (N.D. Ga. July 15, 2011) ("HERA mirrors the language of FIRREA in almost all respects.").

[19]  *Compare* 12 U.S.C. § 4617(b)(12) *with* 12 U.S.C. § 1821(d)(14).

[20]  From a policy perspective, Congress' decision to extend limitations periods without extending repose periods in FIRREA and in HERA makes sense.  Unlike limitations periods, which generally begin to run when <u>plaintiff</u> is in a position to assert its rights, repose periods generally run for "a specified time since the <u>defendant</u> acted."  *In re*

**(b)      HERA's Reference to Statutes of Limitations Cannot
Repeal By Implication the Securities Act's Statute of Repose**

Further, even if there were any ambiguity as to whether Section 12 of HERA

applies to statutes of repose (and there is none), such ambiguity must be resolved in favor of

interpreting HERA to be consistent with already-existing federal law – in this case, the three-

year statute of repose expressly contained in Section 13 of the Securities Act.  Under binding

Supreme Court precedent, "[s]tatutory repeal will not be inferred unless the later statute

'expressly contradict[s] the original act' or such a construction is <u>absolutely necessary</u> [to give the

later statute's words] <u>any meaning at all</u>.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,

551 U.S. 644, 646 (2007) (emphasis added) (citation omitted).  *See also id.* ("[r]epeals by

implication are not favored and will not be presumed <u>unless the legislature's intention to repeal</u>

<u>[is] clear and manifest</u>"); *accord Morton v. Mancari*, 417 U.S. 535, 551 (1974); 2A C. Sands,

Sᴜᴛʜᴇʀʟᴀɴᴅ Sᴛᴀᴛᴜᴛᴏʀʏ Cᴏɴsᴛʀᴜᴄᴛɪᴏɴ § 53.01, at 549-50 (4th ed. 1984 Revision).

Here, it is beyond dispute that nothing in Section 12 of HERA "expressly

contradicts" or otherwise references the statute of repose contained in Section 13 of the

Securities Act, which explicitly provides that "[<u>i]n no event</u> shall any such action be brought to

enforce a liability created under [Section 11 or Section 12(a)(1)] more than <u>three years after the</u>

<u>security was bona fide offered to the public</u>, or under [Section 12(a)(2)] of this title <u>more than</u>

<u>three years after the sale</u>."  15 U.S.C. § 77m (emphasis added).  Given that Section 12 of HERA

_____

*Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 199 (3d Cir. 2007) (emphasis added).  Extending a statute of
limitations merely lengthens a period that is already uncertain because the limitations period often is "determined by
the personal circumstances of the plaintiff, such as, for example, the date of 'discovery' or 'damage.'"  *Caviness*, 983
F.2d at 1300 n.7.  But where a claim is governed by a statute of repose, the legislature has set "a fixed date easily
determined by the defendant," after which potential defendants can rest assured that they face no outstanding claims,
serving "the need for finality in certain financial and professional dealings."  *Id.*  Extending a statute of repose upsets
these expectations in a way that extending the statute of limitations does not, especially where, as here, the purported
extension is to be triggered by a change in plaintiff's status by placement in conservatorship under the HERA statute.

refers only to "statutes of limitations" and makes no mention whatsoever of statutes of repose, these two federal statutes undeniably "are capable of co-existence," and Plaintiff's contention that HERA "repealed by implication" Section 13 of the Securities Act fails.

### (c)   A Federal Statute Cannot Be Interpreted to Re-Write State Substantive Law

Section 12 of HERA does not apply to the Virginia and D.C. state statutes of repose for the additional reason that a federal statute cannot be interpreted to re-write state substantive law to create liability under state law where it otherwise would not exist.  *See, e.g.*, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Congress has no power to declare substantive rules of common law applicable in a State, whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts.").  In *Resolution Trust*, the court considered whether the materially identical provision in FIRREA could preempt a three-month statute of repose governing certain claims brought under Arizona state law.  768 F. Supp. at 285.  Just as FHFA contends with respect to HERA here, the plaintiff in *Resolution Trust* argued that the Arizona statute of repose was tolled by the provision in FIRREA extending the applicable state statutes of limitations.  In rejecting this argument, the district court emphasized the distinction between "procedural statutes of limitations" and "substantive statutes of repose."  *Id.*  Concluding that the statute was the latter, the court held that plaintiff's suit was barred by statute of repose notwithstanding FIRREA's language extending applicable state statutes of limitations.  *Id.* at 285.

Similarly, in *United States v. Hartford Accident & Indemnity Co.*, 460 F.2d 17 (9th Cir. 1972), the Ninth Circuit affirmed the dismissal of an action brought by the federal government under a California law that contained a statute of repose requiring suits to be brought within one year after injury.  The government relied on 28 U.S.C. § 2415 – which provides statutory time limits for commencing actions brought by the United States – to argue that the

complaint could not be time-barred because it was not subject to state statutes of limitations. The court rejected this argument, holding that the statute at issue was not a statute of limitations but instead "an absolute prerequisite to accrual of any cause of action."  460 F.2d at 19.  The Court held that while there was "clear authority for the proposition that an action vested in the United States cannot be defeated by a state statute of limitations," there was no support for the proposition that "considerations of federal supremacy can create a cause of action where none exists under state law or otherwise."  *Id.* at 19 (emphasis added); *see also United States v. Cal.*, 932 F.2d 1346, 1351 (9th Cir. 1991), *aff'd*, 507 U.S. 746 (1993); c*f. United States v. Harpootlian*, 24 F.2d 646, 649 (2d Cir. 1928).

Here, the statutes of repose contained in the Virginia and D.C. Securities Acts – like the three-year statute of repose in Section 13 of the Securities Act – create a substantive "condition precedent to the bringing  of suit."  *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 531 (S.D.N.Y. 2010) (Sullivan, J.); s*ee supra* at pp. 12-13. Accordingly, neither HERA nor any other federal law can extend statutes of repose to create a state cause of action where one otherwise would not exist.

2.      **Section 12 of HERA Does Not Apply to Federal Claims**

HERA cannot save Plaintiff's federal securities claims from dismissal for the independent reason that this provision, on its face, applies only to state – not federal – statutes of limitations.  Specifically, Sections 12(i) and 12(ii) of HERA each expressly provide that the statute of limitations shall be the longer of either six or three years, respectively, from the date of the appointment of the conservatorship or "the period applicable under State law." 12 U.S.C. § 4617(b)(12)(A) (emphasis added).  Indeed, other provisions of HERA make clear that Congress knew how to reference both state and federal law when it so intended.  *See* 12 U.S.C. § 4617(i)(7)(A)(iii) ("The transfer of any assets or liabilities of a regulated entity in default or in

18

danger of default to a limited-life regulated entity shall be effective without any further approval under <u>Federal or State law</u>. . . ."); *see also* 12 U.S.C. § 4617(a)(3)(B).  In interpreting other statutes that reference only "state law," courts have repeatedly rejected any construction that would include "federal law."  *See, e.g.*, *Nghiem v. U.S. Dep't of Veterans Affairs*, 451 F. Supp. 2d 599, 603-604 (S.D.N.Y. 2006) (Holwell, J.) ("The plain language of [Section 1981 which refers to 'state law'] very plainly does not include actions taken under color of federal law"); *accord* *Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005) ("This court has long construed the phrase 'under color of state law' . . . to apply only to state actors, not federal officials").

        **(a)**      **Plaintiff's "Interpretation" of**
                      **HERA Would Lead to Perverse Results**

        Adopting Plaintiff's contention that HERA should be "interpreted" to apply to federal, as well as state, claims would lead to the perverse result that this statute would operate to <u>shorten</u> the time for which FHFA could assert certain claims.  For example, absent application of HERA, civil claims under Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") would be subject to a four-year statute of limitations running from the date plaintiff is on inquiry notice of its injury.  *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009).  Applying HERA's "tort claim" provision to federal claims, however, as Plaintiff urges, the time to assert a RICO claim would be <u>shortened</u> to the "3-year period beginning on the date on which the claim accrues" – instead of the applicable four-year period triggered by plaintiff's inquiry notice – because RICO claims have no "period applicable under State law."

        **(b)**      **Any Ambiguity Must Be Resolved in Favor of Interpreting**
                      **HERA as Consistent with Already-Existing Federal Law**

        Finally, to the extent the Court finds any ambiguity in Section 12 concerning HERA's inapplicability to federal law claims, such ambiguity must be resolved in favor of

reading HERA to be consistent with the three-year statute of repose expressly contained in

Section 13 of the Securities Act.  Indeed, given that Section 12 of HERA refers only to "state

law" and makes no mention whatsoever of federal law claims, these two federal statutes

undeniably "are capable of co-existence."  Accordingly, Plaintiff's contention that this Court

should interpret HERA to apply to federal claims is also foreclosed by the well-established

doctrine that federal statutes may not be "repealed by implication."[21]  (*See supra* at p. 16 .)[22]

## C.   Fannie Mae's Tolling Agreement Does Not Save Its Claims

Plaintiff's contention that "[t]he time period since May 20, 2009, is tolled for

statute of limitations purposes by virtue of a tolling agreement entered into between Fannie Mae,

UBS Securities, UBS Real Estate, and MASTR" (AC ¶¶ 327) is also unavailing.  As a threshold

issue, the Tolling Agreement does not – and is not alleged to – cover any of the Certificates

purchased by Freddie Mac, which was not even a signatory to the Agreement.[23]  Moreover, the

agreement purports to apply only to six of the Certificates purchased by Fannie Mae.[24]

---

[21]  Section 12 of HERA is also inapplicable because it only extends the statute of limitations for state law "contract" and "tort" claims, 12 U.S.C. § 4617(b)(12)(A); it does not mention statutory claims such as those alleged here.  *See, e.g., Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir. 1989) (Section 12(2), which is based on rescission, is not derived from tort law principles).

[22]  Even if the Court disagreed as to each of these arguments, HERA still cannot save Plaintiff's Section 11 claims as to seven of the Certificates.  The effective date of the first three Registration Statements listed in Table 2 of the Amended Complaint (AC ¶ 39) – which covers seven of the Certificates at issue – occurred prior to September 6, 2005.  Specifically, the Registration Statement covering ARSI 2006-W3 (Reg. Stmt #333-121782) was deemed effective on January 14, 2005 (Ex. L); the Registration Statement covering MABS 2005-WF1, MABS 2005-FRE1, MABS 2005-HE2 and MARM 2005-8 (Reg. Stmt #333-124678) was deemed effective on June 2, 2005 (Ex. M); and the Registration Statement covering INABS 2005-C and INABS 2005-D (Reg Stmt #333-127617) was deemed effective on August 22, 2005 (Ex. N).  Accordingly, Section 11's three-year statute of statute of repose, which began to run as of the effective date of those registration statements (*see supra* note 13), expired prior to September 6, 2008 – the date Fannie Mae and Freddie Mac were placed into conservatorship.  Because Section 13(B) of HERA explicitly provides that the statute will not revive any claims for which the statute of limitations already has expired unless the claim "aris[es] from fraud [or] intentional misconduct," 12 U.S.C. § 4617(b)(13)(B), Plaintiff's Section 11 claims are barred as to these seven Certificates even if HERA were to apply.

[23]  The Tolling Agreement cannot toll any claims against the Individual Defendants because Plaintiff does not allege that they were signatories to the Agreement, much less that they were even employees at the time of its execution.

[24]  Two of these six Certificates – MARM 2005-8 and MARM 2006-2 – were purchased prior to May 20, 2006, and

In any event, because statutes of repose extinguish altogether the underlying claim, courts have repeatedly held that they may not be tolled through private agreement.  For example, in *Mid State Horticultural Co. v. Pa. R. Co.*, 320 U.S. 356 (1943), the Supreme Court held that an agreement to waive the three-year statute of repose contained in the Interstate Commerce Act was invalid as violating the intent of Congress, which had created an absolute bar to ensure the timely collection of charges.[25]  In reaching its holding, the Supreme Court distinguished between statutes that "extinguish the right which is the foundation for the claim" and those which serve "merely to bar the remedy for its enforcement."  *Id.* at 358-59.  In concluding that the statute was the former, the court held that "the bar is absolute and invariable by any act of the parties."  *Id.*

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), the Supreme Court held that the (then-applicable) three-year statute of repose in Section 13 establishes an outer limit that is "inconsistent with tolling."  *Id.* at 363.  As the Court held, in language squarely applicable here, "[b]ecause the purpose of the 3-year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period."  *Id.*

Applying this controlling precedent to the Securities Act's three-year statute of repose, several recent decisions in this District have unequivocally held that this statute of repose is "absolute" and subject to only "legislatively created exceptions . . . set forth in the statute of repose."  *Footbridge*, 770 F. Supp. 2d at 622 ("A statute of repose extinguishes the claim after a fixed period of time . . . .  Section 13's plain language sets forth '<u>an absolute limitation</u>.'" (emphasis added)).  As Judge Kaplan recently held, the Securities Act's three-year statute of

---

thus were already barred by the federal and D.C. Securities Act's three-year statutes of repose at the time of the Agreement's execution on May 20, 2009.  Because the Tolling Agreement explicitly provides that it does not "preclude [UBS] from raising as a defense that any claim lapsed prior to the Effective Date of this Agreement," it cannot revive the already-expired federal and D.C. Securities Act claims with respect to these Certificates.

[25]  The statute of repose provided that "all actions at law by carriers subject to this Act . . . shall be begun within three years from the time the cause of action accrues, and not after."  320 U.S. at 357.

repose is not subject to "any other form of tolling."  *In re IndyMac Mortgage-Backed Sec. Litig.*,

No. 09 Civ. 4583, 2011 WL 2508254, at *2 (S.D.N.Y. 2011); *Lehman*, 2011 WL 1453790, at *3.

Other federal courts have repeatedly held that tolling agreements may not be invoked to toll

statutes of repose.  *See, e.g.*, *SEI Hawaiian Cogenerators, Inc. v. ABB Hawaiian Cogeneration,*

*Inc.*, No. 95-00048-ACK, at 12-16 (D. Haw. June 30, 1995) (tolling agreement may not extend

three-year statute of repose following *Lampf*) (*see* Ex. O); *Stone & Webster Eng'g Corp. v.*

*Duquesne Light Co.*, 79 F. Supp. 2d 1, 3-4, 7-8 (D. Mass. 2000) (agreement not to "plead or rely

upon any time-related defense" did not preclude application of statute of repose barring liability);

*accord In re Commercial Fin. Servs., Inc.*, 294 B.R. 164, 172 (Bankr. N.D. Okla. 2003); *In re*

*Outboard Marine Corp.*, 299 B.R. 488 (Bankr. N.D. Ill. 2003).

## II.     PLAINTIFF'S FEDERAL CLAIMS  AND CLAIMS UNDER THE D.C. SECURITIES ACT ARE BARRED BY THE ONE-YEAR DISCOVERY PERIOD

Plaintiff's federal and D.C. Securities Act claims should also be dismissed because

they are barred by the applicable one-year statute of limitations.  In addition to the three-year

absolute period of repose, Section 13 of the Securities Act also provides that "[n]o action shall be

maintained to enforce any liability created under [Section 11 or Section 12(a)(2)] unless brought

within one year after the discovery of the untrue statement or omission, or after such discovery

should have been made by the exercise of reasonable diligence."[26]  15 U.S.C. § 77m.[27]  In

---

[26]  The D.C. Securities Act's statute of limitations – which is modeled after the Securities Act – also expires one year "after the discovery of the untrue statement or omission or after the discovery should have been made by the exercise of reasonable diligence," D.C. Code § 31-5606.05(f)(2)(B) (2009), and thus Plaintiff's claims under that statute are barred for the same reasons.

[27]  FHFA has an affirmative burden to plead and prove facts demonstrating its compliance with the one-year discovery rule.  *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).  To satisfy this burden, a complaint must set forth with particularity:  "(1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier . . . . ; and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery."  *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 631 (S.D.N.Y. 1993).  FHFA's conclusory allegation that "[t]his action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12

contrast to Section 10(b) fraud claims, where a plaintiff must be on notice of facts relating to

defendant's scienter, *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1801 (2010), a Section 11 or

12(a)(2) plaintiff is "on inquiry notice when it learns of the probability of an earlier 'untrue

statement' or 'omission,' [known as "storm warnings"] not when it learns a misstatement involved

fraud." *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 288 (S.D.N.Y. 2009) (Cote, J.);

*accord Footbridge*, 770 F. Supp. 2d at 623; *see Merck*, 130 S. Ct. at 1801 (concurrence, Scalia, J.)

("determining when the plaintiff should have uncovered an untrue assertion in a registration

statement or prospectus is much simpler than assessing when a plaintiff should have learned that

the defendant deliberately misled him using a deceptive device covered by [Section] 10(b)").[28]

Although the "storm warnings" must relate to the misrepresentations and

omissions at issue, "they need not detail every aspect of the alleged scheme." *NovaGold*, 629 F.

Supp. 2d at 285.  "[R]ather, the plaintiff simply needs to have a 'hint' or 'suspicion' of the injury

and its cause to be put on inquiry notice." *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38,

48 (S.D.N.Y. 2001).[29]  Moreover, the Second Circuit repeatedly has held that "'[w]here inquiry

---

U.S.C. § 4617(b)(12)" (AC ¶ 327) does not address whether it complied with Section 13's one-year inquiry notice requirement and thus is entirely insufficient.  For this reason, the Amended Complaint should be dismissed.  *Chaus*, 801 F. Supp. at 1265.

[28]  As Judge Kaplan made clear in *IndyMac*, *Merck* does not apply to Securities Act claims.  *See IndyMac*, 2011 WL 2508254, at *7 ("[T]he Supreme Court's decision in [Merck], which held that inquiry notice does not trigger the statute of limitations in the specific context of [Section 10(b) claims] – which is not at issue here – based on the precise language of that statute.  That holding does not apply [to Securities Act claims].").

[29]  Although this Court has held that a plaintiff's lack of sophistication does not excuse a plaintiff on inquiry notice from bringing suit within one year, *see Cosmos Import & Export Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96 CIV. 6224(DLC), 1997 WL 328068, at *5 (S.D.N.Y. June 16, 1997) (Cote, J.), a number of courts in this District have held that an investor's heightened sophistication and experience is properly considered when addressing whether it was on inquiry notice of its claims.  *See GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 332 (S.D.N.Y. 2008) (Sweet, J.) (citing *Lenz v. Associated Inns & Restaurants Co. of Am.*, 833 F. Supp. 362, 376 (S.D.N.Y. 1993)); *Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 811 n.3 (S.D.N.Y. 1994) (Schwartz, J.) ("It is well settled that a court may consider the sophistication of a plaintiff investor in evaluating issues of inquiry notice") (citing cases).  While Fannie Mae and Freddie Mac were admittedly among the most sophisticated purchasers of RMBS, they were on inquiry notice of the alleged misstatements under any standard.

notice is clearly established, dismissal of a . . . complaint as untimely may be readily affirmed.'"

*Shah v. Meeker*, 435 F.3d 244, 248 (2d Cir. 2006) (citation omitted); *accord LC Capital Partners,*

*LP v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003).[30]

      Here, even assuming *arguendo* that HERA applies to Plaintiff's claims (which it

does not, *see supra* at § I.B), they are still time-barred because Fannie Mae and Freddie Mac

were on inquiry notice of their claims prior to <u>September 6, 2007</u> – one year before they were

placed in conservatorship.[31]  The Amended Complaint alleges that the registration statements for

the Certificates "falsely represented that the underlying mortgage loans complied with certain

underwriting guidelines and standards, including representations that significantly overstated the

borrowers' capacity to repay their mortgage loans" and that such misrepresentations were "due to

widespread falsification of borrowers' income and debt [and] inflated property values."  (AC ¶ 1,

4, 6, 10-11).  Plaintiff bases these allegations on (i) "government investigations into originators'

underwriting practices, which have revealed widespread abandonment of originators' reported

underwriting guidelines during the relevant period"; (ii) "the collapse of the Certificates' credit

ratings"; and (iii) "the surge in delinquency and default in the mortgages in the Securitizations."

---

[30]  It is also well-established that "the court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action' without converting the motion into one for summary judgment." *Jackson v. Broadcast Music, Inc.*, No. 04 CV 5948, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006) (Greisa, J.) (citation omitted).  It is also "proper to take judicial notice of the <u>fact</u> that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Shah*, 435 F.3d at 249; *accord Marshall v. Milberg LLP*, No. 07 Civ. 6950, 2009 WL 5177975, at *3-4 (S.D.N.Y. Dec. 23, 2009) (Preska, C.J.) ("Even a single news article can place a plaintiff on inquiry notice.").

[31]  Section 13(B) of HERA explicitly provides that the statute will not revive any claims for which the statute of limitations already has expired prior to conservatorship unless the claim "aris[es] from fraud [or] intentional misconduct."  12 U.S.C. § 4617(b)(13)(B).  Here, Plaintiff has not even attempted to plead intentional misconduct and, in fact, has expressly disclaimed any allegation of fraud.  (*See, e.g.*, AC ¶ 315 ("<u>Plaintiff expressly excludes any allegation that could be construed as alleging fraud.</u>").)

If HERA does not apply to Plaintiff's claims, then Plaintiff's claims are time-barred if Plaintiff was on notice of the claims prior to May 20, 2008 – one year before the Tolling Agreement was executed.

(AC ¶ 258.)[32]  As demonstrated below, Fannie Mae and Freddie Mac were on notice of all three

of these purported bases for their claims by September 6, 2007.

### A.    Fannie Mae and Freddie Mac Have Already Admitted They Were On Notice of the Misrepresentations and Omissions About Which They Complain

Although Fannie Mae and Freddie Mac claim they were misled concerning the

Originators' adherence to underwriting standards for the loans backing the Certificates, Freddie

Mac admitted in earlier litigation that it was aware of this same issue with respect to at least one

of the Originators whose loans were included in the Certificates it purchased.  Specifically, on

August 2, 2007, Freddie Mac sued American Home Mortgage ("AHM") claiming, *inter alia*, that

AHM's financial deterioration prevented the company from complying with Freddie Mac's

requests that AHM repurchase certain loans "determined to be of non-investment quality," and

that "AHM has failed to maintain qualified loan origination or servicing staff and/or adequate

facilities to assure . . . the investment quality of the Mortgages sold to [Freddie Mac]."  (*See* Ex.

P, Complaint and Appended Letter dated August 1, 2007, *Fed. Home Loan Mortg. Corp. v. Am.

Home Mortg. Corp.*, 07-cv-1335 (N.D. Tex. Aug. 2, 2007).)  Freddie Mac alleged that it had

notified AHM that its eligibility to sell or service loans "was terminated immediately," and also

admitted that it "is continuing its review of loans sold by AHM and additional repurchases may

be issued as a result."  (*Id.* at 13.)  It is difficult to imagine a more unequivocal admission of

inquiry notice than Freddie Mac's allegation that it is reviewing loans because it is aware that

AHM failed to repurchase loans "determined to be of non-investment quality."  (*Id.*)  As set forth

below, AHM's own shareholders also brought suit against AHM in July 2007.  (*See infra* at 30.)

---

[32]  Plaintiff also relies on a purported "forensic review" of certain loans from two of the 22 Certificates but pleads no facts, as required by Section 13, demonstrating why it could not have performed this review prior to September 2007. *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 2:11-CV-05236, 2011 WL 5067128, at *12 (C.D. Cal. Oct. 21, 2011) plaintiff was on inquiry notice because facts underlying its"loan-level" analysis were available years earlier).

Moreover, as of September 6, 2007, dozens of other lawsuits had been brought against the Originators alleging that they had disregarded underwriting guidelines and inflated appraisals, some of which specifically allege that Fannie Mae and Freddie Mac were being defrauded.  (*See, e.g.*, Ex. Q at ¶ 1, Corrected Third Amended Complaint, *Fitzhugh v. Countrywide Fin. Corp.*, No. 04-6830 B (D.C. Super. Ct. Sept. 13, 2004) (Countrywide perpetrated a "fraud and predatory lending conspiracy . . . designed to deceive the Federal Housing Administration ('FHA'), Fannie Mae, investors and Plaintiffs"); Ex. R at ¶ 33, Class Action Complaint, *Cedeno* v. *IndyMac Bancorp, Inc.*, No. 06 CV 06438 (S.D.N.Y. filed Aug. 25, 2006) (IndyMac had "conspired to mislead regulators and Secondary Market buyers of loans, including 'Fannie Mae' and 'Freddie Mac' . . . to allow [IndyMac] to continue practices designed to improperly inflate appraisal values and violate FIRREA, its regulations and Guidelines").)

Further, while Plaintiff bases its allegations on "the surge in delinquency and default in the mortgages in the Securitizations" (*see, e.g.*, AC ¶¶ 258, 307), Fannie Mae and Freddie Mac had full access to loan performance data for the Certificates from publicly-available monthly trustee reports.  For example, the monthly remittance reports for MABS 2006-FRE2 showed that the percentage of delinquent loans spiked from under 3% in June 2006 to over 12.5% in August 2007.  (Ex. S, MABS 2006-FRE2 Remittance Reports.)  Likewise, the remittance reports for MABS 2006-WMC4 show that the percentage of delinquent loans jumped from approximately 3% in December 2006 to over 10% in August 2007.  (Ex. T, MABS 2006-WMC4 Remittance Reports.)  Accordingly, Plaintiff's own purported basis for its claims – *i.e.*, that the poor performance of the loans demonstrates the abandonment of underwriting guidelines – was available to Fannie Mae and Freddie Mac well before September 6, 2007.  *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS), 2010 WL

3239430, at *7 (S.D.N.Y, Aug. 17, 2010) (Swain, J.) (plaintiffs were on inquiry notice of claims based in part on fact that they received monthly reports showing increases in delinquencies).

Additionally, prior to September 2007, Fannie Mae and Freddie Mac were being warned by their own employees of the risks involved with subprime loans such as those underlying the Certificates.  For example, when testifying before the Congressional Committee on Oversight and Government Reform, former Fannie Mae chief executive officer Daniel Mudd admitted that, as far back as 2005, the company was well aware of the significant risks involved in investing in subprime and other nontraditional mortgages.  (*See* Ex. U, Testimony before the Committee on Oversight and Government Reform: "The Role of Fannie Mae and Freddie Mac in the Financial Crisis," at 60 (December 9, 2008).)

In October 2006, bank regulators issued guidance on underwriting practices for nontraditional mortgage loans like those backing the Certificates at issue here.  When Fannie Mae and Freddie Mac did not voluntarily comply with this guidance, their previous regulator specifically directed them to "[d]esign and implement internal controls to ensure that mortgages purchased and guaranteed by [Freddie Mac] meet the underwriting and consumer protection standards of the guidance."  (Ex. V, Letters from James Lockhart to Richard Syron and Daniel Mudd (Dec. 8, 2006).)

Similarly, in its 10-K filing for 2006, Fannie Mae admitted it "relaxed some of [its] underwriting criteria to obtain goals-qualifying mortgage loans and increased [its] investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could further increase our credit losses."  (Ex. W at 27, Fannie Mae 10-K (filed Aug. 16, 2007).)  The 10-K further admitted that because Fannie Mae "use[s] a process of delegated underwriting . . . [it does] not independently verify most borrower

27

information that is provided to [it]," and that this exposes it to risk of "mortgage fraud."  (*Id.* at 66 (emphasis added).)  Finally, it recognized that from 2001 to mid-2006, "there was a relaxation of credit underwriting standards, as the Subprime and Alt-A sectors grew rapidly."  (*Id.* at 47.)

**B.     Fannie Mae and Freddie Mac Were on Notice of Their Claims Based on Lawsuits and Extensive Media Coverage Involving the Originators**

Although it is well-established that storm warnings need not be "company-specific" to place Plaintiff on inquiry notice, *see Staehr*, 547 F.3d at 432, here, there were myriad storm warnings concerning the underwriting practices of most of the specific Originators identified in the Amended Complaint.  For example, with respect to Countrywide – which originated loans backing the MARM 2005-8 and MARM 2007-3 Certificates (AC ¶¶ 143, 211) – Judge Pfaelzer determined on a motion to dismiss that a plaintiff far less sophisticated than Fannie Mae or Freddie Mac was on inquiry notice of its securities fraud claims concerning Countrywide's loan origination practices by 2007 and, on that basis, dismissed the complaint as time barred.  *Stichting Pensionenfonds ABP v. Countrywide Fin. Corp.*, No. 10-CV-07275 MRP (MANx), 2011 WL 3558173 (C.D. Cal. Aug. 9, 2011).

The court began its analysis by recognizing that the "gravamen" of plaintiff's Section 10(b) claim is that Countrywide knowingly and systematically abandoned its underwriting practices beginning in 2003.  *Id.* at *7.  After reviewing some of the key allegations in Countrywide-related complaints, the court held that Plaintiff was on inquiry notice of its claims "by 2007."  *Id.* at *11.  In reaching its decision, the *Stichting* court relied on a lawsuit filed in August 2007 against Countrywide, *id.* at *8, which alleged that Countrywide concealed "the erosion of underwriting guidelines . . . baked into the Company's loan portfolio."  (Ex. X at ¶ 16, Complaint, *Pappas v. Countrywide Fin. Corp.* (*In re Countrywide Fin. Corp. Sec. Litig.*), No. 07-CV-05295 MRP (MANx) (C.D. Cal. originally filed Aug. 14, 2007).)  This finding

applies with even greater force here, given that Plaintiff's Securities Act claims as pled do not require allegations of scienter.[33]

As demonstrated below, there were myriad lawsuits, news articles and other storm warnings with respect to most of the other Originators identified in the Amended Complaint. Standing alone, each of the following storm warnings was sufficient to put Fannie Mae and Freddie Mac on notice of their Securities Act claims here before September 2007; taken together, these storm warnings establish unassailably that they had the requisite notice by then.

### 1.    IndyMac Bank ("IndyMac")

Plaintiff alleges that IndyMac originated loans backing six Certificates:  INABS 2005-C; INABS 2005-D; INABS 2006-D; INABS 2007-A; MARM 2007-1; and MARM 2007-3 Certificates.  (AC ¶¶ 88, 96, 103, 111, 196, 211.)  In August 2006, IndyMac's residential home mortgage borrowers filed a class action in this Court predicated specifically on IndyMac's alleged practice of approving inflated appraisals – the same allegation made by Plaintiff here. (*Id.* ¶ 256.)  The IndyMac complaint alleged a systematic and continued failure to provide independent and effective appraisals and evaluations.  (Ex. R , Complaint, *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438  (S.D.N.Y. filed Aug. 25, 2006).)  Similarly, in March 2007, shareholders filed a lawsuit in federal court based on IndyMac's  problematic internal

---

[33]  In addition to the August 2007 lawsuit filed against Countrywide, other public information put Fannie Mae and Freddie Mac on notice of their claims regarding Countrywide's origination practices prior to September 2007.  For example, as Judge Pfaelzer expressly recognized, "Countrywide took a charge against earnings in July of 2007. That charge was directly related to the quality of the loans Countrywide was underwriting."  *Allstate*, 2011 WL 5067128, at *14.  Also, an August 2007 article from The New York Times asserted that "Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided." (Ex. Y, Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times (Aug. 26, 2007).) Finally, in August 2007, Senator Charles Schumer publicly called on Countrywide to stop paying higher commissions to brokers who steer borrowers to high-cost loans that are "designed to fail."  (Ex. Z, Alison Vekshin, *Schumer Urges Countrywide to Help Refinance Loans*, Bloomberg.com (Aug. 29, 2007).)

controls and underwriting practices.  (Ex. AA ¶¶ 10, 37, Complaint, *Reese v. IndyMac Bancorp*

*Inc., et al.*, No. 07-CV-01635-GW-VBK (C.D. Cal. filed Mar. 12, 2007).)

 **2.**   **AHM**

   AHM originated loans backing the MARM 2005-8 and MARM 2006-OA1

Certificates.  (AC ¶¶ 143, 158.)  In addition to Freddie Mac's own suit against AHM in August

2007 (*see supra* at p. 25), several other lawsuits and news articles emerged prior to September

2007 that clearly put Fannie Mae and Freddie Mac on notice of their claims with respect to

Certificates backed by AHM loans.  For example:

- On July 31, 2007, a lawsuit was filed against AHM alleging that the company misled the public regarding its business operations and failed to disclose that it "was experiencing an increasing level of loan delinquencies" and the value of its loans "had declined substantially in value."  (*See* Ex.BB at ¶ 26, Complaint, *Greenberg v. Am. Home Mort. Inv. Corp.*, No. 07 cv 3152 (E.D.N.Y. filed on July 31, 2007).)

- AHM filed for bankruptcy on August 6, 2007, triggering additional lawsuits.  (Ex. CC, Petition, *In re American Home Mortgage, Inc.*, No. 07-11047 (Bankr. D. Del. filed Aug. 6, 2007).)[34]

- In July 2007, Forbes.com reported that AHM "makes loans to home buyers with less-than-sterling credit histories and/or little or no documentation."  (Ex. DD, Ruthie Ackerman, *AHM Infected by Subprime Problems*, Forbes.com (July 26, 2007).)

- In August 2007, Newsday.com reported the criminal convictions of several former AHM employees, detailing internal e-mails that stated "[a]t AHM, we pride ourselves on having a loan for virtually any borrower, regardless of whether or not they have the ability to verify their Income, Assets or Employment history."  (Ex. EE, Daniel Wagner, *Ex-American Mortgage Manager Going to Prison*, Newsday.com (Aug. 28, 2007).)

 **3.**   **Fremont Investment & Loan ("Fremont")**

   Fremont originated loans underlying the MABS 2005-FRE1, FHLT 2006-B and

---

[34]  Standing alone, AHM's bankruptcy announcement was sufficient to put Fannie Mae and Freddie Mac on notice of their potential claims related to AHM.  *See, e.g., Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 312 (S.D.N.Y. 1996) (inquiry notice based on bankruptcy of issuer); *In re Integrated*, 815 F. Supp. at 665 (inquiry notice based on coverage of company's financial demise).

MABS 2006-FRE2 Certificates.  (AC ¶¶ 82, 124, 165.)  On March 7, 2007, the FDIC announced

that it had issued a cease and desist order against Fremont because it found that the company

"was operating without effective risk management policies and procedures in place in relation to

its subprime mortgage and commercial real estate lending," and that Fremont "had been

operating without adequate subprime mortgage loan underwriting criteria."  The order required

Fremont, *inter alia*, to adopt a new subprime mortgage lending policy.  (Ex. FF, FDIC Press

Release (Mar. 7, 2007).)[35]  The following additional information regarding Fremont's loan

origination standards was publicly available prior to September 2007:

- In April 2007, Fremont employees sued the company, claiming the company's stock was an imprudent investment because of Fremont's "unsound underwriting, risk management, and lending practices" and "inadequate underwriting"  (Ex. GG at 9, 12, Complaint, *McCoy v. Fremont*, 07-cv-02693 (C.D. Cal. Apr. 7, 2007).)

- On June 18, 2007, a lawsuit was filed in federal court by master servicer Aurora Loan Services LLC against Fremont for breaches of representations and warranties regarding the loans Fremont originated.  (Ex. HH at 2, Complaint, *Aurora Loan Servs. LLC v. Fremont Investment & Loan Corp.*, 07-cv-1284 (D. Colo. filed June 18, 2007).)  The complaint alleges that "the large number of questionable Fremont loans at issue in this case, for which Plaintiffs seek repurchase or damages from Fremont, result from Fremont's inadequate underwriting practices and questionable marketing practices, as cited by the FDIC."  (*Id.* at 2.)

- On June 18, 2008, Fremont's parent company, Fremont General Corporation filed for Chapter 11 bankruptcy on June 18, 2008.  No. 08-bk-13421-ES (C.D. Cal.).

- In August 2007, Reuters noted downgrades on "deals . . . dominated by loans made by Fremont General Corp. . . . ."  (Ex. II, *Fitch subprime downgrades hit Barclays, Merrill*, Reuters.com (Aug. 1, 2007).)

## 4.    New Century Mortgage ("New Century")

New Century originated loans underlying the MABS 2005-HE2, MABS 2006-

NC2 and MABS 2006-NC3 Certificates.  (AC ¶¶ 130, 179, 191.)  The following public

---

[35]  In fact, Plaintiff relies on a similar cease and desist order issued with respect to Wells Fargo, another Originator in this case, as support for its allegation that the Originators abandoned their underwriting standards.  (AC ¶ 281.)

information regarding New Century's lending practices was available prior to September 2007:

- On February 7, 2007, New Century announced that it would restate its financial results for the first three quarters of 2006 because the company had failed to account for all of the defective loans it had been forced to repurchase.  (Ex. JJ, New Century Form 8-K (February 7, 2007).)  The next day, a lawsuit was filed on behalf of purchasers of New Century shares alleging securities law violations based on the company's announcement.  (Ex. KK, Complaint, *Gold v. Morrice*, No. 07-CV-00931 (C.D. Cal. Feb. 8, 2007).)

- In March 2007, The New York Times reported on the high rates of delinquency of loans sold by New Century for securitization in 2005, and noted that New Century faced over $469 million in put back claims as a result of the early payment defaults. (Ex. LL, Julie Creswell & Vikas Bajaj, *A Mortgage Crisis Begins to Spiral, and the Casualties Mount*, The New York Times (Mar. 5, 2007).)

- Also in March 2007, the Ohio Attorney General and the Ohio Department of Commerce entered into a stipulated preliminary injunction against New Century arising in part out of its predatory lending practices.  (Ex. MM, Press Release, Office of the Attorney General, State of Ohio.)

- On April 2, 2007, New Century filed for Chapter 11 bankruptcy.  *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. D. Del. filed Apr. 2, 2007); (Ex. NN, Bradley Keoun & Steven Church, *New Century, Biggest Subprime Casualty, Goes Bankrupt*, Bloomberg (Apr. 2, 2007).)

- On May 7, 2007, the Washington Post reported that "a detailed inquiry into the situation at New Century and other subprime lenders suggests that in the feeding frenzy for housing loans, basic quality controls were ignored . . . ."  (Ex. OO, David Cho, *Pressure at Mortgage Firm Led To Mass Approval of Bad Loans*, Washington Post (May 7, 2007).)

### 5.   **MILA, Inc. ("MILA")**

MILA allegedly originated loans underlying the MABS 2005-HE2 Certificate. (AC ¶ 130.)  On October 27, 2006 and May 17, 2007, respectively, two lawsuits were brought in federal court by a mortgage loan purchaser against MILA alleging that the originator sold loans that "were underwritten and/or originated based upon materially inaccurate information or on material misrepresentations made by the borrower," and that "MILA failed to cure the defect or defects in all [the loans] during the cure period [plaintiff] provided" (Ex. PP at ¶ 5, Complaint, *Citimortgage, Inc. v. Mila, Inc.*, No. 06-cv-1586 (E.D. Mo. October 27, 2006); Ex. QQ at ¶¶ 3-5,

Complaint, *Citimortgage, Inc. v. Mila, Inc.*, No. 07-cv-0989 (E.D. No. May 17, 2007).)

Moreover, in July 2007, MILA filed for Chapter 11 bankruptcy in the Western District of

Washington.  No. 07-13059-KAO (W.D. Wash. July 2, 2007).

### 6.   WMC Mortgage Corp. ("WMC")

According to the Amended Complaint, WMC originated loans underlying the

MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-WMC4 and MABS 2007-WMC1

Certificates.  (AC ¶¶ 169, 176, 204.)  Several news articles published prior to September 2007

detail extensive problems regarding WMC's origination practices:

- In March 2007, Reuters reported that WMC was "responsible for some of the worst-performing loans" in the subprime market.  (Ex. RR, Al Yoon, GE's *WMC Mortgage Loans Hit Subprime ABX Index*, Reuters (Mar. 10, 2007).)

- Also in March 2007, the *New York Times* reported that WMC issued loans based on fraudulent income and asset disclosures unknown to the borrower.  (Ex. SS, Vikas Bajaj, *For Some Subprime Borrowers, Few Good Choices*, The New York Times (Mar. 22, 2007).)

- In July 2007, another article announced that General Electric was looking to sell WMC and "abandon the subprime mortgage market" due to the negative effects of the subprime environment.  (Ex. TT, *General Electric to Sell WMC Mortgage, a Subprime Loan Unit*, The New York Times (July 13, 2007).)

### 7.   Argent Mortgage Company ("Argent")

The Amended Complaint alleges that Argent originated the loans backing the

ARSI 2006-W3 certificate.  (AC ¶ 75.)  Borrowers nationwide brought a number of purported

class action lawsuits against Argent and its mortgage lending affiliate Ameriquest Mortgage

Company as early as 2005.  *See In Re Ameriquest Mortgage Co. Mortgage Lending Practices

Litig.*, MDL No. 1715, Docket Entry 1 (N.D. Ill.).  A consolidated complaint, filed on December

6, 2006, alleged that Argent and Ameriquest "engaged in uniform unfair, unconscionable,

deceptive and unlawful commercial practices in soliciting and closing residential mortgage

transactions nationwide" and "target[ed] consumers for predatory, 'subprime' home loans and

33

induce[d] borrowers to enter into unfair and deceptive residential mortgages without regard for the homeowners' interests or ability to pay."  (Ex. UU at ¶ 5, Complaint, *In re Ameriquest Mortgage Co. Mortgage Lending Practices Litig.*)

### 8.    Option One Mortgage Corporation ("Option One")

The Amended Complaint alleges that Option One originated loans backing the MABS 2007-HE2 Certificate.  (AC ¶ 220.)  The MABS 2007-HE2 Prospectus Supplement itself, which Fannie Mae and Freddie Mac relied upon when purchasing the certificate on August 30, 2007 (AC ¶ 437), disclosed the existence of an impending lawsuit by the Ohio Attorney General against subprime mortgage lenders and Wall Street investment banks, and an investigation by New York Attorney General regarding subprime lending practices.  (MABS 2007-HE2 Pros. Supp. at 20.)  With respect to both of these announcements, Option One stated that it "has no reason to believe that Option One Mortgage Corporation will be excluded" from the investigation and lawsuit.  (*Id.*)  The following additional information regarding Option One's loan origination standards was publicly available prior to September 2007:

- In March 2007, Option One's President Steve Nadon said to a mortgage conference that "We have not had rational pricing or underwriting criteria for the last 12 months. The trend of rising early payment defaults was evident for some time and we should have raised our rates in response but we did not because we were afraid our competition wouldn't."  (Ex. VV, Lew Sichelman, *Millions May Be Unable to Refinance Home Loans*, National Mortgage News (Mar. 26, 2007).)

- In April 2007, Option One's parent company announced it would likely take a noncash impairment charge of $320 million on its investment in Option One, because of a "surge in defaults on subprime mortgages."  (Ex. WW, *H&R Block Agreeme to Sell Subprime Unit, Sees Loss For Year*, CNBC.com (Apr. 20, 2007).)

## III.   FHFA LACKS STANDING TO BRING THIS ACTION

In addition to being time-barred under the applicable statutes of repose and statutes of limitations, the complaint should be dismissed in its entirety because FHFA lacks standing to prosecute this case.

**A.    The Provision Under Which James Lockhart**
       **Assumed Office, 12 U.S.C. § 4512(b)(5), Is Unconstitutional**

As a threshold issue, the appointment of James Lockhart by Congress as the original Acting Director of FHFA was unconstitutional.  Under the Appointments Clause, "[the President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  The Constitution does not permit Congress to appoint officers.[36]  A statutory provision under which Congress appoints an individual to serve as an officer constitutes an unconstitutional usurpation by Congress of the President's power and duty to nominate the officer.  *See Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1192-93 (D.D.C. 1990).

*Olympic* is squarely on point.  There, the court considered the constitutionality of the FIRREA transitional provision, which provided, "the Chairman of the Federal Home Loan Bank Board ["FHLBB"] on the date of enactment of [FIRREA] shall be the Director until the date on which that individual's term as Chairman of the [FHLBB] would have expired."  12 U.S.C. § 1462a.  The court held that this provision was unconstitutional under the Appointments Clause, and that Director Danny Wall's appointment under the provision was therefore invalid.  *See Olympic,* 732 F. Supp. at 1192-94.

Here, the transitional provision in HERA, 12 U.S.C. § 4512(b)(5) – a statute based on FIRREA (*see supra* at p. 15) – is likewise unconstitutional.  The provision states that "the person serving as the Director of the [OFHEO] on [the] effective date [of HERA] shall act for all purposes as, and with the full powers of, the Director."  *Id.*  Through this provision,

---

[36]   The requirements of the Appointments Clause apply broadly to all "officers."  The Supreme Court has held that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [the Appointments Clause]."  *Buckley v. Valeo*, 424 U.S. 1, 125 (1976).  Temporary "acting" officers are officers because such individuals are "exercising significant authority pursuant to the laws of the United States."  *Id.*

Congress impermissibly appointed an officer – namely, the Acting Director of FHFA.

Accordingly, James Lockhart's appointment under 12 U.S.C. § 4512(b)(5) was unconstitutional

and he never validly served as Acting Director.  Because HERA grants only the Director of

FHFA the power to appoint FHFA as conservator of a regulated entity such as Fannie Mae or

Freddie Mac, 12 U.S.C. § 4617(a)(1)-(2), FHFA was never validly appointed conservator of

Fannie Mae and Freddie Mac and, therefore, FHFA lacks standing to bring this lawsuit.

**B.**     **FHFA Lacks Authority to Prosecute this Lawsuit Because**
           **Edward DeMarco's Actions in Filing this Lawsuit were Invalid**

FHFA also lacks authority to prosecute this action because the current Acting

Director of FHFA, Edward DeMarco, was not validly appointed under HERA.  On its face,

HERA provides that "[i]n the event of the death, resignation, sickness, or absence of the Director,

the President shall designate . . . [a] Deputy Director to serve as acting Director."  12 U.S.C. §

4512(f).  Here, Lockhart's resignation from office was not a "resignation . . . or absence . . . of

the Director" because Lockhart never validly served as Director.  Accordingly, his resignation

did not trigger § 4512(f) to validate DeMarco's appointment.[37]

Again, *Olympic* is instructive.  There, following the resignation of the initial

director who was unconstitutionally appointed by Congress, the President designated the Acting

Director of the OTS pursuant to 5 U.S.C. §§ 3345-47 (which, prior to the enactment of the

Federal Vacancies Reform Act in 1998, governed temporary appointments to fill vacancies).

---

[37]  By its terms, 12 U.S.C. § 4512(f) cannot be read to allow the original vacancy of the office to count as an
"absence" of the Director.  The section states that the designee shall serve as acting Director "until *the return* of the
Director, or the appointment of *a successor* pursuant to subsection (b)."  In the case of the original vacancy of the
office, the Director could not "return" to the office, and no "successor" to the Director could be appointed because
there would not have been an original Director to whom a new Director would be a successor.  *See Olympic*, 732 F.
Supp. at 1194-96.  Moreover, Section 4512(f) could not provide for the original vacancy because it requires the
President to designate a Deputy Director as Acting Director, and under Section 4512(c)-(e), the Deputy Directors are
designated by the Director.

Like HERA's transitional provision, these sections applied only "[w]hen an officer of a bureau of an Executive department . . . dies, resigns, or is sick or absent."  The Court held that "[b]ecause [the initial director] never constitutionally became an officer, his resignation d[id] not constitute the resignation of 'an officer of a bureau of an Executive department,'" and thus this provision did not authorize the President to designate the Acting Director.  *Olympic*, 732 F. Supp. at 1194. In responding to the argument that the Act should be read loosely to give the President the power to fill vacancies, however created, the Court held that it is "not free to do this.  The statute clearly states that it applies '[w]hen an officer . . . dies, resigns, or is sick or absent.'  [. . .]  Had Congress wanted to give the President general power to fill vacancies, it could have done so by wording the statute differently."  *Id*. at 1196.

Similarly, to the extent Plaintiff attempts to invoke the Federal Vacancies Reform Act of 1998 ("FVRA") to salvage DeMarco's appointment, this statute is equally inapplicable. The Act grants the President powers to make temporary appointments "[i]f an officer of an Executive agency . . . dies, resigns, or is otherwise unable to perform the functions and duties of the office."  5 U.S.C. § 3345(a).  Again, since Lockhart was unconstitutionally appointed to serve, his departure did not trigger § 3345 and the FVRA did not authorize the President to appoint DeMarco as Acting Director.  *See Olympic*, 732 F. Supp. at 1194-96.[38]

---

[38]  Moreover, DeMarco was serving (and continues to serve) beyond the period allowed for acting directors under the FVRA.  The Act states that "[i]f the first nomination for the office is . . . withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after [that] date."  5 U.S.C. § 3346(b)(1).  In late 2010, President Obama nominated Joseph Smith to serve as Director of FHFA.  On December 27, 2010, the Senate returned Smith's nomination to the President.  The 210-day period began to run with the return of Smith's nomination to the President on December 27, 2010 and expired 210 days later on July 25, 2011. Since this lawsuit was filed on July 27, 2011, even if DeMarco had been validly appointed to serve as Acting Director under the FVRA (and he was not), DeMarco exceeded the 210-day period under which he could validly serve as acting Director by the time FHFA filed this lawsuit.

## IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT

### A.   Standard for Liability Under the Securities Act

Section 11 imposes liability for a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 175 n.5 (2d Cir. 2011) (quoting 15 U.S.C. § 77k(a)).  Similarly, Section 12(a)(2) imposes liability for "a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77*l*(a)(2); *Fait*, 655 F.3d at 109.  Thus, to establish liability under either Sections 11 or 12(a)(2), a plaintiff must allege facts demonstrating that "(1) the defendant has an affirmative duty to disclose the information but fails to do so, and (2) the untrue or omitted information was material." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) (Crotty, J.).  "The central inquiry in determining whether a prospectus is materially misleading [is] whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991).

### B.   The Amended Complaint Does Not Allege Any Untrue Statement or Actionable Omission

Plaintiff alleges that the Offering Materials contained material misstatements and omissions regarding:  (1) LTV (loan-to-value) ratios for the loans underlying the Certificates; (2)

owner occupancy data for the subject properties of the loans; and (3) the Originators' compliance

with stated underwriting standards.  Each of Plaintiff's allegations fails as a matter of law.[39]

### 1.    LTV Ratios Are Non-Actionable Statements of Opinion

As a matter of well settled law, Plaintiff's allegations concerning LTV data in the

Offering Materials (AC ¶ 251-256) are non-actionable statements of opinion.  As the Second

Circuit recently held in *Fait*, statements of opinion are non-actionable under the Securities Act

unless plaintiff demonstrates facts as to both their objective and subjective falsity.  655 F.3d at

113.  In *Fait*, the Second Circuit concluded that because a company's decision to take a goodwill

writedown and increase loan loss reserves were not matters of objective fact – but rather were

subjective opinions – plaintiff could not state a claim unless it demonstrated that the defendants'

opinions "were both false and not honestly believed when made."  *Id.* at 113; *see also Va.*

*Bankshares,* 501 U.S. at 1095-96.

Consistent with *Fait*, courts in this District have routinely held that LTV ratios –

and the appraisals underlying them – are non-actionable opinions.  *See, e.g.*, *In re IndyMac*

*Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510-12 (S.D.N.Y. 2010) (Kaplan, J.); *N.J.*

*Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2010 WL

1473288, at *7-8 (S.D.N.Y. 2010) (Crotty, J.); *Tsereteli v. Residential Asset Securitization Trust*

*2006-A8*, 692 F. Supp. 2d 387, 393-95 (S.D.N.Y. 2010) (Kaplan, J.).  Relying on the same

reasoning espoused by the Second Circuit in *Fait*, Judge Kaplan held in *Tsereteli* that "neither an

appraisal nor a judgment that a property's value supports a particular loan amount is a statement

---

[39]  The Virginia and D.C. Securities Acts are modeled on, and nearly identical to, the Securities Act.  *Dunn v. Borta*, 369 F.3d 421, 428, 433 (4th Cir. 2004) (Virginia Securities Act is "substantially identical" to Section 12 of the Securities Act); *Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 115 (D.D.C. 2006) (D.C. Securities Act "tracks the language of Section 12" of the Securities Act); *see also* D.C. Code § 31-5601.02(b) (2009).  For the reasons discussed herein, the grounds for dismissal of Plaintiff's Securities Act claims are equally applicable to Plaintiff's Virginia and D.C. statutory claims.

of fact" because "[e]ach is instead a <u>subjective opinion</u> based on the particular methods and assumptions the appraiser uses."  692 F. Supp. 2d at 393 (emphasis added).

       Here, Plaintiff makes no allegation whatsoever that any statement by Defendants in the Offering Materials concerning LTVs was not "honestly believed when made."  *Fait*, 655 F.3d at 113.  To the contrary, Plaintiff "expressly excludes any allegation that could be construed as alleging fraud."  (AC ¶ 315.)  Moreover, Plaintiff merely cites the hindsight views of a few individuals – not associated with Defendants – who claimed generally that pressure was put on appraisers to inflate values.  (AC ¶ 256.)  Relying solely on these statements, Plaintiff offers the bare legal conclusion that appraisers "furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties."  (*Id.*)  As a matter of law, Plaintiff's factual allegations, which say nothing about whether any of the appraisals for the particular loans at issue here were false – let alone whether Defendants knew they were false – are insufficient to state a claim under *Fait*.  *See* 655 F.3d at 113; *see also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *13 (S.D.N.Y. Sept. 28, 2010) (Castel, J.) (generalized allegations about appraisal practices are insufficient as a matter of law if not linked to the securitizations at issue).

       Even if Plaintiff had alleged facts demonstrating that the LTV ratios were not "honestly believed when made" (which it has not), Plaintiff's claims fail for the additional reason that the Amended Complaint does not allege facts demonstrating that the LTV ratios were objectively false.  Plaintiff merely alleges that its automated valuation model ("AVM"), when applied to a selection of 1,000 loans hand-picked by Plaintiff years after they were originated (AC ¶ 251), returned different LTV values than the appraisals originally conducted on the subject properties.  This attempt to demonstrate the objective falsity of the disclosed LTV ratios

fails because Plaintiff does not allege that its particular AVM – employed years later – considered the same inputs as the appraisals which generated the original LTVs at the time of origination.[40]  *Tsereteli*, 692 F. Supp. 2d at 395 (claims based on "inference that some people believed or now believe that a different set of models, based on a different set of assumptions, might have" yielded a different result, fail as matter of law); *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251–52 (S.D.N.Y. 2005) (Lynch, J.) ("[V]aluation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions").[41]

### 2.   Plaintiff Fails to Allege That Statements About Owner Occupancy Were False When Made

Plaintiff's allegations concerning owner occupancy rates (AC ¶¶ 247-250) fare no better.  As disclosed in the Offering Materials, owner occupancy was determined <u>at the time of origination</u> and based primarily on a <u>representation by the borrower</u>.  (*See* MABS 2005-FRE1 Pros. Supp. at S-35 (owner occupancy statistics based on "[o]ccupancy as represented by the mortgagor at the time of origination").)[42]  Plaintiff utterly fails to allege that any of the representations recited in the Offering Materials were not in fact made by the borrower at the time of the origination.  *See Footbridge*, 2010 WL 3790810, at *9 (dismissing securities fraud

---

[40]  Indeed, Fannie Mae's and Freddie Mac's own websites discuss their concerns about AVM methodology.  *See* FannieMae, Perspective on Automated Valuation Models (AVMs), https://www.efanniemae.com/sf/guides/ssg/relatedsellinginfo/avms/ (last visited Dec. 2, 2011) (AVMs have inherent limitations compared to "traditional appraisals" because of, among things, "data issues"); Freddie Mac, Home Value Explorer: Frequently Asked Questions, http:/www.freddiemac.com/hve/faq.html (last visited Dec. 2, 2011) ("Freddie Mac does not view [its own AVM] as a replacement for an appraisal.").

[41]  Confirming that valuation for LTV purposes is a non-actionable matter of judgment, Plaintiff's AVM purportedly considered data on "comparable" properties (AC ¶ 81), but Plaintiff alleges no objective basis to determine what is a "comparable" property for purposes of valuing the subject properties.

[42]  *See* MABS 2005-HE2 Pros. Supp. at S-35; MABS 2005-WF1 Pros. Supp. at S-36; MABS 2006-FRE2 Pros. Supp. at 34; MABS 2006-NC2 Pros. Supp. at 31; MABS 2006-NC3 Pros. Supp. at 31; MABS 2006-WMC2 Pros. Supp. at 35; MABS 2006-WMC3 Pros. Supp. at 33; MABS 2006-WMC4 Pros. Supp. at 34; MABS 2007-HE2 Pros. Supp. at 27; MABS 2007-WMC1 Pros. Supp. at 34; ARSI 2006-W3 Pros. Supp. at III-7; INABS 2005-C Pros. Supp. at II-5; INABS 2005-D Pros. Supp. at II-5; INABS 2006-D Pros. Supp. at 90; INABS 2007-A Pros. Supp. at 94.

case based on purported misstatements concerning owner occupancy data where complaint "does not allege that the percentages reported in the Detailed Reports or the Prospectus Supplements are inaccurate representations of the data received from borrowers").  Instead of alleging that the disclosed information concerning owner occupancy inaccurately represented the data received from the borrowers – or even that the underlying owner occupancy data was false at the time of origination – Plaintiff attempts to conduct an *ex post* review to show that owner occupancy rates "months after the loan closed" differed from those disclosed.  (AC ¶ 248.)  As a matter of law, Plaintiff's failure to (1) challenge the accuracy of the representations of the data received from the borrowers and (2) allege the falsity of the occupancy data at the time of origination is fatal to its claims.  *See Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 851(RPP), 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009) (Patterson, J.).

### 3. Plaintiff Fails To Allege False Statements or Omissions Regarding Underwriting Standards

#### (a) The Offering Materials Sufficiently Disclosed the Potential for Non-Compliance with Underwriting Standards

Finally, Plaintiffs' claims that the Offering Materials contained false statements concerning compliance with the stated underwriting guidelines fail to allege a material misstatement of fact.  Plaintiff alleges that the Originators "systematically disregarded their respective underwriting guidelines" (AC ¶ 258) based on a purported forensic analysis of the loans that showed that approximately one-third were "waived" in to the pools. (AC ¶ 66.)[43] These allegations, however, completely ignore the Offering Materials themselves, which stated that the mortgage loans were only "generally" underwritten in accordance with the stated

---

[43]  This same forensic analysis relied upon in the Amended Complaint (AC ¶ 64-66), which was allegedly performed by Clayton Holdings, showed that Freddie Mac had a waiver rate for loans backing its own certificates of 60% – nearly double the UBS Defendants' alleged waiver rate.  (Ex. XX, Clayton Holdings Trending Reports.)

guidelines and that "exceptions" to those standards existed.[44]  Moreover, the Offering Materials

for many of the Certificates expressly disclosed that a "substantial number" or "substantial

portion" of the underlying loans deviated from the stated guidelines.[45]  Accordingly, Plaintiff's

allegations that they were misled concerning the existence of non-conforming loans fail a matter

of law.  *Cf. Wilson*, 2011 WL 5515958, at *11 ("Merrill's statement that it 'may routinely' place

support bids is not inconsistent with the possibility that it would place such bids in every Merrill

ARS auction that took place over a particular period.").[46]

       Moreover, all of the Offering Materials established a mechanism by which non-

conforming loans – which the parties knew would exist – could be cured, repurchased, or

substituted.[47]  Standing alone, the existence of a mechanism to address non-conforming loans

renders unreasonable any belief that all loans conformed to the underwriting guidelines.  *See*

*Footbridge*, 2010 WL 3790810, at *16 ("repurchase or substitute" provisions rendered

---

[44]  *See, e.g.*, MABS 2006-FRE2 Pros. Supp. at 76; MARM 2005-8 Pros. Supp. at 24; MARM 2006-2 Pros. Supp. at S-32; MABS 2005-FRE1 at Pros. Supp. S-62; MARM 2006-OA1 Pros. Supp. at S-34 to S-35; MARM 2007-1 Pros. Sup. at 50; MARM 2007-3 Pros. Supp. at 47; MABS 2007-HE2 Pros. Supp. at 19; FHLT 2006-B Pros. Supp. at S-50; INABS 2005-C Pros. Supp. at S-28; INABS 2005-D Pros. Supp. at S-28 to S-29; INABS 2006-D Pros. Supp. at 32; INABS 2007-A Pros. Supp. at 36.

[45]  *See, e.g.*, MABS 2006-WMC2 Pros. Supp. at 78; *see also* MABS 2006-WMC3 Pros. Supp. at 76; MABS 2006-WMC4 Pros. Supp. at 78; MABS 2007-WMC1 Pros. Supp. at 75-76; MABS 2006-NC2 Pros. Supp. at 73; MABS 2006-NC3 Pros. Supp. at 72; ARSI 2006-W3 Pros. Supp. at S-32.

[46]  In addition, the Offering Materials for some of the Certificates disclosed that the information regarding underwriting standards was "provided by the originator."  *See, e.g.*, MABS 2005-WF1 Pros. Supp. at S-66; MABS 2005-FRE1 Pros. Supp. at S-61; MABS 2006 NC2 Pros. Supp. at 72; MABS 2006-NC3 Pros. Supp. at 71.  Thus, these Offering Materials were not making objective statements of fact regarding the underwriting standards at issue but merely reporting the information that had been provided by third parties.  *Footbridge*, 2010 WL 3790810, at *9 (dismissing complaint that failed to allege that purported misleading information constituted "inaccurate representations of the data received" by third-party borrowers).

[47]  *See, e.g.*, MABS 2005-WF1 Pros. Supp. at S-25, S-31 S-106, Pros. at 9, 27-28; MABS 2005-FRE1 Pros. Supp. at S-25, S-108; MABS 2005-HE2 Pros. Supp. at S-25, S-101; MARM 2005-8 Pros. Supp. at 18, 24; MARM 2006-2 Pros. Supp. at S-20, S-30; MARM 2006-OA1 Pros. Supp. at S-27, S-38; MABS 2006-FRE2 Pros. Supp. at 15, 27, 117; MABS 2006-WMC2 Pros. Supp. at 15, 27, 128; MABS 2006-WMC3 Pros. Supp. at 14, 27, 129; MABS 2006-WMC4 Pros. Supp. at 16, 135; MABS 2006-NC2 Pros. Supp. at 13, 25, 136; MABS 2006-NC3 Pros. Supp. at 24, 140; MARM 2007-1 Pros. Supp. at 38, 56, 141; MARM 2007-3 Pros. Supp. at 37, 45, 55; MABS 2007-WMC1 Pros. Supp. at 15, 28, 128; MABS 2007-HE2 Pros. Supp. at 11, 15, 19, 22; ARSI 2006-W3 Pros. Supp. at S-10, S-15, S-89; FHLT 2006-B Pros. Supp. at S-14, S-86; INABS 2005-C Pros. Supp. at S-19 to S-20, S-21, S-27; INABS 2005-D Pros. Supp. at S-21, S-27; INABS 2006-D Pros. Supp. at 8, 23, 29; INABS 2007-A Pros. Supp. at 9, 23, 26, 33.

statements regarding the characteristics of underlying mortgages non-actionable); *see also Lone Star Fund V (U.S.), L.P.* v. *Barclays Bank PLC*, 594 F.3d 383, 389-90 (5th Cir. 2010).

Plaintiff also attempts to demonstrate the falsity of the representations concerning adherence to origination guidelines by pointing to "the overall poor performance of the mortgage loans" as of <u>July 2011</u> (AC ¶¶ 305-306) – over three years after the last of the Certificates was purchased. This type of allegation by hindsight exemplifies the type of allegations that courts routinely hold are insufficient to plead a misstatement. *See Panther Partners*, 538 F. Supp. 2d at 669-72.[48] Indeed, by 2011, myriad other factors – including the unprecedented nationwide decline in the housing market – contributed to what Fannie Mae has called the "hundred-year storm [that] befell the U.S. housing and credit markets." (Ex. YY at 2, Motion to Dismiss, *In re Fannie Mae 2008 Sec. Litig.,* No. 08-cv-7831 (S.D.N.Y. Sept. 18, 2009)); *see also Kuriakose v. Fed. Home Loan Mortg. Corp.*, No. 08-cv-7281 (JFK), 2011 WL 1158028, at *2 (S.D.N.Y. Mar. 30, 2011) ("Freddie Mac suffered losses due to a nation-wide decline in housing prices").[49]

**(b)   Plaintiff Fails to Allege that Defendants had a Duty to <u>Disclose Any Purported Omissions Regarding Exceptions</u>**

Even if Plaintiff had adequately alleged that exceptions to the Originators'

---

[48]   For these same reasons, Plaintiff's citation of the purported "collapse of the certificates' credit ratings" (AC ¶ 258) years after the loans were originated cannot state a claim that the Offering Materials misrepresented compliance with underwriting guidelines. Moreover, Plaintiff's allegations regarding credit ratings are non-actionable, as ratings are statements of opinion. *See In re Lehman*, 650 F.3d at 183; *Tsereteli*, 692 F. Supp. 2d at 394 ("Like the appraisals, whether the 'credit quality of the mortgage pool' was 'properly considered' or 'adequate' to support a particular rating was not a matter of objective fact.").

[49]   FHFA also relies on an impermissible mix of hearsay sources, including allegations in other complaints against Originators and testimony at congressional hearings (*See* AC ¶¶ 275-300), as ostensible support for the allegations that Originators abandoned their stated underwriting guidelines. *Footbridge*, 2010 WL 3790810, at *5. But each of those allegations relates either to mortgage loans generally or to unrelated offerings. An allegation that an originator did not comply with its underwriting guidelines with respect to some other security in no way shows that the offering documents in this case misrepresented originator practices. *See N.J. Carpenters Health Fund v. Novastar Mortg., Inc.*, No. 08 Civ. 5310 (DAB), 2011 WL 1338195, at *11 (S.D.N.Y. Mar. 31, 2011) (Batts, J.) (plaintiff "fail[ed] to make allegations specific to the . . . origination practices that relate to the only offering that is relevant"); *Landesbank*, 2011 WL 4495034, at *5; *Tsereteli*, 692 F. Supp. 2d at 393-94.

underwriting guidelines were not disclosed (and it has not), Plaintiff's claims would fail as a matter of law because Section 1111 of SEC Regulation AB requires Defendants to disclose only <u>known</u> exceptions.  17 C.F.R. § 229.1111(a)(3) (2011).[50]  Regulation AB instructs issuers regarding what information must be included in a registration statement for mortgage-backed securities: a description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, <u>to the extent known</u>, any changes in such criteria and the extent to which such policies and criteria are or could be overridden.  *Id.*

Far from alleging Defendants' knowledge that underwriting criteria had been changed, Plaintiff repeatedly disclaims any such knowledge by expressly excluding any allegations of fraud on the part of Defendants.  (*See supra* at note 30.)  Thus, Plaintiff's failure to allege Defendants' knowledge of the purportedly omitted material is fatal.  *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008) (Chin, J.), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) (dismissing Section 11 claim where regulation required disclosure of "known trends" and plaintiff failed to allege defendants' knowledge of omitted information).[51]

---

[50]  Four decisions by this Court have concluded that the knowledge requirement set forth in Item 1111 applies only to omission claims, not misstatement claims.  *See N.J. Carpenters Vacation Fund v. Royal Bank of Scotl. Grp., PLC*, 720 F. Supp. 2d 254, 268-69 (S.D.N.Y. 2010) (Baer, J.); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010) (Kaplan, J.), *aff'd sub nom. In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *5 (S.D.N.Y. Mar. 31, 2010) (Baer, J.); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp.*, No. 09 CV 1110 (HB), 2011 WL 135821, at *10-11 (S.D.N.Y. Jan. 12, 2011) (Baer, J.).  These cases posit a distinction between omission and misstatement claims that nowhere appears in the regulation and ignore that the relevant misrepresentation alleged in those cases was a supposed failure to disclose unknown departures from underwriting standards required to be disclosed by Regulation 1111.  This issue is currently on appeal to the Second Circuit in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288, 292 (S.D.N.Y. 2010), *appeal docketed*, No. 11-2762 (2d Cir. July 8, 2011).

[51]  Additionally, MASTR cannot be held liable under Section 12 of the Securities Act because thee is no allegation that it sold the Certificates to Fannie Mae or Freddie Mac or directly solicited their purchases.  Thus, Plaintiff fails to allege that MASTR is a "statutory seller" as required to establish liability under the statute.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *DeMaria v. Andersen*, 153 F.Supp.2d 300, 308 (S.D.N.Y. 2001) (Pauley, J.), *aff'd* 318 F.3d 170 (2003).  For these same reasons, MASTR cannot be held liable under the D.C. Securities Act, which "tracks the language of Section 12," *Hite*, 429 F. Supp. 2d at 115, and the Virginia Securities

## V.      PLAINTIFF FAILS TO STATE A
## CLAIM FOR NEGLIGENT MISREPRESENTATION

Plaintiff also fails to allege a cognizable negligent misrepresentation claim.[52]

Under New York law,[53] a plaintiff must establish that "(1) the defendant had a duty, as a result of

a special relationship, to give correct information; (2) the defendant made a false representation

that he or she should have known was incorrect; (3) the information supplied in the

representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4)

the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or

her detriment." *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758 (S.D.N.Y. 2011) (Kaplan,

J.); *Bombardier Capital Inc. v. Naske Air GMBH*, No. 02 CV 10176 (DLC), 2003 WL 22137989,

at *4 (S.D.N.Y. Sept. 17, 2003) (Cote, J.).  A "special relationship" exists only when (1) the

_____

Act, which imposes liability only on actual sellers, *Atocha Ltd. P'ship v. Witness Tree, LLC*, No. 180921, 2004 WL 1665009, at *5-6 (Va. Cir. Ct. July 16, 2004).

[52]   As a threshold issue, Plaintiff's common law negligent misrepresentation claim should be dismissed because it is preempted by New York's blue-sky statute, the Martin Act, N.Y. Gen. Bus. L. § 352 *et seq.*, which contains no private right of action.  *See Castellano v. Young & Rubicam*, 257 F.3d 171, 190 (2d Cir. 2001).  Although this court has held otherwise, *Cromer Fin. Ltd.* v. *Berger*, No. 00 Civ. 2498, 2001 WL 1112548, at *3-4  (S.D.N.Y. Sept. 19, 2001), the majority of more recent decisions in this District have dismissed common law claims involving securities as preempted by the Martin Act.  *See, e.g.*, *Meridian Horizon Fund LP v. Tremont Grp. Holdings, Inc.*, 2010 WL 1257567, at *9 (S.D.N.Y. Mar. 31, 2010) (Griesa, J.); *In re Beacon Assoc's Litig.*, 2010 WL 3895582, at *35-38 (S.D.N.Y. Oct. 5, 2010) (Sand, J.).  This issue is currently under consideration by the New York Court of Appeals.  *See Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Mgmt. Inc.*, 915 N.Y.S. 2d 7, 15 (1st Dep't 2010), *lv. granted*, 2011 WL 537099 (1st Dep't 2011), and *CMMF, LLC v. J.P. Morgan Inv. Mgt. Inc.*, 915 N.Y.S.2d 2 (1st Dep't 2010).  Until the New York Court of Appeals addresses this issue, however, "this Court is bound to apply the result in the only Second Circuit case that addresses the subject of Martin Act preemption:  *Castellano*." *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 378 (S.D.N.Y. 2011) (McMahon, J.).

[53]   New York law applies to Plaintiff's negligent misrepresentation claims.  Under New York choice-of-law rules, tort claims are governed by an "interest analysis," where "the law of the jurisdiction with the most significant interest in, or relationship to, the dispute" is applied.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997).  Here, New York has the most significant relationship to Plaintiff's claims.  Not only does Plaintiff challenge statements made by New York-based entities regarding securities issued by New York trusts, but as the Amended Complaint concedes, the relevant Offering Materials were prepared and disseminated in New York, where Defendants maintain their principal places of business.  (AC ¶¶ 15-23, 27.)  Likewise, the pooling and servicing agreements, which the Prospectus Supplements describe as the governing instruments for the trusts, contain New York choice-of-law provisions.  (Ex. ZZ); *see Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010) (applying New York law to California plaintiffs' negligent misrepresentation claims where "New York was the site of virtually all the conduct at issue in the transaction").  Even if New York law does not apply, Plaintiff's negligent misrepresentation claims still fail under Virginia and D.C. common law based on Plaintiff's failure to allege a false or misleading statement or omission upon which Plaintiff reasonably relied.

parties are in a relationship of trust and confidence, or (2) one of the parties has superior

knowledge or expertise. *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996).

Under well-settled New York law, a special relationship of trust and confidence

does not exist between sophisticated commercial entities that enter into an agreement through an

arm's-length business transaction. *Amusement Indus.*, 786 F. Supp. 2d at 778-79.  Additionally, a

plaintiff "cannot claim it relied on [a defendant's] special expertise [where] it is clear that [the

plaintiff] itself had the relevant expertise at issue." *Landesbank*, 2011 WL 4495034, at *7.

Accordingly, "New York courts generally do not permit negligent misrepresentation claims

based on arm's-length transactions between sophisticated counterparties." *Id.* (citation omitted).

Here, it is difficult to imagine two more sophisticated investors in mortgage-

backed securities than Fannie Mae and Freddie Mac, and Plaintiff makes no allegation that their

purchases of the Certificates were not made pursuant to arm's-length commercial transactions.

Although Plaintiff conclusorily alleges that UBS Securities or MASTR had "unique, exclusive,

and special knowledge" regarding the loans underlying the Certificates (AC ¶¶ 430-434),  New

York courts have held that a defendant's "knowledge of the particulars of its own business is not

the type of unique or specialized knowledge" necessary to sustain a negligent misrepresentation

claim. *MBIA Ins. Co. v. Residential Funding Co.*, No. 603552/08, 2009 WL 5178337, at *5 (Sup.

Ct. N.Y. Cnty Dec. 22, 2009); *Amusement Indus.*, 786 F. Supp. 2d at 779 ("[T]he mere fact that a

defendant possesses certain documentation relating to a transaction is not enough to meet the

'special expertise' element.").

*MBIA Insurance Co. v. GMAC Mortgage LLC*, 30 Misc.3d 856 (Sup. Ct. N.Y.

Cnty 2010), is squarely on point.  In ruling that defendant's access to mortgage loan file

information did not support a claim that the plaintiff justifiably relied on the defendant's superior

knowledge, the court held, in language squarely applicable here, that "[m]ere possession of the

loan files and servicing files does not create the type of specialized knowledge discussed in

*Kimmell*."  30 Misc.3d at 865.[54]

## VI.   PLAINTIFF FAILS TO ALLEGE CONTROL PERSON LIABILITY

Finally, Plaintiff's "tack-on" claims under Section 15 of the Securities Act for

"control person" liability against UBS Real Estate, UBS Americas and the Individual Defendants

(AC ¶¶ 349-362) should be dismissed for several reasons.  As a threshold issue, Plaintiff's failure

to allege a primary violation under Sections 11 and 12 by any of the Defendants (*see supra*

§ IV.B) is fatal to its Section 15 claims.  *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir.

1993) ("Section 15 merely creates a derivative liability for violations of Sections 11 and 12").[55]

Second, Plaintiff's attempt to establish control person liability due to UBS

Americas' status as "corporate parent" (AC ¶ 387) of other alleged primary violators fails

because "[t]he parent/subsidiary relationship is an insufficient basis from which to infer

control . . . . and mere allegations of corporate affiliation between the defendants are insufficient

---

[54]  FHFA also fails to plead loss causation – *i.e.*, "that the misrepresentations directly caused the loss about which plaintiff complains." *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002); *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 30 (2000).  It is well established that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[d] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted).  During the months following the Securitizations, the financial markets experienced unprecedented dislocation, yet FHFA never explains how the Certificates performed any differently than comparable ones.  To the contrary, FHFA concedes that comparable certificates performed comparably when it attempted to use the sale of "similar" certificates to measure its alleged damages.  (AC ¶ 314.)

Moreover, Plaintiff has not adequately pled a cognizable injury because it has not alleged that Fannie Mae or Freddie Mac failed to receive any payments to which they are entitled based on the cash flows generated by the underlying loans.  (AC ¶ 30, 38.)  Because this issue is currently on appeal to the Second Circuit in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288, 292 (S.D.N.Y. 2010), Defendants preserve the argument that FHFA's allegations that the Certificates' market value declined are insufficient as a matter of law to plead a cognizable loss under Sections 11 or 12(a)(2).

[55]  Plaintiff also brings control person claims under Section 13.1-522(c) of the Virginia Securities Act and Section 31-5606.05(c) of the D.C. Securities Act, each of which require the pleading of a primary violation.  Because Plaintiff has failed to plead a primary violation under these Acts, the control person claims fail as well.

to indicate control by one over another." *Id.*; *see also In re WorldCom, Inc., Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) (Cote, J.).[56]

## **CONCLUSION**

For the foregoing separate and independent reasons, Defendants respectfully request that the Amended Complaint be dismissed with prejudice.

Dated:   New York, New York
             December 2, 2011

Respectfully submitted,

 /s/ Jay B. Kasner
Jay B. Kasner (jay.kasner@skadden.com)
Scott D. Musoff (scott.musoff@skadden.com)
Robert A. Fumerton (robert.fumerton@skadden.com)
SKADDEN, ARPS, SLATE
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000
Fax:  (212) 735-2000

*Attorneys for Defendants UBS Americas Inc., UBS Real Estate Securities Inc., UBS Securities LLC, Mortgage Asset Securitization Transactions, Inc., David Martin, Per Dyrvik, Hugh Corcoran and Peter Slagowitz*

---

[56]  Additionally, a number of courts have held that a complaint must allege "meaningful culpable conduct." *P. Stolz Family P'ship, L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001) (Rakoff, J.), *aff'd in part, rev'd in part on other grounds*, 355 F.3d 92 (2d Cir. 2004) (internal quotation omitted); *see also Wallace v. Buttar*, 239 F. Supp. 2d 388, 397 (S.D.N.Y. 2003) (Sweet, J.), *rev'd on other grounds*, 378 F.3d 182 (2d Cir. 2004).  Here, the Amended Complaint offers only bare legal conclusions that UBS Americas and UBS Real Estate "culpably participated in the violations of Section 11 and 12(a)(2) set forth above" because they "oversaw the actions" of the alleged violators. (AC ¶¶ 352, 357.)  Plaintiff's mere formulaic recitation is insufficient.  While this Court has held that culpable participation is not required to plead a claim under Section 15, *see In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 638268, at *16, n. 20 (S.D.N.Y. Mar. 21, 2005), Defendants respectfully preserve this argument for appellate review.

### APPENDIX A[57]

| Certificate | Date(s) Purchased | Purchaser | Originator(s) |
|---|---|---|---|
| MABS 2005-WF1 A-1A | September 28, 2005 | Freddie Mac | Wells Fargo |
| INABS 2005-C AI1 | September 29, 2005 | Freddie Mac | IndyMac |
| MABS 2005-FRE1 A-1 | November 29, 2005 | Freddie Mac | Fremont |
| MABS 2005-HE2 A-1 | September 30, 2005 | Freddie Mac | MILA; New Century |
| ARSI 2006-W3 A1 | March 29, 2006 | Freddie Mac | Argent |
| MARM 2005-8 2-A-1, 3-A-1 | December 21, 2005; January 25, 2006 | Fannie Mae | Countrywide; AHM; First Horizon |
| INABS 2005-D AI1 | December 23, 2005 | Fannie Mae | IndyMac |
| MARM 2006-2 2-A-1 | April 17, 2006 | Fannie Mae, Freddie Mac | Provident Funding Associates; Wells Fargo |
| MARM 2006-OA1 2-A-1 | April 28, 2006 | Freddie Mac | AHM |
| MABS 2006-FRE2 A-1 | May 30, 2006 | Freddie Mac | Fremont |
| FHLT 2006-B 1A | August 3, 2006 | Freddie Mac | Fremont |
| MABS 2006-WMC2 A-1 | April 20, 2006 | Fannie Mae | WMC |
| MABS 2006-WMC3 A-1 | September 28, 2006 | Freddie Mac | WMC |
| MABS 2006-WMC4 A-1, A-2 | November 30, 2006 | Fannie Mae | WMC |
| INABS 2006-D 1A | September 13, 2006 | Fannie Mae | IndyMac |
| MABS 2006-NC2 A-1 | September 28, 2006 | Freddie Mac | New Century |
| MABS 2006-NC3 A-1 | December 28, 2006 | Freddie Mac | New Century |
| MARM 2007-1 I-1A | January 16, 2007 | Freddie Mac | IndyMac |
| MARM 2007-3 1-1A1, 1-1A2, 2-1A1, 2-1A2 | May 4, 2007 | Fannie Mae | Countrywide; IndyMac |
| MABS 2007-WMC1 A-1 | February 12, 2007 | Fannie Mae | WMC |
| INABS 2007-A 1A | March 13, 2007 | Fannie Mae | IndyMac |
| MABS 2007-HE2 A-1 | August 30, 2007 | Freddie Mac | Option One; Fieldstone Mortgage Company |

---

[57] Information in Appendix A is based solely on the allegations in the Amended Complaint and documents relied upon therein.