## SCHEDULE 1

| Certificate | Exhibit Number for Excerpts from Prospectuses and Prospectus Supplements |
|---|---|
| MABS 2005-WF1 | 1 |
| MABS 2005-FRE1 | 2 |
| MABS 2005-HE2 | 3 |
| MARM 2005-8 | 4 |
| MARM 2006-2 | 5 |
| MARM 2006-OA1 | 6 |
| MABS 2006-FRE2 | 7 |
| MABS 2006-WMC2 | 8 |
| MABS 2006-WMC3 | 9 |
| MABS 2006-WMC4 | 10 |
| MABS 2006-NC2 | 11 |
| MABS 2006-NC3 | 12 |
| MARM 2007-1 | 13 |
| MARM 2007-3 | 14 |
| MABS 2007-WMC1 | 15 |
| MABS 2007-HE2 | 16 |
| ARSI 2006-W3 | 17 |
| FHLT 2006-B | 18 |
| INABS 2005-C | 19 |
| INABS 2005-D | 20 |
| INABS 2006-D | 21 |
| INABS 2007-A | 22 |

# Exhibit 1

Pursuant to Rule 424(b)(5)
Registration File No. 333-124678

PROSPECTUS SUPPLEMENT DATED September 26, 2005
(To Prospectus dated June 2, 2005)

$909,033,000 (APPROXIMATE)

MASTR ASSET BACKED SECURITIES TRUST 2005-WF1

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
(DEPOSITOR)

UBS REAL ESTATE SECURITIES INC.
(SELLER)

WELLS FARGO BANK, N.A.

(MASTER SERVICER)

MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2005-WF1

The MASTR Asset Backed Securities Trust 2005-WF1 is issuing nineteen classes of certificates, but is offering only fourteen classes through this prospectus supplement.

o   The trust's main source of funds for making distributions on the certificates will be collections on closed end, fixed-rate and adjustable-rate mortgage loans secured by first and second mortgages or deeds of trust on residential one- to four-family properties.

o   Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates--Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates--Overcollateralization Provisions," excess interest as described in this prospectus supplement under "Description of the Certificates--Overcollateralization Provisions," an interest rate swap agreement as described in this prospectus supplement under "Description of the Certificates--Interest Rate Swap Agreement, the Swap Provider and the Swap Account" and a mortgage pool insurance policy as described in this prospectus supplement under "Description of the Certificates--The Pool Policy."

--------------------------------------------------------------------------
YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-18 IN THIS PROSPECTUS SUPPLEMENT AND PAGE 8 IN THE PROSPECTUS.

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.
--------------------------------------------------------------------------

NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE OFFERED CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE ACCOMPANYING PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about September 28, 2005.

The proceeds to the depositor are expected to be approximately $909,033,000 before deducting expenses. See "UNDERWRITING" in this prospectus supplement. UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.

[UBS INVESTMENT BANK LOGO]

The seller will represent and warrant as of the closing date that each mortgaged property is free of material damage and in good repair. In the event of a breach of that representation and warranty that materially and adversely affects the value of such mortgage loan, the seller will be obligated to repurchase or substitute for the related mortgage loan. Any such repurchase would have the effect of increasing the rate of principal payment on the Class A Certificates and Mezzanine Certificates. Any damage to a mortgaged property that secures a mortgage loan in the trust fund occurring after the closing date as a result of any other casualty event will not cause a breach of this representation and warranty.

The full economic impact of Hurricane Katrina and Hurricane Rita is uncertain but may affect the ability of borrowers to make payments on their mortgage loans. We have no way to determine the particular nature of such economic effects, how long any of these effects may last, or how these effects may impact the performance of the mortgage loans. Any impact of these events on the performance of the mortgage loans may increase the amount of losses borne by the holders of the Class A Certificates or Mezzanine Certificates or impact the weighted average lives of the Class A Certificates or Mezzanine Certificates.

BANKRUPTCY OF BORROWERS MAY ADVERSELY AFFECT DISTRIBUTIONS ON CERTIFICATES

The application of federal and state laws, including bankruptcy and debtor relief laws, may interfere with or adversely affect the ability to realize on the mortgaged properties, enforce deficiency judgments or pursue collection litigation with respect to defaulted mortgage loans. As a consequence, borrowers who have defaulted on their mortgage loans and sought, or are considering seeking, relief under bankruptcy or debtor relief laws will have substantially less incentive to repay their mortgage loans. As a result, these mortgage loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses.

VIOLATION OF VARIOUS FEDERAL, STATE AND LOCAL LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the originator. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

o        the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

o        the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o        the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such mortgage loans against either the trust or subsequent holders of the mortgage loans.

The originator or the seller will represent that as of the closing date, each mortgage loan is in compliance with applicable federal, state and local laws and regulations. In the event of a breach of such representation, the originator or the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described under "The Pooling and Servicing Agreement--Assignment of the Mortgage Loans" in this prospectus supplement.

Under the Master Agreement and the Assignment Agreement, certain representations and warranties regarding the Mortgage Loans have been made by the originator. Pursuant to the Assignment Agreement, the seller has assigned its rights with respect to the Master Agreement, including remedies with respect to breaches of representations and warranties, to the depositor (who will further assign such rights to the trustee on behalf of the trust) and made certain additional representations and warranties regarding such Mortgage Loans. To the extent set forth under "the Pooling Agreement--Assignment of the Mortgage Loans," the trustee will enforce the obligations of the originator under the Master Agreement and the Assignment Agreement (as assigned by the depositor to the trustee pursuant to the Pooling Agreement) or the seller under the Assignment Agreement, to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists uncured deficient documentation or an uncured breach of any such representation or warranty, if such breach or deficiency materially and adversely affects the Certificateholders' interests in such Mortgage Loan. The seller is selling the Mortgage Loans without recourse and will have no obligation with respect to the certificates in its capacity as seller, other than in connection with certain limited representations and warranties as described above. The originator will have no obligation with respect to the certificates in its capacity as originator, other than in connection with representations and warranties made by it under the Master Agreement and assigned to the trustee as described above.

The Mortgage Loans are subject to the "due-on-sale" provisions included therein which provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 79.84% of the Group I Mortgage Loans are Adjustable-Rate Group I Mortgage Loans and approximately 20.16% of the Group I Mortgage Loans are Fixed-Rate Group I Mortgage Loans. Approximately 66.71% of the Group II Mortgage Loans are Adjustable-Rate Group II Mortgage Loans and approximately 33.29% of the Group II Mortgage Loans are Fixed-Rate Group II Mortgage Loans.

Each Fixed-Rate Mortgage Loan has a Mortgage Rate that is fixed for the life of such Mortgage Loan.

Each Adjustable-Rate Mortgage Loan accrues interest at a Mortgage Rate that is adjustable following an initial period of one year, two years or three years following origination. Generally, the Adjustable-Rate Mortgage Loans provide for semi-annual adjustment to the Mortgage Rate thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each Adjustment Date applicable thereto; provided, that (i) the first adjustment for the Adjustable-Rate Group I Mortgage Loans will occur after an initial period of one year in the case of approximately 0.14% of the Adjustable-Rate Group I Mortgage Loans, two years in the case of approximately 91.42% of the Adjustable-Rate Group I Mortgage Loans and three years in the case of approximately 8.44% of the Adjustable-Rate Group I Mortgage Loans and (ii) the first adjustment for the Adjustable-Rate Group II Mortgage Loans will occur after an initial period of one year in the case of approximately 0.23% of the Adjustable-Rate Group II Mortgage Loans, two years in the case of approximately 93.33% of the Adjustable-Rate Group II Mortgage Loans and three years in the case of approximately 6.45% of the Adjustable-Rate Group II Mortgage Loans. On each Adjustment Date for each adjustable-rate Mortgage Loan, the Mortgage Rate thereon will be adjusted to equal the sum, rounded to the nearest or next highest multiple of 0.125%, of Six-Month LIBOR or One-Year CMT and the Gross Margin. The Mortgage Rate on any adjustable-rate Mortgage Loan will not decrease or increase by more than a stated percentage (up to a maximum of no more than 3.000% per annum, as specified in the related mortgage note) on the first related Adjustment Date and will not increase or decrease by more than a stated percentage (up to a maximum of no more than 2.000% per annum, as specified in the related mortgage note) on any Adjustment Date thereafter. The Adjustable-Rate Group I Mortgage Loans have a weighted average Initial Periodic Rate Cap of approximately 3.000% per annum and a weighted average Periodic Rate Cap of approximately 1.007% per annum thereafter. The Adjustable-Rate Group II Mortgage Loans have a weighted average Initial Periodic Rate Cap of approximately 3.000% per annum and a weighted average Periodic Rate Cap of approximately 1.005% per annum thereafter. Each Mortgage Rate on each adjustable-rate Mortgage Loan will not exceed the Maximum Mortgage Rate or be less than the Minimum Mortgage Rate. Effective with the first monthly payment due on each adjustable-rate Mortgage Loan after each related Adjustment Date, the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding Principal Balance of the related adjustable-rate Mortgage Loan over its remaining term, and pay interest at the Mortgage Rate as so adjusted. Due to the application of the Periodic Rate Caps and the Maximum Mortgage Rates, the Mortgage Rate on each adjustable-rate Mortgage Loan, as adjusted on any related Adjustment Date, may be less than the sum of the Index and the related Gross Margin, rounded as described in this prospectus supplement. None of the adjustable-rate Mortgage Loans will permit the related mortgagor to convert the adjustable Mortgage Rate thereon to a fixed Mortgage Rate.

## PROPERTY TYPES OF THE MORTGAGE LOANS

<TABLE>
<CAPTION>

| PROPERTY TYPE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIENS |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Single Family....... | 5,536 | $821,728,880 | 89.40% | $148,434 | 6.824% | 80.12% | 620 | 91.48% | 2.15% |
| PUD(1)............... | 162 | 31,747,616 | 3.45 | 195,973 | 6.650 | 74.95 | 625 | 97.28 | 2.36 |
| Low Rise Condo (2-4 floors)............ | 215 | 30,662,317 | 3.34 | 142,615 | 6.852 | 82.25 | 631 | 95.25 | 3.28 |
| Two Family.......... | 154 | 28,706,249 | 3.12 | 186,404 | 6.661 | 77.43 | 625 | 90.72 | 0.23 |
| Three Family........ | 17 | 3,168,715 | 0.34 | 186,395 | 6.766 | 64.41 | 617 | 94.40 | 0.00 |
| High Rise Condo (greater than 8 floors)............ | 8 | 2,139,930 | 0.23 | 267,491 | 5.739 | 70.88 | 678 | 92.50 | 0.00 |
| Four Family......... | 4 | 870,655 | 0.09 | 217,664 | 6.424 | 73.74 | 629 | 48.35 | 0.00 |
| Condominium......... | 1 | 123,285 | 0.01 | 123,285 | 6.250 | 78.48 | 661 | 100.00 | 0.00 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 6,097 | $919,147,645 | 100.00% | $150,754 | 6.811% | 79.85% | 620 | 91.75% | 2.12% |

</TABLE>

--------

(1)  PUD refers to a home or "unit" in a Planned Unit Development.

## OCCUPANCY STATUS OF THE MORTGAGE LOANS(1)

<TABLE>
<CAPTION>

| OCCUPANCY STATUS | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIENS |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Owner Occupied...... | 5,947 | $904,346,209 | 98.39% | $152,068 | 6.813% | 80.00% | 620 | 91.76% | 2.16% |
| Investor Occupied... | 124 | 10,580,781 | 1.15 | 85,329 | 6.791 | 69.77 | 638 | 91.19 | 0.00 |
| Second Home......... | 26 | 4,220,656 | 0.46 | 162,333 | 6.401 | 72.07 | 635 | 91.63 | 0.00 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 6,097 | $919,147,645 | 100.00% | $150,754 | 6.811% | 79.85% | 620 | 91.75% | 2.12% |

</TABLE>

--------

(1)  Occupancy as represented by the mortgagor at the time of origination.

## PURPOSE OF THE MORTGAGE LOANS

<TABLE>
<CAPTION>

| PURPOSE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIENS |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Cash Out Refinance.. | 3,996 | $657,700,209 | 71.56% | $164,590 | 6.682% | 76.97% | 615 | 91.53% | 0.44% |
| Purchase............ | 1,596 | 188,985,562 | 20.56 | 118,412 | 7.248 | 89.23 | 637 | 91.92 | 8.25 |
| Rate & Term Refinance........... | 505 | 72,461,874 | 7.88 | 143,489 | 6.840 | 81.48 | 626 | 93.32 | 1.46 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 6,097 | $919,147,645 | 100.00% | $150,754 | 6.811% | 79.85% | 620 | 91.75% | 2.12% |

</TABLE>

S-36

THE ORIGINATOR

The information set forth in the following paragraphs has been provided by the originator (referred to herein as Wells Fargo).

Wells Fargo originates subprime first lien residential mortgage loans through a network of retail, wholesale, and correspondent offices located throughout all 50 states and the District of Columbia.

The underwriting functions of Wells Fargo are performed in its Arizona, California, Iowa, Louisiana, Minnesota, North Carolina and South Carolina offices. Wells Fargo does not delegate underwriting authority to any broker or correspondent. Wells Fargo employs loan credit underwriters to scrutinize the applicant's credit profile and to evaluate whether an impaired credit history is a result of adverse circumstances or a continuing inability or unwillingness to meet credit obligations in a timely manner. Personal circumstances such as divorce, family illnesses or deaths and temporary job loss due to layoffs and corporate downsizing will often impair an applicant's credit record. The underwriting guidelines used by Wells Fargo are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a Mortgage Loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant including, depending on the program, the applicant's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. With respect to every applicant, a credit report summarizing the applicant's credit history with merchants and lenders is obtained. Significant unfavorable credit information reported by the applicant or by a credit reporting agency is taken into account in the credit decision. Loan applications are classified according to certain characteristics, including but not limited to: condition and location of the collateral, credit history of the applicant, ability to pay, loan-to-value ratio and general stability of the applicant in terms of employment history and time in residence.

Wells Fargo has established classifications with respect to the credit profile of the applicant, and each loan is placed into one of nine credit levels denoted as "Y9 through Y1" (see table below). Terms of Mortgage Loans made by Wells Fargo, as well as maximum loan-to-value ratios, vary depending on the credit level classification of the applicant. Loan applicants with less favorable credit profiles generally are restricted to consideration for loans with higher interest rates, lower maximum loan amounts and lower loan-to-value ratios than applicants with more favorable credit profiles. Generally, the loan-to-value ratio is the ratio, expressed as a percentage, of the principal amount of the Mortgage Loan at origination to the lesser of (i) the appraised value of the related mortgaged property, as established by an appraisal obtained by the originator generally no more than 120 days prior to origination and (ii) the sale price for such property. In some instances, the loan-to-value ratio may be based on the value determined by an appraisal that was obtained by the originator more than 120 days prior to origination, provided that (i) an appraisal update is obtained and (ii) the original appraisal was obtained no more than 180 days prior to origination. Generally, the maximum total debt to gross income ratio for each credit level is 55%. Subject to the consideration of certain compensating factors described below, the general criteria used by Wells Fargo's underwriting staff in classifying loan applicants are as follow:

S-66

ASSIGNMENT OF THE MORTGAGE LOANS

On the closing date, the depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the trustee and other related documents, including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date. The trust administrator, concurrently with such transfer, will deliver the certificates to the depositor. Each Mortgage Loan transferred to the trust will be identified on a mortgage loan schedule delivered to the trust administrator pursuant to the Pooling and Servicing Agreement. The mortgage loan schedule will include information such as the Cut-off Date Principal Balance of each Mortgage Loan, its Mortgage Rate as well as other information with respect to each Mortgage Loan.

The Pooling and Servicing Agreement will require that, within the time period specified therein, the depositor will deliver or cause to be delivered to the trustee (or a custodian, as the trustee's agent for such purpose) the mortgage notes endorsed to the trustee on behalf of the certificateholders and the other related documents. In lieu of delivery of original Mortgages or mortgage notes, if such original is not available or lost, the depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found to be defective in any material respect and such defect is not cured within 90 days following notification thereof to the seller or the originator, as applicable, by the trustee, or a custodian on its behalf, the seller or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a qualified substitute mortgage loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the master servicer for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the seller or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a qualified substitute mortgage loan, the seller or the originator, as applicable will be required to remit to the servicer for deposit in the custodial account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Master Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Master Agreement, the originator represented and warranted that, among other things: each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the trustee will promptly notify the servicer and will enforce the obligations of the originator or the seller, as applicable, under the Master Agreement or the Assignment Agreement to effect a cure by either (i) as permitted pursuant to the Master Agreement or pursuant to the Pooling and Servicing Agreement, as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Master Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Master Agreement or the Assignment Agreement that materially and adversely affects the interests of the certificateholders.

PROSPECTUS
JUNE 2, 2005

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
Depositor

ASSET-BACKED CERTIFICATES

ASSET-BACKED NOTES
(ISSUABLE IN SERIES)

Mortgage Asset Securitization Transactions, Inc. from time to time will offer asset-backed pass-through certificates or asset-backed notes. We will offer the certificates or notes through this prospectus and a separate prospectus supplement for each series.

For each series we will establish a trust fund consisting primarily of

o   a segregated pool of various types of single-family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them; or

o   pass-through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

The certificates of a series will evidence beneficial ownership interests in the trust fund. The notes of a series will evidence indebtedness of the trust fund. The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 7 IN THIS PROSPECTUS AND IN THE RELATED PROSPECTUS SUPPLEMENT.

The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

You should consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

The Securities and Exchange Commission and state securities regulators have not approved or disapproved of the offered certificates or notes or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

UBS Investment Bank

o   the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "YIELD CONSIDERATIONS" and "MATURITY AND PREPAYMENT CONSIDERATIONS" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

o   prevailing mortgage market interest rates;

o   local and national interest rates;

o   homeowner mobility; and

o   the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "DESCRIPTION OF THE SECURITIES--DISTRIBUTIONS" and "--PRINCIPAL AND INTEREST ON THE SECURITIES" in this prospectus.

BORROWER MAY BE UNABLE TO MAKE BALLOON PAYMENT

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, I.E., balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

o   timely refinance the loan; or

o   timely sell the related residential property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

o   the level of available mortgage rates at the time of sale or refinancing;

o   the borrower's equity in the related residential property;

o   the financial condition of the borrower; and

o   the tax laws.

A borrower's failure to make a balloon payment would increase the risk that you might not receive all payments to which you are entitled.

NATURE OF MORTGAGES COULD ADVERSELY AFFECT VALUE OF PROPERTIES

Several factors could adversely affect the value of the residential properties. As a result, the outstanding balance of the related residential loans, together with any senior financing on the residential properties, if applicable, may equal or exceed the value of the residential properties. Among these factors are:

o   an overall decline in the residential real estate market in the areas in which the residential properties are located;

o   a decline in the general condition of the residential properties as a result of failure of borrowers to adequately maintain the residential properties; or

o   a decline in the general condition of the residential properties as a result of natural disasters that are not necessarily covered by insurance, such as earthquakes and floods.

A decline that affects residential loans secured by junior liens could extinguish the value of the interest of a junior mortgagee in the residential property before having any effect on the interest of the related senior mortgagee. If a decline occurs, the actual rates of delinquencies, foreclosures and losses on all residential loans could be higher than those currently experienced in the mortgage lending industry in general.

9

In addition, Multifamily Loans may contain "due-on-encumbrance" clauses permitting the lender to accelerate the maturity of the Multifamily Loan if there is a further encumbrance by the borrower of the underlying residential property. In general, where a "due-on-sale" or "due-on-encumbrance" clause is contained in a conventional residential loan under a Freddie Mac or the Fannie Mae program, the lender's right to accelerate the maturity of the residential loan if there is a transfer or further encumbrance of the property must be exercised, so long as the acceleration is permitted under applicable law.

With respect to a series of securities evidencing interests in a trust fund including residential loans, the master servicer generally is required to enforce any provision limiting prepayments and any due-on-sale or due-on-encumbrance clause. The master servicer is required to enforce these provisions only to the extent it has knowledge of the conveyance or encumbrance or the proposed conveyance or encumbrance of the underlying residential property and reasonably believes that it is entitled to do so under applicable law. However, the master servicer will generally be prohibited from taking any enforcement action that would impair or threaten to impair any recovery under any related insurance policy. See "DESCRIPTION OF THE SECURITIES--COLLECTION AND OTHER SERVICING PROCEDURES" and "CERTAIN LEGAL ASPECTS OF RESIDENTIAL LOANS--ENFORCEABILITY OF CERTAIN PROVISIONS" and "--PREPAYMENT CHARGES AND PREPAYMENTS" in this prospectus for a description of provisions of each pooling and servicing agreement and legal developments that may affect the prepayment experience on the residential loans. See also "DESCRIPTION OF THE SECURITIES--TERMINATION" in this prospectus for a description of the possible early termination of any series of securities. See also "RESIDENTIAL LOANS--REPRESENTATIONS BY UNAFFILIATED SELLERS; REPURCHASES" and "DESCRIPTION OF THE SECURITIES--ASSIGNMENT OF ASSETS OF THE TRUST FUND" in this prospectus for a description of the circumstances under which the Unaffiliated Sellers, the master servicer and the depositor are generally obligated to repurchase residential loans.

With respect to a series of securities evidencing interests in a trust fund including agency securities, principal prepayments may also result from guaranty payments and from the exercise by the issuer or guarantor of the related agency securities of any right to repurchase the underlying residential loans. The prospectus supplement relating to each series of securities will describe the circumstances and the manner in which the optional repurchase right, if any, may be exercised.

In addition, the mortgage securities included in the trust fund may be backed by underlying residential loans having differing interest rates. Accordingly, the rate at which principal payments are received on the related securities will, to a certain extent, depend on the interest rates on the underlying residential loans.

The prospectus supplement for each series of securities may set forth additional information regarding related maturity and prepayment considerations.

## THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713-2000.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential loans, mortgage securities and agency securities, offering securities or other mortgage- or asset-related securities, and related activities.

Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the securities of any series.

## RESIDENTIAL LOANS

### UNDERWRITING STANDARDS

The residential loans will have been purchased by the depositor, either directly or through affiliates, from loan sellers that may be affiliated or unaffiliated with the depositor. The related prospectus supplement will specify the underwriting criteria generally used to originate the residential loans. The underwriting standards applicable to residential loans underlying mortgage securities may vary substantially from the underwriting standards set forth in the related prospectus supplement.

### REPRESENTATIONS BY UNAFFILIATED SELLERS; REPURCHASES

Each Unaffiliated Seller made representations and warranties in respect of the residential loans sold by the Unaffiliated Seller. The related prospectus supplement will specify these representations and warranties which may include, among other things:

o    that the Unaffiliated Seller had good title to each residential loan and the residential loan was subject to no offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive certain indebtedness of a borrower;

27

- o   if the trust fund includes mortgage loans, that each mortgage constituted a valid lien on the mortgaged property, subject only to permissible title insurance exceptions and senior liens, if any;

- o   if the trust fund includes manufactured housing contracts, each manufactured housing contract creates a valid, subsisting and enforceable first priority security interest in the manufactured home covered by the contract;

- o   that the residential property was free from damage and was in good repair;

- o   that there were no delinquent tax or assessment liens against the residential property;

- o   that each residential loan was current as to all required payments; and

- o   that each residential loan was made in compliance with all applicable local, state and federal laws and regulations in all material respects.

In certain cases, the representations and warranties of an Unaffiliated Seller in respect of a residential loan may have been made as of the date on which the Unaffiliated Seller sold the residential loan to the depositor or its affiliate. A substantial period of time may have elapsed between that date and the date of initial issuance of the series of securities evidencing an interest in the residential loan. Since the representations and warranties of an Unaffiliated Seller do not address events that may occur following the sale of a residential loan by the Unaffiliated Seller, its repurchase obligation will not arise if the relevant event that would otherwise have given rise to this type of obligation occurs after the date of the sale to or on behalf of the depositor.

The master servicer or the trustee will be required to promptly notify the relevant Unaffiliated Seller of any breach of any representation or warranty made by it in respect of a residential loan which materially and adversely affects the interests of the holders of the securities in the residential loan. If the Unaffiliated Seller cannot cure the breach, then the Unaffiliated Seller will be obligated to repurchase this residential loan from the trustee at the purchase price for the loan. The related prospectus supplement will specify this purchase price, which is generally equal to the sum of:

- o   the unpaid principal balance of the residential loans;

- o   unpaid accrued interest on the unpaid principal balance from the date as to which interest was last paid by the borrower to the end of the calendar month in which the purchase is to occur at a rate equal to the net mortgage rate minus the rate at which the sub-servicer's servicing fee is calculated if the sub-servicer is the purchaser; and

- o   if applicable, any expenses reasonably incurred or to be incurred by the master servicer or the trustee in respect of the breach or defect giving rise to a purchase obligation.

An Unaffiliated Seller, rather than repurchase a residential loan as to which a breach has occurred, may have the option to cause the removal of the breached residential loan from the trust fund and substitute in its place one or more other residential loans. This option must be exercised within a specified period after initial issuance of the related series of securities and be done in accordance with the standards described in the related prospectus supplement. The related prospectus supplement may specify that this repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by an Unaffiliated Seller.

Neither the depositor nor the master servicer unless the master servicer is an Unaffiliated Seller will be obligated to purchase or substitute for a residential loan if an Unaffiliated Seller defaults on its obligation to do so. We cannot assure you that Unaffiliated Sellers will carry out their repurchase and substitution obligations with respect to residential loans. Any residential loan that is not repurchased or substituted for will remain in the related trust fund. Any resulting losses on that residential loan will be borne by holders of the securities, to the extent not covered by credit enhancement.

SUB-SERVICING

Any master servicer may delegate its servicing obligations in respect of a residential loan to sub-servicers pursuant to a sub-servicing agreement. The sub-servicing agreement must be consistent with the terms of the servicing agreement relating to the trust fund that includes the residential loan. Although each sub-servicing agreement will be a contract solely between the master servicer and the sub-servicer, the related pooling and servicing agreement pursuant to which a series of securities is issued may provide that, if for any reason the master servicer for the series of securities is no longer acting in that capacity, the trustee or any successor master servicer must recognize the sub-servicer's rights and obligations under any sub-servicing agreement.

28

# Exhibit 2

PROSPECTUS SUPPLEMENT DATED November 23, 2005
(To Prospectus dated June 2, 2005)

$1,175,569,000 (APPROXIMATE)

[MASTR LOGO]

MASTR ASSET BACKED SECURITIES TRUST 2005-FRE1,
MORTGAGE PASS-THROUGH CERTIFICATES

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
(DEPOSITOR)

UBS REAL ESTATE SECURITIES INC.
(SELLER)

HOMEQ SERVICING CORPORATION
(SERVICER)

The MASTR Asset Backed Securities Trust 2005-FRE1, Mortgage
Pass-Through Certificates consists of nineteen classes of certificates, but only
fourteen classes are offered through this prospectus supplement.

o        The trust's main source of funds for making distributions on the
         certificates will be collections on closed-end, fixed-rate and
         adjustable-rate mortgage loans secured by first and second mortgages or
         deeds of trust on residential one- to four-family properties.

o        Credit enhancement will be provided by subordination as described in
         this prospectus supplement under "Description of the Offered
         Certificates--Credit Enhancement," overcollateralization as described
         in this prospectus supplement under "Description of the Offered
         Certificates--Overcollateralization Provisions," excess interest as
         described in this prospectus supplement under "Description of the
         Offered Certificates--Overcollateralization Provisions" and an interest
         rate swap agreement as described in this prospectus supplement under
         "Description of the Offered Certificates--Interest Rate Swap Agreement,
         the Swap Provider and the Swap Account."

--------------------------------------------------------------------------

YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-17 IN THIS
PROSPECTUS SUPPLEMENT AND PAGE 8 IN THE PROSPECTUS.

The certificates will not represent obligations of Mortgage Asset
Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS
Securities LLC or any other person or entity. No governmental agency or
instrumentality will insure the certificates or the collateral securing the
certificates.

You should consult with your own advisors to determine if the offered
certificates are appropriate investments for you and to determine the
applicable legal, tax, regulatory and accounting treatment of the offered
certificates.
--------------------------------------------------------------------------

NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE
OFFERED CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE
ACCOMPANYING PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE
CONTRARY IS A CRIMINAL OFFENSE.

We will not list the offered certificates on any national securities
exchange or on any automated quotation system of any registered securities
association such as NASDAQ.

UBS Securities LLC will purchase the offered certificates from Mortgage
Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver
the offered certificates in book entry form through the facilities of The
Depository Trust Company, and upon request, through the facilities of
Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or
about November 29, 2005.

The proceeds to the depositor are expected to be approximately
$1,168,233,948 before deducting expenses. See "Underwriting" in this prospectus
supplement. UBS Securities LLC will sell the offered certificates from time to
time in negotiated transactions at varying prices determined at the time of
sale.

[UBS INVESTMENT BANK LOGO]

VIOLATION OF VARIOUS FEDERAL, STATE AND LOCAL LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS

Applicable state laws generally regulate interest rates and other charges, require certain disclosure and require licensing of the originator. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

o        the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

o        the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o        the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such mortgage loans against either the trust or subsequent holders of the mortgage loans.

The originator or the seller will represent that as of the closing date, each mortgage loan is in compliance with applicable federal, state and local laws and regulations. In the event of a breach of such representation, the originator or the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described under "The Pooling and Servicing Agreement--Assignment of the Mortgage Loans" in this prospectus supplement.

High Cost Loans

None of the mortgage loans are "High Cost Loans" within the meaning of the Homeownership Act or any state or local law, ordinance or regulation similar to the Homeownership Act. See "Certain Legal Aspects of Residential Loans--Anti-Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders--Homeownership Act and Similar State Laws" in the prospectus.

In addition to the Homeownership Act, however, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such mortgage loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. The originator's failure to comply with these laws could subject the trust, and other assignees of the mortgage loans, to monetary penalties and could result in the borrowers rescinding such mortgage loans against either the trust or subsequent holders of the mortgage loans. Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

Under the anti-predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if the originator reasonably believed that the test was satisfied. Any determination by a court that

otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time. A limited number of other Mortgage Loans may be included in each Loan Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary.

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the Cut-off Date Principal Balance in the aggregate or with respect to the related Loan Group.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed-rate and adjustable-rate, first and second lien, fully-amortizing mortgage loans with Principal Balances that conform to Fannie Mae and Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed-rate and adjustable-rate, first and second lien, fully-amortizing mortgage loans with Principal Balances that may or may not conform to Fannie Mae and Freddie Mac loan limits. In addition, certain of the conforming balance Mortgage Loans included in Loan Group II might otherwise have been included in Loan Group I, but were excluded from Loan Group I because they did not meet Freddie Mac criteria (including published guidelines) for factors other than principal balance.

The Group I Mortgage Loans consist of 3,331 Mortgage Loans and have a Cut-off Date Principal Balance of approximately $540,710,947. The Group II Mortgage Loans consist of 2,353 Mortgage Loans and have a Cut-off Date Principal Balance of approximately $664,387,934.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one- to four-family residential properties consisting of attached or detached one- to four-family dwelling units and individual condominium units. Approximately 96.87% of the Group I Mortgage Loans are secured by first Mortgages and approximately 3.31% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 92.38% of the Group II Mortgage Loans are secured by first Mortgages and approximately 7.62% of the Group II Mortgage Loans are secured by second Mortgages.

The seller previously purchased the Mortgage Loans from the originator pursuant to the Master Agreement. The depositor will purchase the Mortgage Loans from the seller and acquire the seller's rights against the originator under the Master Agreement pursuant to the Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Master Agreement and the Assignment Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling Agreement" herein.

Each of the Mortgage Loans was selected from the seller's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by the originator in accordance with its respective underwriting standards as described under "The Originator" in this prospectus supplement.

Under the Master Agreement and the Assignment Agreement, certain representations and warranties regarding the Mortgage Loans have been made by the originator. Pursuant to the Assignment Agreement, the seller has assigned its rights with respect to the Master Agreement, including remedies with respect to breaches of representations and warranties, to the depositor (who will further assign such rights to the trustee on behalf of the trust) and made certain additional representations and warranties regarding such Mortgage Loans. To the extent set forth under "The Pooling Agreement--Assignment of the Mortgage Loans," the trustee will enforce the obligations of the originator under the Master Agreement and the Assignment Agreement (as assigned by the depositor to the trustee pursuant to the Pooling Agreement) or the seller under the Assignment Agreement, to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists

## OCCUPANCY STATUS OF THE MORTGAGE LOANS(1)

<TABLE>
<CAPTION>

| OCCUPANCY STATUS | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIEN |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Owner Occupied...... | 5,199 | $1,117,263,422 | 92.71% | $214,900 | 7.308% | 81.09% | 626 | 58.25% | 6.00% |
| Non-Owner Occupied.. | 437 | 75,520,883 | 6.27 | 172,817 | 7.705 | 83.06 | 646 | 72.47 | 0.71 |
| Second Home......... | 48 | 12,314,576 | 1.02 | 256,554 | 7.562 | 81.86 | 630 | 44.66 | 0.25 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 5,684 | $1,205,098,881 | 100.00% | $212,016 | 7.336% | 81.22% | 626 | 59.00% | 5.61% |

</TABLE>
--------------------
(1) Occupancy as represented by the mortgagor at the time of origination.

## PURPOSE OF THE MORTGAGE LOANS

<TABLE>
<CAPTION>

| PURPOSE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIEN |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Purchase............ | 3,296 | $ 632,633,802 | 52.50% | $131,940 | 7.376% | 83.68% | 644 | 57.06% | 8.62% |
| Cash Out Refinance.. | 2,349 | 563,598,677 | 46.77 | 239,931 | 7.293 | 78.43 | 605 | 60.82 | 2.27 |
| Rate & Term Refinance | 39 | 8,866,402 | 0.74 | 227,344 | 7.171 | 83.46 | 616 | 81.29 | 2.87 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 5,684 | $1,205,098,881 | 100.00% | $212,016 | 7.336% | 81.22% | 626 | 59.00% | 5.61% |

</TABLE>

## ORIGINAL LOAN-TO-VALUE RATIOS OF THE MORTGAGE LOANS(1)(2)

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIEN |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 50.00 or less.... | 74 | $ 13,169,224 | 1.09% | $177,962 | 7.628% | 41.83% | 589 | 45.05% | 0.00% |
| 50.01- 55.00..... | 43 | 8,577,002 | 0.71 | 199,465 | 7.390 | 52.70 | 564 | 48.42 | 0.00 |
| 55.01- 60.00..... | 101 | 21,338,103 | 1.77 | 211,268 | 7.527 | 58.03 | 570 | 51.75 | 0.00 |
| 60.01- 65.00..... | 147 | 33,513,554 | 2.78 | 227,983 | 7.683 | 63.36 | 571 | 54.45 | 0.00 |
| 65.01- 70.00..... | 197 | 47,598,761 | 3.95 | 241,618 | 7.713 | 68.91 | 585 | 57.48 | 0.00 |
| 70.01- 75.00..... | 266 | 66,372,632 | 5.51 | 249,521 | 7.417 | 73.86 | 589 | 49.43 | 0.00 |
| 75.01- 80.00..... | 2,326 | 615,891,818 | 51.11 | 264,786 | 6.944 | 79.85 | 641 | 51.90 | 0.00 |
| 80.01- 85.00..... | 392 | 96,103,925 | 7.97 | 245,163 | 7.186 | 84.52 | 601 | 73.84 | 0.14 |
| 85.01- 90.00..... | 888 | 208,014,839 | 17.26 | 234,251 | 7.375 | 89.82 | 620 | 81.52 | 0.38 |
| 90.01- 95.00..... | 201 | 20,540,506 | 1.70 | 102,192 | 8.362 | 94.90 | 644 | 56.12 | 20.77 |
| 95.01- 100.00.... | 1,049 | 73,978,517 | 6.14 | 70,523 | 9.812 | 99.97 | 652 | 53.67 | 84.33 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 5,684 | $1,205,098,881 | 100.00% | $212,016 | 7.336% | 81.22% | 626 | 59.00% | 5.61% |

</TABLE>
--------------------
(1)  The weighted average original loan-to-value ratio of the Mortgage Loans as
     of the Cut-off Date was approximately 81.22%.
(2)  For a description of the determination of loan-to-value ratio by the
     originator, see "The Originator--Underwriting Standards" in this prospectus
     supplement.

S-35

## PRODUCT TYPE OF THE GROUP II MORTGAGE LOANS

<TABLE>
<CAPTION>

| PRODUCT TYPE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIEN |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 2/6 Month LIBOR..... | 1,105 | $383,909,720 | 57.78% | $347,430 | 7.209% | 81.42% | 631 | 39.93% | 0.00% |
| 2/6 Month LIBOR-60 Month IO.......... | 478 | 184,331,681 | 27.74 | 385,631 | 6.567 | 81.19 | 652 | 78.49 | 0.00 |
| 3/6 Month LIBOR..... | 15 | 4,679,674 | 0.70 | 311,978 | 6.843 | 79.60 | 648 | 59.76 | 0.00 |
| 3/6 Month LIBOR-60 Month IO.......... | 13 | 5,767,812 | 0.87 | 443,678 | 6.073 | 80.61 | 687 | 91.96 | 0.00 |
| 5/6 Month LIBOR..... | 10 | 3,469,668 | 0.52 | 346,967 | 6.787 | 76.70 | 658 | 63.14 | 0.00 |
| Fixed............. | 732 | 82,229,377 | 12.38 | 112,335 | 8.831 | 92.65 | 655 | 57.09 | 61.57 |
| Total /Weighted Average/Percentage of the Group II Mortgage Loans...... | 2,353 | $664,387,934 | 100.00% | $282,358 | 7.217% | 82.70% | 640 | 53.46% | 7.62% |

</TABLE>

## PREPAYMENT CHARGE TERMS OF THE GROUP II MORTGAGE LOANS

<TABLE>
<CAPTION>

| ORIGINAL PREPAYMENT CHARGE TERM (MONTHS) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIEN |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 0.................. | 566 | $141,191,857 | 21.25% | $249,456 | 7.617% | 83.44% | 643 | 40.24% | 10.17% |
| 12................. | 332 | 106,099,743 | 15.97 | 319,578 | 7.258 | 82.38 | 648 | 44.90 | 6.93 |
| 24................. | 1,325 | 374,383,435 | 56.35 | 282,554 | 7.115 | 82.55 | 636 | 58.28 | 7.21 |
| 36................. | 130 | 42,712,889 | 6.43 | 328,561 | 6.681 | 82.40 | 649 | 76.28 | 4.56 |
| Total/Weighted Average/Percentage of the Group II Mortgage Loans...... | 2,353 | $664,387,934 | 100.00% | $282,358 | 7.217% | 82.70% | 640 | 53.46% | 7.62% |

</TABLE>

## THE ORIGINATOR

The information set forth in the following paragraphs with regard to the originator and the originator's underwriting standards has been provided by the originator.

### GENERAL

The originator is a California state chartered industrial bank headquartered in Brea, California. The originator currently operates wholesale residential real estate loan production offices located in Anaheim, California; Concord, California; Downers Grove, Illinois; Westchester County, New York; and Tampa, Florida. The originator conducts business in 45 states and the District of Columbia and its primary source of originations is through licensed mortgage brokers.

Established in 1937, the originator is currently engaged in the business of residential sub-prime real estate lending and commercial real estate lending. Acquired in 1990, the originator is an indirect subsidiary of Fremont General Corporation, a financial services holding company listed on the New York Stock Exchange. As of September 30, 2005, Fremont had approximately $10.81 billion in assets, approximately $9.31 billion in liabilities and approximately $1.50 billion in equity. Fremont's sub-prime residential originations totaled approximately $6.94 billion, $13.74 billion and $23.91 billion for the years ended 2002, 2003 and 2004, respectively. For the first nine months of 2005, Fremont's sub-prime residential originations totaled approximately $26.62 billion.

S-61

UNDERWRITING GUIDELINES

All of the Mortgage Loans were originated or acquired by the originator generally in accordance with the underwriting criteria described in this section. The following is a summary of the underwriting guidelines believed by the depositor to have been applied, with some variation, by the originator. This summary does not purport to be a complete description of the underwriting guidelines of the originator.

Substantially all of the mortgage loans originated by the originator are based on loan application packages submitted through licensed mortgage brokers. These brokers must meet minimum standards set by the originator based on an analysis of the following information submitted with an application for approval: applicable state lending license (in good standing), signed broker agreement, and signed broker authorization. Once approved, licensed mortgage brokers are eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

The Mortgage Loans are underwritten in accordance with the originator's current underwriting programs (referred to as the Scored Programs), subject to various exceptions as described in this section. The originator's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the Mortgage Loans were underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market.

The Scored Programs were developed to simplify the origination process. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance. Licensed mortgage brokers are able to access Credit Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon the originator's Scored Programs risk-based pricing matrices. Final loan terms are subject to approval by the originator.

Under the Scored Programs, the originator requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository. For the purpose of determining program eligibility,

- o if Credit Scores are available from all three credit repositories, the middle of the three Credit Scores is used;

- o if Credit Scores are available from only two of the repositories, the lower of the two Credit Scores is used; and

- o if a single Credit Score is available, the single Credit Score will be used; however, potential borrowers with a single Credit Score will not qualify for loan amounts in excess of $750,000, loans with loan-to-value ratios in excess of 90% or 80% (depending on type of program) and second mortgage loans with loan-to-value ratios in excess of 5%.

Generally, the minimum applicable Credit Score allowed is 500, however borrowers with no Credit Scores are not automatically rejected and may be eligible for certain loan programs in appropriate circumstances.

All of the Mortgage Loans were underwritten by the originator's underwriters having the appropriate approval authority. Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills. On a case by case basis, the originator may determine that, based upon

ASSIGNMENT OF THE MORTGAGE LOANS

On the closing date, the depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the trustee and other related documents, including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date. The trustee, concurrently with such transfer, will deliver the certificates to the depositor. Each Mortgage Loan transferred to the trust will be identified on a mortgage loan schedule delivered to the trustee pursuant to the Pooling and Servicing Agreement. The mortgage loan schedule will include information such as the Cut-off Date Principal Balance of each Mortgage Loan, its Mortgage Rate as well as other information with respect to each Mortgage Loan.

The Pooling and Servicing Agreement will require that, within the time period specified therein, the depositor will deliver or cause to be delivered to the trustee (or a custodian, as the trustee's agent for such purpose) the mortgage notes endorsed to the trustee on behalf of the certificateholders and the other related documents. In lieu of delivery of original Mortgages or mortgage notes, if such original is not available or lost, the depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found to be defective in any material respect and such defect is not cured within 90 days following notification thereof to the originator by the trustee, or a custodian on its behalf, the originator will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the originator or the seller, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Master Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Master Agreement, the originator represented and warranted that, among other things: each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the trustee will promptly notify the servicer and will enforce the obligations of the originator or the seller, as applicable, under the Master Agreement or the Assignment Agreement to effect a cure by either (i) as permitted pursuant to the Master Agreement or pursuant to the Pooling and Servicing Agreement, as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Master Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient

PROSPECTUS
JUNE 2, 2005

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
Depositor

ASSET-BACKED CERTIFICATES

ASSET-BACKED NOTES
(ISSUABLE IN SERIES)

Mortgage Asset Securitization Transactions, Inc. from time to time will offer asset-backed pass-through certificates or asset-backed notes. We will offer the certificates or notes through this prospectus and a separate prospectus supplement for each series.

For each series we will establish a trust fund consisting primarily of

o   a segregated pool of various types of single-family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them; or

o   pass-through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

The certificates of a series will evidence beneficial ownership interests in the trust fund. The notes of a series will evidence indebtedness of the trust fund. The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 7 IN THIS PROSPECTUS AND IN THE RELATED PROSPECTUS SUPPLEMENT.

The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

You should consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

The Securities and Exchange Commission and state securities regulators have not approved or disapproved of the offered certificates or notes or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

UBS Investment Bank

In addition, Multifamily Loans may contain "due-on-encumbrance" clauses permitting the lender to accelerate the maturity of the Multifamily Loan if there is a further encumbrance by the borrower of the underlying residential property. In general, where a "due-on-sale" or "due-on-encumbrance" clause is contained in a conventional residential loan under a Freddie Mac or the Fannie Mae program, the lender's right to accelerate the maturity of the residential loan if there is a transfer or further encumbrance of the property must be exercised, so long as the acceleration is permitted under applicable law.

With respect to a series of securities evidencing interests in a trust fund including residential loans, the master servicer generally is required to enforce any provision limiting prepayments and any due-on-sale or due-on-encumbrance clause. The master servicer is required to enforce these provisions only to the extent it has knowledge of the conveyance or encumbrance or the proposed conveyance or encumbrance of the underlying residential property and reasonably believes that it is entitled to do so under applicable law. However, the master servicer will generally be prohibited from taking any enforcement action that would impair or threaten to impair any recovery under any related insurance policy. See "Description of the Securities--Collection and Other Servicing Procedures" and "Certain Legal Aspects of Residential Loans--Enforceability of Certain Provisions" and "--Prepayment Charges and Prepayments" in this prospectus for a description of provisions of each pooling and servicing agreement and legal developments that may affect the prepayment experience on the residential loans. See also "Description of the Securities--Termination" in this prospectus for a description of the possible early termination of any series of securities. See also "Residential Loans--Representations by Unaffiliated Sellers; Repurchases" and "Description of the Securities--Assignment of Assets of the Trust Fund" in this prospectus for a description of the circumstances under which the Unaffiliated Sellers, the master servicer and the depositor are generally obligated to repurchase residential loans.

With respect to a series of securities evidencing interests in a trust fund including agency securities, principal prepayments may also result from guaranty payments and from the exercise by the issuer or guarantor of the related agency securities of any right to repurchase the underlying residential loans. The prospectus supplement relating to each series of securities will describe the circumstances and the manner in which the optional repurchase right, if any, may be exercised.

In addition, the mortgage securities included in the trust fund may be backed by underlying residential loans having differing interest rates. Accordingly, the rate at which principal payments are received on the related securities will, to a certain extent, depend on the interest rates on the underlying residential loans.

The prospectus supplement for each series of securities may set forth additional information regarding related maturity and prepayment considerations.

## THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc.. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713-2000.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential loans, mortgage securities and agency securities, offering securities or other mortgage- or asset-related securities, and related activities.

Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the securities of any series.

## RESIDENTIAL LOANS

### UNDERWRITING STANDARDS

The residential loans will have been purchased by the depositor, either directly or through affiliates, from loan sellers that may be affiliated or unaffiliated with the depositor. The related prospectus supplement will specify the underwriting criteria generally used to originate the residential loans. The underwriting standards applicable to residential loans underlying mortgage securities may vary substantially from the underwriting standards set forth in the related prospectus supplement.

### REPRESENTATIONS BY UNAFFILIATED SELLERS; REPURCHASES

Each Unaffiliated Seller made representations and warranties in respect of the residential loans sold by the Unaffiliated Seller. The related prospectus supplement will specify these representations and warranties which may include, among other things:

   o  that the Unaffiliated Seller had good title to each residential loan and the residential loan was subject to no offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive certain indebtedness of a borrower;

    o  if the trust fund includes mortgage loans, that each mortgage constituted a valid lien on the mortgaged property, subject only to permissible title insurance exceptions and senior liens, if any;

    o  if the trust fund includes manufactured housing contracts, each manufactured housing contract creates a valid, subsisting and enforceable first priority security interest in the manufactured home covered by the contract;

    o  that the residential property was free from damage and was in good repair;

    o  that there were no delinquent tax or assessment liens against the residential property;

    o  that each residential loan was current as to all required payments; and

    o  that each residential loan was made in compliance with all applicable local, state and federal laws and regulations in all material respects.

In certain cases, the representations and warranties of an Unaffiliated Seller in respect of a residential loan may have been made as of the date on which the Unaffiliated Seller sold the residential loan to the depositor or its affiliate. A substantial period of time may have elapsed between that date and the date of initial issuance of the series of securities evidencing an interest in the residential loan. Since the representations and warranties of an Unaffiliated Seller do not address events that may occur following the sale of a residential loan by the Unaffiliated Seller, its repurchase obligation will not arise if the relevant event that would otherwise have given rise to this type of obligation occurs after the date of the sale to or on behalf of the depositor.

The master servicer or the trustee will be required to promptly notify the relevant Unaffiliated Seller of any breach of any representation or warranty made by it in respect of a residential loan which materially and adversely affects the interests of the holders of the securities in the residential loan. If the Unaffiliated Seller cannot cure the breach, then the Unaffiliated Seller will be obligated to repurchase this residential loan from the trustee at the purchase price for the loan. The related prospectus supplement will specify this purchase price, which is generally equal to the sum of:

    o  the unpaid principal balance of the residential loans;

    o  unpaid accrued interest on the unpaid principal balance from the date as to which interest was last paid by the borrower to the end of the calendar month in which the purchase is to occur at a rate equal to the net mortgage rate minus the rate at which the sub-servicer's servicing fee is calculated if the sub-servicer is the purchaser; and

    o  if applicable, any expenses reasonably incurred or to be incurred by the master servicer or the trustee in respect of the breach or defect giving rise to a purchase obligation.

An Unaffiliated Seller, rather than repurchase a residential loan as to which a breach has occurred, may have the option to cause the removal of the breached residential loan from the trust fund and substitute in its place one or more other residential loans. This option must be exercised within a specified period after initial issuance of the related series of securities and be done in accordance with the standards described in the related prospectus supplement. The related prospectus supplement may specify that this repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by an Unaffiliated Seller.

Neither the depositor nor the master servicer unless the master servicer is an Unaffiliated Seller will be obligated to purchase or substitute for a residential loan if an Unaffiliated Seller defaults on its obligation to do so. We cannot assure you that Unaffiliated Sellers will carry out their repurchase and substitution obligations with respect to residential loans. Any residential loan that is not repurchased or substituted for will remain in the related trust fund. Any resulting losses on that residential loan will be borne by holders of the securities, to the extent not covered by credit enhancement.

SUB-SERVICING

Any master servicer may delegate its servicing obligations in respect of a residential loan to sub-servicers pursuant to a sub-servicing agreement. The sub-servicing agreement must be consistent with the terms of the servicing agreement relating to the trust fund that includes the residential loan. Although each sub-servicing agreement will be a contract solely between the master servicer and the sub-servicer, the related pooling and servicing agreement pursuant to which a series of securities is issued may provide that, if for any reason the master servicer for the series of securities is no longer acting in that capacity, the trustee or any successor master servicer must recognize the sub-servicer's rights and obligations under any sub-servicing agreement.

# Exhibit 3

[LOGO OF MASTR]

PROSPECTUS SUPPLEMENT DATED SEPTEMBER 28, 2005
(TO PROSPECTUS DATED JUNE 2, 2005)

$529,095,000 (APPROXIMATE)

MASTR ASSET BACKED SECURITIES TRUST 2005-HE2

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
(DEPOSITOR)

UBS REAL ESTATE SECURITIES INC.
(SELLER)

WELLS FARGO BANK, N.A.
(MASTER SERVICER)

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
(SERVICER)

MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2005-HE2

The MASTR Asset Backed Securities Trust 2005-HE2 is issuing nineteen classes of certificates, but is offering only fourteen classes through this prospectus supplement.

o        The trust's main source of funds for making distributions on the certificates will be collections on closed-end, fixed-rate and adjustable-rate mortgage loans secured by first and second mortgages or deeds of trust on residential one- to four-family properties.

o        Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates-- Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates-- Overcollateralization Provisions," excess interest as described in this prospectus supplement under "Description of the Certificates-- Overcollateralization Provisions" and an interest rate swap agreement as described in this prospectus supplement under "Description of the Certificates--Interest Rate Swap Agreement, the Swap Provider and the Swap Account."

YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-18 IN THIS PROSPECTUS SUPPLEMENT AND PAGE 8 IN THE PROSPECTUS.

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE OFFERED CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE ACCOMPANYING PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about September 30, 2005.

The proceeds to the depositor are expected to be approximately $526,985,845 before deducting expenses. See "Underwriting" in this prospectus supplement. UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.

[LOGO OF UBS INVESTMENT BANK]

The seller will represent and warrant as of the closing date that each mortgaged property is free of material damage and in good repair. In the event of a breach of that representation and warranty that materially and adversely affects the value of such mortgage loan, the seller will be obligated to repurchase or substitute for the related mortgage loan. Any such repurchase would have the effect of increasing the rate of principal payment on the Class A Certificates and Mezzanine Certificates. Any damage to a mortgaged property that secures a mortgage loan in the trust fund occurring after the closing date as a result of any other casualty event will not cause a breach of this representation and warranty.

The full economic impact of Hurricane Katrina and Hurricane Rita is uncertain but may affect the ability of borrowers to make payments on their mortgage loans. We have no way to determine the particular nature of such economic effects, how long any of these effects may last, or how these effects may impact the performance of the mortgage loans. Any impact of these events on the performance of the mortgage loans may increase the amount of losses borne by the holders of the Class A Certificates or Mezzanine Certificates or impact the weighted average lives of the Class A Certificates or Mezzanine Certificates.

BANKRUPTCY OF BORROWERS MAY ADVERSELY AFFECT DISTRIBUTIONS ON CERTIFICATES

The application of federal and state laws, including bankruptcy and debtor relief laws, may interfere with or adversely affect the ability to realize on the mortgaged properties, enforce deficiency judgments or pursue collection litigation with respect to defaulted mortgage loans. As a consequence, borrowers who have defaulted on their mortgage loans and sought, or are considering seeking, relief under bankruptcy or debtor relief laws will have substantially less incentive to repay their mortgage loans. As a result, these mortgage loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses.

VIOLATION OF VARIOUS FEDERAL, STATE AND LOCAL LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the originator. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

o        the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

o        the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o        the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such mortgage loans against either the trust or subsequent holders of the mortgage loans.

Each originator or the seller will represent that as of the closing date, each mortgage loan is in compliance with applicable federal, state and local laws and regulations. In the event of a breach of such representation, the related originator or the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described under "The Pooling and Servicing Agreement--Assignment of the Mortgage Loans" in this prospectus supplement.

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the Cut-off Date Principal Balance in the aggregate or with respect to the related Loan Group.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed-rate and adjustable-rate, first lien and second lien, fully-amortizing, balloon and interest-only mortgage loans with Principal Balances that conform to Fannie Mae and Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed-rate and adjustable-rate, first lien and second lien, fully-amortizing, balloon and interest-only mortgage loans with Principal Balances that may or may not conform to Fannie Mae and Freddie Mac loan limits. In addition, certain of the conforming balance Mortgage Loans included in Loan Group II might otherwise have been included in Loan Group I, but were excluded from Loan Group I because they did not meet Freddie Mac criteria (including published guidelines) for factors other than principal balance.

The Group I Mortgage Loans consist of 2,086 Mortgage Loans and have a Cut-off Date Principal Balance of approximately $282,422,588. The Group II Mortgage Loans consist of 1,340 Mortgage Loans and have a Cut-off Date Principal Balance of approximately $257,752,271.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one- to four-family residential properties consisting of attached or detached one- to four-family dwelling units and individual condominium units. Approximately 98.64% of the Group I Mortgage Loans are secured by first Mortgages and approximately 1.36% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 97.68% of the Group II Mortgage Loans are secured by first Mortgages and approximately 2.32% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 98.18% of the Mortgage Loans are secured by first Mortgages and approximately 1.82% of the Mortgage Loans are secured by second Mortgages.

The seller previously purchased the Mortgage Loans from each originator pursuant to the various Originator Master Agreements. The depositor will purchase the Mortgage Loans from the seller and acquire the seller's rights against each originator under the Originator Master Agreements pursuant to the Assignment Agreements. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Originator Master Agreements and the Assignment Agreements to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling Agreement" herein.

Each of the Mortgage Loans was selected from the seller's portfolio of mortgage loans. The Mortgage Loans were originated by the originators or acquired by the originators in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by each originator in accordance with its respective underwriting standards as described under "The Originators" in this prospectus supplement.

Under the Originator Master Agreements and the Assignment Agreements, certain representations and warranties regarding the Mortgage Loans have been made by the originators, and under the Mortgage Loan Purchase Agreement and Assignment Agreements, certain representations and warranties regarding the Mortgage Loans have been made by the seller. Pursuant to the Assignment Agreements, the seller has assigned its rights with respect to each Originator Master Agreement, including remedies with respect to breaches of representations and warranties, to the depositor (who will further assign such rights to the trustee on behalf of the trust) and made certain additional representations and warranties regarding such Mortgage Loans. To the extent set forth under "The Pooling Agreement--Assignment of the Mortgage Loans," the trustee will enforce the obligations of the related originator under the related Originator Master Agreement and the related Assignment Agreement (as assigned by the depositor to the trustee pursuant to the Pooling Agreement) or the seller under the Assignment Agreements or the Mortgage Loan Purchase Agreement, to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists uncured deficient documentation or an uncured breach of any such representation or warranty, if such breach or deficiency materially and adversely affects the Certificateholders' interests in such Mortgage Loan. The seller is selling the Mortgage Loans without recourse and will have no obligation with respect to the certificates in its capacity as seller, other than in connection with certain limited representations and warranties as described above. The originators will have no obligation with respect to the certificates in their capacity as an originator, other than in connection with representations and warranties made by them under the related Originator Master Agreement and assigned to the trustee as described above.

REMAINING TERMS TO MATURITY OF THE MORTGAGE LOANS(1)

<TABLE>
<CAPTION>

| RANGE OF REMAINING TERMS (MONTHS) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIENS |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 180 or less ........ | 102 | $ 7,013,704 | 1.30% | $ 68,762 | 8.709% | 84.48% | 649 | 37.03% | 50.83% |
| 181 - 240 .......... | 196 | 6,221,194 | 1.15 | 31,741 | 10.050 | 89.54 | 625 | 25.72 | 66.73 |
| 241 - 300 .......... | 2 | 183,355 | 0.03 | 91,677 | 6.757 | 69.97 | 645 | 0.00 | 0.00 |
| 301 - 360 .......... | 3,126 | 526,756,606 | 97.52 | 168,508 | 7.162 | 80.11 | 626 | 39.21 | 0.40 |
| Total /Weighted Average/Percentage of the Mortgage Loans .............. | 3,426 | $ 540,174,858 | 100.00% | $ 157,669 | 7.215% | 80.28% | 626 | 39.02% | 1.82% |

</TABLE>

----------
(1)      The weighted average remaining term to maturity of the Mortgage Loans
         was approximately 352 months.

PROPERTY TYPES OF THE MORTGAGE LOANS

<TABLE>
<CAPTION>

| PROPERTY TYPE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIENS |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Single Family ....... | 2,488 | $ 381,804,238 | 70.68% | $ 153,458 | 7.219% | 80.19% | 623 | 40.55% | 1.75% |
| PUD(1) .............. | 360 | 53,229,253 | 9.85 | 147,859 | 7.331 | 81.69 | 629 | 46.51 | 2.91 |
| Condominium ......... | 201 | 31,751,289 | 5.88 | 157,967 | 7.038 | 80.92 | 643 | 36.57 | 2.51 |
| Two Family .......... | 141 | 30,345,319 | 5.62 | 215,215 | 7.132 | 79.38 | 653 | 16.26 | 0.73 |
| PUD Detached(1) ..... | 109 | 20,842,827 | 3.86 | 191,219 | 7.225 | 79.30 | 614 | 27.44 | 1.69 |
| Single Family Attached ..... | 66 | 8,223,958 | 1.52 | 124,605 | 7.251 | 80.87 | 633 | 56.27 | 1.63 |
| PUD Attached(1) ..... | 24 | 4,140,648 | 0.77 | 172,527 | 7.096 | 77.74 | 617 | 18.77 | 2.39 |
| Two-Four Family(2) . | 15 | 3,489,433 | 0.65 | 232,629 | 7.101 | 78.63 | 659 | 44.35 | 0.00 |
| Three Family ....... | 9 | 2,878,487 | 0.53 | 319,832 | 7.615 | 83.59 | 610 | 31.33 | 0.00 |
| Four Family ........ | 8 | 2,586,354 | 0.48 | 323,294 | 7.083 | 79.15 | 659 | 18.53 | 0.00 |
| Low Rise Condo (2-4 floors) ....... | 3 | 516,746 | 0.10 | 172,249 | 7.534 | 45.55 | 570 | 40.15 | 0.00 |
| Manufactured Housing | 1 | 253,911 | 0.05 | 253,911 | 6.850 | 99.83 | 738 | 100.00 | 0.00 |
| Rowhouse ........... | 1 | 112,393 | 0.02 | 112,393 | 8.625 | 80.00 | 586 | 100.00 | 0.00 |
| Total /Weighted Average/Percentage of the Mortgage Loans .............. | 3,426 | $ 540,174,858 | 100.00% | $ 157,669 | 7.215% | 80.28% | 626 | 39.02% | 1.82% |

</TABLE>

----------
(1)      PUD refers to a home or "unit" in a Planned Unit Development.
(2)      Number of units unknown.

OCCUPANCY STATUS OF THE MORTGAGE LOANS(1)

<TABLE>
<CAPTION>

| OCCUPANCY STATUS | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF UNITS | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE FICO | % OF FULL DOC LOANS | % OF SECOND LIENS |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Owner Occupied ..... | 3,260 | $ 513,282,718 | 95.02% | $ 157,449 | 7.204% | 80.13% | 624 | 39.44% | 1.91% |
| Investor Occupied .. | 156 | 25,312,028 | 4.69 | 162,257 | 7.450 | 83.03 | 671 | 30.07 | 0.04 |
| Second Home ........ | 10 | 1,580,112 | 0.29 | 158,011 | 7.068 | 83.86 | 659 | 43.63 | 0.00 |
| Total /Weighted Average/Percentage of the Mortgage Loans .............. | 3,426 | $ 540,174,858 | 100.00% | $ 157,669 | 7.215% | 80.28% | 626 | 39.02% | 1.82% |

</TABLE>

----------
(1)      Occupancy as represented by the mortgagor at the time of origination.

ASSIGNMENT OF THE MORTGAGE LOANS

On the closing date, the depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the trustee and other related documents, including all scheduled payments with respect to each Mortgage Loan due after the Cut-off Date. The trust administrator, concurrently with such transfer, will deliver the certificates to the depositor. Each Mortgage Loan transferred to the trust will be identified on a mortgage loan schedule delivered to the trust administrator pursuant to the Pooling and Servicing Agreement. The mortgage loan schedule will include information such as the Cut-off Date Principal Balance of each Mortgage Loan, its Mortgage Rate as well as other information with respect to each Mortgage Loan.

The Pooling and Servicing Agreement will require that, within the time period specified therein, the depositor will deliver or cause to be delivered to the trustee (or a custodian, as the trustee's agent for such purpose) the mortgage notes endorsed to the trustee on behalf of the certificateholders and the other related documents. In lieu of delivery of original Mortgages or mortgage notes, if such original is not available or lost, the depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found to be defective in any material respect and such defect is not cured within 90 days following notification thereof to the seller or the related originator, as applicable, by the trustee, or a custodian on its behalf, the seller or the related originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a qualified substitute mortgage loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the master servicer for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the seller or the related originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a qualified substitute mortgage loan, the seller or the related originator, as applicable will be required to remit to the servicer for deposit in the custodial account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Originator Master Agreements (as assigned to the depositor pursuant to the Assignment Agreements and to the trustee pursuant to the Pooling Agreement), each originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Originator Master Agreements, each originator represented and warranted that, among other things: each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreements and the Mortgage Loan Purchase Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the trustee will promptly notify the servicer and will enforce the obligations of the related originator or the seller, as applicable, under the related Originator Master Agreement or the related Assignment Agreement or the Mortgage Loan Purchase Agreement to effect a cure by either (i) as permitted pursuant to the related Originator Master Agreement (in the case of an originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the related Originator Master Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted

Mortgage Loan as a result of a breach of a representation or warranty in the related Originator Master Agreement or the related Assignment Agreement or the Mortgage Loan Purchase Agreement that materially and adversely affects the interests of the certificateholders. Notwithstanding the foregoing, to the extent of a breach by the related originator or the seller of any representation, warranty or covenant in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the certificateholders, the trustee will first request that the related originator cure such breach or repurchase such Mortgage Loan and if the related originator fails to cure such breach or repurchase such Mortgage Loan within 60 days of receipt of such request from the trustee, the trustee will then request that the seller cure such breach or repurchase such Mortgage Loan.

Pursuant to the Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

PAYMENTS ON MORTGAGE LOANS; DEPOSITS TO DISTRIBUTION ACCOUNT

The master servicer will establish and maintain a distribution account for the benefit of the certificateholders. Upon receipt by the master servicer from the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the related Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the master servicer will deposit such amounts in the distribution account for distribution to certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the distribution account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such permitted investments are invested in investments managed or advised by the trust administrator or an affiliate thereof, in which case such permitted investments may mature on the related Distribution Date.

ADVANCES

Subject to the following limitations, the servicer will be obligated to advance or cause to be advanced to the master servicer on or before each Remittance Date from (i) its own funds, (ii) Funds in the related custodial account that are not included in the Available Funds for such Distribution Date or (iii) a combination of (i) and (ii), all Advances for such Distribution Date.

Advances are required to be made only to the extent they are deemed by the servicer to be recoverable from related late collections, insurance proceeds, condemnation proceeds and liquidation proceeds on the related Mortgage Loan as to which such Advances were made. The purpose of making such Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses. The servicer will not be required, however, to make any Advances with respect to reductions in the amount of the monthly payments on the Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act. Subject to the recoverability standard above, the servicer's obligation to make Advances as to any Mortgage Loan serviced by it will continue through the last scheduled payment due prior to the payment in full of the Mortgage Loan, or through the last Remittance Date prior to the Remittance Date for the distribution of all liquidation proceeds and other payments or recoveries (including insurance proceeds and condemnation proceeds) with respect to the Mortgage Loan. Failure by the servicer to remit any required Advance, which failure goes unremedied for the number of days specified in the Servicing Agreement, would constitute an event of default under the Servicing Agreement. Such event of default will then obligate the master servicer, as successor servicer (subject to a determination of recoverability) to advance such amounts to the extent provided in the Pooling and Servicing Agreement.

All Advances will be reimbursable to the servicer or the master servicer, as applicable, from late collections, insurance proceeds, condemnation proceeds and liquidation proceeds from the Mortgage Loan as to which such unreimbursed Advance was made unless such amounts are deemed to be nonrecoverable by the servicer or the master servicer, as applicable, from the proceeds of the related Mortgage Loan, in which event reimbursement will be made to the servicer or the master servicer, as applicable, from general funds in the related custodial account or the distribution account. The master servicer may reimburse the servicer or recover from amounts in the distribution account the amount of any Advance that remains unreimbursed to the servicer or the master servicer, as applicable, from the related liquidation proceeds after the final liquidation of the related Mortgage Loan, and such

S-109

PROSPECTUS
JUNE 2, 2005

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
Depositor

ASSET-BACKED CERTIFICATES

ASSET-BACKED NOTES
(ISSUABLE IN SERIES)

Mortgage Asset Securitization Transactions, Inc. from time to time will offer asset-backed pass-through certificates or asset-backed notes. We will offer the certificates or notes through this prospectus and a separate prospectus supplement for each series.

For each series we will establish a trust fund consisting primarily of

o   a segregated pool of various types of single-family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them; or

o   pass-through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

The certificates of a series will evidence beneficial ownership interests in the trust fund. The notes of a series will evidence indebtedness of the trust fund. The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 7 IN THIS PROSPECTUS AND IN THE RELATED PROSPECTUS SUPPLEMENT.

The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

You should consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

The Securities and Exchange Commission and state securities regulators have not approved or disapproved of the offered certificates or notes or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

UBS Investment Bank

In addition, Multifamily Loans may contain "due-on-encumbrance" clauses permitting the lender to accelerate the maturity of the Multifamily Loan if there is a further encumbrance by the borrower of the underlying residential property. In general, where a "due-on-sale" or "due-on-encumbrance" clause is contained in a conventional residential loan under a Freddie Mac or the Fannie Mae program, the lender's right to accelerate the maturity of the residential loan if there is a transfer or further encumbrance of the property must be exercised, so long as the acceleration is permitted under applicable law.

With respect to a series of securities evidencing interests in a trust fund including residential loans, the master servicer generally is required to enforce any provision limiting prepayments and any due-on-sale or due-on-encumbrance clause. The master servicer is required to enforce these provisions only to the extent it has knowledge of the conveyance or encumbrance or the proposed conveyance or encumbrance of the underlying residential property and reasonably believes that it is entitled to do so under applicable law. However, the master servicer will generally be prohibited from taking any enforcement action that would impair or threaten to impair any recovery under any related insurance policy. See "Description of the Securities--Collection and Other Servicing Procedures" and "Certain Legal Aspects of Residential Loans--Enforceability of Certain Provisions" and "--Prepayment Charges and Prepayments" in this prospectus for a description of provisions of each pooling and servicing agreement and legal developments that may affect the prepayment experience on the residential loans. See also "Description of the Securities--Termination" in this prospectus for a description of the possible early termination of any series of securities. See also "Residential Loans--Representations by Unaffiliated Sellers; Repurchases" and "Description of the Securities--Assignment of Assets of the Trust Fund" in this prospectus for a description of the circumstances under which the Unaffiliated Sellers, the master servicer and the depositor are generally obligated to repurchase residential loans.

With respect to a series of securities evidencing interests in a trust fund including agency securities, principal prepayments may also result from guaranty payments and from the exercise by the issuer or guarantor of the related agency securities of any right to repurchase the underlying residential loans. The prospectus supplement relating to each series of securities will describe the circumstances and the manner in which the optional repurchase right, if any, may be exercised.

In addition, the mortgage securities included in the trust fund may be backed by underlying residential loans having differing interest rates. Accordingly, the rate at which principal payments are received on the related securities will, to a certain extent, depend on the interest rates on the underlying residential loans.

The prospectus supplement for each series of securities may set forth additional information regarding related maturity and prepayment considerations.

THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc.. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713-2000.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential loans, mortgage securities and agency securities, offering securities or other mortgage- or asset-related securities, and related activities.

Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the securities of any series.

RESIDENTIAL LOANS

UNDERWRITING STANDARDS

The residential loans will have been purchased by the depositor, either directly or through affiliates, from loan sellers that may be affiliated or unaffiliated with the depositor. The related prospectus supplement will specify the underwriting criteria generally used to originate the residential loans. The underwriting standards applicable to residential loans underlying mortgage securities may vary substantially from the underwriting standards set forth in the related prospectus supplement.

REPRESENTATIONS BY UNAFFILIATED SELLERS; REPURCHASES

Each Unaffiliated Seller made representations and warranties in respect of the residential loans sold by the Unaffiliated Seller. The related prospectus supplement will specify these representations and warranties which may include, among other things:

o that the Unaffiliated Seller had good title to each residential loan and the residential loan was subject to no offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive certain indebtedness of a borrower;

27

o   if the trust fund includes mortgage loans, that each mortgage
    constituted a valid lien on the mortgaged property, subject only to
    permissible title insurance exceptions and senior liens, if any;

o   if the trust fund includes manufactured housing contracts, each
    manufactured housing contract creates a valid, subsisting and
    enforceable first priority security interest in the manufactured home
    covered by the contract;

o   that the residential property was free from damage and was in good
    repair;

o   that there were no delinquent tax or assessment liens against the
    residential property;

o   that each residential loan was current as to all required payments; and

o   that each residential loan was made in compliance with all applicable
    local, state and federal laws and regulations in all material respects.

In certain cases, the representations and warranties of an Unaffiliated
Seller in respect of a residential loan may have been made as of the date on
which the Unaffiliated Seller sold the residential loan to the depositor or its
affiliate. A substantial period of time may have elapsed between that date and
the date of initial issuance of the series of securities evidencing an interest
in the residential loan. Since the representations and warranties of an
Unaffiliated Seller do not address events that may occur following the sale of a
residential loan by the Unaffiliated Seller, its repurchase obligation will not
arise if the relevant event that would otherwise have given rise to this type of
obligation occurs after the date of the sale to or on behalf of the depositor.

The master servicer or the trustee will be required to promptly notify the
relevant Unaffiliated Seller of any breach of any representation or warranty
made by it in respect of a residential loan which materially and adversely
affects the interests of the holders of the securities in the residential loan.
If the Unaffiliated Seller cannot cure the breach, then the Unaffiliated Seller
will be obligated to repurchase this residential loan from the trustee at the
purchase price for the loan. The related prospectus supplement will specify this
purchase price, which is generally equal to the sum of:

o   the unpaid principal balance of the residential loans;

o   unpaid accrued interest on the unpaid principal balance from the date as
    to which interest was last paid by the borrower to the end of the
    calendar month in which the purchase is to occur at a rate equal to the
    net mortgage rate minus the rate at which the sub-servicer's servicing
    fee is calculated if the sub-servicer is the purchaser; and

o   if applicable, any expenses reasonably incurred or to be incurred by the
    master servicer or the trustee in respect of the breach or defect giving
    rise to a purchase obligation.

An Unaffiliated Seller, rather than repurchase a residential loan as to
which a breach has occurred, may have the option to cause the removal of the
breached residential loan from the trust fund and substitute in its place one or
more other residential loans. This option must be exercised within a specified
period after initial issuance of the related series of securities and be done in
accordance with the standards described in the related prospectus supplement.
The related prospectus supplement may specify that this repurchase or
substitution obligation will constitute the sole remedy available to holders of
securities or the trustee for a breach of representation by an Unaffiliated
Seller.

Neither the depositor nor the master servicer unless the master servicer is
an Unaffiliated Seller will be obligated to purchase or substitute for a
residential loan if an Unaffiliated Seller defaults on its obligation to do so.
We cannot assure you that Unaffiliated Sellers will carry out their repurchase
and substitution obligations with respect to residential loans. Any residential
loan that is not repurchased or substituted for will remain in the related trust
fund. Any resulting losses on that residential loan will be borne by holders of
the securities, to the extent not covered by credit enhancement.

SUB-SERVICING

Any master servicer may delegate its servicing obligations in respect of a
residential loan to sub-servicers pursuant to a sub-servicing agreement. The
sub-servicing agreement must be consistent with the terms of the servicing
agreement relating to the trust fund that includes the residential loan.
Although each sub-servicing agreement will be a contract solely between the
master servicer and the sub-servicer, the related pooling and servicing
agreement pursuant to which a series of securities is issued may provide that,
if for any reason the master servicer for the series of securities is no longer
acting in that capacity, the trustee or any successor master servicer must
recognize the sub-servicer's rights and obligations under any sub-servicing
agreement.

# Exhibit 4



PROSPECTUS SUPPLEMENT DATED December 28, 2005
(To Prospectus dated June 2, 2005)

**$755,494,000 (Approximate)**

**MASTR Adjustable Rate Mortgages Trust 2005−8,
Mortgage Pass−Through Certificates, Series 2005−8**

**Mortgage Asset Securitization Transactions, Inc.
(Depositor)**

**UBS Real Estate Securities Inc.
(Transferor)**

**Wells Fargo Bank, N.A.
(Master Servicer and Trust Administrator)**

The MASTR Adjustable Rate Mortgages Trust 2005−8, is issuing certificates consisting of 15 classes of certificates, but is offering only 11 classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed end, adjustable−rate loans secured by first mortgages or deeds of trust on residential one− to four−family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Offered Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Offered Certificates—Overcollateralization Provisions," excess interest as described in this prospectus supplement under "Description of the Offered Certificates—Overcollateralization Provisions," an interest rate swap agreement as described in this prospectus supplement under "Description of the Offered Certificates—Interest Rate Swap Agreement, the Swap Provider and the Swap Account" and an interest rate cap agreement as described in this prospectus supplement under "Description of the Offered Certificates—Interest Rate Cap Agreement, the Cap Provider and the Cap Account."

You should consider carefully the risk factors beginning on page S−16 in this prospectus supplement and page 8 in the prospectus.

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC, the Master Servicer, the Trust Administrator, any of the Servicers or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense. We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about December 29, 2005.

The proceeds to the depositor from the offered certificates are expected to be approximately $756,291,145 before deducting expenses, estimated at $653,088. See "*Underwriting*" in this prospectus supplement. The underwriter will sell the offered certificates purchased by it from time to time in negotiated transactions at varying prices determined at the time of sale.

prepayment of the loans.

**Bankruptcy of Borrowers May Adversely Affect Distributions on Certificates**

The application of federal and state laws, including bankruptcy and debtor relief laws, may interfere with or adversely affect the ability to realize on the mortgaged properties, enforce deficiency judgments or pursue collection litigation with respect to defaulted loans. As a consequence, borrowers who have defaulted on their loans and sought, or are considering seeking, relief under bankruptcy or debtor relief laws will have substantially less incentive to repay their loans. As a result, these loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses.

**Violation of Various Federal and State Laws May Result in Losses on the Loans**

Applicable state laws generally regulate interest rates and other charges, require certain disclosure and require licensing of the originator. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the loans.

The loans are also subject to federal laws, including:

- the Federal Truth−in−Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the related servicer to collect all or part of the principal of or interest on the loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans.

The transferor will represent that as of the closing date, each loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the transferor will be obligated to cure such breach or repurchase or replace the affected loan in the manner described under "*The Pooling and Servicing Agreement—Assignment of the Loans*" in this prospectus supplement.

**High Cost Loans**

None of the loans are "High Cost Loans" within the meaning of the Homeownership Act or any state law, ordinance or regulation similar to the Homeownership Act. See "*Certain Legal Aspects of Residential Loans—Anti−Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders—Homeownership Act and Similar State Laws*" in the prospectus.

In addition to the Homeownership Act, however, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. An originator's failure to comply with these laws could subject the trust, and other assignees of the loans, to monetary penalties and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans. Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

Under the anti−predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a loan does not meet the test even if an originator reasonably believed that the test was satisfied. Any determination by a court that a Loan does not meet the test will result in a violation of the state anti−predatory lending law, in which case the transferor will be required to purchase such Loan from the Trust.

See "*Certain Legal Aspects of Residential Loans—Anti−Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders*" in the prospectus.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| January | 2.86% | 1.24% | 1.36% | 2.16% | 4.81% | 6.12% | 4.51% | 5.24% |
| February | 3.03% | 1.24% | 1.30% | 2.23% | 4.68% | 6.22% | 4.70% | 5.31% |
| March | 3.30% | 1.19% | 1.24% | 2.57% | 4.30% | 6.22% | 4.78% | 5.39% |
| April | 3.32% | 1.43% | 1.27% | 2.48% | 3.98% | 6.15% | 4.69% | 5.38% |
| May | 3.33% | 1.78% | 1.18% | 2.35% | 3.78% | 6.33% | 4.85% | 5.44% |
| June | 3.36% | 2.12% | 1.01% | 2.20% | 3.58% | 6.17% | 5.10% | 5.41% |
| July | 3.64% | 2.10% | 1.12% | 1.96% | 3.62% | 6.08% | 5.03% | 5.36% |
| August | 3.87% | 2.02% | 1.31% | 1.76% | 3.47% | 6.18% | 5.20% | 5.21% |
| September | 3.85% | 2.12% | 1.24% | 1.72% | 2.82% | 6.13% | 5.25% | 4.71% |
| October | 4.18% | 2.23% | 1.25% | 1.65% | 2.33% | 6.01% | 5.43% | 4.12% |
| November | 4.33% | 2.50% | 1.34% | 1.49% | 2.18% | 6.09% | 5.55% | 4.53% |
| December | — | 2.67% | 1.31% | 1.45% | 2.22% | 5.60% | 5.84% | 4.52% |

## Statistical Information

Statistical information regarding characteristics of the Loans in the aggregate, as well as by Loan Group, as of the Cut−Off Date, is set forth in Annex A to this prospectus supplement.

Before the Closing Date, the depositor may remove any of the Loans identified as of the date of this prospectus supplement or may substitute comparable loans for any of the Loans identified as of the date of this prospectus supplement. However, the aggregate principal balance of the substituted Loans will not vary by more than plus or minus 5% of the Loans, by Cut−Off Date Pool Balance for each Loan Group. As a result, the statistical information presented in Annex A to this prospectus supplement regarding the characteristics of the Loans identified for inclusion in the trust may vary in some respects from comparable information based on the actual composition of the Loans included in the trust on the Closing Date. In addition, after the Cut−Off Date, the characteristics of the Loans may materially vary from the information below due to a number of factors. These factors include prepayments of the Loans after the Cut−Off Date and the substitution or repurchase of Loans after the Closing Date.

### UNDERWRITING STANDARDS

## General

The Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section "—*General*," or the following section pertaining to Countrywide Home Loans, Inc. and its related Loans.

A majority of the Loans (other than the Group 2 Loans) are "conventional non−conforming mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority or partially guaranteed by the Department of Veteran Affairs or which do not qualify for sale to Fannie Mae or Freddie Mac and are secured by liens on one− to four−family residential properties).

The underwriting standards applicable to the Loans (other than the Group 2 Loans) typically differ from, and are, with respect to a substantial number of such Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan−to−value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two  to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for

| March 25, 2012 | 1,488,290.04 | 7.6970 | 10.2000 |
| April 25, 2012 | 1,459,867.09 | 7.1752 | 10.2000 |
| May 25, 2012 | 1,431,971.19 | 7.4893 | 10.2000 |
| June 25, 2012 | 1,404,579.02 | 7.2845 | 10.2000 |
| July 25, 2012 | 1,377,683.87 | 7.5502 | 10.2000 |
| August 25, 2012 | 1,351,287.06 | 7.3015 | 10.2000 |
| September 25, 2012 | 1,325,380.02 | 7.3059 | 10.2000 |
| October 25, 2012 | 1,299,953.69 | 7.5687 | 10.2000 |
| November 25, 2012 | 1,274,999.18 | 8.8027 | 10.2000 |
| December 25, 2012 | 1,250,106.47 | 9.2916 | 10.2000 |

---

**PROSPECTUS**
**June 2, 2005**

# Mortgage Asset Securitization Transactions, Inc.

Depositor

## Asset−Backed Certificates

## Asset−Backed Notes
## (Issuable in Series)

Mortgage Asset Securitization Transactions, Inc. from time to time will offer asset−backed pass−through certificates or asset−backed notes.  We will offer the certificates or notes through this prospectus and a separate prospectus supplement for each series.

For each series we will establish a trust fund consisting primarily of

· a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them; or

· pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

The certificates of a series will evidence beneficial ownership interests in the trust fund.  The notes of a series will evidence indebtedness of the trust fund.  The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times.  In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

**You should consider carefully the risk factors beginning on page 7 in this prospectus and in the related prospectus supplement.**

The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates.  No governmental agency will insure the securities or the collateral securing the securities.

You should consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

The Securities and Exchange Commission and state securities regulators have not approved or disapproved of the offered certificates or notes or determined if this prospectus is truthful or complete.  Any representation to the contrary is a criminal offense.

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

**Borrower May Be Unable to Make Balloon Payment**

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- timely sell the related residential property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

- the level of available mortgage rates at the time of sale or refinancing;

- the borrower's equity in the related residential property;

- the financial condition of the borrower; and

- the tax laws.

A borrower's failure to make a balloon payment would increase the risk that you might not receive all payments to which you are entitled.

In addition, the mortgage securities included in the trust fund may be backed by underlying residential loans having differing interest rates. Accordingly, the rate at which principal payments are received on the related securities will, to a certain extent, depend on the interest rates on the underlying residential loans.

The prospectus supplement for each series of securities may set forth additional information regarding related maturity and prepayment considerations.

## THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc.. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713–2000.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential loans, mortgage securities and agency securities, offering securities or other mortgage– or asset–related securities, and related activities.

Neither the depositor nor any of the depositor's affiliates will insure or guarantee distributions on the securities of any series.

## RESIDENTIAL LOANS

### Underwriting Standards

The residential loans will have been purchased by the depositor, either directly or through affiliates, from loan sellers that may be affiliated or unaffiliated with the depositor. The related prospectus supplement will specify the underwriting criteria generally used to originate the residential loans. The underwriting standards applicable to residential loans underlying mortgage securities may vary substantially from the underwriting standards set forth in the related prospectus supplement.

### Representations by Unaffiliated Sellers; Repurchases

Each Unaffiliated Seller made representations and warranties in respect of the residential loans sold by the Unaffiliated Seller. The related prospectus supplement will specify these representations and warranties which may include, among other things:

- that the Unaffiliated Seller had good title to each residential loan and the residential loan was subject to no offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive certain indebtedness of a borrower;

- if the trust fund includes mortgage loans, that each mortgage constituted a valid lien on the mortgaged property, subject only to permissible title insurance exceptions and senior liens, if any;

- if the trust fund includes manufactured housing contracts, each manufactured housing contract creates a valid, subsisting and enforceable first priority security interest in the manufactured home covered by the contract;

- that the residential property was free from damage and was in good repair;

- that there were no delinquent tax or assessment liens against the residential property;

- that each residential loan was current as to all required payments; and

- that each residential loan was made in compliance with all applicable local, state and federal laws and regulations in all material respects.

In certain cases, the representations and warranties of an Unaffiliated Seller in respect of a residential loan may have been made as of the date on which the Unaffiliated Seller sold the residential loan to the depositor or its affiliate. A substantial period of time may have elapsed between that date and the date of initial issuance of the series of securities evidencing an interest in the residential loan. Since the representations and warranties of an Unaffiliated Seller do not address events that may occur following the sale of a residential loan by the Unaffiliated Seller, its repurchase obligation will not arise if the relevant event that would otherwise have given rise to this type of obligation occurs after the date of the sale to or on behalf of the depositor.

The master servicer or the trustee will be required to promptly notify the relevant Unaffiliated Seller of any breach of any representation or warranty made by it in respect of a residential loan which materially and adversely affects the interests of the holders of the securities in the residential loan.  If the Unaffiliated Seller cannot cure the breach, then the Unaffiliated Seller will be obligated to repurchase this residential loan from the trustee at the purchase price for the loan.  The related prospectus supplement will specify this purchase price, which is generally equal to the sum of:

- the unpaid principal balance of the residential loans;

- unpaid accrued interest on the unpaid principal balance from the date as to which interest was last paid by the borrower to the end of the calendar month in which the purchase is to occur at a rate equal to the net mortgage rate minus the rate at which the sub−servicer's servicing fee is calculated if the sub−servicer is the purchaser; and

- if applicable, any expenses reasonably incurred or to be incurred by the master servicer or the trustee in respect of the breach or defect giving rise to a purchase obligation.

An Unaffiliated Seller, rather than repurchase a residential loan as to which a breach has occurred, may have the option to cause the removal of the breached residential loan from the trust fund and substitute in its place one or more other residential loans.  This option must be exercised within a specified period after initial issuance of the related series of securities and be done in accordance with the standards described in the related prospectus supplement.  The related prospectus supplement may specify that this repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by an Unaffiliated Seller.

Neither the depositor nor the master servicer unless the master servicer is an Unaffiliated Seller will be obligated to purchase or substitute for a residential loan if an Unaffiliated Seller defaults on its obligation to do so.  We cannot assure you that Unaffiliated Sellers will carry out their repurchase and substitution obligations with respect to residential loans.  Any residential loan that is not repurchased or substituted for will remain in the related trust fund.  Any resulting losses on that residential loan will be borne by holders of the securities, to the extent not covered by credit enhancement.

## Sub−Servicing
Any master servicer may delegate its servicing obligations in respect of a residential loan to sub−servicers pursuant to a sub−servicing agreement.  The sub−servicing agreement must be consistent with the terms of the servicing agreement relating to the trust fund that includes the residential loan.  Although each sub−servicing agreement will be a contract solely between the master servicer and the sub−servicer, the related pooling and servicing agreement pursuant to which a series of securities is issued may provide that, if for any reason the master servicer for the series of securities is no longer acting in that capacity, the trustee or any successor master servicer must recognize the sub−servicer's rights and obligations under any sub−servicing agreement.

## DESCRIPTION OF THE SECURITIES

### General
The certificates of each series evidencing interests in a trust fund will be issued pursuant to a separate pooling and servicing agreement or trust agreement.  Each series of notes, or, in certain instances, two or more series of notes, will be issued pursuant to an indenture, and the issuer of the notes will be a trust established by the depositor pursuant to an owner trust agreement or another entity as may be specified in the related prospectus supplement.  As to each series of notes where the issuer is an owner trust, the ownership of the trust fund will be evidenced by equity certificates issued under the owner trust agreement, which may be offered by the related prospectus supplement.

Forms of each of the agreements referred to above are filed as exhibits to the Registration Statement of which this prospectus is a part.  The agreement relating to each series of securities will be filed as an exhibit to a report on Form 8−K to be filed with the SEC within fifteen days after the initial issuance of the securities and a copy of the agreement will be available for inspection at the corporate trust office of the trustee specified in the related prospectus supplement.

As to each series, the securities will be issued in authorized denominations evidencing a portion of all of the securities of the related series as set forth in the related prospectus supplement.  Each trust fund will consist of:

- residential loans, including any mortgage securities, or agency securities, exclusive of

- any portion of interest payments relating to the residential loans retained by the depositor, any of its affiliates or its predecessor in interest ("Retained Interest") and

# Exhibit 5

PROSPECTUS SUPPLEMENT DATED APRIL 12, 2006
(TO PROSPECTUS DATED APRIL 4, 2006)

$744,806,100                                    [MASTR LOGO]
(APPROXIMATE)

MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-2
(ISSUING ENTITY)

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
(DEPOSITOR)

UBS REAL ESTATE SECURITIES INC.
(TRANSFEROR/SPONSOR)

WELLS FARGO BANK, N.A.
(MASTER SERVICER AND TRUST ADMINISTRATOR)

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-2

The MASTR Adjustable Rate Mortgages Trust 2006-2, the issuing entity, is
issuing certificates consisting in the aggregate of 18 classes, but is offering
only 14 classes through this prospectus supplement.

  o    The trust's main source of funds for making distributions on the
       certificates will be collections on closed-end, adjustable-rate
       loans secured by first mortgages or deeds of trust on residential
       one- to four-family properties.

  o    Credit enhancement of the certificates will be provided by the
       subordination of certain classes of certificates in respect of the
       right to receive interest and principal.

-----------------------------------------------------------------------------

YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-16 OF
THIS PROSPECTUS SUPPLEMENT AND PAGE 8 IN THE PROSPECTUS.

The certificates will represent an interest in the issuing entity only and
will not represent obligations of the depositor, the sponsor or any of
their affiliates. No governmental agency or instrumentality or any other
person will insure the certificates or the collateral securing the
certificates.

You should consult with your own advisors to determine if the offered
certificates are appropriate investments for you and to determine the
applicable legal, tax, regulatory and accounting treatment of the offered
certificates.

-----------------------------------------------------------------------------

NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE OFFERED
CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS
IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL
OFFENSE.

                              ----------

We will not list the offered certificates on any national securities exchange
or on any automated quotation system of any registered securities association
such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates
from Mortgage Asset Securitization Transactions, Inc. and expects to deliver
the offered certificates (other than the Class A-LR and Class A-UR
certificates) in book-entry form through the facilities of The Depository
Trust Company to purchasers on or about April 13, 2006.

The proceeds to the depositor from the offered certificates are expected to be
approximately $731,577,416 plus accrued interest and before deducting
expenses, estimated at $525,628. See "Underwriting" in this prospectus
supplement. The underwriter will sell the offered certificates purchased by it
from time to time in negotiated transactions at varying prices determined at
the time of sale.

                         [UBS INVESTMENT BANK LOGO]

Distribution Account" in this prospectus supplement. A potential conflict of interest exists because Wells Fargo Bank, N.A., which acts as the master servicer and the trust administrator, will also act as servicer of approximately 22.38% of the loans by aggregate cut-off date principal balance. However, the master servicer is required to act in accordance with the master servicing standard set forth in the pooling and servicing agreement, without regard to who is servicing the loans. If any servicer fails to perform its servicing obligations, or if the master servicer fails to perform its master servicing obligations, this failure may result in the termination of such servicer or the master servicer, as applicable. That termination with its corresponding transfer of daily collection activities will likely increase the rates of delinquencies, defaults and losses on the loans. As a result, shortfalls in the distributions due on your certificates could occur.

THE TRANSFEROR MAY NOT BE ABLE TO REPURCHASE OR REPLACE DEFECTIVE LOANS

UBS Real Estate Securities Inc. will make various representations and warranties related to the loans. Those representations are summarized in "The Pooling and Servicing Agreement--Assignment of the Loans" in this prospectus supplement.

If UBS Real Estate Securities Inc. fails to cure a material breach of its representations and warranties with respect to any loan in a timely manner, then it will be required to repurchase or replace the defective loan. See "The Pooling and Servicing Agreement--Assignment of the Loans" in this prospectus supplement. It is possible that UBS Real Estate Securities Inc. may not be capable of repurchasing or replacing any defective loans, for financial or other reasons. The inability of UBS Real Estate Securities Inc. to repurchase or replace defective loans would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your certificates could occur. See "--The Credit Enhancement Features May Be Inadequate to Provide Protection for the Certificates" above.

THERE ARE RISKS IN HOLDING SUBORDINATE CERTIFICATES AND THE CLASS 1-A-2, CLASS 3-A-2, CLASS 4-A-2 AND CLASS 5-A-2 CERTIFICATES

The protections afforded the senior certificates create risks for the subordinate certificates. Prior to any purchase of any subordinate certificates, consider the following factors that may adversely impact your yield:

   o   Because the subordinate certificates receive interest and/or principal distributions after the senior certificates receive those distributions, there is a greater likelihood that the subordinate certificates will not receive the distributions to which they are entitled on any distribution date.

   o   If any servicer determines not to advance a delinquent payment on a loan because such servicer determines the amount is not recoverable from a borrower or if the master servicer is required to make an advance and makes a similar determination and does not advance funds with respect to such delinquent payment, there may be a shortfall in principal and interest payments allocated to the senior certificates that will impact the subordinate certificates.

   o   If certain losses on the loans in a loan group exceed stated levels, a portion of the principal distribution payable to classes of related subordinate certificates with higher alphanumerical class designations will be paid to the classes of related subordinate certificates with lower alphanumerical designations.

   o   Losses resulting from the liquidation of defaulted loans will generally be allocated to the subordinate certificates. A loss allocation results in a reduction in a certificate principal balance, potentially to zero, without a corresponding distribution of cash to the holder. A lower certificate principal balance will result in less interest accruing on the certificate.

   o   The earlier in the transaction that a loss on a loan occurs, the greater the impact on yield.

If you purchase Class 1-A-2, Class 3-A-2, Class 4-A-2 and Class 5-A-2 certificates, you should consider the risk that after the date on which the aggregate principal balance of the subordinate certificates has been reduced to zero, the principal portion of losses (other than certain excess losses as described under "Description of the Offered

STATISTICAL INFORMATION

Statistical information regarding characteristics of the Loans in the aggregate, as well as by Loan Group, as of the Cut-Off Date, is set forth in Annex A to this prospectus supplement.

Before the Closing Date, the depositor may remove any of the Loans identified as of the date of this prospectus supplement or may substitute comparable loans for any of the Loans identified as of the date of this prospectus supplement. However, the aggregate principal balance of the substituted Loans will not vary by more than plus or minus 5% of the Loans, by Cut-Off Date Pool Balance for each Loan Group. As a result, the statistical information presented in Annex A to this prospectus supplement regarding the characteristics of the Loans identified for inclusion in the trust may vary in some respects from comparable information based on the actual composition of the Loans included in the trust on the Closing Date. In addition, after the Cut-Off Date, the characteristics of the Loans may materially vary from the information below due to a number of factors. These factors include prepayments of the Loans after the Cut-Off Date and the substitution or repurchase of Loans after the Closing Date.

STATIC POOL INFORMATION

The depositor shall make available any of the sponsor's material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus supplement or the registration statement of which this prospectus supplement is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

THE ORIGINATORS

The originators of the Loans are Provident Funding Associates, L.P. ("Provident") and Wells Fargo Bank, N.A. ("Wells Fargo") with respect to 68.82% and 22.38%, respectively, of the Cut-Off Date Principal Balance of all of the Loans, and certain other originators, each of which originated less than 20% of the Cut-Off Date Principal Balance of all of the Loans.

PROVIDENT FUNDING ASSOCIATES, L.P.

Provident Funding Associates, L.P., ("Provident") is a mortgage banking company that originates, purchases, sells, and services primarily residential mortgage loans, and performs related mortgage banking services throughout the United States. Provident is a privately held limited partnership, organized in the state of California in 1992. Provident's principal executive offices are located at 1633 Bayshore Hwy., Suite 155, Burlingame, California 94010. Provident is approved as a seller and servicer of mortgage loans by Fannie Mae and Freddie Mac.

From and including 2001 to 2005, Provident originated or acquired a total of approximately $79.75 billion of mortgage loans similar to the Loans. Information regarding Provident's experience in originating mortgage loans similar to the Loans for the periods indicated is described in the following table.

```
<TABLE>
<CAPTION>
```

|  | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|
| ASSET TYPE | NO. OF LOANS | AGGREGATE ORIGINAL PRINCIPAL BALANCE OF LOANS | NO. OF LOANS | AGGREGATE ORIGINAL PRINCIPAL BALANCE OF LOANS | NO. OF LOANS | AGGREGATE ORIGINAL PRINCIPAL BALANCE OF LOANS |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| PRIME 30-YEAR FIXED-RATE RELOCATION LOANS | 1,812 | $   844,941,789 | 861 | $   405,719,632 | 1,250 | $   636,020,072 |
| PRIME 30-YEAR FIXED-RATE NON-RELOCATION LOANS | 111,425 | 40,134,188,567 | 24,267 | 9,865,227,462 | 44,978 | 21,686,693,836 |
| PRIME 15-YEAR FIXED-RATE LOANS | 29,622 | 10,106,128,064 | 5,394 | 2,560,373,384 | 4,536 | 2,430,641,359 |
| PRIME ADJUSTABLE-RATE LOANS | 142,930 | 56,515,937,239 | 125,454 | 54,089,704,631 | 113,744 | 53,072,900,484 |

```
</TABLE>
```

For the underwriting guidelines of Wells Fargo, see "Underwriting Standards -- Wells Fargo Bank, N.A."

## UNDERWRITING STANDARDS

GENERAL

    The Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section "--General," or one of the following sections pertaining to a particular Loan Seller and related Loans.

    A majority of the Loans are "conventional non-conforming mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority or partially guaranteed by the Department of Veteran Affairs or which do not qualify for sale to Fannie Mae or Freddie Mac and are secured by first liens on one to four family residential properties).

    The underwriting standards applicable to the Loans typically differ from, and are, with respect to a substantial number of Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

    Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

PROSPECTUS
APRIL 4, 2006

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
Depositor

ASSET-BACKED CERTIFICATES
ASSET-BACKED NOTES
(ISSUABLE IN SERIES)

ISSUING ENTITIES:

o  Issuing entities will be established to issue from time to time
   asset-backed pass-through certificates or asset-backed notes in one or
   more classes, which will be offered through this prospectus and a separate
   prospectus supplement for each series.

o  The issuing entities will be established to hold assets transferred to it
   by Mortgage Asset Securitization Transactions, Inc.

o  The assets of the issuing entities, as specified in the related prospectus
   supplement, will consist primarily of:

   o  a segregated pool of various types of single-family and multifamily
      residential mortgage loans, home equity loans and home improvement
      contracts, cooperative apartment loans or manufactured housing
      conditional sales contracts and installment loan agreements or
      beneficial interests in them;

   o  mortgage securities consisting of previously issued asset-backed
      certificates, collateralized mortgage obligations or participation
      certificates; or

   o  pass-through or participation certificates issued or guaranteed by
      the Government National Mortgage Association, the Federal National
      Mortgage Association or the Federal Home Loan Mortgage Corporation.

SECURITIES:

o  The certificates of a series will evidence beneficial ownership interests
   in the related issuing entity.

o  The notes of a series will evidence indebtedness of the related issuing
   entity.

o  The certificates or notes of a series may be divided into two or more
   classes which may have different interest rates and which may receive
   principal payments in differing proportions and at different times. In
   addition, the rights of certain holders of classes may be subordinate to
   the rights of holders of other classes to receive principal and interest.

o  The securities will not represent obligations of Mortgage Asset
   Securitization Transactions, Inc. or any of its affiliates. No
   governmental agency will insure the securities or the collateral securing
   the securities.

o  No secondary market will exist for a series of certificates or notes prior
   to its offering. We cannot assure you that a secondary market will develop
   for the certificates or notes, as applicable, of any series, or, if it
   does develop, that it will continue.

    YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 8 IN THIS
PROSPECTUS AND IN THE RELATED PROSPECTUS SUPPLEMENT.

    You are encouraged to consult with your own advisors to determine if the
offered securities are appropriate investments for you and to determine the
applicable legal, tax, regulatory and accounting treatment of the offered
securities.

    Neither the Securities and Exchange Commission nor any state securities
commission has approved or disapproved of these securities or determined if this
prospectus is truthful or complete. Any representation to the contrary is a
criminal offense.

                        UBS Investment Bank

    o  any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

    The securities will not represent an interest in or obligation of the
depositor, the master servicer or any of their respective affiliates.

CREDIT ENHANCEMENT IS LIMITED IN AMOUNT AND COVERAGE

    Credit enhancement reduces your risk of delinquent payments or losses.
However, the amount of credit enhancement will be limited, as set forth in the
related prospectus supplement, and may decline and could be depleted under
certain circumstances before payment in full of your securities. As a result,
you may suffer losses. Moreover, the credit enhancement may not cover all
potential losses or risks. For example, it may or may not fully cover fraud or
negligence by a loan originator or other parties. See "Description of Credit
Support" in this prospectus.

YIELD IS SENSITIVE TO RATE OF PRINCIPAL PREPAYMENT

    The yield on the securities of each series will depend in part on the rate
of principal payment on the assets of the trust fund. In particular, variations
on this rate will include:

    o  the extent of prepayments of the residential loans and, in the case of
       agency securities or mortgage securities, the underlying loans,
       comprising the trust fund;

    o  the allocation of principal and/or payment among the classes of
       securities of a series as specified in the related prospectus
       supplement;

    o  the exercise of any right of optional termination; and

    o  the rate and timing of payment defaults and losses incurred with respect
       to the assets of the trust fund.

    Material breaches of representations and warranties by sellers of
residential loans not affiliated with the depositor, the originator or the
master servicer may result in repurchases of assets of the trust fund. These
repurchases may lead to prepayments of principal. The rate of prepayment of the
residential loans comprising or underlying the assets of the trust fund may
affect the yield to maturity on your securities. See "Yield Considerations" and
"Maturity and Prepayment Considerations" in this prospectus.

    The rate of prepayments is influenced by a number of factors, including:

    o  prevailing mortgage market interest rates;

    o  local and national interest rates;

    o  homeowner mobility; and

    o  the ability of the borrower to obtain refinancing.

    Interest payable on the securities on each distribution date will include
all interest accrued during the period specified in the related prospectus
supplement. If interest accrues over a period ending two or more days before a
distribution date, your effective yield will be reduced from the yield you would
have obtained if interest payable on the securities accrued through the day
immediately before each distribution date. Consequently, your effective yield,
at par, will be less than the indicated coupon rate. See "Description of the
Securities--Distributions" and "--Principal and Interest on the Securities" in
this prospectus.

BORROWER MAY BE UNABLE TO MAKE BALLOON PAYMENT

    Some of the residential loans may not fully amortize over their terms to
maturity and, thus, may require principal payments, i.e., balloon payments, at
their stated maturity. Residential loans with balloon payments involve greater
risk because a borrower's ability to make a balloon payment typically will
depend on its ability to:

    o  timely refinance the loan; or

    o  timely sell the related residential property.

    A number of factors will affect a borrower's ability to accomplish either
of these goals, including:

    o  the level of available mortgage rates at the time of sale or
       refinancing;

9

   o  subject any person to whom the seller assigns its consumer credit
      transaction to all claims and defenses which the obligated party in a
      credit sale transaction could assert against the seller of the goods.

   Violations of certain provisions of these federal laws may limit the
ability of the master servicer to collect all or part of the principal of or
interest on the residential loans. In addition, violations could subject the
trust fund to damages and administrative enforcement. Accordingly, violations of
these federal laws would increase the risk that you might not receive all
payments to which you are entitled. See "Certain Legal Aspects of Residential
Loans" in this prospectus.

THE TRANSFEROR MAY NOT BE ABLE TO REPURCHASE OR REPLACE DEFECTIVE ASSETS

   UBS Real Estate Securities Inc. ("UBSRES") will make various
representations and warranties related to the assets of the related trust fund.

   If UBSRES fails to cure a material breach of its representations and
warranties with respect to any asset in a timely manner, then it will be
required to repurchase or replace the defective asset as required under the
related agreement. It is possible that UBSRES may not be capable of repurchasing
or replacing any defective assets, for financial or other reasons. The inability
of UBSRES to repurchase or replace defective assets would likely cause the loans
to experience higher rates of delinquencies, defaults and losses. As a result,
shortfalls in the distributions due on your securities could occur.

RATING OF THE SECURITIES ARE LIMITED AND MAY BE WITHDRAWN OR LOWERED

   Each class of securities offered by this prospectus and the related
prospectus supplement must be rated upon issuance in one of the four highest
rating categories by one or more rating agencies. The rating will be based on,
among other things:

   o  the adequacy of the value of the assets of the trust fund;

   o  any credit enhancement with respect to the class; and

   o  the likelihood that you will receive payments to which you are entitled
      under the terms of your securities.

The rating will not be based on:

   o  the likelihood that principal prepayments on the related residential
      loans will be made;

   o  the degree to which prepayments might differ from those originally
      anticipated; or

   o  the likelihood of early optional termination of the series of
      securities.

   You should not interpret the rating as a recommendation to purchase, hold
or sell securities, because it does not address market price or suitability for
a particular investor. The rating will not address:

   o  the possibility that prepayment at higher or lower rates than you
      anticipate may cause you to experience a lower than anticipated yield;
      or

   o  the possibility that if you purchase your security at a significant
      premium, then you might fail to recoup your initial investment under
      certain prepayment scenarios.

   We cannot assure you that any rating will remain in effect for any given
period of time or that a rating agency will not lower or withdraw its rating
entirely in the future due to, among other reasons:

   o  if in the judgment of the rating agency, circumstances in the future so
      warrant;

   o  any erosion in the adequacy of the value of the assets of the trust fund
      or any credit enhancement with respect to a series; or

   o  an adverse change in the financial or other condition of a credit
      enhancement provider or a change in the rating of the credit enhancement
      provider's long term debt.

   Each rating agency rating the securities will establish criteria to
determine the amount, type and nature of credit enhancement, if any, established
with respect to a class of securities. Rating agencies often determine the
amount of credit enhancement required with respect to each class based on an
actuarial analysis of the behavior of similar loans in a larger group. With
respect to the rating, we cannot assure you:

   o  that the historical data supporting the actuarial analysis will
      accurately reflect future experience;

15

# Exhibit 6

PROSPECTUS SUPPLEMENT DATED APRIL 19, 2006
(TO PROSPECTUS DATED APRIL 18, 2006)

[LOGO OF MASTR]

$1,111,556,000
(APPROXIMATE)

MASTR ADJUSTABLE RATE MORTGAGES TRUST 2006-OA1
(ISSUING ENTITY)

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
(DEPOSITOR)

UBS REAL ESTATE SECURITIES INC.
(TRANSFEROR/SPONSOR)

WELLS FARGO BANK, N.A.
(MASTER SERVICER AND TRUST ADMINISTRATOR)

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-OA1

The MASTR Adjustable Rate Mortgages Trust 2006-OA1, the issuing entity, is
issuing certificates consisting of 23 classes of certificates, but is offering
only 19 classes through this prospectus supplement.

o The trust's main source of funds for making distributions on the
  certificates will be collections on closed end, adjustable-rate loans
  secured by first mortgages or deeds of trust on residential one- to four-
  family properties.

o Credit enhancement will be provided by subordination, overcollateralization
  and excess interest as described in this prospectus supplement under
  "Description of the Offered Certificates" and an interest rate cap
  agreement as described in this prospectus supplement under "Description of
  the Offered Certificates--The Cap Contract," "--The Cap Provider" and
  "--The Cap Account."

---------------------------------------------------------------------------
  YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-20 OF THIS
  PROSPECTUS SUPPLEMENT AND PAGE 8 IN THE PROSPECTUS.

  The certificates will represent an interest in the issuing entity only and
  will not represent obligations of the depositor, the sponsor or any of their
  affiliates. No governmental agency or instrumentality or any other person will
  insure the certificates or the collateral securing the certificates.

  You should consult with your own advisors to determine if the offered
  certificates are appropriate investments for you and to determine the
  applicable legal, tax, regulatory and accounting treatment of the offered
  certificates.
---------------------------------------------------------------------------

NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE OFFERED
CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE ACCOMPANYING
PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A
CRIMINAL OFFENSE.

------------------------

We will not list the offered certificates on any national securities exchange or
on any automated quotation system of any registered securities association such
as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from
Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to
deliver the offered certificates in book entry form through the facilities of
The Depository Trust Company, and upon request, through the facilities of
Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or
about April 20, 2006.

The proceeds to the depositor from the offered certificates are expected to be
approximately $1,130,078,615 before deducting expenses, estimated at $4,065,680.
See "Underwriting" in this prospectus supplement. The underwriter will sell the
offered certificates purchased by it from time to time in negotiated
transactions at varying prices determined at the time of sale.

[LOGO UBS Investment Bank]

loans. As a result, these loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses.

VIOLATION OF VARIOUS FEDERAL AND STATE LAWS MAY RESULT IN LOSSES ON THE LOANS

Applicable state laws generally regulate interest rates and other charges, require certain disclosure and require licensing of the originator. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the loans.

The loans are also subject to federal laws, including:

o    the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the loans;

o    the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o    the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the related servicer to collect all or part of the principal of or interest on the loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans.

The transferor will represent that as of the closing date, each loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the transferor will be obligated to cure such breach or repurchase or replace the affected loan in the manner described under "The Pooling and Servicing Agreement--Assignment of the Loans" in this prospectus supplement.

HIGH COST LOANS

None of the loans are "High Cost Loans" within the meaning of the Homeownership Act or any state law, ordinance or regulation similar to the Homeownership Act. See "Certain Legal Aspects of Residential Loans--Anti-Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders--Homeownership Act and Similar State Laws" in the prospectus.

In addition to the Homeownership Act, however, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. An originator's failure to comply with these laws could subject the trust, and other assignees of the loans, to monetary penalties and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans. Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

due to a number of factors. These factors include prepayments of the Loans after the Cut-Off Date and the substitution or repurchase of Loans after the Closing Date.

## STATIC POOL INFORMATION

The depositor shall make available any of the sponsor's material static pool information as required under the SEC's rules and regulations. The static pool information material to this offering of certificates is located at www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

## THE ORIGINATORS

The originators of the Loans are American Home Mortgage Corp. ("American Home") with respect to 95.42% of the Cut-Off Date Principal Balance of all of the Loans and other unaffiliated originators, each of which represents less than 10% of the Cut-Off Date Principal Balance of the Loans.

AMERICAN HOME MORTGAGE CORP.

American Home is a New York corporation. American Home conducts lending through retail and wholesale loan production offices and its correspondent channel as well as its direct-to-consumer channel supported by American Home 's call center. American Home operates more than 600 retail and wholesale loan production offices located in 45 states and the District of Columbia and makes loans throughout all 50 states and the District of Columbia. American Home has been originating mortgage loans since its incorporation in 1998, and has been originating hybrid mortgage loans since such date. The principal executive offices of American Home are located at 538 Broadhollow Road, Melville, New York 11747.

The following table reflects American Home's originations of "short reset" adjustable-rate mortgage ("ARM") loans (which include one-month to three-month ARM loans, six-month ARM loans, one-year ARM loans, 2/1 hybrid ARM loans, 3/1 hybrid ARM loans and negative amortization loans) for the past three years:

| SHORT RESET ARM LOANS | YEAR ENDED DECEMBER 31, 2003 | YEAR ENDED DECEMBER 31, 2004 | YEAR ENDED DECEMBER 31, 2005 |
|---|---|---|---|
| Number of Loans | 9,652 | 21,858 | 28,177 |
| Principal Balance | $ 2,019,187,747 | $ 5,258,161,603 | $ 9,538,959,441 |

American Home is not aware of any material legal proceedings pending against it or against any of its property, including any proceedings known to be contemplated by governmental authorities material to the holders of the Certificates.

For the underwriting guidelines of American Home, see "Underwriting Standards-- American Home Mortgage Corp." in this prospectus supplement.

## UNDERWRITING STANDARDS

GENERAL

The Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance

with the underwriting criteria described in this section "--General," or the following section pertaining to American Home Mortgage Corp. and its related Loans.

A majority of the Loans (other than the Group 2 Loans) are "conventional non-conforming mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority or partially guaranteed by the Department of Veteran Affairs or which do not qualify for sale to Fannie Mae or Freddie Mac and are negative amortization loans secured by second liens on one- to four-family residential properties).

The underwriting standards applicable to the Loans (other than the Group 2 Loans) typically differ from, and are, with respect to a substantial number of such Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a Loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

Certain of the Loans have been originated under alternative documentation, streamlined documentation, reduced documentation, "lite" documentation, stated income, low/limited or "Express" documentation, no stated income, no ratio, "NIV" or no documentation programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a streamlined documentation program, a borrower's income and assets that have been previously documented are re verified, and any additional documentation and verification is limited. Under a reduced documentation program, verification of either a borrower's stated income or stated assets, but not both, is undertaken by the originator. Under a "lite" documentation, "stated income" or "NIV" program, a borrower is required to state both their income and assets, but the originator only undertakes to verify such borrower's assets. Under low/limited or "Express" documentation program, the amount of documentation required to document a borrower's income and assets is limited. Under a stated income program or a no ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no documentation program, the borrower is not required to state either their income or assets, and accordingly no verification of such borrower's income or assets is undertaken by the originator. The underwriting for such Loans may be based primarily or entirely on other factors, such as an appraisal of the mortgaged property, the loan-to-value ratio at origination and the borrower's credit score and previous mortgage payment history.

S-35

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

American Home is an affiliate of American Home Mortgage Servicing, Inc., one of the servicers.

### THE SPONSOR

Unless otherwise specified in the prospectus supplement, UBSRES will act as sponsor of the trust fund. Any other entity that acts as sponsor instead of UBSRES will be described in the related prospectus supplement.

GENERAL

UBS Real Estate Securities, Inc. ("UBSRES") is a Delaware corporation that is engaged in a variety of capital markets related activities, including purchases and sales of loan portfolios, sales of assets for inclusion in securitizations and origination and acquisition of loans and interests in such loans and the related servicing rights for sale, securitization or portfolio. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713 2000.

SECURITIZATION PROGRAM

UBSRES has been engaged in the securitization of a variety of assets since 1983. During the 2003, 2004 and 2005 fiscal years, UBSRES securitized approximately $26,586,046,432, $23,715,469,420 and $9,044,655,402 of financial assets.

The following table describes size, composition and growth of UBSRES's total portfolio of assets it has securitized as of the dates indicated.

<TABLE>
<CAPTION>

| | DECEMBER 31, 2003 | | DECEMBER 31, 2004 | | DECEMBER 31, 2005 | |
| LOAN TYPE | NUMBER | TOTAL PORTFOLIO OF LOANS | NUMBER | TOTAL PORTFOLIO OF LOANS | NUMBER | TOTAL PORTFOLIO OF LOANS |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Alt-A ARM | 1,831 | $ 704,818,691.15 | 15,172 | $ 4,196,433,786.47 | 7,319 | $ 2,141,793,872.88 |
| Alt-A Fixed | 30,014 | $ 4,808,312,278.14 | 33,732 | $ 5,578,131,022.96 | 12,658 | $ 2,301,424,102.78 |
| Prime ARM | 5,510 | $ 2,097,734,162.54 | 12,527 | $ 5,574,915,529.55 | 3,447 | $ 1,201,231,043.87 |
| Prime Fixed | 29,586 | $ 14,090,593,768.16 | 10,566 | $ 4,822,540,192.90 | 2,831 | $ 1,072,342,586.00 |
| Reperforming | 0 | None | 162 | $ 24,426,327.00 | 142 | $ 16,680,656.00 |
| Scratch&Dent | 0 | None | 1,133 | $ 188,828,039.00 | 2,411 | $ 337,609,459.00 |
| Seconds | 0 | None | 0 | None | 4,788 | $ 247,087,151.00 |
| SubPrime | 27,665 | $ 4,327,714,923.39 | 20,424 | $ 2,603,908,932.00 | 5,489 | $ 982,036,702.30 |
| Seasoned | 1,174 | $ 556,872,608.80 | 1,724 | $ 726,285,590.60 | 2,444 | $ 744,449,828.62 |

</TABLE>

Through the use of subservicers, UBSRES may contract for the servicing of loans. As specified in the related prospectus supplement, the trust fund may include loans subserviced on behalf of UBSRES as owner of the related servicing rights.

UBSRES typically acquires loans from third party originators. Employees of UBSRES or its affiliates will structure securitization transactions in which loans are sold to the depositor. In consideration for the sale of loans, the depositor will cause the issuance of the securities that are entitled to the cashflows from such loans and enter into an arrangement with one or more underwriters for the purchase of such securities.

Pursuant to the agreement conveying assets from UBSRES to the depositor, UBSRES may make representations and warranties relating to certain characteristics of such assets. As specified in the related prospectus supplement, breaches of such representations and warranties that materially affect the value of the related loan or the interests of the related securityholders in such loan will result in an obligation on the part of UBSRES to cure, repurchase or substitute for such

loan. In certain situations, rather than making such representations and warranties itself, UBSRES may assign its interest under the related purchase agreement pursuant to which it acquired the loans from the related originator.

## THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713 2000.

The depositor has been engaged in the securitization of loans since its incorporation in 1987. The depositor is generally engaged in the business of acting as a depositor of one or more trust funds that may issue or cause to be issued, sell and deliver bonds or other evidences of indebtedness or certificates of interest that are secured by, or represent an interest in loans. The depositor typically acquires loans and other assets for inclusion in securitizations from the sponsor.

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to the issue and sale of one or more series of securities and to act as depositor of trusts that may issue and sell securities.

After the issuance of the securities, the depositor will have limited or no obligations with respect to the securities and the related trust fund. Those obligations may include cure, repurchase or substitution obligations relating to breaches of representations and warranties, if any, that the depositor makes with respect to the loans, certain actions with respect to the creation of a security interest in the related assets, to arrange for derivative instruments or replacement instruments to be included in a trust, to appoint replacements to certain transaction participants, to prepare and file and required reports under the Exchange Act, to provide notices to certain parties under the operative agreements or to provide requested information to the various transaction participants.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential loans, mortgage securities and agency securities, offering securities or other mortgage- or asset-related securities, and related activities.

Since the depositor's main securitization experience is in connection with securitization of assets sold by the sponsor to the depositor, the depositor's portfolio of assets securitized are similar to the securitization experience described above under "The Sponsor--Securitization Program".

## THE MASTER SERVICER AND THE SERVICERS

GENERAL

Wells Fargo Bank, N.A. ("Wells Fargo"), will act as the master servicer of the Loans pursuant to the Pooling and Servicing Agreement, dated as of March 1, 2006 (the "Pooling and Servicing Agreement"), among Mortgage Asset Securitization Transactions, Inc., as depositor, UBS Real Estate Securities Inc., as transferor, Wells Fargo, as master servicer, trust administrator and custodian, and U.S. Bank National Association, as trustee.

Primary servicing of the Loans will be provided for by American Home Mortgage Servicing, Inc. which will service approximately 95.42% of the Cut-Off Date Principal Balance of all of the Loans, and certain other servicers, each of which will service less than 10% of the Cut-Off Date Principal Balance of all of the Loans, in accordance with the applicable Servicing Agreements. Each servicer will be responsible for the servicing of those Loans subject to the related Servicing Agreement, and the master servicer will be required to supervise, monitor and oversee the performance of each servicer. In the event of a default by a servicer under the related Servicing Agreement, the master servicer will be required to enforce any remedies against the servicer, and will either find a successor servicer or will assume the primary servicing obligations for the related Loans.

PROSPECTUS
APRIL 18, 2006

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
Depositor

ASSET-BACKED CERTIFICATES
ASSET-BACKED NOTES
(Issuable in Series)

ISSUING ENTITIES:

o   Issuing entities will be established to issue from time to time
    asset-backed pass-through certificates or asset-backed notes in
    one or more classes, which will be offered through this
    prospectus and a separate prospectus supplement for each series.

o   The issuing entities will be established to hold assets
    transferred to it by Mortgage Asset Securitization Transactions,
    Inc.

o   The assets of the issuing entities, as specified in the related
    prospectus supplement, will consist primarily of:

        o   a segregated pool of various types of single-family and
            multifamily residential mortgage loans, home equity
            loans and home improvement contracts, cooperative
            apartment loans or manufactured housing conditional
            sales contracts and installment loan agreements or
            beneficial interests in them;

        o   mortgage securities consisting of previously issued
            asset-backed certificates, collateralized mortgage
            obligations or participation certificates; or

        o   pass-through or participation certificates issued or
            guaranteed by the Government National Mortgage
            Association, the Federal National Mortgage Association
            or the Federal Home Loan Mortgage Corporation.

SECURITIES:

o   The certificates of a series will evidence beneficial ownership
    interests in the related issuing entity.

o   The notes of a series will evidence indebtedness of the related
    issuing entity.

o   The certificates or notes of a series may be divided into two or
    more classes which may have different interest rates and which
    may receive principal payments in differing proportions and at
    different times. In addition, the rights of certain holders of
    classes may be subordinate to the rights of holders of other
    classes to receive principal and interest.

o   The securities will not represent obligations of Mortgage Asset
    Securitization Transactions, Inc. or any of its affiliates. No
    governmental agency will insure the securities or the collateral
    securing the securities.

o   No secondary market will exist for a series of certificates or
    notes prior to its offering. We cannot assure you that a
    secondary market will develop for the certificates or notes, as
    applicable, of any series, or, if it does develop, that it will
    continue.

    YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 8 IN THIS
PROSPECTUS AND IN THE RELATED PROSPECTUS SUPPLEMENT.

    You are encouraged to consult with your own advisors to determine if the
offered securities are appropriate investments for you and to determine the
applicable legal, tax, regulatory and accounting treatment of the offered
securities.

    Neither the Securities and Exchange Commission nor any state securities
commission has approved or disapproved of these securities or determined if this
prospectus is truthful or complete. Any representation to the contrary is a
criminal offense.

                        UBS Investment Bank

○   any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

CREDIT ENHANCEMENT IS LIMITED IN AMOUNT AND COVERAGE

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "Description of Credit Support" in this prospectus.

YIELD IS SENSITIVE TO RATE OF PRINCIPAL PREPAYMENT

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

○   the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

○   the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

○   the exercise of any right of optional termination; and

○   the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "Yield Considerations" and "Maturity and Prepayment Considerations" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

○   prevailing mortgage market interest rates;

○   local and national interest rates;

○   homeowner mobility; and

○   the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest were payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "Description of the Securities--Distributions" and "--Principal and Interest on the Securities" in this prospectus.

BORROWER MAY BE UNABLE TO MAKE BALLOON PAYMENT

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, i.e., balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

○   timely refinance the loan; or

○   timely sell the related residential property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

○   the level of available mortgage rates at the time of sale or refinancing;

9

     o    subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "Certain Legal Aspects of Residential Loans" in this prospectus.

## THE TRANSFEROR MAY NOT BE ABLE TO REPURCHASE OR REPLACE DEFECTIVE ASSETS

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

## RATING OF THE SECURITIES ARE LIMITED AND MAY BE WITHDRAWN OR LOWERED

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

     o    the adequacy of the value of the assets of the trust fund;

     o    any credit enhancement with respect to the class; and

     o    the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

     o    the likelihood that principal prepayments on the related residential loans will be made;

     o    the degree to which prepayments might differ from those originally anticipated; or

     o    the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

     o    the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

     o    the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

     o    if in the judgment of the rating agency, circumstances in the future so warrant;

     o    any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

     o    an adverse change in the financial or other condition of a credit enhancement provider or a change in the rating of the credit enhancement provider's long term debt.

Each rating agency rating the securities will establish criteria to determine the amount, type and nature of credit enhancement, if any, established with respect to a class of securities. Rating agencies often determine the amount of credit enhancement required with respect to each class based on an actuarial analysis of the behavior of similar loans in a larger group. With respect to the rating, we cannot assure you:

     o    that the historical data supporting the actuarial analysis will accurately reflect future experience;

# Exhibit 7

PROSPECTUS SUPPLEMENT DATED May 4, 2006
(To Prospectus dated April 18, 2006)

*$848,982,000 (Approximate)*

***MASTR Asset Backed Securities Trust***
***2006–FRE2***
***(Issuing Entity)***

***Mortgage Asset Securitization Transactions, Inc.***
***(Depositor)***



***UBS Real Estate Securities Inc.***
***(Sponsor and Seller)***

***Wells Fargo Bank, N.A.***
***(Master Servicer, Servicer and Trust***
***Administrator)***

***Mortgage Pass Through Certificates, Series***
***2006–FRE2***

The MASTR Asset Backed Securities Trust 2006–FRE2 is issuing twenty classes of certificates, but is offering only fourteen classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions," and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "Description of the Certificates—Interest Rate Swap Agreement and the Swap Provider" and a Interest Rate Cap Agreement as described in this prospectus supplement under "Description of the Certificates—Interest Rate Cap Agreement."

*You should consider carefully the risk factors beginning on page S–20 in this prospectus supplement and page 8 in the prospectus.*

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

*Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.*

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

may be used to make certain distributions to the holders of the Group I Certificates.

See "Description of the Offered Certificates—Allocation of Available Funds" in this prospectus supplement for additional information.

**Advances**

The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans serviced by it. Subject to a determination of recoverability, the master servicer, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer is required to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.

See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information.

**Optional Termination**

The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the master servicer and the NIMS Insurer (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut-off date.

See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass-Through Rates" in this prospectus supplement for additional information.

**Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties**

The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan.

See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information.

**Credit Enhancement**

Subordination

The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates.

In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the mortgage loans.

See "Description of the Certificates—Credit Enhancement" in this prospectus supplement for additional information.

Excess Interest

The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the Class A Certificates and Mezzanine Certificates and to pay certain fees and expenses of the trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than any Swap Termination Payment resulting from a Swap Provider Trigger Event). The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans, to maintain overcollateralization at required levels and to cover basis risk shortfall amounts as described in the pooling and servicing agreement.

See "Description of the Certificates—Allocation of Available Funds" and "—Overcollateralization Provisions" in this prospectus supplement for additional information.

15

Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary. Any statistic presented on a weighted average basis or any statistic based the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8−K within four days following the Closing Date.

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the Cut−off Date Principal Balance in the aggregate or with respect to the related Loan Group.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed−rate and adjustable−rate, first lien and second lien, fully−amortizing, balloon and interest−only mortgage loans with Principal Balances that conform to Fannie Mae and Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed−rate and adjustable−rate, first lien and second lien, fully−amortizing, balloon and interest−only mortgage loans with Principal Balances that may or may not conform to Fannie Mae and Freddie Mac loan limits. In addition, certain of the conforming balance Mortgage Loans included in Loan Group II might otherwise have been included in Loan Group I, but were excluded from Loan Group I because they did not meet Freddie Mac criteria (including published guidelines) for factors other than principal balance.

The Group I Mortgage Loans consist of 1,456 Mortgage Loans and have a Cut−off Date Principal Balance of approximately $245,730,574. The Group II Mortgage Loans consist of 2,821 Mortgage Loans and have a Cut−off Date Principal Balance of approximately $629,061,412.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one− to four−family residential properties consisting of attached or detached one− to four−family dwelling units and individual condominium units. Approximately 95.55% of the Group I Mortgage Loans are secured by first Mortgages and approximately 4.45% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 93.53% of the Group II Mortgage Loans are secured by first Mortgages and approximately 6.47% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 94.09% of the Mortgage Loans are secured by first Mortgages and approximately 5.91% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers. A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The sponsor previously purchased the Mortgage Loans from the originator pursuant to the Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against the originator under the Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re−underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the Mortgage Loans. Subject to certain limitations, the originator or the sponsor will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due−on−sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 88.14% of the Group I Mortgage Loans are Adjustable−Rate Group I Mortgage Loans and approximately 11.86% of the Group I Mortgage Loans are Fixed−Rate Group I Mortgage Loans. Approximately 88.91% of the Group II Mortgage Loans are Adjustable−Rate Group II Mortgage Loans and approximately 11.09% of the Group II Mortgage Loans are Fixed−Rate

### Occupancy Status of the Mortgage Loans[1]

| Occupancy Status | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 301 | $ 51,926,736 | 5.94% | $ 172,514 | 8.604% | 83.01% | 646 | 69.96% | 1.07% |
| Investor Occupied | 3,947 | 815,394,450 | 93.21 | 206,586 | 8.178 | 81.03 | 621 | 55.59 | 6.26 |
| Second Home | 29 | 7,470,799 | 0.85 | 257,614 | 8.204 | 78.34 | 615 | 72.43 | 0.63 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 4,277 | $874,791,986 | 100.00% | $ 204,534 | 8.203% | 81.13% | 622 | 56.59% | 5.91% |

(1) Occupancy as represented by the mortgagor at the time of origination.

### Purpose of the Mortgage Loans

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Cash Out Debt Consolidation | 465 | $110,949,044 | 12.68% | $ 238,600 | 8.242% | 78.53% | 596 | 57.05% | 2.33% |
| Cash Out Refinance | 1,410 | 324,737,378 | 37.12 | 230,310 | 8.231 | 78.77 | 603 | 55.52 | 2.02 |
| Home Improvement | 106 | 30,308,446 | 3.46 | 285,929 | 7.741 | 78.15 | 623 | 48.64 | 1.56 |
| Purchase | 2,252 | 400,273,796 | 45.76 | 177,741 | 8.203 | 83.91 | 646 | 57.61 | 10.41 |
| Rate & Term Refinance | 44 | 8,523,323 | 0.97 | 193,712 | 8.304 | 84.34 | 590 | 71.29 | 4.07 |
| Total /Weighted Average/Percentage of the Mortgage Loans | 4,277 | $874,791,986 | 100.00% | $ 204,534 | 8.203% | 81.13% | 622 | 56.59% | 5.91% |

### Original Loan-to-Value Ratios of the Mortgage Loans[1][2][3]

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 82 | $ 13,236,188 | 1.51% | $ 161,417 | 8.700% | 41.92% | 579 | 44.36% | 0.00% |
| 50.01–55.00 | 33 | 6,388,445 | 0.73 | 193,589 | 8.775 | 52.23 | 570 | 39.83 | 0.00 |
| 55.01–60.00 | 69 | 14,033,414 | 1.60 | 203,383 | 8.669 | 58.02 | 573 | 45.77 | 0.00 |
| 60.01–65.00 | 143 | 31,451,866 | 3.60 | 219,943 | 8.703 | 63.55 | 575 | 40.80 | 0.00 |
| 65.01–70.00 | 159 | 36,566,168 | 4.18 | 229,976 | 8.719 | 69.08 | 574 | 40.61 | 0.00 |

34

*STATIC POOL INFORMATION*

The depositor will make available any material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

*THE ORIGINATOR*

*General*

The information set forth in the following paragraphs with regard to the originator and the originator's underwriting standards has been provided by the originator.

The originator is a California industrial bank headquartered in Brea, California. The originator currently operates wholesale residential real estate loan production offices located in Anaheim, California; Concord, California; Downers Grove, Illinois; Westchester County, New York; and Tampa, Florida. The originator conducts business in 45 states and the District of Columbia and its primary source of originations is through licensed mortgage brokers.

Established in 1937, the originator is currently engaged in the business of residential sub–prime real estate lending and commercial real estate lending. Acquired in 1990, the originator is an indirect subsidiary of Fremont General Corporation, a financial services holding company listed on the New York Stock Exchange. As of March 31, 2005, Fremont had approximately $12.86 billion in assets, approximately $11.32 billion in liabilities and approximately $1.54 billion in equity. As part of its residential sub–prime mortgage loan origination program, Fremont either,

- sells its mortgage loans to third parties in whole loan sales transactions,

- transfers such loans in connection with a securitization, or

- retains the loans for long term portfolio investment.

Fremont has been originating sub–prime residential mortgage loans since May 1994 and substantially all of its residential mortgage loan originations consist of sub–prime mortgage loans. Fremont's sub–prime residential originations totaled approximately $6.94 billion, $13.74 billion, $23.91 billion and $36.24 billion for the years ended 2002, 2003, 2004 and 2005, respectively and approximately $8.54 billion for the first quarter of 2006.

*Underwriting Standards*

All of the Mortgage Loans were originated or acquired by the originator generally in accordance with the underwriting criteria described in this section. The following is a general summary of the underwriting guidelines believed by the Depositor to have been applied, with some variation, by the originator. This summary does not purport to be a complete description of the underwriting standards of the originator.

*Fremont's Underwriting Standards*

Substantially all of the mortgage loans originated by Fremont are based on loan application packages submitted through licensed mortgage brokers. These brokers must meet minimum standards set by Fremont based on an analysis of the following information submitted with an application for approval: applicable state license (in good standing), signed broker application and agreement, and signed broker authorization. Once approved, licensed mortgage brokers are eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

Mortgage Loans are underwritten in accordance with Fremont's current underwriting programs , referred to as the Scored Programs ("Scored Programs"), subject to various exceptions as described in this section. Fremont began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004. Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan–to–value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage

depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the sponsor and the originator, by the trustee, or a custodian on its behalf, the sponsor or the originator will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the sponsor or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor or the originator will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

The seller and the originator will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the sponsor or the originator, as applicable, will have a period of 90 days after discovery or notice of the breach to effect a cure. If the breach cannot be cured within the 90–day period, the sponsor or the originator, as applicable, will be obligated to (i) substitute for such Deleted Mortgage Loan a Qualified Substitute Mortgage Loan or (ii) repurchase such Deleted Mortgage Loan from the trust. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement that materially and adversely affects the interests of the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

***Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account***

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut–off Date and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the servicer will deposit such amounts in the collection account for remittance to the trust administrator on the Remittance Date. Amounts on deposit in the collection account may be invested in permitted investments maturing on or before the business day prior to the related Remittance Date. The trust administrator will establish an account (the "Distribution Account") into which will be deposited amounts remitted from the servicer for distribution to Certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the Distribution Account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such permitted investments are invested in investments managed or advised by the trust administrator or an affiliate thereof, in which case such permitted investments may mature on the related Distribution Date.

Any amounts received on a mortgage loan (including, but not limited to monthly payments, prepayments or liquidation proceeds) will first be applied to payments due on or prior to the Cut–off Date before such amounts are available to the trust.

***Advances***

Subject to the following limitations, the servicer will be obligated to advance or cause to be advanced to the master servicer on or before each Remittance Date from (i) its own funds, (ii) funds in the collection account that are not included in the Available Funds for such Distribution Date or (iii) a combination of (i) and (ii), all Advances for such Distribution Date.

Advances are required to be made only to the extent they are deemed by the servicer to be recoverable from related late collections, insurance proceeds, condemnation proceeds and liquidation proceeds on the related Mortgage Loan as to which such Advances were made. With respect to any balloon mortgage loans, neither the servicer nor the master servicer will make any advances covering the balloon payment. The purpose of making such Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses. The servicer will not be required,

*PROSPECTUS*
*April 18, 2006*

### *Mortgage Asset Securitization Transactions, Inc.*
Depositor

### *Asset−Backed Certificates*
### *Asset−Backed Notes*
### *(Issuable in Series)*

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

  o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

  o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

  o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

***You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.***

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

### UBS Investment Bank

- adequate provision for future payments on certain classes of securities; and

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

### Credit Enhancement Is Limited in Amount and Coverage

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

### Yield Is Sensitive to Rate of Principal Prepayment

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

### Borrower May Be Unable to Make Balloon Payment

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See *"Certain Legal Aspects of Residential Loans"* in this prospectus.

***The Transferor May Not Be Able to Repurchase or Replace Defective Assets***

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

***Rating of the Securities Are Limited and May be Withdrawn or Lowered***

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

- the adequacy of the value of the assets of the trust fund;

- any credit enhancement with respect to the class; and

- the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

- the likelihood that principal prepayments on the related residential loans will be made;

- the degree to which prepayments might differ from those originally anticipated; or

- the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

- the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

- the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

- if in the judgment of the rating agency, circumstances in the future so warrant;

- any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

-

# Exhibit 8

PROSPECTUS SUPPLEMENT DATED June 1, 2006
(To Prospectus dated April 18, 2006)

*$745,078,000 (Approximate)*

***MASTR Asset Backed Securities Trust 2006–WMC2***
*(Issuing Entity)*

***Mortgage Asset Securitization Transactions, Inc.***
*(Depositor)*

***UBS Real Estate Securities Inc.***
*(Sponsor and Seller)*

***Wells Fargo Bank, N.A.***
*(Servicer, Master Servicer, Trust Administrator and Custodian)*

***Mortgage Pass Through Certificates, Series 2006–WMC2***

The MASTR Asset Backed Securities Trust 2006–WMC2 is issuing nineteen classes of certificates, but is offering only fourteen classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions," and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "Description of the Certificates—Interest Rate Swap Agreement, the Swap Provider and the Swap Account."

---

*You should consider carefully the risk factors beginning on page S–19 in this prospectus supplement and page 8 in the prospectus.*

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

---

*Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.*

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about June 29, 2006.

| | |
|---|---|
| Fees and Expenses | Before distributions are made on the certificates, the following fees and expenses will be payable: (i) the servicer will be paid a monthly fee equal to one−twelfth of 0.500% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period and (ii) the credit risk manager will be paid a monthly fee equal to one−twelfth of 0.0125% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period. The servicing fee will be payable from amounts on deposit in the collection account. The credit risk manager fee will be payable from amounts on deposit in the distribution account. |

The Swap Provider is entitled to a monthly payment calculated as one−twelfth of 5.3500%, on the Swap Base Calculation Amount (as defined herein) multiplied by 250. The trust is entitled to an amount equal to one−month LIBOR (as set forth in the Interest Rate Swap Agreement and calculated on an actual/360 basis) on the Swap Base Calculation Amount for such Distribution Date multiplied by 250. Only the positive net payment of the two obligations will be paid by the applicable party. If a net payment is owed to the Swap Provider, the trust administrator will pay such amount from the distribution account before distributions are made on the certificates.

| | |
|---|---|
| Cross collateralization | In certain circumstances, payments on the Group I Mortgage Loans may be used to make certain distributions to the holders of the Group II Certificates and payments on the Group II Mortgage Loans may be used to make certain distributions to the holders of the Group I Certificates. |

See "Description of the Offered Certificates—Allocation of Available Funds" in this prospectus supplement for additional information.

| | |
|---|---|
| *Advances* | The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans serviced by it. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer or the Trustee, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer is required to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses. |

See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information.

| | |
|---|---|
| *Optional Termination* | The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the master servicer and the NIMS Insurer (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut−off date. |

See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass−Through Rates" in this prospectus supplement for additional information.

| | |
|---|---|
| *Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties* | The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan. |

See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information.

| | |
|---|---|
| *Credit Enhancement* | |

| | |
|---|---|
| Subordination | The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates. |

In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement.

of the certificates, Mortgage Loans may be removed from either of the Loan Groups as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time. A limited number of other Mortgage Loans may be included in each Loan Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary. Any statistic presented on a weighted average basis or any statistic based on the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8−K within four days following the Closing Date.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed−rate and adjustable−rate, first lien and second lien, fully−amortizing, balloon and interest−only mortgage loans with Principal Balances at origination that conform to Fannie Mae loan limits, and the Group II Mortgage Loans, consisting of a group of fixed−rate and adjustable−rate, first lien and second lien, fully−amortizing, balloon and interest−only mortgage loans with Principal Balances at origination that may or may not conform to Fannie Mae loan limits.

The Group I Mortgage Loans consist of 2,068 Mortgage Loans and have a Cut−off Date Principal Balance of approximately $333,473,184. The Group II Mortgage Loans consist of 1,959 Mortgage Loans and have a Cut−off Date Principal Balance of approximately $432,676,968.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one− to four−family residential properties consisting of attached or detached one− to four−family dwelling units and individual condominium units. Approximately 90.03% of the Group I Mortgage Loans are secured by first Mortgages and approximately 9.97% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 87.99% of the Group II Mortgage Loans are secured by first Mortgages and approximately 12.01% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 88.88% of the Mortgage Loans are secured by first Mortgages and approximately 11.12% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers. A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The sponsor previously purchased the Mortgage Loans from the originator pursuant to the Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against the originator under the Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re−underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the Mortgage Loans. Subject to certain limitations, the originator or the sponsor will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than the repurchase or substitution obligations described above. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due−on−sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 80.64% of the Group I Mortgage Loans are Adjustable−Rate Group I Mortgage Loans and approximately 19.36% of the Group I Mortgage Loans are Fixed−Rate Group I Mortgage Loans. Approximately 79.56% of the Group II Mortgage Loans are Adjustable−Rate Group II Mortgage Loans and approximately 20.44% of the Group II Mortgage Loans are Fixed−Rate Group II Mortgage Loans.

**Occupancy Status of the Mortgage Loans(1)**

| Occupancy Status | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 3,826 | 725,446,892 | 94.69 | 189,610 | 8.339 | 82.18 | 633 | 28.82 | 11.33 |
| Second Home | 127 | 27,660,127 | 3.61 | 217,796 | 8.378 | 84.21 | 677 | 10.50 | 10.56 |
| Investor | 74 | 13,043,133 | 1.70 | 176,259 | 8.772 | 85.72 | 670 | 52.12 | 0.64 |
| *Total* | *4,027* | *766,150,152* | *100.00* | *190,253* | *8.348* | *82.31* | *635* | *28.56* | *11.12* |

(1) Occupancy as represented by the mortgagor at the time of origination.

**Purpose of the Mortgage Loans**

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Purchase | 2,468 | 414,669,592 | 54.12 | 168,018 | 8.495 | 84.30 | 652 | 24.67 | 16.39 |
| Cash Out Refinance | 1,480 | 336,454,468 | 43.91 | 227,334 | 8.181 | 79.99 | 614 | 32.71 | 5.05 |
| Rate & Term Refinance | 79 | 15,026,092 | 1.96 | 190,204 | 8.053 | 79.54 | 618 | 42.91 | 1.36 |
| *Total* | *4,027* | *766,150,152* | *100.00* | *190,253* | *8.348* | *82.31* | *635* | *28.56* | *11.12* |

**Original Loan-to-Value Ratios of the Mortgage Loans(1)(2)(3)**

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 59 | 9,746,237 | 1.27 | 165,190 | 7.922 | 42.61 | 596 | 23.67 | 0.00 |
| 50.01 − 55.00 | 23 | 4,969,677 | 0.65 | 216,073 | 7.488 | 53.23 | 617 | 21.44 | 0.00 |
| 55.01 − 60.00 | 43 | 9,852,711 | 1.29 | 229,133 | 8.019 | 57.63 | 580 | 45.15 | 0.00 |
| 60.01 − 65.00 | 43 | 9,794,560 | 1.28 | 227,780 | 8.001 | 62.83 | 602 | 41.02 | 0.00 |
| 65.01 − 70.00 | 96 | 21,883,196 | 2.86 | 227,950 | 7.759 | 68.58 | 596 | 31.84 | 0.00 |
| 70.01 − 75.00 | 139 | 40,460,592 | 5.28 | 291,083 | 8.086 | 73.87 | 600 | 21.39 | 0.00 |
| 75.01 − 80.00 | 1,667 | 428,775,970 | 55.97 | 257,214 | 7.887 | 79.89 | 646 | 25.09 | 0.00 |
| 80.01 − 85.00 | 182 | 42,192,965 | 5.51 | 231,829 | 8.131 | 84.52 | 603 | 43.00 | 0.08 |
| 85.01 − 90.00 | 253 | 65,079,036 | 8.49 | 257,229 | 8.227 | 89.64 | 627 | 34.35 | 1.13 |

### STATIC POOL INFORMATION

The depositor will make available any material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

### THE ORIGINATOR

WMC Mortgage Corp. is a mortgage banking company incorporated in the State of California. Established in 1955, WMC Mortgage Corp. has developed a national mortgage origination franchise, with special emphasis on originating single–family, alternative non–prime mortgage loans in each of the regions in which it competes. WMC Mortgage Corp. historically originated both prime–quality mortgage loans and non–prime–quality mortgage loans. WMC Mortgage Corp. sold its prime mortgage loan origination business in 1998 and, since April of 2000, originates prime mortgage loans only on a very limited basis. WMC Mortgage Corp. was owned by a subsidiary of Weyerhaeuser Company until May 1997 when it was sold to WMC Finance Co., a company owned principally by affiliates of a private investment firm. On June 14, 2004, GE Consumer Finance acquired WMC Finance Co.

Until March 2000, WMC Mortgage Corp. originated mortgage loans through both wholesale and retail channels, with wholesale originations accounting for approximately 85% of total origination volume prior to March 2000. As of March 2000, WMC Mortgage Corp. changed its business model to underwrite and process 100% of its loans on the Internet via "WMC Direct" resulting in a substantial reduction in employees, underwriting centers and closing centers, and the elimination of all retail branches. In April 2005, WMC Mortgage Corp.'s headquarters relocated to Burbank, California from Woodland Hills, California. A majority of its business operations are presently conducted at Burbank. WMC Mortgage Corp. also has eight (8) regional offices in Dallas, Texas, Orangeburg, New York, Costa Mesa, California, San Ramon, California, Jacksonville, Florida, Woburn, Massachusetts, Schaumburg, Illinois, and Bellevue, Washington. WMC Mortgage Corp.'s originations come primarily through its broker relationships. As of May 15, 2006, WMC Mortgage Corp. had approximately 2149 employees, including approximately 636 business development representatives and associates who are responsible for recruiting and managing the independent broker network. In 2003, 2004 and 2005, WMC Mortgage Corp. originated $8,177,700,459, $19,127,701,750 and $31,794,995,806 of non–prime mortgage loans, respectively, including loans acquired by WMC from correspondent lenders.

#### Underwriting Standards of the Originator

The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the "**Underwriting Guidelines**") or (ii) purchased by WMC Mortgage Corp. after re–underwriting the mortgage loans generally in accordance with the Underwriting Guidelines. WMC Mortgage Corp. also originates certain other mortgage loans that are underwritten to the guidelines of specific investors, however, such mortgage loans are not included among those sold to the trust as described herein. The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case–by–case basis WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt–to–income ratio ("**Debt Ratio**"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.

On July 15, 2005 WMC Mortgage Corp. launched a program called WMC Select. Using new credit matrices, WMC Select allows a borrower to choose loan features (such as rate, term, prepayment options, and other important features) based on the borrower's mortgage/housing history, credit depth, loan–to–value ratio ("**LTV**") and Debt Ratio. WMC Select allows WMC Mortgage Corp. greater flexibility in qualifying the borrower for a loan since the borrower selects the loan features most important to him.

The mortgage loans in the trust will fall within the following documentation categories established by WMC Mortgage Corp.: Full Documentation, Full–Alternative Documentation, Limited Documentation, Lite Documentation, Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation. In addition to single–family residences, certain of the mortgage loans will have been underwritten (in many cases, as described above, subject to exceptions for compensating factors) in accordance with programs established by WMC Mortgage Corp. for the origination of mortgage loans secured by mortgages on condominiums, vacation and second homes, manufactured housing, two– to four–family properties and other property types. In addition, WMC Mortgage Corp. has established specific parameters for jumbo loans, which are designated in the Underwriting Guidelines as mortgage loans with original principal balances in excess of $650,000 ($850,000 under WMC Select). However, WMC Mortgage Corp.

forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the sponsor and the originator, by the trustee, or a custodian on its behalf, the sponsor or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the sponsor or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor or the originator, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Mortgage Loan Purchase Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling and Servicing Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Mortgage Loan Purchase Agreement, the originator represented and warranted that, among other things: each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the discovering party will promptly notify the trust administrator or the trustee, as applicable, and such party will inform the other parties to the Pooling and Servicing Agreement, the originator and the seller of such breach and if the originator or the seller, as applicable, fails to remedy such breach, the trustee will enforce the obligations of the originator or the seller, as applicable, under the Mortgage Loan Purchase Agreement or the Assignment Agreement, as applicable, to effect a cure by either (i) as permitted pursuant to the Mortgage Loan Purchase Agreement (in the case of the originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Mortgage Loan Purchase Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement or the related Assignment Agreement that materially and adversely affects the interests of the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

***Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account***

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut-off Date and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the servicer will deposit such amounts in the collection account for remittance to the trust administrator on the Remittance Date. Amounts on deposit in the collection account may be invested in permitted investments maturing on or before the business day prior to the related Remittance Date. The trust administrator will establish an account (the "Distribution Account") into which will be deposited amounts remitted from the servicer for distribution to Certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the Distribution Account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such permitted investments are invested in investments managed or advised by the trust administrator or an affiliate thereof, in which case such permitted investments may mature on the related Distribution Date.

Any amounts received on a mortgage loan (including, but not limited to monthly payments, prepayments or liquidation proceeds) will first be applied to payments due on or prior to the Cut-off Date before such amounts are available to the trust.

***Advances***

Subject to the following limitations, the servicer will be obligated to advance or cause to be advanced to the master servicer on or before each Remittance Date from (i) its own funds, (ii) funds in the collection account that are not included in the Available Funds for such Distribution Date or (iii) a

*PROSPECTUS*
*April 18, 2006*

### *Mortgage Asset Securitization Transactions, Inc.*
Depositor

### *Asset−Backed Certificates*
### *Asset−Backed Notes*
### *(Issuable in Series)*

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

    o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

    o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

    o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

*You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.*

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

UBS Investment Bank

- adequate provision for future payments on certain classes of securities; and

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

### *Credit Enhancement Is Limited in Amount and Coverage*

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

### *Yield Is Sensitive to Rate of Principal Prepayment*

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

### *Borrower May Be Unable to Make Balloon Payment*

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "*Certain Legal Aspects of Residential Loans*" in this prospectus.

### The Transferor May Not Be Able to Repurchase or Replace Defective Assets

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

### Rating of the Securities Are Limited and May be Withdrawn or Lowered

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

- the adequacy of the value of the assets of the trust fund;

- any credit enhancement with respect to the class; and

- the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

- the likelihood that principal prepayments on the related residential loans will be made;

- the degree to which prepayments might differ from those originally anticipated; or

- the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

- the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

- the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

- if in the judgment of the rating agency, circumstances in the future so warrant;

- any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

-

176

# Exhibit 9

PROSPECTUS SUPPLEMENT DATED September 12, 2006
(To Prospectus dated August 3, 2006)

*$891,282,000 (Approximate)*

*MASTR Asset Backed Securities Trust 2006–WMC3*
*(Issuing Entity)*

*Mortgage Asset Securitization Transactions, Inc.*
*(Depositor)*



*UBS Real Estate Securities Inc.*
*(Sponsor and Seller)*

*Wells Fargo Bank, N.A.*
*(Master Servicer, Trust Administrator and Custodian)*

*JPMorgan Chase Bank, National Association*
*(Servicer)*

*Mortgage Pass Through Certificates, Series 2006–WMC3*

The MASTR Asset Backed Securities Trust 2006–WMC3 is issuing nineteen classes of certificates, but is offering only fourteen classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions" and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "The Interest Rate Swap Agreement" and a cap contract as described in this prospectus supplement under "The Cap Contract."

*You should consider carefully the risk factors beginning on page S–20 in this prospectus supplement and page 8 in the prospectus.*

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

*Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.*

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about September 28, 2006.

| | |
|---|---|
| Fees and Expenses | Before distributions are made on the certificates, the following fees and expenses will be payable: (i) the servicer will be paid a monthly fee equal to one−twelfth of 0.500% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period, (ii) the master servicer will be paid a monthly fee equal to one−twelfth of 0.0095% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period and (iii) the credit risk manager will be paid a monthly fee equal to one−twelfth of 0.0125% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period. The servicer fee will be payable from amounts on deposit in the collection account. The master servicer fee and the credit risk manager fee will be payable from amounts on deposit in the distribution account. |
| | The Swap Provider is entitled to a monthly payment calculated as one−twelfth of 5.4500%, on the Swap Notional Amount (as defined herein) multiplied by 250. The trust is entitled to an amount equal to one−month LIBOR (as set forth in the Interest Rate Swap Agreement and calculated on an actual/360 basis) on the Swap Notional Amount for such Distribution Date multiplied by 250. Only the positive net payment of the two obligations will be paid by the applicable party. If a net payment is owed to the Swap Provider, the trust administrator will pay such amount from the distribution account before distributions are made on the certificates. |
| Cross collateralization | In certain circumstances, payments on the Group I Mortgage Loans may be used to make certain distributions to the holders of the Group II Certificates and payments on the Group II Mortgage Loans may be used to make certain distributions to the holders of the Group I Certificates. |
| | See "Description of the Offered Certificates—Allocation of Available Funds" in this prospectus supplement for additional information. |
| *Advances* | The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer or the Trustee, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer fails to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses. |
| | See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information. |
| *Optional Termination* | The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the master servicer, the servicer and the NIMS Insurer (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut−off date. |
| | See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass−Through Rates" in this prospectus supplement for additional information. |
| *Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties* | The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan. |
| | See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information. |
| *Credit Enhancement* | |
| Subordination | The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates. |
| | In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement. |

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8–K within four days following the Closing Date.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed–rate and adjustable–rate, first lien and second lien, fully–amortizing, balloon and interest–only mortgage loans with Principal Balances at origination that conform to Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed–rate and adjustable–rate, first lien and second lien, fully–amortizing, balloon and interest–only mortgage loans with Principal Balances at origination that may or may not conform to Freddie Mac loan limits.

The Group I Mortgage Loans consist of 1,239 Mortgage Loans and have a Cut–off Date Principal Balance of approximately $175,547,671. The Group II Mortgage Loans consist of 3,608 Mortgage Loans and have a Cut–off Date Principal Balance of approximately $741,886,169.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one– to four–family residential properties consisting of attached or detached one– to four–family dwelling units and individual condominium units. Approximately 90.11% of the Group I Mortgage Loans are secured by first Mortgages and approximately 9.89% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 88.68% of the Group II Mortgage Loans are secured by first Mortgages and approximately 11.32% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 88.96% of the Mortgage Loans are secured by first Mortgages and approximately 11.04% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers. A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The sponsor previously purchased the Mortgage Loans from the originator pursuant to the Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against the originator under the Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re–underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the Mortgage Loans. Subject to certain limitations, the originator or the sponsor will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than the repurchase or substitution obligations described above. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due–on–sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 79.71% of the Group I Mortgage Loans are Adjustable–Rate Group I Mortgage Loans and approximately 20.29% of the Group I Mortgage Loans are Fixed–Rate Group I Mortgage Loans. Approximately 79.03% of the Group II Mortgage Loans are Adjustable–Rate Group II Mortgage Loans and approximately 20.97% of the Group II Mortgage Loans are Fixed–Rate Group II Mortgage Loans.

Each Fixed–Rate Mortgage Loan has a Mortgage Rate that is fixed for the life of such Mortgage Loan.

Each Adjustable–Rate Mortgage Loan accrues interest at a Mortgage Rate that is adjustable following an initial period of six months, two years, three years, five years or ten years following origination. Generally, the Adjustable–Rate Mortgage Loans provide for semi–annual adjustment to the Mortgage Rate thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each Adjustment Date applicable thereto; provided, that (i) the first adjustment of the rates for approximately 0.29% of the adjustable–rate Group I Mortgage Loans and approximately 0.06% of the adjustable–rate Group II Mortgage Loans (in each case, by aggregate principal balance of the adjustable–rate mortgage loans in the related loan group as of the cut–off date) will not occur until six months after the date of origination, (ii) the first adjustment of the rates for approximately 91.03% of the

*Occupancy Status of the Mortgage Loans*(1)

| Occupancy Status | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut–off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut–off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,626 | $880,532,768 | 95.98% | $ 190,344 | 8.189% | 82.31% | 639 | 26.26% | 11.11% |
| Second Home | 161 | 26,592,125 | 2.90 | 165,168 | 8.060 | 84.40 | 693 | 23.91 | 12.92 |
| Investor Occupied | 60 | 10,308,947 | 1.12 | 171,816 | 8.660 | 85.79 | 670 | 55.68 | 0.44 |
| Total | 4,847 | $917,433,840 | 100.00% | $ 189,279 | 8.191% | 82.41% | 641 | 26.52% | 11.04% |

(1) Occupancy as represented by the mortgagor at the time of origination.

*Purpose of the Mortgage Loans*

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut–off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut–off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Purchase | 3,349 | $571,932,924 | 62.34% | $ 170,777 | 8.311% | 83.78% | 653 | 21.87% | 15.09% |
| Cash Out Refinance | 1,425 | 327,383,088 | 35.68 | 229,743 | 8.007 | 80.16 | 622 | 34.43 | 4.43 |
| Rate & Term Refinance | 73 | 18,117,828 | 1.97 | 248,189 | 7.712 | 79.81 | 630 | 30.33 | 2.69 |
| Total | 4,847 | $917,433,840 | 100.00% | $ 189,279 | 8.191% | 82.41% | 641 | 26.52% | 11.04% |

*Original Loan–to–Value Ratios of the Mortgage Loans*(1)(2)(3)

| Range of Original Loan–to–Value Ratios (%) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut–off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut–off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 50 | $ 7,463,723 | 0.81% | $ 149,274 | 8.064% | 37.80% | 592 | 40.15% | 0.00% |
| 50.01–55.00 | 18 | 3,532,429 | 0.39 | 196,246 | 7.972 | 53.39 | 615 | 25.68 | 0.00 |
| 55.01–60.00 | 40 | 7,085,837 | 0.77 | 177,146 | 8.083 | 58.04 | 595 | 36.18 | 0.00 |
| 60.01–65.00 | 48 | 11,567,328 | 1.26 | 240,986 | 7.693 | 62.87 | 608 | 30.52 | 0.00 |
| 65.01–70.00 | 100 | 25,306,398 | 2.76 | 253,064 | 7.816 | 68.77 | 599 | 24.79 | 0.00 |
| 70.01–75.00 | 127 | 27,504,275 | 3.00 | 216,569 | 7.797 | 73.63 | 602 | 34.19 | 0.00 |
| 75.01–80.00 | 2,254 | 582,720,139 | 63.52 | 258,527 | 7.696 | 79.93 | 652 | 21.69 | 0.00 |
| 80.01–85.00 | 164 | 43,117,264 | 4.70 | 262,910 | 8.124 | 84.55 | 608 | 39.80 | 0.12 |
| 85.01–90.00 | 247 | 58,689,777 | 6.40 | 237,610 | 8.239 | 89.49 | 622 | 43.27 | 1.86 |
| 90.01–95.00 | 306 | 53,325,355 | 5.81 | 174,266 | 8.892 | 94.66 | 613 | 54.70 | 8.78 |
| 95.01–100.00 | 1,493 | 97,121,315 | 10.59 | 65,051 | 11.068 | 99.98 | 652 | 20.12 | 98.34 |

WMC Mortgage Corp. ("WMC") is a mortgage banking company incorporated in the State of California. Established in 1955, WMC has developed a national mortgage origination franchise, with special emphasis on originating single–family, alternative non–prime mortgage loans in each of the regions in which it competes. WMC historically originated both prime–quality mortgage loans and non–prime–quality mortgage loans. WMC sold its prime mortgage loan origination business in 1998 and, since April of 2000, originates prime mortgage loans only on a very limited basis. WMC was owned by a subsidiary of Weyerhaeuser Company until May 1997 when it was sold to WMC Finance Co., a company owned principally by affiliates of a private investment firm. On June 14, 2004, a subsidiary of the General Electric Company ("*GE*") acquired WMC Finance Co.

Until March 2000, WMC originated mortgage loans through both wholesale and retail channels, with wholesale originations accounting for approximately 85% of total origination volume prior to March 2000. As of March 2000, WMC changed its business model to underwrite and process 100% of its loans on the Internet via "WMC Direct" resulting in a substantial reduction in employees, underwriting centers and closing centers, and the elimination of all retail branches. In April 2005, WMC's headquarters relocated to Burbank, California from Woodland Hills, California. A majority of its business operations are presently conducted at Burbank. WMC also has eight (8) regional offices in Addison, Texas, Orangeburg, New York, Costa Mesa, California, San Ramon, California, Jacksonville, Florida, Woburn, Massachusetts, Schaumburg, Illinois, and Bellevue, Washington. WMC's originations come primarily through its broker relationships. As of August 15, 2006, WMC had approximately 2216 employees, including approximately 662 business development representatives and associates who are responsible for recruiting and managing the independent broker network. In 2003, 2004 and 2005, WMC originated $8,177,700,459, $19,127,701,750 and $31,794,995,806 of non–prime mortgage loans, respectively, including loans acquired by WMC from correspondent lenders.

*Underwriting Standards.* The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the "*Underwriting Guidelines*") or (ii) purchased by WMC after re–underwriting the mortgage loans generally in accordance with the Underwriting Guidelines. WMC also originates certain other mortgage loans that are underwritten to the guidelines of specific investors, however, such mortgage loans are not included among those sold to the trust as described herein. The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case–by–case basis WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt–to–income ratio ("*Debt Ratio*"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.

On July 15, 2005, WMC launched a program called WMC Select. Using new credit matrices, WMC Select allows a borrower to choose loan features (such as rate, term, prepayment options, and other important features) based on the borrower's mortgage/housing history, credit depth, loan–to–value ratio ("*LTV*") and Debt Ratio. WMC Select allows WMC greater flexibility in qualifying the borrower for a loan since the borrower selects the loan features most important to him.

The mortgage loans in the trust will fall within the following documentation categories established by WMC: Full Documentation, Full–Alternative Documentation, Limited Documentation, Lite Documentation, Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation. In addition to single–family residences, certain of the mortgage loans will have been underwritten (in many cases, as described above, subject to exceptions for compensating factors) in accordance with programs established by WMC for the origination of mortgage loans secured by mortgages on condominiums, vacation and second homes, manufactured housing, two– to four–family properties and other property types. In addition, WMC has established specific parameters for jumbo loans, which are designated in the Underwriting Guidelines as mortgage loans with original principal balances in excess of $650,000 ($850,000 under WMC Select). However, WMC sometimes increases the original principal balance limits if borrowers meet other compensating credit factors.

Under the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC–approved appraiser or by WMC's in–house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.

The Underwriting Guidelines permit mortgage loans with LTVs and CLTVs (in the case of mortgaged properties which secure more than one mortgage loan) of up to 100% (which is subject to reduction depending upon credit–grade, loan amount and property type). In general, loans with greater documentation standards are eligible for higher LTV and CLTV limits across all risk categories. Under the Underwriting Guidelines, cash out on refinance mortgage loans is generally available, but the amount is restricted for C grade loans and stated income interest only loans.

originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the sponsor and the originator, by the trustee, or a custodian on its behalf, the sponsor or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the trust administrator for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the sponsor or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor or the originator, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Mortgage Loan Purchase Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling and Servicing Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Mortgage Loan Purchase Agreement, the originator represented and warranted that, among other things: each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. In addition, the seller or the originator will represent and warrant, among other things that at the time of transfer to the Depositor: (i) each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan; (ii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iii) the prepayment penalties included in the transaction are enforceable and were originated in compliance with all applicable federal, state and local laws; (iv) none of the Mortgage Loans are High Cost as defined by the applicable predatory and abusive lending laws; (v) no Mortgage Loan is a high cost loan or a covered loan, as applicable (as such terms are defined in Standard & Poor's LEVELS Version 5.7 Glossary Revised, Appendix E) and (vi) no Mortgage Loan originated from and including October 1, 2002 to and including March 6, 2003, is secured by property located in the State of Georgia. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the discovering party will promptly notify the trust administrator or the trustee, as applicable, and such party will inform the other parties to the Pooling and Servicing Agreement, the originator and the seller of such breach and if the originator or the seller, as applicable, fails to remedy such breach, the trustee will enforce the obligations of the originator or the seller, as applicable, under the Mortgage Loan Purchase Agreement or the Assignment Agreement, as applicable, to effect a cure by either (i) as permitted pursuant to the Mortgage Loan Purchase Agreement (in the case of the originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Mortgage Loan Purchase Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement or the related Assignment Agreement that materially and adversely affects the interests of the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

### *Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account*

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicer Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut–off Date and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the servicer will deposit such amounts in the collection account for remittance to the trust administrator on the Remittance Date. Amounts on deposit in the collection account may be invested in permitted investments maturing on or before the business day prior to the related Remittance Date. The trust administrator will establish an account (the "Distribution Account") into which will be deposited amounts remitted from the servicer for distribution to Certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the Distribution Account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such

*PROSPECTUS*
*August 3, 2006*

### *Mortgage Asset Securitization Transactions, Inc.*
Depositor

### *Asset−Backed Certificates*
### *Asset−Backed Notes*
### *(Issuable in Series)*

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

  - o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

  - o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

  - o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

*You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.*

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

UBS Investment Bank

- adequate provision for future payments on certain classes of securities; and

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

### Credit Enhancement Is Limited in Amount and Coverage

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

### Yield Is Sensitive to Rate of Principal Prepayment

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

### Borrower May Be Unable to Make Balloon Payment

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "*Certain Legal Aspects of Residential Loans*" in this prospectus.

### *The Transferor May Not Be Able to Repurchase or Replace Defective Assets*

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

### *Rating of the Securities Are Limited and May be Withdrawn or Lowered*

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

- the adequacy of the value of the assets of the trust fund;

- any credit enhancement with respect to the class; and

- the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

- the likelihood that principal prepayments on the related residential loans will be made;

- the degree to which prepayments might differ from those originally anticipated; or

- the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

- the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

- the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

- if in the judgment of the rating agency, circumstances in the future so warrant;

- any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

- an adverse change in the financial or other condition of a credit enhancement provider or a change in the rating of the credit enhancement provider's long term debt.

# Exhibit 10

PROSPECTUS SUPPLEMENT DATED November 3, 2006
(To Prospectus dated October 17, 2006)

*$923,325,000 (Approximate)*

***MASTR Asset Backed Securities Trust 2006–WMC4***
***(Issuing Entity)***

***Mortgage Asset Securitization Transactions, Inc.***
***(Depositor)***

***UBS Real Estate Securities Inc.***
***(Sponsor and Seller)***

***Wells Fargo Bank, N.A.***
***(Master Servicer, Trust Administrator and Custodian)***

***JPMorgan Chase Bank, National Association***
***(Servicer)***

***Mortgage Pass Through Certificates, Series 2006–WMC4***

The MASTR Asset Backed Securities Trust 2006–WMC4 is issuing twenty–one classes of certificates, but is offering only sixteen classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions" and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "The Interest Rate Swap Agreement."

---

***You should consider carefully the risk factors beginning on page S–18 in this prospectus supplement and page 8 in the prospectus.***

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

---

***Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.***

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about November 30, 2006.

| | |
|---|---|
| *Advances* | The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer or the Trustee, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer is required to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.<br><br>See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information. |
| *Optional Termination* | The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the master servicer, the servicer and the NIMS Insurer (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut–off date.<br>See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass–Through Rates" in this prospectus supplement for additional information. |
| *Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties* | The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan.<br><br>See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information. |
| *Credit Enhancement* | |
| Subordination | The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates.<br><br>In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement.<br><br>Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the mortgage loans.<br><br>See "Description of the Certificates—Credit Enhancement" in this prospectus supplement for additional information. |
| Excess Interest | The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the Class A Certificates and Mezzanine Certificates and to pay certain fees and expenses of the trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than any Swap Termination Payment resulting from a Swap Provider Trigger Event). The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans, to |

16

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the Cut−off Date Principal Balance.

The statistical information presented in this prospectus supplement relates to the Mortgage Loans and related Mortgaged Properties in each Loan Group as of the Cut−off Date, as adjusted for scheduled principal payments due on or before the Cut−off Date whether or not received. Prior to the issuance of the certificates, Mortgage Loans may be removed from either of the Loan Groups as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time. A limited number of other Mortgage Loans may be included in each Loan Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary. Any statistic presented on a weighted average basis or any statistic based on the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8−K within four days following the Closing Date.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed−rate and adjustable−rate, first lien and second lien, fully−amortizing, balloon and interest−only mortgage loans with Principal Balances at origination that conform to Fannie Mae loan limits, and the Group II Mortgage Loans, consisting of a group of fixed−rate and adjustable−rate, first lien and second lien, fully−amortizing, balloon and interest−only mortgage loans with Principal Balances at origination that may or may not conform to Fannie Mae loan limits.

The Group I Mortgage Loans consist of 1,671 Mortgage Loans and have a Cut−off Date Principal Balance of approximately $258,920,118. The Group II Mortgage Loans consist of 3,225 Mortgage Loans and have a Cut−off Date Principal Balance of approximately $691,007,075.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one− to four−family residential properties consisting of attached or detached one− to four−family dwelling units, individual condominium units and individual planned unit developments. Approximately 89.91% of the Group I Mortgage Loans are secured by first Mortgages and approximately 10.09% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 88.46% of the Group II Mortgage Loans are secured by first Mortgages and approximately 11.54% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 88.85% of the Mortgage Loans are secured by first Mortgages and approximately 11.15% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers. A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The sponsor previously purchased the Mortgage Loans from the originator pursuant to the Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against the originator under the Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re−underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the Mortgage Loans. Subject to certain limitations, the originator or the sponsor, as applicable, will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than the repurchase or substitution obligations described above. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due−on−sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

*Original Terms to Maturity of the Mortgage Loans(1)*

| Range of Original Terms (months) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 180 or less | 1,648 | $106,687,153 | 11.23% | $ 64,737 | 10.985% | 99.06% | 655 | 20.74% | 98.32% |
| 241–300 | 1 | 175,107 | 0.02 | 175,107 | 6.875 | 80.00 | 678 | 0.00 | 0.00 |
| 301–360 | 3,247 | 843,064,933 | 88.75 | 259,644 | 7.818 | 80.07 | 642 | 25.92 | 0.12 |
| Total | 4,896 | $949,927,193 | 100.00% | $ 194,021 | 8.174% | 82.21% | 643 | 25.34% | 11.15% |

(1) The weighted average original term to maturity of the Mortgage Loans was approximately 340 months.

*Remaining Terms to Maturity of the Mortgage Loans(1)*

| Range of Remaining Terms (months) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 180 or less | 1,648 | $106,687,153 | 11.23% | $ 64,737 | 10.985% | 99.06% | 655 | 20.74% | 98.32% |
| 241–300 | 1 | 175,107 | 0.02 | 175,107 | 6.875 | 80.00 | 678 | 0.00 | 0.00 |
| 301–360 | 3,247 | 843,064,933 | 88.75 | 259,644 | 7.818 | 80.07 | 642 | 25.92 | 0.12 |
| Total | 4,896 | $949,927,193 | 100.00% | $ 194,021 | 8.174% | 82.21% | 643 | 25.34% | 11.15% |

(1) The weighted average remaining term to maturity of the Mortgage Loans was approximately 336 months.

*Property Types of the Mortgage Loans*

| Property Type | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Single Family | 3,311 | $635,841,985 | 66.94% | $ 192,039 | 8.154% | 81.95% | 640 | 26.01% | 11.12% |
| Planned Unit Development | 743 | 145,226,782 | 15.29 | 195,460 | 8.331 | 82.75 | 637 | 28.07 | 11.17 |
| Two to Four Family | 310 | 86,058,324 | 9.06 | 277,607 | 8.230 | 82.44 | 654 | 15.97 | 9.73 |
| Condominium | 532 | 82,800,102 | 8.72 | 155,639 | 7.995 | 82.94 | 665 | 25.13 | 12.78 |
| Total | 4,896 | $949,927,193 | 100.00% | $ 194,021 | 8.174% | 82.21% | 643 | 25.34% | 11.15% |

*Occupancy Status of the Mortgage Loans(1)*

*Occupancy Status*

### STATIC POOL INFORMATION

The depositor will make available any material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

### THE ORIGINATOR

WMC Mortgage Corp. ("WMC") is a mortgage banking company incorporated in the State of California. Established in 1955, WMC has developed a national mortgage origination franchise, with special emphasis on originating single–family, alternative non–prime mortgage loans in each of the regions in which it competes. WMC historically originated both prime–quality mortgage loans and non–prime–quality mortgage loans. WMC sold its prime mortgage loan origination business in 1998 and, since April of 2000, originates prime mortgage loans only on a very limited basis. WMC was owned by a subsidiary of Weyerhaeuser Company until May 1997 when it was sold to WMC Finance Co., a company owned principally by affiliates of a private investment firm. On June 14, 2004, a subsidiary of the General Electric Company ("GE") acquired WMC Finance Co.

Until March 2000, WMC originated mortgage loans through both wholesale and retail channels, with wholesale originations accounting for approximately 85% of total origination volume prior to March 2000. As of March 2000, WMC changed its business model to underwrite and process 100% of its loans on the Internet via "WMC Direct" resulting in a substantial reduction in employees, underwriting centers and closing centers, and the elimination of all retail branches. In April 2005, WMC's headquarters relocated to Burbank, California from Woodland Hills, California. A majority of its business operations are presently conducted at Burbank. WMC also has eight (8) regional offices in Addison, Texas, Orangeburg, New York, Costa Mesa, California, San Ramon, California, Jacksonville, Florida, Woburn, Massachusetts, Schaumburg, Illinois, and Bellevue, Washington. WMC's originations come primarily through its broker relationships. As of October 15, 2006, WMC had approximately 2296 employees, including approximately 709 business development representatives and associates who are responsible for recruiting and managing the independent broker network. In 2003, 2004 and 2005, WMC originated $8,177,700,459, $19,127,701,750 and $31,794,995,806 of non–prime mortgage loans, respectively, including loans acquired by WMC from correspondent lenders.

*Underwriting Standards*. The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the "***Underwriting Guidelines***") or (ii) purchased by WMC after re–underwriting the mortgage loans generally in accordance with the Underwriting Guidelines. WMC also originates certain other mortgage loans that are underwritten to the guidelines of specific investors, however, such mortgage loans are not included among those sold to the trust as described herein. The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case–by–case basis WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt–to–income ratio ("***Debt Ratio***"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.

On July 15, 2005, WMC launched a program called WMC Select. Using new credit matrices, WMC Select allows a borrower to choose loan features (such as rate, term, prepayment options, and other important features) based on the borrower's mortgage/housing history, credit depth, loan–to–value ratio ("***LTV***") and Debt Ratio. WMC Select allows WMC greater flexibility in qualifying the borrower for a loan since the borrower selects the loan features most important to him.

The mortgage loans in the trust will fall within the following documentation categories established by WMC: Full Documentation, Full–Alternative Documentation, Limited Documentation, Lite Documentation, Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation. In addition to single–family residences, certain of the mortgage loans will have been underwritten (in many cases, as described above, subject to exceptions for compensating factors) in accordance with programs established by WMC for the origination of mortgage loans secured by mortgages on condominiums, vacation and second homes, manufactured housing, two– to four–family properties and other property types. In addition, WMC has established specific parameters for jumbo loans, which are designated in the Underwriting Guidelines as mortgage loans with original principal balances in excess of $650,000 ($850,000 under WMC Select). However, WMC sometimes increases the original principal balance limits if borrowers meet other compensating credit factors.

however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement, and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the sponsor and the originator, by the trustee, or a custodian on its behalf, the sponsor or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the trust administrator for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the sponsor or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor or the originator, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Mortgage Loan Purchase Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling and Servicing Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Mortgage Loan Purchase Agreement, the originator represented and warranted that, among other things, each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. In addition, the seller or the originator will represent and warrant, among other things, that at the time of transfer to the Depositor: (i) each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan; (ii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iii) the prepayment penalties included in the transaction are enforceable and were originated in compliance with all applicable federal, state and local laws; (iv) none of the Mortgage Loans are High Cost as defined by the applicable predatory and abusive lending laws; (v) no Mortgage Loan is a high cost loan or a covered loan, as applicable (as such terms are defined in Standard & Poor's LEVELS Version 5.7 Glossary Revised, Appendix E) and (vi) no Mortgage Loan originated from and including October 1, 2002 to and including March 6, 2003, is secured by property located in the State of Georgia. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the Mortgage Loan and other related documents, the discovering party will promptly notify the trust administrator or the trustee, as applicable, and such party will inform the other parties to the Pooling and Servicing Agreement, the originator and the seller of such breach, and if the originator or the seller, as applicable, fails to remedy such breach, the trustee will enforce the obligations of the originator or the seller, as applicable, under the Mortgage Loan Purchase Agreement or the Assignment Agreement, as applicable, to effect a cure by either (i) as permitted pursuant to the Mortgage Loan Purchase Agreement (in the case of the originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Mortgage Loan Purchase Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement or the Assignment Agreement that materially and adversely affects the interests of the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

### Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut–off Date and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the servicer will deposit such amounts in the collection account for remittance to the trust administrator on the Remittance Date. Amounts on deposit in the collection account may be invested in permitted investments maturing on or before the business day prior to the related Remittance Date. The trust administrator will establish an account (the "Distribution Account") into which will be deposited amounts remitted from the servicer for distribution to Certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the Distribution Account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such permitted investments are invested in investments managed or advised by the trust administrator or an affiliate thereof, in which case such permitted

*PROSPECTUS*
*October 17, 2006*

### Mortgage Asset Securitization Transactions, Inc.
Depositor

### Asset−Backed Certificates
### Asset−Backed Notes
### (Issuable in Series)

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

   o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

   o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

   o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

*You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.*

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

## UBS Investment Bank

We may offer the certificates or notes, as applicable, through one or more different methods, including offerings through underwriters, as more fully described under *"Plan of Distribution"* in this prospectus and in the related prospectus supplement. Our affiliates may, from time to time, act as agents or underwriters in connection with the sale of the offered certificates or notes, as applicable. We or our affiliates may retain or hold for sale, from time to time, one or more classes of a series of certificates or notes, as applicable. We may offer certain classes of the certificates or notes, as applicable, if so specified in the related prospectus supplement, in one or more transactions exempt from the registration requirements of the Securities Act of 1933, as amended. These offerings will not be made pursuant to this prospectus or the related registration statement.

162

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

*Credit Enhancement Is Limited in Amount and Coverage*

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

*Yield Is Sensitive to Rate of Principal Prepayment*

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

*Borrower May Be Unable to Make Balloon Payment*

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- timely sell the related residential property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

- the level of available mortgage rates at the time of sale or refinancing;

- the borrower's equity in the related residential property;

- the financial condition of the borrower; and

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to securityholders and increase the amount of losses on the loans.

### *Violations of Federal Laws May Adversely Affect Ability to Collect on Loans*

The residential loans may also be subject to federal laws, including:

- the federal Truth in Lending Act and Regulation Z promulgated under that act, which require certain disclosures to the borrowers regarding the terms of the residential loans;

- the Equal Credit Opportunity Act and Regulation B promulgated under that act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience; and

- the Home Equity Loan Consumer Protection Act of 1988, which requires additional disclosures, limits changes that may be made to the loan documents without the borrower's consent. This Act also restricts a lender's ability to declare a default or to suspend or reduce a borrower's credit limit to certain enumerated events.

Certain mortgage loans may be subject to the Home Ownership and Equity Protection Act of 1994. These provisions may:

- impose additional disclosure and other requirements on creditors with respect to non–purchase money mortgage loans with high interest rates or high up–front fees and charges;

- impose specific statutory liabilities on creditors who fail to comply with their provisions; and

- affect the enforceability of the related loans.

In addition, any assignee of the creditor, including the trust fund, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including, without limitation, the right to rescind the mortgage loan.

The Home Improvement Contracts are also subject to the Preservation of Consumers' Claims and Defenses regulations of the Federal Trade Commission and other similar federal and state statutes and regulations. These laws:

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "*Certain Legal Aspects of Residential Loans*" in this prospectus.

### *The Transferor May Not Be Able to Repurchase or Replace Defective Assets*

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

### *Rating of the Securities Are Limited and May be Withdrawn or Lowered*

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

# Exhibit 11

PROSPECTUS SUPPLEMENT DATED August 21, 2006
(To Prospectus dated August 3, 2006)

$824,227,000(Approximate)

***MASTR Asset Backed Securities Trust 2006–NC2***
*(Issuing Entity)*

***Mortgage Asset Securitization Transactions, Inc.***
*(Depositor)*



***UBS Real Estate Securities Inc.***
*(Sponsor and Seller)*

***Wells Fargo Bank, N.A.***
*(Master Servicer and Trust Administrator)*

***HomEq Servicing Corporation***
*(Servicer)*

***Mortgage Pass Through Certificates, Series 2006–NC2***

The MASTR Asset Backed Securities Trust 2006–NC2 is issuing twenty classes of certificates, but is offering only fourteen classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions" and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "The Interest Rate Swap Agreement" and a cap contract as described in this prospectus supplement under "The Cap Contract."

***You should consider carefully the risk factors beginning on page S–20 in this prospectus supplement and page 8 in the prospectus.***

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

***Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.***

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about September 28, 2006.

The proceeds to the depositor are expected to be approximately $822,166,433 before deducting expenses. See "Underwriting" in this prospectus supplement. UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.

| | |
|---|---|
| *Advances* | The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans serviced by it. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer or the Trustee, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer is required to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses. |
| | See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information. |
| *Optional Termination* | The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the master servicer, the servicer and the NIMS Insurer (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut−off date. |
| | See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass−Through Rates" in this prospectus supplement for additional information. |
| *Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties* | The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan. |
| | See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information. |
| *Credit Enhancement* | |
| Subordination | The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates. |
| | In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement. |
| | Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the mortgage loans. |
| | See "Description of the Certificates—Credit Enhancement" in this prospectus supplement for additional information. |
| Excess Interest | The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the Class A Certificates and Mezzanine Certificates and to pay certain fees and expenses of the trust (including any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider, other than any Swap Termination Payment resulting from a Swap Provider Trigger Event). The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans, to maintain overcollateralization at required levels and to cover basis risk shortfall amounts as described in the pooling and servicing agreement. |
| | See "Description of the Certificates—Allocation of Available Funds" and "—Overcollateralization Provisions" in this prospectus supplement for additional information. |
| Overcollateralization | As of the closing date, the aggregate principal balance of the mortgage loans as of the cut−off date will exceed the aggregate certificate principal balance of the Class A Certificates and Mezzanine Certificates and the Class P Certificates by approximately $14,237,645, approximately equal to the initial certificate principal balance of the Class CE Certificates. Such amount represents approximately 1.65% of the aggregate principal balance of the mortgage loans as of the cut−off date and is the |

pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the Mortgage Loans. Subject to certain limitations, the originator or the sponsor will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than the repurchase or substitution obligations described above. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due-on-sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 82.59% of the Group I Mortgage Loans are Adjustable-Rate Group I Mortgage Loans and approximately 17.41% of the Group I Mortgage Loans are Fixed-Rate Group I Mortgage Loans. Approximately 82.06% of the Group II Mortgage Loans are Adjustable-Rate Group II Mortgage Loans and approximately 17.94% of the Group II Mortgage Loans are Fixed-Rate Group II Mortgage Loans.

Each Fixed-Rate Mortgage Loan has a Mortgage Rate that is fixed for the life of such Mortgage Loan.

Each Adjustable-Rate Mortgage Loan accrues interest at a Mortgage Rate that is adjustable following an initial period of two years or three years following origination. Generally, the Adjustable-Rate Mortgage Loans provide for semi-annual adjustment to the Mortgage Rate thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each Adjustment Date applicable thereto; provided, that (i) the first adjustment of the rates for approximately 96.84% of the adjustable-rate Group I Mortgage Loans and approximately 97.06% of the adjustable-rate Group II Mortgage Loans (in each case, by aggregate principal balance of the adjustable-rate mortgage loans in the related loan group as of the cut-off date) will not occur until two years after the date of origination and (ii) the first adjustment of the rates for approximately 3.16% of the adjustable-rate Group I Mortgage Loans and approximately 2.94% of the adjustable-rate Group II Mortgage Loans (in each case, by aggregate principal balance of the adjustable-rate mortgage loans in the related loan group as of the cut-off date) will not occur until three years after the date of origination. On each Adjustment Date for each Adjustable-Rate Mortgage Loan, the Mortgage Rate thereon will be adjusted to equal the sum, rounded to the nearest or next highest multiple of 0.125% of Six-Month LIBOR and the Gross Margin. The Mortgage Rate on any Adjustable-Rate Mortgage Loan will not decrease or increase by more than a stated percentage (up to a maximum of no more than 2.000% per annum, as specified in the related mortgage note) on the first related Adjustment Date and will not increase or decrease by more than a stated percentage (up to a maximum of no more than 2.000% per annum, as specified in the related mortgage note) on any Adjustment Date thereafter. The Adjustable-Rate Group I Mortgage Loans have a weighted average Initial Periodic Rate Cap of approximately 1.538% per annum and a weighted average Periodic Rate Cap of approximately 1.499% per annum thereafter. The Adjustable-Rate Group II Mortgage Loans have a weighted average Initial Periodic Rate Cap of approximately 1.532% per annum and a weighted average Periodic Rate Cap of approximately 1.498% per annum thereafter. Each Mortgage Rate on each Adjustable-Rate Mortgage Loan will not exceed the Maximum Mortgage Rate or be less than the Minimum Mortgage Rate. Effective with the first monthly payment due on each Adjustable-Rate Mortgage Loan (other than the Interest Only Mortgage Loans), after each related Adjustment Date the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding Principal Balance of the related Adjustable-Rate Mortgage Loan over its remaining term, and pay interest at the Mortgage Rate as so adjusted. Due to the application of the Periodic Rate Caps and the Maximum Mortgage Rates, the Mortgage Rate on each Adjustable-Rate Mortgage Loan, as adjusted on any related Adjustment Date, may be less than the sum of the Index and the related Gross Margin, rounded as described in this prospectus supplement. None of the Adjustable-Rate Mortgage Loans will permit the related mortgagor to convert the adjustable Mortgage Rate thereon to a fixed Mortgage Rate.

Approximately 13.46% of the Group I Mortgage Loans and approximately 10.62% require the borrowers to make monthly payments only of accrued interest for the first 60 months following origination. At the end of such period, the monthly payments on each such Interest Only Mortgage Loans will be recalculated to provide for amortization of the Principal Balance by the maturity date and payment of interest at the then-current Mortgage Rate.

Approximately 69.83% of the Group I Mortgage Loans and approximately 74.37% of the Group II Mortgage Loans provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments. Generally, such Mortgage Loan provides for payment of a prepayment

### Occupancy Status of the Mortgage Loans(1)

| Occupancy Status | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut−off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut−off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,180 | $777,057,390 | 90.08% | $ 185,899 | 8.420% | 81.05% | 617 | 56.12% | 6.16% |
| Investor Occupied | 343 | 55,437,264 | 6.43 | 161,625 | 9.238 | 83.14 | 639 | 36.33 | 0.00 |
| Second Home | 173 | 30,122,091 | 3.49 | 174,116 | 8.830 | 82.24 | 672 | 21.95 | 9.12 |
| Total | 4,696 | $862,616,745 | 100.00% | $ 183,692 | 8.487% | 81.23% | 621 | 53.65% | 5.86% |

(1) Occupancy as represented by the mortgagor at the time of origination.

### Purpose of the Mortgage Loans

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut−off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut−off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 2,062 | $428,060,146 | 49.62% | $ 207,595 | 8.335% | 78.53% | 600 | 63.07% | 1.54% |
| Purchase | 2,274 | 368,437,253 | 42.71 | 162,022 | 8.747 | 84.45 | 645 | 38.76 | 11.69 |
| Rate & Term Refinance | 360 | 66,119,346 | 7.66 | 183,665 | 8.025 | 80.76 | 619 | 75.64 | 1.43 |
| Total | 4,696 | $862,616,745 | 100.00% | $ 183,692 | 8.487% | 81.23% | 621 | 53.65% | 5.86% |

### Original Loan−to−Value Ratios of the Mortgage Loans(1)(2)(3)

| Range of Original Loan−to−Value Ratios (%) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut−off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut−off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 124 | $ 17,524,432 | 2.03% | $ 141,326 | 7.789% | 40.35% | 598 | 72.27% | 0.00% |
| 50.01−55.00 | 73 | 14,502,673 | 1.68 | 198,667 | 7.821 | 52.88 | 609 | 59.11 | 0.00 |
| 55.01−60.00 | 88 | 16,542,866 | 1.92 | 187,987 | 7.986 | 57.64 | 579 | 62.09 | 0.00 |
| 60.01−65.00 | 114 | 24,819,389 | 2.88 | 217,714 | 7.960 | 63.27 | 589 | 71.44 | 0.00 |
| 65.01−70.00 | 184 | 40,628,927 | 4.71 | 220,809 | 7.984 | 68.64 | 601 | 59.20 | 0.00 |
| 70.01−75.00 | 273 | 56,738,235 | 6.58 | 207,832 | 8.241 | 73.99 | 587 | 62.72 | 0.00 |
| 75.01−80.00 | 1,589 | 332,716,009 | 38.57 | 209,387 | 8.094 | 79.82 | 639 | 48.00 | 0.00 |
| 80.01−85.00 | 506 | 103,125,001 | 11.95 | 203,804 | 8.526 | 84.48 | 584 | 65.37 | 0.00 |
| 85.01−90.00 | 723 | 142,334,934 | 16.50 | 196,867 | 8.768 | 89.71 | 617 | 50.09 | 0.04 |
| 90.01−95.00 | 295 | 61,638,186 | 7.15 | 208,943 | 8.760 | 94.76 | 639 | 55.86 | 1.74 |
| 95.01−100.00 | 727 | 52,046,094 | 6.03 | 71,590 | 11.327 | 99.99 | 656 | 40.52 | 95.03 |

*Historical Delinquency of the Group II Mortgage Loans Since Origination*

| Delinquency Period (months)* | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut–off Date | % of Aggregate Principal Balance Outstanding as of the Cut–off Date | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 1 x 30 | 20 | $ 2,408,189 | 0.37% | $ 120,409 | 9.538% | 80.93% | 587 | 45.21% | 9.29% |
| 1 x 60 | 2 | 558,645 | 0.09 | 279,322 | 8.347 | 81.28 | 625 | 12.84 | 0.00 |
| 2 x 30 | 4 | 759,217 | 0.12 | 189,804 | 8.728 | 85.13 | 571 | 25.92 | 0.00 |
| None | 3,339 | 646,307,761 | 99.43 | 193,563 | 8.531 | 81.65 | 624 | 52.79 | 6.45 |
| Total | 3,365 | $650,033,811 | 100.00% | $ 193,175 | 8.535% | 81.65% | 623 | 52.70% | 6.45% |

(*) Based on the "OTS" methodology for determining delinquencies.

### STATIC POOL INFORMATION

The depositor will make available any material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

### THE ORIGINATOR

The information set forth in the following paragraphs with regard to the originator and the originator's underwriting standards has been provided by the originator.

*General*

All of the Mortgage Loans were originated or acquired by the originator. The originator is a wholly owned operating subsidiary of New Century Financial Corporation, a publicly traded company. Founded in 1995 and headquartered in Irvine, California, New Century Financial Corporation is a real estate investment trust and a full service mortgage finance company, providing first and second mortgage products to borrowers nationwide. New Century Financial Corporation offers a broad range of mortgage products designed to meet the needs of all borrowers.

The originator is a consumer finance and mortgage banking company that originates, purchases and sells first lien and second lien mortgage loans and other consumer loans. New Century Mortgage Corporation emphasizes the origination of mortgage loans that are commonly referred to as non–conforming "B&C" loans or subprime loans.

As of June 30, 2006, New Century Financial Corporation employed approximately 7,100 associates and originated loans through its wholesale network of more than 53,000 independent mortgage brokers through 33 regional processing centers operating in 19 states. Its retail network operates through 246 sales offices in 35 states. For the six months ending June 30, 2006, New Century Financial Corporation originated $29.6 billion in mortgage loans.

The following table describes the size, composition and growth of New Century's total residential mortgage loan production over the periods indicated.

| December 31, 2003 | | December 31, 2004 | | December 31, 2005 | | June 30, 2006 | |
|---|---|---|---|---|---|---|---|
| Number | Total Mortgage Loan Production | Number | Total Mortgage Loan Production | Number | Total Mortgage Loan Production | Number | Total Mortgage Loan Production |

| | ($) | | ($) | | ($) | | ($) |
|---|---|---|---|---|---|---|---|
| Residential Mortgage Loans | 164,373 | 27,382,838 | 242,877 | 42,199,640 | 310,389 | 56,108,241 | 161,965 | 29,610,757 |

*Underwriting Standards*

All of the Mortgage Loans will be acquired on the closing date by the depositor from the sponsor and were acquired by the sponsor from New Century prior to the closing date. All of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein (the "New Century Underwriting Guidelines"). The following is a general summary of the New Century Underwriting Guidelines as generally applied, with some variation, by the originator. This summary does not purport to be a complete description of the underwriting standards of the originator.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market. While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service–to–income ratio, as well as the type and use of the mortgaged property. The Mortgage Loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more traditional manner. As a result of the originator's underwriting criteria, changes in the values of the related Mortgaged Properties may have a greater effect on the delinquency, foreclosure and loss experience on the Mortgage Loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. In addition, there can be no assurance that the value of the related Mortgaged Property estimated in any appraisal or review is equal to the actual value of that Mortgaged Property at the time of that appraisal or review.

The Mortgage Loans have been originated in accordance with the New Century Underwriting Guidelines. On a case–by–case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator. The originator uses the value as determined by the review in computing the loan–to–value ratio of the related mortgage loan if the appraised value of a mortgaged property, as determined by a review, is (i) more than 10% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan–to–value ratio or a combined loan–to–value ratio of up to 90%, and (ii) more than 5% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan–to–value ration or a combined loan–to–value ratio of between 91–95%. For mortgage loans having a loan–to–value ratio or a combined loan–to–value ratio greater than 95%, the appraised value as determined by the review is used in computing the loan–to–value ratio of the related mortgage loan. If the appraised value of a mortgaged property as determined by a review is 25% or more lower than the value as determined by the appraisal, then the originator obtains a new appraisal and repeats the review process.

The Mortgage Loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service–to–income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan. The New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance. In general, the maximum loan amount for mortgage loans originated under the programs is $1,500,000 (additional requirements may be imposed in connection with Mortgage Loans in excess of $1,500,000). The New Century Underwriting Guidelines generally permit loans on one– to four–family residential properties to have a loan–to–value ratio at origination of up to 95% with respect to first liens loans. The maximum loan–to–value ratio depends

73

however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the sponsor and the originator, by the trustee, or a custodian on its behalf, the sponsor or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the trust administrator for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the sponsor or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor or the originator, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Mortgage Loan Purchase Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling and Servicing Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). In addition, pursuant to the Mortgage Loan Purchase Agreement, the originator represented and warranted that, among other things: each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws. Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. In addition, the seller or the originator will represent and warrant, among other things that at the time of transfer to the Depositor: (i) each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan; (ii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iii) the prepayment penalties included in the transaction are enforceable and were originated in compliance with all applicable federal, state and local laws; (iv) none of the Mortgage Loans are High Cost as defined by the applicable predatory and abusive lending laws; (v) no Mortgage Loan is a high cost loan or a covered loan, as applicable (as such terms are defined in Standard & Poor's LEVELS Version 5.7 Glossary Revised, Appendix E) and (vi) no Mortgage Loan originated from and including October 1, 2002 to and including March 6, 2003, is secured by property located in the State of Georgia. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the discovering party will promptly notify the trust administrator or the trustee, as applicable, and such party will inform the other parties to the Pooling and Servicing Agreement, the originator and the seller of such breach and if the originator or the seller, as applicable, fails to remedy such breach, the trustee will enforce the obligations of the originator or the seller, as applicable, under the Mortgage Loan Purchase Agreement or the Assignment Agreement, as applicable, to effect a cure by either (i) as permitted pursuant to the Mortgage Loan Purchase Agreement (in the case of the originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Mortgage Loan Purchase Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement or the related Assignment Agreement that materially and adversely affects the interests of the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

*Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account*

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicer Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut-off Date and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the servicer will deposit such amounts in the collection account for remittance to the trust administrator on the Remittance Date. Amounts on deposit in the collection account may be invested in permitted investments maturing on or before the business day prior to the related Remittance Date. The trust administrator will establish an account (the "Distribution Account") into which will be deposited amounts remitted from the servicer for distribution to Certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the Distribution Account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such permitted investments are invested in investments managed or advised by the trust administrator or an affiliate thereof, in which case such permitted

*PROSPECTUS*
*August 3, 2006*

### *Mortgage Asset Securitization Transactions, Inc.*
Depositor

### *Asset—Backed Certificates*
### *Asset—Backed Notes*
### *(Issuable in Series)*

*Issuing Entities:*

- Issuing entities will be established to issue from time to time asset—backed pass—through certificates or asset—backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

  o a segregated pool of various types of single—family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

  o mortgage securities consisting of previously issued asset—backed certificates, collateralized mortgage obligations or participation certificates; or

  o pass—through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

*Securities:*

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

*You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.*

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

UBS Investment Bank

- adequate provision for future payments on certain classes of securities; and

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

### Credit Enhancement Is Limited in Amount and Coverage

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

### Yield Is Sensitive to Rate of Principal Prepayment

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

### Borrower May Be Unable to Make Balloon Payment

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See *"Certain Legal Aspects of Residential Loans"* in this prospectus.

### *The Transferor May Not Be Able to Repurchase or Replace Defective Assets*

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

### *Rating of the Securities Are Limited and May be Withdrawn or Lowered*

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

- the adequacy of the value of the assets of the trust fund;

- any credit enhancement with respect to the class; and

- the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

- the likelihood that principal prepayments on the related residential loans will be made;

- the degree to which prepayments might differ from those originally anticipated; or

- the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

- the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

- the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

- if in the judgment of the rating agency, circumstances in the future so warrant;

- any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

- an adverse change in the financial or other condition of a credit enhancement provider or a change in the rating of the credit enhancement provider's long term debt.