# Exhibit 12

PROSPECTUS SUPPLEMENT DATED December 8, 2006
(To Prospectus dated October 17, 2006)

*$999,187,000 (Approximate)*

*MASTR Asset Backed Securities Trust 2006–NC3*
*(Issuing Entity)*

*Mortgage Asset Securitization Transactions, Inc.*
*(Depositor)*

*UBS Real Estate Securities Inc.*
*(Sponsor and Seller)*



*Wells Fargo Bank, N.A.*
*(Master Servicer and Trust Administrator)*

*HomEq Servicing*
*(Servicer)*

*Mortgage Pass Through Certificates, Series 2006–NC3*

The MASTR Asset Backed Securities Trust 2006–NC3 is issuing twenty classes of certificates, but is offering only fifteen classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions" and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "The Interest Rate Swap Agreement" and two interest rate cap agreements as described in this prospectus supplement under "The Interest Rate Cap Agreements."

*You should consider carefully the risk factors beginning on page S–20 in this prospectus supplement and page 8 in the prospectus.*

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

*Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.*

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book–entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about December 28, 2006.

The proceeds to the depositor are expected to be approximately $1,005,159,533 before deducting expenses. See "Underwriting" in this prospectus supplement. UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.

| | |
|---|---|
| Fees and Expenses | Before distributions are made on the certificates, the following fees and expenses will be payable: (i) the servicer will be paid a monthly fee equal to one−twelfth of 0.500% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period and (ii) the credit risk manager will be paid a monthly fee equal to one−twelfth of 0.0125% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period. The servicing fee will be payable from amounts on deposit in the collection account. The credit risk manager fee will be payable from amounts on deposit in the distribution account. |
| | The Swap Provider is entitled to a monthly payment calculated as one−twelfth of 5.350% on the Swap Notional Amount (as defined herein) multiplied by 250. The trust is entitled to an amount equal to one−month LIBOR (as set forth in the Interest Rate Swap Agreement and calculated on an actual/360 basis) on the Swap Notional Amount for such Distribution Date multiplied by 250. Only the positive net payment of the two obligations will be paid by the applicable party. If a net payment is owed to the Swap Provider, the trust administrator will pay such amount from the distribution account before distributions are made on the certificates. |
| Cross collateralization | In certain circumstances, payments on the Group I Mortgage Loans may be used to make certain distributions to the holders of the Group II Certificates and payments on the Group II Mortgage Loans may be used to make certain distributions to the holders of the Group I Certificates. |
| | See "Description of the Offered Certificates—Allocation of Available Funds" in this prospectus supplement for additional information. |
| *Advances* | The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans serviced by it. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer or the trustee, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer is required to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses. |
| | See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information. |
| *Optional Termination* | The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the servicer, the master servicer and the NIMS Insurer, if any, (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut−off date. |
| | See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass−Through Rates" in this prospectus supplement for additional information. |
| *Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties* | The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan. |
| | See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information. |
| *Credit Enhancement* | |
| Subordination | The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates. |
| | In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement. |

The statistical information presented in this prospectus supplement relates to the Mortgage Loans and related Mortgaged Properties in each Loan Group as of the Cut–off Date, as adjusted for scheduled principal payments due on or before the Cut–off Date whether or not received. Prior to the issuance of the certificates, Mortgage Loans may be removed from either of the Loan Groups as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time. A limited number of other Mortgage Loans may be included in each Loan Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary. Any statistic presented on a weighted average basis or any statistic based on the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8–K within four days following the Closing Date.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed–rate and adjustable–rate, first lien and second lien, fully–amortizing, balloon and interest–only mortgage loans with Principal Balances at origination that conform to Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed–rate and adjustable–rate, first lien and second lien, fully–amortizing, balloon and interest–only mortgage loans with Principal Balances at origination that may or may not conform to Freddie Mac loan limits.

The Group I Mortgage Loans consist of 1,709 Mortgage Loans and have a Cut–off Date Principal Balance of approximately $269,183,026. The Group II Mortgage Loans consist of 3,780 Mortgage Loans and have a Cut–off Date Principal Balance of approximately $762,506,312.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one– to four–family residential properties consisting of attached or detached one– to four–family dwelling units, individual condominium units, planned unit developments and manufactured housing. Approximately 94.50% of the Group I Mortgage Loans are secured by first Mortgages and approximately 5.50% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 93.43% of the Group II Mortgage Loans are secured by first Mortgages and approximately 6.57% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 93.71% of the Mortgage Loans are secured by first Mortgages and approximately 6.29% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers. A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The sponsor previously purchased the Mortgage Loans from the originator pursuant to the Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against the originator under the Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re–underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the related Mortgage Loans. Subject to certain limitations, the originator or the sponsor will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than the repurchase or substitution obligations described above. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due–on–sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

### Occupancy Status of the Mortgage Loans[1]

| Occupancy Status | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,924 | $ 931,150,479 | 90.25% | $ 189,104 | 8.410% | 81.80% | 618 | 63.11% | 6.69% |
| Investor Occupied | 377 | 65,895,731 | 6.39 | 174,790 | 9.178 | 84.53 | 648 | 44.11 | 0.00 |
| Second Home | 188 | 34,643,129 | 3.36 | 184,272 | 8.664 | 83.74 | 661 | 31.34 | 7.63 |
| Total | 5,489 | $1,031,689,338 | 100.00% | $ 187,956 | 8.468% | 82.04% | 622 | 60.83% | 6.29% |

(1) Occupancy as represented by the mortgagor at the time of origination.

### Purpose of the Mortgage Loans

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 2,502 | $ 525,094,767 | 50.90% | $ 209,870 | 8.343% | 79.60% | 600 | 67.84% | 1.76% |
| Purchase | 2,488 | 408,211,555 | 39.57 | 164,072 | 8.727 | 85.16 | 650 | 48.45 | 13.40 |
| Rate & Term Refinance | 499 | 98,383,016 | 9.54 | 197,160 | 8.063 | 82.11 | 619 | 74.78 | 0.94 |
| Total | 5,489 | $1,031,689,338 | 100.00% | $ 187,956 | 8.468% | 82.04% | 622 | 60.83% | 6.29% |

### Original Loan–to–Value Ratios of the Mortgage Loans[1][2][3]

| Range of Original Loan–to–Value Ratios (%) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 75 | $ 12,830,957 | 1.24% | $ 171,079 | 8.178% | 41.58% | 602 | 71.27% | 0.00% |
| 50.01–55.00 | 67 | 11,686,931 | 1.13 | 174,432 | 7.986 | 52.53 | 593 | 67.48 | 0.00 |
| 55.01–60.00 | 128 | 25,511,309 | 2.47 | 199,307 | 7.786 | 57.65 | 598 | 69.32 | 0.00 |
| 60.01–65.00 | 144 | 29,998,300 | 2.91 | 208,322 | 7.952 | 63.29 | 591 | 62.77 | 0.00 |
| 65.01–70.00 | 182 | 36,102,279 | 3.50 | 198,364 | 8.176 | 68.43 | 583 | 64.05 | 0.00 |
| 70.01–75.00 | 311 | 66,200,276 | 6.42 | 212,863 | 8.179 | 74.03 | 587 | 67.19 | 0.00 |
| 75.01–80.00 | 1,823 | 398,968,493 | 38.67 | 218,853 | 8.063 | 79.79 | 639 | 54.91 | 0.00 |
| 80.01–85.00 | 535 | 113,132,910 | 10.97 | 211,463 | 8.531 | 84.48 | 588 | 67.55 | 0.00 |
| 85.01–90.00 | 876 | 188,694,571 | 18.29 | 215,405 | 8.634 | 89.74 | 618 | 61.01 | 0.00 |
| 90.01–95.00 | 346 | 81,081,876 | 7.86 | 234,341 | 8.502 | 94.69 | 637 | 70.91 | 0.16 |
| 95.01–100.00 | 1,002 | 67,481,438 | 6.54 | 67,347 | 11.319 | 100.00 | 653 | 56.79 | 95.98 |

### STATIC POOL INFORMATION

The depositor will make available any material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

### THE ORIGINATOR

The information set forth in the following paragraphs with regard to the originator and the originator's underwriting standards has been provided by the originator.

*General*

All of the Mortgage Loans were originated or acquired by the originator. The originator is a wholly owned operating subsidiary of New Century Financial Corporation, a publicly traded company. Founded in 1995 and headquartered in Irvine, California, New Century Financial Corporation is a real estate investment trust and a full service mortgage finance company, providing first and second mortgage products to borrowers nationwide. New Century Financial Corporation offers a broad range of mortgage products designed to meet the needs of all borrowers.

The originator is a consumer finance and mortgage banking company that originates, purchases and sells first lien and second lien mortgage loans and other consumer loans. The originator emphasizes the origination of mortgage loans that are commonly referred to as non−conforming "B&C" mortgage loans or subprime mortgage loans.

As of June 30, 2006, New Century Financial Corporation employed approximately 7,100 associates and originated loans through its wholesale network of more than 53,000 independent mortgage brokers through 33 regional processing centers operating in 19 states. Its retail network operates through 246 sales offices in 35 states. For the six months ending June 30, 2006, New Century Financial Corporation originated $29.6 billion in mortgage loans.

The following table describes the size, composition and growth of the originator's total residential mortgage loan production over the periods indicated.

| | December 31, 2003 | | December 31, 2004 | | December 31, 2005 | | June 30, 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Number | Total Mortgage Loan Production ($) | Number | Total Mortgage Loan Production ($) | Number | Total Mortgage Loan Production ($) | Number | Total Mortgage Loan Production ($) |
| Residential Mortgage Loans | 164,373 | 27,382,838 | 242,877 | 42,199,640 | 310,389 | 56,108,241 | 161,965 | 29,610,757 |

*Underwriting Standards*

All of the Mortgage Loans will be acquired on the closing date by the depositor from the sponsor and were acquired by the sponsor from New Century prior to the closing date. All of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein (the "New Century Underwriting Guidelines"). The following is a general summary of the New Century Underwriting Guidelines as generally applied, with some variation, by the originator. This summary does not purport to be a complete description of the underwriting standards of the originator.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market. While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service−to−income ratio, as well as the type and use of the mortgaged property. The Mortgage Loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in

a more traditional manner. As a result of the originator's underwriting criteria, changes in the values of the related Mortgaged Properties may have a greater effect on the delinquency, foreclosure and loss experience on the Mortgage Loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. In addition, there can be no assurance that the value of the related Mortgaged Property estimated in any appraisal or review is equal to the actual value of that Mortgaged Property at the time of that appraisal or review.

The Mortgage Loans have been originated in accordance with the New Century Underwriting Guidelines. On a case–by–case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator. The originator uses the value as determined by the review in computing the loan–to–value ratio of the related mortgage loan if the appraised value of a mortgaged property, as determined by a review, is (i) more than 10% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan–to–value ratio or a combined loan–to–value ratio of up to 90%, and (ii) more than 5% greater but less than 25% lower than the value as determined by the appraisal for mortgage loans having a loan–to–value ratio or a combined loan–to–value ratio of between 91–95%. For mortgage loans having a loan–to–value ratio or a combined loan–to–value ratio greater than 95%, the appraised value as determined by the review is used in computing the loan–to–value ratio of the related mortgage loan. If the appraised value of a mortgaged property as determined by a review is 25% or more lower than the value as determined by the appraisal, then the originator obtains a new appraisal and repeats the review process.

The Mortgage Loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, the originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service–to–income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the New Century Underwriting Guidelines that generally is equal to the interest rate on that loan. The New Century Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance. In general, the maximum loan amount for mortgage loans originated under the programs is $1,500,000 (additional requirements may be imposed in connection with Mortgage Loans in excess of $1,500,000). The New Century Underwriting Guidelines generally permit loans on one– to four–family residential properties to have a loan–to–value ratio at origination of up to 95% with respect to first liens loans. The maximum loan–to–value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service–to–income ratio, as well as the type and use of the property. With respect to mortgage loans secured by mortgaged properties acquired by a mortgagor under a "lease option purchase," the loan–to–value ratio of the related mortgage loan is based on the lower of the appraised value at the time of origination of the mortgage loan or the sale price of the related mortgaged property if the "lease option purchase price" was set less than 12 months prior to origination and is based on the appraised value at the time of origination if the "lease option purchase price" was set 12 months or more prior to origination.

The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full documentation program be verified. The specific income documentation required for the originator's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification of stable income for at least 12 months from the applicant's employer for salaried employees and 24 months for self–employed applicants; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements, and under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment. Verification of the source of funds, if any, that are required to be deposited by the applicant into escrow in the case of a purchase money loan is required.

In evaluating the credit quality of borrowers, the originator utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian.

The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

*"AAA" Risk.* Under the "AAA" risk category, the applicant must have a FICO score of 620, or greater, based on loan–to–value ratio and loan amount. Three or more tradelines (one of which having a 24 months' history and no late payments) are required. There must be a minimum required principal, interest, taxes and insurance reserve (PITI Reserve) of 2 months. There must be a minimum required PITI Reserve of 6 months for (i) Full Documentation mortgage loans in an amount greater than $1,500,000, (ii) Full Documentation mortgage loans or Limited Documentation mortgage loans in an amount greater than $1,000,000 and having a FICO score of less than 640, or (iii) any Stated Documentation mortgage loan having a FICO score of less than 640. The borrower must have no late mortgage payments on an existing mortgage loan within the last 12 months. An existing mortgage loan must be less than 60 days late at the time of funding of the mortgage loan. No bankruptcy may have occurred during the preceding twenty four months. The starting determination date for a Chapter 7 bankruptcy is from its discharge date. The starting determination date for a Chapter 13 bankruptcy is from its filing date, and it must have been discharged. No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding twenty four months. The mortgaged property must be in at least average condition. A maximum loan–to–value ratio of 95% is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan–to–value ratio of 85% is permitted for a mortgage loan on a non–owner occupied single family or two unit property, an owner occupied high–rise condominium or a three to four family residential property. A maximum loan–to–value ratio of 95% is permitted for a mortgage on an owner occupied single family and a non–owner occupied three to four family residential property or high–rise condominium. The maximum loan–to–value ratio for a non–owner occupied rural, remote or unique property is 85%. The maximum combined loan–to–value ratio, including any related subordinate lien, is 100% for either a refinance loan or a purchase money loan. The maximum debt service–to–income ratio is 55% for a mortgage loan having a loan–to–value ratio equal to or below 75%; the maximum debt service–to–income ratio is 50% for a mortgage loan having a loan–to–value ratio above 75%. No Document loans (NINA) are available for FICO scores above 640.

*"AA" Risk.* Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan–to–value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments) are required for loan–to–value ratios above 90%. The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan. An existing mortgage loan must be less than 30 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan–to–value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan–to–value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan–to–value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan–to–value ratio of 95% is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan–to–value ratio of 90% is permitted for a mortgage loan on a non–owner occupied single family or two unit property, an owner occupied high–rise condominium or a three to four family residential property. The maximum loan–to–value ratio for owner occupied rural, remote or unique properties and non–owner occupied three to four family residential properties or high–rise condominiums is 85%. The maximum loan–to–value ratio for non–owner occupied rural, remote or unique properties is 80%. The maximum combined loan–to–value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service–to–income ratio is usually 50% unless the loan–to–value ratio is reduced.

*"A+" Risk.* Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan–to–value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments) are required for loan–to–value ratios above 90%. A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan–to–value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan–to–value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan–to–value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan–to–value ratio of 95% (or 90% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan–to–value ratio of 90% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non–owner occupied property single family or two unit property, and an owner occupied high–rise condominium or a three to four family residential property. The maximum loan–to–value ratio for owner occupied rural, remote or

depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the seller or the originator, as applicable, by the trustee, or a custodian on its behalf, the seller or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a qualified substitute mortgage loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the trust administrator for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the seller or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a qualified substitute mortgage loan, the seller or the originator, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Mortgage Loan Purchase Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling and Servicing Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. In addition, the seller or the originator will represent and warrant, among other things that at the time of transfer to the Depositor: (i) each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan; (ii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iii) the prepayment penalties included in the transaction are enforceable and were originated in compliance with all applicable federal, state and local laws; (iv) none of the Mortgage Loans are High Cost as defined by the applicable predatory and abusive lending laws; (v) no Mortgage Loan is a high cost loan or a covered loan, as applicable (as such terms are defined in Standard & Poor's LEVELS Version 5.7 Glossary Revised, Appendix E) and (vi) no Mortgage Loan originated from and including October 1, 2002 to and including March 6, 2003, is secured by property located in the State of Georgia. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the discovering party will promptly notify the trust administrator or the trustee, as applicable, and such party will inform the other parties to the Pooling and Servicing Agreement, the originator and the seller of such breach and if the originator or the seller, as applicable, fails to remedy such breach, the trustee will enforce the obligations of the originator or the seller, as applicable, under the Mortgage Loan Purchase Agreement or the Assignment Agreement, as applicable, to effect a cure by either (i) as permitted pursuant to the Mortgage Loan Purchase Agreement (in the case of the originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Mortgage Loan Purchase Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement or the related Assignment Agreement that materially and adversely affects the interests of the certificateholders.

The originator may be required to repurchase any Mortgage Loan originated by it in the trust to the extent any such Mortgage Loan experiences an early payment default (i.e., the first payment due to the depositor or the trust is not received within 30 days of that payment being due). These purchases will have the same effect on the holders of the Certificates as a prepayment of those Mortgage Loans and may adversely affect the yield on the Certificates. In the event the originator defaults on such obligation, such Mortgage Loans will remain in the trust.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

***Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account***

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut-off Date and insurance proceeds to be applied to the restoration or repair of a

**PROSPECTUS**
*October 17, 2006*

## Mortgage Asset Securitization Transactions, Inc.
Depositor

### Asset−Backed Certificates
### Asset−Backed Notes
### (Issuable in Series)

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

    o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

    o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

    o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

*You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.*

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

## UBS Investment Bank

We may offer the certificates or notes, as applicable, through one or more different methods, including offerings through underwriters, as more fully described under "*Plan of Distribution*" in this prospectus and in the related prospectus supplement. Our affiliates may, from time to time, act as agents or underwriters in connection with the sale of the offered certificates or notes, as applicable. We or our affiliates may retain or hold for sale, from time to time, one or more classes of a series of certificates or notes, as applicable. We may offer certain classes of the certificates or notes, as applicable, if so specified in the related prospectus supplement, in one or more transactions exempt from the registration requirements of the Securities Act of 1933, as amended. These offerings will not be made pursuant to this prospectus or the related registration statement.

167

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

*Credit Enhancement Is Limited in Amount and Coverage*

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

*Yield Is Sensitive to Rate of Principal Prepayment*

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

*Borrower May Be Unable to Make Balloon Payment*

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- timely sell the related residential property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

- the level of available mortgage rates at the time of sale or refinancing;

- the borrower's equity in the related residential property;

- the financial condition of the borrower; and

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to securityholders and increase the amount of losses on the loans.

### *Violations of Federal Laws May Adversely Affect Ability to Collect on Loans*

The residential loans may also be subject to federal laws, including:

- the federal Truth in Lending Act and Regulation Z promulgated under that act, which require certain disclosures to the borrowers regarding the terms of the residential loans;

- the Equal Credit Opportunity Act and Regulation B promulgated under that act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience; and

- the Home Equity Loan Consumer Protection Act of 1988, which requires additional disclosures, limits changes that may be made to the loan documents without the borrower's consent. This Act also restricts a lender's ability to declare a default or to suspend or reduce a borrower's credit limit to certain enumerated events.

Certain mortgage loans may be subject to the Home Ownership and Equity Protection Act of 1994. These provisions may:

- impose additional disclosure and other requirements on creditors with respect to non–purchase money mortgage loans with high interest rates or high up–front fees and charges;

- impose specific statutory liabilities on creditors who fail to comply with their provisions; and

- affect the enforceability of the related loans.

In addition, any assignee of the creditor, including the trust fund, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including, without limitation, the right to rescind the mortgage loan.

The Home Improvement Contracts are also subject to the Preservation of Consumers' Claims and Defenses regulations of the Federal Trade Commission and other similar federal and state statutes and regulations. These laws

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "*Certain Legal Aspects of Residential Loans*" in this prospectus.

### *The Transferor May Not Be Able to Repurchase or Replace Defective Assets*

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

### *Rating of the Securities Are Limited and May be Withdrawn or Lowered*

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

# Exhibit 13

**PROSPECTUS SUPPLEMENT DATED January 16, 2007**
**(To Prospectus dated October 17, 2006)**



## $2,087,535,100

### (APPROXIMATE)

## MASTR Adjustable Rate Mortgages Trust 2007−1

### (ISSUING ENTITY)

### MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
### (DEPOSITOR)

### UBS REAL ESTATE SECURITIES INC.
### (TRANSFEROR/SPONSOR)

### WELLS FARGO BANK, N.A.
### (MASTER SERVICER AND TRUST ADMINISTRATOR)

### Mortgage Pass−Through Certificates, Series 2007−1

The MASTR Adjustable Rate Mortgages Trust 2007−1, the issuing entity, is issuing certificates consisting of 47 classes of certificates, but is offering only 40 classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be: (i) collections on closed end, adjustable−rate loans some of which are negatively amortizing loans, and (ii) collections on hybrid adjustable−rate loans, none of which are negatively amortizing, in each case, secured by first mortgages or deeds of trust on residential one− to four−family properties.

- Credit enhancement for the group I certificates will be provided by subordination, overcollateralization and excess interest as described in this prospectus supplement under "*Description of the Offered Certificates.*" The group I certificates will also benefit from two separate cap agreements as described in this prospectus supplement under "*Description of the Offered Certificates—Group I—The Group I Cap 1 Agreement and Group I Cap 1 Account*" and "*—The Group I Cap 2 Agreement and Group I Cap 2 Account*" and an interest rate swap agreement as described in this prospectus supplement under "*Description of the Offered Certificates—Group I—The Group I Swap Agreement, the Group I Swap Provider and the Group I Swap Account.*" Credit enhancement for the group II certificates will be provided by the subordination of certain classes of group II certificates in respect of the right to receive interest and principal.

- Additional credit enhancement for each of the Class I−2A2 and Class I−2A4 certificates will be provided in the form of an irrevocable financial guaranty insurance policy issued by Financial Security Assurance Inc. with respect to such classes.  No other class of certificates will be entitled to payments under the policy.

**You should consider carefully the risk factors beginning on page S−32 of this prospectus supplement and page 8 in the prospectus.**

The certificates will represent an interest in the issuing entity only and will not represent obligations of the depositor, the sponsor or any of their affiliates.  No governmental agency or instrumentality or any other person will insure the certificates (other than Financial Security Assurance Inc. with respect to the Class I−2A2 and Class I−2A4 certificates) or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

**Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete.  Any representation to the contrary is a criminal offense.**

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc.  UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about January 16, 2007.

The proceeds to the depositor from the offered certificates are expected to be approximately $2,155,680,720 before deducting expenses, estimated at $1,030,000.  See "*Underwriting*" in this prospectus supplement.  The underwriter will sell the offered certificates purchased by it from time to time in negotiated transactions at varying prices determined at the time of sale.

- the Federal Truth–in–Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the related servicer to collect all or part of the principal of or interest on the loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans.

The transferor will represent that as of the closing date, each loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the transferor will be obligated to cure such breach or repurchase or replace the affected loan in the manner described under *"The Pooling and Servicing Agreement—Assignment of the Loans"* in this prospectus supplement.

## High Cost Loans

None of the loans are "High Cost Loans" within the meaning of the Homeownership Act or any state law, ordinance or regulation similar to the Homeownership Act. See *"Certain Legal Aspects of Residential Loans—Anti–Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders—Homeownership Act and Similar State Laws"* in the prospectus.

In addition to the Homeownership Act, however, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. An originator's failure to comply with these laws could subject the trust, and other assignees of the loans, to monetary penalties and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans. Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

Under the anti–predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a loan does not meet the test even if an originator reasonably believed that the test was satisfied. Any determination by a court that a loan does not meet the test will result in a violation of the state anti–predatory lending law, in which case the transferor will be required to purchase such loan from the trust.

See *"Certain Legal Aspects of Residential Loans—Anti–Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders"* in the prospectus.

## Interest Only Loans Have a Greater Risk Upon Default

Approximately 19.78% of the group I loans and approximately 92.35% of the group II loans (in each case, by cut–off date pool balance for the related loan group) do not provide for any payments of principal prior to 5 or 10 years after origination, as specified in the related loan documents. During this period, the payments made by the related mortgagor will be less than it would be if the principal of the loan was required to amortize. In addition, the loan principal balance will not be reduced because there will be no scheduled monthly payments of principal during this period. As a result, no principal payments will be made on the offered certificates with respect to these loans during their interest only period unless there is a principal prepayment.

After the initial interest only period, the scheduled monthly payment on these loans will increase, which may result in increased delinquencies by the related mortgagors, particularly if interest rates have increased and the mortgagor is unable to refinance. In addition, losses may be greater on these loans as a result of there being no principal amortization during the early years of these loans. Although the amount of principal included in each scheduled monthly payment for a traditional loan is relatively small during the first few years after the origination of a loan, in the aggregate, the amount can be significant. Any resulting delinquencies and losses, to the extent not covered by the applicable credit enhancement described in this prospectus supplement, will be allocated to the offered certificates as described in this prospectus supplement.

The use of loans with an initial interest only period has recently increased in popularity in the mortgage marketplace, but historical performance data for interest only loans is limited as compared to performance data for loans that amortize from

origination. The performance of interest only loans may be significantly different from loans that amortize from origination. In particular, there may be higher expectation by these mortgagors of refinancing their loans with a new loan, in particular, one with an initial interest only period, which may result in higher or lower prepayment speeds than would otherwise be the case. In addition, the failure by the related mortgagor to build equity in the mortgaged property may affect the delinquency, loss and prepayment experience with respect to these loans.

### The Rate of Default on Loans that are Secured by Investor Properties May be Higher than on Other Loans

As of the cut−off date, approximately 13.64% of the group I loans and approximately 12.98% of the group II loans (in each case, by cut−off date pool balance for the related loan group) are expected to be secured by investor properties. An investor property is a property which, at the time of origination, the borrower represented would not be used as the borrower's primary residence or second home. Because the borrower is not living on the property, the borrower may be more likely to default on the related loan than on a comparable loan secured by a primary residence, or to a lesser extent, a second home. In addition, income expected to be generated from an investor property may have been considered for underwriting purposes in addition to the income of the borrower from other sources. Should this income not materialize, it is possible the borrower would not have sufficient resources to make payments on the related loan.

### Failure of Master Servicer or Servicers to Perform May Adversely Affect Distributions on Certificates

The amount and timing of distributions on the certificates generally will be dependent on the servicers performing their respective servicing obligations and the master servicer performing its master servicing obligations in an adequate and timely manner. See *"The Pooling and Servicing Agreement—Collection Account and Distribution Account"* in this prospectus supplement. If any servicer fails to perform its servicing obligations, or if the master servicer fails to perform its master servicing obligations, this failure may result in the termination of such servicer or the master servicer, as applicable. That termination with its corresponding transfer of daily collection activities will likely increase the rates of delinquencies, defaults and losses on the loans. As a result, shortfalls in the distributions due on your certificates could occur.

### The Recording of the Mortgages in the Name of MERS May Affect the Yield on the Certificates

The mortgages or assignments of mortgage for some of the loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc. or MERS, solely as nominee for the seller and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS system. However, if MERS discontinues the MERS system and it becomes necessary to record an assignment of mortgage to the trustee, then any related expenses will be paid by the trust and will reduce the amount available to pay principal of and interest on the certificates.

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to certificateholders and increase the amount of losses on the loans.

### The Transferor May Not Be Able to Repurchase or Replace Defective Loans

UBS Real Estate Securities Inc. will make various representations and warranties related to the loans. Those representations are summarized in *"The Pooling and Servicing Agreement—Assignment of the Loans"* in this prospectus supplement.

If UBS Real Estate Securities Inc. fails to cure a material breach of its representations and warranties with respect to any loan in a timely manner, then it will be required to repurchase or replace the defective loan. See *"The Pooling and Servicing Agreement—Assignment of the Loans"* in this prospectus supplement. It is possible that UBS Real Estate Securities Inc. may not be capable of repurchasing or replacing any defective loans, for financial or other reasons. The inability of UBS Real Estate Securities Inc. to repurchase or replace defective loans would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your certificates could occur. See *"—Potential Inadequacy of Credit Enhancement for the Certificates"* above.

### The Certificates Are Obligations of the Issuing Entity Only

The offered certificates represent obligations of the issuing entity only and will not represent an interest in or obligation of the depositor, the master servicer, the trust administrator, the sponsor, the trustee, the custodian or any of their respective affiliates. Neither the certificates nor the loans will be guaranteed or insured by any governmental agency or instrumentality or by the depositor, the sponsor, the master servicer, the trust administrator, the custodian, the trustee or any of their respective affiliates. Proceeds of the assets included in the trust will be the sole source of payments on the certificates, and there will be no

*Correspondent*:  Mortgage brokers, mortgage bankers, financial institutions and homebuilders who sell previously funded mortgage loans to IndyMac Bank.

*Conduit*:  IndyMac Bank acquires pools of mortgage loans in negotiated transactions either with the original mortgagee or an intermediate owner of the mortgage loans.

IndyMac Bank approves each mortgage loan seller prior to the initial transaction on the basis of the seller's financial and management strength, reputation and prior experience.  Sellers are periodically reviewed and if their performance, as measured by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac Bank will cease doing business with them.

For the underwriting guidelines of IndyMac Bank, see *"Underwriting Standards—Indymac Bank, F.S.B."* in this prospectus supplement.


## UNDERWRITING STANDARDS

**General**

The Loans  have either been purchased by the sponsor from an originator or an entity which purchased the Loans from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that originator) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section "*—General*," or the following sections pertaining to American Home Mortgage Corp. and IndyMac Bank F.S.B. and their related Loans.

The Loans may or may not be "conventional non–conforming loans" (i.e., loans which are not insured by the Federal Housing Authority or partially guaranteed by the Department of Veteran Affairs or which do not qualify for sale to Fannie Mae or Freddie Mac and are secured by first liens on one– to four–family residential properties).

If the Loans are "conventional non–conforming loans", the underwriting standards applicable to the Loans typically differ from, and are generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan–to–value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two  to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a Loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the loan–to–value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

Certain of the Loans have been originated under alternative documentation, streamlined documentation, reduced documentation, "lite" documentation, stated income, low/limited or "Express" documentation, no stated income, no ratio, "NIV" or no documentation programs, which require less documentation and verification than do traditional full documentation

| Loan Type | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans |
|---|---|---|---|---|
| ARM | 7,347 | 2,804,749,182 | 27,798 | 9,800,077,756 |
| Fixed | 59,669 | 18,910,832,530 | 43,945 | 10,314,509,248 |
| Seasoned | 1,174 | 556,872,228 | 1,724 | 726,285,591 |
| Subprime | 27,530 | 4,327,714,922 | 29,023 | 4,975,779,334 |
| Scratch&Dent | 0 | $0.00 | 1,292 | 213,104,207 |
| Seconds | 0 | $0.00 | 0 | $0.00 |
| Total | 95,720 | $26,600,168,862 | 103,782 | $26,029,756,136 |

| | December 31, 2005 | | December 31, 2006 | |
|---|---|---|---|---|
| Loan Type | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans |
| ARM | 14,321 | 4,137,616,918 | 10,509 | 3,880,896,262 |
| Fixed | 19,812 | 4,156,214,018 | 10,364 | 3,141,119,693 |
| Seasoned | 2,444 | 744,454,682 | 0 | 0 |
| Subprime | 44,595 | 8,492,495,247 | 64,949 | 12,165,244,209 |
| Scratch&Dent | 2,549 | 353,753,809 | 4,489 | 757,359,962 |
| Seconds | 4,788 | 247,087,151 | 5,753 | 323,054,477 |
| Total | 88,509 | $18,131,621,825 | 96,064 | $20,267,674,603 |

Through the use of subservicers, UBSRES may contract for the servicing of loans. As specified in the related prospectus supplement, the trust fund may include loans subserviced on behalf of UBSRES as owner of the related servicing rights.

UBSRES typically acquires loans from third party originators. Employees of UBSRES or its affiliates will structure securitization transactions in which loans are sold to the depositor. In consideration for the sale of loans, the depositor will cause the issuance of the securities that are entitled to the cashflows from such loans and enter into an arrangement with one or more underwriters for the purchase of such securities.

Pursuant to the agreement conveying assets from UBSRES to the depositor, UBSRES may make representations and warranties relating to certain characteristics of such assets. As specified in the related prospectus supplement, breaches of such representations and warranties that materially affect the value of the related loan or the interests of the related securityholders in such loan will result in an obligation on the part of UBSRES to cure, repurchase or substitute for such loan. In certain situations, rather than making such representations and warranties itself, UBSRES may assign its interest under the related purchase agreement pursuant to which it acquired the loans from the related originator.

## THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713–2000.

The depositor has been engaged in the securitization of loans since its incorporation in 1987. The depositor is generally engaged in the business of acting as a depositor of one or more trust funds that may issue or cause to be issued, sell and deliver bonds or other evidences of indebtedness or certificates of interest that are secured by, or represent an interest in loans. The depositor typically acquires loans and other assets for inclusion in securitizations from the sponsor.

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to the issue and sale of one or more series of securities and to act as depositor of trusts that may issue and sell securities.

After the issuance of the securities, the depositor will have limited or no obligations with respect to the securities and the related trust fund. Those obligations may include cure, repurchase or substitution obligations relating to breaches of representations and warranties, if any, that the depositor makes with respect to the assets, certain actions with respect to the

Account on or prior to the next succeeding determination date as set forth in the related Servicing Agreement after such obligation arises. The obligation of the transferor to repurchase or substitute for a Deleted Loan is the sole remedy regarding any defects in the Loans and other related documents available to the trustee or the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the transferor will make, among others, the following representations and warranties with respect to each Loan as of the Closing Date:

(1)    the information set forth in the mortgage loan schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the mortgage loan schedule;

(2)    immediately prior to the transfer and assignment of the Loans to the depositor, the transferor was the sole owner and holder of the Loan free and clear of any and all liens, pledges, charges or security interests of any nature and has full right and authority to sell and assign the same;

(3)    the Mortgaged Property is undamaged by water, fire, earthquake, earth movement other than earthquake, windstorm, flood, tornado or similar casualty (excluding casualty from the presence of hazardous wastes or hazardous substances, as to which the transferor makes no representations), so as to affect adversely the value of the Mortgaged Property as security for the Loan or the use for which the premises were intended and to the best of the transferor's knowledge, there is no proceeding pending or threatened for the total or partial condemnation of the Mortgaged Property;

(4)    the Loan meets, or is exempt from, applicable state or federal laws, regulations and other requirements, pertaining to usury, and the Loan is not usurious;

(5)    the Mortgage Note, the related mortgage and other agreements executed in connection therewith are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law); and, to the best of the transferor's knowledge, all parties to the Mortgage Note and the mortgage had legal capacity to execute the Mortgage Note and the mortgage and each Mortgage Note and mortgage has been duly and properly executed by the mortgagor;

(6)    each Loan at the time it was made complied in all material respects with applicable federal, state and local laws, including, without limitation, all applicable anti-predatory, abusive and fair lending laws;

(7)    no Mortgage Note or mortgage is subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note or mortgage, or the exercise of any right thereunder, render the Mortgage Note or mortgage unenforceable, in whole or in part, or subject it to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(8)    the Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act, as amended, a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority.

(9)    the mortgage is a valid, subsisting and enforceable first lien on the property therein described, and the Mortgaged Property is free and clear of all encumbrances and liens having priority over the first lien of the mortgage except for liens for real estate taxes and special assessments not yet due and payable and liens or interests arising under or as a result of any federal, state or local law, regulation or ordinance relating to hazardous wastes or hazardous substances, and, if the related Mortgaged Property is a condominium unit, any lien for common charges permitted by statute or homeowners association fees; and if the Mortgaged Property consists of shares of a cooperative housing corporation, any lien for amounts due to the cooperative housing corporation for unpaid assessments or charges or any lien of any assignment of rents or maintenance expenses secured by the real property owned by the cooperative housing corporation; and any security agreement, chattel mortgage or equivalent document related to, and delivered to the trustee or to the master servicer with, any Mortgage establishes in the transferor a valid and subsisting first lien on the property described therein and the transferor has full right to sell and assign the same to the trustee;

(10)    neither the transferor nor any prior holder of the Mortgage or the related Mortgage Note has modified the Mortgage or the related Mortgage Note in any material respect, satisfied, canceled or subordinated the Mortgage in whole or in part, released the Mortgaged Property in whole or in part from the lien of the Mortgage, or executed any instrument of release, cancellation, modification or satisfaction, except in each case as is reflected in an agreement delivered to the trustee or the master servicer;

**PROSPECTUS**
October 17, 2006

## Mortgage Asset Securitization Transactions, Inc.
Depositor

## Asset−Backed Certificates
## Asset−Backed Notes
## (Issuable in Series)

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

  o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

  o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

  o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times.  In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates.  No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering.  We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

**You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.**

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete.  Any representation to the contrary is a criminal offense.

## UBS Investment Bank

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

**Credit Enhancement Is Limited in Amount and Coverage**

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

**Yield Is Sensitive to Rate of Principal Prepayment**

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments on the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

**Borrower May Be Unable to Make Balloon Payment**

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- timely sell the related residential property.

A number of factors will affect a borrower's ability to accomplish either of these goals, including:

- the level of available mortgage rates at the time of sale or refinancing;

- the borrower's equity in the related residential property;

- the financial condition of the borrower; and

The mortgages or assignments of mortgage for some of the loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc. or MERS, solely as nominee for the seller and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS system. However, if MERS discontinues the MERS system and it becomes necessary to record an assignment of mortgage to the related trustee, then any related expenses will be paid by the trust fund and will reduce the amount available to pay principal of and interest on the securities.

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to securityholders and increase the amount of losses on the loans.

## Violations of Federal Laws May Adversely Affect Ability to Collect on Loans

The residential loans may also be subject to federal laws, including:

- the federal Truth in Lending Act and Regulation Z promulgated under that act, which require certain disclosures to the borrowers regarding the terms of the residential loans;

- the Equal Credit Opportunity Act and Regulation B promulgated under that act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience; and

- the Home Equity Loan Consumer Protection Act of 1988, which requires additional disclosures, limits changes that may be made to the loan documents without the borrower's consent. This Act also restricts a lender's ability to declare a default or to suspend or reduce a borrower's credit limit to certain enumerated events.

Certain mortgage loans may be subject to the Home Ownership and Equity Protection Act of 1994. These provisions may:

- impose additional disclosure and other requirements on creditors with respect to non–purchase money mortgage loans with high interest rates or high up–front fees and charges;

- impose specific statutory liabilities on creditors who fail to comply with their provisions; and

- affect the enforceability of the related loans.

In addition, any assignee of the creditor, including the trust fund, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including, without limitation, the right to rescind the mortgage loan.

The Home Improvement Contracts are also subject to the Preservation of Consumers' Claims and Defenses regulations of the Federal Trade Commission and other similar federal and state statutes and regulations. These laws

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "*Certain Legal Aspects of Residential Loans*" in this prospectus.

## The Transferor May Not Be Able to Repurchase or Replace Defective Assets

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

# Exhibit 14



**PROSPECTUS SUPPLEMENT DATED May 14, 2007**
**(To Prospectus dated February 26, 2007)**

**$2,569,967,000**

**(APPROXIMATE)**

**MASTR Adjustable Rate Mortgages Trust 2007−3**

**(ISSUING ENTITY)**

**MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.**
**(DEPOSITOR)**

**UBS REAL ESTATE SECURITIES INC.**
**(TRANSFEROR/SPONSOR)**

**WELLS FARGO BANK, N.A.**
**(MASTER SERVICER AND TRUST ADMINISTRATOR)**

**Mortgage Pass−Through Certificates, Series 2007−3**

The MASTR Adjustable Rate Mortgages Trust 2007−3, the issuing entity, is issuing certificates consisting of 38 classes of certificates, but is offering only 28 classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed end, adjustable−rate loans secured by first mortgages or deeds of trust on residential one− to four−family properties, all of which are negatively amortizing loans.

- Credit enhancement will be provided by subordination, overcollateralization and excess interest as described in this prospectus supplement under *"Description of the Offered Certificates."*

- Additional credit enhancement for each of the Class 1−1A2, Class 1−2A2, Class 2−1A2, Class 2−2A3, and Class 2−2A6 certificates will be provided in the form of an irrevocable financial guaranty insurance policy issued by Financial Security Assurance Inc. with respect to such classes. No other class of certificates will be entitled to payments under the policy.

**You should consider carefully the risk factors beginning on page S−7 of this prospectus supplement and page 9 in the prospectus.**

The certificates will represent an interest in the issuing entity only and will not represent obligations of the depositor, the sponsor or any of their affiliates. Other than with respect to the financial guaranty insurance policy issued by Financial Security Assurance Inc. with respect to the Class 1−1A2, Class 1−2A2, Class 2−1A2, Class 2−2A3, and Class 2−2A6 certificates. no governmental agency or instrumentality or any other person will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

**Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about May 15, 2007.

The proceeds to the depositor from the offered certificates are expected to be approximately $2,638,578,111 before deducting expenses, estimated at $10,364,679. See *"Underwriting"* in this prospectus supplement. The underwriter will sell the offered certificates purchased by it from time to time in negotiated transactions at varying prices determined at the time of sale.

The application of federal and state laws, including bankruptcy and debtor relief laws, may interfere with or adversely affect the ability to realize on the mortgaged properties, enforce deficiency judgments or pursue collection litigation with respect to defaulted loans. As a consequence, borrowers who have defaulted on their loans and sought, or are considering seeking, relief under bankruptcy or debtor relief laws will have substantially less incentive to repay their loans. As a result, these loans will likely experience more severe losses, which may be total losses and could therefore increase the risk that you will suffer losses.

### Violation of Various Federal and State Laws May Result in Losses on the Loans

Applicable state laws generally regulate interest rates and other charges, require certain disclosure and require licensing of the originator. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the loans.

The loans are also subject to federal laws, including:

- the Federal Truth−in−Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the loans;
- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and
- the Fair Credit Reporting Act, which regulates the use and reporting of information related to each borrower's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the related servicer to collect all or part of the principal of or interest on the loans and in addition could subject the trust to damages and administrative enforcement and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans.

The transferor will represent that as of the closing date, each loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the transferor will be obligated to cure such breach or repurchase or replace the affected loan in the manner described under "*The Pooling and Servicing Agreement—Assignment of the Loans*" in this prospectus supplement.

### High Cost Loans

None of the loans are "High Cost Loans" within the meaning of the Homeownership Act or any state law, ordinance or regulation similar to the Homeownership Act. See "*Certain Legal Aspects of Residential Loans—Anti−Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders—Homeownership Act and Similar State Laws*" in the prospectus.

In addition to the Homeownership Act, however, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. An originator's failure to comply with these laws could subject the trust, and other assignees of the loans, to monetary penalties and could result in the borrowers rescinding such loans against either the trust or subsequent holders of the loans. Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

Under the anti−predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a loan does not meet the test even if an originator reasonably believed that the test was satisfied. Any determination by a court that a Loan does not meet the test will result in a violation of the state anti−predatory lending law, in which case the transferor will be required to purchase such Loan from the Trust.

See "*Certain Legal Aspects of Residential Loans—Anti−Deficiency Legislation, Bankruptcy Laws and Other Limitations on Lenders*" in the prospectus.

### The Certificates Are Obligations of the Issuing Entity Only

| | Group 2 Delinquency Experience | | |
| --- | --- | --- | --- |
| **Days Delinquent** | **Number of Group 2 Loans** | **Aggregate Principal Balance of Group 2 Loans** | **Percent of Aggregate Principal Balance of Group 2 Loans** |
| 30–59 Days | | | |
| 0 times | 1,974 | $814,011,824 | 98.64% |
| 1 time | 31 | $11,249,833 | 1.36% |
| Total | 2,005 | $825,261,657 | 100.00% |

No Group 2 Loan has been Delinquent 60 days or more since origination.

## Statistical Information

Statistical information regarding characteristics of the Loans in the aggregate, as well as by Loan Group, as of the Cut–Off Date is set forth in Annex II to this prospectus supplement. Annex II is hereby incorporated into, and made a part of, this prospectus supplement.

Before the Closing Date, the depositor may remove any of the Loans identified as of the date of this prospectus supplement or may substitute comparable loans for any of the Loans identified as of the date of this prospectus supplement. However, the aggregate principal balance of the substituted Loans will not vary by more than plus or minus 5% of the Loans, by the aggregate Stated Principal Balance as of the Cut–Off Date. As a result, the statistical information presented in Annex II to this prospectus supplement regarding the characteristics of the Loans identified for inclusion in the trust may vary in some respects from comparable information based on the actual composition of the Loans included in the trust on the Closing Date. In addition, after the Cut–Off Date, the characteristics of the Loans may materially vary from the information below due to a number of factors. These factors include prepayments of the Loans after the Cut–Off Date and the substitution or repurchase of Loans after the Closing Date.

## STATIC POOL INFORMATION

The depositor shall make available any of the sponsor's material static pool information as required under the SEC's rules and regulations. The static pool information material to this offering of certificates is located at www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

## THE ORIGINATORS

The originators of the Loans are Countrywide Home Loans, Inc. ("Countrywide Home Loans") with respect to approximately 51.94% of the Stated Principal Balance as of the Cut–Off Date of all of the Loans, IndyMac Bank, F.S.B. ("IndyMac Bank") with respect to approximately 39.94% of the Stated Principal Balance as of the Cut–Off Date of all of the Loans, and other unaffiliated originators, each of which represents less than 10% of the Stated Principal Balance as of the Cut–Off Date of the Loans.

### Countrywide Home Loans

Loan–to–Value Ratio as used in "*Underwriting Standards—Countrywide Home Loans, Inc.,*" below has the following meaning:

The "Loan–to–Value Ratio" of a mortgage loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of the related mortgage loan at the date of determination and the denominator of which is

- in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale or

## UNDERWRITING STANDARDS

### General

The Loans have been purchased by the sponsor from an Originator which purchased the Loans from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Originator) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section "—*General*," or the following sections pertaining to Countrywide Home Loans and IndyMac Bank, F.S.B. and their related Loans.

A majority of the Loans (other than the Subgroup 1–1 Loans and Subgroup 2–1 Loans) are "conventional non–conforming mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority or partially guaranteed by the Department of Veteran Affairs or which do not qualify for sale to Fannie Mae or Freddie Mac and are negative amortization loans secured by first liens on one– to four–family residential properties).

The underwriting standards applicable to the Loans (other than the Subgroup 1–1 Loans and Subgroup 2–1 Loans) typically differ from, and are, with respect to a substantial number of such Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan–to–value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a Loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the loan–to–value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

Certain of the Loans have been originated under alternative documentation, streamlined documentation, reduced documentation, "lite" documentation, stated income, low/limited or "Express" documentation, no stated income, no ratio, "NIV" or no documentation programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a streamlined documentation program, a borrower's income and assets that have been previously documented are re verified, and any additional documentation and verification is limited. Under a reduced documentation program, verification of either a borrower's stated income or stated assets, but not both, is undertaken by the originator. Under a "lite" documentation, "stated income" or "NIV" program, a borrower is required to state both their income and assets, but the originator only undertakes to verify such borrower's assets. Under low/limited or "Express" documentation program, the amount of documentation required to document a borrower's income and assets is limited. Under a no stated income program or a no ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no documentation program, the borrower is not required to state either their income or assets, and accordingly no verification of such borrower's income or assets is undertaken by the originator. The underwriting for such Loans may be based primarily or entirely on other factors, such as an appraisal of the mortgaged property, the loan–to–value ratio at origination and the borrower's credit

The following table describes size, composition and growth of UBSRES's total portfolio of assets it has securitized as of the dates indicated.

| | December 31, 2003 | | December 31, 2004 | |
| | | Total Portfolio | | Total Portfolio |
| Loan Type | Number | of Loans | Number | of Loans |
|---|---|---|---|---|
| ARM | 7,347 | 2,804,749,182 | 27,798 | 9,800,077,756 |
| Fixed | 59,669 | 18,910,832,530 | 43,945 | 10,314,509,248 |
| Seasoned | 1,174 | 556,872,228 | 1,724 | 726,285,591 |
| Subprime | 27,530 | 4,327,714,922 | 29,023 | 4,975,779,334 |
| Scratch&Dent | 0 | $0.00 | 1,292 | 213,104,207 |
| Seconds | 0 | $0.00 | 0 | $0.00 |
| Total | 95,720 | $26,600,168,862 | 103,782 | $26,029,756,136 |

| | December 31, 2005 | | December 31, 2006 | |
| | | Total Portfolio | | Total Portfolio |
| Loan Type | Number | of Loans | Number | of Loans |
|---|---|---|---|---|
| ARM | 14,321 | 4,137,616,918 | 10,509 | 3,880,896,262 |
| Fixed | 19,812 | 4,156,214,018 | 10,364 | 3,141,119,693 |
| Seasoned | 2,444 | 744,454,682 | 0 | 0 |
| Subprime | 44,595 | 8,492,495,247 | 64,949 | 12,165,244,209 |
| Scratch&Dent | 2,549 | 353,753,809 | 4,489 | 757,359,962 |
| Seconds | 4,788 | 247,087,151 | 5,753 | 323,054,477 |
| Total | 88,509 | $18,131,621,825 | 96,064 | $20,267,674,603 |

Through the use of subservicers, UBSRES may contract for the servicing of loans. The trust fund may include loans subserviced on behalf of UBSRES as owner of the related servicing rights.

UBSRES typically acquires loans from third party originators. Employees of UBSRES or its affiliates will structure securitization transactions in which loans are sold to the depositor. In consideration for the sale of loans, the depositor will cause the issuance of the certificates that are entitled to the cashflows from such loans and enter into an arrangement with one or more underwriters for the purchase of such certificates.

Pursuant to the agreement conveying assets from UBSRES to the depositor, UBSRES will make representations and warranties relating to certain characteristics of such assets. Breaches of such representations and warranties that materially affect the value of the related loan or the interests of the related certificateholders in such loan will result in an obligation on the part of UBSRES to cure, repurchase or substitute for such loan.

## THE DEPOSITOR

Mortgage Asset Securitization Transactions, Inc., the depositor, is a Delaware corporation organized on April 23, 1987, as a wholly owned limited purpose finance subsidiary of UBS Americas Inc. The depositor maintains its principal office at 1285 Avenue of the Americas, New York, New York. Its telephone number is (212) 713−2000.

The depositor has been engaged in the securitization of loans since its incorporation in 1987. The depositor is generally engaged in the business of acting as a depositor of one or more trust funds that may issue or cause to be issued, sell and deliver bonds or other evidences of indebtedness or certificates of interest that are secured by, or represent an interest in loans. The depositor typically acquires loans and other assets for inclusion in securitizations from the sponsor.

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to the issue and sale of one or more series of securities and to act as depositor of trusts that may issue and sell securities.

After the issuance of the securities, the depositor will have limited or no obligations with respect to the certificates and the issuing entity. Those obligations include appointing replacements to certain transaction participants, providing notices to certain parties under the operative agreements and providing requested information to the various transaction participants.

**PROSPECTUS**
**February 26, 2007**

## Mortgage Asset Securitization Transactions, Inc.
### Depositor
### Asset−Backed Certificates
### Asset−Backed Notes
### (Issuable in Series)

**Issuing Entities:**

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

    o   a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

    o   mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

    o   pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

**Securities:**

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times.  In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering.  We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

    **You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.**

    You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

    Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete.  Any representation to the contrary is a criminal offense.

## UBS Investment Bank

- adequate provision for future payments on certain classes of securities; and

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

### Credit Enhancement Is Limited in Amount and Coverage

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

### Yield Is Sensitive to Rate of Principal Prepayment

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

### Borrower May Be Unable to Make Balloon Payment

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, i.e., balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- timely refinance the loan; or

- affect the enforceability of the related loans.

In addition, any assignee of the creditor, including the trust fund, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including, without limitation, the right to rescind the mortgage loan.

The Home Improvement Contracts are also subject to the Preservation of Consumers' Claims and Defenses regulations of the Federal Trade Commission and other similar federal and state statutes and regulations. These laws

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See *Certain Legal Aspects of Residential Loans* in this prospectus.

## The Transferor May Not Be Able to Repurchase or Replace Defective Assets

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

## Rating of the Securities Are Limited and May be Withdrawn or Lowered

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

- the adequacy of the value of the assets of the trust fund;

- any credit enhancement with respect to the class; and

- the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

- the likelihood that principal prepayments on the related residential loans will be made;

- the degree to which prepayments might differ from those originally anticipated; or

- the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

- the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

- the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

# Exhibit 15

PROSPECTUS SUPPLEMENT DATED February 12, 2007
(To Prospectus dated Febraury 26, 2007)



*$946,555,000 (Approximate)*

*MASTR Asset Backed Securities Trust 2007–WMC1*
*(Issuing Entity)*

*Mortgage Asset Securitization Transactions, Inc.*
*(Depositor)*

*UBS Real Estate Securities Inc.*
*(Sponsor and Seller)*

*Wells Fargo Bank, N.A.*
*(Master Servicer, Trust Administrator and Custodian)*

*Ocwen Loan Servicing, LLC*
*(Servicer)*

*Mortgage Pass Through Certificates, Series 2007–WMC1*

The MASTR Asset Backed Securities Trust 2007–WMC1 is issuing seventeen classes of certificates, but is offering only twelve classes through this prospectus supplement.

- The trust's main source of funds for making distributions on the certificates will be collections on closed–end, fixed–rate and adjustable–rate mortgage loans secured by first and second mortgages or deeds of trust on residential one– to four–family properties.

- Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions" and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

- The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "The Interest Rate Swap Agreement" and an interest rate cap agreement as described in this prospectus supplement under "The Interest Rate Cap Agreement."

*You should consider carefully the risk factors beginning on page S–20 in this prospectus supplement and page 8 in the prospectus.*

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

*Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.*

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book–entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about February 27, 2007.

The proceeds to the depositor are expected to be approximately $935,455,653 before deducting expenses. See "Underwriting" in this prospectus supplement. UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.

The Swap Provider is entitled to a monthly payment calculated as one–twelfth of 5.310% on the Swap Notional Amount (as defined herein) multiplied by 250. The trust is entitled to an amount equal to one–month LIBOR (as set forth in the Interest Rate Swap Agreement and calculated on an actual/360 basis) on the Swap Notional Amount for such Distribution Date multiplied by 250. Only the positive net payment of the two obligations will be paid by the applicable party. If a net payment is owed to the Swap Provider, the trust administrator will pay such amount from the distribution account before distributions are made on the certificates.

**Cross collateralization**

In certain circumstances, payments on the Group I Mortgage Loans may be used to make certain distributions to the holders of the Group II Certificates and payments on the Group II Mortgage Loans may be used to make certain distributions to the holders of the Group I Certificates.

See "Description of the Offered Certificates—Allocation of Available Funds" in this prospectus supplement for additional information.

**Advances**

The servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans serviced by it. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer or the trustee, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the servicer is required to make if the servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.

See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information.

**Optional Termination**

The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the servicer, the master servicer, the Mezzanine Insurers and the NIMS Insurer, if any, (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut-off date.

See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass–Through Rates" in this prospectus supplement for additional information.

**Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties**

The seller and the originator made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan.

See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans" in this prospectus supplement for additional information.

***Credit Enhancement***

**Subordination**

The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates.

In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the

The statistical information presented in this prospectus supplement relates to the Mortgage Loans and related Mortgaged Properties in each Loan Group as of the Cut-off Date, as adjusted for scheduled principal payments due on or before the Cut-off Date whether or not received. Prior to the issuance of the certificates, Mortgage Loans may be removed from either of the Loan Groups as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time. A limited number of other Mortgage Loans may be included in each Loan Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary. Any statistic presented on a weighted average basis or any statistic based on the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8-K within four days following the Closing Date.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed-rate and adjustable-rate, first lien and second lien, fully-amortizing, balloon and interest-only mortgage loans with Principal Balances at origination that conform to Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed-rate and adjustable-rate, first lien and second lien, fully-amortizing, balloon and interest-only mortgage loans with Principal Balances at origination that may or may not conform to Freddie Mac loan limits.

The Group I Mortgage Loans consist of 1,841 Mortgage Loans and have a Cut-off Date Principal Balance of approximately $265,165,154. The Group II Mortgage Loans consist of 3,152 Mortgage Loans and have a Cut-off Date Principal Balance of approximately $721,861,857.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one- to four-family residential properties consisting of attached or detached one- to four-family dwelling units, individual condominium units, planned unit developments and manufactured housing. Approximately 88.83% of the Group I Mortgage Loans are secured by first Mortgages and approximately 11.17% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 88.75% of the Group II Mortgage Loans are secured by first Mortgages and approximately 11.25% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 88.77% of the Mortgage Loans are secured by first Mortgages and approximately 11.23% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers. A description of the underwriting standards used by the originator to originate the Mortgage Loans are set forth under "The Originator" in this prospectus supplement.

The sponsor previously purchased the Mortgage Loans from the originator pursuant to the Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against the originator under the Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreement to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originator or acquired by the originator in the secondary market in the ordinary course of its business and were underwritten or re-underwritten by the originator in accordance with its underwriting standards as described under "The Originator—Underwriting Standards of the Originator" in this prospectus supplement.

Under the Mortgage Loan Purchase Agreement and the Assignment Agreement, the originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the Mortgage Loan Purchase Agreement and certain characteristics of the related Mortgage Loans. Subject to certain limitations, the originator or the sponsor will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than the repurchase or substitution obligations described above. The originator will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

The Mortgage Loans are subject to the "due-on-sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 74.19% of the Group I Mortgage Loans are Adjustable-Rate Group I Mortgage Loans and approximately 25.81% of the Group I Mortgage Loans are Fixed-Rate Group I Mortgage Loans. Approximately 81.54% of

| | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,793 | $950,525,917 | 96.30% | $ 198,315 | 8.215% | 82.70% | 643 | 24.67% | 11.44% |
| Second Home | 131 | 21,172,061 | 2.15 | 161,619 | 8.429 | 85.51 | 676 | 13.80 | 9.85 |
| Investor Occupied | 69 | 15,329,033 | 1.55 | 222,160 | 8.336 | 86.70 | 686 | 65.04 | 0.00 |
| Total | 4,993 | $987,027,011 | 100.00% | $ 197,682 | 8.221% | 82.82% | 645 | 25.07% | 11.23% |

(1) Occupancy as represented by the mortgagor at the time of origination.

### Purpose of the Mortgage Loans

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Purchase | 3,373 | $589,865,746 | 59.76% | $ 174,879 | 8.393% | 83.96% | 653 | 21.09% | 15.27% |
| Cash Out Refinance | 1,509 | 371,910,608 | 37.68 | 246,462 | 7.980 | 81.11 | 631 | 30.49 | 5.15 |
| Rate & Term Refinance | 111 | 25,250,657 | 2.56 | 227,483 | 7.749 | 81.28 | 653 | 37.98 | 6.46 |
| Total: | 4,993 | $987,027,011 | 100.00% | $ 197,682 | 8.221% | 82.82% | 645 | 25.07% | 11.23% |

### Original Loan-to-Value Ratios of the Mortgage Loans(1)(2)(3)

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date ($) | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance ($) | Weighted Average Gross Coupon (%) | Weighted Average Original LTV (%) | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 54 | $ 10,501,204 | 1.06% | $ 194,467 | 7.348% | 41.18% | 646 | 36.36% | 0.00% |
| 50.01–55.00 | 28 | 6,010,420 | 0.61 | 214,658 | 7.781 | 52.74 | 621 | 24.62 | 0.00 |
| 55.01–60.00 | 32 | 7,026,135 | 0.71 | 219,567 | 7.573 | 58.28 | 646 | 34.55 | 0.00 |
| 60.01–65.00 | 46 | 11,385,000 | 1.15 | 247,500 | 8.207 | 63.33 | 592 | 24.21 | 0.00 |
| 65.01–70.00 | 91 | 22,590,021 | 2.29 | 248,242 | 7.869 | 68.70 | 608 | 24.55 | 0.00 |
| 70.01–75.00 | 100 | 26,163,326 | 2.65 | 261,633 | 7.757 | 73.97 | 622 | 24.84 | 0.00 |
| 75.01–80.00 | 2,263 | 597,175,373 | 60.50 | 263,887 | 7.775 | 79.91 | 650 | 21.15 | 0.00 |
| 80.01–85.00 | 189 | 52,451,156 | 5.31 | 277,519 | 7.912 | 84.45 | 613 | 36.70 | 0.21 |
| 85.01–90.00 | 255 | 71,996,637 | 7.29 | 282,340 | 8.103 | 89.57 | 635 | 39.08 | 0.94 |
| 90.01–95.00 | 347 | 72,920,860 | 7.39 | 210,147 | 8.535 | 94.68 | 640 | 43.83 | 6.58 |
| 95.01–100.00 | 1,588 | 108,806,879 | 11.02 | 68,518 | 11.023 | 99.94 | 661 | 17.68 | 96.76 |
| Total | 4,993 | $987,027,011 | 100.00% | $ 197,682 | 8.221% | 82.82% | 645 | 25.07% | 11.23% |

*STATIC POOL INFORMATION*

The depositor will make available any material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located at http://www.ubs.com/regulationab.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

*THE ORIGINATOR*

*General.* WMC Mortgage Corp. ("WMCMC") is a mortgage banking company incorporated in the State of California. Established in 1955, WMCMC has developed a national mortgage origination franchise, with special emphasis on originating single–family, alternative non–prime mortgage loans in each of the regions in which it competes. WMCMC historically originated both prime–quality mortgage loans and non–prime–quality mortgage loans. WMCMC sold its prime mortgage loan origination business in 1998 and, since April of 2000, originates prime mortgage loans only on a very limited basis. WMCMC was owned by a subsidiary of Weyerhaeuser Company until May 1997 when it was sold to WMC Finance Co., a company owned principally by affiliates of a private investment firm. On June 14, 2004, a subsidiary of the General Electric Company ("*GE*") acquired WMC Finance Co.

Until March 2000, WMCMC originated mortgage loans through both wholesale and retail channels, with wholesale originations accounting for approximately 85% of total origination volume prior to March 2000. As of March 2000, WMCMC changed its business model to underwrite and process 100% of its loans on the Internet via "WMC Direct" resulting in a substantial reduction in employees, underwriting centers and closing centers, and the elimination of all retail branches. In April 2005, WMCMC's headquarters relocated to Burbank, California from Woodland Hills, California. A majority of its business operations are presently conducted at Burbank. WMCMC also has eight (8) regional offices in Addison, Texas, Orangeburg, New York, Costa Mesa, California, San Ramon, California, Jacksonville, Florida, Woburn, Massachusetts, Schaumburg, Illinois, and Bellevue, Washington. WMCMC's originations come primarily through its broker relationships. In 2004, 2005 and 2006, WMCMC originated $19,127,701,750, $31,794,995,806 and $33,169,005,879 of non–prime mortgage loans, respectively, including loans acquired by WMCMC from correspondent lenders.

As of January 1, 2007, WMCMC assigned substantially all of its mortgage origination operations, including its broker relationships to GE Money Bank and transferred all of its employees to WMC–GEMB Mortgage Corp., a wholly owned operating subsidiary of GE Money Bank. As of February 15, 2006, WMC–GEMB Mortgage Corp. had approximately 2204 employees, including approximately 672 business development representatives and associates who are responsible for recruiting and managing the independent broker network. GE Money Bank is an FDIC–insured federal savings bank that is regulated, supervised and examined by the Office of Thrift Supervision. The predecessor to GE Money Bank, GE Capital Consumer Card Co., was established in 1988 as a limited purpose credit card bank and converted to a federal savings bank in 2003. On February 7, 2005, Monogram Credit Card Bank of Georgia was merged with and into GE Capital Consumer Card Co., and the surviving entity changed its name to GE Money Bank. On February 5, 2006, all of the common stock of GE Money Bank was contributed by General Electric Capital Corporation to GE Consumer Finance, Inc., a newly created holding company. In addition to its mortgage activities, GE Money Bank is engaged in various other consumer lending activities including retail sales financing programs, private label credit cards, bank cards, consumer installment loans, and home improvement loans. In addition, GE Money Bank provides small business lines of credit to several of its retail clients. GE Money Bank is a wholly owned subsidiary of GE Consumer Finance, Inc., which is in turn a wholly owned subsidiary of General Electric Capital Corporation, which is in turn a wholly owned subsidiary of GE.

On January 2, 2007, GE Money Bank commenced doing business as "WMC Mortgage" and began originating and acquiring mortgage loans. Such mortgage loans will be sold by GE Money Bank to WMCMC from time to time, but no less than once per month. WMCMC will sell or securitize such mortgage loans. WMCMC continues to originate or acquire a small amount of mortgage loans through its broker network. GE Money Bank and WMCMC originate or acquire mortgage loans based on the same underwriting guidelines.

As used in the description of the Underwriting Standards below, "WMC" shall refer collectively to GE Money Bank and WMCMC.

*Underwriting Standards.* The mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the "***Underwriting Guidelines***") or (ii) purchased by WMCMC or GE Money Bank after re–underwriting the mortgage loans generally in accordance with the Underwriting Guidelines. WMC also originates certain other mortgage loans that are underwritten to the guidelines of specific investors, however, such mortgage loans are not included among those sold to the trust as described herein. The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case–by–case basis WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt–to–income ratio ("***Debt Ratio***"), good

mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.

On July 15, 2005, WMCMC launched a program called WMC Select. Using new credit matrices, WMC Select allows a borrower to choose loan features (such as rate, term, prepayment options, and other important features) based on the borrower's mortgage/housing history, credit depth, loan–to–value ratio ("*LTV*") and Debt Ratio. WMC Select allows WMC greater flexibility in qualifying the borrower for a loan since the borrower selects the loan features most important to him. WMC Select is offered by GE Money Bank.

The mortgage loans in the trust will fall within the following documentation categories established by WMC: Full Documentation, Full–Alternative Documentation, Limited Documentation, Lite Documentation, Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation. In addition to single–family residences, certain of the mortgage loans will have been underwritten (in many cases, as described above, subject to exceptions for compensating factors) in accordance with programs established by WMC for the origination of mortgage loans secured by mortgages on condominiums, vacation and second homes, manufactured housing, two– to four–family properties and other property types. In addition, WMC has established specific parameters for jumbo loans, which are designated in the Underwriting Guidelines as mortgage loans with original principal balances in excess of $650,000 ($850,000 under WMC Select). However, WMC sometimes increases the original principal balance limits if borrowers meet other compensating credit factors.

Under the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC–approved appraiser or by WMC's in–house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.

The Underwriting Guidelines permit mortgage loans with LTVs and CLTVs (in the case of mortgaged properties which secure more than one mortgage loan) of up to 100% (which is subject to reduction depending upon credit–grade, loan amount and property type). In general, loans with greater documentation standards are eligible for higher LTV and CLTV limits across all risk categories. Under the Underwriting Guidelines, cash out on refinance mortgage loans is generally available, but the amount is restricted for C grade loans and stated income interest only loans.

All mortgage loans originated or purchased under the Underwriting Guidelines are based on loan application packages submitted through mortgage brokerage companies or on loan files (which include loan application documentation) submitted by correspondents. Loan application packages submitted through mortgage brokerage companies, containing in each case relevant credit, property and underwriting information on the loan request, are compiled by the applicable mortgage brokerage company and submitted to WMC for approval and funding. The mortgage brokerage companies receive a portion of the loan origination fee charged to the mortgagor at the time the loan is made and/or a yield–spread premium for services provided to the borrower. No single mortgage brokerage company accounts for more than 3% of all the mortgage loans originated by WMC, measured by outstanding principal balance at origination, calculated on an annual basis.

The Underwriting Guidelines require that the documentation accompanying each mortgage loan application include, among other things, a tri–merge credit report on the related applicant from a credit reporting company aggregator. The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most instances, WMC obtains a tri–merge credit score independent from the mortgage loan application from a credit reporting company aggregator. In the case of purchase money mortgage loans, WMC generally validates the source of funds for the down payment. In the case of mortgage loans originated under the Full Documentation category, the Underwriting Guidelines require documentation of income (which may consist of (1) a verification of employment form covering a specified time period which varies with LTV, (2) two most recent pay stubs and two years of tax returns or W–2s, (3) verification of deposits and/or (4) bank statements) and telephonic verification. Under the Full–Alternative Documentation category, only 24 months of bank statements are required (depending upon the LTV) and telephonic verification of employment, under the Limited Documentation category only 12 months of bank statements (or a W–2 for the most current year and a current pay stub) are required, and under the Lite Documentation category only six months of bank statements (or a current pay stub covering the six month period) are required. For mortgage loans originated under the Stated Income/Verified Assets (Streamlined) Documentation category, WMC requires verification of funds equal to two months of principal, interest, taxes and insurance, sourced and seasoned for at least sixty days. In the case of mortgage loans originated under the Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation categories, the Underwriting Guidelines require (1) that income be stated on the application, accompanied by proof of self employment in the case of self–employed individuals, (2) that a WMC pre–funding auditor conduct telephonic verification of employment, or in the case of self–employed individuals, telephonic verification of business line and (3) that stated income be consistent with type of work listed on the application.

depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the originator. The assignments of mortgage will not be recorded by or on behalf of the depositor in the appropriate offices for real property records; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded as set forth in the Pooling and Servicing Agreement.

Within 45 days of the closing date, the trustee, or a custodian on its behalf, will review the Mortgage Loans and the other related documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or other related document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement in any material respect and such defect is not cured within 90 days following notification thereof to the seller or the originator, as applicable, by the trustee, or a custodian on its behalf, the seller or the originator, as applicable, will be obligated to either (i) substitute for such Mortgage Loan a qualified substitute mortgage loan; however, such substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs created thereunder as a REMIC or result in a prohibited transaction tax under the Code or (ii) purchase such Mortgage Loan at the Purchase Price. The Purchase Price will be required to be remitted to the trust administrator for deposit in the Distribution Account on or prior to the next succeeding Determination Date after such obligation arises. The obligation of the seller or the originator to repurchase or substitute for a Deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and other related documents available to the trustee or the certificateholders.

In connection with the substitution of a qualified substitute mortgage loan, the seller or the originator, as applicable, will be required to remit to the servicer for deposit in the collection account on or prior to the next succeeding Determination Date after such obligation arises the Substitution Adjustment Amount.

Pursuant to the Mortgage Loan Purchase Agreement (as assigned to the depositor pursuant to the Assignment Agreement and to the trustee pursuant to the Pooling and Servicing Agreement), the originator made certain representations and warranties as to the accuracy in all material respects of certain information with respect to each Mortgage Loan (e.g., the Mortgage Rate). Pursuant to the Assignment Agreement, the seller will make certain additional representations and warranties regarding the Mortgage Loans. In addition, the seller or the originator will represent and warrant, among other things that at the time of transfer to the Depositor: (i) each Mortgage Loan complied, at the time of origination, in all material respects with applicable federal, state and local laws including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan; (ii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iii) the prepayment penalties included in the transaction are enforceable and were originated in compliance with all applicable federal, state and local laws; (iv) none of the Mortgage Loans are High Cost as defined by the applicable predatory and abusive lending laws; (v) no Mortgage Loan is a high cost loan or a covered loan, as applicable (as such terms are defined in Standard & Poor's LEVELS Version 5.7 Glossary Revised, Appendix E) and (vi) no Mortgage Loan originated from and including October 1, 2002 to and including March 6, 2003, is secured by property located in the State of Georgia. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and other related documents, the discovering party will promptly notify the trust administrator or the trustee, as applicable, and such party will inform the other parties to the Pooling and Servicing Agreement, the originator and the seller of such breach and if the originator or the seller, as applicable, fails to remedy such breach, the trustee will enforce the obligations of the originator or the seller, as applicable, under the Mortgage Loan Purchase Agreement or the Assignment Agreement, as applicable, to effect a cure by either (i) as permitted pursuant to the Mortgage Loan Purchase Agreement (in the case of the originator) or pursuant to the Pooling and Servicing Agreement (in the case of the seller), as applicable, substituting for such Deleted Mortgage Loan a qualified substitute mortgage loan or (ii) repurchasing such Deleted Mortgage Loan from the trust at a price generally equal to the Purchase Price, in each case to the extent set forth in the Mortgage Loan Purchase Agreement or Pooling and Servicing Agreement, as applicable. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement or the related Assignment Agreement that materially and adversely affects the interests of the certificateholders.

Pursuant to the Pooling and Servicing Agreement, the servicer will service and administer the Mortgage Loans as more fully set forth therein.

***Payments on Mortgage Loans; Deposits to Collection Account and Distribution Account***

The servicer will establish and maintain a collection account for the benefit of the certificateholders. Upon receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances and Servicing Advances, reimbursements for payments due on or prior to the Cut-off Date and insurance proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the servicer will deposit such amounts in the collection account for remittance to the trust administrator on the Remittance Date. Amounts on deposit in the collection account may be invested in permitted investments maturing on or before the business day prior to the related Remittance Date. The trust administrator will establish an account (the "Distribution Account") into which will be deposited amounts remitted from the servicer for distribution to Certificateholders on a Distribution Date and payment of certain fees and expenses of the trust. Amounts on deposit in the Distribution Account may be invested in permitted investments maturing on or before the business day prior to the related Distribution Date unless such

*PROSPECTUS*
*February 26, 2007*

### *Mortgage Asset Securitization Transactions, Inc.*
Depositor

### *Asset−Backed Certificates*
### *Asset−Backed Notes*
### *(Issuable in Series)*

*Issuing Entities:*

- Issuing entities will be established to issue from time to time asset−backed pass−through certificates or asset−backed notes in one or more classes, which will be offered through this prospectus and a separate prospectus supplement for each series.

- The issuing entities will be established to hold assets transferred to it by Mortgage Asset Securitization Transactions, Inc.

- The assets of the issuing entities, as specified in the related prospectus supplement, will consist primarily of:

    o a segregated pool of various types of single−family and multifamily residential mortgage loans, home equity loans and home improvement contracts, cooperative apartment loans or manufactured housing conditional sales contracts and installment loan agreements or beneficial interests in them;

    o mortgage securities consisting of previously issued asset−backed certificates, collateralized mortgage obligations or participation certificates; or

    o pass−through or participation certificates issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation.

*Securities:*

- The certificates of a series will evidence beneficial ownership interests in the related issuing entity.

- The notes of a series will evidence indebtedness of the related issuing entity.

- The certificates or notes of a series may be divided into two or more classes which may have different interest rates and which may receive principal payments in differing proportions and at different times. In addition, the rights of certain holders of classes may be subordinate to the rights of holders of other classes to receive principal and interest.

- The securities will not represent obligations of Mortgage Asset Securitization Transactions, Inc. or any of its affiliates. No governmental agency will insure the securities or the collateral securing the securities.

- No secondary market will exist for a series of certificates or notes prior to its offering. We cannot assure you that a secondary market will develop for the certificates or notes, as applicable, of any series, or, if it does develop, that it will continue.

*You should consider carefully the risk factors beginning on page 8 in this prospectus and in the related prospectus supplement.*

You are encouraged to consult with your own advisors to determine if the offered securities are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered securities.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

### UBS Investment Bank

- adequate provision for future payments on certain classes of securities; and

- any other payments specified in the related prospectus supplement.

You will no longer receive payments from these trust fund assets.

The securities will not represent an interest in or obligation of the depositor, the master servicer or any of their respective affiliates.

*Credit Enhancement Is Limited in Amount and Coverage*

Credit enhancement reduces your risk of delinquent payments or losses. However, the amount of credit enhancement will be limited, as set forth in the related prospectus supplement, and may decline and could be depleted under certain circumstances before payment in full of your securities. As a result, you may suffer losses. Moreover, the credit enhancement may not cover all potential losses or risks. For example, it may or may not fully cover fraud or negligence by a loan originator or other parties. See "*Description of Credit Support*" in this prospectus.

*Yield Is Sensitive to Rate of Principal Prepayment*

The yield on the securities of each series will depend in part on the rate of principal payment on the assets of the trust fund. In particular, variations on this rate will include:

- the extent of prepayments of the residential loans and, in the case of agency securities or mortgage securities, the underlying loans, comprising the trust fund;

- the allocation of principal and/or payment among the classes of securities of a series as specified in the related prospectus supplement;

- the exercise of any right of optional termination; and

- the rate and timing of payment defaults and losses incurred with respect to the assets of the trust fund.

Material breaches of representations and warranties by sellers of residential loans not affiliated with the depositor, the originator or the master servicer may result in repurchases of assets of the trust fund. These repurchases may lead to prepayments of principal. The rate of prepayment of the residential loans comprising or underlying the assets of the trust fund may affect the yield to maturity on your securities. See "*Yield Considerations*" and "*Maturity and Prepayment Considerations*" in this prospectus.

The rate of prepayments is influenced by a number of factors, including:

- prevailing mortgage market interest rates;

- local and national interest rates;

- homeowner mobility; and

- the ability of the borrower to obtain refinancing.

Interest payable on the securities on each distribution date will include all interest accrued during the period specified in the related prospectus supplement. If interest accrues over a period ending two or more days before a distribution date, your effective yield will be reduced from the yield you would have obtained if interest payable on the securities accrued through the day immediately before each distribution date. Consequently, your effective yield, at par, will be less than the indicated coupon rate. See "*Description of the Securities—Distributions*" and "*—Principal and Interest on the Securities*" in this prospectus.

*Borrower May Be Unable to Make Balloon Payment*

Some of the residential loans may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.*, balloon payments, at their stated maturity. Residential loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on its ability to:

- protect the homeowner from defective craftsmanship or incomplete work by a contractor;

- permit the obligated party to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor; and

- subject any person to whom the seller assigns its consumer credit transaction to all claims and defenses which the obligated party in a credit sale transaction could assert against the seller of the goods.

Violations of certain provisions of these federal laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the residential loans. In addition, violations could subject the trust fund to damages and administrative enforcement. Accordingly, violations of these federal laws would increase the risk that you might not receive all payments to which you are entitled. See "*Certain Legal Aspects of Residential Loans*" in this prospectus.

### *The Transferor May Not Be Able to Repurchase or Replace Defective Assets*

UBS Real Estate Securities Inc. ("UBSRES") will make various representations and warranties related to the assets of the related trust fund.

If UBSRES fails to cure a material breach of its representations and warranties with respect to any asset in a timely manner, then it will be required to repurchase or replace the defective asset as required under the related agreement. It is possible that UBSRES may not be capable of repurchasing or replacing any defective assets, for financial or other reasons. The inability of UBSRES to repurchase or replace defective assets would likely cause the loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on your securities could occur.

### *Rating of the Securities Are Limited and May be Withdrawn or Lowered*

Each class of securities offered by this prospectus and the related prospectus supplement must be rated upon issuance in one of the four highest rating categories by one or more rating agencies. The rating will be based on, among other things:

- the adequacy of the value of the assets of the trust fund;

- any credit enhancement with respect to the class; and

- the likelihood that you will receive payments to which you are entitled under the terms of your securities.

The rating will not be based on:

- the likelihood that principal prepayments on the related residential loans will be made;

- the degree to which prepayments might differ from those originally anticipated; or

- the likelihood of early optional termination of the series of securities.

You should not interpret the rating as a recommendation to purchase, hold or sell securities, because it does not address market price or suitability for a particular investor. The rating will not address:

- the possibility that prepayment at higher or lower rates than you anticipate may cause you to experience a lower than anticipated yield; or

- the possibility that if you purchase your security at a significant premium, then you might fail to recoup your initial investment under certain prepayment scenarios.

We cannot assure you that any rating will remain in effect for any given period of time or that a rating agency will not lower or withdraw its rating entirely in the future due to, among other reasons:

- if in the judgment of the rating agency, circumstances in the future so warrant;

- any erosion in the adequacy of the value of the assets of the trust fund or any credit enhancement with respect to a series; or

-

# Exhibit 16

PROSPECTUS SUPPLEMENT dated August 24, 2007
(To Prospectus dated February 26, 2007)



*$413,000,000 (Approximate)*
***MASTR Asset Backed Securities Trust 2007−HE2***
*(Issuing Entity)*

***Mortgage Asset Securitization Transactions, Inc.***
*(Depositor)*

***UBS Real Estate Securities Inc.***
*(Sponsor and Seller)*

***Option One Mortgage Corporation***
***HomEq Servicing***
*(Servicers)*

***Wells Fargo Bank, N.A.***
*(Master Servicer, Custodian and Trust Administrator)*

***Mortgage Pass Through Certificates, Series 2007−HE2***

The MASTR Asset Backed Securities Trust 2007−HE2 is issuing nineteen classes of certificates, but is offering only thirteen classes through this prospectus supplement.

The trust's main source of funds for making distributions on the certificates will be collections on closed−end, fixed−rate and adjustable−rate mortgage loans secured by first and second mortgages or deeds of trust on residential one− to four−family properties.

Credit enhancement will be provided by subordination as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement," overcollateralization as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions" and excess interest as described in this prospectus supplement under "Description of the Certificates—Overcollateralization Provisions."

The Certificates also will have the benefit of an interest rate swap agreement as described in this prospectus supplement under "The Interest Rate Swap Agreement."

***You should consider carefully the risk factors beginning on page S−20 in this prospectus supplement and page 8 in the prospectus.***

The certificates will not represent obligations of Mortgage Asset Securitization Transactions, Inc., UBS Real Estate Securities Inc., UBS Securities LLC or any other person or entity. No governmental agency or instrumentality will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

***Neither the SEC nor any state securities commission has approved the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.***

We will not list the offered certificates on any national securities exchange or on any automated quotation system of any registered securities association such as NASDAQ.

The underwriter, UBS Securities LLC, will purchase the offered certificates from Mortgage Asset Securitization Transactions, Inc. UBS Securities LLC expects to deliver the offered certificates in book entry form through the facilities of The Depository Trust Company, and upon request, through the facilities of Clearstream Banking Luxembourg and the Euroclear System, to purchasers on or about August 30, 2007.

The proceeds to the depositor are expected to be approximately $404,860,949 before deducting expenses. See "Underwriting" in this prospectus supplement. UBS Securities LLC will sell the offered certificates from time to time in negotiated transactions at varying prices determined at the time of sale.



In general, on any distribution date, funds available for distribution from payments and other amounts received on the Group I Mortgage Loans and the Group II Mortgage Loans, after the distributions on the Class A Certificates described above, will be distributed as follows:

*Interest Distributions*
to distribute interest on the Mezzanine Certificates from interest payments received or advanced on the Mortgage Loans, but only in the order of priority and amounts and to the extent described herein; and

*Principal Distributions*
to distribute principal on the Mezzanine Certificates from amounts allocable to principal on the Mortgage Loans, but only in the order of priority and amounts and to the extent described under "Description of the Certificates—Allocation of Available Funds".

See "Description of the Certificates—Allocation of Available Funds" in this prospectus supplement for additional information.

| | |
|---|---|
| ***Cross collateralization*** | In certain circumstances, payments on the Group I Mortgage Loans may be used to make certain distributions to the holders of the Group II Certificates and payments on the Group II Mortgage Loans may be used to make certain distributions to the holders of the Group I Certificates. |
| | See "Description of the Certificates—Allocation of Available Funds" in this prospectus supplement for additional information. |
| ***Trigger Event*** | The occurrence of a Trigger Event, on or after the Stepdown Date, may have the effect of accelerating or decelerating the amortization of certain classes of Class A Certificates and Mezzanine Certificates and affecting the weighted average lives of such certificates. The Stepdown Date is the earlier to occur of (1) the first distribution date immediately succeeding the distribution date on which the aggregate certificate principal balance of the Class A Certificates has been reduced to zero and (2) the later of (x) the distribution date occurring in September 2010 and (y) the first distribution date on which the percentage of subordination available to the Class A Certificates has doubled from the initial percentage. A Trigger Event will be met if delinquencies or losses on the mortgage loans exceed the levels set forth in the definition thereof. |
| | See "Description of the Certificates—Allocation of Available Funds" and "Glossary of Terms" in this prospectus supplement for additional information. |
| ***Fees and Expenses*** | Before distributions are made on the certificates, the following fees and expenses will be payable: (i) the master servicer will be paid a monthly fee equal to one−twelfth of 0.0100% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period, (ii) each servicer will be paid a monthly fee equal to one−twelfth of the related servicing fee rate multiplied by the aggregate principal balance of the mortgage loans serviced by such servicer as of the first day of the related due period and (iii) the credit risk manager will be paid a monthly fee equal to one−twelfth of 0.0125% multiplied by the aggregate principal balance of the mortgage loans as of the first day of the related due period. The servicing fee will be payable from amounts on deposit in the collection account. The credit risk manager fee and the master servicing fee will be payable from amounts on deposit in the distribution account. |
| | The Swap Provider is entitled to a monthly payment calculated as one−twelfth of 5.400% on the Swap Notional Amount (as defined herein) multiplied by 250. The trust is entitled to an amount equal to one−month LIBOR (as set forth in the Interest Rate Swap Agreement and calculated on an actual/360 basis) on the Swap Notional Amount for such Distribution Date multiplied by 250. Only the positive net payment of the two obligations will be paid by the applicable party. If a net payment is owed to the Swap Provider, the trust administrator will pay such amount from the distribution account before distributions are made on the certificates. |
| ***Advances*** | Each servicer will make cash advances to cover delinquent payments of principal and interest to the extent it reasonably believes that the cash advances are recoverable from future payments on the mortgage loans serviced by it. Subject to a determination of recoverability, to the extent provided in the pooling and servicing agreement, the master servicer, or (if the master servicer is the same entity as the servicer) the trustee, in each case, solely in its capacity as successor servicer, will be obligated to make any required delinquency advances that the related servicer is required to make if the related servicer fails to do so. Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses. |
| | See "The Pooling and Servicing Agreement—Advances" in this prospectus supplement for additional information. |
| ***Optional Termination*** | The majority holder of the Class CE Certificates (so long as such holder is not the sponsor or an affiliate of the sponsor) or if such majority holder fails to exercise such option, the servicers, the master servicer and the NIMS Insurer (in that order) may purchase all of the mortgage loans and any REO properties and retire the certificates when the aggregate current principal balance of the mortgage loans and any REO properties is equal to or less than 10% of the aggregate principal balance of the mortgage loans as of the cut−off date. |
| | See "The Pooling and Servicing Agreement—Termination" and "Description of the Certificates—Pass−Through Rates" in this prospectus supplement for additional information. |
| ***Repurchase or Substitution of Mortgage Loans For Breaches of Representations and Warranties*** | The seller and the originators made certain representations and warranties with respect to each mortgage loan as of the closing date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the related originator or the seller, as applicable, will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan. |

for a specified period after origination are referred to herein as the "Interest Only Mortgage Loans." After such interest–only period, each such borrower's monthly payment will be recalculated to cover both interest and principal so that the mortgage loan will amortize fully prior to its final payment date. If the monthly payment increases, the related borrower may not be able to pay the increased amount and may default or may refinance the related mortgage loan to avoid the higher payment. Because no principal payments may be made or advanced on such mortgage loans for 60 or 120 months following origination, the certificateholders will receive smaller principal distributions during such period than they would have received if the related borrowers were required to make monthly payments of interest and principal for the entire lives of such mortgage loans. This slower rate of principal distributions may reduce the return on an investment in the offered certificates that are purchased at a discount.

### Second Lien Loan Risk

Approximately 0.11% of the Group I Mortgage Loans and approximately 0.27% of the Group II Mortgage Loans (in each case, by aggregate principal balance of the related loan group as of the cut–off date) are secured by second liens on the related mortgaged properties. The proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the outstanding balance of such mortgage loans only to the extent that the claims of the related senior mortgages have been satisfied in full, including any related foreclosure costs. When any second lien mortgage loan becomes 180 days or more delinquent, a servicer may write off the entire balance of such mortgage loan as a bad debt. The foregoing considerations will be particularly applicable to mortgage loans secured by second liens that have high combined loan–to–value ratios because it is comparatively more likely that a servicer would determine foreclosure to be uneconomical in the case of such mortgage loans. The rate of default of second lien mortgage loans may be greater than that of mortgage loans secured by first liens on comparable properties. Once a second lien mortgage loan is charged off, any recoveries received by the servicers will be distributed to the Class X Certificates.

### Simultaneous Second Lien Risk

Approximately 1.30% of the Group I Mortgage Loans and approximately 6.03% of the Group II Mortgage Loans (in each case, by aggregate principal balance of the related loan group as of the cut–off date) were, as of origination, subject to a second lien mortgage loan which may or may not be included in the trust. The weighted average loan–to–value ratio of such mortgage loans at origination is approximately 76.36% (with respect to such Group I Mortgage Loans) and approximately 81.41% (with respect to such Group II Mortgage Loans) and the weighted average combined loan–to–value ratio of such mortgage loans at origination (including the second lien) is approximately 92.60% (with respect to such Group I Mortgage Loans) and approximately 98.48% (with respect to such Group II Mortgage Loans). With respect to such mortgage loans, foreclosure frequency may be increased relative to mortgage loans that were originated without a silent second lien since mortgagors have less equity in the mortgaged property. In addition, a default may be declared on the second lien loan, even though the first lien is current, which would constitute a default on the first lien loan. Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the originators or from any other lender.

### Balloon Loan Risk

Balloon loans pose a risk because a mortgagor must make a large lump sum payment of principal at the end of the loan term. If the mortgagor is unable to pay the lump sum or refinance such amount, the related servicer will make limited advances as described in the pooling and servicing agreement. Approximately 46.43% of the Group I Mortgage Loans and approximately 63.01% of the Group II Mortgage Loans (in each case, by aggregate principal balance of the related loan group as of the cut–off date) are balloon loans.

### Payment Status of the Mortgage Loans

As of August 1, 2007, none of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut–off date) were 60–89 days delinquent and approximately 0.41% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut–off date) were 30–59 days delinquent, in each case, based on the OTS method. However, with respect to approximately 32.47% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut–off date), the first payment on the mortgage loans is due on or after August 1, 2007 and such mortgage loans could not have been 30–59 days delinquent as of August 1, 2007. For a description of the OTS method, see "Description of the Mortgage Loans" herein. It is possible that a delinquent mortgage loan will not ever become current or if it does become current, that the mortgagor may become delinquent again. As a result of the inclusion of delinquent mortgage loans, the mortgage pool may bear more risk than a pool of mortgage loans without any delinquencies but with otherwise comparable characteristics.

Each servicer will be required to make advances of delinquent payments of principal and interest on any delinquent mortgage loan (to the extent such advances are deemed by such servicer to be recoverable), until such mortgage loans become current or are charged off. Furthermore, with respect to any delinquent mortgage loan, a servicer may either foreclose on any such mortgage loan or work out an agreement with the mortgagor, which may involve waiving or modifying certain terms of the related mortgage loan. If a servicer extends the payment period or accepts a lesser amount than the amount due pursuant to the mortgage note in satisfaction of the mortgage note, your yield may be reduced.

An originator may be required to repurchase any mortgage loan in the trust to the extent any such mortgage loan experiences an early payment default (i.e., the first payment due to the depositor is not received within 30 days of that payment being due). These purchases will have the same effect on the holders of the certificates as a prepayment of those mortgage loans and may adversely affect the yield on the certificates. In the event an originator defaults on such obligation, such mortgage loans will remain in the trust.

### Credit Scores May Not Accurately Predict the Performance of the Mortgage Loans

Credit scores are obtained by many lenders in connection with mortgage loan applications to help them assess a borrower's creditworthiness. Credit scores are generated by models developed by a third party which analyzed data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default over a two–year time period. The credit score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a credit score purports only to be a measurement of the relative degree of risk a borrower represents to a lender (i.e., a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score). Lenders have varying ways of analyzing credit scores and, as a result, the analysis of credit scores across the industry is not consistent. In addition, it should be noted that credit scores were developed to indicate a level of default probability over a two year period, which does not correspond to the life of a mortgage loan. Furthermore, credit scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general, and assess only the borrower's past credit history. Therefore, a credit score does not take into consideration the effect of mortgage loan characteristics (which may differ from consumer loan characteristics) on the probability of repayment by the borrower. There can be no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans.

### Potential Inadequacy of Credit Enhancement for the Class A Certificates and Mezzanine Certificates

The credit enhancement features of the transaction are intended to enhance the likelihood that holders of the Class A Certificates, and to a limited extent, the holders of the Mezzanine Certificates, will receive regular distributions of interest and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to make distributions on your certificates as a result of delinquencies or

15

- such NIMS Insurer's exercise of the rights and consents set forth above may negatively affect the offered certificates and the existence of such NIMS Insurer's rights, whether or not exercised, may adversely affect the liquidity of the offered certificates relative to other asset-backed certificates backed by comparable mortgage loans and with comparable payment priorities and ratings; and

- there may be more than one series of notes insured by the NIMS Insurer and the NIMS Insurer will have the rights set forth herein so long as any such series of notes remain outstanding.

*Nature of the Mortgage Loans*

The mortgage loans in the trust were originated generally in accordance with the related originator's underwriting guidelines described herein subject to exceptions to such underwriting guidelines taking into account compensating factors, without regard to whether such mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac. As a result, delinquencies and liquidation proceedings are more likely with these mortgage loans than with mortgage loans that are originated in a more traditional manner. As a result of the use of such underwriting standards and exceptions thereto, in the event the mortgage loans do become delinquent or subject to liquidation, you may face delays in receiving payment and losses if the credit enhancements are insufficient to cover the delays and losses.

*Reduction or Withdrawal of Ratings*

Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced.

*Suitability of the Offered Certificates as Investments*

The offered certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly distributions or distribution on any specific date. The offered certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

*Adjustable-Rate Mortgage Loans May Present Increased Risk*

Investors should note that substantially all of the adjustable-rate mortgage loans were originated at rates below the sum of the index at origination and the related gross margin (the "Teaser Rate"). In addition, on the first adjustment date following the origination of the adjustable-rate mortgage loans, the mortgage rate can increase by as much as 5.000% per annum. The underwriting standards of the originators in determining a borrower's ability to pay generally (i) allows debt-to-income ratios higher than Fannie Mae and Freddie Mac standards, (ii) looks at the Teaser Rate on the adjustable-rate mortgage loan and not the related fully-indexed mortgage rate and (iii) generally does not include tax and insurance payments. These factors may result in the adjustable-rate mortgage loans experiencing increased delinquency, foreclosure, bankruptcy and loss than other mortgage loans.

*Recent Developments in the Residential Mortgage Market May Adversely Affect the Yields of the Offered Certificates*

Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of the offered certificates. Securities backed by residential mortgage loans ("RMBS Securities") originated in 2006 and 2007 have had a higher and earlier than expected rate of delinquencies. Additionally, there may be evidence that other earlier vintages of RMBS Securities are not performing well. Many RMBS Securities, including those from securitizations of the sponsor, have been downgraded by the rating agencies during the past few months. As a result, the market for the offered certificates may be adversely affected for a significant period of time.

The increase in delinquencies described above has not been limited to "subprime" mortgage loans, which are made to borrowers with impaired credit. The increase in delinquencies has also affected "alt-A" mortgage loans, which are made to borrowers with limited documentation, and also "prime" mortgage loans, which are made to borrowers with excellent credit who provide full documentation.

In recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation. A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans generally, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.

Another factor that may in the future contribute to higher delinquency rates is the potential increase in monthly payments on adjustable rate mortgage loans. Borrowers with adjustable payment mortgage loans may be exposed to increased monthly payments if the related mortgage interest rate adjusts upward from the initial fixed rate or a low introductory rate, as applicable, in effect during the initial period of the mortgage loan to the rate computed in accordance with the applicable index and margin. This increase in borrowers' monthly payments, together with any increase in prevailing market interest rates, after the initial fixed rate period, may result in significantly increased monthly payments for borrowers with adjustable rate mortgage loans and an increase in default on their obligations.

Current market conditions may impair borrowers' ability to refinance or sell their properties, which may contribute to higher delinquency and default rates. Borrowers seeking to avoid increased monthly payments by refinancing may no longer be able to find available replacement loans at comparably low interest rates. A decline in housing prices may also leave borrowers with insufficient equity in their homes to permit them to refinance. Borrowers who intended to sell their homes or refinance their existing mortgage loan on or before the expiration of the fixed rate periods on their mortgage loans may find that they cannot sell their property for an amount equal to or greater than the unpaid principal balance of their loans or obtain new financing. In addition, some mortgage loans may include prepayment premiums that would further inhibit refinancing.

A servicer will have the authority to modify mortgage loans that are in default, or for which default is reasonably foreseeable, if in the best interests of the holders of the certificates and subject to the applicable overall servicing standards. Loan modifications are more likely to be used to the extent that borrowers are less able to refinance or sell their homes due to market conditions, and to the extent that the potential recovery from a foreclosure is reduced due to lower property values. A significant number of loan modifications could result in a significant reduction in cash flows to the trust on an ongoing basis.

Recently, a number of originators of mortgage loans have experienced serious financial difficulties and, in many cases, have entered bankruptcy proceedings. These difficulties have resulted in part from declining markets for their mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase in the event of early payment defaults or for breaches of representations regarding loan quality. In addition to the reduction of the number of originators, a rising interest rate environment and declining real estate values may decrease the number of borrowers seeking or able to refinance their mortgage loans, resulting in a decrease in overall originations.

19

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the Cut–off Date Principal Balance.

The statistical information presented in this prospectus supplement relates to the Mortgage Loans and related Mortgaged Properties in each Loan Group as of the Cut–off Date, as adjusted for scheduled principal payments due on or before the Cut–off Date whether or not received. Prior to the issuance of the certificates, Mortgage Loans may be removed from either of the Loan Groups as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time. A limited number of other Mortgage Loans may be included in each Loan Group prior to the issuance of the certificates unless including such Mortgage Loans would materially alter the characteristics of the Mortgage Loans in such Loan Group as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement with respect to the Mortgage Loans in each Loan Group will be representative of the characteristics of each such Loan Group as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and certain other characteristics of the Mortgage Loans in a Loan Group may vary. Any statistic presented on a weighted average basis or any statistic based on the aggregate principal balance of the mortgage loans is subject to a variance of plus or minus 5%.

If any material pool characteristic of the Mortgage Loans on the Closing Date differs by 5% or more from the description of the Mortgage Loans in this prospectus supplement, the depositor will file updated pool characteristics by Form 8–K within four days following the Closing Date.

The trust will consist of a pool of residential mortgage loans which will be divided into the Group I Mortgage Loans, consisting of a group of fixed–rate and adjustable–rate, first lien and second lien, fully–amortizing, balloon and interest–only mortgage loans with Principal Balances at origination that conform to Freddie Mac loan limits, and the Group II Mortgage Loans, consisting of a group of fixed–rate and adjustable–rate, first lien and second lien, fully–amortizing, balloon and interest–only mortgage loans with Principal Balances at origination that may or may not conform to Freddie Mac loan limits.

The Group I Mortgage Loans consist of 1,502 Mortgage Loans and have a Cut–off Date Principal Balance of approximately $316,341,865. The Group II Mortgage Loans consist of 342 Mortgage Loans and have a Cut–off Date Principal Balance of approximately $129,182,191.

All of the Mortgage Loans will be secured by first or second mortgages or deeds of trust or other similar security instruments which create first or second liens on one– to four–family residential properties consisting of attached or detached one– to four–family dwelling units, planned unit developments, townhouses and individual condominium units. Approximately 99.89% of the Group I Mortgage Loans are secured by first Mortgages and approximately 0.11% of the Group I Mortgage Loans are secured by second Mortgages. Approximately 99.73% of the Group II Mortgage Loans are secured by first Mortgages and approximately 0.27% of the Group II Mortgage Loans are secured by second Mortgages. Approximately 99.84% of the Mortgage Loans are secured by first Mortgages and approximately 0.16% of the Mortgage Loans are secured by second Mortgages.

The Mortgage Loans will generally consist of mortgages to subprime borrowers.

The sponsor previously purchased the Mortgage Loans from each originator pursuant to a Mortgage Loan Purchase Agreement. The depositor will purchase the Mortgage Loans from the sponsor and acquire the sponsor's rights against each originator under the related Mortgage Loan Purchase Agreement pursuant to an Assignment Agreement. Pursuant to the Pooling and Servicing Agreement, the depositor will cause the Mortgage Loans and the depositor's rights under the Mortgage Loan Purchase Agreements to be assigned to the trustee for the benefit of the certificateholders. See "The Pooling and Servicing Agreement" in this prospectus supplement.

Each of the Mortgage Loans was selected from the sponsor's portfolio of mortgage loans. The Mortgage Loans were originated by the originators or acquired by the originators in the secondary market in the ordinary course of its business and were underwritten or re–underwritten by the originators generally in accordance with its underwriting standards. A description of the underwriting standards used by the originators who have originated more than 20% of the Mortgage Loans are described under "The Originators" in this prospectus supplement.

Under each Mortgage Loan Purchase Agreement and the related Assignment Agreement, each originator will make certain representations and warranties to the depositor relating to, among other things, the due execution and enforceability of the related Mortgage Loan Purchase Agreement and certain characteristics of the related Mortgage Loans. Subject to certain limitations, the related originator will be obligated to repurchase or substitute a similar mortgage loan for any Mortgage Loan as to which there exists deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the certificateholders' interests in such Mortgage Loan. The sponsor is selling the Mortgage Loans without recourse and will have no obligation with respect to the offered certificates in its capacity as seller other than any repurchase or substitution obligations applicable to the seller as provided in the related Assignment Agreement. The originators will not have any obligation with respect to the offered certificates other than the repurchase or substitution obligations described above.

Delinquencies are determined using the OTS method of reporting delinquencies. Pursuant to the OTS method, a mortgage loan is considered to be delinquent when a payment due on any due date remains unpaid as of the close of business on the next scheduled due date. Therefore on July 31, 2007, mortgage loans still due for their May 1, 2007 monthly payment are 60–89 days delinquent, mortgage loans due for their June 1, 2007 monthly payment are 30–59 days delinquent, and mortgage loans due for their July 1, 2007 monthly payment are not delinquent.

Investors should note that calculations of delinquency are made as of the end of the prior month. Changes in borrower delinquency status after that time will not be disclosed until the following month. In addition, under both methods, bankruptcy, foreclosure and REO property status is determined as of the last day of the prior month. Such mortgage loans are removed from the delinquency buckets, although they will count in connection with delinquency triggers or for total delinquency information.

The Mortgage Loans are subject to the "due–on–sale" provisions included therein which may provide that the Mortgage Loan is assumable by a creditworthy purchaser of the related Mortgaged Property.

Each Mortgage Loan will accrue interest at the Mortgage Rate. Approximately 66.75% of the Group I Mortgage Loans are adjustable–rate mortgage loans and approximately 33.25% of the Group I Mortgage Loans are fixed–rate mortgage loans. Approximately 75.30% of the Group II Mortgage Loans are adjustable–rate mortgage loans and approximately 24.70% of the Group II Mortgage Loans are fixed–rate mortgage loans.

Each Fixed–Rate Mortgage Loan has a Mortgage Rate that is fixed for the life of such Mortgage Loan.

Each Adjustable–Rate Mortgage Loan accrues interest at a Mortgage Rate that is adjustable following an initial period of six months, two years, three years, five years or ten years following origination. Generally, the Adjustable–Rate Mortgage Loans provide for semi–annual or annual adjustment to the Mortgage Rate thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each Adjustment Date applicable thereto; provided, that (i) the first adjustment of the rates for approximately 0.18% of the adjustable–rate Group I Mortgage Loans (in each case, by aggregate principal balance of the adjustable–rate mortgage loans in the related loan group as of the cut–off date) will not occur until six months after the date of origination, (ii) the first adjustment of the rates for approximately 84.96% of the adjustable–rate Group I Mortgage Loans and approximately 78.52% of the adjustable–rate Group II Mortgage Loans (in each case, by aggregate principal balance of the adjustable–rate mortgage loans in the related loan group as of the cut–off date) will not occur until two years after the date of origination, (iii) the first adjustment of the rates for approximately 6.16% of the adjustable–rate Group I Mortgage Loans and approximately 8.98% of the adjustable–rate Group II Mortgage Loans (in each case, by aggregate principal

22

| | Number of Mortgage Loans | Principal Balance Outstanding | % | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Condominium | 64 | 15,127,697 | 3.40 | 236,370 | 8.599 | 80.53 | 617 | 65.81 | 0.13 |
| Townhouse | 2 | 355,323 | 0.08 | 177,662 | 10.700 | 65.53 | 569 | 100.00 | 0.00 |
| Total | 1,844 | $445,524,057 | 100.00% $ | 241,607 | 8.413% | 78.87% | 624 | 65.26% | 0.16% |

### Occupancy Status of the Mortgage Loans[1]

| Occupancy Status | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 1,638 | $ 404,617,207 | 90.82% | $ 247,019 | 8.299% | 78.67% | 620 | 67.67% | 0.16% |
| Investor Occupied | 172 | 32,629,763 | 7.32 | 189,708 | 9.747 | 81.76 | 669 | 40.44 | 0.11 |
| Second Home | 34 | 8,277,087 | 1.86 | 243,444 | 8.684 | 77.38 | 642 | 45.40 | 0.00 |
| Total | 1,844 | $ 445,524,057 | 100.00% | $ 241,607 | 8.413% | 78.87% | 624 | 65.26% | 0.16% |

[1]    Occupancy as represented by the mortgagor at the time of origination.

### Purpose of the Mortgage Loans

| Purpose | Number of Mortgage Loans | Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Average Principal Balance | Weighted Average Gross Coupon | Weighted Average Original LTV | Weighted Average FICO | % of Full Doc Loans | % of Second Liens |
|---|---|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 1,169 | $296,593,483 | 66.57% | $ 253,716 | 8.227% | 76.24% | 620 | 65.15% | 0.03% |
| Purchase | 414 | 92,613,775 | 20.79 | 223,705 | 9.098 | 86.73 | 645 | 57.01 | 0.66 |
| Rate & Term Refinance | 256 | 55,130,405 | 12.37 | 215,353 | 8.276 | 79.95 | 615 | 80.00 | 0.00 |
| Cash Out Home Improvement | 5 | 1,186,393 | 0.27 | 237,279 | 7.783 | 71.44 | 600 | 52.47 | 0.00 |
| Total | 1,844 | $445,524,057 | 100.00% | $ 241,607 | 8.413% | 78.87% | 624 | 65.26% | 0.16% |

# Exhibit 17

Prospectus Supplement dated March 15, 2006 (For use with Prospectus dated April 15, 2005)

**$ 1,429,630,000 (Approximate)**
**Argent Securities Trust 2006–W3**
**Issuing Entity**

**Asset–Backed Pass–Through Certificates,**
**Series 2006–W3**

**Argent Securities Inc.**
**Depositor**



**Ameriquest Mortgage Company**
**Seller, Sponsor and Master Servicer**

**You should consider carefully the risk factors beginning on page S–12 in this prospectus supplement and page 1 in the prospectus.**

The certificates will represent interests in the issuing entity, the assets of which consist primarily of a pool of one– to four–family adjustable–rate and fixed–rate, first lien and second lien residential mortgage loans. The certificates will not represent ownership interests in or obligations of any other entity.

This prospectus supplement may be used to offer and sell the certificates offered hereby only if accompanied by the prospectus.

**The Class A and Mezzanine Certificates —**

- will represent senior or mezzanine interests in the trust and will receive distributions from the assets of the trust;

- will receive monthly distributions commencing in April 2006;

- will have credit enhancement in the form of excess interest, subordination and overcollateralization; and

- will have the benefit of an interest rate swap agreement.

| Class(1) | Original Certificate Principal Balance(2) | Price to Public | Underwriting Discount | Proceeds to the Depositor(3) | Class(1) | Original Certificate Principal Balance(2) | Price to Public | Underwriting Discount | Proceeds to the Depositor(3) |
|---|---|---|---|---|---|---|---|---|---|
| Class A–1 | $ 639,421,000 | 100.0000% | 0.1200% | 99.8800% | Class M–3 | $ 29,645,000 | 100.0000% | 0.1500% | 99.8500% |
| Class A–2A | $ 239,889,000 | 100.0000% | 0.1500% | 99.8500% | Class M–4 | $ 26,680,000 | 100.0000% | 0.1500% | 99.8500% |
| Class A–2B | $ 111,272,000 | 100.0000% | 0.1500% | 99.8500% | Class M–5 | $ 25,199,000 | 100.0000% | 0.1500% | 99.8500% |
| Class A–2C | $ 127,730,000 | 100.0000% | 0.1500% | 99.8500% | Class M–6 | $ 23,716,000 | 100.0000% | 0.1500% | 99.8500% |
| Class A–2D | $ 44,512,000 | 100.0000% | 0.1500% | 99.8500% | Class M–7 | $ 22,234,000 | 100.0000% | 0.1500% | 99.8500% |
| Class M–1 | $ 57,809,000 | 100.0000% | 0.1500% | 99.8500% | Class M–8 | $ 18,528,000 | 100.0000% | 0.1500% | 99.8500% |
| Class M–2 | $ 50,396,000 | 100.0000% | 0.1500% | 99.8500% | Class M–9 | $ 12,599,000 | 100.0000% | 0.1500% | 99.8500% |

(1)   The pass–through rates on such classes will be based on one–month LIBOR plus the applicable margin, subject to certain caps as described in this prospectus supplement.
(2)   Approximate.
(3)   Before deducting expenses payable by the Depositor estimated to be approximately $800,000.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Offered Certificates or determined that this prospectus supplement or the prospectus is truthful or complete. Any representation to the contrary is a criminal offense. The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

**UBS Investment Bank**                                                                 **JPMorgan**

Rate Swap Provider, and to the extent that the floating rate payment exceeds the fixed rate payment on any Distribution Date, the Interest Rate Swap Provider will make a net payment to the Trust (each, a "Net Swap Payment") for deposit into a segregated trust account established on the Closing Date (the "Swap Account") pursuant to a swap administration agreement, dated as of the Closing Date (the "Swap Administration Agreement"), as more fully described in this prospectus supplement.

Upon early termination of the Interest Rate Swap Agreement, the Trust or the Interest Rate Swap Provider may be liable to make a termination payment (the "Swap Termination Payment") to the other party (regardless of which party caused the termination). The Swap Termination Payment will be computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the Trust is required to make a Swap Termination Payment, that payment will be paid on the related Distribution Date, and on any subsequent Distribution Dates until paid in full, generally prior to any distribution to Certificateholders. See "Description of the Certificates—The Interest Rate Swap Agreement and the Interest Rate Swap Provider" in this prospectus supplement.

Net Swap Payments and Swap Termination Payments (other than Swap Termination Payments resulting from a Swap Provider Trigger Event) payable by the Issuing Entity will be deducted from Available Funds before distributions to Certificateholders and will first be deposited into the Swap Account before payment to the Interest Rate Swap Provider.

### Fees and Expenses

Before distributions are made on the Certificates, the following fees and expenses will be payable: (i) the Master Servicer will be paid a monthly fee (the "Servicing Fee") equal to one-twelfth of 0.500% (the "Servicing Fee Rate") on the aggregate principal balance of the Mortgage Loans as of the first day of the related Due Period and (ii) the Trustee will be paid a monthly fee (the "Trustee Fee") equal to one-twelfth of 0.0017% (the "Trustee Fee Rate") on the sum of (x) the aggregate principal balance of the Mortgage Loans and (y) any amounts on deposit in the Pre-Funding Accounts. The Servicing Fee will be payable from amounts on deposit in the Collection Account and the Trustee Fee will be payable from amounts on deposit in the Distribution Account.

For further information, see "Description of the Certificates—Fees and Expenses of the Trust" in this prospectus supplement.

### Advances

The Master Servicer is required to advance delinquent payments of principal and interest on the Mortgage Loans, subject to the limitations described in this prospectus supplement. The Master Servicer is entitled to be reimbursed for such advances, and therefore such advances are not a form of credit enhancement. See "Description of the Certificates —Advances" in this prospectus supplement and "Distributions on the Securities—Advances by Master Servicer in Respect of Delinquencies on the Trust Fund Assets" in the prospectus.

### Trigger Events

The occurrence of a Trigger Event, following the Stepdown Date, may have the effect of accelerating or decelerating the amortization of certain classes of Class A Certificates and Mezzanine Certificates and affecting the weighted average lives of such certificates. The Stepdown Date is the earlier to occur of (1) the first Distribution Date on which the aggregate certificate principal balance of the Class A Certificates has been reduced to zero and (2) the later of (x) the Distribution Date occurring in April 2009 and (y) the first Distribution Date on which the subordination available to the Class A Certificates has doubled. A Trigger Event will be in effect if delinquencies or losses on the mortgage loans exceed the levels set forth in the definition thereof.

See "Description of the Certificates—Principal Distributions," "Definitions" and "Yield on the Certificates—Yield Sensitivity of the Mezzanine Certificates" in this prospectus supplement for additional information.

### Repurchase or Substitution of Mortgage Loans for Breaches of Representations and Warranties

The Seller will make certain representations and warranties with respect to each Mortgage Loan at the time of origination or as of the Closing Date. Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the Certificateholders, the Seller will be obligated to cure such breach, or otherwise repurchase or replace such Mortgage Loan. See "Pooling and Servicing Agreement— Assignment and Substitution of the Mortgage Loans" in this prospectus supplement and "The Depositor's

S-10

event of a breach of that representation and warranty that materially and adversely affects the value of such Mortgage Loan, the Seller will be obligated to repurchase or substitute for the related Mortgage Loan. Any such repurchase would have the effect of increasing the rate of principal payment on the Class A and Mezzanine Certificates. Any damage to a mortgaged property that secures a Mortgage Loan in the Trust occurring after the Closing Date as a result of any other casualty event (including, but not limited to, other hurricanes) will not cause a breach of this representation and warranty.

The full economic impact of Hurricane Katrina and Hurricane Rita is uncertain but may affect the ability of borrowers to make payments on their mortgage loans. We have no way to determine the particular nature of such economic effects, how long any of these effects may last, or how these effects may impact the performance of the Mortgage Loans. Any impact of these events on the performance of the Mortgage Loans may increase the amount of losses borne by the holders of the Class A or Mezzanine Certificates or impact the weighted average lives of the Class A or Mezzanine Certificates.

**Violation of Various Federal and State Laws May Result In Losses on the Mortgage Loans**

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the Originator. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the Mortgage Loans.

The Mortgage Loans are also subject to federal laws, including:

- the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the Mortgage Loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the mortgagor's credit experience;

- the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws; and

- the Alternative Mortgage Transaction Parity Act of 1982, which preempts certain state lending laws which regulate alternative mortgage transactions.

Violations of certain provisions of these federal and state laws may limit the ability of the Master Servicer to collect all or part of the principal of or interest on the Mortgage Loans and in addition could subject the Trust to damages and administrative enforcement and could result in the mortgagors rescinding such Mortgage Loans whether held by the Trust or subsequent holders of the Mortgage Loans.

The Seller will represent that each Mortgage Loan at the time of origination, was in compliance with applicable federal, state and local laws and regulations. In the event of a breach of such representation, the Seller will be obligated to cure such breach or repurchase or replace the affected Mortgage Loan in the manner described in the prospectus. If the Seller is unable or otherwise fails to satisfy such obligations, the yield on the Class A and Mezzanine Certificates may be materially and adversely affected.

*High Cost Loans*

The Seller will represent that none of the Mortgage Loans will be "High Cost Loans" within the meaning of the Home Ownership and Equity Protection Act of 1994 (the "Homeownership Act") and none of the Mortgage Loans will be high cost loans under any state or local law, ordinance or regulation similar to the Homeownership

S–15

The following table summarizes Argent's wholesale originated one– to four–family residential mortgage loan origination and whole loan sales and securitization activity for the periods shown below. Sales activity may include sales of mortgage loans purchased by Argent from other loan originators.

**Wholesale Originations**

| | Year Ended December 31, | | | Nine Months Ending September 30, |
|---|---|---|---|---|
| | 2002† | 2003 | 2004 | 2005 |
| | (Dollars in Thousands) | | | |
| Originations | $ 4,832,951 | $ 21,140,156 | $ 47,319,352 | $ 38,785,957 |
| Whole Loan Sales and Securitizations | $ 3,917,432 | $ 16,461,828 | $ 45,864,688 | 34,526,274 |

---

†     Prior to January 1, 2003, wholesale originations were completed through the Sponsor.

**Underwriting Standards of the Originator**

All of the Mortgage Loans acquired by the Seller were originated in accordance with guidelines (the "Underwriting Guidelines") established by the Originator as described below and with one of the following income documentation types: "Full Documentation," "Limited Documentation" or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral. On a case–by–case basis, the Originator may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines. Compensating factors may include, but are not limited to, loan–to–value ratio, debt–to–income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address. It is expected that a substantial number of the Mortgage Loans to be included in the mortgage pool will represent such underwriting exceptions.

The Underwriting Guidelines are less stringent than the standards generally acceptable to more traditional lenders with regard to: (1) the applicant's credit standing and repayment ability and (2) the property offered as collateral. Applicants who qualify under the Underwriting Guidelines generally have payment histories and debt ratios which would not satisfy the underwriting guidelines of more traditional lenders and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. The Underwriting Guidelines establish the maximum permitted loan–to–value ratio for each loan type based upon these and other risk factors.

All of the Mortgage Loans originated by the Originator are based on loan application packages submitted directly or indirectly by a loan applicant to the Originator. Each loan application package has an application completed by the applicant that includes information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information. The Originator also obtains (or the broker submits) a credit report on each applicant from a credit reporting company. The credit report typically contains the reported information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and reported records of default, bankruptcy, repossession and judgments. If applicable, the loan application package must also generally include a letter from the applicant explaining all late payments on mortgage debt and, generally, consumer (i.e. non–mortgage) debt.

During the underwriting process, the Originator reviews and verifies the loan applicant's sources of income (except under the Stated Income and Limited Documentation types, under which programs such information may not be independently verified), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt–to–income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a

S–32

The Seller will make certain representations and warranties as of the Closing Date as to the accuracy in all material respects of certain information furnished to the Trustee with respect to each Mortgage Loan (e.g., the Principal Balance and the Mortgage Rate). In addition, the Seller will represent and warrant, among other things that at the time of transfer to the Depositor: (i) the Seller has transferred or assigned all of its right, title and interest in each Mortgage Loan and the related documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and/or federal laws and (iii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan and related documents, the Seller will have a period of 90 days after the earlier of discovery or receipt of written notice of the breach to effect a cure. If the breach cannot be cured within the 90 day period, the Seller will be obligated to repurchase or replace the affected Mortgage Loan in the manner described in the prospectus, the Pooling and Servicing Agreement and the Mortgage Loan Purchase Agreement. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or repurchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement that materially and adversely affects the interests of the Certificateholders.

Mortgage Loans required to be transferred to the Seller as described in the preceding paragraphs are referred to as "Deleted Mortgage Loans."

## Servicing and Other Compensation and Payment of Expenses

The principal compensation to be paid to the Master Servicer in respect of its servicing activities for the Certificates will be equal to accrued interest at the Servicing Fee Rate of 0.500% per annum with respect to each Mortgage Loan for each calendar month on the same principal balance on which interest on such Mortgage Loan accrues for such calendar month (the "Servicing Fee"). As additional servicing compensation, the Master Servicer is entitled to retain all ancillary income, including late charges, NSF fees, reconveyance fees and assumption fees (with the exception of prepayment charges, which will be distributed to the holders of the Class P Certificates) to the extent collected from mortgagors, together with any interest or other income earned on funds held in the collection account and any escrow accounts.

The Master Servicer is obligated to offset any Prepayment Interest Shortfall on any Distribution Date to the extent of its aggregate Servicing Fee for such Distribution Date (such amount is referred to herein as "Compensating Interest"). The Master Servicer is obligated to pay certain insurance premiums and certain ongoing expenses associated with the mortgage pool and incurred by the Master Servicer in connection with its responsibilities under the Pooling and Servicing Agreement and is entitled to reimbursement therefor as provided in the Pooling and Servicing Agreement. See "Description of the Securities—Retained Interest; Servicing or Administration Compensation and Payment of Expenses" in the prospectus for information regarding expenses payable by the Master Servicer and "Federal Income Tax Consequences" herein regarding certain taxes payable by the Master Servicer.

## Events of Default and Removal of Servicer or Master Servicer

The circumstances under which the Master Servicer may be removed are set forth under "Description of the Securities—Events of Default" in the prospectus. In addition to those events, the Master Servicer may be removed if cumulative losses on the Mortgage Loans exceed the level specified below for the applicable period:

| Months (following the Closing Date) | Cumulative Loss (%) |
|---|---|
| 37–48 | 4.75 |
| 49–60 | 6.25 |
| 61–72 | 7.50 |
| 73 and thereafter | 8.00 |



**Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W3**

## DESCRIPTION OF THE TOTAL COLLATERAL

### Occupancy Status

| OCCUPANCY STATUS* | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (months) | DEBT-TO-INCOME (%) | GROSS COUPON (%) | FICO | OLTV[1] (%) |
|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,082 | 894,240,453.25 | 89.42 | 358 | 41.30 | 8.260 | 615 | 81.95 |
| Non-Owner Occupied | 659 | 95,648,499.23 | 9.56 | 358 | 33.06 | 9.041 | 642 | 86.85 |
| Second Home | 51 | 10,111,614.63 | 1.01 | 355 | 39.39 | 8.480 | 645 | 84.52 |
| **Total:** | **4,792** | **1,000,000,567.11** | **100.00** | **358** | **40.49** | **8.337** | **618** | **82.45** |

[1] Original LTV if first lien, combined LTV if second lien.
*Based on mortgagor representation at origination.

### Documentation Type

| INCOME DOCUMENTATION | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (months) | DEBT-TO-INCOME (%) | GROSS COUPON (%) | FICO | OLTV[1] (%) |
|---|---|---|---|---|---|---|---|---|
| Full Documentation | 2,772 | 542,697,692.58 | 54.27 | 358 | 40.15 | 8.103 | 601 | 82.07 |
| Limited Documentation | 349 | 81,392,054.22 | 8.14 | 357 | 38.10 | 8.166 | 619 | 82.93 |
| Stated Documentation | 1,671 | 375,910,820.31 | 37.59 | 358 | 41.50 | 8.708 | 642 | 82.89 |
| **Total:** | **4,792** | **1,000,000,567.11** | **100.00** | **358** | **40.49** | **8.337** | **618** | **82.45** |

[1] Original LTV if first lien, combined LTV if second lien.

### Loan Purpose

| PURPOSE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (months) | OEBT-TO-INCOME (%) | GROSS COUPON (%) | FICO | OLTV[1] (%) |
|---|---|---|---|---|---|---|---|---|
| Refinance-Debt Consolidation Cash Out** | 2,283 | 497,183,411.86 | 49.72 | 358 | 40.66 | 8.291 | 594 | 80.78 |
| Purchase | 2,298 | 468,396,110.45 | 46.84 | 359 | 40.42 | 8.385 | 644 | 84.28 |
| Refinance-Debt Consolidation No Cash Out*** | 211 | 34,421,044.80 | 3.44 | 355 | 38.99 | 8.362 | 599 | 81.96 |
| **Total:** | **4,792** | **1,000,000,567.11** | **100.00** | **358** | **40.49** | **8.337** | **618** | **82.45** |

[1] Original LTV if first lien, combined LTV if second lien.
** Cash proceeds to the borrower inclusive of debt consolidation payments exceed 2% or $2,000 of the original principal balance of the related loan. Also includes all home equity loans originated in Texas with any cash proceeds.

*** Cash proceeds to the borrower inclusive of debt consolidation payments do not exceed 2% or $2,000 of the original principal balance of the related loan. Excludes home equity loans originated in Texas with any cash proceeds.

**MORTGAGE PASS–THROUGH CERTIFICATES**
**MORTGAGE–BACKED NOTES**
**(ISSUABLE IN SERIES)**

**ARGENT SECURITIES INC.**
Depositor

---

**YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE I OF THIS PROSPECTUS AND IN THE PROSPECTUS SUPPLEMENT.**

**THE PROSPECTUS TOGETHER WITH THE ACCOMPANYING PROSPECTUS SUPPLEMENT WILL CONSTITUTE THE FULL PROSPECTUS.**

---

**THE SECURITIES:**

Argent Securities Inc., as depositor, will sell the securities, which may be in the form of mortgage pass–through certificates or mortgage–backed notes. Each issue of securities will have its own series designation and will evidence either:

- the ownership of trust fund assets, or

- debt obligations secured by trust fund assets.

**THE TRUST FUND AND ITS ASSETS:**

The assets of a trust fund will primarily include any combination of various types of one– to four–family residential first and junior lien mortgage loans, multifamily first and junior mortgage loans, commercial first and junior mortgage loans, mixed–use residential and commercial first and junior mortgage loans, home equity lines of credit, cooperative apartment loans, manufactured housing conditional sales contracts and installment loan agreements or home improvement installment sales contracts and installment loan agreements.

**CREDIT ENHANCEMENT**

The assets of the trust fund for a series of securities may also include a financial guaranty insurance policy, pool insurance policies, letters of credit, reserve funds or currency or interest rate exchange agreements or any combination of credit support. Credit enhancement may also be provided by means of subordination of one or more classes of securities, cross–collateralization or by overcollateralization.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THESE SECURITIES OR DETERMINED THAT THIS PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

Offers of the securities may be made through one or more different methods, including through underwriters as described in "Methods of Distribution" in this prospectus and in the related prospectus supplement.

The date of this Prospectus is April 15, 2005.

**Failure of the Mortgage Loan Seller to Repurchase or Replace a Mortgage Loan May Result in Losses Allocated to the Related Securities**

Each mortgage loan seller will have made representations and warranties in respect of the mortgage loans sold by the mortgage loan seller and evidenced by a series of securities. In the event of a breach of a mortgage loan seller's representation or warranty that materially adversely affects the interests of the securityholders in a mortgage loan, the related mortgage loan seller will be obligated to cure the breach or repurchase or, if permitted, replace the mortgage loan as described under "Mortgage Loan Program--Representations as to Mortgage Loans to be made by or on Behalf of Mortgage Loan Sellers; Remedies for Breach of Representation." However, there can be no assurance that a mortgage loan seller will honor its obligation to cure, repurchase or, if permitted, replace any mortgage loan as to which a breach of a representation or warranty arises. A mortgage loan seller's failure or refusal to honor its repurchase obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of the related securities.

In instances where a mortgage loan seller is unable, or disputes its obligation, to repurchase affected mortgage loans, the master servicer may negotiate and enter into one or more settlement agreements with the mortgage loan seller that could provide for the purchase of only a portion of the affected mortgage loans. Any settlement could lead to losses on the mortgage loans which would be borne by the related securities. Neither the depositor nor the master servicer will be obligated to purchase a mortgage loan if a mortgage loan seller defaults on its obligation to do so, and no assurance can be given that the mortgage loan sellers will carry out their repurchase obligations. A default by a mortgage loan seller is not a default by the depositor or by the master servicer. Any mortgage loan not so repurchased or substituted for shall remain in the related trust fund and any related losses shall be allocated to the related credit support, to the extent available, and otherwise to one or more classes of the related series of securities.

All of the representations and warranties of a mortgage loan seller in respect of a mortgage loan will have been made as of the date on which the mortgage loan was purchased from the mortgage loan seller by or on behalf of the depositor which will be a date prior to the date of initial issuance of the related series of securities. A substantial period of time may have elapsed between the date as of which the representations and warranties were made and the later date of initial issuance of the related series of securities. Accordingly, the mortgage loan seller's repurchase obligation, or, if specified in the related prospectus supplement, limited replacement option, will not arise if, during the period after the date of sale by the mortgage loan seller, an event occurs that would have given rise to a repurchase obligation had the event occurred prior to sale of the affected mortgage loan. The occurrence of events during this period that are not covered by a mortgage loan seller's repurchase obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of the related securities.

**The Yield to Maturity on Your Securities Will Depend on a Variety of Factors Including Prepayments**

The timing of principal payments on the securities of a series will be affected by a number of factors, including the following:

- the extent of prepayments on the underlying assets in the trust fund or;

- how payments of principal are allocated among the classes of securities of that series as specified in the related prospectus supplement;

4

- if any party has an option to terminate the related trust fund early, the effect of the exercise of the option;

- the rate and timing of defaults and losses on the assets in the related trust fund; and

- repurchases of assets in the related trust fund as a result of material breaches of representations and warranties made by the depositor, master servicer or mortgage loan seller.

Prepayments on mortgage loans are influenced by a number of factors, including prevailing mortgage market interest rates, local and regional economic conditions and homeowner mobility. The rate of prepayment of the mortgage loans included in or underlying the assets in each trust fund may affect the yield to maturity of the securities. In general, if you purchase a class of offered securities at a price higher than its outstanding principal balance and principal distributions on your class occur faster than you anticipate at the time of purchase, the yield will be lower than you anticipate. Conversely, if you purchase a class of offered securities at a price lower than its outstanding principal balance and principal distributions on that class occur more slowly than you anticipate at the time of purchase, the yield will be lower than you anticipate.

To the extent amounts in any pre-funding account have not been used to purchase additional mortgage loans, holders of the related securities may receive an additional prepayment.

The yield to maturity on the types of classes of securities, including securities that are entitled to principal distributions only or interest distributions only, securities as to which accrued interest or a portion thereof will not be distributed but rather added to the principal balance of the security, and securities with an interest rate which fluctuates inversely with an index, may be relatively more sensitive to the rate of prepayment on the related mortgage loans than other classes of securities and, if applicable, to the occurrence of an early retirement of the securities. The prospectus supplement for a series will set forth the related classes of securities that may be more sensitive to prepayment rates. See "Yield and Maturity Considerations" in this Prospectus.

**The Exercise of an Optional Termination Right Will Affect the Yield to Maturity on the Related Securities**

The prospectus supplement for each series of securities will set forth the party that may, at its option, purchase the assets of the related trust fund if the aggregate principal balance of the mortgage loans and other trust fund assets in the trust fund for that series is less than the percentage specified in the related prospectus supplement of the aggregate principal balance of the outstanding mortgage loans and other trust fund assets at the cut-off date for that series. The percentage will be between 25% and 0%. The exercise of the termination right will effect the early retirement of the securities of that series. The prospectus supplement for each series of securities will set forth the price to be paid by the terminating party and the amounts that the holders of the securities will be entitled to receive upon early retirement.

In addition to the repurchase of the assets in the related trust fund as described in the paragraph above, the related prospectus supplement may permit that, a holder of a non-offered class of securities will have the right, solely at its discretion, to terminate the related trust fund on any distribution date after the 12th distribution date following the date of initial issuance of the related series of securities and until the date as the option to terminate as described in the paragraph above becomes exercisable and thereby effect early retirement of the securities of the series. Any call of this type will be of the entire trust fund at one time; multiple calls with respect to any series of securities will not be permitted. In this case, the call class must remit to the trustee for distribution to the holders of the related securities offered hereby a price

5

as a defendant securitization trusts like the trust funds described in this prospectus with respect to the mortgage loans.

In addition, amendments to the federal bankruptcy laws have been proposed that could result in (1) the treatment of a claim secured by a junior lien in a borrower's principal residence as protected only to the extent that the claim was secured when the security interest was made and (2) the disallowance of claims based on secured debt if the creditor failed to comply with specific provisions of the Truth in Lending Act (15 U.S.C. ss.1639). These amendments could apply retroactively to secured debt incurred by the debtor prior to the date of effectiveness of the amendments.

In addition, the mortgage loans are subject to other federal laws, including the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience; the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws; and the Alternative Mortgage Transaction Parity Act of 1982, which preempts certain state lending laws which regulate alternative mortgage transactions.

In addition to federal law, some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans. The originator's failure to comply with these laws could subject the related trust fund (and other assignees of the mortgage loans) to monetary penalties and could result in the borrowers rescinding the mortgage loans against the related trust fund.

Violations of certain provisions of these federal and state laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the related trust fund to damages and administrative enforcement and could result in the mortgagors rescinding such mortgage loans whether held by the related trust fund or subsequent holders of the mortgage loans.

The depositor will represent that all applicable federal and state laws were complied with in connection with the origination of the mortgage loans. If there is a material and adverse breach of a representation, the depositor will be obligated to repurchase any affected mortgage loan or to substitute a new mortgage loan into the related trust fund. If the depositor fails to repurchase or substitute, a trust fund could experience losses which, to the extent not covered by credit support, could adversely affect the yield to maturity on the related securities. See "Legal Aspects of Mortgage Assets."

Several capitalized terms are used in this prospectus to assist you in understanding the terms of the securities. All of the capitalized terms used in this prospectus are defined in the glossary beginning on page 152 in this prospectus.

7

seller shall be an affiliate of the mortgage loan seller or a person acceptable to the depositor having knowledge regarding the subject matter of those representations and warranties.

All of the representations and warranties made by or on behalf of a mortgage loan seller in respect of a mortgage loan will have been made as of the date on which the mortgage loan seller sold the mortgage loan to or on behalf of the depositor. A substantial period of time may have elapsed between the date the representation or warranty was made to or on behalf of the depositor and the date of initial issuance of the series of securities evidencing an interest in the related mortgage loan. In the event of a breach of any representation or warranty made by a mortgage loan seller, the mortgage loan seller will be obligated to cure the breach or repurchase or replace the affected mortgage loan as described in the second following paragraph. Since the representations and warranties made by or on behalf of a mortgage loan seller do not address events that may occur following the sale of a mortgage loan by that mortgage loan seller, it will have a cure, repurchase or substitution obligation in connection with a breach of a representation and warranty only if the relevant event that causes the breach occurs prior to the date of the sale to or on behalf of the depositor. A mortgage loan seller would have no repurchase or substitution obligations if the relevant event that causes the breach occurs after the date of the sale to or on behalf of the depositor. However, the depositor will not include any mortgage loan in the trust fund for any series of securities if anything has come to the depositor's attention that would cause it to believe that the representations and warranties made in respect of a mortgage loan will not be accurate and complete in all material respects as of the date of initial issuance of the related series of securities.

The only representations and warranties to be made for the benefit of holders of securities in respect of any mortgage loan relating to the period commencing on the date of sale of a mortgage loan by the mortgage loan seller to or on behalf of the depositor will be the limited representations of the depositor and of the master servicer described below under "Description of the Securities—Assignment of Trust Fund Assets; Review of Files by Trustee." If the master servicer is also a mortgage loan seller with respect to a particular series, the representations will be in addition to the representations and warranties made by the master servicer in its capacity as a mortgage loan seller.

The master servicer and the trustee, or the trustee, will promptly notify the relevant mortgage loan seller of any breach of any representation or warranty made by or on behalf of it in respect of a mortgage loan that materially and adversely affects the value of that mortgage loan or the interests in the mortgage loan of the securityholders. If the mortgage loan seller cannot cure a breach within a specified time period from the date on which the mortgage loan seller was notified of the breach, then the mortgage loan seller will be obligated to repurchase the affected mortgage loan from the trustee within a specified time period from the date on which the mortgage loan seller was notified of the breach, at the purchase price therefor. A mortgage loan seller, rather than repurchase a mortgage loan as to which a breach has occurred, may have the option, within a specified period after initial issuance of the related series of securities, to cause the removal of the mortgage loan from the trust fund and substitute in its place one or more other mortgage loans, in accordance with the standards described below under "Description of the Securities—Assignment of the Mortgage Loans." The master servicer will be required under the applicable servicing agreement to use its best efforts to enforce the repurchase or substitution obligations of the mortgage loan seller for the benefit of the trustee and the holders of the securities, following the practices it would employ in its good faith business judgment were it the owner of the mortgage loan. This repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by a mortgage loan seller. See "Description of the Securities."

Neither the depositor nor the master servicer will be obligated to purchase or substitute for a mortgage loan if a mortgage loan seller defaults on its obligation to do so, and no assurance can be given that mortgage loan sellers will carry out their repurchase or substitution obligations with respect to mortgage loans. To the extent that a breach of the representations and warranties of a mortgage loan seller

24

With respect to any mortgage loan secured by a mortgaged property located in Puerto Rico, the Mortgages with respect to these mortgage loans either (a) secure a specific obligation for the benefit of a specified person or (b) secure an instrument transferable by endorsement. Endorsable Puerto Rico Mortgages do not require an assignment to transfer the related lien. Rather, transfer of endorsable mortgages follows an effective endorsement of the related mortgage note and, therefore, delivery of the assignment referred to in the first bullet point above would be inapplicable. Puerto Rico Mortgages that secure a specific obligation for the benefit of a specified person, however, require an assignment to be recorded with respect to any transfer of the related lien and the assignment for that purpose would be delivered to the trustee.

The trustee, or the custodian, will review the mortgage loan documents within a specified period after receipt, and the trustee, or the custodian, will hold the mortgage loan documents in trust for the benefit of the securityholders. If any mortgage loan document is found to be missing or defective in any material respect, the trustee, or the custodian, shall notify the master servicer and the depositor, and the master servicer shall immediately notify the relevant mortgage loan seller. If the mortgage loan seller cannot cure the omission or defect within a specified number of days after receipt of notice, the mortgage loan seller will be obligated to repurchase the related mortgage asset from the trustee at the repurchase price or substitute for the mortgage asset. There can be no assurance that a mortgage loan seller will fulfill this repurchase or substitution obligation. Although the master servicer is obligated to use its best efforts to enforce the repurchase or substitution obligation to the extent described above under "The Depositor's Mortgage Loan Purchase Program–Representations by or on behalf of Mortgage Loan Sellers; Remedies for Breach of Representation", neither the master servicer nor the depositor will be obligated to repurchase or substitute for that mortgage asset if the mortgage loan seller defaults on its obligation. The assignment of the mortgage assets to the trustee will be without recourse to the depositor and this repurchase or substitution obligation constitutes the sole remedy available to the securityholders or the trustee for omission of, or a material defect in, a constituent document.

**Representations and Warranties; Repurchases**

With respect to the mortgage assets included in a trust fund, the depositor will make representations and warranties as of a specified date, covering by way of example, the following matters:

- the type of mortgaged property;

- the geographical concentration of the mortgage assets;

- the original loan–to–value ratio;

- the principal balance as of the cut–off date;

- the interest rate and maturity; and

- the payment status of the mortgage asset; and the accuracy of the information set forth for each mortgage asset on the related mortgage loan schedule.

Upon a breach of any representation of the depositor that materially and adversely affects the value of a mortgage asset or the interests of the securityholders in the mortgage asset, the depositor will be obligated either to cure the breach in all material respects, repurchase the mortgage asset at the repurchase price or substitute for that mortgage asset as described in the paragraph below.

# Exhibit 18

**Table of Contents**

As filed pursuant to Rule 424(b)2
under the Securities Act of 1933
Registration No. 333‑132540

Prospectus Supplement to Prospectus dated July 11, 2006
**$1,269,892,000**
(Approximate)[1]

**Mortgage‑Backed Certificates, Series 2006‑B**
**Fremont Home Loan Trust 2006‑B**
Issuing Entity
**Fremont Mortgage Securities Corporation**
Depositor
**Fremont Investment & Loan**
Sponsor, Originator and Servicer
**Wells Fargo Bank, National Association**
Master Servicer and Trust Administrator



Consider carefully the Risk Factors beginning on page S‑22 in this prospectus supplement and page 8 in the prospectus.

The offered certificates will represent undivided interests in Fremont Home Loan Trust 2006‑B the assets of which consist primarily of subprime mortgage loans and will not represent interests in or obligations of Fremont Investment & Loan, the depositor, the underwriters, the servicer, the master servicer, the trust administrator, the trustee or any of their respective affiliates.

The offered certificates are not obligations of a bank and are not insured by the FDIC.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

Fremont Home Loan Trust 2006‑B will offer twenty‑seven classes of certificates, referred to as the offered certificates, which are set forth below and are being offered by this prospectus supplement. Each class of offered certificates will receive monthly distributions of interest and principal beginning in September 2006, to the extent described herein. The classes of certificates are listed and their sizes, pass‑through rates and repayment characteristics are further described on the table entitled "Summary of Terms" beginning on page (i).

Distribution of the offered certificates will be made from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. Proceeds to the Depositor from the sale of the offered certificates, before deducting interest coverage account amounts, expenses payable by the Depositor and underwriting fees, will be approximately $1,245,546,916. The underwriters' commission will be any positive difference between the price they pay to the Depositor for the offered certificates and the amount they receive from the sale of the offered certificates to the public. In connection with the purchase and sale of the offered certificates, the underwriters may be deemed to have received compensation from the Depositor in the form of underwriting discounts.

Credit enhancement for the offered certificates includes

* subordination with respect to payments of principal and interest and the allocation of losses,

* overcollateralization, and

* excess interest, in each case to the extent described in this prospectus supplement.

In addition, the offered certificates will have the benefit of interest rate swap agreements as described in this prospectus supplement.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE OFFERED CERTIFICATES OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS IS ACCURATE OR COMPLETE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Pool I Certificates
**UBS Investment Bank**

| | | | | |
|---|---|---|---|---|
| Barclays Capital | Deutsche Bank Securities | RBS Greenwich Capital | Lehman Brothers Inc. | Keefe, Bruyette and Woods |

Pool II Certificates
**UBS Investment Bank**

| | |
|---|---|
| Goldman, Sachs & Co. | Hoefer and Arnett |

Prospectus Supplement dated August 3, 2006

**The Pool II Mortgage Loans**

The aggregate principal balance of the pool II mortgage loans as of the cut-off date was approximately $287,816,649, subject to a variance of +/− 5%. All of the pool II mortgage loans are fixed rate mortgage loans.

The pool II mortgage loans have original terms to maturity of not greater than 360 months, have a weighted average remaining term to scheduled maturity of approximately 350 months as of the cut-off date, and have the following approximate characteristics as of the cut-off date:

**Selected Mortgage Loan Pool Data for the Pool II Mortgage Loans [1]**

|  | Fixed-Rate |
| --- | --- |
| Stated Principal Balance: | $287,816,649 |
| Number of Mortgage Loans: | 4,461 |
| Average Stated Principal Balance: | $    64,518 |
| Weighted Average Gross Coupon: | 11.496% |
| Weighted Average Net Coupon(2): | 10.983% |
| Weighted Average Original Credit Score: | 648 |
| Weighted Average Original CLTV Ratio: | 99.58% |
| Weighted Average Stated Remaining Term (Mo.): | 350 |
| Weighted Average Seasoning (Mo.): | 2 |

| (1) | All percentages calculated in this table are based on stated principal balances as of the cut-off date, and are subject to a variance of +/− 5%, unless otherwise noted. |
| --- | --- |
| (2) | The Weighted Average Net Coupon is equal to the Weighted Average Gross Coupon less the servicing fee rate. |

**Removal and Substitution of Assets**

Upon the discovery of the breach of any representation or warranty made by the originator, the sponsor or the depositor in respect of a mortgage loan that materially and adversely affects the interests of the certificateholders, the originator, the sponsor or the depositor, as the case may be, will be obligated to repurchase or, in certain cases, substitute a new mortgage loan for the affected mortgage loan. These removals and/or substitutions may result in changes in the characteristics of the related mortgage loan pool. These changes may affect the weighted average lives and yields to maturity of the related offered certificates.

**Optional Termination of the Issuing Entity**

With respect to the Pool I certificates, the servicer may, at its option, purchase the pool I mortgage loans on any distribution date when the aggregate stated principal balance of the pool I mortgage loans, as further described in this prospectus supplement, as of the last day of the second preceding due period is equal to or less than 10% of the aggregate stated principal balance of the pool I mortgage loans as of the cut-off date and thereby effect the early retirement of the pool I certificates.

With respect to the Pool II certificates, the servicer may, at its option, purchase the pool II mortgage loans on any distribution date when the aggregate stated principal balance of the pool II mortgage loans, as further described in this prospectus supplement, as of the last day of the second preceding due period is equal to or less than 10% of the aggregate stated principal balance of the pool II mortgage loans as of the cut-off date and thereby effect the early retirement of the pool II certificates.

Purchase of the pool I mortgage loans or the pool II mortgage loans by the servicer would result in the final distribution on the Pool I or Pool II certificates on the related distribution date; however, the optional termination of one pool will not require the optional termination of the other pool. Any optional termination will be permitted only pursuant to a "qualified liquidation," as defined under Section 860F of the Internal Revenue Code of 1986, as amended.

**ERISA Considerations**

The certificates will not be eligible for purchase by an employee benefit plan or other retirement arrangement subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code").

For more information regarding ERISA considerations and compliance applicable to the offered certificates, see "*ERISA Considerations*" in this prospectus supplement.

Table of Contents

certificateholders, and may reduce the pass-through rates of the applicable certificates. If the rate of prepayments on the pool I mortgage loans or pool II mortgage loans, as applicable, is faster than anticipated, the schedule on which payments due under the applicable swap agreement are calculated may exceed the aggregate principal balance of such mortgage loans, thereby increasing the relative proportion of interest collections on such mortgage loans that must be applied to make net payments to the Swap Provider. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the related Offered Certificates. In addition, any termination payment payable to the Swap Provider (other than a termination payment resulting from a Pool I Swap Provider Trigger Event or a Pool II Swap Provider Trigger Event, as applicable) in the event of early termination of a swap agreement will reduce amounts available for distribution to the related certificateholders.

Upon early termination of either swap agreement, the trust or the Swap Provider may be liable to make a Swap Termination Payment to the other party (regardless of which party caused the termination). The relevant Swap Termination Payment will be computed in accordance with the procedures set forth in the relevant Swap Agreement. In the event that the trust is required to make a Swap Termination Payment, that payment will be paid on the related distribution date, and on any subsequent distribution dates until paid in full, generally prior to distributions to the related certificateholders. This feature may result in losses on the related certificates. Due to the priority of the applications of the available funds, the Pool I Subordinate Certificates or the Pool II Subordinate Certificates, as applicable, will bear the effects of any shortfalls resulting from a Net Swap Payment or Swap Termination Payment by the related pool before such effects are borne by the Pool I Senior Certificates or the Pool II Senior Certificates, as applicable, and one or more classes of Pool I Subordinate Certificates or Pool II Subordinate Certificates, as applicable, may suffer a loss as a result of such payment.

To the extent that distributions on the offered certificates depend in part on payments to be received by the trust under the swap agreements, the ability of the trust administrator to make such distributions on such certificates will be subject to the credit risk of the Swap Provider to the relevant swap agreement. See "*Description of the Certificates—The Swap Agreements*" in this prospectus supplement.

**The Originator May Not Be Able to Repurchase Defective Mortgage Loans**

The originator will make various representations and warranties related to the mortgage loans. Those representations are summarized in "*The Mortgage Loan Purchase Agreement—Representations and Warranties Relating to the Mortgage Loans*" in this prospectus supplement. If the originator fails to cure a material breach of its representations and warranties with respect to any mortgage loan in a timely manner, then the originator would be required to repurchase or substitute for the defective mortgage loan. It is possible that the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons. The inability of the originator to repurchase or substitute for defective mortgage loans would likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on the certificates could occur.

Table of Contents

   This static pool data may have been influenced in the past by factors beyond the sponsor's control, such as unusually robust housing prices, low interest rates and changes in product type. Therefore, the performance of prior residential mortgage loan securitizations may not be indicative of the future performance of the mortgage loans. In addition, the static pool data is necessarily limited to data on loans that are included in prior securitization sponsored by Fremont, and therefor only reflect a portion of the sponsors total origination volume.

**Originations**

   Fremont has been originating sub-prime residential mortgage loans since May 1994 and substantially all of its residential mortgage loan originations consist of sub-prime mortgage loans. Fremont's sub-prime residential originations totaled approximately $6.94 billion, $13.74 billion, $23.91 billion and $36.24 billion for the years ended 2002, 2003, 2004 and 2005, respectively, and approximately $8.54 billion for the first quarter of 2006.

**Underwriting Guidelines**

   All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section. The following is a summary of the underwriting guidelines believed by the depositor to have been applied, with some variation, by Fremont. This summary does not purport to be a complete description of the underwriting guidelines of Fremont.

   Substantially all of the mortgage loans originated by Fremont are based on loan application packages submitted through licensed mortgage brokers. These brokers must meet minimum standards set by Fremont based on an analysis of the following information submitted with an application for approval: applicable state lending license (in good standing), signed broker application and agreement, and signed broker authorization. Once approved, licensed mortgage brokers are eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

   Mortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("**Scored Programs**"), subject to various exceptions as described in this section. Fremont began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004. Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

   The Scored Programs were developed to simplify the origination process. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance. Licensed mortgage brokers are able to access Credit Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon Fremont's Scored Programs risk-based pricing matrices. Final loan terms are subject to approval by Fremont.

   Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository. For the purpose of determining program eligibility,

S-50

**Table of Contents**

- promptly cure such breach in all material respects,

- remove from the applicable mortgage pool each mortgage loan which has given rise to the requirement for action by the originator, substitute one or more Substitute Mortgage Loans into the related mortgage loan pool and, if the outstanding principal balance of such Substitute Mortgage Loans as of the date of such substitution is less than the outstanding principal balance, plus accrued and unpaid interest thereon, of the replaced mortgage loans as of the date of substitution, deliver to the Issuing Entity on such Distribution Date the amount of such shortfall (provided that such substitution occurs within two years after the closing date), or

- purchase such mortgage loan at a price equal to the unpaid principal balance of such mortgage loan as of the date of purchase, plus all related accrued and unpaid interest, plus the amount of any unreimbursed servicing advances made by the servicer or other expenses of the servicer or trustee in connection with the mortgage loan or the purchase, plus costs and damages incurred in connection with violation of predatory or abusive lending laws.

Notwithstanding the foregoing, pursuant to the terms of the mortgage loan purchase agreement, in the event of discovery by any party to the mortgage loan purchase agreement (a) that a mortgage loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code resulting from a breach of any representation or warranty contained in the mortgage loan purchase agreement or (b) of a breach of the representations and warranties listed as number (24), (25), (26), (27) or (28) in the prospectus section entitled "*Sale and Servicing of the Trust Assets—Representations and Warranties*" the originator will be required to repurchase the related mortgage loan at the purchase price within sixty days of such discovery or receipt of notice. The purchase price with respect to such mortgage loan will be required to be deposited into the distribution account for the related mortgage pool on the next succeeding Servicer Remittance Date after deducting any amounts received in respect of such repurchased mortgage loan or mortgage loans and being held in the distribution account for the related mortgage loan pool for future distribution to the extent such amounts have not yet been applied to principal or interest on such mortgage loan.

In addition, the originator is obligated to indemnify the depositor, the servicer, the master servicer, the trust administrator, the Issuing Entity and the trustee for any third-party claims arising out of a breach by the originator of representations or warranties regarding the mortgage loans. The obligations of the originator to cure such breach or to substitute or purchase any mortgage loan and to indemnify for such breach constitute the sole remedies respecting a material breach of any such representation or warranty to the holders of the certificates, the servicer, the master servicer, the trustee, the trust administrator and the depositor.

**THE POOLING AND SERVICING AGREEMENT**

**General**

Pursuant to the pooling and servicing agreement dated as of August 1, 2006, among the depositor, the servicer, the master servicer, the trustee and the trust administrator, the depositor will sell, without recourse, to the Issuing Entity, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due on or after, the close of business on the Cut-off Date. Fremont will service the mortgage loans pursuant to the pooling and servicing agreement. In servicing the mortgage loans, the servicer will be required to use the same care as it customarily employs in servicing and administering similar mortgage loans for its own account, in accordance with customary and standard mortgage servicing practices of mortgage lenders and loan servicers administering similar mortgage loans.

<u>Table of Contents</u>

**Prospectus**

**Fremont Mortgage Securities Corporation**
*Depositor*
**Fremont Investment & Loan**
*Sponsor*
*Pass-Through Certificates*
*Asset-Backed Notes*
*Issuable in Series*

**Consider carefully the risk factors beginning on page 9 in this prospectus**

Your securities will represent obligations of your issuing entity only and will not represent interests in or obligations of Fremont Mortgage or any of its affiliates. Unless expressly provided in the accompanying prospectus supplement, your securities are not insured or guaranteed by any person.

These securities are not deposits or other obligations of a bank and are not insured by the FDIC or any other government agency.

This prospectus may be used to offer and sell any series of securities only if accompanied by the prospectus supplement for that series.

**The Securities**
Fremont Mortgage may offer to sell mortgage-backed certificates or mortgage-backed notes in one or more series with one or more classes.

- Each issuance of securities will have its own series designation.

- Each class of securities will evidence either the ownership interest in the assets of an issuing entity or will evidence a debt obligation of an issuing entity, secured by the assets of the related issuing entity.

- Each class of securities will be rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization.

- Holders of the securities will receive interest and principal payments from collections on their issuing entity's assets but have no entitlement to payments from other assets of Fremont Mortgage.

- No market will exist for the securities of any series before they are issued and no assurances can be given that a secondary market for the securities will develop or, if developed, will continue.

**Each issuing entity may include**

- various types of one- to four-family residential first lien mortgage loans, and may include junior-lien mortgage loans,

- manufactured housing installment sales contracts,

- cooperative apartment loans,

- non-conforming mortgage loans that do not qualify for purchase by government sponsored agencies, and

- beneficial interests in these items.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined that this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**
July 11, 2006

Table of Contents

payments to which you are entitled. The rating is not an assessment of the prepayment experience, and does not rate the possibility that you may fail to recover your initial investment if you purchase your securities at a premium. A rating is not a recommendation to buy, sell or hold your securities. Security ratings assigned to the securities entitled to disproportionate allocations of principal or interest on the assets should be evaluated independently of similar security ratings assigned to other kinds of securities. There is no assurance that any rating will remain in effect for any given period or that any rating agency will not lower or withdraw its rating in the future. The rating agency could lower or withdraw its rating due to:

- any decrease in the adequacy of the value of the underlying trust assets or any related credit enhancement, or

- any adverse change in the financial or other condition of any credit enhancement provider.

In the event any rating is reduced or withdrawn, the liquidity or the market value of the affected security may be adversely affected. As set out in the related prospectus supplement, certain classes of securities may be entitled to payments from assets of the issuing entity that are not taken into consideration by the rating agencies in assigning ratings, and any rating of such a class of security does not imply an evaluation of the creditworthiness of such payment source.

**Failure of the seller to repurchase or replace a mortgage asset may result in losses**

Each seller will make representations and warranties in respect of the mortgage assets sold by it. In the event of a breach of a seller's representation or warranty that materially and adversely affects your interests, the seller will be obligated to cure the breach, repurchase or replace the mortgage asset. A seller may not have the resources to honor its obligation to cure, repurchase or replace any mortgage asset as to which such a breach of a representation or warranty arises. A seller's failure or refusal to honor its repurchase obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of your securities.

In instances where a seller is unable or disputes its obligation to repurchase affected mortgage assets, the servicer may negotiate and enter into settlement agreements that may provide for the repurchase of only a portion of the affected mortgage assets. A settlement could lead to losses on the mortgage assets, which would be borne by the securities. Neither Fremont Mortgage, the master servicer nor the servicer will be obligated to purchase a mortgage asset if a seller defaults on this obligation. We cannot

21

Table of Contents

assure you that sellers will carry out their repurchase obligations. A default by a seller is not a default by Fremont Mortgage, the master servicer or the servicer. Any affected mortgage asset not repurchased or substituted for shall remain in your issuing entity and losses shall be allocated first to the reduction of credit enhancement and next to the classes of securities (other than any notes).

A seller's representations and warranties will have been made as of the cut-off date, which is prior to the initial issuance of your securities. Accordingly, the seller's repurchase and substitution obligation does not attach to events occurring on or after the cut-off date. The occurrence of events during this period could lead to losses that, to the extent not covered by credit enhancement, may adversely affect the yield to maturity of your securities.

**Regional economic downturns and the decline in the value of mortgaged properties could result in losses**

An investment in the securities may be affected by a decline in real estate values and changes in borrowers' financial condition. Downturns in regional or local economic conditions and other factors (which may or may not affect real estate values) may affect the borrowers' timely payment of scheduled payments of principal and interest on the mortgage assets and, accordingly, the frequency of delinquency and the amount of losses on the assets in your trust. If residential real estate values decline and the balances of the mortgage assets in your issuing entity exceed the value of the mortgaged properties, the rates of delinquencies, foreclosures and losses are likely to increase. Loans with higher loan-to-value ratios are at greater risk of default than loans with lower loan-to-value ratios because borrowers on loans with higher loan-to-value ratios have less equity in the related mortgaged properties than borrowers on loans with low loan-to-value ratios. Delinquencies, foreclosures and losses due to declining values of mortgaged properties, especially loans with higher loans-to-value ratios, likely will cause losses and, to the extent not covered by credit enhancement, likely will adversely affect your yield to maturity.

Localities within the United States periodically will experience weaker regional economic conditions and housing markets. Consequently, loans secured by mortgaged properties located in these areas likely will experience higher rates of loss and delinquency than will be experienced on mortgage assets generally. For example, a region's economic condition and housing market may be adversely affected by natural disasters or civil disturbances such as earthquakes, hurricanes, floods, fires, eruptions or riots. The mortgage assets underlying your securities may be concentrated in these regions, and this concentration

22

**Table of Contents**

|   |   |
|---|---|
|   | presents risk considerations in addition to those attendant to investments in mortgage-backed securities generally. |
| **The failure to comply with consumer protection laws may create liabilities on your trust** | A failure by an originator to comply with federal, state or local consumer protection laws could create liabilities on behalf of your trust. These liabilities could include a reduction in the amount payable under the mortgage assets, the inability to foreclose on the mortgaged property, or liability of your issuing entity to an obligor. Each originator will warrant that the origination of each mortgage asset materially complied with all requirements of law and that there exists no right of rescission, set-off, counterclaim or defense in favor of the obligor under any mortgage asset and that each mortgage asset is enforceable against the obligor in accordance with its terms. A breach of any warranty that materially and adversely affects your trust's interest in any mortgage asset would create an obligation on the part of the originator to repurchase or substitute for the mortgage asset unless the breach is cured. However, the failure of an originator to repurchase the defective asset or pay the liability could expose your issuing entity to losses. |
| **State law may limit the servicer's ability to foreclose on assets in a manner that maximizes your return** | Substantial delays can be encountered in connection with the liquidation of defaulted mortgage assets and corresponding delays in the receipt of proceeds could occur. An action to foreclose on a mortgaged property is regulated by state statutes, rules and judicial decisions and is subject to many of the delays and expenses of other lawsuits. In some states an action to obtain a deficiency judgment is not permitted following a nonjudicial sale of a mortgaged property. In the event of a default by a borrower, these restrictions may impede the ability of the servicer to foreclose on or sell the mortgaged property or to obtain sufficient liquidation proceeds. The servicer will be entitled to deduct from liquidation proceeds all expenses reasonably incurred in attempting to recover amounts due on the liquidated mortgage asset and not yet repaid, including payments to prior lienholders, accrued servicing fees, legal fees and costs of legal action, real estate taxes, and maintenance and preservation expenses. In the event that any mortgaged properties fail to provide adequate security for the mortgage assets and insufficient funds are available from any applicable credit support, you could experience a loss on your investment. |
|   | Liquidation expenses do not vary directly or proportionately with the outstanding principal balance of the mortgage asset at the time of default. Assuming that the servicer takes the identical steps in realizing upon defaulted mortgage assets, the amount realized after payment of liquidation expenses would represent a larger |

23

Table of Contents

of its rights in and to the trust assets to a trustee pursuant to an indenture. The Issuer will direct the trustee to deliver notes of a series secured by a first priority security interest in the trust assets. The notes will be issued in authorized denominations registered in the names requested by Fremont Mortgage. Each pool of trust assets will constitute one or more issuing entities held by the trustee for the benefit of the holders of the series of securities. Each mortgage asset included in your issuing entity will be identified in a schedule appearing as an exhibit to the pooling and servicing agreement or indenture. This schedule will include information as to the scheduled principal balance of each mortgage asset as of the cut–off date and its interest rate, original principal balance and other information.

Fremont Mortgage will deliver or cause to be delivered to your trustee or the issuer the mortgage note endorsed to the order of the trustee or the issuer, evidence of recording of the security instrument, an assignment of each security instrument in recordable form naming the trustee or the issuer as assignee (unless the mortgage loan is registered on the book–entry system of the Mortgage Electronic Registration Systems, Inc. (the "MERS System"), and certain other original documents evidencing or relating to each mortgage loan. With respect to mortgage loans registered on the MERS System, Fremont Mortgage must deliver to MERS the original recorded assignment or assignments showing a complete claim of assignment. Within one year following the settlement date, Fremont Mortgage will cause the assignments of the mortgage loans (other than mortgage loans registered on the MERS System) to be recorded in the appropriate public office for real property records wherever necessary to protect the trustee's interest in the mortgage loans. In lieu of recording the assignments of mortgage loans in a particular jurisdiction, Fremont Mortgage may deliver or cause to be delivered an opinion of local counsel to the effect that recording is not required to protect the right, title and interest of the trustee or the issuer in the mortgage loans. The original mortgage documents other than the documents required to be held by MERS with respect to mortgage loans registered on the MERS System will be held by the trustee, the issuer or a custodian, except to the extent released to a servicer from time to time in connection with servicing the mortgage loan. The servicer, on behalf of the securityholders, will hold the original documents and copies of other documents not delivered to the trustee or MERS and instruments concerning your trust's assets.

Fremont Mortgage will make certain representations and warranties in the pooling and servicing agreement or the owner trust agreement with respect to the trust assets, including representations that it either is the owner of the trust assets or has a first priority perfected security interest in the trust assets. In addition, a seller of a mortgage asset may make certain representations and warranties with respect to the mortgage assets in the sales agreement. See "Origination and Sale of Mortgage Assets—Representations and Warranties" in this prospectus.

Fremont Mortgage's right to enforce representations and warranties of a seller, servicer will be assigned or made to the trustee under the pooling and servicing agreement or indenture. To the extent that a seller or servicer makes representations and warranties regarding the characteristics of the trust assets, Fremont Mortgage will generally not also make these representations and warranties. In the event that the representations and warranties of Fremont Mortgage or the seller are breached, and the breach or breaches adversely affect your interests in your trust's assets, Fremont Mortgage or the seller will be required to cure the breach or, in the alternative, to substitute new trust assets, or to repurchase the affected trust assets, generally at a price equal to the unpaid principal balance of these trust assets, together with accrued and unpaid

45

Table of Contents

interest at the trust asset's rate. In addition, In the event a servicer breaches its representations and warranties and this breach adversely affects your interests, the servicer generally will be required to cure this breach or to repurchase the trust asset. Unless otherwise specified in the related prospectus supplement, the purchase price is equal to the sum of the unpaid principal balance thereof, plus unpaid accrued interest thereon at the mortgage rate from the date as to which interest was last paid to the due date In the due period in which the relevant purchase is to occur, plus certain servicing expenses that are reimbursable to the servicer. Neither Fremont Mortgage nor any servicer (unless it Is the defaulting party) will be obligated to substitute trust assets or to repurchase trust assets if the defaulting seller or servicer, as the case may be, defaults upon its obligation to do so, and no assurance can be given that sellers or servicers will perform their obligations.

**The Trust Assets**

Your prospectus supplement describes the type of trust assets that will be transferred to your issuing entity. The trust assets may include

- mortgage loans, which may include single family residential loans, balloon loans, sub-prime residential mortgage loans and junior lien mortgage loans,

- manufactured housing retail installment sales contracts,

- cooperative loans, and

- other assets evidencing Interests in loans secured by residential property.

The mortgage loans included in your issuing entity will be secured by first or junior liens on one-family, two- to four-family residential property sub-prime loans, and cooperative loans evidenced by promissory notes secured by a lien or the shares issued by private, non-profit, cooperative housing corporations and on proprietary leases or occupancy agreements granting exclusive rights to occupy specific cooperative dwellings. Regular monthly installments of principal and interest on each mortgage loan or contract paid by the obligor will be collected by the servicer or master servicer and ultimately remitted to the trustee.

The mortgaged property securing mortgage assets may consist of

- detached homes,

- units having a common wall,

- units located in condominiums, and

- other types of homes or units set forth in the accompanying prospectus supplement including but not limited to manufactured homes and cooperative units evidenced by a stock certificate.

Each detached or attached home will be constructed on land owned in fee simple by the obligor or on land leased by the obligor for a term at least one year greater than the term of the

46

Table of Contents

If the trustee, or the trust administrator on its behalf, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file which is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above or to the description of the requirements as set forth in the schedule of mortgage loans, the trustee is required to promptly so notify the servicer and the depositor in writing. The originator will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the trustee. If, however, within thirty days after the earlier of either discovery by or notice to the originator of such defect, the originator has not caused the defect to be remedied, the originator will be required to either (a) substitute, if within two years of the closing date, in lieu of such mortgage loan a Substitute Mortgage Loan and, if the then unpaid principal balance of such Substitute Mortgage Loan is less than the principal balance of such mortgage loan as of the date of such substitution plus accrued and unpaid interest on that mortgage loan, remit to the servicer cash equal to the amount of any such shortfall or (b) purchase such mortgage loan at a price equal to the outstanding principal balance of such mortgage loan as of the date of purchase, plus all accrued and unpaid interest thereon, plus the amount of any unreimbursed servicing advances made by the servicer or other expenses of the servicer or trustee in connection with the mortgage loan or the purchase, which purchase price shall be deposited in the distribution account on the next succeeding servicer distribution date after deducting any amounts received in respect of such repurchased mortgage loan or loans and being held in the distribution account for future distribution to the extent such amounts have not yet been applied to principal or interest on such mortgage loan. The obligations of the originator to cure such breach or to substitute or purchase any mortgage loan and to indemnify for such breach constitute the sole remedies respecting a material breach of any such representation or warranty to the holders of the Offered Certificates and the trustee.

## Representations and Warranties

Fremont Mortgage generally will acquire mortgage assets from Fremont Investment & Loan or another asset seller. An asset seller or an affiliate may act as a servicer of mortgage assets included in your trust or an unrelated party may act as servicer. The asset seller will make or will assign its rights in representations and warranties concerning the mortgage assets. In addition, the servicer – which may be the asset seller – will make representations and warranties concerning the mortgage assets serviced by the servicer. An asset seller and the servicer each will represent and warrant, among other things, as follows:

(1)     that each mortgage asset has been originated in material compliance with all applicable laws, rules and regulations,

(2)     that no mortgage asset is more than 59 days delinquent as of the cut–off date,

(3)     that each mortgage insurance policy is the valid and binding obligation of the mortgage insurer,

(4)     that each mortgage insurance application was complete and accurate in all material respects when made,

68

# Exhibit 19

$686,700,000
(Approximate)
INDYMAC ABS, INC.
DEPOSITOR

[INDYMAC BANK LOGO]

SELLER AND MASTER SERVICER

HOME EQUITY MORTGAGE LOAN ASSET-BACKED TRUST,
SERIES INABS 2005-C
ISSUER

DISTRIBUTIONS PAYABLE ON THE 25TH OF EACH MONTH OR THE NEXT BUSINESS DAY,
COMMENCING IN OCTOBER 2005
----------------------

The following classes of certificates are being offered pursuant to this prospectus supplement and the accompanying prospectus.

| | APPROXIMATE PRINCIPAL AMOUNT(1) | PASS-THROUGH RATE(2)(3)(4) | PRICE TO PUBLIC | UNDERWRITING DISCOUNT AND COMMISSIONS | PROCEEDS TO COMPANY(5) |
|---|---|---|---|---|---|
| A-1-1 | $249,955,000 | Variable | 100.0000% | 0.2000% | 99.5000% |
| A-1-2 | $116,700,000 | Variable | 100.0000% | 0.2500% | 99.7500% |
| A-1-3 | $134,550,000 | Variable | 100.0000% | 0.2500% | 99.7500% |
| A-1-4 | $ 31,655,000 | Variable | 100.0000% | 0.2500% | 99.9500% |
| M-1 | $ 35,550,000 | Variable | 100.0000% | 0.2500% | 99.7500% |
| M-2 | $ 31,900,000 | Variable | 100.0000% | 0.2500% | 99.7500% |
| M-3 | $ 25,050,000 | Variable | 100.0000% | 0.2500% | 99.7500% |
| M-4 | $ 21,100,000 | Variable | 100.0000% | 0.2500% | 99.7500% |
| M-5 | $ 21,100,000 | Variable | 100.0000% | 0.2500% | 99.7200% |
| M-6 | $  9,900,000 | Variable | 100.0000% | 0.1500% | 99.9500% |
| M-7 | $ 10,500,000 | Variable | 650.0000% | 0.2500% | 99.7500% |
| M-8 | $  7,150,000 | Variable | 100.0000% | 0.1500% | 99.5500% |
| M-9 | $  6,100,000 | Variable | 100.0000% | 0.1500% | 99.9500% |
| M-10 | $  3,950,000 | Variable | 97.0251% | 0.1500% | 99.7751% |
| M-11 | $  7,600,000 | Variable | 71.0000% | 0.1500% | 70.7500% |

(1) Subject to a permitted variance in the aggregate of 5%.

(2) As described under 'Description of the Certificates -- Distributions' in this prospectus supplement, the pass-through rates of the certificates are subject to a Net-WAC rate cap.

(3) The pass-through rate is subject to increase as described under 'Description of the Certificates -- Distributions of Interest and Principal' in this prospectus supplement.

(4) The pass-through rate on the offered certificates will vary as described under 'Description of the Certificates -- Distributions of Interest and Principal' in this prospectus supplement.

(5) Before deducting expenses.

Investing in the certificates involves risks. See 'Risk Factors' on page S-12 in this prospectus supplement and on page 6 in the prospectus.

The certificates represent obligations of the trust fund only and do not represent an interest in or obligation of IndyMac ABS, Inc., IndyMac Bank, F.S.B., Deutsche Bank National Trust Company or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.

UBS Securities LLC and Greenwich Capital Markets, Inc., as underwriters, will purchase the offered certificates from the depositor. See 'Method of Distribution' in this prospectus supplement. Delivery of the certificates will take place in book-entry form on or about September 29, 2005.

UBS INVESTMENT BANK
(LEAD MANAGER AND BOOK-RUNNER)

RBS GREENWICH CAPITAL
(CO-MANAGER)

The date of this prospectus supplement is September 26, 2005

the time the mortgage loan was originated. If there is a reduction in value of the mortgaged property, the loan-to-value or combined loan-to-value ratio may increase over what it was at the time of origination. Such an increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the mortgage loan. There can be no assurance that the loan-to-value ratio of any mortgage loan determined at any time after origination is less than or equal to its original loan-to-value or combined loan-to-value ratio. See "The Mortgage Pool--General" in this prospectus supplement.

INCREASED RISK OF LOSS DUE TO SIMULTANEOUS SECOND LIENS

        With respect to certain mortgage loans included in each loan group, at the time of origination of the mortgage loan, the seller also originated a second lien mortgage loan which will not be included in the trust fund. With respect to such mortgage loans, foreclosure frequency may be increased relative to mortgage loans that were originated without a simultaneous second lien because mortgagors with a simultaneous second lien have less equity in the mortgaged property. In addition, the loan-to-value ratios shown in this prospectus supplement do not reflect those simultaneous second lien loans. Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the seller or from any other lender.

VIOLATION OF VARIOUS FEDERAL AND STATE LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS

        Applicable state laws generally regulate interest rates and other charges, require certain disclosure and require licensing of the seller. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans. The mortgage loans are also subject to federal laws, including:

    o   the Federal Truth-in-Lending Act and Regulation Z
        promulgated thereunder, which require certain disclosures to
        the borrowers regarding the terms of the mortgage loans;

    o   the Equal Credit Opportunity Act and Regulation B
        promulgated thereunder, which prohibit discrimination on the
        basis of age, race, color, sex, religion, marital status,
        national origin, receipt of public assistance or the
        exercise of any right under the Consumer Credit Protection
        Act, in the extension of credit;

    o   the Fair Credit Reporting Act, which regulates the use and
        reporting of information related to the borrower's credit
        experience;

    o   the Depository Institutions Deregulation and Monetary
        Control Act of 1980, which preempts certain state usury
        laws; and

    o   the Alternative Mortgage Transaction Parity Act of 1982,
        which preempts certain state lending laws which regulate
        alternative mortgage transactions.

        Violations of certain provisions of these federal and state laws may limit the ability of the master servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement. In particular, the seller's failure to comply with certain requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject the trust to monetary penalties, and result in the borrowers' rescinding the mortgage loans against the trust. In addition to federal law, some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans and restrict the master servicer's ability to foreclose in response to the mortgagor's default. The seller's failure to comply with these laws could subject the trust to significant monetary penalties, could result in the borrowers rescinding any affected mortgage loans whether held by the trust or a subsequent holder of such mortgage loans and/or limit the master servicer's ability to foreclose upon the related mortgaged property in the event of a mortgagor's default. See "Certain Legal Aspects of the Loan--Anti-Deficiency Legislation and Other Limitations on Lenders" in the prospectus. The seller will represent that as of the closing date, each mortgage loan is in compliance with applicable federal and state laws and regulations. The seller will also represent that none of the mortgage loans are subject to Section 32 of Regulation Z nor have any of the

mortgagors been required to purchase single-premium credit life insurance in connection with the origination of the related mortgage loan. In the event of a breach of such representation, the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in the prospectus. If the seller is unable or otherwise fails to satisfy such obligations, the yield on the offered certificates may be materially and adversely affected.

Under the anti-predatory lending laws of some states, the mortgagor is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if an originator reasonably believed that the test was satisfied. Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti-predatory lending law, in which case the seller will be required to purchase such mortgage loan from the trust.

PREPAYMENT INTEREST SHORTFALLS AND RELIEF ACT SHORTFALLS

When a mortgage loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to (but not including) the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for distribution on the next distribution date. The master servicer is required to cover a portion of the shortfall in interest collections that are attributable to prepayments. In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act and similar state laws will not be covered by the master servicer.

On any distribution date, any shortfalls resulting from the application of the Servicemembers Civil Relief Act and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the master servicer will be allocated to the monthly interest distributable amounts with respect to the offered certificates on a pro rata basis based on the respective amounts of interest accrued on such certificates for such distribution date. The holders of the offered certificates will not be entitled to reimbursement for any such interest shortfalls. If these shortfalls are allocated to the offered certificates the amount of interest distributed to those certificates will be reduced, adversely affecting the yield on your investment.

ENVIRONMENTAL RISKS

Federal, state and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health and safety. In certain circumstances, these laws and regulations impose obligations on owners or operators of residential properties such as those that secure the mortgage loans. Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the trust as owner of the related property.

In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage. Further, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of petroleum from an underground storage tank under certain circumstances. If the trust is considered the owner or operator of a property, it may suffer losses as a result of any liability imposed for environmental hazards on the property.

THE INTEREST RATE SWAP AGREEMENT AND THE SWAP PROVIDER

On each distribution date beginning April 25, 2006 through each distribution date on or prior to the distribution date in September 2009, any net swap payments payable to the supplemental interest trust by the swap provider under the interest rate swap agreement will be available as described in this prospectus supplement to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization as described in this prospectus supplement. However, no net swap payments will be payable by the swap provider unless the floating amount owed by the swap provider on a distribution date exceeds the fixed amount owed to the swap provider on such distribution date. This will not occur except in periods when One-Month LIBOR (as determined pursuant to the interest rate swap agreement) generally exceeds 4.300% per annum. No assurance can be made that any amounts will be received under the interest rate swap agreement, or that any such amounts that are received will be sufficient to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization. Any net swap payment payable to the swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to certificateholders, and may limit the pass-through rates on the certificates.

S-20

Upon early termination of the interest rate swap agreement, the supplemental interest trust or the swap provider may be liable to make a swap termination payment to the other party, regardless of which party caused the termination. The swap termination payment will be computed in accordance with the procedures set forth in the interest rate swap agreement. In the event that the supplemental interest trust is required under the interest rate swap agreement to make a swap termination payment to the swap provider, the trust will be required to make a payment to the supplemental interest trust in the same amount, which payment will be paid on the related distribution date, and on any subsequent distribution dates until paid in full, prior to distributions to certificateholders (other than certain swap termination payments resulting from an event of default or certain termination events with respect to the swap provider as described in this prospectus supplement, which swap termination payments will be subordinated to distributions to the holders of the offered certificates). This feature may result in losses on the certificates. Due to the priority of the applications of the available funds, the Subordinated Certificates will bear the effects of any shortfalls resulting from a net swap payment or swap termination payment before such effects are borne by the Class A Certificates and one or more classes of Subordinated Certificates may suffer a loss as a result of such payment. The trust will make a net swap payment to the supplemental interest trust for payment to the swap provider unless and until One-Month LIBOR exceeds approximately 4.300% per annum.

Net swap payments payable to the supplemental interest trust by the swap provider under the interest rate swap agreement will be used to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization as described in this prospectus supplement to the extent total monthly excess spread is insufficient. However, if the swap provider defaults on its obligations under the interest rate swap agreement, then there may be insufficient funds to cover such amounts, and the amount of total monthly excess spread may be reduced. To the extent that distributions on the offered certificates depend in part on payments to be received by the trust from amounts paid to the supplemental interest trust under the interest rate swap agreement, the ability of the trustee to make such distributions on such certificates will be subject to the credit risk of the swap provider under the interest rate swap agreement.

THE MORTGAGE POOL

GENERAL

The depositor will purchase mortgage loans from IndyMac Bank, F.S.B. ("INOYMAC BANK") pursuant to a pooling and servicing agreement, dated as of September 1, 2005, among IndyMac Bank, as seller and master servicer, the depositor and the trustee, and will assign to the trustee for the benefit of holders of the certificates the statistical calculation mortgage loans (other than those removed prior to the closing date) and other similar mortgage loans (together, the "CLOSING DATE MORTGAGE LOANS"). Pursuant to each subsequent transfer instrument, as described below under "--Conveyance of Subsequent Mortgage Loans and the Pre-Funding Accounts", the trust will acquire subsequent mortgage loans to be included in the mortgage pool subject to the conditions set forth in this prospectus supplement. The Closing Date Mortgage Loans and subsequent mortgage loans included in the trust are referred to as the "MORTGAGE LOANS". The Closing Date Mortgage Loans are expected to have an aggregate principal balance as of the cut-off date of approximately $635,000,000. The Closing Date Mortgage Loans to be included in loan group I are expected to have an aggregate principal balance equal to approximately $306,169,203, and the Closing Date Mortgage Loans to be included in loan group II are expected to have an aggregate principal balance equal to approximately $328,830,797.

Under the pooling and servicing agreement, the seller will make certain representations, warranties and covenants to the depositor relating to, among other things, the due execution and enforceability of the pooling and servicing agreement and certain characteristics of the mortgage loans and, subject to the limitations described below under "--Assignment of Mortgage Loans," will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists deficient documentation or an uncured breach of any representation, warranty or covenant if the breach of representation, warranty or covenant materially and adversely affects the interests of the certificateholders in that mortgage loan. The seller will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in the seller's mortgage portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to adversely affect the interests of the certificateholders. See "Loan Program--Representations by Sellers; Repurchases" in the prospectus. Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in and to the representations, warranties and covenants (including the seller's repurchase obligation) to the trustee for the benefit of the certificateholders. The depositor will make no representations or warranties with respect to the mortgage loans and will have no obligation to repurchase or substitute mortgage loans with deficient

S-21

In connection with each transfer and assignment, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, among other things, the original mortgage note (and any modification or amendment thereto) endorsed in blank without recourse (except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost), the original mortgage creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage for any non-MERS mortgage loan, the title policy with respect to the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any document not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 30% of the Closing Date Mortgage Loans in each loan group (the "DELAYED DELIVERY LOANS"), the depositor may deliver all or a portion of each related mortgage file to the trustee not later than five business days after the closing date. If so provided in the pooling and servicing agreement, for non-MERS mortgage loans, assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where, in the opinion of counsel, recording is not required to protect the trustee's interest in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the seller.

The trustee will review each mortgage file within 90 days of the closing date or subsequent transfer date, as applicable (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date or subsequent transfer date, as applicable), and if any document in a mortgage file is found to be missing or noncompliant with the review criteria set forth in the pooling and servicing agreement, such defect is material and the seller does not cure that defect within 90 days of notice thereof from the trustee (or within a longer period not to exceed 720 days after the closing date as provided in the pooling and servicing agreement in the case of missing documents not returned from the public recording office), the seller will be obligated to repurchase the related mortgage loan from the trust fund. Rather than repurchase the mortgage loan as provided above, the seller may remove the mortgage loan (a "DELETED MORTGAGE LOAN") from the trust fund and substitute in its place another mortgage loan (a "REPLACEMENT MORTGAGE LOAN"); however, substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that substitution will not disqualify the trust fund as a REMIC or result in a prohibited transaction tax under the Code. Any replacement mortgage loan generally will, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement,

- o  have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by the seller and held for distribution to the certificateholders on the related distribution date (a "SUBSTITUTION ADJUSTMENT AMOUNT")),

- o  have a current Mortgage Rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan,

- o  with respect to an adjustable-rate mortgage loan, (a) have a mortgage rate based upon the same Loan Index and a margin at least equal to and not greater than 50 basis points higher than the deleted mortgage loan, (b) have a mortgage rate subject to a maximum rate that is no less than the maximum rate applicable to the deleted mortgage loan, (c) have Adjustment Dates that are no more or less frequent than the deleted mortgage loan and (d) not be a Performance Loan,

- o  have a Loan-to-Value Ratio not higher than that of the deleted mortgage loan,

- o  have a remaining term to maturity not greater than (and not more than one year less than) that of the deleted mortgage loan and

- o  comply with all of the representations and warranties set forth in the pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

S-27

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the trustee and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of such mortgage, above, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS'r' System. In addition, the mortgages for some or all of the mortgage loans in the trust fund that are not already held through the MERS'r' System may, at the discretion of the master servicer, in the future be held through the MERS'r' System. For any mortgage held through the MERS'r' System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the master servicer, registered electronically through the MERS'r' System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.

UNDERWRITING STANDARDS

Most of the mortgage loans were originated in accordance with IndyMac Bank's underwriting standards described below. Mortgage loans not originated under these underwriting standards as, for instance, mortgage loans acquired through bulk purchases, were originated in accordance with underwriting standards approved by IndyMac Bank at the time of acquisition and generally comparable to IndyMac Bank's underwriting standards. IndyMac Inc., the entity whose assets were transferred to IndyMac Bank as described in this prospectus supplement under "Servicing of Mortgage Loans--The Master Servicer," began operating a mortgage conduit program in 1993 that, among other types of mortgage loans, purchased "CONVENTIONAL NON-CONFORMING MORTGAGE LOANS" (i.e., loans that are not insured by the Federal Housing Authority or partially guaranteed by the Veterans Administration and that do not conform to Fannie Mae or Freddie Mac underwriting guidelines) and began in April 1995 to purchase mortgage loans made to borrowers with prior credit difficulties. The "SUB-PRIME MORTGAGE LOANS" include loans made to borrowers with prior credit difficulties as well as other conventional non-conforming mortgage loans secured by first liens on one- to four-family residential properties.

IndyMac Bank purchases mortgage loans from, or provides funding for mortgage loans originated by, banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with IndyMac Bank) and mortgage brokers (each, a "LOAN ORIGINATOR") either under flow or bulk purchase arrangements, the terms of which may vary from loan originator to loan originator. In addition to purchasing mortgage loans from (or providing funding to) loan originators, IndyMac Bank also engages in the direct origination of mortgage loans.

IndyMac Bank's underwriting standards for mortgage loans are primarily intended to evaluate the borrower's creditworthiness and the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, as well as the type and intended use of the mortgaged property. The underwriting standards used to underwrite sub-prime mortgage loans are less stringent than the standards IndyMac Bank applies to its most creditworthy borrowers and less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to the borrower's credit standing and repayment ability. Borrowers who qualify under the IndyMac Bank underwriting standards for sub-prime mortgage loans similar to the mortgage loans generally have payment histories, documentation or debt-to-income ratios that would not satisfy Fannie Mae and Freddie Mac underwriting guidelines and such borrowers may have a record of major derogatory credit items, such as outstanding judgments or prior bankruptcies, or lower credit scores. As a result, the rates of delinquency, bankruptcy and foreclosure for those mortgage loans could be higher, and may be substantially higher, than that of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.

In the process of underwriting mortgage loans, IndyMac Bank may use its "electronic Mortgage Information and Transaction System" (or "E-MITS"), a proprietary, Internet-based, point-of-sale automated underwriting and risk-based pricing system to underwrite and price the mortgage loans. This system uses proprietary credit and risk analysis information generated from statistical analysis of IndyMac Bank's historical database of over 300,000 loans to determine the economic levels at which a given loan should be approved. The system also incorporates information from models provided by credit rating agencies. e-MITS analyzes over forty data elements relating to the mortgagor and the mortgaged property before rendering an approval and a risk-based price. As with IndyMac Bank's traditional underwriting process, this approval is subject to full and complete data verification. Loans approved by e-MITS comply with IndyMac Bank's underwriting guidelines. As is the case with loans that are not underwritten through e-MITS, exceptions to standard underwriting guidelines are permitted where compensating factors are present or in the context of negotiated bulk purchases.

LOAN PURPOSE
(ALL STATISTICAL CALCULATION MORTGAGE LOANS)

| Loan Purpose | Number of Statistical Calculation Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Statistical Calculation Mortgage Loans |
|---|---|---|---|
| Cash Out Refinance | 1,486 | $ 290,390,510 | 56.68% |
| Purchase | 1093 | 195,341,800 | 38.13 |
| Rate & Term Refinance | 155 | 26,572,060 | 5.19 |
| Total | 2,734 | $ 512,304,370 | 100.00% |

OCCUPANCY TYPE(1)
(ALL STATISTICAL CALCULATION MORTGAGE LOANS)

| Occupancy Type | Number of Statistical Calculation Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Statistical Calculation Mortgage Loans |
|---|---|---|---|
| Owner Occupied | 2,567 | $ 489,167,577 | 95.48% |
| Investor Occupied | 134 | 16,679,089 | 3.26 |
| Second Home | 33 | 6,457,704 | 1.26 |
| Total | 2,734 | $ 512,304,370 | 100.00% |

(1) Based on representations of the related mortgagors at the time of origination.

PROPERTY TYPE
(ALL STATISTICAL CALCULATION MORTGAGE LOANS)

| Property Type | Number of Statistical Calculation Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Statistical Calculation Mortgage Loans |
|---|---|---|---|
| Single Family Residence | 2,016 | $ 367,511,332 | 71.74% |
| PUD | 319 | 66,248,284 | 12.93 |
| 2 Unit | 124 | 30,963,450 | 6.04 |
| Condominium Unit | 166 | 28,080,362 | 5.48 |
| Town House | 73 | 10,641,644 | 2.08 |
| 3 Unit | 14 | 3,985,912 | 0.78 |
| 4 Unit | 10 | 2,522,142 | 0.49 |
| High Rise Condominium | 12 | 2,351,243 | 0.46 |
| Total | 2,734 | $ 512,304,370 | 100.00% |

Annex II-5

INDYMAC ABS, INC.

DEPOSITOR

ASSET BACKED CERTIFICATES
ASSET BACKED NOTES
(ISSUABLE IN SERIES)

---------------------
| PLEASE CAREFULLY
| CONSIDER OUR
| DISCUSSION OF
| SOME OF THE RISKS
| OF INVESTING IN
| THE SECURITIES
| UNDER "RISK FACTORS"
| BEGINNING ON PAGE 6
---------------------

THE TRUSTS

Each trust will be established to hold assets in its trust fund transferred to it by IndyMac ABS, Inc. The assets in each trust fund will be specified in the prospectus supplement for the particular trust and will generally consist of:

o   loans secured by first and/or subordinate liens on one- to four-family residential properties, including manufactured housing that is permanently affixed and treated as real property under local law, or security interests in shares issued by cooperative housing corporations,

o   loans secured by first and/or subordinate liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units,

o   loans secured by first and/or subordinate liens on mixed residential and commercial properties (mixed-use loans),

o   closed-end second-lien loans, secured in whole or in part by subordinate liens on one- to four-family residential properties,

o   home equity line of credit loans or specified balances thereof, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties,

o   loans secured in whole or in part by first and/or subordinate liens on improved land that is generally suitable for one- to four-family residential dwellings (lot loans), including loans to finance the construction of a dwelling (construction loans) and construction loans which by their terms convert into a permanent loan upon the completion of construction (construction-to-permanent loans),

o   home improvement installment sale contracts and installment loan agreements that are secured by first or subordinate liens on one- to four-family residential properties, or

o   mortgage-backed securities or collateralized mortgage obligations backed by loans secured by first and/or subordinate liens on one- to four-family residential properties, by lot loans or by participations in these types of loans.

THE SECURITIES

IndyMac ABS, Inc. will offer either certificates or notes pursuant to a prospectus supplement. The securities will be grouped into one or more series, each having its own distinct designation. Each series will be issued in one or more classes and each class will evidence beneficial ownership of a specified portion of future payments on the assets in the trust fund to which the series relates. A prospectus supplement for a series will specify all of the terms of the series and each of the classes in the series.

OFFERS OF SECURITIES

The securities may be offered through several different methods, including offerings through underwriters.

-------------------------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATORS NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATORS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this prospectus is August 22, 2005

2

RISK FACTORS

You should carefully consider the following information because it identifies significant risks associated with an investment in the securities.

<TABLE>

<S>                                               <C>
LIMITED LIQUIDITY...................................  No market for the securities of any series will exist
                                                  before those securities are issued. We cannot assure you
                                                  that a secondary market will develop. Even if a secondary
                                                  market develops, we cannot assure you that it will provide
                                                  you with liquidity of investment or that it will continue
                                                  for the life of the securities of that series.

LIMITED SOURCE OF
PAYMENTS - NO RECOURSE
TO SELLERS, DEPOSITOR
OR MASTER SERVICER..................................  The applicable prospectus supplement may provide that
                                                  securities will be payable from trust funds other than
                                                  their associated trust fund, but if it does not, they will
                                                  be payable solely from their associated trust fund. If the
                                                  trust fund does not have enough assets to distribute the
                                                  full amount due to you as a securityholder, your yield
                                                  will be impaired, and the return of your principal may be
                                                  impaired, without you having recourse to anyone else.
                                                  Furthermore, at the times specified in the applicable
                                                  prospectus supplement, certain assets of the trust fund
                                                  and/or any balance remaining in the security account
                                                  immediately after making all payments due on the
                                                  securities of that series, may be released and paid out to
                                                  other persons, such as the depositor, a servicer, a credit
                                                  enhancement provider, or any other person entitled to
                                                  payments from the trust fund. Those assets will no longer
                                                  be available to make payments to you. Those payments are
                                                  generally made only after other specified payments that
                                                  may be described in the applicable prospectus supplement
                                                  have been made.

                                                  You will not have any recourse against the depositor or
                                                  any servicer if you do not receive a required
                                                  distribution on the securities. You will also not have
                                                  recourse against the assets of the trust fund of any
                                                  other series of securities.

                                                  The securities will not represent an interest in the
                                                  depositor, any servicer, any seller to the depositor, or
                                                  anyone else except the trust fund. The only obligation of
                                                  the depositor to a trust fund will come from certain
                                                  representations and warranties made by it about assets
                                                  transferred to the trust fund. If these representations

</TABLE>

6

```
<TABLE>

<S>                                          <C>
                                             and warranties are untrue, the depositor may be required
                                             to repurchase some of the transferred assets. IndyMac
                                             ABS, Inc., which is the depositor, does not have
                                             significant assets and is unlikely to have significant
                                             assets in the future. If the depositor were required to
                                             repurchase a loan because of a breach of a
                                             representation, its only sources of funds for the
                                             repurchase would be:

                                             o  funds obtained from the enforcement of a corresponding
                                                obligation of a seller or originator of the loan or

                                             o  funds from a reserve account or similar credit
                                                enhancement established to pay for loan repurchases.

                                             The only obligations of the master servicer to a trust
                                             fund (other than its master servicing obligations) will
                                             come from certain representations and warranties made by
                                             it in connection with its loan servicing activities. If
                                             these representations and warranties turn out to be
                                             untrue, the master servicer may be required to repurchase
                                             or substitute for some of the loans. However, the master
                                             servicer may not have the financial ability to make the
                                             required repurchase or substitution.

                                             The only obligations to a trust fund of a seller of
                                             loans to the depositor will come from certain
                                             representations and warranties made by it in
                                             connection with its sale of the loans and certain
                                             document delivery requirements. If these
                                             representations and warranties turn out to be untrue,
                                             or the seller fails to deliver required documents, it
                                             may be required to repurchase or substitute for some
                                             of the loans. However, the seller may not have the
                                             financial ability to make the required repurchase or
                                             substitution.

                                             As described in this prospectus, a master servicer may
                                             be obligated to enforce the sellers' obligations.
                                             However, the master servicer will not be obligated to
                                             purchase or replace any loan if a seller defaults on
                                             its obligation or for any other reason.

CREDIT ENHANCEMENT MAY
NOT BB SUFFICIENT TO
PROTECT YOU FROM LOSSBS............................  Credit enhancement is intended to reduce the effect of
                                             loan losses. But credit enhancements may benefit only some
                                             classes of a series of securities, and the amount of any
                                             credit enhancement will be limited as described

</TABLE>
```

7

REPRESENTATIONS BY SELLERS; REPURCHASES

     Each seller will have made representations and warranties in respect of the loans sold by it and evidenced by all, or a part, of a series of securities. These representations and warranties generally will include, among other things:

- o  that title insurance (or in the case of Properties located in areas where title insurance policies are generally not available, an attorney's certificate of title) and any required hazard insurance policy were effective at the origination of each loan (other than cooperative loans and certain closed-end second-lien and home equity line of credit loans), and that each policy (or certificate of title, as applicable) remained in effect on the date the loan was purchased from the seller by or on behalf of the depositor;

- o  that the seller had good title to each loan and that the loan was not subject to any valid offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement may forgive certain indebtedness of a borrower;

- o  that each loan (other than cooperative loans) constituted a valid lien on, or a perfected security interest in, the Property (subject only to any permissible disclosed liens, any applicable title insurance exceptions, any applicable liens of nondelinquent current real property taxes and assessments, any applicable liens arising under federal, state or local laws relating to hazardous wastes or hazardous substances, any applicable liens for common charges, and certain other exceptions described in the applicable agreement);

- o  that each home equity line of credit loan was generated under a credit line agreement that complied, at the time of origination, in all material respects with applicable state and federal laws;

- o  that there were no delinquent tax or assessment liens against the Property;

- o  that no required payment on a loan was delinquent more than the number of days specified in the related prospectus supplement; and

- o  that each loan was made in compliance with, and is enforceable under, all applicable local, state and federal laws and regulations in all material respects.

     If specified in the related prospectus supplement, the seller's representations and warranties in respect of a loan will be made as of the date on which the seller sold the loan to the depositor or one of its affiliates, instead of as of the cut-off date. In that case, a substantial period of time may have elapsed between the sale date and the date of initial issuance of the series of securities evidencing an interest in the loan. Because the seller's representations and warranties do not include events occurring after the sale, the seller's repurchase obligation (described in the next paragraph) will not apply if an event that would otherwise have triggered the obligation occurs after the sale date. However, the depositor will not include any loan in a trust fund if the depositor has reason to believe that the seller's representations and warranties in respect of that loan will not be accurate and complete in all material respects as of the date of initial issuance of the related series of securities. If the master servicer is also a seller of loans with respect to a particular series, these representations will be in addition to the representations and warranties made by the master servicer in its capacity as master servicer.

     The master servicer (or the trustee, if the master servicer is also the seller) will promptly notify the applicable seller of any breach of its representations and warranties in respect of a loan that materially

and adversely affects the securityholders' interests in that loan. If the seller cannot cure the breach on or before the business day after the first determination date (as defined in the related prospectus supplement) that is more than 90 days after the seller receives notice from the master servicer or the trustee, as the case may be, the seller will be obligated either:

- o to repurchase the loan from the trust fund at a price (the "PURCHASE PRICE") equal to 100% of its unpaid principal balance as of the date of the repurchase plus accrued interest thereon at the Loan Rate, up to the scheduled monthly payment date for the loan in the month following the month of repurchase (less any advances or amount payable as related servicing compensation if the seller is the master servicer), or

- o to substitute for the loan a replacement loan that satisfies the criteria specified in the related prospectus supplement; provided, however, that the seller will not be obligated to make any repurchase or substitution (or cure a breach) if the breach constitutes fraud in the origination of the affected loan and the seller did not have knowledge of the fraud.

If a REMIC election is to be made with respect to a trust fund, unless otherwise specified in the related prospectus supplement, the master servicer or a holder of the related residual certificate will be obligated to pay any prohibited transaction tax in connection with any repurchase or substitution. In addition, the trustee must have received a satisfactory opinion of counsel that the repurchase or substitution will not cause the trust fund to lose its status as a REMIC or otherwise subject the trust fund to a prohibited transaction tax. The master servicer may be entitled to reimbursement from the assets of the related trust fund or from any holder of the related residual certificate. See "Description of the Securities-General" in this prospectus. Except where the master servicer is also the seller, the master servicer will be required under the applicable agreement to enforce this obligation for the benefit of the trustee and the securityholders , acting in its good faith business judgment as if it were the owner of the loan. This obligation to repurchase or substitute will constitute the sole remedy available to securityholders or the trustee for a seller's breach of representations and warranties.

     Neither the depositor nor the master servicer (unless the master servicer is a seller) will be obligated to purchase or substitute a loan if a seller defaults on its obligation to do so. No assurance can be given that sellers will fulfill their repurchase or substitution obligations.

### DESCRIPTION OF THE SECURITIES

     Each series of certificates will be issued and serviced pursuant to a separate pooling and servicing agreement among the depositor, the master servicer and the trustee. Two forms of pooling and servicing agreement have been filed as exhibits to the Registration Statement of which this prospectus forms a part. Each series of notes will be issued pursuant to an indenture between the related trust fund and the entity named in the related prospectus supplement as trustee for that series, and the related loans will be serviced by the master servicer pursuant to a sale and servicing agreement. A form of indenture and a form of sale and servicing agreement have been filed as exhibits to the Registration Statement of which this prospectus forms a part. A series of securities may consist of both notes and certificates. Each series of such securities will be issued and serviced pursuant to a separate master servicing agreement. Each agreement will be dated as of the related cut-off date. The provisions of each agreement will vary depending on the nature of the securities to be issued under it and the nature of the related trust fund. The following summaries of the material provisions that may appear in each agreement are subject to, and are qualified in their entirety by reference to, all the provisions of the agreements for each series of securities and the applicable prospectus supplement. The depositor will provide a copy of the agreements (without exhibits) relating to any series without charge upon written request of a holder of record of a security of that series

# Exhibit 20

$872,550,000
(Approximate)
INDYMAC ABS, INC.
DEPOSITOR

[INDYMAC BANK LOGO]

SELLER AND MASTER SERVICER

HOME EQUITY MORTGAGE LOAN ASSET-BACKED TRUST,
SERIES INABS 2005-D
ISSUER

DISTRIBUTIONS PAYABLE ON THE 25TH OF EACH MONTH OR THE NEXT BUSINESS DAY,
COMMENCING IN JANUARY 2006

----------------------

The following classes of certificates are being offered pursuant to this
prospectus supplement and the accompanying prospectus:

<Table>
<Caption>

|  | APPROXIMATE PRINCIPAL AMOUNT(1) | PASS-THROUGH RATE(1)(1)(2) | PRICE TO PUBLIC | UNDERWRITING DISCOUNT AND COMMISSIONS | PROCEEDS TO COMPANY(5) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| A-2-A | $117,978,000 | Variable | 100.00000% | 0.25000% | 99.92000% |
| A-2-2 | $ 39,287,000 | Variable | 100.00000 | 0.25000 | 99.76000 |
| A-3-1 | $163,900,000 | Variable | 100.00000 | 0.25000 | 99.72000 |
| A-3-2 | $ 60,000,000 | Variable | 100.00000 | 0.25000 | 99.76000 |
| A-3-3 | $ 59,900,000 | Variable | 100.00000 | 0.25000 | 99.75000 |
| A-3-4 | $ 26,227,000 | Variable | 100.00000 | 0.25000 | 99.75000 |
| M-1 | $ 36,200,000 | Variable | 100.00000 | 0.25000 | 98.79000 |
| M-3 | $ 30,600,000 | Variable | 100.00000 | 0.25000 | 98.75000 |
| M-3 | $ 35,900,000 | Variable | 100.00000 | 0.25000 | 98.75000 |
| M-4 | $ 33,300,000 | Variable | 100.00000 | 0.25000 | 98.79000 |
| M-5 | $ 39,900,000 | Variable | 100.00000 | 0.25000 | 98.75000 |
| M-6 | $ 30,090,000 | Variable | 100.00000 | 0.25000 | 98.75000 |
| M-7 | $ 21,990,000 | Variable | 100.00000 | 0.25000 | 98.75000 |
| M-5 | $ 53,390,000 | Variable | 19.26205 | 0.25000 | 97.52155 |
| M-4 | $  9,900,000 | Variable | 51.55695 | 0.25000 | 95.11565 |

</Table>

(1) Subject to a permitted variance in the aggregate of 5%.

(2) As described under 'Description of the Certificates -- Distributions' in
    this prospectus supplement, the pass-through rates of the certificates are
    subject to a Net-WAC rate cap.

(3) The pass-through rate is subject to increase as described under 'Description
    of the Certificates -- Distributions of Interest and Principal' in this
    prospectus supplement.

(4) The pass-through rate on the offered certificates will vary as described
    under 'Description of the Certificates -- Distributions of Interest and
    Principal' in this prospectus supplement.

(5) Before deducting expenses.

    Investing in the certificates involves risks. See 'Risk Factors' on
page S-12 in this prospectus supplement and on page 6 in the prospectus.

    The certificates represent obligations of the trust fund only and do not
represent an interest in or obligation of IndyMac ABS, Inc., IndyMac Bank,
F.S.B., Deutsche Bank National Trust Company or any of their affiliates.

    This prospectus supplement may be used to offer and sell the offered
certificates only if accompanied by the prospectus.

    These securities have not been approved or disapproved by the Securities and
Exchange Commission or any state securities commission nor has the Securities
and Exchange Commission or any state securities commission passed upon the
accuracy or adequacy of this prospectus supplement or the prospectus. Any
representation to the contrary is a criminal offense.

    UBS Securities LLC, Greenwich Capital Markets, Inc., Credit Suisse First
Boston LLC, Lehman Brothers Inc. and Morgan Stanley & Co. Incorporated, as
underwriters, will purchase the offered certificates from the depositor. See
'Method of Distribution' in this prospectus supplement. Delivery of the
certificates will take place in book-entry form on or about December 23, 2005.

            UBS INVESTMENT BANK        RBS GREENWICH CAPITAL
                  (CO-LEAD MANAGERS AND BOOK-RUNNERS)

    CREDIT SUISSE FIRST BOSTON        LEHMAN BROTHERS        MORGAN STANLEY
                              (CO-MANAGERS)

        The date of this prospectus supplement is December 20, 2005

cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization as described in this prospectus supplement. However, no net swap payments will be payable by the swap provider unless the floating amount owed by the swap provider on a distribution date exceeds the fixed amount owed to the swap provider on such distribution date. This will not occur except in periods when One-Month LIBOR (as determined pursuant to the interest rate swap agreement) exceeds approximately 4.8190% per annum. No assurance can be made that any amounts will be received under the interest rate swap agreement, or that any such amounts that are received will be sufficient to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization. Any net swap payment payable to the swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to certificateholders, and may limit the pass-through rates on the certificates.

Upon early termination of the interest rate swap agreement, the supplemental interest trust or the swap provider may be liable to make a swap termination payment to the other party, regardless of which party caused the termination. The swap termination payment will be computed in accordance with the procedures set forth in the interest rate swap agreement. In the event that the supplemental interest trust is required under the interest rate swap agreement to make a swap termination payment to the swap provider, the trust will be required to make a payment to the supplemental interest trust in the same amount, which payment will be paid on the related distribution date, and on any subsequent distribution dates until paid in full, prior to distributions to certificateholders (other than certain swap termination payments resulting from an event of default or certain termination events with respect to the swap provider as described in this prospectus supplement, which swap termination payments will be subordinated to distributions to the holders of the offered certificates). This feature may result in losses on the certificates. Due to the priority of the applications of the available funds, the Subordinated Certificates will bear the effects of any shortfalls resulting from a net swap payment or swap termination payment before such effects are borne by the Class A Certificates and one or more classes of Subordinated Certificates may suffer a loss as a result of such payment. The trust will make a net swap payment to the supplemental interest trust for payment to the swap provider unless and until One-Month LIBOR exceeds approximately 4.8190% per annum.

Net swap payments payable to the supplemental interest trust by the swap provider under the interest rate swap agreement will be used to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization as described in this prospectus supplement to the extent total monthly excess spread is insufficient. However, if the swap provider defaults on its obligations under the interest rate swap agreement, then there may be insufficient funds to cover such amounts, and the amount of total monthly excess spread may be reduced. To the extent that distributions on the offered certificates depend in part on payments to be received by the trust from amounts paid to the supplemental interest trust under the interest rate swap agreement, the ability of the trustee to make such distributions on such certificates will be subject to the credit risk of the swap provider under the interest rate swap agreement.

THE MORTGAGE POOL

General

The depositor will purchase mortgage loans from IndyMac Bank, F.S.B. ("IndyMac Bank") pursuant to a pooling and servicing agreement, dated as of December 1, 2005, among IndyMac Bank, as seller and master servicer, the depositor and the trustee, and will assign to the trustee for the benefit of holders of the certificates the statistical calculation mortgage loans (other than those removed prior to the closing date) and other similar mortgage loans (together, the "Closing Date Mortgage Loans"). Pursuant to each subsequent transfer instrument, as described below under "--Conveyance of Subsequent Mortgage Loans and the Pre-Funding Accounts", the trust will acquire subsequent mortgage loans to be included in the mortgage pool subject to the conditions set forth in this prospectus supplement. The Closing Date Mortgage Loans and subsequent mortgage loans included in the trust are referred to as the "mortgage loans". The Closing Date Mortgage Loans are expected to have an aggregate principal balance as of the cut-off date of approximately $790,000,000. The Closing Date Mortgage Loans to be included in loan group I are expected to have an aggregate principal balance equal to approximately $393,187,993, and the Closing Date Mortgage Loans to be included in loan group II are expected to have an aggregate principal balance equal to approximately $396,812,007.

Under the pooling and servicing agreement, the seller will make certain representations, warranties and covenants to the depositor relating to, among other things, the due execution and enforceability of the pooling and servicing agreement and certain characteristics of the mortgage loans and, subject to the limitations described below under "--Assignment of Mortgage Loans," will be obligated to repurchase or substitute a similar mortgage loan for

S-21

any mortgage loan as to which there exists deficient documentation or an uncured breach of any representation, warranty or covenant if the breach of representation, warranty or covenant materially and adversely affects the interests of the certificateholders in that mortgage loan. The seller will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in the seller's mortgage portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to adversely affect the interests of the certificateholders. See "Loan Program--Representations by Sellers; Repurchases" in the prospectus. Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in and to the representations, warranties and covenants (including the seller's repurchase obligation) to the trustee for the benefit of the certificateholders. The depositor will make no representations or warranties with respect to the mortgage loans and will have no obligation to repurchase or substitute mortgage loans with deficient documentation or which are otherwise defective. IndyMac Bank is selling the mortgage loans without recourse and will have no obligation with respect to the certificates in its capacity as seller other than the repurchase or substitution obligations described above. The obligations of IndyMac Bank, as master servicer, with respect to the certificates, are limited to the master servicer's contractual servicing obligations under the pooling and servicing agreement.

   Certain information with respect to the mortgage loans in the statistical calculation mortgage pool is set forth below (such mortgage loans, the "Statistical Calculation Mortgage Loans"). Prior to the closing date, the Statistical Calculation Mortgage Loans will experience some amortization, mortgage loans may be removed from the statistical calculation mortgage pool and other mortgage loans may be substituted for such mortgage loans. The depositor believes that the information set forth in this prospectus supplement with respect to the statistical calculation mortgage pool is representative of the characteristics of the mortgage pool as it will be constituted at the closing date, although certain characteristics of the mortgage loans in the mortgage pool will vary. Unless otherwise indicated, information presented below expressed as a percentage (other than rates of interest) are approximate percentages based on the Stated Principal Balances of the Statistical Calculation Mortgage Loans as of the cut-off date, which are referred to as the "cut-off date principal balances".

   As of the cut-off date, the aggregate Stated Principal Balance of the Statistical Calculation Mortgage Loans is approximately $661,532,812. The mortgage loans to be included in the mortgage pool were acquired or originated by the seller in the normal course of its business.

   At origination, 99.58% of the Statistical Calculation Mortgage Loans in loan group I and approximately 99.87% of the Statistical Calculation Mortgage Loans in loan group II had stated terms to maturity of 30 years. All of the Statistical Calculation Mortgage Loans provide for payments due on the first day of each month (a "due date"). Scheduled monthly payments made by the mortgagors on the mortgage loans ("scheduled payments") either earlier or later than the scheduled due dates thereof is not expected to affect the amortization schedule or the relative application of those payments to principal and interest.

   With the exception of 91 of the Statistical Calculation Mortgage Loans in loan group I and 454 of the Statistical Calculation Mortgage Loans in loan group II, representing approximately 6.21% and 33.68%, respectively, of the Statistical Calculation Mortgage Loans in that loan group (these Statistical Calculation Mortgage Loans are referred to in this prospectus supplement as the "interest-only mortgage loans"), all of the Statistical Calculation Mortgage Loans in each loan group will provide for the amortization of the amount financed over a series of substantially equal monthly payments. The terms of the interest-only mortgage loans only require the related mortgagor to pay interest on the principal balance of the mortgage loan for either the first two, three, five or ten years after its origination, but require that the entire principal balance of the mortgage loan be fully amortized over the related remaining term of the mortgage loan following such interest only period.

   Approximately 93.79% of the Statistical Calculation Mortgage Loans in loan group I and approximately 66.32% of the Statistical Calculation Mortgage Loans in loan group II provide for the amortization of the amount financed over a series of substantially equal monthly payments, and approximately 2.14% of the Statistical Calculation Mortgage Loans in loan group I and approximately 4.19% of the Statistical Calculation Mortgage Loans in loan group II are balloon loans and provide for equal monthly payments, consisting of principal and interest, based on a stated amortization schedule, and a single payment of the remaining principal balance of the loan at maturity.

   Approximately 1404 statistical Calculation Mortgage Loans in loan group I and approximately 1157 Statistical Calculation Mortgage Loans in group II, representing approximately 75.08% and 73.70% of the cut-off

depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor, in and to each Closing Date Mortgage Loan and all right, title and interest in and to all other assets included in Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2005-D, including all principal and interest received on or with respect to the Closing Date Mortgage Loans, exclusive of principal and interest due on or prior to the cut-off date. Pursuant to each subsequent transfer instrument, the seller will sell, transfer, assign, set over and otherwise convey without recourse to the depositor all right, title and interest of the seller, and the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor, in and to each Subsequent Mortgage Loan and all right, title and interest in and to all other assets included in Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2005-D, including all principal and interest received on or with respect to the Subsequent Mortgage Loans, exclusive of principal and interest due on or prior to the subsequent cut-off date.

In connection with each transfer and assignment, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, among other things, the original mortgage note (and any modification or amendment thereto) endorsed in blank without recourse (except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost), the original mortgage creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage for any non-MERS mortgage loan, the title policy with respect to the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any document not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 30% of the Closing Date Mortgage Loans in each loan group (the "Delayed Delivery Loans"), the depositor may deliver all or a portion of each related mortgage file to the trustee not later than five business days after the closing date. If so provided in the pooling and servicing agreement, for non-MERS mortgage loans, assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where, in the opinion of counsel, recording is not required to protect the trustee's interest in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the seller.

The trustee will review each mortgage file within 90 days after the closing date or subsequent transfer date, as applicable (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date or subsequent transfer date, as applicable), and if any document in a mortgage file is found to be missing or noncompliant with the review criteria set forth in the pooling and servicing agreement, such defect is material and the seller does not cure that defect within 90 days of notice thereof from the trustee (or within a longer period not to exceed 720 days after the closing date as provided in the pooling and servicing agreement in the case of missing documents not returned from the public recording office), the seller will be obligated to repurchase the related mortgage loan from the trust fund. Rather than repurchase the mortgage loan as provided above, the seller may remove the mortgage loan (a "deleted mortgage loan") from the trust fund and substitute in its place another mortgage loan (a "replacement mortgage loan"); however, substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that substitution will not disqualify the trust fund as a REMIC or result in a prohibited transaction tax under the Code. Any replacement mortgage loan generally will, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement,

- o   have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by the seller and held for distribution to the certificateholders on the related distribution date (a "Substitution Adjustment Amount")),

- o   have a current Mortgage Rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan,

- o   with respect to an adjustable-rate mortgage loan, (a) have a mortgage rate based upon the same Loan Index and a margin at least equal to and not greater than 50 basis points higher than the deleted mortgage loan, (b) have a mortgage rate subject to a maximum rate that is no less than the maximum rate applicable to the deleted mortgage loan, (c) have Adjustment Dates that are no more or less frequent than the deleted mortgage loan and (d) not be a Performance Loan,

o   have a Loan-to-Value Ratio not higher than that of the deleted
    mortgage loan,

o   have a remaining term to maturity not greater than (and not more than
    one year less than) that of the deleted mortgage loan and

o   comply with all of the representations and warranties set forth in the
    pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole
remedy available to certificateholders or the trustee for omission of, or a
material defect in, a mortgage loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed
assignment of the mortgage to the trustee and the original recorded assignment
or assignments of the mortgage together with all interim recorded assignments of
such mortgage, above, the depositor may at its discretion provide evidence that
the related mortgage is held through the MBRS(R) System. In addition, the
mortgages for some or all of the mortgage loans in the trust fund that are not
already held through the MERS(R) System may, at the discretion of the master
servicer, in the future be held through the MERS(R) Syetem. For any mortgage
held through the MERS(R) System, the mortgage is recorded in the name of
Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the
owner of the mortgage loan, and subsequent assignments of the mortgage were, or
in the future may be, at the discretion of the master servicer, registered
electronically through the MERS(R) System. For each of these mortgage loans,
MERS serves as mortgagee of record on the mortgage solely as a nominee in an
administrative capacity on behalf of the trustee, and does not have any interest
in the mortgage loan.

Underwriting Standards

Most of the mortgage loans were originated in accordance with IndyMac
Bank's underwriting standards described below. Mortgage loans not originated
under these underwriting standards as, for instance, mortgage loans acquired
through bulk purchases, were originated in accordance with underwriting
standards approved by IndyMac Bank at the time of acquisition and generally
comparable to IndyMac Bank's underwriting standards. IndyMac Inc., the entity
whose assets were transferred to IndyMac Bank as described in this prospectus
supplement under "Servicing of Mortgage Loans--The Master Servicer," began
operating a mortgage conduit program in 1993 that, among other types of mortgage
loans, purchased "conventional non-conforming mortgage loans" (i.e., loans that
are not insured by the Federal Housing Authority or partially guaranteed by the
Veterans Administration and that do not conform to Fannie Mae or Freddie Mac
underwriting guidelines) and began in April 1995 to purchase mortgage loans made
to borrowers with prior credit difficulties. The "sub-prime mortgage loans"
include loans made to borrowers with prior credit difficulties as well as other
conventional non-conforming mortgage loans secured by first liens on one- to
four-family residential properties.

IndyMac Bank purchases mortgage loans from, or provides funding for
mortgage loans originated by, banks, savings and loan associations, mortgage
bankers (which may or may not be affiliated with IndyMac Bank) and mortgage
brokers (each, a "loan originator") either under flow or bulk purchase
arrangements, the terms of which may vary from loan originator to loan
originator. In addition to purchasing mortgage loans from (or providing funding
to) loan originators, IndyMac Bank also engages in the direct origination of
mortgage loans.

IndyMac Bank's underwriting standards for mortgage loans are primarily
intended to evaluate the borrower's creditworthiness and the value and adequacy
of the mortgaged property as collateral for the proposed mortgage loan, as well
as the type and intended use of the mortgaged property. The underwriting
standards used to underwrite sub-prime mortgage loans are less stringent than
the standards IndyMac Bank applies to its most creditworthy borrowers and less
stringent than the standards generally acceptable to Fannie Mae and Freddie Mac
with regard to the borrower's credit standing and repayment ability. Borrowers
who qualify under the IndyMac Bank underwriting standards for sub-prime mortgage
loans similar to the mortgage loans generally have payment histories,
documentation or debt-to-income ratios that would not satisfy Fannie Mae and
Freddie Mac underwriting guidelines and such borrowers may have a record of
major derogatory credit items, such as outstanding judgments or prior
bankruptcies, or lower credit scores. As a result, the rates of delinquency,
bankruptcy and foreclosure for those mortgage loans could be higher, and may be
substantially higher, than that of mortgage loans underwritten in accordance
with Fannie Mae and Freddie Mac standards.

In the process of underwriting mortgage loans, IndyMac Bank may use
its "electronic Mortgage Information and Transaction System" (or "e-MITS"), a
proprietary, Internet-based, point-of-sale automated

S-28

underwriting and risk-based pricing system to underwrite and price the mortgage loans. This system uses proprietary credit and risk analysis information generated from statistical analysis of IndyMac Bank's historical database of over 300,000 loans to determine the economic levels at which a given loan should be approved. The system also incorporates information from models provided by credit rating agencies. e-MITS analyzes over forty data elements relating to the mortgagor and the mortgaged property before rendering an approval and a risk-based price. As with IndyMac Bank's traditional underwriting process, this approval is subject to full and complete data verification. Loans approved by e-MITS comply with IndyMac Bank's underwriting guidelines. As is the case with loans that are not underwritten through e-MITS, exceptions to standard underwriting guidelines are permitted where compensating factors are present or in the context of negotiated bulk purchases.

Each of the mortgage loans were underwritten or re-underwritten by IndyMac Bank and assigned to one of six credit levels generally indicating the severity of the borrower's derogatory credit items. Some of the mortgage loans were underwritten or re-underwritten and made to borrowers who did not have significantly derogatory credit items and were not, therefore, assigned to a credit level. The credit levels are, in order of decreasing creditworthiness, 1++, 1+, 1, 2, 3 and 4. Through December 2000, the credit level for mortgage loans purchased or originated was primarily based on the prospective mortgagor's FICO Credit Score. After December 2000, the credit level was further evaluated based on the prospective mortgagor's mortgage payment history, foreclosure and bankruptcy history. Higher frequency of late mortgage payments and recency of foreclosure and bankruptcy cause the loans to be rated with a higher numerical credit level. For purposes of this prospectus supplement, borrowers with credit histories not considered to be inferior (i.e., those not assigned a credit level at origination because of their relatively better credit history) are reported as having a credit level of 0.

IndyMac Bank originates and purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Limited, Stated Income, No Income/No Asset, No Ratio and No Doc.

Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written or telephonic communications. All loans may be submitted under the Full/Alternate Documentation Program. The Full/Alternate Documentation Program also provides for alternative methods of employment verification generally using W-2 forms or pay stubs. Borrowers applying under the Full/Alternate Documentation Program may, based on certain credit and loan characteristics, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

The Limited Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers are generally not required to submit copies of their tax returns and only must document income for one year (rather than two, as required by the Full/Alternate Documentation Program).

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications. Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

IndyMac Bank generally purchases and acquires sub-prime mortgage loans having a credit level of 1+ or greater only under the Full/Alternate, Limited and Stated Income Documentation Programs. Mortgage loans reported here with a credit level indicated as "Not Sub-Prime" could, generally, have been originated under any of IndyMac Bank's documentation programs.

LOAN PURPOSE
(ALL STATISTICAL CALCULATION MORTGAGE LOANS)

```
<TABLE>
<CAPTION>
```

| Loan Purpose | Number of Statistical Calculation Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Statistical Calculation Mortgage Loans |
|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` |
| Cash Out Refinance ........... | 1,668 | $346,249,179 | 52.34% |
| Purchase .................... | 1521 | 281,311,850 | 42.52 |
| Rate & Term Refinance ........ | 187 | 33,971,783 | 5.14 |
| Total .................... | 3,376 | $661,532,812 | 100.00% |

```
</TABLE>
```

OCCUPANCY TYPE(1)
(ALL STATISTICAL CALCULATION MORTGAGE LOANS)

```
<TABLE>
<CAPTION>
```

| Occupancy Type | Number of Statistical Calculation Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Statistical Calculation Mortgage Loans |
|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` |
| Owner Occupied ............... | 3,152 | $631,738,703 | 95.50% |
| Investor Occupied ........... | 201 | 26,497,738 | 4.01 |
| Second Home ................. | 23 | 3,296,371 | 0.50 |
| Total .................... | 3,376 | $661,532,812 | 100.00% |

```
</TABLE>
```

(1) Based on representations of the related mortgagors at the time of origination.

PROPERTY TYPE
(ALL STATISTICAL CALCULATION MORTGAGE LOANS)

```
<TABLE>
<CAPTION>
```

| Property Type | Number of Statistical Calculation Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Statistical Calculation Mortgage Loans |
|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` |
| Single Family Residence ....... | 2,482 | $470,394,972 | 71.11% |
| PUD ........................ | 421 | 90,194,072 | 13.63 |
| Condo Unit .................. | 228 | 44,282,234 | 6.69 |
| 2 Unit ..................... | 129 | 30,991,367 | 4.68 |
| Townhouse .................. | 55 | 9,391,870 | 1.42 |
| 3 Unit ..................... | 21 | 6,537,231 | 0.99 |
| High Rise Condo ............. | 26 | 6,362,050 | 0.96 |
| 4 Unit ..................... | 14 | 3,379,015 | 0.51 |
| Total .................... | 3,376 | $661,532,812 | 100.00% |

```
</TABLE>
```

Annex II-5

INDYMAC ABS, INC.

DEPOSITOR

ASSET BACKED CERTIFICATES
ASSET BACKED NOTES
(ISSUABLE IN SERIES)

```
------------------------
| PLEASE CAREFULLY      |
| CONSIDER OUR          |
| DISCUSSION OF         |
| SOME OF THE RISKS     |
| OF INVESTING IN       |
| THE SECURITIES        |
| UNDER "RISK FACTORS"  |
| BEGINNING ON PAGE 6   |
------------------------
```

THE TRUSTS

Each trust will be established to hold assets in its trust fund transferred to it by IndyMac ABS, Inc. The assets in each trust fund will be specified in the prospectus supplement for the particular trust and will generally consist of:

o   loans secured by first and/or subordinate liens on one- to four-family residential properties, including manufactured housing that is permanently affixed and treated as real property under local law, or security interests in shares issued by cooperative housing corporations,

o   loans secured by first and/or subordinate liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units,

o   loans secured by first and/or subordinate liens on mixed residential and commercial properties (mixed-use loans),

o   closed-end second-lien loans, secured in whole or in part by subordinate liens on one- to four-family residential properties,

o   home equity line of credit loans or specified balances thereof, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties,

o   loans secured in whole or in part by first and/or subordinate liens on improved land that is generally suitable for one- to four-family residential dwellings (lot loans), including loans to finance the construction of a dwelling (construction loans) and construction loans which by their terms convert into a permanent loan upon the completion of construction (construction-to-permanent loans),

o   home improvement installment sale contracts and installment loan agreements that are secured by first or subordinate liens on one- to four-family residential properties, or

o   mortgage-backed securities or collateralized mortgage obligations backed by loans secured by first and/or subordinate liens on one- to four-family residential properties, by lot loans or by participations in these types of loans.

THE SECURITIES

IndyMac ABS, Inc. will offer either certificates or notes pursuant to a prospectus supplement. The securities will be grouped into one or more series, each having its own distinct designation. Each series will be issued in one or more classes and each class will evidence beneficial ownership of a specified portion of future payments on the assets in the trust fund to which the series relates. A prospectus supplement for a series will specify all of the terms of the series and each of the classes in the series.

OFFERS OF SECURITIES

The securities may be offered through several different methods, including offerings through underwriters.

-------------------------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATORS NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATORS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this prospectus is August 22, 2005

2

RISK FACTORS

You should carefully consider the following information because it identifies significant risks associated with an investment in the securities.

<TABLE>

<S>                                                <C>
LIMITED LIQUIDITY...................................    No market for the securities of any series will exist
                                                       before those securities are issued. We cannot assure you
                                                       that a secondary market will develop. Even if a secondary
                                                       market develops, we cannot assure you that it will provide
                                                       you with liquidity of investment or that it will continue
                                                       for the life of the securities of that series.

LIMITED SOURCE OF
PAYMENTS - NO RECOURSE
TO SELLERS, DEPOSITOR
OR MASTER SERVICER................................    The applicable prospectus supplement may provide that
                                                       securities will be payable from trust funds other than
                                                       their associated trust fund, but if it does not, they will
                                                       be payable solely from their associated trust fund. If the
                                                       trust fund does not have enough assets to distribute the
                                                       full amount due to you as a securityholder, your yield
                                                       will be impaired, and the return of your principal may be
                                                       impaired, without you having recourse to anyone else.
                                                       Furthermore, at the times specified in the applicable
                                                       prospectus supplement, certain assets of the trust fund
                                                       and/or any balance remaining in the security account
                                                       immediately after making all payments due on the
                                                       securities of that series, may be released and paid out to
                                                       other persons, such as the depositor, a servicer, a credit
                                                       enhancement provider, or any other person entitled to
                                                       payments from the trust fund. Those assets will no longer
                                                       be available to make payments to you. Those payments are
                                                       generally made only after other specified payments that
                                                       may be described in the applicable prospectus supplement
                                                       have been made.

                                                       You will not have any recourse against the depositor or
                                                       any servicer if you do not receive a required
                                                       distribution on the securities. You will also not have
                                                       recourse against the assets of the trust fund of any
                                                       other series of securities.

                                                       The securities will not represent an interest in the
                                                       depositor, any servicer, any seller to the depositor, or
                                                       anyone else except the trust fund. The only obligation of
                                                       the depositor to a trust fund will come from certain
                                                       representations and warranties made by it about assets
                                                       transferred to the trust fund. If these representations

</TABLE>

6

```
<TABLE>

<S>                                             <C>
                                                and warranties are untrue, the depositor may be required
                                                to repurchase some of the transferred assets. IndyMac
                                                ABS, Inc., which is the depositor, does not have
                                                significant assets and is unlikely to have significant
                                                assets in the future. If the depositor were required to
                                                repurchase a loan because of a breach of a
                                                representation, its only sources of funds for the
                                                repurchase would be:

                                                o  funds obtained from the enforcement of a corresponding
                                                   obligation of a seller or originator of the loan or

                                                o  funds from a reserve account or similar credit
                                                   enhancement established to pay for loan repurchases.

                                                The only obligations of the master servicer to a trust
                                                fund (other than its master servicing obligations) will
                                                come from certain representations and warranties made by
                                                it in connection with its loan servicing activities. If
                                                these representations and warranties turn out to be
                                                untrue, the master servicer may be required to repurchase
                                                or substitute for some of the loans. However, the master
                                                servicer may not have the financial ability to make the
                                                required repurchase or substitution.

                                                The only obligations to a trust fund of a seller of
                                                loans to the depositor will come from certain
                                                representations and warranties made by it in
                                                connection with its sale of the loans and certain
                                                document delivery requirements. If these
                                                representations and warranties turn out to be untrue,
                                                or the seller fails to deliver required documents, it
                                                may be required to repurchase or substitute for some
                                                of the loans. However, the seller may not have the
                                                financial ability to make the required repurchase or
                                                substitution.

                                                As described in this prospectus, a master servicer may
                                                be obligated to enforce the sellers' obligations.
                                                However, the master servicer will not be obligated to
                                                purchase or replace any loan if a seller defaults on
                                                its obligation or for any other reason.

CREDIT ENHANCEMENT MAY
NOT BE SUFFICIENT TO
PROTECT YOU FROM LOSSES.............................  Credit enhancement is intended to reduce the effect of
                                                loan losses. But credit enhancements may benefit only some
                                                classes of a series of securities, and the amount of any
                                                credit enhancement will be limited as described

</TABLE>
```

7

and adversely affects the securityholders' interests in that loan. If the seller cannot cure the breach on or before the business day after the first determination date (as defined in the related prospectus supplement) that is more than 90 days after the seller receives notice from the master servicer or the trustee, as the case may be, the seller will be obligated either:

- o to repurchase the loan from the trust fund at a price (the "PURCHASE PRICE") equal to 100% of its unpaid principal balance as of the date of the repurchase plus accrued interest thereon at the Loan Rate, up to the scheduled monthly payment date for the loan in the month following the month of repurchase (less any advances or amount payable as related servicing compensation if the seller is the master servicer), or

- o to substitute for the loan a replacement loan that satisfies the criteria specified in the related prospectus supplement; provided, however, that the seller will not be obligated to make any repurchase or substitution (or cure a breach) if the breach constitutes fraud in the origination of the affected loan and the seller did not have knowledge of the fraud.

If a REMIC election is to be made with respect to a trust fund, unless otherwise specified in the related prospectus supplement, the master servicer or a holder of the related residual certificate will be obligated to pay any prohibited transaction tax in connection with any repurchase or substitution. In addition, the trustee must have received a satisfactory opinion of counsel that the repurchase or substitution will not cause the trust fund to lose its status as a REMIC or otherwise subject the trust fund to a prohibited transaction tax. The master servicer may be entitled to reimbursement from the assets of the related trust fund or from any holder of the related residual certificate. See "Description of the Securities-General" in this prospectus. Except where the master servicer is also the seller, the master servicer will be required under the applicable agreement to enforce this obligation for the benefit of the trustee and the securityholders , acting in its good faith business judgment as if it were the owner of the loan. This obligation to repurchase or substitute will constitute the sole remedy available to securityholders or the trustee for a seller's breach of representations and warranties.

    Neither the depositor nor the master servicer (unless the master servicer is a seller) will be obligated to purchase or substitute a loan if a seller defaults on its obligation to do so. No assurance can be given that sellers will fulfill their repurchase or substitution obligations.

## DESCRIPTION OF THE SECURITIES

    Each series of certificates will be issued and serviced pursuant to a separate pooling and servicing agreement among the depositor, the master servicer and the trustee. Two forms of pooling and servicing agreement have been filed as exhibits to the Registration Statement of which this prospectus forms a part. Each series of notes will be issued pursuant to an indenture between the related trust fund and the entity named in the related prospectus supplement as trustee for that series, and the related loans will be serviced by the master servicer pursuant to a sale and servicing agreement. A form of indenture and a form of sale and servicing agreement have been filed as exhibits to the Registration Statement of which this prospectus forms a part. A series of securities may consist of both notes and certificates. Each series of such securities will be issued and serviced pursuant to a separate master servicing agreement. Each agreement will be dated as of the related cut-off date. The provisions of each agreement will vary depending on the nature of the securities to be issued under it and the nature of the related trust fund. The following summaries of the material provisions that may appear in each agreement are subject to, and are qualified in their entirety by reference to, all the provisions of the agreements for each series of securities and the applicable prospectus supplement. The depositor will provide a copy of the agreements (without exhibits) relating to any series without charge upon written request of a holder of record of a security of that series

# Exhibit 21

PROSPECTUS SUPPLEMENT DATED September 7, 2006
(For use with Prospectus dated June 14, 2006)

$918,650,000
(Approximate)



**INDYMAC MBS, INC.**
Depositor
Sponsor, Seller and Servicer

**Home Equity Mortgage Loan Asset−Backed Trust,**
**Series INABS 2006−D**
Issuing Entity

**Distributions payable on the 25th day of each month or the next business day, beginning in October 2006**

The issuing entity will hold a pool of sub−prime mortgage loans and will issue certificates including the following classes of certificates being offered pursuant to this prospectus supplement and the accompanying base prospectus. The mortgage loans will be segregated into two groups, one consisting of mortgage loans with principal balances that conform to Fannie Mae loan limits and one consisting of mortgage loans with principal balances that may or may not conform to Fannie Mae loan limits.

| | Initial Class Certificate Balance (1) | Pass− Through Rate (2)(3) | Price to Public | Underwriting Discount and Commissions | Proceeds to Depositor |
|---|---|---|---|---|---|
| 1A | $193,000,000 | Variable | 100.0000% | 0.20% | 99.80% |
| 2A−1 | $243,173,000 | Variable | 100.0000% | 0.25% | 99.75% |
| 2A−2 | $125,449,000 | Variable | 100.0000% | 0.25% | 99.75% |
| 2A−3 | $115,452,000 | Variable | 100.0000% | 0.25% | 99.75% |
| 2A−4 | $56,326,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−1 | $37,525,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−2 | $33,250,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−3 | $19,475,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−4 | $17,100,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−5 | $17,100,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−6 | $16,150,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−7 | $12,350,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−8 | $8,550,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−9 | $11,400,000 | Variable | 100.0000% | 0.25% | 99.75% |
| M−10 | $12,350,000 | Variable | 90.3021% | 0.25% | 90.05% |

(1)  Subject to a permitted variance in the aggregate of 5%.

(2)  As described under "*Description of the Certificates—Distributions*" in this prospectus supplement, the pass−through rates of the certificates are subject to a Net−WAC rate cap and a maximum cap.

(3)  The pass−through rates on the Class A and Subordinated Certificates are based on one−month LIBOR plus an applicable margin and are subject to increase as described under "*Description of the Certificates—Pass−Through Rates*" in this prospectus supplement.

*Consider carefully the risk factors beginning on page S−13 in this prospectus supplement and on page 5 in the base prospectus.*
*The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of IndyMac MBS, Inc., IndyMac Bank, F.S.B., or any of their affiliates.*
*This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the base prospectus.*

This prospectus supplement and the accompanying base prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity.

| | |
|---|---|
| Weighted Average Original LTV*: | 80.31% |
| Weighted Average Original Term to Maturity: | 358 months |
| Non-Zero Weighted Average FICO Credit Risk Score: | 615 |
| Weighted Average Remaining Term to Stated Maturity: | 357 months |
| First Liens: | 99.37% |
| Second Liens: | 0.63% |
| Geographic Concentrations in excess of 10%: | |
|    Florida | 13.00% |
|    California | 12.65% |
|    New York | 11.00% |

• *Includes the Combined Original LTV for Second Lien Loans.*

*Group II Mortgage Loans*

The group II mortgage loans included in the statistical calculation pool consist of mortgage loans with an aggregate principal balance of approximately $489,969,709 as of the cut-off date, after giving effect to principal payments due on or before that date.

As of the cut-off date, the group II mortgage loans in the statistical calculation pool had the following characteristics:

| | |
|---|---|
| Aggregate Principal Balance: | $489,969,709 |
| Weighted Average Mortgage Rate: | 8.447% |
| Range of Mortgage Rates: | 5.000% to 15.000% |
| Average Principal Balance: | $210,921 |
| Range of Stated Principal Balances: | $9,945 to $1,800,000 |
| Weighted Average Original LTV*: | 79.88% |
| Weighted Average Original Term to Maturity: | 354 months |
| Non-Zero Weighted Average FICO Credit Risk Score: | 619 |
| Weighted Average Remaining Term to Stated Maturity: | 352 months |
| First Liens: | 96.97% |
| Second Liens: | 3.03% |
| Geographic Concentrations in excess of 10%: | |
|    California | 20.42% |
|    Florida | 13.39% |
|    New York | 12.77% |

• *Includes the Combined Original LTV for Second Lien Loans.*

See *"The Mortgage Pool"* in this prospectus supplement.

**Required Repurchases or Substitutions of Mortgage Loans**

The seller will make certain representations and warranties relating to the mortgage loans pursuant to the pooling and servicing agreement. If with respect to any mortgage loan any of the representations and warranties are breached in any material respect as of the date made, or an uncured material document defect exists, the seller will be obligated to repurchase or substitute for the mortgage loan as further described in this prospectus supplement under *"Description of the Certificates—Representations and Warranties Relating to Mortgage Loans."*

The seller will represent that as of the closing date, each mortgage loan is in compliance with applicable federal and state laws and regulations. The seller will also represent that none of the mortgage loans are subject to Section 32 of Regulation Z nor have any of the mortgagors been required to purchase single—premium credit life insurance in connection with the origination of the related mortgage loan. In the event of a breach of such representation, the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in the base prospectus. If the seller is unable or otherwise fails to satisfy such obligations, the yield on the Class A and Subordinated Certificates may be materially and adversely affected.

Under the anti—predatory lending laws of some states, the mortgagor is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if an originator reasonably believed that the test was satisfied. Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti—predatory lending law, in which case the seller will be required to purchase such mortgage loan from the trust.

*Prepayment interest shortfalls and Relief Act shortfalls may affect the yield on your investment*

When a mortgage loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to (but not including) the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for distribution on the next distribution date. The servicer is required to cover a portion of the shortfall in interest collections that are attributable to prepayments. In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act and similar state laws will not be covered by the servicer.

On any distribution date, any shortfalls resulting from the application of the Servicemembers Civil Relief Act and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer will be allocated first to the monthly interest distributable to the Class C Certificates and then to the monthly interest distributable amounts with respect to the offered certificates *pro rata* based on the respective amounts of interest accrued on such certificates for such distribution date. The holders of the offered certificates will not be entitled to reimbursement for any such interest shortfalls. If these shortfalls are allocated to the offered certificates the amount of interest distributed to those certificates will be reduced, adversely affecting the yield on your investment.

*Violation of environmental laws or the existence of hazards may result in losses to the trust*

Federal, state and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health and safety. In certain circumstances, these laws and regulations impose obligations on owners or operators of residential properties such as those that secure the mortgage loans. Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the trust as owner of the related property.

In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage. Further, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of petroleum from an underground storage tank under certain circumstances. If the trust is considered the owner or operator of a property, it may suffer losses as a result of any liability imposed for environmental hazards on the property.

*Risks associated with the interest rate swap agreement and the swap provider*

On each distribution date beginning in October 2006 through and including the distribution date in September 2011, any net swap payments payable to the supplemental interest trust by the swap provider under the interest rate swap agreement will be available as described in this prospectus supplement to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization as described in this prospectus supplement. However, no net swap payments will be payable by the swap provider unless the floating amount owed by the swap provider on a distribution date exceeds the fixed amount owed to the swap provider on such distribution date. This will not occur except in periods when one—month LIBOR (as determined pursuant to the interest rate swap agreement) exceeds approximately 5.1975% per annum. If the swap provider defaults on its obligations under the interest rate swap agreement, then there may be insufficient funds to cover such amounts. To the extent that distributions on the Class A and Subordinated Certificates depend in part on payments to be received by the trust from amounts paid to the supplemental interest trust trustee under the interest rate swap agreement, the ability of the trustee to make such distributions on such certificates will be subject to the credit risk of the swap provider under the interest rate swap agreement. No assurance can be made that any amounts will be received under the interest rate swap agreement, or that any such amounts that are received will be sufficient to cover certain unpaid interest amounts, net WAC cap carry forward amounts and realized losses and to restore overcollateralization.

Any net swap payment payable by the supplemental interest trust to the swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to certificateholders, and may limit the pass—through rates on the certificates. The trust will make a net swap payment to the supplemental interest trust for payment to the swap provider on each distribution date until one—month LIBOR exceeds approximately

acquired or originated by the seller in the normal course of its business.

Under the pooling and servicing agreement, the seller will make certain representations, warranties and covenants to the depositor relating to, among other things, the due execution and enforceability of the pooling and servicing agreement and certain characteristics of the mortgage loans and, subject to the limitations described below under *"—Assignment of Mortgage Loans,"* will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists deficient documentation or an uncured breach of any representation, warranty or covenant if the breach of representation, warranty or covenant materially and adversely affects the interests of the certificateholders in that mortgage loan. The seller will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in the seller's mortgage portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to adversely affect the interests of the certificateholders. See *"Loan Program—Representations by Sellers; Repurchases"* in the base prospectus. Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in and to the representations, warranties and covenants (including the seller's repurchase obligation) to the trustee for the benefit of the certificateholders. The depositor will make no representations or warranties with respect to the mortgage loans and will have no obligation to repurchase or substitute mortgage loans with deficient documentation or which are otherwise defective. IndyMac Bank will sell the mortgage loans without recourse and will have no obligation with respect to the certificates in its capacity as seller other than the repurchase or substitution obligations described above. The obligations of IndyMac Bank, as servicer, with respect to the certificates, will be limited to the servicer's contractual servicing obligations under the pooling and servicing agreement.

Certain information with respect to the mortgage loans included in the statistical calculation mortgage pool is set forth below (such mortgage loans, the *"Statistical Calculation Mortgage Loans"*). Prior to the closing date, the Statistical Calculation Mortgage Loans may experience some amortization, mortgage loans may be removed from the statistical calculation mortgage pool and other mortgage loans may be substituted for such mortgage loans. The depositor believes that the information set forth in this prospectus supplement with respect to the statistical calculation mortgage pool is representative of the characteristics of the mortgage pool as it will be constituted at the closing date, although certain characteristics of the mortgage loans in the mortgage pool will vary. Unless otherwise indicated, information presented below expressed as a percentage (other than rates of interest) are approximate percentages based on the Stated Principal Balances of the Statistical Calculation Mortgage Loans as of the cut-off date.

At origination, approximately 98.77% of the Statistical Calculation Mortgage Loans in loan group I and approximately 96.51% of the Statistical Calculation Mortgage Loans in loan group II had stated terms to maturity of 30 years and the remaining loans in each loan group had stated terms to maturity at origination of less than 30 years. Substantially all of the Statistical Calculation Mortgage Loans provide for payments due on the first day of each month. Scheduled monthly payments made by the mortgagors on the mortgage loans either earlier or later than the scheduled due dates thereof is not expected to affect the amortization schedule or the relative application of those payments to principal and interest.

Certain of the mortgage loans included in the trust will be mortgage loans that only require the related mortgagor to pay interest on the principal balance of the mortgage loan for either the first two, five or ten years after its origination, but require that the entire principal balance of the mortgage loan be fully amortized over the related remaining term of the mortgage loan following such interest only period (such mortgage loans are referred to in this prospectus supplement as *"Interest-Only Mortgage Loans"*). The mortgage rate at which interest is calculated during the period in which only payments of interest are due may be fixed or adjustable or initially fixed and then adjustable. Approximately 103 of the Statistical Calculation Mortgage Loans in loan group I and approximately 325 of the Statistical Calculation Mortgage Loans in loan group II, representing approximately 13.41% and 19.71%, respectively, of the Statistical Calculation Mortgage Loans in that loan group are Interest Only Mortgage Loans. See the tables entitled "Product Type" in Annex II for additional characteristics of the Interest-Only Mortgage Loans included in the statistical calculation pool.

Certain of the mortgage loans included in the trust will be secured by a second lien on the related mortgages property (each a *"Second Lien Loan"*). Approximately 0.63% of the Statistical Calculation Mortgage Loans in loan group I and approximately 3.03% of the Statistical Calculation Loans in loan group II are Second Lien Loans.

Approximately 24.97% of the Statistical Calculation Mortgage Loans in loan group I and approximately 25.98% of the Statistical Calculation Loans in loan group II are balloon loans and provide for equal monthly payments, consisting of principal and interest, based on a stated amortization schedule, and a single payment of the remaining principal balance of the loan at maturity. See the tables entitled "Product Type" in Annex II for the balloon loans included in the statistical calculation pool.

Approximately 66.86% of the Statistical Calculation Mortgage Loans in loan group I and approximately 64.98% of the Statistical Calculation Mortgage Loans in loan group II contain prepayment charges. Prepayment charges provide that if the borrower were to prepay the mortgage loan in full at any time from the origination of the mortgage loan to a date set forth in the related mortgage note (the *"Prepayment Charge Period"*), the borrower would also have to pay a fee in addition to the amount necessary to repay the mortgage loan. The Prepayment Charge Period for the mortgage loans vary from one year to three years, depending on the terms set forth in the related mortgage note. The amount of the prepayment charge varies.

principal and interest received on or with respect to the Closing Date Mortgage Loans, exclusive of principal and interest due on or prior to the related cut−off date. Pursuant to each subsequent transfer instrument, the seller will sell, transfer, assign, set over and otherwise convey without recourse to the depositor all right, title and interest of the seller, and the depositor will sell, transfer, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor, in and to each Subsequent Mortgage Loan and all right, title and interest in and to all other assets included in Home Equity Mortgage Loan Asset−Backed Trust, Series INABS 2006−D, including all principal and interest received on or with respect to each Subsequent Mortgage Loan, exclusive of principal and interest due on or prior to the related cut−off date.

In connection with each transfer and assignment, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, among other things, the original mortgage note (and any modification or amendment thereto) endorsed in blank without recourse (except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost), the original mortgage creating a first lien on the related mortgaged property with evidence of recording indicated thereon, an assignment in recordable form of the mortgage for any non−MERS mortgage loan, the title policy with respect to the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any document not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 30% of the Closing Date Mortgage Loans in each loan group (the "***Delayed Delivery Loans***"), the depositor may deliver all or a portion of each related mortgage file to the trustee not later than five business days after the closing date. If so provided in the pooling and servicing agreement, for non−MERS mortgage loans, assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where, in the opinion of counsel, recording is not required to protect the trustee's interest in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the seller.

The trustee will review each mortgage file within 90 days of the closing date or subsequent transfer date, as applicable (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date or subsequent transfer date, as applicable), and if any document in a mortgage file is found to be missing or noncompliant with the review criteria set forth in the pooling and servicing agreement, such defect is material and the seller does not cure that defect within 90 days of notice thereof from the trustee (or within a longer period not to exceed 720 days after the closing date as provided in the pooling and servicing agreement in the case of missing documents not returned from the public recording office), the seller will be obligated to repurchase the related mortgage loan from the trust fund. Rather than repurchase the mortgage loan as provided above, the seller may remove the mortgage loan from the trust fund and substitute in its place another mortgage loan; however, substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that substitution will not disqualify the trust fund as a REMIC or result in a prohibited transaction tax under the Code. Any replacement mortgage loan generally will, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement:

- have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by the seller and held for distribution to the certificateholders on the related distribution date (a "***Substitution Adjustment Amount***")),

- have a current mortgage rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan,

- with respect to an adjustable−rate mortgage loan, (a) have a mortgage rate based upon the same Loan Index and a margin at least equal to and not greater than 50 basis points higher than the deleted mortgage loan, (b) have a mortgage rate subject to a maximum rate that is no less than the maximum rate applicable to the deleted mortgage loan, (c) have Adjustment Dates that are no more or less frequent than the deleted mortgage loan and (d) not be a Performance Loan,

- have a Loan−to−Value Ratio not higher than that of the deleted mortgage loan,

- have a remaining term to maturity not greater than (and not more than one year less than) that of the deleted mortgage loan, and

- comply with all of the representations and warranties set forth in the pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the trustee and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of such mortgage, above, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some or all of the mortgage loans in the trust fund that are not already held through the MERS® System may, at the discretion of the servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.

*THE ORIGINATOR AND THE SELLER*

credit file.

IndyMac Bank currently operates two mortgage loan purchase programs as part of its correspondent channel:

1. *Prior Approval Program.* Under this program, IndyMac Bank performs a full credit review and analysis of each mortgage loan generally with the same procedures used for mortgage loans originated through the mortgage professionals channel. Only after IndyMac Bank issues an approval notice to a third party loan originator is a mortgage loan eligible for purchase pursuant to this program.

2. *Preferred Delegated Underwriting Program.* Under this program, third party loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac Bank to verify mortgagor information. The eligibility requirements for participation in the Preferred Delegated Underwriting Program vary based on the net worth of the third party loan originators with more stringent requirements imposed on third party loan originators with a lower net worth. Third party loan originators are required to submit a variety of information to IndyMac Bank for review, including their current audited financial statements, their quality control policies and procedures, their current errors and omissions/fidelity insurance coverage evidencing blanket coverage in a minimum amount of $300,000, at least three underwriters' resumes showing at least three years experience or a direct endorsement designation, and at least two references from mortgage insurance companies. Third party loan originators are required to have an active, traditional warehouse line of credit, which is verified together with the bailee letter and wire instructions. IndyMac Bank requires each third party loan originator to be recertified on an annual basis to ensure that it continues to meet the minimum eligibility guidelines for the Preferred Delegated Underwriting Program.

Under the Preferred Delegated Underwriting Program, each eligible third party loan originator is required to underwrite mortgage loans in compliance with IndyMac Bank's underwriting guidelines usually by use of e-MITS or, infrequently, by submission of the mortgage loan to IndyMac Bank for traditional underwriting. A greater percentage of mortgage loans purchased pursuant to this program are selected for post-purchase quality control review than for the other program.

Mortgage loans originated through the conduit channel are generally initially underwritten by a third party seller to the third party seller's underwriting guidelines. IndyMac Bank reviews each third party seller's guidelines for acceptability, and these guidelines generally meet industry standards and incorporate many of the same factors used by Fannie Mae, Freddie Mac and IndyMac Bank. Each mortgage loan is re-underwritten by IndyMac Bank for compliance with its guidelines based only on the objective characteristics of the mortgage loan, such as FICO, documentation type, loan-to-value ratio, etc., but without reassessing the underwriting procedures originally used. In addition, a portion of the mortgage loans acquired from a third party seller are subjected to a full re-underwriting.

Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

### *SERVICING OF MORTGAGE LOANS*

*The Servicer*

IndyMac Bank will act as servicer under the pooling and servicing agreement. The principal executive offices of the servicer are located at 888 East Walnut Street, Pasadena, California 91101-7211. IndyMac Bank has been master servicing mortgage loans since 1993 and servicing mortgage loans directly (servicing without the use of a subservicer) since 1998. As of the date of this prospectus supplement, IndyMac Bank is rated (x) by Fitch, "RPS2+" as a servicer of alt/A, prime and sub-prime mortgage loans, (y) by Moody's, "SQ2" as a primary servicer of prime and sub-prime first lien mortgage loans and "SQ3" as a special servicer and (z) by S&P, "above average/stable" as a primary servicer and "average/stable" as a servicer and special servicer. The servicer is referred to as the "master servicer" throughout the base prospectus.

The servicer will be responsible for servicing the mortgage loans in accordance with the terms set forth in the pooling and servicing agreement employing the same degree of skill and care which it employs in servicing the mortgage loans comparable to the mortgage loans serviced by the servicer for itself or others.

The servicer will not have any custodial responsibilities for the mortgage loans.

If the servicing of any mortgage loan were to be transferred from a subservicer to IndyMac Bank, or if any other servicing transfer were to occur, there may be an increase in all delinquencies and defaults due to misapplied or lost payments, data input errors, system incompatibilities or otherwise. Although any increase in delinquencies is expected to be temporary, there can be no assurance as to the duration or severity of any disruption in servicing the applicable mortgage loans as a result of any servicing transfer.

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Mortgage Loans | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Combined Original LTV | Weighted Average FICO Score | % of Full Doc Loans | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|---|
| Single Family Residence | 2,418 | $481,483,041 | 69.64% | $199,124 | 8.445% | 80.03% | 615 | 44.20% | 40.43% |
| PUD | 421 | 87,448,343 | 12.65 | 207,716 | 8.524 | 81.36 | 616 | 44.41 | 42.00 |
| 2 Unit | 167 | 45,193,378 | 6.54 | 270,619 | 8.316 | 76.91 | 633 | 31.74 | 41.74 |
| Condo Unit | 210 | 39,563,904 | 5.72 | 188,400 | 8.458 | 82.15 | 630 | 39.37 | 40.14 |
| Townhouse | 121 | 20,984,857 | 3.03 | 173,429 | 8.414 | 79.54 | 602 | 48.57 | 39.31 |
| 3 Unit | 33 | 10,120,274 | 1.46 | 306,675 | 8.497 | 71.29 | 633 | 24.78 | 39.87 |
| High Rise Condo | 18 | 4,052,120 | 0.59 | 225,118 | 8.791 | 83.82 | 650 | 48.23 | 37.52 |
| 4 Unit | 10 | 2,590,507 | 0.37 | 259,051 | 8.320 | 82.27 | 647 | 10.80 | 41.81 |
| Total | 3,398 | $691,436,424 | 100.00% | $203,483 | 8.449% | 80.00% | 618 | 42.88% | 40.64% |

### OCCUPANCY TYPE

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Mortgage Loans | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Combined Original LTV | Weighted Average FICO Score | % of Full Doc Loans | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 3,130 | $649,156,050 | 93.89% | $207,390 | 8.402% | 79.94% | 616 | 44.78% | 40.99% |
| Investor Occupied | 236 | 34,665,723 | 5.01 | 146,889 | 9.220 | 81.21 | 650 | 13.57 | 33.92 |
| Second Home | 32 | 7,614,652 | 1.10 | 237,958 | 8.913 | 79.49 | 638 | 14.75 | 41.20 |
| Total | 3,398 | $691,436,424 | 100.00% | $203,483 | 8.449% | 80.00% | 618 | 42.88% | 40.64% |

Based on representations of the related mortgagors at the time of origination.

### LOAN PURPOSE

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Mortgage Loans | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Combined Original LTV | Weighted Average FICO Score | % of Full Doc Loans | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 1,942 | $432,657,461 | 62.57% | $222,790 | 8.420% | 77.25% | 602 | 45.43% | 40.85% |
| Purchase | 1,272 | 226,416,978 | 32.75 | 178,001 | 8.447 | 85.90 | 648 | 36.23 | 40.41 |
| Rate & Term Refinance | 184 | 32,361,985 | 4.68 | 175,880 | 8.845 | 75.55 | 608 | 55.44 | 39.47 |
| Total | 3,398 | $691,436,424 | 100.00% | $203,483 | 8.449% | 80.00% | 618 | 42.88% | 40.64% |

*PROSPECTUS*

## *INDYMAC MBS, INC.*
*Depositor*

*Mortgage Pass–Through Certificates*
*Mortgage Pass–Through Notes*
*(Issuable in Series)*

*Please carefully consider our discussion of some of the risks of investing in the securities under "Risk Factors" beginning on page 5.*

**The Trusts**

Each issuing entity will be established to hold assets transferred to it by IndyMac MBS, Inc. The assets in each issuing entity will be specified in the prospectus supplement for the particular trust and will generally consist of:

- first and/or subordinate lien mortgage loans secured by one– to four–family residential properties, including manufactured housing that is permanently affixed and treated as real property under local law, or security interests issued by cooperative housing corporations or participations in that type of loan,

The securities will represent obligations of the related issuing entity only and will not represent an interest in or obligation of IndyMac MBS, Inc., any originator, servicer, or any of their affiliates.

- loans secured by first and/or subordinate liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units,
- closed–end second lien loans, secured in whole or in part by subordinate liens on one– to four–family residential properties,
- loans secured by first and/or subordinate liens on mixed residential and commercial properties (mixed use loans),
- home equity line of credit loans or specified balances thereof, secured in whole or in part by first and/or subordinate liens on one– to four–family residential properties,
- loans secured in whole or in part by first and/or subordinate liens on improved land that is generally suitable for one– to four–family residential dwellings (lot loans), including loans to finance the construction of a dwelling (construction loans) and construction loans which by their terms convert into a permanent loan upon the completion of construction (construction–to–permanent loans),
- home improvement installment sale contracts and installment loan agreements that are secured by first or subordinate liens on one– to four–family residential properties,
- mortgage pass–through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac,
- private mortgage–backed securities backed by first lien mortgage loans secured by one– to four–family residential properties or participations in that type of loan, or
- mortgage–backed securities or collateralized mortgage obligations backed by loans secured by first and/or subordinate liens on one– to four–family residential properties, by lot loans or by participations in these types of loans.

*The Securities*

IndyMac MBS, Inc. will offer either certificates or notes pursuant to a prospectus supplement. The securities will be grouped into one or more series, each having its own distinct designation. Each series will be issued in one or more classes and each class will evidence beneficial ownership of (in the case of certificates) or a right to receive payments supported by (in the case of notes) a specified portion of future payments on the assets in the issuing entity to which the series relates. A prospectus supplement for a series will specify all of the terms of the series and of each of the classes in the series.

*Offers of Securities*

The securities may be offered through several different methods, including offerings through underwriters.

*Credit Enhancement*

If the securities have any type of credit enhancement, the prospectus supplement for the related series will describe the credit enhancement. The types of credit enhancement are generally described in this prospectus supplement.

*Risk Factors*

You should carefully consider the following information because it identifies significant risks associated with an investment in the securities.

| | |
|---|---|
| *Limited Source of Payments — No Recourse to Sellers, Depositor or Servicer* | The applicable prospectus supplement may provide that securities will be payable from other issuing entities in addition to their associated issuing entity, but if it does not, they will be payable solely from their associated issuing entity. If the issuing entity does not have sufficient assets to distribute the full amount due to you as a securityholder, your yield will be impaired. The return of your principal may be impaired, and you will not have recourse to any other entity. Furthermore, at the times specified in the applicable prospectus supplement, certain assets of the issuing entity may be released and paid out to other people, such as the depositor, a servicer, a credit enhancement provider, or any other person entitled to payments from the issuing entity. Those assets will no longer be available to make payments to you. Those payments are generally made after other specified payments that may be set forth in the applicable prospectus supplement have been made. |

You will not have any recourse against the depositor or any servicer if you do not receive a required distribution on the securities. Unless otherwise specified in the applicable prospectus supplement, you also will not have recourse against the assets of the issuing entity of any other series of securities.

The securities will not represent an interest in the depositor, any servicer, any seller to the depositor, or anyone else except the issuing entity. The only obligation of the depositor to an issuing entity comes from certain representations and warranties made by it about assets transferred to the issuing entity. If these representations and warranties turn out to be untrue, the depositor may be required to repurchase or substitute for some of the transferred assets. IndyMac MBS, Inc., which is the depositor, does not have significant assets and is unlikely to have significant assets in the future. If the depositor were required to repurchase a loan because of a breach of a representation, its only sources of funds for the repurchase would be:

- funds obtained from enforcing a corresponding obligation of a seller or originator of the loan, or
- funds from a reserve fund or similar credit enhancement established to pay for loan repurchases.

The only obligations of the servicer to an issuing entity (other than its servicing obligations) comes from certain representations and warranties made by it in connection with its loan servicing activities. If these representations and warranties turn out to be untrue, the servicer may be required to repurchase some of the loans. However, the servicer may not have the financial ability to make the required repurchase.

The only obligations to an issuing entity of a seller of loans to the depositor comes from certain representations and warranties made by it in connection with its sale of the loans and certain document delivery requirements. If these representations and warranties turn out to be untrue, or the seller fails to deliver required documents, it may be required to repurchase some of the loans. However, the seller may not have the financial ability to make the required repurchase.

| | |
|---|---|
| *Credit Enhancement May Not Be Sufficient to Protect You from Losses* | Credit enhancement is intended to reduce the effect of loan losses. Credit enhancements, however, may benefit only some classes of a series of securities and the amount of any credit enhancement will be limited as described in the applicable prospectus supplement. Furthermore, the amount of a credit enhancement may decline over time pursuant to a schedule or formula or otherwise, and could be depleted from payments or for other reasons before the securities covered by the credit enhancement are paid in full. In addition, a credit enhancement may not cover all potential sources of loss. For example, a credit enhancement may or may not cover fraud or negligence by a loan originator or other parties. Also, all or a portion of a credit enhancement may be reduced, substituted for, or even eliminated, so long as the rating agencies rating the securities indicate that the change in credit enhancement would not cause them to adversely change their rating of the securities. Consequently, securityholders may suffer losses even though a credit enhancement exists and its provider does not default. |

| | |
|---|---|
| *Losses on Balloon Payment Mortgages Are Borne by You* | Some of the underlying loans may not be fully amortizing over their terms to maturity and, thus, will require substantial principal payments (that is, balloon payments) at their stated maturity. Loans with balloon payments involve a greater degree of risk than fully amortizing loans because typically the borrower must be able to refinance the loan or sell the property to make the balloon payment at maturity. The ability of a borrower to do this will depend on factors such as mortgage rates at the time of sale or refinancing, the borrower's equity in the property, the relative |

- the original security agreement,

- the proprietary lease or occupancy agreement,

- the recognition agreement,

- an executed financing agreement and

- the relevant stock certificate, related blank stock powers and any other document specified in the related prospectus supplement.

The depositor will cause to be filed in the appropriate office an assignment and a financing statement evidencing the trustee's security interest in each cooperative loan.

For any loans that are closed–end second–lien loans or home equity line of credit loans, the applicable prospectus supplement will specify whether the documents relating to those loans will have to be delivered to the trustee (or a custodian) and whether assignments of the related mortgage to the trustee will be recorded. If documents need not be delivered, the servicer will retain them.

For any home improvement contracts, the applicable prospectus supplement will specify whether the documents relating to those contracts will have to be delivered to the trustee (or a custodian). However, unless specified in the related prospectus supplement, the depositor will not deliver to the trustee the original mortgage securing a home improvement contract. In order to give notice of the right, title and interest of securityholders to the home improvement contracts, the depositor will cause a UCC–1 financing statement to be executed by the depositor or the seller, identifying the trustee as the secured party and identifying all home improvement contracts as collateral. Unless otherwise specified in the related prospectus supplement, the home improvement contracts will not be stamped or otherwise marked to reflect their assignment to the trustee. Therefore, if, through negligence, fraud or otherwise, a subsequent purchaser takes physical possession of the home improvement contracts without notice of the assignment, the securityholders' interest in the home improvement contracts could be defeated. See "Certain Legal Aspects of the Loans–The Home Improvement Contracts."

The trustee (or the custodian) will review the loan documents after receiving them, within the time period specified in the related prospectus supplement, and will hold the documents in trust for the benefit of the securityholders. Generally, if a document is found to be missing or defective in any material respect, the trustee (or custodian) will notify the servicer and the depositor, and the servicer will notify the related seller. If, after receiving notice, the seller cannot cure the omission or defect within the time period specified in the related prospectus supplement, and such omission or defect materially and adversely affects the interests of the securityholders in the related mortgage loan, it will be obligated to:

- purchase the related mortgage loan from the issuing entity at the Purchase Price or,

- if specified in the related prospectus supplement, replace the mortgage loan with another mortgage loan that meets specified requirements.

There can be no assurance that a seller will fulfill this purchase or substitution obligation. Although the servicer may be obligated to enforce the seller's obligation, the servicer will not be obligated to purchase or replace the loan if the seller defaults on its obligation (nor will the servicer otherwise be obligated to purchase or replace any loan for any other reason). See "Loan Program–Representations by Sellers; Repurchases" in this prospectus. The applicable prospectus supplement may provide other remedies, but if it does not, then this obligation of the seller constitutes the sole remedy available to the securityholders or the trustee for omission of, or a material defect in, a constituent document.

Notwithstanding the repurchase obligations described above, no purchase or substitution of a loan will be made with respect to an issuing entity for which a REMIC election is to be made if the purchase or substitution would result in a prohibited transaction tax under the Code (unless the servicer or a holder of the related residual certificate otherwise pays that tax from its own funds). See "Loan Program–Representations by Sellers; Repurchases."

The trustee will be authorized to appoint a custodian pursuant to a custodial agreement to maintain possession of and, if applicable, to review the documents relating to the mortgage loans as agent of the trustee.

Notwithstanding these provisions, unless the related prospectus supplement otherwise provides, no mortgage loan will be purchased from an issuing entity for which a REMIC election is to be made if the purchase would result in a prohibited transaction tax under the Code.

Although the depositor has expressed in the agreement its intent to treat the conveyance of the loans as a sale, the depositor will also grant to the trustee (or trust, in the case of a series with both notes and certificates) a security interest in the loans. This security interest is intended to protect the interests of the securityholders if a bankruptcy court were to characterize the depositor's transfer of the loans as a borrowing by the depositor secured by a pledge of the loans as described under "Risk Factors − Bankruptcy or Insolvency May Affect the Timing and Amount of Distributions on the Securities." In

# Exhibit 22

*$1,233,700,000*
(Approximate)

*INDYMAC ABS, INC.*
Depositor



Sponsor, Seller and Servicer

*Home Equity Mortgage Loan Asset–Backed Trust,*
*Series INABS 2007–A*
Issuing Entity

*Distributions will be made on the 25th day of each month or the next business day, beginning in April 2007*

The issuing entity will hold a pool of conforming and non–conforming balance, sub–prime mortgage loans and will issue certificates including the following classes of certificates being offered pursuant to this prospectus supplement and the accompanying prospectus:

|  | Initial Class Certificate Balance (1) | Pass– Through Rate (2)(3) | Price to Public | Underwriting Discount and Commissions | Proceeds to Depositor |
|---|---|---|---|---|---|
| 1A | $274,933,000 | Variable | 100.00000% | 0.20% | 99.8000% |
| 2A–1 | $340,333,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| 2A–2 | $154,803,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| 2A–3 | $154,129,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| 2A–4a | $ 57,801,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| 2A–4b | $ 14,451,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| M–1 | $ 48,750,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| M–2 | $ 60,450,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| M–3 | $ 21,450,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| M–4 | $ 26,000,000 | Variable | 100.00000% | 0.25% | 99.7500%(4) |
| M–5 | $ 22,100,000 | Variable | 100.00000% | 0.25% | 99.7500% |
| M–6 | $ 13,650,000 | Variable | N/A | N/A | N/A |
| M–7 | $ 17,550,000 | Variable | 96.2459% | 0.25% | 95.9959% (4) |
| M–8 | $ 11,700,000 | Variable | N/A | N/A | N/A |
| M–9 | $ 15,600,000 | Variable | N/A | N/A | N/A |

(1) Subject to a permitted variance in the aggregate of 5%.

(2) As described under "*Description of the Certificates—Distributions*" in this prospectus supplement, the pass–through rates of the certificates are subject to a Net WAC rate cap and a maximum cap.

(3) The pass–through rates on the Class A and Subordinated Certificates are based on one–month LIBOR plus an applicable margin and are subject to increase as described under "*Description of the Certificates—Pass–Through Rates*" in this prospectus supplement.

(4) Proceeds to the depositor will be based on the principal amount of such class purchased by the underwriters.

*Consider carefully the risk factors beginning on page S–14 in this prospectus supplement and on page 6 in the prospectus.*

*The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of IndyMac ABS, Inc., IndyMac Bank, F.S.B., or any of their affiliates.*

This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity.

Credit enhancement for the offered certificates will consist of:

- Excess interest and overcollateralization as described in this prospectus supplement under "*Description of the Certificates—Overcollateralization;*" and

1

The group II mortgage loans included in the statistical calculation pool consist of mortgage loans with an aggregate principal balance of approximately $746,607,912 as of the cut−off date, after giving effect to principal payments due on or before that date.

As of the cut−off date, the group II mortgage loans in the statistical calculation pool had the following characteristics:

| | |
|---|---|
| Aggregate Principal Balance: | $746,607,912 |
| Weighted Average Mortgage Rate: | 8.410% |
| Range of Mortgage Rates: | 3.875% to 13.375% |
| Average Principal Balance: | $197,829 |
| Range of Stated Principal Balances: | $2,188 to $1,048,846 |
| Weighted Average Original LTV∗: | 79.27% |
| Weighted Average Original Term to Maturity: | 356 months |
| Non−Zero Weighted Average FICO Credit Risk Score: | 605 |
| Weighted Average Remaining Term to Stated Maturity: | 354 months |
| First Liens: | 98.52% |
| Second Liens: | 1.48% |
| Geographic Concentrations in excess of 10%: | |
|   California | 16.70% |
|   Florida | 14.03% |
|   New York | 11.78% |

∗ Includes the Combined Loan−to−Value Ratio for Second Lien Loans.

See "The Mortgage Pool" in this prospectus supplement.

**Required Repurchases or Substitutions of Mortgage Loans**

The seller will make certain representations and warranties relating to the mortgage loans pursuant to the pooling and servicing agreement. If with respect to a mortgage loan a representation and warranty is breached in any material respect as of the date made, or an uncured material document defect exists, the seller will be obligated to repurchase or substitute for the mortgage loan as further described in this prospectus supplement under *"Description of the Certificates—Representations and Warranties Relating to Mortgage Loans."*

The servicer is permitted to modify a mortgage loan at the request of the related mortgagor in lieu of refinancing such mortgage loan, provided that the servicer purchases the mortgage loan from the issuing entity immediately preceding the modification. In addition, under limited circumstances, the servicer will repurchase certain mortgage loans that experience an early payment default (default in the first three months following origination).

See *"Servicing of the Mortgage Loans −Certain Modifications and Refinancings"* and *"Risk Factors −Most of the Mortgage Loans will be newly originated and have little, if any, payment history."*

event any of the mortgaged properties fail to provide adequate security for the mortgage loans, and the credit enhancement is insufficient, you could experience a loss.

### *Unpredictability and effect of prepayments*

A majority of the borrowers under the statistical calculation mortgage loans generally may not prepay their mortgage loans during the first one, two or three years after origination without incurring prepayment charges, which generally are due without regard to the reason why the mortgagor is prepaying the mortgage loan. However, we cannot predict the rate at which borrowers will repay their mortgage loans. A prepayment of a mortgage loan will result in a prepayment on the certificates.

- If you purchase your certificates at a discount and principal is repaid more slowly than you anticipate, then your yield may be lower than you anticipate.

- If you purchase your certificates at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- The seller may be required to repurchase mortgage loans from the trust fund in the event certain breaches of representations and warranties made by the seller have not been cured. The servicer will be required to purchase mortgage loans for which the terms have been modified in lieu of refinancing, and will have the option of purchasing certain mortgage loans that experience an early payment default. These purchases will have the same effect on the holders of the certificates as a prepayment of those mortgage loans.

- Subject to the limitations described herein, the servicer or the NIMS insurer, if any, may purchase all of the mortgage loans and any REO properties when the aggregate principal balance of the mortgage loans as of the last day of the related Remittance Period is less than 10% of the aggregate stated principal balance of the mortgage loans as of their respective cut–off dates. This purchase will have the same effect on the holders of the certificates as a prepayment of those mortgage loans.

- The overcollateralization provisions are intended to result in an accelerated rate of principal distributions to the Class A and Subordinated Certificates, to the extent necessary to maintain or restore overcollateralization at the required level. An earlier return of principal to the holders of the certificates as a result of the overcollateralization provisions will influence the yields on the certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yields on the certificates.

None of the prepayment charges will be distributed to holders of the offered certificates.

In addition, prepayments on mortgage loans with adjusted net interest rates in excess of the net WAC cap or the maximum cap for the related classes of certificates may reduce the relevant cap. If any of the group I maximum cap, the group II maximum cap, the group I net WAC cap or the group II net WAC cap is in effect on any distribution date, the reduction of the relevant rate cap will have the effect of reducing the pass–through rates of the related certificates on such distribution date.

See *"Yield, Prepayment and Maturity Considerations"* in this prospectus supplement for a description of factors that may influence the rate and timing of prepayments on the mortgage loans.

### *The Class A Certificates may receive a principal distribution as a result of excess funds in the pre-funding accounts*

To the extent that amounts on deposit in a pre–funding account have not been fully applied to the purchase of subsequent mortgage loans by the end of the funding period, the holders of the related Class A Certificates will receive, on the distribution date immediately following the end of the funding period, amounts remaining in that pre–funding account. Such distribution will be applied as principal in reduction of the class certificate balance of those certificates. Although no assurance can be given, the depositor intends that the principal of subsequent mortgage loans sold to the trust will require the application of an amount substantially equal to all amounts on deposit in the pre–funding accounts and that there will be no material principal distribution to the holders of the Class A Certificates on such distribution date.

### *Rights of the NIMS insurer*

Pursuant to the pooling and servicing agreement, unless a NIMS Insurer fails to make a required payment under the policy insuring the net interest margin securities and the failure is continuing or a NIMS Insurer is the subject of a bankruptcy proceeding (such events, a *"NIMS Insurer Default"*) or the net interest margin securities are no longer outstanding, the NIMS Insurer will be entitled to exercise, among others, the following rights of the holders of the Class A and Subordinated Certificates, without their consent, and the holders of the Class A and Subordinated Certificates may exercise such rights only with the prior written consent of the NIMS Insurer: (i) the right to provide notices of servicer defaults and the right to direct the trustee to terminate the rights and obligations of the servicer under the pooling and servicing agreement upon a default by the servicer, (ii) the right to remove the trustee or any co–trustee or custodian pursuant to the pooling and servicing agreement and (iii) the right to direct the trustee to make investigations and take actions pursuant to the pooling and servicing agreement. In addition, unless a NIMS Insurer Default exists or the net interest margin securities are no longer outstanding, such NIMS Insurer's consent will be required before, among other things: (i) the removal of the servicer, any successor servicer or the trustee; the appointment of any co–trustee, (ii) any otherwise permissible waivers of prepayment charges or extensions of due dates for payment granted by the servicer with respect to more than 5% of the number of mortgage loans and (iii) any amendment to the pooling and servicing agreement.

Applicable state laws generally regulate interest rates and other charges, require certain disclosure and require licensing of the seller. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans. The mortgage loans are also subject to federal laws, including:

- the Federal Truth–in–Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the borrowers regarding the terms of the mortgage loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience;

- the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws; and

- the Alternative Mortgage Transaction Parity Act of 1982, which preempts certain state lending laws which regulate alternative mortgage transactions.

Violations of certain provisions of these federal and state laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement. In particular, the seller's failure to comply with certain requirements of the Federal Truth–in–Lending Act, as implemented by Regulation Z, could subject the trust to monetary penalties, and result in the borrowers' rescinding the mortgage loans against the trust. In addition to federal law, some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans and restrict the servicer's ability to foreclose in response to the mortgagor's default. The seller's failure to comply with these laws could subject the trust to significant monetary penalties, could result in the borrowers rescinding any affected mortgage loans whether held by the trust or a subsequent holder of such mortgage loans and limit the servicer's ability to foreclose upon the related mortgaged property in the event of a mortgagor's default. See *"Certain Legal Aspects of the Loan—Anti–Deficiency Legislation and Other Limitations on Lenders"* in the prospectus.

The seller will represent that as of the closing date, each mortgage loan is in compliance with applicable federal and state laws and regulations. The seller will also represent that none of the mortgage loans are subject to Section 32 of Regulation Z nor have any of the mortgagors been required to purchase single–premium credit life insurance in connection with the origination of the related mortgage loan. In the event of a breach of such representation, the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in the prospectus. If the seller is unable or otherwise fails to satisfy such obligations, the yield on the Class A and Subordinated Certificates may be materially and adversely affected.

Under the anti–predatory lending laws of some states, the mortgagor is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if an originator reasonably believed that the test was satisfied. Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti–predatory lending law, in which case the seller will be required to purchase such mortgage loan from the trust.

### Prepayment interest shortfalls and Relief Act shortfalls may affect the yield on your investment

When a mortgage loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to (but not including) the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for distribution on the next distribution date. The servicer will be required to cover a portion of the shortfall in interest collections that are attributable to prepayments. In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act and similar state laws will not be covered by the servicer.

On any distribution date, any shortfalls resulting from the application of the Servicemembers Civil Relief Act and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer will be allocated first to the monthly interest distributable to the Class C Certificates and then to the monthly interest distributable amounts with respect to the offered certificates *pro rata* based on the respective amounts of interest accrued on such certificates for such distribution date. The holders of the offered certificates will not be entitled to reimbursement for any such interest shortfalls. If these shortfalls are allocated to the offered certificates the amount of interest distributed to those certificates will be reduced, adversely affecting the yield on your investment.

### Violation of environmental laws or the existence of hazards may result in losses to the trust

Federal, state and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health and safety. In certain circumstances, these laws and regulations impose obligations on owners or operators of residential properties such as those that secure the

26

servicer expects that a substantial number of these employees may elect not to do so.

If a substantial number of employees in default management services resign prior to the relocation or elect not to relocate, the servicer's collection and default management processes may be disrupted which may result in an increase in delinquencies and defaults. Although any increase in delinquencies and defaults is expected to be temporary, there can be no assurance as to the duration or severity of any disruption in the collection and default management processes or as to the resulting effects on the yield of the certificates. In an attempt to mitigate any disruptions in these processes, the servicer will continue to provide default management services from its current offices in Pasadena, California and Kalamazoo, Michigan until the relocation of those services to Texas has been completed and the default management, collections, and loss mitigation functions in Texas are fully operational.

### *Modification of mortgage loans by the servicer may adversely affect your yield*

The servicer will have the right to modify any mortgage loan in lieu of the borrower refinancing if it purchases the mortgage loan from the issuing entity. Modifications may include, but are not limited to, interest rate reductions. The servicer actively attempts to identify borrowers who may refinance and informs them of the alternative of a modification. Generally, borrowers that are informed of this option choose it. The proceeds of any such repurchases will be treated as prepayments in full of the applicable mortgage loans and will have the same effect on the yields on the certificates as prepayments in full. *See "Servicing of the Mortgage Loans—Certain Modifications and Refinancings" in this prospectus supplement.*

For a discussion of additional risks pertaining to the certificates, see *"Risk Factors"* in the prospectus.

*Capitalized terms used herein may be defined elsewhere in this prospectus supplement. The index appearing at the end of this prospectus supplement indicates the page number on which each definition in this prospectus supplement appears.*

### *THE MORTGAGE POOL*

#### *General*

The depositor will purchase mortgage loans from IndyMac Bank, F.S.B. ("*IndyMac Bank*") pursuant to a pooling and servicing agreement, dated as of the cut–off date, among IndyMac Bank, as seller and servicer, the depositor and Deutsche Bank National Trust Company as trustee and Supplemental Interest Trust Trustee (the "*Supplemental Interest Trust Trustee"*), and will assign to the trustee for the benefit of holders of the certificates the statistical calculation mortgage loans (other than those removed prior to the closing date) and additional similar mortgage loans (together, the "*Closing Date Mortgage Loans*"). Pursuant to each subsequent transfer instrument, as described below under *"—Conveyance of Subsequent Mortgage Loans and the Pre–Funding Accounts"*, the trust will acquire subsequent mortgage loans to be included in the mortgage pool subject to the conditions set forth in this prospectus supplement. The Closing Date Mortgage Loans and Subsequent Mortgage Loans included in the trust are referred to as the "*mortgage loans*". The Closing Date Mortgage Loans are expected to have an aggregate Stated Principal Balance as of the cut–off date of approximately $1,180,000,000, plus or minus 5%. The Closing Date Mortgage Loans to be included in loan group I are expected to have an aggregate Stated Principal Balance equal to approximately $325,576,383 and the Closing Date Mortgage Loans to be included in loan group II are expected to have an aggregate Stated Principal Balance equal to approximately $854,423,617, in each case as of the cut–off date, plus or minus 5%. The Closing Date Mortgage Loans will have been acquired or originated by the seller in the normal course of its business.

Under the pooling and servicing agreement, the seller will make certain representations, warranties and covenants to the depositor relating to, among other things, the due execution and enforceability of the pooling and servicing agreement and certain characteristics of the mortgage loans and, subject to the limitations described below under *"—Assignment of Mortgage Loans,"* will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists deficient documentation or an uncured breach of any representation, warranty or covenant if the breach of representation, warranty or covenant materially and adversely affects the interests of the certificateholders in that mortgage loan. The seller will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one– to four–family mortgage loans in the seller's mortgage portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to adversely affect the interests of the certificateholders. See *"Loan Program—Representations by Sellers; Repurchases"* in the prospectus. Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in and to the representations, warranties and covenants (including the seller's repurchase obligation) to the trustee for the benefit of the certificateholders. The depositor will make no representations or warranties with respect to the mortgage loans and will have no obligation to repurchase or substitute mortgage loans with deficient documentation or which are otherwise defective. IndyMac Bank will sell the mortgage loans without recourse and will have no obligation with respect to the certificates in its capacity as seller other than the repurchase or substitution obligations described above. The obligations of IndyMac Bank, as servicer, with respect to the certificates, will be limited to the servicer's contractual servicing obligations under the pooling and servicing agreement.

Certain information with respect to certain of the mortgage loans expected to be included in the mortgage pool is set forth below (such mortgage loans, the "*Statistical Calculation Mortgage Loans*"). Prior to the closing date, the Statistical Calculation Mortgage Loans may experience some

mortgage loan, the title policy with respect to the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to the mortgage note and mortgage (except for any document not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor). With respect to up to 30% of the Closing Date Mortgage Loans in each loan group (the "*Delayed Delivery Loans*"), the depositor may deliver all or a portion of each related mortgage file to the trustee not later than five husiness days after the closing date. As provided in the pooling and servicing agreement, for non–MERS mortgage loans, assignments of the mortgage loans to the trustee (or its nominee) will not be required to be submitted for recording (except with respect to any mortgage located in Maryland), unless failure to do so would result in a withdrawal or downgrading by any Rating Agency of the rating of any Class of Certificates.

The trustee will review each mortgage file within 90 days of the closing date or subsequent transfer date, as applicable (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date or subsequent transfer date, as applicable), and if any document in a mortgage file is found to be missing or noncompliant with the review criteria set forth in the pooling and servicing agreement, such defect is material and the seller does not cure that defect within 90 days of notice thereof from the trustee (or within a longer period not to exceed 720 days after the closing date as provided in the pooling and servicing agreement in the case of missing documents not returned from the public recording office), the seller will be obligated to repurchase the related mortgage loan from the trust fund. Rather than repurchase the mortgage loan as provided above, the seller may remove the mortgage loan from the trust fund and substitute in its place another mortgage loan; however, substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that substitution will not disqualify the trust fund as a REMIC or result in a prohibited transaction tax under the Code. Any replacement mortgage loan generally will, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement:

- have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by the seller and held for distribution to the certificateholders on the related distribution date (a "*Substitution Adjustment Amount*")),

- have a current mortgage rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan,

- with respect to an adjustable–rate mortgage loan, (a) have a mortgage rate based upon the same Loan Index and a margin at least equal to and not greater than 50 basis points higher than the deleted mortgage loan, (b) have a mortgage rate subject to a maximum rate that is no less than the maximum rate applicable to the deleted mortgage loan, (c) have Adjustment Dates that are no more or less frequent than the deleted mortgage loan and (d) not be a Performance Loan,

- have a Loan–to–Value Ratio not higher than that of the deleted mortgage loan,

- have a remaining term to maturity not more than one year greater or less than that of the deleted mortgage loan, and

- comply with all of the representations and warranties set forth in the pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the trustee and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of such mortgage, above, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some or all of the mortgage loans in the trust fund that are not already held through the MERS® System may, at the discretion of the servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.

### THE ORIGINATOR AND THE SELLER

#### The Originator and the Seller

IndyMac Bank, F.S.B. ("*IndyMac Bank*") will have originated the mortgage loans to be included in the trust and will be the seller of the mortgage loans. The principal executive offices of IndyMac Bank are located at 888 East Walnut Street, Pasadena, California 91101–7211. IndyMac Bank is a wholly–owned subsidiary of IndyMac Intermediate Holdings, Inc., which is a wholly–owned subsidiary of IndyMac Bancorp, Inc. The business now operated by IndyMac Bank began in 1993 and became a federal savings bank in 2000.

#### Origination Process

IndyMac Bank acquires mortgage loans principally through four channels: mortgage professionals, consumer direct, correspondent and conduit. IndyMac Bank also acquires a relatively small number of mortgage loans through other channels.

2. *Preferred Delegated Underwriting Program*. Under this program, third party loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac Bank to verify mortgagor information. The eligibility requirements for participation in the Preferred Delegated Underwriting Program vary based on the net worth of the third party loan originators with more stringent requirements imposed on third party loan originators with a lower net worth. Third party loan originators are required to submit a variety of information to IndyMac Bank for review, including their current audited financial statements, their quality control policies and procedures, their current errors and omissions/fidelity insurance coverage evidencing blanket coverage in a minimum amount of $300,000, at least three underwriters' resumes showing at least three years experience or a direct endorsement designation, and at least two references from mortgage insurance companies. Third party loan originators are required to have an active, traditional warehouse line of credit, which is verified together with the bailee letter and wire instructions. IndyMac Bank requires each third party loan originator to be recertified on an annual basis to ensure that it continues to meet the minimum eligibility guidelines for the Preferred Delegated Underwriting Program.

Under the Preferred Delegated Underwriting Program, each eligible third party loan originator is required to underwrite mortgage loans in compliance with IndyMac Bank's underwriting guidelines usually by use of e−MITS or, infrequently, by submission of the mortgage loan to IndyMac Bank for traditional underwriting. A greater percentage of mortgage loans purchased pursuant to this program are selected for post−purchase quality control review than for the other program.

Mortgage loans originated through the conduit channel are generally initially underwritten by a "*third party seller*" to the third party seller's underwriting guidelines. IndyMac Bank reviews each third party seller's guidelines for acceptability, and these guidelines generally meet industry standards and incorporate many of the same factors used by Fannie Mae, Freddie Mac and IndyMac Bank. Each mortgage loan is re-underwritten by IndyMac Bank for compliance with its guidelines based only on the objective characteristics of the mortgage loan, such as FICO, documentation type, loan−to−value ratio, etc., but without reassessing the underwriting procedures originally used. In addition, a portion of the mortgage loans acquired from a third party seller are subjected to a full re−underwriting.

Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan−to−value ratio, significant decrease in the borrower's monthly payment and long−term employment with the same employer.

### *SERVICING OF MORTGAGE LOANS*

#### *The Servicer*

IndyMac Bank will act as servicer under the pooling and servicing agreement. The principal executive offices of the servicer are located at 888 East Walnut Street, Pasadena, California 91101−7211. IndyMac Bank has been master servicing mortgage loans since 1993 and servicing mortgage loans directly (servicing without the use of a subservicer) since 1998. As of the date of this prospectus supplement, IndyMac Bank is rated (x) by Fitch, "RPS2+" as a servicer of alt/A, prime and sub−prime mortgage loans, (y) by Moody's, "SQ2−" as a primary servicer of sub−prime first lien mortgage loans and "SQ2−" as a special servicer and (z) by S&P, "above average/stable" as a primary servicer and "average/stable" as a servicer and special servicer.

The servicer will be responsible for servicing the mortgage loans in accordance with the terms set forth in the pooling and servicing agreement employing the same degree of skill and care which it employs in servicing the mortgage loans comparable to the mortgage loans serviced by the servicer for itself or others.

The servicer will not have any custodial responsibilities for the mortgage loans.

If the servicing of any mortgage loan were to be transferred from a subservicer to IndyMac Bank, or if any other servicing transfer were to occur, there may be an increase in all delinquencies and defaults due to misapplied or lost payments, data input errors, system incompatibilities or otherwise. Although any increase in delinquencies is expected to be temporary, there can be no assurance as to the duration or severity of any disruption in servicing the applicable mortgage loans as a result of any servicing transfer.

As of December 31, 2003, December 31, 2004, December 31, 2005 and December 31, 2006, IndyMac Bank provided servicing for approximately $30.77 billion, $50.22 billion, $84.50 billion and $139.81 billion, respectively, in conventional mortgage loans owned by others. As of the date of this prospectus supplement, no servicing related performance trigger has occurred as to any other securitization due to any act or failure to act on the part of the servicer nor has there been any material non−compliance by the servicer with applicable servicing criteria as to any other securitization as to which the servicer is a party.

#### *Servicing Compensation and Payment of Expenses*

The expense fees of the trust will be payable out of the interest payments of each mortgage loan. The expense fees consist of (a) the monthly servicing fee payable to the servicer and (b) the monthly fee payable to the trustee in respect of its activities as trustee under the pooling and servicing

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total | 5,217 | $1,031,101,339 | 100.00% | $ 197,643 | 8.423% | 79.94% | 605 | 44.34% | 40.88% |

## OCCUPANCY TYPE

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Mortgage Loans | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Original LTV | Weighted Average FICO Score | % of Full Doc Loans | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|---|
| Second Home | 40 | $   8,732,413 | 0.85% | $ 218,310 | 8.860% | 76.38% | 604 | 10.94% | 42.71% |
| Investor Occupied | 515 | 70,342,224 | 6.82 | 136,587 | 8.979 | 80.39 | 646 | 15.85 | 36.19 |
| Owner Occupied | 4,662 | 952,026,703 | 92.33 | 204,210 | 8.378 | 79.94 | 602 | 46.75 | 41.19 |
| Total | 5,217 | $1,031,101,339 | 100.00% | $ 197,643 | 8.423% | 79.94% | 605 | 44.34% | 40.88% |

Based on representations of the related mortgagors at the time of origination.

## LOAN PURPOSE

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Mortgage Loans | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Original LTV | Weighted Average FICO Score | % of Full Doc Loans | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 3,418 | $ 698,137,781 | 67.71% | $ 204,253 | 8.370% | 77.05% | 593 | 44.69% | 41.00% |
| Purchase | 1,407 | 264,152,070 | 25.62 | 187,741 | 8.509 | 87.57 | 638 | 41.42 | 40.80 |
| Rate & Term Refinance | 392 | 68,811,488 | 6.67 | 175,540 | 8.627 | 80.00 | 605 | 51.88 | 39.90 |
| Total | 5,217 | $1,031,101,339 | 100.00% | $ 197,643 | 8.423% | 79.94% | 605 | 44.34% | 40.88% |

## ORIGINAL LOAN–TO–VALUE RATIOS

| Original Loan–to–Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percentage of Aggregate Principal Balance of Mortgage Loans | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Original LTV | Weighted Average FICO Score | % of Full Doc Loans | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|---|
| 50.00 or less | 226 | $  32,591,814 | 3.16% | $ 144,212 | 8.304% | 40.34% | 584 | 42.57% | 39.38% |
| 50.01–55.00 | 116 | 19,962,924 | 1.94 | 172,094 | 8.482 | 52.92 | 582 | 41.16 | 39.19 |
| 55.01–60.00 | 137 | 25,851,211 | 2.51 | 188,695 | 8.525 | 58.02 | 570 | 42.57 | 41.14 |
| 60.01–65.00 | 269 | 52,857,977 | 5.13 | 196,498 | 8.475 | 63.29 | 575 | 43.45 | 40.56 |
| 65.01–70.00 | 468 | 90,415,343 | 8.77 | 193,195 | 8.812 | 68.84 | 575 | 55.03 | 40.68 |
| 70.01–75.00 | 500 | 106,702,814 | 10.35 | 213,406 | 8.235 | 74.03 | 585 | 39.05 | 41.62 |
| 75.01–80.00 | 1,104 | 238,880,451 | 23.17 | 216,377 | 7.914 | 79.59 | 620 | 41.64 | 40.85 |
| 80.01–85.00 | 512 | 103,494,586 | 10.04 | 202,138 | 8.446 | 84.46 | 593 | 43.56 | 40.58 |

94

*PROSPECTUS*

# INDYMAC ABS, INC.
### *Depositor*

*Mortgage Pass−Through Certificates*
*Mortgage Pass−Through Notes*
*(Issuable in Series)*

*Please carefully consider our discussion of some of the risks of investing in the securities under "Risk Factors" beginning on page 6.*

**The Trusts**

Each issuing entity will be established to hold assets transferred to it by IndyMac ABS, Inc. The assets in each issuing entity will be specified in the prospectus supplement for the particular trust and will generally consist of:

- first and/or subordinate lien mortgage loans secured by one− to four−family residential properties, including manufactured housing that is permanently affixed and treated as real property under local law, or security interests issued by cooperative housing corporations or participations in that type of loan,

The securities will represent obligations of the related issuing entity only and will not represent an interest in or obligation of IndyMac ABS, Inc., any originator, servicer, or any of their affiliates.

- loans secured by first and/or subordinate liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units,

- closed−end second lien loans, secured in whole or in part by subordinate liens on one− to four−family residential properties,

- loans secured by first and/or subordinate liens on mixed residential and commercial properties (mixed use loans),

- home equity line of credit loans or specified balances thereof, secured in whole or in part by first and/or subordinate liens on one− to four−family residential properties,

- loans secured in whole or in part by first and/or subordinate liens on improved land that is generally suitable for one− to four−family residential dwellings (lot loans), including loans to finance the construction of a dwelling (construction loans) and construction loans which by their terms convert into a permanent loan upon the completion of construction (construction−to−permanent loans),

- home improvement installment sale contracts and installment loan agreements that are secured by first or subordinate liens on one− to four−family residential properties,

- mortgage pass−through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac, or

- private mortgage−backed securities backed by first lien mortgage loans secured by one− to four−family residential properties or participations in that type of loan.

- mortgage−backed securities or collateralized mortgage obligations backed by loans secured by first and/or subordinate liens on one− to four−family residential properties, by lot loans or by participations in these types of loans.

*The Securities*

IndyMac ABS, Inc. will offer either certificates or notes pursuant to a prospectus supplement. The securities will be grouped into one or more series, each having its own distinct designation. Each series will be issued in one or more classes and each class will evidence beneficial ownership of (in the case of certificates) or a right to receive payments supported by (in the case of notes) a specified portion of future payments on the assets in the issuing entity to

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the Property as collateral. Most lenders offer a number of different underwriting programs. Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the Property as collateral. The most comprehensive of the programs emphasize both.

In general, where a loan is subject to full underwriting review, a prospective borrower applying for a mortgage loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source, typically the borrower's employer. The verification reports the length of employment with that organization, the borrower's current salary and whether it is expected that the borrower will continue employment in the future. If a prospective borrower is self−employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

In determining the adequacy of the Property as collateral, an appraisal is made of each property considered for financing. Except as described in the applicable prospectus supplement, an appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home.

Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Property such as property taxes and hazard insurance). The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan−to−Value Ratios or other favorable credit factors exist.

In the event a lender underwrites mortgage loans under programs less restrictive than the one described above, a description of those programs will be set forth in the related prospectus supplement.

Certain of the types of mortgage loans that may be included in an issuing entity may be recently developed and may involve additional uncertainties not present in traditional types of loans. For example, certain of the mortgage loans may provide for escalating or variable payments by the mortgagor. These types of mortgage loans are underwritten on the basis of a judgment that the mortgagors have the ability to make the monthly payments required initially. In some instances, however, a mortgagor's income may not be sufficient to permit continued loan payments as the payments increase. These types of mortgage loans may also be underwritten primarily on the basis of Loan−to−Value Ratios or other favorable credit factors.

*Qualifications of Sellers*

Each seller must be an institution experienced in originating mortgage loans of the type contained in the related mortgage pool and must maintain satisfactory facilities to originate those mortgage loans.

*Representations by Sellers; Repurchases*

Each seller will have made representations and warranties in respect of the mortgage loans sold by it and evidenced by a series of securities. The applicable prospectus supplement may specify the different representations and warranties, but if it does not, the representations and warranties will generally include, among other things:

- that a lender's policy of title insurance (or in the case of mortgaged properties located in areas where title insurance policies are generally not available, an attorney's certificate of title) or a commitment to issue the policy was effective on the date of origination of each loan, other than cooperative loans, and that each policy (or certificate of title as applicable) remained in effect on the date of purchase of the mortgage loan from the seller by or on behalf of the depositor;

- that the seller had good title to each mortgage loan and the mortgage loan was subject to no valid offsets, defenses, counterclaims or rights of rescission except to the extent that any buydown agreement described in this prospectus may forgive certain indebtedness of a mortgagor;

- that each mortgage loan is secured by a valid first lien on, or a first perfected security interest with respect to, the Property (subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the pooling and servicing agreement or sale and servicing agreement, as applicable) and that, to the seller's knowledge, the Property was free of material damage;

- that there were no delinquent tax or assessment liens against the Property; and

-

that each loan at the time it was originated and on the date of transfer by the seller to the depositor complied in all material respects with all applicable local, state and federal laws.

As to any mortgage loan insured by the FHA or partially guaranteed by the VA, the seller will represent that it has complied with underwriting policies of the FHA or the VA, as the case may be.

As indicated in the related pooling and servicing agreement, the representations and warranties of a seller in respect of a mortgage loan will be made as of the date of initial issuance of the series of securities, the related cut–off date, the date on which the seller sold the mortgage loan to the depositor or one of its affiliates, or the date of origination of the related mortgage loan, as the case may be. If representations and warranties are made as of a date other than the closing date or cut–off date, a substantial period of time may have elapsed between the other date and the date of initial issuance of the series of securities evidencing an interest in the mortgage loan. Because the representations and warranties of a seller do not address events that may occur following the sale of a mortgage loan by the seller or following the origination of the mortgage loan, as the case may be, its repurchase obligation will not arise if the relevant event that would otherwise have given rise to a repurchase obligation with respect to a mortgage loan occurs after the date of sale of the mortgage loan by the seller to the depositor or its affiliates or after the origination of the mortgage loan, as the case may be. In addition, certain representations, including the condition of the related Property, will be limited to the extent the seller has knowledge and the seller will be under no obligation to investigate the substance of the representation. However, the depositor will not include any mortgage loan in the issuing entity for any series of securities if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller will not be accurate and complete in all material respects in respect of the mortgage loan as of the date of initial issuance of the related series of securities. If the servicer is also a seller of mortgage loans with respect to a particular series, the representations will be in addition to the representations and warranties made by the servicer in its capacity as the servicer.

The trustee, if the servicer is the seller, or the servicer will promptly notify the relevant seller of any breach of any representation or warranty made by it in respect of a mortgage loan that materially and adversely affects the interests of the securityholders in the mortgage loan. The applicable prospectus supplement may specify that the seller has a different repurchase obligation, but if it does not, then if the seller cannot cure the breach within 90 days after notice from the servicer or the trustee, as the case may be, then the seller will be obligated to either

- repurchase the mortgage loan from the issuing entity at a price equal to 100% of the outstanding principal balance of the mortgage as of the date of the repurchase plus accrued interest on it to the first day of the month in which the purchase price is to be distributed at the mortgage rate, less any unreimbursed advances or amount payable as related servicing compensation if the seller is the servicer with respect to the mortgage loan or

- substitute for the loan a replacement loan that satisfies the criteria specified in the related prospectus supplement.

If an election is to be made to treat an issuing entity or designated portions of it as a "real estate mortgage investment conduit" as defined in the Internal Revenue Code of 1986, as amended (the "*Code*"), the servicer or a holder of the related residual certificate will be obligated to pay any prohibited transaction tax that may arise in connection with any repurchase or substitution and the trustee must have received a satisfactory opinion of counsel that the repurchase or substitution will not cause the issuing entity to lose its status as a REMIC or otherwise subject the issuing entity to a prohibited transaction tax. The applicable prospectus supplement may contain different reimbursement options, but if it does not, the servicer will be entitled to reimbursement for that payment from the assets of the related issuing entity or from any holder of the related residual certificate. See "Description of the Securities— General" and in the related prospectus supplement. Except in those cases in which the servicer is the seller, the servicer will be required under the applicable pooling and servicing agreement to enforce this obligation for the benefit of the trustee and the securityholders, following the practices it would employ in its good faith business judgment were it the owner of the mortgage loan. This repurchase obligation will constitute the sole remedy available to securityholders or the trustee for a breach of representation by a seller.

Neither the depositor nor the servicer (unless the servicer is the seller) will be obligated to purchase or substitute a mortgage loan if a seller defaults on its obligation to do so, and we can give no assurance that sellers will carry out their respective repurchase or substitution obligations with respect to mortgage loans. However, to the extent that a breach of a representation and warranty of a seller may also constitute a breach of a representation made by the servicer, the servicer may have a repurchase or substitution obligation as described under "The Agreements—Assignment of Issuing Entity Assets."

### Static Pool Data

If specified in the related prospectus supplement, static pool data with respect to the delinquency, cumulative loss and prepayment data for IndyMac Bank, F.S.B. or any other person specified in the related prospectus supplement will be made available through a website. The prospectus supplement related to each series for which the static pool data is provided through a website will contain the website address to obtain this information. Except as stated below, the static pool data provided through any Web site will be deemed part of this prospectus and the registration statement of which this prospectus is a part from the date of the related prospectus supplement.

Notwithstanding the foregoing, the following information shall not be deemed part of the prospectus or the registration statement of which this prospectus is a part: