# Exhibit A

**OFFICE COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

        -against-

UBS AMERICAS INC., UBS REAL ESTATE
SECURITIES INC., UBS SECURITIES,
LLC, MORTGAGE ASSET
SECURITIZATION TRANSACTIONS, INC.,
DAVID MARTIN, PER DYRVIK, HUGH
CORCORAN, and PETER SLAGOWITZ,

            Defendants.

---

11 CIV. 05201 (DLC)


<u>**SECOND AMENDED COMPLAINT**</u>

<u>**JURY TRIAL DEMANDED**</u>



RECEIVED
DEC 21 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...........................................................................................1

PARTIES ...............................................................................................................6

JURISDICTION AND VENUE ..............................................................................9

FACTUAL ALLEGATIONS ................................................................................10

I.   The Securitizations.....................................................................................10

    A.   Residential Mortgage-Backed Securitizations In General....................10

    B.   The Securitizations At Issue In This Case ............................................12

    C.   The Securitization Process....................................................................13

        1.   UBS Real Estate Pools Mortgage Loans In Special Purpose Trusts .........13

        2.   The Trusts Issue Securities Backed by the Loans.....................................14

II.  The Defendants' Participation In The Securitization Process ...........................18

    A.   The Role of Each of the Defendants .....................................................18

        1.   Defendant UBS Real Estate ...................................................................18

        2.   Defendant MASTR ...............................................................................19

        3.   Defendant UBS Securities .....................................................................20

        4.   Defendant UBS Americas.......................................................................20

        5.   The Individual Defendants......................................................................22

    B.   UBS's Failure To Conduct Proper Due Diligence.................................23

III. The Statements In The Registration Statements ................................................27

    A.   Compliance With Underwriting Guidelines ..........................................27

        1.   The ARSI 2006-W3 Securitization ........................................................28

        2.   The FHLT 2006-B Securitization ..........................................................30

3.    The INABS 2005-C Securitization .................................................32

4.    The INABS 2005-D Securitization .................................................34

5.    The INABS 2006-D Securitization .................................................37

6.    The INABS 2007-A Securitization .................................................39

7.    The MABS 2005-WF1 Securitization .................................................42

8.    The MABS 2005-FRE1 Securitization .................................................44

9.    The MABS 2005-HE2 Securitization .................................................46

10.    The MARM 2005-8 Securitization .................................................50

11.    The MARM 2006-2 Securitization .................................................52

12.    The MARM 2006-OA1 Securitization .................................................55

13.    The MABS 2006-FRE2 Securitization .................................................58

14.    The MABS 2006-WMC2 Securitization .................................................60

15.    The MABS 2006-WMC3 Securitization .................................................62

16.    The MABS 2006-NC2 Securitization .................................................64

17.    The MABS 2006-WMC4 Securitization .................................................66

18.    The MABS 2006-NC3 Securitization .................................................68

19.    The MARM 2007-1 Securitization .................................................70

20.    The MABS 2007-WMC1 Securitization .................................................73

21.    The MARM 2007-3 Securitization .................................................75

22.    The MABS 2007-HE2 Securitization .................................................79

B.    Statements Regarding Occupancy Status Of Borrower ...........................83

C.    Statements Regarding LTV Ratios .................................................85

D.    Statements Regarding Credit Ratings .................................................88

IV.    Falsity Of Statements In The Registration Statements And Prospectus Supplements .................................................90

A.    The Statistical Data Provided In The Prospectus Supplements Concerning

       Owner Occupancy And LTV Ratios Was Materially False Or Misleading .........90

1.     Owner Occupancy Data Was Materially False ..........................................90

2.     Loan to Value Data Was Materially False ................................................93

B.     The Originators Of The Underlying Mortgage Loans Systematically
    Disregarded Their Underwriting Guidelines .............................................97

1.     A Forensic Review Of Loan Files Has Revealed Pervasive Failure
    To Adhere To Underwriting Guidelines ....................................................98

    a.     Stated Income Was Not Reasonable ............................................101

    b.     Inconsistent Stated Income On The Loan Applications ..............104

    c.     Evidence Of Occupancy Misrepresentations ................................104

    d.     Debts Incorrectly Calculated; Debt-To-Income Exceeded
    Guidelines ...................................................................................107

    e.     Credit Inquiries That Indicated Misrepresentation Of Debt ........109

2.     Both Government and Private Investigations Have Confirmed That
    The Originators Of The Loans In The Securitizations
    Systematically Failed To Adhere To Underwriting Guidelines .............112

    a.     Wells Fargo .................................................................................113

    b.     Countrywide ................................................................................115

    c.     American Home ..........................................................................116

    d.     Fremont .......................................................................................119

    e.     WMC Mortgage ..........................................................................120

    f.     IndyMac ......................................................................................121

    g.     New Century ...............................................................................124

    h.     Option One ..................................................................................126

    i.     Argent .........................................................................................128

    j.     EquiFirst .....................................................................................130

    k.     First Horizon ...............................................................................131

l.      Inflated Appraisals ........................................................................... 132

3.      The Collapse Of The Certificates' Credit Ratings Further Indicates
        That The Mortgage Loans Were Not Originated In Adherence To
        The Stated Underwriting Guidelines .......................................... 133

4.      The Surge In Mortgage Delinquency And Default Further
        Demonstrates That The Mortgage Loans Were Not Originated In
        Adherence To The Stated Underwriting Guidelines.................... 135

V.   Fannie Mae's And Freddie Mac's Purchases Of The GSE Certificates And The
     Resulting Damages ................................................................................. 136

FIRST CAUSE OF ACTION ............................................................................ 139

SECOND CAUSE OF ACTION ....................................................................... 143

THIRD CAUSE OF ACTION ........................................................................... 146

FOURTH CAUSE OF ACTION ........................................................................ 150

FIFTH CAUSE OF ACTION ............................................................................ 153

SIXTH CAUSE OF ACTION ........................................................................... 157

SEVENTH CAUSE OF ACTION ..................................................................... 160

EIGHTH CAUSE OF ACTION ........................................................................ 164

PRAYER FOR RELIEF ................................................................................... 168

JURY TRIAL DEMANDED............................................................................. 169

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against UBS Americas, Inc. ("UBS Americas"), UBS Real Estate Securities, Inc. ("UBS Real Estate"), UBS Securities, LLC ("UBS Securities"), Mortgage Asset Securitization Transactions, Inc. ("MASTR") (collectively, "UBS"), David Martin, Per Dyrvik, Hugh Corcoran, and Peter Slagowitz (the "Individual Defendants") (together with UBS, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.      This action arises out of securities law and common law violations committed by Defendants in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs"). These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false statements and omissions. Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans. These representations were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and constitutes common law negligent misrepresentation.

1

2.      Between September 28, 2005 and August 30, 2007, Fannie Mae and Freddie Mac

purchased over $6.4 billion in residential mortgage-backed securities (the "GSE Certificates")

issued in connection with twenty-two UBS-sponsored and/or UBS-underwritten securitizations.[1]

The twenty-two securitizations at issue are:

    i.    Argent Securities Inc. Trust, Series 2006-W3 ("ARSI 2006-W3");

    ii.    Fremont Home Loan Trust, Series 2006-B  ("FHLT 2006-B");

    iii.    Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2005-C ("INABS 2005-C");

    iv.    Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2005-D ("INABS 2005-D");

    v.    Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2006-D ("INABS 2006-D");

    vi.    Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2007-A ("INABS 2007-A");

    vii.    MASTR Asset Backed Securities Trust, Series 2005-WF1 ("MABS 2005-WF1");

    viii.    MASTR Asset Backed Securities Trust, Series 2005-FRE1 ("MABS 2005-FRE1");

    ix.    MASTR Asset Backed Securities Trust, Series 2005-HE2 ("MABS 2005-HE2");

    x.    MASTR Adjustable Rate Mortgages Trust, Series 2005-8 ("MARM 2005-8");

    xi.    MASTR Adjustable Rate Mortgages Trust, Series 2006-2 ("MARM 2006-2");

    xii.    MASTR Adjustable Rate Mortgages Trust, Series 2006-OA1 ("MARM 2006-OA1");

    xiii.    MASTR Asset Backed Securities Trust, Series 2006-FRE2 ("MABS 2006-FRE2");

---

[1]   For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2, *infra*) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

xiv.   MASTR Asset Backed Securities, Series 2006-WMC2 ("MABS 2006-WMC2");

xv.   MASTR Asset Backed Securities Trust, Series 2006-WMC3 ("MABS 2006-WMC3");

xvi.   MASTR Asset Backed Securities Trust, Series 2006-NC2 ("MABS 2006-NC2");

xvii.   MASTR Asset Backed Securities, Series 2006-WMC4 ("MABS 2006-WMC4");

xviii.   MASTR Asset Backed Securities Trust, Series 2006-NC3 ("MABS 2006-NC3");

xix.   MASTR Adjustable Rate Mortgages Trust, Series 2007-1 ("MARM 2007-1");

xx.   MASTR Asset Backed Securities Trust, Series 2007-WMC1 ("MABS 2007-WMC1");

xxi.   MASTR Adjustable Rate Mortgages Trust, Series 2007-3 ("MARM 2007-3"); and

xxii.   MASTR Asset Backed Securities Trust 2007-HE2 ("MABS 2007-HE2");

(collectively, the "Securitizations").

3.     The Certificates were offered for sale pursuant to one of seven shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC"). Defendant MASTR filed two Shelf Registration Statements that pertained to 16 of the Securitizations at issue in this action. Those two Shelf Registration Statements, and the amendments thereto, were signed by or on behalf of the Individual Defendants. UBS Securities was the lead underwriter and the underwriter who sold the Certificates to the GSEs for all of the Securitizations.

4.     For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement for that Securitization.[2] The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac

---

[2] The term "Registration Statement," as used herein, incorporates the Shelf Registration

pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers of those underlying mortgage loans, and the origination and underwriting practices used to make and approve such loans.  Such statements were material to a reasonable investor's decision to purchase the Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices and had materially poorer credit quality than what was represented in the Registration Statements.

6.      For example, a forensic review of several hundred loan files for three of the Securitizations has revealed that for the vast majority of loans in those Securitizations, there were numerous breaches of the originator's underwriting guidelines, such as a failure to confirm the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan.  Adherence to underwriting guidelines, particularly on such key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

7.      The Registration Statements also contained statistical summaries of the groups of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with

---

Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

loan-to-value ratios within specified ranges.  This information was also material to reasonable investors.  However, a loan-level analysis of a sample of loans for each Securitization—a review that encompassed thousands of mortgages across all of the Securitizations—has revealed that these statistics were also false and omitted material facts due to widespread misrepresentations of borrowers' incomes and debts, inflated property values, and misrepresentations of other key characteristics of the mortgage loans.

8.    The Prospectus Supplements for each Securitization contained statements regarding the percentage of borrowers who would be occupying the properties securing the mortgages.  The percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan-level review reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans, and the actual ability of the individual mortgage holders to satisfy their debts.

9.    Defendants MASTR, UBS Securities, and the Individual Defendants are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

10.    Defendants UBS Americas and UBS Real Estate are also responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue

of their direction and control over Defendants MASTR and UBS Securities. UBS Americas directly participated in and exercised dominion and control over the business operations of Defendants MASTR and UBS Securities. UBS Real Estate directly participated in and exercised dominion and control over the business operations of Defendant MASTR.

11.    Fannie Mae and Freddie Mac purchased over $6.4 billion of the Certificates pursuant to the Registration Statements filed with the SEC. These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate and underwrite such loans. As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

12.    FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for common law negligent misrepresentation.

## PARTIES

### *The Plaintiff and the GSEs*

13.    The Federal Housing Finance Agency is a federal agency that has its principal executive offices at 1700 G Street, NW in Washington, D.C. FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA") to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed

FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac. 12 U.S.C. § 4617(b)(2).

14.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets. As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities. Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C. Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### The Defendants

15.     Defendant UBS Americas, Inc. is incorporated in Delaware and has its principal place of business in Stamford, Connecticut. UBS Americas has an office located at 1285 Avenue of the Americas in New York, New York. UBS Americas is a wholly-owned direct subsidiary of UBS AG, and is a holding company for several of UBS AG's indirect operating subsidiaries located in the United States, including Defendants UBS Real Estate, UBS Securities, and MASTR.

16.     Defendant UBS Real Estate, Inc. is incorporated in Delaware with its principal place of business at 1285 Avenue of the Americas in New York, New York. UBS Real Estate is a subsidiary of UBS Americas. It engaged in a variety of capital markets-related activities, including purchases and sales of loan portfolios, sales of assets for inclusion in securitizations, and origination and acquisition of loans. UBS Real Estate was the sponsor of 16 of the Securitizations.

17.     Defendant Mortgage Asset Securitization Transactions, Inc. is incorporated in Delaware as a wholly-owned, limited purpose subsidiary of UBS Americas, and maintains its principal place of business at 1285 Avenue of the Americas in New York, New York. MASTR

is generally engaged in the business of acting as a depositor of one or more trust funds that may issue, cause to be issued, sell, and/or deliver bonds or other evidence of indebtedness or certificates of interest that are secured by, or represent an interest in, mortgage loans. MASTR acted as the depositor for 16 of the Securitizations. MASTR, as depositor, was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

18.     Defendant UBS Securities, LLC is a limited liability company incorporated in Delaware with its principal places of business at 677 Washington Boulevard, in Stamford, Connecticut and 299 Park Avenue in New York, New York. UBS Securities is an indirect wholly-owned subsidiary of UBS Americas. UBS Securities is a registered broker/dealer and, at all relevant times, was one of the leading underwriters of mortgage and asset-backed securities in the United States. UBS Securities served as the lead underwriter for each of the Securitizations, and was intimately involved in the offerings. Fannie Mae and Freddie Mac purchased all of the GSE Certificates from UBS Securities in its capacity as underwriter of the Securitizations.

19.     Defendant David Martin is an individual residing in Scarsdale, New York. Mr. Martin was the President and Chief Executive Officer of Defendant MASTR. Mr. Martin was also the Global Head of Residential Mortgage Backed Securitizations and Asset Backed Securitizations for UBS. He signed the two Shelf Registration Statements filed by MASTR and the amendments thereto, and did so in New York.

20.     Defendant Per Dyrvik was the Managing Director and Principal Accounting and Financial Officer of Defendant MASTR. Mr. Dyrvik was also a Managing Director at UBS AG and UBS Americas, as well as the Managing Director of UBS Securities. He signed or

authorized Mr. Martin to sign on his behalf the two Shelf Registration Statements filed by
MASTR and the amendments thereto, and did so in New York.

21.    Defendant Hugh Corcoran is an individual residing in South Salem, New York.
Mr. Corcoran was a Managing Director of Defendant MASTR, and was also a Managing
Director at UBS Securities.  He signed or authorized Mr. Martin to sign on his behalf the two
Shelf Registration Statements filed by MASTR and the amendments thereto, and did so in New
York.

22.    Defendant Peter Slagowitz is an individual residing in New York, New York.  Mr.
Slagowitz was a Managing Director of Defendant MASTR.  Mr. Slagowitz was also a Managing
Director and Head of Loan Conduits for UBS AG, and was also a Managing Director at UBS
Real Estate.  He signed or authorized Mr. Martin to sign on his behalf the two Shelf Registration
Statements filed by MASTR and the amendments thereto, and did so in New York.

**The Non-Party Originators:**

23.    The loans underlying the Certificates were acquired by the sponsor for each
Securitization from non-party mortgage originators.  The originators responsible for the loans
underlying the Certificates include Countrywide Home Loans, Inc. ("Countrywide"), Fremont
Investment & Loan ("Fremont"), IndyMac Bank, F.S.B. ("IndyMac"), New Century Mortgage
Corp. ("New Century Mortgage"), Wells Fargo Bank, N.A. ("Wells Fargo"), WMC Mortgage
Corp. ("WMC Mortgage"), and American Home Mortgage Corp. ("American Home").

## JURISDICTION AND VENUE

24.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal
courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie
Mae and Freddie Mac.

25.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

26.     This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  This Court also has jurisdiction over the common law claims of negligent misrepresentation pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

27.     Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Several of the UBS Defendants are principally located in this district, at least one of the Individual Defendants resides in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements, occurred in substantial part in the State of New York.  Additionally, the GSE Certificates were actively marketed and sold from this State and several of the Defendants can be found and transact business in this District.  Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

I.     **The Securitizations**

A.     **Residential Mortgage-Backed Securitizations In General**

28.     Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

29.     The most common form of securitization of mortgage loans involves a sponsor or seller—the entity that acquires or originates the mortgage loans and initiates the securitization—and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is established pursuant to a Pooling and Servicing Agreement entered into by, among others, the "depositor" for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor ... and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

30.     Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group. Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans.  Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

31.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage group underlying the certificates.  Certificates are issued by the

trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

32.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee. The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance. The servicer is required to report key information about the loans to the trustee. The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

## B.     The Securitizations At Issue In This Case

33.     This case involves the 22 Securitizations listed in paragraph 2 *supra*, 16 of which were sponsored and structured by UBS Real Estate and deposited by MASTR, and all of which were underwritten by UBS Securities. For each of the twenty-two Securitizations, Table 1 identifies the (1) sponsor; (2) depositor; (3) lead underwriter; (4) principal amount issued for the tranches purchased by the GSEs; (5) date of issuance; and (6) loan group or groups backing the GSE Certificate(s) for that Securitization (referred to as the "Supporting Loan Groups").

### Table 1

| Securitization | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued (Per Tranche) ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| ARSI 2006-W3 | A1 | Ameriquest Mortgage Company | Argent Securities Inc. | UBS Securities | 639,421,000 | 3/29/2006 | Group 1 |
| FHLT 2006-B | 1A | Fremont Investment & Loan | Fremont Mortgage Securities Corp | UBS Securities | 170,455,000 | 8/3/2006 | Group 1 |
| INABS 2005-C | AII | Indymac Bank | IndyMac ABS Inc. | UBS Securities | 268,995,000 | 9/29/2005 | Group 1 |
| INABS 2005-D | AII | IndyMac Bank | IndyMac ABS Inc. | UBS Securities | 317,676,000 | 12/23/2005 | Group 1 |

[3] A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

| Securitization | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued Per Tranche ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| INABS 2006-D | 1A | IndyMac Bank | IndyMac MBS Inc. | UBS Securities | 193,000,000 | 9/13/2006 | Group 1 |
| INABS 2007-A | 1A | IndyMac Bank | IndyMac ABS Inc. | UBS Securities | 274,933,000 | 3/12/2007 | Group 1 |
| MABS 2005-FRE1 | A1 | UBS Real Estate | MASTR | UBS Securities | 407,426,000 | 11/29/2005 | Group 1 |
| MABS 2005-HE2 | A1 | UBS Real Estate | MASTR | UBS Securities | 223,961,000 | 9/30/2005 | Group 1 |
| MABS 2005-WF1 | A1A | UBS Real Estate | MASTR | UBS Securities | 304,942,000 | 9/28/2005 | Group 1 |
| MABS 2006-FRE2 | A1 | UBS Real Estate | MASTR | UBS Securities | 195,110,000 | 5/30/2006 | Group 1 |
| MABS 2006-NC2 | A1 | UBS Real Estate | MASTR | UBS Securities | 161,350,000 | 9/28/2006 | Group 1 |
| MABS 2006-NC3 | A1 | UBS Real Estate | MASTR | UBS Securities | 206,732,000 | 12/28/2006 | Group 1 |
| MABS 2006-WMC2 | A1 | UBS Real Estate | MASTR | UBS Securities | 269,613,000 | 6/29/2006 | Group 1 |
| MABS 2006-WMC3 | A1 | UBS Real Estate | MASTR | UBS Securities | 142,810,000 | 9/28/2006 | Group 1 |
| MABS 2006-WMC4 | A1 | UBS Real Estate | MASTR | UBS Securities | 187,821,000 | 11/30/2006 | Group 1 |
| | A2 | UBS Real Estate | MASTR | UBS Securities | 20,869,000 | 11/30/2006 | Group 1 |
| MABS 2007-HE2 | A1 | UBS Real Estate | MASTR | UBS Securities | 237,414,000 | 8/30/2007 | Group 1 |
| MABS 2007-WMC1 | A1 | UBS Real Estate | MASTR | UBS Securities | 218,363,000 | 2/27/2007 | Group 1 |
| MARM 2005-8 | 2A1 | UBS Real Estate | MASTR | UBS Securities | 425,594,000 | 12/29/2005 | Group 2 |
| | 3A1 | UBS Real Estate | MASTR | UBS Securities | 152,390,000 | 12/29/2005 | Group 3 |
| MARM 2006-2 | 2A1 | UBS Real Estate | MASTR | UBS Securities | 119,176,000 | 4/13/2006 | Group 2 |
| MARM 2006-OA1 | 2A1 | UBS Real Estate | MASTR | UBS Securities | 258,807,000 | 4/20/2006 | Group 2 |
| MARM 2007-1 | 11A | UBS Real Estate | MASTR | UBS Securities | 386,287,000 | 1/16/2007 | Sub-Group 1-1 |
| MARM 2007-3 | 11A1 | UBS Real Estate | MASTR | UBS Securities | 309,106,000 | 5/15/2007 | Sub-Group 1-1 |
| | 11A2 | UBS Real Estate | MASTR | UBS Securities | 206,071,000 | 5/15/2007 | Sub-Group 1-1 |
| | 21A1 | UBS Real Estate | MASTR | UBS Securities | 116,046,000 | 5/15/2007 | Sub-Group 2-1 |
| | 21A2 | UBS Real Estate | MASTR | UBS Securities | 77,364,000 | 5/15/2007 | Sub-Group 2-1 |

### C.    The Securitization Process

#### 1.    UBS Real Estate Pools Mortgage Loans In Special Purpose Trusts

34.    As the sponsor for 16 of the 22 Securitizations, Defendant UBS Real Estate purchased mortgage loans underlying the Certificates for those 16 Securitizations after the loans were originated, either directly from the originators or through affiliates of the originators.[4]

35.    UBS Real Estate then sold the mortgage loans for the 16 Securitizations it sponsored to the depositor, Defendant MASTR, pursuant to an Assignment and Recognition Agreement or Mortgage Purchase Loan Agreement that contained various representations and warranties regarding the mortgage loans.[5]  With respect to the remaining six Securitizations,

---

[4]    Non-party sponsors Ameriquest Mortgage Company, Fremont Investment & Loan, and IndyMac Bank were each a sponsor of one or more of the remaining six Securitizations. Specifically, Ameriquest Mortgage Company sponsored one Securitization, Fremont sponsored one Securitization, and IndyMac sponsored four Securitizations.

[5]    Specifically, UBS Real Estate sold the loans for the MABS 2005-WF1, MABS 2005-HE2, MABS 2005-FRE1, MABS 2006-FRE2, MABS 2006-WMC2, MABS 2006-WMC3,

non-party sponsors sold the mortgage loans to non-party depositors, as reflected in Table 1, *supra* at paragraph 33; Defendant UBS Securities was the lead and selling underwriter for those six Securitizations.

36.     MASTR was a wholly-owned, limited-purpose financial subsidiary of UBS Americas.  MASTR's sole purpose was to act as depositor and serve as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

37.     As depositor for 16 of the Securitizations, MASTR transferred the relevant mortgage loans to the trusts.  As part of each of the Securitizations, the trustee, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

### 2.     The Trusts Issue Securities Backed by the Loans

38.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cash-flows from the underlying mortgages in the Supporting Loan

---

MABS 2006-WMC4, MABS 2006-NC2, MABS 2006-NC3, MABS 2007-WMC1, and MABS 2007-HE2 Securitizations to MASTR pursuant to an Assignment and Recognition Agreement. UBS Real Estate sold the loans for the MARM 2005-8, MARM 2006-2, MARM 2006-OA1, MARM 2007-1, and MARM 2007-3 Securitizations to MASTR pursuant to a Mortgage Loan Purchase Agreement.

Group. The level of risk inherent in the Certificates was a function of the capital structure of the related transaction, the credit quality of the underlying mortgages and the risk that the underlying mortgages would become delinquent or default.

39.     The Certificates were issued pursuant to one of seven Shelf Registration Statements filed with the SEC on Form S-3. The Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC. Each Individual Defendant signed one or more of the two Shelf Registration Statements that were filed by MASTR, and either signed the amendments thereto or authorized Mr. Martin to sign on his or her behalf. The SEC filing number, registrants, signatories, and filing dates for each Shelf Registration Statement and amendments thereto, as well as the Certificates covered by each Shelf Registration Statement, are set forth in Table 2 below.

## Table 2

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-121782 | 12/30/2004 | N/A | Argent Securities Inc. | ARSI 2006-W3 | Adam J. Bass; John P. Grazer; and Andrew L. Stidd | N/A |
| 333-124678 | 5/6/2005 | 6/2/2005 | MASTR | MABS 2005-HE2 MARM 2005-8 MABS 2005-FRE1 MABS 2005-WF1 | David Martin; Per Dyrvik; Hugh Corcoran; and Peter Slagowitz | David Martin; Per Dyrvik; Hugh Corcoran; and Peter Slagowitz |
| 333-127617 | 8/17/2005 | N/A | IndyMac ABS, Inc. | INABS 2005-C INABS 2005-D | S. Blair Abernathy; John Olinski; Samir Grover; Lynette Antosh; and Victor H. Woodworth | N/A |
| 333-130373 | 12/16/2005 | 2/27/2006 3/28/2006 4/03/2006 4/04/2006 | MASTR | MABS 2006-FRE2 MABS 2006-NC2 MABS 2006-NC3 MABS 2006-WMC2 MABS 2006-WMC3 MABS 2006-WMC4 MABS 2007-HE2 MABS 2007-WMC1 MARM 2006-OA1 MARM 2006-2 MARM 2007-1 MARM 2007-3 | David Martin; Per Dyrvik; Hugh Corcoran; and Peter Slagowitz | David Martin; Per Dyrvik; Hugh Corcoran; and Peter Slagowitz |
| 333-132042 | 2/24/2006 | 3/29/2006 4/13/2006 | IndyMac MBS, Inc. | INABS 2006-D | John Olinski; S. Blair Abernathy; Raphael Bostic; Samir Grover; and Victor H. Woodworth | John Olinski; S. Blair Abernathy; Raphael Bostic; Simon Heyrick; and Victor H. Woodworth |

15

| SEC File No. | Date Registration Statement Filed | Date(s) amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-132540 | 3/17/2006 | 5/16/2006 6/23/2006 | Fremont Mortgage Securities Corporation | FHLT 2006-B | Murray L. Zoota; Louis J. Rampino; Wayne R. Bailey; Thomas W. Hayes; Donald Puglisi; Kyle R. Walker; and Ronald Nicolas, Jr. | 5/16/2006: Murray L. Zoota; Louis J. Rampino; Wayne R. Bailey; Thomas W. Hayes; Donald Puglisi; Patrick E. Lamb; Alan Faigin 6/23/2006: Kyle W. Walker; Louis J. Rampino; Wayne R. Bailey; Thomas W. Hayes; Donald Puglisi; Murray L. Zoota; Ronald Nicolas, Jr.; Alan Faigin |
| 333-134691 | 6/2/2006 | 8/23/2006 10/10/2006 | IndyMac ABS, Inc. | INABS 2007-A | Blair Abernathy; John Olinski; Raphael Bostic; Simon Heyrick; and Victor H. Woodworth | Blair Abernathy; John Olinski; Raphael Bostic; Simon Heyrick; Victor H. Woodworth |

40.    The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide detailed statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

41.    The Prospectus Supplements associated with each Securitization were filed with the SEC, pursuant to Rule 424(b), as part of the Registration Statements.  The Form 8-Ks attaching the PSAs for each Securitization were also filed with the SEC.  The dates on which the

Prospectus Supplement and Form 8-K was filed for each Securitization, as well as the filing

number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

### Table 3

| Transaction | Date Prospectus Supplement Filed | Date Report 8-K Attaching PSA Filed | Filing No. of Related Registration Statement |
|---|---|---|---|
| ARSI 2006-W3 | 3/27/2006 | 4/12/2006 | 333-121782 |
| FHLT 2006-B | 8/7/2006 | 8/21/2006 | 333-132540 |
| INABS 2005-C | 9/27/2005 | 10/14/2005 | 333-127617 |
| INABS 2005-D | 12/22/2005 | 1/9/2006 | 333-127617 |
| INABS 2006-D | 9/13/2006 | 10/24/2006 | 333-132042 |
| INABS 2007-A | 3/13/2007 | 5/23/2007 | 333-134691 |
| MABS 2005-FRE1 | 11/28/2005 | 12/14/2005 | 333-124678 |
| MABS 2005-HE2 | 9/29/2005 | 10/19/2005 | 333-124678 |
| MABS 2005-WF1 | 9/28/2005 | 10/17/2005 | 333-124678 |
| MABS 2006-FRE2 | 5/30/2006 | 6/16/2006 | 333-130373 |
| MABS 2006-NC2 | 9/28/2006 | 10/17/2006 | 333-130373 |
| MABS 2006-NC3 | 12/28/2006 | 2/9/2007 | 333-130373 |
| MABS 2006-WMC2 | 6/27/2006 | 7/14/2006 | 333-130373 |
| MABS 2006-WMC3 | 9/28/2006 | 10/16/2006 | 333-130373 |
| MABS 2006-WMC4 | 11/30/2006 | 1/31/2007 | 333-130373 |
| MABS 2007-HE2 | 8/31/2007 | 9/17/2007 | 333-130373 |
| MABS 2007-WMC1 | 2/28/2007 | 3/22/2007 | 333-130373 |
| MARM 2005-8 | 12/29/2005 | 1/25/2006 | 333-124678 |
| MARM 2006-2 | 4/14/2006 | 4/28/2006 | 333-130373 |
| MARM 2006-OA1 | 4/20/2006 | 5/5/2006 | 333-130373 |
| MARM 2007-1 | 1/17/2007 | 2/16/2007 | 333-130373 |
| MARM 2007-3 | 5/17/2007 | 5/30/2007 | 333-130373 |

42.     The Certificates were issued pursuant to the PSAs, and Defendants MASTR and

UBS Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac in the

primary market pursuant to the Registration Statements, which, as noted previously, included the

Prospectuses and Prospectus Supplements.

43.     Defendants UBS Securities and MASTR targeted Fannie Mae in Washington, DC

and Freddie Mac in Virginia.  Defendants UBS Securities and MASTR sent offering materials,

including the Prospectuses and Prospectus Supplements, to Fannie Mae in Washington, DC and

Freddie Mac in Virginia.  Defendants UBS Securities and MASTR knew that Fannie Mae was

located in the District of Columbia and that Freddie Mac was located in Virginia.

II.     **The Defendants' Participation In The Securitization Process**

    A.     **The Role of Each of the Defendants**

    44.     Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

    45.     With respect to each Securitization, the depositor, underwriter, and Individual Defendants who signed the Registration Statement, as well as the Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statements, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

    1.     **Defendant UBS Real Estate**

    46.     Defendant UBS Real Estate has been involved in the securitization of a variety of assets since 1983.  One of its activities was to purchase residential mortgage loan portfolios for inclusion in securitizations.  As stated in the Prospectus Supplement for the MARM 2007-3 Securitization, from the period of January 2003 through December 2006, UBS Real Estate securitized mortgage loans with an aggregate principal balance of approximately $91 billion; during the 2003, 2004, 2005 and 2006 fiscal years, UBS Real Estate securitized approximately $26.6 billion, $26.03 billion, $18.1 billion, and $20.2 billion of mortgage loans, respectively.

47.     Defendant UBS Real Estate acted as the sponsor of 16 of the 22 Securitizations. In that capacity, UBS Real Estate determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates. UBS Real Estate also selected MASTR as the special purpose vehicle that would be used to transfer the mortgage loans from UBS Real Estate to the issuing trusts, and selected UBS Securities as the underwriter for the Securitizations. In its role as sponsor, UBS Real Estate knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

48.     For the 16 Securitizations that it sponsored, Defendant UBS Real Estate also conveyed the mortgage loans to Defendant MASTR pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement. In these agreements, UBS Real Estate made certain representations and warranties to MASTR regarding the group of loans collateralizing the Certificates. These representations and warranties were assigned by MASTR to the trustees for the benefit of the Certificateholders.

### 2.     Defendant MASTR

49.     Defendant MASTR has been engaged in the securitization of mortgage loans since its incorporation in 1987. It is a special purpose entity formed for the sole purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

50.    MASTR was the depositor for sixteen of the twenty-two Securitizations.  In its capacity as depositor, MASTR purchased the mortgage loans from UBS Real Estate pursuant to the Assignment and Recognition Agreements or Mortgage Loan Purchase Agreements, as applicable.  MASTR then grouped the loans into tranches and determined the various levels of seniorities, and sold, transferred, or otherwise conveyed the securitized loans to the trusts. MASTR, together with the other Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.

51.    The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3.    Defendant UBS Securities

52.    Defendant UBS Securities is an investment bank, and was, at all relevant times, a registered broker/dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States.  According to industry research for 2005, UBS Securities was ranked fifth in the market for underwriters of mortgage-backed securities in the United States.

53.    Defendant UBS Securities was the lead underwriter for the Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors.  UBS Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred and underwritten.

### 4.    Defendant UBS Americas

54.    Defendant UBS Americas employed its wholly-owned subsidiaries, UBS Real Estate, UBS Securities, and MASTR, in the key steps of the securitization process.  Unlike

typical arms-length securitizations, the Securitizations here involved various UBS subsidiaries and affiliates at virtually each step in the chain. With respect to over two-thirds of the Securitizations, the sponsor was UBS Real Estate, the depositor was MASTR, and the lead underwriter was UBS Securities. As to the remaining Securitizations, UBS Securities was the lead and selling underwriter.

55.    As the sole corporate parent of UBS Securities, MASTR, and UBS Real Estate, UBS Americas had the practical ability to direct and control the actions of UBS Securities, MASTR, and UBS Real Estate related to the Securitizations, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.

56.    As detailed, *supra*, the Securitizations here involved UBS entities, including the aforementioned subsidiaries of UBS Americas, at virtually each step in the process. UBS Americas profited substantially from this vertically integrated approach to mortgage-backed securitization. Furthermore, UBS Americas shares, and, on information and belief, shared during the relevant time period, overlapping management with the other Defendant entities. For instance, Defendant David Martin was the President and CEO of MASTR; he signed two Shelf Registration Statements on behalf of MASTR; and he is the Global Head of Residential Mortgage Backed Securitizations and Asset Backed Securitizations for UBS Americas. Likewise, Defendant Peter Slagowitz was a Managing Director of Defendant MASTR; he signed two Shelf Registration Statements on behalf of MASTR; and he was a Managing Director and Head of Loan Conduits for UBS AG, which wholly owns UBS Americas, and was also a Managing Director at UBS Real Estate. Similarly, Defendant Per Dyrvik was a Managing Director and Principal Accounting and Financial Officer of Defendant MASTR; he signed two Shelf Registration Statements on behalf of MASTR; and he was a Managing Director of UBS

Securities and also Managing Director at UBS AG and at UBS Americas.  And again, Defendant Hugh Corcoran was a Managing Director of MASTR; he signed two Shelf Registration Statements on behalf of MASTR; and he was a Managing Director of UBS Securities.

57.     UBS Americas expanded its share of the residential mortgage-backed securitization market to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

### 5.     The Individual Defendants

58.     Defendant David Martin acted as the President and Chief Executive Officer of Defendant MASTR.  In that capacity, Mr. Martin signed the Registration Statement under file number 333-130373 filed with the SEC on December 16, 2005 and the related pre-effective amendments on Forms S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006.  Mr. Martin also signed the Registration Statement under file number 333-124678 filed with the SEC on May 6, 2005 and the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005.

59.     Defendant Per Dyrvik was the Director and Chief Financial Officer of Defendant MASTR.  In that capacity, he signed the Registration Statement under file number 333-130373 filed with the SEC on December 16, 2005, and Defendant Martin signed the related pre-effective amendments on Forms S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 on Mr. Dyrvik's behalf.  Mr. Dyrvik further signed the Registration Statement under file number 333-124678 filed with the SEC on May 6, 2005, and Defendant Martin signed the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005 on Mr. Dyrvik's behalf.

60.     Defendant Hugh Corcoran was one of Defendant MASTR's Managing Directors. In that capacity, he signed the Registration Statement under file number 333-130373 filed with the SEC on December 16, 2005, and Defendant Martin signed the related pre-effective amendments on Forms S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 on Mr. Corcoran's behalf. Mr. Corcoran further signed the Registration Statement under file number 333-124678 filed with the SEC on May 6, 2005, and Defendant Martin signed the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005 on Mr. Corcoran's behalf.

61.     Defendant Peter Slagowitz was one of Defendant MASTR's Managing Directors. In that capacity, he signed the Registration Statement under file number 333-130373 filed with the SEC on December 16, 2005, and Defendant Martin signed the related pre-effective amendments on Form S-3/A filed with the SEC on or about February 27, 2006, March 28, 2006, April 3, 2006, and April 4, 2006 on Mr. Slagowitz's behalf. Mr. Slagowitz further signed the Registration Statement under file number 333-124678 filed with the SEC on May 6, 2005, and Defendant Martin signed the related pre-effective amendment on Form S-3/A filed with the SEC on or about June 2, 2005 on Mr. Slagowitz's behalf.

**B.      UBS's Failure To Conduct Proper Due Diligence**

62.     UBS failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the statements in the Registration Statements.

63.     Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence. For example, UBS Securities, as the underwriter, was paid a commission based on the amount it received from the sale of the

23

Certificates to the public.  Likewise, UBS Real Estate and MASTR received substantial revenues and additional fees from UBS Securities for the sale of the Certificates.

64.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate diligence or otherwise to ensure the accuracy of the statements in the Registrations Statements pertaining to the Securitizations.

65.     For instance, UBS retained third-parties, including Clayton Holdings, Inc. ("Clayton"), to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with the applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

66.     UBS was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to UBS by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from the third-party due diligence firms that there

were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, UBS failed to exclude material numbers of these loans from the Securitizations. It also failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

67.     Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 20 percent of the mortgage loans UBS submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 33 percent of the loans were subsequently waived in by UBS without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested. *See* Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report") at 167, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

68.     Based on the information provided to it by the third-party due diligence firms, UBS should have known that a substantial number of the mortgage loans did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements, and that the mortgage loans did not have the characteristics represented in those documents.

69.     By late 2007, various government regulators commenced investigations relating to UBS's involvement in the securitizations of residential mortgages, including the due diligence practices of UBS Securities.

70.     On December 24, 2007, Swiss regulators announced that the Swiss banking department charged with oversight of Swiss investment banks would be initiating a full investigation into how UBS Securities incurred massive losses in connection with the subprime markets in the United States, resulting in it taking a $10 billion write-down in its mortgage-backed investments.

71.     On January 30, 2008, UBS pre-announced its fourth-quarter 2007 and full-year 2007 results and disclosed an additional $4 billion in write-downs in positions related to the United States residential mortgage market.

72.     On or about March 13, 2008, after a seven-month investigation requested by the President of the United States, a working group led by the Secretary of Treasury and including the chairmen of the Federal Reserve Board, the SEC, and the Commodities Futures Trading Commission, issued a report finding:  (i) a significant erosion of market discipline by those involved in the securitization process, including originators, underwriters, and credit rating agencies, related in part to failures to provide or obtain adequate risk disclosures; and that (ii) the turmoil in financial markets clearly was triggered by a dramatic weakening of underwriting standards for United States subprime mortgages.

73.     In April 2008, UBS AG, the ultimate corporate parent of UBS Americas, UBS Securities, UBS Real Estate, and MASTR, presented Swiss banking regulators with a report detailing the reasons for its massive losses related to the United States subprime mortgage market.  In that report, which was summarized in a shareholder report issued by UBS AG on April 21, 2008, UBS AG admitted that its losses in the U.S. subprime mortgage market were due to a litany of errors, including inadequate risk management and a focus on revenue growth, which contributed to the dangers in its substantial subprime portfolio.

74.     Confidential witnesses confirm that UBS prioritized speed and price over accuracy, and that UBS was aware that many of the loans it was securitizing did not meet the representations about their quality in the Prospectuses and Prospectus Supplements.  For example, one confidential witness, who worked for UBS throughout the time in which UBS purchased and securitized the mortgage loans at issue in this complaint, controlled a portfolio of mortgages that were so toxic that he described his job as "babysitting crap."  This same witness noted that ultimately all of the loans he managed defaulted.

75.     Another confidential witness, who worked for UBS Securities through most of the time in which UBS purchased and securitized the mortgage loans at issue in this complaint, noted that every investment bank engaged in heavy competition to securitize loans from originators such as New Century, IndyMac, and Fremont, and that their primary consideration was the low price of these loans, rather than any concern with the loans' poor quality.

## III.     The Statements In The Registration Statements

### A.     Compliance With Underwriting Guidelines

76.     The Prospectus and Prospectus Supplements for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systematic breaches of those guidelines with respect to the securitized loans.

77.     The statements about compliance with underwriting guidelines made in the Prospectus and Prospectus Supplement, which, as discussed, formed part of the Registration

Statement for each Securitization, were material to a reasonable investor's decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in greater economic risk to an investor such as Fannie Mae or Freddie Mac.

### 1.     The ARSI 2006-W3 Securitization

78.     The Prospectus Supplement for the ARSI 2006-W3 Securitization contained several key statements with respect to the underwriting standards of Argent Mortgage Company, LLC ("Argent"), which originated the loans in the ARSI 2006-W3 Securitization.

79.     The Prospectus Supplement stated that "[a]ll of the Mortgage Loans acquired by the Seller were originated in accordance with guidelines (the 'Underwriting Guidelines') established by the Originator."

80.     With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[a]ll of the Mortgage Loans originated by the Originator are based on loan application packages submitted directly or indirectly by a loan applicant to the Originator. Each loan application package has an application completed by the applicant that includes information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information. The Originator also obtains (or the broker submits) a credit report on each applicant from a credit reporting company. The credit report typically contains the reported information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and reported records of default, bankruptcy, repossession and judgments. If applicable, the loan application package must also generally include a letter from the applicant explaining all late payments on mortgage debt and, generally, consumer (*i.e.* non-mortgage) debt."

81.    The Prospectus Supplement further represented that "[t]he Stated Income residential loan program requires the applicant's employment and income sources to be stated on the application.  The applicant's income as stated must be reasonable for the related occupation in the loan underwriter's discretion."

82.    The Prospectus Supplement also stated that "[t]he Originator's underwriting standards are primarily intended to assess the applicant's credit standing and ability to repay as well as the value and the adequacy of the mortgaged property as collateral for the mortgage loan." The Prospectus Supplement further stated that "[w]hile the Originator's primary considerations in underwriting a mortgage loan are the applicant's credit standing and repayment ability, as well as the value and adequacy of the mortgaged property as collateral, the Originator also considers, among other things, the applicant's credit history and debt service-to-income ratio, and the type and occupancy status of the mortgaged property."

83.    While the Prospectus Supplement noted that the originator might make "exceptions" to its underwriting guidelines, it stated that those exceptions would be "[o]n a case-by-case basis" and be "based upon compensating factors."

84.    With respect to information regarding appraisals, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of the Originator or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property."

85.     The Prospectus Supplement further elaborated that "[p]roperties that are to secure mortgage loans have a valuation obtained by an appraisal performed by a qualified and licensed appraiser who is an independent appraiser who is in good standing with the Originator's in-house appraisal department.  Generally, properties below average standards in condition and repair are not acceptable as security for mortgage loans under the Underwriting Guidelines.  Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  Every independent appraisal is reviewed through an automated valuation model, by a representative of the Originator or a fee appraiser before the mortgage loan is funded."

## 2.     The FHLT 2006-B Securitization

86.     The Prospectus Supplement for the FHLT 2006-B Securitization contained several key statements with respect to the underwriting standards of Fremont Investment & Loan, which originated the loans in the FHLT 2006-B Securitization.

87.     The Prospectus Supplement stated that "[a]ll of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section."

88.     The Prospectus Supplement further stated that "[m]ortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ('Scored Programs'), subject to various exceptions as described in this section. Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. ... The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage

payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment."

89.     With respect to the information evaluated by the originator, the Prospectus Supplement stated that "Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application.  The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work."

90.     The Prospectus Supplement also stated that, "Based on the data provided in the loan application, the required supporting documents, and the appraisal or other valuation of the mortgaged property, Fremont Investment & Loan determines whether the borrower's monthly income would be sufficient to enable the borrower to meet his monthly obligations on the mortgage loan and other expenses related to the property, such as property taxes, utility costs, standard hazard insurance and other fixed obligations."

91.     While the Prospectus Supplement noted that the originator might make "an underwriting exception" to its underwriting guidelines, it stated that those exceptions would be "[o]n a case by case basis" and be "based upon compensating factors."

92.     Regarding appraisals, the Prospectus Supplement stated that "initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by Fremont.  In some cases, Fremont

relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."

### 3. The INABS 2005-C Securitization

93.     The Prospectus Supplement for the INABS 2005-C Securitization contained several key statements with respect to the underwriting standards of IndyMac Bank, which originated the majority of the loans and acquired the remaining balance of the loans in the INABS 2005-C Securitization.

94.     The Prospectus stated that "[l]oans that the depositor acquires will have been originated in accordance with the underwriting criteria specified in this prospectus under 'Loan Program-Underwriting Standards' or as otherwise described in the related prospectus supplement."

95.     The Prospectus further stated that "IndyMac Bank's underwriting standards for mortgage loans are primarily intended to evaluate the borrower's creditworthiness and the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, as well as the type and intended use of the mortgaged property."

96.     Further, the Prospectus Supplement stated that "[m]ost of the mortgage loans were originated in accordance with IndyMac Bank's underwriting standards described below. Mortgage loans not originated under these underwriting standards as, for instance, mortgage

loans acquired through bulk purchases, were originated in accordance with underwriting standards approved by IndyMac Bank at the time of acquisition and generally comparable to IndyMac Bank's underwriting standards."

97.     The Prospectus Supplement also noted that "[i]n the process of underwriting mortgage loans, IndyMac Bank may use its 'electronic Mortgage Information and Transaction System' (or 'E-MITS'), a proprietary, Internet-based, point-of-sale automated underwriting and risk-based pricing system to underwrite and price the mortgage loans. ... As with IndyMac Bank's traditional underwriting process, this approval is subject to full and complete data verification. Loans approved by e-MITS comply with IndyMac Bank's underwriting guidelines."

98.     Regarding information evaluated by the originator, the Prospectus stated that "a prospective borrower applying for a loan is required to fill out a detailed application that will supply the underwriting officer with pertinent credit information, including the principal balance and payment history with respect to any senior mortgage. Unless otherwise specified in the related prospectus supplement, the related seller will verify the credit information supplied by the borrower. The borrower generally must provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report summarizing the borrower's credit history with local merchants and lenders and any record of bankruptcy."

99.     With regards to exceptions, the Prospectus Supplement stated that "exceptions to standard underwriting guidelines are permitted where compensating factors are present or in the context of negotiated bulk purchases." However, with respect to bulk purchases, the Prospectus Supplement stated that "mortgage loans acquired through bulk purchases[] were originated in

accordance with underwriting standards approved by IndyMac Bank at the time of acquisition and generally comparable to IndyMac Bank's underwriting standards."

100.    The Prospectus Supplement also stated that "[i]n those cases where the seller obtains the employment, credit and property information, the seller may use a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to make payments on the loan in addition to any other monthly credit obligations. The 'DEBT-TO-INCOME RATIO' is the ratio of the borrower's total monthly payments to the borrower's gross monthly income. The maximum monthly debt-to-income ratio will vary depending on a borrower's credit grade and loan program. Variations in the debt-to-income ratio limit will be permitted based on any compensating factors specified in the related prospectus supplement."

101.    As for appraisals, the Prospectus Supplement stated that "[i]n determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The scope and detail of an appraisal may be limited to a query to a third party valuation service or may be broader and more detailed. At most, the appraiser may be required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal may be based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."

102.    Regarding owner occupancy, the Prospectus Supplement also stated that "[t]he related prospectus supplement will disclose the aggregate principal balance of loans secured by owner-occupied properties."

### 4.    The INABS 2005-D Securitization

103.    The Prospectus Supplement for the INABS 2005-D Securitization contained several key statements with respect to the underwriting standards of IndyMac Bank, which either

originated the loans in the INABS 2005-D Securitization or purchased those loans from other "flow" or "bulk" purchase arrangements.

104.    Regarding the underwriting guidelines, the Prospectus stated that "[L]oans that the depositor acquires will have been originated in accordance with the underwriting criteria specified in this prospectus under 'Loan Program-Underwriting Standards' or as otherwise described in the related prospectus supplement." The Prospectus also stated that "IndyMac Bank's underwriting standards for mortgage loans are primarily intended to evaluate the borrower's creditworthiness and the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, as well as the type and intended use of the mortgaged property."

105.    The Prospectus Supplement stated that there may be "[v]ariations in maximum loan amount limits," but that such variations would be "based on compensating factors."

106.    The Prospectus Supplement further stated that "[m]ortgage loans not originated under these underwriting standards as, for instance, mortgage loans acquired through bulk purchases, were originated in accordance with underwriting standards approved by IndyMac Bank at the time of acquisition and generally comparable to IndyMac Bank's underwriting standards."

107.    Regarding information evaluated by IndyMac, the Prospectus stated "[i]n general, a prospective borrower applying for a loan is required to fill out a detailed application that will supply the underwriting officer with pertinent credit information, including the principal balance and payment history with respect to any senior mortgage. Unless otherwise specified in the related prospectus supplement, the related seller will verify the credit information supplied by the borrower. The borrower generally must provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report

summarizing the borrower's credit history with local merchants and lenders and any record of bankruptcy."

108.   The Prospectus Supplement further noted that "[t]he Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income.  Information regarding assets is verified through written communications," and that "[t]he No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications."

109.   The Prospectus Supplement also stated that "[i]n those cases where the seller obtains the employment, credit and property information, the seller may use a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to make payments on the loan in addition to any other monthly credit obligations. The 'DEBT-TO-INCOME RATIO' is the ratio of the borrower's total monthly payments to the borrower's gross monthly income. The maximum monthly debt-to-income ratio will vary depending on a borrower's credit grade and loan program. Variations in the debt-to-income ratio limit will be permitted based on any compensating factors specified in the related prospectus supplement."

110.   Regarding appraisals, the Prospectus Supplement stated that "[i]n determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing.  The scope and detail of an appraisal may be limited to a query to a third valuation service or may be broader and more detailed.  At most, the appraiser may be required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal may be based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."

5.    **The INABS 2006-D Securitization**

111.    The Prospectus Supplement for the INABS 2006-D Securitization contained several key statements with respect to the underwriting standards of IndyMac Bank, which originated the loans in the INABS 2006-D Securitization.

112.    Regarding the underwriting guidelines, the Prospectus Supplement stated that: "The mortgage loans included in the trust will have been originated in accordance with IndyMac Bank's underwriting standards and origination practices described herein." The Prospectus also stated that "IndyMac Bank's underwriting standards for mortgage loans are primarily intended to evaluate the borrower's creditworthiness and the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, as well as the type and intended use of the mortgaged property."

113.    The Prospectus Supplement stated that IndyMac would allow "[e]xceptions" to its underwriting guidelines, but only where "compensating factors exist." Similarly, while the Prospectus Supplement stated that "[t]he underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied," such variances would occur "in appropriate cases where factors such as low Loan-to-Value ratios or other favorable credit factors exist."

114.    Regarding information evaluated by the originator, the Prospectus Supplement stated that "[i]n the process of underwriting mortgage loans, IndyMac Bank may use its 'electronic Mortgage Information and Transaction System' (or 'e-MITS'), a proprietary, internet-based, point-of-sale automated underwriting and risk-based pricing system to underwrite and price the mortgage loans. ... As with IndyMac Bank's traditional underwriting process, this approval is subject to full and complete data verification. Loans approved by e-MITS comply with IndyMac Bank's underwriting guidelines."

115.    The Prospectus Supplement further stated that "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Property such as property taxes and hazard insurance."

116.    The Prospectus Supplement further elaborated that "[i]n general, where a loan is subject to full underwriting review, a prospective borrower applying for a mortgage loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

117.    The Prospectus Supplement also stated that "[i]n those cases where the seller obtains the employment, credit and property information, the seller may use a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to make payments on the loan in addition to any other monthly credit obligations. The 'DEBT-TO-INCOME RATIO' is the ratio of the borrower's total monthly payments to the borrower's gross monthly income. The maximum monthly debt-to-income ratio will vary depending on a borrower's credit grade and loan program. Variations in the debt-to-income ratio limit will be permitted based on any compensating factors specified in the related prospectus supplement."

118.   The Prospectus Supplement also made statements regarding appraisals, stating that "[t]o determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice.  The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form."

119.   The Prospectus further stated that "[i]n determining the adequacy of the Property as collateral, an appraisal is made of each property considered for financing.  Except as described in the applicable prospectus supplement, an appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."

### 6.   The INABS 2007-A Securitization

120.   The Prospectus Supplement for the INABS 2007-A Securitization contained several key statements with respect to the underwriting standards of IndyMac Bank, which originated the loans in the INABS 2007-A Securitization.

121.   Regarding the underwriting guidelines, the Prospectus stated that:  "Mortgage loans acquired by the depositor will have been originated in accordance with the underwriting criteria specified below under 'Mortgage Loan Program—Underwriting Standards' or as otherwise described in a related prospectus supplement."  The Prospectus continued, "IndyMac Bank's underwriting standards for mortgage loans are primarily intended to evaluate the borrower's creditworthiness and the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, as well as the type and intended use of the mortgaged property."

122.    The Prospectus Supplement stated that IndyMac would allow "[e]xceptions" to its underwriting guidelines, but only where "compensating factors exist." Similarly, while the Prospectus Supplement stated that "[t]he underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied," such variances would occur "in appropriate cases where factors such as low Loan-to-Value ratios or other favorable credit factors exist."

123.    Regarding information evaluated by the originator, the Prospectus Supplement stated that "[i]n the process of underwriting mortgage loans, IndyMac Bank may use its 'electronic Mortgage Information and Transaction System' (or 'e-MITS'), a proprietary, internet-based, point-of-sale automated underwriting and risk-based pricing system to underwrite and price the mortgage loans. ... As with IndyMac Bank's traditional underwriting process, this approval is subject to full and complete data verification. Loans approved by e-MITS comply with IndyMac Bank's underwriting guidelines."

124.    The Prospectus Supplement further elaborated that "[m]ortgage loans originated through the conduit channel are generally initially underwritten by a 'third party seller' to the third party seller's underwriting guidelines. IndyMac Bank reviews each third party seller's guidelines for acceptability, and these guidelines generally meet industry standards and incorporate many of the same factors used by Fannie Mae, Freddie Mac and IndyMac Bank. Each mortgage loan is re-underwritten by IndyMac Bank for compliance with its guidelines based only on the objective characteristics of the mortgage loan, such as FICO, documentation type, loan-to-value ratio, etc., but without reassessing the underwriting procedures originally used. In addition, a portion of the mortgage loans acquired from a third party seller are subjected to a full re-underwriting."

125.    Regarding information evaluated in the loan application, the Prospectus Supplement stated that "[i]n general, where a loan is subject to full underwriting review, a prospective borrower applying for a mortgage loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

126.    The Prospectus Supplement further stated that "[o]nce all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Property such as property taxes and hazard insurance). The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist."

127.    The Prospectus also made statements regarding appraisals, stating that "[t]o determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal

report form, or other acceptable form." The Prospectus also stated that "[e]xcept as described in the applicable prospectus supplement, an appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home."

### 7.    The MABS 2005-WF1 Securitization

128.    The Prospectus Supplement for the MABS 2005-WF1 Securitization contained several key statements with respect to the underwriting standards of Wells Fargo Bank, N.A., which originated the loans in the MABS 2005-WF1 Securitization.

129.    As a general matter, the Prospectus Supplement stated that "[t]he mortgage loans in the trust were originated in accordance with the originator's underwriting guidelines described herein."

130.    The Prospectus Supplement further stated that "[t]he underwriting guidelines used by Wells Fargo are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a Mortgage Loan is required to complete a detailed application."

131.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[t]he loan application elicits pertinent information about the applicant including, depending on the program, the applicant's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. With respect to every applicant, a credit report summarizing the applicant's credit history with merchants and lenders is obtained. Significant unfavorable credit information reported by the applicant or by a credit reporting agency is taken into account in the credit decision. Loan applications are

42

classified according to certain characteristics, including but not limited to: condition and location

of the collateral, credit history of the applicant, ability to pay, loan-to-value ratio and general

stability of the applicant in terms of employment history and time in residence."

132.    The Prospectus Supplement further represented that, "Under Wells Fargo's 'stated

income, stated asset' program, the applicant's employment, income sources and assets must be

stated on the initial signed application.  The applicant's income as stated must be reasonable for

the applicant's occupation as determined in the discretion of the loan underwriter; however, such

income is not independently verified.  Similarly, the applicant's assets as stated must be

reasonable for the applicant's occupation as determined in the discretion of the loan underwriter;

however, such assets are not independently verified."

133.    While the Prospectus Supplement stated that Wells Fargo may evaluate loans on a

"case-by-case basis," it emphasized that there must be "compensating factors" for an exception:

"Wells Fargo may make the determination that the prospective borrower warrants loan

parameters beyond those shown above based upon the presence of acceptable compensating

factors.  Examples of compensating factors include, but are not limited to, loan-to-value ratio,

debt-to-income ratio, long-term stability of employment and/or residence, statistical credit

scores, verified cash reserves or reduction in overall monthly expenses."

134.    Additionally, the Prospectus Supplement claimed that "Wells Fargo's

underwriting of every Mortgage Loan submitted consists of not only a credit review, but also a

separate appraisal conducted by (i) a third-party appraiser, (ii) an appraiser approved by Value

Information Technology, Inc. ('Value I.T.'), an entity jointly owned by Wells Fargo and an

unaffiliated third party, or (iii) Value I.T. itself.  Appraisals generally conform to current Fannie

Mae and Freddie Mac secondary market requirements for residential property appraisals.  All

43

appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the Mortgage Loan amount or the identity of the appraiser."

### 8.    The MABS 2005-FRE1 Securitization

135.    The Prospectus Supplement for the MABS 2005-FRE1 Securitization contained several key statements with respect to the underwriting standards of Fremont Investment & Loan, which originated the loans in the MABS 2005-FRE1 Securitization.

136.    The Prospectus Supplement specifically stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator generally in accordance with the underwriting criteria" described in the Prospectus Supplement.  The Prospectus Supplement further explained that Fremont's "underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs [underwriting guidelines] assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment."  The Prospectus Supplement further stated that "the originator requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility.  Credit Scores must be requested from each national credit repository."

137.    The Prospectus Supplement further stated that, "The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work."

138.    While the Prospectus Supplement stated that the originator might make exceptions, it emphasized that those exceptions would be based on "compensating factors."  It

further stated that "[c]ompensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."

139.    The Prospectus Supplement also stated that "Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.... Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the originator. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home."

140.    The Prospectus Supplement further stated that "[t]he originator conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by the originator's senior management.  Adverse findings are tracked monthly.  This review procedure allows the originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."

141.    With respect to appraisals, the Prospectus Supplement stated that "[t]he originator's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by the originator.... Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the originator."

### 9.    The MABS 2005-HE2 Securitization

142.    The Prospectus Supplement for the MABS 2005-HE2 Securitization contained several key statements with respect to the underwriting standards of MILA, Inc. and New Century Mortgage, which each originated more than 10 percent of the loans in the MABS 2005-HE2 Securitization.

143.    For loans originated by MILA, the Prospectus Supplement specifically stated that "[t]he mortgage loans originated by MILA, Inc. were done so in accordance with the underwriting guidelines established by it."

144.    The Prospectus Supplement further explained that "[t]he MILA Underwriting Guidelines are primarily intended to assess the borrower's income stability, credit history, and capacity to repay the mortgage loan as well as to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the mortgage loans in the mortgage loan pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While MILA's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, MILA also considers,

among other things, a mortgagor's credit history, repayment ability and debt to income ratio, as well as the type and use of the mortgaged property."

145.   Moreover, the Prospectus Supplement stated that MILA required "that the income of each applicant for a mortgage loan under the full documentation program be verified" and that all salaried applicants in any program had their salaries verified by telephone.

146.   While the Prospectus Supplement noted that MILA might make "exceptions" to its underwriting guidelines, it stated those exceptions would be "made where compensating factors exist."

147.   The Prospectus Supplement further stated that "[e]ach applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The MILA Underwriting Guidelines require a credit report on each applicant from an approved nationally recognized credit reporting company.  The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

148.   Even for reduced documentation programs, the Prospectus Supplement stated that "MILA reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property."

149.   With respect to appraisals, the Prospectus Supplement represented: "Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in

acceptable condition. Following each appraisal, the appraiser prepares a report which includes a

market value analysis based on recent sales of comparable homes in the area and, when deemed

appropriate, replacement cost analysis based on the current cost of constructing a similar home.

All appraisals are required to conform to the Uniform Standards of Professional Appraisal

Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are

generally on forms acceptable to Fannie Mae and Freddie Mac. The MILA Underwriting

Guidelines require a review of the appraisal by a qualified employee of MILA or by an appraiser

retained by MILA."

150.    For loans originated by New Century, the Prospectus Supplement stated that

"[t]he mortgage loans were originated or acquired by New Century in accordance with the

underwriting guidelines established by it."

151.    The Prospectus Supplement further stated that "[t]he underwriting guidelines are

primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value

of the mortgaged property and to evaluate the adequacy of the property as collateral for the

mortgage loan. All of the mortgage loans in the mortgage pool were also underwritten with a

view toward the resale of the mortgage loans in the secondary mortgage market. While New

Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged

property, New Century also considers, among other things, a mortgagor's credit history,

repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged

property."

152.    While the Prospectus Supplement stated that New Century might make

"exceptions to [its] underwriting guidelines," it emphasized that those exceptions would be based

on "compensating factors."

153.    The Prospectus Supplement further stated that "[e]ach [New Century] applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The underwriting guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

154.    With respect to appraisals, the Prospectus Supplements represented that "[m]ortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac. The underwriting guidelines require a review of the appraisal by a qualified employee of New Century or by an appraiser retained by New Century."

155.    The Prospectus Supplement further stated that "New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. In determining the ability

of the applicant to repay the loan, a qualifying rate has been created under the underwriting guidelines that generally is equal to the interest rate on that loan."

156.    The Prospectus Supplement further stated that "[t]he underwriting guidelines require that the income of each applicant for a mortgage loan under the full and limited documentation programs be verified."

### 10.    The MARM 2005-8 Securitization

157.    The Prospectus Supplement for the MARM 2005-8 Securitization contained several key statements with respect to the underwriting standards of Countrywide Home Loans, Inc., which originated over 58 percent of the loans in the MARM 2005-8 Securitization.

158.    As a general matter, the Prospectus stated that "[t]he Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

159.    The Prospectus Supplement also states that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

160.    The Prospectus Supplement elaborated that "a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits."

161.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

162.    Additionally, the Prospectus Supplement stated that "[t]he adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with preestablished appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."

163.    The Prospectus Supplement also stated that "[u]nder the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income."

164.    With respect to the loans purchased from Countrywide Home Loans, the Prospectus Supplement additionally stated that they "have been originated or acquired by Countrywide in accordance with its credit, appraisal and underwriting standards."  The Prospectus Supplement further stated that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's

credit standing and repayment ability and the value and adequacy of the mortgaged property as
collateral."

165.    With respect to the specific data evaluated by Countrywide in connection with the
purchase or origination of loans, the Prospectus Supplement stated that "[i]n assessing a
prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit
Scores" and that it evaluated whether "the borrower's monthly gross income and the ratio of total
monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable
limits."

166.    Regarding appraisals, the Prospectus Supplement states that "[t]he adequacy of
the mortgaged property as security for repayment of the related Loan will generally have been
determined by an appraisal in accordance with pre established appraisal procedure standards for
appraisals established by or acceptable to the originator. All appraisals conform to the Uniform
Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the
Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.
Appraisers may be staff appraisers employed by the originator or independent appraisers selected
in accordance with pre established appraisal procedure standards established by the originator.
The appraisal procedure standards generally will have required the appraiser or an agent on its
behalf to personally inspect the property and to verify whether the property was in good
condition and that construction, if new, had been substantially completed. "

### 11.    The MARM 2006-2 Securitization

167.    The Prospectus Supplement for the MARM 2006-2 Securitization contained
several key statements with respect to the underwriting standards of Provident Funding
Associates, L.P., which originated over 68 percent of the loans in the MARM 2006-2
Securitization, and Wells Fargo Bank, N.A., which originated over 22 percent of the loans.

168.    The Prospectus Supplement stated that "[t]he Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

169.    With respect to the information evaluated by the originator, the Prospectus Supplement stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

170.    The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

171.    Additionally, the Prospectus Supplement claimed that "[t]he adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with preestablished appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform

Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. "

172.    With respect to the loans purchased from Provident Lending Associates, LP, the Prospectus Supplement additionally stated that they "will have been originated or acquired by Provident in accordance with its credit, appraisal and underwriting standards."

173.    With respect to the specific data evaluated by Provident in connection with the purchase or origination of loans, the Prospectus Supplement stated that "[d]uring the origination period for these mortgage loans, Provident relied upon Residential Funding Corporation's AssetWise automated underwriting system.  This system reviews the borrower's credit history and takes into account factors such as loan purpose, Loan-to-Value, and Debt-to-Income Ratio to generate a credit analysis for the loan.  The approval engine generates a credit report for each borrower, which in turn is used in the approval and credit scoring of the loan.  All mortgage loans require a credit score that is based on a minimum of four credit lines, two-year credit history and a minimum of two credit (FICO) scores."

174.    Regarding appraisals, the Prospectus Supplement states that "[m]ortgages with a loan amount less than or equal to $1,000,000 require a complete Uniform Residential Appraisal Report ('URAR') or an equivalent.  Mortgages with loan amount exceeding $1,000,000 require two complete Uniform Residential Appraisal Report ('URAR') or equivalents from independent appraisers.  An appraisal review by Provident's internal Appraisal Review Department is generally required for all mortgages with a loan amount that exceeds $650,000 or when the mortgage loan characteristics include a high Loan to Value and low Credit Score combination."

175.    With respect to the loans purchased from Wells Fargo Bank, N.A., the Prospectus Supplement additionally stated that they "will have been originated or acquired by Wells Fargo

in accordance with its credit, appraisal and underwriting standards." The Prospectus Supplement further stated that "Wells Fargo's underwriting standards are applied by or on behalf of Wells Fargo to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history."

176.    The Prospectus Supplement also states that the transferor, such as Provident or Wells Fargo, will warrant that "the Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination with exceptions thereto exercised in a reasonable manner," as well as that, "certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower."

### 12.    The MARM 2006-OA1 Securitization

177.    The Prospectus Supplement for the MARM 2006-OA1 Securitization contained several key statements with respect to the underwriting standards of American Home Mortgage Corp., which originated over 95 percent of the loans in the MARM 2006-OA1 Securitization.

178.    As a general matter, the Prospectus stated that "[t]he Loans have either been originated by a Loan Seller or purchased by a Loan Seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Loan Seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

179.    The Prospectus Supplement further stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

180.    The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

181.    The Prospectus Supplement further stated that the "adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. ...  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when

deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

182.    With respect to loans purchased from American Home Mortgage Corp., the Prospectus Supplement stated, "American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations."

183.    The Prospectus Supplement stated that American Home Mortgage Corp. could grant exceptions to its underwriting guidelines but also stated that those exceptions would "be permitted where compensating factors are present."

184.    The Prospectus Supplement added that "[i]n addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. … When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility."

185.    Even for "non-conforming loans," the Prospectus Supplement stated that "[n]on-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income,

assets, other liabilities, etc." The Prospectus Supplement also represented that "Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements."

### 13.    The MABS 2006-FRE2 Securitization

186.    The Prospectus Supplement for the MABS 2006-FRE2 Securitization contained several key statements with respect to the underwriting standards of Fremont Investment & Loan, which originated the loans in the MABS 2006-FRE2 Securitization.

187.    The Prospectus Supplement stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator generally in accordance with the underwriting criteria described in this section." The Prospectus Supplement further represented that "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."

188.    The Prospectus Supplement further stated that these underwriting guidelines, known as the Scored Programs, "assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."

189.    The Prospectus Supplement further stated that, "The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work."

190.    The Prospectus Supplement stated that exceptions to the underwriting guidelines could be granted if there were "compensating factors," which could include "low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."

191.    With respect to appraisals, the Prospectus Supplement stated that "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by Fremont....  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont."

192.    The Prospectus Supplement further stated that Fremont, the originator of the loans, "conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision."

193.    For debt-to-income ratios, the Prospectus Supplement represented that "Fremont's underwriting guidelines under the Scored Programs with respect to each rating category generally require: debt to income ratios of 55% or less on mortgage loans with loan-to-value

ratios of 90% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 90%."

### 14.    The MABS 2006-WMC2 Securitization

194.    The Prospectus Supplement for the MABS 2006-WMC2 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2006-WMC2 Securitization.

195.    The Prospectus Supplement specifically stated that "[t]he mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC Mortgage Corp. after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."

196.    In addition, the Prospectus Supplement further explained that "[t]he Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

197.    The Prospectus Supplement represented that "[u]nder the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines."

198.    While the Prospectus Supplement noted that "WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an

underwriting exception," and that "[i]t is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions" it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

     199.    The Prospectus Supplement further stated that "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

     200.    Additionally, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

201.   Moreover, the Prospectus Supplement stated that WMC Mortgage verified employment for every loan applicant before approving a mortgage loan.  Indeed, the Prospectus Supplement stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC Mortgage's "Underwriting Guidelines require (1) that income be stated on the application, accompanied by proof of self employment in the case of self-employed individuals, (2) that a WMC Mortgage Corp. pre-funding auditor conduct telephonic verification of employment, or in the case of self-employed individuals, telephonic verification of business line and (3) that stated income be consistent with type of work listed on the applicatio"

### 15.   The MABS 2006-WMC3 Securitization

202.   The Prospectus Supplement for the MABS 2006-WMC3 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2006-WMC3 Securitization.

203.   The Prospectus Supplement stated that the "mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."  The Prospectus Supplement further stated that its "Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."  The Prospectus Supplement noted that WMC could make exceptions to its underwriting guidelines, but only where there were "compensating factors," such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an

abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

204.     The Prospectus Supplement further stated that "[u]nder the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines.  The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

205.     The Prospectus Supplement further stated that, "For mortgage loans originated under the Stated Income/Verified Assets (Streamlined) Documentation category, WMC Mortgage Corp. requires verification of funds equal to two months of principal, interest, taxes and insurance, sourced and seasoned for at least sixty days.  In the case of mortgage loans originated under the Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation categories, the Underwriting Guidelines require (1) that income be stated on the application, accompanied by proof of self employment in the case of self-employed individuals, (2) that a WMC Mortgage Corp. pre-funding auditor conduct telephonic verification

of employment, or in the case of self-employed individuals, telephonic verification of business line and (3) that stated income be consistent with type of work listed on the application."

206.    The Prospectus Supplement noted that WMC Mortgage could make exceptions to its underwriting guidelines, but only where there were "compensating factors," such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

### 16.    The MABS 2006-NC2 Securitization

207.    The Prospectus Supplement for the MABS 2006-NC2 Securitization contained several key statements with respect to the underwriting standards of New Century Mortgage Corporation, which originated the loans in the MABS 2006-NC2 Securitization.

208.    The Prospectus Supplement stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein," which are "primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan.  All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market.  While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property."

209.    The Prospectus Supplement stated that exceptions to the underwriting guidelines could be made where there were "compensating factors," including "low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last

12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more."

210.    Additionally, the Prospectus Supplement stated that, with respect to the loans originated or acquired by New Century, "[e]ach applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

211.    Moreover, the Prospectus Supplement stated that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator."

212.    The Prospectus Supplement stated that "[t]he maximum debt service-to-income ratio is 50% for a mortgage loan having a loan-to-value ratio below 80%; the maximum debt service-to-income ratio is 55% for a mortgage loan having a loan-to-value ratio above 80%."

### 17.    The MABS 2006-WMC4 Securitization

213.    The Prospectus Supplement for the MABS 2006-WMC4 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2006-WMC4 Securitization.

214.    The Prospectus Supplement specifically stated that "[t]he mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."

215.    In addition, the Prospectus Supplement further explained that "[t]he Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

216.    While the Prospectus Supplement noted that "WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception," and that "[i]t is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions," it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

217.    The Prospectus Supplement further stated that "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan.  These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors.  In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

218.    Additionally, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

219.    Moreover, the Prospectus Supplement stated that WMC Mortgage verified employment for every loan applicant before approving a mortgage loan.  Indeed, the Prospectus Supplements stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC Mortgage's "Underwriting Guidelines require (1) that income be stated on the application, accompanied by proof of self employment in the case of self-employed individuals, (2) that a WMC pre-funding auditor conduct telephonic verification

of employment, or in the case of self-employed individuals, telephonic verification of business line and (3) that stated income be consistent with type of work listed on the application."

### 18.    The MABS 2006-NC3 Securitization

220.    The Prospectus Supplement for the MABS 2006-NC3 Securitization contained several key statements with respect to the underwriting standards of New Century Mortgage Corporation, which originated the loans in the MABS 2006-NC3 Securitization.

221.    The Prospectus Supplement stated that "[a]ll of the Mortgage Loans were originated or acquired by the originator in accordance with the underwriting guidelines described herein." The Prospectus Supplement further stated that, with respect to the loans originated or acquired by New Century, the "New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market. While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property."

222.    Additionally, the Prospectus Supplement stated that "[e]ach applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

223.    The Prospectus Supplement added that "[m]ortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting Guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator."

224.    The Prospectus Supplement represented that "The maximum debt service-to-income ratio is 55% for a mortgage loan having a loan-to-value ratio equal to or below 75%; the maximum debt service-to-income ratio is 50% for a mortgage loan having a loan-to-value ratio above 75%."

225.    The Prospectus Supplement further stated that New Century could make exceptions to its underwriting guidelines "if the application reflects compensating factors, such as: low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more."

### 19.   The MARM 2007-1 Securitization

226.   The Prospectus Supplement for the MARM 2007-1 Securitization contained several key statements with respect to the underwriting standards of American Home Mortgage Corp., which originated approximately 78 percent of the Subgroup I-1 and I-2 mortgage loans in the MARM 2007-1 Securitization, and IndyMac Bank, which originated approximately 16 percent of the Subgroup I-1 and I-2 mortgage loans in the MARM 2007-1 Securitization.

227.   The Prospectus stated that the loans in the Securitization were originated "generally in accordance with the underwriting criteria described in this section." The Prospectus Supplement further stated that "[g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

228.   The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

229.   Additionally, the Prospectus Supplement stated that the "adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for

70

appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."

230.   With respect to the loans originated or acquired by American Home, the Prospectus Supplement stated that "American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring."  The Prospectus Supplement further stated that "[i]n addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history."

231.   The Prospectus Supplement further stated that "[e]very [American Home] mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter."

232.   The Prospectus Supplement further stated that "[n]on-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the

accuracy of the information on the application such as income, assets, other liabilities, etc."
However, the Prospectus Supplement represented that "Alt-A products with less verification
documentation generally have other compensating factors such as higher credit score or lower
loan-to-value requirements."

233.    With respect to the loans originated or acquired by IndyMac, the Prospectus
Supplement stated "IndyMac Bank's underwriting criteria for traditionally underwritten
mortgage loans includes an analysis of the borrower's credit history, ability to repay the
mortgage loan and the adequacy of the mortgaged property as collateral." The Prospectus
Supplement further stated that "[t]o determine the adequacy of the property to be used as
collateral, an appraisal is generally made of the subject property in accordance with the Uniform
Standards of Professional Appraisal Practice. The appraiser generally inspects the property,
analyzes data including the sales prices of comparable properties and issues an opinion of value
using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases,
an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer
programs that use real estate information, such as demographics, property characteristics, sales
prices, and price trends to calculate a value for the specific property. The value of the property,
as indicated by the appraisal or AVM, must support the loan amount."

234.    The Prospectus Supplement stated that IndyMac allowed exceptions to its
underwriting guidelines where "compensating factors exist. Examples of these factors are
significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's
monthly payment and long-term employment with the same employer."

### 20.   The MABS 2007-WMC1 Securitization

235.   The Prospectus Supplement for the MABS 2007-WMC1 Securitization contained several key statements with respect to the underwriting standards of WMC, which originated the loans in the MABS 2007-WMC1 Securitization.

236.   The Prospectus Supplement specifically stated that "[t]he mortgage loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC (collectively, the 'Underwriting Guidelines') or (ii) purchased by WMC or GE Money Bank after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines."

237.   In addition, the Prospectus Supplement further explained that "[t]he Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

238.   While the Prospectus Supplement noted that "WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception," and that "[i]t is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions," it also stated that such exceptions would be made "[o]n a case-by-case basis" and only upon "compensating factors" such as "low debt-to-income ratio ('Debt Ratio'), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address."

239.   The Prospectus Supplement further stated that "various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage

loan.  These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors.  In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies."

240.    Additionally, the Prospectus Supplement stated that "[t]he Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model."

241.    Moreover, the Prospectus Supplement stated that WMC Mortgage verified employment for every loan applicant before approving a mortgage loan.  Indeed, the Prospectus Supplement stated that even for loan applications accepted under its Stated Income and Stated Income Verified Assets programs, WMC Mortgage's "Underwriting Guidelines require (1) that income be stated on the application, accompanied by proof of self employment in the case of self-employed individuals, (2) that a WMC pre-funding auditor conduct telephonic verification of employment, or in the case of self-employed individuals, telephonic verification of business line and (3) that stated income be consistent with type of work listed on the application."

### 21.   The MARM 2007-3 Securitization

242.   The Prospectus Supplement for the MARM 2007-3 Securitization contained several key statements with respect to the underwriting standards of Countrywide Home Loans, Inc., which originated over 51 percent of the loans in the MARM 2007-3 Securitization, and IndyMac Bank, F.S.B., which originated over 39 percent of the loans.

243.   The Prospectus stated that "[t]he Loans have been purchased by the sponsor from an Originator which purchased the Loans from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Originator) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

244.   With respect to the information evaluated by the originator, the Prospectus Supplement stated that "generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

245.   The Prospectus Supplement further stated that "[b]ased on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

246.    The Prospectus Supplement further stated that, "Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income."

247.    Additionally, the Prospectus Supplement claimed that "[t]he adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for appraisals established by or acceptable to the originator."

248.    With respect to the loans purchased from Countrywide Home Loans, the Prospectus Supplement additionally stated that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

249.    With respect to the specific data evaluated by Countrywide in connection with the purchase or origination of loans, the Prospectus Supplement stated that "[I]n assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores" and that it evaluated whether "the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." The Prospectus Supplement also stated that "[i]f required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two

years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization."

250.     With respect to appraisals, the Prospectus Supplement stated that "Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home."

251.     The Prospectus Supplement further stated that "[u]nder its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%"

252.     With respect to the loans purchased from IndyMac Bank, the Prospectus Supplement additionally stated that "[m]ortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines." The Prospectus Supplement further stated that "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines."

253.     The Prospectus Supplement further explained that "[m]aximum loan-to-value and combined loan-to-value ratios and loan amounts are established [by Indy Mac] according to the

occupancy type, loan purpose, property type, FICO credit score, number of previous late

mortgage payments, and the age of any bankruptcy or foreclosure actions. Additionally,

maximum total monthly debt payments-to-income ratios and cash-out limits may be applied.

Other factors may be considered in determining loan eligibility such as a borrower's residency

and immigration status, whether a non-occupying borrower will be included for qualification

purposes, sales or financing concessions included in any purchase contract, the acquisition cost

of the property in the case of a refinance transaction, the number of properties owned by the

borrower, the type and amount of any subordinate mortgage, the amount of any increase in the

borrower's monthly mortgage payment compared to previous mortgage or rent payments and the

amount of disposable monthly income after payment of all monthly expenses."

254.    The Prospectus Supplement also represented that "[g]enerally, mortgage loans

originated through the mortgage professional channel will be submitted to e-MITS [an

'automated, internet-based underwriting and risk-based pricing system'] for assessment and

subjected to a full credit review and analysis. Mortgage loans that do not meet IndyMac Bank's

guidelines may be manually re-underwritten and approved under an exception to those

underwriting guidelines."

255.    The Prospectus Supplement further stated that "[t]o determine the adequacy of the

property to be used as collateral, an appraisal is generally made of the subject property in

accordance with the Uniform Standards of Professional Appraisal Practice. The appraiser

generally inspects the property, analyzes data including the sales prices of comparable properties

and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other

acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an

appraisal. AVMs are computer programs that use real estate information, such as demographics,

property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount."

### 22.     The MABS 2007-HE2 Securitization

256.     The Prospectus Supplement for the MABS 2007-HE2 Securitization contained several key statements with respect to the underwriting standards of Option One Mortgage Corporation ("Option One"), which originated approximately 58 percent of the loans in the MABS 2007-HE2 Securitization, and Fieldstone Mortgage Company, which originated approximately 35 percent of the loans.

257.     The Prospectus Supplement stated that the mortgage loans "were underwritten or re-underwritten by the originators generally in accordance with [the originators'] underwriting standards."

258.     With respect to the loans originated or acquired by Option One, the Prospectus Supplement stated that "[t]he Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan. The mortgage loans were also generally underwritten with a view toward resale in the secondary market." The Prospectus Supplement further stated that "[e]ach [Option One] mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information."

259.     Additionally, the Prospectus Supplement stated that "[m]ortgaged properties that are to secure [Option One] mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report

which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."

260.    Moreover, the Prospectus Supplement stated that "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed."

261.    The Prospectus Supplement stated that Option One could make exceptions to its underwriting guidelines "if the application reflects certain compensating factors, among others: a relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance. Upgrade points may also be earned if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more."

262.    With respect to loans originated or acquired by the Fieldstone Mortgage Company ("FMC"), the Prospectus Supplement stated that the "Fieldstone Underwriting Guidelines generally have been designed to evaluate a prospective borrower's credit history and ability to

repay the loan, as well as the value and adequacy of the related mortgaged property as collateral." The Prospectus Supplement further stated that "FMC's underwriting procedures have considered a combination of factors in deciding whether to approve a loan, including documentation of the borrower's income, mortgage and consumer credit payment history, credit score, property type and LTV. FMC's mortgage loan underwriting process involved an underwriter's analysis of the prospective borrower's ability to repay the loan according to its terms, the risk that the prospective borrower will not repay, the fees and rates charged, the value of the related mortgaged property as collateral, the benefit the loan is providing to the prospective borrower and the loan amount relative to its risk." The Prospectus Supplement further stated that the "Fieldstone Underwriting Guidelines also have included a review of the income of each applicant. FMC personnel have reviewed the loan applicant's source of income, calculated the amount of income from sources indicated on the loan application or similar documentation and calculated debt-to-income ratios to determine the applicant's ability to repay the loan."

263.    Additionally, the Prospectus Supplement stated that "FMC required a full appraisal of each property to be pledged as collateral in connection with the origination of each loan. Appraisals generally were required to conform to the Uniform Standards of Professional Appraisal Practice and to be on forms acceptable to Freddie Mac and Fannie Mae. Appraisals were performed by licensed, third-party, fee-based appraisers and included inspection of the exterior and interior of the subject property and review and evaluation of neighborhood conditions, site and zoning status and the condition and value of improvements. FMC's appraisal review process required that each appraisal be validated (except in limited circumstances) by either a non-affiliated appraisal review firm or by one of FMC's qualified

underwriters using additional data to evaluate the appraisal. In most cases, FMC utilized automated value measures to validate appraisals. FMC generally required that an appraisal be no more than 180 days old on the day the loan is funded."

264.    Moreover, the Prospectus Supplement stated that "FMC emphasizes quality control prior to origination. FMC's quality control department also reviews and conducts post-funding re-underwriting of approximately 10% of all mortgage loans that FMC originates. FMC generally selects loans for post-funding re-underwriting on a random basis (though FMC selects targeted samples of loans from time to time) and reports its findings to management and underwriting department managers on a regular basis. Underwriting changes and corrective actions are implemented from time to time as a result of analysis of the quality control data, performance trends and servicing issues."

265.    The Prospectus Supplement further stated that FMC considered "compensating factors that may be used to offset certain areas of weakness. These compensating factors include credit scores, proposed reductions in the borrower's debt service expense, borrower assets, employment stability, number of years in residence and net disposable income. FMC's underwriting process and the Fieldstone Underwriting Guidelines have required a thorough application review and documentation designed to maximize the value of the mortgage loans."

266.    For the vast majority of the Securitizations, the Prospectuses and Prospectus Supplements described additional representations and warranties concerning the mortgage loans backing the Securitizations that were made by the originator to the seller in the PSA. Such representations and warranties included: (i) the mortgage loans were underwritten in accordance with the originator's underwriting guidelines in effect at the time of origination, subject to only limited exceptions; and (ii) the origination and collection practices used by the originator with

respect to each mortgage note and mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business.

267.    The inclusion of these representations in the Prospectuses and Prospectus Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of the mortgage collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These representations were material to a reasonable investor's decision to purchase the Certificates.

### B.    Statements Regarding Occupancy Status Of Borrower

268.    The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplements for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status, *e.g.*, into the following categories:  (i) "Primary," or "Owner Occupied"; (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[6]

---

[6]    Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

**Table 4**

| Transaction | Supporting Loan Group | Primary or Owner Occupied (%) | Second Home/Secondary (%) | Investor (%) |
|---|---|---|---|---|
| ARSI 2006-W3 | Group 1 | 81.50 | 1.41 | 17.10 |
| FHLT 2006-B | Group 1 | 92.65 | 1.43 | 5.92 |
| INABS 2005-C | Group 1 | 93.36 | 1.49 | 5.15 |
| INABS 2005-D | Group 1 | 92.17 | 0.76 | 7.07 |
| INABS 2006-D | Group 1 | 94.98 | 0.84 | 4.19 |
| INABS 2007-A | Group 1 | 91.48 | 0.42 | 8.11 |
| MABS 2005-FRE1 | Group 1 | 86.91 | 1.17 | 11.92 |
| MABS 2005-HE2 | Group 1 | 94.63 | 0.29 | 5.08 |
| MABS 2005-WF1 | Group 1 | 96.85 | 0.51 | 2.64 |
| MABS 2006-FRE2 | Group 1 | 91.14 | 0.69 | 8.17 |
| MABS 2006-NC2 | Group 1 | 78.44 | 7.44 | 14.12 |
| MABS 2006-NC3 | Group 1 | 87.36 | 4.68 | 7.96 |
| MABS 2006-WMC2 | Group 1 | 95.55 | 3.19 | 1.26 |
| MABS 2006-WMC3 | Group 1 | 94.27 | 5.00 | 0.73 |
| MABS 2006-WMC4 | Group 1 | 91.38 | 7.24 | 1.38 |
| MABS 2007-HE2 | Group 1 | 87.82 | 2.13 | 10.05 |
| MABS 2007-WMC1 | Group 1 | 98.32 | 0.76 | 0.92 |
| MARM 2005-8 | Group 2 | 62.63 | 9.86 | 27.52 |
| | Group 3 | 71.14 | 10.06 | 18.80 |
| MARM 2006-2 | Group 2 | 97.84 | 1.44 | 0.72 |
| MARM 2006-OA1 | Group 2 | 50.55 | 9.69 | 39.76 |
| MARM 2007-1 | Sub-Group 1-1 | 51.68 | 10.77 | 37.55 |
| MARM 2007-3 | Sub-Group 1-1 | 77.90 | 5.01 | 17.08 |
| | Sub-Group 2-1 | 73.38 | 10.45 | 16.18 |

269.    As Table 4 makes clear, the Prospectus Supplements for each Securitization reported that a majority of the mortgage loans in the Supporting Loan Groups were owner occupied, while a much smaller percentage were reported to be non-owner occupied (*i.e.* a second home or investment property).

270.    The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securities that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral group of

a securitization that are not secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

271.    Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed *infra* at paragraphs 282 through 286, the Registration Statement for each Securitization grossly overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

### C.    Statements Regarding LTV Ratios

272.    The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

273.    The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan. Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

274.    The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans with an LTV ratio at or under 80 percent and the percentage of loans with an LTV ratio

85

greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan

Groups are set forth in Table 5 below.[7]

### Table 5

| Transaction | Supporting Loan Group | Percentage of loans by aggregate principal balance with LTV less than or equal to 80% | Percentage of loans by aggregate principal balance with LTV greater than 100% |
|---|---|---|---|
| ARSI 2006-W3 | Group 1 | 51.67 | 0.00 |
| FHLT 2006-B | Group 1 | 65.26 | 0.00 |
| INABS 2005-C | Group 1 | 65.45 | 0.00 |
| INABS 2005-D | Group 1 | 69.15 | 0.00 |
| INABS 2006-D | Group 1 | 59.67 | 0.00 |
| INABS 2007-A | Group 1 | 46.46 | 0.00 |
| MABS 2005-FRE1 | Group 1 | 65.07 | 0.00 |
| MABS 2005-HE2 | Group 1 | 64.94 | 0.00 |
| MABS 2005-WF1 | Group 1 | 56.13 | 0.00 |
| MABS 2006-FRE2 | Group 1 | 61.59 | 0.00 |
| MABS 2006-NC2 | Group 1 | 61.99 | 0.00 |
| MABS 2006-NC3 | Group 1 | 50.65 | 0.00 |
| MABS 2006-WMC2 | Group 1 | 70.86 | 0.00 |
| MABS 2006-WMC3 | Group 1 | 70.00 | 0.00 |
| MABS 2006-WMC4 | Group 1 | 67.57 | 0.00 |
| MABS 2007-HE2 | Group 1 | 53.86 | 0.00 |
| MABS 2007-WMC1 | Group 1 | 70.76 | 0.00 |
| MARM 2005-8 | Group 2 | 95.38 | 0.00 |
| | Group 3 | 93.25 | 0.00 |
| MARM 2006-2 | Group 2 | 97.78 | 0.00 |
| MARM 2006-OA1 | Group 2 | 91.28 | 0.00 |
| MARM 2007-1 | Sub-Group 1-1; Group 1 | 79.28 | 0.00 |
| MARM 2007-3 | Sub-Group 1-1; Group 1 | 86.48 | 0.00 |
| | Sub-Group 2-1; Group 2 | 84.77 | 0.00 |

---

[7]   As used in this Amended Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  Where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

275.    As Table 5 makes clear, the Prospectus Supplements for all but one of the Securitizations reported that the majority of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less, and the Prospectus Supplements for all of the Securitizations reported that *zero* mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

276.    The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is likewise one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  This ratio is a strong indicator of the likelihood of default.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

277.    Thus, a reasonable investor considers the LTV ratio important to the decision whether to purchase a certificate in a securitization of mortgage loans.  The 80 percent threshold is particularly relevant to a reasonable investor given that prudent lenders traditionally require borrowers to pay 20 percent of the value of the property, and thus only lend 80 percent of the value of the property. Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed *infra* at paragraphs 289 through 295, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with

87

an LTV ratio at or under 80 percent, and materially *understated* the percentage of loans in the

Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree

of risk of the GSE Certificates.

### D.    Statements Regarding Credit Ratings

278.    Credit ratings are assigned to the tranches of mortgage backed securitizations by

the credit rating agencies, including Moody's Investors Service, Standard & Poor's, Fitch

Ratings, and DBRS. Each credit rating agency uses its own scale with letter designations to

describe various levels of risk. In general, AAA or its equivalent ratings are at the top of the

credit rating scale and are intended to designate the safest investments. C and D ratings are at

the bottom of the scale and refer to investments that are currently in default and exhibit little or

no prospect for recovery. At the time the GSEs entered into the Securitizations, investments

with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.

Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than

one percent. As a result, securities with credit ratings between AAA or its equivalent through

BBB- or its equivalent were generally referred to as "investment grade."

279.    Rating agencies determine the credit rating for each tranche of a mortgage-backed

securitization by comparing the likelihood of contractual principal and interest repayment to the

'credit enhancements' available to protect investors. Rating agencies determine the likelihood of

repayment by estimating cash-flows based on the quality of the underlying mortgages by using

sponsor-provided, loan-level data. Credit enhancements, such as subordination, represent the

amount of "cushion" or protection from loss incorporated into a given securitization.[8] This

---

[8] "Subordination" refers to the fact that the certificates for a mortgage-backed
securitization are issued in a hierarchical structure, from senior to junior. The junior certificates
are "subordinate" to the senior certificates in that, should the underlying mortgage loans become

cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled. The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral pool and entire securitization. Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificate holders. If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for an AAA or its equivalent rating.

280.    Credit ratings have been an important tool to gauge risk when making investment decisions. For almost a hundred years, investors like pension funds, municipalities, insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments. Fannie Mae and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

281.    Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche. Defendants reported the credit ratings for each tranche in the Prospectus Supplements. The credit rating provided for each of the GSE Certificates was "investment grade," always "AAA" or its equivalent. The accuracy of these ratings was material to a reasonable investor's decision to purchase the GSE Certificates. As set forth in Table 8, *infra* at paragraph 361, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying

---

delinquent or default, the junior certificates suffer losses first. These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the

GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

IV.     **Falsity Of Statements In The Registration Statements And Prospectus Supplements**

     A.    **The Statistical Data Provided In The Prospectus Supplements Concerning Owner Occupancy And LTV Ratios Was Materially False Or Misleading**

    282.    A review of loan-level data for a sample of mortgage loans in each Securitization

was conducted in order to assess whether the statistical information provided in the Prospectus

Supplements was true and accurate.  For each Securitization, the sample consisted of the greater

of (i) one half of the loans in the Supporting Loan Group or (ii) the lesser of 1,000 loans and the

number of loans in the Supporting Loan Group.  By application of this rule, each sample

consisted of at least 1,000 loans, except for MARM 2006-2, which had only 412 loans in the

Supporting Loan Group, MARM 2005-8, which had only 835 loans in Supporting Loan Group 3,

and MARM 2007-3, which had only 785 loans in Supporting Loan Group 2, Sub-Group 2-1.

The sample data confirms, on a statistically-significant basis, material misrepresentations of

underwriting standards and of certain key characteristics of the mortgage loans across the

Securitizations at the time of their origination.  The data review further demonstrates that the

data concerning owner occupancy and LTV ratio, as set forth by Defendants in the Registration

Statements, was materially false and misleading at the time of their origination and the

Securitizations.

       1.    **Owner Occupancy Data Was Materially False**

    283.    The data review reveals that the owner occupancy statistics reported in the

Prospectus Supplements were materially false and inflated at the time of the loans' origination.

In fact, far fewer underlying properties were occupied by their owners than disclosed in the

Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

284.    To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, whether the borrower's tax bill was being mailed to the mortgaged property or to a different address six months after the loan closed; whether the borrower had claimed an owner-occupied tax exemption on the mortgaged property; whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records. Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan.

285.    A significant number of the loans failed two or more of these tests, indicating that the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading. For example, for the MABS 2006-FRE2 Securitization, for which UBS Real Estate was the sponsor, MASTR was the depositor, and UBS Securities was the underwriter, the Prospectus Supplement stated that 8.86 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that, for 13.18 percent of the properties represented as owner-occupied, the owners in fact lived elsewhere, indicating that the true percentage of non-owner occupied properties was 20.87 percent, more than double the percentage reported in the Prospectus Supplement.[9]

---

[9]   This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 8.86 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 91.14 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 13.18 percent).

286.    The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties.  The true percentage of non-owner occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization is set forth in Table 6 below.

**Table 6**

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[10] | Actual Percentage of Non-Owner Occupied Properties | Percentage of Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| ARSI 2006-W3 | Group 1 | 18.50 | 11.90 | 28.20 | 9.70 |
| FHLT 2006-B | Group 1 | 7.35 | 16.17 | 22.33 | 14.98 |
| INABS 2005-C | Group 1 | 6.64 | 12.04 | 17.87 | 11.24 |
| INABS 2005-D | Group 1 | 7.83 | 12.66 | 19.50 | 11.67 |
| INABS 2006-D | Group 1 | 5.02 | 12.59 | 16.98 | 11.96 |
| INABS 2007-A | Group 1 | 8.52 | 10.55 | 18.17 | 9.65 |
| MABS 2005-FRE1 | Group 1 | 13.09 | 12.91 | 24.31 | 11.22 |
| MABS 2005-HE2 | Group 1 | 5.37 | 10.52 | 15.32 | 9.96 |
| MABS 2005-WF1 | Group 1 | 3.15 | 9.02 | 11.88 | 8.74 |
| MABS 2006-FRE2 | Group 1 | 8.86 | 13.18 | 20.87 | 12.01 |
| MABS 2006-NC2 | Group 1 | 21.56 | 13.19 | 31.91 | 10.35 |
| MABS 2006-NC3 | Group 1 | 12.64 | 13.61 | 24.53 | 11.89 |
| MABS 2006-WMC2 | Group 1 | 4.45 | 13.27 | 17.12 | 12.68 |
| MABS 2006-WMC3 | Group 1 | 5.73 | 15.76 | 20.59 | 14.86 |
| MABS 2006-WMC4 | Group 1 | 8.62 | 11.10 | 18.76 | 10.14 |
| MABS 2007-HE2 | Group 1 | 12.18 | 10.83 | 21.70 | 9.51 |
| MABS 2007-WMC1 | Group 1 | 1.68 | 11.62 | 13.11 | 11.42 |
| MARM 2005-8 | Group 2 | 37.37 | 16.67 | 47.81 | 10.44 |
| | Group 3 | 28.86 | 14.98 | 39.52 | 10.66 |
| MARM 2006-2 | Group 2 | 2.16 | 11.88 | 13.79 | 11.62 |
| MARM 2006-OA1 | Group 2 | 49.45 | 15.57 | 57.32 | 7.87 |
| MARM 2007-1 | Sub-Group I-1; Group 1 | 48.32 | 17.38 | 57.30 | 8.98 |
| MARM 2007-3 | Sub-Group I-1; Group 1 | 22.10 | 17.16 | 35.47 | 13.37 |
| | Sub-Group 2-1; Group 2 | 26.62 | 14.76 | 37.45 | 10.83 |

287.    The GSEs understood that the Defendants had determined that the statistics provided in the Prospectus Supplements were true and correct in all material respects.  In fact, Table 6 demonstrates that the Prospectus Supplement for each Securitization was grossly

---

[10]    As described more fully in paragraph 284, failing two or more tests of owner-occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

inaccurate, understating the percentage of non-owner occupied properties by at least seven percent, and for many Securitizations by ten percent or more.  By including in its offering documents materially inaccurate statistics based upon those representations, Defendants misled the GSEs and other investors.  The Prospectus Supplements containing the owner occupancy statistics bore UBS's name and UBS was endorsing the statistics in these documents.

288.    Specific examples of the misrepresentations and omissions showing that the owner occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of origination are discussed in detail below.  *See infra* ¶¶ 311-312.  Forensic loan reviews reaffirm what the above statistics demonstrate: the owner occupancy data in the Prospectus Supplements was materially false at the time of origination.

### 2.    Loan to Value Data Was Materially False

289.    The data review further reveals that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated at the time of the loans' origination, as more specifically set out below.  For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates at the time of the loan's origination by applying modeling techniques to this data.  The more conservative ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation, repeat sales indexes, and regression analysis, relying only on sales made within the last 24 months prior to the origination of the mortgage loan at issue.

290.    Applying the VP4 AVM to the available data for the properties securing the
sampled loans shows that the appraised value given to such properties was significantly higher
than the actual value of such properties at the time they were originated. The result of this
overstatement of property values is a material understatement of LTV. That is, if a property's
true value is significantly less than the value used in the loan underwriting, then the loan
represents a significantly higher percentage of the property's value. This, of course, increases
the risk a borrower will not repay the loan and the risk of greater losses in the event of a default.
As stated in the Prospectus Supplement for MARM 2006-OA1, "[a] lower loan-to-value ratio
requires a borrower to have more equity in the property, which is a significant additional
incentive to the borrower to avoid default on the loan."

291.    For example, for the MABS 2007-WMC1 Securitization, for which UBS Real
Estate was the sponsor, MASTR was the depositer, and UBS Securities was the underwriter, the
Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100
percent. In fact, 18.55 percent of the sample of loans included in the data review had LTV ratios
above 100 percent. In addition, the Prospectus Supplement stated that 70.76 percent of the loans
had LTV ratios at or below 80 percent. The data review indicated that only 38.03 percent of the
loans had LTV ratios at or below 80 percent.

292.    The data review revealed that for each Securitization, the Prospectus Supplement
misrepresented the percentage of loans with an LTV ratio that were above 100 percent, as well as
the percentage of loans that had an LTV ratio at or below 80 percent, at the time of their
origination. Table 7 reflects (i) the true percentage of mortgages in each Supporting Loan Group
at the time of origination with LTV ratios above 100 percent, versus the percentage reported in
the Prospectus Supplement; and (ii) the true percentage of mortgages in each Supporting Loan

Group at the time of origination with LTV ratios at or below 80 percent, versus the percentage as reported in the Prospectus Supplement. The percentages listed in Table 7 were calculated by aggregated principal balance.

### Table 7

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At Or Under 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At Or Under 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100 | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| ARSI 2006-W3 | Group I | 51.67 | 31.39 | 0.00 | 18.29 |
| FHLT 2006-B | Group I | 65.26 | 36.64 | 0.00 | 17.97 |
| INABS 2005-C | Group I | 65.45 | 50.25 | 0.00 | 9.06 |
| INABS 2005-D | Group I | 69.15 | 42.38 | 0.00 | 13.62 |
| INABS 2006-D | Group I | 59.67 | 36.15 | 0.00 | 22.24 |
| INABS 2007-A | Group I | 46.46 | 32.24 | 0.00 | 24.74 |
| MABS 2005-FRE1 | Group I | 65.07 | 43.19 | 0.00 | 14.33 |
| MABS 2005-HE2 | Group I | 64.94 | 46.69 | 0.00 | 7.99 |
| MABS 2005-WF1 | Group I | 56.13 | 47.09 | 0.00 | 12.26 |
| MABS 2006-FRE2 | Group I | 61.59 | 35.05 | 0.00 | 15.07 |
| MABS 2006-NC2 | Group I | 61.99 | 41.59 | 0.00 | 14.36 |
| MABS 2006-NC3 | Group I | 50.65 | 32.60 | 0.00 | 22.35 |
| MABS 2006-WMC2 | Group I | 70.86 | 39.89 | 0.00 | 16.06 |
| MABS 2006-WMC3 | Group I | 70.00 | 34.23 | 0.00 | 16.65 |
| MABS 2006-WMC4 | Group I | 67.57 | 35.54 | 0.00 | 19.44 |
| MABS 2007-HE2 | Group I | 53.86 | 39.58 | 0.00 | 17.54 |
| MABS 2007-WMC1 | Group I | 70.76 | 38.03 | 0.00 | 18.55 |
| MARM 2005-8 | Group 2 | 91.86 | 64.98 | 0.00 | 5.59 |
| | Group 3 | 93.25 | 57.97 | 0.00 | 6.64 |
| MARM 2006-2 | Group 2 | 97.78 | 69.77 | 0.00 | 3.51 |
| MARM 2006-OA1 | Group 2 | 91.28 | 57.26 | 0.00 | 8.85 |
| MARM 2007-1 | Sub-Group 1-1; Group 1 | 79.28 | 40.09 | 0.00 | 21.56 |
| MARM 2007-3 | Sub-Group 1-1; Group 1 | 86.48 | 45.44 | 0.00 | 14.15 |
| | Sub-Group 2-1; Group 2 | 84.77 | 51.20 | 0.00 | 13.50 |

---

[11] The Prospectus Supplements for the Securitizations typically provide LTV data in several forms, including LTV, which expresses the value of a first mortgage lien as a percentage of the value of the property; CLTV, which expresses the value of the sum of all mortgage liens on a property as a percentage of the value of the property; and "mixed" LTV, which reflects the loan-to-value ratio for first lien mortgages and the combined loan-to-value ratio for second lien mortgages. As stated in note 7, *supra*, the LTV ratio reported in the Prospectus Supplements and stated in this Amended Complaint is the "mixed" LTV. Thus, in order to ensure an "apples-to-apples" comparison between Defendants' representations in the Prospectus Supplements and the true data revealed by the automated valuation model, the results of the automated valuation model in Table 7 have also been expressed on a "mixed" basis.

293.    As Table 7 demonstrates, the Prospectus Supplements for the Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.  In contrast, the data review revealed that at least 3.51 percent of the mortgage loans for each Securitization, had an LTV ratio over 100 percent, and for most Securitizations this figure was much larger.  Indeed, for 17 of the Securitizations the data review revealed that more than ten percent of the mortgage loans in the Supporting Loan Group had a true LTV ratio over 100 percent.  For four Securitizations, the data review revealed that more than 20 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

294.    These systemic inaccuracies with respect to reported LTV ratios also indicate that the representations and warranties in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  As described in greater detail below, government investigations and news reports have shown that appraisers for nearly all of the originators from which UBS purchased mortgage loans did not produce independent appraisals and that the appraisers did not honestly believe their appraisals when they were made.  For example, as described *infra* ¶ 321, employees of Wells Fargo have admitted under oath that they repeatedly obtained loans based on inflated appraisals so as to allow borrowers to get larger loans than they could afford.  Similarly, the Massachusetts Attorney General obtained a preliminary injunction against Option One, as described *infra* ¶ 346, based on the fact that Option One regularly inflated the appraised value of applicants' homes; Option One ultimately settled the suit in 2011.  And again, as described *infra* ¶¶ 349-351, Cuyahoga County indicted two Argent appraisers who regularly inflated their appraisals, and one Argent fraud investigator discovered that the

"appraisals" at issue were conducted on fake houses using the same pictures for each fake property. These and the many other examples discussed below demonstrate that the appraisals underlying the LTV ratios described above were both *objectively* false, because the appraisals vastly overstated the actual value of the property, and not *subjectively* believed by the appraisers themselves at the time the appraisals were made.

295.    Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that, as demonstrated by Table 7, deviate so significantly (and so consistently upward) from the true values of the appraised properties. These consistent errors demonstrate that, contrary to the representations in the Prospectuses and Prospectus Supplements described above, the appraisers did not comply with the Uniform Standards of Professional Appraisal Practice but instead generated appraisal values to justify the issuance of a mortgage loan. This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results. *See* FCIC Report at 91-92; *see also infra* ¶¶ 356-357.

## B.    The Originators Of The Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines

296.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.

297.    The originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses. This is confirmed by the systematically misreported owner occupancy and LTV statistics, discussed *supra*, and by (1) a forensic review

of over a thousand loans in the MABS 2006-WMC2, MARM 2006-OA1, and MABS 2007-WMC1 Securitizations; (2) government investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period; (3) the collapse of the Certificates' credit ratings; and (4) the surge in delinquency and default in the mortgages in the Securitizations.

### 1.    A Forensic Review Of Loan Files Has Revealed Pervasive Failure To Adhere To Underwriting Guidelines

298.    A forensic review of 996 randomly selected loans from the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations, for which UBS Real Estate served as the sponsor, MASTR as the depositor, and UBS Securities as the lead underwriter, has revealed that approximately 78 percent of the reviewed loans were not underwritten in accordance with the applicable underwriting guidelines.

299.    A further forensic review of 363 defaulted loans, out of the 1,177 loans in the MARM 2006-OA1 Securitization, for which UBS Real Estate served as the sponsor, MASTR as the depositor, and UBS Securities as the lead underwriter, has revealed that approximately 99 percent of the defaulted loans were not underwritten in accordance with the applicable underwriting guidelines.

300.    The forensic review consisted of an analysis of the loan file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration, documentation with pertinent information indicating a borrower's assets or residence and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information.

301.   The mortgage loans in the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations were originated by WMC Mortgage. The MABS 2006-WMC2 Prospectus Supplement stated that the mortgage loans underlying the Securitization were "either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp... or (ii) purchased by WMC Mortgage Corp. after re-underwriting the mortgage loans generally in accordance with the Underwriting Guidelines." The MABS 2007-WMC1 Prospectus Supplement likewise stated that the mortgage loans underlying the Securitization "were underwritten or re-underwritten by the originator in accordance with [WMC Mortgage's] underwriting standards ...."

302.   Over 95 percent of the mortgage loans in the MARM 2006-OA1 Securitizations were originated by American Home. The MARM 2006-OA1 Prospectus Supplement stated that the mortgage loans underlying the Supporting Loan Group at issue "have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home."

303.   The results of the forensic review demonstrate, however, that the disclosures in the Registration Statements, stating that the mortgage loans were underwritten in accordance with the applicable underwriting guidelines and as described in the applicable Prospectus Supplements, were materially false.

304.    The WMC Mortgage and American Home underwriting guidelines that were

disregarded were designed to assess the likelihood a borrower would be able to repay the loan.

The forensic review revealed abandonment of underwriting guidelines, including as follows:

- failure to test the reasonableness of the borrower's stated income contributing to material misrepresentations of income;

- failure to investigate the submission from the same borrower of multiple loan applications showing increasing stated incomes, also contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject properties when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended for investment;

- failure to calculate properly the borrower's outstanding debt causing the debt-to-income ratio ("DTI") to exceed the maximum allowed under the underwriting guidelines; and

- failure to investigate properly information on the borrower's credit reports of potential misrepresentations of outstanding debt.

305.    The results of the forensic review demonstrate that the disclosures in the

Registration Statements, that the mortgage loans were underwritten in accordance with

applicable underwriting guidelines described in the Prospectus Supplements, were materially

false.  Moreover, although the Prospectus Supplements represented that exceptions would be

justified by sufficient compensating factors, none of the loan files reflecting a breach of

underwriting guidelines evidenced sufficient compensating factors that would justify or support

such an exception.  A 78 percent breach rate in a random sample, in any event, could not

possibly be explained by the proper application of any such exceptions.

306.    The following categories from the forensic review of the MABS 2006-WMC2,

MARM 2006-OA1, and MABS 2007-WMC1 Securitizations illustrate the types of breaches

discussed above that pervade the loan pools for the Securitizations.

### a.  Stated Income Was Not Reasonable

307.   Although no verification of income was required for stated income loans, the applicable underwriting guidelines required the underwriter to verify the employment listed by the borrower on the application and to assess whether the stated income was reasonable given the applicant's line of work.  The applicable WMC Mortgage underwriting guidelines stated that, although not verified, "the income disclosed on the application must be reasonable for the profession and experience level of the borrower" and that the underwriting of the loan shall "consider if the annualized income is sensible for the applicant's line of work.  The stated income should be no more than 25% over the high median income."  Furthermore, the applicable WMC Mortgage underwriting guidelines directed underwriters to "use websites similar to www.salary.com" "[t]o validate whether income stated is reasonable," and referenced WMC Mortgage's Quality Assurance Department's test, which provided that "[i]f the stated income is greater than 25% of the 75th percentile of income stated on www.salary.com, it would be considered unreasonable."  The American Home underwriting guidelines had similar requirements, utilizing a "'Reasonableness Test' [that] is applied to the stated income to ensure that it is appropriate for the job description."

308.   The following examples reveal instances where there was no evidence that the underwriter tested the reasonableness of the borrower's stated income for the employment listed on the application as required by the applicable underwriting guidelines.  Additionally, the forensics review verified that the borrower actually misrepresented his or her income on the application.  Had the loan underwriter performed a reasonableness test as required by the applicable underwriting guidelines, the unreasonableness of the borrower's stated income would have been evident.

- A loan that closed in February 2006 with a principal amount of $367,199 was originated under the Stated Income Loan Program. The borrower stated earnings of $9,250 per month as a machine shop technician. There is no evidence in the file that the loan underwriting tested the stated income of the borrower against Salary.com or any other similar salary site. Per Salary.com, the 75th percentile for this occupation in the borrower's geographic region was $4,802 per month, making the borrower's income more than 1.5 times the "reasonable" threshold of 25 percent above the 75th percentile or $6,003 per month. Furthermore, the borrower's stated income was 1.9 times greater than the 90th percentile from the U.S. Bureau of Labor Statistics for the relevant occupation and geographic region, and the time period matching the date of the loan application, further supporting that the loan underwriting process should have questioned the borrower's stated income. Moreover, the borrower's employer verified that the borrower's actual income at that time was $2,340 per month. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered. The borrower's recalculated DTI based on all evidence uncovered in the forensic review is 181 percent, greatly exceeding the guideline maximum of 50 percent. The subject loan defaulted after seven payments resulting in a loss of $200,714, which is over 54 percent of the original loan amount.

- A loan that closed in October 2006 with a principal amount of $121,000 was originated under the Stated Income Loan Program. The borrower stated earnings of $11,795 per month as a paralegal. There is no evidence in the file that the loan underwriting tested the stated income of the borrower against Salary.com or any other similar salary site. Per Salary.com, the 75th percentile for this occupation in the borrower's geographic region was $5,518 per month, making the borrower's income more than 1.7 times the "reasonable" threshold of 25 percent above the 75th percentile or $6,897 per month. Furthermore, the borrower's stated income was 1.8 times greater than the 90th percentile from the U.S. Bureau of Labor Statistics for the relevant occupation and geographic region, and the time period matching the date of the loan application, further supporting that the loan underwriting process should have questioned the borrower's stated income. The forensics review firm verified the borrower's actual income at that time was $1,500 per month. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered. The borrower's recalculated DTI based on all evidence uncovered in the forensic review is 380 percent, greatly exceeding the guideline maximum of 50 percent. The subject loan defaulted after five payments resulting in a loss of $126,286, which is over 104 percent of the original loan amount.[12]

---

[12] Loan losses may amount to more than 100 percent of the original loan amount due to loan service costs and costs incurred in the course of foreclosure and liquidation of the property.

- A loan that closed in February 2006 with a principal amount of $318,750 was originated under the Stated Income Loan Program. The borrower stated employment as a paralegal earning $11,000 per month on the loan application. There is no evidence in the file that the loan underwriting tested the stated income of the borrower against Salary.com or any other similar site. Payscale.com reported that the average salary at the 90th percentile for a Paralegal in the same geographic region was $4,395 per month. The Borrower's stated income was more than 2.5 times the Payscale.com 90th percentile, which should have been a red flag to the Underwriter that the Borrower's income was overstated. In addition, the loan file contains a 2006 tax return, filed subsequent to the loan closing, which is signed and dated by the borrower and lists the income 2006 as $2,020 per month. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered. The borrower's recalculated DTI based on all evidence uncovered in the forensic review is 494.06 percent, which exceeds the applicable guideline maximum. The subject loan defaulted, resulting in a loss of $224,510, which is over 70 percent of the original loan amount.

- A loan that closed in January 2006 with a principal amount of $320,000 was originated under the Low Documentation Program. The borrower stated on the loan application employment as a maintenance supervisor for a bowling center for 22 years, earning $14,732 per month. There is no evidence in the file that the loan underwriting tested the stated income of the borrower against Salary.com or any other similar salary site. Payscale.com reported that the average salary at the 90th percentile for a maintenance supervisor in the same geographic region was $6,090 per month, making the borrower's stated income more than 2.4 times the Payscale.com 90th percentile. Had the loan underwriting tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered. The borrower's recalculated DTI based on all evidence uncovered in the forensic review is 109.83 percent, which exceeds the applicable guideline maximum. The subject loan defaulted, resulting in a loss of $246,313, which is over 77 percent of the original loan amount.

309.     Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the originators' verification of the reasonableness of the stated income were materially false and misleading. In particular, a significant number of mortgage loans were made on the basis of "stated incomes" that were patently unreasonable, and were not properly underwritten through efforts to verify the borrowers' incomes.

### b.  Inconsistent Stated Income On The Loan Applications

310.    Instances where multiple loan applications exist within a loan file that present inconsistent stated income amounts is an indication of potential fraud and should prompt a loan underwriter to investigate further and properly document the inconsistency. The following examples from the forensic review are instances where a borrower provided multiple applications and where the borrower's stated income increased between the initial loan application and the income used for approving the loan. In each case, had the loan underwriter used the stated income from the initial application, the borrower's DTI would have exceeded the applicable underwriting guidelines maximum. In addition, the forensic review revealed that the income used for approving the loan was indeed misrepresented.

- A loan that closed in February 2006 with a principal amount of $480,000 was originated under the Stated Income Loan Program. The initial loan application disclosed a total stated income of $11,000 per month. A second, "final" loan application disclosed $15,000 per month. The loan was approved using $15,000 per month. No evidence in the loan file shows that the underwriting process addressed the inconsistent income amounts. The forensic review of the loan file verified the borrower's actual monthly income was $2,114. The borrower's actual DTI based on all evidence uncovered in the forensic review is 367 percent, exceeding the applicable guideline limits. The subject loan defaulted after 17 payments and the property is currently in the possession of the lender awaiting sale.

- A loan that closed in January 2006 with a principal amount of $355,000 was originated under the Stated Income Loan Program. The loan application disclosed income of $7,000 per month, but the loan underwriting documents indicate the underwriter approved the loan using $10,000 per month. Nothing in the loan file demonstrates that the underwriter addressed the inconsistent income amounts. The borrower's actual DTI based on all evidence uncovered in the forensic review was 54 percent, exceeding the applicable guideline limits. The subject loan defaulted after 30 payments, and the property is in the possession of the lender awaiting sale.

### c.  Evidence Of Occupancy Misrepresentations

311.    The following examples from the forensic review are instances where the loan underwriters did not adequately question the borrower's intended occupancy of the subject property. The WMC Mortgage guidelines state that "[o]wner-occupied properties will not

qualify for loans unless at least one of the borrowers occupies all or part of the mortgaged premises as a primary residence within 60 days of the Note date." Similarly, the American Home guidelines require that "[a]t least one of the borrowers must occupy and take title to the property and execute the note and mortgage" in order to be owner occupied. A significant number of the loan files that were reviewed contained facts or circumstances that would have put a prudent loan underwriter on notice of potential occupancy misrepresentations. The lack of compliance with the underwriting process in this regard materially increased the credit risk of the loans and the portfolio because investment and second home properties generally have a higher rate of default and higher loss severities than owner-occupied primary residences.

- A loan that closed in October 2006 with a principal amount of $66,000 was originated as a second lien under the Stated Income Loan Program. The borrower indicated on the occupancy statement that the subject property was a second home. The borrower's mailing address certification in the loan file reflected that the borrower would not be occupying the subject property. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the borrower was acquiring the property as an "Owner Occupied" property. The subject loan was not eligible for financing under the applicable underwriting guidelines because Stated Income loans were not allowed for Non-Owner Occupied properties. The subject loan defaulted without any payments being made, resulting in a loss of $68,340, which is over 103 percent of the original loan amount.

- A loan that closed in February 2006 with a principal amount of $208,000 was originated under the Stated Income Loan Program. The occupancy statement executed by the borrower stated that the subject property was an investment property. Additionally, the hazard insurance declarations page in the loan file reflected the borrower's mailing address as the borrower's previous address. No evidence in the file indicates that the underwriting process addressed these issues, and the loan was underwritten as if the borrower was acquiring the property as an "Owner Occupied" property. The subject loan was not eligible for financing under the applicable underwriting guidelines because Stated Income loans were not allowed for Non-Owner Occupied properties. The subject loan defaulted after one payment, resulting in a loss of $57,177, which is over 27 percent of the original loan amount.

- A loan that closed in February 2006 with a principal amount of $320,000 was originated under the Stated Income Loan Program. The hazard insurance declarations page for the subject property stated rental/landlord coverage. No evidence in the file indicates that the underwriting process addressed this issue, and the loan was

underwritten as if the borrower was acquiring the property as an "Owner Occupied" property. The subject loan was not eligible for financing under the applicable underwriting guidelines because Stated Income loans were not allowed for Non-Owner Occupied properties. The subject loan defaulted after eight payments, resulting in a loss of $313,135, which is over 97 percent of the original loan amount.

- A loan that closed in February 2006 with a principal amount of $63,900 was originated as a second lien under the Stated Income Loan Program. The hazard insurance declarations page for the subject property listed the mailing address as the borrower's previous address. The file contained an "Occupancy Statement," executed by the borrower and stating the subject property will be an investment property. The file also contained a "Borrower's Mailing Address Certification," executed by the borrower, which identified the borrower's mailing address as a different address from the property address. No evidence in the file indicates that the underwriting process addressed any of these issues, and the loan was underwritten as if the borrower was acquiring the property as an "Owner Occupied" property. The subject loan was not eligible for financing under the applicable underwriting guidelines because Stated Income loans were not allowed for Non-Owner Occupied properties. The subject loan defaulted after nine payments, resulting in a loss of $69,231, which is over 108 percent of the original loan amount.

- A loan that closed in January 2006 with a principal amount of $378,000 was originated under the Stated Income Loan Program. The loan was a refinancing of a purportedly owner-occupied property. However, the origination credit report showed that in June 2005 the borrower reported to Transunion an address in Perris, CA, which was not the subject property. Furthermore, the loan file did not contain complete bank statements, and the borrower's address could not be verified on the pages that were included in the loan file. No evidence in the file indicates that the underwriting process addressed any of these issues, and the loan was underwritten as if the borrower was acquiring the subject property as an "Owner Occupied" property. The borrower's misrepresentation of occupancy was confirmed through post-closing documentation filed in June 2008 with the United States Bankruptcy Court, Central District of California. The borrower filed the paperwork at the same address in Perris, CA, and stated on the statement of financial affairs that the borrower did not reside at a different address in the past three years. The subject loan defaulted, resulting in a loss of $311,986, which is over 83 percent of the original loan amount.

- A loan that closed in December 2005 with a principal amount of $334,800 was originated under the Low Documentation Loan Program. The loan was a refinancing of a purportedly owner-occupied property. However, the borrower's driver's license at closing indicated a mailing address other than the subject property. In addition, the appraisal invoice for the subject property indicates rental forms were included with the subject appraisal. The comparable sales grid pages also provide the address of the borrower's adjoining property rather than the subject address and Accurint (a public records search tool offered by Lexis/Nexis) associated the borrower with the adjoining property rather than the subject property. The audit credit report indicated that payment was maintained on the adjoining property when the borrower defaulted

on the subject property, which had negative equity due to the 90% cash-out refinance on the subject property and the borrower failed to close secondary financing. The subject loan defaulted, resulting in a loss of $109,921, which is over 32 percent of the original loan amount.

312.    Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the borrowers' occupancy status were materially false or misleading and that the loans were not subject to adequate underwriting. In particular, the Prospectus Supplements materially understated the proportion of loans secured by non-owner occupied properties. The lack of compliance with the underwriting process in this regard materially increased the credit risk of the loans and the portfolio because investment and second home properties generally have a higher rate of default and higher loss severities than owner-occupied primary residences.

### d. Debts Incorrectly Calculated; Debt-To-Income Exceeded Guidelines

313.    Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan. The following are some examples where the underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated. When properly calculated, the borrower's actual DTI ratio exceeded the limits established by applicable underwriting guidelines. The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

- A loan that closed in January 2006 with a principal amount of $603,250 was originated under WMC Mortgage's "Limited Documentation Loan Program." The loan underwriter approved the borrower with a 50 percent DTI with consumer debt payments totaling $163 per month. A credit report included in the origination loan file dated prior to closing showed additional liabilities totaling $160,407, with monthly payments of $1,915. There is no evidence in the file that the loan underwriting process addressed these additional debt obligations. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 59 percent, exceeding the applicable underwriting guideline maximum. The subject loan

defaulted after 12 payments, resulting in a loss of $288,638, which is over 47 percent
of the original loan amount.

- A loan that closed in October 2006 with a principal amount of $49,000 was originated
  under the Stated Income Loan Program. The loan underwriter approved the borrower
  with a 49 percent DTI with consumer debts totaling $1,045 per month. A credit
  report included in the origination loan file dated prior to closing showed additional
  liabilities in the amount of $33,833, with a monthly payment of $578. With the
  addition of this monthly payment, the borrower's total monthly consumer debt
  payments increased to $1,623. There is no evidence in the file that the loan
  underwriting process addressed this additional liability. The borrower's recalculated
  DTI based on all evidence uncovered in the forensic review was 56.4 percent,
  exceeding the applicable underwriting guideline maximum. The subject loan
  defaulted after 20 payments, resulting in a loss of $49,154, which is over 100 percent
  of the original loan amount.

- A loan that closed in September 2006 with a principal amount of $385,000 was
  originated under the Limited Documentation Loan Program. The loan underwriter
  approved the borrower with a 56.7 percent DTI with no additional consumer debts. A
  credit report included in the origination loan file showed additional liabilities of
  $15,254, with total monthly payments of $354. There is no evidence in the file that
  the loan underwriting process addressed these additional liabilities. The borrower's
  recalculated DTI based on all evidence uncovered in the forensic review was 61.5
  percent, exceeding the applicable underwriting guideline maximum. The subject loan
  defaulted after 27 payments, resulting in a loss of $253,314, which is over 65 percent
  of the original loan amount.

- A loan that closed in January 2006 with a principal amount of $94,400 was originated
  under the Low Documentation Loan Program. The loan underwriter approved the
  borrower with a 29.5 percent DTI with a monthly debt totaling $2,539. However, a
  search of public records obtained through MERS and the audit credit report showed
  that the borrower purchased an additional 22 properties prior to the subject loan's
  closing date in January 2006, with 20 acquired in September 2005 and two more
  acquired in October 2005, plus an additional two loans that were acquired within 30
  days after the subject closing. The originations credit report itself showed six
  inquires prior to the closing of the loan. The total of undisclosed mortgages
  amounted to $2,584,156, with total undisclosed monthly mortgage payments of
  $16,383. The borrower's recalculated DTI based on the borrower's undisclosed debt
  and other evidence uncovered in the forensic review yielded a DTI of 325.04 percent,
  exceeding the guideline maximum allowable DTI of 45 percent. The subject loan
  defaulted, resulting in a loss of $85,154, which is over 90 percent of the original loan
  amount.

- A loan that closed in January 2006 with a principal amount of $276,000 was
  originated under the Low Documentation Loan Program. The loan underwriter
  approved the borrower with a 29.9 percent DTI with no consumer debt. However, the
  underwriter had failed to detect that the borrower had taken on several mortgages,

both prior to and after the loan's closing. The borrower had obtained the following mortgages on other properties both before and within 30 days after the subject loan closed: a mortgage for $20,000, with a monthly payment of $130 in January 2006; a mortgage for $461,000, with a monthly payment of $2,999 in January 2006; and a mortgage for $635,200, with a monthly payment of $4,132 in February 2006. The borrower's recalculated DTI based on the borrower's undisclosed debt and other evidence uncovered in the forensic review yielded a DTI of 238.89 percent, exceeding the applicable guidelines maximum. The subject loan defaulted, resulting in a loss of $155,049, which is over 56 percent of the original loan amount.

314.    In the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations, the applicable underwriting guidelines specified a maximum debt-to-income ratio of 55 percent, with the exception of stated income loans, for which it was 50 percent. Of the 996 loans in the MABS 2006-WMC2 and MABS 2007-WMC1 Securitizations that were reviewed, 32 percent contained a debt-to-income ratio that exceeded the applicable underwriting guidelines for the product type.

### e.    Credit Inquiries That Indicated Misrepresentation Of Debt

315.    WMC Mortgage's underwriting guidelines stated that "WMC staff and partners involved in the underwriting process must conduct a review of the loan documents submitted for each loan" and that the "credit report must [...] show all credit inquiries made over the last 90 days." Similarly, as described in the MARM 2006-OA1 Prospectus Supplement, the American Home underwriting guidelines required the underwriter to "review[] the borrower's credit history and credit score," including "recent attempts by a borrower to obtain additional credit." The following examples are instances where the borrowers' credit reports contained numerous credit inquiries that should have put the loan underwriters on notice for potential misrepresentations of debt obligations to be included in the borrowers' DTI. In each of these instances there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities would have been discovered. Failure to investigate these issues prevented the loan

underwriting process from appropriately qualifying the loan and evaluating the borrower's

"ability to produce timely payments."

- A loan that closed in February 2006 with a principal amount of $156,000 was originated under the Stated Income Loan Program. The origination credit report in the file shows 17 inquiries within the prior 30 days. There is no evidence in the file that the loan underwriting process adequately addressed the inquiries prior to approving the subject loan. The forensic analysis uncovered two additional mortgage loans for a total of $761,000 that were originated by two of the 17 companies listed in the inquiries. These debts were not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 61.53 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted after one payment, resulting in a loss of $82,780, which is over 53 percent of the original loan amount.

- A loan that closed in January 2006 with a principal amount of $103,380 was originated under the Stated Income Loan Program. The origination credit report in the file shows ten inquiries within the prior 30 days. There is no evidence in the file that the loan underwriting process adequately addressed the inquiries prior to approving the subject loan. The forensic analysis uncovered three additional mortgage loans for a total of $1,571,700 that were originated by three of the ten companies listed in the inquiries. These debts were not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 183 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted after two payments resulting in a loss of $114,238, which is over 110 percent of the original loan amount.

- A loan that closed in January 2006 with a principal amount of $47,500 was originated under the Limited Documentation Loan Program. The origination credit report in the file shows five inquiries within the prior 30 days. There was no evidence in the file that the loan underwriting process adequately addressed the inquiries prior to approving the subject loan. The forensic analysis uncovered two loans for a total of $173,050 that were originated by two of the five companies listed in the inquiries. These debts were not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 137 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted after three payments, resulting in a loss of $17,937, which is over 37 percent of the original loan amount.

- A loan that closed in February 2006 with a principal amount of $166,768 was originated under the Limited Documentation Loan Program. The origination credit report in the file shows 31 inquiries within the prior 30 days. There was no evidence in the file that the loan underwriting process adequately addressed the inquiries prior

to approving the subject loan. The forensic analysis uncovered 20 additional mortgage loans for a total of $5,281,336 that were all originated by companies that had made inquiries within the prior 30 days. These debts were not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 152.76 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted after seven payments, resulting in a loss of $37,941, which is over 22 percent of the original loan amount.

- A loan that closed in September 2006 with a principal amount of $465,600 was originated under the "Full Documentation Loan Program." The origination credit report in the file shows ten inquiries within the prior 30 days. There is no evidence in the file that the loan underwriting process adequately addressed the inquiries prior to approving the subject loan. The forensic analysis uncovered four loans for a total of $1,029,404 that were originated by companies that made inquiries within the prior 30 days. These debts were not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 81.15 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted after one payment, resulting in a loss of $441,562, which is over 94 percent of the original loan amount.

- A loan that closed in October 2006 with a principal amount of $448,000 was originated under the "Full Documentation Loan Program." The origination credit report in the file shows 16 inquiries within the prior 30 days. There is no evidence in the file that the loan underwriting process adequately addressed the inquiries prior to approving the subject loan. The forensic analysis uncovered that the borrower had obtained an additional mortgage loan for $116,079 that was originated by a company that made an inquiry on the borrower's credit report. This debt was not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process. The borrower's recalculated DTI based on all evidence uncovered in the forensic review was 76.55 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted after three payments, resulting in a loss of $189,667, which is over 42 percent of the original loan amount.

- A loan that closed in February 2006 with a principal amount of $51,500 was originated under the "Full Documentation Loan Program." The origination credit report in the file shows three inquiries within the prior 90 days. There is no evidence in the file that the loan underwriting process adequately addressed the inquiries prior to approving the subject loan. The forensic analysis uncovered that the borrower had acquired 32 undisclosed mortgages between November 2005 and February 2006, with a total mortgage amount of $1,699,130 and a total monthly debt obligation of $12,869. The borrower also had obtained an undisclosed home equity line in September 2005 on an unknown property in the amount of $10,800 with a monthly payment of $108. Several of the undisclosed mortgages were financed by the originating lender. There was also a payoff letter in the loan file that listed several other undisclosed mortgages and properties to be paid. The borrower's recalculated

DTI based on all evidence uncovered in the forensic review was 199.2 percent, which exceeds the applicable underwriting guideline maximum. The subject loan defaulted, resulting in a loss of $63,887, which is over 124 percent of the original loan amount.

316.    In each of these instances there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities would have been discovered. Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's "ability to produce timely payments."

### 2.    Both Government and Private Investigations Have Confirmed That The Originators Of The Loans In The Securitizations Systematically Failed To Adhere To Underwriting Guidelines

317.    The abandonment of underwriting guidelines with respect to the collateral underlying the Securitizations is further confirmed by several government reports and investigations that have described rampant underwriting failures throughout the period of the Securitizations, and, more specifically, have confirmed underwriting failures by the very originators whose loans were included by Defendants in the Securitizations.

318.    For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. Numerous originators for the mortgage loans underlying the Securitizations are on that list, including Wells Fargo, Countrywide, American Home, Fremont, IndyMac, New Century, Option One, Argent, and WMC Mortgage. *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.

### a. Wells Fargo

319.    Wells Fargo originated all of the mortgage loans for the MABS 2005-WF1

Securitization, and more than 20 percent of the mortgage loans in the Supporting Loan Group for

the MARM 2006-2 Securitization.  In March 2009, residential mortgage-backed securities

investors filed suit against Wells Fargo, alleging that it had misrepresented its underwriting

guidelines and loan quality.  *See In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-

CV-01376 (N.D. Cal. 2009).  In denying in part a motion to dismiss, the court found that

plaintiffs had adequately pled that "variance from the stated [underwriting] standards was

essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting

process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972

(N.D. Cal. 2010).  Wells Fargo agreed to settle the investors' claims.

320.    Further, a number of government actors have announced investigations of Wells

Fargo's lending practices.  In July 2009, the Attorney General of Illinois filed a lawsuit, *People

v. Wells Fargo & Co.*, No. 09-CH-26434 (Ill. Cir. Ct. 2009), alleging that Wells Fargo "engaged

in deceptive practices by misleading Illinois borrowers about their mortgage terms."  The

complaint details how borrowers were placed into loans that were "unaffordable and unsuitable,"

and how Wells Fargo "failed to maintain proper controls."

321.    In April 2010, the City of Memphis filed its First Amended Complaint in

*Memphis v. Wells Fargo Bank*, No. 09-CV-02857 (W.D. Tenn. 2009), alleging that Wells Fargo

"failed to underwrite African-American borrowers properly."  A similar lawsuit was filed by the

City of Baltimore, *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*, No. 08-CV-

00062 (D. Md. 2008).  The *City of Memphis* and *City of Baltimore* complaints include sworn

declarations from many former Wells Fargo employees, which provide evidence of predatory

lending and abandonment of underwriting guidelines.  For instance, Camille Thomas, a loan

processor at Wells Fargo from January 2004 to January 2008, stated under oath that loans were granted based on inflated appraisals, which allowed borrowers to get larger loans than they could afford due to the impact on the LTV calculation and some loans were even granted based on falsified income documents. Similarly, another affidavit by Doris Dancy, a credit manager at Wells Fargo from July 2007 to January 2008, stated that managers put pressure on employees to convince people to apply for loans, even if the person could not afford the loan or did not qualify for it. She was also aware that loan applications contained false data, used to get customers to qualify for loans.

322.    The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007. Ms. Parmer confirmed that, during her tenure, Wells Fargo's underwriting standards were loosening, adding that they were being applied "on the fly" and that "[p]eople were making it up as they went." She also told the FCIC that 99 percent of the loans she would review in a day would get approved, and that, even though she later became a "fraud analyst," she never received any training in detecting fraud. The FCIC's January 2011 Report described how "hundreds and hundreds and hundreds of fraud cases" that were identified within Wells Fargo's home equity loan division were not reported to FinCEN.[13] In addition, according to Ms. Palmer, at least half the loans she flagged for fraud were nevertheless funded, over her objections.

323.    In July 2011, the Federal Reserve Board issued a consent cease and desist order and assessed an $85 million civil money penalty against Wells Fargo & Co. and Wells Fargo Financial, Inc. According to the Federal Reserve's press release, the order addressed in part

---

[13]   FinCEN is the Financial Crimes Enforcement Network, a bureau within the Treasury Department that collects and analyzes information regarding financial fraud.

allegations that "Wells Fargo Financial sales personnel falsified information about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes." The Federal Reserve Board also found that the poor practices of Wells Fargo were fostered by Wells Fargo Financial's incentive compensation and sales quota programs, and the lack of adequate controls to manage the risks resulting from these programs.

### b. Countrywide

324.    Countrywide originated approximately 58.12 percent of the mortgage loans in the Supporting Loan Group for the MARM 2005-8 Securitization and 51.94 percent of all mortgage loans in the MARM 2007-3 Securitization.  In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  The FCIC Report singled out Countrywide for its role:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*See* FCIC Report, at xxii.

325.    Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices.  In June 2009, for instance, the SEC initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading.  In a September 16, 2010 opinion denying these

defendants' motions for summary judgment, the United States District Court for the Central

District of California found that the SEC raised genuine issues of fact as to, among other things,

whether the defendants had misrepresented the quality of Countrywide's underwriting processes.

The court noted that the SEC presented evidence that Countrywide "routinely ignored its official

underwriting to such an extent that Countrywide would underwrite any loan it could sell into the

secondary mortgage market," and that "a significant portion (typically in excess of 20%) of

Countrywide's loans were issued as exceptions to its official underwriting guidelines ...." The

court concluded that "a reasonable jury could conclude that Countrywide all but abandoned

managing credit risk through its underwriting guidelines ...." *S.E.C. v. Mozilo*, No. CV 09-3994,

2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010).  Mozilo, Sambol, and Sieracki

subsequently settled with the SEC.

326.   The testimony and documents only recently made available to the GSEs by way

of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions"

and low-documentation processes in order to circumvent its own underwriting standards.  For

example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned

that certain subprime loans had been originated "with serious disregard for process [and]

compliance with guidelines," resulting in the delivery of loans "with deficient documentation."

Mozilo further stated that "I have personally observed a serious lack of compliance within our

origination system as it relates to documentation and generally a deterioration in the quality of

loans originated versus the pricing of those loan[s]."

### c.  American Home

327.   American Home originated 95.42 percent of the mortgage loans in the Supporting

Loan Group for the MARM 2006-OA1 Securitization, and 78.27 percent of the mortgage loans

in the Supporting Loan Group for the MARM 2007-1 Securitization.  An internal American

Home "Credit Update" presentation from October 2005, which was made public in June 2008, made clear that American Home's underwriting guidelines were to be either relaxed substantially or essentially rendered meaningless, in order to allow American Home to make loans to high-risk borrowers. Specifically, the Credit Update set forth a new "interpretation" of guidelines that included:

- Not requiring verification of income sources on stated income loans.

- Reducing the time that need have passed since the borrower was in bankruptcy or credit counseling.

- Reducing the required documentation for self-employed borrowers.

- Broadening the acceptable use of second and third loans to cover the full property value.

328.    An internal American Home e-mail sent on November 2, 2006, made public in June 2008, from Steve Somerman, an American Home Senior Vice President of Product and Sales Support in California and co-creator of the American Home's "Choice Point Loans" program, to loan officers nationwide, stated that American Home would make a loan to virtually any borrower, regardless of the borrower's ability to verify income, assets or even employment. The e-mail specifically encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (3) "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history. *See* Complaint, *In re American Home Mortgage Securities Litigation*, No. 07-MD-1898 (TCP) (E.D.N.Y. June 3, 2008).

329.    American Home is involved in several criminal probes and investigations, and

federal prosecutors have convicted one American Home sales executive, Kourash Partow, of

mortgage fraud.  *See* Judgment in a Criminal Case, *U.S. v. Partow*, Case No. 3:06-CR-00070-08-

HRH, Aug. 31, 2007; *see also U.S. v. Partow*, 283 Fed. Appx. 476 (9th Cir. 2008).  After

conviction, Partow, who worked for Countrywide before joining American Home, sought a

lighter sentence on the grounds that his former employers (Countrywide and American Home)

both had knowledge of the loan document inaccuracies and in fact encouraged manipulation by

intentionally misrepresenting the performance of loans and the adequacy of how the loans were

underwritten.  Partow admitted that he would falsify clients' income or assets in order to get

loans approved, and that American Home did not require documentary verification of such

figures.  "Loan Data Focus of Probe, Countrywide Files May Have Included Dubious

Information," *The Wall Street Journal*, March 22, 2008; MSNBC.com, "Inside the fiasco that led

to the mortgage mess and Countrywide's collapse," updated March 22, 2009.

330.    In May of 2009, Edmund Andrews, a New York Times economics reporter, wrote

about his experience applying for a mortgage through American Home:

> I thought I knew a lot about go-go mortgages.  I had already written
> several articles about the explosive growth of liar's loans, no-money-down
> loans, interest-only loans and other even more exotic mortgages.  I had
> interviewed people with very modest incomes who had taken out big
> loans.  Yet for all that, I was stunned at how much money people were
> willing to throw at me.
>
> [The American Home loan officer] called back the next morning.  "Your
> credit scores are almost perfect, he said happily.  "Based on your income,
> you can qualify for a mortgage of about $500,000."
>
> What about my alimony and child-support obligations?  No need to
> mention them.  What would happen when they saw the automatic
> withholdings in my paycheck?  No need to show them.  If I wanted to buy
> a house, [the American Home loan officer] figured, it was my job to
> decide whether I could afford it.  His job was to make it happen.

> "I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do?  I am here to sell money and to help you do what you want to do.  At the end of the day, it's your signature on the mortgage – not mine."

Edmund L. Andrews, "My Personal Credit Crisis," *New York Times*, May 17, 2009.  Predictably,

Mr. Andrews was not able to make his monthly mortgage payments.

### d.  Fremont

331.    Fremont originated or acquired all of the loans in the FHLT 2006-B, MABS

2005-FRE1, and MABS 2006-FRE2 Securitizations.  On October 4, 2007, the Commonwealth of

Massachusetts, through its Attorney General, brought an enforcement action against Fremont for

an array of "unfair and deceptive business conduct," "on a broad scale."  *See* Complaint,

*Commonwealth v. Fremont Investment & Loan and Fremont General Corp.*, No. 07-4373 (Mass.

Super. Ct.) (the "Fremont Complaint").  According to the Massachusetts Attorney General's

complaint, Fremont "approve[ed] borrowers without considering or verifying the relevant

documentation related to the borrower's credit qualifications, including the borrower's income";

"approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly

consider the borrowers' ability to meet their overall level of indebtedness and common housing

expenses"; "failed to meaningfully account for [ARM] payment adjustments in approving and

selling loans"; "approved borrowers for these ARM loans based only on the initial fixed 'teaser'

rate, without regard for borrowers' ability to pay after the initial two year period"; "consistently

failed to monitor or supervise brokers' practices or to independently verify the information

provided to Fremont by brokers"; and "ma[de] loans based on information that Fremont knew or

should have known was inaccurate or false, including, but not limited to, borrowers' income,

property appraisals, and credit scores."  *See* Fremont Complaint.

332.   On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the lower court's conclusions that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow." *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008). The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.

333.   A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Freemont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that "Freemont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this."  The same witness also said that employees at Freemont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams.  He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

### e.   WMC Mortgage

334.   WMC Mortgage originated or acquired all of the loans in the MABS 2006-WMC2, MABS 2006-WMC3, MABS 2006-WMC4, and MABS 2007-WMC1 Securitizations. WMC Mortgage employed reckless underwriting standards and practices, as described more

fully below, that resulted in a huge amount of foreclosures, ranking WMC Mortgage fourth in

the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators

in the "Worst Ten" metropolitan areas. *See* "Worst Ten in the Worst Ten," Office of the

Comptroller of the Currency Press Release, November 13, 2008. General Electric, which

purchased WMC Mortgage in 2004, closed down operations at WMC Mortgage in late 2007 and

took a $1.4 billion charge in the third quarter of that year. *See, e.g.*, Diane Brady, Adventures of

a Subprime Survivor, Bloomberg Businessweek, Oct. 29, 2007 (available at

http://www.businessweek .com/magazine/content/07_44/b4056074.htm).

335.    WMC Mortgage's reckless loan originating practices attracted attention by

regulatory authorities. In June 2008, the Washington State Department of Financial Institutions,

Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an

Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect

Investigation Fees (the "Statement of Charges") against WMC Mortgage and its principal owners

individually. *See* Statement of Charges, No. C-07-557-08-SC01, Jun. 4, 2008. The Statement of

Charges included 86 loan files, which revealed that at least 76 loans were defective or otherwise

in violation of Washington state law. *Id.* Among other things, the investigation uncovered that

WMC Mortgage had originated loans with unlicensed or unregistered mortgage brokers,

understated amounts of finance charges on loans, understated amounts of payments made to

escrow companies, understated annual percentage rates to borrowers and committed many other

violations of Washington State deceptive and unfair practices laws. *Id.*

### f.  IndyMac

336.    IndyMac originated or acquired all of the loans in the INABS 2005-C, INABS

2005-D, INABS 2006-D, and INABS 2007-A Securitizations, and a portion of the loans in the

MARM 2007-1 and MARM 2007-3 Securitizations. IndyMac was the subject of a February 26,

2009 report issued by the Office of Inspector General ("OIG") of the U.S. Department of Treasury entitled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "OIG Report"). The OIG Report found that IndyMac Bank had "embarked on a path of aggressive growth" that was supported by its high risk business strategy of "originating … Alt-A loans on a large scale" and then "packag[ing] them together in securities" and selling "them on the secondary market" to investors. OIG Report at 2, 6, 7. The OIG Report further stated that: "To facilitate this level of [loan] production … IndyMac often did not perform adequate underwriting." *Id.* at 2.

337.    According to a recently filed SEC complaint, in 2007 Blair Abernathy, who at the time was IndyMac's executive vice president, "made misleading statements about the quality of the loans in six IndyMac offerings of residential mortgage-backed securities totaling $2.5 billion." Sarah N. Lynch, "SEC Charges Ex-IndyMac Execs With Fraud," Reuters, Feb. 11, 2011. Specifically,

> Abernathy received internal monthly reports showing that 12% to 18% of a random sample of IndyMac Bank's loans contained misrepresentations regarding important information about the loans' characteristics (such as a loan's status as an owner-occupied loan or its loan-to-value ("LTV") ratio) and/or the borrowers' creditworthiness (such as a borrower's identity, income, or debt load). Despite receiving those monthly reports showing that a significant percentage of loans contained misrepresentations, Abernathy negligently failed to take reasonable or responsible steps to ensure that the RMBS offering documents, which had been prepared by inside and outside counsel, included accurate disclosures concerning the loans in the RMBS or notified investors that the presented information was materially misleading in light of IndyMac Bank's monthly reports…These six offerings have experienced substantial loan delinquencies and ratings downgrades.

Complaint, *SEC v. Abernathy*, No. CV11-01308 (C.D. Cal. Feb. 11, 2011). In a settlement with the SEC, Abernathy agreed to pay a fine and "consented to the issuance of an administrative order…suspending him from appearing or practicing before the SEC as an accountant." SEC

Press Release, "SEC Charges Former Mortgage Lending Executives With Securities Fraud,"
Feb. 11, 2011.

338.    Similarly, a February 2009 report by the Treasury Department's Inspector
General noted that IndyMac issued "shaky loans based on inflated property values." William
Heisel, "Federal Regulators Ignored Problems At IndyMac, Report Finds: The Treasury
Department's Inspector General Says The Office Of Thrift Supervision Missed Key Signals
Pointing To Shaky Loans, Leading To The Mortgage Lender's Collapse Last Summer," *Los
Angeles Times*, Feb. 27, 2009. The report cited an instance where a borrower took out a
$926,000 loan to buy what was supposedly a $1.4 million home. According to Inspector General
Eric Thurson, when the buyer defaulted "[t]he property went up for sale for $599,000." *Id.* The
report also found that "in one case IndyMac sought multiple appraisals on a property that ranged
from $500,000 to $5 million." *Id.* Assistant Inspector General Marla Freedman noted that
IndyMac used the $5 million appraisal "'because their goal was to get these loans done and make
a profit.'" *Id.*

339.    A June 30, 2008 report issued by the Center for Responsible Lending ("CRL")
also found that IndyMac Bank often ignored its stated underwriting and appraisal standards and
encouraged its employees to approve loans regardless of the borrower's ability to repay them.
*See* IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and
Abusive Mortgage Lending (the "CRL Report"). For example, the CRL Report noted that
IndyMac Bank "engaged in unsound and abusive lending practices" and "allowed outside
mortgage brokers and in-house sales staffers to inflate applicants' [financial information] ... [to]
make them look like better credit risks." *See* CRL Report at 2, 8. Further, former IndyMac
employees stated that they relied on "bogus appraisals" in giving out loans and that employees

"were intimidated by higher-ups and told they would be fired if they tried to block fraudulent appraisals." *Id.* at 2, 13.

### g. New Century

340.    New Century originated or acquired all of the loans in the MABS 2006-NC2 and MABS 2006-NC3 Securitizations, and a portion of the loans in the MABS 2006-HE2 Securitization. As stated in the Prospectus Supplement for the MABS 2006-NC2 Securitization, "[f]or the six months ending June 20, 2006, New Century Financial Corporation originated $29.6 billion in mortgage loans." By the end of 2006, New Century was the third largest subprime mortgage loan originator in the United States, with a loan production volume that year of $51.6 billion. And before its collapse in the first half of 2007, New Century was one of the largest subprime lenders in the country.

341.    In its final report addressing the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy, the FCIC singled out New Century for its role:

> New Century—once the nation's second-largest subprime lender—ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence. In a June 2004 presentation, the Quality Assurance staff reported they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. In 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated. The same year, the Internal Audit department identified numerous deficiencies in loan files; out of nine reviews it conducted in 2005, it gave the company's loan production department "unsatisfactory" ratings seven times. Patrick Flanagan, president of New Century's mortgage-originating subsidiary, cut the department's budget, saying in a memo that the "group was out of control and tries to dictate business practices instead of audit."

342.    On February 29, 2008, after conducting an extensive document review and over

100 interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a

detailed report on the various deficiencies at New Century, including lax mortgage standards and

a failure to follow its own underwriting guidelines.  Among his findings, the Examiner reported:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy.... Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels."

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.  A senior officer of New Century warned in 2004 that the "number one issue is exceptions to the guidelines."  Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies.

- "New Century ... layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers."

Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*,

No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), *available at*

http://graphics8.nytimes.com/packages/pdf/business/Final_Report_New_Century.pdf.

343.    On December 9, 2009, the SEC charged three of New Century's top officers with

violations of federal securities laws.  The SEC's complaint details how New Century's

representations regarding its underwriting guidelines, e.g., that New Century was committed to

"adher[ing] to high origination standards in order to sell [its] loan products in the secondary

market" and "only approv[ing] subprime loan applications that evidence a borrower's ability to

repay the loan," were blatantly false.

344.    Confidential witnesses confirmed that New Century abandoned its underwriting

guidelines.  One confidential witness, who was an internal bureau quality assurance underwriter

for New Century, stated that he had doubts about the quality of the loans he reviewed.  A second

confidential witness managed an appraisal review staff at New Century. His team would review the application to ensure that the collateral was sufficient to support the loan. He estimated that over 50 percent of the loans his group reviewed did not have the proper collateral, and as such his group would rate the loans either "Low" or "Unacceptable"; however, those above him often overrode these decisions.

345.    Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century. Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income. *See* Written Testimony of Patricia Lindsay for the FCIC Hearing, April 7, 2010 ("Lindsay Testimony"), http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.

### h.  Option One

346.    Option One, which originated approximately 57.59 percent of the mortgage loans for the MABS 2007-HE2 Securitization, has also been identified through multiple reports and investigations for its faulty underwriting. On June 3, 2008, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One (the "Option One Complaint"), and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. *See* Complaint, *Commonwealth v. H&R Block, Inc.*, CV NO. 08-2474-BLS (Mass. Super. Ct. June. 3, 2008). According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime

loans to the secondary market." *Id.* at ¶ 4. The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id.* at ¶ 8. Option One's "origination policies ... employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id.* at ¶ 10.

347.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008). On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *See Commonwealth v. Option One Mortgage Co.*, No. 09-P-134, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009). On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million by implementing "an aggressive loan modification program" and paying penalties to the Commonwealth of Massachusetts. *See* "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions," Massachusetts Attorney General Press Release, Aug. 9, 2011. Media reports noted that the suit was being settled amidst ongoing discussions among multiple states' attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices. The Massachusetts Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. *See, e.g.,*

H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit, Bloomberg.com, Aug. 9, 2011.

### i. Argent

348. Argent originated or acquired all of the mortgage loans for the ARSI 2006-W3 Securitization. In July 2008, Orson Benn, a former vice president of Argent who was in charge of overseeing the state of Florida for the mortgage company, was convicted of mortgage fraud stemming from his approval of fraudulent loan applications. Benn, who "taught" mortgage brokers "how to doctor credit reports, coached them to inflate income on loan applications, and helped them invent phantom jobs for borrowers," was sentenced to 18 years in prison for his role in more than $550 million in fraudulent loans that were "bundl[ed]" and sold "to investors." Jack Dolan, Matthew Haggman, and Rob Barry, "Home Loan Racket Flourished in Florida," *The Miami Herrald*, Jan. 29, 2009. Benn testified that because Argent was securitizing the mortgages and was not dependent on the borrowers' ability to repay the loans, the accuracy of individual loan applications was not a priority. *Id.*

349. On June 22, 2011 nine former Argent account managers, supervisors, and underwriters were indicted in Ohio for falsifying documents in order to approve loans that did not meet Argent's underwriting standards. "Nine Former Argent Mortgage Company Account Managers, Supervisors and Underwriters Indicted," Press Release, Cuyahoga County Prosecutor, June 22, 2011. The indicted Argent employees "helped coach mortgage brokers about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's incomes and assets" and then "approved the loans knowing that the company's own lending rules had not been satisfied." Mark Gillispie, "Former Employees of Subprime Mortgage Lender Indicted by Cuyahoga County Grand Jury," *The Plain Dealer*, June 23, 2011. According to Cuyahoga County Prosecutor, in applications for at least 100 loans "the buyers,

with the assistance of mortgage brokers and account managers from Argent or other
representatives from Argent, misstated one of more of the following: the amount of their assets,
their income, the source of or existence of any down payment, the existence of a legitimate seller
carryback mortgage, and/or basic and fundamental financial information regarding their financial
condition, in order to gain approval for the loan amounts requested in these applications." Press
Release, Cuyahoga County Prosecutor, *supra*. Also indicted were two appraisers who worked
with Argent to falsify the appraised values for the subject properties. *Id*. In November 2011,
Angela Pasternak, one of the indicted Argent account managers was subsequently indicted a
second time for "approv[ing] exceptions knowing that loan applications contained false income
information and bogus credit scores." Mark Gillispie, "Argent Mortgage Worker Gets Indicted
Again In Suspected Mortgage Fraud Case, *The Plain Dealer*, November 15, 2011. Ms.
Pasternak's attorney has stated that she was following the directives of supervisors. *Id*.

350.    Other former Argent employees have repeatedly discussed the failure of Argent to
follow its underwriting guidelines.  For example, Jacquelyn Fishwick, a former Argent
underwriter and account manager, has stated that "Argent employees played fast and loose with
the rules" and that she "personally saw some stuff [that she] didn't agree with," including Argent
"account managers remov[ing] documents from files and creat[ing] documents by cutting and
pasting them." "Subprime House of Cards," *Cleveland Plain Dealer*, May 11, 2008.  According
to the same article, "[a]ll kinds of people [who] were in on the scam, from buyers and sellers of
real estate to the mortgage brokers, appraisers and title officials who facilitated this massive
fraud." *Id.*

351.    Similarly, Steve Jerigan, a fraud investigator for Argent has called into question
the company's appraisal practices.  Jerigan has described a particularly telling instance when he

went to investigate a new subdivision for which Argent had made a number of loans. According to Jerigan, the addresses on the loans led to the middle of a cornfield and an identical fake picture had been included in each file. In short, he quickly discovered that the loans were based on fabrications. Michael W. Hudson, "Silencing the Whistle-Blowers," *The Investigative Fund*, May 10, 2010.

352.    When Citigroup acquired Argent in 2007, Richard Bowen, the Chief Underwriter in Citigroup's Consumer Lending Group, performed a review of Argent. Bowen found that "large numbers" of Argent's loans were "not underwritten according to the representations that were there." FCIC Hearing Transcript, Apr. 7, 2010, p. 239.

### j.   EquiFirst

353.    EquiFirst Corporation ("EquiFirst") originated or acquired an unspecified number of the mortgage loans for the MABS 2007-HE2 Securitization. The New Jersey Department of Banking & Insurance Office of Consumer Finance Licensee Enforcement Activity issued a consent order against EquiFirst and fined the company for accepting mortgage loan applications from unlicensed entities and failing to submit information related to address changes. New Jersey Department of Banking & Insurance Office of Consumer Finance Licensee Enforcement Activity Consent Order #E09-007408, July 8, 2010. In 2008 Mike Willoughby, the Chief Credit Officer of Regions Financial Corp., EquiFirst's parent company at the time of origination of the loans in the MABS 2007-HE2 Securitization, stated that Regions was aware in the second half of 2007 "that unpaid loans were going to start hitting banks in the wallet." Russell Hubbard, "Regions' Bad Year Swamps High Hopes: Housing Crisis, Economy Push Stocks Down," *Birmingham News*, July 14, 2008. Despite this awareness, until Regions was able to exit the business by selling EquiFirst, they continued issuing sub-prime mortgages that were bundled into securitizations including the MABS 2007-HE2 Securitization at issue here.

### k.  First Horizon

354.  First Horizon Home Loan Corporation ("First Horizon") originated or acquired an unspecified number of the mortgage loans for the MARM 2005-8 Securitization.  In July 2008, Dow Jones reported that Stephanie Jones, a former First Horizon corporate security investigator, alleged that the company "habitually ignored cases of mortgage and banking fraud committed by high-producing loan officers, and even concealed incidents by altering official filings sent to bank regulators."  Marshall Eckblad, "Complaint Alleges First Horizon Concealed Mortgage Fraud," *Dow Jones Newswires*, July 2, 2008.  According to Jones, First Horizon "allowed loan officers—as long as they were raking in the money—to do whatever they wanted."  *Id.*  Jones alleges that "she uncovered approximately 50 cases of mortgage fraud at First Horizon" and that First Horizon managers engaged in a "systematic effort…to conceal [the] mortgage fraud she uncovered."  *Id.*  At one First Horizon branch in Idaho, Jones uncovered fraud by a loan officer who "conceded he had illegally altered loan documents, but told Jones that 'everyone in the branch [wa]s doing it.'"  *Id.*  When Jones proceeded to investigate the other employees at the branch she found that they "routinely…inflated borrowers' income on applications."  *Id.*  Jones then reported her findings to her supervisor who she stated "didn't want me to pursue it."  *Id.*  Additionally, Jones alleges that Suspicious Activities Reports that were submitted to regulators "would come back changed" from one of First Horizon's directors of corporate security who "typically removed from the reports any references to fraud committed by loan officers and typically directed the allegations toward loan applicants instead."  *Id.*

355.  In 2008, many of the entities that had purchased loans originated by First Horizon began to discover the substandard quality of First Horizon's originations and exercised their right to have First Horizon repurchase defective loans.  As First Horizon stated in its 2008 Annual Report, "In addition to the negative aspects of asset quality on FHN's loan portfolio, increased

repurchase and make-whole claims from agency and private purchases of loans originated and subsequently sold by FHN hampered earnings as FHN recorded $148.5 million in charges for its obligations related to these assets." First Horizon National Corporation's 2008 Annual Report (available at http://ir.fhnc.com/annuals.cfm). Additionally, in their 2010 Annual Report First Horizon admitted that it had "observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 and 40 percent of the repurchase and make-whole requests." First Horizon National Corporation's 2010 Annual Report (available at http://ir.fhnc.com/annuals.cfm).

### l.  Inflated Appraisals

356.    As described above, the originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals. Appraisal pressure was especially strong when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization. This resulted in lower LTV ratios, discussed *supra*, which in turn made the loans appear to investors less risky than they were.

357.    As described by Ms. Lindsay in her FCIC testimony, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5. Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a

property, or else never see work from those parties again .... [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'" *See* Testimony of Jim Amorin to the FCIC, available at

www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf. Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

### 3. The Collapse Of The Certificates' Credit Ratings Further Indicates That The Mortgage Loans Were Not Originated In Adherence To The Stated Underwriting Guidelines

358.   The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were impaired from the start.

359.   The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or the equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. These ratings were artificially inflated, however, as a result of the very same misrepresentations that Defendants made to investors in the Prospectus Supplements.

360.   UBS provided or caused to be provided loan-level information, including the borrower's LTV ratios, debt-to-income ratio, owner occupancy status, and other loan-level information as described in aggregation reports in the Prospectus Supplements, to the rating agencies.   The rating agencies in turn relied on this information to calculate the Certificates' assigned credit ratings.   Because the information that UBS provided or caused to be provided was materially false, the models used by the rating agencies under-predicted the likelihood of

delinquency and loss, as well as the loss severity.   As a result of the false information provided by UBS, the securitizations lacked the level of subordination required for the certificates to be rated AAA (or its equivalent), and investors, including Fannie Mae and Freddie Mac, were deprived of the level of protection commensurate with a AAA (or its equivalent) rating.  As a result, the GSEs paid Defendants inflated prices for purportedly AAA (or its equivalent) Certificates, unaware that those Certificates in reality carried a greater risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).

361.   The GSEs could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest, February 15, 2008 for Freddie Mac and March 3, 2008 for Fannie Mae.  These are the first dates on which any of the certificates purchased by the GSEs were downgraded below investment grade by a credit ratings agency.  In subsequent months and years, most of the GSE Certificates were downgraded by the credit rating agencies from AAA (or its equivalent) to below investment grade.  Prior to the initial downgrades in February and March 2008, the GSEs had no basis to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements. After these downgrades, it required significant investigation and fact-finding for the GSEs to formulate the claims stated herein.  The downgrades beginning in 2008 raised questions regarding the true underwriting practices used to originate the mortgage loans, and the mortgage loans' true value and credit quality.  Table 8 details the extent of the downgrades.[14]

---

[14]   Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch/DBRS.  A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

Table 8

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch/DBRS) | Rating at July 31, 2011 (Moody's/S&P/Fitch/DBRS) |
|---|---|---|---|
| ARSI 2006-W3 | AI | Aaa/AAA/AAA/-- | Caa3/CCC/C/-- |
| FHLT 2006-B | IA | Aaa/AAA/AAA/AAA | Ca/CCC/C/C |
| INABS 2005-C | AII | Aaa/AAA/AAA/-- | Ba1/A+/B/-- |
| INABS 2005-D | AII | Aaa/AAA/AAA/-- | B1/B-/CCC/-- |
| INABS 2006-D | IA | Aaa/AAA/AAA/-- | Caa3/CCC/C/-- |
| INABS 2007-A | IA | Aaa/AAA/AAA/-- | Caa3/CCC/C/-- |
| MABS 2005-FRE1 | AI | Aaa/AAA/AAA/-- | Aaa/AAA/AAA/-- |
| MABS 2005-HE2 | AI | Aaa/AAA/--/-- | A2/AAA/--/-- |
| MABS 2005-WF1 | A1A | Aaa/AAA/AAA/-- | Aa3/AAA/AA/-- |
| MABS 2006-FRE2 | AI | Aaa/AAA/--/-- | Caa3/CCC/--/-- |
| MABS 2006-NC2 | AI | Aaa/AAA/AAA/-- | Ca/B-/C/-- |
| MABS 2006-NC3 | AI | Aaa/AAA/--/-- | Ca/CCC/--/-- |
| MABS 2006-WMC2 | AI | Aaa/AAA/--/-- | Ca/CCC/--/-- |
| MABS 2006-WMC3 | AI | Aaa/AAA/--/-- | Ca/CCC/--/-- |
| MABS 2006-WMC4 | AI | Aaa/AAA/--/-- | Ca/CCC/--/-- |
|  | A2 | Aaa/AAA/--/-- | Ca/CCC/--/-- |
| MABS 2007-HE2 | AI | Aaa/AAA/--/-- | Caa3/CCC/--/-- |
| MABS 2007-WMC1 | AI | Aaa/AAA/--/-- | Ca/CCC/--/-- |
| MARM 2005-8 | 2AI | --/AAA/AAA/-- | Caa3/CCC/--/C |
|  | 3AI | --/AAA/AAA/-- | Caa3/CCC/--/C |
| MARM 2006-2 | 2AI | --/AAA/AAA/-- | --/B-/C/-- |
| MARM 2006-OA1 | 2AI | Aaa/AAA/--/-- | Ca/D/--/-- |
| MARM 2007-1 | IIA | Aaa/AAA/--/-- | Ca/D/--/-- |
| MARM 2007-3 | IIAI | Aaa/AAA/--/-- | Caa3/CCC/--/-- |
|  | IIA2 | Aaa/AAA/--/-- | Aa3/AA+/--/-- |
|  | 21AI | Aaa/AAA/--/-- | Caa3/CCC/--/-- |
|  | 21A2 | Aaa/AAA/--/-- | Aa3/AA+/--/-- |

4.   **The Surge In Mortgage Delinquency And Default Further Demonstrates That The Mortgage Loans Were Not Originated In Adherence To The Stated Underwriting Guidelines**

362.   Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with the applicable underwriting guidelines as represented in the Registration Statements.

363.   Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and

delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting

Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

### Table 9

| Transaction | Supporting Loan Group | Percentage of Delinquent/Default/Foreclosed Loans |
|---|---|---|
| ARSI 2006-W3 | Group 1 | 46.1 |
| FHLT 2006-B | Group 1 | 60.5 |
| INABS 2005-C | Group 1 | 43.3 |
| INABS 2005-D | Group 1 | 47.4 |
| INABS 2006-D | Group 1 | 47.7 |
| INABS 2007-A | Group 1 | 50.0 |
| MABS 2005-FRE1 | Group 1 | 40.2 |
| MABS 2005-HE2 | Group 1 | 43.3 |
| MABS 2005-WF1 | Group 1 | 39.3 |
| MABS 2006-FRE2 | Group 1 | 52.8 |
| MABS 2006-NC2 | Group 1 | 35.7 |
| MABS 2006-NC3 | Group 1 | 38.1 |
| MABS 2006-WMC2 | Group 1 | 56.3 |
| MABS 2006-WMC3 | Group 1 | 57.6 |
| MABS 2006-WMC4 | Group 1 | 52.6 |
| MABS 2007-HE2 | Group 1 | 34.7 |
| MABS 2007-WMC1 | Group 1 | 43.8 |
| MARM 2005-8 | Group 2 | 34.6 |
| | Group 3 | 40.1 |
| MARM 2006-2 | Group 2 | 6.4 |
| MARM 2006-OA1 | Group 2 | 33.4 |
| MARM 2007-1 | Sub-Group 1-1; Group 1 | 31.5 |
| MARM 2007-3 | Sub-Group 1-1; Group 1 | 56.2 |
| | Sub-Group 2-1; Group 2 | 49.0 |

364.    The confirmed misstatements concerning owner occupancy and LTV ratios; the

forensic review of nearly one thousand loan files for three of the Securitizations; the confirmed

systematic underwriting failures by the originators responsible for the mortgage loans across the

Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those

Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to

the representations in the Registration Statements, were not originated in accordance with the

stated underwriting guidelines.

## V.    Fannie Mae's And Freddie Mac's Purchases Of The GSE Certificates And The Resulting Damages

365.    In total, between September 28, 2005 and August 30, 2007, Fannie Mae and

Freddie Mac purchased over $6.4 billion in residential mortgage-backed securities issued in

connection with the Securitizations.  Table 10 sets forth Freddie Mac's purchases of the

Certificates.[15]

### Table 10

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Unpaid Principal Balance As Of June 30, 2011 | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|---|
| ARSI 2006-W3 | A1 | 040104SN2 | 3/29/2006 | $639,421,000 | $187,882,039 | 100.00 | UBS Securities |
| FHLT 2006-B | 1A | 35729QAA6 | 8/3/2006 | $168,810,000 | $74,942,570 | 100.00 | UBS Securities |
| INABS 2005-C | AII | 456606JF0 | 9/29/2005 | $268,995,000 | $37,453,871 | 100.00 | UBS Securities |
| MABS 2005-FRE1 | A1 | 57643LLV6 | 11/29/2005 | $407,426,000 | $13,987,789 | 100.00 | UBS Securities |
| MABS 2005-HE2 | A1 | 57643LKG0 | 9/30/2005 | $223,961,000 | $19,959,108 | 100.00 | UBS Securities |
| MABS 2005-WF1 | A1A | 57643LJR8 | 9/28/2005 | $304,942,000 | $33,384,871 | 100.00 | UBS Securities |
| MABS 2006-FRE2 | A1 | 57643GAA5 | 5/30/2006 | $195,110,000 | $37,987,954 | 100.00 | UBS Securities |
| MABS 2006-NC2 | A1 | 55275BAA5 | 9/28/2006 | $161,350,000 | $57,384,559 | 100.00 | UBS Securities |
| MABS 2006-NC3 | A1 | 55275RAA0 | 12/28/2006 | $206,732,000 | $96,584,190 | 100.00 | UBS Securities |
| MABS 2006-WMC3 | A1 | 55291KAA5 | 9/28/2006 | $142,810,000 | $66,185,676 | 100.00 | UBS Securities |
| MABS 2007-HE2 | A1 | 57646LAN3 | 8/30/2007 | $237,414,000 | $141,236,856 | 100.00 | UBS Securities |
| MARM 2006-2 | 2A1 | 576438AC9 | 4/17/2006 | $58,149,000 | $25,707,928 | 98.81 | UBS Securities |
| MARM 2006-OA1 | 2A1 | 576433G75 | 4/28/2006 | $258,807,000 | $108,399,986 | 102.33 | UBS Securities |
| MARM 2007-1 | 11A | 576431AA8 | 1/16/2007 | $386,287,000 | $233,840,394 | 99.98 | UBS Securities |

366.    Table 11 sets forth Fannie Mae's purchases of the Certificates.

### Table 11

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Unpaid Principal Balance As Of June 30, 2011 | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|---|
| INABS 2005-D | AII | 456606JH6 | 12/23/2005 | $317,676,000 | $54,246,782 | 100.00 | UBS Securities |
| INABS 2006-D | 1A | 43709LAQ0 | 9/13/2006 | $193,000,000 | $81,764,270 | 100.00 | UBS Securities |
| INABS 2007-A | 1A | 43710BAA4 | 3/13/2007 | $274,933,000 | $159,121,919 | 100.00 | UBS Securities |
| MABS 2006- | A1 | 57644TAA6 | 6/29/2006 | $269,613,000 | $96,905,057 | 100.00 | UBS Securities |

[15]    Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

[16]    The "Settlement Date," as used herein, refers to the date by which a buyer must pay for the securities delivered by the seller, as opposed to the "trade date," which is the date on which a security trade actually occurs.

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Unpaid Principal Balance As of (Dec. 30, 2011) | Purchase Price/Percent Paid | Seller to Fannie Mae |
|---|---|---|---|---|---|---|---|
| WMC2 | | | | | | | |
| MABS 2006-WMC4 | A1 | 57645MAA0 | 11/30/2006 | $187,821,000 | $100,780,449 | 100.00 | UBS Securities |
| | A2 | 57645MAB8 | 11/30/2006 | $20,869,000 | $11,197,828 | 100.00 | UBS Securities |
| MABS 2007-WMC1 | A1 | 55275TAA6 | 2/27/2007 | $218,363,000 | $136,190,913 | 100.00 | UBS Securities |
| MARM 2005-8 | 2A1 | 576433E69 | 12/29/2005 | $425,594,000 | $182,487,744 | 100.01 | UBS Securities |
| | 3A1 | 576433E77 | 1/30/2006 | $59,444,919 | $32,848,456 | 100.88 | UBS Securities |
| MARM 2006-2 | 2A1 | 576438AC9 | 4/17/2006 | $60,000,000 | $26,526,263 | 98.88 | UBS Securities |
| MARM 2007-3 | 11A1 | 57645NAA8 | 5/15/2007 | $309,106,000 | $204,563,334 | 100.00 | UBS Securities |
| | 11A2 | 57645NAB6 | 5/15/2007 | $206,071,000 | $130,567,196 | 100.00 | UBS Securities |
| | 21A1 | 57645NAM2 | 5/15/2007 | $116,046,000 | $74,856,181 | 100.00 | UBS Securities |
| | 21A2 | 57645NAN0 | 5/15/2007 | $77,364,000 | $46,750,590 | 100.00 | UBS Securities |

367.    The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the Certificates.  Defendants were responsible for the contents of those Registration Statements.  A reasonable investor would have had this understanding and it would have influenced its purchasing decision.

368.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer billions of dollars in damages, including without limitation depreciation in the value of the securities.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the Trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

369.   Fannie Mae's and Freddie Mac's losses on the GSE Certificates have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

370.   UBS's misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the primary and proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of the GSE Certificates.   Fannie Mae and Freddie Mac did not know of Defendants' misstatements and omissions at the time they purchased the Certificates.  UBS's misstatements and omissions both understated the risk and overstated the value of the GSE Certificates, and had the GSEs known of these misstatements and omissions, they would not have purchased the GSE Certificates.  Defendants' misrepresentations and omissions, which proximately caused the GSEs' losses, also contributed to the Nation's housing crisis.

371.   UBS proximately caused billions of dollars in damages to Fannie Mae and Freddie Mac.  Based upon sales of the Certificates or similar certificates in the secondary market, Fannie Mae and Freddie Mac calculate that they have already lost in excess of 18 percent of their entire investment of approximately $6.4 billion in the GSE Certificates.

### FIRST CAUSE OF ACTION

#### Violation of Section 11 of the Securities Act of 1933
#### (Against UBS Securities, MASTR, and the Individual Defendants)

372.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

373.   This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements.  This claim is brought against

Defendant UBS Securities with respect to each of the Registration Statements, and is brought against Defendant MASTR and the Individual Defendants with respect to the Registration Statements filed by MASTR that registered securities that were bona fide offered to the public on or after September 6, 2005.

374.    This claim is predicated upon Defendant UBS Securities' strict liability for making false and materially misleading statements in the Registration Statements for all of the Securitizations and for omitting facts necessary to make the facts stated therein not misleading. Defendants MASTR and the Individual Defendants are strictly liable for making false and materially misleading statements in the Registration Statements filed by MASTR that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 12 of the 22 Securitizations (as specified in Table 1, *supra* at paragraph 33), and for omitting facts necessary to make the facts stated therein not misleading.

375.    Defendant UBS Securities served as underwriter of each of the Securitizations, and as such, is liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

376.    Defendant MASTR filed one Registration Statement dated December 16, 2005, and last amended on April 4, 2006, under which 12 of the 22 Securitizations were carried out. As depositor, Defendant MASTR is an issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, it is liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement that registered securities that were bona fide offered to the public on or after September 6, 2005 .

377.   At the time Defendant MASTR filed the Registration Statement applicable to 12 of the Securitizations, the Individual Defendants were officers and/or directors of MASTR. In addition, the Individual Defendants signed those Registration Statements and either signed or authorized another to sign on their behalf the amendments to those Registration Statements. As such, the Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in the Registration Statement that registered securities that were bona fide offered to the public on or after September 6, 2005.

378.   At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above. The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statements.

379.   The untrue statements of material facts and omissions of material facts in the Registration Statements are set forth above in Section IV and pertain to compliance with underwriting guidelines, occupancy status and loan-to-value ratios.

380.   Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements. Fannie Mae and Freddie Mac made these purchases in the primary market. At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

381.   UBS Securities owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct

141

and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.  The Individual Defendants owed the same duty with respect to the one Registration Statement that they signed that registered securities that were bona fide offered to the public on or after September 6, 2005, which is applicable to 12 of the Securitizations.

382.    UBS Securities and the Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein. In addition, MASTR, though subject to strict liability without regard to whether it performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

383.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

384.    The time period since May 20, 2009 is tolled for statute of limitations purposes by virtue of a tolling agreement entered into among Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

385.    By reason of the conduct herein alleged, UBS Securities, MASTR, and the Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against Defendants UBS Securities and MASTR)

386.     Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

387.     This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities

Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements in the Securitizations listed in

paragraph 2.

388.     This claim is predicated upon UBS Securities' negligence in making false and

materially misleading statements in the Prospectuses (as supplemented by the Prospectus

Supplements, hereinafter referred to in this Section as "Prospectuses") for each of the

Securitizations listed in paragraph 2.  Defendant MASTR acted negligently in making false and

materially misleading statements in the Prospectuses for the Securitizations carried out under the

Registration Statements it filed, which are applicable to 16 of the Securitizations.

389.     UBS Securities is prominently identified in the Prospectuses, the primary

documents that it used to sell the GSE Certificates.  UBS Securities offered the Certificates

publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in

the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

390.     UBS Securities offered and sold the GSE Certificates to Fannie Mae and Freddie

Mac by means of the Prospectuses, which contained untrue statements of material facts and

omitted to state material facts necessary to make the statements, in light of the circumstances

under which they were made, not misleading.  UBS Securities reviewed and participated in

drafting the Prospectuses.

391.   UBS Securities successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriter, UBS Securities obtained substantial commissions based upon the amount it received from the sale of the Certificates to the public.

392.   UBS Securities offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

393.   MASTR is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that it filed.  These Prospectuses were the primary documents each used to sell Certificates for the 16 Securitizations under those Registration Statements.  MASTR, a statutory seller, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac, for the benefit of UBS.

394.   With respect to the 16 Securitizations for which it filed Registration Statements, MASTR offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  MASTR reviewed and participated in drafting the Prospectuses.

395.   MASTR offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

396.   Each of UBS Securities and MASTR actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

397.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

398.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

399.    UBS Securities and MASTR offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

400.    UBS Securities owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading. MASTR owed the same duty with respect to the Prospectuses for the Securitizations carried out under the two Registration Statements filed by it.

401.    UBS Securities and MASTR failed to exercise such reasonable care. These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

402.    In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates. If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

403.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

404.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

405.    The time period since May 20, 2009, is tolled for statute of limitations purposes by virtue of a tolling agreement entered into among Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

### THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933**
**(Against Defendants UBS Real Estate, UBS Americas, and the Individual Defendants)**

406.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

407.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o, against UBS Real Estate, UBS Americas, and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of action set forth above.

408.    The Individual Defendants at all relevant times participated in the operation and management of MASTR and its related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of MASTR's business affairs.  Defendant David Martin was the President and Chief Executive Officer of Defendant MASTR.  Defendant Per Dyrvik was the Managing Director and Principal Accounting and Financial Officer of Defendant MASTR.

Defendant Hugh Corcoran was a Managing Director of Defendant MASTR. Defendant Peter Slagowitz was a Managing Director of Defendant MASTR.

409.    Defendant UBS Real Estate was the sponsor for the 16 Securitizations carried out under the two Registration Statements filed by MASTR, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting MASTR as the special purpose vehicle, and selecting UBS Securities as underwriter for the Securitizations. In its role as sponsor, UBS Real Estate knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cash-flows would be issued by the relevant trusts.

410.    Defendant UBS Real Estate also acted as the seller of the mortgage loans for the 16 Securitizations carried out under the two Registration Statements filed by Defendant MASTR, in that it conveyed such mortgage loans to MASTR pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

411.    Defendant UBS Real Estate also controlled all aspects of the business of MASTR, as MASTR was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of UBS Real Estate overlapped with the officers and directors of MASTR. For example, Defendant David Martin was both the President and CEO of MASTR and the Global Head of Residential Mortgage Backed Securitizations and Asset Backed Securitizations for UBS. Likewise, Defendant Peter Slagowitz was both a Managing Director of Defendant MASTR and a Managing Director and Head of Loan Conduits for UBS AG, which wholly owns UBS

Americas, and was also a Managing Director at UBS Real Estate. Similarly, Defendant Per

Dyrvik was a Managing Director and Principal Accounting and Financial Officer of Defendant

MASTR, a Managing Director of UBS Securities, and also Managing Director at UBS AG and at

UBS Americas. And again, Defendant Hugh Corcoran was a Managing Director of both

MASTR and UBS Securities. Thus, the Individual Defendants served in numerous roles and

exercised control over multiple Defendants. In addition, because of its position as sponsor, UBS

Real Estate was able to, and did in fact, control the contents of the two Registration Statements

filed by MASTR, including the Prospectuses and Prospectus Supplements, which pertained to 16

Securitizations and which contained material misstatements of fact and omitted facts necessary

to make the facts stated therein not misleading.

412.    Defendant UBS Americas controlled the business operations of UBS Securities

and MASTR. Defendant UBS Americas is the corporate parent of UBS Securities and MASTR.

As the sole corporate parent of UBS Securities and MASTR, UBS Americas had the practical

ability to direct and control the actions of UBS Securities and MASTR in issuing and selling the

Certificates, and in fact exercised such direction and control over the activities of UBS Securities

and MASTR in connection with the issuance and sale of the Certificates.

413.    UBS Americas expanded its share of the residential mortgage-backed

securitization market in order to increase revenue and profits. The push to securitize large

volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and

omissions of material facts in the Registration Statements.

414.    Defendant UBS Americas wholly owns UBS Real Estate, UBS Securities, and

MASTR. UBS Americas culpably participated in the violations of Sections 11 and 12(a)(2) set

forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the

mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as MASTR and the issuing trusts to serve as conduits for the mortgage loans.

415.   Defendants UBS Americas, UBS Real Estate, and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of UBS Securities and MASTR at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, UBS generated profits at multiple levels of the securitization process.

416.   Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

417.   Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

418.   Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

419.   The time period since May 20, 2009, is tolled for statute of limitations purposes by virtue of a tolling agreement entered into among Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the

FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## FOURTH CAUSE OF ACTION

### Violation of Section 13.1-522(A)(ii) of the Virginia Code
### (Against Defendants UBS Securities and MASTR)

420.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

421.    This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain to only those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

422.    This claim is predicated upon UBS Securities' negligence in making false and materially misleading statements in the Prospectuses for the Securitizations (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses"). Defendant MASTR acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements it filed.

423.    UBS Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  UBS Securities offered the Certificates publicly, including selling to Freddie Mac its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

424.    UBS Securities offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they

were made, not misleading.  UBS Securities reviewed and participated in drafting the
Prospectuses.

425.    UBS Securities successfully solicited Freddie Mac's purchases of the GSE
Certificates.  As underwriter, UBS Securities obtained substantial commissions based upon the
amount it received from the sale of the Certificates to the public.

426.    UBS Securities offered the GSE Certificates for sale, sold them, and distributed
them to Freddie Mac in the State of Virginia.

427.    MASTR is prominently identified in the Prospectuses for the Securitizations
carried out under the Registration Statements that it filed.  These Prospectuses were the primary
documents each used to sell Certificates for the Securitizations under those Registration
Statements.  MASTR, a statutory seller, offered the Certificates publicly and actively solicited
their sale, including to Freddie Mac, for the benefit of UBS.

428.    With respect to the Securitizations for which it filed Registration Statements,
MASTR offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained
untrue statements of material facts and omitted to state material facts necessary to make the
statements, in the light of the circumstances under which they were made, not misleading.
MASTR reviewed and participated in drafting the Prospectuses.

429.    Each of UBS Securities and MASTR actively participated in the solicitation of
Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such
solicitation included assisting in preparing the Registration Statements, filing the Registration
Statements, and assisting in marketing the GSE Certificates.

430.   Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

431.   The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

432.   UBS Securities and MASTR offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

433.   UBS Securities owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  MASTR owed the same duty with respect to the Prospectuses for the Securitizations carried out under the Registration Statements it filed.

434.   UBS Securities and MASTR failed to exercise such reasonable care.  These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

435.   In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Freddie Mac would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

436.    Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

437.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FIFTH CAUSE OF ACTION

### Violation of Section 13.1-522(C) of the Virginia Code
### (Against Defendants UBS Real Estate, UBS Americas, and the Individual Defendants)

438.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

439.    This claim is brought by Plaintiff under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac. The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006. This claim is brought against UBS Real Estate, UBS, and the Individual Defendants for controlling-person liability with regard to the Fourth Cause of Action set forth above.

440.    The Individual Defendants at all relevant times participated in the operation and management of MASTR and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of MASTR's business affairs. Defendant David Martin was the President and Chief Executive Officer of Defendant MASTR. Defendant Per Dyrvik was the Managing Director and Principal Accounting and Financial Officer of Defendant MASTR. Defendant Hugh Corcoran was a Managing Director of Defendant MASTR. Defendant Peter Slagowitz was a Managing Director of Defendant MASTR.

441.    Defendant UBS Real Estate was the sponsor for the Securitizations carried out under the Registration Statements filed by MASTR, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting MASTR as the special purpose vehicle, and selecting UBS Securities as underwriter for the Securitizations.  In its role as sponsor, UBS Real Estate knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cash-flows would be issued by the relevant trusts.

442.    Defendant UBS Real Estate also acted as the seller of the mortgage loans for the Securitizations carried out under the Registration Statements filed by Defendant MASTR, in that it conveyed such mortgage loans to MASTR pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

443.    Defendant UBS Real Estate also controlled all aspects of the business of MASTR, as MASTR was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of UBS Real Estate overlapped with the officers and directors of MASTR.  For example, Defendant David Martin was both the President and CEO of MASTR and the Global Head of Residential Mortgage Backed Securitizations and Asset Backed Securitizations for UBS. Likewise, Defendant Peter Slagowitz was both a Managing Director of Defendant MASTR and a Managing Director and Head of Loan Conduits for UBS AG, which wholly owns UBS Americas, and was also a Managing Director at UBS Real Estate.  Similarly, Defendant Per Dyrvik was a Managing Director and Principal Accounting and Financial Officer of Defendant

MASTR, a Managing Director of UBS Securities, and also Managing Director at UBS AG and at UBS Americas. And again, Defendant Hugh Corcoran was a Managing Director of both MASTR and UBS Securities. Thus, the Individual Defendants served in numerous roles and exercised control over multiple Defendants. In addition, because of its position as sponsor, UBS Real Estate was able to, and did in fact, control the contents of the Registration Statements filed by MASTR, including the Prospectuses and Prospectus Supplements, which pertained to the Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

444.    Defendant UBS Americas controlled the business operations of UBS Securities and MASTR. Defendant UBS Americas is the corporate parent of UBS Securities and MASTR. As the sole corporate parent of UBS Securities and MASTR, UBS Americas had the practical ability to direct and control the actions of UBS Securities and MASTR in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of UBS Securities and MASTR in connection with the issuance and sale of the Certificates.

445.    UBS Americas expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

446.    UBS Americas culpably participated in the violations of Section 13.1-522(A)(ii) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as MASTR and the issuing trusts to serve as conduits for the mortgage loans.

447. Defendant UBS Americas wholly owns UBS Real Estate, UBS Securities, and MASTR. UBS Americas culpably participated in the violations of Section 13.1-522(A)(ii) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as MASTR and the issuing trusts to serve as conduits for the mortgage loans.

448. Defendants UBS Americas, UBS Real Estate, and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of UBS Securities and MASTR at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements. By virtue of this coordinated approach across the various Defendants, UBS generated profits at multiple levels of the securitization process.

449. Freddie Mac purchased the Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

450. Freddie Mac did not know of the misstatements and omissions in the Registration Statements. Had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

451. Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

452.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION

### Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
### (Against Defendants UBS Securities and MASTR)

453.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

454.    This claim is brought by Plaintiff pursuant to 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae. The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above that were purchased by Fannie Mae.

455.    This claim is predicated upon UBS Securities' negligence in making false and materially misleading statements in the Prospectuses for each of the Securitizations listed in paragraph 2 (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses"). Defendant MASTR acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements that it filed.

456.    UBS Securities is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates. UBS Securities offered the Certificates publicly, including selling to Fannie Mae its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

457.    UBS Securities offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they

were made, not misleading.  UBS Securities reviewed and participated in drafting the Prospectuses.

458.    UBS Securities successfully solicited Fannie Mae's and purchases of the GSE Certificates.  As underwriter, UBS Securities obtained substantial commissions based upon the amount it received from the sale of the Certificates to the public.

459.    UBS Securities offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

460.    MASTR is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that it filed.  These Prospectuses were the primary documents each used to sell Certificates for the Securitizations under those Registration Statements.  MASTR, a statutory seller, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae, for the benefit of UBS.

461.    With respect to the Securitizations for which it filed Registration Statements, MASTR offered the GSE Certificates to Fannie Mae by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading. MASTR reviewed and participated in drafting the Prospectuses.

462.    Each of UBS Securities and MASTR actively participated in the solicitation of the Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

463.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

464.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

465.    UBS Securities and MASTR offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

466.    UBS Securities owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  MASTR owed the same duty with respect to the Prospectuses for the Securitizations carried out under the Registration Statements filed by it.

467.    UBS Securities and MASTR failed to exercise such reasonable care.  These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

468.    In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Fannie Mae would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

469.   Fannie Mae sustained substantial damages in connection with its investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

470.   The time period since May 20, 2009, is tolled for statute of limitations purposes by virtue of a tolling agreement entered into among Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae, and is thus timely under 12 U.S.C. § 4617(b)(12).

## SEVENTH CAUSE OF ACTION

### Violation of Section 31-5606.05(c) of the District of Columbia Code
### (Against Defendants UBS Real Estate, UBS Americas, and the Individual Defendants)

471.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

472.   This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above, that were purchased by Fannie Mae.  This claim is brought against UBS Real Estate, UBS, and the Individual Defendants for controlling-person liability with regard to the Sixth Cause of Action set forth above.

473.   The Individual Defendants at all relevant times participated in the operation and management of MASTR and their related subsidiaries, and conducted and participated, directly and indirectly, in the conduct of MASTR's business affairs.  Defendant David Martin was the President and Chief Executive Officer of Defendant MASTR.  Defendant Per Dyrvik was the Managing Director and Principal Accounting and Financial Officer of Defendant MASTR.

Defendant Hugh Corcoran was a Managing Director of Defendant MASTR. Defendant Peter Slagowitz was a Managing Director of Defendant MASTR.

474.   Defendant UBS Real Estate was the sponsor for the Securitizations carried out under the Registration Statements filed by MASTR, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting MASTR as the special purpose vehicle, and selecting UBS Securities as underwriter for the Securitizations. In its role as sponsor, UBS Real Estate knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cash-flows would be issued by the relevant trusts.

475.   Defendant UBS Real Estate also acted as the seller of the mortgage loans for the Securitizations carried out under the Registration Statements filed by Defendant MASTR, in that it conveyed such mortgage loans to MASTR pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.

476.   Defendant UBS Real Estate also controlled all aspects of the business of MASTR, as MASTR was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of UBS Real Estate overlapped with the officers and directors of MASTR. For example, Defendant David Martin was both the President and CEO of MASTR and the Global Head of Residential Mortgage Backed Securitizations and Asset Backed Securitizations for UBS. Likewise, Defendant Peter Slagowitz was both a Managing Director of Defendant MASTR and a Managing Director and Head of Loan Conduits for UBS AG, which wholly owns UBS

Americas, and was also a Managing Director at UBS Real Estate. Similarly, Defendant Per

Dyrvik was a Managing Director and Principal Accounting and Financial Officer of Defendant

MASTR, a Managing Director of UBS Securities, and also Managing Director at UBS AG and at

UBS Americas. And again, Defendant Hugh Corcoran was a Managing Director of both

MASTR and UBS Securities. Thus, the Individual Defendants served in numerous roles and

exercised control over multiple Defendants. In addition, because of its position as sponsor, UBS

Real Estate was able to, and did in fact, control the contents of the Registration Statements filed

by MASTR, including the Prospectuses and Prospectus Supplements, which pertained to the

Securitizations and which contained material misstatements of fact and omitted facts necessary

to make the facts stated therein not misleading.

477. Defendant UBS Americas controlled the business operations of UBS Securities

and MASTR. Defendant UBS Americas is the corporate parent of UBS Securities and MASTR.

As the sole corporate parent of UBS Securities and MASTR, UBS Americas had the practical

ability to direct and control the actions of UBS Securities and MASTR in issuing and selling the

Certificates, and in fact exercised such direction and control over the activities of UBS Securities

and MASTR in connection with the issuance and sale of the Certificates.

478. UBS Americas expanded its share of the residential mortgage-backed

securitization market in order to increase revenue and profits. The push to securitize large

volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and

omissions of material facts in the Registration Statements.

479. Defendant UBS Americas wholly owns UBS Real Estate, UBS Securities, and

MASTR. UBS Americas culpably participated in the violations of Section 31-5606.05(a)(1)(B)

set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the

mortgage loans' characteristics in the Registration Statements and established special-purpose

financial entities such as MASTR and the issuing trusts to serve as conduits for the mortgage

loans.

480.    Defendants UBS Americas, UBS Real Estate, and the Individual Defendants are

controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power

over, control of, ownership of, and/or directorship of UBS Securities and MASTR at the time of

the wrongs alleged herein and as set forth herein, including their control over the content of the

Registration Statements. By virtue of this coordinated approach across the various Defendants,

UBS generated profits at multiple levels of the securitization process.

481.    Fannie Mae purchased the Certificates issued pursuant to the Registration

Statements, including the Prospectuses and Prospectus Supplements, which, at the time they

became effective, contained material misstatements of fact and omitted facts necessary to make

the facts stated therein not misleading.  The facts misstated and omitted were material to a

reasonable investor reviewing the Registration Statements.

482.    Fannie Mae did not know of the misstatements and omissions in the Registration

Statements.  Had Fannie Mae known of those misstatements and omissions, it would not have

purchased the GSE Certificates.

483.    Fannie Mae has sustained damages as a result of the misstatements and omissions

in the Registration Statements, for which it is entitled to compensation.

484.    The time period since May 20, 2009, is tolled for statute of limitations purposes

by virtue of a tolling agreement entered into among Fannie Mae, UBS Securities, UBS Real

Estate, and MASTR.  In addition, this action is brought within three years of the date that the

FHFA was appointed as Conservator of Fannie Mae and is thus timely under 12 U.S.C. § 4617(b)(12).

## EIGHTH CAUSE OF ACTION

### Common Law Negligent Misrepresentation
### (Against Defendants UBS Securities and MASTR)

485.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

486.    This is a claim for common law negligent misrepresentation against Defendants UBS Securities and MASTR.

487.    Between September 28, 2005 and August 30, 2007, UBS Securities and MASTR sold the GSE Certificates to the GSEs as described above.  Because MASTR owned and then conveyed the underlying mortgage loans that collateralized the Securitizations for which it served as depositor, MASTR had unique, exclusive, and special knowledge about the mortgage loans in the Securitizations through its possession of the loan files and other documentation.

488.    Likewise, as underwriter for the Securitizations, UBS Securities was obligated to—and had the opportunity to—perform sufficient due diligence to ensure that the Registration Statements for those Securitizations, including without limitation the corresponding Prospectus Supplements, did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading  As a result of this privileged position as underwriter—which gave it access to loan file information and obligated it to perform adequate due diligence to ensure the accuracy of the Registration Statements—UBS Securities had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.

489.    UBS Securities also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, who identified significant failures of originators to adhere to the underwriting standards represented in the Registration Statements. The GSEs, like other investors, had no access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates. Accordingly, when determining whether to purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis. The GSEs therefore reasonably relied on UBS Securities' knowledge and its express representations made prior to the closing of the Securitizations regarding the underlying mortgage loans.

490.    In many cases, UBS Securities and MASTR structured the Securitizations, at both a loan pool and tranche level, to conform with the GSEs' charter and other restrictions on the purchase of residential mortgage-backed securities. By purporting to conform and customize portions of the Securitizations to the particular requirements of each GSE, UBS Securities and MASTR repeatedly and intentionally exploited a special relationship of trust between themselves and the GSEs.

491.    UBS Securities and MASTR were aware that the GSEs reasonably relied on UBS Securities' and MASTR's reputations and unique, exclusive, and special expertise and experience, as well as their express representations made prior to the closing of the Securitizations, and that the GSEs depended upon these Defendants for complete, accurate, and timely information. The standards under which the underlying mortgage loans were actually originated were known to these Defendants and were not known, and could not be determined, by the GSEs prior to the closing of the Securitizations.

492.    Based upon their unique, exclusive, and special knowledge and expertise about the loans held by the trusts in the Securitizations, UBS Securities and MASTR had a duty to provide the GSEs complete, accurate, and timely information regarding the mortgage loans and the Securitizations.  UBS Securities and MASTR negligently breached their duty to provide such information to the GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or otherwise misrepresenting to the GSEs material facts about the Securitizations.  The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.

493.    In addition, having made actual representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, UBS Securities and MASTR had a duty to correct misimpressions left by their statements, including with respect to any "half truths."  The GSEs were entitled to rely upon UBS Securities and MASTR's representations about the Securitizations, and these Defendants failed to correct in a timely manner any of their misstatements or half truths, including misrepresentations as to compliance with underwriting guidelines for the mortgage loans.

494.    Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by UBS as the sponsor, depositor, and lead and selling underwriter in all 16 of the UBS-sponsored Securitizations.  Upon information and belief, UBS provided term sheets to the GSEs that contained critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value

ratios for the underlying collateral, and owner occupancy statistics. This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

495.    The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements. In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by UBS Real Estate and UBS Securities relating to the collateral quality of the underlying loans and the structure of the Securitization. These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

496.    UBS, as sponsor, depositor, and lead and selling underwriter in all 16 of the UBS-sponsored Securitizations, provided detailed information about the underlying collateral and structure of each Securitization it sponsored to the credit rating agencies. The credit rating agencies based their ratings on the information provided to them by UBS, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information. The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of UBS's representations in the term sheets and Prospectus Supplements.

497.    In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements. Compliance with underwriting guidelines was a precondition to the GSE's purchase of the GSE Certificates in that the GSEs' decision to

purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

498.    In purchasing the GSE Certificates, the GSEs justifiably relied on UBS's false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

499.    But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

500.    The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of UBS Securities' and MASTR's misrepresentations, including any half truths.

501.    The time period since May 20, 2009, is tolled for statute of limitations purposes by virtue of a tolling agreement entered into among Fannie Mae, UBS Securities, UBS Real Estate, and MASTR.  In addition, this action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

502.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.       Rescission and recovery of the consideration paid for the GSE

Certificates, with interest thereon;

      b.    Each GSE's monetary losses, including any diminution in value of the GSE Certificates, as well as lost principal and lost interest payments thereon;

      c.    Attorneys' fees and costs;

      d.    Prejudgment interest at the maximum legal rate; and

      e.    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

503.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:   New York, New York
         December 21, 2011

                           QUINN EMANUEL URQUHART &
                           SULLIVAN, LLP


                           By: _____
                               Philippe Z. Selendy
                               Adam M. Abensohn
                               Manisha M. Sheth

                           51 Madison Avenue, 22nd Floor
                           New York, New York  10010-1601
                           (212) 849-7000

                           *Attorneys for Plaintiff FHFA*