# Exhibit B

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### NON-PROSECUTION AGREEMENT

1.　　This agreement arises out of an investigation by the Division of Enforcement (the "Division") of the United States Securities and Exchange Commission (the "Commission") into possible violations of the federal securities laws by the Federal Home Loan Mortgage Corporation (the "Respondent" or "Freddie Mac") and others that occurred in or about December 2006 through September 6, 2008, arising from, among other things, public statements concerning Freddie Mac's exposure to Subprime and Alt-A mortgages (collectively, the "Investigation"). Prior to a public enforcement action being brought by the Commission against Freddie Mac, without admitting or denying liability, Respondent has offered to accept responsibility for its conduct and to not dispute, contest, or contradict the factual statements set forth in Exhibit A, as specifically provided herein. Accordingly, the Commission and the Respondent enter into this Non-Prosecution Agreement (the "Agreement").

2.　　The Respondent is a corporation organized and operated under the laws of the United States of America, subject to the ongoing supervision of the Federal Housing Finance Agency ("FHFA"). On September 6, 2008, FHFA placed the Respondent into conservatorship, and as conservator, succeeded to all rights, titles, powers and privileges of the Respondent and its shareholders, officers, and directors with respect to the Respondent and its assets. As conservator, FHFA maintains a continuous on-site presence at the Respondent and provides substantial oversight over the Respondent, including, among other things, with respect to its corporate governance, regulatory compliance and operations. In addition, the United States Treasury has made substantial capital investments in the Respondent and holds senior preferred stock, as well as warrants representing an ownership stake of up to 79.9 percent of the Respondent's common stock.

3.　　In entering into this Agreement, the Commission recognizes the unique circumstances presented by the Respondent's current status, including the financial support provided to the Respondent by the U.S. Treasury, the role of another government agency (FHFA) as conservator, and the costs that may be imposed on U.S. taxpayers. Based on these circumstances and in consideration of the public interest, subject to the full, truthful, and continuing cooperation of the Respondent as described below and its satisfactory performance of all obligations and undertakings herein, the Commission and Respondent enter into this Agreement with the terms and conditions contained herein.

### COOPERATION

4.　　The Respondent agrees to cooperate fully and truthfully in the Investigation and any other related enforcement litigation or proceeding to which the Commission is a party (the "Proceedings"), without regard to the time period in which the cooperation is required ("Cooperation Period"). In addition, the Respondent agrees to cooperate fully and truthfully, when directed by the Division's staff, in any other related official investigation or proceeding by any U.S. federal agency (the "Other Proceedings"). The Respondent acknowledges and

understands that its ongoing cooperation with the Commission is an important and material factor underlying the Commission's decision to enter into this Agreement.  The full, truthful, and continuing cooperation of the Respondent shall include, but not be limited to:

      a.     identifying, assembling, organizing and producing, in a responsive and prompt manner, all non-privileged, non-attorney work-product documents, information, and other materials (including but not limited to providing reports or analyses of data concerning Respondent's models, credit risk reporting or data systems) to the Commission as requested by the Division's staff, wherever located, in the possession, custody, or control of the Respondent;

      b.     providing declarations authenticating all documents, information, and other materials produced to the Commission by Respondent upon request by the Division's staff;

      c.     providing declarations, upon request by the Division's staff, certifying that documents, information, and other materials produced to the Commission by Respondent comply with Federal Rule of Evidence 902(11)(A-C);

      d.     providing Federal Rule of Civil Procedure 30(b)(6) witnesses, and authenticating documents, for the purpose of establishing the facts set forth in Exhibit A;

      e.     using its best efforts to secure the full, truthful, and continuing cooperation, as defined in Paragraph 4, of Freddie Mac's current and former board members, officers, employees and agents, including making these persons available, when requested to do so by the Division's staff, for interviews and the provision of testimony in the investigation, deposition, trial and other judicial proceedings in connection with the Proceedings or Other Proceedings;

      f.     authenticating all documents, information, and other materials identified by the Division's staff, to the extent able to do so;

      g.     responding to all inquiries, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings;

      h.     producing to the Commission, in a responsive and prompt manner, any documents, information and materials not previously produced to the Commission that are provided formally or informally to any party for use in the Proceedings or Other Proceedings at the request of such party or otherwise;

      i.     notifying the Division's staff, in a prompt manner, of the receipt and substance of any request for documents, information or materials by a party to the Proceedings or Other Proceedings or the scheduling or facilitation of interviews or meetings between parties to the Proceedings or Other Proceedings (or their counsel) and any of Freddie Mac's current and former board members, officers, employees and agents in connection with the Proceedings or Other Proceedings;

      j.     maintaining the confidentiality of communications with the Division's staff relating to the cooperation required under paragraphs a-i above, and refusing to enter into, not entering into, modifying or withdrawing from existing formal or informal joint-defense agreements or arrangements with any person relating to the Proceedings or Other Proceedings to

the extent such agreements limit Respondent's ability to provide or share information with the Commission; *and*,

      k.      providing appropriate assistance to the Commission to obtain documents or other information necessary for the Commission to assess and respond to defenses raised in the Proceedings or Other Proceedings.

5.      The full, truthful, and continuing cooperation of each person described in Paragraph 4(e) above will be subject to the procedures and protections of this Paragraph, and shall include, but not be limited to:

      a.      producing all non-privileged documents, information, and other materials as requested by the Division's staff;·

      b.      appearing for interviews, at such times and places as requested by the Division's staff;

      c.      authenticating all documents, information, and other materials identified by the Division's staff, to the extent able to do so;

      d.      responding to all inquiries, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings; *and*,

      e.      testifying at deposition, at trial and in other judicial proceedings, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings.

## STATUTE OF LIMITATIONS

6.      The Respondent agrees that the running of any statute of limitations applicable to any action or proceeding against it authorized, instituted, or brought by or on behalf of the Commission arising out of the Investigation (the "Enforcement Proceeding"), including any sanctions or relief that may be imposed therein, is tolled and suspended during the Cooperation Period.

      a.      The Respondent and any of its attorneys or agents shall not include the Cooperation Period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to the Enforcement Proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense.

      b.      This agreement shall not affect any applicable statute of limitations defense or any other time-related defense that may be available to Respondent before the commencement of the Cooperation Period or be construed to revive an Enforcement Proceeding that may be barred by any applicable statute of limitations or any other time-related defense before the commencement of the Cooperation Period.

      c.      The running of any statute of limitations applicable to the Enforcement Proceeding shall commence again after the end of the Cooperation Period, unless there is an extension of the tolling period executed in writing by or on behalf of the parties hereto.

d.      This agreement shall not be construed as an admission by the Commission relating to the applicability of any statute of limitations to the Enforcement Proceeding, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply, or to the applicability of any other time-related defense.

## UNDERTAKINGS

7.      During the Cooperation Period, the Respondent understands and agrees to perform the following undertakings:

a.      to provide written notification to the Division, within five days, if it has been questioned in the context of an investigation, charged, or convicted of an offense related to the securities laws by any federal, state, or local law enforcement organization or regulatory agency; and

b.      to submit a report to the Division detailing its efforts to identify and implement improved disclosure procedures since being placed into conservatorship on September 6, 2008, and, if requested, to meet with the Division's staff to discuss the report and its progress with respect to its obligations pursuant to this Agreement.

## PUBLIC STATEMENTS

8.      The Respondent agrees not to take any action or to make or permit any public statement through present or future attorneys, employees, agents, or other persons authorized to speak for it ("Related Person"), except in legal proceedings in which the Commission is not a party, denying, directly or indirectly, any aspect of this Agreement or creating the impression that the statements in Exhibit A to this Agreement are without factual basis. This paragraph is not intended to apply to any statement made by an individual in the course of any criminal, civil, or regulatory proceeding initiated by the government or self-regulatory organization against such individual, unless such individual is speaking on behalf of the Respondent.[1]  If it is determined by the Commission that a public statement by the Respondent or any Related Person contradicts in whole or in part this Agreement, at its sole discretion, the Commission may bring an enforcement action in accordance with Paragraphs 15 through 18, but only provided that Respondent does not cure the statement by promptly making appropriate public statements or court filings satisfactory to the Commission after a reasonable opportunity to do so by the Commission.

9.      Prior to issuing any press release concerning this Agreement, the Respondent agrees to have the text of the release approved by the staff of the Division.

## SERVICE

10.     The Respondent agrees to serve by hand delivery or by next-day mail all written notices and correspondence required by or related to this Agreement to Charles Cain, Assistant Director,

---

[1]  Nothing in this Agreement affects Respondent's and Related Person's (i) testimonial obligations or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

4

100 F Street, N.E., Washington, D.C. 20549 ((202) 551-4911), unless otherwise directed in writing by the staff of the Division.

## VIOLATION OF AGREEMENT

11.     The Respondent understands and agrees that it shall be a violation of this Agreement if it knowingly provides false or misleading information or materials in connection with the Proceedings or Other Proceedings. In the event of such misconduct, the Division will advise the Commission of the Respondent's misconduct and may make a criminal referral for providing false information (18 U.S.C. § 1001), contempt (18 U.S.C. §§ 401-402) and/or obstructing justice (18 U.S.C. § 1503 *et seq.*).

12.     The Respondent understands and agrees that should the Division determine that the Respondent has failed materially to comply with any term or condition of this Agreement, the Division will notify the Respondent or its counsel of the fact and provide an opportunity for the Respondent to make a Wells submission pursuant to the Securities Act of 1933 Release No. 5310. Under these circumstances, the Division may, in its sole discretion and not subject to judicial review, recommend to the Commission an enforcement action against the Respondent for any securities law violations, including, but not limited to, the substantive offenses relating to the Investigation.

13.     The Respondent understands and agrees that in any future enforcement action resulting from its violation of the Agreement, any documents, statements, information, testimony, or evidence provided by it during the Investigation, Proceedings or Other Proceedings, and any leads derived there from, may be used against it in future legal proceedings.

14.     In the event it breaches this Agreement, the Respondent agrees not to dispute, contest, or contradict the factual statements contained in Exhibit A, or their admissibility, in any future Commission enforcement action against it.

## COMPLIANCE WITH AGREEMENT

15.     Subject to the full, truthful, and continuing cooperation of the Respondent, as described in Paragraphs 4 and 5, and compliance by Respondent with all obligations, prohibitions and undertakings in this Agreement, the Commission agrees not to bring any enforcement action or proceeding against the Respondent arising from the Investigation. This Agreement should not, however, be deemed to exonerate the Respondent or be construed as a finding by the Commission that violations of the federal securities laws have not occurred.

16.     The Respondent understands and agrees that this Agreement does not bind other U.S. federal, state or self-regulatory organizations, but the Commission may, at its discretion, issue a letter to these organizations detailing the fact, manner, and extent of its cooperation during the Proceedings or Other Proceedings, upon the written request of the Respondent.

17.     The Respondent understands and agrees that if it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such a sale is structured as a stock or asset sale, merger, or transfer during the Cooperation

Period, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser or successor in interest to the obligations set forth in this Agreement.

18.    The Respondent understands and agrees that the Agreement only provides protection against enforcement actions arising from the Investigation and does not relate to any other violations, or to any individual or entity other than the Respondent.

## VOLUNTARY AGREEMENT

19.    The Respondent's decision to enter into this Agreement is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than those contained in this Agreement.

20.    The Respondent has read and understands this Agreement.  Furthermore, the Respondent has reviewed all legal and factual aspects of this matter with its attorney and is fully satisfied with its attorney's legal representation.  The Respondent has thoroughly reviewed this Agreement with its attorney and has received satisfactory explanations concerning each paragraph of the Agreement.  After conferring with its attorney and considering all available alternatives, the Respondent has made a knowing decision to enter into the Agreement.

21.    The Respondent represents that its Board of Directors has duly authorized, in the resolution attached as Exhibit B to this Agreement, the execution and delivery of this Agreement, and that the person signing this Agreement has authority to bind the Respondent.

## ENTIRETY OF AGREEMENT

22.    This Agreement constitutes the entire agreement between the Commission and the Respondent, and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein.

23.    This Agreement cannot be modified except in writing, signed by the Respondent and an authorized representative of the Commission.

24.    This agreement may be executed in counterparts.

25.    In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring the Commission or the Respondent by virtue of the authorship of any of the provisions of the Agreement.

The signatories below acknowledge acceptance of the foregoing terms and conditions.

RESPONDENT:

| | |
|---|---|
| _12/13/11_<br>Date | *Charles Edgar Haldeman, J*<br>Charles E. Haldeman, Jr.<br>CEO, Freddie Mac<br>8200 Jones Branch Drive<br>McLean, VA<br>22102-3110 |

Attached hereto is the Certificate of the Secretary to the Board of Directors of Freddie Mac, certifying that Charles E. Haldeman, Jr. is, and at the time of the signing and delivery of the Agreement was, the duly appointed, qualified and acting Chief Executive Officer of Freddie Mac and duly authorized to execute the Agreement on behalf of Freddie Mac, and that the signature of Charles E. Haldeman, Jr. appearing on the Agreement is his genuine signature.

RESPONDENT'S COUNSEL:

Approved as to form:

| | |
|---|---|
| Date | Neal E. Sullivan, Esq.<br>Bingham McCutchen LLP<br>2020 K Street NW<br>Washington, DC  20006-1806 |

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT:

| | |
|---|---|
| Date | Robert Khuzami<br>Director, Enforcement Division<br>United States Securities and Exchange<br>Commission<br>100 F Street, N.E.<br>Washington, D.C. 20549 |

The signatories below acknowledge acceptance of the foregoing terms and conditions.

RESPONDENT:

| Date | Charles E. Haldeman, Jr.<br>CEO, Freddie Mac<br>8200 Jones Branch Drive<br>McLean, VA<br>22102-3110 |
| --- | --- |

Attached hereto is the Certificate of the Secretary to the Board of Directors of Freddie Mac, certifying that Charles E. Haldeman, Jr. is, and at the time of the signing and delivery of the Agreement was, the duly appointed, qualified and acting Chief Executive Officer of Freddie Mac and duly authorized to execute the Agreement on behalf of Freddie Mac, and that the signature of Charles E. Haldeman, Jr. appearing on the Agreement is his genuine signature.

RESPONDENT'S COUNSEL:

Approved as to form:

| Dec 13 2011<br>Date | Neal E. Sullivan, Esq.<br>Bingham McCutchen LLP<br>2020 K Street NW<br>Washington, DC 20006-1806 |
| --- | --- |

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT:

| December 15, 2011<br>Date | Robert Khuzami<br>Director, Enforcement Division<br>United States Securities and Exchange<br>Commission<br>100 F Street, N.E.<br>Washington, D.C. 20549 |
| --- | --- |

7

**EXHIBIT A**

## STATEMENT OF FACTS

### *Freddie Mac*

1.        Federal Home Loan Mortgage Corporation ("Freddie Mac") is a government-sponsored enterprise that was chartered by Congress in 1970 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold.  Freddie Mac manages its business through three reportable segments: (1) single-family guarantee, (2) multifamily, and (3) investments.  Freddie Mac's primary business segment is its single-family guarantee portfolio, through which it guarantees the payment of principal and interest on single-family mortgage related securities, in exchange for guarantee fees.  The single family business purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them as Freddie Mac mortgage-backed securities, known as Participation Certificates ("PCs").  Freddie Mac guarantees the payment of principal and interest on the mortgage loans that underlie these PCs.  The multifamily segment activities include purchases of multifamily mortgages for investment and guarantees of payments of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds.  Through the investment segment, which includes the retained portfolio, the company invests principally in mortgage-related securities and single-family mortgages, including its own PCs.

2.        In or about November 2007, Freddie Mac began reporting significant credit losses in its portfolio of mortgage-related assets and guaranty contracts.  On November 20, 2007, Freddie Mac reported a net loss of $2 billion, which reflected "a higher provision for credit losses and losses on mark-to-market items."  For the period January 1, 2007 through March 31, 2011, Freddie Mac reported cumulative net losses of $88.1 billion.

3.        From 1992 until July 30, 2008, Freddie Mac's primary regulator was the Office of Federal Housing Enterprise Oversight.

4.        On July 30, 2008, when the President signed into law the Housing and Economic Recovery Act of 2008, the Federal Housing Finance Agency ("FHFA") became Freddie Mac's primary regulator.  On September 6, 2008, FHFA placed Freddie Mac into conservatorship, and as conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, its shareholders, and the officers or directors of Freddie Mac with respect to the company and its assets.

5.        On July 8, 2010, Freddie Mac's common stock was delisted from the New York Stock Exchange.  Freddie Mac's common stock presently is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the ticker symbol "FMCC."  Freddie Mac's debt securities are actively traded in the over-the-counter market.

6.        From March 23, 2007 through August 6, 2008 (the "Relevant Period"), Freddie Mac published mortgage credit risk disclosures in annual information statements and periodic information statement supplements posted on its website and, as of August 6, 2008, in periodic

filings with the Securities and Exchange Commission.  These disclosures included information on Freddie Mac's single-family credit guarantee portfolio which consisted of mortgage loans and PCs backed by mortgage loans (whether held in its portfolio or by third parties).

7.    During the Relevant Period, Freddie Mac provided disclosures regarding its exposure to Alt-A and subprime mortgage loans in its single-family mortgage credit guarantee portfolio.

### *Subprime Disclosures*

8.    During the Relevant Period, Loan Prospector ("LP") was Freddie Mac's proprietary automated underwriting system ("AUS").  Loan originators used LP to obtain an AUS score, which could be used to determine the terms on which a loan could be sold to Freddie Mac.  For example, whether a loan could be sold to Freddie Mac without certain representations and warranties or without additional cost.

9.    LP was based on performance models calibrated to loans in Freddie Mac's guarantee portfolio and to other data acquired by Freddie Mac.  Using these models, LP generated a score reflecting an estimate of the risk of default associated with loans.  Freddie Mac grouped these numerical scores into six bands or "grades," roughly corresponding to the level of anticipated risk:  A+, A1, A2, A3, C1 or C2.  The first four categories were called "Accept" loans; the C1 and C2 categories were designated "Caution" loans.  In general, loans categorized as C1 or C2 were those with multiple higher risk characteristics, such as high LTVs, low FICOs, unusual property types or high debt-to-income ratios.

10.    In 1998, Freddie Mac developed its "A-minus" offering under which a loan that scored C1 under LP could be sold to Freddie Mac on the same terms as an Accept loan with the payment of an additional fee by the seller.  Contemporaneous Freddie Mac internal documents described A-minus loans as comprising "approximately 50 percent of subprime loans," and as "[m]ortgages that generally comprise the first and second tier of subprime lender risk grades."

11.    As of November 1998, an internal Freddie Mac document titled Credit Policy Book described mortgage loans that received an LP C2 rating as having a credit quality of "subprime."

12.    In 1999, in order to manage the company's risk exposure to "traditional subprime residential mortgages," Freddie Mac developed a model to estimate the likelihood that a loan was being made to someone who traditionally would have borrowed through the subprime channel.  The model scored mortgage loans on a variety of credit risk characteristics, such as debt ratio, FICOs, and time since most recent foreclosure, and generated a "subprime score" which, if the score was below certain thresholds, resulted in an automatic LP rating of C1 or C2. In addition, the model contained certain overrides that required a mortgage loan to receive an LP C1 or C2 rating if certain characteristics were present, such as a debt-to-income ratio greater than 50 percent, assuming that the loan did not possess certain specific mitigating factors.

13.     During the Relevant Period, Freddie Mac also purchased loans that qualified under the Federal National Mortgage Association ("Fannie Mae") Expanded Approval ("EA") program.  On August 17, 2005, a direct report to Freddie Mac's Senior Vice President, Credit Policy & Portfolio Management, signed an internal policy document authorizing increased purchases of EA loans.  Comments by the direct report to Freddie Mac's SVP for Credit Policy and others annexed to the document stated:

- "[B]ased on an analysis of available data, there is also high risk associated with the purchase of EA Mortgages, since performance compares to subprime products."

- "[EA loans] appear to be subprime in nature."

14.     On August 20, 2007, Freddie Mac's SVP, Credit Policy & Portfolio Management ("SVP for Credit Policy"), described EA loans as "clearly subprime."

15.     The approximate aggregate amount (in billions of U.S. dollars), measured by unpaid principal balance, of C1, C2 and EA loans on Freddie Mac's single-family credit guarantee book at the end of the following periods was as follows:

| Single-Family Guarantee Portfolio | | | | | | |
|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 1Q05 | $1 | $39 | $35 | $74 | $75 | $1,220 | 6% |
| 2Q05 | $1 | $42 | $37 | $79 | $80 | $1,244 | 6% |
| 3Q05 | $1 | $47 | $39 | $86 | $87 | $1,274 | 7% |
| 4Q05 | $2 | $53 | $42 | $95 | $97 | $1,318 | 7% |
| 1Q06 | $2 | $60 | $47 | $107 | $109 | $1,360 | 8% |
| 2Q06 | $2 | $64 | $50 | $114 | $116 | $1,387 | 8% |

3

| | | | Single-Family Guarantee Portfolio | | | |
|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 3Q06 | $2 | $71 | $54 | $125 | $127 | $1,428 | 9% |
| 4Q06 | $3 | $78 | $60 | $138 | $141 | $1,467 | 10% |
| 1Q07 | $4 | $89 | $67 | $156 | $160 | $1,528 | 10% |
| 2Q07 | $6 | $100 | $77 | $177 | $183 | $1,586 | 12% |
| 3Q07 | $8 | $110 | $88 | $198 | $206 | $1,642 | 13% |
| 4Q07 | $11 | $118 | $98 | $216 | $227 | $1,692 | 13% |
| 1Q08 | $11 | $123 | $104 | $227 | $238 | $1,739 | 14% |
| 2Q08 | $11 | $127 | $106 | $233 | $244 | $1,784 | 14% |

16.     During the Relevant Period, Freddie Mac's single-family guarantee segment entered into contracts with certain larger customers that required the companies to sell to or securitize with Freddie Mac a specified minimum share of their eligible loan originations, subject to certain conditions and exclusions. The purchase and securitization of mortgage loans from customers under these longer-term contracts had fixed pricing schedules for Freddie Mac's guarantee fees that were negotiated at the outset of the contract. Freddie Mac referred to these transactions as "flow" activity (the "flow channel"), which represented the majority of Freddie Mac's purchase volumes during the Relevant Period. The remainder of Freddie Mac's purchases and securitizations of mortgage loans during the Relevant Period occurred in "bulk" transactions for which purchase prices and guarantee fees were negotiated on an individual transaction basis.

4

17.     During the Relevant Period, in addition to purchasing and guaranteeing the payment of principal and interest on loans that had been underwritten using Loan Prospector, Freddie Mac also purchased and guaranteed the payment of principal and interest on loans underwritten using automated underwriting systems created by others.

18.     During the Relevant Period, Freddie Mac tracked, in senior-level presentations and other documents, the relative risk of mortgages purchased through automated underwriting systems other than Loan Prospector.  Freddie Mac used an internal modeling system called LP Emulator to conduct a post-purchase evaluation of all loans.  Freddie Mac used the term "defect rate" to track the percentage of all loans purchased on terms equivalent to LP "Accept" loans that were scored by the LP Emulator as "Caution."  The designation as part of a "defect rate" signified that, among other things, Freddie Mac was taking on greater credit risk than projected by the original assessment.

19.     In the second quarter of 2003, Freddie Mac's aggregate defect rate of purchases from the flow channel was at 1.1 percent.  As Freddie Mac's share of residential mortgages purchased through automated underwriting systems other than LP increased, however, so did the defect rate.  In August 2007, the aggregate defect rate of all purchases from the flow channel was 21.1%.

20.     During a June 7, 2007 Board committee meeting attended by Freddie Mac's Executive Vice President, Investments and Capital Markets (and later Chief Business Officer) (the "CBO"), and the SVP for Credit Policy, among others, the following information was presented:

- As of January 2007, approximately 40 percent of Freddie Mac's flow channel purchases came through Fannie Mae's own proprietary automated underwriting system, called Desktop Underwriter ("DU"), and through an automated underwriting system used by Countrywide Financial Corporation ("Countrywide"), called "CLUES."

- "Fannie Mae-approve loans have a much higher defect rate than Freddie Mac-accept loans[.]"

- "Fannie Mae-approves have higher share of low FICO loans and subprime-like loans[.]"

- "Countrywide is particularly volatile and a high proportion of defects are subprime in nature[.]"

- The defect rate for Freddie Mac's purchases through both DU and CLUES at that time was at least 20 percent.

21.     During the Relevant Period, one of Freddie Mac's largest customers was Countrywide.  Countrywide organized its business into two channels – the "Retail" channel and the "TPO" (third-party originator) channel.  Countrywide's Retail channel included Full Spectrum Lending.  Full Spectrum Lending was a subprime lending division.

5

22.    Countrywide delivered loans from both of its origination channels to Freddie Mac. Countrywide Retail deliveries to Freddie Mac included approximately $3 billion worth of loans from Full Spectrum Lending in 2006; $6 billion in 2007; and $2 billion in 2008.

23.    Beginning in or about early 2007, executive-level reports prepared for monthly meetings of Freddie Mac's Enterprise Risk Management Committee (the "ERMC") attended by senior executives at Freddie Mac observed that "[l]oan level risk grades are blurred as capital retreats in [the] subprime market, increasing the risk that we are already purchasing subprime loans under existing acquisition programs." This language continued to appear in essentially the same form in these reports throughout 2007. Freddie Mac's Chief Executive Officer and Chairman of the Board of Directors (the "CEO"), Freddie Mac's Chief Financial Officer (the "CFO"), and the CBO generally attended these ERMC meetings.

24.    In February 2007, Freddie Mac's senior executives, including the CEO, CFO, CBO and the SVP for Credit Policy, attended a two-day offsite meeting. A presentation used at the meeting stated the following:

- Freddie Mac was "taking on more risky product . . .and combining higher-risk loans with higher-risk borrowers[.]"

- Freddie Mac was purchasing and guaranteeing increasing amounts of "risk layering" loans, "leading to more 'Cautions[.]'"

- "'Caution' loans have greater default costs . . . resulting in higher expected losses[.]"

- Freddie Mac "already purchase[d] subprime-like loans . . .but with considerably lower fees[.]"

- The "worst 10% of [Freddie Mac's] Flow Business" were "subprime-like loans[.]"

25.    In March 2007, Freddie Mac's senior executives, including the CEO, CFO, CBO and SVP for Credit Policy, attended a Board of Directors meeting. The CBO and the former President and Chief Operating Officer (the "COO") led a discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow Business" was listed as an example of "subprime-like loans" the company already purchased, and in which they conveyed:

- "We already purchase subprime-like loans to help achieve our HUD goals . . . [b]ut we receive considerably lower fees than subprime loans would fetch in the market."

- "Some of our current purchases have subprime-like risk[.]"

- "[F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, with returns five to six times as great, not universal for all subprime."

6

26.     On March 23, 2007, Freddie Mac published its Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2006 (the "2006 IS"). Freddie Mac stated in the 2006 IS that:

> Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by increasing the availability of mortgage credit.

> While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

> With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages. However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement based on their structure and more than 99.9 percent of these securities were rated AAA at December 31, 2006.

27.     The same day that Freddie Mac released the 2006 IS, it held an earnings conference call with research analysts. On the earnings conference call, Freddie Mac's CFO discussed the company's "very low levels" of credit-related expenses, and attributed that "to the fact that our portfolio is predominantly based on long-term fixed-rate mortgages, our overall average LTV ratio is about 57 percent, and we have little to no exposure to the subprime risk layered mortgage products that have drawn so much activity lately."

7

28.     At December 31, 2006, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $141 billion of C1, C2 and EA loans, which equated to approximately 10 percent of Freddie Mac's single-family credit guarantee portfolio.  As described above, Freddie Mac disclosed in its 2006 IS that the number of subprime loans underlying the PCs and Structured Securities in its single-family credit guarantee portfolio was "not significant."

29.     During 2007, Freddie Mac internally explored the possibility of offering a new product, referred to as the "model subprime offering."

30.     One project undertaken by the team charged with developing the model subprime offering involved an analysis of Freddie Mac's existing products.  Those existing products were compared to the proposed parameters for purchasing and guaranteeing mortgages under the model subprime offering.  Under the direction of Freddie Mac's SVP for Credit Policy, the team concluded in June 2007 that:

- "Subprime mortgages are not considered unique in the industry.  An analysis of Freddie Mac's existing products indicates our current A-minus offering has credit risk and product parameters (business terms) that match, and in some cases, are broader than those outlined in the proposed model Subprime offering."

- The model subprime offering "will compete with affordable offerings like Home Possible and [Fannie Mae's] MyCommunityMortgage, as well as our LP A-minus offering and [Fannie Mae's] newly revamped EA program."

31.     Senior executives and officials within Freddie Mac, including Freddie Mac's CBO, were aware of the conclusions of this analysis.

32.     On May 11, 2007, the then-head of External Reporting, in an e-mail including Freddie Mac's SVP for Credit Policy, among others, remarked on a draft version of a speech to be given by Freddie Mac's CEO at the UBS Global Financial Services Conference (the "UBS Conference"): "We need to be careful how we word this.  Certainly our portfolio includes loans that under some definitions would be considered subprime.  Look back at the subprime language in the annual report and use that as a guide as what to say.  Basically, we said we don't have a definition of subprime and we don't acquire loans from subprime lenders.  We should reconsider making as sweeping a statement as we have 'basically no subprime exposure.'"

33.     On May 14, 2007, Freddie Mac's CEO spoke at the UBS Conference (the "May 14 speech") and stated:  "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

34.     On May 17, 2007, Freddie Mac's CBO gave a speech at the Lehman Brothers 10th Annual Financial Services Conference (the "May 17 speech") and stated:  "As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained portfolio."

35.     Freddie Mac's single-family credit guarantee portfolio is the Company's largest business segment (by portfolio unpaid principal balance), which purchases and guarantees the payment of principal and interest on mortgage loans originated by lenders and packages such loans into mortgage-backed securities. Freddie Mac's retained portfolio is under the Company's Investments segment, and holds mortgage-related securities and single-family mortgages for investment purposes.

36.     On June 14, 2007, Freddie Mac published its Financial Report for the Three Months Ended March 31, 2007 (the "1Q07 ISS"). In the 1Q07 ISS, Freddie Mac did not include any statement regarding its exposure to subprime loans in its single-family credit guarantee portfolio.

37.     On the same day that Freddie Mac released its 1Q07 ISS, Freddie Mac held a conference call to discuss its earnings for the quarter ended March 31, 2007. On that call, Freddie Mac's CFO stated that "[a]t the end of the first quarter, our total reserves for credit loss stood at $545 million or roughly 3 basis points of the total mortgage portfolio. . . . Just a reminder – we do not hold subprime loans directly so there is no contribution in the numbers I just mentioned from subprime. Also, we continue to expect no losses from our subprime-backed AAA-rated ABS security exposure."

38.     In a memorandum dated June 15, 2007, the Chair of Freddie Mac's Disclosure Committee informed the Chair of Freddie Mac's Audit Committee that there was no clear definition of subprime loans in the market.

39.     At March 31, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $160 billion of C1, C2 and EA loans, which equated to approximately 10 percent of Freddie Mac's single-family credit guarantee portfolio. As described above, in the 1Q07 ISS, Freddie Mac did not include any statement regarding its subprime exposure in its single-family guarantee portfolio.

40.     On August 30, 2007, Freddie Mac published its Financial Report for the Three and Six Months Ended June 30, 2007 (the "2Q07 ISS"). Freddie Mac stated in the 2Q07 ISS that:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.

We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.

With respect to our Retained portfolio, at June 30, 2007 and December 31, 2006, we held investments of approximately $119 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans.   These securities include significant credit enhancement, particularly through subordination, and approximately 99.9 percent of these securities held at June 30, 2007, were rated AAA at August 27, 2007.

41.     At June 30, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $182 billion of C1, C2 and EA loans, which equated to approximately 12 percent of Freddie Mac's single-family credit guarantee portfolio. As described above, when describing its single-family credit guarantee portfolio, Freddie Mac disclosed in its 2Q07 ISS that, at June 30, 2007, it had approximately $2 billion, or 0.1 percent, of loans underlying its single-family credit guarantee portfolio that were classified as subprime mortgage loans.  Freddie Mac made no other disclosure in its 2Q07 ISS quantifying its subprime exposure in its single-family credit guarantee book of business as of June 30, 2007.

42.     On November 20, 2007, Freddie Mac published its Financial Report for the Three and Nine Months Ended September 30, 2007 (the "3Q07 ISS").  Freddie Mac stated in the 3Q07 ISS that:

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.    The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.  The subprime market helps certain borrowers by broadening the availability of mortgage credit.

We estimate that approximately $5 billion and $3 billion of loans underlying our Structured Transactions at September 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.    With respect to our retained portfolio, at September 30, 2007 and December 31, 2006, we held investments of approximately $105 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans.

10

These securities include significant credit enhancement, particularly through subordination, and approximately 97.6% of these securities were rated AAA at November 15, 2007.

Between September 30 and November 15, 2007, credit ratings for several mortgage-related securities backed by subprime loans with an aggregate unpaid principal balance of $2.5 billion were downgraded from AAA to a lesser investment-grade rating by at least one nationally recognized statistical rating organization. To date, we have not recorded any impairment charges on these securities because we have the ability and intent to hold these securities for a period of time sufficient to recover all unrealized losses; however, since these are designated as available-for-sale securities, there are $55 million of unrealized losses, net as of September 30, 2007 that are reflected in AOCI. We expect that these and any further credit downgrades of our non-agency mortgage-related securities backed by subprime loans will result in declines in their fair value.

43.     At September 30, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $206 billion of C1, C2 and EA loans, which equated to approximately 13 percent of Freddie Mac's single-family credit guarantee portfolio. As described above, when describing its single-family credit guarantee portfolio, Freddie Mac disclosed in its 3Q07 ISS that at September 30, 2007, it had approximately $5 billion of loans underlying its Structured Transactions that were classified as subprime mortgage loans. Freddie Mac made no other disclosure in its 3Q07 ISS quantifying its subprime exposure in its single-family credit guarantee book of business as of September 30, 2007.

44.     On December 11, 2007, Freddie Mac's CEO gave a speech at the Goldman Sachs Financial Services Conference (the "December 11 speech"), during which he stated: "Finally, we feel that our credit position in the current guarantee book, actually, is very near the best of the entire industry. A very major reason for this is that we have very low exposures to alt A in risk-layered mortgage products in the guarantee business. We didn't do any subprime business." Later, in response to a question from the audience, the CEO added "[i]n terms of our insight in the subprime stuff, we didn't buy any subprime loans. I mean, we bought some securities, which we can go through, and we think we're fine in. We bought them for goal purposes. But we didn't buy in [sic] guarantee, essentially any subprime loans. So we weren't in that business."

45.     On February 28, 2008, Freddie Mac published its Information Statement and Annual Report to Stockholders for the fiscal year ended December 31, 2007 (the "2007 IS"). Freddie Mac stated in the 2007 IS that:

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves

11

borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.   The subprime market helps certain borrowers by broadening the availability of mortgage credit.

While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk.   See "*Mortgage Portfolio Characteristics — Higher Risk Combinations*" for further information.   We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were classified as subprime mortgage loans.   To support our mission, we announced in April 2007 that we will purchase up to $20 billion in fixed-rate and hybrid ARM products that will provide lenders with more choices to offer subprime borrowers.   The products are intended to be consumer-friendly mortgages for borrowers that will limit payment shock by offering reduced adjustable-rate margins, longer fixed-rate terms and longer reset periods than existing similar products.   Subsequent to our announcement, we have entered into purchase commitments of $207 million of mortgages on primary residence, single-family properties specifically pursuant to this commitment.   We also fulfill this commitment through purchases of refinance mortgages made to credit challenged borrowers, who may have previously been served by the subprime mortgage market.   As of December 31, 2007, we have purchased approximately $43 billion of conventional mortgages made to borrowers who otherwise might have been limited to subprime products, including approximately $23 billion of refinance mortgages meeting our criteria.

With respect to our retained portfolio, at December 31, 2007 and 2006, we held investments of approximately $101 billion and $122 billion, respectively, of non-agency mortgage-related securities backed by subprime loans.   These securities include significant credit enhancement, particularly through subordination, and 81% of these securities were AAA-rated at February 25, 2008.   During 2007, we recognized $10 million of credit losses as impairment expense on these securities related to four positions that were below AAA-rated at acquisition.   The net unrealized losses, net of tax, on the remaining securities that are below AAA-rated are included in AOCI and totaled $504 million as of December 31,

2007.  Between December 31, 2007 and February 25, 2008, credit ratings for mortgage-related securities backed by subprime loans with an aggregate unpaid principal balance of $16 billion were downgraded by at least one nationally recognized statistical rating organization.  In addition, there were $5 billion of unrealized losses, net of tax, associated with AAA-rated, non-agency mortgage-related securities backed by subprime collateral that are principally a result of decreased liquidity in the subprime market. The extent and duration of the decline in fair value of these securities relative to our cost have met our criteria that indicate the impairment of these securities is temporary.  However, if market conditions continue to deteriorate, further credit downgrades to our non-agency mortgage-related securities backed by subprime loans could occur and may result in additional declines in their fair value.

46.    Freddie Mac's "Higher Risk Combinations" disclosure stated that, as of December 31, 2007, approximately one percent of single-family mortgage loans it guaranteed were made to borrowers with credit scores below 620 and had original LTV ratios above 90 percent at the time of mortgage origination.

47.    At December 31, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $226 billion of C1, C2 and EA loans, which equated to approximately 13 percent of Freddie Mac's single-family credit guarantee portfolio.  As described above, when describing its single-family credit guarantee portfolio, Freddie Mac disclosed in its 2007 IS that at December 31, 2007, it had approximately $6 billion of loans underlying its Structured Transactions that were classified as subprime mortgage loans.  Freddie Mac made no other disclosure in its 2007 IS quantifying its subprime exposure in its single-family credit guarantee book of business as of December 31, 2007.

48.    On May 14, 2008, Freddie Mac published its Financial Report for the Three Months Ended March 31, 2008 (the "1Q08 ISS").  Freddie Mac stated in the 1Q08 ISS that:

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime.  The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.   The subprime market helps certain borrowers by broadening the availability of mortgage credit.  While we have not historically characterized the single-family loans underlying our

13

PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see *Higher Risk Combinations*" for further information). In addition, we estimate that approximately $4 billion of security collateral underlying our Structured Transactions at both March 31, 2008 and December 31, 2007 were classified as subprime.

With respect to our retained portfolio, at March 31, 2008 and December 31, 2007, we held investments of approximately $93 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement, particularly through subordination, and 70% and 96% of these securities were AAA-rated at March 31, 2008 and December 31, 2007, respectively. The unrealized losses, net of tax, on these securities that are below AAA-rated are included in AOCI and totaled $5 billion and $504 million as of March 31, 2008 and December 31, 2007, respectively. In addition, there were $6 billion of unrealized losses, net of tax, included in AOCI on these securities that are AAA-rated, principally as a result of decreased liquidity and larger risk premiums in the subprime market. We receive substantial monthly remittances of principal repayments on these securities, which totaled more than $8 billion during the first quarter of 2008.

49.    At March 31, 2008, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $239 billion of C1, C2 and EA loans, which equated to approximately 14 percent of Freddie Mac's single-family credit guarantee portfolio. As described above, when describing its single-family credit guarantee portfolio, Freddie Mac disclosed in its 1Q08 ISS that at March 31, 2008, it had approximately $4 billion of security collateral underlying its Structured Transactions that were classified as subprime. Freddie Mac made no other disclosure in its 1Q08 ISS quantifying its subprime exposure in its single-family credit guarantee book of business as of March 31, 2008.

50.    On July 18, 2008, Freddie Mac filed a Form 10 Registration Statement with the Commission ("Form 10"). In its Form 10, Freddie Mac repeated verbatim the subprime disclosure from Freddie Mac's 2007 IS, described above at paragraph 45.

51.    Freddie Mac's first periodic report following its registration with the Commission occurred on August 6, 2008, when it filed a Form 10-Q for the quarterly period ended June 30, 2008 (the "2Q08 10-Q"). Freddie Mac stated in the 2Q08 10-Q that:

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves

14

borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit. While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Combinations*" for further information). In addition, we estimate that approximately $6 billion of security collateral underlying our Structured Transactions at both June 30, 2008 and December 31, 2007 were classified as subprime.

With respect to our retained portfolio, at June 30, 2008 and December 31, 2007, we held investments of approximately $86 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement, particularly through subordination, and 91% and 100% of these securities were investment grade at June 30, 2008 and December 31, 2007, respectively. During 2008, the credit characteristics of these securities have experienced significant and rapid declines. See "CONSOLIDATED BALANCE SHEET ANALYSIS — Retained Portfolio" for further discussion and our evaluation of these securities for impairment.

52.     At June 30, 2008, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $244 billion of C1, C2 and EA loans, which equated to approximately 14 percent of Freddie Mac's single-family credit guarantee portfolio. As described above, when describing its single-family credit guarantee portfolio, Freddie Mac disclosed in its 2Q08 10-Q that at June 30, 2008, it had approximately $6 billion of security collateral underlying its Structured Transactions that were classified as subprime. Freddie Mac made no other disclosure in its 2Q08 10-Q quantifying its subprime exposure in its single-family credit guarantee book of business as of June 30, 2008.

53.     Freddie Mac's CEO and CFO both certified the 2006 IS, the 2Q07 ISS, the 3Q07 ISS, the 2007 IS, the 1Q08 ISS, and the 2Q08 10-Q. The certifications stated, among other things:

- "Based on my knowledge, this [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this [Report.]"

15

- "Based on my knowledge, the consolidated financial statements, and other financial information included in this [Report], fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this [Report]."

54.   Freddie Mac's CBO sub-certified the 2006 IS, the 2Q07 ISS, the 3Q07 ISS, the 2007 IS, the 1Q08 ISS, and the 2Q08 10-Q.  Freddie Mac's SVP for Credit Policy sub-certified the 2006 IS, the 2Q07 ISS and the 2Q08 10-Q.  Those sub-certifications stated, among other things:

- "Based upon my role and responsibilities, I have reviewed the appropriate sections of the [Report]."

- "I have consulted with such members of my staff and others whom I thought should be consulted in connection with my execution of this attestation."

- "Based upon my role and responsibilities, but limited in all respects to the matters that come to my attention in fulfilling my responsibilities as [CBO or SVP for Credit Policy], I hereby certify to the best of my knowledge and belief that:"

- "The [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, to not be misleading."

- "The financial statements and other financial information included in the [report] fairly present, in all material respects, the financial condition and results of operations, and cash flows of the Company as of and for the periods presented in the [Report]."

55.   In addition to sub-certifying the disclosures as described above in paragraph 54, the SVP for Credit Policy served on the disclosure committee that considered the 1Q08 ISS and 2Q08 10-Q.

### Freddie Mac's Alt-A Disclosures

56.   Prior to June 14, 2007, Freddie Mac did not publicly disclose its quantitative exposure to Alt-A loans.

57.   On June 14, 2007, Freddie Mac held its first quarter of 2007 financial results conference call with research analysts.  In response to an analyst's question, Freddie Mac's CBO stated "[t]he mix of our portfolio that is defined as Alt-A by our customers, because that is really the only way you get at that designation, we would estimate that maybe 5 percent or less of our portfolio that comes through flow is Alt-A, and on the bulk business it is about 2.  So I am comfortable saying it is less than 10."

58.   On August 30, 2007, in its 2Q07 ISS, Freddie Mac disclosed the following:

16

Many mortgage market participants classify single-family loans that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan. Although there is no universally accepted definition of Alt-A, industry participants have used this classification principally to describe loans for which the underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation. We principally acquire mortgage loans originated as Alt-A from our traditional lenders that largely specialize in originating prime mortgage loans. These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process.

In determining our Alt-A exposure in loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A. We estimate that approximately $120 billion, or eight percent, of loans underlying our single-family mortgage portfolio at June 30, 2007 were classified as Alt-A mortgage loans. For these loans, our average credit score was 715 and our estimated current LTV ratios were 71 percent.

59.     The same day that Freddie Mac released the 2Q07 ISS, it held a financial results conference call with research analysts. On the conference call, Freddie Mac's CFO said: "On mortgage product concentrations, we have low exposure to all day [sic] and risk-layered loans, and when taken together, these represent about 8 percent of the total single-family guarantee portfolio. On the Alt-A side, as of the end of June, we guaranteed $120 billion of loans that were either identified by the originator as Alt-A or had reduced levels of documentation."

60.     At June 30, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $462 billion of reduced documentation loans, which equated to approximately 29 percent of Freddie Mac's single-family credit guarantee portfolio. Only a portion of these loans were included in Freddie Mac's disclosed amount of $120 billion.

61.     Freddie Mac's quantification of its Alt-A exposure was derived from seller-identified loans and an internal model known as DEFCAP that was used to calculate its guarantee obligation. Certain reduced documentation loan programs were not flagged as "low- or no-doc" loans within the DEFCAP model based upon determinations made at the time. Those determinations were not reviewed in connection with providing public disclosure of the company's exposure to Alt-A loans. As such, those loans were not included in Freddie Mac's quantification of its Alt-A exposure in its 2Q07 ISS.

17

62.     On October 15, 2007, Freddie Mac's Vice President, Customer Facing Models and Analytics, wrote an e-mail in which he stated: "It is said that Countrywide 'Fast and Easy' loans, for example, have . . . morphed into some aggressive true 'Low Doc' dimensions more recently."  However, Freddie Mac determined not to flag Countrywide's Fast and Easy loans as "low- or no-doc" in the DEFCAP model; thus, they were not included in the quantification of Alt-A loan exposure that Freddie Mac provided in its public disclosures.

63.     On November 20, 2007, in the 3Q07 ISS, Freddie Mac disclosed the following regarding its Alt-A exposure as of September 30, 2007:

> Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan.  Although there is no universally accepted definition of Alt-A, industry participants have used this classification principally to describe loans for which the underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation.

> We principally acquire mortgage loans originated as Alt-A from our traditional lenders that largely specialize in originating prime mortgage loans.  These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process.  In determining our Alt-A exposure in loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A.  We estimate that approximately $131 billion, or 8%, of loans underlying our single-family mortgage portfolio at September 30, 2007 were classified as Alt-A mortgage loans.  For these loans, our average credit score was 715 and our estimated current average LTV ratio was 72%.

64.     At September 30, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $484 billion of reduced documentation loans, which equated to approximately 30 percent of Freddie Mac's single-family credit guarantee portfolio.

65.    On February 28, 2008, in the 2007 IS, Freddie Mac disclosed the following regarding its Alt-A exposure as of December 31, 2007:

> Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan.  Although there is no universally accepted definition of Alt-A, industry participants have used this classification principally to describe loans for which the underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation.

> We principally acquire Alt-A mortgage loans from our traditional lenders that largely specialize in originating prime mortgage loans. These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process.  In determining our exposure to Alt-A loans in our PC and Structured Securities portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loans should be classified as Alt-A.    We estimate that approximately $154 billion, or 9%, of our single-family PCs and Structured Securities at December 31, 2007 were backed by Alt-A mortgage loans.  For these loans, our average credit score was 719, our estimated current average LTV ratio was 72% and our delinquency rate, excluding certain Structured Transactions, was 1.86% at December 31, 2007.

66.    At December 31, 2007, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $505 billion of reduced documentation loans, which equated to approximately 30 percent of Freddie Mac's single-family credit guarantee portfolio.

67.    On May 14, 2008, in the 1Q08 ISS, Freddie Mac disclosed the following regarding its Alt-A exposure as of March 31, 2008:

> Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan.  Although there is no universally accepted definition of Alt-A, industry participants have used this classification   principally   to   describe   loans   for   which   the

19

underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation.

We principally acquire mortgage loans originated as Alt-A from our traditional lenders that largely specialize in originating prime mortgage loans. These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process. In determining our Alt-A exposure in loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements, which indicate that the loan should be classified as Alt-A. We estimate that approximately $188 billion, or 11%, of loans underlying our guaranteed PCs and Structured Securities at March 31, 2008 were classified as Alt-A mortgage loans. We estimate that approximately $2 billion, or 7%, of our investments in single-family mortgage loans in our retained portfolio were classified as Alt-A loans as of March 31, 2008. For all of these Alt-A loans combined, the average credit score was 723, the estimated current average LTV ratio was 76% and the delinquency rate, excluding certain Structured Transactions, was 2.32% at March 31, 2008.

68.    At March 31, 2008, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $527 billion of reduced documentation loans, which equated to approximately 30 percent of Freddie Mac's single-family credit guarantee portfolio.

69.    On July 18, 2008, Freddie Mac filed a Form 10 with the Commission. In its Form 10, Freddie Mac repeated verbatim the Alt-A disclosure from Freddie Mac's 2007 IS, described above at paragraph 65.

70.    On August 6, 2008, in the 2Q08 10-Q, Freddie Mac disclosed the following regarding its Alt-A exposure as of June 30, 2008:

Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category or may be underwritten with lower or alternative documentation than a full documentation mortgage loan. Although there is no universally accepted definition of Alt-A, industry participants have used this classification principally to describe loans for which the underwriting process has been streamlined in order to reduce the documentation requirements of the borrower or allow alternative documentation.

20

We principally acquire mortgage loans originated as Alt-A from our traditional lenders that largely specialize in originating prime mortgage loans. These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process. In determining our Alt-A exposure in loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements, which indicate that the loan should be classified as Alt-A. We estimate that approximately $188 billion, or 10%, of loans underlying our guaranteed PCs and Structured Securities at June 30, 2008 were classified as Alt-A mortgage loans. In addition, we estimate that approximately $2 billion, or approximately 7%, of our investments in single-family mortgage loans in our retained portfolio were classified as Alt-A loans as of June 30, 2008. For all of these Alt-A loans combined, the average credit score was 724, the estimated current average LTV ratio, based on our guaranteed exposure, was 78%. The delinquency rate for these Alt-A loans was 3.72% and 1.86% at June 30, 2008 and December 31, 2007, respectively. We implemented several changes in our underwriting and eligibility criteria in 2008 to reduce our acquisition of certain higher-risk loan products, including Alt-A loans. As a result there are approximately $14 billion of single-family Alt-A mortgage loans in our retained portfolio and underlying our PCs and Structured Securities as of June 30, 2008 that were originated in 2008 as compared to $60 billion remaining as of June 30, 2008 that were originated in 2007.

71.   At June 30, 2008, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $541 billion of reduced documentation loans, which equated to approximately 30 percent of Freddie Mac's single-family credit guarantee portfolio.

72.   On November 6, 2009, Freddie Mac disclosed in its third quarter Form 10-Q the following:

In determining our Alt-A exposure on loans underlying our single-family mortgage portfolio, we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit attributes and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. There are circumstances where loans with reduced documentation are not classified as Alt-A because we already own the credit risk on the loans or the loans fall within various programs which we believe support not

21

classifying the loans as Alt-A.  For our non-agency mortgage-related securities that are backed by Alt-A loans, we classified securities as Alt-A if the securities were labeled as Alt-A when sold to us.

# Exhibit C

UNITED STATES OF AMERICA
SECURITIES AND EXCHANGE COMMISSION

<u>NON-PROSECUTION AGREEMENT</u>

1.      This agreement arises out of an investigation by the Division of Enforcement (the
"Division") of the United States Securities and Exchange Commission (the "Commission") into
possible violations of the federal securities laws by the Federal National Mortgage Association
(the "Respondent" or "Fannie Mae") and others that occurred in or about December 2006
through September 6, 2008, arising from, among other things, public statements concerning
Fannie Mae's exposure to Subprime and Alt-A mortgages (collectively, the "Investigation").
Prior to a public enforcement action being brought by the Commission against Fannie Mae,
without admitting or denying liability, Respondent has offered to accept responsibility for its
conduct and to not dispute, contest, or contradict the factual statements set forth in Exhibit A, as
specifically provided herein.  Accordingly, the Commission and the Respondent enter into this
Non-Prosecution Agreement (the "Agreement").

2.      The Respondent is a corporation organized and operated under the laws of the United
States of America, subject to the ongoing supervision of the Federal Housing Finance Agency
("FHFA").  On September 6, 2008, FHFA placed the Respondent into conservatorship, and as
conservator, succeeded to all rights, titles, powers and privileges of the Respondent and its
shareholders, officers, and directors with respect to the Respondent and its assets.  As
conservator, FHFA maintains a continuous on-site presence at the Respondent and provides
substantial oversight over the Respondent, including, among other things, with respect to its
corporate governance, regulatory compliance and operations.  In addition, the United States
Treasury has made substantial capital investments in the Respondent and holds senior preferred
stock, as well as warrants representing an ownership stake of up to 79.9 percent of the
Respondent's common stock.

3.      In entering into this Agreement, the Commission recognizes the unique circumstances
presented by the Respondent's current status, including the financial support provided to the
Respondent by the U.S. Treasury, the role of another government agency (FHFA) as conservator,
and the costs that may be imposed on U.S. taxpayers.  Based on these circumstances and in
consideration of the public interest, subject to the full, truthful, and continuing cooperation of the
Respondent as described below and its satisfactory performance of all obligations and
undertakings herein, the Commission and Respondent enter into this Agreement with the terms
and conditions contained herein.

COOPERATION

4.      The Respondent agrees to cooperate fully and truthfully in the Investigation and any
other related enforcement litigation or proceeding to which the Commission is a party (the
"Proceedings"), without regard to the time period in which the cooperation is required
("Cooperation Period").  In addition, the Respondent agrees to cooperate fully and truthfully,
when directed by the Division's staff, in any other related official investigation or proceeding by
any U.S. federal agency (the "Other Proceedings").  The Respondent acknowledges and

1

understands that its ongoing cooperation with the Commission is an important and material factor underlying the Commission's decision to enter into this Agreement. The full, truthful, and continuing cooperation of the Respondent shall include, but not be limited to:

      a.    identifying, assembling, organizing and producing, in a responsive and prompt manner, all non-privileged, non-attorney work-product documents, information, and other materials (including but not limited to providing reports or analyses of data concerning Respondent's models, credit risk reporting or data systems) to the Commission as requested by the Division's staff, wherever located, in the possession, custody, or control of the Respondent;

      b.    providing declarations authenticating all documents, information, and other materials produced to the Commission by Respondent upon request by the Division's staff;

      c.    providing declarations, upon request by the Division's staff, certifying that documents, information, and other materials produced to the Commission by Respondent comply with Federal Rule of Evidence 902(11)(A-C);

      d.    providing Federal Rule of Civil Procedure 30(b)(6) witnesses, and authenticating documents, for the purpose of establishing the facts set forth in Exhibit A;

      e.    using its best efforts to secure the full, truthful, and continuing cooperation, as defined in Paragraph 5, of Fannie Mae's current and former board members, officers, employees and agents, including making these persons available, when requested to do so by the Division's staff, for interviews and the provision of testimony in the investigation, deposition, trial and other judicial proceedings in connection with the Proceedings or Other Proceedings;

      f.    authenticating all documents, information, and other materials identified by the Division's staff, to the extent able to do so;

      g.    responding to all inquiries, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings;

      h.    producing to the Commission, in a responsive and prompt manner, any documents, information and materials not previously produced to the Commission that are provided formally or informally to any party for use in the Proceedings or Other Proceedings at the request of such party or otherwise;

      i.    notifying the Division's staff, in a prompt manner, of the receipt and substance of any request for documents, information or materials by a party to the Proceedings or Other Proceedings or the scheduling or facilitation of interviews or meetings between parties to the Proceedings or Other Proceedings (or their counsel) and any of Fannie Mae's current and former board members, officers, employees and agents in connection with the Proceedings or Other Proceedings;

      j.    maintaining the confidentiality of communications with the Division's staff relating to the cooperation required under paragraphs a-i above, and refusing to enter into, not entering into, modifying or withdrawing from existing formal or informal joint-defense agreements or arrangements with any person relating to the Proceedings or Other Proceedings to

the extent such agreements limit Respondent's ability to provide or share information with the Commission; *and,*

      k.     providing appropriate assistance to the Commission to obtain documents or other information necessary for the Commission to assess and respond to defenses raised in the Proceedings or Other Proceedings.

5.    The full, truthful, and continuing cooperation of each person described in Paragraph 4(e) above will be subject to the procedures and protections of this Paragraph, and shall include, but not be limited to:

      a.     producing all non-privileged documents, information, and other materials as requested by the Division's staff;·

      b.     appearing for interviews, at such times and places as requested by the Division's staff;

      c.     authenticating all documents, information, and other materials identified by the Division's staff, to the extent able to do so;

      d.     responding to all inquiries, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings; *and,*

      e.     testifying at deposition, at trial and in other judicial proceedings, when requested to do so by the Division's staff, in connection with the Proceedings or Other Proceedings.

## STATUTE OF LIMITATIONS

6.    The Respondent agrees that the running of any statute of limitations applicable to any action or proceeding against it authorized, instituted, or brought by or on behalf of the Commission arising out of the Investigation (the "Enforcement Proceeding"), including any sanctions or relief that may be imposed therein, is tolled and suspended during the Cooperation Period.

      a.     The Respondent and any of its attorneys or agents shall not include the Cooperation Period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to the Enforcement Proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense.

      b.     This agreement shall not affect any applicable statute of limitations defense or any other time-related defense that may be available to Respondent before the commencement of the Cooperation Period or be construed to revive an Enforcement Proceeding that may be barred by any applicable statute of limitations or any other time-related defense before the commencement of the Cooperation Period.

      c.     The running of any statute of limitations applicable to the Enforcement Proceeding shall commence again after the end of the Cooperation Period, unless there is an extension of the tolling period executed in writing by or on behalf of the parties hereto.

d.    This agreement shall not be construed as an admission by the Commission relating to the applicability of any statute of limitations to the Enforcement Proceeding, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply, or to the applicability of any other time-related defense.

## UNDERTAKINGS

7.    During the Cooperation Period, the Respondent understands and agrees to perform the following undertakings:

a.    to provide written notification to the Division, within five days, if it has been questioned in the context of an investigation, charged, or convicted of an offense related to the securities laws by any federal, state, or local law enforcement organization or regulatory agency; and

b.    to submit a report to the Division detailing its efforts to identify and implement improved disclosure procedures since being placed into conservatorship on September 6, 2008, and, if requested, to meet with the Division's staff to discuss the report and its progress with respect to its obligations pursuant to this Agreement.

## PUBLIC STATEMENTS

8.    The Respondent agrees not to take any action or to make or permit any public statement through present or future attorneys, employees, agents, or other persons authorized to speak for it ("Related Person"), except in legal proceedings in which the Commission is not a party, denying, directly or indirectly, any aspect of this Agreement or creating the impression that the statements in Exhibit A to this Agreement are without factual basis. This paragraph is not intended to apply to any statement made by an individual in the course of any criminal, civil, or regulatory proceeding initiated by the government or self-regulatory organization against such individual, unless such individual is speaking on behalf of the Respondent.[1]  If it is determined by the Commission that a public statement by the Respondent or any Related Person contradicts in whole or in part this Agreement, at its sole discretion, the Commission may bring an enforcement action in accordance with Paragraphs 15 through 18, but only provided that Respondent does not cure the statement by promptly making appropriate public statements or court filings satisfactory to the Commission after a reasonable opportunity to do so by the Commission.

9.    Prior to issuing any press release concerning this Agreement, the Respondent agrees to have the text of the release approved by the staff of the Division.

---

[1]    Nothing in this Agreement affects Respondent's and Related Person's (i) testimonial obligations or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

4

## SERVICE

10.    The Respondent agrees to serve by hand delivery or by next-day mail all written notices and correspondence required by or related to this Agreement to Charles Cain, Assistant Director, 100 F Street, N.E., Washington, D.C. 20549 ((202) 551-4911), unless otherwise directed in writing by the staff of the Division.

## VIOLATION OF AGREEMENT

11.    The Respondent understands and agrees that it shall be a violation of this Agreement if it knowingly provides false or misleading information or materials in connection with the Proceedings or Other Proceedings. In the event of such misconduct, the Division will advise the Commission of the Respondent's misconduct and may make a criminal referral for providing false information (18 U.S.C. § 1001), contempt (18 U.S.C. §§ 401-402) and/or obstructing justice (18 U.S.C. § 1503 *et seq.*).

12.    The Respondent understands and agrees that should the Division determine that the Respondent has failed materially to comply with any term or condition of this Agreement, the Division will notify the Respondent or its counsel of the fact and provide an opportunity for the Respondent to make a Wells submission pursuant to the Securities Act of 1933 Release No. 5310. Under these circumstances, the Division may, in its sole discretion and not subject to judicial review, recommend to the Commission an enforcement action against the Respondent for any securities law violations, including, but not limited to, the substantive offenses relating to the Investigation.

13.    The Respondent understands and agrees that in any future enforcement action resulting from its violation of the Agreement, any documents, statements, information, testimony, or evidence provided by it during the Investigation, Proceedings or Other Proceedings, and any leads derived there from, may be used against it in future legal proceedings.

14.    In the event it breaches this Agreement, the Respondent agrees not to dispute, contest, or contradict the factual statements contained in Exhibit A, or their admissibility, in any future Commission enforcement action against it.

## COMPLIANCE WITH AGREEMENT

15.    Subject to the full, truthful, and continuing cooperation of the Respondent, as described in Paragraphs 4 and 5, and compliance by Respondent with all obligations and undertakings in this Agreement, the Commission agrees not to bring any enforcement action or proceeding against the Respondent arising from the Investigation. This Agreement should not, however, be deemed to exonerate the Respondent or be construed as a finding by the Commission that violations of the federal securities laws have not occurred.

16.    The Respondent understands and agrees that this Agreement does not bind other U.S. federal, state or self-regulatory organizations, but the Commission may, at its discretion, issue a letter to these organizations detailing the fact, manner, and extent of its cooperation during the Proceedings or Other Proceedings, upon the written request of the Respondent.

5

17.    The Respondent understands and agrees that if it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such a sale is structured as a stock or asset sale, merger, or transfer during the Cooperation Period, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser or successor in interest to the obligations set forth in this Agreement.

18.    The Respondent understands and agrees that the Agreement only provides protection against enforcement actions arising from the Investigation and does not relate to any other violations, or to any individual or entity other than the Respondent.

## VOLUNTARY AGREEMENT

19.    The Respondent's decision to enter into this Agreement is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than those contained in this Agreement.

20.    The Respondent has read and understands this Agreement.  Furthermore, the Respondent has reviewed all legal and factual aspects of this matter with its attorney and is fully satisfied with its attorney's legal representation.  The Respondent has thoroughly reviewed this Agreement with its attorney and has received satisfactory explanations concerning each paragraph of the Agreement.  After conferring with its attorney and considering all available alternatives, the Respondent has made a knowing decision to enter into the Agreement.

21.    The Respondent represents that its Board of Directors has duly authorized, in the resolution attached as Exhibit B to this Agreement, the execution and delivery of this Agreement, and that the person signing this Agreement has authority to bind the Respondent.

## ENTIRETY OF AGREEMENT

22.    This Agreement constitutes the entire agreement between the Commission and the Respondent, and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein.

23.    This Agreement cannot be modified except in writing, signed by the Respondent and an authorized representative of the Commission.

24.    This agreement may be executed in counterparts.

6

25.     In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring the Commission or the Respondent by virtue of the authorship of any of the provisions of the Agreement.

The signatories below acknowledge acceptance of the foregoing terms and conditions.

RESPONDENT:

| | |
|---|---|
| *December 13, 2011*<br>Date | *Michael J. Williams*<br>Michael J. Williams<br>President and CEO, Fannie Mae<br>3900 Wisconsin Avenue NW<br>Washington, DC<br>20016 |

Attached hereto is the Certificate of the Secretary to the Board of Directors of Federal National Mortgage Association, certifying that Michael J. Williams is, and at the time of the signing and delivery of the Agreement was, the duly appointed, qualified and acting Chief Executive Officer of Fannie Mae and duly authorized to execute the Agreement on behalf of Fannie Mae, and that the signature of Michael J. Williams appearing on the Agreement is his genuine signature.

RESPONDENT'S COUNSEL:

Approved as to form:

| | |
|---|---|
| *December 13, 2011*<br>Date | *Harry J. Weiss*<br>Harry J. Weiss, Esq.<br>WilmerHale<br>1875 Pennsylvania Avenue NW<br>Washington, D.C. 20006 |

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT:

| | |
|---|---|
| *December 15, 2011*<br>Date | *Robert Khuzami*<br>Robert Khuzami<br>Director, Enforcement Division<br>United States Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington, D.C. 20549 |

**EXHIBIT A**

## STATEMENT OF FACTS

### *Fannie Mae*

1. Federal National Mortgage Association ("Fannie Mae") is a government-sponsored enterprise that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Fannie Mae provides market liquidity by securitizing mortgage loans originated by lenders in the primary mortgage market into Fannie Mae mortgage-backed securities ("MBS"), known as Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities in the secondary market for its mortgage portfolio. In or about February 2008, Fannie Mae began reporting billion-dollar credit losses resulting from its portfolio of mortgage-related assets and guaranty contracts. For the period January 1, 2007 through March 31, 2011, Fannie Mae reported cumulative net losses of $153.2 billion.

2. From 1992 until July 30, 2008, Fannie Mae's primary regulator was the Office of Federal Housing Enterprise Oversight ("OFHEO").

3. On July 30, 2008, when the President signed into law the Housing and Economic Recovery Act of 2008, the Federal Housing Finance Agency ("FHFA") became Fannie Mae's primary regulator. On September 6, 2008, FHFA placed Fannie Mae into conservatorship, and as conservator succeeded to all rights, titles, powers and privileges of Fannie Mae, its shareholders, and the officers or directors of Fannie Mae with respect to the company and its assets.

4. On July 8, 2010, Fannie Mae's common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange. Fannie Mae's common stock currently is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the ticker symbol "FNMA." Fannie Mae's debt securities are actively traded in the over-the-counter market.

5. From December 6, 2006 through November 10, 2008 (the "Relevant Period"), Fannie Mae provided mortgage credit risk disclosures in its periodic filings and other filings with the Securities and Exchange Commission (the "Commission") relating to Fannie Mae's single-family mortgage credit book of business, which consisted of whole single-family mortgage loans and Fannie Mae MBS backed by single-family mortgage loans (whether held in its portfolio or by third parties).

6. During the Relevant Period, Fannie Mae provided disclosures regarding its exposure to Alt-A and subprime mortgage loans in its single-family mortgage credit book of business.

*Subprime Disclosures*

7.  On February 27, 2007 Fannie Mae provided its first public quantitative disclosure of its exposure to subprime mortgage loans in a 12b-25 filing with the Commission (the "February 2007 12b-25 Filing").

8.  The February 2007 12b-25 Filing stated that "[a]lthough there is no uniform definition for sub-prime and Alt-A loans across the mortgage industry, Alt-A loans are generally defined as loans with lower or alternative documentation requirements, while sub-prime loans typically are made to borrowers with weaker credit histories." The February 2007 12b-25 Filing further stated:

> • "We estimate that approximately 0.2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of sub-prime mortgage loans or structured Fannie Mae MBS backed by sub-prime mortgage loans."
>
> • "We estimate that approximately 2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of private-label mortgage-related securities backed by sub-prime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by sub-prime mortgage loans."

9.  During the Relevant Period, one of Fannie Mae's primary mortgage loan products targeted towards borrowers with weaker credit histories was called Expanded Approval/Timely Payment Rewards ("EA"). As of December 31, 2006, the percentage of EA loans held on Fannie Mae' book of business was 1.8%.

10. The Unpaid Principal Balance ("UPB") of EA loans owned or securitized by Fannie Mae in its single-family mortgage credit book of business was $39.7 billion as of December 31, 2005, $43.3 billion as of December 31, 2006, and $55.6 billion as of December 31, 2007. The UPB of loans Fannie Mae classified and disclosed as subprime, which it owned or securitized in its single-family mortgage credit book of business, was $2.3 billion as of December 31, 2005, $4.8 billion as of December 31, 2006, and $8.3 billion as of December 31, 2007. In addition to EA, Fannie Mae had other mortgage loan programs, such as My Community Mortgage ("MCM") that served low-to-moderate income borrowers, including borrowers with weaker credit histories.

11. In anticipation of communications with investors in March, 2004, Fannie Mae's then-Chief Executive Officer ("CEO") received a document listing questions and answers ("Q&A") relating to Fannie Mae's business. That document stated in part: "…. Delinquencies in the subprime market have been rising. What is Fannie Mae's exposure to subprime loans? Does subprime include Alt-A loans? ANSWER [:] Our strong risk management tools and practices have enabled expansion of Fannie Mae's product offerings to include products targeted to borrowers with minor credit blemishes. The most notable product line for reaching these borrowers, Expanded Approval with Timely

2

Payment Rewards, has grown in volume but represents less than two percent of Single Family credit portfolio." Further, in March of 2005, Fannie Mae's CEO was provided with a Q&A that stated in part: ".... Delinquencies in the subprime market have been rising. What is Fannie Mae's exposure to subprime loans? Does subprime include Alt-A loans? ANSWER [:] Fannie Mae's subprime exposure primarily consists of our own product line for serving credit-impaired borrowers—the Expanded Approval with Timely Payment Rewards product, and mortgage related securities backed by subprime loans that we hold in our mortgage portfolio ..."

12. Prior to the February 2007 12b-25 Filing, in April 2005 and April 2006, in response to requests for information on Fannie Mae single-family subprime loans, Fannie Mae provided OFHEO with data and information on mortgage loan purchases and mortgage loan securities under its EA program and described the EA loans as its "most significant initiative to serve credit-impaired borrowers."

13. EA loans were not included in Fannie Mae's calculation or quantification of its subprime mortgage loans or other subprime exposure set forth in Fannie Mae's February 2007 12b-25 Filing.

14. In its February 2007 12b-25 Filing, Fannie Mae publicly disclosed that its subprime exposure as of December 31, 2006 was approximately 2.2% of its single-family mortgage credit book of business, of which approximately 0.2% ($4.8 billion) consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans. Fannie Mae's exposure to EA loans in its single-family mortgage credit book of business was approximately $43.3 billion as of December 31, 2006.

15. During the Relevant Period, Fannie Mae tracked the serious delinquency rate ("SDQ Rate") of its mortgage loan products in order to measure the credit risk of its loan portfolio. Fannie Mae defined SDQ as a loan that is 90 days or more past due and loans that are in the process of foreclosure. Generally, the higher the SDQ Rate of loans, the higher the credit risk of those loans. As Fannie Mae stated in its 2004 Form 10-K: "The SDQ is an indicator of potential future foreclosures, although most loan that become seriously delinquent do not result in foreclosure. The rate at which new loans become seriously delinquent and the rate at which existing seriously delinquent loans are resolved significantly affect the level of future credit losses."

16. Internal reports show that Fannie Mae's publicly disclosed subprime loans had an SDQ rate of 4.72% as of December 31, 2006, and Fannie Mae's EA loans had an SDQ rate of 5.57% as of December 31, 2006.

17. During the Relevant Period, information described in paragraphs 7-16 above was provided and/or available to senior executives, including Fannie Mae's CEO, Fannie Mae's Executive Vice President for its Single Family business ("Single Family EVP"), and its Chief Risk Officer ("CRO") through internal reports, presentations, and briefings.

18. The CEO, the Single Family EVP and the CRO each reviewed and approved the February 2007 12b-25 Filing.

19. On May 2, 2007, Fannie Mae filed its 2005 Form 10-K with the Commission (the "May 2, 2007 10-K Filing"). This filing stated "'Subprime mortgage' generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold."

20. In the May 2, 2007 10-K Filing, Fannie Mae also stated that "subprime loans represented approximately 2.2% of our single-family mortgage credit book of business as of December 31, 2006, of which approximately 0.2% consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans and approximately 2% consisted of private-label mortgage-related securities backed by subprime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by subprime mortgage loans."

21. The calculation and quantification of Fannie Mae's subprime mortgage loans or other subprime exposure set forth in the May 2, 2007 10-K Filing did not include Fannie Mae's exposure to EA loans. As of December 31, 2006, the percentage of EA loans held on Fannie Mae's single-family mortgage credit book of business was 1.8%.

22. During the Relevant Period, the Department of Housing and Urban Development provided a list of lenders specializing in the subprime business (the "HUD Subprime Lender List"). As of December 31, 2006, the HUD Subprime Lender List consisted of 210 subprime lenders.

23. In calculating and quantifying its subprime loans and other subprime exposure as disclosed in the May 2, 2007 10-K Filing, Fannie Mae did not use the HUD Subprime Lender List to identify lenders "specializing in this type of business" and included loans only from fifteen loan originators. Fannie Mae did not publicly disclose that loans from only fifteen originators were considered when calculating its subprime exposure or the names of those originators.

24. During the Relevant Period, Fannie Mae purchased and securitized loans from lenders on the HUD Subprime Lender List but did not include those loans when calculating or quantifying its subprime loans.

25. On May 2, 2007, Fannie Mae's CEO certified the May 2, 2007 10-K Filing. The certification stated, among other things:

4

    a.   [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and

    b.   [T]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

26. The Single Family EVP and the CRO signed sub-certifications for the May 2, 2007 10-K Filing. Those sub-certifications stated, among other things:

    a.   [T]he Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by the Report.

    b.   [T]he financial statements, and other financial information included in the Report, fairly present in all material respects the financial condition, results of operations and cash flows of the business segments for which I am responsible as of, and for, the periods presented in the Report.

27. On August 16, 2007, Fannie Mae provided a virtually identical subprime definition and the same subprime quantitative exposure amounts in its 2006 Form 10-K filed with the Commission (the "August 2007 10-K Filing") as it did in its May 2, 2007 10-K Filing.

28. Fannie Mae's calculation and quantification of its subprime loans or other subprime exposure set forth in the August 2007 10-K Filing did not include its EA loans.

29. On August 16, 2007, simultaneous with filing its 2006 10-K, Fannie Mae filed an 8-K credit supplement (the "August 2007 Credit Supplement Filing"), which disclosed that, as of June 30, 2007, 1% of its single family mortgage credit book of business consisted of loans with both a FICO Score below 620 and Original-Loan-To-Value ("OLTV") Greater than 90% (the "Low FICO/High OLTV Loans").

30. As of June 30, 2007, only 15.5% of the EA loans had both a FICO score below 620 and an OLTV greater than 90%.

31. During the Relevant Period, information described in paragraphs 19-30 was provided and/or available to the CEO, the Single Family EVP and the CRO through internal reports, presentations, and briefings.

32. The CEO certified the August 2007 10-K Filing and reviewed and approved the August 2007 Credit Supplement Filing. The certification was substantially similar to the representations set forth above in Paragraph 25.

33. The Single Family EVP and the CRO sub-certified the August 2007 10-K Filing. Those sub-certifications were substantially similar to the representations set forth above in

Paragraph 26. The Single Family EVP and the CRO reviewed and approved the August 2007 Credit Supplement Filing.

34. On November 9, 2007, Fannie Mae simultaneously filed its first, second, and third quarter 2007 Form 10-Q filings with the Commission (the "November 2007 10-Q Filings").

35. Each of the November 2007 10-Q Filings stated: "A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or a subprime division of a large lender."

36. During the Relevant Period, Fannie Mae did not keep separate statistical reports or otherwise track loans made by the subprime division of originators. It therefore could not quantify the number of loans it acquired or securitized that were originated by the subprime division of a large lender.

37. Throughout most of the Relevant Period, Fannie Mae's largest customer was Countrywide Financial Corporation. Countrywide's retail subprime lending division was known as Full Spectrum Lending.

38. Records indicate that Fannie Mae purchased or securitized $7.7 billion worth of loans originated by Full Spectrum Lending in 2006, $13.2 billion in 2007, and $7.6 billion in 2008.

39. During the Relevant Period, Fannie Mae purchased or securitized loans from other subprime divisions of large lenders.

40. In the November 2007 10-Q Filings, Fannie Mae stated that approximately 0.2% of its total single-family mortgage credit book of business as of March 31, 2007 and June 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans and that this percentage increased to approximately 0.3% as of September 30, 2007. Fannie Mae also disclosed that less than 1% of its single-family business volume for the nine months ended September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans.

41. In Fannie Mae's single family mortgage credit book of business, the dollar amount of the subprime loans and other subprime exposure as disclosed in each of Fannie Mae's February 2007 12b-25 Filing, May 2, 2007 10-K Filing, August 2007 10-K Filing or November 2007 10-Q Filings did not exceed $8.3 billion.

42. Fannie Mae's quantitative subprime disclosure in the November 2007 10-Q Filings did not include its exposure to EA loans. Fannie Mae's quantitative exposure to EA loans for the periods covered by the Form 10-Qs was at least $43 billion.

43. On November 9, 2007, Fannie Mae provided disclosure of its exposure to loans that were both Low FICO/High OLTV in its Form 8-K Credit Supplement that it filed concurrent with its November 2007 10-Q Filings with the Commission (the "November 2007 8-K Filings").

44. Fannie Mae's calculation and quantification of its exposure to loans that were both Low FICO/High OLTV in the November 2007 8-K Filings did not include all of its EA loans.

45. During the Relevant Period, members of Fannie Mae's senior management were provided with information indicating that Fannie Mae purchased and securitized loans from subprime divisions of large lenders such as Countrywide's Full Spectrum Lending. For example, in a February 2007 meeting, the then-CEO received a presentation on the volume of agency-eligible loans from each of Countrywide's four lending divisions, including Full Spectrum Lending.

46. The CEO certified the November 2007 10-Q Filings and reviewed and approved the November 2007 8-K Filings. The Single Family EVP and the CRO sub-certified the November 2007 10-Q Filings. The Single Family EVP and the CRO reviewed and approved the November 2007 8-K Filings.

47. Post-conservatorship, on November 10, 2008, in its third quarter Form 10-Q ("November 2008 10-Q Filing"), Fannie Mae disclosed for the first time that certain loans with features similar to subprime loans were not included in the calculation or quantification of Fannie Mae's subprime exposure. The November 2008 10-Q Filing stated in part: "We have classified mortgage loans as subprime if the mortgage loan is originated by a lender specializing in subprime business or by subprime divisions of large lenders. We apply these classification criteria in order to determine our ... subprime loan exposures; however, we have other loans with some features that are similar to ... subprime loans that we have not classified as ... subprime because they do not meet our classification criteria."

48. On February 24, 2011, in its Form 10-K for the fiscal year 2010, Fannie Mae stated for the first time: "We exclude from the subprime classification loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system."

*Alt-A Disclosures*

49. In its February 2007 12b-25 Filing, Fannie Mae stated that Alt-A loans "are generally defined as loans with lower or alternative documentation requirements."

50. Prior to May 2, 2007, Fannie Mae did not quantify its exposure to Alt-A loans in its public filings with the SEC or in other disclosures provided to investors.

51. Fannie Mae increased its acquisition of reduced documentation loans in its conventional single family mortgage guarantee business from at least 17.8% percent of new acquisitions in 2004 to at least 27.8% of new acquisitions in 2006.

52. From December 6, 2006 through May 31, 2008, according to internal Fannie Mae loan acquisition data reports, at least 25% of Fannie Mae's loan acquisitions in its conventional single family mortgage guarantee business were reduced documentation loans.

53. On May 9, 2007, for the first time in a public filing, Fannie Mae quantified its exposure to Alt-A loans in a 12b-25 filed with the Commission (the "May 9, 2007 12b-25 Filing").

54. In the May 9, 2007 12b-25 Filing, Fannie Mae stated that in reporting "Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features, or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as Alt-A when sold. We estimate that approximately 11% of our total single-family mortgage credit book of business as of both March 31, 2007 and December 31, 2006 consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans."

55. Fannie Mae had a coding system to identify the loan characteristics for certain mortgages ("Special Feature Codes"). Loan sellers in the lender channel were instructed by Fannie Mae to use certain Special Feature Codes in delivering loans to Fannie Mae. Thus, Fannie Mae's coding system determined those loans that such sellers classified as Alt-A.

56. In calculating its Alt-A exposure, Fannie Mae excluded what it classified as lender-selected loans ("Lender-Selected Reduced Documentation Loans").

57. During the Relevant Period, Fannie Mae did not publicly disclose that it excluded Lender-Selected Reduced Documentation Loans from its reported Alt-A exposure.

58. At times during the Relevant Period, Lender-Selected Reduced Documentation Loans had an SDQ Rate that was on average 1.4 times higher than Fannie Mae's full documentation loans with a similar credit risk profile.

59. As of March 31, 2007, at least 17.9% of Fannie Mae's total conventional single-family mortgage guarantee business consisted of reduced documentation mortgage loans or structured Fannie Mae MBS backed by reduced documentation mortgage loans.

60. During the Relevant Period, information described in paragraphs 49-59 was provided and/or available to the CEO, the Single Family EVP and the CRO through internal reports, presentations, and/or briefings.

61. Fannie Mae's CEO certified periodic filings during the Relevant Period that included Fannie Mae's Alt-A disclosures. Those certifications were substantially similar to the representations set forth above in Paragraph 25.

62. The Single Family EVP and Fannie Mae's CRO sub-certified periodic filings during the Relevant Period that included Fannie Mae's Alt-A disclosures. Those sub-certifications were substantially similar to the representations set forth above in Paragraph 26.

63. Fannie Mae's CEO, its Single Family EVP and its CRO reviewed and approved Alt-A disclosures contained in Fannie Mae's 12b-25 filings during the Relevant Period.

64. Post-conservatorship, in its November 2008 10-Q Filing, Fannie Mae disclosed for the first time that it excluded certain loans with features similar to Alt-A loans from its calculation and quantification of its Alt-A exposure. The November 2008 10-Q Filing stated in part: "We have classified mortgage loans as Alt-A if the lender that delivers the mortgage to us has classified the loans as Alt-A based on documentation or other features; however, we have other loans with some features that are similar to … Alt-A loans that we have not classified as … Alt-A because they do not meet our classification criteria."

9

# Exhibit D



# 11 CIV 9201

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 11-cv-_____ |
| Plaintiff, | ECF CASE |
| v. | (Jury Trial Demanded) |
| RICHARD F. SYRON, PATRICIA L. COOK, and DONALD J. BISENIUS, | |
| Defendants. | |

APR 18 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows:

### SUMMARY OF ALLEGATIONS

1.    This action arises out of a series of materially false and misleading public disclosures by the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") and certain of its senior executives relating to the exposure of Freddie Mac's largest business segment – Single Family Guarantee – to subprime mortgage loans.

2.    Between March 23, 2007, and August 6, 2008 (the "Relevant Period"), a period of heightened investor interest in the credit risks associated with subprime loans, Freddie Mac and defendants Richard F. Syron ("Syron"), Patricia L. Cook ("Cook"), and Donald J. Bisenius ("Bisenius") misled investors into believing that the Company had far less exposure to these riskier mortgages than in fact existed. To that end, at various times, each made or substantially assisted Freddie Mac and each other in making materially false and misleading statements that

claimed in substance that Freddie Mac had little or no exposure to subprime loans in its Single Family Guarantee business.

3.      While Freddie Mac disclosed during the Relevant Period that the exposure of its Single Family Guarantee business to subprime loans was between $2 billion and $6 billion, or between 0.1 percent and 0.2 percent, of Freddie Mac's Single Family Guarantee portfolio – its exposure to subprime was materially greater.  As of December 31, 2006, Freddie Mac's Single Family Guarantee business was exposed to approximately $141 billion (or 10 percent of the portfolio) in loans the Company internally referred to as "subprime," "otherwise subprime" or "subprime-like" and its exposure grew to approximately $244 billion (or 14 percent of the portfolio) by June 30, 2008, as the Company sought to win back lost market share by increasing its acquisition of such loans.

4.      Syron had ultimate authority over the subprime disclosures in Freddie Mac's Information Statements and supplements to the Information Statements published between March 23, 2007 and May 14, 2008, and in its Form 10-Q filed with the Commission on August 6, 2008, and also in speeches he gave or public statements he made in 2007 and 2008.  Cook spoke at an investor conference on May 17, 2007, in which she told investors that Freddie Mac had "basically no subprime exposure" and she provided substantial assistance to Syron and Freddie Mac in making subprime disclosures in the Information Statements and supplements and a Form 10-Q by certifying to the accuracy of the disclosures, which related to her area of responsibility.  Bisenius also certified to the accuracy of the subprime disclosures in certain Information Statements and supplements published during the Relevant Period and the Form 10-Q and thus substantially assisted Syron and Freddie Mac in making the misleading statements in these documents; he also substantially assisted Syron and Cook in making oral misstatements

2

about subprime by failing to correct statements in their prepared speeches that he knew misstated the Company's subprime exposure. Each defendant made, or substantially assisted others in the making of, these misleading subprime disclosures at a time when each knew, or was reckless in not knowing, that the Company was increasing its acquisition of higher-risk loans that it internally referred to as "subprime," "otherwise subprime" or "subprime-like."

5.    By this conduct, Syron and Cook violated, and Syron, Cook and Bisenius aided and abetted violations of, the antifraud and reporting provisions of the federal securities laws.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

7.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

8.    In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Syron, Cook and Bisenius have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

3

**RELEVANT ENTITY**

9.      **Freddie Mac** was, at all times relevant to this Complaint, a shareholder-owned Government Sponsored Enterprise ("GSE") established by the U.S. Congress on July 24, 1970, with the passage of the Federal Home Loan Mortgage Corporation Act (the "FHLMC Act"), to provide a continuous flow of funds for residential mortgages.  Freddie Mac performed this function by buying and guaranteeing residential mortgage loans and mortgage-related securities, which it financed by issuing mortgage-related securities, debt securities and equity securities. Under the FHLMC Act, the Company's securities were "exempt securities," meaning they were exempt from the registration and disclosure requirements of the federal securities laws.  On July 18, 2008, Freddie Mac voluntarily registered its common and preferred stock under Section 12(g) of the Exchange Act by filing a Form 10 registration statement with the Commission. Prior to July 18, 2008, Freddie Mac publicly disseminated annual and quarterly reports of its financial condition and results of operations in Information Statements and Information Statement Supplements, which were virtually identical in presentation to annual and quarterly reports filed with the Commission by registrants.  Since July 18, 2008, Freddie Mac has been subject to the reporting requirements of the federal securities laws.  During the Relevant Period, Freddie Mac's common stock was actively traded on the New York Stock Exchange under the ticker symbol "FRE."  Its principal place of business was, and is, in McLean, Virginia.

10.     Freddie Mac manages its business through three reportable segments: (i) Single Family Guarantee ("Single Family"), (ii) Investments, and (iii) Multifamily.

11.     Single Family is Freddie Mac's primary business segment.  During the Relevant Period, Freddie Mac reported that the size of its Single Family business was $1.4 trillion as of December 31, 2006, $1.7 trillion as of December 31, 2007 and $1.8 trillion as of June 30, 2008.

4

12.    Through its Single Family business, Freddie Mac purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them as Freddie Mac mortgage-backed securities, known as Participation Certificates ("PCs"). Freddie Mac guarantees the payment of principal and interest on the mortgage loans that underlie these PCs in exchange for guarantee fees.

13.    During the Relevant Period, Freddie Mac completed at least four preferred stock offerings, raising approximately $7.5 billion: (i) pursuant to an Offering Circular dated April 10, 2007, it issued $500 million worth of 5.66 percent non-cumulative perpetual preferred stock, (ii) pursuant to an Offering Circulated dated July 17, 2007, it issued $500 million worth of 6.02 percent non-cumulative perpetual preferred stock, (iii) pursuant to an Offering Circular dated September 25, 2007, it issued $500 million of 6.55 percent non-cumulative perpetual preferred stock and (iv) pursuant to an Offering Circular dated November 29, 2007, it issued $6 billion fixed-to-floating rate non-cumulative perpetual preferred stock. Additionally, in mid-2008, Freddie Mac executives attempted to make at least one additional preferred stock offering in the amount of $5.5 billion. Throughout the Relevant Period, Freddie Mac also routinely issued debt securities.

14.    On September 6, 2008, following mounting losses, Freddie Mac's primary regulator, the FHFA, placed it into conservatorship. On September 7, 2008, FHFA, as conservator, adopted a resolution eliminating the par value of Freddie Mac's common stock, increasing the number of shares of Freddie Mac common stock authorized for issuance to four billion, preventing Freddie Mac from making any payment to purchase or redeem its capital stock or pay any dividends to holders of Freddie Mac's common stock, and limiting the voting rights of holders of Freddie Mac's common stock.

5

## DEFENDANTS

15.    **Richard F. Syron**, age 68, was Chairman of the Board of Directors ("Chairman")

and Chief Executive Officer ("CEO") of Freddie Mac from December 2003 until September 7,

2008, when Freddie Mac's regulator, the Federal Housing Finance Agency ("FHFA"), placed it

into conservatorship.  Syron's compensation grew from approximately $14.7 million in 2006 to

$18.3 million in 2007 – tied, in part, to the "Touch More Loans" initiative discussed further

below in Paragraph 45 and to quarterly financial reporting.  Syron formally ceased to be an

employee of Freddie Mac on November 7, 2008, and was deemed to have resigned from the

Board of Directors, effective as of that date.  Syron is a resident of Massachusetts.

16.    As Chairman and CEO of Freddie Mac, Syron oversaw all three of Freddie Mac's

reportable segments, including Single Family.  As Chairman, Syron was a regular attendee at

Board meetings and Board committee meetings, including the Board's Mission, Sourcing and

Technology Committee meetings.  As CEO, he chaired a team that he personally selected from

the upper echelons of executive management called the "SET" or "Senior Executive Team,"

which met periodically to consider Freddie Mac's strategic direction.  Syron also regularly

attended monthly meetings of the Enterprise Risk Management Committee (the "ERMC"),

which was a committee comprised of executives and senior management from Freddie Mac's

three reportable segments that considered the status of credit, market and operational risks,

among others, to the Freddie Mac enterprise.  Syron received monthly materials from the ERMC

that apprised him of the credit, market and operational risks, among others, to the Freddie Mac

enterprise.  Syron also attended meetings of the ERMC.

17.    Syron had extensive knowledge and experience in housing market-related issues.

He wrote a dissertation about the housing market and served in various leadership positions at

both the Federal Reserve Bank of Boston and the Federal Home Loan Bank of Boston, including President and CEO. Syron was knowledgeable about the housing market and mortgage-related risks, and familiar with the views held by other market participants.

18.     Syron regularly received and reviewed drafts of the Freddie Mac Information Statements and Annual Reports to Stockholders ("Information Statements") and supplements to the Information Statements ("Information Statement Supplements") and, once Freddie Mac became an SEC-reporting company, drafts of Freddie Mac's first Form 10-Q. Syron certified Freddie Mac's Information Statements and Supplements published between March 23, 2007 and May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008.

19.     **Patricia L. Cook**, age 58, was an officer of Freddie Mac and held several titles, including Executive Vice President ("EVP") of Investments and Capital Markets and Chief Business Officer ("CBO"), from August 2004 through September 26, 2008. Cook's compensation was $4.9 million in 2006 and $4.8 million in 2007 – tied, in part, to the Touch More Loans strategy discussed below in Paragraph 45 and to quarterly financial reporting. Cook formally ceased to be an employee of the Company on November 17, 2008, approximately two months after the Company announced certain management and organizational changes, including the elimination of her position. Cook is a resident of Washington, D.C.

20.     As EVP of Investments and Capital Markets and as CBO, Cook oversaw Single Family. Cook attended Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings. Cook was one of the senior executives who served on Syron's SET. She also attended or, on occasion, sent representatives on her behalf, to the monthly ERMC meetings. She received materials from the ERMC that apprised her of the credit, market and operational risks, among others, to the Freddie Mac enterprise. As

7

the senior executive in charge of the Single Family business, Cook was knowledgeable about Freddie Mac's acquisitions and the performance of Freddie Mac's high risk loan portfolio, including certain loans the Company internally considered to be subprime.

21.     The Touch More Loans strategy, discussed below in Paragraph 45, also played a role in Cook's compensation.  In 2006, Cook's target bonus was $2 million and her target long-term equity award for performance was $2.4 million.  Cook received a bonus of $2.3 million, or $300,000 in excess of her target, and a long-term equity award equating to $2.763 million, or $363,000 greater than her target, in part due to Cook's Touch More Loans strategy.  In 2007, Cook received a bonus of $1.4 million dollars plus a supplemental bonus of $200,000 with a three-year vesting schedule, again in part because of Touch More Loans.

22.     Cook was responsible for ensuring that Single Family's public disclosures were accurate.  Cook was considered an expert on credit risk within Freddie Mac.  Furthermore, during the Relevant Period, the Disclosure Committee consulted Cook at least once regarding the Company's public disclosures concerning subprime.

23.     Cook signed sub-certifications directed to Syron and other senior executives for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007 and May 14, 2008, and for Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008.  Each of Cook's sub-certifications covered the Company's subprime disclosures.

24.     **Donald J. Bisenius**, age 53, was employed by Freddie Mac from 1992 through April 1, 2011, and held a number of titles, including Senior Vice President ("SVP") of Credit Policy and Portfolio Management from November 2003 to April 2008, SVP of Single Family

Credit Guarantee from May 2008 to May 2009 and, most recently, EVP of Single Family Credit Guarantee. Bisenius is a resident of Virginia.

25.     In 2007 and 2008, Bisenius reported directly to Cook and was the senior-most officer for credit risk in Single Family during the periods covered by the Information Statement and Information Statement Supplements for the periods ended December 31, 2006, March 31 and June 30, 2007, the Information Statement Supplement for the period ended March 31, 2008, and the Form 10-Q for the period ended June 30, 2008. As the senior-most officer for credit risk in Single Family, Bisenius was recognized within Freddie Mac as an expert on single-family mortgages and on credit risk and was responsible for developing credit policies for Freddie Mac's guarantee of loans.

26.     Between approximately March 2007 and April 2008, Bisenius also focused on certain "special projects," including a "Model Subprime Offering" discussed below in Paragraph 61, aimed at borrowers previously serviced by lenders who self-identified as subprime originators.

27.     Bisenius signed sub-certifications for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007, and August 30, 2007, Freddie Mac's Information Statement Supplement published on May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008. Each of Bisenius' sub-certifications covered the Company's subprime disclosures. Bisenius also served on the Disclosure Committee that considered Freddie Mac's Information Statement Supplement for the period ended March 31, 2008, and its Form 10-Q for the period ended June 30, 2008.

9

***Background***

28.     As described below, in or about June 2006, Freddie Mac began to quantify in its public disclosures the approximate amount of exposure to subprime loans in the Single Family guarantee business. During the Relevant Period, Freddie Mac provided various such estimates – ranging between $2 and $6 billion, or 0.1 to 0.2 percent of its Single Family guarantee business. In fact, during this period, Single Family had exposure to between approximately $140 billion and $244 billion of loans that Freddie Mac internally recognized were "subprime," "otherwise subprime" or "subprime-like." The misleading statements identified herein all relate to attempts by Freddie Mac and its senior executives, including defendants, to minimize and mislead investors concerning the exposure of Freddie Mac's Single Family guarantee business to subprime loans.

29.     Beginning with its Information Statement for the fiscal year ended December 31, 2003 (the "2003 Information Statement"), and continuing through the Relevant Period, Freddie Mac published tables of credit risk characteristics for Single Family loans (the "Credit Risk Tables"). Those Credit Risk Tables contain information describing risk characteristics such as original loan-to-value ("LTV") ratio bands, product type, property type, occupancy type, FICO credit score bands, loan purpose, geographic concentration, and origination year. The Credit Risk Tables did not quantify or otherwise provide estimates of Freddie Mac's exposure to subprime loans.

30.     In or about March 2007, as investor interest in the credit risk associated with subprime loans continued to increase, Freddie Mac began to provide narrative disclosure describing and estimating the exposure of its Single Family guarantee business to subprime

10

loans. These disclosures contained blatantly false and misleading statements for the reasons described below.

*Since the 1990s, Freddie Mac Internally Categorized Loans*
*As Subprime Or Subprime-Like As Part Of Its Loan Acquisition Programs*
*And In Connection With Monitoring The Risk Of Its Portfolios*

31.     As part of its loan acquisition and securitization process in the Single Family credit guarantee portfolio, Freddie Mac provided mortgage loan originators with a series of mortgage underwriting standards and/or automated underwriting software tools, including, since at least 1995, its proprietary automated underwriting system ("AUS") called "Loan Prospector."

32.     Loan Prospector generated a credit risk classification for each loan and was used to determine the terms on which a loan could be sold to Freddie Mac, including whether a loan could be sold to Freddie Mac without certain representations and warranties or without additional cost.

33.     During the Relevant Period, Loan Prospector generated a score that estimated the risk of default for each loan. The scores, in turn, were grouped into six bands or "grades," which roughly corresponded to the level of anticipated risk: A+, A1, A2, A3, C1 or C2. These grades were visible to Freddie Mac but not to mortgage loan originators or the public. Loans falling into the first four grades (A+, A1, A2 and A3) were designated "Accept Loans." Loans falling into the bottom two grades (C1 and C2) were designated "Caution Loans."

34.     A loan designated as an Accept Loan permitted automated underwriting, reduced documentation and generally did not require originators to make special representations and warranties regarding the credit quality of the loan because Loan Prospector had already determined the loan was creditworthy.

35.     By contrast, Loan Prospector's designation of a loan as a Caution Loan meant that the system had identified concerns about the loan's creditworthiness. Originators were required

11

manually to underwrite Caution Loans, produce additional documentation regarding the borrower's creditworthiness, and make special representations and warranties regarding the credit quality of the loan. Caution Loans had multiple higher risk characteristics, such as high LTV ratios, borrowers with lower FICO scores, unusual property types or high debt-to-income ratios, and were recognized within Freddie Mac as loans that had a high risk of default relative to Accept Loans. Internally at Freddie Mac, Caution Loans were considered to be equivalent to subprime.

36.    On October 8, 1997, Freddie Mac publicly announced the roll-out of its "A-minus Program" at the Mortgage Bankers Association's annual meeting in New York. "A-minus" was a term commonly used in the marketplace to refer to subprime loans. The next day, the *American Banker* published an article reporting on Freddie Mac's announcement and observed that "Freddie Mac is diving into subprime lending, ending months of speculation over how deeply the agency would go into the burgeoning market." Under the A-minus Program, Caution Loans that received a score of C1 in Loan Prospector could be sold to Freddie Mac on the same terms as an Accept Loan with the payment of an additional fee by the seller. As noted by the *American Banker* article, the A-minus Program was publicly perceived as expanding Freddie Mac's exposure to subprime loans.

37.    Sales and marketing materials prepared for Single Family as part of the roll-out of the A-minus Program advised the Company's sales force that "Freddie Mac is expanding the range of loans it will purchase, including many loans in the A-minus sector of the market. Now lenders can use Loan Prospector to provide less costly, more efficient financing to borrowers with weaker credit." In describing the A-minus sector of the housing market, the sales and

12

marketing materials stated that "A-minus loans account for approximately 50 percent of subprime loans."

38.     In or about November 1998, in connection with the A-minus Program, Freddie Mac revised its Credit Policy Book as it related to the broader credit risk parameters and processes under which Freddie Mac was willing to guarantee loans in Single Family.  The memorandum authorizing these revisions described mortgages eligible for the A-minus Program as "[m]ortgages that generally comprise the first and second tier of subprime lender risk grades" and "mortgages generally includ[ing] 54% to 56% of the subprime market."  Mortgage loans that received a C1 rating in Loan Prospector were described as having a credit quality of "A-minus," and those that received a C2 rating in Loan Prospector were described as having a credit quality of "subprime."  Bisenius signed and approved the revisions to the Credit Policy Book.

39.     In or about 1999, at the request of Bisenius, Freddie Mac developed an econometric model called "Segmentor," which enhanced Loan Prospector's ability to identify subprime loans prior to Freddie Mac guaranteeing those loans.  The model scored mortgage loans on a variety of credit risk characteristics, such as debt ratio, FICOs, and time since most recent foreclosure, and generated a "subprime score."  If the Segmentor "subprime score" fell below certain thresholds or had certain characteristics such as a high debt-to-income ratio, the loan received an automatic rating of C1 or C2 in Loan Prospector.

40.     Loan Prospector developed and evolved over time, but, the internal view that Caution Loans (C1 and C2) were synonymous with subprime or were "subprime-like" did not change.

41.     Freddie Mac's exposure to Caution Loans up through the Relevant Period steadily rose.  As of the end of 2004, Freddie Mac guaranteed the principal and interest on Caution Loans

in the amount of approximately $70 billion. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to Caution Loans from approximately $73 billion to $233 billion, with the largest annual increase between the fourth quarter of 2006 (approximately $138 billion) and the fourth quarter of 2007 (approximately $216 billion). While Caution Loans were internally referred to as subprime, they were not disclosed publicly as part of the Company's Single Family subprime exposure.

### *Freddie Mac Acquires Increasingly Risky Loans to Maintain Market Share*

42.    In or about the early 2000s, Freddie Mac and the Federal National Mortgage Association ("Fannie Mae") began to lose market share in mortgage loan securitizations to new competitors, including Wall Street banks. Mortgage originations had shifted from traditional fixed-rate loans to higher risk loan products with features such as adjustable rates ("ARMs"), interest-only payments, and reduced documentation requirements.

43.    By 2005, the Freddie Mac and Fannie Mae combined share of the market for mortgage securitizations had fallen to approximately 42 percent from a high of nearly 60 percent in 2000. Within that shrinking GSE share of the market, Freddie Mac also had been steadily losing market share to Fannie Mae. Freddie Mac responded to this loss of market share by broadening its credit risk parameters to purchase and guarantee increasingly risky mortgages in its Single Family guarantee portfolio between approximately 2004 and 2007.

44.    For example, in or about late 2004, despite contrary advice from the Company's senior credit risk experts, Syron authorized Freddie Mac's continued purchases of a particularly risky type of mortgage commonly referred to in the industry as a "No Income, No Asset" loan or "NINA." NINAs were widely considered to be particularly risky because they did not require any verification of a borrower's income or assets. Freddie Mac's senior credit risk officers

advocated to Syron that the Company stop guaranteeing NINA mortgages, in part, because of the high risk of default associated with such mortgages within their first year and because of perceived reputation risk to the Company. Syron rejected the advice, in part due to his desire to improve Freddie Mac's market share.

45.     Another example of increased risk taking occurred in or about 2005, when the Company embarked on a business strategy called Touch More Loans. Touch More Loans was designed to gain back lost market share by granting exceptions to Freddie Mac's existing credit policy to permit the acquisition and guarantee of riskier loans that were being originated in the marketplace. Cook led the Touch More Loans strategy.

46.     Coinciding with the introduction of Touch More Loans, the Company embarked on two additional initiatives to expand market share:

        a.     First, in February 2005, Freddie Mac introduced a new residential mortgage product called Home Possible, which was geared to low-to-moderate income borrowers (such as teachers, law enforcement personnel, healthcare workers and the military) and permitted lower down payments or higher loan-to-value ratios, among other higher credit risk characteristics, than had previously been allowed. Loans acquired through Home Possible were internally considered to be "subprime-like."

        b.     Second, on August 17, 2005, Freddie Mac internally issued a policy statement authorizing increased guarantees of a Fannie Mae proprietary product called "Expanded Approval" (or "EA") loans. As of December 2004, Freddie Mac guaranteed the principal and interest on EA loans in the approximate amount of $69 million. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to EA loans from approximately $1 billion to $11 billion (with the largest increase of

15

approximately $8 billion coming between the fourth quarter of 2006 and the fourth quarter of 2007).  EA loans were considered to have, at best, credit risk equivalent to A-minus loans and were internally described in this policy statement as (1) "appear[ing] to be subprime in nature[;]" and (2) "high risk . . . since performance compares to subprime products."  In fact, on August 20, 2007, in an email that was sent to Cook and others, Bisenius described EA loans as "clearly subprime."

47.    From 2005 forward, Freddie Mac also substantially increased its exposure to loans from a subprime lending division of Countrywide Financial Corporation ("Countrywide") known as Full Spectrum Lending.  Between 1999 and 2004, Freddie Mac acquired loans from Countrywide's Full Spectrum Lending division in the aggregate amount of approximately $279 million.  From 2005 through 2008, Freddie Mac acquired approximately $12 billion of Full Spectrum Lending loans (with the largest increase between 2006 (approximately $3 billion) and 2007 (approximately $6 billion)).

48.    The approximate aggregate amount (in billions of U.S. dollars), measured by unpaid principal balance, of C1, C2 and EA loans in Single Family at the end of the following periods was as follows:

| Single-Family Guarantee Portfolio | | | | | | |
|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 1Q05 | $1 | $39 | $35 | $74 | $75 | $1,220 | 6% |

16

| | | | | Single-Family Guarantee Portfolio | | | |
|---|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 2Q05 | $1 | $42 | $37 | $79 | $80 | $1,244 | 6% |
| 3Q05 | $1 | $47 | $39 | $86 | $87 | $1,274 | 7% |
| 4Q05 | $2 | $53 | $42 | $95 | $97 | $1,318 | 7% |
| 1Q06 | $2 | $60 | $47 | $107 | $109 | $1,360 | 8% |
| 2Q06 | $2 | $64 | $50 | $114 | $116 | $1,387 | 8% |
| 3Q06 | $2 | $71 | $54 | $125 | $127 | $1,428 | 9% |
| 4Q06 | $3 | $78 | $60 | $138 | $141 | $1,467 | 10% |
| 1Q07 | $4 | $89 | $67 | $156 | $160 | $1,528 | 10% |
| 2Q07 | $6 | $100 | $77 | $177 | $183 | $1,586 | 12% |
| 3Q07 | $8 | $110 | $88 | $198 | $206 | $1,642 | 13% |
| 4Q07 | $11 | $118 | $98 | $216 | $227 | $1,692 | 13% |
| 1Q08 | $11 | $123 | $104 | $227 | $238 | $1,739 | 14% |
| 2Q08 | $11 | $127 | $106 | $233 | $244 | $1,784 | 14% |

### *Freddie Mac's Acquisition and Guarantee Of*
### *Loans From Other AUSs Increases its Subprime Exposure*

49.     Beginning in or about 2004, in addition to purchasing and guaranteeing the payment of principal and interest on loans that had been underwritten using Loan Prospector, Freddie Mac increasingly purchased and guaranteed mortgage loans underwritten through other proprietary AUSs.   For example, Freddie Mac purchased and guaranteed mortgage loans underwritten using AUSs such as Fannie Mae's Desktop Underwriter and Countrywide's CLUES.

50.     To assess the relative risk of mortgages underwritten through other AUSs, Freddie Mac used an internal modeling system called LP Emulator to approximate how the loans would have scored under Loan Prospector.   LP Emulator used the same scoring metric as Loan Prospector -- Accept Loans (A+, A1, A2 and A3) and Caution Loans (C1 and C2) -- but, LP Emulator was run on a loan after Freddie Mac had agreed to guarantee the loan.   Using LP Emulator, Freddie Mac could identify a loan that would have been designated as a Caution Loan if underwritten through Loan Prospector, but had instead been guaranteed on terms equivalent to an Accept Loan after being underwritten through another AUS.   Loans falling into this category were deemed to have a "defect."  Beginning in 2004, Freddie Mac tracked the "defect rate" of loans acquired through other AUSs.

51.     In the second quarter of 2003, before Freddie Mac increased its purchases through AUSs other than Loan Prospector, Freddie Mac's aggregate defect rate was approximately 1 percent.   Freddie Mac's purchase and guarantee of mortgages underwritten through other AUSs increased to the point where it was acquiring fewer loans through Loan Prospector (approximately 27 percent) than through Fannie Mae's Desktop Underwriter (approximately 31 percent).   The defect rate rose dramatically, and in August 2007, the aggregate defect rate

18

reached a historical high of approximately 22 percent.  Approximately 22 percent of the loans Freddie Mac purchased and guaranteed that were underwritten through other AUSs therefore met the Freddie Mac internal definition of subprime.

*Defendants Were Aware of Subprime Exposure in Single Family*

52.    On May 25, 2006, Cook attended a meeting of the Board's Finance and Capital Deployment Committee.  Prior to that meeting, she received a memorandum authored by the Company's then-Chief Enterprise Risk Officer, highlighting for her and the other attendees that "[t]he credit parameters of new single-family purchases continue to decline.  In order to support our business strategies to increase customer focus, build market share and meet affordable goals, we continue to expand credit policies and increase purchases of higher-risk products."

53.    Six days later, on May 31, 2006, Syron and Cook attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was highlighted that the Touch More Loans strategy had resulted in significantly greater credit risk to the Company. Specifically, a presentation made by a senior credit risk officer stated that, pursuant to Touch More Loans, Freddie Mac was "expanding our appetite" for, among other things, risk layering of lower FICOs, higher LTV's, other AUSs, and other high-risk loans.  To the extent it was not already clear to them prior to the meeting, Syron and Cook also were informed that the Company was loosening its underwriting standards through its implementation of the Touch More Loans strategy by, among other things, increasing exceptions to the Company's existing credit policy – exceptions that had almost tripled between 2004 and 2005, from 286 in 2004 to 770 in 2005.

54.    On November 30, 2006, Bisenius' staff informed him that loans sold to Freddie Mac through Fannie Mae's Desktop Underwriter were contributing disproportionately to the Company's increasing defect rate and included loans that were equivalent to subprime. Specifically, Bisenius' staff told him and others that loans from Fannie Mae's Desktop

19

Underwriter "have a much higher percent of defect loans, loans that are subprime-like, loans that have very low FICOs" in referring to loans that contributed to the increasing "defect rate" at the Company.

55.     On December 7, 2006, Syron and Cook attended a meeting of the Mission, Sourcing and Technology Committee of the Board of Directors.   Attached to a presentation prepared for that meeting was a glossary of terms, the purpose of which was to inform the Board of how management used certain terms. The glossary defined "Subprime Mortgages" as follows:

> There is no longer a clear-cut distinction between prime and subprime mortgages as the mortgage market has evolved to provide for mortgage credit to a full range of borrowers with a variety of products and processes.  Subprime mortgages generally are mortgages that involve elevated credit risk.  Whereas prime loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who have a blemished or weak credit history and/or a weaker capacity to repay.

Ultimately, during the Relevant Period, the Company's public subprime disclosures were inconsistent with how management characterized its use of the term "subprime" for its own Board members.

56.     Beginning on or about January 18, 2007, Freddie Mac's ERMC began to report on Freddie Mac's exposure to subprime loans. Attendees of the January 18 ERMC meeting – including Syron and Cook – were told that "[l]oan level risk grades are blurred as capital retreats in [the] subprime market, increasing the likelihood that we are already purchasing subprime loans under existing acquisition programs."   Accordingly, this presentation reinforced to attendees of this meeting that it was likely that Freddie Mac already was purchasing loans with credit risk characteristics similar to loans originated by self-identified subprime originators, and that market participants would consider to be subprime loans. The ERMC met monthly after this

20

and Syron and Cook generally attended ERMC meetings. Going forward, the ERMC reports consistently contained this same warning. Syron typically received the ERMC reports in advance of the meetings and generally reviewed them prior to the meetings.

57.     On February 6 and 7, 2007, Syron gathered his Senior Executive Team for a two-day offsite planning meeting in Florida to discuss Freddie Mac's strategic direction. Cook attended as a member of the SET, as did Bisenius (who was invited even though he was not formally a member of the SET). At least one presentation was devoted to Freddie Mac's role in the subprime market. That presentation highlighted for attendees the following regarding Freddie Mac's exposure to subprime:

- Freddie Mac "already purchase[s] subprime-like loans . . . but with considerably lower fees[,]" which attendees generally understood meant that Freddie Mac was purchasing loans with credit risk and expected default rates similar to the loans originated by a small handful of institutions that self-identified as subprime originators.

- The "[w]orst 10% of [the Single Family] Flow Business" – which comprised approximately 70 percent of Single Family purchases in 2006 – were "subprime-like loans."

- Freddie Mac was purchasing greater percentages of "risk layer[ed]" loans, defined as loans consisting of total LTV greater than 90 percent and FICO scores less than 680, which was "leading to more 'Cautions'" and a higher "[d]efect rate."

- "'Caution' loans have greater default costs . . . resulting in higher expected losses[.]"

21

58.    On February 17, 2007, Syron received and responded to an email from Bisenius regarding a new "Subprime Project." Bisenius told Syron and others that an expanded role in the subprime market only made sense if Freddie Mac was adequately compensated for the risk, and reminded Syron and others that there were certain categories of loans, including "free cautions," that the Company already purchased and did not receive adequate compensation for the risk.

59.    On March 2 and 3, 2007, Syron, Cook and Bisenius attended a two-day Board of Directors meeting, a significant portion of which was dedicated to the Company's strategic direction in subprime. Cook was one of the presenters at the Board meeting and she, along with the then-Chief Operating Officer, presented similar information to the Board as contained in the February 6 and 7 offsite meeting. Specifically, Cook and the then-Chief Operating Officer led a discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow Business" was listed as an example of "subprime-like loans" the Company already purchased, and in which they conveyed:

- "We already purchase subprime-like loans to help achieve our HUD goals . . . [b]ut we receive considerably lower fees than subprime loans would fetch in the market."

- "Some of our current purchases have subprime-like risk[.]"

- "[F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, with returns five to six times as great, not universal for all subprime."

60.    In addition to receiving at least the SET and Board materials referred to above in Paragraphs 57 and 59 which highlighted, among other things, that a material portion of the Single Family business was "subprime-like," and monthly ERMC reports which repeatedly warned of the increasing risk that Freddie Mac was buying subprime loans (and showed data

22

suggesting that the credit risk of the principal and interest of loans to be securitized by Freddie Mac was increasing to historic proportions), Syron also was aware at least as early as February 17, 2007 of Freddie Mac's efforts to develop a model subprime offering targeted at customers of self-identified subprime originators.

61.    By at least early April 2007, Bisenius transitioned into a new role at Freddie Mac, where he was placed in charge of developing a Model Subprime Offering that was later publicly known as a product called "Freddie Mac SafeStep Mortgages," to give subprime borrowers a more consumer-friendly mortgage option.

62.    Although the Model Subprime Offering purportedly had been developed as an alternative to subprime products, Freddie Mac personnel, including Syron, Cook and Bisenius, recognized that it actually competed with existing programs that Freddie Mac had internally recognized as "subprime," "otherwise subprime," or "subprime-like."

63.    On April 12, 2007, Bisenius proposed abolishing Freddie Mac's A-minus Program – which was long-recognized as subprime – "so as to not canabalize [sic] our [Model Subprime Offering]."

64.    By mid-April 2007, Bisenius also knew that the credit characteristics of loans to be guaranteed under the Model Subprime Offering were similar to those of other existing Freddie Mac programs in addition to the A-minus Program, such as Home Possible and Fannie Mae's EA program, which he was well aware internally were perceived as programs that exposed Freddie Mac to subprime or subprime-like loans – as he had used those same descriptions for those programs.

65.    Bisenius regularly briefed Cook on the Model Subprime Offering.   Cook requested these briefings to discuss the role of the Company's existing Single Family guarantee

23

programs relative to the Model Subprime Offering.  At a briefing on April 20, 2007, highlighted
that there were "alignment" issues between the Model Subprime Offering loans and Freddie
Mac's existing loan programs.

66.    On May 16, 2007, Bisenius sent an e-mail commenting on a set of
recommendations regarding certain of Freddie Mac's current offerings as related to the Model
Subprime Offering.  In the email, Bisenius observed that the recommendations did not "address
DU approves or Proprietary AUS approves that we think are subprime (ie., [sic] they would
score Caution in LP) and therefore might compete with our model offering."

67.    On June 7, 2007, Cook and Bisenius attended a meeting of the Board's Mission,
Sourcing and Technology Committee, where it was conveyed that:

- Certain higher risk loans sold to Freddie Mac through other AUSs were
  equivalent to subprime.

- Freddie Mac-securitized loans obtained through Fannie Mae's Desktop
  Underwriter had a "higher share of low FICO loans and subprime-like loans"
  relative to other AUS loans.

- Loans sold to Freddie Mac through Countrywide's CLUES were "particularly
  volatile" and, in particular, of those loans sourced through CLUES that were later
  scored by Freddie Mac's LP Emulator as "Caution," (called "defect loans" for
  their contributions to the "defect rate"), a high proportion of such loans were
  "subprime in nature."

68.    On or about June 11, 2007, Cook and others received an "Executive Summary"
sponsored by Bisenius, that stated that the Model Subprime Offering would compete with
existing loans the Company acquired and guaranteed such as "[Freddie Mac's] affordable

24

offerings like Home Possible and [Fannie Mae's] MyCommunityMortgage, as well as our LP

Loan Prospector A-minus offering and [Fannie Mae's] newly revamped EA program." The

Executive Summary also highlighted that "[s]ubprime mortgages are not considered unique in

the industry. An analysis of Freddie Mac's existing products indicates our current A-minus

offering has credit risk and product parameters (business terms) that match, and in some cases,

are broader than those outlined in the proposed model Subprime offering." Cook attended the

meeting of the New Products Committee where this Executive Summary was discussed.

69.    At the September 25, 2007 ERMC meeting, both Syron and Cook were told that

the defect rate of purchases, which had been steadily rising, had increased from approximately

13 percent at the end of June 2007, to 19 percent in July 2007, to approximately 22 percent in

August 2007. The presentation highlighted for Syron and Cook that principal drivers of the

defect rate were low FICOs and high LTVs. Syron and Cook were presented with similar facts

at the October 23, 2007 ERMC meeting.

70.    Additionally, on September 26, 2007, Cook received a memorandum describing

how the Model Subprime Offering would be positioned for marketing purposes. The

memorandum noted that the Model Subprime Offering was consistent with Freddie Mac's

"longer term corporate 'touch more loans' strategy to expand into adjacent markets" and that the

offering would replace Freddie Mac's A-minus loan program.

71.    On November 27, 2007, the ERMC distributed a packet of materials to Syron and

Cook, among others. Although no meeting took place, the materials further informed Syron and

Cook of the stresses on Single Family as a result of Freddie Mac's acquisition of riskier loans.

Specifically, the materials highlighted that the "2007 book performance is worse than in 2006,

both exhibiting much higher serious delinquency rates than other book years;" that expected

default costs for October 2007 "are 76% higher than in 2006;" and that the defect rate had risen to approximately 20 percent.

72.    On December 18, 2007, Syron and Cook attended an ERMC meeting, which highlighted for them the deterioration of credit quality for the largest portion of Freddie Mac's Single Family guarantee portfolio.  According to the report used at that meeting, the defect rate for the third quarter of 2007 had increased to approximately 20 percent, up from approximately 16 percent in the second quarter of 2007 and approximately 13 percent in the first quarter of 2007.  Similar facts were highlighted for Syron and Cook at meetings of the ERMC on January 23, 2008

73.    On January 23, 2008, Syron and Cook attended another ERMC meeting, during which they were told that the defect rate on the largest part of the business was at approximately 20 percent in November, still at historically high levels.  Syron and Cook also were told that EA loans accounted for approximately 19 percent of expected default costs in Single Family. Similar trends were highlighted for Syron and Cook at ERMC meetings on February 19, 2008, March 25, 2008 and April 29, 2008

### *Syron, Cook and Bisenius Were Responsible for Freddie Mac's Disclosures*

74.    Syron, Cook and Bisenius each made, or aided and abetted Freddie Mac or each other in making, false and misleading credit risk disclosures regarding subprime loans in the Company's Single Family guarantee portfolio as a result of their authority over, or knowing and substantial assistance in, such disclosures.

75.    As CEO of Freddie Mac, Syron certified the Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2006 (the "2006 Information Statement"), the Financial Report for the Three and Six months Ended June 30, 2007 (the "2Q07 Information Statement Supplement"), the Financial Report for the Three and Nine Months Ended

26

September 30, 2007 (the "3Q07 Information Statement Supplement"), the Information Statement

and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2007 (the "2007

Information Statement"), the Financial Report for the Three Months Ended March 31, 2008 (the

"1Q08 Information Statement Supplement"), and the Form 10-Q for the Quarterly Period Ended

June 30, 2008 (the "2Q08 Form 10-Q"). The certifications stated, among other things:

- "Based on my knowledge, this [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this [Report.]"

- "Based on my knowledge, the consolidated financial statements, and other financial information included in this [Report], fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this [Report]."

76.    Cook sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement, the 3Q07 Information Statement Supplement, the 2007 Information Statement, the 1Q08 Information Statement Supplement, and 2Q08 Form 10-Q. Bisenius sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement and the 2Q08 Form 10-Q. Those sub-certifications stated, among other things:

- "Based upon my role and responsibilities, I have reviewed the appropriate sections of the [Report]."

- "I have consulted with such members of my staff and others whom I thought should be consulted in connection with my execution of this attestation."

- "Based upon my role and responsibilities, but limited in all respects to the matters that come to my attention in fulfilling my responsibilities as [CBO (Cook) or SVP for Credit Policy (Bisenius)], I hereby certify to the best of my knowledge and belief that:"

- "The [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, to not be misleading."

- "The financial statements and other financial information included in the [Report] fairly present, in all material respects, the financial condition and results of

operations, and cash flows of the Company as of and for the periods presented in the [Report]."

77.     Cook and Bisenius each sub-certified to the accuracy of Freddie Mac's subprime disclosures in those Information Statements and Information Statement Supplements described above in Paragraph 76 based upon their respective roles and responsibilities at the Company.

78.     As EVP for Investments and Capital Markets and CBO, during the Relevant Period, Cook specifically had responsibility over the Company's Single Family business, including the Company's subprime loan exposure as it related to the credit risks associated with that business.

79.     As SVP of Credit Policy and Portfolio Management and SVP of Single Family Credit Guarantee, during a portion of the Relevant Period, Bisenius had direct responsibility over the credit risks, including subprime loan exposure, associated with the Single Family business. During that portion of the Relevant Period that Bisenius was working on "special projects" for Cook, including the Model Subprime Offering, Bisenius continued to carry on certain responsibilities as the SVP for Credit Policy and Portfolio Management, and sub-certified to those Information Statements and Information Statement Supplements described above in Paragraph 76. In addition to sub-certifying these disclosures, Bisenius served on the Disclosure Committee that considered the 2Q08 Form 10-Q.

80.     Given their respective roles and responsibilities and the importance of the sub-certifications to the Company's disclosure process, Cook and Bisenius substantially assisted in the making of the Company's false and misleading statements by validating the accuracy of the Company's subprime disclosures, which they knew or were reckless in not knowing were false.

### *Freddie Mac's Subprime Disclosures*

81.     On June 28, 2006, in its Information Statement and Annual Report to Stockholders for the fiscal year end December 31, 2005 (the "2005 Information Statement"), Freddie Mac publicly quantified for the first time the exposure of its Single Family portfolio to subprime loans.   The Company represented that:  "At December 31, 2005 and 2004, we guaranteed $2.3 billion and $4.5 billion of securities backed by subprime mortgages which constituted less than one percent of our Total mortgage portfolio, respectively."

82.     The Company also noted that it participated in the subprime segment in two other ways:  (i) "our Retained portfolio makes investments in non-Freddie Mac mortgage-related securities that were originated in this market segment" and (ii) "we made investments through our Retained Portfolio in some of the structured securities we issue with underlying collateral that is subprime."

83.     During the Relevant Period, Freddie Mac continued to make public disclosure of its Single Family subprime exposure.  However, the disclosures during the Relevant Period were consistently materially false and misleading.

### *Year-End 2006*

84.     On March 23, 2007, in its 2006 Information Statement, Freddie Mac disclosed the following regarding it subprime exposure in Single Family:

> Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime.  There is no universally accepted definition of subprime.   The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans.  Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income.  The

29

subprime market helps certain borrowers by increasing the availability of mortgage credit.

While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

The 2006 Information Statement also disclosed that Freddie Mac held, at December 31, 2006 and 2005, in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

85.    The statement in the 2006 Information Statement that Freddie Mac's subprime exposure in Single Family was "not significant" was materially false and misleading because it communicated the misleading impression that after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac determined that its Single Family guarantee portfolio had no significant exposure.

86.    Contrary to its disclosure, at December 31, 2006, Freddie Mac's single-family credit guarantee portfolio consisted of approximately $141 billion of C1, C2 and EA loans – loans that Single Family internally described as "subprime," "otherwise subprime" or "subprime-like loans" -- which represented approximately 10 percent of Freddie Mac's single-family credit guarantee portfolio.

87.    Syron certified, and Cook and Bisenius each signed sub-certifications, for the 2006 Information Statement even though they knew, or were reckless in not knowing, that the

30

disclosure regarding exposure to subprime loans contained in the 2006 Information Statement was materially false and misleading.

88.    The disclosures contained in Freddie Mac's 2006 Information Statement were incorporated by reference into, among other things, Freddie Mac's April 10, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of 5.66 percent non-cumulative perpetual preferred stock.

*Syron Makes a Materially False and Misleading Statement Regarding Freddie Mac's Exposure to Subprime Loans on an Earnings Conference Call*

89.    The same day that Freddie Mac published the 2006 Information Statement, the Company's senior executives held an earnings conference call. Syron and others participated in the call. On the call, Syron had the following question-and-answer exchange with a research analyst:

> Q:    "Seems like over the last couple of years that subprime market has really replaced the FHA product. You and to some degree Fannie Mae both have abstained from those higher LTV products. . . ."
>
> A:    "Fortunately, at least speaking for ourselves as a GSE, we as you know weren't involved in underwriting much of that business any of that business directly. Having said all of that … [w]e are working fairly intensely right now on how we can develop products in the subprime space that [are] both shareholder and consumer friendly . . . we're doing it on a pretty accelerated basis."

90.    Syron's statement that, with respect to the subprime market, Freddie Mac was not "involved in underwriting much of that business any of that business directly" was materially false and misleading. Furthermore, his answer reinforced the already misleading impression that Freddie Mac did not participate in the "subprime space," but was exploring ways to develop products for that market.

31

*Syron and Cook Make Materially False and Misleading Statements Regarding*
*Single Family's Exposure to Subprime in Speeches at Investor Conferences*

91.     Less than two months after the 2006 Information Statement was issued, Syron and

Cook each spoke at separate investor conferences and reiterated the misleading assertion that

Single Family's exposure to subprime loans was not significant.

92.     On May 14, 2007, Syron spoke in New York at the UBS Global Financial

Services Conference (the "UBS Conference") and stated: "As we discussed in the past, at the

end of 2006, Freddie had basically no subprime exposure in our guarantee business, and about

$124 billion of AAA rated subprime exposure in our retained portfolio."

93.     Three days later, on May 17, 2007, Cook gave a speech at the Lehman Brothers

10th Annual Financial Services Conference (the "Lehman Conference") in London and stated:

"As we discussed in the past, at the end of 2006, Freddie had basically no subprime exposure in

our guarantee business, and about $124 billion of AAA rated subprime exposure in our retained

portfolio."

94.     Each of Syron's statement at the UBS Conference quoted in Paragraph 92 and

Cook's statement at the Lehman Conference quoted in Paragraph 93 was materially false and

misleading because the statements reinforced the misleading impression that Freddie Mac had

little or no exposure to subprime loans in its Single Family guarantee business and was not in the

"subprime space."

95.     Prior to these speeches, Syron and Cook both knew or were reckless in not

knowing that it was false and misleading to claim the Company "had basically no subprime

exposure." The then-head of External Reporting and others at Freddie Mac recognized that this

statement was inaccurate.

32

96.     Prior to Syron and Cook giving these speeches, Freddie Mac's then-head of External Reporting reviewed a draft of Syron's speech and warned Bisenius, among others, that it would be false to state that Freddie Mac has basically no exposure to subprime:

> We need to be careful how we word this. Certainly our portfolio includes loans that under some definitions would be considered subprime. . . . We should reconsider making as sweeping a statement as we have "basically no subprime exposure."

97.     Bisenius did not respond to the concern raised by the then-head of External Reporting or otherwise seek to correct the speeches before they were given. He reported to Cook at the time.

### *First and Second Quarters of 2007*

98.     On June 14, 2007, Freddie Mac published its financial report for the three months ended March 31, 2007 (the "1Q07 Information Statement Supplement"), which appended, among other things, a June 14 press release in which Syron suggested that Freddie Mac was just starting to become exposed to subprime: "I'm particularly proud that our company took a leadership role in the subprime mortgage market, announcing new underwriting standards and products and committing to purchase up to $20 billion mortgages to support subprime borrowers."

99.     Freddie Mac did not quantify its subprime exposure in its 1Q07 Information Statement Supplement but incorporated by reference the misleading subprime disclosure contained in its 2006 Information Statement.

100.    The disclosures contained in Freddie Mac's 2006 Information Statement and its 1Q07 Information Statement Supplement were incorporated by reference into, among other things, Freddie Mac's July 17, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of 6.02 percent non-cumulative perpetual preferred stock.

33

101.   On August 30, 2007, Freddie Mac published its 2Q07 Information Statement Supplement, which purported to disclose Freddie Mac's total Single Family exposure to subprime:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.

> We estimate that approximately $2 billion, or 0.1 percent, and $3 billion, or 0.2 percent, of loans underlying our single-family mortgage portfolio, at June 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.

The 2Q07 Information Statement Supplement also disclosed that, at June 30, 2007 and December 31, 2006, Freddie Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $119 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

102.   The statement in Freddie Mac's 2Q07 Information Statement Supplement concerning Single Family's exposure to subprime in it guarantee portfolio was materially false and misleading.  It communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac determined that its Single Family guarantee portfolio included only $2 billion, or 0.1 percent, of subprime loans as of June 30, 2007.

34

103.     Contrary to its disclosure, as of June 30, 2007, Freddie Mac's Single Family guarantee portfolio consisted of more than $182 billion of C1, C2 and EA loans – loans internally described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented approximately 11 percent of the Single Family credit guarantee portfolio.

104.     In July 2007, in between the publication of Freddie Mac's 1Q07 and 2Q07 Information Statement Supplements, Cook was involved in developing the Company's definition of subprime for disclosure purposes.

105.     Syron certified and Cook and Bisenius each sub-certified the 2Q07 Information Statement Supplement even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

106.     The disclosures contained in Freddie Mac's 2006 Information Statement and its 2Q07 Information Statement Supplements were incorporated by reference into, among other things, Freddie Mac's September 25, 2007 Offering Circular, pursuant to which Freddie Mac issued $500 million of 6.55 percent non-cumulative perpetual preferred stock.

### *Third Quarter of 2007*

107.     On November 20, 2007, Freddie Mac published its 3Q07 Information Statement Supplement, which purported to disclose Freddie Mac's total Single Family exposure to subprime:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a

35

borrower's income.  The subprime market helps certain borrowers by broadening the availability of mortgage credit.

We estimate that approximately $5 billion and $3 billion of loans underlying our Structured Transactions at September 30, 2007 and December 31, 2006, respectively, were classified as subprime mortgage loans.

The 3Q07 Information Statement Supplement also disclosed that, at September 30, 2007 and December 31, 2006, Freddie Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $105 billion and $124 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

108.   The statement in Freddie Mac's 3Q07 Information Statement Supplement concerning Single Family's exposure to subprime in its guarantee portfolio was materially false and misleading.  It communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its Single Family guarantee portfolio included only $5 billion of subprime loans as of September 30, 2007.

109.   Contrary to its disclosure, Freddie Mac's Single Family credit guarantee portfolio had exposure to approximately $206 billion of C1, C2 and EA loans – loans internally described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented approximately 13 percent of the Single Family credit guarantee portfolio as of September 30, 2007.

110.   Syron certified and Cook sub-certified the 3Q07 Information Statement Supplement even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

111.   The disclosures contained in Freddie Mac's 2006 Information Statement and its 3Q07 Information Statement Supplements were incorporated by reference into, among other

36

things, Freddie Mac's November 29, 2007 Offering Circular, pursuant to which Freddie Mac

issued $6 billion of fixed-to-floating rate non-cumulative perpetual preferred stock.

*Syron Makes a False and Misleading Statement Regarding*
*Single Family's Exposure to Subprime at an Investor Conference*

112.   On December 11, 2007, Syron spoke at a Goldman Sachs & Co. Financial

Services Conference (the "GS Conference") in New York.   At the GS Conference, Syron

knowingly or recklessly made the false and misleading representation that Freddie Mac had not

guaranteed any subprime loans in its Single Family guarantee business. He stated:

> Finally, we feel that our credit position in the current guarantee
> book, actually, is very near the best of the entire industry.  A very
> major reason for this is that we have very low exposures to alt A in
> risk-layered mortgage products in the guarantee business.   We
> didn't do any subprime business. . . .  In terms of our insight into
> the subprime stuff, we didn't buy any subprime loans.  I mean, we
> bought some securities, which we can go through, and we think
> we're fine in.  We bought them for goal purposes.  But we didn't
> buy in guarantee, essentially any subprime loans.  So we weren't in
> that business.

113.   Syron's statement was materially false and misleading because his statement

reinforced the misleading impression that Freddie Mac had little or no exposure to subprime

loans in its Single Family guarantee business.  Although Syron appears to have rationalized this

false and misleading statement based on the fact that Single Family did not typically acquire

loans from a small handful of institutions that self-identified as subprime originators, this

rationale was not publicly disclosed and not shared with the audience as the basis for his

sweeping public statement.  In fact, as set forth above, at the time of Syron's statement, the

Freddie Mac Single Family guarantee business consisted of approximately $206 billion of

exposure to loans that Freddie Mac internally recognized were "subprime," "otherwise

subprime" or "subprime-like."

37

### *Year-End 2007*

114.   On February 28, 2008, Freddie Mac published its 2007 Information Statement,

which purported to disclose Freddie Mac's total Single Family exposure to subprime:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit.

> While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. See "Mortgage Portfolio Characteristics — Higher Risk Combinations" for further information. We estimate that approximately $6 billion and $3 billion of loans underlying our Structured Transactions at December 31, 2007 and 2006, respectively, were classified as subprime mortgage loans.

The 2007 Information Statement Supplement also disclosed that, as of December 31, 2007 and

December 31, 2006, Freddie Mac held in its Retained Portfolio – which is distinct from the

Single Family guarantee portfolio – "approximately $110 billion and $122 billion, respectively,

of non-agency mortgage-related securities backed by subprime loans." Additionally, Freddie

Mac announced that, to date, it had made purchase commitments of $207 million of mortgages

on primary residence, single-family properties, pursuant to the commitment it announced in

April 2007 to purchase up to $20 billion in fixed-rate and hybrid ARM products and also

purchases of $43 billion of mortgages to borrowers that otherwise might have been limited to

subprime products.

115.    The statement in Freddie Mac's 2007 Information Statement concerning Single Family's subprime exposure in its guarantee portfolio was materially false and misleading because it communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its Single Family guarantee portfolio included only $6 billion of exposure to subprime loans as of December 31, 2007.

116.    Contrary to its disclosure, Freddie Mac was exposed in its Single Family guarantee business to approximately $226 billion of C1, C2 and EA loans – loans internally described as "subprime," "otherwise subprime" or "subprime-like loans" – which represented approximately 13 percent of Freddie Mac's Single Family credit guarantee portfolio as of December 31, 2007.

117.    Syron certified and Cook sub-certified the 2007 Information Statement even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

### *First Quarter of 2008*

118.    On May 14, 2008, Freddie Mac published its 1Q08 Information Statement Supplement, purported to assure investors that it monitors the subprime loans it guarantees and purported to disclose Freddie Mac's exposure to subprime loans underlying Structured Transactions:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans.

> Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit. While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "Higher Risk Combinations" for further information). In addition, we estimate that approximately $4 billion of security collateral underlying our Structured Transactions at both March 31, 2008 and December 31, 2007 were classified as subprime.

The 1Q08 Information Statement Supplement also disclosed that, as of March 31, 2008 and December 31, 2007, Freddie Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio – "approximately $93 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

119.   The statement in Freddie Mac's 1Q08 Information Statement Supplement concerning Single Family's exposure to subprime in its guarantee portfolio was materially false and misleading because it communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its total Single Family exposure to subprime loans was only $4 billion, or the amount of its Structured Transactions as of March 31, 2008. In fact, at the time, Freddie Mac was exposed to approximately $239 billion of C1, C2 and EA loans – loans that were internally referred to as "subprime," "otherwise subprime" or "subprime-like loans – which represented approximately 14 percent of Freddie Mac's Single Family credit guarantee portfolio.

120.   Syron certified and Cook sub-certified the 1Q08 Information Statement Supplement even though they knew or were reckless in not knowing that the Statement was materially misleading.

### *Second Quarter of 2008*

121.    On August 6, 2008, Freddie Mac filed with the Commission its 2Q08 Form 10-Q,

which was the first periodic report it filed following its registration with the Commission. The

2Q08 Form 10-Q disclosed the following regarding Freddie Mac's subprime exposure:

> Participants in the mortgage market often characterize single-family loans based upon their overall credit-quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high LTV ratios, low credit scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by broadening the availability of mortgage credit. While we have not historically characterized the single-family loans underlying our PCs and Structured Securities as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "Higher Risk Combinations" for further information). In addition, we estimate that approximately $6 billion of security collateral underlying our Structured Transactions at both June 30, 2008 and December 31, 2007 were classified as subprime.
>
> . . . .
>
> Although we do not categorize our single-family loans into prime or subprime, we recognize that certain of the mortgage loans in our retained portfolio exhibit higher risk characteristics. Total single-family loans include $1.3 billion at both June 30, 2008 and December 31, 2007, of loans with higher-risk characteristics, which we define as loans with original LTV ratios greater than 90% and borrower credit scores less than 620 at the time of loan origination.

The 2Q08 Form 10-Q also disclosed that, as of June 30, 2008 and December 31, 2007, Freddie

Mac held in its Retained Portfolio – which is distinct from the Single Family guarantee portfolio

41

– "approximately $86 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans."

122.    The statement in Freddie Mac's 2Q08 Form 10-Q concerning Single Family's exposure to subprime in its guarantee portfolio was materially false and misleading.   It communicated the misleading impression that, after considering a mix of credit risk characteristics to assess its exposure to subprime loans, Freddie Mac had determined that its Single Family exposure to subprime loans was only $6 billion, or the amount of its Structured Transactions, as of June 30, 2008.  In fact, at June 30, 2008, Freddie Mac's Single Family guarantee portfolio was exposed to approximately $244 billion of C1, C2 and EA loans – loans that were internally referred to as "subprime," "otherwise subprime" or "subprime-like loans – which represented approximately 14 percent of Freddie Mac's Single Family credit guarantee portfolio.

123.    Syron certified and Bisenius and Cook sub-certified to the 2Q08 Form 10-Q even though they knew or were reckless in not knowing that the Statement was materially false and misleading.

124.    The chart below summarizes (in billions of U.S. dollars) the approximate exposure to subprime loans in the Freddie Mac Single Family guarantee business, as disclosed by Freddie Mac, compared to the Freddie Mac exposure to Caution Loans (C1 and C2) and EA loans – loans that were internally described as "subprime," "otherwise subprime" or "subprime like" – during the same period:

| Period | Disclosed Subprime Exposure | % Disclosed Subprime Exposure of Total Single-Family Guarantee Portfolio | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
|---|---|---|---|---|---|
| 4Q06 | "Not Significant" | 0.1% | $141 | $1,467 | 10% |
| 1Q07 | N/A | 0.1% | $159 | $1,528 | 10% |
| 2Q07 | $2 | 0.1% | $182 | $1,586 | 11% |
| 3Q07 | $5 | N/A | $206 | $1,642 | 13% |
| 4Q07 | $6 | N/A | $226 | $1,692 | 13% |
| 1Q08 | $4 | N/A | $239 | $1,739 | 14% |
| 2Q08 | $6 | N/A | $244 | $1,784 | 14% |

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b)
### (Against Syron and Cook)

125. Paragraphs 1 through 124 are realleged and incorporated by reference as if set forth fully herein.

126. Syron and Cook, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Freddie Mac securities, knowingly or recklessly, made

43

untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

127.   By reason of the foregoing, Syron and Cook violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rules 10b-5(b)
### (Against Syron, Cook and Bisenius)

128.   Paragraphs 1 through 127 are realleged and incorporated by reference as if set forth fully herein.

129.   Freddie Mac, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

130.   By reason of the foregoing, Syron knowingly or recklessly provided substantial assistance to and thereby aided and abetted Freddie Mac in its violations of Exchange Act Section 10(b) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; therefore, Syron is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

131.   By reason of the foregoing, Cook knowingly or recklessly provided substantial assistance to Freddie Mac and/or Syron and thereby aided and abetted Freddie Mac and/or Syron in their violations of Exchange Act Section 10(b) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; therefore, Cook is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

132.    By reason of the foregoing, Bisenius knowingly or recklessly provided substantial assistance to Freddie Mac, Syron and/or Cook and thereby aided and abetted Freddie Mac, Syron and/or Cook in their violations of Exchange Act Section 10(b) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; therefore, Bisenius is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

133.    Unless restrained and enjoined, Syron, Cook and Bisenius will in the future aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CLAIM FOR RELIEF

#### Violations of Sections 17(a)(2) of the Securities Act
#### (Against Syron and Cook)

134.    Paragraphs 1 through 133 are realleged and incorporated by reference as if set forth fully herein.

135.    Syron and Cook, directly or indirectly, in the offer and sale of Freddie Mac securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly, recklessly, or negligently have obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.    By reason the foregoing, Syron and Cook violated, and unless enjoined will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CLAIM FOR RELIEF

### Violation of Exchange Act Rule 13a-14
### (Against Syron)

137.   Paragraphs 1 through 136 are realleged and incorporated by reference as if set forth fully herein.

138.   On August 6, 2008, Syron signed false certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder, that were included in Freddie Mac's Form 10-Q filed with the Commission on that date.   His certification falsely stated that:   he had reviewed each report; based upon his knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and based upon his knowledge, the financial statements and information contained in each report fairly present in all material respects the financial condition, results of operations and cash flows of the issuer.

139.   By reason of the foregoing, Syron violated, and unless restrained and enjoined will in the future violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20 and 13a-13
### (Against Syron, Cook and Bisenius)

140.   Paragraphs 1 through 139 are realleged and incorporated by reference as if set forth fully herein.

141.   Section 13(a) of the Exchange Act and Rule 13a-13 thereunder require issuers of registered securities to file with the Commission factually accurate quarterly reports.   Exchange

46

Act Rule 12b-20 provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

142.    Freddie Mac violated Exchange Act § 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-13].

143.    By reason of the foregoing, Syron, Cook and Bisenius acted knowingly or recklessly provided substantial assistance to and thereby aided and abetted Freddie Mac's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13]; therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a)    Permanently restrain and enjoin defendants Syron and Cook from violating or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13, and with respect to defendant Syron only, Exchange Act Rule 13a-14 [17 C.F.R. §§ 240.b-20, 240.13a-13, and 240.13a-14];

(b)    Permanently restrain and enjoin defendant Bisenius from aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.b-20 and 240.13a-13];

47

(c)     Order Syron, Cook and Bisenius to pay disgorgement, together with prejudgment interest;

(d)     Order Syron, Cook and Bisenius to pay penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(e)     Permanently bar Syron, Cook and Bisenius, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

48

(f)     Grant such other relief as this Court may deem necessary and proper.

Dated: December 14, 2011
     Washington, DC                 Respectfully submitted,

                                            Suzanne J. Romajas
                                            Kevin P. O'Rourke

Of Counsel:                 SECURITIES AND EXCHANGE COMMISSION
Stephen L. Cohen          100 F Street, N.E.
Charles E. Cain            Washington, DC 20549-5971
Giles T. Cohen            Tel:  202-551-4473 (Romajas)
David S. Karp             Email (Romajas): RomajasS@sec.gov
                                      Email (O'Rourke): ORourkeK@sec.gov

                                      Counsel for Plaintiff

# Exhibit E

JUDGE CARTER    11 CIV 9202

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | Civil Action No. 11-C... |
| -v.- | ECF Case |
| **DANIEL H. MUDD, ENRICO DALLAVECCHIA, and THOMAS A. LUND,** | Jury Trial Demanded |
| Defendants. | |

RECEIVED
DEC 16 2011
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission") for its Complaint alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises out of a series of materially false and misleading public disclosures by the Federal National Mortgage Association ("Fannie Mae" or the "Company") and certain of its former senior executives concerning the Company's exposure to subprime mortgage and reduced documentation Alt-A loans. Eager to promote the impression that Fannie Mae had limited exposure to subprime and Alt-A loans during a period of heightened investor interest in the credit risks associated with these loans, Fannie Mae and its executives misled investors into believing that the Company had far less exposure to these riskier mortgages than in fact existed.

2.      Between December 6, 2006, and August 8, 2008, (the "Relevant Period"), Daniel H. Mudd ("Mudd"), Enrico Dallavecchia ("Dallavecchia") and Thomas A. Lund ("Lund")

(collectively, "Defendants"), made or substantially assisted others in making materially false and misleading statements regarding Fannie Mae's exposure to subprime and Alt-A loans.

3.     For example, in a February 2007 public filing, Fannie Mae described subprime loans as loans "made to borrowers with weaker credit histories" and reported that 0.2%, or approximately $4.8 billion, of its Single Family credit book of business as of December 31, 2006, consisted of subprime mortgage loans or structured Fannie Mae Mortgage Backed Securities ("MBS") backed by subprime mortgage loans.

4.     Fannie Mae did not disclose to investors that in calculating the Company's reported exposure to subprime loans, Fannie Mae did not include loan products specifically targeted by the Company towards borrowers with weaker credit histories, including Expanded Approval ("EA") loans. As of December 31, 2006, the amount of EA loans owned or securitized in the Company's single-family credit business was approximately $43.3 billion, yet none of these loans were included in the Company's disclosed subprime exposure.

5.     Fannie Mae's exclusion of loans such as EA from its subprime disclosures was particularly misleading because EA loans were exactly the type of loans that investors would reasonably believe Fannie Mae included when calculating its exposure to subprime loans. In fact, the Company identified EA as its "most significant initiative to serve credit impaired borrowers" in response to regulatory requests for information on its subprime loans. In addition, all of the Defendants knew that EA loans had higher average serious delinquency rates, higher credit losses, and lower average credit scores than the loans Fannie Mae included when calculating its disclosed subprime loan exposure.

6.     In a November 2007 public filing, Fannie Mae described subprime loans as a loan to a borrower with a "weaker credit profile than that of a prime borrower," classified mortgage

2

loans as "subprime" if the mortgage loans were originated by a "specialty" subprime lender or a "subprime division of a large lender," and again represented that only 0.2%, or approximately $4.8 billion, of its Single Family credit book of business consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans as of both March 31, 2007, and June 30, 2007.

7.      Fannie Mae did not tell investors that in calculating the Company's exposure to subprime loans reported in this filing, Fannie Mae again did not include at least $43 billion of EA loans, included loans from only fifteen loan originators of the approximately 210 lenders listed on the HUD Subprime Lender list, and did not even have the capacity to track whether loans were originated by a subprime division of a large lender.

8.      Fannie Mae made similarly misleading disclosures concerning its exposure to subprime loans in public filings throughout the Relevant Period. The result of these disclosures was to mislead investors into seriously underestimating Fannie Mae's exposure to subprime loans.

9.      Similarly, Fannie Mae misled investors concerning its exposure to Alt-A loans with reduced or alternative documentation requirements. Fannie Mae did not disclose the total percentage of its Single Family mortgage guarantee business consisting of reduced documentation loans as reflected in its own internal reporting, which Defendants routinely received throughout the Relevant Period.

10.      Instead, in its public disclosures, Fannie Mae described Alt-A loans as loans with lower or alternative documentation requirements, and then further stated that it classified loans as "Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features."

3

11.    Based on this reporting construct, for example, in a May 2007 filing, Fannie Mae publicly reported that approximately 11% of its total Single Family mortgage credit book of business as of March 31, 2007, consisted of Alt-A mortgage loans or Fannie Mae mortgage securities backed by Alt-A mortgage loans. This filing materially underreported the extent of Fannie Mae's total exposure to low documentation loans, which was approximately 17.9% as of March 31, 2007, based on Fannie Mae's own internal records.

12.    Fannie Mae also did not disclose to investors that certain reduced documentation loans it received from lenders were not included in the calculation of Fannie Mae's publicly disclosed Alt-A loan exposure if the reduced documentation requirements were internally designated as Lender-Selected. Despite this exclusion, during the Relevant Period, Lender-Selected Reduced Documentation Loans had a serious delinquency rate that was substantially higher than Fannie Mae's full documentation loans with a similar credit risk profile. Further, Fannie Mae did not tell investors that the Company itself provided lenders—in advance—with the coding designations for Alt-A versus Lender-Selected.

13.    The result of these disclosures was to mislead investors into materially underestimating Fannie Mae's exposure to reduced documentation loans. Fannie Mae made similarly misleading disclosures concerning its exposure to reduced documentation loans in public filings throughout the Relevant Period.

14.    Mudd, Lund and Dallvecchia each knew, based on reports and internal data they received on a regular basis, that the Company's reported exposure to subprime and Alt-A loans was inaccurate. The misleading statements describing subprime and Alt-A loans occurred in periodic and other filings with the Commission, and public settings, including investor and analyst calls and media interviews. Mudd, Lund and Dallavecchia reviewed and approved each

4

of the false public filings. Mudd and Dallavecchia each made public statements falsely claiming that the Company's exposure to subprime loans was minimal.

15.     By engaging in the misconduct described herein, Mudd violated and aided and abetted the violation of the antifraud and reporting provisions of the federal securities laws; Dallavecchia violated the antifraud provisions and aided and abetted the violation of the antifraud and reporting provisions of the federal securities laws; and Lund aided and abetted violations of the antifraud and reporting provisions of the federal securities laws. The Commission seeks injunctive relief, disgorgement of profits, prejudgment interest, civil penalties and other appropriate and necessary equitable relief from both defendants.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa)], and 28 U.S.C. § 1331.

17.     Venue is proper in the Court pursuant to Section 22(a) of the Securities Act, [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

18.     Defendants Mudd, Dallavecchia and Lund directly or indirectly made use of the means or instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

5

## DEFENDANTS

19.     **Daniel Mudd**, age 53, was Chief Executive Officer ("CEO") of Fannie Mae from June 2005 until September 2008, interim CEO from December 2004 until June 2005, and Chief Operating Officer ("COO") from February 2000 until November 2004.  Ultimately, Mudd was removed as CEO of Fannie Mae after its regulator, the Federal Housing Finance Agency ("FHFA"), placed Fannie Mae into conservatorship in September 2008.  Mudd is a resident of Greenwich, Connecticut.  Mudd certified Fannie Mae's Forms 10-K and Forms 10-Q during the Relevant Period, including Fannie Mae's 2005 10-K filed May 2, 2007, its 2006 10-K filed August 16, 2007, its 2007 Form 10-Qs filed November 9, 2007, and its 2007 Form 10-K filed February 27, 2008.  Mudd reviewed and approved Fannie Mae's Forms 12b-25 filed February 27, 2007, and May 9, 2007.

20.     **Enrico Dallavecchia**, age 50, was Chief Risk Officer ("CRO") of Fannie Mae from June 2006 until August 2008 when he was removed by the Board along with two other executives.  As CRO, Dallavecchia sub-certified all of Fannie Mae's Annual Forms 10-K and quarterly Forms 10-Q.  He also reviewed and approved Fannie Mae's Forms 12b-25 dated February 27, 2007 and May 9, 2007.  Dallavecchia is a resident of Potomac, Maryland.

21.     **Thomas Lund**, age 53, was a Fannie Mae employee since 1995 who served as Executive Vice-President ("EVP") of Fannie Mae's Single Family Credit Guarantee ("Single Family") business from July 2005 until June 2009.  As EVP of the Single Family business, Lund sub-certified all of Fannie Mae's Annual Forms 10-K and quarterly Forms 10-Q.  He also reviewed and approved Fannie Mae's Forms 12b-25 dated February 27, 2007, and May 9, 2007.  Lund is a resident of Cabin John, Maryland.

## RELEVANT ENTITY

22.     **Fannie Mae** was, at all times relevant to this Complaint, a shareholder-owned Government Sponsored Enterprise ("GSE") established by the U.S. Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold.  Fannie Mae provides market liquidity by securitizing mortgage loans originated by lenders in the primary mortgage market into Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities in the secondary market for Fannie Mae's mortgage portfolio.  By law, securities issued by Fannie Mae are "exempted securities." Accordingly, registration statements with respect to Fannie Mae's offerings are not filed with the Commission.

23.     In March 2003, Fannie Mae voluntarily registered its common stock with the SEC under Section 12(g) of the Exchange Act and has, since then, been required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.

24.     Throughout the Relevant Period, Fannie Mae's common stock traded publicly on the New York Stock Exchange ("NYSE").  Its principal place of business was and is in Washington, D.C.

25.     On July 30, 2008, when the President signed into law the Housing and Economic Recovery Act of 2008 ("HERA"), the Federal Housing Finance Agency ("FHFA") became Fannie Mae's primary regulator.

26.     On August 8, 2008, Fannie Mae announced a net loss of $2.3 billion.  Fannie Mae stated that it was no longer certain that it would have enough capital to carry it through its losses. At this time, the Company announced that the main cause for its increased credit losses was the

7

deterioration in the credit performance of a small number of higher risk loan products, including Alt-A loans. As of the third quarter of 2008, more than 70% of Fannie Mae's credit losses were caused by its subprime and Alt-A loans.

27.    On September 6, 2008, FHFA placed Fannie Mae into conservatorship and, as conservator, FHFA succeeded to all the rights, titles, powers and privileges of Fannie Mae, its shareholders, and the officers or directors of Fannie Mae with respect to the Company and its assets.

### BACKGROUND
*Fannie Mae Single Family Mortgage Guarantee Business*

28.    Fannie Mae's Single Family mortgage credit book of business was $2.34 trillion in 2006, $2.65 trillion in 2007, and $2.8 trillion in September 2008 when the Company was placed into Conservatorship.

29.    During the Relevant Period, Fannie Mae operated three business segments—(i) Single Family; (ii) Multi-Family; and, (iii) Capital Markets.

30.    Fannie Mae's primary business segment is the Single Family business, which works with lender customers to securitize Single Family mortgage loans (relating to properties with four or fewer residential units) into Fannie Mae MBS and to facilitate the purchase of Single Family mortgage loans for Fannie Mae's portfolio. Revenues in Fannie Mae's Single Family business are derived primarily from fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans underlying Fannie Mae's Single Family MBS. During the Relevant Period, the Single Family business comprised approximately 51%, 64% and 54% of Fannie Mae's net revenues in each of 2006, 2007, and 2008, respectively.

31.    Fannie Mae's Single Family business principally acquired loans through one of two channels: (i) the Lender (or flow) channel, which obtained loans from lenders on a going-

forward or contractual basis through agreements to purchase loans from lenders before those loans were originated based on certain terms and conditions; and, (ii) the Investor (or bulk) channel, which acquired from lenders loans that had already been originated based on data files for those loans that were provided by lenders to Fannie Mae for review prior to purchase.

32.    Fannie Mae's Single Family business had a proprietary automated underwriting system called Desktop Underwriter ("DU"). DU was used by the Single Family business to assess the primary risk factors of a loan in order to measure that loan's default risk. Customers of Fannie Mae also used DU to originate and underwrite loans so those customers would know— in advance—whether any given loan was eligible for sale to Fannie Mae. When DU provided a Fannie Mae customer with an "approve" for a loan application, that customer knew that Fannie Mae would agree to acquire that loan and waive certain warrants and representations so long as the loan is originated in accordance with information originally submitted via DU.

33.    At various times during the Relevant Period, Fannie Mae adjusted and recalibrated the risk assessment models within its DU system. For instance, in 2006, in connection with its *Say Yes* strategy to regain market share, Fannie Mae employed a "DU Bump" wherein eligibility parameters were expanded to provide more "approve" messages in DU for larger volumes of loans with lower FICO scores and higher LTVs than previously permitted. By adjusting and recalibrating the risk assessment models within its DU system, Fannie Mae took on increasingly risky loans during the Relevant Period.

34.    While many mortgage originators used Fannie Mae's DU system as part of the underwriting process, many large mortgage lenders also had their own automated origination and underwriting platforms. For instance, during the Relevant Period, Countrywide Financial

Corporation's (Countrywide) proprietary underwriting system was called *Clues*, and Freddie
Mac had a system similar to DU that was called *Loan Prospector*.

35.    Not all loans acquired by Fannie Mae were underwritten using DU. During the
Relevant Period, Fannie Mae acquired and securitized mortgage loans that were underwritten
through other automated underwriting systems or simply by agreed-upon standards in a manual
process. For instance, Fannie Mae acquired loans under Countrywide Financials *Fast and Easy*
loan program that were underwritten using Countrywide's *Clues* system. Similarly, most of the
My Community Mortgage ("MCM") loans Fannie Mae acquired during the Relevant Period
were manually underwritten by loan officers and mortgage brokers at various companies
nationwide and not evaluated using DU.

### *Mudd's Role at Fannie Mae and his Disclosure Responsibilities*

36.    As COO and then CEO from 2000 until September 2008, Mudd oversaw all three
Fannie Mae business units, including the Single Family business. Additionally, during the
Relevant Period Mudd was a member of the Board of Directors, the Audit Committee, a regular
attendee at the Board's Risk Policy and Capital Committee meetings, held regular weekly
meetings with his direct reports the business units, and attended quarterly business unit briefings.
Mudd regularly read, reviewed and marked-up draft periodic filings and met with individuals
who provided sub-certifications prior to certifying Forms 10-K and Forms 10-Q.

37.    As CEO, and based on his prior role as COO, Mudd possessed detailed
operational knowledge concerning Fannie Mae's subprime and reduced documentation loan
exposure. Further, during the Relevant Period, Mudd routinely received acquisition, delinquency
and credit loss data concerning subprime and Alt-A loans. Mudd certified filings and made

10

public statements describing Fannie Mae's subprime and reduced documentation loan exposure knowing that those public statements were false and misleading.

38.     With regard to subprime-quality and reduced documentation loans, he received at least quarterly risk briefings on the Single Family business in which data showing Fannie Mae's total subprime and reduced documentation loan exposure was presented.  Additionally, Mudd met weekly with his direct reports, who, among other things, informed him about Single Family loan acquisitions, trends and status with respect to market share targets.

39.     Mudd was well aware of the Company's increased acquisition of reduced documentation loans—indeed, Mudd himself directed the company to pursue that market.  For instance, in an April 26, 2006, Credit Risk meeting following a presentation on reduced documentation loans and their risks by the Single Family credit officer (who noted low documentation loans were riskier), Mudd stated that "the market is moving to low documentation and we need to actively pursue the keys to this market."

40.     Mudd oversaw Fannie Mae's 2006 market share increase during which the Single Family business grew its market share from 20% of total mortgage loan originations to 25% by acquiring more subprime and reduced documentation loans.  In part as a result of Fannie Mae's successful market share growth and timely filing of the company's periodic reports, Mudd's taxable compensation grew from $6.16 million in 2006 to $10.64 million in 2007.

41.     Throughout the Relevant Period, in addition to wages earned, Mudd—like all Fannie Mae executives—received an Annual Incentive Plan ("AIP") bonus that was tied to two things:  (i) Company performance, measured by attaining corporate year-end goals;  and, (ii) personal performance, measured by attaining individual year-end goals.  The AIP program was designed to "put part of the participants' total compensation package at risk, based on the

11

achievement of one-year goals for both the participant and the corporation" with individual
performance driving the AIP payout each year, adjusted for corporate goal performance. The
AIP bonus for a given year's performance was paid out in the following fiscal year such that an
AIP bonus for performance in 2006 was received in 2007.

42.     In his 2006 year-end report to the Board, Mudd noted that the Single Family
business increased its market share, in part by entering new markets "especially Alt-A and
subprime," that in response to filing the Company's 2004 Form 10-K, "the market and ratings
agency reactions generally were positive—there were no big surprises," and that the Company's
stock price improved by more than 20%. Mudd's 2006 taxable compensation was more than $6
million with approximately $2.5 million from his AIP bonus. In 2007, Fannie Mae's corporate
goals included growing revenue, which the Single Family business set about doing by increasing
its book by 5.6% with a plan to acquire more Alt-A and subprime loans. In 2007, Mudd's
taxable compensation was more than $10 million—with $3.5 million from his AIP bonus alone.
Mudd served as CEO for only eight full months in 2008, but his taxable compensation in 2008
was $7.4 million—with more than $2.2 million from his AIP bonus based on his personal
performance for 2007.

43.     Mudd was also well aware that investors were increasingly focused on subprime
loans. In a February 6, 2007 memo to the Board of Directors of Fannie Mae, Mudd wrote that
investors and analysts were "focused on our market share, subprime risk and our portfolio
strategy." As CEO of Fannie Mae, Mudd routinely interacted with investors and the media.
During the Relevant Period, as investors and the media increasingly focused their attention on
the credit risks associated with subprime and Alt-A mortgage loans, Mudd made numerous false
and misleading statements that downplayed the Company's exposure to such loans and provided

12

false assurance to the market that Fannie Mae was participating in a safer segment of the mortgage market. Indeed, Mudd created the false perception that Fannie Mae's participation in high credit risk loans such as Alt-A and subprime was small and contained, and reinforced this false and misleading impression, telling investors that Fannie Mae was in the prime—not the subprime—market with a different, higher set of standards and underwriting.

44.     Mudd was knowledgeable about the mortgage markets. While CEO of Fannie Mae, Mudd made numerous appearances before Congress to testify about the mortgage markets, the role of the GSEs and the subprime market. In that setting, Mudd repeatedly minimized Fannie Mae's reported exposure, falsely claiming it was less than 2% of the Company's book or that Fannie Mae held about zero percent subprime.

45.     During the Relevant Period, Mudd received, reviewed and commented on (often in handwritten notes) multiple draft versions of each of Fannie Mae's periodic and other filings with the Commission. Prior to certification, Mudd met—seriatim—with officers of the Company who had provided sub-certifications to discuss issues presented by upcoming public filings. Also, as a member of the Audit Committee at Fannie Mae and the Board of Directors, Mudd participated in final committee and board reviews of Fannie Mae's Forms 10-K and Forms 10-Q during the Relevant Period prior to certifying.

*Lund's Role at Fannie Mae and his Disclosure Responsibilities*

46.     Lund served as an officer at Fannie Mae for fourteen years, from 1995 until his retirement in 2009, and was EVP of the Single Family business at Fannie Mae from 2005 forward. Lund was a member of the Executive Committee and was the senior-most executive in charge of the Single Family business. He received and provided regular reports on the actual

volumes of Single Family subprime and reduced documentation loan acquisitions, the associated

delinquency rates, and credit losses for all subprime-quality and reduced documentation loans.

47.     Lund received Single Family acquisition data on at least a monthly basis detailing

acquisitions of reduced documentation and subprime-quality loans.  As the senior executive in

charge of the Single Family business, Lund was knowledgeable about Fannie Mae's loan

acquisitions and the performance of Fannie Mae's high credit risk loan portfolio.

48.     At Mudd's weekly direct reports meetings, Lund provided Single Family business

overviews to the CEO and others.  Lund also held weekly meetings with his direct reports.  The

SVP for the Western Business Office of Fannie Mae routinely updated Lund on that region's

then-most significant customers: Countrywide, IndyMac and WAMU.

49.     Lund was also a member of Fannie Mae's Disclosure Committee, which oversaw

the preparation of the Company's periodic (and other) filings with the Commission.  During the

Relevant Period, Lund was the only Single Family business executive that sat on Fannie Mae's

Disclosure Committee and was, therefore, uniquely positioned to inform that Committee about

the Single Family loan portfolio.  Fannie Mae attendance records from the Relevant Period

reflect that Lund routinely attended Disclosure Committee meetings where contemplated draft

filings with the Commission were reviewed and issues discussed.

50.     During the Relevant Period, Lund also received and reviewed draft versions of

Fannie Mae's periodic and other filings with the Commission before they were publicly filed.

While he knew the difference between the actual and the reported volumes of subprime and

reduced documentation loans, Lund did not ensure that investors were likewise informed.

Instead, he sub-certified as to the accuracy of the Company's materially false and misleading

disclosures concerning its exposure to subprime and Alt-A loans, which were directly within his area of knowledge and responsibility.

51.     During his tenure as EVP of the Single Family business, Lund oversaw Fannie Mae's 2006 market share growth, and, in part as a result of its success and timely filing of the company's periodic reports, Lund's taxable compensation grew from $833,658 in 2006 to $1.9 million in 2007.

52.     Throughout the Relevant Period, in addition to wages earned, Lund  received an AIP bonus tied to attaining corporate and personal goals.  In 2006, Fannie Mae's corporate goals included filing its 2004 Form 10-K, hitting Single Family MBS issuance targets, increasing profitability in the Single Family business, and reintroducing the Company to investors.  In 2006, owing to its *Say Yes* business strategy, the Single Family business exceeded its goal of increasing market share from 20% to 25.4%, and on a corporate level, the Company grew its stock price more than 20%—from just under $49 to over $60 per share.  Lund's 2006 taxable compensation was $833,658 with $792,960 from his AIP bonus.  By contrast, in 2005, Lund's wages totaled $497,285.  This represented a 67% increase in compensation between 2005 and 2006.

### *Dallavecchia's Role at Fannie Mae and his Disclosure Responsibilities*

53.     Enrico Dallavecchia served as Fannie Mae's EVP and Chief Risk Officer from June 2006 through August 2008.  In that position, Dallavecchia reported directly to Mudd and was responsible for credit, market, counterparty, and operational risk oversight for all business units within Fannie Mae, which included measuring, reporting, and monitoring Fannie Mae's risk profile and formulating the Company's risk policies.  As the senior-most executive in charge of credit risk, Dallavecchia received and provided regular reports on the actual volumes of

subprime and reduced documentation loan acquisitions, the associated delinquency rates, and credit losses for those loans at Fannie Mae.

54.    Dallavecchia was also a member of Fannie Mae's Disclosure Committee, which oversaw the preparation of the Company's periodic (and other) filings with the Commission. During the Relevant Period, Dallavecchia was the only executive from the Chief Risk Office who sat on Fannie Mae's Disclosure Committee.   As CRO, Dallavecchia was uniquely positioned to recognize and inform others about the overall credit risks presented by Fannie Mae's loan portfolio.

55.    Fannie Mae attendance records from the Relevant Period reflect that Dallavecchia routinely attended Disclosure Committee meetings where contemplated draft filings with the Commission were reviewed and issues discussed.   Dallavecchia personally received and reviewed draft versions of Fannie Mae's periodic and other filings with the Commission. Dallavecchia sub-certified as to the accuracy of the Company's materially false and misleading disclosures concerning its exposure to subprime and Alt-A loans, thereby substantially assisting the Company's fraud.

56.    Dallavecchia and the Single Family CRO team assisted in drafting the definition of subprime contained in the February 27, 2007, Form 12b-25 in which Fannie Mae first quantified its subprime exposure.

57.    Dallavecchia occasionally led the Board's Risk, Policy and Capital Committee meetings and attended Executive Committee meetings.   In those roles, Dallavecchia received information and data concerning Fannie Mae's total exposure to reduced documentation and subprime loans.

16

58.     As Fannie Mae's CRO, Dallavecchia had credit risk oversight for Fannie Mae's 2006 market share growth, and, in part as a result of its success and timely filing of the company's periodic reports, Dallavecchia's taxable compensation more than doubled from $617,886 for 7 months of service in 2006 to $2.68 million in 2007.

59.     Throughout the Relevant Period, in addition to wages earned, Dallavecchia received an AIP bonus tied to attaining corporate and personal goals.   When Dallavecchia began as Fannie Mae's CRO, the then-Chairman of the Board of Directors noted in an address to Senior Management, "We have to think differently and creatively about risk ... Enrico Dallavecchia was not brought on-board to be a business dampener."   In 2006, Fannie Mae's corporate goals included filing its 2004 Form 10-K, increasing its earnings per share, profitability, and subprime penetration while building a CRO function and implementing business unit risk officers.   In his year-end 2006 self-assessment, Dallavecchia noted that the most significant achievement was his office playing a role "from both a risk perspective and also from a business perspective." Dallavecchia further noted that his office "authored the Risk Section of the 2004 10-K."

60.     In 2007, Fannie Mae's corporate goals included growing revenue and timely periodic filings with the Commission. In addition to Fannie Mae meeting most of its 2007 corporate goals with respect to growing revenue, Mudd's year-end 2007 review of Dallavecchia noted that he completed the build out of the CRO structure, developed risk limits and did good work on the Board Risk Policy and Capital Committee.   Dallavecchia's 2007 taxable compensation was more than $2.6 million with $1.04 million from his AIP bonus.

61.     One month prior to conservatorship, in August 2008, Dallavecchia was terminated as CRO.   Accordingly, Dallavecchia served as CRO for only seven full months in 2008; his 2008 taxable compensation was $2.3 million with $923,780 from his AIP bonus.

17

## OVERVIEW OF FANNIE MAE LOAN PROGRAMS

### *Fannie Mae's Reduced Documentation Loan Programs*

62. During the 1990s, Fannie Mae had limited market presence in Alt-A mortgage loans, which were not a large part of mortgage originations nationwide.

63. In July 1999, Fannie Mae and Countrywide Home Loans entered into an alliance agreement, which included a reduced documentation loan program called the "internet loan," which was soon thereafter re-branded by Countrywide as the *Fast and Easy* loan. This loan program featured a streamlined documentation process, which allowed mortgage-loan applicants with a qualifying FICO credit score to be preapproved for a mortgage loan without providing documentation to verify income or assets.

64. The *Fast and Easy* loan program was popular. Fannie Mae executives referred to it as Countrywide's "signature" or "flagship" mortgage product. By the mid-2000s, other mortgage lenders developed similar reduced documentation loan programs such as Mortgage Express and PaperSaver—many of which Fannie Mae acquired in ever-increasing volumes throughout the Relevant Period.

65. Alt-A loans proliferated in the marketplace, and during the Relevant Period Fannie Mae's Single Family business pushed to increase its acquisitions of those Alt-A loans. By year-end 2006, 35% of Fannie Mae's Single Family loan acquisitions were Alt-A loans. By year-end 2007, that number increased to 37%, and by June 30, 2008, 26% of its Single Family loan acquisitions were Alt-A loans.

### *Fannie Mae's Subprime Loan Programs*

66. Since the late 1990s, Fannie Mae acquired and guaranteed subprime mortgage loans described in Fannie Mae periodic filings during the Relevant Period as loans made to

"borrowers with weaker credit histories" or "weaker credit profile[s]" that "have a higher likelihood of default than prime loans" as part of the Company's two primary programs for borrowers with weaker credit histories: Expanded Approval/Timely Payment Rewards ("EA") and MyCommunityMortgage ("MCM").

67.     The credit risks posed by these programs were well understood by senior management at Fannie Mae. Mudd was familiar with the EA and MCM loan programs and the credit risks those loan programs entailed. Throughout the Relevant Period all the Defendants received reports, briefings and presentations containing acquisition volume, Serious Delinquency Rates ("SDQ Rates") and credit loss data with respect to Fannie Mae's EA and MCM loans. Throughout the Relevant Period, Mudd, Lund and Dallavecchia knew that EA loans were—on average—the highest credit risk loans on Fannie Mae's book of business, and knew that EA loans contributed disproportionately to Fannie Mae's credit losses.

68.     Indeed, in May 2001, Mudd wrote a memo to the then-CEO noting that EA loans "are the highest default risk loans we have ever done."

69.     Traditionally, Fannie Mae treated EA loans as part of its subprime exposure. For example, a March 2002 Report prepared for the U.S. Department of Housing and Urban Development ("HUD") with the participation of Fannie Mae, entitled "Subprime Markets, the Role of GSEs and Risk-Based Pricing," stated under a section entitled 'Agency Subprime Lending Products' that:

> The agencies are increasing their presence in the subprime market by rolling-out
> new subprime mortgage products through updated versions of their automated
> underwriting systems. Fannie Mae seller/servicers now offer loan products to
> three groups of credit-impaired borrowers under two new programs. Fannie
> Mae's Expanded Approval program allows lenders to approve borrowers who
> would have been formerly classified as 'Refer with Caution' ... by Fannie Mae's
> Desktop Underwriter (DU). ... The Expanded Approval products are recent
> innovations, and, according to Fannie Mae representatives, account for a

relatively small portion of that GSE's book of business … At most, according to a Fannie Mae stock analyst, these subprime loan purchases will account for no more than five percent of that GSE's purchase volumes. (Emphasis added).

70.     Similarly, in its annual exam process in 2004 and 2005, Fannie Mae's then-primary regulator, the Office of Federal Housing Enterprise Oversight's ("OFHEO") asked for information on Fannie Mae's total Single Family subprime loan exposure, specifically requesting: "[t]he volume of loans purchased in 2004 [and 2005] defined as CE structured subprime … or sub-prime as otherwise defined."  In March of 2005 and April of 2006, respectively, Fannie Mae responded by providing OFHEO with information on mortgage loan purchases and mortgage-backed securities under the EA program, describing the EA program as, "our most significant initiative to serve credit-impaired borrowers."

71.     Moreover, before December 2006, various internal Fannie Mae reports, including reports to the Board, identified subprime loans as including: (i) investor channel subprime loans acquired as part of its Subprime NBI; (ii) A- Deal loans that pre-date December 2005; and, (iii) EA loans.

### Fannie Mae Excluded EA and MCM Loans from its Subprime Disclosure

72.     When Fannie Mae first reported its quantitative exposure to subprime loans in a filing with the Commission on February 27, 2007, the Company broadly defined subprime as loans to "borrowers with weaker credit histories."  EA and MCM loans fell squarely within this definition, but were not included in the accompanying quantification of Fannie Mae's subprime exposure.

73.     Instead, the quantification consisted primarily of private label securities it held that were marketed as being backed by subprime loans, certain "A-" loans that the company acquired prior to 2005, and certain loans that had been acquired through a limited new business

initiative beginning in 2006. Fannie Mae's subprime quantification did not include significant numbers of other loans that fell within its published subprime definition of loans to "borrowers with weaker credit histories."

74.     Throughout the Relevant Period, EA loans had, on average, higher SDQ rates than the loans Fannie Mae used in calculating its disclosed subprime exposure. Senior management at Fannie Mae, including the Defendants, were aware of this fact, as SDQ rates were tracked and regularly included in reports and other internal presentations. For example, in a meeting of the Risk Policy and Capital Committee ("RPCC") of Fannie Mae's Board, the CRO reported that as of July 2007 Fannie Mae's SDQ rates for EA were 5.57% (the highest on its book); by contrast, the SDQ rate of its disclosed subprime loans were 4.95 %.

75.     Throughout the Relevant Period, the credit risk associated with Fannie Mae's EA and MCM acquisitions was reported to and tracked by senior management, including Defendants, in terms of acquisition volume, delinquencies, and credit losses—alongside those loans that were included when quantifying its disclosed "subprime" exposure in its public filings. EA and MCM loans were routinely included in reports tracking Fannie Mae's high risk loan products (which ranged from three to five or more loan types during the Relevant Period) that were received by the Defendants.

76.     Also during the Relevant Period, senior executives, including the Defendants, were provided with credit loss data that showed that the greatest amount of credit losses attributable to any one loan type or product on Fannie Mae's Single Family book were attributable to the EA product. For instance, in an October 26, 2007, Disclosure Committee report, it is noted that EA loans were responsible for $188.9 million in losses and MCM loans

21

were responsible for $16 million in losses—compared to $5.5 million in losses for the loan population Fannie Mae disclosed as its subprime exposure.

77.     As a portion of Fannie Mae's book of business, EA loans increased in volume between 2006 and 2008 from $43.3 billion to $58.3 billion, totaling approximately 2% of the company's book of business during the Relevant Period. MCM loans, which were intended for low-to-moderate income borrowers, accounted for between 0.3% and 1.5% of Fannie Mae's book of business over the same period. None of these loans were included in Fannie Mae's calculation of its publicly disclosed subprime exposure.

## FANNIE MAE'S DISCLOSURES
### *Overview*

78.     Since 2003 in its annual Form 10-K filings, Fannie Mae included a table of credit risk characteristics for Single Family loans ("Credit Risk Tables"). Those Credit Risk Tables contain information describing risk characteristics such as original LTV, Product Type, Property Type, Occupancy Type, FICO Credit Score bands, Loan Purpose, Geographic Concentration, and Origination Year. The tables did not include any statement or representation as to whether Fannie Mae held subprime and Alt-A loans.

79.     During the Relevant Period, Fannie Mae also provided narrative disclosures in its periodic filings concerning the company's expectation of credit losses, delinquencies, market environment and economic factors that could impact the company's business. These narrative disclosures repeatedly contained materially false and misleading statements and representations regarding Fannie Mae's Alt-A and subprime exposure.

80.     During part of the Relevant Period, Fannie Mae also filed supplemental Form 8-Ks filed simultaneously with various Forms 10-K and Forms 10-Q that contained credit characteristic information concerning its Single Family book of business, along with a purported

tabular description of Fannie Mae's subprime and Alt-A holdings.   None of the information contained in those supplement Form 8-Ks provided investors with an accurate description of the Company's subprime or Alt-A holdings. Although Fannie Mae claimed to provide additional information to investors, labeling a portion of loans "subprime" and "Alt-A" in a disclosure table, those tables included only a fraction of the loans that met Fannie Mae's own public definition of "subprime" or "Alt-A" in the quantification under each category.   These supplemental disclosures deliberately gave investors false comfort that the Company's exposure to subprime and Alt-A loans was dramatically smaller than it, in fact, was.

*Fannie Mae's Initial Quantification of Subprime Exposure Was False and Misleading*

81.   By February 2007, following S&P's downgrade of high-profile subprime lender, New Century Financial Corporation, and other indicia of subprime market turmoil—including HSBC Holdings PLC's announcement that the U.S. subprime market was unstable—investors were increasingly focused on subprime loans and the risks associated with these loans.

82.   In a February 6, 2007 memo to the Board of Directors of Fannie Mae, Mudd wrote that investors and analysts were "focused on our market share, subprime risk and our portfolio strategy."  With this backdrop, Fannie Mae's Disclosure Committee, which included Lund and Dallavecchia as members, decided to include a quantitative disclosure of Fannie Mae's exposure to subprime loans in the Company's public filings.

83.   According to an internal e-mail sent to both Lund and Dallavecchia, "Enrico [Dallavechia]'s team has been tasked with developing a definition of 'sub-prime,' as well as providing the numbers for the 12b-25."

23

84.    On February 23, 2007 in a call with investors Mudd stated: "Subprime mortgages are those offered to borrowers with damaged credit" and Fannie Mae's "subprime investment constitutes well below 2 percent of our book."

85.    Four days later on February 27, 2007, in a Form 12b-25 filing with the Commission, the Company disclosed the following regarding Fannie Mae's subprime exposure:

> Although there is no uniform definition for sub-prime ... loans across the mortgage industry... sub-prime loans typically are made to borrowers with weaker credit histories ... We estimate that approximately 0.2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of sub-prime mortgage loans or structured Fannie Mae MBS backed by sub-prime mortgage loans ... We estimate that approximately 2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of private-label mortgage-related securities backed by sub-prime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by sub-prime mortgage loans. (Emphasis added.)

86.    The percentage of subprime loans disclosed by Fannie Mae did not include a material number of subprime-quality loans in the Fannie Mae Single Family mortgage credit book of business as of December 31, 2006, made to "borrowers with weaker credit histories." In particular, the percentage of subprime loans disclosed by Fannie Mae did not include the EA and MCM loans, which were the very types of loans that investors (and analysts) believed were the company's primary subprime exposure.

87.    Fannie Mae's exposure to EA loans in its Single Family mortgage credit book of business was approximately $43.3 billion as of December 31, 2006—approximately 10 times greater than the 0.2% ($4.8 billion) disclosed as "sub-prime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

88.    The February 27, 2007, disclosure falsely stated that Fannie Mae's total exposure to loans made to borrowers with weaker credit histories (subprime) was 2.2% of its total

24

mortgage credit book of business, when in fact its exposure was at least 4.64% (as of December 31, 2006).

89.    Nothing in Fannie Mae's public disclosures alerted investors that it held a much larger volume of loans that matched the Company's description of subprime loans but were not included in the reported subprime number.

90.    Although Fannie Mae excluded EA from its subprime reporting, Fannie Mae's EA loans had, on average throughout the Relevant Period, SDQ rates higher than those loans Fannie Mae actually included in calculating its disclosed exposure to subprime loans. As of January 2007, EA loans had an SDQ rate of 5.69%; disclosed Subprime loans (as-quantified in Fannie Mae's filings) had an SDQ rate of 4.82%.

91.    EA and MCM loans accounted for a higher percentage of Single Family credit losses (20.4%) at year-end 2006 than loans Fannie reported as its subprime exposure, which at the time were responsible for no credit losses.

92.    Mudd, Lund and Dallavecchia each reviewed and approved the February 27, 2007, Form 12b-25 statement before it was released by the Company, knowing its quantified subprime disclosure excluded EA and MCM loans.

### *Dallavecchia's False and Misleading Statement*

93.    That same day, February 27, 2007, Dallavecchia spoke directly to investors on a conference call and explained:

> In our filing today, we also indicate that we have increased our participation in subprime product in 2006. Our purchases have been prudent and have been made when we concluded that they would contribute to our mission objectives or they would general a profitable return.   Given our view of the subprime market generally, let me offers [sic] some insight into our approach to this segment and the exposure to the risk. The first point, as per our filing, is that our exposure is modest.   Approximately 0.2% of our single-family credit book of business consisted of subprime loans or Fannie Mae MBS backed by subprime loans … to

conclude my thoughts on credit risk, I anticipate our credit losses will trend upward as a result of the general softening of the housing market … At the same time, I would advise that you consider our exposure in light of the strength of the risk characteristics I have described <u>and the immaterial size of our participation in the subprime market</u>. (Emphasis added.)

94.    Despite knowledge that the Company had exposure to approximately $43.3 billion worth of EA loans and $13.8 billion in MCM loans as of December 31, 2006, which fell squarely within Fannie Mae's publicly stated definition of subprime, Dallavecchia falsely represented that only "0.2% of [Fannie Mae's] Single Family credit book of business consisted of subprime loans,"

95.    Moreover, Dallavecchia further misled investors regarding Fannie Mae's subprime exposure by emphasizing that Fannie Mae's subprime was "modest," "prudent" and "immaterial." He gave the public these assurances knowing Fannie Mae's exposure to EA loans was at least ten times greater than "0.2% of [Fannie Mae's] single-family credit book of business." His purpose was clear. As Dallavecchia explained in an internal email on February 23, 2007, in preparing for the investor call, "I am trying to say that if you look at our guarantee book of business we have an insignificant exposure in subprime loans."

### Mudd's False and Misleading Testimony Before Congress

96.    On March 15, 2007, Mudd appeared before the House Financial Services Committee and gave testimony in a hearing on Legislative Proposals on GSE Reform. Mudd was asked: "And you have not engaged in the subprime market. You hadn't gone there to a great extent is that right?" In response, Mudd testified:

> The answer for Fannie Mae on behalf of subprime is that it's important to remember there is subprime and there is predatory. Subprime simply means . . . that you have a credit blemish, and we think those people are part of the market. It's less than 2 percent of our book. It's 80 percent insured. It's highly subordinated. We've been in it very carefully, consistent with some very strong anti-predatory lending guidelines we have.

97.     At the time that Mudd gave this testimony, he knew that Fannie Mae EA loans were designed to provide loans to borrowers with weaker credit histories, i.e., "credit blemish[ed]" borrowers, and that the quantification of Fannie Mae's subprime holding as "less than 2 percent of our book" did not include EA or MCM loans. The following month, on April 17, 2007, Mudd again appeared before the Committee on Financial Services to provide testimony in a hearing on solutions to the subprime market turmoil. Mudd again testified: "'Subprime' is, after all, simply the description of a borrower who doesn't have perfect credit." He provided a broad description of Fannie Mae's efforts to reach "borrower[s] who do[n't] have perfect credit":

> We see it as part of our mission and our charter to make safe mortgages available to people who don't have perfect credit. In the past several years, for example, we have designed mortgage options to give borrowers with blemished credit access to high-quality, low-cost, non-predatory loans. We also set conservative underwriting standards for loans we finance to ensure the homebuyers can afford their loans over the long term . . . we continued our careful entry into the subprime market, by and large supporting lenders, products and practices that met our standards, and which helped us meet our HUD affordable housing requirements.

98.     Having broadly defined "subprime" and described Fannie Mae's outreach to the market for borrowers without perfect credit, Mudd testified as to the amount of subprime held by Fannie Mae: "Today, our exposure remains relatively minimal – less than 2.5 percent of our book of business can be defined as subprime."

99.     Mudd knew EA loans were loans specifically designed for "people who don't have perfect credit" —his own definition for subprime—and that the 2.5 percent figure he used did not include billions of dollars of EA and MCM loans. As such, his statement was knowingly false and misleading when made.

*Fannie Mae's False and Misleading Subprime Disclosures in its 2005 10-K Filing*

27

100.    In May 2007, Fannie Mae filed its 2005 Form 10-K, in which it supplemented its prior public definition of subprime. In addition to asserting that "subprime" generally refers to loans made to borrowers "with a weaker credit profile" and "borrowers [who] have a higher likelihood of default," Fannie Mae now disclosed that it classified loans as subprime if the loans were originated from a specialty subprime lender.

101.    On May 2, 2007, Fannie Mae filed its 2005 Form 10-K and stated:

> "*Subprime mortgage*" generally refers to a mortgage loan made to a borrower
> with a weaker credit profile than that of a prime borrower. As a result of the
> weaker credit profile, subprime borrowers have a higher likelihood of default than
> prime borrowers. Subprime mortgage loans are often originated by lenders
> specializing in this type of business, using processes unique to subprime loans. In
> reporting our subprime exposure, we have classified mortgage loans as subprime
> if the mortgage loans are originated by one of these specialty lenders or, for the
> original or resecuritized private-label, mortgage-related securities that we hold in
> our portfolio, if the securities were labeled as subprime when sold …We also
> estimate that subprime loans represented approximately 2.2% of our single-family
> mortgage credit book of business as of December 31, 2006, of which
> approximately 0.2% consisted of subprime mortgage loans or structured Fannie
> Mae MBS backed by subprime mortgage loans and approximately 2% consisted
> of private-label mortgage-related securities backed by subprime mortgage loans
> and, to a lesser extent, resecuritizations of private-label mortgage-related
> securities backed by subprime mortgage loans.

102.    Fannie Mae's reporting of its subprime exposure omitted approximately $43.3 billion worth of EA loans and $13.8 billion in MCM loans in Fannie Mae's Single Family mortgage credit book of business as of December 31, 2006—approximately 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

103.    Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

104. In addition, while Fannie Mae stated that it classified loans as subprime if those loans were originated by specialty subprime lenders, that statement was materially false and misleading as well. Since 1993, the U.S. Department of Housing and Urban Development ("HUD") posted a publicly available HUD Subprime Lender list based on loan data and interviews with lenders themselves. Companies in the mortgage industry rely on the HUD Subprime Lender list as a proxy for identifying subprime lenders. Internal Fannie Mae documents reflect that its personnel, including Lund, were aware of the HUD Subprime Lender list as an accepted source for subprime-lender identification. During the Relevant Period, the HUD Subprime Lender list included approximately 210 lenders.

105. The Company failed to disclose, however, that, when calculating Fannie Mae's subprime exposure, only certain loans that had been originated by 15 lenders were included. Fannie Mae purchased and guaranteed loans from many other lenders on the HUD list, but they were not included when calculating the Company's subprime exposure. Fannie Mae disclosed neither that it was restricting its definition of "specialty lender" to 15 lenders on the HUD list, nor the names of those lenders on the HUD list that it included in its calculations. In fact, Fannie Mae acquired loans from many other specialty lenders on the HUD Subprime Lender list, and EA loans were originated by lenders on the HUD list.

106. Although EA was left out of Fannie Mae's subprime reporting, it was well-known within Fannie Mae that EA was generally considered subprime in the marketplace. For example, on April 5, 2007, the SVP of business and strategic development sent an email to a group of Fannie Mae executives including Lund and Dallavecchia, stating "mcm and ea are much deeper risks that we take and many (if not all) in the market call EA subprime. They are growing very

fast." Within a month, Fannie Mae filed its next public statement concerning its subprime exposure, and again omitted its exposure to EA and MCM loans.

107.    On May 9, 2007, Fannie Mae filed a Form 12b-25 with the Commission, which repeated the disclosure contained in the May 2, 2007 filing.

108.    As it had previously, Fannie Mae's reporting of its subprime disclosure in this May 9, 2007 filing omitted approximately $43.3 billion worth of EA loans and $13.8 billion in MCM loans in Fannie Mae's Single Family mortgage credit book of business as of December 31, 2006.  That undisclosed subprime exposure was approximately 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

109.    Mudd, Lund and Dallavecchia had each reviewed and approved the Form 12b-25 dated May 9 2007 that was released by the Company.

*Fannie Mae's False and Misleading Subprime Disclosures for Year-End 2006*

110.    In early August 2007, as Fannie Mae prepared a draft Form 8-K Credit Supplement to be filed simultaneous with its upcoming 2006 Form 10-K, Mudd personally requested additional basic data concerning the Company's credit book in a draft version of the Form 8-K.  The additional data Mudd received from the CRO office on August 5, 2007, included details on the total volume of EA, MCM, disclosed subprime, and Alt-A loans Fannie Mae had on its book of business.  This draft included SDQ data that clearly showed EA loans had a higher rate of delinquency (5.38%) than the Company's disclosed subprime loans (4.8%).

111.    The data provided to Mudd also included data on FICO scores that demonstrated that the credit quality of EA loans was worse than the credit quality of the loans that Fannie Mae disclosed as its subprime exposure.  Specifically, the document disclosed that 53% of EA loans

30

had FICO scores below 620; whereas 47% of Fannie Mae's disclosed subprime had FICO scores below 620. Further, 26% of EA had FICO scores below 580 while 23% of disclosed subprime loans had FICO scores that low.

112.   On August 3, 2007, as members of the Disclosure Committee, Dallavecchia and Lund both received the same draft credit supplement sent to Mudd. This information concerning EA and MCM was not ultimately made public.

113.   Fannie Mae issued its 2006 Form 10-K less than two weeks after each of the defendants received the draft 8-K disclosure comparing EA and disclosed subprime, and documenting that EA loans had a higher serious delinquency rate than disclosed subprime and that EA loans had a weaker credit profile than disclosed subprime.. The public filing again defined "subprime" as "loans to borrowers with riskier credit profiles." Nevertheless, EA and MCM loans were not included when quantifying Fannie Mae's subprime exposure; nor was it disclosed that there were "loans to borrowers with riskier credit profiles" that were excluded from Fannie Mae's subprime reporting.

114.   On August 16, 2007 Fannie Mae filed its 2006 Form 10-K and stated:

In recent years, we have increased our acquisitions of loans to borrowers with riskier credit profiles, referred to as subprime loans by the industry. Subprime mortgage loans that we acquire are generally originated by lenders specializing in this type of business, using processes unique to subprime loans. Based on data published by National Mortgage News and our internal economic analysis of the mortgage market, subprime mortgage loan originations have increased sharply in recent years, rising to a record high of approximately 24% of single-family mortgage loan originations in the first quarter of 2006 ... Our acquisitions of subprime mortgage loans have been significantly less than the overall market's share. We estimate that approximately 0.2% of our total single-family mortgage credit book of business as of December 31, 2006 consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans. We have also invested in highly rated private-label mortgage-related securities that are backed by ... subprime mortgage loans ... We estimate that ... private-label mortgage-related securities backed by subprime mortgage loans, including

resecuritizations, accounted for approximately ... 2% ... of our single-family mortgage credit book of business as of June 30, 2007.

115.    Fannie Mae's Single Family mortgage credit book of business consisted of approximately $43.3 billion worth of EA loans and $13.8 billion worth of MCM loans as of December 31, 2006 — more than 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

116.    Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

117.    Mudd certified and Lund and Dallavecchia each sub-certified the 2006 Form 10-K even though they knew that the statements regarding the Company's subprime exposure were materially misleading.

### Fannie Mae's False and Misleading Subprime Disclosures for First, Second and Third Quarters of 2007

118.    In preparing to review the upcoming Fannie Mae filing, a Disclosure Committee Analytical Report was sent on October 26, 2007, to several individuals, including Mudd, Dallavecchia and Lund. The report presented data on Single Family's "[h]igher risk products," including EA, MCM, and disclosed subprime. The data documented that, in the two periods addressed in the document, year-to-date as of September 2006 and year-to-date as of September 2007, Fannie Mae's credit losses from EA and MCM far outweighed losses compared to the loans reported as the company's subprime exposure. As of September 2006, Fannie Mae had $80.6 million in losses from EA and $1.7 million in losses from MCM, compared to no losses from loans disclosed as subprime. As of September 2007, Fannie Mae had $188.9 million in

32

losses from EA, and $16 million in losses from MCM, compared to $5.5 million in losses from loans disclosed as subprime. Fannie Mae's credit losses from EA in 2006 and 2007 were overwhelmingly greater than any losses it experienced related to its disclosed subprime holdings during the same period. A key observation in the Report showed that the Company's highest risk products (which included EA and MCM loans) "comprise less than 15% of the S[ingle] F[amily] book but accounted for 57% of the $440MM" increase in credit losses.

119.    Within two weeks, on November 9, 2007, Fannie Mae filed its Forms 10-Q for the first, second and third quarters of 2007.  Even though each of the Defendants knew that EA and MCM loans fit Fannie Mae's public definition of subprime loans and were a source of credit losses far greater than losses triggered by the loans that were disclosed as subprime, EA or MCM loans were not included in the quantification of subprime. The Company stated in its first quarter Form 10-Q:

> A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are typically originated by lenders specializing in this type of business <u>or by subprime divisions of large lenders,</u> using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders <u>or a subprime division of a large lender</u>. ... Approximately 0.2% of our total single-family mortgage credit book of business as of March 31, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans. This percentage increased to approximately 0.3% as of September 30, 2007. Less than 1% of our single-family business volume for the nine months ended September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans. (Emphasis added.)

120.    The Company's subprime disclosures in its second and third quarter Forms 10-Q were comparable.

33

121.    The quantified subprime exposure omitted at least $43 billion worth of EA loans that were part of Fannie Mae's Single Family mortgage credit book of business and $17.6 billion in MCM loans as of March 31, 2007—approximately 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of March 31, 2007.

122.    Nothing in Fannie Mae's public disclosures alerted investors to this much larger volume of loans that matched the Company's description of subprime loans but were not included in the reported subprime exposure.

123.    The November 9, 2007, Form 10-Q filings supplemented its prior public definition of subprime. In addition to stating that it classified "mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders," it also stated that it classified loans as subprime if the loans are originated by "a subprime division of a large lender."

124.    This statement in the November 9, 2007 Form 10-Q was false. In reality, Fannie Mae never tracked loans from the subprime divisions of large lenders and, accordingly, the Company never included any of those subprime loans in its reported subprime exposure—despite its explicit claim that it did so.

125.    Since at least 2003, Mudd was aware that subprime divisions of major lenders were originating and selling EA loans to Fannie Mae. Nevertheless, the Company never included any EA loans in its subprime reporting.

126.    In February 2007, Mudd traveled to meet with Fannie Mae's then-largest customer, Countrywide. At the meeting, Mudd was briefed by the President and COO of Countrywide Home Loans about the volume of loans Fannie Mae acquired from that customer's subprime lending division (Full Spectrum Lending), which between 2004 and 2006 totaled

34

$14.23 billion worth of loans. The presentation explicitly referred to Countrywide's subprime lending division customers as subprime "Fallen Angels."

127.   In the Relevant Period alone, Fannie Mae acquired loans totaling approximately $28.5 billion from Countrywide's subprime division—the subprime division of a large lender. That number is far greater than the amount of "sub-prime mortgage loans or structured Fannie Mae MBS back by subprime mortgage loans" that Fannie Mae publicly disclosed to investors at any point during the Relevant Period.

128.   Disclosing loans acquired from Countrywide's subprime division alone would have more than doubled the disclosed subprime exposure in Fannie Mae's Single Family guarantee portfolio. However, those loans were not included in the Company's reported subprime exposure.

129.   During the Relevant Period, Fannie Mae purchased or securitized loans from subprime divisions of other large lenders including Citigroup, JPMorgan and GMAC.

130.   Lund's direct reports knew and informed him that subprime divisions of large lenders sold loans to Fannie Mae—including Citi's Argent/Ameriquest, Countrywide's Full Spectrum Lending, and First Franklin's Flagstar bank.

131.   On November 9, 2007, for the quarter ended September 30, 2007, Fannie Mae also filed a "credit supplement" on Form 8-K with the Commission. The document contained a summary description of certain credit risk characteristics of its Single Family book of business in chart form. Included in this chart were separate columns identifying Fannie Mae's subprime holdings and designating that 0.3% of its Single Family holdings were subprime loans. This supplemental disclosure did not inform investors of the additional subprime exposure from EA and MCM loans, or loans originated by the subprime divisions of large lenders. Fannie Mae

35

continued to issue credit supplements that were similarly false and misleading throughout the

Relevant Period.

### Mudd's False and Misleading Subprime Statements to the Media

132.    On December 2, 2007, Mudd spoke about Fannie Mae's subprime holdings in a

newspaper interview published in the San Francisco Gate.

> Q: We know you very well for the fact that you have well-underwritten loans,
> fully amortizing, and that you either keep these loans in portfolio or guarantee
> them. So how are you having involvement with these subprime loans at all?
>
> A: I'll give you two pieces to understand it. The notion that there is a delineation
> between a lower prime loan and a high subprime loan are incorrect. There's a
> FICO score, there's an LTV (loan to value) and a bunch of other factors. We
> have about 2 percent of our broker's business in total that meets our definition of
> what would be a subprime loan, not a predatory loan, but typically a loan to an
> individual that has had a credit blemish in the past. We made a decision a few
> years ago that there were lots of creditworthy individuals who had a credit
> blemish which would have previously either disqualified them from a prime loan,
> or condemn them to a subprime lender. They were probably eligible for what we
> call affordability product. So we have about 2 percent of that business on our
> books, and that is how our involvement happened.

133.    Mudd made these claims when he knew they were false and misleading. At the

time that he made this statement, Mudd knew that the "2 percent" figure did not include billions

of dollars in EA or MCM loans held by Fannie Mae. Mudd also knew that those undisclosed

loans were specifically designed for "credit blemish[ed]" borrowers and that the figure could not

reflect loans originated by the subprime division of large lenders, which by then the Company

claimed to include in its reported subprime exposure.

### Fannie Mae's False and Misleading Subprime Disclosures for Year-End 2007

134.    In February 27, 2008, Fannie Mae issued its 2007 Form 10-K, which was

identical to prior disclosures but further included the following statement:

> Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae
> MBS, represented less than 1% of our single-family business volume in each of
> 2007, 2006 and 2005. We estimate that subprime mortgage loans held in our

portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of December 31, 2007, compared with 0.2% and 0.1% as of December 31, 2006 and 2005, respectively.

135.    Approximately $55.6 billion worth of Fannie Mae's Single Family mortgage credit book of business consisted of EA loans as of December 31, 2007, and $38.8 billion in MCM loans—approximately 11 times greater than the 0.3% ($8.3 billion) disclosed as "subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS" as of December 31, 2007.

136.    Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

137.    As of January 31, 2008, the serious delinquency rate of EA was 7.14%— performance that was worse than the disclosed subprime serious delinquency rate of 6.21% for the same period. By February 2008, it was clear from reports provided to all three defendants that credit losses from EA loans were "disproportionate to the amount of the book they constitute."

*Fannie Mae's False and Misleading first and second quarter 2008 filings*

138.    On May 6, 2008, Fannie Mae filed its Form 10-Q first quarter 2008 and stated:

Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS represented less than 1% of our single-family business volume for the first quarter of 2008 and 2007. We estimate that subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of both March 31, 2008 and December 31, 2007. (Emphasis added.)

37

139.   Approximately $101 billion worth of Fannie Mae's Single Family mortgage credit book of business of March 31, 2008, consisted of undisclosed loans that fell within the company's description of subprime, and approximately $94.4 billion worth of Fannie Mae's Single Family mortgage credit book of business consisted of undisclosed loans as of December 31, 2007—approximately 12 times greater than the 0.3% ($8 billion as of March 31, 2008 and $8.3 billion as of December 31, 2007) disclosed as "subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS" as of December 31, 2007.

140.   Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans, but were not included in the reported quantitative number.

141.   By July 2008, Dallavecchia was emailing Mudd directly to highlight that EA and MCM were generating approximately 20% of the Company's credit losses.

142.   As of the beginning of August 2008, EA and MCM were classified in internal Fannie Mae documents as two of Fannie Mae's top three highest-risk loan products and Fannie Mae made plans to eliminate the EA loan program as part of an attempt to improve the overall credit quality of its Single Family book of business.

143.   This was not disclosed.   Instead, on August 8, 2008, Fannie Mae filed its Form 10-Q for the second quarter 2008 and explained:

> Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS represented less than 1% of our single-family business volume for the first six months of 2008 and 2007.   We estimate that subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of both June 30, 2008 and December 31, 2007.

38

144.    Approximately $60 billion worth of Fannie Mae's Single Family mortgage credit book of business consisted of EA loans and $41.7 billion in MCM loans as of June 30, 2008—approximately 12 times greater than the 0.3% ($8 billion) disclosed as "subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS" as of both June 30, 2008 and December 31, 2007.

145.    Nothing in Fannie Mae's public disclosures alerted investors to the fact this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

*Mudd Publicly Declares that Fannie Mae has Zero Subprime*

146.    On August 20, 2008, Mudd falsely stated in a radio interview: Fannie Mae has "about zero percent" exposure to subprime loans, and "[s]ubprime to Fannie Mae means a loan to a borrower that has had a credit problem in the past." When Mudd made this statement, he knew that Fannie Mae had substantial exposure to loans made to borrowers who have had a credit problem in the past.

*Post-conservatorship Fannie Mae Acknowledges*
*Additional Subprime Holdings*

147.    After Fannie Mae had been placed into conservatorship on September 6, 2008, the Company made a disclosure that highlights the misleading nature of the Company's prior subprime reports. At the time this disclosure was made, neither Mudd nor Dallavecchia were at Fannie Mae and Lund, who remained EVP of the Single Family business until June 2009, was no longer a member of the Disclosure Committee.

148.    On November 10, 2008, Fannie Mae filed its Form 10-Q for the third quarter and stated:

> We have classified mortgage loans as subprime if the mortgage loan is originated by a lender specializing in subprime business or by subprime divisions of large lenders. We apply these classification criteria in order to determine our ... subprime loan exposures; <u>however, we have other loans with some features that are similar to ... subprime loans that we have not classified as ... subprime because they do not meet our classification criteria.</u> (Emphasis added).

149.   In this statement, for the first time the Company publicly acknowledged what Mudd, Lund and Dallavecchia had known throughout the Relevant Period; namely, that Fannie Mae held loans squarely within the public definition of subprime that it had not included in calculating its publicly disclosed exposure to subprime loans.

150.   Based on the facts alleged above, Mudd, Lund and Dallavecchia, knew or were reckless in not knowing that Fannie Mae's statements disclosing its subprime holdings, and as to Mudd and Dallavecchia, their respective statements regarding Fannie Mae's subprime holdings, were false and misleading.

## FANNIE MAE'S ALT-A DISCLOSURE FRAUD

### *Fannie Mae Increases Market Share By Acquiring Reduced Documentation Alt-A Loans*

151.   Fannie Mae acquired increasing amounts of reduced documentation loans. Prior to 2000, Fannie Mae had a limited market presence in purchasing reduced documentation loans, and those loans were not a large part of mortgage originations nationwide. This changed during the 2000s, and by 2007, reduced documentation loans were surging in popularity, representing approximately 40% of mortgage loan originations nationwide.

152.   Traditionally, Fannie Mae's MBS dominated the nationwide mortgage-related securities market. However, by 2005, private label competition for mortgage-backed securities overtook Fannie Mae's MBS market dominance; as a result, Fannie Mae's nationwide share of mortgage loan originations fell from 40% in 2004 to 20% in 2005.

153.   In response, at the end of 2005, Fannie Mae's board of directors instructed the Single Family business to adjust its business plan to gain back market share.  The goal was to increase Single Family's purchases from 20% of total mortgage loan originations to at least 25% by the end of 2006.  In an April 2006 meeting, Mudd directed the Single Family business to acquire more reduced documentation loans specifically, saying:  "the market is moving to low documentation and we need to actively pursue the keys to this market."

154.   Fannie Mae's push to increase its reduced documentation loans was dramatic.  At the end of 2004, reduced documentation loans constituted 17.8% of Fannie Mae's Single Family loan acquisitions: by year-end 2005 that number was 20.2%, and by year-end 2006, 27.8% of Fannie Mae's Single Family loan acquisitions were reduced documentation loans.  This represented a nearly 40% increase from 2005 and a greater than 50% increase from 2004.

*Fannie Mae Internally Tracked Its Loans With Low Or Alternative Documentation Requirements As Reduced Documentation Loans*

155.   As described in internal Company records, documentation level is a key credit risk characteristic of a loan.  Because Alt-A loans do not require that a borrower fully document their income, assets and/or employment, Alt-A loans have a greater risk of default than fully documented loans.   Fannie Mae executives—including Mudd, Lund and Dallavecchia— regularly monitored the total reduced documentation loan acquisition trends at the Company and the attendant credit risk those loans presented via internal reports.

156.   Mudd, for example, was well aware of the Company's increased acquisition of reduced documentation loans. An April 26, 2006 CEO credit risk briefing stated that of all loans acquired by Fannie Mae's Single Family business, 20.2% were reduced documentation loans at year-end 2005, and this number increased to 23.5% of acquisitions by February 2006.  That same report noted that credit risks (such as reduced documentation) are a strong predictor of serious

41

delinquency within the first year of a loan's acquisition and therefore present significant credit risk.

157.   Similarly, at the beginning of his tenure as CRO of Fannie Mae in June 2006, Dallavecchia was briefed on Fannie Mae's increasing stake in reduced documentation loans. Dallavecchia received a credit risk briefing that explained: Fannie Mae's Single Family business has seen an increase in "potentially riskier products like ... low documentation loans ... [and] Alt-A loans as a percent of total acquisitions increased from 11.5% in 2002 to 20.2% in 2005." That same presentation described this increase as an acquisition "trend" and noted Fannie Mae's Single Family plan for an "Alt-A push. Goal of $60B in 2006."

158.   As a member of the Disclosure Committee, throughout the fall of 2006, Dallavecchia received draft versions of Fannie Mae's 2004 Form 10-K, which contained detailed acquisition data concerning reduced documentation mortgages, including quantitative exposure data that showed reduced documentation mortgages "represented approximately 18%, 20% and 24% of our single-family acquisitions in 2004, 2005, and the first half of 2006."

159.   Likewise, throughout the Relevant Period, as EVP of the Single Family business, Lund was aware of Fannie Mae's increasing exposure to Alt-A loans.  He received monthly reports that presented Fannie Mae's total reduced documentation loan exposure, which between 2006 and 2008 ranged from 13% to 21% of the Single Family mortgage book of business. Those loan acquisition reports were sometimes called the "Tom Lund Report."

160.   During the Relevant Period, Lund's Single Family officers—from his Single Family Credit Risk officers to Product Management and Development executives—routinely prepared presentations and reports concerning not only Fannie Mae's increasing acquisitions of reduced documentation loans, but also the credit risks associated with those loans, including their

42

expected and actual SDQ rates.  As the head of the Single-Family business, Lund had access to data and information prepared by his officers, as well as Early Warning reports—all of which conveyed, as described by his staff: "Low doc is more likely to default than full doc."

*Fannie Mae Failed to Report All The Reduced Documentation Loans*
*That It Tracked Internally for Credit Risk Monitoring Purposes*

161.    In its public filings, when it publicly disclosed the amount of reduced or alternative documentation loans it held, the Company did not report all of the reduced documentation loans that it tracked internally as one of seven key credit risks.

162.    Each of the Defendants knew that approximately half of the reduced documentation loans in the Single Family book were not included when the Company reported its Alt- A loans.

163.    When the Company internally tracked its reduced documentation loans it included loans that it referred to as "Special Lender Programs" or Lender-Selected loans.  These were loans in which the lender ostensibly initiated the reduced documentation option for processing the loan.  The Company also tracked "Other Low/No Doc loans," which are Borrower-Selected loans, or loans in which borrowers specifically requested loans for which minimal documentation was required.

164.    When the Company reported its Alt-A holdings it failed to disclose all its reduced documentation loans: it disclosed Borrower-Selected loans but did not report its Lender-Selected loans. This limited disclosure misrepresented the extent of Fannie Mae's total exposure to reduced documentation loans.

165.    On average throughout the Relevant Period, Lender-Selected Reduced Documentation Loans—the undisclosed Alt-A loans—had SDQ rates that were 1.4 times higher than full documentation loans with otherwise similar credit risks.  Moreover, during the Relevant Period, certain types of Lender-Selected Reduced Documentation Loans that Fannie Mae acquired, such as Countrywide's *Fast and Easy* loans, had SDQ rates that were 2 times higher than full documentation loans with otherwise similar credit risks.

44

166.    Fannie Mae's Alt-A disclosure misrepresented the extent of its reduced documentation high risk holdings as evidenced by the undisclosed loans from a single source of Lender-Selected reduced documentation loans. At year-end 2006, Fannie Mae had $102.5 billion worth of *Fast and Easy* loans alone on its Single Family book of business, which grew to $129.2 billion by year-end 2007, and by the end of the third quarter of 2008, Fannie Mae had $133.4 billion worth of *Fast and Easy* loans on its Single Family book of business. None of these loans, or other similar Lender-Selected reduced documentation loans, were ever disclosed to investors when the Company quantified its Alt-A exposure.

167.    This single unreported Alt-A product from one customer—Countrywide— accounted for 4.63% of Fannie Mae's 2006 Single Family business, 5.10% in 2007 and 4.94% as of September 2008. As one of Lund's officers stated in a presentation: "CHL [Countrywide] sells whatever it can through Fast & Easy."

### *Fannie Mae Failed To Disclose That*
### *The Company Directed Lenders When To Classify Loans as Alt-A*

168.    Fannie Mae stated that it classified loans as "Alt-A if the lender that delivers the mortgage loans to us has classified the loans as Alt-A based on documentation or other product features." This reporting materially understated the extent of Fannie Mae's total exposure to reduced documentation loans.

169.    Fannie Mae did not disclose that the Company directed lenders that delivered the mortgage loans to Fannie Mae's lender channel whether to label reduced documentation loans as Alt-A or not. The Alt-A classification, in practice, came from Fannie Mae and was executed by the originating lenders; the lenders did not make the coding determination.

170.    Fannie Mae had contractual agreements with lenders that included instructions on when to code reduced documentation loans for delivery through its Lender Channel as Alt-A.

Occasionally, when a customer delivered loans to Fannie Mae's Lender channel with an Alt-A code that Fannie Mae had not prescribed for delivery for that loan type, Fannie Mae would instruct the customer to re-code its loans to remove the Alt-A code prior to accepting delivery.

171.    Fannie Mae determined whether the lender classified the loan as Alt-A rather than accepting an Alt-A classification as designated by a lender

### Fannie Mae Issues a Series of False and Misleading Disclosures on Alt-A

172.    In its 2004 Form 10-K, which was filed on December 6, 2006, the Company disclosed that it had increased its holdings of reduced documentation loans, but did not quantify those holdings:

> We also have increased the proportion of reduced documentation loans that we purchase . . . we began to increase our participation in these product types where we concluded that it would be economically advantageous or that it would contribute to our mission objectives ... In addition, there has been an increasing industry trend towards streamlining the mortgage loan underwriting process by reducing the documentation requirements for borrowers. Reduced documentation loans in some cases present higher credit risk than loans underwritten with full standard documentation.

173.    In its discussion of Alt-A, Fannie Mae did not disclose that the amount of "loans that are underwritten with lower or alternative documentation" in the Single Family mortgage credit book of business was $390 billion as of September 30, 2006, or the fact that by June 30, 2006, approximately 24% of Fannie Mae's Single Family loan acquisitions were reduced documentation loans.

174.    As Fannie Mae prepared to file its 2005 Form 10-K in February 2007, Single Family officers working on the credit risk disclosures voiced concern: "Given Alt-A is an increasing as part of our business [sic] strategy and volume and this is the 2005 disclosure it seems to warrant more than a fairly benign reference, as is the case in the 2004 disclosure ... The decision now may very well be not to include numbers for this segment and just disclose an

increasing trend in words, but by the time we are done with 2006 we need to reflect the reality of the business."

175. During this time period, senior management at Fannie Mae recognized that investors wanted to know the Company's Alt-A exposure. In April 2007, the director of Investor Relations at Fannie Mae wrote an email acknowledging, "In anticipation of IR's 2005 10-K briefing with Dan and Bob tomorrow, we would like to get your direction on how management should address questions related to FNMs exposure to Alt-A product ... we expect the question to be asked and need to plan for it." (Emphasis added).

### Fannie Mae's False and Misleading Alt-Disclosures in its May 9, 2007 Form 12b-25 Filing

176. On May 9, 2007, for the first time, Fannie Mae disclosed a quantification of its Alt-A holdings in its Form 12b-25 filing. The Company defined Alt-A as loans with "lower or alternative documentation" and disclosed that it held 11% of Alt-A in its Single Family mortgage credit book of business. Fannie Mae stated:

> Although there is no uniform definition of Alt-A ... [Alt-A] loans generally are loans that are underwritten with lower or alternative documentation than a full documentation mortgage loan and that also may include other alternative features ... In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features, or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as Alt-A when sold. We estimate that approximately 11% of our total single-family mortgage credit book of business as of both March 31, 2007 and December 31, 2006 consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans ... As described below in the discussion of our Capital Markets group, we also have invested in highly rated private-label mortgage-related securities backed by Alt-A loans. We estimate that approximately 1% of our total single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans as of both March 31, 2007 and December 31, 2006. (Emphasis added.)

47

177.   The amount of Alt-A Fannie Mae publicly disclosed did not include the "lower or alternative documentation loans" that were internally referred to as Lender-Selected reduced document loans. Yet nothing in Fannie Mae's public disclosures alerted investors to the fact that a much larger volume of loans that matched the Company's description of its Alt-A holdings were excluded from the amount of Alt-A that the Company disclosed.

178.   Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 20.7% and 20.1% of its total Single Family mortgage credit book of business at March 31, 2007, and December 31, 2006, respectively, not 11% as disclosed. Fannie Mae's reporting of its Alt-A mortgage loans omitted approximately $219 billion and $201 billion worth of Fannie Mae's Single Family mortgage credit book of business which consisted of reduced documentation loans as of March 31, 2007, and December 31, 2006, almost equal to the volume of Single Family loans ($263 billion and $257 billion) that were disclosed as Alt-A.

*Fannie Mae's False and Misleading Alt-A Disclosures in its 2006 Form 10-K*

179.   In June 2007, Lund's Single Family personnel prepared Single Family Credit Committee presentation materials, which acknowledged that, for internal Fannie Mae calculations, Fannie Mae's undisclosed Alt-A loan programs were treated as reduced documentation loans, not full document loans.

180.   Even though senior management, including Mudd, Lund and Dallavecchia, recognized that Fannie Mae had an increasing volume of reduced documentation loans that performed as poorly as some loans disclosed as Alt-A, none of these loans were disclosed. On August 16, 2007, in its 2006 Form 10-K, the Company stated:

> *"Alt-A mortgage"* generally refers to a loan that can be underwritten with lower or alternative documentation than a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans. In

reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features, or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as Alt-A when sold ...We estimate that approximately 11% of our total single-family mortgage credit book of business as of December 31, 2006 consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans. This percentage increased to approximately 12% as of June 30, 2007 ... We estimate that private label mortgage-related securities backed by Alt-A loans ... accounted for approximately 1% (and 2% respectively) ... of our single-family mortgage credit book of business as of June 30, 2007. (Emphasis added.)

181.    At the time of this disclosure, Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 22% of its total Single Family mortgage credit book of business, not 12% as disclosed. Fannie Mae's reporting of its Alt-A omitted approximately $238 billion worth of Fannie Mae's Single Family mortgage credit book of business, which consisted of reduced document loans as of June 30, 2007— almost equal to the $296 billion that was disclosed as Alt-A.

### Fannie Mae's False and Misleading Alt-A Disclosures in its first, second and third quarter 2007 10-Qs

182.    By October 2007, reduced documentation loans comprised 29.1% of Fannie Mae's Single Family loan acquisition volume and 22% of the Single Family mortgage credit book of business.

183.    Nevertheless, on November 9, 2007, in its 2007 Forms 10-Q for the first quarter, the Company disclosed:

As of March 31, 2007, we estimate that approximately 11% of our total single-family mortgage credit book of business consisted of Alt-A mortgage loans or Fannie Mae MBS backed by Alt-A mortgage loans. This percentage increased to approximately 12% as of September 30, 2007 ... As of March 31, 2007, we held in our investment portfolio approximately $34.5 billion in private-label mortgage-related securities backed by Alt-A mortgage loans.

184.   On that same day, November 9, 2007, Fannie Mae also filed its 2007 Forms 10-Q for the second and third quarter, the Alt-A disclosures for which were comparable to the 2007 Form 10-Q for the first quarter.

185.   Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 22% of its total Single Family mortgage credit book of business, not 12% as disclosed.  Fannie Mae's reporting of its Alt-A omitted approximately $267 billion worth of Fannie Mae's Single Family mortgage credit book of business which consisted of reduced document loans as of September 30, 2007— almost equal to the $306 billion that was disclosed as Alt-A.

186.   On November 9, 2007, for the quarter ended September 30, 2007, Fannie Mae also filed a Form 8-K credit supplement with the Commission.  The document contained a summary description of certain credit risk characteristics of its Single Family book of business in chart form. Included in this chart was a separate column identifying Fannie Mae's Alt-A holdings, and designating that 12.5% of its Single Family mortgage credit book of business were Alt-A loans. Nowhere in this supplemental disclosure was there any statement to suggest that Single Family holdings included billions of dollars of additional reduced documentation loans that were not reflected in the 12.5% figure.  Fannie Mae continued to issue credit supplements that were similarly misleading throughout the Relevant Period.

*Fannie Mae's False and Misleading Disclosure in its Year-End 2007 10-K Filing*

187.   On February 27, 2008, in its 2007 Form 10-K, the Company repeated its prior statement on Alt-A and updated its reporting as follows:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented approximately 16% of our single-family business volume in 2007, compared with approximately 22% and 16% in 2006 and 2005, respectively.

50

188.   Fannie Mae's total volume of loans with "lower or alternative documentation"

(Alt-A) was actually 37% of its Single Family acquisitions, not 16% as disclosed.

189.   On May 6, 2008, in its 2008 Form 10-Q for the first quarter, the Company stated:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS
> represented approximately 4% of our single-family business volume for the first
> quarter of 2008, compared with approximately 23% for the first quarter of 2007.
> Alt-A mortgage loans held in our portfolio or Alt-A mortgage loans backing
> Fannie Mae MBS, excluding resecuritized private-label mortgage-related
> securities backed by Alt-A mortgage loans, represented approximately 11% of our
> total single-family mortgage credit book of business as of March 31, 2008,
> compared with approximately 12% as of December 31, 2007.

190.   Fannie Mae's total exposure to loans with "lower or alternative documentation"

(Alt-A) was actually 22% of its total Single Family mortgage credit book of business, not 11% as

disclosed.  Fannie Mae's reporting of its Alt-A loans omitted approximately $323 billion worth

of mortgage loans in Fannie Mae's Single Family mortgage credit book of business that

consisted of reduced document loans as of March 31, 2008— more than the $300 billion that was

disclosed as Alt-A.

191.   As of December 2007, 23% of Fannie Mae's Single Family mortgage credit book

of business consisted of reduced documentation loans, not the 11% reported in the public filing.

192.   Approximately two and a half months after the 2008 Form 10-Q filing, in July 29,

2008, Lund held a staff meeting which addressed issues related to reduced documentation loans.

Countrywide's *Fast and Easy* program—a Lender-Selected loan program whose loans were

tracked as a reduced document high risk loan internally but excluded from Fannie Mae's public

disclosure of its Alt-A exposure— was specifically discussed in the presentation. The briefing

addressed that these loans performed as poorly as some loans that were disclosed as Alt-A.

51

Despite this knowledge, *Fast and Easy* loans were not disclosed as part of Fannie Mae's Alt-A

exposure, and Lund continued to sub-certify Fannie Mae's public statements.

193.    By August 2008, and before the filing of its 2008 Form 10-Q for the second

quarter, Fannie Mae was planning to eliminate its high risk products, including Alt-A.  The

Company still did not disclose its total Alt-A loans.

194.    On August 8, 2008, in its 2008 Form 10-Q for the second quarter, its final filing

before conservatorship, the Company stated:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS
> represented approximately 4% of our single-family business volume for the first
> six months of 2008, compared with approximately 22% for the first six months of
> 2007 … Alt-A mortgage loans held in our portfolio or Alt-A mortgage loans
> backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related
> securities backed by Alt-A mortgage loans, represented approximately 11% of our
> total single-family mortgage credit book of business as of June 30, 2008,
> compared with approximately 12% as of December 31, 2007.

195.    Fannie Mae's total exposure to loans with "lower or alternative documentation"

(Alt-A) was actually 23% of its total Single Family mortgage credit book of business, not 11% as

disclosed.  Fannie Mae's reporting of its Alt-A omitted approximately $341 billion worth of

Fannie Mae's Single Family mortgage credit book of business which consisted of reduced

documentation loans as of June 30, 2008—more than the $306 billion that was disclosed as Alt-

A to investors on August 8, 2008.

*Post-conservatorship Fannie Mae Acknowledges Additional Alt-A Holdings*

196.    In its first periodic filing post-conservatorship, Fannie Mae made a disclosure that

highlights the misleading nature of the Company's prior Alt-A disclosures.  At the time this

disclosure was made neither Mudd nor Dallavecchia were at Fannie Mae, and Lund, who

remained EVP of the Single Family business, was no longer a member of the Disclosure

Committee. The Company explained:

52

We have classified mortgage loans as Alt-A if the lender that delivers the mortgage to us has classified the loans as Alt-A based on documentation or other features ... We apply these classification criteria in order to determine our Alt-A ... loan exposure[ ]; <u>however, we have other loans with some features that are similar to Alt-A ... that we have not classified as Alt-A ... because they do not meet our classification criteria.</u>  (Emphasis added.)

197.    In this statement for the first time the Company publicly acknowledged what Mudd, Lund and Dallavecchia had known throughout the Relevant Period, that it held loans that matched its public definition of Alt-A, but had not included them when reporting its Alt-A exposure:

198.    Based on the facts alleged above, Mudd, Lund and Dallavecchia, knew or were reckless in not knowing that Fannie Mae's statements reporting Alt-A were false and misleading.

### FIRST CLAIM FOR RELIEF
### <u>VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)</u>
### <u>(MUDD)</u>

1.    Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

2.    Mudd directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Fannie Mae securities, knowingly or recklessly, has made untrue statements of material facts or omitted to state material facts necessary in order to make statement made, in the light of the circumstances under which they were made, not misleading.

3.    By reason of the foregoing, Mudd directly or indirectly has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rules 10b-5(b) thereunder (17 C.F.R. § 240.10b-5(b)).

## SECOND CLAIM FOR RELIEF
### VIOLATION OF SECTION 17(a)(2) OF THE SECURITIES ACT
### (MUDD AND DALLAVECCHIA)

4.      Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

5.      Mudd and Dallavecchia, directly or indirectly, in the offer and sale of Fannie Mae securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly, recklessly or negligently have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

6.      By reason the foregoing, Mudd and Dallavecchia have violated, and unless enjoined will again violate, Sections 17(a)(2) of the Securities Act (15 U.S.C. § 77q(a)(2)).

## THIRD CLAIM FOR RELIEF
### AIDING AND ABETTING VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5(b)
### (MUDD, DALLAVECCHIA AND LUND)

7.      Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

8.      Fannie Mae and Mudd, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Fannie Mae securities, knowingly or recklessly, has made untrue statements of material facts or omitted to state material facts necessary in order to make statement made, in the light of the circumstances under which they were made, not misleading.

54

9.      Mudd, Dallavecchia and Lund acted knowingly or recklessly and provided substantial assistance to and thereby aided and abetted Fannie Mae in its violations of Exchange Act Section 10(b) and Rule 10b-5(b); [17 C.F.R. § 240.10b-5(b)]; therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

10.     Dallavecchia and Lund acted knowingly or recklessly and provided substantial assistance to and thereby aided and abetted Mudd in his violations of Exchange Act Section 10(b) and Rule 10b-5(b); [17 C.F.R. § 240.10b-5(b)]; therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

11.     Unless restrained and enjoined, Mudd, Dallavecchia and Lund will continue to aid and abet violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rules 10b-5(b) thereunder (17 C.F.R. § 240.10b-5(b)).

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF EXCHANGE ACT RULE 13A-14(A)
### (MUDD)

12.     Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

13.     On December 6, 2006, May 2, 2007, August 16, 2007, and February 27, 2008, Mudd signed false certifications of Fannie Mae Forms 10-K, and on November 9, 2007, May 6, 2008, and August 8, 2008, Mudd signed false certifications of Fannie Mae Forms 10-Q. Each of those Forms 10-K and Forms 10-Q certifications Mudd made were pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14(a) promulgated thereunder. His certifications falsely stated that: he had reviewed each report; based upon his knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not

55

misleading; and based upon his knowledge, the financial statements and information contained in each report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant.

14.    By reason of the foregoing, Mudd violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13a-14(a) (17 C.F.R. § 240.13a-14) promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

### FIFTH CLAIM FOR RELIEF
#### AIDING AND ABETTING VIOLATIONS OF SECTION 13(A) OF THE EXCHANGE ACT AND RULES 12B-20, 13A-1 AND 13A-13 (MUDD, DALLAVECCHIA AND LUND)

15.    Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

16.    Section 13(a) of the Exchange Act and Rule 13a-1 and Rule 13a-13 thereunder requires issuers of registered securities to file with the Commission factually accurate current and quarterly reports.  Exchange Act Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

17.    Fannie Mae violated Exchange Act § 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 (17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13).

18.    By reason of the foregoing, Mudd, Dallavecchia and Lund acted knowingly or recklessly and provided substantial assistance to and thereby aided and abetted Fannie Mae's violations of Section 13(a) of the Exchange Act (15 U.S.C. § 78m(a)) and Exchange Act Rules 12b-20, 13a-1 and 13a-13 (17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13); therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

(a)     Permanently restrain and enjoin defendant Mudd from violating Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. §77q(a) ("the Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) ("the Exchange Act") and Exchange Act Rule 10b-5, 17 C.F.R. §240.10b-5, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Exchange Act Rules 12b-20 and 13a-13,17 C.F.R. §§ 240.12b-20, 240.13a-13 and Exchange Act Rule 13a-14(a) (17 C.F.R. § 240.13a-14), and aiding and abetting Fannie Mae's violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

(b)     Permanently restrain and enjoin defendant Dallavecchia from violating Section 17(a)(2) of the Securities Act, aiding and abetting Fannie Mae's and Mudd's violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, and aiding and abetting Fannie Mae's violation of  Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13.

(c)     Permanently restrain and enjoin defendant Lund from aiding and abetting Fannie Mae's and Mudd's violations of Section 10(b) and Rule 10b-5, aiding and abetting Fannie Mae's violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13.

(d)     Order defendants Mudd, Dallavecchia and Lund to pay disgorgement, together with prejudgment interest;

(e)     Order defendants Mudd, Dallavecchia and Lund to pay penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(f)      Permanently bar defendants Mudd, Dallavecchia and Lund, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act (15 U.S.C. § 78u(d)(2)), from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act (15 U.S.C. § 78l) or that is required to file reports pursuant to Section 15(d) of the Exchange Act (15 U.S.C. § 78o(d)); and

(g)     Grant such other relief as this Court may deem necessary and proper.

Dated:   December __16__ , 2011

       Washington, D.C.

                            Respectfully Submitted,

                            UNITED STATES SECURITIES AND
                            EXCHANGE COMMISSION

                            By:  _____

                            Natasha S. Guinan (4320636)
                            Sarah L. Levine
                            James A. Kidney
                            Stephen L. Cohen
                            Charles E. Cain

                            100 F Street, N.W.
                            Washington, D.C. 20549
                            Tel.:       (202) 551-4572 (Guinan)
                            Fax:       (202) 772-9236 (Guinan)
                            E-mail:   GuinanN@sec.gov