# Exhibit F

  **Federal Housing Finance Agency**

CONFIDENTIAL

September 4, 2008

Mr. Richard Syron
Chairman and Chief Executive Officer
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive
McLean, Virginia 22102

Dear Mr. Syron:

Please find attached a draft of our mid-year letter for Freddie Mac.  Please note that the composite rating is "Critical Concerns."

This draft is provided for your information and should be provided to your Board.

Please contact me if you have any questions.

Sincerely,

Christopher H. Dickerson
Acting Deputy Director
Division of Enterprise Regulation

cc:  Jerry Weiss

CONTAINS NONPUBLIC INFORMATION
DISCLOSURE IS PROHIBITED

CONFIDENTIAL

 **Federal Housing Finance Agency**

**DRAFT MID YEAR LETTER**

September [ ] 2008

Mr. Richard Syron
Chairman and Chief Executive Officer
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive
McLean, Virginia 22102

Dear Mr. Syron:

The composite rating of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Enterprise") is "Critical Concerns." This rating reflects critical safety and soundness concerns with Freddie Mac. The financial condition of the Enterprise is vulnerable to continuing adverse business conditions and management has not demonstrated the ability to implement effective corrective actions. Moreover, the amount and quality of the Enterprise's capital is of critical concern and remains the subject of an ongoing examination. Given the critical unsafe or unsound practices and conditions that gave rise to the Enterprise's existing condition, the deterioration in overall asset quality and net losses experienced year-to-date June 2008 as well as forecasted future losses, likely will require recapitalization of the enterprise.

This rating reflects a downgrade from the prior quarter and stems from the continued and significant deterioration in credit quality in both the credit guarantee and retained portfolios, ongoing weakness in credit governance, concerns related to the capacity of the present management team and Board of Directors to resolve current issues, use of outdated models to inform decisions, weak financial performance, and less than a fully effective internal control environment, including the internal audit function. Additional determinations of other than temporary impairments ("OTTI") of private-label securities ("PLS") and the likely potential of not fully realizing deferred tax assets ("DTA") are possible. A significant lack of market confidence has eliminated the ability to raise capital at the present time.

As a consequence of a series of ill-advised and poorly executed decisions and other serious misjudgments, the Enterprise's poor financial performance, expected negative future earnings and loss expectations, capital position, and an inability to fully rely on representations made by the Board of Directors and management to the agency, the Federal Housing Finance Agency

**CONTAINS NONPUBLIC INFORMATION**
**DISCLOSURE IS PROHIBITED**

**CONFIDENTIAL**                                                                    Page 2

("FHFA") [1] has lost confidence in the Board of Directors and the executive management team. This is particularly true given the delay and lack of transparency demonstrated by executive management in addressing repeatedly communicated regulatory issues and criticisms. Moreover, the agency is increasingly concerned that the same management team responsible for the Enterprise's current condition is also charged with overcoming the many challenges the Enterprise now faces as the result of that condition. This task may be seriously compromised by executive management's demonstrated and continuing apparent unwillingness and/or inability to implement numerous necessary corrective actions within an acceptable time frame. These unsafe or unsound practices have caused and are likely to continue to cause a substantial dissipation of assets and earnings and cause the Enterprise to be in an unsafe or unsound condition. Management has allowed its capital base to deteriorate substantially in the past months, dangerously reducing the capital resources available to the Enterprise to absorb losses embedded in its existing portfolio and credit guarantee book. The Enterprise is clearly vulnerable to substantial further deterioration in capital given the current conditions in the mortgage market. As described more fully below:

- The Enterprise's own public filings have indicated accelerated credit losses in the most recent quarter;

- Reflecting increasing credit losses and the unpredictability of future losses, the Enterprise has ceased providing public guidance on credit losses;

- FHFA's current examination of the reserve process could have an additional negative impact on capital calculations;

- If unable to rebut the OTTI guidelines, the Enterprise may incur significant write-downs;

- The significant increase in DTA over the past five quarters, combined with uncertain market conditions, has raised questions about the DTA's quality and recoverability and about the current core capital number;

- The Enterprise lacks sufficient reserves for exposures to mortgage insurers and financial guarantors;

- The Enterprise continues to rely on inadequate modeling that has forced the Enterprise to repeatedly revise its own forecasts; and

- The Enterprise continues to rely almost exclusively on short, term, discount note funding.

Given the seriousness of our concerns, this letter communicates our summary judgment of the operations of the Enterprise based on long-standing areas of concern and our most recent

---

[1] For purposes of this communication, the term "FHFA" will refer either to the Federal Housing Finance Agency or its predecessor, the Office of Federal Housing Enterprise Oversight ("OFHEO"), as appropriate.

observations from both the first and second quarters of this year and year-to-date.  Key issues facing the Enterprise at this time include, but are not limited to:

- The strength, cohesiveness, and depth of the present executive management team to cope with the severity and level of significant issues as well as to fulfill their mission are a critical concern to FHFA.

- The Board of Directors remains in continuing violation of the December 2003 Consent Order executed between the Enterprise and FHFA.  Further, the Board of Directors has failed to comply with agreements reached with FHFA in 2008 to raise significant levels of capital.

- Credit risk management, the conduct of the Chief Financial Officer, capital management, portfolio management, and the development of a well-controlled and SOX-compliant internal control environment are areas of serious concern to FHFA.

- The combination of serious internal weaknesses, including the Enterprise's failure to adhere to prudent underwriting standards, policies, and risk management practices, along with heightened public scrutiny as a result of current conditions, has materially increased the Enterprise's exposure to litigation.

- Deteriorating market confidence in Freddie Mac and the other GSEs, as well as worsening market liquidity for GSE bullet and callable debt increased pressure on Freddie Mac's discount note issuance program to a critical level.  The Enterprise's practice of relying on repo financing of its agency collateral to raise cash in the current credit and liquidity environment is an unsafe and sound practice or condition given the unavailability of willing lenders to provide secured financing in significant size to reduce pressure on its discount notes borrowings.

- Asset quality is poor and continues to deteriorate.  Single-family serious delinquencies, credit related losses, and real estate owned ("REO") levels have dramatically increased.  The PLS portfolio has more than $30 billion in mark-to-market losses, and 3Q OTTI is likely to have a material adverse impact on earnings and capital.

- Counterparty risk is growing very rapidly at a time when financial institutions are under increasing stress.  The widespread financial weakness of counterparties on which the Enterprise relies for credit enhancements, loan repurchases, portfolio servicing, effective default management and loss mitigation, derivatives, and other contractual safeguards cast doubt on the full collectability of potential obligations, thereby creating an unsafe and unsound condition to transact business.

- Executive management is aware that models are not performing well in the current environment and has not devoted the resources to address this problem.  Given that key models have been functioning outside acceptable tolerances and are producing flawed outputs, the Board of Directors and executive management have relied on

mannual processes and extensive changes that are not subject to disciplined model change controls.  These adjustments include very material reduction of model-produced loss reserves.  This combination of problems makes the Enterprise vulnerable to errors, misjudgments, and possible manipulation and is an unsafe and unsound practice.

- The Enterprise had a GAAP net loss of $3.1 billion in 2007 and has experienced GAAP net losses of nearly $1 billion (before dividends) in the first six months of 2008.  Given present market conditions, deteriorating housing price trends, continuing accounting issues, increasing counterparty and mortgage credit risk, increased cost of funding, and modeling problems, future earnings are at grave risk.  Correspondingly, FHFA-mandated capital surpluses are also at grave risk as losses continue to mount.

- The amount and quality of capital is declining, and there is a very limited potential to augment capital meaningfully from external sources.  This could lead to non-compliance with regulatory requirements, particularly if deteriorating asset condition requires further write-downs or the Enterprise is unable to raise additional capital.

The Board of Directors and executive management of the Enterprise continue to demonstrate significant material weaknesses in their oversight and operation of the Enterprise.  These weaknesses have repeatedly been brought to the attention of the Enterprise in periodic examinations and interim regulatory guidance and direction, including the 2003 Consent Order imposed by FHFA.  The Director met with the Board on several occasions to discuss these issues.  Many of these and other issues were discussed in the Director's monthly meetings with the Chairman and Chief Executive Officer Richard Syron.  Although the 2007 Report of Examination identifies certain areas in which some progress has been made, very serious fundamental problems have remained and, in some cases, worsened.  Among other things, we have identified situations where the Enterprise has failed to inform FHFA adequately of its actions or has failed to take actions specifically requested by FHFA.  In some instances, conduct of executive management has amounted to unsafe and unsound practices that have caused the Enterprise to operate in an unsafe and unsound condition to transact business.  Recent adverse changes in the overall economic environment have magnified the impact of the Enterprise's weaknesses to the point where they pose serious risks to its mission and continued operation.  In particular, FHFA is concerned that Enterprise conduct has resulted in:

- A substantial dissipation of earnings and assets due to unsafe or unsound practices.

- The Enterprise being in an unsafe or unsound condition to transaction business.

- A combination of inappropriate accounting practices, including an unsafe and unsound reduction in loss reserves.

- The Enterprise facing an inability to meet its obligations in the normal course of its business.



**CONFIDENTIAL**                                                                                  Page 5

- Unsafe and unsound practices that are likely to cause insolvency or substantial dissipation of assets or earnings or to weaken the condition of the Enterprise.

FHFA replaced its CAMELSO and Enterprise Risk Management evaluation ratings on January 1, 2008 with a combined ratings methodology of GSEER: Governance, Solvency, Earnings and Enterprise Risk (Credit, Market, and Operational).

**Governance**

For the reasons set forth below, Governance is rated "Critical Concerns." Governance comprises Board and management actions, accounting, compensation, compliance, enterprise wide risk management, external audit, internal audit, management, reputation and strategy. This rating reflects FHFA's determination that more than moderate weaknesses and unsafe or unsound practices or conditions exist. Issues of concern include:

<u>The Board of Director's Failure to Separate the Positions of Chairman of the Board and Chief Executive Officer</u>

The Board of Directors is in violation of Article II, paragraph 13 of the consent order dated December 9, 2003 ("Consent Order") between FHFA and the Freddie Mac Board of Directors. The Board has failed to separate the position of the chairman of the board and the chief executive officer within a reasonable period of time. Notwithstanding repeated expressions over the past 55 months of its commitment and specific plans to satisfy this requirement, the Board has not separated these positions, and has broken several agreements with the Director on when this would be done. Conduct that violates a consent order provides grounds for a cease-and-desist order and civil money penalties.

<u>Board's Failure to Retain a Qualified President & Chief Operating Officer</u>

The Board of Directors is responsible for hiring and retaining qualified senior executive officers to conduct the Enterprise's affairs, and to maintain an appropriate succession plan for senior executive officers. In May 2007, Freddie Mac announced that President and Chief Operating Officer Eugene McQuade would leave the Enterprise in September 2007. It has now been over a year since the Enterprise announced Mr. McQuade's departure and the Board of Directors still has not filled this key position. The lack of a complete executive management team during this period of tumult in the housing finance sector has exposed the Enterprise to increased risk. The combined failure of the Board to fill this important position and to maintain a viable succession plan raises serious safety and soundness concerns.

<u>Board's Failure to Address Identified Matters Requiring Attention</u>

The preceding findings are also indicative of broader failures of oversight by the Board of Directors. For example, there are 46 currently outstanding Matters Requiring Attention ("MRAs") covering Internal Controls, Credit Risk Management, Compliance with FHFA's Mortgage Fraud Reporting Regulation; and Governance. The majority of these MRAs are currently past due.

CONFIDENTIAL                                                                 Page 6

Management Weaknesses in Credit Risk Management

Enterprise management of credit risk has been a source of ongoing concern which the Director first raised to the Board in June 2006. More recently the 2007 Report of Examination noted a marked deterioration in credit quality – a reflection of market developments, pursuit of housing mission goals, and management's strategic decision to purchase and guarantee certain single family mortgages originated in 2006 and 2007 with higher-risk characteristics including: interest-only products, loans with secondary financing, mortgages with FICO scores less than 660, and loans with higher loan-to-value ratios. Evidence of increased risk layering has also occurred. Contract provisions precluded simultaneously increasing pricing commensurate with the increased risk. Also noted were concerns with MIS and the failure of the Enterprise to operate without a Chief Credit Officer. In 2006 FHFA informed the Enterprise of its conclusion that the expansion of the Subprime Private Label Securities Portfolio outpaced the attendant risk management structure, and that the weaknesses in the pattern of practice in risk management rendered the Enterprise "vulnerable to unidentified and latent risk" in the portfolio. However, management continued to replace run-off with new purchases into 2007 averaging approximately $22 billion per quarter. Had management stopped purchasing these securities concurrent to the issuance of FHFA's conclusion letter, the vast majority of the $193 billion Retained ABS portfolio would have runoff.

The failure to exercise appropriate credit risk discipline is an unsafe and unsound practice that has caused the Enterprise to be in an unsafe and unsound condition to transact business. Weaknesses in credit risk management are discussed further under the heading "Credit Risk Management".

Management Failure to Maintain Adequate Liquidity Contingency Planning

The Enterprise's practice of relying on repo financing of its agency collateral to raise cash in a systemic liquidity event is an unsafe and unsound practice or condition given the unavailability of willing lenders to provide secured financing in significant size. Management failed to ensure that the Enterprise could convert unencumbered agency MBS to cash through secured lines of credit or an active repo funding program.

For example, Freddie Mac's 90-day liquidity policy was designed to make sure that under extreme stress, i.e., no access to the discount note market, that Freddie Mac would be able to borrow from the market using its agency collateral. Today, given stressed credit and liquidity conditions, market lenders are not willing to issue term-repos or to commit secured lines to Freddie Mac in significant size.

Liquidity deficiencies are discussed more fully below under "Market Risk".

General Auditor Friction with Chief Financial Officer

The episode that ensued from acrimony between the General Auditor and the Chief Financial Officer reflects poorly on executive management and is the source of significant supervisory concern. The facts revealed through Board counsel's investigation reflect a pattern of inappropriate actions by both of these executive officers. Although the Board of Directors



took appropriate action to investigate the underlying facts, the Board did not issue a formal reprimand to the CFO or take any meaningful disciplinary action to penalize the inappropriate conduct of which the Board of Directors became aware.

## Capital Raising

The Board and management failed to raise capital despite the March 19, 2008 agreement with FHFA as they were reluctant to honor their commitment to raise "significant capital" - especially any common equity. Management pursued several months of discussions with FHFA before coming forth with a proposal to raise $5.5 billion, half in common equity, that was accepted by the Board of Directors. The Enterprise's failure to raise new capital in 2008 has now placed it in a market of heightened debt, equity, and mortgage market uncertainty, raising grave doubts about its current ability to raise additional capital. Most recently, private investors have indicated a lack of interest in Freddie's stock without government backing. Freddie Mac was hoping the private equity issuance could anchor a comprehensive and significant capital raise, which now appears highly unlikely or cost prohibitive. The failure of the Board of Directors and executive management to anticipate and act on capital needs or to position the Enterprise to raise needed capital in a down economic market has placed the Enterprise in an unsafe and unsound condition to transact business.

The Chief Executive Officer's explanations for this failure emphasize factors that were just as relevant in March 2008, when management committed to raise capital, and invite the conclusion that the Board and CEO did not deal with the FHFA Director in good faith during the negotiations that lead to the Director's decision to reduce the capital surcharge at the time of the agreement. In a June 13, 2008 letter, FHFA pressed Chairman and CEO Syron to move expeditiously to meet its commitment, and criticized him for growing the portfolio without first raising capital as promised. Growing the Enterprise's portfolio against this background was an unsafe and unsound practice that has caused the Enterprise to be operating in an unsafe and unsound condition to transact business.

## Accounting

FHFA has significant continuing concerns regarding the Enterprise's application of generally accepted accounting principles ("GAAP"), based upon our analysis, findings, and observations. These concerns are exacerbated by the fact that the economic environment in which the Enterprise operates has continued to deteriorate. The incidence of mortgage loan-related delinquencies and foreclosures has increased dramatically, and the Enterprise's large investments in mortgage-related securities have continued their decline in value at an accelerated pace. As we have previously communicated to you, management has been aggressive in its accounting in some critical areas, particularly with respect to OTTI and the implementation of the fair value option.

FHFA is concerned about the large amount of losses deferred in accumulated other comprehensive income ("AOCI") as they represent potential losses that would be realized if all the investments needed to be liquidated at once. These losses have continued to grow since June 30, 2008. Moreover, the large amount of losses deferred in AOCI have a negative implication for the quality of the Enterprise's statutory capital. In this same connection there

**CONFIDENTIAL**                                                                 **Page 8**

has been a serious reluctance on the part of the Enterprise to take OTTI write-downs despite clear signals from the market that losses are likely. Only after FHFA threatened to issue a cease-and-desist order did management agree to write down to market securities in the long-term liquidity portfolio. A recent example of this reluctance to take OTTI was management's hasty reversal of an impairment decision just prior to the issuance of the second quarter financial statements that served to partially offset liquidity portfolio losses. This involved bonds insured by XLCA. In this instance, management elected not to impair several bonds insured by XLCA despite significant uncertainties regarding XLCA's claims- paying ability and below investment grade credit ratings. The decision which served to partially off-set the long term liquidity portfolio write down was based on a pending transaction that was expected to improve claims paying ability, although the extent of the impact was far from clear, as evidenced by the rating agencies "wait and see" approach. Management reversed its initial decision to impair, despite serious reservations expressed by FHFA regarding both the financial soundness of the insurer and the potential reputation risk to Freddie Mac.

To address OTTI shortcomings and to further consistency between the Enterprises, FHFA has issued a supervisory letter on the assessment and recognition of OTTI, which establishes a baseline set of assumptions for OTTI assessment with respect to all investment securities and in particular subprime and Alt-A PLS. The implementation of this guidance could result in a significant increase in OTTI recognized by the Enterprise.

FHFA periodically issues examination guidance regarding the implementation of new accounting standards, most recently for the Fair Value Option ("FVO"). Freddie Mac has failed to implement the FVO guidance with respect to its Liquidity and Contingency ("L&C") portfolio. However, management has made a verbal commitment to begin moving the L&C portfolio to full fair value beginning no later than October 1, 2008. As mentioned above, for the second quarter, Freddie Mac recognized $214 million in impairments on $72 billion of securities in the L&C portfolio.

Additionally, Freddie Mac's DTA have increased from $4.3 billion in 1Q 2007 to approximately $18.4 billion in 2Q 2008. This increase in DTA, coupled with the uncertain market conditions, has heightened our concern appreciably about the quality and recoverability of this ($18.4 billion) tax benefit. As a result, the reliability of the current core capital number has been called into question.

The continuing failure of the Board of Directors and management has raised serious concerns about the continuing safety and soundness of the Enterprise, has resulted in unsafe and unsound practices and has caused the Enterprise to be operating in an unsafe and unsound condition to transact business.

**Solvency**

Solvency is rated "Critical Concerns." Solvency evaluates the quantitative measurement of available capital in relation to the risks facing the Enterprise, the sufficiency of capital planning, and other capital management tools in light of the risks and future capital requirements. A "Critical Concerns" solvency rating indicates that actions taken to manage day-to-day capital

CONFIDENTIAL                                                      Page 9

adequacy place continued pressure on the Enterprise's long-term ability to ensure adequacy. Losses compounded by large preferred dividends payments are not consistent with the augmentation of capital. Sources of additional capital are constrained and impact the ability of the Enterprise to react and respond to changing risks and market conditions in a timely and cost-effective manner.

There are significant uncertainties in the Enterprise's financial condition that raise serious concerns that the Enterprise's capital may in fact not be adequate. The quality of the Enterprise's capital has clearly weakened, with:

- substantial declines in the price of the Enterprise's common and preferred stock;

- increasing reliance on preferred stock relative to common stock;

- aggressive application of certain accounting policies;

- increasing shortfall between GAAP reserves and total expected losses.

- loss reserves and counterparty exposures, especially mortgage guaranty insurers (MI's) exposure to existing and future business;

- substantial increases in AOCI, which is not reflected in the statutory definition of core capital that we must use for regulatory purposes. Large negative AOCI amounts reduce shareholders equity even though it is not counted as part of core capital; and

- growing tax deferred assets and questionable realization of those assets.

Additional factors impacting the Solvency rating include, but are not limited to:

- The Board of Directors' and executive management's failure to date to raise additional capital totaling a minimum of $5.5 billion, as previously committed to FHFA. This failure is an unsafe and unsound practice that has placed the Enterprise at a significant disadvantage to raise the needed capital given the uncertainty and pricing in the market. Private equity investors are indicating that the risks are too high at this point, and there are no indications of when (if ever), the Enterprise could successfully return to the equity markets.

- The continued high exposure from both market and credit-related risks place pressure on the capital base of Freddie Mac, further eroding the core capital surplus as losses continue. Current and projected earnings capacity remains insufficient to grow the capital base through normal operations.

- Lack of market confidence in the Enterprises continues to place pressure on liquidity.

- Capital projections have been repeatedly revised downward, raising concerns over capital adequacy in 2009 under a severe stress scenario. Identification of further asset write-downs likely will exacerbate this problem.

Taken as a whole, the preceding factors have caused the Enterprise to be operating in an unsafe and unsound condition to transact business.

## Earnings

Earnings are rated "Critical Concerns." This rating comprises all aspects of earnings and financial analysis, including the soundness of the business model, adequacy of earnings to build and maintain capital, and the quality of earnings. The rating of "Critical Concerns" reflects FHFA's assessment that immediate fundamental changes are necessary to address the issues evaluated and concern that the Enterprise is unable to implement corrective actions in the current environment. Earnings generally have declined over the past 5 years and were most recently driven by increased credit costs. FHFA has previously issued supervisory letters s identifying concerns related to earnings.

The Enterprise has experienced net losses of $972 million in the first six months of 2008. Earnings during this period have been adversely impacted by increasing credit-related expenses, substantial fair value losses on the trading portfolio, and OTTI impairments on private label security impairments. Forecasts of future earnings have been revised downward, as projections of credit-related expenses continue to rise substantially. Notwithstanding the dominance of credit-related expenses in earnings forecasts, future earnings are also exposed to fair value losses from spread widening of private-label securities, and security impairments. Future earnings are threatened by a massive overhang of unrealized losses on available-for-sale securities that may convert into security impairments in a stress scenario. These results are likely to cause a substantial dissipation of earnings and assets due to unsafe or unsound practices. Other factors resulting into the "Critical Concerns" earnings rating include the following:

- The Enterprise net losses available to common shareholders in the first half of 2008 were $1.5 billion.

- The provision for credit losses at $3.8 billion for the first half of 2008 is 31% higher than the full year 2007 amount of $2.9 billion. Future provision requirements would further depress earnings.

- Earnings do not account for potential future losses which are embedded in AOCI ($24.2 billion), DTA (total exposure of approximately $18.4 billion as of 2Q 2008); future expected credit losses not yet reserved for and substantial remaining OTTI and MI exposure.

- The Enterprise's own base-case earnings forecast results in a thin capital cushion by year end 2009. The matter is further complicated by the fact that the forecasting process has one outstanding Matter Requiring Attention. Thus, capital in the base-case forecast could erode much faster than indicated in the projections. Further, the forecast of earnings in a FHFA-specified stress scenario indicates that Freddie Mac's ability to meet regulatory capital requirements in a stress scenario may be at risk as soon as year-end 2008.



**CONFIDENTIAL**                                                        **Page 11**

Based on the foregoing, reflecting significant shortcomings and weaknesses in internal controls and risk management practices, FHFA has determined that the Enterprise's financial condition has deteriorated to the point where the Enterprise is in an unsafe and unsound condition to transact business.

**Enterprise Risk Management (Includes Credit Risk, Market Risk, Operational Risk)**

**Credit Risk Management**

Credit risk is rated "Critical Concerns."   This component is comprised of an evaluation of accounting, counterparty, credit models, multifamily, portfolio credit, and single family and incorporates both the quantity of risk in the Enterprise and the quality of risk management in these areas. The rating of "critical concerns" reflects FHFA's assessment that immediate fundamental changes are necessary to address the issues evaluated and concern that the Enterprise is unable to implement corrective actions in the current environment. Data, models, systems, and risk management practices do not and have not fully accommodated the growing levels of complex and higher risk products, which is an unsafe or unsound practice.

The "Critical Concerns" rating reflects a downgrade from "Significant Concerns" in 1Q08. The worsening rating is due to weak internal credit controls and risk management, as demonstrated by:

- Management's failure and refusal to take more than limited proactive measures to improve overall credit governance practices, despite repeated urgings by FHFA.

- The Enterprise operating without a Chief Credit Officer and with credit-related internal management information systems and risk management processes that are not commensurate with the condition of the portfolio.  This failing was discussed on several occasions with the Chief Executive Officer and the Board and is an unsafe and unsound practice that has put the Enterprise in an unsafe and unsound condition to transact business.

- The absence of a corporate-wide Credit Committee.

- The absence of risk-based pricing in 2006 and 2007 has created a situation that resulted in contractual provisions precluding simultaneously increasing pricing commensurate with the increased risk.

The failure to have an adequate credit risk governance structure in place likewise raises concerns about the Enterprise's ongoing safety and soundness.

The adverse effect of these shortcomings has compounded by continued and significant deteriorating single-family performance indicators, rapidly growing credit losses, declining financial capacity of mortgage insurers and financial guarantors, financial weakness of significant servicers, and market pressures that are expected to stress Enterprise performance, including earnings and capital, for the foreseeable future.

**CONFIDENTIAL**                                                    **Page 12**

The amount by which the lifetime expected losses related to credit exposures exceeds the GAAP credit loss reserves has increased markedly. In response to increasing questions and heightened credit risk, FHFA is nearing completion of an examination to review the supporting documentation and process used in the reserving methodology, focusing on critical areas such as high risk products; the setting of the loss confirmation period; establishment of appropriate risk "buckets" for the transition rate calculation; the basis of collateral values used in the calculations of loss severity; and comparability between the Enterprises.

## Single Family Credit Risk

The quantity of risk is high as evidenced by rapidly rising levels of credit losses and significant adverse changes in performance indicators. Delinquencies, real estate owned (REO), and credit losses have risen substantially during this quarter and year-over-year. Moreover, the loan loss reserve for 2Q 2008 has increased by more than five-fold since 2Q 2007 signifying the Enterprise's acknowledgement and continued expectation of rapidly deteriorating credit conditions. Current market conditions, including continued rapid declines in house prices, double-digit levels of housing supply, and a cycle of loan resets that are expected to peak in 2010 continue to put considerable stress on credit performance

Credit losses (defined as net charge-offs and REO operations expense) in the first six months of 2008 were $1.338 billion, a sharp rise from $137 million in the first six months of 2007. Equivalent credit loss ratios have risen from 1.7 by to 14.5 bps. The Single-Family Operating Committee projected full-year 2008 credit losses to be $3.209 billion, more than six times 2007 levels of $495 million. These trends are likely to result in a substantial dissipation of earnings and capital. Compounding this dire situation is the fact that REO loan recovery at disposition is tracking downward; in June 2008, REO loan recovery at disposition was 77.8%, versus 83.0% in March 2008, and 91.3% for 2007.

Significant declines in house prices and rising levels of housing supply continue to pressure serious delinquency rates and levels of REO. Year-over-year serious delinquency rates more than doubled from 0.42% in 2Q 2007 to 0.93% (excluding structured transactions) in 2Q 2008 and 1.01% in July. Alt-A mortgages are leading contributors to serious delinquency rates and credit losses. The Enterprise continues to promote alternatives to foreclosure and has piloted several new loss mitigation initiatives. The volume of workouts is up almost 40% in 2Q 2008 to 17,415 from 12,480 one year earlier. However, REO inventories continue to rise substantially as inflows exceed dispositions. At June 30, 2008 there were 22,029 properties in REO inventory, more than double inventory levels in 2Q 2007 at 10,260. An estimated 52,754 REO properties will be acquired in 2008 high REO acquisition states include California, Arizona, Michigan, Virginia, Florida and Nevada — areas with higher than national average inventories or regional economic challenges.

Negative expectations of future credit performance and losses and ultimately earning and capital levels are demonstrated by the rapidly rising loss reserve. In 2Q 2008 management recommended a single-family loss reserve of $5.8 billion, compared to $1.1 billion for 2Q 2007, an increase of more than five-fold reflecting the deterioration in the credit markets. Projected credit related expenses, including the loan loss provision and REO operations

expense for 2008 is $7.987 billion. Even more disconcerting is a series of memos in July and August that included the Controller and Chief Credit Officer that justified lowering the model-based credit reserves that required a series of aggressive, insufficiently backed adjustments.

The acquisition profile in 2008 has improved somewhat as a result of credit tightening and pricing increases effective earlier this year. However, early performance of the 2008 vintage is tracking to 2007 and has not shown improvement.

The deterioration in overall credit are the result of unsafe and unsound practices that have stressed the existing credit governance structure and have caused the Enterprise to be in an unsafe and unsound condition to transact business. The implementation of an Enterprise credit committee and designation of a Chief Credit Officer responsible for the credit strategy and credit results would augment and strengthen the credit governance structure.   The business unit has begun to strengthen its credit management reporting, including reporting information on portfolio and purchase information; performance results and asset disposition; top counterparty and exposure detail; credit loss drilldown; profitability and return analysis; segment earnings; forecasts; and a comparison actual versus planned performance. The failure to have such structure in place raises concerns about the Enterprise's ongoing safety and soundness and has caused the Enterprise to be operating in an unsafe and unsound condition to transact business.

## Multifamily (MF) Credit Risk

Risk in the multifamily business is increasing due to rising cap rates and property level expenses, and slower rent growth. Increasing expenses and cap rates combined with slower rent growth may lead to a decline in apartment values. Enterprise research suggests that cap rates are likely to increase in excess of 125 bps over the next few years from 6% to 7.25%, which could lead to a drop in property values between 10 and 15%.

The percent of the portfolio on the critical and high watchlist has remained flat at 0.4% since August 2007. There was a credit gain in April of $143,000 bringing the YTD credit loss total to approximately $0.4 million. Credit losses are expected to increase slightly from their historical lows. Delinquencies decreased to 3 bps, consisting of two 60-day delinquent loans totaling $20 million.

## Centerline

The December 2007 Centerline $2.8 billion TEBS (tax exempt bond securitization) transaction highlights continued weaknesses in multiple critical areas -- governance, internal controls, credit risk, model risk and accounting. It serves as an example of a management philosophy that appears to value getting the deal done over ensuring that proper risk management is in place and financial viability is established first. This transaction was an unsafe and unsound practice for several reasons — among them are the following:

- To the extent the transaction represented a bailout of Centerline, a key Multifamily counterparty for the Enterprise, it constituted an improper use of the franchise and

**CONFIDENTIAL**                                                    Page 14

exposed the Enterprise to reputation risk.

- Use of an accelerated new product approval process was inappropriate for a transaction of this size, complexity and risk. Transaction review and approval processes were inconsistent with internal controls. Accounting policy related to TEBS was investigated only after closing, and surfaced the need for an unforeseen change impacting the balance sheet.

- Financial evaluation and risk analysis were inadequate when the transaction was initially approved.

- Potential conflicts of interest may have arisen as a result of the failure to identify all parties benefiting from the transaction.

- Pre-closing due diligence underwriting was inadequate given the amount, condition and location of properties. Management operated under the unproven assumption that credit risks could be mitigated with the credit support and structure. The adequacy and appropriateness of models used to determine the credit support and structure could not be established.

An apparent desire to meet year-end housing goals cannot serve as a justification for engaging in an unsafe and unsound transaction, compromising internal controls and ignoring prudent risk management practices.

<u>Enterprise Counterparties</u>

Counterparty risk is growing very rapidly at a time when financial institutions are under increasing stress. The widespread financial weakness of counterparties on which the Enterprise relies for credit enhancements, repurchases of substandard loans, portfolio servicing, loan modifications, derivatives, and other contractual safeguards creates an unsafe and unsound condition to transact business.

The rating agencies have downgraded most mortgage insurers ("MIs") and many of the financial guarantors that are Enterprise counterparties. The Enterprise continues to rely heavily on expectations of substantial recovery from the MIs despite widespread concerns about their financial stability. Four MIs were downgraded to below the AA- trigger level. Triad was terminated as an approved MI and is currently in runoff mode. As a result of the downgrades, PMI, Radian, and MGIC have initiated their approved remediation plans and are being actively monitored by the Enterprise. Rating agencies continue to downgrade the MIs, making it challenging for them to raise much-needed capital. The Enterprise is concerned the MIs may not have sufficient capital and reserves to meet their commitments of first loss coverage. The eroding financial condition of the MIs may also negatively impact the Enterprise's ability to continue to purchase product in accordance with its charter guidelines. Declining levels of reserves and capital at the MIs could result in reduced levels of business reflecting an inability or reluctance by the MIs to underwrite or insure product with LTVs greater than 80%.

**CONFIDENTIAL**                                                                    Page 15

Also, the Enterprise's subprime PLS portfolio is backed by financially weak monoline insurers. While the Enterprise is responding to these downgrades with closer monitoring and protection of exposures where possible, the risk remains evident.

In addition, significant servicers are experiencing financial strain which exposes the Enterprise to disruptions in the servicing of portfolios. The Enterprise cannot efficiently and cost-effectively transfer large servicing portfolios because there are not an adequate number of experienced servicers in a position to take over the servicing.

Finally, the Enterprise had to increase its derivatives counterparty limits due to concentrations in suitable counterparties. This rapid growth is caused by volatile markets and the inability to fund themselves with any significant amount of medium or long term callable debt. Given the size of the Enterprise, there are a limited number of suitable counterparties. To the extent that this results in excessive transactions with the remaining available counterparties these transactions may constitute in the aggregate an unsafe and unsound practice that would result in the Enterprise being in an unsafe and unsound transaction to transact business.

**Market Risk Management**

Market risk is rated "Critical Concern." This component is comprised of an evaluation of accounting, interest rate, liquidity and market models. and incorporates both the quantity of risk in the Enterprise and the quality of risk management in these areas.

The overall program for Market Risk is rated "Critical Concern." The subordinate risk ratings for liquidity risk and portfolio management risk are "Critical Concerns" while the subordinate rating for interest rate risk is "Significant Concern."

<u>Retained Mortgage Portfolios</u>

At June 30, 2008, the non-agency portfolio had unrealized losses of about $30 billion on a portfolio of $212 billion, all of which is held as available-for-sale yet Freddie Mac recognized only $826 million non-agency securities impairment for Q2. Freddie Mac does not model impairments at a loan level and uses a single CPR/Loss severity curve per asset type. Further, significant credit downgrades of the bonds in the PLS portfolio (currently $8.6 billion below investment grade) may be indicative of further impairment. Additionally, FHFA has issued a supervisory letter on OTTI that provides presumptive indicators of impairment. The use of these indicators could lead to significant increases in impairments as could the significant deterioration of PLS prices since June 30th.

In addition, Freddie Mac's capital surplus may not be sufficient to absorb large changes in value of Freddie Mac's $159.6 billion mortgage-related securities classified as "trading" due to the risk of MBS spread widening which Freddie Mac does not hedge. For example, a 50 basis point widening in MBS spreads would decrease capital by about $3 billion.

And finally, with the lifting of the retained portfolio cap in March 2008, Freddie Mac grew its Retained Portfolio by approximately $73 billion during 2Q 2008. Second quarter growth

provided above-average projected returns driven by attractive option adjusted spreads assuming credit assumptions do not deteriorate. However capital constraints and illiquidity in long term debt markets will likely limit future growth.

**Liquidity-related Safety and Soundness Conditions**

Deteriorating market confidence in Freddie Mac, and the other GSEs, as well as worsening market liquidity for GSE bullet and callable debt increased pressure on Freddie Mac's discount note issuance program to a critical level. Freddie Mac's almost exclusive reliance on discount note funding is a critical concern. In addition, this lack of market confidence in GSE funding resulted in the Treasury proposal, and Congressional approval, for Treasury to potentially provide funding and/or capital to the GSEs.

Weekly auction pricing of discount notes are at historically wide levels versus Treasury bills (though less historically wide when compared to LIBOR and swaps). Continued deterioration in market confidence could lead to failure of a weekly auction that would trigger an increase in headline risk and a further erosion of investor confidence in GSE debt.

Similarly, deterioration of scheduled monthly pricing of long-term Benchmark Notes could lead to a failure of a monthly Benchmark Note issuance that also results in headline risk and a further erosion of investor confidence in GSE debt. This further lack of confidence could trigger significant sales of GSE debt, push down prices on GSE debt and effectively cut-off Freddie Mac's already very limited ability to issue longer-term debt.

Callable issuance of medium-term debt has also decreased significantly. This lack of investor interest impacts both liquidity and also interest rate risk ("IRR") management as callable issuance is a key component to the IRR management practices of Freddie Mac, specifically the repurchase of options to offset the mortgage portfolio's short option position.

And finally, mortgage market conditions are so weak that significant MBS sales from the Freddie Mac retained portfolio to raise cash would likely trigger significant decreases in MBS prices and increase mortgage rates offered to consumers. The magnitude of this consumer impact is significant as option adjusted spreads on TBA MBS are already at historically high levels and incremental sales could widen mortgage rates 25-50 bps or more. Continued widening in spreads will create GAAP losses in the trading portfolio and fair value losses in the AFS portfolio further weakening the capital position.

**Liquidity-related Safety and Soundness Practices**

Freddie Mac's liquidity management practices are critically inadequate and unsafe and unsound because Management failed to: ensure that the Enterprise could, in the current environment, convert unencumbered agency MBS to cash through secured lines of credit, create an active repo funding program or outright sales of MBS; designate the liquidity & contingency portfolio as held-for-trading; and ensure adequate cash management reporting.

**CONFIDENTIAL**                                                                            Page 17

- For example, Freddie Mac's 90-day liquidity report was designed to make sure that under extreme stress, i.e., no access to the discount note market that Freddie Mac would be able to borrow from the market using its agency collateral to raise more than $100 billion to cover 90 days of net cash needs. Today, given stressed credit and liquidity conditions, market lenders are not willing to issue term-repos or to commit secured lines to Freddie Mac in that size.

- On January 1, 2008, Freddie Mac decided not to include its Liquidity & Contingency assets in a held-for-trading account against the express requests of FHFA. During July 2008, Freddie Mac resisted selling long-term Liquidity & Contingency assets because of the potential embedded losses until FHFA forced Freddie Mac to take OTTI on that portfolio.

- During Q2, 2008, Freddie Mac's cash management report did not include $8.8B of possible contractual cash outflows associated with liquidity facilities provided by the multi-family business area. FHFA cash management exam identified this potential cash outflow and Freddie Mac amended its cash management report to include this significant liquidity contingency.

A mitigating factor is that management is complying with FHFA's request to manage its net cash needs to ensure that it has cash or cash equivalents to last 30 calendar days without access to the discount note market. Furthermore, Freddie Mac relies on its ability to use the TBA mortgage market to fund prior commitments to purchase MBS by rolling its commitment to purchase MBS to future months. Currently, that practice relieves liquidity pressure by reducing anticipated cash outflows, however if the TBA mortgage market becomes stressed, Freddie Mac's economic cost to roll those significant MBS positions will increase. Today, Freddie Mac rolls between $50-$60 billion of TBA mortgages. The downside risk is that Freddie Mac could be forced to close out these commitments to purchase at a loss.

<u>Interest Rate Risk</u>

Extreme market volatility, ongoing model updates and estimated risk positions close to management limits raised significant supervisory concerns in Q2. During the quarter, management risk limits, including PMVS-L, Vega and peak convexity were breached on several occasions. Although the ALM desk successfully brought these risk positions in line with management limits following approved policies and procedures, the occurrences were more frequent than previous quarters.

Despite two earlier adjustments, Freddie Mac's prepayment models continue to overstate prepayments for conventional fixed rate products relative to actual prepayments. Although Freddie Mac's prepayment models are slower than other Street benchmarks, the ALM team and the modeling group expect to further slow down the conventional fixed rate models. Freddie Mac also plans to change its mortgage current coupon model in the third quarter. Combined these model changes will extend duration by $100 billion with minimal impact on convexity and Vega exposures. This model change, and the PLS on-top adjustment, raise

significant supervisory concerns about the reliability of the interest rate risk statistics, though we believe the PLS on-top adjustment was reasonable and well documented.

Freddie Mac has continued to increase its short convexity and Vega exposures during the second quarter. Increased purchases of fixed rate mortgages and decreasing option repurchases due to high option prices contributed to this net increase in option exposure. Although these risks remain within management and Board limits, their increase has complicated the work of duration management in this volatile market environment.

<u>Model Risk</u>

As the foregoing discussion indicates, deficiencies in the Enterprise's modeling practices have had a pervasive negative impact on the Enterprise. Model risk has been a significant concern for some time. For example, in 3Q 2006 Risk Assessment Letter, FHFA specifically identified the lack of sufficient model oversight as a "significant deficiency". Model risk remains high due to the wide application of models in business decisions and financial reporting and the magnitude of the dollar amounts affected. The level of model risk has been increased by the unprecedented environment in which the Enterprise will be operating for the foreseeable future. Management is aware that models are not performing well in the current environment and has not sufficiently devoted the resources to address this problem. Given that key models have been functioning outside acceptable tolerances and are producing flawed outputs, executive management has relied on manual processes and extensive changes that are not subject to disciplined model change controls or may not be implemented in a timely manner due to resource limitations. This combination of problems makes the Enterprise vulnerable to errors, misjudgments, and possible manipulation and is an unsafe and unsound practice.

(a) The market has moved beyond models at Enterprises. For example, prepayment models' projections do not match current experience requiring substantial management judgments. This model uncertainty results in greater risk in interest rate risk hedging.

(b) Model change control – Resources to adequately document model changes are limited. At a recent count, the number of model changes scheduled was 47. The result is pressure to approve model changes without the controls called for by Freddie Mac policy. Alternatively, model changes that correct poorly functioning models are delayed. An example is replacement of the SF LLR system that has been delayed three quarters so far. This issue has been raised in meetings with Model Oversight and with the business unit. Most recently, Freddie Mac's Operations Risk Oversight has raised this issue to senior management.

The current SF LLR model was the subject of an examination that was completed in early 2007. Numerous necessary changes are documented in the conclusion letter. Most important are the manual nature of data updates; the use of EUCs for calculating accounting carve-outs; the lack of transparency as to the cause of losses and their concentrations within the portfolio. A more general finding was that the approach does not conform to best or even current practice in its use of granular (i.e. state/local) information in estimating loss events. A new model is proposed and under development to address these shortcomings. It has been delayed by nine months, to the end of this quarter, so far.

**CONFIDENTIAL**                                                                                      Page 19

(c) Model Inventory and Flow Charts -- When Model Risk began examining Freddie Mac, there was no model inventory and no documentation of the interaction among the models. An inventory now exists, but it is deficient in that new models are still being "found" (e.g., SF Costing) and added. Further, there is still no description of model interaction for the vast majority of models.

(d) OTTI for PLS — The model used to evaluate OTTI impairment for PLS is not estimated at the loan level and does not model collateral.

(e) Independence of model development staff-- Model governance fails to have adequate segregation of duties, e.g. model development staff were deeply involved in Centerline transaction negotiations.

(f) Outdated Credit Risk Models – Until last month, Freddie's key G-fee pricing and valuation model, Defcap, was 3 years out of date. FRE continues to base earning scenarios on this model which it believes under predicts loss severities and was not intended for the purpose of evaluating seasoned loans with delinquency histories.

(g) Changing Risk Metrics - The historically used PMVS measure was discontinued in 1Q 2008 due to a sharp erosion of the fair value of equity. Between 2007 and 2008 the Board, based on the recommendation by management, decided to increase interest risk exposures at a time when credit costs were escalating. Interest rate metrics are subject to high degree of model risk in this environment. The Enterprise needs to maintain close attention to prepayment model exposure.

(h) An economic capital model - in the process of development - was used to support significant expansion of the portfolio and calculate returns for the portfolio. The economic capital model was changed when it began to show that required economic capital exceeded available capital. In other words, the Enterprise shifted to a new measure when the existing measure would have required a capital raise or reduction in risk.

(i) FRE does not have data to track exposure to servicers in PLS. On the other hand, management has mishandled impairments of PLS where the Enterprise has the data and employed very optimistic prepayment and loss severity curves (the Enterprise ignored data and acted on uninformed management judgment).

(j) Management continues to base earning scenarios on a model it believes under predicts loss severities and was intended for the purpose of evaluating seasoned loans.

In short, the problems with the Enterprise's modeling constitute unsafe and unsound practices that result in the Enterprise being in an unsafe and unsound condition to transact business.

**CONFIDENTIAL**                                                                    Page 20

### Operational Risk Management

Operational risk is rated "Significant Concerns." This component evaluates accounting, financial reporting, information technology, internal controls, and operational models. This rating reflects FHFA's determination that more than moderate weaknesses and unsafe or unsound practices or conditions exist. This has been an area of identified weakness for some time. For example, in the 2006 ROE, FHFA stated that continuing weaknesses existed in information technology systems development and deliver, information security, end-user computing systems, data quality, and change management.

### Information Technology

Although there has been evidence of improvement in the Enterprise's IT governance processes and functions, the Enterprise's systems are inflexible and do not easily adapt to changing business needs. As a result the Enterprise relies on manual processes and controls (workarounds and data handoffs) to handle changes in volumes and products. As the Enterprise evolves to a more automated environment management, it must balance the sequencing of business process changes needed to leverage systems and automation improvements. The success of the "alternative platform" is critical to the success of Freddie Mac in this area because the approach used (a modified service oriented architecture) will serve as the model for reusing legacy software in a way that provides flexibility and reliability without having to replace entire systems all at once.

In early 2008, Freddie Mac management determined that the material weaknesses related to Systems Development Life Cycle ("SDLC") and information security were remediated. However, management also identified and disclosed four significant deficiencies related to SDLC and information security. Management believes that the two significant deficiencies related to the SDLC were remediated as of June 30, 2008. The two information security significant deficiencies are scheduled for remediation in 3Q 2008. Remediation status is subject to Finance Internal Control Office and independent verification.

The establishment of an out-of-region area warm site for disaster recovery purposes continues. Management has signed a contract with EDS to provide warm site recovery capability in Auburn, Michigan. This location will provide four hour recovery for Tier 0 business processes and applications. This effort is nearly complete and on course for September 2008 implementation, but risks remains high until the implementation of the warm site is complete and effectiveness has been tested. To mitigate this risk until the Michigan facility is fully operational, management is using the Dallas data center for cut over-capability of Tier 0 applications.

### Data Quality

During the last twelve months the Enterprise recognized that data quality problems are symptoms of deeper systems and infrastructure problems. This resulted in a significant re-orientation of the Enterprise's approach to addressing data quality.

CONFIDENTIAL

The new data quality approach focuses around data architecture, the use of data models and services, and the importance of data quality metrics. The Enterprise's executive management recognizes the (1) need to address data quality in the application and system design processes (by ensuring that applications contain automated edit checks when delivered), (2) the need to give users the ability to correct and update data directly (with all the appropriate permissions and auditing trails) and (3) that Data Correction Utilities cannot serve as replacements for that functionality.

The Enterprise has presented an "Information Roadmap", which is a plan that addresses many of these issues.  Risks now reside with plan execution.  Initial steps related to the plan (including the creation of a geo-coding service and revision of data quality policies and standards) are promising, but successful implementation of key plan milestones over the next several months will provide a better indication of implementation success.

However, despite the Enterprise's assertions that there have been measurable improvements in the quality of the Enterprise's data, they do not have a set of data quality metrics in place that would provide management with an understanding of the Enterprise's most basic data quality problems.

Internal Controls

Internal controls are not considered fully effective. Despite years of effort the Enterprise is not SOX compliant and independent testing of reportedly remediated controls has not been completed.  The E2E (end to end) design documentation and analysis effort is still not completed after major project "course corrections" in 2006 and 2007.  This shows that project management and senior management direction have not been effective. Recent PwC design reviews show approximately 800 detailed comments/ issues outstanding about the control design.  Certain E2E work streams (including debt and derivatives and loan loss reserve) have not completed even the initial E2E documentation effort.  Managers and staff are not held accountable for results, especially related to the E2E project.  Numerous internal project deadlines have been over-run since 2004, with very few repercussions for management and staff.

Operational Risk Management Oversight (ORO)

The Enterprise wide operational risk management function continues to be developed. The recent resignation of Gareth Davies creates a void in this key leadership position.  Although a foundation for the program is in place, all necessary risk management tools such as operational risk assessments are not fully functioning. Disaster recovery planning is not

**CONFIDENTIAL**                                                      **Page 22**

complete and has been cited as a deficiency for a number of years. The continuing failure to have adequate disaster recovery planning in place constitutes an unsafe and unsound practice that results in the Enterprise being in an unsafe and unsound condition to transact business.

For the foregoing reasons, the composite rating of the Federal Home Loan Mortgage Corporation is "Critical Concerns."

Sincerely,

Christopher H. Dickerson
Acting Deputy Director
Division of Enterprise Regulation

cc: Jerry Weiss

# Exhibit G

## TOLLING AGREEMENT

This Tolling Agreement ("Agreement") is effective as of May 20, 2009 (the "Effective Date") and is entered into between Fannie Mae (f/k/a Federal National Mortgage Association) and Mortgage Asset Securitization Transactions, Inc., UBS Securities LLC and UBS Real Estate Securities Inc. (together, "UBS").

WHEREAS, Fannie Mae is considering whether to pursue various claims against UBS and/or any of their predecessors, successors, parents, subsidiaries, divisions, affiliates, agents, directors, officers, partners, principals, employees, representatives, shareholders, licensees, sublicensees, underwriters, issuing trusts, issuing entities (collectively, "UBS Parties"), or assigns, for, but not limited to, violations of the federal securities laws, related to Fannie Mae's purchase of residential mortgage-backed securities identified on Exhibit A attached hereto ("RMBS"), and

WHEREAS, UBS requires sufficient time to review the information provided by Fannie Mae to determine how to respond; and

WHEREAS, Fannie Mae and UBS (each, a "Party," and collectively, the "Parties") believe that their interests will best be served by attempting to resolve any such claims by compromise prior to the filing of any such claims;

THEREFORE, the Parties stipulate and agree as follows:

1.      The Term of this Agreement ("Tolling Period") shall begin on May 20, 2009, and shall end on the earlier of (a) the filing of any claim by Fannie Mae against UBS or the UBS Parties; (b) ten business days following the provision of written notice of termination by any Party; or (c) 5:00 p.m. Eastern Standard Time on May 20, 2010.

2.      The Parties agree that the Tolling Period shall not be included in calculating any statute of limitations that might be applicable to any claims of any type that the Parties may file against each other or the UBS Parties with respect to the RMBS (the "Tolled Claims"). The Parties agree, and, to the extent allowable under contract or law, UBS agrees on behalf of the UBS Parties, not to assert, plead, or raise in any fashion, whether by answer, motion, or otherwise, any defense based on the running of any statute of limitations or on laches or other principle of timeliness that may apply during the Tolling Period.

3.      Notwithstanding any other provisions herein, this Agreement shall not operate to (a) revive or extend the time for filing any claim that has lapsed prior to the Effective Date of this Agreement by operation of law, statute, regulation or otherwise, or (b)

preclude the Parties from raising as a defense that any claim lapsed prior to the Effective Date of this Agreement and is barred by operation of law, statute, regulation or otherwise.

4.    This Agreement does not prejudice, waive, or limit any other defenses that the Parties may have except as set forth in paragraph 2 above.

5.    This Agreement contains the entire agreement between the Parties, and no statement, promise or inducement made by any Party to this Agreement, or any agent of the Parties, that is not set forth in this Agreement shall be valid or binding. This Agreement may not be enlarged, modified or altered except in writing signed by both Parties. This Agreement may be executed in counterparts.

6.    This Agreement does not constitute any admission of any fact, circumstance, or liability on the part of any Party, or an admission or acknowledgment on the part of any Party as to the date on which the statute of limitations for any claim begins or ends.

7.    The terms and conditions of this Agreement shall inure to the benefit of and shall be binding upon the respective successors of the Parties.

8.    Each person executing this Agreement represents that he or she is authorized to execute this Agreement on behalf of the Party he or she purports to represent.

9.    In interpreting this Agreement, the Parties expressly agree that the Agreement was prepared jointly by the Parties, and that no ambiguity shall be resolved against any Party on the basis that it was responsible, or primarily responsible, for having drafted the Agreement. Each of the Parties acknowledges that it did not execute this Agreement under duress and was represented by competent counsel in connection with this Agreement.

10.    This Agreement shall be governed by and construed and interpreted in accordance with the laws of New York without reference to principles of conflict of laws.

11.    This Agreement may be terminated on ten (10) business days' written notice to:

William Quinn                           John Moon
Senior Vice President,                  Executive Director
Capital Markets Strategy                UBS Investment Bank
Fannie Mae                              1285 Avenue of the Americas
4000 Wisconsin Ave., NW                 New York, NY 10019
Washington, DC 20016

12.    The Parties agree that the existence and terms of this Agreement shall be kept confidential and shall not be disclosed without prior written consent of the other party, except (a) as required by law; (b) for corporate financial reporting; (c) for examination or audit of the Parties' respective businesses; (d) as necessary to carry out or enforce the

2

Parties' obligations under the Agreement; (e) as required by a court or arbitration panel or (f) as required or requested by a regulatory agency, or governmental authority. To the extent that disclosure is to be made to a court or arbitration panel, the party disclosing the Agreement shall inform the other party of the disclosure by written notice and email ten (10) business days in advance of any such disclosure.

13.  All materials created by either Party or exchanged between the Parties relating to either this Agreement or potential settlement of the Tolled Claims, as well as all discussions relating to either this Agreement or potential settlement of the Tolled Claims, have been and will be without prejudice to the rights, remedies and defenses of the Parties and any related materials or at law or in equity.  All such materials and discussions shall constitute settlement discussions and shall not be the subject of any discovery proceedings, to the extent permitted by law, and shall not be used or admitted into evidence by any Party in any court proceeding in accordance with Federal Rule of Evidence 408 and any applicable state law.  Without limiting the foregoing, each Party agrees that it will not use this Agreement or any of such materials or discussions as a basis for a claim against the other Party.  Notwithstanding the foregoing, this Agreement may be offered by either of the Parties in any lawsuit, arbitration, or other proceeding without prior notice solely for the purpose of establishing, if contested, the tolling of all time-related contractual, legal, or equitable defenses as set forth in this Agreement. Paragraph 13 shall survive termination of this Agreement.

14.  Should the Parties wish to exchange documents or materials in an effort to resolve the Tolled Claims, the Parties shall negotiate in good faith a separate nondisclosure agreement concerning the confidentiality of those documents.

15.  No Party shall file or assert a claim against any other Party prior to ten (10) business days following the provision of written notice of termination. The tolling period shall not

* * *

expire until ten (10) business days following the provision of written notice of termination.

IN WITNESS WHEREOF, the Parties or their duly authorized representatives have executed this Agreement, consisting of five pages (including this signature page and Exhibit A).

FANNIE MAE

By:
Name: WILLIAM F. QUINN
Title: Senior Vice President

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.

By:
Name: Greg Walker
Title: Managing Director

By:
Name: Christopher Scalvo
Title: Director

UBS REAL ESTATE SECURITIES, INC.

By:
Name: Greg Walker
Title: Managing Director

By:
Name: Christopher Scalvo
Title: Director

UBS SECURITIES LLC

By:
Name:
Title:

By:
Name: Alan J. Brudner
Title: Managing Director
Region Americas Legal

John Moon
Director
Region Americas Legal

4

expire until ten (10) business days following the provision of written notice of termination.

IN WITNESS WHEREOF, the Parties or their duly authorized representatives have executed this Agreement, consisting of five pages (including this signature page and Exhibit A).

FANNIE MAE

By: _____
Name: WILLIAM F QUINN
Title: Senior Vice President

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.

By: _____
Name: Greg Walker
Title: Managing Director

By: _____
Name: Christopher Scalaro
Title: Director

UBS REAL ESTATE SECURITIES, INC.

By: _____
Name: Greg Walker
Title: Managing Director

By: _____
Name: Christopher Scalaro
Title: Director

UBS SECURITIES LLC

By: _____
Name:
Title:

John Moon
Director
Region Americas Legal

By: _____
Name:
Title:

Alan J. Brudner
Managing Director
Region Americas Legal

4

expire until ten (10) business days following the provision of written notice of termination.

IN WITNESS WHEREOF, the Parties or their duly authorized representatives have executed this Agreement, consisting of five pages (including this signature page and Exhibit A).

FANNIE MAE

By: _____
Name:   WILLIAM F. QUINN
Title:   Senior Vice President

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.

By: _____
Name:   Greg Walker
Title:   Managing Director

By: _____
Name:   Christopher Scolaro
Title:   Director

UBS REAL ESTATE SECURITIES, INC.

By: _____
Name:   Greg Walker
Title:   Managing Director

By: _____
Name:   Christopher Scolaro
Title:   Director

UBS SECURITIES LLC

By: _____
Name:
Title:
   John Moon
   Director
   Region Americas Legal

By: _____
Name:
Title:
   Alan J. Bruder
   Managing Director
   Region Americas Legal

4

## EXHIBIT A

| CUSIP | Bloomberg Name | BOND | Product | UPB- 04/30/09 | Deal Issuer | Deal Issuer Parent |
|---|---|---|---|---|---|---|
| 57643LHJ8 | MABS 2005-OPT1 | A1 | Subprime | 38,229,515 | UBS | UBS |
| 57644TAA6 | MABS 2006-WMC2 | A1 | Subprime | 119,350,199 | UBS | UBS |
| 57645MAA0 | MABS 2006-WMC4 | A1 | Subprime | 120,449,269 | UBS | UBS |
| 57645MAB8 | MABS 2006-WMC4 | A2 | Subprime | 13,383,252 | UBS | UBS |
| 56275TAA6 | MABS 2007-WMC1 | A1 | Subprime | 154,692,607 | UBS | UBS |
| 576434CB2 | MALT 2005-1 | 3A1 | Alt-A | 23,236,838 | UBS | UBS |
| 576434CB4 | MALT 2005-4 | 3A1 | Alt-A | 26,920,965 | UBS | UBS |
| 576433EB9 | MARM 2005-8 | 2A1 | Alt-A | 236,934,100 | UBS | UBS |
| 576433E77 | MARM 2005-8 | 3A1 | Alt-A | 40,557,363 | UBS | UBS |
| 576439AC9 | MARM 2006-2 | 2A1 | Alt-A | 38,623,298 | UBS | UBS |
| 57645NAA8 | MARM 2007-3 | 11A1 | OptionARM Alt-A | 252,404,544 | UBS | UBS |
| 57645NAB6 | MARM 2007-3 | 11A2 | OptionARM Alt-A | 168,269,938 | UBS | UBS |
| 57645NAM2 | MARM 2007-3 | 21A1 | OptionARM Alt-A | 94,286,998 | UBS | UBS |
| 57645NAN0 | MARM 2007-3 | 21A2 | OptionARM Alt-A | 62,857,997 | UBS | UBS |

# Exhibit H

**Table of Contents**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10–K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2010**

**Commission File No.: 0–50231**

# Federal National Mortgage Association
*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation**<br>*(State or other jurisdiction of<br>incorporation or organization)* | **52–0883107**<br>*(I.R.S. Employer<br>Identification No.)* |
| **3900 Wisconsin Avenue,<br>NW Washington, DC**<br>*(Address of principal executive offices)* | **20016**<br>*(Zip Code)* |

**Registrant's telephone number, including area code:
(202) 752–7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title<br>of<br>Each<br>Class | Name<br>of<br>Each<br>Exchange<br>on<br>Which<br>Registered |
|---|---|
| None | |

**Securities registered pursuant to Section 12(g) of the Act:**

Common Stock, without par value
*(Title of class)*
8.25% Non–Cumulative Preferred Stock, Series T, stated value $25 per share
*(Title of class)*
8.75% Non–Cumulative Mandatory Convertible Preferred Stock, Series 2008–1, stated value $50 per share
*(Title of class)*
Fixed-to-Floating Rate Non–Cumulative Preferred Stock, Series S, stated value $25 per share
*(Title of class)*
7.625% Non–Cumulative Preferred Stock, Series R, stated value $25 per share
*(Title of class)*
6.75% Non–Cumulative Preferred Stock, Series Q, stated value $25 per share
*(Title of class)*
Variable Rate Non–Cumulative Preferred Stock, Series P, stated value $25 per share
*(Title of class)*
Variable Rate Non–Cumulative Preferred Stock, Series O, stated value $50 per share
*(Title of class)*
5.375% Non–Cumulative Convertible Series 2004–1 Preferred Stock, stated value $100,000 per share
*(Title of class)*
5.50% Non–Cumulative Preferred Stock, Series N, stated value $50 per share
*(Title of class)*
4.75% Non–Cumulative Preferred Stock, Series M, stated value $50 per share
*(Title of class)*
5.125% Non–Cumulative Preferred Stock, Series L, stated value $50 per share
*(Title of class)*
5.375% Non–Cumulative Preferred Stock, Series I, stated value $50 per share
*(Title of class)*
5.81% Non–Cumulative Preferred Stock, Series H, stated value $50 per share
*(Title of class)*
Variable Rate Non–Cumulative Preferred Stock, Series G, stated value $50 per share
*(Title of class)*
Variable Rate Non–Cumulative Preferred Stock, Series F, stated value $50 per share
*(Title of class)*
5.10% Non–Cumulative Preferred Stock, Series E, stated value $50 per share
*(Title of class)*
5.25% Non–Cumulative Preferred Stock, Series D, stated value $50 per share
*(Title of class)*

Indicate by check mark if the registrant is a well–known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.  Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S–T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☑

# PART I

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in "Conservatorship and Treasury Agreements."*

*This report contains forward-looking statements, which are statements about matters that are not historical facts. Forward-looking statements often include words like "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "would," "should," "could," "may," or similar words. Actual results could differ materially from those projected in the forward-looking statements as a result of a number of factors including those discussed in "Risk Factors" and elsewhere in this report. Please review "Forward-Looking Statements" for more information an the forward-looking statements in this report.*

*We provide a glossary of terms in "Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Glossary of Terms Used in This Report."*

## Item I.   Business

### OVERVIEW

Fannie Mae is a government-sponsored enterprise that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market. Our most significant activities include providing market liquidity by securitizing mortgage loans originated by lenders in the primary mortgage market into Fannie Mae mortgage-backed securities, which we refer to as Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities in the secondary market for our mortgage portfolio. We acquire funds to purchase mortgage-related assets for our mortgage portfolio by issuing a variety of debt securities in the domestic and international capital markets. We also make other investments that increase the supply of affordable housing. During 2010, we concentrated much of our efforts on minimizing our credit losses by using home retention solutions and foreclosure alternatives to address delinquent mortgages, starting with solutions, such as modifications, that permit people to stay in their homes. When there is no lower-cost alternative, our goal is to move to foreclosure expeditiously. We describe our business activities below.

As a federally chartered corporation, we are subject to extensive regulation, supervision and examination by FHFA, and regulation by other federal agencies, including Treasury, the Department of Housing and Urban Development ("HUD"), and the Securities and Exchange Commission ("SEC").

Although we are a corporation chartered by the U.S. Congress, our conservator is a U.S. government agency, Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock, and Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions to maintain a positive net worth, the U.S. government does not guarantee our securities or other obligations. Our common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and since then has been traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

The conservatorship we have been under since September 2008, with FHFA acting as conservator, has no specified termination date. There can be no assurance as to when or how the conservatorship will be terminated, whether we will continue to exist following conservatorship, or what changes to our business structure will be made during or following the conservatorship.

Table of Contents

unrealized losses in our holdings of available–for–sale securities. Our net worth, which is the basis for determining the amount that Treasury has committed to provide us under the senior preferred stock purchase agreement, equals the "Total deficit" reported in our consolidated balance sheets. In February 2011, the Acting Director of FHFA submitted a request to Treasury on our behalf for $2.6 billion to eliminate our net worth deficit as of December 31, 2010. When Treasury provides the requested funds, the aggregate liquidation preference on the senior preferred stock will be $91.2 billion, which will require an annualized dividend payment of $9.1 billion. This amount exceeds our reported annual net income for each of the last nine years, in most cases by a significant margin. Through December 31, 2010, we have paid an aggregate of $10.2 billion to Treasury in dividends on the senior preferred stock.

Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, increased to $66.3 billion as of December 31, 2010 from $64.7 billion as of September 30, 2010, $61.4 billion as of January 1, 2010 and $64.9 billion as of December 31, 2009. Our total loss reserve coverage to total nonperforming loans was 30.85% as of December 31, 2010, compared with 30.34% as of September 30, 2010 and 29.98% as of December 31, 2009.

We recognized net income of $73 million for the fourth quarter of 2010, driven primarily by net interest income of $4.6 billion and fair value gains of $366 million, which were partially offset by credit–related expenses of $4.3 billion and administrative expenses of $592 million. Our fourth quarter results were favorably impacted by the cash payment received from Bank of America, because it reduced our credit–related expenses for the period. The net loss attributable to common stockholders, which includes $2.2 billion in dividends on senior preferred stock, was $2.1 billion and our diluted loss per share was $0.37. In comparison, we recognized a net loss of $1.3 billion, a net loss attributable to common stockholders of $3.5 billion and a diluted loss per share of $0.61 for the third quarter of 2010. We recognized a net loss of $15.2 billion, a net loss attributable to common stockholders of $16.3 billion and a diluted loss per share of $2.87 for the fourth quarter of 2009.

### Providing Mortgage Market Liquidity

We support liquidity and stability in the secondary mortgage market, serving as a stable source of funds for purchases of homes and multifamily rental housing and for refinancing existing mortgages. We provide this financing through the activities of our three complementary businesses: our Single–Family business ("Single–Family"), our Multifamily Mortgage Business ("Multifamily," formerly "Housing and Community Development," or "HCD") and our Capital Markets group. Our Single–Family and Multifamily businesses work with our lender customers to purchase and securitize mortgage loans customers deliver to us into Fannie Mae MBS. Our Capital Markets group manages our investment activity in mortgage–related assets, funding investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. The Capital Markets group works with our lender customers to provide funds to the mortgage market through short–term financing and other activities, making short–term use of our balance sheet. These financing activities include whole loan conduit transactions, early funding transactions, Real Estate Mortgage Investment Conduit ("REMIC") and other structured securitization activities, and dollar rolls, which we describe in more detail in "Business Segments — Capital Markets Group."

In 2010, we purchased or guaranteed approximately $856 billion in loans, measured by unpaid principal balance, which includes approximately $217 billion in delinquent loans we purchased from our single–family MBS trusts. Our purchases and guarantees financed approximately 2,712,000 single–family conventional loans, excluding delinquent loans purchased from our MBS trusts, and approximately 306,000 units in multifamily properties.

Our mortgage credit book of business — which consists of the mortgage loans and mortgage–related securities we hold in our investment portfolio, Fannie Mae MBS held by third parties and other credit enhancements that we provide on mortgage assets — totaled $3.1 trillion as of September 30, 2010, which represented approximately 27.4% of U.S. residential mortgage debt outstanding on September 30, 2010, the latest date for which the Federal Reserve has estimated U.S. residential mortgage debt outstanding. We remained the largest single issuer of mortgage–related securities in the secondary market, with an estimated market share of new

# Exhibit I

Table of Contents

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2010

Commission File Number: 000-53330

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | | | |
|---|---|---|---|
| **Federally chartered corporation**<br>*(State or other jurisdiction of incorporation or organization)* | **8200 Jones Branch Drive**<br>**McLean, Virginia 22102-3110**<br>*(Address of principal executive offices, including zip code)* | **52-0904874**<br>*(I.R.S. Employer Identification No.)* | **(703) 903-2000**<br>*(Registrant's telephone number, including area code)* |

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

Voting Common Stock, no par value per share (OTC: FMCC)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCI)
5% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCKK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCG)
5.1% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCH)
5.79% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCL)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCM)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCN)
5.81% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCO)
6% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCP)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCJ)
5.7% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCKP)
Variable Rate, Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCCS)
6.42% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCCT)
5.9% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKO)
5.57% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKM)
5.66% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKN)
6.02% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKL)
6.55% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKI)
Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKJ)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☐ Yes  ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.  Large accelerated filer ☐  Accelerated filer ☒  Non-accelerated filer *(Do not check if a smaller reporting company)* ☐  Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

The aggregate market value of the common stock held by non-affiliates computed by reference to the price at which the common equity was last sold on June 30, 2010 (the last business day of the registrant's most recently completed second fiscal quarter) was $266.2 million.

As of February 11, 2011, there were 649,182,461 shares of the registrant's common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE: None**

**Table of Contents**

believe may have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds under the Purchase Agreement.

In a letter to the Chairmen and Ranking Members of the Congressional Banking and Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. Specifically, the Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to engage in the development of new products is inconsistent with the goals of the conservatorship. This directive could have an adverse effect on our business and profitability in future periods.

We had a net worth deficit of $401 million as of December 31, 2010, and, as a result, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $500 million. As a result of draws under the Purchase Agreement, the aggregate liquidation preference of the senior preferred stock increased from $1.0 billion as of September 8, 2008 to $64.2 billion as of December 31, 2010. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we may not be able to do so for the foreseeable future, if at all. The aggregate liquidation preference of the senior preferred stock and our related dividend obligations will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash. The amounts we are obligated to pay in dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth. We expect to make additional draws under the Purchase Agreement in future periods.

Our annual dividend obligation on the senior preferred stock, based on the current liquidation preference, is $6.4 billion, which is in excess of our annual historical earnings in all but one period. Continued cash payment of senior preferred dividends, combined with potentially substantial quarterly commitment fees payable to Treasury under the Purchase Agreement, will have an adverse impact on our future financial condition and net worth. The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury.

For more information on our current business objectives, see "Executive Summary — *Our Primary Business Objectives.*" For more information on the conservatorship and government support for our business see "Executive Summary — *Government Support for Our Business*" and "Conservatorship and Related Matters."

**Executive Summary**

*You should read this Executive Summary in conjunction with our MD&A and consolidated financial statements and related notes for the year ended December 31, 2010.*

*Overview*

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. Taken together, we believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure.

*Summary of Financial Results*

Our financial performance in 2010, including our net loss, continued to be impacted by the ongoing weakness in the economy, including the mortgage market. Our total comprehensive income (loss) was $1.2 billion and $282 million for the fourth quarter and full year of 2010, respectively, consisting of: (a) a net loss of $113 million and $14.0 billion, respectively, reflecting significant provisions for credit losses; and (b) $1.3 billion and $14.3 billion of changes in other comprehensive income (loss), respectively, primarily resulting from improved fair values on available-for-sale securities recorded in AOCI.

Our total equity (deficit) was $(401) million at December 31, 2010 due to several contributing factors, including our dividend payments on our senior preferred stock, which exceeded total comprehensive income (loss) for the fourth quarter of 2010. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $500 million.

*Freddie Mac*

**Table of Contents**

**Our Business**

We conduct business in the U.S. residential mortgage market and the global securities market under the direction of our Conservator, FHFA, and under regulatory supervision of FHFA, the SEC, HUD, and Treasury. The size of the U.S. residential mortgage market is affected by many factors, including changes in interest rates, home ownership rates, home prices, the supply of housing and lender preferences regarding credit risk and borrower preferences regarding mortgage debt. The amount of residential mortgage debt available for us to purchase and the mix of available loan products are also affected by several factors, including the volume of mortgages meeting the requirements of our charter (which is affected by changes in the conforming loan limit by FHFA), our own preference for credit risk reflected in our purchase standards and the mortgage purchase and securitization activity of other financial institutions. We conduct our operations solely in the U.S. and its territories, and do not generate any revenue from or have assets in geographic locations outside of the U.S. and its territories.

Our charter forms the framework for our business activities, the initiatives we bring to market and the services we provide to the nation's residential housing and mortgage industries. Our charter also determines the types of mortgage loans that we are permitted to purchase. Our statutory mission as defined in our charter is to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages for low- and moderate-income families, involving a reasonable economic return that may be less than the return earned on other activities); and

- promote access to mortgage credit throughout the U.S. (including central cities, rural areas, and other underserved areas).

Our charter does not permit us to originate mortgage loans or lend money directly to consumers in the primary mortgage market. We provide liquidity, stability and affordability to the U.S. housing market primarily by providing our credit guarantee for residential mortgages originated by mortgage lenders and investing in mortgage loans and mortgage-related securities. We use mortgage securitization as an integral part of our activities. Mortgage securitization is a process by which we purchase mortgage loans that lenders originate, and pool these loans into guaranteed mortgage securities that are sold in global capital markets, generating proceeds that support future loan origination activity by lenders. The primary Freddie Mac guaranteed mortgage-related security is the single-class PC. We also aggregate and resecuritize mortgage-related securities that are issued by us, other GSEs, HFAs, or private (non-agency) entities, and issue other single-class and multiclass mortgage-related securities to third-party investors. We also enter into other guarantee commitments for multifamily mortgage loans, certain HFA bonds under the HFA initiative, and housing revenue bonds held by third parties.

Our charter limits our purchases of single-family loans to the conforming loan market. The conforming loan market is defined by loans originated with UPBs at or below limits determined annually based on changes in FHFA's housing price index, a method established and maintained by FHFA for determining the national average single-family home price. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000 with higher limits in certain "high-cost" areas. Higher limits also apply to two- to four-family residences. The conforming loan limits are 50% higher for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

Our charter generally prohibits us from purchasing first-lien single-family mortgages if the outstanding UPB of the mortgage at the time of our purchase exceeds 80% of the value of the property securing the mortgage unless we have one of the following credit protections:

- mortgage insurance from a mortgage insurer that we determine is qualified on the portion of the UPB of the mortgage that exceeds 80%;

- a seller's agreement to repurchase or replace any mortgage that has defaulted; or

- retention by the seller of at least a 10% participation interest in the mortgage.

Under our charter, our mortgage purchase operations are confined, so far as practicable, to mortgages which we deem to be of such quality, type and class as to meet generally the purchase standards of other private institutional mortgage investors. This is a general marketability standard.

Our charter requirement for credit protection on mortgages with LTV ratios greater than 80% does not apply to multifamily mortgages or to mortgages that have the benefit of any guarantee, insurance or other obligation by the U.S. or any of its agencies or instrumentalities (*e.g.*, the FHA, the VA or the USDA Rural Development).

Until June 2011, as part of the MHA Program, we may purchase single-family mortgages that refinance borrowers whose mortgages we currently own or guarantee without obtaining additional credit enhancement in excess of that already in

# Exhibit J



# Systemic Risk:
# Fannie Mae, Freddie Mac
# and
# The Role of OFHEO

**February 2003**

that value by expending foreign reserves or raising interest rates—occurred in Europe in 1991-93, Latin America in 1994-95, and East Asia in 1997-98.[17]

Most of those financial episodes were costly both in lost economic output and in government outlays to shore up fragile financial sectors. IMF economists estimate that cumulative losses attributed to banking problems in 54 member nations from 1980 to 1995 averaged 11.6 percent of the Gross Domestic Product (GDP) of the affected countries over an average recovery period of three years.[18] Another study of 24 major banking and currency crises in the last two decades estimated that cumulative losses—the direct costs of resolving insolvent institutions and the cost of lost economic output—averaged roughly 15-20 percent of annual GDP.[19]

Analyses of financial crises and systemic events typically consider neither how those episodes affected or could affect economic activity in specific sectors of the economy such as housing, manufacturing, or agriculture, nor the potential for specific financial institutions to lead or contribute to such episodes. The housing sector is a large part of the U.S. economy—accounting for over 11 percent of GDP[20]—and Fannie Mae and Freddie Mac are the dominant firms in U.S. housing finance markets.[21] A major reduction in or cessation of an Enterprise's mortgage purchases could disrupt the functioning of those markets and increase mortgage rates sufficiently to reduce U.S. housing activity—such as housing starts and home sales—relative to the level that would have occurred absent the disruption.[22] A substantial reduction in housing activity could substantially lower aggregate economic activity—such as consumption, output, and employment. Therefore, this report focuses on one type of systemic event – an episode in which severe financial difficulties at Fannie Mae or Freddie Mac contribute to a financial crisis that sufficiently disrupts the functioning of housing finance markets to reduce substantially aggregate economic activity in the U.S. relative to the level that would have occurred absent the crisis.

Whether an episode constitutes a systemic event is a judgment call that requires assessing whether a financial crisis occurred and, if so, whether the resulting economic losses are sufficiently large. The widespread failures of banks and other financial intermediaries in the U.S.

---

[17]    Kaminsky, G.L., and C.M. Reinhart, "The Twin Crises:  The Causes of Banking and Balance-of-Payments Problems," *American Economic Review*, Vol. 89, No. 3 (June 1999), 473-500.

[18]    International Monetary Fund, "Financial Crises: Characteristics and Indicators of Vulnerability," *op. cit.*, 79.

[19]    Hoggarth, G., R. Reis, and V. Saporta, "Costs of Banking System Instability:  Some Empirical Evidence," *Journal of Banking and Finance*, Vol. 26, No. 5 (May 2002), 825-855.

[20]    That percentage reflects the gross output originating from the construction, real estate services, and real estate finance and insurance sectors.  For statistics for 1988-1997, see Hu, D., and A. Pennington-Cross, *The Evolution of Real Estate and The Economy*, (Washington, DC:  Research Institute for Housing America, June 2000), 4, available online at http://www.housingamerica.org/docs/RIHA00-02.pdf.

[21]    In 2001, for example, the Enterprises purchased 40 percent of the single-family mortgages not insured or guaranteed by the government—so-called conventional loans—that were originated in that year.  Office of Federal Housing Enterprise Oversight, *Mortgage Markets and the Enterprises in 2001* (Washington, DC:  August 2002), 13.

[22]    For discussions of the importance of the secondary market in the housing finance system and the effect of changes in mortgage rates on housing activity, respectively, see Hendershott, P.H. and K.E. Villani, "Secondary Residential Mortgage Markets and the Cost of Mortgage Funds," *AREUEA Journal*, Vol. 8 (Spring 1980), 50-76; and Chinloy, P., "Real Estate Cycles:  Theory and Empirical Evidence," *Journal of Housing Research*, Vol. 7, No. 2 (1996), 173-190.

# Exhibit K

**Embargoed until:**
**10:00 a.m.**
**December 9, 2008**

**Testimony by Franklin D. Raines**
**Before the House Committee on**
**Oversight and Government Reform**
**December 9, 2008, 10:00 a.m.**

## Introduction

Chairman Waxman and distinguished Members of the Committee, my name is Franklin D. Raines. Although I have had the opportunity to testify before congressional committees on many occasions, this is my first testimony before this committee. Let me introduce myself.

In the 32 years since I graduated from law school, I have practiced law for less than one year, served in government for four years, and worked in the financial services and investment industry for 27 years.

I have 12 years of experience in investment banking, having served as a financial advisor to state and local governments and agencies while a General Partner at Lazard Freres & Co. in the 1980s. Many of these clients faced financial crisis or needed to borrow large sums of money for investment projects. I assisted the cities of Chicago, Washington, D.C., and Cleveland and the states of Iowa and Texas to eliminate deficits, to finance their operations, and to restore their credit ratings. I advised on some of the largest public infrastructure projects in the country, such as the redevelopment of airports in Chicago, Washington, D.C., and San Francisco, and of the water, sewer, electric power, and transit systems in Seattle, Cleveland, and Milwaukee.

I have 11 years of experience in the mortgage industry as a Vice-Chairman and then as Chairman and CEO of Fannie Mae. I was appointed Chairman and CEO by the independent Board of Directors of Fannie Mae. This Board included Republicans, Democrats, and Independents, with 13 of 18 directors elected by shareholder vote.

In my six years as Chairman and CEO, Fannie Mae provided over $3.4 trillion of financing, serving more than 30 million low-, moderate-, and middle-income families. The company's revenue, book of business, and economic value more than doubled during this period, and the stock outperformed the S&P 500. The company became a leader in e-commerce with more than $1.6 trillion in transactions over the internet in 2004. Fannie Mae was cited as a *Fortune* magazine Most Admired Company, a *Business Ethics* 100 Best Corporate Citizen, and as a Best Company to Work For in several publications, including those reporting on minorities, women, working mothers, and information-technology employees. In 2003, the company received the Ron Brown Award from the U.S. Department of Commerce for corporate leadership.

I announced my retirement on December 21, 2004, and I have had no management role at the company since that time. For the past four years, I have been an investor in start-up businesses in the fields of health and financial services.

My national partisan political experience during my 32-year career is limited to having volunteered on the issues staff of Michael Dukakis when he was the Democratic nominee for President in 1988. I had no role in the recent presidential election. I did not contribute money to any candidate's presidential campaign nor did I advise any candidate.

My government experience includes service in the administrations of two Presidents. I was the Director of the Office of Management and Budget in the Cabinet of President Bill Clinton. In that position I was able to play a role in creating the first balanced federal budget in a generation. Earlier, I was a member of the Domestic Policy Staff and an Associate Director of the OMB under President Jimmy Carter. My service to these Presidents totaled four years.

As is readily apparent from this summary, my predominant career experience has been in business, and, in particular, in financial services. My experience in financial services, along with my tenure at OMB, will form the basis of much of my testimony today.

**Causes of the Current Financial Crisis**

The current financial crisis—which has now been confirmed as a recession—has a variety of complex sources. It did not result from Fannie Mae's recent business decisions or its accounting practices of four years ago. I will discuss my view of the separate causes of the financial crisis before I address the recent losses and conservatorship at Fannie Mae.

The crisis afflicting the national and international financial system is without precedent since the Great Depression. Everyone from large financial institutions to the families and businesses of Main Street has suffered dramatic reductions in net worth, and many face insolvency. Credit has dried up for banks, large corporations, small businesses, and consumers alike. The country faces a significant contraction in economic activity and perhaps the deepest and longest recession in a generation.

The federal government's policy in response has been large in dollars but limited in its success. As a former budget director, I can attest that the interventions by the Congress, the Treasury, and the Federal Reserve System involve staggering amounts. But the tepid response of the markets to the various rescue plans is not surprising given the lack of coordination between the plans.

Financial market convulsions are not new phenomena. The past quarter century alone has witnessed the Third World debt crisis, the junk-bond meltdown, the savings-and-loan collapse, the oil-patch debt bubble, the overextension of financial-derivatives trading, the municipal-market crunch, the international foreign-currency-reserve run, the internet-stock implosion, and the present mortgage and credit-derivatives crisis. These separate events have many features in common.

First, these cases all began when the financial markets discovered a new asset class that was not well understood. Because it was not well understood, the asset class was illiquid. The new asset

class was usually growing or capable of great growth, and had profit margins that far exceeded those of other assets.

The lack of understanding about the asset class allowed financial-services companies to offer customers a differentiated product that had not yet been turned into a commodity. Banks and investment banks increased the asset's liquidity by making a market in the securities and by supporting the market with their own balance sheets. In this way, the banks could add value to the market, for which they would be handsomely compensated. While traditional asset classes tend to grow with the economy, the new class could be made to grow more quickly. Moreover, because there was initially less competition in trading in the new asset, the profit margin was wider than in commoditized asset classes.

The second common element is that the new asset class soon morphed from a prosaic form to a more exotic form, with greater potential for explosive growth. For example, junk bonds were originally corporate bonds issued by creditworthy companies that had fallen on hard times. These corporate debt securities were nicknamed "fallen angel" bonds because the debt, although backed by substantial assets and rated investment grade at issuance by the credit rating agencies, was now rated below investment grade. The track record for these bonds created a small but consistent market among specialist investors. Certain Wall Street entrepreneurs went one step—and then several steps—further. They reasoned that if investors would buy the junk bonds of established industrial companies, then perhaps they would buy the debt of companies with far fewer assets, or they would buy junk bonds issued as part of mergers or acquisitions. The entrepreneurs grew their new market by advertising the performance track record of fallen angel bonds as applying to these far riskier junk bonds. After a period of explosive expansion, this market caved in on itself.

The third commonality is financial leverage. An investment firm's use of a small base of equity capital and a large component of debt magnifies the returns derived from buying or trading in the new asset class but simultaneously magnifies the firm's exposure. A derivative trade, for example, might lead to a profit of only a few basis points and to a small return on equity if equity was the only source of funding. But if the firm uses financial leverage, those basis points would be multiplied into quite substantial sums of money. Long Term Capital Management employed this model to significant profit until the markets turned on its investments and the firm collapsed. Periods of easy credit and monetary liquidity amplify the temptation to add leverage.

The fourth and final commonality is commission-based compensation on Wall Street and in financial-services firms generally. Financial entrepreneurs are often paid by the volume of securities in a deal, rather than by the ultimate success of the transaction. Bankers who specialize in mergers, for example, are paid a percentage of the overall deal's value. Underwriters of bonds and stocks are paid similarly. This compensation structure causes the professionals to focus on the size and volume of deals, often to the exclusion of the deal's quality. The flow of deals, rather than their ultimate business success, is also the primary driver for many financial executives. Only an executive's own sense of professionalism and longevity tempers this attention to deal flow rather than to deal success. In periods in which a firm is making money-positioning deals on its own books, this focus on volume to the exclusion of success is exacerbated, and the "carry trade" needs constant nourishing through new deals.

It has been often said, and is generally true, that it is hard to spot a bubble contemporaneously. But it is my view that when these four common elements are present, history suggests a bubble is occurring and a bust is coming.

So how does this analysis explain the current subprime mortgage meltdown?

Subprime mortgages predate this current crisis. Mortgage-finance companies have long issued such mortgages to "house poor" homeowners who cannot find affordable credit elsewhere. The loans were almost always refinances because they were based on the assumption that the homeowner had substantial equity in their home. Lending under these circumstances at a 25 to 50 percent loan-to-value ratio, at very high interest rates, was a good business. If the borrower defaulted, the lender could seize and sell the house for more than the amount owed. To the financial entrepreneurs of the later part of the 1990s, this looked like a new, illiquid asset class. Not only did the profit margins look healthy, but, with a few innovations, this class of mortgages could be made to grow more rapidly than the sleepy conforming-mortgage market.

Similar to the transformation of fallen angel bonds into riskier junk bonds, subprime mortgages soon morphed from loans backed by substantial assets into loans used to buy new assets, with little in the way of equity or down payment. The whole theory of subprime loans had been that payment was assured by the low loan-to-value ratio. But the new subprime loans were backed by nothing but the credit of the borrower. And although the history of traditional subprime loans showed predictable performance, that performance was based on the strength of the collateral and not on the credit score of the borrower, someone who had already demonstrated an inability to manage consumer credit.

The mortgage originators who first offered this new form of subprime mortgage were not depository institutions with large balance sheets, and their lack of financial leverage restrained the growth of the asset class. The ratings agencies solved this problem when they agreed to give investment-grade ratings to mortgage-backed securities, or MBS, backed by these subprime loans—ratings equivalent to those given to MBS backed by prime loans. As subprime origination changed from asset-based lending to lending based on a credit score, the credit agencies did not substantially toughen the criteria for a triple-A rating on MBS backed by such riskier mortgages. With triple-A ratings and the creative financing of so-called "support" tranches, the entrepreneurs now had almost unlimited liquidity and leverage.

Finally, traditional subprime mortgages always had high interest rates, which lenders employed to offset the inherent credit risk of the loans. But the entrepreneurs behind the new subprime mortgages thought that if ratings agencies and MBS investors could be convinced that the credit risk was not in fact that high, then profits from the high interest rates consumers paid could be diverted from MBS investors to the loan originators and their intermediaries. The ratings agencies obliged, which resulted in a turbo-charging of volume for the new asset class. The rewards of originating a subprime loan versus a prime loan were so high that originators had a financial incentive to convince consumers to take a subprime loan even when they qualified for a prime loan. Indeed, lenders securitizing their subprime loans would boast in their offering documents that many of the loans were really of prime quality, and the lenders were often

correct. The commissions on these MBS, in turn, were so large for Wall Street traders and salespeople that there was an enormous incentive to convince their asset-buying customers to load up on these new securities with impressively high credit ratings.

The same analysis explains the rise in origination and securitization of Alternative-A mortgages and option-adjustable-rate mortgages.

There is little new in the underlying causes of the current mortgage crisis. The global financial markets have seen such financial-product bubbles before and are likely to see them again, in the absence of any change in regulatory practice.

But note that prior financial-product dislocations did not have the widespread impact of the current mortgage meltdown. There are several reasons for the difference.

First, the market for residential property is enormous in this country, and residential mortgages are one of the nation's biggest asset classes. The value of American residential mortgages outstanding far exceeds the value of corporate bonds, consumer credit cards, or commercial loans. Even so, a meltdown affecting a discrete $500 billion market will not infect the entire international financial system. But the nation's mortgage market, even in normal times, requires substantial leverage in the origination, servicing, securitization, and guarantee of individual mortgages. A meltdown involving trillions of dollars of mortgage products closely tied to the asset-backed securities, commercial paper, bank deposits, and derivatives markets will have an effect several orders of magnitude larger than a problem in a discrete market alone. Beyond size, the interconnectedness of the residential-mortgage market and its supporting markets contributed to the breadth of the crisis.

A second reason for the magnitude of this crisis is that regulators significantly loosened the capital requirements for international banks and investment banks holding American mortgage assets. The Basel II capital standards first applied only to international banks, and the Securities and Exchange Commission's later decision to apply them to investment banks substantially reduced the amount of capital a bank was required to hold for each dollar of U.S. mortgages in its portfolio. This capital change greatly increased a bank's leverage to acquire American mortgage assets. The decision to apply Basel II to investments banks was based on the credit experience of Fannie Mae and Freddie Mac with these assets. But the GSEs employed strict credit standards for the mortgage assets they held, while, by contrast, banks and investment banks were not limited to holding mortgages that met those credit standards.

Third, the country's monetary policy also contributed to the size of the present financial crisis. Before 2005, central bankers in the United States and other industrialized nations were concerned about the prospect of deflation. To combat deflation, monetary policy leaned toward lower interest rates, which made it possible for commercial and investment banks to engage in a carry trade: borrowing at low, short-term rates and investing in higher-interest-rate bearing mortgages and mortgage securities. Mortgage originators began to alter the terms of the mortgages they offered to take advantage of these secondary-market investors. Adjustable-rate mortgages, with very low interest rates in the first two years that jumped to market rates for the next 28 years, became very popular with income-stretched consumers and with speculators in

residential housing.  Upon securitization, the secondary-market investors obtained assets with nominal, short maturities matching their short-term funding, and the borrower received a bargain-basement interest rate for two years with the clear expectation of refinancing before the higher, 28-year rate kicked in.  (Of course, many borrowers found refinancing impossible as the financial crisis spread in 2007 and 2008.)

There is a fourth and final reason for the enormity of the present financial crisis emanating from the mortgage market meltdown.  A large number and wide range of the financial institutions that invested in private-label MBS were new to the market, not natural holders of 30-year obligations, and unfamiliar with how to value the assets underlying the securities they purchased.  When the market began to drop, these players panicked, drove down the prices of MBS, and dried up the liquidity of the market.

## Fannie Mae and the Current Financial Crisis

This hearing is focused on Fannie Mae and Freddie Mac, so I should explain how my analysis of the causes of the financial crisis applies to those firms.  I will focus on Fannie Mae.

Fannie Mae is, of course, not new to the mortgage business.  Residential mortgages in the United States are the only asset class in which it is permitted to invest.  The company had significant experience during the 1980s and early 1990s with the impact of falling housing prices on the value of mortgages.  In the 1980s, the company experienced significant credit losses as a result of the economic meltdown in the oil patch areas of the Southwest.  In the early 1990s, the overheated housing markets in California and New England also caused significant losses.

The company also studied the different credit performance characteristics of mortgages with certain features, such as adjustable rates or negative amortization; mortgages with certain underwriting approaches, such as no documentation of assets or income; and mortgages with certain borrower types, such as those with marginal credit or housing speculators.  These features create greater credit risk.  Furthermore, the layering of more than one of these characteristics on an individual loan greatly magnifies the risk.  In many cases, there is no precedent to rely on to calculate the performance of such risk layering.

As a result of its experiences and research, Fannie Mae developed tools to evaluate and manage the new types of mortgages that began to come into the market in the early part of this decade. The automated underwriting system that Fannie Mae developed allowed the company to evaluate more precisely the risk of mortgage products and borrowers.  Risk-based pricing insured that the company was compensated for the risk it took.  Economic capital requirements and caps on the aggregate amount of risk limited the number of risky loans the company took onto its books. This risk management structure was put into place over a number of years and was formally adopted by the Board of Directors of the company in 2003, while I was CEO.

As subprime and Alt-A loans began to grow as a share of the overall mortgage market, the risk management restrictions Fannie Mae had in place limited the company's involvement with those products.  Indeed, during 2004 the company's share of the overall secondary market in

residential mortgages plummeted. Commercial banks and investment banks saw their share grow significantly as private-label MBS flourished.

So, before 2005, Fannie Mae had a limited market presence in promoting or investing in subprime or Alt-A loans. It had certainly not taken the lead in "morphing" these loans into riskier types.

Fannie Mae was certainly leveraged. The company typically held only 2.5% of capital for each dollar of assets it held on its books, and, over the last decade, regulators, commentators, and company executives paid an extraordinary amount of attention to Fannie Mae's leveraged investments held in its mortgage portfolio. However, the company avoided the largest problem with excess leverage, namely, a wide "duration gap," which is the gap between the duration of assets and liabilities. For example, the typical thrift institution might hold two or three times the percentage of capital as Fannie Mae, but it also might have a duration gap of a two- to three-year mismatch between its assets and liabilities, compared to a gap of one to six months for Fannie Mae. By holding down its duration gap, Fannie Mae significantly reduced the risk of its leverage, but at a great cost to its margins. This discipline held true both before and after 2005.

Fannie Mae's risk profile was not as affected by its compensation structure as were the risk profiles of most participants in the mortgage industry. Importantly, very few Fannie employees received commissions or deal-related compensation. While market share was one part of a comprehensive compensation scheme, Fannie Mae rewarded profitability of the book of business both in the short-run and the long-run and weighed risk management as a major factor in pay.

As explained below, the credit risk profile of Fannie Mae changed after 2004 because Fannie Mae, like a lot of smart investors, changed its appetite for credit risk in response to the changing market. Fannie Mae was a late entrant to the market for these risky mortgages, and, rather than lead the market in the direction of looser credit standards, Fannie Mae initially resisted pressures to relax its credit standards until 2006 to 2007. This helps to explain why Fannie's losses, while large in absolute dollar amount, are relatively small compared to mortgage credit losses suffered by the market as a whole. Indeed, even among the risky Alt-A loans the company acquired after 2004, the loans held by Fannie Mae performed better than Alt-A loans in general.

**Causes of Conservatorship, 2005–2008**

Fannie Mae did not cause the current crisis. By the time the GSE began its most significant investments in riskier loans in 2005, the roots of the present crisis had long taken hold. If anything, Fannie Mae played catch-up to the banks and investment banks who drove the securitization of the most toxic subprime mortgages. In fact, to this day, Fannie Mae has invested relatively little in subprime mortgages, which account for less than one percentage point of Fannie Mae's guaranty book of business. Most of Fannie Mae's losses are related to credit losses on Alt-A loans, not subprime loans, as I will explain.

Despite the size of its overall book of business, Fannie Mae is a small player in the present crisis. For example, the Troubled Asset Relief Program ("TARP"), the government's plan to purchase

the nation's illiquid mortgage assets, is funded at $700 billion. Fannie Mae's total provision for credit losses in the first three quarters of this year are no more than $20 billion, less than 3% of TARP.

Fannie Mae did incur losses in the first three quarters of 2008, and its financial performance ultimately caused the federal government to step in and place the entity under the control of the newly-established Federal Housing Finance Agency ("FHFA").[1]  I will give my understanding of the nature and cause of this situation, but I note at the outset that the losses Fannie Mae has reported, and the actions and events that resulted in those losses, occurred after I announced my retirement from Fannie Mae in December 2004.  Since I retired from Fannie Mae, I have not been a manger, consultant, or employee of Fannie Mae.  Accordingly, what I say today is based solely on what I have gleaned from my review of the public disclosures made by Fannie Mae.

A significant part of Fannie Mae's business is its so-called "guaranty business," also known as the "credit" business—that is, the business of assuming the credit risk of mortgages in exchange for a fee.  Fannie Mae typically does so by taking a pool of mortgage loans from mortgage lenders and providing the lenders with Fannie Mae-issued mortgage-backed securities (known as "Fannie Mae MBS"), which are backed by the pool of mortgage loans and represent a beneficial ownership interest in each of the loans in the pool.  Fannie Mae guarantees the timely payment of principal and interest on the mortgages underlying the Fannie Mae MBS.  As of September 30, 2008, Fannie Mae's total guaranty book of business was $2.94 trillion, nearly all of that representing the unpaid principal on loans underlying Fannie Mae MBS or held in Fannie Mae's portfolio.[2]  The vast majority of the loans in Fannie Mae's guaranty book of business are single-family conventional mortgages, which represented approximately $2.7 trillion of Fannie Mae's guaranty book of business as of September 30, 2008.[3]

The most serious losses reported by Fannie Mae in 2008 have stemmed from its guaranty book of business.  Specifically, in the first three quarters of 2008, Fannie Mae was forced to recognize nearly $18 billion in credit-related expenses, of which nearly $17 billion was the result of provisioning for credit losses associated with its guaranty book of business.[4]  By way of comparison, in 2004—my last year at Fannie Mae—the entity recognized only $352 million in credit-related expenses due to provisioning for credit losses, and only approximately $1 billion in total over the last *three years* of my tenure.[5]  Similarly, as of September 30, 2008, Fannie Mae

---

[1] "Statement of FHFA Director James B. Lockhart," FHFA News Release (Sept. 7, 2008) (attached as Ex. 1).

[2] Fannie Mae 2008 Q3 10Q, at 17–18 (attached as Ex. 2).

[3] 2008 Q3 10Q, at 111–12; Fannie Mae 2008 Q3 10Q Credit Supplement, at 5, http://www.fanniemae.com/media/pdf/newsreleases/2008_Q3_10Q_Investor_Summary.pdf (attached as Ex. 3).

[4] 2008 Q3 10Q, at 56–57.

[5] Fannie Mae 2004 10K (restated), at F-4 (attached as Ex. 4).

estimated that, using its Credit Loss Performance Metrics—terms not defined within Generally Accepted Accounting Principles ("GAAP"), it had incurred approximately $4.3 billion in actual credit losses during the first three quarters of 2008.[6]  By contrast, in 2004, Fannie Mae estimated only $221 million in credit losses, and only $550 million in total for 2002, 2003, and 2004.[7]

These losses are attributable in large part to Fannie Mae's guaranteeing of certain high-risk loans, largely so-called "Alt-A" loans, and, to a lesser extent, subprime loans.  Although the public record is not entirely clear, it appears that at some point in 2005 or 2006, Fannie Mae began to increase substantially the number of Alt-A loans in its guaranty book of business.[8]  In its report to Congress in 2007,  Fannie Mae's regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), noted that "[h]igher risk products such as interest-only, sub-prime, Alt-A and negative amortization loans are growing," although the regulator did not express any particular concerns.[9]  By year-end 2006, Fannie Mae's guaranty business included approximately $257 billion in Alt-A loans, and by year end 2007 that number had grown to $318 billion.[10]  Moreover, it appears that in taking on these loans, Fannie Mae had altered its underwriting standards by, for example, not running many of those loans through its DesktopUnderwriter ("DU") system, an automated tool that helps lenders evaluate and price credit risk.[11]  Perhaps not surprisingly, Fannie Mae has now reported that its serious delinquencies are disproportionately represented by Alt-A loans from its 2006 and 2007 vintages, and that default rates for 2005 vintage Alt-A loans are increasing.[12]

The high-risk loans—in particular Alt-A loans—that Fannie Mae guaranteed from 2005 to 2007 have driven the losses the company has experienced this year.  Over 70% of Fannie Mae's 2008 credit losses are attributable to high-risk loans.[13]  Nearly half of Fannie Mae's 2008 single-family credit losses are attributable to its Alt-A loans even though those loans make up less than 11% of Fannie Mae's single-family conventional guaranty book of business.[14]  Similarly,

---

[6] 2008 Q3 10Q, at 64–65

[7] 2004 10K (restated), at 151–52.

[8] Chares Duhigg, "Pressured to Take More Risk, Fannie Reached Tipping Point," *N.Y. Times* (Oct. 5, 2008) (attached as Ex. 5).

[9] OFHEO, *Report to Congress* 24 (March 2007) (attached as Ex. 6).

[10] Fannie Mae 2007 10K, at F-83 (attached as Ex. 7).

[11] Fannie Mae 2008 Q2 Investor Conference Call, at 25 (Aug. 8, 2008) (T. Lund: "Well just to be clear.  A significant portion of Alt-A doesn't go through DU."), http://www.fanniemae.com/media/pdf/webcast/080808transcript.pdf (attached as Ex. 8); 2008 Q3 10Q, at 13 (discussing Underwriting Changes).

[12] 2008 Q3 10Q, at 58.

[13] 2008 Q3 10Q, at 65.

[14] 2008 Q3 10Q, at 115; 2008 Q3 10Q Credit Supplement, at 5.

approximately 2% of Fannie Mae's 2008 single-family credit losses are attributable to subprime loans, which make up only a third of a percent of its single-family book.[15]

These high-risk loans were mostly placed on Fannie Mae's books after 2004.  Nearly three-quarters of the Alt-A loans in Fannie Mae's single-family book were originated from 2005 to 2007, as were over 80% of the subprime loans.[16]  Similarly, of the non-Alt-A or subprime categories of high-risk loans, between approximately 60% to 80% were originated from 2005 to 2007.[17]  Moreover, it appears that the loans generated in the 2005 to 2007 time period were riskier than their pre-2005 counterparts.  For example, over 95% of the credit losses attributable to Alt-A loans this year are attributable to Alt-A loans guaranteed after 2004.[18]  And, more generally, between 70-85% of the credit losses incurred in the first three quarters of 2008 are attributable to loans (of whatever quality) originated after 2004, even though only approximately 60% of the single-family book of business consists of post-2004 loans.[19]  In short, it appears that the credit-loss expenses that Fannie Mae has recognized in the first three *quarters* of this year—nearly 17 times the total credit loss expenses incurred in the last three *years* of my tenure at Fannie Mae—are the result of a significant increase in the number of high-risk loans, and in particular Alt-A loans, guaranteed by Fannie Mae from 2005 to 2007.

In addition to the loans it guarantees, Fannie Mae also owns a portfolio of "private-label" MBS issued by third parties.  As of September 30, 2008, Fannie Mae held approximately $117 billion of such securities.[20]  Approximately $55 billion of those securities were backed by either Alt-A or subprime mortgages.[21]  In the first three quarters of 2008, Fannie Mae recognized other-than-temporary impairment of approximately $2.4 billion related to its available-for-sale private-label MBS backed by Alt-A and subprime.[22]  (Fannie Mae has not quantified publicly the extent to which fair value losses on trading securities are attributable to private-label MBS backed by Alt-A or subprime mortgages.[23])

Although these losses do not appear to be as significant as the losses in the guaranty business, it is clear that, like the credit losses, these securities losses are principally attributable to

---

[15] 2008 Q3 10Q Credit Supplement, at 5.

[16] 2008 Q3 10Q Credit Supplement, at 5.

[17] 2008 Q3 10Q Credit Supplement, at 5.

[18] 2008 Q3 10Q Credit Supplement, at 11.

[19] 2008 Q3 10Q Credit Supplement, at 6.

[20] 2008 Q3 10Q, at 74.

[21] 2008 Q3 10Q, at 183.

[22] 2008 Q3 10Q, at 161–62.

[23] 2008 Q3 10Q, at 159–62.

investments made after 2004.  Over 75% of Fannie Mae's holdings in private-label MBS backed by Alt-A or subprime mortgages are from a 2005 or later vintage.[24]  Similarly, Fannie Mae has observed that its private-label Alt-A and subprime-backed MBS from 2005 to 2007 were subject to "relaxed underwriting and eligibility standards,"[25] and that the 2006 to 2007 loans underlying those securities "have experienced significantly higher delinquency rates than other vintages."[26]

**Role of Regulation and Regulators**

There have been many assertions made by commentators about the role of financial services regulation and regulators in the causation of the current financial crisis.  While much of this commentary is erroneous, there are legitimate criticisms that can be made of the regulatory system.

A very common allegation that has been made is that the Community Reinvestment Act ("CRA") forced mortgage originators to make loans that were too risky and burdened banks with assets that would later default.  This claim is incorrect.  The most risky loans in the system tended to be originated by lenders not covered by the CRA.  Also, both Ben Bernanke, the Chairman of the Federal Reserve, and, John Dugan, the Comptroller of the Currency, have stated that they have found no evidence that the CRA contributed in any substantive way to the current mortgage difficulties or is in any way to blame for causing the subprime loan crisis.[27]  Indeed, an analysis by the Federal Reserve found that only a small portion of subprime mortgage originations are related to the CRA and that most foreclosure filings have taken place in middle- or higher-income neighborhoods.[28]

A variation on this accusation is that affordable housing goals caused Fannie Mae and Freddie Mac to acquire loans made to low- and moderate-income households that subsequently went bad.  However, as presented earlier, the majority of losses at Fannie Mae came from Alt-A loans.  Alt-A loans were disproportionately *not* made to low- and moderate-income borrowers.  As such,

---

[24] 2008 Q3 10Q, at 81–83.

[25] 2008 Q3 10Q, at 78.

[26] 2008 Q3 10Q, at 80.

[27] Letter from Ben S. Bernanke, Chairman, Bd. of Governors of the Fed. Reserve Sys., to Hon. Robert Menendez, U.S. Senate (Nov. 25, 2008), http://menendez.senate.gov/pdf/112508ResponsefromBernankeonCRA.pdf (attached as Ex. 9); John C. Dugan, Comptroller of the Currency, Remarks Before the Enterprise Annual Network Conference (Nov. 19, 2008), http://www.occ.gov/ftp/release/2008-136a.pdf (attached as Ex. 10).

[28] Randall S. Kroszer, Bd. of Governors of the Fed. Reserve Sys., "The Community Reinvestment Act and the Recent Mortgage Crisis," Speech at the Confronting Concentrated Poverty Policy Forum (Dec. 3, 2008) http://www.federalreserve.gov/newsevents/speech/kroszner20081203a.htm (attached as Ex. 11).

Alt-A loans purchased actually hurt the ability of the GSE to meet its affordable housing goals, which were expressed as a percentage of Fannie Mae's total business. Moreover, a recent study by researchers at the University of North Carolina of a subset of affordable housing loans guaranteed by Fannie Mae found that these loans had performed as expected, with losses close to those of prime loans and substantially lower than subprime loans.[29]

No regulation or law forced banks or the GSEs to acquire loans that were so risky they imperiled the safety and soundness of the institutions. The acquisition of such loans was a business judgment made by management and the boards of directors. However, there remains the question of why regulators did not criticize or restrict the acquisition of such loans by regulated institutions.

Fannie Mae was clearly under close regulatory scrutiny from 2003 through 2008. In early 2004 the company entered into a series of agreements with its regulator, OFHEO, subjecting the company to unprecedented supervision of its business activities.[30] In the 2005 to 2007 time period, as Fannie Mae acquired the vast majority of the loans that caused its subsequent problems, OFHEO did not seek to restrict the amount of credit risk taken on by the company. The regulator limited its intervention to the size of the on-balance sheet mortgage portfolio and the attendant interest rate risk.[31] Indeed, right up until the time Fannie Mae was placed into conservatorship, the Director of OFHEO maintained that the company was well capitalized to withstand the losses it would face.[32]

While it is primarily the responsibility of the regulated financial institution to manage its own credit risk, it is remarkable that during the period that Fannie Mae substantially increased its exposure to credit risk its regulator made no visible effort to enforce any limits. This was true even though that regulator oversaw only two companies and was then enforcing a form of quasi-conservatorship.

While regulations did not *force* financial institutions to make bad loans, the absence of consumer protection regulation *allowed* many bad loans to be made to the detriment of consumers. The mortgage finance system does not have just one consumer protection regulator. That responsibility is divided among the Federal Reserve Board, the other bank regulators, the Federal

---

[29] Lei Ding et al., "Risky Borrowers or Risky Mortgages?" at 11, Presentation at the HUD Tuesday Series (Oct. 28, 2008), http://www.ccc.unc.edu/documents/HUD_Oct2008_final.pdf (attached as Ex. 12); Lei Ding et al., *Risky Borrowers or Risky Mortgages: Disaggregating Effects Using Propensity Score Models* 16 (Ctr. for Cmty. Capital, UNC, Working Paper, Oct. 27, 2008), http://www.ccc.unc.edu/documents/RiskyBorrowers_RiskyMortgages_1008.pdf (attached as Ex. 13).

[30] 2004 10K (restated), at 1–4.

[31] 2007 10K, at 17.

[32] "Statement of OFHEO Director James B. Lockhart," OFHEO News Release (July 10, 2008) (attached as Ex. 14).

Trade Commission, the Department of Housing and Urban Development, and state and local officials. Fannie Mae and Freddie Mac exercise quasi-regulatory authority through the promulgation of their Seller/Servicer Guides. During the height of the mortgage boom the only entities actively seeking to protect consumers from abusive mortgage practices were the state and local officials and the GSEs. Fannie Mae began trying to improve consumer protection for impaired-credit borrowers as early as 1999. The company issued rules restricting the types of subprime loans it would purchase, and these rules led to major reforms in the market, such as the elimination of mandatory credit life insurance. The Federal Reserve Board did not exercise its statutory authority to regulate subprime loans until 2008.

Preventing future financial-services industry crises and the attendant damage to consumers will require three things. First, executives will have to exercise greater discipline in managing risk. Second, there will need to be increased and better informed regulation of large, leveraged financial entities, regardless of charter, by a single regulator. And third, there must be greater protection of consumers from financial products they cannot reasonably be expected to understand.

**Accounting Restatement, 2004–2006**

On December 15, 2004, the SEC announced that certain of Fannie Mae's accounting practices did not comply with GAAP.[33] The SEC required Fannie Mae both to restate its financial statements to eliminate the use of hedge accounting and to reevaluate other information prepared under GAAP for possible restatement.[34] Fannie Mae completed its restatement on December 6, 2006.[35]

My understanding is that this restatement did not contribute to Fannie Mae's recent losses. The main result of the restatement was to eliminate hedge accounting, and this accounting change did not affect the credit-risk management function at Fannie Mae.

The large losses that Fannie Mae has reported so far in 2008 derive from its credit-guaranty activities. By contrast, the financial restatement announced in 2004 and completed in 2006 primarily related to accounting concerning Fannie Mae's mortgage portfolio. Indeed, most criticism of the company and of the risks it was undertaking before 2008 related to the portfolio, and some commentators even suggested that the company should solely focus on its financial guaranty activities as the safer of the two.[36]

---

[33] "Office of the Chief Accountant Issues Statement on Fannie Mae Accounting," SEC Press Release 2004-172 (Dec. 15, 2004) (attached as Ex. 15).

[34] *Id.*

[35] 2004 10K (restated).

[36] Peter J. Wallison, "Regulating Fannie Mae and Freddie Mac: Now It Gets Serious," *Financial Services Outlook* (AEI May 2005), http://www.aei.org/publications/pubID.22514/pub_detail.asp (attached as Ex. 16).

While the actual restatement took two years, Fannie Mae had mitigated the economic consequences by the end of 2004. Just before I departed the company, Fannie Mae initiated the sale of $5 billion of new preferred stock that, together with a surplus of $6 billion on the books, restored the company's capital to meet regulatory requirements.[37] The company reported in its 2004 annual report to the SEC that it had capital surplus at year-end of $2.4 billion.[38] The stock price remained at about $70 per share both before and after the SEC ordered the restatement, proof that the restatement did not indicate a fundamental economic problem for Fannie Mae. The stock price did not decline until mid-January 2005 when the company—without my input or advice—made the business decision to cut its dividend in half and, later, when OFHEO placed additional restrictions on the company's business. In a related securities suit, a federal judge recently held that the relevant information about the restatement was available to investors shortly after the SEC decision was made public, when Fannie Mae filed an 8-K on December 22, 2004, advising investors that they should no longer rely on previously filed financial statements.[39]

Even under the restated financials, on a marked-to-market basis the fair value of Fannie Mae's assets and liabilities actually rose during the period I ran the company.[40]

## Accountability

On September 20, 2004, OFHEO delivered to Fannie Mae's Board of Directors a report of the findings to date of its "Special Examination." The report raised questions about Fannie Mae's use of two accounting standards, FAS 91 and FAS 133. Fannie Mae requested that the SEC review Fannie Mae's accounting practices with respect to these two standards.

On October 6, 2004, I testified before the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, of the Committee on Financial Services, and answered questions about the allegations in the OFHEO report. I told that Subcommittee that if "after a thorough review of all the facts, it is determined that our company made significant mistakes, our board and our shareholders will hold me accountable." I also said that "I will hold myself accountable. That comes with being a CEO. I accepted that burden on the day I took the job, and I accept it today."[41]

---

[37] 2004 10K (restated), at 182.

[38] 2004 10K (restated), at 180.

[39] Mem. Op. 11, *In re Fed. Nat'l Mortgage Ass'n Sec., Derivative, and "ERISA" Litig.*, MDL No. 1668 [Dkt. No. 568] (RJL Jan. 7, 2008) (attached as Ex. 17).

[40] 2004 10K (restated), at 72.

[41] *The OFHEO Report: Allegations of Accounting and Management Failure at Fannie Mae: Hearing Before the Subcomm. on Capital Markets, Insurance, and Government Sponsored Enterprises of the H. Comm. on Fin. Servs.*, 108th Cong. 76 (2004) (attached as Ex. 18).

On December 15, 2004, the SEC's Office of the Chief Accountant announced that its "review indicate[d] that during the period under [its] review, from 2001 to mid-2004, Fannie Mae's accounting practices did not comply in material respects with the accounting requirements" of FAS 91 and FAS 133. The SEC advised Fannie Mae that it should (i) restate it financial statements to "eliminate the use of hedge accounting," (ii) evaluate the accounting under FAS 91 and restate its financial statements "if the amounts required for correction are material," and (iii) reevaluate the information prepared under GAAP and non-GAAP information that Fannie Mae previously provided to investors.[42]

Following the SEC's announcement, I held myself accountable even though I never had personal knowledge that Fannie Mae's accounting practices failed to comply with GAAP, as was confirmed by the $80 million independent investigation of the accounting controversy. In February 2006, Senator Warren Rudman and the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, hired by Fannie Mae's independent Board members and approved by OFHEO, completed their investigation into OFHEO's allegations. Senator Rudman and his team "did not find that [Raines] knew that the Company's accounting practices departed from GAAP in significant ways."[43] In particular, Sen. Rudman "saw no indication that [Raines] knew that the Company's application of FAS 133 contained substantial departures from GAAP."[44]

Although I never had personal knowledge or independent reason to believe that Fannie Mae's accounting practices failed to comply with GAAP, I nevertheless announced my retirement from Fannie Mae on December 21, 2004, one week after the SEC's announcement regarding the Company's accounting. Through Fannie Mae, I released a public statement making clear that I was holding myself accountable:

> I have advised the Board of Directors today that I am retiring as Chairman and Chief Executive Officer of Fannie Mae.
>
> I previously stated that I would hold myself accountable if the SEC determined that significant mistakes were made in the Company's accounting. Although, to my knowledge, the Company has always made good faith efforts to get its accounting right, the SEC has determined that mistakes were made. By my early retirement, I have held myself accountable.[45]

---

[42] "Office of the Chief Accountant Issues Statement on Fannie Mae Accounting," SEC Press Release 2004-172 (Dec. 15, 2004).

[43] Paul, Weiss, Rifkind, Wharton & Garrison LLP & Huron Consulting Group Inc., *A Report to the Special Review Committee of the Board of Directors of Fannie Mae*, Executive Summary 5 (Feb. 23, 2006) (attached as Ex. 19).

[44] *Id.* at 9.

[45] "Statement by Franklin D. Raines, Chairman and CEO, Fannie Mae," Fannie Mae Press Release (Dec. 21, 2004) (attached as Ex. 20).

I have held myself accountable for the accounting practices that led to the restatement because I was CEO during the time those practices were in use. I told the House Subcommittee in 2004 that I would hold myself accountable if the SEC found significant problems, and I acted on this commitment by announcing my retirement from Fannie Mae in December 2004.

I have been held accountable financially, as well.

OFHEO has stated that I was paid $90 million as Chairman and CEO of Fannie Mae, a period when the company earned in excess of $20 billion on a restated basis. At least $36 million, or about 40 percent, of the $90 million amount has been rendered worthless because the company's recent financial problems make the stock options awarded to me worthless. In addition, I gave up or did not receive approximately 351,127 of the shares of Fannie Mae common stock that were reported in the company's annual proxy statements as target Long-Term Incentive Plan Awards to me. According to those proxy statements, the expected payout of these stock awards would have totaled approximately $27 million. In addition to these amounts, I, along with other investors, lost millions of dollars on the shares of Fannie Mae stock that I held.

The large discrepancy between the reported expected value of my compensation and the compensation that I actually realized demonstrates that the Fannie Mae compensation system functioned as designed—to tie executive compensation to Fannie Mae's performance over a blend of short-term, medium-term, and long-term horizons, thereby ensuring that an executive's financial interest would never be disproportionately tied to any single period. When the company's performance faltered—in this case, years after my departure—the value of my previously awarded compensation was likewise reduced or clawed-back. It should not be surprising that Fannie Mae tied executive compensation to corporate performance—Congress mandated that the company do so. The company's charter requires "a significant portion of potential compensation" for its officers to be "based on the performance of the corporation," and the company complied.[46] The charter also requires the company to pay compensation "comparable with compensation for employment in similar businesses (including publicly held financial institutions or major financial services companies) involving similar duties and responsibilities."

OFHEO itself confirmed the reasonableness of Fannie Mae's compensation policies. OFHEO periodically reviewed Fannie Mae's executive compensation because OFHEO's statute required the agency to prohibit Fannie Mae from providing excessive compensation to any executive officer of the GSEs.[47] While I was CEO of Fannie Mae, OFHEO in fact retained expert consultants to help assess the GSEs' compensation. As OFHEO reported to Congress in 2003, "[i]n 2002, an executive compensation consultant retained by OFHEO completed a study initiated in 2001, which compared the components and levels of executive compensation of executive officers at the Enterprises with those of executive officers in other similar businesses

---

[46] 12 U.S.C. § 1723a(d)(2) (attached as Ex. 21).

[47] 12 U.S.C. § 4518(a) (attached as Ex. 22).

involving similar duties and responsibilities."[48]  The study assisted OFHEO in its supervisory review of executive compensation, and OFHEO reported no problems to Fannie Mae or to Congress with the level of executive compensation while I was CEO.

OFHEO has also stated that it believes it has held me financially accountable.  As part of a settlement of litigation that the agency initiated against me, OFHEO announced earlier this year that it had required me to forfeit or pay a total of $24.7 million.  The bulk of this amount involved my surrendering and relinquishing claims to some of the stock and options referenced earlier.[49]

## Role of Government Sponsored Enterprises

A number of commentators have suggested that there are inherent flaws in the government sponsored enterprise model.  Some suggest these flaws merely lead to a lack of transparency regarding risk.  Others have alleged that the GSE model caused the current financial crisis.  I believe these views to be mistaken.

What exactly is a government sponsored enterprise?  Originally that term was created merely as a convenient way to refer to a variety of entities in the federal budget process.  These entities had in common a corporate form and the use of private shareholder capital to carry out, for profit, business activities that also advanced public policy objectives.  The Federal National Mortgage Association was a subsidiary of a government-owned corporate entity at its birth in 1938.  Over time, lenders who transacted business with the association were required to buy stock.  In 1968, the government sold its remaining interest in Fannie Mae and the activities of the company were removed from the unified federal budget.  The federal budget continued to report on Fannie Mae's activities in its appendix, therein referring to it as a government sponsored enterprise.

Once the government sold its interest in Fannie Mae, the company looked a lot like other government-chartered national associations—for example, national banks—except that the government retained the right to appoint members to the Fannie Mae board.  The company did not have a safety and soundness regulator until 1992, lacked any explicit guarantee or insurance from the government, and had the ability to borrow up to $2.5 billion from the Treasury.  Despite the lack of a formal guarantee of Fannie Mae's debt, the market assumed that the government would take steps to keep the company functioning if Fannie Mae threatened to fail.  The ambiguity of this assurance meant that the company did not receive the full benefit of a guarantee in lower interest rates on its debt and that buyers of the company's debt were at risk for some unknown percentage of their investment.

---

[48] OFHEO, *Report to Congress* 5 (June 2003) (attached as Ex. 23).

[49] "OFHEO Issues Consent Orders Regarding Former Fannie Mae Executives," OFHEO News Release (Apr. 18, 2008) (attached as Ex. 24).

Federal legislation in 1992 moved Fannie Mae closer to the traditional model of a regulated financial institution and made explicit that its public policy role went beyond providing liquidity to the general mortgage market to making affirmative efforts specifically to serve households below the median income. (A similar expansion of public responsibility was applied to depository institutions much earlier, through the Community Reinvestment Act.)

It has been argued that this mixing of public purpose with a for-profit enterprise leads to irreconcilable conflicts. However, such an admixture is not new or unique. As mentioned, depository institutions operate under government charters and receive substantial benefits from the government, including a full faith and credit guarantee of deposits. In return, they have been given certain obligations to serve their communities. Defense contractors primarily serve a public purpose with their production, but are, in most cases, ordinary, for-profit corporations. Deregulated electric energy companies can exercise certain governmental powers, such as eminent domain, while also earning private profits. This is not to say there are not conflicts to be resolved; only that the need to resolve those conflicts exists in many businesses whose work significantly affects public policy objectives. (The issue of conflicts does not go away simply by changing the ownership of the entity from common shareholders to a cooperative-type structure.)

It has also been argued that Fannie Mae receives a subsidy that is not adequately reflected in the budget or paid for by the company. First, there is no doubt that Fannie Mae receives a benefit from its status as a GSE. Second, if those benefits are treated as a subsidy there is already a mechanism for recording them in the federal budget. Under credit reform, the present value cost of a government guarantee is supposed to be recorded as an outlay in the budget. To date, this has not been done with Fannie Mae. One reason for that may be that, until recently, under the economic assumptions of the government and the risk-based capital rules imposed on Fannie Mae, the likely outcome of the calculation would be that there was no present value cost of the implicit guarantee. Finally, as a federal taxpayer, Fannie Mae was subject to the corporate income tax, which would have more than compensated the government for any reasonable cost of its implicit guarantee in the pre-financial-meltdown period. Obviously, no level of fee from Fannie Mae, commercial banks, investment banks, or insurance companies could have compensated the federal government for the extraordinary costs it has incurred in dealing with the financial crisis.

In light of the costs the federal government may incur in addressing the financial problems of Fannie Mae and Freddie Mac, some people have said that the GSEs had a deal where the profits they made were privatized and the costs were socialized. That, of course, can be said of any situation where the government bails out a for-profit enterprise. But the assertion is not entirely correct in the cases of Fannie and Freddie. When the government sold its interest in Fannie Mae in 1968, the company had less than $2 billion of equity capital. When I announced my retirement as CEO at the end of 2004, the company had $38.9 billion of equity capital. By the end of 2007, shareholder equity had risen to $44 billion. This capital, all the property of private shareholders, stood between the losses of the company and the U.S. Treasury as the company incurred losses in 2008.

Some might allege that stockholders prospered by receiving dividends from the company, which is true. However, the company paid out dividends equal to less than 25 percent of its after-tax

income. That means that three-quarters of the profits remained in the company to absorb the risks of the business.

Moreover, at the end of 2004, the common stock of Fannie Mae had a market value of about $70 billion despite the accounting controversy. The stock value was 1.8 times the book value of the company measured by shareholder equity. That multiple indicated that common stock shareholders had high expectations for the future profitability of the company. The value of the company's stock has moved down over the last four years and is currently worth less than $1 billion. Thus, Fannie Mae shareholders can argue that they, not the government, have been the biggest losers from the company's current problems.

The GSE model is a far from perfect way to achieve the goal of using private capital to achieve the public purpose of homeownership and affordable rental housing. However, if the public policy goal remains the same, it will be hard to find a model that has more benefits and fewer demerits than the model that worked reasonably well for almost seven decades at Fannie Mae.

**Conclusion**

It has been almost four years since my decisions have had any impact on Fannie Mae, the housing market, or the global market for mortgages and mortgage-backed securities.

I continue to believe in the mission for which Congress created Fannie Mae and Freddie Mac, to expand middle- and low-income home ownership by providing liquidity to the primary mortgage market. This function frees capital so that lenders can help prospective home buyers into homes. I believe that, properly regulated, these entities have a more important role than ever to play in increasing the liquidity in the mortgage market and innovating solutions to today's mortgage-financing crisis.

Thank you, and I would be happy to answer any questions.

# Exhibit L



# Report to Congress
## 2008



## Table 4. Fannie Mae Balance Sheet

| End of Period | Balance Sheet (S in Millions) | | | | | | | Mortgage-Backed Securities Outstanding (S in Millions) | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Assets[1] (S) | Total Mortgage Assets[2] (S) | Nonmortgage Investments[3] (S) | Debt Outstanding (S) | Shareholders' Equity (Deficit)[4] (S) | Core Capital[4] (S) | Fair Value of Net Assets (S) | Total MBS Outstanding[5] (S) | Multiclass MBS Outstanding[6] (S) |
| 4Q08 | 912,404 | 767,989 | 71,550 | 870,393 | (15,314) | (8,641) | (105,150) | 2,289,459 | 481,137 |
| 3Q08 | 896,615 | 746,496 | 49,634 | 831,310 | 9,276 | 16,645 | (46,422) | 2,278,170 | 491,423 |
| 2Q08 | 885,918 | 738,964 | 60,941 | 799,502 | 41,226 | 46,964 | 12,452 | 2,252,282 | 491,738 |
| 1Q08 | 843,227 | 717,529 | 52,710 | 760,340 | 38,836 | 42,676 | 12,210 | 2,200,958 | 492,287 |
| Annual Data | | | | | | | | | |
| 2008 | 912,404 | 767,989 | 71,550 | 870,393 | (15,314) | (8,641) | (105,150) | 2,289,459 | 481,137 |
| 2007 | 882,547 | 723,620 | 86,875 | 796,299 | 44,011 | 45,373 | 35,799 | 2,118,909 | 490,692 |
| 2006 | 843,936 | 726,434 | 56,983 | 767,046 | 41,506 | 41,950 | 43,699 | 1,777,550 | 456,970 |
| 2005 | 834,168 | 736,803 | 46,016 | 764,010 | 39,302 | 39,433 | 42,199 | 1,598,918 | 412,060 |
| 2004 | 1,020,934 | 925,194 | 47,839 | 953,111 | 38,902 | 34,514 | 40,094 | 1,408,047 | 368,567 |
| 2003 | 1,022,275 | 919,589 | 59,518 | 961,280 | 32,268 | 26,953 | 28,393 | 1,300,520 | 398,516 |
| 2002 | 904,739 | 820,627 | 39,376 | 841,293 | 31,899 | 20,431 | 22,130 | 1,040,439 | 401,406 |
| 2001 | 799,948 | 706,347 | 65,982 | 763,467 | 18,118 | 25,182 | 22,675 | 863,445 | 392,457 |
| 2000 | 675,224 | 607,731 | 52,347 | 642,682 | 20,838 | 20,827 | 20,677 | 706,722 | 334,508 |
| 1999 | 575,308 | 523,103 | 37,299 | 547,619 | 17,629 | 17,876 | 20,525 | 679,145 | 335,514 |
| 1998 | 485,146 | 415,434 | 58,515 | 460,291 | 15,453 | 15,465 | 14,885 | 637,143 | 361,613 |
| 1997 | 391,673 | 316,592 | 64,596 | 369,774 | 13,793 | 13,793 | 15,982 | 579,138 | 388,360 |
| 1996 | 351,041 | 286,528 | 56,606 | 331,270 | 12,773 | 12,773 | 14,556 | 548,173 | 339,798 |
| 1995 | 316,550 | 252,868 | 57,273 | 299,174 | 10,959 | 10,959 | 11,037 | 513,230 | 353,528 |
| 1994 | 272,508 | 220,815 | 46,335 | 257,230 | 9,541 | 9,541 | 10,924 | 486,345 | 378,733 |
| 1993 | 216,979 | 190,169 | 21,396 | 201,112 | 8,052 | 8,052 | 9,126 | 471,306 | 381,865 |
| 1992 | 180,978 | 156,260 | 19,574 | 166,300 | 6,774 | Not Applicable | 9,096 | 424,444 | 312,369 |
| 1991 | 147,072 | 126,679 | 9,836 | 133,937 | 5,547 | Before 1993 | Not Available | 355,284 | 224,806 |
| 1990 | 133,113 | 114,066 | 9,868 | 123,403 | 3,941 | | Before 1992 | 288,075 | 127,278 |
| 1989 | 124,315 | 107,981 | 8,338 | 116,064 | 2,991 | | | 216,512 | 64,826 |
| 1988 | 112,258 | 100,099 | 5,289 | 105,459 | 2,260 | | | 170,097 | 26,660 |
| 1987 | 103,459 | 93,665 | 3,468 | 97,057 | 1,811 | | | 135,734 | 11,359 |
| 1986 | 99,621 | 94,123 | 1,775 | 93,563 | 1,182 | | | 95,568 | Not Issued |
| 1985 | 99,076 | 94,609 | 1,466 | 93,985 | 1,009 | | | 54,552 | Before 1987 |
| 1984 | 87,798 | 84,135 | 1,840 | 83,719 | 918 | | | 35,738 | |
| 1983 | 78,383 | 75,247 | 1,689 | 74,594 | 1,000 | | | 25,121 | |
| 1982 | 72,981 | 69,356 | 2,430 | 69,614 | 953 | | | 14,450 | |
| 1981 | 61,578 | 59,629 | 1,047 | 58,551 | 1,080 | | | 717 | |
| 1980 | 57,879 | 55,589 | 1,556 | 54,880 | 1,457 | | | Not Issued | |
| 1979 | 51,300 | 49,777 | 843 | 48,424 | 1,501 | | | Before 1981 | |
| 1978 | 43,506 | 42,103 | 834 | 40,985 | 1,362 | | | | |
| 1977 | 33,980 | 33,252 | 318 | 31,890 | 1,173 | | | | |
| 1976 | 32,393 | 31,775 | 245 | 30,565 | 983 | | | | |
| 1975 | 31,596 | 30,820 | 239 | 29,963 | 861 | | | | |
| 1974 | 29,671 | 28,666 | 466 | 28,168 | 772 | | | | |
| 1973 | 24,318 | 23,589 | 227 | 23,000 | 680 | | | | |
| 1972 | 20,346 | 19,652 | 268 | 19,239 | 559 | | | | |
| 1971 | 18,591 | 17,886 | 349 | 17,672 | 460 | | | | |

Source: Fannie Mae

1 Beginning in 1996, the guaranty liability for Fannie Mae MBS held as investments is classified as a liability.

2 Gross mortgage assets net of unamortized purchase premiums, discounts, and cost basis adjustments and, beginning in 2002, fair value adjustments on available-for-sale and trading securities, as well as impairments on available-for-sale securities. Excludes the allowance for loan losses on loans held for investment. The amounts for 1999 through 2001 include certain loans held for investment that were previously classified as nonmortgage investments.

3 Data reflect unpaid principal balance net of unamortized purchase premiums, discounts, and cost basis adjustments, as well as fair-value adjustments and impairments on available-for-sale and trading securities. Since 2005, advances to lenders are not included. Amounts for periods prior to 2005 may include or consist of advances to lenders. Prior to 1982, the majority of nonmortgage investments consisted of U.S. government securities and agency securities.

4 The sum of (a) the stated value of outstanding common stock (common stock less Treasury stock); (b) the stated value of outstanding noncumulative perpetual preferred stock; (c) paid-in capital; and (d) retained earnings (accumulative deficit), less Treasury stock. Core capital excludes accumulated other comprehensive income (loss).

5 Unpaid principal balance of Fannie Mae MBS held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once.

6 Beginning in 2005, consists of securities guaranteed by Fannie Mae that are backed by Ginnie Mae collateral, grantor trusts, and REMICs, as well as stripped MBS backed by Fannie Mae certificates.

## Table 13.  Freddie Mac Balance Sheet

| End of Period | Balance Sheet ($ in Millions) | | | | | | | Mortgage-Backed Securities Outstanding ($ in Millions)[1] | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Assets ($) | Total Mortgage Assets[2] ($) | Non-Mortgage Investments ($) | Debt Outstanding ($) | Shareholders' Equity (Deficit) ($) | Core Capital[3] ($) | Fair Value of Net Assets ($) | Total MBS Outstanding ($) | Multiclass MBS Outstanding[4] ($) |
| 4Q08 | 850,963 | 748,746 | 18,944 | 843,021 | (30,731) | (13,174) | (95,600) | 1,402,714 | 517,475 |
| 3Q08 | 804,390 | 695,077 | 18,410 | 783,950 | (13,795) | 10,839 | (42,400) | 1,459,462 | 515,587 |
| 2Q08 | 879,043 | 761,328 | 28,134 | 835,812 | 12,948 | 37,128 | (5,600) | 1,409,896 | 513,179 |
| 1Q08 | 802,992 | 687,940 | 65,458 | 759,769 | 16,024 | 38,320 | (5,200) | 1,437,227 | 520,396 |
| Annual Data | | | | | | | | | |
| 2008 | 850,963 | 748,746 | 18,944 | 843,021 | (30,731) | (13,174) | (95,600) | 1,402,714 | 517,475 |
| 2007 | 794,368 | 710,042 | 41,663 | 738,557 | 26,724 | 37,887 | 12,600 | 1,381,863 | 526,604 |
| 2006 | 804,910 | 700,002 | 68,614 | 744,341 | 26,914 | 35,366 | 31,800 | 1,122,761 | 491,696 |
| 2005 | 806,222 | 709,503 | 57,324 | 748,792 | 25,691 | 35,043 | 30,900 | 974,200 | 437,668 |
| 2004 | 795,284 | 664,582 | 62,027 | 731,697 | 31,416 | 34,106 | 30,900 | 852,270 | 390,516 |
| 2003 | 803,449 | 660,531 | 53,124 | 739,613 | 31,487 | 32,417 | 27,300 | 752,164 | 347,833 |
| 2002 | 752,249 | 589,899 | 91,871 | 665,696 | 31,330 | 28,991 | 22,900 | 729,809 | 392,545 |
| 2001 | 641,100 | 503,769 | 89,849 | 578,368 | 19,624 | 20,181 | 18,300 | 653,084 | 299,652 |
| 2000 | 459,297 | 385,451 | 43,521 | 426,899 | 14,837 | 16,273 | Not Available Before 2001 | 576,101 | 309,185 |
| 1999 | 386,684 | 322,914 | 34,152 | 360,711 | 11,525 | 13,417 | | 537,883 | 316,168 |
| 1998 | 321,421 | 255,670 | 42,160 | 287,396 | 10,835 | 11,266 | | 478,351 | 260,504 |
| 1997 | 194,597 | 164,543 | 16,430 | 172,842 | 7,521 | 7,376 | | 475,985 | 233,829 |
| 1996 | 173,866 | 137,826 | 22,248 | 156,981 | 6,731 | 6,743 | | 473,065 | 237,939 |
| 1995 | 137,181 | 107,706 | 12,711 | 119,961 | 5,863 | 5,829 | | 459,045 | 246,336 |
| 1994 | 106,199 | 73,171 | 17,808 | 93,279 | 5,162 | 5,169 | | 460,656 | 264,152 |
| 1993 | 83,880 | 55,938 | 18,225 | 49,993 | 4,437 | 4,437 | | 439,029 | 265,178 |
| 1992 | 59,502 | 33,629 | 12,542 | 29,631 | 3,570 | Not Applicable Before 1993 | | 407,514 | 218,747 |
| 1991 | 46,860 | 26,667 | 9,956 | 30,262 | 2,566 | | | 359,163 | 146,978 |
| 1990 | 40,579 | 21,520 | 12,124 | 30,941 | 2,136 | | | 316,359 | 88,124 |
| 1989 | 35,462 | 21,448 | 11,050 | 26,147 | 1,916 | | | 272,870 | 52,865 |
| 1988 | 34,352 | 16,918 | 14,607 | 26,882 | 1,584 | | | 226,406 | 15,621 |
| 1987 | 25,674 | 12,354 | 10,467 | 19,547 | 1,182 | | | 212,635 | 3,652 |
| 1986 | 23,229 | 13,093 | Not Available Before 1987 | 15,375 | 953 | | | 169,186 | 5,333 |
| 1985 | 16,587 | 13,547 | | 12,747 | 779 | | | 99,909 | 5,047 |
| 1984 | 13,778 | 10,018 | | 10,999 | 606 | | | 70,026 | 3,214 |
| 1983 | 8,995 | 7,485 | | 7,273 | 421 | | | 57,720 | 1,669 |
| 1982 | 5,999 | 4,679 | | 4,991 | 296 | | | 42,952 | Not Issued Before 1983 |
| 1981 | 6,326 | 5,178 | | 5,680 | 250 | | | 19,897 | |
| 1980 | 5,478 | 5,006 | | 4,886 | 221 | | | 16,962 | |
| 1979 | 4,648 | 4,003 | | 4,131 | 238 | | | 15,316 | |
| 1978 | 3,697 | 3,038 | | 3,216 | 202 | | | 12,017 | |
| 1977 | 3,501 | 3,204 | | 3,110 | 177 | | | 6,765 | |
| 1976 | 4,832 | 4,175 | | 4,523 | 156 | | | 2,765 | |
| 1975 | 5,899 | 4,878 | | 5,609 | 142 | | | 1,643 | |
| 1974 | 4,901 | 4,469 | | 4,684 | 126 | | | 780 | |
| 1973 | 2,873 | 2,521 | | 2,696 | 121 | | | 791 | |
| 1972 | 1,772 | 1,726 | | 1,639 | 110 | | | 444 | |
| 1971 | 1,038 | 935 | | 915 | 107 | | | 64 | |

Source: Freddie Mac

[1]  Based on unpaid principal balances held by third parties, and excludes mortgage loans and mortgage-related securities traded but not yet settled.

[2]  Excludes allowance for loan losses.

[3]  The sum of (a) the stated value of outstanding common stock, (b) the stated value of outstanding noncumulative perpetual preferred stock, (c) paid-in capital, and (d) retained earnings (accumulated deficit), less Treasury stock.

[4]  Amounts are included in total MBS outstanding column.

# Exhibit M

**Single-Family MBS Prospectus**



### Guaranteed Mortgage Pass-Through Certificates
### (Single-Family Residential Mortgage Loans)

**The Certificates**

We, the Federal National Mortgage Association or Fannie Mae, will issue and guarantee the mortgage pass-through certificates. Each issue of certificates will have its own identification number and will represent the ownership of a pool of residential mortgage loans secured by single-family (one- to four-unit) dwellings, or by a pool of participation interests in loans of that type.

**Fannie Mae Guaranty**

We guarantee that the holders of the certificates will receive timely payments of interest and principal. We alone are responsible for making payments under our guaranty. **The certificates and payments of principal and interest on the certificates are not guaranteed by the United States, and do not constitute a debt or obligation of the United States or any of its agencies or instrumentalities other than Fannie Mae.**

---

**Consider carefully the risk factors section beginning on page 9. Unless you understand and are able to tolerate these risks, you should not invest in the certificates.**

---

**The certificates are exempt from registration under the Securities Act of 1933, as amended, and are "exempted securities" under the Securities Exchange Act of 1934, as amended. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these certificates or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**The date of this Prospectus is January 1, 2006.**

**Even if the mortgage loans are prepaid at a rate that on average is consistent with your expectations, variations in the rate of prepayment over time can significantly affect your yield.**

Generally, the earlier the payment of principal, the greater the effect on the yield to maturity. As a result, if the rate of principal prepayment during any period is faster or slower than you expect, a corresponding reduction or increase in the prepayment rate during a later period may not fully offset the effect of the earlier prepayment rate on your yield.

**Borrowers could make full or partial prepayments of principal, accelerating the rate at which you receive your return of principal on the certificates.**

Some borrowers may elect to make a full or partial principal prepayment and thereby reduce or eliminate their outstanding loan balance. The outstanding principal balance of the certificates will be reduced by the amount of this prepaid principal, resulting in an earlier return of principal than otherwise might be the case. While this risk of prepayment is applicable to all pool types, it is particularly noteworthy in the context of pools that contain loans obligating the borrower to pay only interest for a stated period, before beginning to amortize principal. Although these loans are interest-only for that stated period, distributions on the certificates during and after that stated period will typically include any unscheduled payment of principal made by the borrower.

*Refinance Environment*

**Prevailing interest rates could decline, causing borrowers to prepay their loans and refinance at a lower mortgage interest rate, accelerating the rate at which you receive your return of principal on the certificates.**

If prevailing rates decline and borrowers are able to obtain new loans at lower rates, they are more likely to refinance their mortgage loans. As a result, you could receive payments of principal on the certificates more quickly than you expect, at a time when reinvestment rates are lower. The mortgage loans may or may not contain prepayment premiums that discourage borrowers from prepaying.

**The mortgage origination industry could change its procedures and prices for refinancing loans, accelerating the rate at which you receive your return of principal on the certificates.**

Mortgage originators are continually reviewing and revising procedures to ease the burden for themselves and borrowers of processing refinance loans. Sometimes these changes occur with our cooperation. Their changes may include reducing the amount of documentation required to refinance and easing their underwriting standards. In addition, mortgage originators are working to find ways to reduce borrower costs to refinance. To the extent mortgage originators are successful in streamlining procedures and reducing costs for refinancing, this could encourage borrowers to refinance their loans. An increase in the prevalence of refinances of the mortgage loans in the pool will accelerate the rate at which you receive payments of principal on your certificates.

11

every 14 days. The amount that is due every 14 days is one-half of the amount that would have been due on an otherwise identical loan with 12 equal monthly payments. Since payments are made every 14 days, 26 payments are made per year (27 in some years). Therefore, biweekly payments are made as if there were one additional payment made each year (1 ½ in some years) on a comparable monthly payment loan. In addition, because of the manner in which the biweekly payment amount is calculated, a biweekly loan with a higher interest rate will amortize more rapidly than an otherwise identical biweekly loan with a lower interest rate. Consequently, biweekly mortgage loans have a reduced term, when compared with otherwise identical monthly payment loans. This is because the principal balance of each loan is reduced every 14 days, and because the total dollar amount of payments made in a year is more than the total dollar amount of the payments made in a year on a monthly payment mortgage loan with the same principal balance and interest rate. Certificates backed by pools of biweekly mortgage loans have shorter stated maturities, usually in the range of approximately 20 years, as compared with certificates backed by monthly payment loans. Certificates backed by pools of biweekly loans with higher interest rates will have shorter stated terms to maturity as compared with certificates backed by biweekly loans with lower interest rates.

   *Biweekly Collection Option Mortgage Loans.*   Unlike the traditional biweekly mortgage loans described above, which require biweekly payment for the entire term of a mortgage loan, some mortgage loans have terms that allow a borrower to switch between a biweekly and monthly payment during the mortgage term. If borrowers choose the biweekly payment option, then principal collections on these mortgage loans during that collection period may reduce the mortgage loan principal balance faster than if the principal balance of the mortgage loans was being reduced with monthly payments. If we include mortgage loans with a biweekly collection option in a pool, we will use a special prefix or prospectus supplement.

   *Borrower Refinancing.*   Generally, when current interest rates decline below the mortgage interest rates on existing loans, prepayments will increase. In a declining interest rate environment, borrowers often refinance their mortgage loans. When a borrower refinances a loan in a pool, the proceeds from the borrower's new loan pay off the loan in the pool. This results in a prepayment for the certificateholders. Certain adjustable-rate loans have long initial fixed-rate interest periods. Because of the potential for a significant rate increase for these loans at the first interest rate change date, borrowers may be more likely to refinance at the first change date or in anticipation of the first change date.

   It is increasingly difficult to predict how far interest rates must decline before significant prepayments occur. This difficulty results from several developments. For instance, various lenders (in some cases in conjunction with us) have instituted streamlined refinance procedures and liberalized fee structures and underwriting guidelines. That may increase the number of borrowers who are eligible for refinance loans, and may narrow the interest rate differential that would make refinancing attractive to borrowers. In addition, increased borrower sophistication regarding the benefits of refinancing and extensive mass solicitation of borrowers by lenders (including our mortgage loan servicers) may increase the frequency with which borrowers refinance their mortgage loans. Our policy permits lenders who service mortgage loans in our pools to advertise in a general manner their availability and willingness to make new refinancing loans, but does not permit them to specifically target borrowers whose loans are in our pools.

   *Loan Modifications.*   While we do allow repurchase and modification of certain non-performing loans under terms specified in our trust indenture, we generally prohibit lenders servicing our performing loans from (i) repurchasing mortgage loans from our pools for the purpose of making loan modifications or (ii) modifying mortgage loans that are in our pools.

   In the case of some adjustable-rate loan pools, however, a lender may repurchase performing adjustable-rate loans in order to modify them as part of the lender's borrower retention strategy. Our policy prohibiting lenders from specifically targeting borrowers whose loans are in our pools in their solicitations applies. Repurchase of those adjustable-rate loans will result in an early repayment of

27

### "J" Prefix Pools

If over 15% of the aggregate principal balance of a pool on its issue date is composed of at least two types of the three special feature mortgage loans described above (relocation loans, cooperative share loans, and buydown loans), we will designate the pool with a special "J" prefix. For example, if relocation mortgage loans constitute 9% and buydown mortgage loans constitute 8% of a pool, the pool will be designated with a "J" prefix, and the percentages of each category of mortgage loans will be included in the prospectus supplement. The "J" prefix also may be used to call attention to additional special disclosure characteristics that are included in a prospectus supplement for certain fixed-rate pools.

### Community Reinvestment Act Mortgage Loans

Many lenders that sell loans to us are required to ensure that they meet the credit needs of their entire community, including low- and moderate-income neighborhoods, pursuant to the Community Reinvestment Act. Mortgage loans originated to meet the Community Reinvestment Act objectives are subject to our eligibility and underwriting criteria and policies as we may waive or modify them from time to time. In addition, the mortgaged properties may be concentrated in low-and moderate-income neighborhoods and localities. The prospectus supplement for certain pools may include loan-level details regarding the census tract information of the properties securing the mortgage loans, the borrowers' income levels and loan balances, or information on how and when these loan-level details can be obtained at a later time. An investor must make its own determination as to whether a particular pool meets the Community Reinvestment Act objectives or other objectives relevant to that particular investor.

### Reperforming Government Mortgage Loans

Some pools are composed entirely of FHA and VA mortgage loans that were ninety days or more delinquent during the twelve months immediately prior to issuance of the certificates. The pool prefix or the prospectus supplement will indicate if this is the case. These loans are referred to as reperforming mortgage loans because all the mortgage loans in the pool will be current as of the date of issuance of the related certificates. Reperforming FHA and VA mortgage loans may experience more delinquencies and a faster rate of prepayment than mortgage loans without similar delinquency histories, although we have no statistical data to indicate if this is the case.

## FANNIE MAE PURCHASE PROGRAM

The mortgage loans we purchase must meet standards required by the law under which we were chartered, which we refer to as the Charter Act. These standards require that the mortgage loans be, in our judgment, of a quality, type and class consistent with the purchase standards imposed by private institutional mortgage investors. Consistent with those requirements, and with the purposes for which we were chartered, we establish eligibility criteria and policies for the mortgage loans we purchase, for the sellers from whom we purchase loans, and for the servicers who service our mortgage loans. See "**FANNIE MAE**" above for information regarding the Charter Act and the charter purpose.

## Selling and Servicing Guides

Our eligibility criteria and policies, summarized below, are set forth in our Selling and Servicing Guides (Guides) and updates and amendments to these Guides. We amend our Guides and our eligibility criteria and policies from time to time. This means it is possible that not all the mortgage loans in a particular pool will be subject to the same eligibility standards. It also means that the standards described in the Guides may not be the same as the standards that applied when loans in a particular pool were originated. We also may waive or modify our eligibility and loan underwriting requirements or policies when we purchase mortgage loans.

**Mortgage Loan Eligibility Standards—Conventional Loans**

### Dollar Limitations

The Charter Act requires that we establish maximum original principal balance dollar limitations for the conventional loans that we purchase. These limitations, which we refer to as our conforming loan limits, typically are adjusted annually. As of January 1, 2006, our conforming loan limit for conventional loans secured by first liens on residences containing one dwelling unit is $417,000, except for mortgage loans secured by property in Alaska, Guam, Hawaii or the Virgin Islands where it is $625,500. Our conforming loan limit as of January 1, 2006 for conventional loans secured by first liens on residences containing two dwelling units is $533,850, three dwelling units is $645,300 and four dwelling units is $801,950, except for mortgage loans secured by property in Alaska, Guam, Hawaii or the Virgin Islands where it will be 50% higher. Our conforming loan limit for mortgage loans secured by subordinate liens on single-family one- to four-unit residences is 50% of the amount for first lien loans secured by one unit residences, or, as of January 1, 2006, $208,500, except in Alaska, Guam, Hawaii and the Virgin Islands, where it is $312,750. In addition, the aggregate original principal balance of all the mortgage loans we own that are secured by the same residence cannot exceed the amount of our first lien conforming loan limit for single-family one- to four-unit residences. Aside from the limits imposed under the Charter Act, we may, from time to time, impose maximum dollar limitations on specific types of mortgage loans that we purchase.

### Loan-to-Value Ratios

The Charter Act requires that we obtain credit enhancement whenever we purchase a conventional mortgage loan secured by a single-family one- to four-unit residence with a loan-to-value ratio over 80%. The credit enhancement may take several forms, including mortgage insurance issued by an insurer acceptable to us covering the amount in excess of 80%, repurchase arrangements with the seller of the mortgage loans, and seller-retained participation interests. In our discretion, we may impose credit enhancement requirements that are more restrictive than those of the Charter Act.

Our loan-to-value ratio requirements for loans we purchase vary depending upon a variety of factors which, for example, can include the type of loan, the loan purpose, loan amount, number of dwelling units in the property securing the loan, repayment terms and borrower credit history. Depending upon these factors, the loan-to-value ratio can be as high as 100%.

### Underwriting Guidelines

We have established underwriting guidelines for mortgage loans that we purchase. These guidelines are designed to provide a comprehensive analysis of the characteristics of a borrower and a mortgage loan, including such factors as the borrower's credit history, the purpose of the loan, the property value and the loan amount.

We review and change our underwriting guidelines, from time to time, including expanding our underwriting criteria in order to make home loans more accessible to borrowers who are members of groups that have been underserved by mortgage lenders, including low and moderate income families, people with no prior credit history and those with less than perfect credit history, rural residents and people with special housing needs. In our discretion, we may grant waivers from our underwriting guidelines when we purchase any particular mortgage loan.

**Mortgage Loan Eligibility Standards—Government Insured Loans**

### Dollar Limitations

The Charter Act sets no maximum dollar limitations on the loans that we can purchase if the loans are government loans.

## POOL STATISTICS METHODOLOGY

We provide to certificateholders the information as reported to us by lenders. If a lender has delivered mortgages that are not within the parameters that a lender represents and warrants to us, the lender may be obligated to repurchase the affected mortgage loans. Certificateholders should make their own conclusions regarding the data provided in the prospectus supplement.

We may update certain information about each pool on an ongoing monthly basis on our Web site.

The issue date unpaid principal balance of each pool may vary by up to 1% from the amount specified in the prospectus supplement.

[1] *Seller and Servicer*

We will provide the name of the seller (the entity that delivered the mortgage loans to us) and the servicer (the entity that is servicing the mortgage loans upon delivery to us) for each pool. For pools that have multiple sellers, we will state "multiple" in the pool statistics section of the prospectus supplement. For pools that have multiple servicers, we will provide a table in the pool statistics section of the prospectus supplement listing the names of all servicers that service five or more percent of the pool (calculated by unpaid principal balance as of the issue date), the number of loans serviced by each of these servicers, the percent of the pool's unpaid principal balance as of the issue date that they service and the aggregate unpaid principal balance of the loans each of them services.

[2] *Average Original Loan Size*

On the issue date, we will calculate both a simple average and a quartile distribution of the original unpaid principal balances of all the underlying mortgage loans.

[3] *Initial Interest Rate Change Date*

For adjustable-rate mortgage loans, we state the first interest rate change date of the loan that has the earliest first interest rate change date in the pool.

[4] *Weighted Average Months to Roll*

For adjustable-rate mortgage loans, on the issue date, we will calculate a weighted average of the number of months until the next interest rate change date for each mortgage loan in the pool.

[5] *Weighted Average Coupon Rate*

On the issue date, we will calculate both a weighted average and a quartile distribution of the interest rates then in effect on the underlying mortgage loans.

[6] *Maximum Pool Accrual Rate*

For a pool containing adjustable-rate mortgage loans, on the issue date, we will calculate the maximum pool accrual rate that would accrue for that pool if all of the underlying mortgage loans were accruing interest at the maximum rate provided in their respective loan documents.

[7] *Minimum Pool Accrual Rate*

For a pool containing adjustable-rate mortgage loans, on the issue date, we will calculate the minimum pool accrual rate that would accrue for that pool if all of the underlying mortgage loans were accruing interest at the minimum rate provided in their respective loan documents. Generally, the minimum pool accrual rate will not be less than the weighted average of the MBS margins of the mortgage loans in the pool.

[8] *Loan Age*

On the issue date, we will calculate both a weighted average and a quartile distribution of the ages of the underlying mortgage loans. The age of a mortgage loan is the number of months from the loan's origination to the issue date of the security. For purposes of calculating this data element, origination shall mean the date on which the first full month of interest begins to accrue on the mortgage loan.

**(9)** *Loan Term*

On the issue date, we will calculate both a weighted average and a quartile distribution of the loan terms of the underlying mortgage loans. The loan term for a mortgage loan is the number of months in which regular scheduled borrower payments are due under the terms of the related mortgage note.

**(10)** *Remaining Maturity*

On the issue date, we will calculate both a weighted average and a quartile distribution of the calculated maturity for the underlying mortgage loans. The calculated maturity for a mortgage loan is the number of months remaining until the borrower will pay off his mortgage loan, assuming that a borrower makes all future scheduled required payments on time as set forth in the mortgage note but makes no additional prepayment after the date of calculation. The calculated maturity for a loan may be earlier than the maturity date stated in the note if a borrower has made any partial prepayments prior to the date of calculation. The maturity date of a pool as stated in the prospectus supplement is the latest calculated maturity for any of the underlying mortgage loans, as calculated on the issue date for such pool.

**(11)** *Loan-to-Value Ratio*

We will calculate both a weighted average and a quartile distribution of the loan-to-value ratios for the mortgage loans, which are expressed as percentages. We generally require the loan-to-value ratio of an underlying mortgage loan in a pool to be a comparison of the delivery date unpaid principal balance of the mortgage loan and either (1) in the case of a purchase, the lower of the sales price of a mortgaged property or its appraised value at the time of a sale or (2) in the case of a refinancing, the appraised or estimated value of the mortgaged property at the time of refinancing. However, we sometimes use other methods to determine the value of a mortgaged property. For instance, the loan-to-value ratio for some mortgage loans that are refinancings is based on a comparison of the delivery date unpaid principal balance of that loan and the value that was determined at the origination of the mortgage loan being refinanced. In any case, appraisals or other valuation methods are merely estimates of the mortgaged property values and may not reflect the actual amount received upon sale or liquidation. For pools containing government mortgage loans, such as mortgage loans insured by FHA or guaranteed by VA, we do not provide loan-to-value ratios.

**(12)** *Credit Score of Borrowers*

Credit scores are often used by the financial services industry to evaluate the quality of borrowers' credit. Credit scores are typically based on a proprietary statistical model that is developed for use by credit data repositories. These credit repositories apply the model to borrower credit information to come up with a credit score. One statistical model used widely in the financial services industry was developed by Fair, Isaac & Company, Inc. ("Fair Isaac"). This model is used to create a credit score called the FICO® score. FICO scores can vary depending on which credit repository is using the Fair Isaac model to supply the score. FICO scores, as reported by the credit repositories, may range from a low of 150 to a high of 950. According to Fair Isaac, a high FICO score indicates a lesser degree of credit risk.

Sellers that provide us with credit scores typically deliver FICO credit scores. If credit scores have been provided to us for underlying mortgage loans in a pool, we will provide both a weighted average and a quartile distribution of the scores in the prospectus supplement. We request our sellers to provide us credit scores, as a matter of course. If no credit score is delivered, the prospectus supplement will set forth the percentage of the unpaid principal balance of the loans for which no credit score was delivered. These loans will be excluded from the quartile distribution and from the weighted average calculation. The credit scores provided to us were obtained at a single point between the date of application for a mortgage loan and the date of origination of a mortgage loan. Certificateholders should note that a borrower's credit score may have changed after the date it was obtained Thus, a credit score obtained at application or at origination may have no relation to a borrower's credit score at the time the MBS backed by that loan is issued. We do not guarantee the methodology used to determine the credit score or the utility of a credit score to a certificateholder.

[13] *% UPB with Interest Only First Distribution*

We provide the percent of the aggregate issue date unpaid principal balance of mortgage loans in a pool that do not have their first scheduled principal payment due until the second due period following the issue date of the certificates. Certificateholders will receive no scheduled principal payment on the first distribution date (but will receive interest) with respect to that percentage of loans.

[14] *Quartile Calculations*

We calculate the quartile figures set forth in the pool statistics as follows. For each mortgage loan characteristic where quartile figures appear, we order each loan in the pool from the highest to the lowest value. For example, we would, in the case of loan-to-value ratios, order each loan in the pool from that with the highest loan-to-value ratio to that with the lowest loan-to-value ratio. The lowest loan-to-value ratio would appear in the pool statistics under "MIN." We determine the next figure in the quartile table for such mortgage loan characteristic by counting the loans starting with the lowest value and continuing upward until the unpaid principal balance of the loans so counted equals twenty-five percent of the issue date principal balance of all the loans in the pool. The value associated with the last loan so counted appears in the quartile distribution table under "25%." We then determine the next figures in the quartile table by counting all of the loans starting with the lowest value and continuing upward until the unpaid principal balance of the loans so counted equals fifty percent of the issue date principal balance of all the loans in the pool. We then repeat this process to determine the value in the quartile table associated with seventy-five percent. The values of the last loan so counted in each case appears in the quartile distribution table under "MED" and "75%," respectively. The highest such value for any mortgage loan in a pool appears in the quartile distribution table under "MAX."

[15] *Loan Purpose*

We will provide information as of the issue date, in a tabular format, on the number of mortgage loans in a pool that are either refinance mortgage loans or purchase money mortgage loans. We also will provide the aggregate dollar amount of these mortgage loans and the percentage of the entire pool (by unpaid principal balance) that these loans constitute.

[16] *Property Type*

We will provide information as of the issue date, in a tabular format, on the number of mortgage loans in a pool that are secured by one unit properties and by two to four unit properties. We also will provide the aggregate dollar amount of these mortgage loans and the percentage of the entire pool (by unpaid principal balance) that these loans constitute.

[17] *Occupancy Type*

We will provide information as of the issue date, in a tabular format, on the number of mortgage loans in a pool that, as of their respective origination dates, were secured by principal residences, second homes, or investment properties. We also will provide the aggregate dollar amount of these mortgage loans and the percentage of the entire pool (by unpaid principal balance) that these loans constitute. The actual occupancy of the properties as of the issue date has not been verified.

[18] *Origination Year*

We will provide information as of the issue date, in a tabular format, regarding the aggregate unpaid principal balance of the underlying mortgage loans originated in a particular year, the count of the loans by such year, and the percentage of the pool's issue date unpaid principal balance that such loans constitute. For purposes of this calculation, origination year shall mean the year in which such loan closed.

[19] *Geographic Distribution*

We will provide information as of the issue date, in a tabular format, regarding the geographic distribution by state of the mortgaged properties underlying the mortgage loans in a pool. We will provide the count of the loans by state, the aggregate unpaid principal balance of those loans, and the percentage of the pool's issue date unpaid principal balance that such loans constitute.

# Exhibit N



# Freddie Mac

## Mortgage Participation Certificates

### Mortgage Participation Certificates

Freddie Mac issues and guarantees Mortgage Participation Certificates, or **"PCs."** PCs are securities that represent undivided beneficial ownership interests in, and receive payments from, pools of one- to four-family residential mortgages.

### Freddie Mac's Guarantee

We guarantee the payment of interest and principal on the PCs as described in this Offering Circular. **Principal and interest payments on the PCs are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac.** We alone are responsible for making payments on our guarantee.

### Tax Status and Securities Law Exemptions

The PCs are not tax-exempt. Because of applicable securities law exemptions, we have not registered the PCs with any federal or state securities commission. No securities commission has reviewed this Offering Circular.

---

**The PCs may not be suitable investments for you.   You should not purchase PCs unless you have carefully considered and are able to bear the associated prepayment, interest rate, yield and market risks of investing in them. The *Risk Factors* section beginning on page 8 highlights some of these risks.**

---

**Offering Circular dated March 19, 2007**

additional credit losses that may be associated with higher LTV ratios: mortgage insurance from an approved mortgage insurer; a seller's agreement to repurchase or replace (for periods and under conditions as we may determine) any Mortgage that has defaulted; or retention by the seller of at least a 10% participation interest in the Mortgages.

The Mortgages we purchase generally do not have LTV ratios exceeding 95%. However, we may reduce or increase the required LTV ratios based on a number of factors, such as the borrower's intended use of Mortgage proceeds, the type of property securing the Mortgage, the existence of special financing arrangements and the market in which the mortgaged property is located. We may from time to time purchase and pool Mortgages having LTV ratios in excess of 95% in order to enable borrowers to purchase homes or refinance existing mortgages and pay certain related expenses. However, we currently do not expect to purchase and pool Mortgages with LTV ratios exceeding 105%.

We use mortgage information available to us to determine which Mortgages we will purchase, the prices we will pay for Mortgages, how to pool the Mortgages we purchase and which Mortgages we will retain in our own portfolio. The information we use varies over time, and may include, among other things, LTV ratio, loan size and age, geographic distribution, weighted average interest rate, purpose or source of origination and credit scoring. We have discretion to determine whether the Mortgages we purchase will be securitized or held in our portfolio.

FHA/VA Mortgages are underwritten using the criteria specified by the Federal Housing Administration, the Veterans Administration or the Rural Housing Service, the federal government agencies which insure or guarantee them, rather than our underwriting standards.

### Eligible Sellers, Servicers and Warranties

We acquire Mortgages only from sellers we approve. We are responsible for supervising the servicing of the Mortgages and we contract with mortgage servicers we have approved to perform most servicing functions on our behalf and in accordance with standards we have established and may change from time to time. We approve sellers and servicers of Mortgages based on a number of factors, including their financial condition, operational capability and mortgage origination and servicing experience. The seller or servicer of a Mortgage need not be the originator of that Mortgage.

When we purchase a Mortgage, we rely on representations and warranties of the seller with respect to certain matters, as is customary in the secondary mortgage market. These representations and warranties cover such matters as:

- The accuracy of the information provided by the borrower.

- The accuracy and completeness of any third party reports prepared by qualified professionals, such as property appraisals and credit reports.

- The validity of each Mortgage as a first or second lien, as applicable.

- The fact that payments on each Mortgage are current at the time of delivery to us.

- The physical condition of the mortgaged property.

- The originator's compliance with applicable state and federal laws, including state anti-predatory lending statutes and other laws that protect borrowers.

22

Our Mortgage custodians check certain stated terms of the Mortgage documents, but we generally do not independently verify the accuracy of the seller's representations and warranties.

### Servicing Responsibilities and Compensation

We generally supervise servicing of the Mortgages according to the policies in our Single-Family Seller/Servicer Guide (the "Guide"). Each servicer is required to perform all services and duties customary to the servicing of mortgages, either directly or through approved subservicers. Those responsibilities include all activities concerning the calculation, collection and processing of Mortgage payments and related borrower inquiries, as well as all Mortgage administrative responsibilities, including claims collection, workouts, foreclosures and reports. We monitor a servicer's performance through periodic and special reports and inspections to ensure it complies with its obligations.

Servicers remit payments to us under various arrangements, but these do not affect the timing of payments to Holders of PCs. We invest payments remitted to us at our own risk and for our own benefit until we pass them through to Holders of PCs.

Servicers receive fees for their services. We generally require that servicers retain a servicing fee of at least 0.25% of the principal balance of the Mortgages they service. However, we may permit lower servicing fee rates for certain servicers or for certain PC Pools. See *Description of the Mortgages — Special Mortgage Characteristics.*

### Prepayments

A borrower may make a full or partial prepayment on a Mortgage at any time without paying a penalty, except for Prepayment Penalty Mortgages. A borrower may partially prepay a Mortgage in order to reduce the number or size of future monthly payments, provided that the Mortgage is current and the prepayment will not result in an interest rate change or an extension of the term. A borrower may fully prepay a Mortgage for several reasons, including an early payoff, a sale of the related mortgaged property or a refinancing of the Mortgage. We pass through all prepayments to the Holders of the related PCs.

### Mortgage Repurchases

We may repurchase Mortgages from PC Pools in certain limited situations. In determining whether a Mortgage should be repurchased, we consider various factors, including whether the repurchase will reduce our administrative costs or our possible exposure under our guarantees and our statutory and other legal obligations.

We always repurchase a Mortgage from its PC Pool shortly before:

- A Balloon/Reset Mortgage reaches its scheduled maturity or reset date, regardless of whether the borrower decides to pay the Mortgage in full or extend it at a reset interest rate.

- A convertible ARM converts to a fixed-rate Mortgage upon the borrower's exercise of the conversion option.

23

# Exhibit O

_**Nat'l Credit Union Admin. Bd., as Liquidating Agent of W. Corp. Fed. Credit Union v.**_
_**RBS Secs., Inc., f/k/a RBS Greenwich Capital Markets, Inc., et al.,**_ Case No. CV 11-5887

Tentative Rulings on:  1) Defendants RBS Securities Inc. (f/k/a RBS Greenwich Capital
Markets, Inc.) and RBS Acceptance Inc.'s (f/k/a Greenwich Capital Acceptance,
Inc.) Motion to Dismiss; 2) Defendants Nomura Asset Acceptance Corp. and
Nomura Home Equity Loan, Inc.'s Motion to Dismiss Plaintiff's Complaint
Pursuant to FRCP 12(b)(6); and 3) Defendant Wachovia Mortgage Loan Trust,
LLC's Motion to Dismiss

## I. Background

The National Credit Union Administration Board ("Plaintiff"), acting in its capacity as the liquidating agent of Western Corporate Federal Credit Union ("WesCorp"), brought this suit on July 18, 2011, against eight players in the residential mortgage-backed securities ("RMBS") market (*see* Complaint ¶¶ 16-24, 34-40) in connection with RMBS that went very, very bad.  The Complaint contains nine claims for relief:  seven alleging violation of Section 11 of the Securities Act of 1933 (the "Securities Act" or the "'33 Act"), one alleging violation of Section 12(a)(2) of the Securities Act, and one alleging violation of Cal. Corp. Code Sections 25401 and 25501. Five of the defendants – RBS Securities Inc. (f/k/a RBS Greenwich Capital Markets, Inc.), RBS Acceptance Inc. (f/k/a Greenwich Capital Acceptance, Inc.),[1] Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc.,[2] and Wachovia Mortgage Loan Trust, LLC ("Wachovia") – now move to dismiss.  Nomura is only a defendant on the first and sixth claims (both Section 11 claims), meaning that there are no state-law claims pled against it.[3]  Wachovia is similarly only named in a federal claim, as it is only implicated by Plaintiff's seventh cause of action, a Section 11 claim.

---

[1] RBS Securities Inc. and RBS Acceptance Inc. will hereinafter be referred to as "RBS."  RBS sold and/or underwrote all of the investments at issue herein.  *See* Complaint ¶¶ 1, 3, 8-9, 17 & Tables 1-2.

[2] Nomura Asset Acceptance Corp. and Nomura Home Equity Loan, Inc. will hereinafter be referred to as "Nomura."

[3] In its opening brief, Nomura indicated that is was a defendant on the first, sixth, eighth and ninth claims. However, only RBS is named as a defendant on the eighth and ninth claims, despite the fact that Nomura's RMBS are named in connection with them.  *See* Complaint ¶¶ 390-91, 399, 401-03, 407.

## II. Analysis

### A. Applicable Standard

Under Rule 12(b)(6), a court must (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pled factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). In its consideration of the motion, the court is limited to the allegations on the face of the Complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *see also see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion"); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir.), *cert. denied*, 512 U.S. 1219 (1994).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007) (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). "A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when 'the running of the statute is apparent on the face of the complaint.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)), *cert. denied*, 131 S.Ct. 3055 (2011). "'[A] complaint cannot be dismissed unless

2

it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Von Saher*, 592 F.3d at 969 (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).

## B. Satisfaction of *Twombly/Iqbal*

Section 11 of the Securities Act provides a private right of action for securities purchasers if an issuer publishes a registration statement in connection with that security that contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *See Sparling v. Daou (In re Daou Sys., Inc., Secs. Litig.)*, 411 F.3d 1006, 1028-29 (9th Cir. 2005) (quoting 15 U.S.C. § 77k). "To prevail in such an action, a plaintiff must prove '(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Id.* at 1027. Section 12(a)(2) of the Securities Act provides for liability "for use of any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes 'an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading....'" *Id.* at 1028-29; 15 U.S.C. § 77*l*(a)(2). California Corporations Code section 25401 imposes liability upon those whom, in offering to sell or selling or in offering to buy or buying a security in California, do so by means of any written or oral communication including an untrue statement of a material fact or omission of a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading. *See* Cal. Corp. Code § 25401; *see also Stewart v. Ragland*, 934 F.2d 1033, 1047 (9th Cir. 1991). Section 25501 of the Corporations Code simply provides the available relief and for certain defenses in connection with a section 25401 violation. *See* Cal. Corp. Code § 25501.

Although the Complaint identifies what Plaintiff alleges are a number of affirmative misrepresentations, *see* Complaint ¶¶ 227-82, 284-95, 297-301, 303-09, the overriding issue on these three motions is whether Plaintiff has stated a sufficient claim under *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009), in that the

originators of the loans backing the RMBS systematically disregarded or abandoned their underwriting guidelines and that the offering documents (*e.g.*, the registration statements, shelf registrations, bases prospectuses and prospectus supplements, *see* Complaint ¶ 3) related to these RMBS thereafter omitted that material information.[4]   In the course of attempting to do so, Plaintiff relies largely – and, with respect to Wachovia, *exclusively* – on post-purchase performance statistics and similar measurements[5] in order to argue that the originators of the loans backing the RMBS *must have* systematically disregarded or abandoned their underwriting guidelines, such that the omission of that fact from the offering documents renders each one of the investments actionable.  *See, e.g.*, Complaint ¶ 66 ("This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by WesCorp, was later discovered to be *indicative of the Originators' systematic disregard of their stated underwriting guidelines.*") (emphasis added); *id.* ¶ 74 ("The actual losses to the mortgage pools underlying the RMBS WesCorp purchased have exceeded expected losses so quickly and by so wide a margin…that a significant portion of the mortgages *could not have been* underwritten as represented in the Offering Documents.") (emphasis added); *id.* ¶¶ 102, 283, 296, 310. There is a strong argument for the conclusion that reliance on these facts to state a claim here is just an example of the conclusory pleading tactic *Twombly* itself expressly rejected – locating an effect and presuming the cause, without the underlying factual

---

[4] For purposes of these motions and in light of its ultimate rulings, there is a question whether the Court can adopt Plaintiff's position that only Fed. R. Civ. P. 8, and not Fed. R. Civ. P. 9(b), is implicated by its claims. *See* Complaint ¶ 4 ("The NCUA Board expressly disclaims and disavows any allegation in this complaint that could be construed as alleging fraud."); *see also id.* ¶¶ 322, 332, 342, 352, 362, 372, 382, 392. *But see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (indicating that Rule 9(b) can apply even where fraud is not an essential element of a claim); *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (indicating that Rule 9(b) applies to section 11 claims that sound in fraud); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) ("In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct."); *Rombach v. Chang*, 355 F.3d 164, 166, 171 (2d Cir. 2004).  Even if Rule 9(b) were implicated, while the Complaint as presently drafted *might* be deficient under that Rule's analysis, in the end it is highly likely that Plaintiff would be able to satisfy it in connection with an *omission*-based theory concerning the systematic or wholesale disregard of underwriting guidelines (though, strangely enough, it still might fall short under Rule 8 with respect to that theory because of the other problems discussed herein).

[5] In particular, Plaintiff relies upon statistics and measurements concerning delinquency and default rates for mortgages in the pools backing the RMBS, actual losses as compared to expected losses for the RMBS, changes in credit ratings for the RMBS, and the percentage of mortgage loans originated-for-distribution by each originator. *See* Complaint ¶¶ 53, 57-58, 61, 63, 65-67, 73-74, 84-85, 90, 97 & Tables 4-6, Figure 2.

allegations necessary to render that cause any more than a *possible* one, or one that is simply "consistent with" liability. *See Twombly*, 550 U.S. at 554, 564-70.

*Twombly* involved an allegation that certain defendants had engaged in a conspiracy in violation of Section 1 of the Sherman Act. There, the plaintiffs had alleged that the defendants had "engaged in parallel conduct" in order to inhibit the growth of upstart competitors, *see Twombly*, 550 U.S. at 550, in addition to agreeing not to compete amongst themselves, *see id.* at 551. This latter agreement, the complaint alleged, was to be inferred from 1) the defendants' common failure to meaningfully pursue "'attractive business opportunities in contiguous markets where they possessed 'substantial competitive advantages'" and 2) the statement by one defendant's CEO that competing in the territory of another of the defendants "might be a good way to turn a quick dollar but that doesn't make it right." *Id.*

In order to meet the pleading standards set forth therein, the *Twombly* Court held that stating a Section 1 Sherman Act claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The expectation of "plausible grounds to infer an agreement…simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* However, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" because, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556-57. In other words, "parallel conduct that could just as well be independent action" would not suffice at the pleadings stage. *Id.* at 557. The Court further provided that "to enter the realm of plausible liability" a plaintiff would have to cross the lines between both "the conclusory and the factual" and "the factually neutral and the factually suggestive." *Id.* at 557 n.5. All of this analysis supported – or was supported by – the Supreme Court's earlier position, announced in *Associated General Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983), that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558.

In concluding that the complaint at issue in *Twombly* fell short of these requirements, the Supreme Court observed that the complaint did "not set forth a single fact in a context that suggests an agreement," *id.* at 562, and concluded that there was "no doubt" that the plaintiffs had not rested their Section 1 claim on "any independent allegation of actual agreement," *id.* at 564.  In doing so, it implicitly rejected as such a fact the CEO's statement that competing with another defendant "might be a good way to turn a quick dollar but that doesn't make it right."

*Iqbal* later clarified the obligation (if it was not clear before) that the plausibility requirement is to be applied on a defendant-by-defendant basis.  *See Iqbal,* 129 S.Ct. at 1942-43, 1949-51.  That decision emphasized that Fed. R. Civ. P. 8 did not require "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," indicating further that a court need not accept as true those legal conclusions that appear in a complaint.  *Id.* at 1949; *see also Moss v. U.S. Secret Serv.,* 572 F.3d 962, 970-71 (9th Cir. 2009).

The theory underlying Plaintiff's claims for violations of Sections 11 and 12(a)(2) of the Securities Act and Sections 25401 and 25501 is that the offering documents prepared in connection with the RMBS at issue here did not disclose that what, in fact, was happening was that the originators of the loans were systematically disregarding the underwriting guidelines used to limit, to varying degrees, the risk associated with the loans and pools of loans.[6]  As noted above, Plaintiff attempts to support this theory by

---

[6] Supporting this general theory are various sub-categories of representations that were rendered misleading by omission of this information relating to the systematic disregard of underwriting guidelines. *See* Complaint ¶¶ 201, 227-310. Most, if not all, of these sub-categories – or at least underwriting, "credit enhancement" (*see id.* ¶¶ 42-52), and reduced documentation programs – appear to be dependent upon Plaintiff supporting its "systematic disregard" allegations. The Complaint draws these links. *See, e.g., id.* ¶ 80. In other words, if Plaintiff's allegation regarding the systematic disregard of underwriting guidelines is viable, the defendants' arguments for why there can be no actionable misrepresentation or omission in connection with these sub-categories cannot prevail at this stage. With particular respect to reduced documentation programs, RBS argues in its Reply brief that a systematic disregard of a guideline that already calls for <u>no</u> verification of income would mean that there actually <u>was</u> – in contrast with the disclosures concerning the underwriting steps as designed and described – verification. Verification of income, however, is just one measure applicable to some underwriting guidelines. *See id.* ¶ 28. In fact, the Complaint frequently references originators including *completely false* information in the course of considering, and ultimately approving, loan applications, a violation of presumably just about any underwriting guideline. With particular respect to the alleged misrepresentations/omissions regarding loan-to-value ratios ("LTV"), Plaintiff alleges that those representations were *mis*representations because the originators actually exceeded those ratios, encouraged inflated appraisals as part of the LTV process, and

way of post-purchase performance statistics associated with the RMBS.  It also refers in its allegations to various industry-related reports largely from media and government agency sources or from allegations appearing in other similar complaints.

Here, the performance statistics Plaintiff has compiled, by themselves, are seemingly analogous to the "parallel conduct" at issue in *Twombly*, leaving the assertions that originators systematically disregarded their underwriting guidelines as analogous to the "conclusory allegation of agreement at some unidentified point" in that case. Wachovia argues that the performance statistics are *all* Plaintiff has with respect to it, and Plaintiff does not contest that argument.[7]  *See* Complaint ¶¶ 108-208, 225.  Wachovia also cannot be pegged with a conclusory assertion that the industry at large was subject to the systematic disregard of underwriting guidelines where there are no facts, beyond indeterminate statistics, supporting that allegation.  To conclude otherwise would be to effectively ignore *Twombly*'s requirement of factual allegations supporting conspiracy (*i.e.*, conduct amongst more than one market participant) claims.  At a *minimum*, therefore, a dismissal with leave to amend under *Twombly* is appropriate as to Wachovia (though, for reasons addressed further below, that dismissal may be transformed into a dismissal *without* leave to amend).[8]

---

granted loans with high ratios without any meaningful assessment of any ability to repay the loans.  *See id.* ¶ 302.  RBS asserts that certain of the LTV-related allegations, if not all of them, are insufficiently factual, and it may be correct in that regard.  In any event, even if any of these particular sub-categories are defective in some respect, if those defects do not serve to dispose of entire claims, the Court can take the approach that they are not appropriately resolved as part of a motion to dismiss.  *See* Schwarzer, Tashima, et al., California Practice Guide:  Federal Civil Procedure Before Trial (2010) § 9:188.1, at 9-56 ("A Rule 12(b)(6) motion cannot be used to challenge just certain allegations within a claim while the underlying claim is not itself challenged.").

[7] The parties do dispute whether the allegation of a systematic disregard of underwriting guidelines is a *factual* allegation in and of itself, or is better regarded as a conclusion undeserving of a truth presumption by itself.  Indeed, the dividing line on that point is unquestionably unclear, but analogies to the available authority certainly suggest that, without additional facts, Plaintiff comes out on the losing side of this debate.  *See Iqbal*, 129 S.Ct. at 1951; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011) ("'Conclusory' and 'implausible' are matters of degree rather than sharp-edged categories.").

[8] It is likely that other claims would suffer similar fates (*see, e.g.*, Complaint ¶¶ 108-208, 215, 219-20, 223), as Plaintiff itself notes in its Opposition brief that seven major originators were widely reported to have systematically disregarded their underwriting guidelines, affecting 24 of the 29 investments at issue here.  Presumably Wachovia's RMBS is one of the remaining five excluded from Plaintiff's analysis in that

With respect to RBS and Nomura, Plaintiff has something more than simply performance statistics. It has a certain number and extent of factual allegations built on reports of loan originators' effective abandonment of underwriting guidelines. *See id.* ¶¶ 108-18, 121-22, 124, 127, 132-35, 141-42, 146-50, 153-55, 160-61, 164, 166, 168-69, 174-77, 179, 188, 193, 196, 199-200, 202-04, 208.[9] Some of those allegations consist of assertions that exceptions to stated underwriting guidelines were so routine as to effectively change, or eliminate, the guideline. *See, e.g., id.* ¶¶ 113, 115, 132-35, 193.[10] Other facts Plaintiff points to represent alarm bells about the industry in general or otherwise fail to identify any particular loan originator, which seemingly cannot suffice – without more – to support a plausible claim against *these* defendants in connection with *these* investments. *See, e.g.,* Complaint ¶ 68 ("A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to '[d]eteriorating lending standards, and

---

regard. In its Reply, RBS argues that First Franklin Mortgage falls into the same category as Wachovia, in that there are no allegations other than performance statistics and related measurements. *See id.* ¶¶ 108-208, 214.

[9] In truth, it is often difficult to see a dividing line between what Plaintiff characterizes as the systematic disregard or wholesale abandonment of underwriting guidelines and the simple relaxation – even extreme relaxation – of traditional underwriting guidelines for purposes of being able to extend loans to individuals who would not qualify under traditional lending standards (and, Plaintiff would say, for the additional – in fact, perhaps primary – purpose of then selling and securitizing those loans). *See, e.g., id.* ¶¶ 94, 97, 104. As Plaintiff itself makes clear in its Opposition brief in another context, relaxation of underwriting standards does not amount to the disregard of underwriting standards. *See, e.g., Plumbers' Union,* 632 F.3d at 772-73 & n.11. Yet, that is what a considerable proportion of Plaintiff's allegations concern. *See, e.g.,* Complaint ¶¶ 104-05, 181-83, 192. If this is all that Plaintiff had in the way of factual allegations, its case would face even more significant, and perhaps insurmountable, hurdles than it already does. Plaintiff does not appear to have a response to the defendants' argument that the originators *were* disclosing that they *were* loosening or relaxing their lending standards to issue more non-traditional mortgages, and that as a result the RMBS were backed by riskier loans resulting from those loosened or relaxed standards. Were the Court only faced with these types of allegations, Plaintiff's *factual* allegations would support *loosening,* but only its *conclusions* would support *wholesale abandonment.*

[10] Plaintiff also points to the fact that some originators had high originate-to-distribute rates, meaning that their intent was presumably simply to originate mortgages for the purposes of securitization. *See* Complaint ¶ 33 ("The securitization process [concerning non-conforming loans] shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS. This practice is known as 'originate-to-distribute'...."). Using that fact to allege a systematic disregard of underwriting guidelines, however, is seemingly little different from conclusorily presuming such disregard based solely on performance statistics. *See* Complaint ¶ 71 ("[O]riginators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans."). It therefore adds little to the Court's plausibility calculus.

posited that 'the surge in early payment defaults suggests that underwriting…deteriorated on dimensions that were less readily apparent to investors.'"); *id.* ¶¶ 69-70; *id.* ¶¶ 99-102.

Nomura argues that the Complaint fails to state a claim against it because the Complaint criticizes the underwriting practices of only seven specific loan originators, only two of which were originators of loans backing the RMBS associated with Nomura – Silver State Mortgage Company ("Silver State") and the First National Bank of Nevada ("FNBN"). As such, Nomura effectively paints itself as an "afterthought" in this litigation. Of course, even afterthoughts can be subject to valid claims. Nomura also asserts that Plaintiff clearly cannot make out any valid claim as to its RMBS because Silver State and FNBN accounted only for one-third of the mortgages backing Nomura's RMBS. As Plaintiff argues in response, however, the Court cannot determine as a matter of law that such a percentage equates to being immaterial.

The additional facts – beyond performance statistics – associating certain loan originators with disregard of the underwriting guidelines certainly adds something to the "plausibility" mix. Even in light of those additional allegations, however, all three defendants argue that Plaintiff has not satisfied *Twombly* and *Iqbal* because there is nothing tying what little factual allegations there are supporting the systematic disregard of underwriting standards to the particular securities that are at issue here and the pools of mortgages underlying those securities. See *New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc.*, No. 08 Civ. 5310(DAB), 2011 U.S. Dist. LEXIS 36363, *33 (S.D.N.Y. Mar. 31, 2011) ("*NovaStar*") ("Plaintiff fails to make allegations specific to the NovaStar Defendants' origination practices that relate to the only offering that is relevant here: the 2007-2 offering."); *cf. Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011) ("The harder problem is whether enough has been said in the complaint – beyond conclusory assertions – to link such practices with specific lending banks that supplied the mortgages that underpinned the trusts."). For instance, Nomura notes that Plaintiff's allegations regarding FNBN and Silver State are anecdotal and exhibit no connection to the actual

loan pools backing Nomura's RMBS.[11]  *See* Complaint ¶¶ 146-49, 181-84.  Of course, Plaintiff is correct that anecdotal does not necessarily mean non-factual.  However, to the extent that the anecdotes are not connected to the actual loans at issue here, there is a strong argument that such facts have no effect on the plausibility of the claims.  Here, too, the Court will have to determine just how direct a tie to the particular loan pools it would require before a claim of systematic disregard of underwriting guidelines affecting these particular loan pools is plausible.[12]  The originate-to-distribute proportion might be one *statistical* fact that *could* render this connection more plausible in the Court's eyes, at least where it relates to an originator as to which Plaintiff has identified at least some non-statistical basis for making a wholesale abandonment/systematic disregard allegation.

Whether or not these additional facts, in combination with the performance statistics, suffice to state a claim is a judgment call the Court will have to make.  *Plumbers' Union* represented a similar case, and there the First Circuit indicated that whether or not a claim had been stated under the facts asserted was a "judgment call." 632 F.3d at 773.  Nonetheless, it concluded that a claim had been stated, citing, as a specific basis for that determination, only "the sharp drop in the credit ratings after the sales and the specific allegations as to FNBN." *Id.* at 773-74.  The Court likely would follow a similar approach here.

Before it does so, however, the Court would also consider the defendants' favored case, a district court decision in *NovaStar*.  The defendants draw comparisons from this case to that one, where the district court concluded the allegations were "conclusory in nature" and likened the plaintiff's allegations to "102 pages of 'the subprime market melted down and Defendants were market participants, so they must be liable for my losses in my risky investment.'"  2011 U.S. Dist. LEXIS 36363, at *32, 34.  The

---

[11] The allegations regarding Silver State, in particular, appear to fall into that gray area mentioned above between wholesale abandonment and simple relaxation of underwriting guidelines (the latter of which was generally disclosed).

[12] Of potential importance in determining the effect of this consideration, defendants appear to disclaim any argument that Plaintiff *necessarily* must point to individual loans that suffered from the systematic disregard so long as it can point to *some facts* indicating that the loans covered by the pools backing the RMBS were so affected.

underlying allegations attempting to portray a situation of systematically disregarded underwriting guidelines in that case were not meaningfully distinguishable from those involved here. *See id.* at *10-11. Plaintiff attempts to distinguish *Novastar* by arguing that it has presented statistics relevant to the specific RMBS involved here, whereas *Novastar* only involved aggregate data. However, one salient point to be drawn from *Novastar*, in combination with *Twombly* and *Iqbal*, is that statistical data is only *consistent with* the defendants' liability due to systematic disregard of underwriting guidelines, meaning that where there are no other facts suggesting such conduct with respect to the particular investments at issue, a claim will not survive the pleadings.

No matter what the Court concludes about Plaintiff's ability to satisfy *Twombly/Iqbal*, the defendants cannot prevail on these motions to the extent they rely on arguments that the disclosures contained within the offering documents either disclosed the very risks that were eventually realized or rendered any misrepresentation/omission concerning the systematic disregard of underwriting standards immaterial. First, no defendant has pointed to any "disclosure" that underwriting guidelines were in fact illusory or were being systematically disregarded. *See Plumbers' Union*, 632 F.3d at 773 & n.11. If the allegation is true, therefore, it is a sufficiently misleading omission,[13] and one that would be material to a reasonable investor. After all, it seems an unassailable proposition (notwithstanding RBS's somewhat strange position to the contrary) that the quality of the underlying loans was one factor, if not the largest factor, in assessing the risk of the RMBS. Second, if the Court is to accept the systematic disregard allegation for its truth (an uncertain conclusion, as detailed above), the effect on that non-disclosure from any other disclosures that the defendants have cited to is uncertain enough to be an issue or issues which are best left for a jury to decide. That effect is not amenable to resolution as a matter of law, though that is not to say that the Court would be precluded from making such a ruling under more-appropriate circumstances. The defendants may very well prevail on these arguments before a factfinder, but it is difficult to see them doing so prior to that stage of this action.

---

[13] It would likewise render misleading any representation that underwriting guidelines were "generally" followed, or any similar statement about the applicability of guidelines or limited exceptions thereto.

Similarly, the Court would reject the suggestion that any defendant can prevail as a matter of law simply by having included and disclosed a cure or repurchase option for purposes of resolving situations where particular loans did not satisfy the applicable underwriting guidelines. Unlike the situation in *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 388 (5th Cir. 2010), Plaintiff does not allege that defendants represented perfect compliance with underwriting guidelines such that this provision would have automatically called into question the viability of such a claim. It alleges systematic disregard and a failure to disclose that state of affairs, an allegation that the Court cannot disregard as a matter of law simply due to the presence and disclosure of a cure/repurchase provision. Although the defendants argue that no investor could have believed any absolute representation given this provision, here we are dealing not with an absolute representation, but largely with an absolute (alleged) omission.

### C. Statutes of Limitation/Repose

In the end, the above *Twombly/Iqbal* analysis may have only limited application in this case. Assuming that Plaintiff can state a claim based on its theory of a systematic disregard of underwriting guidelines, the motions raise the issue of whether at least some of the claims[14] would be barred because of the applicable statutes of limitation and repose.[15] Plaintiff's federal claims are subject to a one-year statute of limitations and a three year statute of repose. *See* 15 U.S.C. § 77m (establishing "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" as statute of limitation for section 11 and 12(a)(2) claims, with three years from bona fide offer to public as outside limit for the former and three years from the sale as outside limit for the latter); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 788 (9th Cir.); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 700 (2d Cir. 1994); *see also Davis v. Birr, Wilson & Co.*,

---

[14] RBS concedes that Plaintiff's ninth claim for relief would not be barred at least as to the three certificates that were not yet purchased as of March 19, 2007.

[15] There is no question that the Court can consider statute of limitations-based arguments in connection with a motion to dismiss. However, as *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010), demonstrates, the showing necessary to prevail on such a motion at this stage is relatively demanding.

*Inc.*, 839 F.2d 1369, 1374 (9th Cir. 1988) (Aldisert, J., concurring) (describing history of statutes of limitation/repose in Securities Act).[16] Plaintiff's Corporations Code § 25401 claim is governed by 2 year/5 year limitations/repose periods. *See* Cal. Corp. Code § 25501 (providing private right of action for section 25401 claim); *id.* § 25506(b) (requiring claim under section 25501 to be brought "before the expiration of five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire").[17]

If the applicable time limits did not expire before Plaintiff took over as the conservator of WesCorp, Plaintiff argues that an "Extender" statute would apply so as to make its claims timely. *See* 12 U.S.C. § 1787(b)(14). The defendants contest whether the Extender statute applies to federal statutory claims at all. Even assuming that it does, they then argue that it does not apply to statutes of repose, as opposed to statutes of limitation. The parties also dispute whether Plaintiff has pled sufficient facts to demonstrate its compliance with the applicable statutes of limitation, especially in connection with its discovery of the purported basis for the claims. Defendants assert that it is clear that WesCorp, had it been diligent, could have known about the basis for its claims (to the extent those claims have any basis) long enough ago that the applicable statutes of limitation would have run before Plaintiff implemented the conservatorship. The Court need not resolve the defense's various arguments at this time for why the

---

[16] No party has argued that the Sarbanes-Oxley Act extended any applicable statute of limitations/repose here. *See* 28 U.S.C. § 1658(b); 15 U.S.C. § 78c(a)(47) (indicating that "securities laws," as used in section 1658(b), includes, among others, the '33 Act); *In re Daou Sys., Inc., Secs. Litig.*, 411 F.3d at 1028-29; *Berman v. Blount Parrish & Co., Inc.*, 525 F.3d 1057 (11th Cir. 2008); *see also United States v. Andrews*, 600 F.3d 1167, 1173 (9th Cir. 2010) ("'[I]t is a 'longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous.'") (quoting *Beck v. Prupis*, 529 U.S. 494, 506 (2000)). *But see Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *cf. In re Exxon Mobil Corp. Secs. Litig.*, 500 F.3d 189, 196-97 (3d Cir. 2007); *In re Worldcom Secs. Litig.*, 496 F.3d 245, 249 (2d Cir. 2007) (noting that district court had rejected effort to benefit from SOX's longer limitations period on '33 Act Section 11 claim "because they had expressly disavowed relying on allegations of fraud or intentional misconduct, basing their Section 11 claims entirely on theories of negligence and strict liability").

[17] As a preliminary matter, although Plaintiff attempts to plead a basis for tolling in its Complaint under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and defendants broach the issue in their motions to dismiss, Plaintiff makes no effort to argue the point in its Opposition. It appears, therefore, that Plaintiff has abandoned any such attempt to toll any applicable statute of limitations.

Extender statute does not apply to Securities Act claims or federal statutory claims in general because 1) the Extender statute clearly does not apply to statutes of repose and 2) Plaintiff has not adequately pled compliance with the statutes of limitation or a reason to apply concepts of delayed discovery in assessing their application.

Plaintiff attempts to avoid the first of those conclusions by way of a number of arguments, but the plain language of the statute is all that the Court needs to resolve the question.  Section 1787(b)(14) of Title 12 of the United States Code reads, in its entirety, as follows:

> (14) <u>Statute of limitations</u> for actions brought by conservator or liquidating agent
>
> (A) In general
>
> Notwithstanding any provision of any contract, the applicable <u>statute of limitations</u> with regard to any action brought by the Board as conservator or liquidating agent shall be--
>
>> (i) in the case of any contract claim, the longer of--
>>
>>> (I) the 6-year period beginning on the date the claim accrues; or
>>>
>>> (II) the period applicable under State law; and
>>
>> (ii) in the case of any tort claim, the longer of--
>>
>>> (I) the 3-year period beginning on the date the claim accrues; or
>>>
>>> (II) the period applicable under State law.
>
> (B) Determination of the date on which a claim accrues
>
> For purposes of subparagraph (A), the date on which the <u>statute of limitation</u> begins to run on any claim described in such subparagraph shall be the later of--
>
>> (i) the date of the appointment of the Board as conservator or liquidating agent; or
>>
>> (ii) the date on which the cause of action accrues.

12 U.S.C. § 1787(b)(14) (emphasis added).   The statute plainly refers to statutes of limitation.  It makes no mention whatsoever of statutes of repose.  *Cf. Resolution Trust Corp. v. Olson*, 768 F.Supp. 283, 285 (D. Ariz. 1991) (considering effect of similar extender statute, 12 U.S.C. § 1821(d)(14) and reaching same conclusion, in part because "substantive time limits," such as statutes of repose, "are binding on the federal

government").[18]

The plain language of a statute is the first resort in any effort at statutory interpretation. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). "It is well established that, when the statutory language is plain, we must enforce it according to its terms." *Id.*; *cf. Davis*, 839 F.2d at 1374 (Aldisert, J., concurring) (noting that statute of repose in the Securities Exchange Act of 1934 was "understood...to be absolute" "because of fear that lingering liabilities would disrupt normal business and facilitate false claims"); *Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1301 (4th Cir. 1993) (stating that permitting equitable tolling of section 13 of the Securities Act "would require us to ignore the plain meaning of the language that says 'in no event' may an action be filed more than three years after the sale and defeat the very purpose of the statute of repose"). It may be true that Plaintiff had little time to analyze its/WesCorp's case and institute an action given this effect from the statute of repose, but if Congress wanted to alleviate that effect, it could have very easily done so clearly. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102-03 (2d Cir. 2004) ("[A] statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action."); *id.* at 102 ("In theory, at least, the legislative bar to subsequent action is absolute, subject to legislatively created exceptions...set forth in the statute of repose."). As it dealt with provisions of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and not section 1787(b)(14) (or any other substantially similar statute), *McDonald v. Sun Oil Co.*, 538 F.3d 774 (9th Cir. 2008), is not controlling on this

---

[18] The defendants are correct that Plaintiff's preferred authority - (*i.e. Stonehedge/Fasa-Texas JDC v. Miller*, 110 F.3d 793, 1997 WL 119899 (5th Cir. 1997), and *Colvest Mortgage, Inc. v. Clark*, 1996 Tex. App. LEXIS 3374 (Tex. App. July 23, 1996)) - largely turned on preemption issues concerning state statutes, which are not present at least with respect to the Securities Act provisions. *See Stonehedge*, 1997 WL 119899, at *2-3; *Colvest*, 1996 Tex. App. LEXIS 3374, *4-6, 8. In addition, both *Stonehedge* and *Colvest* are non-precedential. Moreover, as noted above, the plain language of the Extender statute involved here concerns only statutes of limitation, not repose.

question.  Congress's plain language is. [19]

As a result, this action is effectively barred with respect to all claims where an applicable statute of repose expired prior to Plaintiff filing suit.  Thus, Plaintiff's assertion that none of the sales or public offerings occurred more than three years prior to Plaintiff stepping in as WesCorp's conservator is misdirected; the correct question is whether the three-year periods expired before Plaintiff filed this lawsuit.

At the very least, Wachovia has presented a basis in its motion for this Court to conclude that this analysis bars Plaintiff's claim against it.  Nomura contends in its Reply brief that its RMBS were bona fide offered to the public in November 2006 and January 2007.  *See* Complaint ¶¶ 318-19 (asserting that, with respect to the RMBS subject to the Section 11 claims, the *earliest* date they were bona fide offered to the public was August 28, 2006, and that, with respect to the RMBS subject to the Section 12(a)(2) claim, the *earliest* sale date was August 1, 2006); Tables 1-2 (listing trade dates).  In addition, at least some of the RMBS that are targets of Plaintiff's state-law claims would also be protected by the statute of repose imbedded in the California Corporations Code.  *See* Complaint ¶ 320 (indicating that the earliest purchase or offering date of the RMBS subject to Plaintiff's state-law claim was November 22, 2005); Table 1 (listing trade dates).

For those claims where it still matters, there is at least a strong argument that Plaintiff has not satisfactorily pled its compliance with the statutes of limitation and its discovery of the claims, and potentially that Plaintiff cannot possibly demonstrate compliance with those limitations periods.  In paragraphs 315 and 316 of the Complaint, Plaintiff pleads only that the Federal Reserve Board noted in November 2008 that

---

[19] Plaintiff attempts to draw from *McDonald*'s analysis of whether the term "statute of limitations" was ambiguous when Congress used it in CERCLA in 1986 because the Extender statute was enacted in 1989.  *McDonald* noted that "although some cases [as of 1986] recognized the differences between statutes of limitation and repose, a number of cases confused the terms or used them interchangeably."  *McDonald v. Sun Oil Co.*, 548 F.3d 774, 781 (9th Cir. 2008).  Although the focus here should be on Congress's understanding of the term "statute of limitations" when it was employed in the Extender statute, as Judge Aldisert's 1988 concurring opinion in *Davis v. Birr, Wilson & Co., Inc.*, 839 F.2d 1369 (9th Cir. 1988), makes clear – at least in part by way of its citation to material considering legislative history – that there was an important distinction between statutes of limitation and statutes of repose in the nation's securities legislation by 1989 cannot be disputed.  *See id.* at 1374.  In any event, as noted above, *McDonald* is not controlling precedent here.

"deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting...deteriorated on dimensions that were less readily apparent to investors," and that "[a]ccordingly, WesCorp did not discover and could not have discovered the material untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed WesCorp into conservatorship." Complaint ¶¶ 315-16. Defendants are correct that this level of detail is quite plainly insufficient if Plaintiff does, in fact, have a burden to plead around its failure to satisfy the statute of limitations under normal circumstances. In fact, Nomura points out that Plaintiff does not actually attempt to argue that it has satisfactorily pled compliance with the statute of limitations or the discovery-related information. Instead, Plaintiff simply argues that its claims are timely.

The parties disagree over the controlling precedent on this question, or at least they are talking about somewhat different questions. Plaintiff asserts that *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784 (2010) is the controlling and informative precedent, whereas the defendants point to *Toombs v. Leone*, 777 F.2d 465 (9th Cir. 1985). As the defendants note, *Merck* plainly dealt only with the statute of limitations for Section 10(b) claims under the Securities Exchange Act. *See* 130 S.Ct. at 1789-90. There are seemingly good reasons not to apply *Merck* here (or at least not to apply a strict reading of it) because, as the Supreme Court pointed out in the opening paragraph of its decision, the "facts constituting the violation" for the Section 10(b) claim includes the fact of scienter, *see id.* at 1790, a fact that is absent from this action.[20] *But see In re Bare Escentuals, Inc. Secs. Litig.*, 745 F.Supp.2d 1052, 1082 & n.6 (N.D. Cal. 2010) (applying *Merck* to Section 11 claim); *In re Am. Funds Secs. Litig.*, No. CV 06-7815-GAF, 2011 U.S. Dist. LEXIS 51109, *3-5 (C.D. Cal. Feb. 22, 2011) (applying *Merck* to Section 12 claim); *Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 U.S. Dist. LEXIS 707, *25-28 (N.D. Cal. Jan. 5, 2011) (applying *Merck* to claims under Sections 11 and

---

[20] In a Notice of Supplemental Authority, *see* Docket No. 107, Plaintiff also directs the Court to the Ninth Circuit's very recent decision in *Strategic Diversity, Inc. v. Alchemix Corp.*, __ F.3d __, 2011 U.S. App. LEXIS 23928 (9th Cir. Dec. 2, 2011). Like *Merck*, however, *Strategic Diversity* dealt with a Section 10(b) claim. *See id.* at *1. Although the *Merck* rationale was applied to the state-law claim in that case, the state statute dealt with the discovery of "the fraudulent practice," again implicating scienter. *See id.* at *12.

12(a)(2)).  Even if *Merck* is applicable here – a question the Court can revisit in more detail at a later date, if necessary[21] – it does not stand for the proposition that paragraphs 315 and 316 of the Complaint are sufficient as a matter of *pleading*.

In contrast, *Toombs* specifically dealt with Section 12 of the Securities Act (although a different subsection than involved here) and its statute of limitations, Section 13.  The Ninth Circuit specifically indicated in that decision that "the plaintiff must affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations."  *Toombs*, 777 F.2d at 468.  Given the overall allegations of Plaintiff's Complaint, paragraphs 315 and 316 are at best conclusory and, at worst, implausible.  Its allegations are therefore insufficient thus far to demonstrate compliance with at least the applicable federal statute of limitations.[22]

Ultimately, with respect to *most* claims (to the extent they are not already barred by the statute of repose analysis set forth above), the defendants' explanations for why WesCorp should have known of these particular claims earlier is insufficiently persuasive for purposes of ruling as a matter of law, at least at this stage, that the statutes of limitation have run.  That does not absolve Plaintiff of its pleading burden under *Toombs*, however.  A different conclusion might well be appropriate once Plaintiff re-pleads.

Indeed, Plaintiff unquestionably faces difficulties in asserting that the performance statistics form a large basis for its allegations concerning the systematic disregard of underwriting guidelines while at the same time avoiding a statute of limitations problem.  *See Allstate Insurance Co. v. Countrywide Financial Corp.*, No. 2:11-CV-05236-MRP (MANx), 2011 U.S. Dist. LEXIS 123844, *41 (C.D. Cal. Oct. 21, 2011) ("Allstate is faced here with a Hobson's choice.  If it is correct in its big-picture argument that systemic abandonment is sufficient to state an RMBS § 10(b) claim, then it was on notice of that claim before December 27, 2008.  If it is wrong, as it is forced to argue for purposes of this motion, then its claim is insufficient.").  Those statistics were

---

[21] In other words, assuming *Merck* does apply, the Court cannot determine *how* it applies until Plaintiff improves its pleading with respect to issues relevant to the running of the statute(s) of limitation.

[22] The approach taken in *Toombs* unquestionably has incurred some measure of relatively forceful criticism.  *See Johnson v. Aljian*, 490 F.3d 778, 781 n.13 (9th Cir. 2007).  Nonetheless, that same critique recognizes that this "disapproved pleading rule may survive in [the Ninth Circuit] with respect to Section 12."  *Id.*

short-term statistics, meaning that they involved the time period shortly after the certificates were sold/purchased. *See, e.g.*, Complaint ¶¶ 63, 84-85, Table 5 & Figure 2. Where the statistics are the only basis for the systematic disregard allegation, as with Wachovia, the only way Plaintiff could seemingly avoid application of section 77m would be to argue that the statistics were not available to it at that time. But the defendants argue that the statistics and data were in the public domain, available for observation and analysis almost immediately after purchase.[23] Where that is true, Judge Pfaelzer, in *Allstate*, determined only recently – in the Section 10(b) context – that a plaintiff's delay in filing an action until it completed a "loan-level" analysis confused "fact" with "analysis" and failed to sufficiently delay the running of the statute of limitations because, among other things, Allstate "could have analyzed that [previously-disclosed] information whenever it wished; the fact that it declined to do so does not toll the statute of limitations." *Allstate*, 2011 U.S. Dist. LEXIS 123844, at *43-44. That it required that Plaintiff undertake a "detailed forensic analysis" in this case to reach the conclusions it has now reached and that any detailed investigation of the loans forming any of the pools might be difficult because of their sheer number might speak to the wisdom behind making the investment in RMBS backed by "non-conforming" loans in the first place, *see* Complaint ¶¶ 31-33, but it is an insufficient reason to conclude that a diligent person could not have discovered the facts Plaintiff asserts led it to conclude wrongdoing was present any earlier than Plaintiff actually discovered those facts.

Plaintiff suggests, however, that it needed something more than the performance statistics in order to form its systematic disregard theory. If true, of course, this only supports the conclusion that Plaintiff would have failed to state a claim as to Wachovia even ignoring the effect(s) of the statutes of limitation and repose. But just where Plaintiff locates the dividing line between *no claim* and a *plausible claim* for systematic disregard of underwriting guidelines is at the very least unclear, if not somewhat indefensible. *See* Plaintiff's Opposition at 36 n.41 (arguing that "[t]he limited part of this information [regarding the increase in delinquencies and actual losses] actually available

---

[23] In any event, Plaintiff's claim against Wachovia fails no matter how the statute of limitations issue plays out because of the effect of the statute of repose.

to WesCorp at the relevant time was plausibly insufficient to put WesCorp on notice of the facts supporting its claims").

Nonetheless, the question of just when a diligent plaintiff would have discovered the untrue statement or omission is frequently not one that a court can resolve on the pleadings. *See, e.g., Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005). This seems to be especially true here, where much of the information the parties point to as highlighting the issue for WesCorp much earlier than Plaintiff brought this action is not necessarily tied to the loan pools underlying the RMBS at issue.[24] Of course, while this might save Plaintiff from a fatal statute of limitations problem (and, in the end, it may not in the eyes of the factfinder, if the claims reach that stage), it may very well doom its ability to state a claim in the first place, depending on how the Court resolves that question. Nonetheless, especially considering the standard as explained in *Von Saher* and the difficulty a Court faces in resolving the question as a matter of law as set forth in *Livid*, Plaintiff should be given the opportunity to amend in order to satisfy Section 77m and *Toombs*. The Court cannot say at this time that amendment would be futile. This analysis applies equally to Plaintiff's state-law claims, even assuming that the defendants are correct for how the "discovery" rule applies to those claims.

Of course, any attempt by Plaintiff to amend so as to allege compliance with the applicable statute of limitations would not save its seventh claim against Wachovia because Wachovia also relies on the statute of repose present in section 77m. Plaintiff makes no effort to contest Wachovia's assertion that the particular RMBS in question on the seventh claim was *bona fide* offered for sale to the public no later than December 22, 2006. As a result, any claim brought after December 22, 2009, would be too late. In light of the conclusion above that the Extender statute does not apply to statutes of repose, it does not save this claim, which was not advanced until Plaintiff filed this action on July 18, 2011.

---

[24] In addition, Plaintiff has the better argument as to whether there is a distinction between the warnings the National Credit Union Administration was providing WesCorp concerning relaxed lending standards and the non-disclosure by anyone at that time that what, in fact, was happening (allegedly) was the wholesale disregard of underwriting standards.

Because Plaintiff's seventh claim for relief against Wachovia should be dismissed without leave to amend due – at a minimum – to the effect of the statute of repose, there is no need for the Court to consider Wachovia's additional argument focusing upon the sufficiency of Plaintiff's damages allegations. *See* Complaint ¶¶ 10, 55.

**D. Conclusion**

The foregoing analysis has an obvious effect on the sole claim set forth against Wachovia. At a minimum, the Court would dismiss the seventh claim with leave to amend because of *Twombly/Iqbal* problems. If the Court ultimately adopts the statute-of-repose-based analysis set forth above, it would actually dismiss that claim without leave to amend. This would also presumably serve to provide a basis for dismissal without leave to amend as to other claims raised in the Complaint. However, apart from Wachovia, given the number of claims and investments at issue and the somewhat-less-than-certain application of the above recommendations to those claims and investments, the Court would consider asking defense counsel to prepare a proposed ruling applying the above analysis to the Complaint. As set forth above, certain of the claims are bound to survive the repose-based analysis, but a dismissal with leave to amend should likely be ordered as to them as well if the Court either determines that Plaintiff has thus far insufficiently pled compliance with the applicable statute(s) of limitation(s) and/or determines that the facts above and beyond the performance statistics do not serve to satisfy Plaintiff's obligations under *Twombly/Iqbal*.

# Exhibit P

# ARGENT SECURITIES INC

## Summary

| Issuer Name | File Number | Registration Date |
|---|---|---|
| **ARGENT SECURITIES INC** | **333121782** | **12/30/04** |
| Deal Description | Status | Status Date |
| **Primary Offering** | **Effective (EF)** | **01/14/05** |
| Maximum Offering Price | Form Type | |
| **$ 20,000,000,000** | **S-3** | |

## Issuer Information

| Name | SIC Code |
|---|---|
| **ARGENT SECURITIES INC** | **6189 - Asset-Backed Securities** |
| Address | State Of Incorporation |
| **1100 TOWN & COUNTRY RD SUITE 1100 ORANGE, California 92868** | |
| Ticker | |

## Deal Information

| File Number | Registration Date |
|---|---|
| **333121782** | **12/30/04** |
| Deal Description | Status |
| **Primary Offering Shelf Registration Multiclass Serial Offering** | **Effective (EF)** |
| Security Type | Status Date |
| **Certificates  Mortgage Pass Through Notes  Mortgage Backed** | **01/14/05** |
| Maximum Offering Price | Form Type |
| **$ 20,000,000,000** | **S-3** |

## Related Parties

| Underwriter | Other Counsel |
|---|---|
| | |
| Issuer Counsel | Accountant |
| **Thacher Proffitt & Wood New York, New York 10281** | |
| Underwriter Counsel | Filing Agent |
| | **THACHER PROFFITT & WOOD** |

## Fees

| Legal | Accounting | Printing |
|---|---|---|
| **$ 150,000** | **$ 50,000** | **$ 20,000** |
| Blue Sky | Rating Agency | Total |
| **$ 0** | **$ 90,000** | **$ 2,699,000** |

**Source:** LIVEDGAR® information provided by Thomson Reuters Accelus, ©2011. All Rights Reserved. 800.669.1154 http://www.gsionline.com

# Exhibit Q

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported)   June 27, 2005
-------------------------------

MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.
--------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)

| Delaware | 333-124678 | 06-1204982 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

1285 Avenue of the Americas, New York, New York                    10019
--------------------------------------------------------------------------
(Address of principal executive offices)                        (Zip Code)

Registrant's telephone number, including area code   (212) 713-2000
                                                    -------------------------------

Not applicable
---------------------------------------------------
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR
230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange
Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
Act (17 CFR 240.13e-4(c))

ITEM 8.01.   Other Events
             ------------

On June 2, 2005, a registration statement on Form S-3 (the "Registration Statement") for Mortgage Asset Securitization Transactions, Inc. (the "Company") was declared effective. Attached hereto as exhibits are a legality opinion, tax opinion and consent prepared by Cadwalader, Wickersham & Taft LLP relating to the Company's prospectus forming a part of the Registration Statement that describes Asset-Backed Certificates and Asset-Backed Notes (the "Securities"). The exhibits are to be incorporated herein by reference into the Registration Statement.

Exhibit 5.1

[CADWALADER, WICKERSHAM & TAFT LLP LETTERHEAD]

June 27, 2005

Mortgage Asset
 Securitization Transactions, Inc.
1285 Avenue of the Americas
New York, New York 10019

      Re:   Mortgage Asset Securitization Transactions, Inc.
           Registration Statement on Form S-3 No. 333-124678
           Asset-Backed Certificates and Asset-Backed Notes
           -------------------------------------------------

Ladies and Gentlemen:

    We have acted as special counsel to Mortgage Asset Securitization
Transactions, Inc. (the "Depositor") in connection with the Depositor's
Registration Statement on Form S-3 (the "Registration Statement"). The
Registration Statement was declared effective on June 2, 2005 by the Securities
and Exchange Commission (the "Commission") pursuant to the Securities Act of
1933, as amended. The Prospectus forming a part of the Registration Statement
describes Asset-Backed Certificates and Asset-Backed Notes (collectively, the
"Securities") to be sold by the Depositor in one or more series (each, a
"Series") of Securities. Each Series of Securities will be issued under a
separate pooling and servicing agreement, trust agreement or indenture (each, an
"Agreement") among the Depositor, a servicer (a "Servicer"), a trustee (a
"Trustee"), and, if applicable, such other parties to be identified in the
Prospectus Supplement for such Series. The forms of Agreements were filed as
exhibits to, or incorporated by reference in, the Registration Statement.
Capitalized terms used and not otherwise defined herein have the respective
meanings given to such terms in the Registration Statement.

    In rendering the opinions set forth below, we have examined and relied
upon the following: (1) the Registration Statement, including the Prospectus and
the two forms of Prospectus Supplement constituting a part thereof, in the forms
filed with the Commission; (2) the Agreements in the forms filed with the
Commission; and (3) such other documents, materials and authorities as we have
deemed appropriate as a basis for the opinions set forth below. We express no
opinion concerning the laws of any jurisdiction other than the laws of the State
of New York and, to the extent expressly referred to in this letter, the federal
laws of the United States of America. We express no opinion with respect to any
Series of Securities representing beneficial interests in a Delaware statutory
trust and we express no opinion with respect to any Series of Securities for
which we do not act as counsel to the Depositor.

Based on and subject to the foregoing, we are of the opinion that:

1. When the Securities of a Series have been duly executed, authenticated, delivered and sold in accordance with the terms of the Agreement for such Series, if such Securities are issued in the form of certificates, such Securities will be validly issued and outstanding, fully paid and non-assessable, and entitled to the benefits provided by such Agreement, and if such Securities are issued in the form of notes, such notes will be binding obligations of the trust formed to issue the notes, enforceable against the trust in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, receivership or other laws relating to creditors' rights generally, and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

2. The descriptions of federal income tax consequences appearing under the heading "Federal Income Tax Consequences" in the Prospectus and in the Prospectus Supplements accurately describe the material federal income tax consequences to holders of Securities, under existing law and subject to the qualifications and assumptions stated therein. We also hereby confirm and adopt the opinions expressly set forth under such headings, under existing law and subject to the qualifications and assumptions stated therein.

We hereby consent to the filing of this letter as an exhibit to the Registration Statement and to the reference to this firm under the headings "Legal Matters" and "Federal Income Tax Consequences" in the Prospectus and under the heading "Federal Income Tax Consequences" in the Prospectus Supplements, which are a part of the Registration Statement. This consent is not to be construed as an admission that we are a person whose consent is required to be filed with the Registration Statement under the provisions of the Act.

Very truly yours,

/s/ Cadwalader, Wickersham & Taft LLP

-2-

# Exhibit R

*As filed with the Securities and Exchange Commission on June [ ], 2006*

Registration No. 333–

---

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## REGISTRATION STATEMENT
### ON
### FORM S–3
### UNDER THE SECURITIES ACT OF 1933

---

### INDYMAC ABS, INC.
*(Exact Name of Registrant as Specified in its Charter)*

| | |
|---|---|
| Delaware | 95–4685267 |
| *(State or other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification Number)* |

155 North Lake Avenue
Pasadena, California 91101
(800) 669–2300
*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

---

*Blair Abernathy*
IndyMac ABS, Inc.
155 North Lake Avenue
Pasadena, California 91101
(800) 669–2300
*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

---

*With a copy to:*
*Kathryn Cruze, Esq.*
*Thacher Proffitt & Wood LLP*
2 World Financial Center
New York, New York 10281

---

*Approximate date of commencement of proposed sale to the public:* From time to time on or after the effective date of the registration statement, as determined by market conditions.

---

If the only securities being registered on this form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 other than securities offered only in connection with dividend or interest reinvestment plans, please check the following box. ☑

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post–effective amendment filed pursuant to Rule 462(e) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post–effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.

If this Form is a post–effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to Be Registered | Amount to Be Registered (1) | Proposed Maximum Offering Price Per Unit (2) | Proposed Maximum Aggregate Offering Price (2) | Amount of Registration Fee |
|---|---|---|---|---|
| Mortgage Backed Securities | $1,000,000 | 100% | $1,000,000 | $107.00 |

(1) This Registration Statement relates to the offering from time to time of $1,000,000 aggregate principal amount of Mortgage Backed Securities.

(2) Estimated for the purpose of calculating the registration fee.

*Pursuant to Rule 429 under the Securities Act of 1933, the Prospectus included in this Registration Statement is a combined prospectus and related to the Registration Statement No. 333–127617 as previously filed by the Registrant. That Registration Statement was declared effective on August 22, 2005.*

*The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, or until the Registration Statement shall become effective on such date as the commission, acting pursuant to said Section 8(a), may determine.*

# Exhibit S

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SEI HAWAIIAN COGENERATORS, INC., C.I. HACOA, INC., EPT HAWAII LIMITED PARTNERSHIP, and CIH PARTNERS, L.P., | ) ) ) ) | CIV. NO. 95-00048 ACK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| ABB HAWAIIAN COGENERATION, INC., ASEA BROWN BOVERI, INC., ABB POWER GENERATION, INC., ABB ENERGY SERVICES, INC., ABB ENERGY VENTURES, INC., ABB FINANCIAL SERVICES, INC. and HAWAIIAN COGENERATION, L.P., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| KALAELOA PARTNERS, L.P., | ) ) | |
| Nominal Defendant. | ) ) | |

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 30 1995

at ___ o'clock and ___ min. ___ M.
WALTER A. H. Y. CHINN, CLERK

## ORDER GRANTING MOTION TO DISMISS THE AMENDED COMPLAINT

### BACKGROUND

On April 19, 1995, Defendants filed (1) a Motion To Dismiss The Amended Complaint (Federal Securities And Pendent Claims), (2) a Motion To Stay Or Dismiss The State Law Counts Of The Amended Complaint, and (3) a Motion To Defer Briefing On Defendants' Motion To Stay Or Dismiss State Law Counts Of The Amended Complaint.

On April 24, 1995, following a hearing on Defendants' Motion To Defer Briefing On Defendants' Motion To Stay Or Dismiss State Law Counts Of The Amended Complaint, the Court rescheduled the

70

hearing on the Motion To Stay Or Dismiss The State Law Counts Of The Amended Complaint to July 31, 1995.

The sole motion before the Court on the instant June 12, 1995 hearing is the Motion To Dismiss The Amended Complaint (Federal Securities And Pendent Claims).

<u>**FACTS**</u>

I.   <u>The Parties And The Power Plant</u>

Plaintiffs are limited partners in Kalaeloa Partners, L.P. ("Partnership"), which owns a power plant in Oahu, Hawaii.  The Partnership was created in October 1988.  Defendant ABB Hawaiian Cogeneration Inc. is the general partner of the Partnership. According to Defendants, all parties are Delaware partnerships or corporations.

In November 1988, Defendant ABB Energy Services Inc., an affiliate of the general partner, entered into a written agreement to design and build the power plant.  The agreement required performance tests to determine if the power plant achieved "commercial operation" as defined in the agreement, and it permitted the general partner to require Defendant ABB Energy Services to correct nonconforming or incomplete work.  Defendant ABB Energy Services warranted design and engineering work and other matters.

Defendant ABB Energy Services also entered into a separate written agreement with the Partnership in November 1988 to operate and maintain the plant in accordance with certain criteria and warranties.

2

Plaintiffs charge that Defendants' control of the general partner allowed them to control the information available to prospective purchasers when they decided to sell their limited partnership interest in the plant. Plaintiffs further contend that by misrepresenting and concealing material information about the plant's flaws and incompletions, Defendants were able to sell their limited partnership interest to Plaintiff EPT in December 1991 for $18,000,000.

II. The Tolling Agreement

In early 1993, according to Plaintiffs, Plaintiffs began to discover the power plant's alleged flaws and Defendants' alleged fraudulent misrepresentations in connection with their purchase of their partnership interest. Plaintiffs claim that they intended to file suit immediately. However, in order to allow the parties an opportunity to resolve the dispute themselves, Plaintiffs refrained from filing suit in exchange for a written tolling agreement, which the parties executed on May 13, 1993.

Under the tolling agreement, the parties agreed to toll "all statutes of limitations, laches and other defenses based upon the passage of time" that may apply to any claim or defense that any party has relating to or arising from, among other items, Plaintiff EPT's purchase of Defendants' limited partnership interest. The tolling agreement also states that any claims asserted prior to its expiration "will be deemed to have been asserted as of the date of this tolling agreement." Thus,

3

Plaintiffs contend that the claims set forth in their Complaint are deemed to have been asserted on May 13, 1993.

III.   **The Disputes**

In January 1995, Plaintiffs claim that it became apparent that further negotiations would be "unproductive." Accordingly, they filed their Complaint on January 23, 1995, and later, an Amended Complaint on April 5, 1995.

Plaintiffs assert that Defendants' violations amount to fraud under the federal securities laws (Count I-II), common law fraud (Counts III-IV), conspiracy to defraud (Count V), breach of contract and tortious interference with contract (Counts VI-VII), and breach of fiduciary duties and aiding and abetting such breach (Counts VIII-IX). The Amended Complaint also brings several of the claims as derivative claims on behalf of the Partnership (Counts IV-IX).

IV.   **The Delaware Action**

On March 6, 1995, Defendants filed an action in the Delaware Chancery Court against all Plaintiffs herein. According to Defendants, the Delaware Complaint seeks a declaratory judgment and other relief under Delaware law. Defendants assert that the Delaware action is based largely on the disputes that the Plaintiffs have brought before this Court.

According to Plaintiffs, on May 4, 1995, the Delaware Court granted Plaintiffs' motion to stay the Delaware action in favor of this action and ordered the Delaware action stayed until at least the resolution of the instant motion.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), in determining whether a motion to dismiss for failure to state a claim upon which relief can be granted, this Court must accept as true the plaintiff's allegations contained in the complaint and view them in a light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974); Wileman Bros. & Elliott, Inc. v. Giannini, 909 F.2d 332, 334 (9th Cir. 1990); Shah v. County of Los Angeles, 797 F.2d 743, 745 (9th Cir. 1986). Thus, the complaint must stand unless it appears beyond doubt that the plaintiff has alleged no facts that would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02 (1957); Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. Balistreri, 909 F.2d at 699; Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).

In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir.), cert. denied, 441 U.S. 965 (1979). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under

5

any set of facts that might be proved in support of plaintiffs' claims. Id.

If, in connection with defendants' motion to dismiss for failure to state a claim, the Court considers matters outside the pleadings, that portion of the defendant's motion to dismiss should be treated as one for summary judgment. Fed. R. Civ. P. 12(b)(6); Coverdale v. Dept. of Social & Health Services, 834 F.2d 758 (9th Cir. 1987).

## DISCUSSION

I.  **Tolling Agreement Does Not Extend Three-Year Repose Period Established In Lampf And Its Progeny:  Federal Securities Claims Are Dismissed**

A statute of repose limits potential liability by limiting the period of time during which a cause of action may be filed.[1] At issue here is whether a written consensual tolling agreement may extend the three-year outer limit established in Lampf and its progeny for filing federal securities claims.

---

[1] A statute of repose creates a substantive right in those protected to be free from liability after a legislatively-determined period of time.  First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 866 (4th Cir. 1989). Statutes of repose are based on considerations of the economic best interests of the public as a whole and are substantive grants of immunity based on a legislative balance of the respective rights of potential plaintiffs and defendants struck by determining a time limit beyond which liability no longer exists.  Id.

6

A.    Equitable Tolling And Equitable Estoppel Do Not Extend Limitation Period's Outer Limit[2]

1.    Equitable Tolling

The United States Supreme Court has considered the limitations period applicable to causes of action brought under § 10(b) and Rule 10b-5.  <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 111 S. Ct. 2773 (1991).  The Supreme Court found: "Litigation instituted pursuant to § 10(b) and Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."  <u>Id</u>. at 2782.

The <u>Lampf</u> Court stated:  "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure."  <u>Id</u>. The one-year period, the Supreme Court explained, begins after discovery of the facts constituting the violation, making tolling unnecessary.  <u>Id.</u>  "[T]he inclusion of the three-year period can have no significance in this context other than to impose an outside limit."  <u>Id.</u> (citing Bloomenthal, The Statute of Limitations and Rule 10b-5 Claims:  A Study in Judicial Lassitude, 60 U. Colo. L. Rev. 235, 288 (1989)).  "Because the purpose of the three-year limitation is clearly to serve as a cutoff, we hold that equitable tolling principles do not apply to

---

[2] "[E]quitable tolling applies when the plaintiff is unaware of his cause of action, while equitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's statements or conduct in failing to bring suit." <u>Stitt v. Williams</u>, 919 F.2d 516, 522 (9th Cir. 1990).

that period." <u>Id.</u>; <u>see</u> <u>United Insurance Management, Inc. v.</u> <u>Matsumoto</u>, 14 F.3d 1380, 1385 (9th Cir. 1994) (following <u>Lampf</u>).

Subsequent to <u>Lampf</u>, the Tenth Circuit provided:  "What is critical to understanding Section 13 as a statute of repose . . . is the recognition that, as such, not only is the remedy barred, but, also, the liability itself is extinguished." <u>Anixter v.</u> <u>Home-Stake Production Co.</u>, 939 F.2d 1420, 1434 (10th Cir. 1991) (quotations omitted).  The legislative history reinforces the conclusion that the three-year period is an outside absolute period.  <u>Id.</u>  "[N]o concept of equitable tolling can have validity beyond the three-year period of repose because Congress did not allow for breaching the Chinese Wall it intentionally created."  <u>Id.</u> at 1435.[3]

2.  Equitable Estoppel

Cases after <u>Lampf</u> have held that equitable estoppel does not extend the three-year limitations period on securities fraud claims.  <u>See</u> <u>Anixter</u>, 939 F.2d at 1436 ("'[u]nless the "in no

---

[3] In a pre-<u>Lampf</u> decision, offering one reason for the three-year absolute bar, the Seventh Circuit stated:

Prices of securities are volatile.  If suit may be postponed indefinitely on equitable grounds, then investors may gamble with other people's money.  An investor in [plaintiff's] position may sell her shares for a price certain.  If the firm does poorly, she keeps the money; if it does well, she sues and asks for the increase in value.  Congress chose one year after discovery, and a cap of two additional years on tolling principles, in order to curtail the extent to which securities laws permit recoveries based on the wisdom given by hindsight.

<u>Short v. Belleville Shoe Manufacturing, Co.</u>, 908 F.2d 1385, 1392 (7th Cir. 1990).

event more than three" language cuts off claims of tolling and
estoppel at three years . . . it serves no purpose at all --
what other function could be served by such language in a statute
that starts the time on discovery?'" (citing Short v. Belleville
Shoe, 908 F.2d 1385, 1391 (7th Cir. 1990))); Borden, Inc. v.
Spoor Behrins Campbell & Young, Inc., 778 F. Supp. 695, 698-99
(S.D.N.Y. 1991) (following Lampf and Anixter; equitable estoppel
not available to extend the statute of repose; three-year period
of repose acts as absolute bar); Covell v. Photo Images, Inc.,
774 F. Supp. 1321, 1326 (D.Kan. 1991) (following Lampf and
Anixter; despite plaintiff's allegations that he continually
received reassurances from defendants that the agreement would be
performed, plaintiff's § 10(b) claims are barred by the three-
year statute of repose).

    B.  Application

        1.  Introduction

    Assuming, without deciding, that Plaintiffs have properly
alleged federal securities claims, the Court finds that
Plaintiffs may not extend the three-year limit set forth in Lampf
and its progeny.

    In the case at bar, Plaintiffs allege that federal
securities violations occurred in December 1991.  Plaintiffs
claim that they first learned of the facts giving rise to the
violations in "early" 1993.

    Under the one-year/three-year structure set forth in Lampf,
Plaintiffs' lawsuit should have been commenced within one year

after the discovery of the facts constituting the violation --
that is, by "early" 1994 -- and within three years after such
violation -- that is, by December 1994.  Though caselaw permits
equitable principles to extend the one-year limit (the "early"
1994 cutoff), caselaw does not permit an extension of the three-
year limit (the December 1994 cutoff).  Plaintiffs should have
filed their suit by December 1994.  Instead, Plaintiffs filed on
January 23, 1995.[4]  Plaintiffs' federal securities claims are
therefore time-barred as they were filed approximately two months
late.

>    2.  Plaintiffs' Leading Cases Are Unpersuasive

In spite of the weight of the caselaw against them,
Plaintiffs argue that the three-year limit announced in <u>Lampf</u>
was extended by their tolling agreement.  The three leading cases
Plaintiffs cite in order to demonstrate that tolling agreements
may extend the three-year limit are unpersuasive.  First, in <u>In
re Sunrise Sec. Litig.</u>, 793 F. Supp. 1306 (E.D. Pa. 1992),
Plaintiffs assert that the parties entered into a tolling
agreement within three years of when certain securities
violations occurred (between 1983-1986), but that the plaintiffs
did not bring their claims until "well <u>after</u> three years."  Pls.
Opp. at 8 (emphasis in original).  However, it appears that the
underlying action in <u>In re Sunrise</u> was filed within three years

---

[4] Pursuant to Fed. R. Civ. P. 15(c)(2), Plaintiffs' Amended
Complaint filed on April 5, 1995 relates back to the original
Complaint and is deemed filed as of the date of the original
Complaint.

of those alleged violations, not after that period expired.  See
In re Sunrise Sec. Litig., 131 F.R.D. 450, 452-53 (E.D. Pa.
1990).   The cross-claims, on the other hand, were filed more than
three years after such alleged violations.  Since the decision
did not include an analysis of the effect of the tolling
agreement, it is unclear whether the court allowed the cross-
claims in light of the tolling agreement or based on the ground
that they related back to allegations raised in the consolidated
complaints, which were timely filed.  See Kansa Reinsurance Co.,
Ltd. v. Congressional Mortgage Corp. of Texas, 20 F.3d 1362, 1368
n.6 (5th Cir. 1994) (cross-claim may relate back to original
complaint in certain circumstances); Sharps Run Associates v.
C.G. Realty Capital Ventures, 157 B.R. 766, 781 (D. N.J. 1993)
(same); United States v. Old World Artisans, Inc., 702 F. Supp.
1561, 1569-70 (N.D. Ga. 1988) (same).

The second of Plaintiffs' cases, McCool v. Strata Oil Co.,
972 F.2d 1452 (7th Cir. 1992), does not indicate that the Court
may extend the three-year limit.  McCool involved an Illinois
statute of limitations, not the federal statutes applicable here
and in Lampf.  In fact, the court in McCool held that Lampf was
not applicable to the claims before it because McCool was filed
before Lampf was decided.  Id. at 1458-59.  Moreover, the McCool
court referred to the "absolute three-year bar adopted in Lampf,"
and recognized that if Lampf were applied to the case before it,
plaintiffs' federal securities claims would be barred.  Id. at
1458.

11

The last of Plaintiffs' cases, <u>Teradyne, Inc. v. Drummey,</u> <u>Rosane and Anderson, Inc.,</u> Civ. No. 87-689 (Mass. Super. Ct. April 1993), an unreported state trial court opinion, is also unpersuasive. That case involved whether a claim could be brought for faulty construction under Massachusetts law. The opinion does not discuss or cite any federal securities case. It therefore lacks any bearing on this Court's understanding of the federal securities laws as interpreted by the United States Supreme Court.

### 3. <u>Lampf</u> Bar Is Absolute, Not Relative

Plaintiffs contend that the three-year bar under <u>Lampf</u> is not absolute. First, Plaintiffs cite two unreported cases for the proposition that "class actions <u>do</u> suspend the statute of repose and that, if class certification is denied or members opt out of the class, Rule 10b-5 claims may be brought many years after the alleged violations." Pls. Opp. at 11 (emphasis in original); <u>see generally</u> <u>Salkind v. Wang</u>, Civ. A. No. 93-10912-WGY, 1995 WL 170122 (D. Mass. March 30, 1995) (unreported); <u>In re</u> <u>Activision Securities Litigation</u>, No. C-83-4639(A) MHP, 1986 WL 15339 (N.D. Cal. Oct. 20, 1986) (unreported and pre-<u>Lampf</u>). This statement is misleading. It does not explain that the claims which may be brought later may only include those covered in the timely-filed class action.[5] Different or peripheral claims which do not "concern the same evidence, memories, and witnesses

---

[5] The nature of a class action recognizes that one who opts out of the class is treated as having filed his or her claim when the class action is filed.

as the subject matter of the original class suit" are barred by Lampf's three-year limit.  See Salkind 1995 WL 170122 at *3 (quotations omitted).

Second, Plaintiffs contend that, under Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc., 967 F.2d 742, 751 (2d Cir. 1992), if a defendant fails to assert the three-year statute of repose available under Lampf as an affirmative defense, the defendant will have waived the defense.  Plaintiffs' reference to Litton is wrong.  The court in Litton expressly held that the Lampf rule did not apply to the action pending before it because Lampf did not apply retroactively.  The court said that if Lampf had applied, "Litton's section 10(b)/rule 10b-5 claims would be time barred."  Id. at 751.

Third, Plaintiffs argue that because the three-year bar is considered substantive and not procedural, it may be waived, and is therefore not absolute.  This conclusion is incorrect.  The United States Supreme Court expressly rejected that argument. "The proper test is not whether a time limitation is 'substantive' or 'procedural,' but whether tolling the limitation in a given context is consonant with the legislative scheme. American Pipe And Constructing Co. v. Utah, 414 U.S. 538, 557-58 (1974).  Following the Supreme Court, the Ninth Circuit stated: "Neither the mere fact that a statute creating a cause of action also contains a time limitation nor whether a time limitation is viewed as substantive or procedural forecloses the question of allowing or disallowing tolling; the determinative factor is

13

whether tolling is not inconsistent with the legislative purpose." Whittaker v. Whittaker Corp., 639 F.2d 516, 527 (9th Cir. 1981); see also Davis v. Valley Distributing Co., 522 F.2d 827, 830 n.7 (9th Cir. 1975). Accordingly, because the legislative scheme dictates that the outer limit of the repose period is an absolute bar, the three-year limit may not be waived.

4.   Tolling Agreement Does Not Alter Date Action
      Deemed Filed

Plaintiffs further contend that they did file within the three-year period because the tolling agreement provides that any claim asserted prior to the agreement's expiration will be deemed asserted as of the date of the agreement. Accordingly, Plaintiffs' contend that the effective date of their filing is May 13, 1993 -- well within the three-year limit. The Court is not persuaded by this argument. To permit it would allow parties to undercut the intent of Congress and the rulings of the federal courts. The Court observes that Plaintiffs have been unable to offer a post-Lampf federal court case that extends the three-year limit based on a tolling agreement.[6]

---

[6] While cases outside the federal securities area are largely irrelevant, the Court notes a case Defendants cited, Midstate Horticultural Co., Inc. v. Pennsylvania R. Co., 64 S. Ct. 128, 129 (1943), in which the United States Supreme Court held that a written tolling agreement could not waive the three-year outside period to file actions under the Interstate Commerce Act, as waiver would be contrary to the intent and effect of the Act.

5. Tolling Agreement Raises Equitable Estoppel Argument

Plaintiffs also claim that the cases on equitable tolling and equitable estoppel are inapplicable here because of the contractual nature of the tolling agreement. The Court disagrees: the Court finds that Plaintiffs are in fact asserting an equitable estoppel argument. Instead of failing to bring suit because of Defendants' statements or conduct, Plaintiffs are claiming that they failed to file suit because of a written agreement. Where the terms are uncontested, the Court finds no reason to treat someone who relies on a written agreement differently than someone who relies on an oral agreement. Plaintiffs knew of their cause of action during the three-year period, but mistakenly chose not to file suit in reliance upon the agreement.

6. Conclusion

Though such an outcome may seem harsh, it is proper in light of the emphatic position Congress took in setting the three-year limit. "[T]he congressional debate addressed the problem of parties' attempting to settle or negotiate a claimed violation in the face of the unfairness of the running of the limitations period. Emphatically, Congress opted for the absolute bar." Anixter, 939 F.2d at 1435-36. See also Durning v. Citibank, International, 990 F.2d 1133, 1136 n.3, 1137 (9th Cir. 1993) (noting that the Supreme Court in Lampf created a "bright line three-year period of repose" and that the Supreme Court provided a "clear dictate"); In re Integrated Resources, Inc., 851 F.

15

Supp. 556, 566 (S.D.N.Y. 1994) (the three-year time limit is an absolute outer limit).

Even in the situation where fraud occurs, and through no fault or want of diligence on the part of the injured, that party does not discover the fraud within the three-year limit, the three-year limit may not be extended. Lampf, 111 S. Ct. at 2782; see S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1308 (9th Cir. 1982) (three-year bar is absolute even where fraud actively concealed); Anixter, 939 F.2d at 1434 (if discovery does not occur or should not have occurred within three years of the date of the violation, "the cause of action lapses and cannot be enforced for any reason."); see also Aizuss v. Commonwealth Equity Trust, 847 F. Supp. 1482, 1486 (E.D. Cal. 1993) (any action brought more than three years after sale or purchase of securities at issue is absolutely time-barred).

In light of the foregoing, the Court dismisses the federal securities claims, Counts I and II,[7] due to the three-year outer limit imposed by Lampf and its progeny.

## II.    Court Declines To Exercise Supplemental Jurisdiction: State Law Claims Are Dismissed Without Prejudice

Supplemental jurisdiction over state law claims is governed by 28 U.S.C. § 1367.  Section 1367(a) provides that a district

---

[7] Count II is a derivative action of Count I.  In Count I, Plaintiff EPT alleges a federal securities claim based on § 10(b).  In Count II, Plaintiff EPT alleges liability of those persons that "control" the persons liable under Count I.  Thus, Count II may not be asserted if Count I is dismissed.  Defendants assert this point, the Court agrees with it, and Plaintiffs do not contest it.

16

court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Under § 1367(c), a court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

The Ninth Circuit has recently held that § 1367 requires a district court to exercise its supplemental jurisdiction over pendent state claims unless § 1367(b) or one of the categories specifically enumerated in § 1367(c) applies.  Executive Software North America, Inc. v. United States District Court, 24 F.3d 1545, 1554 (9th Cir. 1994).  Because § 1367(c) provides the exclusive means by which a court may decline supplemental jurisdiction, it restricts the holdings of Gibbs, Carnegie Mellon, and their progeny which permitted a court greater flexibility to decline jurisdiction where doing so "would most sensibly accommodate" the values of "economy, convenience, fairness, and comity."  Executive Software, 24 F.3d at 1554, 1556-57; see also United Mine Workers v. Gibbs, 383 U.S. 715

17

(1966); <u>Carnegie-Mellon University v. Cohill</u>, 484 U.S. 343
(1988).

In order to decline supplemental jurisdiction a court must
first identify a factual predicate that corresponds to one of the
§ 1367(c) categories. <u>Executive Software</u>, 24 F.3d at 1557. Once
that predicate is established, a court should only exercise its
discretion to decline jurisdiction where dismissing or "remanding
the pendent state claims comports with the underlying objective
of most sensibly accommodating the values of economy,
convenience, fairness, and comity." <u>Id.</u> (quoting <u>Gibbs</u>, 383 U.S.
715 (internal quotes omitted)).

In the case at bar, subject matter jurisdiction was
established solely by the presence of federal securities claims.
No diversity jurisdiction exists. Because all federal claims
have now been dismissed, the Court has dismissed all claims over
which it has original jurisdiction, thereby satisfying 28 U.S.C.
§ 1367(c)(3).

The Court finds that dismissal of the pendent state claims
is proper in light of "the values of economy, convenience,
fairness, and comity." Only state law claims now remain. It is
well-settled that "in the usual case in which federal-law claims
are eliminated before trial, the balance of factors will point
toward declining to exercise jurisdiction over the remaining
state law claims." <u>Schneider v. TRW, Inc.</u>, 938 F.2d 986, 993
(9th Cir. 1991) (quoting <u>Carnegie-Mellon Univ.</u>, 484 U.S. at 350
n.7). "'Needless decisions of state law should be avoided both

18

as a matter of comity' and to provide the parties with a 'surer-footed reading of applicable law.'" <u>Executive Software</u>, 24 F.3d at 1553 (quoting <u>Gibbs</u>, 383 U.S. at 726).  The Court also notes that, according to Defendants, all parties are either Delaware partnerships or corporations and that a similar action has already been filed by Defendants before the Delaware Chancery Court.

In light of the foregoing, the Court declines to exercise supplemental jurisdiction over the state law claims and hereby dismisses them without prejudice.

<u>CONCLUSION</u>

The Court GRANTS Defendants' motion to dismiss the federal securities claims set forth in Counts I and II.  Pursuant to 28 U.S.C. § 1367(c)(3) and the relevant caselaw, the Court DECLINES to exercise supplemental jurisdiction over the state law claims, and hereby DISMISSES them without prejudice.  Accordingly, the Motion To Stay Or Dismiss State Law Counts Of The Amended Complaint scheduled for July 31, 1995 is MOOT.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, _____**JUN 3 0 1995**_____.


_____
Chief United States District Judge


<u>SEI HAWAIIAN COGENERATORS, INC., ET AL V. ABB HAWAIIAN COGENERATION, INC., ET AL; CIV. NO. 95-00048 ACK; ORDER GRANTING MOTION TO DISMISS THE AMENDED COMPLAINT</u>

19

# Exhibit T

Case 1:11-cv-05201-DLC   Document 53-5   Filed 01/20/12   Page 134 of 148

Case 3:07-cv-01335-L   Document 1   Filed 08/02/07   Page 1 of 15 PageID #...

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**ORIGINAL**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG – 2 2007

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | |
|---|---|
| FEDERAL HOME LOAN MORTGAGE CORP., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| AMERICAN HOME MORTGAGE CORP., | ) |
| 4600 Regent Blvd., Suite 200 | ) |
| Irving, Texas 75063, | ) |
| | ) |
| Defendant. | ) |

**3-07CV1335-L**

Civil Action No. 3:07cv_____

## COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

Plaintiff Federal Home Loan Mortgage Corp. ["Freddie Mac"] files this Complaint and states:

I.   *JURISDICTION AND VENUE.*

1.   This Court has original jurisdiction over this matter under 12 U.S.C. § 1452 and 28 U.S.C. § 1345.

2.   Venue properly lies in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in this District and Division.

II.   *BACKGROUND.*

3.   Freddie Mac is a corporate instrumentality of the United States of America

pursuant to the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-59. Freddie Mac has its principal place of business in McLean, Virginia.

4.      Congress created Freddie Mac in 1970 to develop a secondary mortgage market for conventional residential loans. To achieve this congressionally mandated purpose, Freddie Mac, among other activities, purchases conventional mortgage loans from mortgage sellers approved by Freddie Mac.

5.      Mortgage sellers agree to sell and service mortgages pursuant to the terms and conditions contained in certain purchase documents consisting of, among others, a purchase contract, Freddie Mac's Sellers and Servicers Guide ["the Guide"], and bulletins issued periodically by Freddie Mac to its sellers and servicers which supplement the parties' agreement.

6.      Freddie Mac sellers may also service mortgages purchased by Freddie Mac. Servicer performs the obligations described in detail in the Guide, including tasks necessary to maintain mortgages sold to Freddie Mac in a manner which protects Freddie Mac's interests.

7.      All Freddie Mac sellers warrant and agree that the seller and/or servicer has complied and will comply with the terms and conditions of the Guide.

8.      The Guide contains terms, conditions and requirements which govern, and also become part of, Freddie Mac's contracts with the institutions with which it does business. The Guide is the basic contract between Freddie Mac and its sellers and servicers. The sellers and servicers agree to all terms, requirements and conditions set

COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION                    Page 2

forth in the Guide.

9.    For each mortgage purchased by Freddie Mac, the Freddie Mac servicer agrees that it will maintain a mortgage file and all underlying books and records, which are owned by Freddie Mac and maintained by the servicer, pertaining to any mortgages serviced by the servicer in accordance with the terms and conditions of the Guide ["the mortgage loan files"]. The mortgage loan files must be maintained during the time Freddie Mac retains any ownership interest in the mortgage and for a period thereafter.

10.    The mortgage loan files maintained by the Freddie Mac servicer contain records that reflect the underwriting decisions and all other documents commonly required by the Guide and commonly maintained in files of private institutional mortgage lenders or servicers ["origination information"].

11.    Each Freddie Mac seller and/or servicer warrants that all information submitted to Freddie Mac is true, complete and accurate, and each agrees to allow Freddie Mac to inspect all of the mortgage loan origination files. In addition, all sellers or servicers agree, on request, to deliver original documents from the mortgage loan files to Freddie Mac.

12.    Defendant American Home Mortgage Corp. ["AHM"] was a Freddie Mac seller and servicer. It serviced approximately 4,500 of Freddie Mac mortgage loans, which have an unpaid principal balance of just under $800 million. Because it was servicing these loans, AHM has in its possession the mortgage loan files and payment information for these Freddie Mac loans.

13.    As a Freddie Mac seller and servicer, AHM's relationship with Freddie

COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION                    Page 3

Mac is governed by the terms and conditions of the Guide.

14.    The Guide includes the following terms and conditions:

§ 5.2   Without limiting Freddie Mac's right to take whatever other action it deems appropriate to protect its interests and enforce its rights (including disqualification or suspension for reasons not listed below), Freddie Mac may disqualify or suspend a Seller or a Servicer for any of the following reasons:

* * * *

8.    The Seller's or the Servicer's failure to maintain qualified loan origination or Servicing staff and/or adequate facilities to assure (i) the investment quality of the Mortgages sold to Freddie Mac or (ii) the adequacy of the Servicing of the Mortgages purchased by Freddie Mac.

9.    Any weakness or notable change in the financial or organizational status of the Seller or the Servicer that, in the opinion of Freddie Mac, could adversely affect Freddie Mac.

10.    The failure of the Seller or the Servicer to meet any requirement as may be prescribed by Freddie Mac for eligibility as a Seller or a Servicer.

* * * *

15.    The Seller or the Servicer's failure to observe or comply with any term or provision of the Purchase Documents.

* * * *

19.    Failure by the Seller or the Servicer to perform under any contract with Freddie Mac including, but not limited to, a contract with Freddie Mac's Securities Sales and Trading Group.

§ 73.1 Freddie Mac may terminate Servicing by the Servicer at any time with cause for any of the reasons for disqualification cited in Section 5.2 . . . . Termination of servicing with cause is a basis for immediate disqualification as a Seller/Servicer . . . .

§ 73.2 If Freddie Mac transfers the Servicing of any Mortgage, the Servicing Compensation . . . is paid to the new Servicer.

§ 73.3 Upon termination of the Servicing of any Mortgage, *the Servicer is responsible for supplying . . . all reports, documents and information . . . requested by Freddie Mac on the date specified by Freddie Mac.*

COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION                    Page 4

§ 73.4 The remittance to Freddie Mac of Mortgage collections for each Mortgage for which Servicing is terminated *must* be made *on the date specified* by Freddie Mac . . . . Additionally, all Escrow Funds, Escrow Accounts and prepared installments . . . must be transferred to the new Servicer on the date specified by Freddie Mac.

The Servicer *must use its best efforts* to effect the orderly and efficient Transfer of Servicing to the new Servicer.

[Emphasis added.]

III.    DEFENDANT'S DISQUALIFICATION.

15.    On or prior to August 1, 2007, AHM's financial condition deteriorated dramatically, and on July 31, 2007, AHM announced that it had not funded its lending obligations of $300 million on July 30, 2007, and that it would not be able to fund its lending obligations of $450-500 million on July 31. Press releases issued by AHM stated that it anticipated the liquidation of its assets. The stock of AHM's parent declined in value precipitously to approximately One Dollar per share. The deterioration of AHM's financial condition continues and puts AHM in a position where it is no longer in compliance with its obligations under the Guide.

16.    In addition, AHM has breached its obligations under the Guide in numerous respects, including but not limited to the following:

a.    AHM failed to report and remit funds to Freddie Mac in a timely manner for repurchases issued for loans determined to be of non-investment quality.

b.    AHM failed to meet Guide requirements to repurchase mortgages after receipt of Freddie Mac's repurchase letter.

c.     As to certain loans, AHM did not appeal from Freddie Mac's request for repurchase but did not repurchase the loan as required by the Guide.

d.     AHM's possible liquidation or bankruptcy materially interferes with its ability to meet its obligations under the Guide and Freddie Mac's investigation into other breaches continues.

17.     By overnight letter dated August 1, 2007, Freddie Mac notified AHM that AHM's eligibility to sell and/or service Freddie Mac mortgages was terminated immediately.  A true and correct copy of this letter is attached hereto and incorporated herein by reference as Exhibit A.  The August 1, 2007, letter also was faxed to AHM that day, and representatives of Freddie Mac left telephone messages with its President and in-house counsel advising of the termination.

18.     Freddie Mac's August 1, 2007, letter explicitly required AHM to deliver all Freddie Mac files and records to Freddie Mac or Freddie Mac's designee forthwith, subject to Freddie Mac's reservation of all rights to pursue additional and further remedies.   All relief requested by Freddie Mac is in accord with the Guide's requirements agreed to by AHM, including but not limited to the Guide's requirements for delivery of files, documents and records upon termination of AHM's relationship with Freddie Mac.

19.     AHM actually received notification of its termination on August 1, 2007, but has failed and refused to deliver the files and records requested by Freddie Mac despite specific oral and written requests that it do so in violation of sections 73.3 and 73.4 of the guide.  Likewise, AHM has refused to deliver the power of attorney required

by Freddie Mac or provide full accounting for and/or delivery of funds due and owing

to Freddie Mac.   Additionally, pursuant to its rights under the Guide, Freddie Mac

demanded the Freddie Mac portfolio files on August 1, 2007, at defendant's servicing

facility in Irving, Texas, but defendant has wrongfully refused to provide such files.

Instead, defendant had its security personnel escort the Freddie Mac representatives out

of the defendant's facility. Under applicable provisions of the Guide, if Freddie Mac

transfers the servicing of any mortgage, the servicing compensation is paid to the new

servicer.

COUNT ONE – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

20.      Freddie Mac incorporates paragraphs 1-19 of this Complaint as though

fully set forth herein.

21.      Freddie Mac is entitled under 28 U.S.C. § 2201 et seq. to a declaratory

judgment that it is entitled to immediate possession of all mortgage loan files and funds

for the mortgages owned by Freddie Mac which were serviced by AHM.

22.      The files and records described in this Complaint contain essential

information for the servicing of mortgages, the proper handling, disposition and

crediting of payments, and the resolution and disposition of foreclosures.  Freddie Mac

will suffer immediate, continuing and irreparable relief, including prejudice to its legal

rights if it does not receive immediate possession of the files and records set forth

herein.

23.      Pursuant to the terms of its contract with AHM and the requirements of

the Guide, Freddie Mac has an absolute and immediate right to possession, custody and

COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION              Page 7

control of these documents, records and materials and funds without the posting of a bond.

24.     Because Freddie Mac has the right to terminate its relationship with AHM, Defendant has no right to possession of these records or funds.

COUNT TWO – SEQUESTRATION

25.     Plaintiff incorporates paragraphs 1-24 hereof as though fully set forth.

26.     Pursuant to its authority under the All Writs Act, this Court has authority to issue all writs necessary in aid of its jurisdiction, including writs of replevin or sequestration as allowed by state law.

27.     Under Chapter 62, TEX. CIV. PRAC. & REM. CODE, this Court has the authority to issue a writ of sequestration directing AHM to turn over the mortgage files described herein.  There is immediate danger that these files and the information they contain will be lost to Freddie Mac if the writ is not granted or that the files will be lost, disposed of or destroyed if the writ is not granted.  Said files are the property of Freddie Mac and it is entitled to immediate possession of them.

COUNT III -- BREACH OF CONTRACT

28.     Freddie Mac incorporates paragraphs 1-25 of this Complaint as though fully set forth herein.

29.     AHM's failure to comply with the terms of its contract with Freddie Mac constitutes a breach thereof which has proximately caused Freddie Mac damages.

30.     In addition, to vindicate its legal rights with respect to a breach of contract which occurred in the state of Texas, Freddie Mac is entitled to recover its reasonable

attorney's fees and costs pursuant to Chapter 38, TEX. CIV. PRAC. & REM. CODE.

WHEREFORE, Plaintiff prays for judgment in its favor including without limitation the following relief:

a.    Entry of a temporary restraining order, temporary injunction, and permanent injunction against Defendant enjoining, restraining and directing Defendant, and its agents, servants, employees, attorneys, affiliates and all others acting for, in active concert or through or under them (i) to deliver to Plaintiff or its designee all mortgage files serviced by AHM for Freddie Mac including all documents described in Exhibit A attached hereto; (ii) to deliver to Plaintiff or its designee all funds derived from these mortgage loans, including any funds designated as impounded funds, less servicing fees earned and hereafter deliver any additional funds Defendant may receive with respect thereto; (iii) to refrain from destroying, altering or disposing of the mortgage loan documents required to be delivered to Plaintiff or its designee; and (iv) to refrain from taking any other action with respect to mortgage loans heretofore serviced by Defendant on behalf of Freddie Mac including without limitation refraining from depositing any payments received by AHM concerning the aforesaid mortgage loans or disbursing any sums held by AHM.

b.    Alternatively, an order or seizure pursuant to the authority set forth above, directing the United States Marshal, or other officer to whom the writ is directed to take immediate possession of the mortgage loan files and deliver the same to Freddie Mac or its designee.

c.    Damages in an amount to be determined at trial;

COMPLAINT AND REQUEST FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION                    Page 9

d.      Such other and further relief as the Court deems appropriate in the premises, including attorney's fees, costs, and pre- and post-judgment interest.

Respectfully submitted,

Thomas B. Alleman          01017485
  *Attorney-in-charge*
Wm. Frank Carroll          03892500
John Reenan               00789777
of
WINSTEAD PC
1201 Elm, Suite 5400
Dallas, Texas 75270
214 745 5400 phone
214 745 5390 fax

ATTORNEYS FOR PLAINTIFF

Dallas_1\5072043\1
999993-1 8/2/2007

# EXHIBIT A

Aug-01-2007  11:59am  From-FM CRM                    6713923446            T-932  P.001/003  F-830



**Freddie Mac**

1551 Park Run Drive
McLean, VA 22102-3110

We make home possible℠

## VIA OVERNIGHT MAIL

August 1, 2007

Mr. Michael Strauss
President
American Home Mortgage Corp.
538 Broadhollow Rd.
Melville, NY 11747

RE:   Seller/Servicer #'s 137027,138277,134095,133196,130245,123272
      **Termination of Seller/Servicer Eligibility**

Dear Mr. Strauss:

This letter provides written notice that pursuant to sections 5.1-5.3 and 73.1 of the Freddie Mac *Single-Family Seller/Servicer Guide* (the *"Guide"*), the eligibility of American Home Mortgage Corp. ("AHM") to sell mortgages to and to service mortgages for Freddie Mac is terminated with cause, effective immediately, August 1, 2007 without further notice from Freddie Mac.

Freddie Mac has determined that AHM is not in compliance with the following requirements:[1]

1.  **Guide Section 5.2 (9):**  AHM has a significant weakness or notable change in its financial status, which in Freddie Mac's opinion could adversely affect Freddie Mac.

2.  **Guide Section 5.2 (10):** AHM has failed to meet requirements as may be prescribed by Freddie Mac for eligibility as a Seller or Servicer;

3.  **Guide Section 5.2 (15):** AHM has failed to observe or comply with a term(s) or provision(s) of the Purchase Documents;

4.  **Guide Section 5.2 (16):**  AHM has failed to maintain qualified loan origination or servicing staff and/or adequate facilities to assure (i) the investment quality of the Mortgages sold to Freddie Mac or (ii) the adequacy of the Servicing of Mortgages purchased by Freddie Mac; and

5.  **Guide Section 5.2 (29):** AHM has failed to fulfill any obligation to Freddie Mac when due including, but not limited to, its failure to pay fees or other monies and remit custodial or buydown funds.

---

[1] The fact that certain grounds for the decision are stated in this letter does not imply that additional grounds do not exist.

Aug-01-2007 11:56am   From-FM CRM                    5713823446              T-932   P.002/003   F-830

Based on the press releases issues by AHM that AHM has had a change in its financial position that continues to deteriorate rapidly and that has resulted in AHM liquidating, or anticipating liquidation of its assets, Freddie Mac has serious concerns about AHM's ability to meet the requirements of the Guide.

In light of AHM's deteriorating financial condition, Freddie Mac is troubled by AHM's failure to report and remit funds to Freddie Mac in a timely manner for repurchases issued for loans determined to be of non-investment quality in accordance with the terms of the *Guide*. According to the terms of the *Guide*, AHM had five days from the date of Freddie Mac's repurchase letter to repurchase those mortgages and to remit the funds to Freddie Mac, five days from the date of the repurchase letter to appeal the repurchase demand, and five days from the date of Freddie Mac's appeal denial letter to repurchase and to remit the repurchase funds to Freddie Mac. AHM has failed to meet these deadlines. Freddie Mac issued a repurchase letter on the Demabveke loan – Freddie Mac loan #292453868 (currently in REO status) and the Perez loan – Freddie Mac loan # 961678054 (currently in Foreclosure status and under appeal) on January 22, 2007 and July 17, 2007 respectively. AHM did not appeal the Demabveke repurchase demand within five days of its issuance and has not yet repurchased the loan. The repurchase of these loans were due on February 21, 2007 and August 16, 2007, respectively, and the repurchases have not yet been made.

Please note, Freddie Mac is continuing its review of loans sold by AHM and additional repurchases may be issued as a result.

AHM's termination status does not affect its warranties and obligations under the Purchase Documents, and is without prejudice to any claim that Freddie Mac may have for other breaches by AHM of the Purchase Documents, including, but not limited to, claims for repurchase of any additional ineligible mortgages and outstanding fees. Also, please be advised that Freddie Mac retains all of its rights under the Purchase Documents to take any further action and to pursue any additional remedies that Freddie Mac may, in its discretion, deem necessary.

Pursuant to Section 73.3 of the Guide, AHM must immediately deliver to Freddie Mac, or its designee, all mortgage files serviced for Freddie Mac. The mortgage files delivered to Freddie Mac or its designee must contain, at a minimum, the information and documentation set forth in Chapter 47 and Section 52.1 of the Guide, including without limitation:

    a) Loan origination documentation, including, but not limited to, the original recorded deed of trust or mortgages and original recorded assignments, to Freddie Mac, original participation certificates, policies, and all loan underwriting documents;

    b) All loan servicing documents, including, but not limited to, tax receipts and bills, insurance policies, insurance premium receipts,

Aug-01-2007 11:56am   From-FM CRM                     5713923446              T-932  P.003/003  F-630

ledger sheets, payment records, insurance claim files and correspondence, foreclosure files and correspondence, current historical data files, and current loan level trial balances, (including documents and records in whatever form existing, whether printed, handwritten, or on computer software); and

c) Any documents of the type described above which come into AHM's possession after the time in which AHM has delivered the loan files.

> Freddie Mac's Designee:
> U.S. Bank N.A.
> 4801 Frederica St.
> Owensboro, KY 42304

*In addition, please execute and provide Freddie Mac a limited power of attorney for the purpose of completing the necessary assignments of these loans.*

Pursuant to Guide Section 5.4, AHM may appeal Freddie Mac's termination decision according to the procedures specified in Section 5.4.  Any appeal must be addressed to:

> Ronald L. Ratcliffe
> VP, Counterparty Credit Risk Management
> 1551 Park Run Drive, MS D3A
> McLean, VA  22102-3107
>       Attn: Karen McKoy

If a written appeal, in compliance with the requirements of Section 5.4, is not postmarked or hand delivered to Freddie Mac within 15 calendar days from the date of receipt of this letter, AHM will be deemed to have waived its right to appeal Freddie Mac's decision. Likewise if AHM is unsuccessful in its appeal AHM's non-exclusive right to Freddie Mac's Loan Prospector® system will be terminated.

If you have any questions regarding the above, please contact me at (571) 382-3455.

Sincerely,

Pam Williams
Director
Counterparty Credit Risk Management

JS 44 (Rev. 10/06)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Federal Home Loan Mortgage Corp.

AUG 2 2007

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**DEFENDANTS**
American Home Mortgage Corp.

ORIGINAL

**(b)** County of Residence of First Listed Plaintiff   n/a
(EXCEPT IN U.S. PLAINTIFF CASES)
(Federal plaintiff)

County of Residence of First Listed Defendant   Dallas, TX
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Winstead PC
1201 Elm Suite 5400      214 745 5400 phone
Dallas TX 75270          214 745 5390 fax

Attorneys (If Known)
n/a

3-07CV1335-L

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

[X] 1 U.S. Government Plaintiff

[ ] 3 Federal Question
(U.S. Government Not a Party)

[ ] 2 U.S. Government Defendant

[ ] 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 |  | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act |  | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 340 Marine | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 365 Personal Injury - Product Liability | [ ] 345 Marine Product Liability | [ ] 690 Other |  | [ ] 490 Cable/Sat TV |
| [ ] 368 Asbestos Personal Injury Product Liability | [ ] 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 370 Other Fraud | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 190 Other Contract |  | [ ] 371 Truth in Lending | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 195 Contract Product Liability |  | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 196 Franchise |  | [ ] 385 Property Damage Product Liability | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence |  | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **Habeas Corpus:** |  | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General |  |  | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty |  |  |  |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other |  |  | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 550 Civil Rights |  |  |  |
|  | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from another district (specify)
[ ] 6 Multidistrict Litigation
[ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause: Action to recover mortgage files and funds of Pltf.

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) PENDING OR CLOSED
(See instructions):   JUDGE   n/a   DOCKET NUMBER

DATE   08 02 07

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE