# Exhibit U

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA

LAVANA FITZHUGH, MAYRA          *
QUIRINDONGO, SHEREE THOMAS
CARTRINA WILLIAMS               *
RUBY MACK, ALFRED OSBORNE
SHARON PEELE, JAMES SHORT       *
SARA WRIGHT,
                                *
and                                           Civ. A. No. 04-6830 B
                                *             Cal. 3
Tasha Settles, *personal representative of*   Judge Joan Zeldon
*The Estate of Robert Settles*  *
1427 Mercer Avenue
College Park, Maryland  30337,  *

and                             *

Debra Misse                     *
3070 30th Street, SE
Unit 203                        *
Washington, D.C.  20020,
                                *
and
                                *
Lucy Younger
8511 Madison Street             *
New Carrollton, Maryland  20784,
                                *
and
.                               *
Jeremy Bennett
8511 Madison Street             *
New Carrollton, Maryland  20784,
                                *
and
                                *
Ava Stapleton
3070 30th Street, SE            *
Unit 101G
Washington, D.C.  20020,        *

and                             *

Ernest Stapleton                                                    *
3070 30th Street, SE
Unit 101G                                                          *
Washington, D.C. 20020,
                                                                   *

and
                                                                   *

Terrence Shepherd                                                  *
P.O. Box 54701
Washington, D.C. 20037,                                            
                                                                   *

and
                                                                   *

Joanne Johnson Cole                                                *
3901 Suitland Road
Apt. 1207
Suitland, Maryland 20746,                                          *

and                                                                *

Maurice Ruffin                                                     *
3070 30th Street, S.E.
Unit 103                                                           *
Washington, D.C. 20020,
                                                                   *

and
                                                                   *

Edward B. McLeod, Sr.
3070 30th Street, S.E.                                  *
Unit 104
Washington, D.C. 20020,                                            *

and                                                                *

Germesa Ellis                                                      *
3070 30th Street, S.E.
Unit 202                                                           *
Washington, D.C. 20020,
                                                                   *

and
                                                                   *

Valerie Deal                                                       *
3070 30th Street, S.E.
Unit 302                                                           *
Washington, D.C. 20020,
                                                                   *

and                                                                *

Wanda Jenkins Anderson                    *
3070 30th Street, S.E.
Unit 303                                  *
Washington, D.C.  20020,
                                          *
and
                                          *
Tyrone Henderson
700 Whittier Street, N.W.                 *
Washington, D.C.  20012,
                                          *
and
                                          *
Annie Bell Bradford
3072 30th Street, S.E.                     *
Unit 101
Washington, D.C.  20020,                   *

and                                       *

Eugene Jones                              *
3072 30th Street, S.E.
Unit 201                                  *
Washington, D.C.  20020,
                                          *
and
                                          *
William Cowling
3072 30th Street, S.E.                     *
Unit 202
Washington, D.C.  20020,                   *

and                                       *

Edward Connors                            *
815 18th St. So.
Apt. 205                                  *
Arlington, Virginia  22202,
                                          *
and
                                          *
Ralph Harmon
1108 Lake Parke Drive                     *
Jacksonville, Florida  32259,
                                          *
and

Martha E. Santeliz                          *
3074 30th Street, S.E.
Unit 104
Washington, D.C.  20020,                    *

and                                         *

Stormy L. Brown                             *
419 Hazlett Avenue
Baltimore, Maryland  21229,                 *

and                                         *

Gloria Campbell                             *
533 Red Tip Lane
Loganville, Georgia  30052,                 *

and                                         *

Deborah Harvin                              *
3072 30th Street, S.E.
Unit 103                                    *
Washington, D.C.  20020,
                                            *
and
                                            *
Thomas Armstrong
3070 30th Street, S.E.                       *
Unit 101
Washington, D.C.  20020,                    *

and                                         *

KINGS CROSSING II OWNERS                    *
     GROUP, INC.
c/o Ernest Stapleton                        *
3070 30th Street, S.E.
Unit 101G                                   *
Washington, D.C. 20020,
                                            *
          Plaintiffs,
                                            *
     v.
COUNTRYWIDE FINANCIAL CORP., *et al.*,      *

          Defendants.                       *

*****ooooo0ooooo*****

## CORRECTED THIRD AMENDED COMPLAINT

Plaintiffs LaVana F. Fitzhugh, Mayra Quirindongo, Sheree Thomas, Cartrina Williams, Ruby Mack, Alfred Osborne, Sharon Peele, James Short, Sarah Wright, the Estate of Robert Settles, Debra Misse, Lucy Younger, Jeremy Bennett, Ava Stapleton, Ernest Stapleton, Terrence Shepherd, Joanne Johnson Cole, Maurice Ruffin, Edward B. McLeod, Sr., Germesa Ellis, Valerie Deal, Wanda Jenkins Anderson, Tyrone Henderson, Annie Bell Bradford, Eugene Jones, William Cowling, Edward J. Connors, Jr., Ralph Harmon, Martha E. Santilez, Gloria Campbell, Deborah Harvin, Thomas Armstrong, Stormy Brown and Kings Crossing II Owners Group, Inc. by their undersigned attorneys, sue Countrywide Home Loans, Inc.; Legacy Financial Group, Inc.; Presidential Bank, FSB; Regent Crossing, LLC; Ascend Communities, LLC; Washington Technology Group; Express Title Company; Eric Fedewa; James Preuss; Mitzie Preuss; Charles Tobias; Roger Black; and Doretha Austin and state:

1.      This case involves the sale of approximately 41 condominium units at King's Crossing II at 3070, 3072, and 3074 Thirtieth Street, S.E., Washington, D.C. ("King's Crossing II"). Plaintiffs, through Defendants' fraud and predatory lending conspiracy, were deceived into purchasing condominium units that are unstable, unsafe, hazardous, and uninhabitable, and into executing mortgage applications designed to deceive the Federal Housing Administration ("FHA"), Fannie Mae, investors and Plaintiffs. As a result of Defendants' fraudulent conduct and conspiracy to engage in such conduct, Plaintiffs have suffered and are continuing to suffer damages that include being subjected to intolerable living conditions and being bound to mortgages on defective condominium units that they cannot afford to maintain and cannot sell.

<u>Summary of the Scheme</u>

2.      This action involves a scheme among a developer, his companies and sales agents, a real estate appraisal company, a settlement attorney, and three mortgage lenders. This scheme was designed to abuse the mortgage lending system, to avoid its historical and regulatory safeguards (which are designed to protect individuals in Plaintiffs' position), and to exploit a national campaign to increase home ownership among minorities and low- to moderate-income individuals. These Defendants each participated in and furthered the conspiracy through fraud, predatory lending, and other tortious acts, including, *inter alia,* knowingly, intentionally, and with reckless disregard for the truth:

(a)      Engaging in false advertisements, promises and representations regarding the condition of condominium units;

(b)      Issuing a false and misleading Public Offering Statement;

(c)      Inflating appraisals of the condominium units;

(d)      Intentionally understating the estimated costs involved in owning and maintaining the condominium units and common areas;

(e)      Misrepresenting the status of down payment assistance to purchasers of the condominium units; and

(f)      Engaging in predatory mortgage practices that victimized minority, unsophisticated homebuyers, including the Plaintiffs.

3.      Defendants' scheme involves three aging properties ("the target properties"), King's Crossing II, and King's Court, in Southeast Washington, D.C., and King's Crossing I, in Temple Hills, Maryland.  These properties are former apartment complexes located in lower-income, minority communities.

2

4.     Defendants' means for accomplishing their scheme to defraud was to:

(a)     Purchase the target properties in a run-down and otherwise distressed state;

(b)     Cosmetically renovate the apartments in these properties and convert them into condominium units;

(c)     Sell the condominium units to primarily low-income, minority, first-time homebuyers, who were unsophisticated in the housing market and who lacked the resources and experience to discern Defendants' schemes;

(d)     Profit from selling the condominium units to these buyers; and

(e)     Realize additional profits through commissions and fees on mortgage loans to these buyers.

5.     Essential to the Defendants' scheme was avoiding the financial loss associated with the inevitable failure of the condominium developments when, as Defendants anticipated, the unsuspecting purchasers of the condominium units could not avoid foreclosure due to their inability to manage the expenses of their loans and maintaining the condominium units and common areas with their various defects.  Thus, on information and belief, to insulate themselves from this exposure, Defendants sold all of Plaintiffs' mortgages to third-party purchasers, such as Fannie Mae and private investors, or issued mortgages backed by FHA mortgage insurance, thereby placing the financial losses associated with the failure of these developments on others.

### The Roles of the Developers and Sales Agents

6.     On information and belief, in or about 2000, Eric Fedewa purchased an aging apartment building now known as King's Crossing II, located at 3070-74 30th Street, S.E., Washington, D.C.  He also established a sole-purpose corporation, Regent Crossing, whose sole asset was the property at 3070-74 30th Street, S.E., Washington, D.C.  Fedewa and Regent

3

Crossing then made cosmetic changes to the apartments therein, with the intent of selling those apartments as condominiums to unsuspecting, first-time homebuyers.

7.      In furtherance of this scheme, the developers, Eric Fedewa and his companies, Ascend Communities, Regent Crossing, and Washington Technology Group (hereinafter "Developer Defendants"), knowingly and intentionally employed unlicensed contractors. These contractors, with the consent and knowledge of Developer Defendants, knowingly and recklessly produced defective condominiums by deliberately failing to, *inter alia:*

     (a)    Comply with construction-industry code requirements;

     (b)    Obtain required construction permits from the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA");

     (c)    Obtain required building inspections from DCRA;

     (d)    Upgrade electrical systems to handle the load of each condominium;

     (e)    Upgrade plumbing systems to handle the increased loads required by their installation of washing machines, dishwashers and garbage disposals;

     (f)    Upgrade or replace aged and deteriorating heating and cooling units; and

     (g)    Otherwise perform in a workmanlike manner.

8.      Through these shoddy construction practices, Developer Defendants transformed King's Crossing II into dangerous, structurally unsound, and unstable condominiums. On information and belief, Developer Defendants employed similar tactics with the same results at King's Crossing I and King's Court.

9.      To market these condominium units, Developer Defendants produced a false and misleading Public Offering Statement, in direct contravention of the law that required them to fully and accurately describe the characteristics and condition of the condominium units, the common areas and the complex as a whole. On information and belief, Developer Defendants

4

produced similarly false and misleading Public Offering Statements for King's Crossing I and King's Court.

10.     Developer Defendants established an artificially low condominium-fee structure that was designed to attract prospective purchasers. Developer Defendants did so knowing that such fees would not cover the costs associated with maintaining the property and paying for utilities. On information and belief, Developer Defendants employed similar tactics at King's Crossing I and King's Court.

11.     Developer Defendants employed and directed Roger Black and Doretha Austin (hereinafter "Sales Defendants") as sales and customer-service agents for King's Crossing I and II and King's Court. With the knowledge, agreement and supervision of Developer Defendants, Sales Defendants targeted a pool of prospective buyers designed to be least likely to have home-buying experience; least likely to retain independent inspectors; least likely to ask probing questions or challenge their tactics; and least likely to commence remedial legal action.

12.     With the knowledge, agreement and supervision of Developer Defendants, Sales Defendants solicited unsuspecting, minority, low-income, unsophisticated homebuyers using tactics designed to convince these potential purchasers that they would receive newly renovated condominiums, and that the costs of owning these condominiums would be less than the costs of renting. Sales Defendants, in conjunction with Developer Defendants, intentionally misled Plaintiffs by, *inter alia:*

(a)     Misrepresenting the extent to which the condominiums and common areas had been or would be renovated;

(b)     Failing to disclose deficiencies in plumbing, heating, air conditioning, convectors, washers, dryers, pipes, ventilation, electrical infrastructure, and roofing, and that some of the condominiums had flooded in the past;

(c)     Falsely promising that the condominiums were backed by a two-year warranty;

(d)     Misrepresenting the costs of living at King's Crossing II in a rent versus ownership analysis performed for prospective buyers.

13.     On information and belief, at King's Crossing I and King's Court, Sales and Developer Defendants employed fraudulent tactics similar to those described in the above paragraph.

14.     With the knowledge agreement and supervision of the Developer Defendants, Mr. Black further induced Class Members and Individual Plaintiffs to purchase units at King's Crossing II by, *inter alia:*

(a)     Representing that each Plaintiff would need to contribute only a minimal down payment, which was less than the standard security deposits on most apartments in Washington, D.C.;

(b)     Enabling Plaintiffs to qualify for the purchase of these condominiums by making fraudulent arrangements with Defendants Countrywide Home Loans, Legacy Financial, James Preuss, Mitzie Preuss, Charles Tobias and Express Title to falsify loan documents to reflect a down payment comprised of gift funds that, in actuality, as these Defendants then knew, did not exist; and

(c)     Steering Plaintiffs to mortgage companies and loan officers, Countrywide Home Loans, Legacy Financial, Presidential Bank, James Preuss, Mitzie Preuss, who knowingly assisted in preparing the fraudulent mortgages and loan applications.

6

15.     On information and belief, Sales and Developer Defendants, Countrywide Home Loans, Legacy Financial, Presidential Bank, James Preuss, Mitzie Preuss, Charles Tobias and Express Title employed similar fraudulent tactics at King's Crossing I and/or King's Court.

### The Role of the Appraisers

16.     In furtherance of the scheme, Chesapeake Appraisals (hereinafter "Appraiser" or "Chesapeake") worked to ensure that prospective purchasers would obtain financing for the King's Crossing II condominiums, and that the condominium unit sales prices would meet FHA and conventional lending criteria. With the knowledge and agreement of the Developer Defendants, Chesapeake's appraisers inflated the value of the condominium units by creating false and misleading appraisal reports that were then submitted to mortgage company underwriters to ensure that Plaintiffs would be approved for mortgages to purchase the condominium units. Chesapeake Appraisal knowingly prepared false and misleading appraisals by, *inter alia:*

(a)     Stating that certain condominium units contained washers and dryers when, in fact, washers and dryers had not been installed in those units at the time of the appraisal, and were not installed until after the purchasers took possession of the condominiums;

(b)     Stating that condominiums had been gutted and rehabbed;

(c)     Inaccurately denoting floor plans by presenting a floor plan that varied significantly from the actual floor plans of some condominium units;

(d)     Denoting condominium units as being in "good / renovated condition," despite their knowledge that the Developer Defendants did not renovate those units, and then only in a cosmetic way, until after they sold them to Plaintiffs.

7

(e)     Denoting condominium units as being in "good / renovated condition," despite their knowledge that the Developer Defendants made only cosmetic changes to those units.

(f)     Concealing that the appraisers had not actually inspected many of the condominium units and had not properly inspected the common areas; and

(g)     Artificially inflating the value of the King's Crossing II condominium units by using as a cost comparison, condominium units in brick, fourplexes with higher market values than those at King's Crossing II.

<u>The Role of the Settlement and Mortgage Companies</u>

17.     In furtherance of the scheme, Mr. Black, and Developer Defendants then conspired with Charles Tobias and Express Title (hereinafter "Escrow Defendants"), and with Defendants Countrywide Home Loans, James Preuss, Mitzie Preuss, Legacy Financial and Presidential Bank (hereinafter "Mortgage Defendants") to falsify loan documents to ensure that Class Members and Individual Plaintiffs qualified for conventional and FHA mortgages. With the knowledge and agreement of Developer Defendants, Escrow Defendants, in conjunction with Mortgage Defendants, furthered the fraudulent and predatory scheme by, *inter alia*, intentionally:

(a)     Creating falsified settlement documents that reflected a down payment that, as these Defendants then knew, did not exist and was never paid;

(b)     Failing to verify that prospective purchasers actually contributed down payments in an amount required by conventional mortgage guidelines and HUD regulations;

(c)     Submitting falsified rental histories, down payment gift letters, and roof certifications to mortgage underwriters and the FHA;

(d) Failing to ensure that prospective purchasers/mortgage applicants could afford their mortgages and all other obligations in contravention of HUD regulations; and

(e) Ignoring the fact that the represented condominium fees were insufficient to maintain the condominium complex and pay utility bills.

18. With the knowledge, agreement and supervision of Developer Defendants, Mr. Black and the Mortgage and Escrow Defendants ensured that Plaintiffs entered into contracts for purchase of the condominium units, and assumption of the mortgages by, *inter alia:*

(a) Conducting multiple loan and property settlement transactions in a single meeting;

(b) Refusing to allow purchasers a meaningful opportunity or time to review documents relating to their purchase and loan transactions; and

(c) Depriving purchasers of a meaningful opportunity to question and understand the commitments to which they were to be bound.

19. Pursuant to the scheme as outlined above, these Defendants lulled each Plaintiff into purchasing his or her condominium unit, and into relying upon Defendants' intentional concealments and misrepresentations. As the Defendants then knew and intended, pursuant to the scheme outlined herein. Plaintiffs unknowingly purchased and secured mortgages on defective condominium units that, *inter alia:*

(a) Have roofs so unstable that they are at risk of collapse;

(b) Have outdated and unsafe major plumbing and heating systems;

(c) Lack adequate air conditioning and heating because their heating/cooling units, known as convectors, are rotted, rusted and leak continuously;

(d) Are contaminated with toxic mold;

9

    (e)    Contain numerous stress fractures;

    (f)    Experience serious flooding and structural and property damage caused by repeated leaks in copper pipes that run throughout the complex;

    (g)    Contain improperly installed washers and dryers, illegal electrical wiring, and improper and inadequate plumbing; and

    (h)    Suffer from inadequate bathroom fixtures that cause damage to units and contribute to the mold and dampness problems.

## JURISDICTION

20.    This Court has subject matter jurisdiction over this action pursuant to D.C. Code § 11-921 (2001) and D.C. Code § 28-3905 et seq. (2001).

21.    This Court may exercise personal jurisdiction over each of the Defendants pursuant to DC Code § 13-423 (2001).

## PARTIES

**THE PLAINTIFFS**

    **A.**    **Countrywide Plaintiffs**

22.    Plaintiff LaVana F. Fitzhugh is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3072 30th Street, SE, Unit 203, in a condominium that she purchased from Defendant Regent Crossing LLC, with a mortgage from Defendant Countrywide Home Loans.

23.    Plaintiff Mayra Quirindongo is, and at all relevant times has been, a resident of the District of Columbia. She lives at 2800 Erie Street, S.E., Apt. B5, Washington, D.C. She formerly lived at 3704 30th Street, S.E., Unit 101, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Defendant Countrywide Home Loans.

24.    Plaintiff Sheree Thomas is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3074 30th Street, SE, Unit 304, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Defendant Countrywide Home Loans.

25.    Plaintiff Cartrina Williams lives at 3512 56th Place, Cheverly, Maryland. She formerly lived at 3070 30th Street, S.E., Unit 304, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Defendant Countrywide Home Loans.

26.    Plaintiff Debra Misse is, and at all relevant times has been, a resident of the District of Columbia until her unit was foreclosed on. She lived at 3070 30th Street, S.E., Unit 203, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

27.    Robert Settles was at the time of his death a resident of the District of Columbia. He lived at 3070 30th Street, S.E., Unit 104G, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans. Mr. Settles' claim is brought by his Estate.

28.    Plaintiffs Lucy Younger and Jeremy Bennett live at 8511 Madison Street, New Carrollton, Maryland. Mr. Bennett formerly lived at 3072 30th Street, S.E., Unit 301, in a condominium he and Lucy Younger purchased from Defendant Regent Crossing LLC, with a mortgage from Defendant Countrywide Home Loans.

29.    Ava and Ernest Stapleton are, and at all relevant times have been, residents of the District of Columbia. They live at 3070 30th Street, SE, Unit 101G, in a condominium they purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

11

30.     Terrence Shepherd is, and at all relevant times has been, a resident of the District of Columbia. His current mailing address is P.O. Box 54701, Washington, D.C. 20037. He previously lived at 3070 30th Street, SE, Unit 103G, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

31.     Joanne Johnson Cole lives at 3901 Suitland Road, Apt. 1207, Suitland, Maryland. She formerly lived at 3070 30th Street, SE, Unit 102, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

32.     Maurice Ruffin formerly lived at 3070 30th Street, SE, Unit 103, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

33.     Edward B. McLeod, Sr. is, and at all relevant times has been, a resident of the District of Columbia. He lives at 3070 30th Street, SE, Unit 104, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

34.     Germesa Ellis is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3070 30th Street, SE, Unit 202, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

35.     Valerie Deal is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3070 30th Street, SE, Unit 302, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

36.     Wanda Jenkins Anderson formerly lived at 3070 30th Street, SE, Unit 303, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

12

37.     Tyrone Henderson is, and at all relevant times has been, a resident of the District of Columbia. He lives at 700 Whittier St., N.W., Washington, D.C. He formerly resided at 3070 30th Street, SE, Unit 304, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

38.     Annie Bell Bradford is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3072 30th Street, SE, Unit 101, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

39.     Eugene Jones is, and at all relevant times has been, a resident of the District of Columbia. He lives at 3072 30th Street, SE, Unit 201, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

40.     William Cowling is, and at all relevant times has been, a resident of the District of Columbia. He lives at 3072 30th Street, SE, Unit 202, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

41.     Edward J. Connors, Jr. lives at 815 18th St. So., Apt. 205, Arlington, Virginia 22202. He formerly resided at 3072 30th Street, SE, Unit 304, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

42.     Ralph Harmon lives at 1108 Lake Parke Drive, Jacksonville, Florida 32259. He formerly resided at 3074 30th Street, SE, Unit 103, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

43.     Martha E. Santeliz is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3074 30th Street, SE, Unit 104, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

13

44. Stormy Brown lives at 419 Hazlett Avenue, Baltimore, Maryland 21229. She formerly lived at 3074 30th Street, SE, Unit 202, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

45. Gloria Campbell lives at 533 Red Tip Lane, Loganville, Georgia 30052. She formerly resided at 3072 30th Street, SE, Unit 103G, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

46. Deborah Harvin is, and at all relevant times has been, a resident of the District of Columbia. She lives at 3072 30th Street, SE, Unit 103, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

47. Thomas Armstrong formerly resided at 3070 30th Street, SE, Unit 101, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Countrywide Home Loans.

48. Plaintiffs Fitzhugh, Quirindongo, Thomas, Williams, Settles, Misse, Younger, Bennett, Stapleton, Shepherd, Cole, Ruffin, McLeod, Ellis, Deal, Anderson, Henderson, Bradford, Jones, Cowling, Connors, Harmon, Santilez, Campbell, Harvin, Armstrong and Brown will be referred to collectively as "the Countrywide" plaintiffs.

**B.   Legacy Plaintiffs**

49. Plaintiff Ruby Mack is, and at all relevant times, was a resident of the District of Columbia. She lives at 3074 30th Street, SE, Unit 303, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Legacy Financial Group, Inc.

50. Plaintiff Alfred Osborne is, and at all relevant times, was a resident of the District of Columbia. He lives at 3074 30th Street, SE, Unit 102, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Legacy Financial Group, Inc.

14

51.     Plaintiff Sharon Peele is, and at all relevant times was, a resident of the District of Columbia. She lives at 3072 30th Street, SE, Unit 204, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Legacy Financial Group, Inc.

52.     Plaintiff James Short is, and at all relevant times, was a resident of the District of Columbia. He lives at 3072 30th Street, SE, Unit 303, in a condominium he purchased from Defendant Regent Crossing LLC, with a mortgage from Columbia National Inc. Mr. Short acquired the unit from Mr. Eduardo Williams, who purchased the unit from Regent Crossing LLC, with a mortgage from Legacy Financial Group, Inc.

53.     Plaintiffs Mack, Osborne, Peele and Short will be referred to collectively as "the Legacy plaintiffs.

**C.     Presidential Plaintiff**

54.     Plaintiff Sarah Wright lives at 1104 Hill Road, Landover, Maryland.  She formerly lived at 3702 30th Street, S.E., Unit 102G, in a condominium she purchased from Defendant Regent Crossing LLC, with a mortgage from Presidential Bank, F.S.B.

**D.     Association Plaintiff**

55.     The Kings Crossing II Owners Group, Inc. ("the Association") is the association of unit owners at Kings Crossing, II. Because the Kings Crossing II Owners Group, Inc. is responsible for the maintenance and repair of all common elements in Kings Crossing II it has been harmed by the conduct of the Defendants and others.

**THE DEFENDANTS**

**A.     Mortgage Defendants**

56.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans" or "Countrywide") is one of the nation's largest residential mortgage lenders with offices across the United States.

15

(a)     Countrywide Home Loans is incorporated in Delaware and its headquarters are in Calabasas, California.

(b)     At all relevant times, Countrywide Home Loans regularly transacted business in the District of Columbia.

(c)     In 2001, Countrywide Home Loans began a ten-year campaign to generate $600 billion in home loans by 2010 to minorities and to borrowers in lower-income communities and it proceeded to advertise heavily to minorities and first-time homebuyers.

57.     Legacy Financial Group, Inc. ("Legacy Financial") was a full-service mortgage lender with offices in Maryland, Virginia, and Texas. At all times relevant to this Complaint, Legacy Financial regularly transacted business in the District of Columbia. Such business included providing mortgage loans for at least three of the condominium units at King's Crossing II.

58.     Defendant Presidential Bank F.S.B. ("Presidential Bank") is a privately held, entrepreneurial organization with headquarters in Bethesda, Maryland. At all relevant times, Presidential Bank had branch offices in the District of Columbia, and regularly transacted business in the District of Columbia.

59.     Defendant James Preuss ("Mr. Preuss"), at all times relevant to this Complaint, was a loan officer for Countrywide, who acted on behalf of and for the benefit of Countrywide, and regularly conducted business in Washington, D.C. Mr. Preuss, together with his wife, Defendant Mitzie Preuss, arranged for the mortgages for the Countrywide plaintiffs to be obtained from Countrywide. On information and belief, Mr. Preuss also arranged mortgages for most of the purchasers at King's Crossing I and King's Court.

60.     Defendant Mitzie Preuss ("Ms. Preuss"), at all times relevant to this Complaint, was a loan officer for Countrywide, who acted on behalf of and for the benefit of Countrywide,

16

and regularly conducted business in Washington, D.C. Ms. Preuss, together with her husband James Preuss, arranged for the mortgages for most of the plaintiffs to be obtained from Countrywide.

**B.      Developer Defendants**

61.      Defendant Regent Crossing, LLC ("Regent Crossing") is a single-purpose company, incorporated in the District of Columbia and owned, operated and controlled by Defendant Eric Fedewa for the sole purpose of developing and selling condominiums at King's Crossing II in Washington, D.C.  At all relevant times, Regent Crossing maintained a place of business in the District of Columbia.

62.      Defendant Ascend Communities, LLC ("Ascend Communities") is a residential development and management firm owned, operated and controlled by Defendant Eric Fedewa. Ascend Communities was formerly the real estate division of Defendant Washington Technology Group.

(a)      Ascend Communities regularly conducts business in Washington, D.C., and its portfolio includes King's Crossing I and II, and King's Court.

(b)      On information and belief, at all times pertinent to this Complaint, in all matters pertaining to King's Crossing II, Ascend Communities controlled and directed the conduct of Regent Crossing.

63.      Defendant Washington Technology Group ("WTG") is a firm owned and operated by Lawrence Fedewa, the father of Eric Fedewa. At all relevant times, WTG regularly conducted business in Washington, D.C. Its functions include real-estate acquisition and development. WTG owns and operates a large apartment complex in southeast Washington, D.C.  WTG actively, knowingly and intentionally participated in the fraudulent scheme

complained of here by, *inter'alia*, commissioning the false and misleading "Building Condition Survey" for the King's Crossing II development.

64.     Defendant Eric Fedewa, at all times relevant to this Complaint, was a real estate developer who, through his use of his various entities — including Defendant Regent Crossing — developed and marketed condominium and other multifamily communities in Washington, D.C., in Prince George's County, Maryland, and elsewhere. Mr. Fedewa regularly conducts business in Washington, D.C., and his companies primarily market to low-income, minority, first-time homebuyers.

C.     **Sales Defendants**

65.     Defendant Roger Black, at all times relevant to this Complaint, was the sales agent at King's Crossing II. Mr. Black's activities complained of herein were done with the knowledge and consent, and under the supervision and direction of the Developer Defendants. Mr. Black regularly conducts business in Washington, D.C.

66.     Defendant Doretha Austin, at all times relevant to this Complaint, was a sales agent and customer service representative at King's Crossing II. Ms. Austin's activities complained of herein were done with the knowledge and consent, and under the supervision and direction of the Developer Defendants. Ms. Austin regularly conducts business in Washington, DC.

67.     On information and belief, the Sales Defendants' economic interests were co-existent with the interests of the Developer Defendants in that they personally profited from the sale of each King's Crossing II condominium unit.

D.     **Escrow Defendants**

68.     Defendant Express Title Company ("Express Title"), at all times relevant to this Complaint, was a real-estate settlement company that regularly conducted real-estate

18

settlements in Rockville, Maryland, and in Washington, D.C., relating to properties in the District of Columbia. Further, on information and belief, Express Title conducted most of the real-estate and mortgage settlements for all purchasers of condominium units at King's Crossing I and II, as well as King's Court.

69.     Defendant Charles Tobias, at all times pertinent to this Complaint, was an attorney admitted to practice in Maryland, and a principal in Defendant Express Title. Further, Mr. Tobias regularly conducts business in Washington, D.C. On information and belief, he handled most of the settlements for all of the purchasers of condominium units at King's Crossing I and II, as well as King's Court.

### Other Participants

70.     Chesapeake Appraisal Services ("Chesapeake Appraisal"), at all times relevant to this Complaint, was a real-estate appraisal company and regularly conducted business in the District of Columbia. Chesapeake Appraisal performed all the appraisals of all the condominium units that purchasers at King's Crossing II bought from Defendant Regent Crossing. At this time Chesapeake is a debtor in a Chapter 7 Bankruptcy Proceeding.

### FACTUAL ALLEGATIONS

### A.     DECEPTION IN THE DEVELOPMENT OF KING'S CROSSING II

71.     On or about May 24, 2000, Defendant Eric Fedewa incorporated Regent Crossing, LLC, in Washington, D.C. The corporation's sole purpose and goal was to purchase and renovate an apartment complex in Southeast Washington, D.C., and resell the apartments as individual condominium units.

72.     In June 2000, Defendant Eric Fedewa obtained a $1.56 million acquisition and construction loan from Bank of America, and used that money to purchase a 43-unit apartment

complex at 3070-74 30th Street, S.E., Washington, D.C. This complex consisted of three apartment buildings built in the 1960s, all of which were aging and deteriorating.

73.    On March 20, 2001, Eric Fedewa, in his capacity as manager of Regent Crossing, filed an application for condominium registration with the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), which included and incorporated a "Public Offering Statement" (the "POS"). In the POS, Defendants WTG, Eric Fedewa, and Regent Crossing purported to describe fully and accurately the condition of the buildings, the planned renovation work on the buildings, and the characteristics of the condominium units that would be listed for sale.

74.    Through the POS, Developer Defendants also purported to describe fully and accurately the common areas of the condominium complex, the condition of all major systems in the complex, and its structural condition. Among the items described were the major plumbing and electrical systems, the heating and air conditioning systems, and the condition of the roofs on the three buildings.

75.    Developer Defendants included in their application for condominium registration a sworn affidavit by Defendant Fedewa representing that "the statements contained and the documents submitted herein [including the POS] are true and complete . . . ." As the Developer Defendants then knew, this affidavit was false, and the documents specified in the affidavit contained false, misleading, and fraudulent statements and representations.

76.    As Developer Defendants then knew, the POS was fraudulent and materially misleading. For example, Developer Defendants knowingly and intentionally represented that the "plumbing in the Renovated Units had been upgraded to include new water and vent arm outs, copper supply lines, fixtures and fittings." To the contrary, Developer Defendants knowingly and intentionally failed to replace, or installed in a shoddy manner, many of the fixtures and fittings in

20

the condominium units, especially in the bathrooms, resulting in repeated leaks into the units below by such fixtures and fittings. As a result, as Developer Defendants then knew, much of the plumbing violated applicable building codes; most of the pipes are aged, corroded, and leaking; and the pipes lacked insulation, creating condensation that has dripped and continues to drip through ceilings and creates perpetual dampness, high humidity and mold.

77.     In their POS, Developer Defendants also falsely and fraudulently represented that "[a]ll renovation and alteration work to King's Crossing II, a condominium, was and is being performed . . . in accordance with applicable zoning ordinances, building codes housing codes and similar laws affecting the Condominium, or as otherwise approved by District of Columbia housing inspectors." To the contrary, as Developer Defendants then knew, they and their contractors performed or caused to be performed all "renovation and alteration work" without obtaining required construction permits from the District of Columbia government. Developer Defendants knowingly and intentionally failed to get such permits in an effort to save costs and time.

78.     Developer Defendants never intended to perform the "renovation and alteration work" to comply with "applicable zoning ordinances, building codes housing codes and similar laws affecting the Condominium, or as otherwise approved by District of Columbia housing inspectors," as they represented in the POS.

79.     Developer Defendants were required to post with DCRA a bond that equaled ten percent of the construction costs. As part of their scheme to knowingly violate applicable ordinances, codes, and laws, Defendant Fedewa, acting on his own behalf and on behalf of Developer Defendants, posted bond in the amount of $45,000 in a fraudulent attempt to deceive the DCRA into believing that they had thereby complied with the bond requirement.

21

80.     The posting of a bond of only $45,000 demonstrated that Developer Defendants planned to spend less than the amount required to properly renovate the 43 units comprising King's Crossing II, the major systems, and common areas. For example, to bring the electrical wiring alone into compliance with applicable building codes would have cost more than $1 million, requiring Developer Defendants to post a $100,000 bond for this limited portion of the project.

81.     The discrepancy between the bond Developer Defendants posted and the actual cost of properly renovating the King's Crossing II complex demonstrates that, at all relevant times, Developer Defendants knowingly and intentionally planned to ignore the electrical codes and knowingly and intentionally planned to flout other applicable construction codes.

82.     As of the date of this Complaint, the Developer Defendants have refused to correct major flaws in the renovation of King's Crossing II, despite having been cited by DCRA for numerous building code violations and despite being served with health department notices and other warnings by the District of Columbia government for serious deficiencies and hazardous conditions at the property. These flaws and violations are continuing as of the date of this Complaint.

83.     Developer Defendants further represented in the POS that each renovated unit "includes individual apartment panels with circuit breakers, smoke detectors, outlets, switches, and fixtures." To the contrary, Developer Defendants knowingly and intentionally failed to conform to the applicable code as it pertains to electric panels, wiring, and circuit breaker loads by, *inter alia:*

(a)     Feeding as many as three condominium units from a single 40 amp breaker panel in an effort to save costs, and in violation of the applicable code, which requires that each unit be supplied electricity from its own 100 amp electrical panel.

22

(b)     Failing to install individual meters for each of the units;

(c)     Failing to obtain required DCRA permits and inspections in an effort to conceal and cover up their violations of the applicable D.C. codes; and

(d)     Failing to install ground fault circuit interrupters in wet locations.

84.     On April 16, 2000, a DCRA inspector issued a Notice of Violation to Developer Defendants, informing them that the electrical wiring at King's Crossing II did not meet applicable electrical codes. The inspector ordered Developer Defendants to separate the wiring for each unit and to install individual electrical meters. To date, Developer Defendants have purposefully refused to correct this hazardous situation.

85.     On or about March 5, 2001, WTG obtained a Building Survey of the King's Crossing II buildings, which included an inspection of the roofs of all three buildings. This Building Survey, included as part of the POS Developer Defendants submitted to DCRA, purposely concealed that:

(a)     The roof membrane over the 3070 building at King's Crossing II was improperly installed and was due for replacement in the near future; and

(b)     The roofs over the 3072 and 3074 buildings at King's Crossing II were past their useful life and needed to be replaced in the near future. Heavy loads of standing water form a three-inch pool over both roof surfaces, and these roofs are at serious risk of collapse during a heavy rain or snow storm.

86.     Chesapeake Appraisals, which performed all of the appraisals on the condominium units at King's Crossing II before these units were sold, knowingly and intentionally inflated the appraisals to assist Developer Defendants. Chesapeake artificially inflated its appraisals by, *inter alia:*

23

(a)     Comparing each of the condominium units purchased by a plaintiff to other units already sold in the same complex, thereby effectively giving control over unit prices to the Developer Defendants. Under proper appraisal methods, condominium complexes are customarily appraised as a block, and compared to other similar blocks. This appraisal method is specifically designed to prevent a developer from fixing the price of units in the market.

(b)     The only outside comparison that Chesapeake Appraisals made in appraising King's Crossing II was an inappropriate comparison to brick fourplexes located in a more affluent neighborhood. On information and belief, the units in these fourplexes were of a far higher value than the King's Crossing II condominiums.

(c)     On information and belief, Chesapeake violated accepted appraisal standards, which require an appraiser to inspect the interior of the property or specifically state that he or she has not done so. In it appraisals of the King's Crossing II condominium units, Chesapeake made numerous, material, misstatements of fact, including, *inter alia:*

     (i)     Stating that the condominium units contained washers and dryers when, in fact, washers and dryers were not installed in many of those units at the time of the appraisal;

     (ii)    Denoting floor plans that varied significantly from the actual floor plans in some of the condominium units;

     (iii)   Stating that each condominium had been individually metered for electricity; and

     (iv)    Appraising several condominium units as being in "good / renovated condition," even though Developer Defendants had not yet renovated those

24

condominium units and did not do any modifications until after they sold those units.

**B.   FRAUDULENT INDUCEMENT**

87.   In the spring of 2001, Developer Defendants advertised the sale of "newly renovated" condominiums at King's Crossing II by, *inter alia:*

(a)   Placing banners on the face of the King's Crossing II complex advertising the condominium unit sales and representing that only $500 was required for a down payment;

(b)   Placing an advertisement in *Apartment Showcase* magazine, touting condominium units for sale at King's Crossing II, as a "[d]ramatically renovated community" with "Gated, Fenced, controlled access entry." The ad promoted a "Lease-Purchase Program," a "Low $500 Deposit," and promised "Easy financing."

88.   As Developer Defendants then knew and intended, these advertisements, promises, and representations were false and fraudulent. Developer Defendants did not "dramatically renovate" the buildings that comprise King's Crossing II. To the contrary, they intentionally performed only cosmetic changes to the aging property and have never installed controlled-access mechanisms on the community's gates and the buildings' doors.

89.   Starting about May 2001, Sales Defendants Roger Black and Doretha Austin, on their own behalf, and on behalf of Developer Defendants, met with several potential buyers of King's Crossing II condominium units, including Stormy Brown, LaVana Fitzhugh, Cartrina Williams and Sharon Peele. During these meetings, Sales Defendants showed these prospective buyers a model unit at King's Crossing II, and knowingly and intentionally misrepresented to them that the condominium units they would purchase would be newly renovated and substantially similar to that model.

25

90.     As Sales and Developer Defendants then knew and intended, the condominium units that Plaintiffs were offered for purchase were in materially and significantly far worse condition than the model used to induce their purchase appeared to be.

91.     Sales Defendants, on their own and on behalf of Developer Defendants, further knowingly and intentionally misrepresented to Plaintiffs that they would receive "newly renovated" condominium units, and reiterated their false and fraudulent promise of a gated community with locked building entrances and intercom systems.

92.     Sales Defendants made virtually identical representations to each Plaintiff. For example:

(a)     In or about April 2001, Mr. Black met with Plaintiff Sharon Peele and represented to her that all of the King's Crossing II condominium units would be newly renovated with new appliances and bathroom fixtures.

(b)     In or about June 2001, Doretha Austin met with Plaintiff LaVana Fitzhugh and told Ms. Fitzhugh that the condominium units would be newly renovated with new appliances and that the common areas would be completed by the time she purchased her condominium.

(c)     In or about July 2001, Ms. Austin informed Plaintiff Sheree Thomas that all of the King's Crossing II condominium units were newly renovated, just like the model. Ms. Austin further represented to Ms. Thomas that all of the condominium units had been inspected; and

(d)     In late November 2001, Mr. Black informed Plaintiff Mayra Quirindongo that the condominium units at King's Crossing II were newly remodeled. He explained that the common areas would be complete by the time she moved in.

26

93.     Sales and Developer Defendants never intended to deliver newly renovated condominium units. These Defendants knew that the planned "renovations" were actually cosmetic rehabilitations, and that the Developer Defendants had merely installed new carpet and paint to conceal the substantial defects in the condominium units.

94.     In or around the summer of 2001, Plaintiffs who had met with Sales Defendants received telephone calls from Mr. Black, Ms. Austin, or both, informing them that they had qualified to purchase condominium units at King's Crossing II.

95.     As part of the process of obtaining the purchase agreements from Plaintiffs, Defendants Black and Doretha Austin, acting on their own behalf and on behalf of Developer Defendants, typically completed for each Plaintiff a worksheet comparing the costs of the Class Member's and Individual Plaintiffs' current rent to the purported costs of condominium ownership. In doing so, they knowingly and intentionally misrepresented the costs of future mortgage payments, utilities, condominium fees, and income-tax savings so that the results of the analysis would falsely represent to the prospective buyer that he or she would pay less to purchase at King's Crossing II than he or she was currently paying in rent.

96.     To further ensure that costs of ownership would appear to the Plaintiff to be less than the Plaintiff's current rent, Defendant Black, acting on his own and on behalf of Developer Defendants, knowingly and intentionally understated each Plaintiff's future property-tax liability.

97.     To further ensure that the costs of ownership would appear to the Plaintiffs to be less than the Plaintiff's then current rent, Defendant Black, acting on his own and on behalf of Developer Defendants, knowingly and intentionally calculated mortgage payments assuming that 100 percent of the payments were interest, concealing the fact that, as a loan is paid down, the percentage of the payment devoted to interest decreases, effectively reducing the tax

27

savings. For example, Mr. Black performed this rent-versus-ownership analysis for Sheree Thomas in August 2001. He performed a similar analysis for Mayra Quirindongo on or about late November 2001.

98.    Defendant Doretha Austin performed similar rent-versus-ownership analysis and made similar representations to Plaintiffs. For example, in June 2001, Ms. Austin prepared this analysis for Plaintiff LaVana Fitzhugh.

99.    Developer Defendants knowingly and intentionally misrepresented to Plaintiffs that the condominium units were backed by a two-year warranty against defects and major repairs. For example, in a written *Certificate of Warranty,* provided to most Plaintiffs in the Public Offering Statement, and filed with the District of Columbia government, Mr. Fedewa and Regent Crossing promised that they would make repairs to each condominium unit for two years after that unit is purchased. They further warranted that they would repair in the common elements for two years following either the date that the first unit was conveyed or the common elements are completed, whichever is later. These Defendants never completed the common elements, and never intended to honor their representations. As of the date of this Complaint, and despite Plaintiffs' repeated requests, Developer Defendants have refused to make repairs or to otherwise correct deficiencies in the condominium units or in the common elements.

100.    Despite their duty to do so, pursuant to the District of Columbia Condominium Act, Developer and Sales Defendants failed to provide many Plaintiffs with a copy of the POS before those Plaintiffs went to settlement on their loans and condominium units. Instead, Sales Defendants, with the knowledge and consent, and under the supervision of the Developer Defendants, promised to promptly deliver the POS, then insisted that the Plaintiff sign an affidavit stating he or she had received it. On information and belief, Developer and Sales

28

Defendants withheld the POS in an effort to further conceal the true condition of the King's Crossing II complex.

101.   Despite their duty to disclose major problems in the condominium units to potential purchasers, Developer Defendants and Sales Defendants failed to do so. For example, these Defendants concealed that many of the convectors that supply heat and air conditioning to each condominium unit were beyond their useful life, and that some of the condominium units lacked any heating and air conditioning.  These Defendants concealed other major defects in the condominium units, including that the condominium unit they sold to Terrence Shepherd was not legally habitable because its bedrooms lacked proper egress.

## C.   THE MORTGAGE FRAUD

102.   To induce prospective buyers to purchase condominium units at King's Crossing II, Sales Defendants, with the knowledge and consent, and under the supervision of the Developer Defendants, told prospective buyers that they would have to contribute little or no down payment to purchase their condominium units. Rather than the typical three- to ten-percent of the total loan value that purchasers are required to contribute as down payment to secure a mortgage on a property, each Plaintiff contributed at most $500, less than percent, for down payments. For example:

(a)   In June 2001, Ms. Austin informed LaVana Fitzhugh that she would only need to contribute $250 to her down payment because she was a government employee. This down payment represented about three-tenths of one percent of the purchase price of the condominium unit she purchased from Developer Defendants for $77,995.00.

(b)   In July 2001, Ms. Austin informed Sheree Thomas that she would only need to contribute $250 to her down payment because she was a government contractor.

29

This down payment represented about three-tenths of one percent of the purchase price of the condominium unit she purchased from Developer Defendants for $79,995.00.

(c)   In December 2001, Mr. Black informed Mayra Quirindongo that she would only need to contribute $500 to her down payment. This down payment represented about seven-tenths of one percent of the purchase price of the condominium unit she purchased from Developer Defendants for $67,995.00.

(d)   In May 2001, Mr. Black informed Sharon Peele that she would only need to contribute $250 to her down payment because she was a government employee. This down payment represented about three-tenths of one percent of the purchase price of the condominium unit she purchased from Developer Defendants for $72,995.00.

(e)   In June 2001, Mr. Black informed Plaintiff Alfred Osborne that he would only need to contribute $250 to his down payment. This down payment represented slightly more than three-tenths of one percent of the purchase price of the condominium unit he purchased from Developer Defendants for $70,995.00.

103.   Sales Defendants made these representations to Plaintiffs who sought and obtained through Defendants federally insured mortgages, known as FHA loans, which, at minimum, required a three-percent down payment.

104.   On information and belief, James Preuss and/or Mitzie Preuss installed Countrywide's software on computers owned by Developer Defendants and used by Sales Defendants. This software was then illegally used to select Plaintiffs as targets of Defendants' predatory lending scheme.

105.    Plaintiffs never completed mortgage applications. Instead, Sales Defendants, acting on their own and on behalf of Developer Defendants, reviewed the credit reports of the Plaintiffs, filled out Plaintiffs' applications, and steered their applications to one of the Mortgage Defendants. On information and belief, Sales Defendants did so without disclosing to Plaintiffs the various interest rates and types of mortgages available to them.

106.    At all relevant times, Mortgage Defendants worked closely with, and conspired with, Sales and Developer Defendants to ensure the approval of loan applications, knowing and intending that the mortgage applications they completed on behalf of Plaintiffs were false, fraudulent and materially incomplete.

107.    On information and belief, Sales Defendants, acting on their own behalf and on behalf of Developer Defendants, conspired with Mortgage and Escrow Defendants to falsify the mortgage applications and other documents to reflect a down payment that, as these defendants then knew, never existed.

108.    On information and belief, the Sales, Developer and Mortgage Defendants then falsified loan applications to reflect inflated assets, false rental histories and/or other fraudulent entries designed to ensure that Plaintiffs would be approved for mortgages on their King's Crossing II condominium units.

109.    On information and belief, Sales and Mortgage Defendants had a duty to discuss with each Plaintiff the available interest rates and types of mortgages, but never did so.

110.    On information and belief, Mr. and Ms. Preuss, Countrywide, and Legacy Financial engaged in a scheme similar to the above-described scheme, involving some of the same co-conspirators, in generating about 30 mortgages at King's Crossing I.

111.   On information and belief, Mr. and Ms. Preuss, Countrywide, and Presidential Bank engaged in another fraudulent and predatory scheme, with the same co-conspirators, in generating about 40 mortgages at King's Court.

112.   At all relevant times, Defendants James Preuss and Mitzie Preuss were agents of Countrywide who acted on behalf of, and in furtherance of the interests of Countrywide, in processing fraudulent mortgage applications for Plaintiffs.

113.   At all relevant times, it was in the interest of Countrywide to approve the mortgage applications of, and to grant home loans to, Plaintiffs, in that:

   (a)   Countrywide packaged all of the mortgages it granted at King's Crossing II, and sold such packages to Fannie Mae, investors, and/or other entities;

   (b)   Upon the issuing of the mortgages and the sale of the mortgage packages, Countrywide profited from these loans; and

   (c)   Upon the making of such loans, Countrywide advanced its publicized goal of generating $600 billion in home loans to minorities and to low- to moderate-income borrowers by the year 2010.

114.   By packaging and selling these loans to Fannie Mae and others, Countrywide purposely sought to avoid the financial loss that would eventually result from what it anticipated to be the inevitable foreclosure on King's Crossing II condominium units while profiting on Plaintiffs' mortgages.

## D.   MISREPRESENTATIONS REGARDING ACORN AND OTHER "GIFTS"

115.   At all relevant times, applicants for mortgages were required to complete a settlement statement using federal government forms known as HUD-1 forms. These forms included an accounting of the buyer's and seller's contributions to a purchase, as well as all purchase-related fees.

32

116.    At all relevant times, Acorn Housing Corporation ("Acorn") was a national organization that provided homeownership counseling to first-time homebuyers. At no time relevant to this Complaint did Acorn provide services to any Plaintiff.

117.    On information and belief, in August 2001, Ms. Preuss met with at least one purchaser, Martha Santeliz, and represented to Ms. Santeliz that her down-payment obligation would be satisfied by a gift from Acorn. On information and belief, Ms. Preuss made these representations knowing that such a gift did not exist.

118.    Sales Defendants made similar misrepresentations to other Plaintiffs about the source of their down payments.  For example:

(a)     In June 2001, Mr. Black informed Plaintiff LaVana Fitzhugh that her down payment funds would be provided by Acorn.

(b)     On December 8, 2001, Mr. Black met with Plaintiff Myra Quirindongo and informed her that she was required to contribute $3,495.00 toward her down payment, but that Acorn would pay $2,995.00 and she would only have to pay $500.00 as a deposit and her portion of the down payment. On or about that same date, Ms. Austin informed Ms. Quirindongo that Acorn was a nonprofit organization that gave low-income people money to help them afford to purchase a new home.

(c)     In or about August 2001, Mr. Black informed Plaintiff Sheree Thomas that she would receive a gift from Acorn for her closing costs, and that she would not have to reimburse Acorn.

(d)     Because Sales, Developer and Mortgage Defendants and Legacy had targeted persons having little or no business experience or education, none of the Plaintiffs were familiar with the operations of Acorn, or suspected that these

33

Defendants were misrepresenting the source of their down payments. Plaintiffs had no knowledge that these down payments did not exist, or that, customarily, he or she would be required to contribute at least three percent toward his or her down payment.

(e)   During 2001 and 2002, Sales, Developer, and Escrow Defendants, Countrywide, Legacy, knowingly and intentionally made or caused to be made an entry on the HUD-1 forms of Countrywide and Legacy Plaintiffs specifying false, fraudulent and non-existent financial assistance and contribution to the buyer's down payment.

(f)   Sales, Developer, Escrow Defendants, Countrywide and Legacy purposely made or caused to be made a false entry in each such HUD-1 form and other loan documents stating that each Countrywide and Legacy Plaintiff contributed approximately $2000 to the down-payment, identifying such contributions as "gift fiends," that, in actuality, did not exist.

(g)   Sales, Developer, Escrow Defendants, Countrywide and Legacy identified the source of such down payments on the HUD-1 forms as "Acorn Gift Funds," or "Gift Funds."  These Defendants intentionally used this description to create a false impression that Acorn had provided down-payment assistance to the Countrywide and Legacy Plaintiffs.  None of these Plaintiffs, however, had enrolled in Acorn's program or received any down-payment assistance from Acorn.

(h)   Entry of such a "gift fund" on a HUD-1 was material to the approval of a mortgage application in that such an entry gave the appearance that that the

34

buyer contributed the required minimum three-percent down payment, as opposed to the $0, $250, or $500 Plaintiffs actually contributed.

119.   None of the Countrywide or Legacy Plaintiffs knew, however, that these entries were false, or that Sales, Developer, and Escrow Defendants Countrywide and Legacy placed these false entries on their mortgage forms to ensure the approval of their mortgage applications.

120.   At all relevant times, Sales and Developer Defendants arranged for Escrow Defendants, exclusively, to handle the settlements on the Plaintiffs' mortgage loans and condominium purchases at King's Crossing II. Pursuant to this arrangement, all Plaintiffs retained Escrow Defendants to handle these settlements.

121.   Escrow Defendants, as attorneys retained by Plaintiffs to conduct their loan and property settlements, had a fiduciary duty to Plaintiffs to represent their interests in the settlements.

122.   Escrow Attorneys, by the acts complained of here, breached their duties to Plaintiffs, who suffered harm as a result of such breaches.

123.   All settlements took place between May 2001 and February 2002.

124.   On information and belief, Mr. and Ms Preuss, or other employees of Mortgage Defendants, gave detailed instructions to Escrow Defendants specifying how Escrow Defendants were to prepare the loan documents for each Plaintiff, including how to reflect the down payment funds.

125.   On information and belief, employees of Legacy Financial and Presidential Bank gave detailed instructions to Escrow Defendants specifying how Escrow Defendants were to prepare the loan documents for each Plaintiff, including how to reflect the down payment funds.

126.    On information and belief, all Mortgage Defendants were required to review for accuracy all the loan documents for each Plaintiff to whom it loaned money, and correct any material inaccuracies therein.

127.    On information and belief, at all relevant times, Mortgage Defendants were required to verify the source and existence of the down payment funds contributed by a mortgage borrower to the purchase of the property secured by the mortgage. This verification duty extended to the "Acorn Gift" or "Gift Funds" that were falsely represented as having been contributed on a Plaintiff's behalf.

128.    On information and belief, FHA requires mortgage lenders to verify the source and existence of down payment funds by, *inter alia,* obtaining a copy of the donor's withdrawal slip or cancelled check along with the borrower's bank statement or deposit slip showing the deposit. If, as here, the funds are not deposited to the borrower's account before closing, a lender must obtain verification that the closing agent received funds from the donor for the amount of the gift.

129.    On information and belief, Mortgage Defendants *did not* verify the source and existence of the down payment funds, and did not obtain verification from Escrow Defendants because no down payments in fact existed.

130.    At all relevant times, the Mortgage Defendants had an affirmative duty to verify the income and liabilities of each mortgage applicant to whom it eventually loaned money, to ensure that the mortgage applicant could afford the mortgage and all other obligations. On information and belief, Mortgage Defendants:

      (a)    *did not* verify the income and liabilities of Plaintiff or otherwise ensure that he or she could afford the mortgage and all his or her other obligations; or

36

(b)     approved the mortgages knowing that Plaintiffs could not afford the

mortgage and all other obligations.

131.   The settlements on Plaintiffs' purchases of condominium units at King's

Crossing II, and the loans securing those condominium units took place in 2001. At the time

of each settlement, Mortgage and Escrow Defendants, with the knowledge and assistance of

Sales and Developer Defendants, made false and fraudulent entries onto the HUD-1 forms and

other loan documents relating to down payments.

132.   Pursuant to the above-described scheme, each Defendant victimized the Plaintiff

to whom it loaned money through predatory lending by inducing and deceiving them into

obtaining mortgages they could not reasonably afford, and to which they would not have

otherwise agreed. In so doing, each and every Defendant increased the probability that

Plaintiffs would eventually default on their mortgage payments and enter foreclosure, thereby

severely damaging their credit histories.

133.   In furtherance of the above-described scheme, each and every Defendant avoided

any meaningful pre-settlement discussions with Plaintiffs regarding their mortgages and

mortgage applications.

## STATUTORY COUNTS

### COUNT I
### VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT
(D.C. Code Ann. §§ 28-3901 (et seq.)(2001)
(All Plaintiffs v. Sales and Developer Defendants)

134.   All Plaintiffs reallege and incorporate by reference the allegations contained in

the preceding paragraphs of this Complaint.

135.   Sales and Developer Defendants violated the District of Columbia Consumer

Protection Procedures Act D.C. Stat. Ann. §§ 28-3901 *(et seq.)* (the "D.C. CPPA."), enacted to

37

assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices, and to promote fair business practices throughout the community.

136.    Sales and Developer Defendants willfully violated the D.C. CPPA. by, *inter alia,* misrepresenting consumer realty, that is, the King's Crossing II condominium development and its condominium units in that they:

(a)    Misrepresented that they had approvals and certification, by DCRA and other District of Columbia authorities, pertaining to licenses, codes, and permission to renovate and sell properties they did not have;

(b)    Represented that fixtures and accessories presented as part of the King's Crossing II condominium development and its condominium units were original or new, when in fact they were deteriorated, second hand, and used; and/or

(c)    Represented that fixtures and accessories presented as part of the King's Crossing II condominium development and its condominium units were of particular standard, quality, grade, style, or model. when in fact they were significantly and materially deteriorated from the standard, quality, grade, style, or model.

137.    Intending that the Plaintiffs rely on their misrepresentations, Sales and Developer Defendants further willfully violated the D.C. CPPA by deception, fraud, false pretense, false promise, misrepresentation, knowing concealment, and suppression and omission of material facts related to the promotion and sale of consumer realty and its subsequent performance with respect to the sale of the property to the Plaintiffs.

138.    Plaintiffs are among the class of people the D.C. CPPA is designed to protect.

38

139.   Plaintiffs have sustained damages as a direct and proximate result of these acts and omissions by the Sales and Developer Defendants in violation of the D.C. CPPA, as described herein.

140.   As the party responsible for the maintenance and repairs of the common elements, the Association plaintiff has been harmed y Defendants' conduct

**COUNT II**
**PREDATORY LENDING -- VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT**
**(D.C. Code Ann. §§ 28-3901 *(et seq.) (*2001))**
**(Countrywide and Association Plaintiffs v. Roger Black, Developer Defendants, Countrywide Home Loans, James Preuss and Mitzi Preuss)**

141.   The Countrywide and Association Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

142.   Roger Black, Developer, and Escrow Defendants with Countrywide Home Loans, James Preuss and Mitzi Preuss entered non-existent down payment assistance on settlement statements that reflected a borrower's contribution of about $2000 in down-payment "gift funds" that, in actuality, did not exist.

143.   The above-described conduct, that is, the entry of such a "gift fund" on a HUD-1, served to ensure that the loan application would be approved in that the entry made it appear that each buyer had contributed a three-percent down payment, as opposed to $0, $250 or $500, or less than one-half of one-percent down payment, that each Plaintiff actually contributed.

144.   Through this method, Roger Black, Developer, and Escrow Defendants with Countrywide Home Loans, James Preuss and Mitzi Preuss ensured that the Plaintiffs would obtain mortgage loans and purchase defective condominium units that, in reality they could not afford to repay, and bear the costs of repairing or maintaining.

39

145.    As a result of the conduct of Countrywide Home Loans, James Preuss, Mitzi Preuss, Roger Black, Developer, and Escrow Defendants, many of the Plaintiffs have been unable to pay their condominium fees, repair defects in their condominium units, and meet their other obligations. Many purchasers have lost their condominium units to foreclosures and remaining Plaintiffs have insufficient condo fee income to pay for desperately needed repairs in the common areas.

146.    At each Plaintiff's settlement, Countrywide Home Loans, James Preuss and Mitzi Preuss, Mortgage and Escrow Defendants, with the knowledge and assistance of Roger Black and Developer Defendants, made false and fraudulent entries onto the HUD-1 forms for Plaintiffs, who were seeking to purchase condominium units at King's Crossing II.

147.    Plaintiffs have sustained damages as a direct and proximate result of Roger Black's, Developer and Escrow Defendants' and Countrywide Home Loans' and James Preuss's and Mitzi Preuss's misrepresentations and fraudulent entries in violation of the D.C. CPPA, as described herein.

## COUNT III
## PREDATORY LENDING -- VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT
### (D.C. Code Ann. §§ 28-3901 *(et* seq.)(2001))
### (Legacy and Association Plaintiffs v. Legacy, Roger Black, Developer Defendants, James Preuss and Mitzi Preuss)

148.    The Legacy and Association Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

149.    Roger Black, Developer and Escrow Defendants and Legacy Financial, James Preuss and Mitzi Preuss  entered non-existent down payment assistance on settlement statements that reflected Ruby Mack's contribution of about $2000 in down-payment "gift funds" that, in actuality, did not exist.

40

150.    The above-described conduct, that is, the entry of such a "gift fund" on a HUD-1, served to ensure that the loan application would be approved in that the entry made it appear that plaintiff had contributed a three-percent down payment, as opposed to the 0, $250 or $500, or less than one-half of one-percent down payment, that plaintiff actually contributed.

151.    Through this method, Roger Black, Developer and Escrow Defendants, Legacy Financial, James Preuss and Mitzi Preuss ensured that the Legacy Plaintiffs would obtain mortgage loans and purchase defective condominium units that, in reality they could not afford to repay, and bear the costs of repairing or maintaining.

152.    As a result of Robert Black's, Developer and Escrow Defendants' and Legacy Financial's, James Preuss's and Mitzi Preuss's conduct, the Legacy Plaintiffs have been unable to pay their condominium fees, repair defects in their condominium units, and meet their other obligations.

153.    The Legacy and Association Plaintiffs have sustained damages as a direct and proximate result of Roger Black's, Developer and Escrow Defendants' and Legacy Financial's, James Preuss's and Mitzi Preuss's misrepresentations and fraudulent entries in violation of the D.C. CPPA, as described herein.

## COUNT IV
### PREDATORY LENDING -- VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT
(D.C. Code Ann. §§ 28-3901 *(et* seq.)(2001)
(Sarah Wright and The Association v. Roger Black & Developer Defendants and Presidential Bank, James Preuss and Mitzi Preuss)

154.    Plaintiff Sarah Wright and The Association reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

155.    Roger Black, Developer and Escrow Defendants and Presidential Bank, James Preuss and Mitzi Preuss knowingly utilized unfounded assumption and inaccurate information in the application for Sarah Wright's loan.

156.    The above-described conduct served to ensure that the loan application would be approved in that the application made it appear that Ms. Wright would be able to afford her mortgage and related condo fees.

157.    Through this method, Roger Black, Developer and Escrow Defendants and Presidential Bank, James Preuss and Mitzi Preuss ensured that Sarah Wright would obtain a mortgage loan and purchase a defective condominium unit that, in reality she could not afford to repay, and bear the costs of repairing or maintaining.

158.    As a result of Roger Black's, Developer and Escrow Defendants' and Presidential Bank's, James Preuss's and Mitzi Preuss's conduct, Plaintiff Sarah Wright has been unable to pay her condominium fees, repair defects in their condominium units, and meet her other obligations.

.159.    Plaintiff Sarah Wright and The Association have sustained damages as a direct and proximate result of Roger Black, Developer Escrow Defendants', Presidential Bank's, James Preuss's and Mitzi Preuss's misrepresentations and fraudulent entries in violation of the D.C. CPPA, as described herein.

## COUNT V
## VIOLATION OF THE D.C. CONDOMINIUM ACT
### (D.C. Code Ann. §§ 42-1904 *et seq.* (2001))
### (All Plaintiffs v. Developer Defendants)

160.    All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

42

161.   Pursuant to the District of Columbia Condominium Act, D.C. Code Ann. §§ 42-1904 *et seq.* (the "D.C. Condo Act"), Developer Defendants warranted that that "[a]ll renovation and alteration work to King's Crossing II, a condominium, was and is being performed . . . in accordance with applicable zoning ordinances, building codes housing codes and similar laws affecting the Condominium, or as otherwise approved by District of Columbia housing inspectors."

162.   In the Public Offering Statement, as required by the D.C. Condo Act, Developer Defendants further warranted each of the condominium units against structural defects for two years from the date it was conveyed. In the Public Offering Statement, as required by the D.C. Condo Act, Developer Defendants further warranted the common elements against structural defects for two years from the date they were completed.

163.   Developer Defendants breached their duties under the warranties and violated the D.C. Condo Act, by performing or causing to be performed renovation work without obtaining required construction permits from the District of Columbia government, in violation of applicable zoning ordinances, building codes, housing codes and similar laws affecting the Condominium, and without obtaining approval from District of Columbia housing inspectors.

164.   In further breach of their duties under the warranties, from the date the above-described violations commenced, to the date of the filing of this Complaint, Developer Defendants have refused to complete the common elements, despite Plaintiffs' repeated requests for them to do so.

165.   As described herein, the condominium units and common areas contain structural defects and other deficiencies proximately caused by Developer Defendants' shoddy construction practices.

166.    In further breach of their duties under the warranties, from the date the above-described violations commenced, to the date of the filing of this Complaint, Developer Defendants have refused to repair these defects, despite Plaintiffs' repeated requests for them to do so. Defendants, despite their promises in the Public Offering Statement, never intended to perform these repairs or otherwise honor their warranties. Beginning almost immediately after Developer Defendants conveyed the condominium units to Plaintiffs, and continuing until the date of this Complaint, Defendants breached these warranties in that they have refused and otherwise failed make necessary and appropriate repairs.

167.    Contrary to their sworn statements in their affidavit stating that the Public Offering Statement is true and complete, and in violation of the D.C. Condo Act, the Public Offering Statement Developer Defendants submitted to the District of Columbia government, and to Plaintiffs, contained material omissions and material misstatements of fact.

168.    In violation of the D.C. Condo Act, Developer Defendants failed to provide some Plaintiffs with a copy of the Public Offering Statement prior to their conveying condominium units to those Plaintiffs.

169.    As a direct and proximate result of each such breach of the D.C. Condo Act, Plaintiffs suffered damages.

## FRAUD COUNTS

### COUNT VI
### FRAUD IN THE INDUCEMENT
(Countrywide and Association Plaintiffs v. Sales, Developer, Escrow Defendants and Countrywide Home Loans)

170.    The Countrywide and Association Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

171.    Through the course of conduct described in this Complaint, Countrywide, James Preuss, Mitzi Preuss and the Sales, Developer and Escrow Defendants and the Appraiser

44

intentionally deceived the Countrywide Plaintiffs and induced them to purchase condominium units in the King's Crossing II condominium development and to apply for and execute mortgages on those units.

172.   As alleged herein, the Sales and Developer Defendants and the Appraiser knowingly and intentionally represented that Plaintiffs would receive newly renovated condominium units in a well-maintained and safe complex.

173.   As alleged herein, Developer and Sales Defendants and the Appraiser sold the Countrywide Plaintiffs defective condominium units at fraudulently inflated prices, by inducing them to rely on fraudulent representations, including, *inter alia,* a fraudulent Public Offering Statement and fraudulently inflated real-estate appraisals;

174.   As alleged herein, Developer and Sales Defendants and the Appraiser knew these representations were false when they made them.

175.   As alleged herein, Sales, Developer, Escrow and Countrywide Home Loans, James Preuss and Mitzi Preuss engaged in a scheme designed to ensure the Countrywide Plaintiffs would be able to purchase the defective condominium units from Developer Defendants by, *inter alia,* falsifying HUD-1 forms and other loan documents;

176.   As alleged herein, Sales, Developer and Escrow Defendants and Countrywide, James Preuss and Mitzi Preuss knew the Acorn Gifts did not exist when they entered them on the HUD-1 forms.

177.   Defendants made these statements and false entries to induce the Countrywide Plaintiffs to purchase defective condominium units from Defendants, and to obtain mortgage loans that they could not afford to repay in addition to the expenses of maintaining and repairing their condominium units.

178.    The Countrywide Plaintiffs reasonably relied on these representations to their detriment.

179.    In fact, Plaintiffs received condo units that:

(a)    Have roofs so unstable that they are at risk of collapse;

(b)    Have outdated and unsafe major plumbing and heating systems;

(c)    Lack adequate air conditioning and heating because their heating/cooling units, known as convectors, are rotted, rusted and leak continuously;

(d)    Are contaminated with toxic mold that covers walls, ceilings and floors and has adversely affected the health of Plaintiffs, whose symptoms include rashes, dizziness, headaches, breathing problems, and asthma attacks;

(e)    Are riddled with stress fractures that, in some units, traverse entire walls, including load-bearing walls;

(f)    Experience serious flooding and structural and property damage caused by repeated leaks in copper pipes that run throughout the complex;

(g)    Contain improperly installed washers and dryers, illegal electrical wiring, and improper and inadequate plumbing; and

(h) Experience leaks from inadequate bathroom fixtures from the units above, which cause ceilings to collapse and contribute to the mold and dampness problems.

180.    Through such fraudulent statements and intentional misrepresentations, Sales, Developer and Escrow Defendants, Countrywide Home Loans, James Preuss and Mitzi Preuss induced the Countrywide Plaintiffs into obtaining mortgage loans, and incurring the resulting loan payments on such defective units.

46

181.    As a result of the fraudulent inducement of James Preuss, Mitzi Preuss, Countrywide Home Loans, Sales, Developer and Escrow Defendants Plaintiffs suffered damages.

**COUNT VII**
**FRAUD IN THE INDUCEMENT**
(Legacy and Association Plaintiffs v. Legacy, Sales, Developer and Escrow Defendants, James Preuss and Mitzi Preuss)

182.    The Legacy and Association Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

183.    Through the course of conduct described in this Complaint, Defendants intentionally deceived the Legacy Plaintiffs and induced them to purchase a condominium unit in the King's Crossing II condominium development and to apply for and execute mortgages on those units.

184.    As alleged herein, Developer and Sales Defendants knowingly and intentionally represented that the Legacy Plaintiffs would receive newly renovated condominium units in a well-maintained and safe complex.

185.    As alleged herein, Developer and Sales Defendants sold the Legacy Plaintiffs defective condominium units at fraudulently inflated prices, by inducing them to rely on fraudulent representations, including, *inter alia,* a fraudulent Public Offering Statement and fraudulently inflated real-estate appraisals;

186.    As alleged herein, Developer and Sales Defendants knew these representations were false when they made them.

187.    As alleged herein, Sales, Developer and Escrow defendants and Legacy Financial, James Preuss and Mitzi Preuss engaged in a scheme designed to ensure that the Legacy Plaintiffs would be able to purchase the defective condominium unit from Developer Defendants by, *inter alia,* falsifying HUD-1 forms and other loan documents;

47

188.    As alleged herein, Sales, Developer and Escrow Defendants and Legacy Financial, James Preuss and Mitzi Preuss knew the Acorn Gifts did not exist when they entered them on the HUD-1 forms.

189.    Defendants named in this Count made these statements and false entries to induce the Legacy Plaintiffs to purchase defective condominium units from Defendants, and to obtain mortgage loans that they could not afford to repay in addition to the expenses of maintaining and repairing their condominium units.

190.    The Legacy Plaintiffs reasonably relied on these representations to their detriment.

191.    In fact, the Legacy Plaintiffs received condo units that:

    (a)    Have a roof so unstable that it is at risk of collapse;

    (b)    Have outdated and unsafe major plumbing and heating systems;

    (c)    Lack adequate air conditioning and heating because her heating/cooling units, known as convectors, are rotted, rusted and leak continuously;

    (d)    Are contaminated with toxic mold that covers walls, ceilings and floors and has adversely affected her health;

    (e)    Are riddled with stress fractures that, in some units, traverse entire walls, including load-bearing walls;

    (f)    Experience serious flooding and structural and property damage caused by repeated leaks in copper pipes that run throughout the complex;

    (g)    Contain an improperly installed washer and dryer, illegal electrical wiring, and improper and inadequate plumbing; and

48

(h)     Experience leaks from inadequate bathroom fixtures from the units above, which cause ceilings to collapse and contribute to the mold and dampness problems.

192.     Through such fraudulent statements and intentional misrepresentations, Defendants named in this Count induced the Legacy Plaintiffs into obtaining mortgage loans, and incurring the resulting loan payments on such a defective unit.

193.     As a result of Sales, Developer, Escrow, Appraisal defendants' and James Preuss's, Mitzi Preuss's and Legacy Financial's fraudulent inducement, the Legacy Plaintiffs have suffered damages.

**COUNT VIII**
**FRAUD IN THE INDUCEMENT**
**(Sarah Wright and the Association Plaintiffs v. Presidential Bank, Sales, Developer, Escrow and Appraisal Defendants and James Preuss and Mitzi Preuss)**

194.     Plaintiff Sarah Wright and the Association Plaintiff reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

195.     Through the course of conduct described in this Complaint, Defendants named in this Count intentionally deceived Sarah Wright and induced her to purchase a condominium unit in the King's Crossing II condominium development and to apply for and execute mortgages on that  units.

196.     As alleged herein, Developer and Sales Defendants knowingly and intentionally represented that Plaintiff Sarah Wright would receive newly renovated condominium units in a well-maintained and safe complex.

197.     As alleged herein, Developer and Sales Defendants sold Plaintiff a defective condominium unit at fraudulently inflated prices, by inducing her to rely on fraudulent representations, including, *inter alia,* a fraudulent Public Offering Statement and fraudulently inflated real-estate appraisals;

49

198.    As alleged herein, Developer and Sales Defendants knew these representations were false when they made them.

199.    As alleged herein, Sales, Developer and Escrow defendants and Presidential Bank, James Preuss and Mitzi Preuss engaged in a scheme designed to ensure Sarah Wright would be able to purchase the defective condominium unit from Developer Defendants

200.    Plaintiff Sarah Wright reasonably relied on these representations to her detriment.

201.    In fact, Plaintiff Sarah Wright received a condo unit that:

    (a)    Has a roof so unstable that it is at risk of collapse;

    (b)    Has outdated and unsafe major plumbing and heating systems;

    (c)    Lacks adequate air conditioning and heating because her heating/cooling units, known as convectors, are rotted, rusted and leak continuously;

    (d)    Is contaminated with toxic mold that covers walls, ceilings and floors and has adversely affected her health;

    (e)    Is riddled with stress fractures that, in some units, traverse entire walls, including load-bearing walls;

    (f)    Experiences serious flooding and structural and property damage caused by repeated leaks in copper pipes that run throughout the complex;

    (g)    Contains an improperly installed washer and dryer, illegal electrical wiring, and improper and inadequate plumbing; and

      (h)    Experiences leaks from inadequate bathroom fixtures from the units above, which cause ceilings to collapse and contribute to the mold and dampness problems.

202.    Through such fraudulent statements and intentional misrepresentations, Defendants named in this Count induced Sarah Wright into obtaining mortgage loans, and incurring the resulting loan payments on such a defective unit.

203.    As a result of Sales, Developer and Escrow Defendants' and James Preuss's, Mitzi Preuss's and Presidential Bank's fraudulent inducement, Sarah Wright and The Association have suffered damages.

**COUNT IX**
**FRAUD**
**(Countrywide and Association Plaintiffs v. Sales, Developer, and**
**Escrow Defendants and Countrywide Home Loans)**

204.    Countrywide and Association Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, and further charge:

205.    Sales, Developer and Escrow Defendants and Countrywide Home Loans, James Preuss and Mitzi Preuss made false and fraudulent entries and statements in HUD-1 forms and other loan documents. These false and fraudulent entries represented that each Plaintiff contributed a down payment for the purchase of a condominium unit that included about $2000 in "gift funds." In truth and in fact, as these Defendants then knew, no such gift funds existed.

206.    These Defendants knowingly and intentionally made and entered these false and fraudulent "gift fund" entries on these documents to:

      (a)    Enable the Plaintiffs to obtain mortgages that they could not afford in addition to their other obligations related to the condominium units, and would otherwise have been unable to obtain;

51

(b)     Deceive the Plaintiffs into believing that they could
        legitimately obtain such mortgages, and that they could
        afford them and all their other obligations related to the
        ownership of the condominium units; and

(c)     Deceive third party purchasers of these mortgages and
        FHA as to the ability of the Plaintiffs to obtain and afford
        mortgages on these condominium units.

207.    Through this method, Sales, Developer and Escrow Defendants and Countrywide Home Loans, James Preuss and Mitzi Preuss ensured that the Plaintiffs would purchase defective condominium units from Defendants, and obtain mortgage loans that they could not afford to repay in addition to the expenses of maintaining and repairing their condominium units.

208.    As a result of Sales, Developer and Escrow Defendants' and Countrywide Home Loan's, James Preuss's and Mitzi Preuss's conduct, many Plaintiffs have been unable to pay their condominium fees, repair defects in their condominium units, and meet their other obligations. Many plaintiffs lost their condominium units to foreclosures.

209.    Countrywide Home Loans, James Preuss, Mitzi Preuss and Escrow Defendants, with the knowledge and assistance of Sales and Developer Defendants, concealed from Plaintiffs the false and fraudulent entries onto the HUD-1 forms and other loan documents of the Plaintiffs seeking to purchase units at King's Crossing II.

210.    Plaintiffs sustained damages as a direct and proximate result of the Sales, Developer, and Escrow Defendants' and Countrywide Home Loan's, James Preuss's and Mitzi Preuss's fraudulent concealment of the non-existent Acorn Gift, as described above.

52

## COUNT X
## Fraud
### (Legacy and Association Plaintiffs v. Legacy, Sales, Developer, and Escrow Defendants, James Preuss and Mitzi Preuss)

211.    The Legacy and Association Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

212.    Sales, Developer and Escrow Defendants and Legacy Financial, James Preuss and Mitzi Preuss made false and fraudulent entries and statements in HUD-1 forms and other loan documents. These false and fraudulent entries represented that the Legacy Plaintiffs contributed down payments for the purchase of condominium units that included about $2000 in "gift funds." In truth and in fact, as these Defendants then knew, no such gift funds existed.

213.    These Defendants knowingly and intentionally made and entered these false and fraudulent "gift fund" entries on these documents to:

    (a)    Enable the Legacy Plaintiffs to obtain mortgages that they could not afford in addition to their other obligations related to the condominium units, and would otherwise have been unable to obtain;

    (b)    Deceive the Legacy Plaintiffs into believing that they could legitimately obtain such a mortgage, and that she could afford it and all her other obligations related to the ownership of the condominium unit; and

    (c)    Deceive third party purchasers of these mortgages and FHA as to the ability of the Legacy Plaintiffs to obtain and afford mortgages on these condominium units.

214.    Through this method, Sales, Developer and Escrow Defendants and Legacy Financial, James Preuss and Mitzi Preuss ensured that the Legacy Plaintiffs would purchase defective

condominium units from Defendants, and obtain mortgage loans that they could not afford to repay in addition to the expenses of maintaining and repairing their condominium units.

215.    As a result of Sales, Developer and Escrow Defendants' and Legacy Financial's, James Preuss's and Mitzi Preuss's conduct, the Legacy Plaintiffs have been unable to pay their condominium fees, repair defects in her condominium unit, and meet her other obligations.

216.    The Legacy Plaintiffs sustained damages as a direct and proximate result of the Sales, Developer, and Escrow Defendants' and Legacy Financial's, James Preuss's and Mitzi Preuss's fraudulent concealment of the non-existent Acorn Gift, as described above.

**COUNT XI**
**Fraud**
**(Sarah Wright and Association Plaintiff v. Sales, Developer, Escrow Defendants**
**and Presidential Bank, James Preuss and Mitzi Preuss)**

217.    Sarah Wright and The Association Plaintiff reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

218.    Sales, Developer and Escrow Defendants and Presidential Bank, James Preuss and Mitzi Preuss made false and fraudulent entries and statements in Sarah Wright's loan documents.

219.    The Defendants named in this Count knowingly and intentionally made and entered these false and fraudulent entries on these documents to:

> (a)    Enable the Plaintiff to obtain a mortgage that she could not
>        afford in addition to their other obligations related to the
>        condominium units, and would otherwise have been unable
>        to obtain;
>
> (b)    Deceive the Plaintiff into believing that she could
>        legitimately obtain such a mortgage, and that she could

54

afford it and all her other obligations related to the

ownership of the condominium unit; and

(c)   Deceive third party purchasers of these mortgages and FHA

as to the ability of the Plaintiff to obtain and afford

mortgages on these condominium units.

220.   Through this method, Sales, Developer and Escrow Defendants and Presidential Bank, James Preuss and Mitzi Preuss ensured that Sarah Wright would purchase a defective condominium unit from Defendants, and obtain a mortgage loan that she could not afford to repay in addition to the expenses of maintaining and repairing her condominium unit.

221.   As a result of Sales, Developer and Escrow Defendants' and Presidential Bank's, James Preuss's and Mitzi Preuss's conduct, Sarah Wright has been unable to pay her condominium fees, repair defects in her condominium unit, and meet her other obligations.

222.   Sarah Wright and The Association sustained damages as a direct and proximate result of the Sales, Developer, and Escrow Defendants' and Presidential Bank's, James Preuss's and Mitzi Preuss's fraudulent conduct.

## OTHER COMMON LAW COUNTS
### COUNT XII
### BREACH OF CONTRACT
#### (All Plaintiffs v. Developer Defendants)

223.   All Plaintiffs reallege and incorporate by reference herein the allegations contained in the preceding paragraphs of this Complaint.

224.   Through the Public Offering Statement, Developer Defendants promised each Plaintiff a condominium unit that, *inter alia,* was "renovated," and constructed "in accordance with applicable zoning ordinances, building codes, housing codes and similar laws affecting the Condominium, or as otherwise approved by District of Columbia housing inspectors."

55

225.     Each individual Plaintiff entered into an agreement ("Purchase Agreement") with Developer Defendants pursuant to which each Plaintiff agreed to pay the Defendants a sum certain, and the Defendants agreed to sell to each Plaintiff a King's Crossing II condominium unit as represented in their offer.

226.     Developer Defendants, contrary to their obligations under the contract, provided individual Plaintiffs with condominium units, that, among other deficiencies:

(a)     Have roofs so unstable that they are at risk of collapse;

(b)     Have outdated and unsafe major plumbing and heating systems;

(c)     Lack adequate air conditioning and heating because their heating/cooling units, known as convectors, are rotted, rusted and leak continuously;

(d)     Are contaminated with toxic mold that covers walls, ceilings and floors and has adversely affected the health of Plaintiffs, whose symptoms include rashes, dizziness, headaches, breathing problems, and asthma attacks;

(e)     Are riddled with stress fractures that, in some units, traverse entire walls, including load-bearing walls;

(f)     Experience serious flooding and structural and property damage caused by repeated leaks in copper pipes that run throughout the complex;

(g)     Contain improperly installed washers and dryers, illegal electrical wiring, and improper and inadequate plumbing; and

(h)     Experience leaks from inadequate bathroom fixtures from the units above, which cause ceilings to collapse and contribute to the mold and dampness problems.

227.     All Plaintiffs complied with their contractual obligations to purchase condominium units at Kings Crossing II pursuant to Purchase Agreements.

228.   Developer Defendants, as described above, materially breached the terms of the Purchase Agreements.

229.   Plaintiffs lack the financial means to obtain another condominium of a quality equal to that Developer Defendants contracted to deliver.

230.   As a direct and proximate result of the aforementioned breaches of contract, all Plaintiffs have sustained damages.

**COUNT XIII**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**
**(All Plaintiffs v. Developer Defendants)**

231.   All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

232.   As alleged herein, Developer Defendants entered into contracts with Plaintiffs whereby Developer Defendants sold and Plaintiffs purchased condominium units at King's Crossing II. Developer Defendants represented, *inter alia,* that at the time the Plaintiffs moved in, these condominium units would be "newly renovated," that the common areas would be in good repair, and that Defendants would make repairs to the condominium units and common areas for two years.

233.   Each contract contained an implied duty of good faith and fair dealing that the parties would deal fairly and honestly with each other and would not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

234.   As Developer Defendants then knew, the King's Crossing II condominium complex was in significant disrepair, and required significant capital to repair and maintain. As alleged herein, Developer Defendants never intended to properly renovate any of the condominium units in the complex, to take the action necessary to put the common areas in good repair, or to honor their promise to make repairs.

57

235.   Developer Defendants withheld from Plaintiffs their intention to deliver, for habitation, condominium units that were not properly renovated and common areas that were in significant disrepair.  Developer Defendants also withheld from Plaintiffs their intent to breach their promises to properly renovate the complex and make repairs to the individual units and common areas. Developer Defendants did not properly renovate the complex and never performed the necessary repairs despite Plaintiffs' repeated requests for them to do so.

236.   Developer Defendants thereby breached their duty of good faith and fair dealing with Plaintiffs by, *inter alia,* refusing to properly renovate the complex and make repairs to the individual units and common areas

237.   As direct and proximate result of Developer Defendants' breach of their duty of good faith and fair dealing, Plaintiffs have suffered damages.

## COUNT XIV
## BREACH OF EXPRESS WARRANTY
### (All Plaintiffs v. Developer Defendants)

238.   All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

239.   Pursuant to the Purchase Agreements with Plaintiffs, Developer Defendants warranted, in writing, that "[a]ll renovation and alteration work to King's Crossing II, a condominium, was and is being performed . . . in accordance with applicable zoning ordinances, building codes housing codes and similar laws affecting the Condominium, or as otherwise approved by District of Columbia housing inspectors."

240.   Developer Defendants, in writing, further warranted each of the condominium units against structural defects for two years from the date it is conveyed.

241.   Developer Defendants, in writing, further warranted the common elements against structural defects for two years from the date they were completed.

58

242.    Even after Plaintiffs purchased their condominium units, Defendants continued making these express warranties, and such warranties have continued to the date of the filing of this Complaint.

243.    As described herein, Developer Defendants performed or caused to be performed renovation work without obtaining required construction permits from the District of Columbia government, in violation of applicable zoning ordinances, building codes, housing codes and similar laws affecting the Condominium, and without obtaining approval from District of Columbia housing inspectors.

244.    From the date the above-described violations commenced, to the date of the filing of this Complaint, Developer Defendants have refused to complete the common elements, despite Plaintiffs' repeated requests for them to do so.

245.    As described herein, the King's Crossing II condominium units and common areas contain structural defects and other deficiencies proximately caused by Developer Defendants' shoddy construction practices.

246.    From the date the above-described violations commenced, to the date of the filing of this Complaint, Developer Defendants have refused to repair these defects, despite Plaintiffs' repeated requests for them to do so.

247.    Beginning immediately after Developer Defendants conveyed the condominium units to Plaintiffs, and continuing until the date of this Complaint, Defendants breached these warranties in that they have refused and otherwise failed make necessary and appropriate repairs.

248.    As a direct and proximate result of each such breach of warranty, Plaintiffs suffered damages.

59

## COUNT XV
## BREACH OF IMPLIED WARRANTIES OF FITNESS FOR PARTICULAR PURPOSE, MERCHANTABILITY AND HABITABILITY
### (All Plaintiffs v. Developer Defendants)

249.    All Plaintiffs reallege and incorporate by reference herein the allegations contained in the preceding paragraphs of this Complaint.

250.    In marketing and selling condominium units at King's Crossing II to Plaintiffs, Developer Defendants expressly and/or impliedly warranted that the condominium units were fit for a particular use, that is, for habitation, and that they were of a merchantable quality.

251.    In fact, when Developer Defendants placed them in commerce, the condominium units and common areas were defective, in that, *inter alia;*

    (a)    Renovations and repairs to both the condominium units and the common areas were performed in an unworkmanlike manner, as alleged herein;

    (b)    Major systems, including plumbing, electric and heating/air conditioning, were and continue to be dangerous, inoperable and on the verge of failure; and

    (c)    Roofs on two of the three buildings that comprise King's Crossing II were and continue to be structurally unsound.

252.    As a direct and proximate result of the defective condition of the property, Plaintiffs have suffered damages.

## COUNT XVI
## STRICT LIABILITY
### (All Plaintiffs v. Developer Defendants)

253.    All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

254.    Developer Defendants engaged in production and marketing with respect to the condominium units at issue such that they placed the condominium units into the stream of commerce.

255.    Developer Defendants sold condominium units in a defective condition unreasonably dangerous to the user, in that they:

      (a)    Failed and continue to fail to meet construction-industry code requirements;

      (b)    Had and continue to have defective roofs at risk of collapse;

      (c)    Had and continue to have outdated and unsafe major plumbing systems;

      (d)    Had and continue to have outdated and unsafe major electrical systems; and

      (e)    Had and continue to have defective convectors.

256.    The condominium units were such that the Developer Defendants expected that they would reach Plaintiffs without any substantial changes from the condition in which they were sold, and in fact no such substantial changes were made.

257.    The defects caused injuries to the Plaintiffs or their property, thereby subjecting the Developer Defendants to strict product liability.

258.    As a result of the defects in the condominium units, Plaintiffs have suffered damages.

**COUNT XVII**
**NEGLIGENCE**
**(All Plaintiffs v. Developer Defendants)**

259.    All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

260.    At all relevant times, all Developer Defendants owed Plaintiffs a duty to exercise ordinary care in performing all construction and renovation at King's Crossing II in a workmanlike manner.

261.    Developer Defendants shoddy construction practices, included, *inter alia,* failing to repair and/or or causing:

(a)  Roofs so unstable that they are at risk of collapse;

(b)  Outdated and unsafe major plumbing and heating systems, illegal electrical wiring, and improper and inadequate plumbing; and

(c)  Structural and property damage caused by repeated leaks in copper pipes that run throughout the complex.

262.    Developer Defendants failure to exercise ordinary care injured Plaintiffs.

263.    As a direct and proximate result of Developer Defendants' negligent conduct, Plaintiffs suffered damages.

## COUNT XVIII
## NEGLIGENT MISREPRESENTATION
### (All Plaintiffs v. Sales and Developer Defendants)

264.    All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

265.    Through the course of conduct described in this Complaint, Sales and Developer Defendants negligently represented the condition of the condominium units in the King's Crossing II condominium development.

266.    As alleged herein, Developer and Sales Defendants negligently represented that Plaintiffs would receive newly renovated condominium units in a well-maintained and safe complex.

267.   As alleged herein, Developer and Sales Defendants sold Plaintiffs condominium units at inflated prices, by inducing them to rely on negligent representations, including, *inter alia,* a misleading Public Offering Statement;.

268.   Plaintiffs reasonably relied on these representations to their detriment.

269.   In fact, Plaintiffs received condo units that:

(a)   Have roofs so unstable that they are at risk of collapse;

(b)   Have outdated and unsafe major plumbing and heating systems;

(c)   Lack adequate air conditioning and heating because their heating/cooling units, known as convectors, are rotted, rusted and leak continuously;

(d)   Are contaminated with toxic mold that covers walls, ceilings and floors and has adversely affected the health of Plaintiffs, whose symptoms include rashes, dizziness, headaches, breathing problems, and asthma attacks;

(e)   Are riddled with stress fractures that, in some units, traverse entire walls, including load-bearing walls;

(f)   Experience serious flooding and structural and property damage caused by repeated leaks in copper pipes that run throughout the complex;

(g)   Contain improperly installed washers and dryers, illegal electrical wiring, and improper and inadequate plumbing; and

(h)   Experience leaks from inadequate bathroom fixtures from the units above, which cause ceilings to collapse and contribute to the mold and dampness problems.

270.   As a result of Sales and Developer Defendants' negligent misrepresentations, Plaintiffs purchased defective condominium units from Developer Defendants, and obtained

mortgage loans that they could not afford to repay in addition to the expenses of maintaining and repairing their condominium units.

271.   As a result of Defendants' negligent misrepresentations, Plaintiffs suffered damages.

**COUNT XIX**
**UNJUST ENRICHMENT**
**(All Plaintiffs v. Eric Fedewa, Ascend Communities, LLC,**
**Express Title and Charles Tobias)**

272.   All Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

273.   As a result of their acts and omissions as described in this Complaint, Eric Fedewa, Ascend Communities, LLC, Charles Tobias and Express Title have received money and consideration pursuant to a scheme that victimized Plaintiffs.

274.   As a result of their acts and omissions as described in this Complaint, Eric Fedewa, Ascend Communities, Charles Tobias and Express Title have received money and consideration that equitably and in the interest of justice, rightfully belong to Plaintiffs.

275.   Through these activities, Eric Fedewa, Ascend Communities, Charles Tobias and Express Title have unjustly enriched themselves at the expense of Plaintiffs.

276.   Eric Fedewa, Ascend Communities, Charles Tobias and Express Title obtained these profits by improper and illegal means, and to allow these Defendants to retain such monies would be unjust and inequitable.

277.   Eric Fedewa, Ascend Communities, Charles Tobias and Express Title were unjustly enriched in an amount to be determined at trial.

**COUNT XXI**
**CONSPIRACY**
**(All Plaintiffs v. All Defendants)**

278.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

279.    Defendants conspired and agreed together and with each other to participate in unlawful conduct, and to engage in lawful conduct through unlawful means, such conduct including, *inter alia:*

    (a)    **Violation of the D.C. Consumer Protection Procedures Act,** as further described in this Complaint, the allegations of which are realleged and incorporated by reference; and

    (b)    **Predatory Lending,** as further described in this Complaint, the allegations of which are realleged and incorporated by reference.

    (c)    **Fraud in the Inducement,** as further described in the Complaint, the allegations of which are realleged and incorporated by reference;

    (d)    **Unjust Enrichment,** as further described in this Complaint, the allegations of which are realleged and incorporated by reference.

280.    As a result of Defendants' conspiracy and agreement to participate in the above described unlawful conduct Plaintiffs suffered damages.

WHEREFORE, plaintiffs demand judgment against defendants jointly and severally as follows:

    (a) Compensatory damages;

    (b) Return of all funds by which certain defendants were unjustly enriched;

(c) Alternatively, rescission and restitution to place the

Plaintiffs in *status quo ante;*

(d) Treble damages;

(e) Pre- and post judgment interest as permitted by law;

(f) Punitive damages in an amount not less than $10,000,000;

(g) Reasonable attorneys fees and costs; and

(h) Such other relief as this Court may deem just and proper.

<u>/s/ Joseph B. Espo</u>
Joseph B. Espo, Bar No. 429699
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030
jbe@browngold.com

<u>/s/ Andrew Grosso</u>
Andrew Grosso, Bar No. 358326
1250 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20037
(202) 261-3593
agrosso@worldnet.att.net

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury with respect to each claim in this Complaint.

<u>/s/ Joseph B. Espo</u>
Joseph B. Espo

## SUPERIOR COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAVANA F. FITZHUGH, *et al.*, | : | 2004 CA 006830 B |
| | | Cal: 3 |
| Plaintiffs, | : | Judge: Joan Zeldon |
| | | |
| v. | : | |
| | | |
| COUNTRYWIDE FINANCIAL CORP., *et al.*, | : | |
| | | |
| Defendants. | : | |

oOo0ooo

### ORDER

Upon consideration of Plaintiffs' Motion to Intervene and Amend Complaint, any opposition thereto and the Plaintiffs' Praecipe and Corrected Third Amended Complaint, it is this _____ day of May, 2008 by the COURT:

ORDERED that the Motion be and hereby is GRANTED; and it is further

ORDERED that Plaintiffs' lodged Corrected Third Amended Complaint be docketed.

Joan Zeldon, Judge
District of Columbia Superior Court

# Exhibit V

**COPY**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Virgen Cedeno, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| IndyMac Bancorp, Inc. as the holding company for IndyMac Bank, F.S.B., | ) ) ) |
| Defendant. | ) ) |

**JUDGE KOELTL**

Civil Action No. **06 CV 6438**

**RECEIVED**
**AUG 25 2006**
**U.S.D.C. S.D. N.Y.**
**CASHIERS**

## CLASS ACTION COMPLAINT

Now comes the Plaintiff, Virgen Cedeno, as a member in a class action seeking relief both for herself and all other similarly situated persons (hereinafter referred to as "Plaintiff"), by and through counsel and for this Complaint against Defendant Indy Mac Bancorp, Inc. as the holding company for IndyMac Bank, F.S.B., herein alleges:

### DEFINITIONS

In connection with this complaint, the following definitions shall apply:

1.     Whenever the terms "Plaintiff" or "Plaintiffs" are used herein, they shall refer to Virgen Cedeno as the named Plaintiff and as a member of the class and to the class as a whole.

2.     Whenever the term "Defendant" is used herein, it refers to IndyMac Bancorp, Inc. as the holding company for IndyMac Bank, F.S.B.

3.      Whenever the terms "and" or "or" are used herein, they shall refer to the term and/or.

4.      In this Complaint, whenever it is alleged that Defendant did any act or thing, it is meant that such Defendant's officers, agents, servants, employees, attorneys, or representatives did such act or thing and that, at the time such act or thing was done, it was done with the full express, implied, or apparent authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of the Defendant's officer, agents, servants, employees, attorneys, or representatives.

## PARTIES

5.      Plaintiff Virgen Cedeno resides at 19 Wyona Street in Brooklyn, New York. Plaintiff is a consumer who while residing in New York purchased mortgage services from Defendant for the property listed above.

6.      Defendant, IndyMac Bancorp, Inc. as the holding company for IndyMac Bank, F.S.B. (hereinafter referred to as "Indy Mac") is a Delaware corporation with its principle place of business located in California.

7.      IndyMac is a publicly traded company on the New York Stock Exchange under the symbol NDE.

8.      Defendant is a national lending services firm with thirteen (13) regional mortgage centers in nine (9) states, and plans to open an additional ten (10) regional mortgage centers in the future. In 2005, IndyMac reported over 1.1 billion dollars in revenue and total assets

2

worth over 21.4 billion dollars with over 14 billion of those assets derived from loans held for sale and investment.

9.     On information and belief, the acts complained of herein caused injury to the named Plaintiff within the State of New York.

10.    On information and belief, Defendant regularly does or solicits business, or engages in other persistent courses of conduct, or derives substantial revenue from services used in the State of New York.

11.    On information and belief, Defendant, its agents and employees, should have expected their acts to have consequences in the State of New York and Defendant derives substantial revenues there from.

12.    In California, Defendant's principle place of business, it has twenty six (26) banking offices and five (5) regional mortgage centers. Therefore, on information and belief, Defendant should have expected its acts to have consequences in California where it derives substantial revenues there from, and were it would be subject to California law.

13.    As a national lending company headquartered in California, Defendant should be innately familiar with California law, and it should expect for its actions throughout the country to have implications on its California based business in accordance with but not limited to California law.

## JURISDICTION AND VENUE

14.    The Court has jurisdiction and venue over this matter pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy is in excess of seventy five thousand dollars ($75, 000), exclusive of interest and cost. The cause of action arises under a federal law question pursuant to the Truth in Lending Act ("TILA") in 15 U.S.C. § 1601 *et. seq.*, and pursuant to 28 U.S.C. § 1331, for the part of the claim arising out of the Defendants' violation of RESPA, as contained in 12 U.S.C. § 2601, *et. seq.* See also, 12 U.S.C. § 2614.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to claims occurred in this judicial district.

## INTRODUCTION

16.    Plaintiffs are all consumers who have paid for and received retail mortgage lending services from Defendant and who have purchased and paid for, directly or indirectly, appraisals, evaluations and other forms of valuations ("Appraisal Services") from Defendant.

17.    In the course of selling and receiving consideration for mortgage services, Defendant procured or performed an Appraisal Service on behalf of a Plaintiff in the course of performing the purchased mortgage services.

18.    In 1989 the federal government passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 [Public Law No. 101-73] ("FIRREA"). FIRREA was passed in response to the savings and loan disaster of the 1980s that led to foreclosure of many financial institutions across the United States.   Regulations and Guidelines were promulgated in final form in 1994, containing a series of rules on the topic of real estate

4

lending and appraisals (collectively referred to hereinafter as "FIRREA"). FIRREA and its regulations and Guidelines were enacted to insure that the conditions leading to that crisis would not recur. FIRREA demanded that the bank and thrift regulatory agencies adopt regulations concerning the preparation and use of real estate appraisals and evaluations in the lending process. Those Regulations and Guidelines clearly and repeatedly call for the total independence and effectiveness of the valuation process and the need for insulation of that process from anyone with an interest in the property valued or the transaction. They call, as well, for the insulation of the valuation process by lenders from production activities of the lender. These Guidelines were followed in 2003 by a series of Joint Memorandum from the Federal Regulators to lenders, warning them of the need to comply with the effectiveness and independence requirements of the Guidelines. In 2005, the Federal Regulators even put out a set of questions and answers to further guide the lending industry in order to promote effective and independent valuation practices. Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA) [Public Law No. 102-242] and the uniform regulations

19.     While FIRREA abated some of the most obvious and blatant fraudulent practices engaged in by mortgage industry professionals (including but not limited to lenders, mortgage brokers, real estate brokers and in some cases appraisers themselves), current lender practices both endanger the financial integrity of the consumer lending industries and result in borrowers paying for services that were not done in compliance with federal standards and regulations.

20.     The Appraisal Standards Board of the Appraisal Foundation was given the power under FIRREA to develop the Uniform Standards of Professional Appraisal Practices

("USPAP"). 12 U.S.C. § 3331-3351. In addition, FIRREA expressly provides that appraisals shall be performed according to the standards established by the Appraisal Foundation Board. 12 U.S.C. § 3339.

21.     Defendant, through its agents, employees and officers, and in the course of providing retail mortgage services to Plaintiffs, has produced defective and faulty Appraisal Services in that they have violated federally mandated standards under FIRREA and the regulations and guidelines that flow there from regarding the performance of appraisal and valuation functions as they pertain to residential lending practices (the "FIRREA Standards"). Further, such practices have violated the common law and fiduciary responsibility owed by mortgage lenders or sellers of Appraisal Services to provide customers such products and services in a reasonable and workmanlike manner.

22.     The practices complained of herein are part and parcel of a systematic and continued failure, to provide independent and effective appraisals and evaluations as mandated under the FIRREA Standards. These practices have been made in furtherance of a fraud and conspiracy to commit fraud amongst certain lenders, including Defendant, real estate brokers and agents, mortgage brokers and certain appraisers, to artificially inflate valuation results in order to both complete more real estate transactions and to obtain greater profit on the transactions made.

23.     The appraisal and evaluation practices of Defendant, as pleaded herein, endanger the financial integrity of the mortgage and consumer lending industries, mislead and defraud investors in the secondary mortgage market, investors in mortgages and mortgage backed securities and investors in the securities of lenders, who have been intentionally misled as to the amount of actual market value collateralization of loans originated by and

6

through defendant lenders. Although not presently plaintiffs in the instant case, investors have overpaid for such securities and debt and face enormous losses in the event of defaults under mortgages supposedly collateralizing them.  As a result, plaintiff consumers are facing potentially enormous losses as a result of the potential collapse of the financial markets that are destabilized by the illegal and improper practices of Defendant.

24.     The appraisal and evaluation practices of Defendant has intentionally or, through gross negligence, increased the closing costs, financing costs and the actual amount paid for homes paid by consumers who have relied on the accuracy, fairness and independence of Appraisal Services provided by Defendant but paid for by consumers.  Consumers, often prompted by real estate agents in order to create sales, have relied upon what is commonly known as "mortgage contingency clauses" within contracts to purchase real estate, to protect them against overpayment for homes.  Within such contractual language most buyers of real estate do not need to complete their purchase without financing approval, which is known to rest, in material part, on the results of Appraisal Services. Consumers believe that they will be protected by accurate, fair and independent appraisals and evaluations purchased from and through lenders.  Defendant and other lenders are well aware of the reliance of the consumer on the accuracy and independence of Appraisal Services and have acted in the manner alleged herein despite such knowledge.

25.     Defendant has intentionally or through gross negligence misled consumers, through advertising, marketing and other means, into believing that the Appraisal Services for which they are paying will be performed in accordance with FIRREA Standards and as a result consumers have relied on non-compliant and defective appraisals that have resulted in material overpayment for homes and mortgages.

7

26.     As a result of the conduct of Defendant, when consumers overpay for a home, or are induced to borrow excessively on the supposed equity their homes, most closing costs that are based upon purchase price or the amount financed are improperly and unjustly inflated; the amount of interest paid on loans is unfairly raised by the excess amount of debt necessary to fund the purchase or extension of credit, and in, many instances, the consumer must obtain private mortgage insurance as they lack the necessary twenty percent down payment ordinarily required in order to avoid such charges.

27.     The appraisal and evaluation practices of Defendant and other lenders have resulted in consumers paying billions of dollars for inherently defective Appraisal Services created by methods and practices that are contrary to federal statutes.

28.     The appraisal and evaluation practices of Defendant has resulted in consumers being mislead to rely upon the existence of equity in homes that does not exist, creating debt that cannot be paid or refinanced out of the equity in consumers' homes.

29.     The over-valuation of real estate that results from the practices complained of herein, creates real estate sales that otherwise would not have occurred, if the consumer had not relied upon Defendant's and other lenders' compliance with FIRREA Standards. These practices, as more fully alleged herein, allow lenders, their production departments, the mortgage brokers who sell and broker loans to such lenders, and the real estate agents involved in sales to improperly influence the appraisal process of appraisers, and valuation management firms removing the independence of the valuation process that is not only vital to the health of the borrower, a lender, and any secondary market purchasers of such loans, but is also required by FIRREA Standards.

8

30.     Through intentional practice and gross negligence, Defendant and other lenders
have retained appraisers and appraisal management firms owned or controlled by
companies which have "interests in the transaction" under FIRREA Standards. Appraisal
and appraisal management firms are retained to do appraisals and evaluations on
transactions in which they or companies owned or affiliated with them perform, provide or
control other closing services, such as title, escrow, flood certification, on which they profit
only and to the extent that the valuation is completed at an amount that would support the
transaction and allow the company or its affiliate to profit from such other closing services.
Through further intentional, gross and other negligence, Defendant lenders do not have
processes and procedures in place to insure that interested parties do not control the
valuation process.

31.     Through intentional practice and gross negligence Defendant and other lenders
have allowed companies that "bundle" closing services or which act as "portals," to profit
from providing such closing and other services on transactions on which they have
provided fee contingent services in addition providing Appraisal Services, becoming
interested parties to the transaction, in direct contravention of FIRREA Standards.

32.     The Defendant and other lenders have created and maintained the practices herein
alleged knowingly and in intentional or grossly negligent disregard of FIRREA Standards.
These practices have been created and maintained in spite of the Defendant's and other
Lenders' knowledge of the illegality thereof.  The five federal regulators responsible for
FIRREA compliance have, since the inception of the FIRREA Guidelines in 1994, warned
lenders that they must comply with the independence requirements of the Guidelines.  In a
Joint Memorandum dated October of 2003, the five Regulators warned lenders were of

9

impending audits concerning this activity. Thereafter the American Bankers Association convened a teleconference of thousands of industry personnel to discuss this Joint Memorandum. The Mortgage Bankers Association has had seminars on the FIRREA Standards. The FBI taskforce on appraisal fraud has commented on these practices. In 2004 over 8,000 appraisers filed a petition that denounced the improper influence of appraisals. In 2004 a study was conducted by October Research, that was published in many leading trade periodicals, detailing the impact of improper valuation practices, on valuation results. In 2005 a bill was introduced in the United States House of Representatives that would make improper influence not just a violation of FIRREA but as well, a federal crime. In 2005 the National Consumer Reinvest Coalition published a "White Paper" detailing improper practices and impact on consumers. Federal regulators including the Office of the Comptroller of the Currency and the Office of Thrift Supervision have warned many lenders, including and known to the Defendant Lenders to come into compliance with FIRREA and its Guidelines. Despite these and many other warnings, Defendant lenders have continued their improper practices or have altered them only enough to appease the regulators.

33.     Defendant and other lenders have intentionally conspired to mislead regulators and Secondary Market buyers of loans, including "Fannie Mae" and "Freddie Mac" and Private Mortgage Insurers, rating agencies and others to allow them to continue practices designed to improperly inflate appraisal values and violate FIRREA, its regulations and Guidelines. Through trade Associations such as the Mortgage Bankers Association, the lending industry and Defendant Lenders have continually attempted to thwart attempts to disclose the industry wide processes alleged herein. Owing to the desire to create mortgages, the

fear of governmental and investor reactions and the reaction of lender "customers" Fannie

Mae and Freddie Mac have disregarded the practices of the lending industry, including

Defendant Lenders.   Federal regulators, which have warned the lending industry and

Defendant Lenders to stop these practices, do not have the resources or manpower to police

lenders, especially those large and nationally prominent lenders.  Through inadvertence and

this lack of resources and despite their continued warnings, Defendant Lenders have been

allowed to circumvent regulations through the practices alleged herein.

34.     Secondary Market Buyers, including Fannie Mae and Freddie Mac, have portfolios

consisting of trillions of dollars of loans that were made with improper lending practices.

Defendant Lenders are aware of both the consumer damage caused by these practices as

well as the prospective impact on the safety and soundness of the mortgage and consumer

lending markets.   According the Alan Greenspan, Chairman of the Federal Reserve,

residential real estate values are definitely softening and a burst of the property value

bubble could be imminent (NYT 10/11).   A burst of the housing bubble like the one feared

by Greenspan would result in a downward adjustment in values and undermine the GSEs,

with a devastating impact on the national economy as well as Plaintiff Consumers.

35.     Defendant and other lenders, who have been made aware of the warnings and

publicity given improper valuation practices, have failed, either intentionally or through

gross negligence, to exercise any type of reasonable care to insure that appraisals and

valuations are compliant with FIRREA Standards.  Defendant, despite its knowledge of

such warnings and publicity, has not created audit standards for insuring compliance.  As

an obvious example, any prudent lender, given the above stated warnings and publicity,

would conduct an anonymous polling of appraisers and management firms to ascertain

11

whether improper practices and pressure was occurring.  To date, nothing of this nature has been done by lenders, including Defendant.

36.     Lenders, including Defendant, have threatened and retaliated against appraisers and management firms that have failed to give in to pressure to inflate values.  The lending industry has threatened, bullied and unfairly retaliated against appraisers and management firms so that they would not turn in complaints to regulators due to the fear of business retaliation from such lenders, including Defendant

## FACTUAL BACKGROUND

37.     Defendant within the last four (4) years and continuing has been engaged in the business of marketing and/or selling mortgage services to consumers related to the new purchase of residential homes and also for the creation of home equity loans throughout the United States and California.  Defendant has represented itself as a federally regulated banking institution and FDIC insured in advertisements, representations and promises in its marketing materials, and in uniform, standard, pre-printed written contracts provided to mortgage consumers.  In the course of selling mortgage services to consumers, Defendant has charged consumers a fee for the provision of Appraisal Services for the purpose of determining the value of the property upon which the mortgage service is based.  Defendant has controlled the provision of these Appraisal Services are obligated to provide these services in compliance with the FIRREA Standards.

38.     Defendant has knowingly and intentionally created systematic processes that are non-compliant with the FIRREA Standards and therefore, Appraisal Services provided to consumers were non-compliant, resulting in consumers being charged a fee for services

that were not performed properly and in violation of the FIRREA Standards that were designed to ensure the independence, accuracy and reliability of the Appraisal Services.

39.     Defendant posted statements and guidelines on its website, which gave the appearance that they had in place and enforced strict appraisal guidelines to ensure fair and independent appraisals in compliance with USPAP.

40.     Defendant Knowingly And Intentionally Failed To Provide The Insulation And Separation Between Production Personnel And Credit/Valuation Personnel Required By The FIRREA Standards.

> 40.1    The Interagency Appraisal and Evaluations Guidelines ("IAEG") are a part of the FIRREA Standards. The IAEG dictates that "Because the appraisal and evaluation process [Appraisal Services] is an integral component of the credit underwriting process, it should be isolated from influences by the institution's loan production process." Defendant knowingly structured the reporting relationships of its officers and employees in such a manner that resulted in personnel responsible for the appraisal and evaluation process ("Credit/Valuation Personnel") being subordinate and responsible to those responsible for the production process ("Production Personnel"). This structure allows Production Personnel to directly influence and control the Credit/Valuation Personnel. This lack of separation and insulation produces, per se, defective and faulty Appraisal Services under the FIRREA Standards on every loan provided to the Consumers.

> 40.2    Defendant lender has, upon information and belief, utilized compensation and other programs that have improperly motivated so called

13

Credit/Valuation Personnel to be interested parties in the results of the valuation process in that they have been offered monetary and other inducements, including continued employment and promotion, to achieve production levels. Accordingly Defendant has created a situation where Credit/Valuation Personnel are interested parties in a loan transaction.

40.3    Further, Defendant has created performance criteria for employees, appraisers and appraisal management companies that promote and encourage the inflation of valuation results. Often these measure the number or percentage of times that the valuation results are high enough to meet the need or desire of the customer or another interested party in the transaction such as a real estate agent or mortgage broker. Sometimes these measurements are couched as "customer service" measurements such as the "appeals rate" where personnel and vendors are rewarded or penalized not for the accuracy of the valuation, but whether there was a complaint that the valuation result was not high enough.

40.4    Additionally, Defendant has improperly utilized staff appraisers (who are employees of Defendant) to perform appraisals on loan transactions. No diligence has been taken to insure that staff appraisers are not subject to the influence of Production Personnel or Credit/Valuation Personnel who have been improperly induced to achieve higher values. Staff appraisers are located in the same physical location as loan production staff without insulation and separation required by FIRREA Standards. Defendant had staff appraisers working along side Production Personnel in the same

14

physical location. Staff appraisers must be isolated from Production Personnel. Defendant's Production Personnel are provided direct, unregulated access to and contact with staff appraisers allowing them to directly discuss and influence Appraisal Services without the required involvement of independent credit risk and valuation personnel. "If an appraisal is prepared by a staff appraiser, that appraiser must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the loan transaction and have no direct or indirect interest, financial or otherwise, in the property." {citation}

40.5    In many instances Defendant has hired additional staff appraisers and reduced the slate of independent fee appraisers to insure that valuations are not being done by truly independent appraisers. As staff appraisers are subject to greater influence due to their employment by Defendant, Defendant should exercise much greater care to insulate staff appraisers from improper influence. Defendant has taken no such precautions and has no viable system of auditing or insuring that total insulation of staff appraisers has occurred.

41.    Defendant Has Knowingly And Intentionally Created And Implemented Policies That Systematically Caused The Improper Selection Of Appraisers For Every Appraisal Service Provided To Consumers.

41.1    With regard to Staff Appraisers and personnel who control the valuation process, Defendant considers how often the appraiser renders the valuation result that supports the closing of the related loan transaction, what is

15

commonly referred to as "Hitting the Value." Hitting the Value is factored into the Defendant's hiring and termination decisions as well as the compensation programs provided to the Staff Appraisers. These systemic policies improperly influence how staff appraisers perform Appraisal Services.

41.2   Defendant designed its compensation programs for staff appraisers that rewards "Hitting the Value." The compensation programs are masked within customer service measurements so that a complaint of a low appraisal is deemed a negative indication of performance.

41.3   Defendant's hiring and termination decisions with regard to staff appraisers and other Credit/Valuation Personnel, wrongfully takes into consideration how often such personnel "Hit the Value." Using this factor to rate the performance of any appraiser or other Credit/Valuation Personnel violates FIRREA Standards and effectively gives the appraiser an interest in the transaction.

42.   Improper Creation Of A Slate Of Appraisers From Which Appraisers Are Selected By Loan Officers And Production Personnel.

42.1   FIRREA establishes that the bank and thrift regulatory agencies adopt regulations concerning the preparation and use of real estate appraisals and evaluations in the lending process.

42.2   Appraisers performing appraisals for the lending institution must be independent, whether the appraiser is employed by the lending institution or

16

an unrelated appraiser performing an appraisal for the lending institution for a fee.

42.3   FIRREA requires that loan officers and production personnel who are responsible for making and approving loans may not influence the choice of appraisers and they may only order the appraisal directly if the selection of the appraiser is made in a "Round Robin" format from a pre-approved schedule of appraisers ("Slate of Appraisers").

42.4   The process commonly known as a "Round Robin" exists where appraisers are chosen based upon chronological order to maintain an even distribution of without the ability of Production Personnel to alter that order.

42.5   The effectiveness of the Round Robin is destroyed when Production Personnel are allowed to deviate from the required order without recourse from the lender.   Defendant allows such deviation without penalty or recourse.

42.6   Defendant pre-selects the appraisers to be placed in the Round Robin Slate of Appraisers with appraisers willing to match the qualifying value provided on the loan application in order to finalize the loan order.   This results in a "loaded" Slate of Appraisers.

42.7   Use of the "Round Robin" method lacks effectiveness when the Slate of Appraisers is "loaded" with improperly influenced appraisers guided to "Hit the Value" instead of complying with FIRREA Standards.   It is common

17

practice that the loan officers are not abiding by the random Round Robin
process anyway.

42.8   Many production goals will not be met if a loan officer is not confident that
an appraiser will return the necessary value in equity of the loan in order to
sustain the necessary financing.

42.9   Many loan officers and staff members are measured on their performances
to meet the necessary production numbers in order to make a profit margin
for the institution.

42.10   Defendant's loan officers are part of the Production Personnel.  There are a
lack of credit risk officers reviewing appraisals – in fact, many of the loan
officers are reviewing the appraisals to implement the loan.

42.11   Years of improper selection of appraisers on the slate has resulted in
situation where even if Defendant complied with the provisions requiring
appraisers to be selected randomly from a predetermined list, the slate of
appraisers for the Defendant is primarily those that have cooperated in
creating valuation results that support loan transactions, in direct opposition
to the dictates of the FIRREA Standards.

43.   Defendant Knowingly And Intentionally Creates And/Or Purchases Loans From
Mortgage Brokers And Correspondent Lenders Without Ensuring That Related Appraisal
Services Are Compliant With FIRREA Standards.

43.1   Defendants acquire and invest in mortgage loans and home equity loans
from and through mortgage brokers and correspondent lenders.  Defendant

has intentionally and knowingly failed to control how Appraisal Services are performed on loans originated by such brokers and correspondent lenders. Defendant does not audit nor does it adopt proper policies to insure that such loans are compliant with FIRREA Standards.

43.2    Defendant has failed to adopt proper policies regarding mortgage brokers and correspondent lenders with actual and/or constructive knowledge that such brokers and lenders are not compliant with FIRREA Standards. Defendant's failure to act amounts to cooperation with the fraudulent and improper practices of mortgage brokers and correspondent lenders whose appraisals practices are not in compliance with FIRREA Standards.

43.3    A great deal of publicity has occurred within the lending industry on the dangers of allowing brokers and correspondent lenders to dictate valuation results. That notwithstanding, Defendant has purchased such loans and assisted in the origination of such loans, and sold such loans with utter disregard for the compliance of the Appraisal Services with FIRREA Standards. FIRREA Standards apply to all transactions in which Defendant's have assisted in the origination, purchased, funded or sold such loans.

44.    Defendant has knowing and intentionally procured Appraisal Services from Conflicted Downstream Vendors.

44.1    "Downstream Vendors" are outside vendors who have an interest in a mortgage transaction due to their provision of other settlement services for the loan transaction. They provide the services themselves, or in an effort to

mask their conflict, through a subsidiary or affiliated company with common ownership.   These services are often contingent upon the finalization of a loan transaction, and therefore, the Downstream Vendor has an interest in the transaction and is motivated to make sure the Appraisal Service it provides has a high enough value to close the loan. These other settlement services are also much more profitable for the Downstream Vendor, making the motivation to Hit the Value even stronger. Because receipt of the Downstream Vendor's fees for these more profitable services are contingent upon loan approval, allowing them to provide the Appraisal Services is akin to allowing a real estate broker perform the appraisal, a practice that is patently illegal.

44.2    Defendant, intentionally, knowingly, and systematically used Downstream Vendors, without regard to whether that vendor or one of its affiliates were interested parties in the transaction.

44.3    Defendant intentionally and knowingly failed to disclose to consumers that an interested party was conducting the Appraisal Service related to their loan transaction.  It is a violation of USPAP's ethics rule for an appraiser to accept an assignment involving parties or property in which the appraiser has a current or prospective interest, the valuation transaction provided by the lender was defective in that it failed to meet USPAP standards.

44.4    The Defendant intentionally and knowingly failed to use reasonable care in auditing, measuring or setting controls on the provision of Appraisal Services by conflicted Downstream Vendors.

45.    Systematic Improper Influence of Appraisers and the Appraisal Process.

45.1    Defendant communicated the "target value' or "qualifying value" directly or
by making indirect statements regarding the return of "low values" resulting
in the persuasion of staff appraisers or independent appraisers to meet the
stated qualifying value to finalize loans.    This is a violation of the
Interagency Appraisal and Evaluation Guidelines.

45.2    Upon information and belief, Plaintiff alleges Defendant's employees
regularly made indirect statements in order to persuade staff appraisers or
independent appraisers to meet the stated qualifying values.

45.3    Upon information and belief, Plaintiff alleges Defendant hired appraisal
management firms or appraisers whose prior performance repeatedly
returned the values needed to match the qualifying loan values resulting in
the refusal to use similarly situated appraisers whose records did not reflect
values needed to secure loans

45.4    Defendant arranged the slate of appraisers in a fashion that resulted in an
improper retaliation against appraisers that failed to routinely meet or
exceed the qualifying values to secure the loan.    Defendant has removed
appraisers and management companies or reduced their business in order to
assure that appraisals would come in at or above the target values.

45.5    Defendant required appraisers to sign a document guaranteeing the
qualifying value would be met on any loan order issued to that appraiser and

this practice resulted in improperly influencing the outcome of the valuations.

45.6   Upon information and belief, Plaintiff alleges that Defendant refused to use appraisers coming in below the qualifying value while continuing to use appraisers that consistently met qualifying values and the Defendant did not independently choose appraisers based upon permissible measurements under FIRREA and its guidelines

45.7   Upon information and belief, Plaintiff alleges that Defendant stopped utilizing the services of independent appraisal management companies following the federal guidelines to be independent and uninterested in the appraisal and property involved, in order to maintain or increase production in the Defendant's institution.

45.8   Furthermore, upon information and belief, Plaintiff alleges that Defendant knowingly withheld business opportunities from appraisers when past valuations from the appraiser did not meet the qualifying value of the loan thereby resulting in an improper retaliation and reducing the business supplied to that appraiser.

45.9   During the course of the business relationship with appraisers and management firms, Defendant was receiving updated reports of production and service and based thereon, Defendant repeatedly offered rewards and promotional opportunities to employees based solely upon the number or percentage of time that target values were obtained.

45.10   Upon information and belief, Plaintiff alleges Defendant reduced the
amount of remuneration for valuation services or refused to pay for
appraisals when the appraiser was unable to meet the target value.

45.11   Upon information and belief, Plaintiff alleges Defendant has encouraged
appraiser to meet the required qualifying value by changing the payment
terms for valuation services or threatening cancellation of a valuation order
during the valuation/appraisal process.

46.   Defendants violated the terms of FIRREA and its guidelines in their home equity
lending area in the following respects.

46.1   Defendants allowed Production Personnel to control and run automated
valuation models ("AVM"s) to ascertain whether loans would be
underwritten.

46.2   Defendant allowed Production Personnel to choose a variety of other
options including brokers market analyses (BMA's), desktop valuations or
appraisals.

46.3   Defendant's Production Personnel, with or without the approval of
Credit/Valuation Personnel would automatically continue to obtain different
valuations until they were able to obtain one that met the desired value.
This practice is essentially modern day "appraisal shopping," allowing
Defendant, when the appraisal result is not high enough, to continue to
obtain others until they can "Hit the Value."

23

46.4    Defendant uses AVM's and brokers market analyses and desktop appraisals
with no "geographic competence" required by FIRREA for the purpose of
obtaining higher values for properties, rather than utilize USPAP compliant
Appraisal Services that might prove more conservative.  Defendant uses
AVM's, BMAs and non-USPAP compliant desktop products on credit
profiles that are unsafe and unsound and fails to disclose that information to
regulators or consumers.

46.5    Consumers are misled into believing that sufficient equity in their homes
exists to warrant the debt that is secured by the home.

## CLASS ALLEGATIONS

47.    Pursuant to Rule 23, Federal Rules of Civil Procedure, the Plaintiff brings this suit
as a class action.  The Class, which Plaintiff represents, consists of those persons in the
United States who have financed or refinanced, or who have sought financing or
refinancing, of their mortgages through Defendant's mortgage services and/or have been
charged for a provision of an appraisal service by Defendant.

48.    Plaintiff reserves the right to modify the definition of the class after further
discovery.  Upon application by the Plaintiff's counsel for certification of the class, the
Court may be requested to utilize and certify subclasses in the interest of ascertainability,
manageability, justice and/or judicial economy.

49.    Class certification is appropriate under Rule 23(a).  The Class is so numerous that
joinder of all members is impractical.  Upon information and belief the number of class

members is in the hundreds of thousands. The actual identity of the class members can be ascertained from the defendants' records.

50.     The questions of law and fact are common to the class include, but are not limited to; whether Defendant engaged in a scheme to manipulate appraisals in order to hit a value that would increase the size of the loan and enhance the likelihood that the deal would go through, which enabled the Defendant to receive a fee, kickback, or thing of value in violation of RESPA; whether Defendant fraudulently misrepresented or suppressed the true nature of the appraisal agreements and/or services provided to the class; whether Defendant engaged in false or misleading advertisements and statements to entice consumers into using their mortgage services under the impression that the Appraisal Services performed were fair, independent and in compliance with USPAP; whether the Defendant's actions described in this complaint constitute unfair, unlawful and fraudulent business practices; whether the Defendant's conduct amounts to deceptive business acts and practices; whether an internal lack of control existed regarding Defendant's Appraisal Services; whether Defendant required reimbursements for non-FIRREA compliant appraisals; whether Defendant violated TILA by demanding reimbursement for the cost to procure the extension of credit when the cost are related to the provision of improper and non-complaint appraisal services; and the appropriate legal remedy in this action.

51.     Furthermore, the representative parties are members of the class they seek to represent. The claims of the representative parties are typical of the claims of the class; the representative parties will fairly and adequately protect the interest of the class; the representative parties have retained counsel experienced in class action litigation.

52.     There is a common character between the rights of the representative parties and the absent class members.

53.     Class certification is appropriate under Rule 23(b)(2).  The Defendants have acted or refused to act on grounds applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

54.     Class certification is also appropriate under Rule 23(b)(3).  The questions of law and fact common to the members of the class predominate over the questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The amount of damages sustained by each class member would make it prohibitive for class member to bring suit.  A class action is the only appropriate remedy for the class members.

**COUNT ONE**
**RESPA Violation**

55.     Plaintiff incorporates by reference, all above paragraphs as if set forth fully herein.

56.     The Real Estate Settlement Protection Act ("RESPA") was enacted by Congress to clarify and outline the settlement process and fees to consumers and eliminate illegal activity such as kickbacks and referral fees among settlement service providers.

57.     Under 12 U.S.C. § 2607(a), "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

58.     Under RESPA, "the term 'thing of value' includes any payment, advance, funds, loan, service, or other consideration." 12 U.S.C. § 2602(2).

59.     The Defendant in this case has for years charged a fee to consumers for the provision of appraisal services.

60.     In addition, by manipulating the appraisal service in the settlement process the Defendant has received a fee, kickback, or thing of value.

61.     The Defendant used its position as the lending institution to influence the appraisal service to produce faulty appraisals for mortgaged property, which resulted in the Defendant receiving additional fees, kickbacks, or things of value.

62.     The Defendant's receipt of value was derived from using the improper appraisals to increase the money they would acquire as a result of the mortgage loans. This was done by encouraging appraisers to meet or hit a desired value, which would match the inflated price of the loan so the sale or refinancing would go through.

63.     Therefore, the Defendant was able to receive value by manipulating appraisals to reach a desired number, which made the home appear more valuable so the loan was larger, and the Defendants commission, fee, thing of value, and/or kickback was also larger.

64.     The Defendant and any and/or all of the appraisal companies and/or appraisers can not be considered part of an affiliated business agreement as defined by 12 U.S.C. § 2602(7). Upon information and belief, the Plaintiff is not aware of any affiliate or ownership interest in the appraisal companies and/or appraisers, which would amount to an affiliated business agreement under 12 U.S.C. § 2602(7).

65.    In addition, if there is such an affiliated business agreement between appraisal companies and/or appraisers it was never disclosed to Plaintiff.  Even if such affiliated agreement did exist, and it was properly disclosed to Plaintiff, the Defendant is limited to a return of ownership interest or franchise relationship from the appraisal service chosen by the Defendant to represent its interest.  12 U.S.C. § 2607(c).  From the facts stated above, even with an affiliated business agreement the Defendant received fees, kickbacks, and/or things of value above and beyond an ownership interest and/or franchise relationship in violation of 12 U.S.C. § 2607.

66.    In accordance with 12 U.S.C. § 2607(d), the Plaintiff is entitled to treble damages, or three times the amount of the payment and/or value received by Defendant.

## COUNT TWO
### TILA Violation

67.    Plaintiff incorporates by reference, all above paragraphs as if set forth fully herein.

68.    The purpose of TILA and its accompanying regulations is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601.

69.    Finance charge is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 USC 1605(a).

70.    Under TILA, appraisal costs associated with residential mortgages are excluded from the term "finance charge" for which disclosure generally is required.

71.     Any generally excluded charge is not excluded if the charge is not legal as defined by the regulation.

72.     Defendants violated TILA by demanding reimbursement for the costs to procure the extension of credit when such costs are related to the provision of appraisal services performed improperly and non-compliantly.

73.     Plaintiff suffered injury when she reasonably relied on Defendants misrepresentations of the true nature of the finance charges when paying the costs for the extension of credit.

74.     Plaintiff has been economically damaged by Defendant's violation of TILA and Plaintiff asks this Honorable Court to declare that Defendant is bound by the terms of the state and federal regulations and that Defendant is required to specifically perform in accordance with the terms and obligations set forth in the state and federal regulations and that Defendant's failure to do so would result in as yet unspecified damages to Plaintiff.

### COUNT THREE
### Unlawful and Fraudulent Business Practices
### CAL. BUS. & PROF. CODE § 17200, et. seq.

75.     Plaintiff incorporates by reference, all above paragraphs as if set for fully herein.

76.     Such acts of Defendant as described above constitute unfair, unlawful and fraudulent business practices and amount to violations of CAL. BUS. & PROF. CODE § 17200, et. seq.

77.     Plaintiff reasonably acted and relied on the misrepresentations made by Defendant regarding Defendant's assurances that the law would not be violated to secure the financing of the home.

78.     Plaintiff suffered an injury as a direct result of the deceptive practices of the
Defendant when the actual value needed to secure the loan was affected by internal
procedures that violate Federal and State laws.

79.     Defendant has created a circular pattern, by which they continue to employ
appraisal services that they know will produce a value higher than the actual worth of the
property, which results in bigger loans and more profits.

80.     As a result of the business practices described above, Plaintiff, on behalf of the
people of the State of California and pursuant to CAL. BUS. & PROF. CODE § 17203, is
entitled to an order enjoining such future conduct on the part of Defendant, and such other
orders and judgments that maybe necessary , including the appointment of a receiver, to
restore to any person in interest any money paid for the provision of Appraisal Services by
Defendant, plus interest.

**COUNT FOUR**
**False or Misleading Statements**
**CAL. BUS. & PROF. CODE § 17500**

81.     Plaintiff incorporates by reference, all above paragraphs as if set for fully herein.

82.     Such acts of Defendant as described above constitute false and misleading
advertising, which amounts to a violation of CAL. BUS. & PROF. CODE § 17500.

83.     At all times relevant hereto, Defendant has engaged in a scheme involving making
statements via media, print, and/or in person, which portray it as a fair and balanced
lending company that does not artificially influence and inflate appraisals to increase loan
amounts and ensure that more loans go through.  However, as demonstrated above, the
Defendant has created a circular pattern of enticing appraisers to meet or hit certain values

30

to increase loan amounts, and then using the same appraisers over and over again to ensure that values keep going up.

84.     Said advertisements and inducements were made within the state of California and fall under the definition of advertisements as described in CAL. BUS. & PROF. CODE § 17500 in that such inducement materials are used to encourage consumers to use Defendant's services under the belief that Defendant will not manipulate the appraisal to increase the apparent value of the property and the size loan needed.   Defendant has accepted and retained additional fees, income, things of value, and/or kickbacks as a result of the extra money they received by enticing consumers into believing they were getting fair and independent appraisal services.

85.     As a result of the above violations of CAL. BUS. & PROF. CODE § 17500, Plaintiff, on behalf of the people of the State of California and pursuant to CAL. BUS. & PROF. CODE § 17535, is entitled to an order enjoining such future conduct on the part of Defendant, and such other orders and judgments that maybe necessary , including the appointment of a receiver, to restore to any person in interest any money paid for the provision of appraisal services by Defendant, plus interest.

**COUNT FIVE**
**Deceptive Acts and Practices**
**N.Y. GEN. BUS. LAW § 349**

86.     Plaintiff incorporates by reference, all above paragraphs as if set forth fully herein.

87.     As described above, Defendant has engaged in deceptive acts and practices in their conduct of business and furnishing of services in the State of New York in violation of N.Y. GEN. BUS. LAW § 349(a).

31

88.     As a result of the foregoing, the Plaintiff Class has been injured in an amount to be proven at trail.

89.     Pursuant to N.Y. GEN. BUS. LAW § 349(h), Plaintiff Class is entitled to and demands payment of three times the amount of actual damages not to exceed one thousand dollars ($1,000.00) per Class Member, but not less than fifty dollars ($50.00) per Class Member.  In addition, and in accordance with the above referenced statute, Plaintiff request the awarding of attorneys fees.

## COUNT SIX
### Unjust Enrichment

90.     Plaintiff incorporates by reference, all above paragraphs as if set forth fully herein.

91.     As stated more precisely in the above sections of this Complaint, the Defendant has used its position as the mortgage lender to improperly influence and manipulate the appraisals used for its mortgage services.  The Defendant has used appraisal companies and/or appraisers to hit or meet particular values with their appraisals that will increase the size of the loan and ensure that more loans go through, which has generated increased but unjustly acquired profits for the Defendant.

92.     Defendant, as a result of the actions described herein, is in possession of money which is rightfully the property of the Plaintiffs and Class Members.

93.     As a result, Defendants have been unjustly enriched to the determent of Plaintiffs and Class Members.

94.     It would be unjust and inequitable to permit Defendant to retain the profits unjustly obtained.

WHEREFORE, Plaintiff requests this Court to determine that this suit may be maintained as a class action pursuant to Rule 23, Federal Rules of Civil Procedure. Plaintiff further requests that judgment be entered in favor of the Class Members and against the Defendant for the any and all fees, kickbacks and/or things of value collected as a result of the Appraisal Services described in this Complaint. Plaintiff requests judgment for three times actual damages, pursuant to RESPA, and for punitive damages, prejudgment interest, postjudgment interest, attorneys' fees, and any other relief to which the Plaintiff may be entitled.

### JURY DEMAND

Plaintiff hereby demands a trail by jury on all counts in its Complaint, said jury to be composed of the maximum number of jurors allowed by law.

Respectfully submitted,

By: _____

Joseph P. Guglielmo (JG-2447)
WHATLEY DRAKE & KALLAS, L.L.C.
75 Rockefeller Plaza, 19th Floor
New York, New York 10019
212.447.7070
212.447.7077 (fax)

Joe R. Whatley, Jr.
Peter H. Burke
W. Todd Harvey
WHATLEY DRAKE & KALLAS, L.L.C.
2323 2nd Avenue North
Birmingham, Alabama 35203
205.328.9576
205.328.9669 (fax)

33

# Exhibit W

29-Nov-2006   3:59:03PM

MASTR Asset Backed Securities
Mortgage Pass-Through Certificates
Distribution Date:   26-Jun-2006

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
7485 New Horizon Way
Frederick, MD 21703
www.ctslink.com
Telephone:  (301) 815-6600
Fax:  (301) 815-6600

## Loan Status Stratification/Credit Enhancement Statement
### MASTR Asset Backed Securities
### Mortgage Pass-Through Certificates
### Series 2006-FRE2

| | DELINQUENT No. of Loans | DELINQUENT Scheduled Balance | BANKRUPTCY No. of Loans | BANKRUPTCY Scheduled Balance | FORECLOSURE No. of Loans | FORECLOSURE Scheduled Balance | REO No. of Loans | REO Scheduled Balance | TOTAL No. of Loans | TOTAL Scheduled Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 0-29 Days | 123 | 29,066,386.89 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 123 | 29,066,386.89 |
| 30 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 60 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 90 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 120 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 150 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 180+ Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **Total** | 123 | 29,066,386.89 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 123 | 29,066,386.89 |
| **%** | 2.925785 % | 3.394762 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 2.925785 % | 3.394762 % |

| Class | | | |
|---|---|---|---|
| Class M-1 | 147,840,986.00 | 147,836,187.81 | 16.9003036 % / 17.26628832 % |
| Class M-2 | 118,097,986.00 | 118,093,187.81 | 13.50012207 % / 13.79250277 % |
| Class M-3 | 100,601,986.00 | 100,597,187.81 | 11.50010375 % / 11.74908576 % |
| Class M-4 | 85,293,986.00 | 85,289,187.81 | 9.75020203 % / 9.96121267 % |
| Class CE | 100.00 | 100.00 | 0.00011143 % / 0.00011168 % |
| Class P | 100.00 | 0.00 | 0.00000000 % / 0.00000000 % |

| | | |
|---|---|---|
| Current Period Class A Insufficient Funds | Principal Balance of Contaminated Properties | Periodic Advance |
| 0.00 | 0.00 | 0.00 |
| | | 1,469,661.83 |

Please Refer to the Prospectus Supplement for a Full Description of Loss Exposure

MASTR Asset Backed Securities
Mortgage Pass-Through Certificates
Distribution Date:    27-Aug-2007

24-Aug-2007     6:30:12PM

Contact: Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
7485 New Horizon Way
Frederick, MD 21703
www.ctslink.com
Telephone:    (301) 815-5600
Fax:    (301) 815-6660

**MASTR Asset Backed Securities**
**Mortgage Pass-Through Certificates**
**Series 2006-FRE2**

## Delinquency Status

### DELINQUENT

| | No. of Loans | Scheduled Balance |
|---|---|---|
| 30 Days | 162 | 33,260,430.32 |
| 60 Days | 97 | 19,053,404.03 |
| 90 Days | 36 | 5,773,369.39 |
| 120 Days | 28 | 3,062,820.49 |
| 150 Days | 17 | 2,153,855.41 |
| 180+ Days | 14 | 1,855,152.79 |
| | 354 | 65,159,032.43 |
| | 12.536559 % | 11.438174 % |

### BANKRUPTCY

| | No. of Loans | Scheduled Balance |
|---|---|---|
| 0-29 Days | 6 | 556,682.92 |
| 30 Days | 5 | 480,429.95 |
| 60 Days | 4 | 305,220.09 |
| 90 Days | 2 | 320,092.94 |
| 120 Days | 5 | 936,105.24 |
| 150 Days | 1 | 99,203.56 |
| 180+ Days | 43 | 9,195,692.43 |
| | 66 | 11,893,427.13 |
| | 2.335456 % | 2.087001 % |

### FORECLOSURE

| | No. of Loans | Scheduled Balance |
|---|---|---|
| 0-29 Days | 0 | 0.00 |
| 30 Days | 0 | 0.00 |
| 60 Days | 3 | 1,000,633.83 |
| 90 Days | 36 | 9,945,347.13 |
| 120 Days | 32 | 8,155,488.36 |
| 150 Days | 28 | 9,071,647.02 |
| 180+ Days | 120 | 33,723,273.14 |
| | 219 | 61,896,389.48 |
| | 7.740469 % | 10.865442 % |

### REO

| | No. of Loans | Scheduled Balance |
|---|---|---|
| 0-29 Days | 0 | 0.00 |
| 30 Days | 0 | 0.00 |
| 60 Days | 0 | 0.00 |
| 90 Days | 0 | 0.00 |
| 120 Days | 2 | 129,183.47 |
| 150 Days | 8 | 1,075,981.55 |
| 180+ Days | 180 | 51,393,635.96 |
| | 190 | 52,598,800.98 |
| | 6.723284 % | 9.233321 % |

### TOTAL

| | No. of Loans | Scheduled Balance |
|---|---|---|
| 0-29 Days | 6 | 556,682.92 |
| 30 Days | 167 | 33,740,860.27 |
| 60 Days | 104 | 20,359,257.95 |
| 90 Days | 74 | 16,038,809.46 |
| 120 Days | 67 | 12,283,597.56 |
| 150 Days | 54 | 12,400,687.54 |
| 180+ Days | 357 | 96,167,754.32 |
| | 829 | 191,547,650.02 |
| | 29.334749 % | 33.624738 % |

| Current Period Class A Insufficient Funds | Principal Balance of Contaminated Properties | Periodic Advance |
|---|---|---|
| 0.00 | 0.00 | 1,696,162.63 |

# Exhibit X

MASTR Asset Backed Securities
Mortgage Pass-Through Certificates
Distribution Date:   26-Dec-2006

08-Jan-2007          9:54:41PM

**MASTR Asset Backed Securities**
**Mortgage Pass-Through Certificates**
**Series 2006-WMC4**

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
7485 New Horizon Way
Frederick, MD 21703
www.ctslink.com
Telephone:   (301) 815-6600
Fax:            (301) 815-6660

## Delinquency Status

| | DELINQUENT | | BANKRUPTCY | | FORECLOSURE | | REO | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | No. of Loans | Scheduled Balance | No. of Loans | Scheduled Balance | No. of Loans | Scheduled Balance | No. of Loans | Scheduled Balance | No. of Loans | Scheduled Balance |
| 30 Days | 121 | 26,563,384.68 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 121 | 26,563,384.68 |
| 60 Days | 30 | 6,452,967.11 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 30 | 6,452,967.11 |
| 90 Days | 1 | 177,693.81 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 1 | 177,693.81 |
| 120 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 150 Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 180+ Days | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | 152 | 33,194,045.60 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 152 | 33,194,045.60 |
| 0-29 Days | 2,493.903 % | 2.827542 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 2,493.903 % | 2.827542 % |
| 30 Days | 0.618174 % | 0.666887 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.618174 % | 0.666887 % |
| 60 Days | 0.020606 % | 0.018915 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.020606 % | 0.018915 % |
| 90 Days | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % |
| 120 Days | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % |
| 150 Days | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % |
| 180+ Days | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % |
| | 3.132083 % | 3.533344 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 0.000000 % | 3.132083 % | 3.533344 % |

## SUBORDINATION LEVEL/CREDIT ENHANCEMENT/CLASS PERCENTAGE AND PREPAYMENT PERCENTAGE

| | Original $ | Original % | Current $ | Current % | Current Class % | Current Prepayment % |
|---|---|---|---|---|---|---|
| Class M-1 | 152,938,193.00 | 16.099910 % | 152,933,789.48 | 16.279054.23 % | 3.336841 % | 0.000000 % |
| Class M-2 | 123,490,193.00 | 12.999963.99 % | 123,485,789.48 | 13.14445860 % | 3.134596 % | 0.000000 % |
| Class M-3 | 107,342,193.00 | 11.3000423 % | 107,337,789.48 | 11.42558234 % | 1.718876 % | 0.000000 % |
| Class M-4 | 91,669,193.00 | 9.65012831 % | 91,664,789.48 | 9.75726871 % | 1.668314 % | 0.000000 % |
| Class CE | 100.00 | 0.00001053 % | | 0.00001064 % | 1.820072 % | 0.000000 % |
| Class P | 100.00 | 0.0000000 % | 0.00 | 0.00000000 % | 0.0000011 % | 0.000000 % |

| Current Period Class A Insufficient Funds | Principal Balance of Contaminated Properties | Periodic Advance | |
|---|---|---|---|
| 0.00 | 0.00 | 866,128.25 | |

Please Refer to the Prospectus Supplement for a Full Description of Loss Exposure

MASTR Asset Backed Securities
Mortgage Pass-Through Certificates
Distribution Date:   27-Aug-2007

24-Aug-2007      7:59:32PM

Contact: Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
7485 New Horizon Way
Frederick, MD 21703
www.ctslink.com
Telephone:   (301) 815-6600
Fax:            (301) 815-6660

## MASTR Asset Backed Securities
## Mortgage Pass-Through Certificates
## Series 2006-WMC4

### Delinquency Status

#### DELINQUENT

| Period | No. of Loans | Scheduled Balance |
|---|---|---|
| 30 Days | 221 | 42,515,512.91 |
| 60 Days | 120 | 20,961,475.80 |
| 90 Days | 41 | 4,247,350.51 |
| 120 Days | 40 | 3,100,223.74 |
| 150 Days | 30 | 2,607,718.51 |
| 180+ Days | 8 | 1,858,249.41 |
| | 460 | 75,290,530.88 |
| | 10.339402 % | 8.734221 % |

Per-bucket percentages (No. of Loans % / Scheduled Balance %):
- 30 Days: 4.967408 % / 4.933222 %
- 60 Days: 2.697235 % / 2.432233 %
- 90 Days: 0.921555 % / 0.492835 %
- 120 Days: 0.899078 % / 0.359730 %
- 150 Days: 0.674309 % / 0.302583 %
- 180+ Days: 0.179816 % / 0.215619 %

#### BANKRUPTCY

| Period | No. of Loans | Scheduled Balance | % Loans | % Balance |
|---|---|---|---|---|
| 0-29 Days | 2 | 271,095.55 | 0.044954 % | 0.031455 % |
| 30 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 60 Days | 1 | 153,015.24 | 0.022477 % | 0.017755 % |
| 90 Days | 2 | 810,824.25 | 0.044954 % | 0.094083 % |
| 120 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 150 Days | 3 | 720,170.62 | 0.067431 % | 0.083564 % |
| 180+ Days | 5 | 1,135,048.07 | 0.112385 % | 0.131704 % |
| | 13 | 3,090,153.73 | 0.292200 % | 0.358561 % |

#### FORECLOSURE

| Period | No. of Loans | Scheduled Balance | % Loans | % Balance |
|---|---|---|---|---|
| 0-29 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 30 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 60 Days | 3 | 816,020.56 | 0.067431 % | 0.094686 % |
| 90 Days | 63 | 17,546,536.25 | 1.416049 % | 2.035985 % |
| 120 Days | 54 | 14,736,313.36 | 1.213756 % | 1.709905 % |
| 150 Days | 49 | 15,539,746.88 | 1.101371 % | 1.803131 % |
| 180+ Days | 85 | 24,113,364.78 | 1.910542 % | 2.797957 % |
| | 254 | 72,751,981.83 | 5.709148 % | 8.441664 % |

#### REO

| Period | No. of Loans | Scheduled Balance | % Loans | % Balance |
|---|---|---|---|---|
| 0-29 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 30 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 60 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 90 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 120 Days | 4 | 911,974.83 | 0.089908 % | 0.105820 % |
| 150 Days | 0 | 0.00 | 0.000000 % | 0.000000 % |
| 180+ Days | 62 | 20,157,792.04 | 1.393572 % | 2.338978 % |
| | 66 | 21,069,766.87 | 1.483479 % | 2.444798 % |

#### TOTAL

| Period | No. of Loans | Scheduled Balance | % Loans | % Balance |
|---|---|---|---|---|
| 0-29 Days | 2 | 271,095.55 | 0.044954 % | 0.031455 % |
| 30 Days | 221 | 42,515,512.91 | 4.967408 % | 4.933222 % |
| 60 Days | 124 | 21,930,511.60 | 2.787143 % | 2.544673 % |
| 90 Days | 106 | 22,604,711.01 | 2.382558 % | 2.622903 % |
| 120 Days | 98 | 18,748,511.93 | 2.202742 % | 2.174555 % |
| 150 Days | 82 | 18,867,636.01 | 1.843111 % | 2.189277 % |
| 180+ Days | 160 | 47,264,454.30 | 3.596314 % | 5.484258 % |
| | 793 | 172,202,433.31 | 17.824230 % | 19.981245 % |

| Current Period Class A Insufficient Funds | Principal Balance of Contaminated Properties | Periodic Advance |
|---|---|---|
| 0.00 | 0.00 | 1,713,775.19 |

# Exhibit Y



# THE ROLE OF FANNIE MAE AND FREDDIE MAC IN THE FINANCIAL CRISIS

## HEARING

BEFORE THE

## COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

## HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

DECEMBER 9, 2008

### Serial No. 110–180

Printed for the use of the Committee on Oversight and Government Reform



Available via the World Wide Web: http://www.gpoaccess.gov/congress/index.html
http://www.house.gov/reform

60

Chairman WAXMAN. Thank you very much, Mr. Raines. We appreciate your testimony.

Before we go to questions by the members of the committee, I would like to ask unanimous consent that all Members may be permitted to enter an opening statement into the record. And, without objection, that will be the order.

By a previous agreement with the minority, I would ask unanimous consent that we start off the questioning with 12 minutes on the Democratic side and 12 minutes on the Republican side before we then go to the 5-minute rule. And, without objection, that will be the order.

The Chair, starting the questions for our side, would yield 10 minutes to the gentleman from Massachusetts, Mr. Tierney.

Mr. TIERNEY. Thank you, Mr. Chairman.

And before I start my questions, I just want to take one moment and appreciate your services here as chairman. I share with Mr. Issa the observation that you have lifted the stature of this committee substantially, and all the Members and the staff are grateful for that.

When you were in the minority as the ranking member, you certainly made every attempt and were successful in refocusing the Congress and the committee on important matters. As chairman, you have focused on a number of important matters that were essential to the country and to the Congress. Now, you bring your duties and your skills over to the Commerce Committee at our loss but, I think, the Nation and Congress's benefit.

And so we thank you very much, and I've been proud to serve with you.

Chairman WAXMAN. The gentleman will be given the full 10 minutes. [Laughter.]

Mr. TIERNEY. I thank all of you gentlemen for being here this morning and working with us on this.

Mr. Mudd, if you might, I would like to ask you a couple of questions, in particular about a document that we found in your internal files at Fannie Mae. It says, "A single family guarantee business facing strategic crossroads," dated in June 2005. And it is listed as confidential and highly restricted.

I'd like to get your responses to it. We have some slides up there, if you find that helpful, sir.

The first slide in this says, "The risk in the environment has accelerated dramatically," and the bullets under that say that there has been a proliferation of higher-risk alternative mortgage products, there is a growing concern about housing bubbles, there is a growing concern about borrowers taking on increased risk and higher debt, and lenders have engaged in aggressive risk layering.

The next slide, if we switch over on that, says the growth in adjustable-rate mortgages continues at an aggressive pace. And here the presentation says that there has been an emphasis on the lowest possible payment, and homes are being utilized more like an ATM.

It appears, Mr. Mudd, that you were aware of both the accelerating risk in this environment, as well as the concerns about housing bubbles as far back as 2005. Is that correct?

Mr. MUDD. Yes.

# Exhibit Z

**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**

1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3801

**OFFICE OF THE DIRECTOR**

December 8, 2006

Richard F. Syron
Chairman and Chief Executive Officer
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive
McLean, VA  22102

RE:  Enterprise Adoption of Interagency Guidance on Nontraditional Mortgage Product Risks

On October 4, 2006 the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration (the agencies) jointly issued the attached "Interagency Guidance on Nontraditional Mortgage Product Risks." The guidance discusses how institutions can offer nontraditional mortgage products in a safe and sound manner and in a way that clearly discloses the benefits and risks to borrowers.

In addition the Conference of State Bank Supervisors and the American Association of Residential Mortgage Regulators issued guidance November 14, 2006 that mirrors that of the agencies.  This guidance is designed to assist state regulators of mortgage brokers and mortgage companies (providers) not affiliated with a bank holding company or an insured financial institution to promote consistent regulation in the mortgage market and clarify how providers can offer nontraditional mortgage products in a way that clearly discloses the risks that borrowers may assume.

In order to promote the safety and soundness of Freddie Mac we are requiring that Freddie Mac immediately take action consistent with the practices referenced in the interagency guidance. Adoption of this guidance by the two housing government-sponsored enterprises (GSEs) should serve to enhance the overall level of underwriting standards, risk management practices, and consumer protection throughout the mortgage market.  All institutions (including the GSEs) should ensure that their risk management practices keep pace with the growth and changing risk profile of their nontraditional mortgage portfolios and changes in the market.  To meet these expectations, Freddie Mac should:

1. Develop and implement written policies that specify acceptable product attributes, portfolio limits, sales and securitization practices, and risk management expectations.

2. Design and implement internal controls to ensure that mortgages purchased and guaranteed by Freddie Mac meet the underwriting and consumer protection standards of the guidance.

3.  Design and implement enhanced performance measures and management reporting that provide early warning for increased risk.

4.  Establish appropriate loan loss allowance levels that consider the credit quality of the portfolio and conditions that affect collectibility.

5.  Maintain capital commensurate with the risk characteristics of their nontraditional mortgage loan portfolios.

Please provide the examiner-in-charge with a complete report on the steps Freddie Mac has taken in response to this guidance and this letter by February 28, 2007.

Very truly yours,

James B. Lockhart III
Director

cc:   Leonard Reid, Director of Supervision
      Jeffrey Spohn, Examiner-in-Charge

**Attachment**

**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**

*1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3801*

**OFFICE OF THE DIRECTOR**

December 8, 2006

Daniel H. Mudd
President and Chief Executive Officer
Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC  20016

RE:  Enterprise Adoption of Interagency Guidance on Nontraditional Mortgage Product Risks

On October 4, 2006 the Office of the Comptroller of the Currency, the Board of Governors of the
Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift
Supervision, and the National Credit Union Administration (the agencies) jointly issued the
attached "Interagency Guidance on Nontraditional Mortgage Product Risks." The guidance
discusses how institutions can offer nontraditional mortgage products in a safe and sound manner
and in a way that clearly discloses the benefits and risks to borrowers.

In addition the Conference of State Bank Supervisors and the American Association of
Residential Mortgage Regulators issued guidance November 14, 2006 that mirrors that of the
agencies.  This guidance is designed to assist state regulators of mortgage brokers and mortgage
companies (providers) not affiliated with a bank holding company or an insured financial
institution to promote consistent regulation in the mortgage market and clarify how providers can
offer nontraditional mortgage products in a way that clearly discloses the risks that borrowers
may assume.

In order to promote the safety and soundness of Fannie Mae we are requiring that Fannie Mae
immediately take action consistent with the practices referenced in the interagency guidance.
Adoption of this guidance by the two housing government-sponsored enterprises (GSEs) should
serve to enhance the overall level of underwriting standards, risk management practices, and
consumer protection throughout the mortgage market.  All institutions (including the GSEs)
should ensure that their risk management practices keep pace with the growth and changing risk
profile of their nontraditional mortgage portfolios and changes in the market.  To meet these
expectations, Fannie Mae should:

1. Develop and implement written policies that specify acceptable product attributes,
   portfolio limits, sales and securitization practices, and risk management expectations.

2. Design and implement internal controls to ensure that mortgages purchased and
   guaranteed by Fannie Mae meet the underwriting and consumer protection standards of
   the guidance.

3.  Design and implement enhanced performance measures and management reporting that provide early warning for increased risk.

4.  Establish appropriate loan loss allowance levels that consider the credit quality of the portfolio and conditions that affect collectibility.

5.  Maintain capital commensurate with the risk characteristics of their nontraditional mortgage loan portfolios.

Please provide the examiner-in-charge with a complete report on the steps Fannie Mae has taken in response to this guidance and this letter by February 28, 2007.

Very truly yours,

James B. Lockhart III
Director

cc:   Leonard Reid, Director of Supervision
      John Kerr, Examiner-in-Charge

**Attachment**

# Exhibit AA

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

### For the fiscal year ended December 31, 2006

### Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*
**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

**Securities registered pursuant to Section 12(b) of the Act:**
**None**

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, without par value**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐    No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐    No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☑    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the price at which the common stock was last sold on June 29, 2007 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $63,724 million.

As of June 30, 2007, there were 973,451,598 shares of common stock of the registrant outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE
None.

The consent order also prohibits our Board of Directors from increasing the dividend at any time if payment of the increased dividend would reduce our capital surplus to less than the OFHEO-directed minimum capital requirement. In addition, the OFHEO consent order requires us to provide OFHEO with prior notice of any planned dividend and a description of the rationale for its payment.

If we fail to comply with any of our agreements with OFHEO or with any OFHEO regulation, including those relating to our minimum, core, risk-based or OFHEO-directed capital, we may incur penalties and could be subject to further restrictions on our activities and operations, or to investigation and enforcement actions by OFHEO.

*Regulation by HUD and Charter Act limitations could adversely affect our results of operations.* HUD supervises our compliance with the Charter Act, which defines our permissible business activities. For example, we may not purchase single-family loans in excess of our conforming loan limits, which are set annually based on U.S. home prices. The conforming loan limit for a one-family mortgage loan in most geographic regions is currently $417,000. In addition, under the Charter Act, our business is limited to the U.S. housing finance sector. As a result of these limitations on our ability to diversify our operations, our financial condition and earnings depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. Our substantial reliance on conditions in the U.S. housing market may adversely affect the investment returns we are able to generate. In addition, the Secretary of HUD must approve any new Fannie Mae conventional mortgage program that is significantly different from those approved or engaged in prior to the enactment of the 1992 Act. As a result, our ability to respond quickly to changes in market conditions by offering new programs in response to these changes is subject to HUD's prior approval process. These restrictions on our business operations may negatively affect our ability to compete successfully with other companies in the mortgage industry from time to time, which in turn may reduce our market share, our earnings and our financial condition.

HUD has established housing goals and subgoals for our business. HUD's housing goals require that a specified portion of our business relate to the purchase or securitization of mortgage loans that finance housing for low- and moderate-income households, housing in underserved areas and qualified housing under the definition of special affordable housing. HUD has increased our housing goals through 2008, and has created purchase money mortgage subgoals that also increase through 2008. These changes in our housing goals and subgoals and declining affordability have made it increasingly challenging to meet our housing goals and subgoals. If we do not meet any enforceable housing goal or subgoal, we may become subject to increased HUD oversight for the following year or be subject to civil money penalties.

Our efforts to meet the increased housing goals and subgoals established by HUD for 2007 and future years may reduce our profitability. In order to obtain business that contributes to our housing goals and subgoals, we have made significant adjustments to our mortgage loan sourcing and purchase strategies. These strategies include entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions. We have also relaxed some of our underwriting criteria to obtain goals-qualifying mortgage loans and increased our investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could further increase our credit losses.

***A decrease in our current credit ratings would have an adverse effect on our ability to issue debt on acceptable terms, which would reduce our liquidity and our earnings.***

Our borrowing costs and our broad access to the debt capital markets depend in large part on our high credit ratings, particularly on our senior unsecured debt. Our ratings are subject to revision or withdrawal at any time by the rating agencies. Any reduction in our credit ratings could increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements in derivative contracts and other borrowing arrangements. A substantial reduction in our credit ratings would reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations and our competitive position. A description of our credit ratings and current ratings outlook is included in "Item 7—MD&A—Liquidity and Capital Management—Liquidity—Credit Ratings and Risk Ratings."

Table of Contents

### Market and Economic Factors Affecting Our Business

*Market Environment: 2001 to Mid–2006*

Our business and financial performance are significantly affected by the dynamics of the U.S. residential mortgage market, including the total amount of residential mortgage debt outstanding, the volume and composition of mortgage originations, the level of competition for mortgage assets generally among investors, and the mortgage credit environment.

Between 2001 and mid–2006, the housing and mortgage markets experienced a sustained period of growth due to a combination of factors, including low mortgage interest rates, positive demographic drivers such as household and immigration growth, and an increase in purchases of homes by investors—all of which fueled extraordinary growth in home prices. As home prices climbed, decreasing affordability led to significant mortgage product innovation and rapid growth in mortgage products other than fully amortizing, fixed–rate, prime mortgage loans, especially between 2004 and mid–2006. Notably, there was rapid growth in interest–only and negative–amortizing loans, as well as adjustable rate mortgages with initial periods of low fixed rates. These types of loans generally required lower initial monthly payments either because the initial interest rates were lower or because they allowed borrowers to defer repayment of principal or interest. At the same time, there was a relaxation of credit underwriting standards, as the subprime and Alt–A sectors grew rapidly. The features of these new mortgage products allowed more borrowers to obtain mortgage loans, which contributed to continued growth in the housing market. As these products increased in popularity, the proportion of fully amortizing, fixed–rate mortgage originations, which historically have represented the majority of our mortgage credit book of business, decreased significantly.

Between 2001 and mid–2006, the substantial growth in mortgage originations and residential mortgage debt outstanding led to substantial growth in our mortgage credit book of business. In addition, we experienced historically low levels of credit losses due in part to the significant increase in home prices. As the composition of loan originations shifted from fixed–rate mortgages to a greater share of higher risk, less traditional mortgages, we concluded that the market's pricing of a significant portion of these loans did not appropriately reflect the underlying, and often layered, credit risks associated with these products. Based on this assessment, we made a strategic decision to forgo the guaranty of a significant proportion of mortgage loans because they did not meet our risk and pricing criteria. As a result of our decision to maintain a disciplined approach to managing our participation in the single–family mortgage market, we ceded significant market share of issuances of single–family mortgage–related securities to our competitors. We believe, however, that this decision has helped us maintain a mortgage credit book of business with strong credit characteristics overall.

*Change in Market Environment: Mid–2006 to Present*

After five consecutive years of record home sales, however, the housing market slowed sharply in 2006, especially in the second half of the year. Housing starts fell by 13%; home sales fell by almost 10%; purchase originations fell for the first time this decade; and national home price appreciation slowed sharply in the second half of the year, with some regions of the country experiencing declines in home prices. Several factors contributed to this softening of the housing market, including: below–trend job growth; a decrease in the affordability of homes; and a decline in the share of mortgage originations made to investors and purchasers of second homes. In addition, as short–term interest rates climbed significantly during 2006 relative to long–term interest rates, the yield curve flattened, causing a continued narrowing of the spreads between the rates available for ARMs and fixed–rate mortgage loans. This change reduced the utility of ARM products as a means of increasing home price affordability for borrowers. As a result, for the first time in six years, residential mortgage debt outstanding grew at single–digit rates in 2006. During the first quarter of 2007, this growth rate declined to 6%, its lowest level in nearly 10 years.

As interest rates increased, many subprime loans (namely, ARMs with interest rates that were fixed for only two to three years) began to reset in 2006 from their below–market initial rates to higher interest rates, often at levels higher than then current market rates. The substantial increase in monthly mortgage payments resulting from the reset of the interest rates on these loans, along with increasing interest rates in the market generally

47

Table of Contents

over us in its role as our conservator. We are also subject to other laws and regulations that affect our business, including those regarding taxation and privacy.

The Charter Act defines our permissible business activities. For example, we may not originate mortgage loans or purchase single−family loans in excess of the conforming loan limits, and our business is limited to the U.S. housing finance sector. In addition, our conservator has determined that, while in conservatorship, we will not be permitted to engage in new products and will be limited to continuing our existing business activities and taking actions necessary to advance the goals of the conservatorship. As a result of these limitations on our ability to diversify our operations, our financial condition and earnings depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. The weak and unstable condition of the U.S. housing market over the past approximately three to four years has therefore had a significant adverse effect on our results of operations, financial condition and net worth, which is likely to continue.

*We could be required to pay substantial judgments, settlements or other penalties as a result of pending government investigations and civil litigation.*

We are subject to investigations by the Department of Justice and the SEC, and are a party to a number of lawsuits. We are unable at this time to estimate our potential liability in these matters, but may be required to pay substantial judgments, settlements or other penalties and incur significant expenses in connection with these investigations and lawsuits, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In addition, responding to requests for information in these investigations and lawsuits may divert significant internal resources away from managing our business. More information regarding these investigations and lawsuits is included in "Legal Proceedings" and "Note 20, Commitments and Contingencies."

*Our common and preferred stock have been delisted from the NYSE and the Chicago Stock Exchange, which could adversely affect the market price and liquidity of our delisted securities.*

Our common stock and previously−listed series of our preferred stock were delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and are now traded exclusively in the over−the−counter market. The market price of our common stock has declined significantly since June 16, 2010, the date we announced our intention to delist these securities, and may decline further.

There can be no assurance that an active trading market in our equity securities will continue to exist. Our quoted securities are likely to experience price and volume fluctuations which may be more significant than when our securities were listed on a national securities exchange, which could adversely affect the market price of these securities. We cannot predict the actions of market makers, investors or other market participants, and can offer no assurances that the market for our securities will be stable.

*Mortgage fraud could result in significant financial losses and harm to our reputation.*

We use a process of delegated underwriting in which lenders make specific representations and warranties about the characteristics of the single−family mortgage loans we purchase and securitize. As a result, we do not independently verify most borrower information that is provided to us. This exposes us to the risk that one or more of the parties involved in a transaction (the borrower, seller, broker, appraiser, title agent, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan. We have experienced financial losses resulting from mortgage fraud, including institutional fraud perpetrated by counterparties. In the future, we may experience additional financial losses or reputational damage as a result of mortgage fraud.

## RISKS RELATING TO OUR INDUSTRY

*A further decline in U.S. home prices or activity in the U.S. housing market would likely cause higher credit losses and credit−related expenses, and lower business volumes.*

We expect weakness in the real estate financial markets to continue in 2011. The deterioration in the credit condition of outstanding mortgages will result in the foreclosure of some troubled loans, which is likely to add

66

# Exhibit BB



Sign In | Register now

Home Deli

**SIGN UP FREE**

When you buy a

Local Search   Site Search

| HOME | TODAY'S GLOBE | NEWS | BUSINESS | SPORTS | LIFESTYLE | A&E | THINGS TO DO | TRAVEL | CARS |

Technology   Healthcare   Markets   Small business   **Personal finance**   Columnists

HOME / BUSINESS / PERSONAL FINANCE

*The Boston Globe*

ADVERTI

# 2,200 to get reprieves on foreclosures

Facing threat of a suit, subprime lender to let state review mortgages

Email | Print | Single Page | Text size  −  +

By Kimberly Blanton
Globe Staff / July 12, 2007

Fremont Investment & Loan yesterday agreed to postpone foreclosure proceedings against 2,200 Massachusetts homeowners after state officials determined the lender gave subprime mortgages to borrowers who could not afford the loan payments.

Attorney General Martha Coakley secured the 90-day foreclosure moratorium from Fremont, once the state's second-largest issuer of subprime loans, after she threatened in May to sue the California company over lending practices she alleged violated the state's consumer-protection laws, such as making mortgages without fully disclosing the terms.

The moratorium "got the clock stopped so the people facing foreclosure get a little bit of breathing room," she said.

Fremont, which has now exited the subprime lending business, declined to comment.

Coakley's action came as Massachusetts Governor Deval Patrick yesterday unveiled an aggressive plan to refinance subprime loans of some delinquent borrowers. State officials said they would pressure lenders to absorb losses on their troubled loans.

In the Fremont case, Coakley said her office will review the company's internal documents on its Massachusetts mortgages to determine whether the loans were made inappropriately or whether a foreclosure is warranted. The state would use that information to determine whether some Fremont customers



## New Trick i

[ January 2012] If you h
drive 25 mi/day or less

**INSIDE BOSTON.COM**

**BUFFALO WINGS IN BOSTON**



**Natives of the N.Y. city rank the
best wings around Boston**

**INTERNATIONAL AUTO SHOW**



**The newest speed demons at
Detroit's annual car convention**

**TOP 10 PATRIOTS PLAYOFF
WINS**

deserve financial relief, she said.

Financial regulators and housing activists have accused Fremont of routinely failing to detail to customers the full implications of their loans, of not properly documenting information such as borrowers' income, and of making loans that borrowers could not afford.

In March, the Federal Deposit Insurance Corp. alleged Fremont made loans "that substantially increased the likelihood of borrower default" and ordered the company to stop making loans.

One such borrower was Patricia Sujballi, who in May 2006 purchased a two-family home in Dorchester. Fremont gave her a subprime mortgage for $529,000, even though she had just moved out of a homeless shelter, was unemployed, and her husband earned around $32,000 a year.

Sujballi said she and her husband tried to get out of the Fremont loan at the closing when they realized they could not afford the $4,700 monthly payment, but said they were pressured by the bank's attorneys to sign it.

Sujballi's home was foreclosed on June 15, and on Tuesday, the mother of two received a 72-hour notice to move out. Sujballi said she faces being homeless again. Coakley's action against Fremont, she said, "is too late for me."

Her loan broker, meantime, earned $9,696.40 in fees, according to mortgage documents provided by ESAC Sustainable Homeownership Center in Boston, which tried to help her. "The broker made out very well," said Virginia Pratt, Sujballi's housing counselor at ESAC, while Sujballi "was completely set up to fail,"

ESAC played a central role in alerting state officials to Fremont's problems. Robert Pulster, the ESAC Center's executive director, said his organization started seeing Fremont borrowers in trouble in early 2006. "There wasn't a Fremont loan that came in that didn't have some issues," he said.

Coakley said her investigators continue to look into consumer complaints.

Meanwhile, under Patrick's plan, the state's housing finance organization, MassHousing, will provide up to $250 million to help subprime borrowers up to 60 days late on their payments refinance into lower-cost fixed-rate mortgages.

Yesterday, Wells Fargo said in a prepared statement it would work on solutions for troubled mortgages "on a case by case basis."

Kevin Cuff, executive director of the Massachusetts Mortgage Bankers Association, said the lenders targeted for refinancing want an opportunity to



Review and then rank the team's best playoff victories

SPOTTED AT DBAR



The Dorchester locale hosted its weekly Show Tune Tuesday

PLUS...
Blogs  Crossword  Comics
Horoscopes  Games  Lottery
Caption contest  Today in
history

1.

2.

3.

4.

5.

6.

7.

mitigate their losses by being able to provide those borrowers with the new mortgages, as well. The state program, he said, is unfair because it "is asking the lender to take the hit and to lose the borrower."

John Battaglia, president of Cambridge Mortgage Group, said one problem in a bailout plan is that many borrowers did not have enough income to pay for their loans in the first place and their homes can't be saved.

Mortgages were based on false beliefs about "real estate values continuing to go up or people thinking they would have more income" in the future to pay the mortgages, he said.

Kimberly Blanton can be reached at blanton@globe.com. ▪

© Copyright 2008 Globe Newspaper Company.



Ads by Google   what's this?

**See Todays Mortgage Rates**
Mortgage Rates Hit 2.5% (3.01%APR) As Seen on Good Morning America!
www.MortgageRates.LowerMyBills.com
**10 Year Mortgage**
See Rates You Actually Qualify For. Refinance From 2.125% (2.989 APR).
TheEasyLoanSite.com
**2.3% 30-Yr Mortgage Rate**
$160,000 Mortgage just $621/mo 1 Bank. 1 Call. Guaranteed. BBB A+
www.freerateupdate.com

http://www.boston.com/business/personalfinance/articles/2007/07/12/2200_to_get_reprieves_on_foreclosures/

Home | Today's Globe | News | Business | Sports | Lifestyle | A&E | Things to Do | Travel | Cars | Jobs | Homes |

CONTACT BOSTON.COM | Help | Advertise | Work here | Privacy Policy | Mobile | RSS feeds | Make Boston.com your

CONTACT THE BOSTON GLOBE | Subscribe | Manage your subscription | Advertise | The Boston Globe Extras | The Boston Globe S

# Exhibit CC

Home | Deposit Insurance | Consumer Protection | Industry Analysis | Regulations & Examinations |

Home > News & Events > Press Releases

## Press Releases

### FDIC Issues Cease and Desist Order Against Fremont Investment & Loan, Brea, California, and its Parents

**FOR IMMEDIATE RELEASE**
**March 7, 2007**

**Media Contact:**
**David Barr (202) 898-6992**
**Cell: 703-622-4790**
**dbarr@fdic.gov**

The Federal Deposit Insurance Corporation (FDIC) today announced it had issued a cease and desist order against Fremont Investment & Loan, Brea, California ("Bank"), and its parent corporations, Fremont General Corporation and Fremont General Credit Corporation. The bank and its parents, without admitting or denying the allegations, consented to the order.

In taking this action, the FDIC found that the bank was operating without effective risk management policies and procedures in place in relation to its subprime mortgage and commercial real estate lending operations. The FDIC determined, among other things, that the bank had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank.

The order sets forth a variety of corrective actions to be undertaken. The order requires that the bank adopt a five-year strategic plan for its business. The order also requires that the bank, within 90 days, adopt a subprime mortgage lending policy with provisions designed to correct its lending practices, including that it underwrite future subprime loans with an analysis of the borrower's ability to repay at the fully indexed rate and provide borrowers with clear information about the benefits and risks of the products.

The order also requires the bank within 90 days to describe efforts it will make to restructure loans in distress consistent with the marketability of such

Press Releases | Online Press Room | Conferences & Events | Financial Institution Letters | Special Alerts | Letters to the Editor/Opi

loans and with sound principles of underwriting. In addition, the order requires the bank to fully comply with all consumer protection laws. The order also requires the bank to correct its commercial real estate lending practices.

"Our concern has always been that banks make loans that borrowers are able to repay," said FDIC Chairman Sheila C. Bair. "We believe that the agreement with Fremont addresses this basic concern."

Attachment: http://www.fdic.gov/bank/individual/enforcement/2007-03-00.pdf - PDF 53k (PDF Help)

# # #

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 8,681 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring and addressing risks to which they are exposed. The FDIC receives no federal tax dollars - insured financial institutions fund its operations.

FDIC press releases and other information are available on the Internet at www.fdic.gov, by subscription electronically (go to www.fdic.gov/about/subscriptions/index.html) and may also be obtained through the FDIC's Public Information Center (877-275-3342 or publicinfo@fdic.gov.) **PR-22-2007**

Last Updated 03/07/2007                                            communications@fdic.gov

Home | Contact Us | Search | Help | SiteMap | Forms | En Español
Website Policies | Privacy Policy | Plain Writing Act of 2010 | USA.gov | FDIC Office
Freedom of Information Act (FOIA) Service Center | FDIC Open Government Webp

# Exhibit DD

1   SCOTT + SCOTT LLP
    Arthur L. Shingler III (181719)
2   5455 Wilshire Blvd., Suite 1800
    Los Angeles, CA  90036
3   Tel: 213/985-1274
    Fax: 213/985-1278
4   Email: ashingler @scott-scott.com

5   Nicholas J. Licato (228402)
    600 B Street, Suite 1500
6   San Diego, CA  92101
    Tel.: 619/233-4565
7   Fax: 619/233-0508
    Email: nlicato@scott-scott.com

8
9   SCOTT + SCOTT LLP
    David R. Scott
10  108 Norwich Avenue
    P. O Box 192
11  Colchester, CT  06415
    Tel:  860/537-5537
12  Fax: 860/537-4432
    Email: drscott@scott-scott.com

13  *Counsel for Plaintiff*

14

15                **UNITED STATES DISTRICT COURT**

16        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17

18

19  GEORGE PAPPAS, on Behalf of          )   Case No.
    Himself and All Others Similarly     )
20  Situated,                            )
                                         )   **CLASS ACTION COMPLAINT**
21              Plaintiff,               )   **FOR VIOLATIONS OF THE**
                                         )   **FEDERAL SECURITIES LAWS**
22       vs.                             )
                                         )
23  COUNTRYWIDE FINANCIAL               )
    CORP., ANGELO MOZILO, AND           )
24  ERIC P. SIERACKI,                    )   JURY TRIAL DEMANDED
                                         )
25              Defendants.              )
                                         )
26                                       )
                                         )
27                                       )
                                         )
28                                       )

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on, inter alia, the investigation conducted by and through plaintiff's attorneys, which included, amongst other things, a review of the Defendants' press releases, Securities and Exchange Commission ("SEC") filings by Countrywide Financial Corp. ("Countrywide Financial" or the "Company") and its related entities (collectively "Defendants"), as well as media reports about the Defendants.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY AND OVERVIEW

1.     This is a securities class action on behalf of all purchasers of the publicly traded securities of Countrywide Financial Corp. ("Countrywide Financial" or the "Company") between October 24, 2006 and August 9, 2007 (the "Class Period"), against Countrywide Financial and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.     Countrywide Financial Corp. is a vertically integrated mortgage lender and finance company. The company operates in five segments: Mortgage Banking, Banking, Capital Markets, Insurance, and Global Operations. The Company's segmented operations places it at the forefront of the mortgage lending business, inclusive of conduit, securities trading, underwriting, brokering and asset management. Pointing to these strengths, the Company assured the investment community of its capacity to stabilize earnings growth and dominate real estate finance, while continuing to plow ahead with diversification and infrastructure strategies, to support business growth and build shareholder value.

**JURISDICTION AND VENUE**

3.      Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act.  New City Financial maintains its corporate offices in this District and many of the false and misleading statements were made in or issued from this District.

**THE PARTIES**

5.      Plaintiff George Pappas purchased Countrywide Financial publicly traded securities as described in the attached certification and was damaged thereby.

6.      Defendant Countrywide Financial a holding company, engages in mortgage lending and other finance-related operations. The company operates in five segments: Mortgage Banking, Banking, Capital Markets, Insurance, and Global Operations. The Mortgage Banking segment originates, purchases, sells, and services non-commercial mortgage loans, as well as provides various loan closing products and services, such as credit reports, appraisals, title reports, property valuation services, flood determinations, and other related services. The Banking segment deposits and invests in mortgage loans and home equity lines of credit, as well as provides short-term secured financing to mortgage lenders. The Capital Markets segment primarily operates as a registered securities broker-dealer, residential mortgage loan manager, and a commercial mortgage loan originator. Its activities include conduit, securities trading, underwriting, brokering, asset management, and origination and sale of commercial mortgage loans. This segment serves institutional customers, such as banks, other depository institutions, insurance companies, asset managers, mutual funds, pension plans, other broker-dealers, and governmental agencies.. Countrywide Financial's principal business offices are located at 4500 Park Granada, Calabasas, CA 91302.

7.      Defendant Angelo Mozilo ("Mozilo") was, during the relevant period, Chairman of the Board and CEO of Countrywide Financial. In addition to his

- 2 -

1   opportunity to sell shares of his awards of Company options and stock, on October 20,
2   2006, Countrywide Financial agreed to enhance Mozilo's compensation, by creating a
3   potential annual bonus opportunity of up to $10,000,000, tied to performance metrics
4   based on return on equity and net income, with targeted performance generally set at
5   the 50th percentile of the Company's peer group. In addition to this, during the
6   relevant period, Mozilo reaped over $150 million in proceeds from the sale of his
7   Countrywide stock. Defendant Mozilo assisted in the preparation of the false financial
8   statements and repeated the contents therein to the market.

9          8.      Defendant Eric P. Sieracki ("Sieracki") was, during the relevant period,
10  Executive Managing Director and Chief Financial Officer of Countrywide Financial.
11  Defendant Sieracki assisted in the preparation of the false financial statements and
12  repeated the contents therein to the market.

13         9.      The individuals named as defendants in ¶¶7-8 are referred to herein as the
14  "Individual Defendants." The Individual Defendants, because of their positions with
15  the Company, possessed the power and authority to control the contents of
16  Countrywide Financial's quarterly reports, press releases and presentations to
17  securities analysts, money and portfolio managers and institutional investors, i.e., the
18  market. Each individual defendant was provided with copies of the Company's
19  reports and press releases alleged herein to be misleading prior to or shortly after their
20  issuance and had the ability and opportunity to prevent their issuance or cause them to
21  be corrected. Because of their positions and access to material non-public information
22  available to them but not to the public, each of these defendants knew that the adverse
23  facts specified herein had not been disclosed to and were being concealed from the
24  public and that the positive representations which were being made were then
25  materially false and misleading. The Individual Defendants are liable for the false
26  statements pleaded herein at ¶¶12-15, as those statements were each "group-
27  published" information, the result of the collective actions of the Individual
28  Defendants.

1

**SCIENTER**

2

    10.    In addition to the above-described involvement, each Individual

3

Defendant had knowledge of Countrywide Financial's problems and was motivated to

4

conceal such problems. Defendant Mozilo, as CEO for the Company and Sieracki, as

5

CFO, respectively, were responsible for financial reporting and communications with

6

the market. Many of the internal reports showing Countrywide Financial's forecasted

7

and actual growth were prepared by the finance department under their direction.

8

Defendants Sambol, Kripalani and Garcia were also responsible for the financial

9

results and press releases issued by the Company. Each Individual Defendant sought

10

to demonstrate that he could lead the Company successfully and generate the growth

11

expected by the market.

12

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

13

    11.    Each defendant is liable for (i) making false statements, *or* (ii) failing to

14

disclose adverse facts known to him about Countrywide Financial. Defendants'

15

fraudulent scheme and course of business that operated as a fraud or deceit on

16

purchasers of Countrywide Financial common stock was a success, as it (i) deceived

17

the investing public regarding Countrywide Financial's prospects and business; (ii)

18

artificially inflated the prices of Countrywide Financial's common stock; (iii) allowed

19

Company insiders to arrange to sell and actually sell over 5 million shares of their

20

Countrywide Financial stock at artificially inflated prices, for proceeds of over $200

21

million; and (iv) caused Plaintiff and other members of the Class to purchase

22

Countrywide Financial common stock at inflated prices.

23

**DEFENDANTS' FALSE AND MISLEADING**
**STATEMENTS ISSUED DURING THE CLASS PERIOD**

24

25

    12.    On October 24, 2006, the Company issued a press release entitled,

26

"COUNTRYWIDE REPORTS 2006 THIRD QUARTER RESULTS - Quarterly

27

Diluted EPS of $1.03 Drove Year-to-Date EPS to a Record 9-Month $3.29 - 2006

28

Guidance Revised to $4.10 to $4.50 per Diluted Share - Board Authorizes Share Repurchase Program."  The release stated in part:

> "Countrywide achieved strong results in the Banking, Capital Markets and Insurance segments, while the Mortgage Banking segment continued to experience the effects of a transitional market," said Angelo R. Mozilo, Chairman and Chief Executive Officer. "Interest rates declined significantly during the quarter, putting pressure on Loan Servicing sector earnings. Despite the decrease in interest rates, real estate finance activity continued to moderate and, as a result, Loan Production sector earnings also declined. However, consistent with the design of our Macro Hedge, we expect the Loan Production sector's fourth quarter results to benefit from increased refinance funding activity stemming from the third quarter decline in interest rates. While third quarter diluted earnings per share of $1.03 remained unchanged compared to the third quarter a year ago, diluted earnings per share of $3.29 for the nine months of 2006 was up 7 percent and represented a new nine-month record."

> "We anticipate the fourth quarter of 2006 will be characterized by a continued slowdown in purchase volume beyond typical seasonality. However, should interest rates remain at their current levels or move lower, we expect that increased refinance activity will mitigate this decline. We also continue to expect that margins will remain under pressure and that pricing will remain competitive as the mortgage market consolidates. In addition, pay-option loans – which have historically provided higher margins – are declining as a percentage of total production and have experienced margin erosion, and this trend may continue."

> "In response to changing market conditions, management has initiated an expense and headcount reduction program. By year end, we expect that this program will generate an annualized cost savings run rate of over $500 million."

> "Additionally, as previously announced, management is executing a capital optimization plan and the Board of Directors has authorized a share repurchase program of up to $2.5 billion. In connection with this program, the Company intends to repurchase $1 billion to $2 billion of its common stock in the fourth quarter financed through the issuance of high equity-content debt securities.

> "While we expect the continuation of a transitional environment in the near term, we are bullish on the positive long-term growth prospects for the mortgage lending industry and Countrywide in particular, as a result of the proven power of our business model and our strategic positioning. We believe Countrywide's core strategies of profitable market share expansion, growth in our mortgage loan investment portfolio and associated spread income, continued synergistic diversification, and ongoing capital optimization will continue to deliver long-term shareholder value."

***

13.   On April 26, 2007, the Company issued a press release entitled, "COUNTRYWIDE REPORTS DILUTED EPS OF $0.72 FOR FIRST QUARTER OF 2007 - 2007 Guidance Updated at $3.50 to $4.30 per Diluted Share - Board Authorizes $0.15 Dividend." The release stated in part:

CALABASAS, CA (April 26, 2007) – Countrywide Financial Corporation (NYSE: CFC) today announced results for the first quarter ended March 31, 2007.

***

"Countrywide's earnings for the first quarter of 2007 were $434 million, despite adverse subprime and housing market conditions," said Angelo R. Mozilo, Chairman and Chief Executive Officer. "While the Company's core operations delivered what was otherwise a strong quarter, earnings were impacted by charges relating to our subprime activities as well as increases to our loss reserves and related asset valuation adjustments stemming from higher delinquencies and softer housing markets."

During the quarter, subprime charges and other credit costs impacted Countrywide as follows:

• *Subprime operations. Mortgage banking revenues from subprime operations, which include both production and investment activities, declined approximately $400 million from the fourth quarter of 2006, the equivalent of approximately $0.41 in earnings per diluted share. Subprime production revenues decreased $245 million, primarily resulting from volatile market conditions and related value declines of loans sold during the quarter and unsold at quarter end, net of credit hedge gains. Revenues from subprime investments fell $155 million from the fourth quarter of 2006, largely as a result of impairment charges against retained interests from subprime and related securities, net of credit hedge gains. The Company has instituted policy and product guideline changes and made other adjustments to reduce exposure to future subprime losses, and as a result management anticipates that both subprime production and investments will return to profitability in subsequent quarters, absent a material worsening of market conditions.*

• Other credit costs. Aside from subprime-related credit costs described above, other net credit costs increased from the first quarter of 2006 by $132 million, the equivalent of $0.14 in earnings per diluted share, as a result of rising delinquencies, deteriorating housing market conditions, and resulting increased loss reserves. *This included a $119 million increase in impairment of prime-quality home equity retained interests and an $81 million increase in the provision for loan losses,* partially offset by a $68 million increase in loss reserve reversal in the Insurance segment.

"Excluding the impact of subprime conditions and increased credit costs in the quarter, Countrywide's core operations made strong contributions to quarterly earnings," said Mozilo. "Our Production sector delivered strong volume and margins for both prime first and home equity loans, which accounted for 93 percent of our total mortgage banking originations; Servicing sector margins, excluding impairment of retained interests, were strong; net interest margins increased in our Banking Operations; and our Capital Markets and Insurance segments both generated sequential quarter pre-tax earnings growth.

"On a consolidated basis, Countrywide's residential lending operations continued to grow market share, with first quarter production representing over 18 percent of U.S. mortgage originations and our servicing portfolio reaching 8.4 million loans, which represents 13 percent of residential loans outstanding. In addition, our pipeline heading into the second quarter is very strong at $69 billion, up 21 percent from the fourth quarter of 2006 and up 8 percent from the first quarter last year.

Furthermore, our increasingly diverse business model has been generating more than half of our earnings from businesses other than mortgage banking, as was the case in 2006 and in the first quarter of 2007 again.

"While turbulent mortgage market conditions had an adverse impact on the Company's first quarter, looking forward, management is optimistic about the long-term future growth prospects and profitability of the Company stemming from the consolidation and rationalization occurring in the residential mortgage markets today.

"I would like to conclude by thanking my 50,000-plus Countrywide colleagues. Each of them works hard every day to deliver outstanding long-term returns to shareholders, and to make the American dream of homeownership available to as many people as possible."

\*\*\*

Loan Production

The Loan Production sector is comprised of the following distribution channels: prime and subprime consumer-direct lending through Countrywide Home Loans' 996-branch retail system, call center operations and the Internet; wholesale lending through a network of mortgage brokers; correspondent lending which buys closed loans from other financial institutions such as independent mortgage companies, commercial banks, savings and loans and credit unions. The sector also includes the mortgage banking activities of Countrywide Bank.

\*\*\*

Subprime gain on sale for the first quarter of 2007 was impacted by deteriorating market conditions, specifically higher investor yield requirements as well as increased future loss estimates, which adversely impacted the value of subprime loans. The $244 million reduction in subprime gain on sale was the result of a decline in the value of loans

sold during the quarter and unsold at quarter end, net of credit hedge gains of $92 million.

Home equity gain on sale declined from the fourth quarter of 2006 because of increased credit enhancement costs and higher investor yield requirements. Prime gain on sale increased from the fourth quarter of 2006 primarily as a result of changes in channel mix toward more retail business.

Factors impacting the overall year-over-year quarterly declines included increased competitive pricing pressures, the decline in production of higher-margin pay option products, and the general deterioration of subprime market conditions discussed previously.

Loan Servicing

The Loan Servicing sector reflects the performance of mortgage servicing rights (MSRs) and retained interests associated with Countrywide's owned servicing portfolio. Countrywide also manages a financial hedge within the Loan Servicing sector to mitigate negative valuation changes in MSRs and retained interests.

\*\*\*

Loan Servicing sector pre-tax earnings were adversely impacted by $429 million in impairment charges against retained interests. Impairment charges of $231 million were related to subprime and similar retained interests, while $135 million was related to retained interests on home equity lines of credit extended to prime borrowers. These impairment charges were driven by increased estimates for future losses on loans underlying the related securities as well as increased market yield requirements.

In addition, the Company incurred $63 million in impairment on other retained interests where Countrywide does not retain credit risk. This impairment related to increased market yield requirements.

Delinquencies (based on loan count, 30 days or more past due) in the servicing portfolio were 4.29 percent at March 31, 2007, which compares to 5.02 percent at December 31, 2006 and 3.68 percent at March 31, 2006. Foreclosures in the servicing portfolio (based on loan count) were 69 basis points at March 31, 2007, which compares to 65 basis points at December 31, 2006 and 47 basis points at March 31, 2006. The year-over-year increase in total delinquencies and foreclosures is generally the result of softening housing market conditions and the seasoning of the loans in the servicing portfolio.

The sequential quarter improvement in the delinquency ratio is primarily attributable to seasonal factors. The weighted average age of the loans in the portfolio at March 31, 2007 was 23 months, while the age at March 31, 2006 was 21 months.

Loan Closing Services

Loan Closing Services are offered through Countrywide's LandSafe companies, which primarily provide credit reports, appraisals and flood determinations. The LandSafe companies' quarterly pre-tax earnings increased from the prior year, primarily as a result of an increase in its credit report and appraisal businesses due to the increase in Countrywide's application activity.

BANKING

The Banking segment includes Banking Operations (primarily the fee and investment activities of Countrywide Bank, FSB) and Countrywide Warehouse Lending, a provider of mortgage inventory financing to independent mortgage bankers. Countrywide Bank ("Bank") provides Countrywide with expanded product capabilities, a low cost source of funds, liquidity, and portfolio lending capabilities that result in substantial recurring earnings. ***The Bank invests primarily in high-quality residential mortgage loans sourced from the Loan Production sector and the secondary market.*** It funds these assets through various means including its retail deposit franchise, which is comprised of an expanding national financial center network of 101 locations (most of which are located in existing Countrywide retail offices), call centers, and Internet presence. The Bank also leverages its deposit base through a variety of wholesale funding activities.

\*\*\*

Banking Operations' quarterly pre-tax earnings were $294 million, a decrease of 15 percent from the prior quarter and 11 percent year over year. The decreases were driven by an increase in the provision for loan losses of $61 million from the fourth quarter and $96 million from the first quarter of 2006 primarily resulting from increases in delinquencies and related increased reserves for loan losses.

This was partially offset by increases in net interest income. Specifically, net interest margin increased 7 basis points from the fourth quarter of 2006 and 22 basis points from the first quarter of 2006, primarily from a smaller rate lag effect.

While the Banking Operations' net residential loan portfolio was up modestly on a year-over-year basis, loan portfolio growth has been slowing and is down on a sequential quarter basis. This is attributable to an increasing percentage of Countrywide's originations being sold in the secondary markets, lesser availability of loans for purchase by the Bank that meet its investment criteria, and portfolio runoff.

Asset growth during the first quarter of 2007 was primarily attributable to acquisitions of high quality mortgage-backed securities.

***During the first quarter, the credit rating agency Moody's upgraded its rating on Countrywide Bank and announced that Countrywide, Countrywide Home Loans and Countrywide Bank were under review for possible additional upgrades.***

The Bank continues to take steps to credit enhance its investment loan portfolio by acquiring supplemental mortgage insurance coverage.

As of March 31, 2007, $19.8 billion of the residential lending portfolio of the Bank, representing 29 percent of its total loan portfolio, was covered by supplemental mortgage insurance on specified pools of loans. The maximum loss coverage available under these policies is $851 million. The Bank is also in the process of negotiating the purchase of additional pool insurance on its loans.

\* \* \*

DIVIDEND DECLARATION

Countrywide's Board of Directors declared a dividend of $0.15 per share. The payable date on the dividend is May 31, 2007 to stockholders of record on May 14, 2007.

2007 OUTLOOK

Management believes that considerable risks remain in the mortgage marketplace, including but not limited to potential further deterioration in the housing market that could impact origination volume and future credit costs; potential pending regulatory or legislative actions that could impose constraints on our operations; and other business risks as outlined in the disclaimer at the end of this press release. While the balance of 2007 is expected to be challenging, management continues to believe that current market conditions will result in opportunities in the form of further industry consolidation. Management also believes that the Company is well-positioned to capitalize upon these opportunities, which should strengthen Countrywide's franchise and result in accelerated future market share and earnings growth.

\* \* \*

14.     Following this, on June 12, 2007 the Company issued a press release entitled, "Countrywide Reports May 2007 Operational Results 06/12/2007." The press release stated in part:

CALABASAS, Calif., June 12 /PRNewswire-FirstCall/ -- Countrywide Financial Corporation (NYSE: CFC) released operational data for the month ended May 31, 2007. Key operational results included the following:

* Mortgage loan fundings for the month of May totaled $44 billion, an increase of 15 percent from May 2006.

-- On a consolidated basis, Countrywide funded $2.3 billion in pay-option loans during the month as compared to $6.6 billion in May 2006. Year-to-date fundings for pay-option loans totaled $15 billion, as compared to $35 billion for the same prior year period.

* Average daily mortgage loan application activity for May 2007 was $3.1 billion, up 17 percent from May 2006. The mortgage

loan pipeline was $70 billion at May 31, 2007 as compared to $66 billion at May 31, 2006.

     * The mortgage loan servicing portfolio continued to grow, totaling $1.4 trillion at May 31, 2007. This is an increase of $214 billion, or 18 percent, from May 31, 2006.

     * Banking Operations' assets were $87 billion at May 31, 2007, which compares to $80 billion at May 31, 2006.

     * Securities trading volume in the Capital Markets segment of $351 billion for May 2007 was 6 percent higher when compared to the same month last year.

     * Net earned premiums from the Insurance segment totaled $118 million, up 30 percent from May 2006.

*"Countrywide generated robust residential mortgage production results for the month of May," said David Sambol, President and Chief Operating Officer. "Production trends included a 17 percent increase in home purchase activity from the prior month; fixed-rate mortgages accounted for 76 percent of monthly production, their highest percentage since August 2003; and the pipeline of mortgage loans-in-process ended the month at $70 billion, its highest amount since October 2005. Reflecting our focus on integrating the activities of our Bank and mortgage company, Countrywide Bank funded $19 billion, or 44 percent, of total residential mortgage production during the month of May 2007, its highest monthly amount to date. According to Inside Mortgage Finance, Countrywide retained its position as the #1 mortgage originator in all channels for the first quarter of 2007. In particular, we expanded our lead in the retail channel from the 4th quarter of 2006.*

     "Strong results were produced by our other businesses. The servicing portfolio increased 18 percent from May 2006 and Banking Operations' assets rose 9 percent year-over-year. On a year-to-date basis, Capital Markets securities trading volume increased 4 percent from the five months ended May 2006, and net earned premiums from our Insurance segment rose 22 percent from the same year-ago period."

                      ***

15.    Then, on July 16, 2006, the Company issued a press release entitled "Countrywide Reports June 2007 Operational Results." The release stated in part:

     CALABASAS, Calif., July 16, 2007 /PRNewswire-FirstCall via COMTEX News Network/ -- Countrywide Financial Corporation (NYSE: CFC) released operational data for the month ended June 30, 2007. Key operational results included the following:

     Mortgage loan fundings for the month of June totaled $45 billion, an increase of 4 percent from June 2006.

Commercial real estate funding volume for the month of June was $814 million, up 75 percent from June 2006.

Average daily mortgage loan application activity for June 2007 was $3.1 billion, up 15 percent from June 2006. The mortgage loan pipeline was $69 billion at June 30, 2007 as compared to $65 billion at June 30, 2006.

The mortgage loan servicing portfolio continued to grow, reaching $1.4 trillion at June 30, 2007. This is an increase of $219 billion, or 18 percent, from June 30, 2006.

***Banking Operations' assets were $90 billion at June 30, 2007, which compares to $84 billion at June 30, 2006.***

Securities trading volume in the Capital Markets segment of $450 billion for June 2007 was 40 percent higher when compared to the same month last year.

Net earned premiums from the Insurance segment were $125 million, up 23 percent from June 2006.

"Market conditions became increasingly challenging throughout the second quarter of 2007," said David Sambol, President and Chief Operating Officer. "The housing market continues to soften, and delinquencies and defaults continue to rise. Additionally, interest rates, price competition in the residential lending markets and secondary market volatility have all increased. However, Countrywide's residential funding volume in June was strong, driven primarily by seasonal purchase activity and higher application volumes in preceding months."

***

16.     Defendants' statements as contained within ¶¶12-15 above were false and misleading. Defendants sought a palatable explanation for the coming impairment charges resulting from the erosion of underwriting guidelines already baked into the Company's loan portfolio. Rather than disclose the truth of these matters, Defendants were upbeat in the assessment of the Company's performance. Had Defendants warned of the likelihood of impairment charges, the news would have jeopardized Moody's ratings for the Company's securities, as well as investor sentiment and confidence in the Company's stock.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **THE TRUTH UNFOLDS**

17.     On July 24, 2007, just before the open of the markets, Defendants issued a shocking press release entitled, "Countrywide Reports Diluted EPS of $0.81 for Second Quarter of 2007 - Strong Loan Production Offset By Higher Credit Costs - 2007 Guidance Updated at $2.70 to $3.30 per Diluted Share - Board Authorizes $0.15 Dividend."  The press release stated in part:

>           CALABASAS, Calif., July 24 /PRNewswire-FirstCall/ --
> Countrywide Financial Corporation (NYSE: CFC - News) today
> announced results for the second quarter ended June 30, 2007.
>
>                                    ***
>
>           "Countrywide's results for the second quarter of 2007 reflected
> strength in our core loan production business, but were adversely
> impacted by continued weakness in the housing market," said Angelo R.
> Mozilo, Chairman and Chief Executive Officer. "During the quarter,
> softening home prices continued to affect many areas of the country and
> delinquencies and defaults continued to rise across all mortgage product
> categories as a result. Due to these adverse conditions, the Company
> incurred increased credit-related costs in the quarter, primarily related to
> its investments in prime home equity loans."
>
>           Credit-related costs in the second quarter included:
>
>           -- Impairment on credit-sensitive retained interests.
> Impairment charges of $417 million were taken during the quarter on the
> Company's investments in credit-sensitive retained interests.  This
> included $388 million, or approximately $0.40 in earnings per diluted
> share based on a normalized tax rate, of impairment on residual
> securities collateralized by prime home equity loans.  The impairment
> charges on these residuals were attributable to accelerated increases in
> delinquency levels and increases in the estimates of future defaults and
> loss severities on the underlying loans.
>
>           -- Held-for-investment (HFI) portfolio. The provision for losses
> on HFI loans incurred in the second quarter was $293 million, ***driven
> primarily by a loan loss provision of $181 million on prime home
> equity HFI loans in the Banking segment.***
>
>           "Partly offsetting increased credit costs, our residential Loan
> Production sector delivered strong results during the quarter," said
> Mozilo. "Consolidated quarterly funding volume was the third-highest in
> our history, prime production margins were relatively stable, and
> subprime production margins substantially improved. As a result, Loan
> Production sector pre-tax profit in the quarter was at its highest level
> since the first quarter of 2005."

During the quarter, the Company also benefited from a non-recurring reduction in its corporate tax rate to 27.0 percent, which compares to 38.1 percent in the first quarter of 2007. The benefit from this tax rate change equated to $0.12 per diluted share. The change in the tax rate is the result of a remeasurement of deferred income taxes precipitated by the relocation of certain operating activities resulting in favorable state income tax consequences. The Company anticipates a recurring benefit to the tax rate in future quarters of approximately 0.5 percent as a result of these operational changes.

"Looking to the second half of 2007, we expect difficult housing and mortgage market conditions to persist," Mozilo concluded. "Nonetheless, management remains optimistic about the long-term future growth prospects and profitability of the Company as industry consolidation continues."

***

18. Defendants shocked investors with their unexpected news of impairment charges totaling $417 million and a loan-loss provision of $292.9 million, tied in large part to the rapidly deteriorating performance of its loan portfolio and securities. As a result of these unexpected and shocking developments, the Company noted that it would cut its 2007 earnings estimate to $2.70 to $3.30 a share, down from its previous guidance of $3.50 to $4.30 a share. The corrective nature of the Company's shocking press release of July 24, 2007 was immediate and overwhelming in its effect, as Countrywide Financial's stock price tumbled $3.56 or 10.4%, closing at $30.50 per share, on astounding and unprecedented volume of 51.2 million shares, a loss of over $1.87 billion in total market capitalization.

19. Then, on August 2, 2007, in an effort to contradict the negative press regarding the selloff on July 24, 2007, the Company issued a press release entitled, "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition." Within that press release, defendant Sieracki gave his reasons why the Company's financial position remained strong, stating that, "[o]ur mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank." Augmenting this view, on August 6, 2007, the Company reinforced this position, by issuing an unprecedented SEC Form 8-K

- 14 -

1  detailing the Company's liquidity sources. On these disclosures, on August 6, 2007,

2  the price of Countrywide rose 7.0% or $1.75, closing at $26.75, on volume of 50.5

3  million shares.

4        20.      Finally, on August 9, 2007, after the close of the markets, defendants

5  issued SEC Form 10-Q, which contained *a shocking and new risk disclosure that*

6  *contradicted defendant Sieracki's remarks on August 2, 2007,* raising questions

7  about the short-term sufficiency and reliability of the reserves presented in the 8-K of

8  August 6, 2007. The 10-Q of August 10, 2007 stated in part:

9

10          Item 1A.        Risk Factors

11          Item 1A of our 2006 Annual Report presents risk factors that may
impact the Company's future results. In light of recent developments in

12  the mortgage, housing and secondary markets, those risk factors are
supplemented by the following risk factor:

13

14          Debt and secondary mortgage market conditions could have a
material adverse impact on our earnings and financial condition

15          We have significant financing needs that we meet through the
capital markets, including the debt and secondary mortgage markets.

16  These markets are currently experiencing unprecedented disruptions,
which could have an adverse impact on the Company's earnings and

17  financial condition, particularly in the short term.

18          Current conditions in the debt markets include reduced liquidity
and increased credit risk premiums for certain market participants. These

19  conditions, which increase the cost and reduce the availability of debt,
may continue or worsen in the future. The Company attempts to mitigate

20  the impact of debt market disruptions by obtaining adequate committed
and uncommitted facilities from a variety of reliable sources. There can

21  be no assurance, however, that the Company will be successful in these
efforts, that such facilities will be adequate or that the cost of debt will

22  allow us to operate at profitable levels. The Company's cost of debt is
also dependent on its maintaining investment-grade credit ratings. Since

23  the Company is highly dependent on the availability of credit to finance
its operations, disruptions in the debt markets or a reduction in our credit

24  ratings, could have an adverse impact on our earnings and financial
condition, particularly in the short term.

25          The secondary mortgage markets are also currently experiencing

26  unprecedented disruptions resulting from reduced investor demand for
mortgage loans and mortgage-backed securities and increased investor

27  yield requirements for those loans and securities. These conditions may
continue or worsen in the future. In light of current conditions, we expect

28  to retain a larger portion of mortgage loans and mortgage-backed

securities than we would in other environments. While our capital and liquidity positions are currently strong and we believe we have sufficient capacity to hold additional mortgage loans and mortgage backed securities until investor demand improves and yield requirements moderate, our capacity to retain mortgage loans and mortgage backed securities is not unlimited. As a result, a prolonged period of secondary market illiquidity may reduce our loan production volumes and could have an adverse impact on our future earnings and financial condition.

\*\*\*

21.     As a result of these new and shocking developments, on August 10, 2007, the price of Countrywide Financial's stock tumbled $1.00 or 3.4%, closing at $27.86 per share, on heightened volume of 48.6 million shares, for a loss of another $524 million in total market capitalization.

22.     The almost 10.4% decline in Countrywide Financial's stock price on July 24, 2007 and 3.4% on August 10, 2007, at the end of the Class Period, were the direct result of the unraveling of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Countrywide Financial's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

23.     While the almost 10.4% and 3.4% declines in Countrywide Financial's stock price occurred as Defendants' fraud was being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate Countrywide Financial's stock price and the subsequent significant decline in the value of Countrywide Financial's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

1    **APPLICABILITY OF PRESUMPTION OF RELIANCE**
2    **FRAUD-ON-THE-MARKET DOCTRINE**

3        24.    At all relevant times, the market for Countrywide Financial was an
4    efficient market, for the following reasons, among others:

5               (a)    Countrywide Financial met the requirements for listing, and was
6    listed and actively traded on the NYSE, a highly efficient and automated market;

7               (b)    As a regulated issuer, defendants filed periodic public reports with
8    the SEC; and

9               (c)    Defendants regularly communicated with public investors via
10   established market communication mechanisms, including through regular
11   disseminations of press releases on the national circuits of major newswire services
12   and through other wide-ranging public disclosures, such as communications with the
13   financial press and other similar reporting services.

14       25.    As a result of the foregoing, the market for the securities of Countrywide
15   Financial promptly digested current information regarding Countrywide Financial
16   from all publicly available sources and reflected such information in stock prices of
17   Countrywide Financial.  Under these circumstances, all persons who purchased or
18   acquired the securities of Countrywide Financial during the Class Period suffered
19   similar injury through their purchase of the aforementioned securities at artificially
20   inflated prices and a presumption of reliance applies.

21                              **NO SAFE HARBOR**

22       26.    The statutory safe harbor provided for forward-looking statements under
23   certain circumstances does not apply to any of the allegedly false statements pleaded
24   in this complaint. Many of the specific statements pleaded herein were not identified
25   as "forward-looking statements" when made.  To the extent there were any forward-
26   looking statements, there were no meaningful cautionary statements identifying
27   important factors that could cause actual results to differ materially from those in the
28   purportedly forward-looking statements. Alternatively, to the extent that the statutory

1 safe harbor does apply to any forward-looking statements pleaded herein, defendants
2 are liable for those false forward-looking statements because at the time each of those
3 forward-looking statements was made, the particular speaker knew that the particular
4 forward-looking statement was false, and/or the forward-looking statement was
5 authorized and/or approved by executive officer(s) of defendants who knew that those
6 statements were false when made.

7                              **CLASS ACTION ALLEGATIONS**

8          27.    Plaintiff brings this action as a class action pursuant to Rule 23 of the
9 Federal Rules of Civil Procedure on behalf of all persons who purchased Countrywide
10 Financial publicly traded securities on the open market during the Class Period (the
11 "Class"). Excluded from the Class are defendants.

12         28.    The members of the Class are so numerous that joinder of all members is
13 impracticable. The disposition of their claims in a class action will provide substantial
14 benefits to the parties and the Court. Countrywide Financial had more than 524
15 million shares of stock outstanding, owned by hundreds if not thousands of persons.

16         29.    There is a well-defined community of interest in the questions of law and
17 fact involved in this case. Questions of law and fact common to the members of the
18 Class which predominate over questions which may affect individual Class members
19 include:

20              (a)     Whether the Exchange Act was violated by defendants;

21              (b)     Whether defendants omitted and/or misrepresented material facts;

22              (c)     Whether Defendants' statements omitted material facts necessary
23 to make the statements made, in light of the circumstances under which they were
24 made, not misleading;

25              (d)     Whether defendants knew or deliberately disregarded that their
26 statements were false and misleading;

27              (e)     Whether the prices of Countrywide Financial's publicly traded
28 securities were artificially inflated; and

1         (f)     The extent of damage sustained by Class members and the

2 appropriate measure of damages.

3         30.    Plaintiff's claims are typical of those of the Class because plaintiff and

4 the Class sustained damages from Defendants' wrongful conduct.

5         31.    Plaintiff will adequately protect the interests of the Class and has retained

6 counsel who are experienced in class action securities litigation.  Plaintiff has no

7 interests which conflict with those of the Class.

8         32.    A class action is superior to other available methods for the fair and

9 efficient adjudication of this controversy.

10                              **COUNT I**

11       **For Violation of §10(b) of the 1934 Act and Rule 10b-5**

12                  **Against All Defendants**

13         33.    Plaintiff incorporates ¶¶1-32 by reference.

14         34.    During the Class Period, Defendants disseminated, approved or

15 deliberately disregarded the false statements specified above, which they knew or

16 should have known were misleading in that they contained misrepresentations and

17 failed to disclose material facts necessary in order to make the statements, in light of

18 the circumstances under which they were made, not misleading.

19         35.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

20         (a)    Employed devices, schemes, and artifices to defraud;

21         (b)    Made untrue statements of material facts or omitted to state

22 material facts necessary in order to make the statements, in light of the circumstances

23 under which they were made, not misleading; or

24         (c)    Engaged in acts, practices, and a course of business that operated

25 as a fraud or deceit upon plaintiff and others similarly situated in connection with their

26 purchases of publicly traded Countrywide Financial publicly traded securities during

27 the Class Period.

28

36.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Countrywide Financial publicly traded securities.    Plaintiff and the Class would not have purchased Countrywide Financial publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

37.    As a direct and proximate result of these Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Countrywide Financial publicly traded securities during the Class Period.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

38.    Plaintiff incorporates ¶¶1-37 by reference.

39.    The Individual Defendants acted as controlling persons of Countrywide Financial within the meaning of §20(a) of the Exchange Act.    By reason of their positions as officers and/or directors of Countrywide Financial and their ownership of Countrywide Financial stock, the Individual Defendants had the power and authority to cause Countrywide Financial to engage in the wrongful conduct complained of herein. Countrywide Financial controlled each of the Individual Defendants and all of its employees.    By reason of such conduct, the Individual Defendants and Countrywide Financial are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

(a)    Declaring this action to be a proper class action pursuant to FRCP 23;

(b)    Awarding plaintiff and the members of the Class damages, interest and costs; and

- 20 -

1          (c)     Awarding such equitable/injunctive or other relief as the Court

2    may deem just and proper.

3

4                                    **JURY DEMAND**

5
        Plaintiff hereby demands a trial by jury on all causes of action so
6    triable.

7    DATED:    August 14, 2007

8                                                    Respectfully submitted,

9

10                                                   SCOTT + SCOTT, LLP
                                                     Arthur L. Shingler III (181719)
11                                                   5455 Wilshire Blvd., Suite 1800
                                                     Los Angeles, CA  90036
12                                                   Tel: 213/985-1274
                                                     Fax: 213/985-1278
13
                                                     -and-
14
                                                     Nicholas J. Licato (228402)
15                                                   600 B Street, Suite 1500
                                                     San Diego, CA  92101
16                                                   Tel.: 619/233-4565
                                                     Fax: 619/233-0508
17
                                                     SCOTT + SCOTT LLP
18                                                   David R. Scott
                                                     108 Norwich Avenue
19                                                   P. O Box 192
                                                     Colchester, CT  06415
20                                                   Tel: 860/537-5537
                                                     Fax: 860/537-4432
21

22                                                   *Counsel for Plaintiff*

23

24

25

26

27

28

# Exhibit EE



1 of 1 DOCUMENT

Copyright 2007 The New York Times Company
The New York Times

August 26, 2007 Sunday
Late Edition - Final

**SECTION:** Section 3; Column 0; Money and Business/Financial Desk; Pg. 1

**LENGTH:** 3578 words

**HEADLINE:** Inside the Countrywide Lending Spree

**BYLINE:** By GRETCHEN MORGENSON

**BODY:**

ON its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. "I want to be sure you are getting the best loan possible," the sales representatives would say.

But providing "the best loan possible" to customers wasn't always the bank's main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.

Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

Now, with the entire mortgage business on tenterhooks and industry practices under scrutiny by securities regulators and banking industry overseers, Countrywide's money machine is sputtering. So far this year, fearful investors have cut its stock in half. About two weeks ago, the company was forced to draw down its entire $11.5 billion credit line from a consortium of banks because it could no longer sell or borrow against home loans it has made. And last week, Bank of America invested $2 billion for a 16 percent stake in Countrywide, a move that came amid speculation that Countrywide's survival was in question and that it had become a takeover target -- notions that Countrywide publicly disputed.

Homeowners, meanwhile, drawn in by Countrywide sales scripts assuring "the best loan possible," are behind on

Inside the Countrywide Lending Spree The New York Times August 26, 2007 Sunday

their mortgages in record numbers. As of June 30, almost one in four subprime loans that Countrywide services was delinquent, up from 15 percent in the same period last year, according to company filings. Almost 10 percent were delinquent by 90 days or more, compared with last year's rate of 5.35 percent.

Many of these loans had interest rates that recently reset from low teaser levels to double digits; others carry prohibitive prepayment penalties that have made refinancing impossibly expensive, even before this month's upheaval in the mortgage markets.

To be sure, Countrywide was not the only lender that sold questionable loans with enormous fees during the housing bubble. And as real estate prices soared, borrowers themselves proved all too eager to participate, even if it meant paying high costs or signing up for a loan with an interest rate that would jump in coming years.

But few companies benefited more from the mortgage mania than Countrywide, among the most aggressive home lenders in the nation. As such, the company is Exhibit A for the lax and, until recently, highly lucrative lending that has turned a once-hot business ice cold and has touched off a housing crisis of historic proportions.

"In terms of being unresponsive to what was happening, to sticking it out the longest, and continuing to justify the garbage they were selling, Countrywide was the worst lender," said Ira Rheingold, executive director of the National Association of Consumer Advocates. "And anytime states tried to pass responsible lending laws, Countrywide was fighting it tooth and nail."

Started as Countrywide Credit Industries in New York 38 years ago by Angelo R. Mozilo, a butcher's son from the Bronx, and David Loeb, a founder of a mortgage banking firm in New York, who died in 2003, the company has become a $500 billion home loan machine with 62,000 employees, 900 offices and assets of $200 billion. Countrywide's stock price was up 561 percent over the 10 years ended last December.

Mr. Mozilo has ridden this remarkable wave to immense riches, thanks to generous annual stock option grants. Rarely a buyer of Countrywide shares -- he has not bought a share since 1987, according to Securities and Exchange Commission filings -- he has been a huge seller in recent years. Since the company listed its shares on the New York Stock Exchange in 1984, he has reaped $406 million selling Countrywide stock.

As the subprime mortgage debacle began to unfold this year, Mr. Mozilo's selling accelerated. Filings show that he made $129 million from stock sales during the last 12 months, or almost one-third of the entire amount he has reaped over the last 23 years. He still holds 1.4 million shares in Countrywide, a 0.24 percent stake that is worth $29.4 million.

"Mr. Mozilo has stated publicly that his current plan recognizes his personal need to diversify some of his assets as he approaches retirement," said Rick Simon, a Countrywide spokesman. "His personal wealth remains heavily weighted in Countrywide shares, and he is, by far, the leading individual shareholder in the company."

Mr. Simon said that Mr. Mozilo and other top Countrywide executives were not available for interviews. The spokesman declined to answer a list of questions, saying that he and his staff were too busy.

A former sales representative and several brokers interviewed for this article were granted anonymity because they feared retribution from Countrywide.

AMONG Countrywide's operations are a bank, overseen by the Office of Thrift Supervision; a broker-dealer that trades United States government securities and sells mortgage-backed securities; a mortgage servicing arm; a real estate closing services company; an insurance company; and three special-purpose vehicles that issue short-term commercial paper backed by Countrywide mortgages.

Last year, Countrywide had revenue of $11.4 billion and pretax income of $4.3 billion. Mortgage banking contributed mightily in 2006, generating $2.06 billion before taxes. In the last 12 months, Countrywide financed almost

$500 billion in loans, or around $41 billion a month. It financed  177,000 to 240,000 loans a month during the last 12 months.

Countrywide lends to both prime borrowers -- those with sterling credit -- and so-called subprime, or riskier, borrowers. Among the $470 billion in loans that Countrywide made last year, 45 percent were conventional nonconforming loans, those that are too big to be sold to government-sponsored enterprises like Fannie Mae or Freddie Mac. Home equity lines of credit given to prime borrowers accounted for 10.2 percent of the total, while subprime loans were 8.7 percent.

Regulatory filings show that, as of last year, 45 percent of Countrywide's loans carried adjustable rates -- the kind of loans that are set to reprice this fall and later, and which are causing so much anxiety among borrowers and investors alike. Countrywide has a huge presence in California: 46 percent of the loans it holds on its books were made there, and 28 percent of the loans it services are there. Countrywide packages most of its loans into securities pools that it sells to investors.

Another big business for Countrywide is loan servicing, the collection of monthly principal and interest payments from borrowers and the disbursement of them to investors. Countrywide serviced 8.2 million loans as of the end of the year; in June the portfolio totaled $1.4 trillion. In addition to the enormous profits this business generates -- $660 million in 2006, or 25 percent of its overall earnings -- customers of the Countrywide servicing unit are a huge source of leads for its mortgage sales staff, say former employees.

In a mid-March interview on CNBC, Mr. Mozilo said Countrywide was poised to benefit from the spreading crisis in the mortgage lending industry. "This will be great for Countrywide," he said, "because at the end of the day, all of the irrational competitors will be gone."

But Countrywide documents show that it, too, was a lax lender. For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a house without putting down any of their own money. And Countrywide waited until Feb. 23 to stop peddling another risky product, loans that were worth more than 95 percent of a home's appraised value and required no documentation of a borrower's income.

As recently as July 27, Countrywide's product list showed that it would lend $500,000 to a borrower rated C-minus, the second-riskiest grade. As long as the loan represented no more than 70 percent of the underlying property's value, Countrywide would lend to a borrower even if the person had a credit score as low as 500. (The top score is 850.)

The company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection, or if the borrower had faced foreclosure or default notices on his or her property.

Such loans were made, former employees say, because they were so lucrative -- to Countrywide. The company harvested a steady stream of fees or payments on such loans and busily repackaged them as securities to sell to investors. As long as housing prices kept rising, everyone -- borrowers, lenders and investors -- appeared to be winners.

One former employee provided documents indicating Countrywide's minimum profit margins on subprime loans of different sizes. These ranged from 5 percent on small loans of $100,000 to $200,000 to 3 percent on loans of $350,000 to $500,000. But on subprime loans that imposed heavy burdens on borrowers, like high prepayment penalties that persisted for three years, Countrywide's margins could reach 15 percent of the loan, the former employee said.

Regulatory filings show how much more profitable subprime loans are for Countrywide than higher-quality prime loans. Last year, for example, the profit margins Countrywide generated on subprime loans that it sold to investors were 1.84 percent, versus 1.07 percent on prime loans. A year earlier, when the subprime machine was really cranking, sales of these mortgages produced profits of 2 percent, versus 0.82 percent from prime mortgages. And in 2004, subprime

loans produced gains of 3.64 percent, versus 0.93 percent for prime loans.

One reason these loans were so lucrative for Countrywide is that investors who bought securities backed by the mortgages were willing to pay more for loans with prepayment penalties and those whose interest rates were going to reset at higher levels. Investors ponied up because pools of subprime loans were likely to generate a larger cash flow than prime loans that carried lower fixed rates.

As a result, former employees said, the company's commission structure rewarded sales representatives for making risky, high-cost loans. For example, according to another mortgage sales representative affiliated with Countrywide, adding a three-year prepayment penalty to a loan would generate an extra 1 percent of the loan's value in a commission. While mortgage brokers' commissions would vary on loans that reset after a short period with a low teaser rate, the higher the rate at reset, the greater the commission earned, these people said.

Persuading someone to add a home equity line of credit to a loan carried extra commissions of 0.25 percent, according to a former sales representative.

"The whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market," the former sales representative said.

CONSIDER an example provided by a former mortgage broker. Say that a borrower was persuaded to take on a $1 million adjustable-rate loan that required the person to pay only a tiny fraction of the real interest rate and no principal during the first year -- a loan known in the trade as a pay option adjustable-rate mortgage. If the loan carried a three-year prepayment penalty requiring the borrower to pay six months' worth of interest at the much higher reset rate of 3 percentage points over the prevailing market rate, Countrywide would pay the broker a $30,000 commission.

When borrowers tried to reduce their mortgage debt, Countrywide cashed in: prepayment penalties generated significant revenue for the company -- $268 million last year, up from $212 million in 2005. When borrowers had difficulty making payments, Countrywide cashed in again: late charges produced even more in 2006 -- some $285 million.

The company's incentive system also encouraged brokers and sales representatives to move borrowers into the subprime category, even if their financial position meant that they belonged higher up the loan spectrum. Brokers who peddled subprime loans received commissions of 0.50 percent of the loan's value, versus 0.20 percent on loans one step up the quality ladder, known as Alternate-A, former brokers said. For years, a software system in Countrywide's subprime unit that sales representatives used to calculate the loan type that a borrower qualified for did not allow the input of a borrower's cash reserves, a former employee said.

A borrower who has more assets poses less risk to a lender, and will typically get a better rate on a loan as a result. But, this sales representative said, Countrywide's software prevented the input of cash reserves so borrowers would have to be pitched on pricier loans. It was not until last September that the company changed this practice, as part of what was called in an internal memo the "Do the Right Thing" campaign.

According to the former sales representative, Countrywide's big subprime unit also avoided offering borrowers Federal Housing Administration loans, which are backed by the United States government and are less risky. But these loans, well suited to low-income or first-time home buyers, do not generate the high fees that Countrywide encouraged its sales force to pursue.

A few weeks ago, the former sales representative priced a $275,000 loan with a 30-year term and a fixed rate for a borrower putting down 10 percent, with fully documented income, and a credit score of 620. While a F.H.A. loan on the same terms would have carried a 7 percent rate and 0.125 percentage points, Countrywide's subprime loan for the same borrower carried a rate of 9.875 percent and three additional percentage points.

Inside the Countrywide Lending Spree The New York Times August 26, 2007 Sunday

The monthly payment on the F.H.A. loan would have been $1,829, while Countrywide's subprime loan generated a $2,387 monthly payment. That amounts to a difference of $558 a month, or $6,696 a year -- no small sum for a low-income homeowner.

"F.H.A. loans are the best source of financing for low-income borrowers," the former sales representative said. So Countrywide's subprime lending program "is not living up to the promise of providing the best loan programs to its clients," he said.

Mr. Simon of Countrywide said that Federal Housing Administration loans were becoming a bigger part of the company's business.

"While they are very useful to some borrowers, F.H.A./V.A. mortgages are extremely difficult to originate in markets with above-average home prices, because the maximum loan amount is so low," he said. "Countrywide believes F.H.A./V.A. loans are an increasingly important part of its product menu, particularly for the homeownership hopes of low-to moderate-income and minority borrowers we have concentrated on reaching and serving."

WORKDAYS at Countrywide's mortgage lending units centered on an intense telemarketing effort, former employees said. It involved chasing down sales leads and hewing to carefully prepared scripts during telephone calls with prospects.

One marketing manual used in Countrywide's subprime unit during 2005, for example, walks sales representatives through the steps of a successful call. "Step 3, Borrower Information, is where the Account Executive gets on the Oasis of Rapport," the manual states. "The Oasis of Rapport is the time spent with the client building rapport and gathering information. At this point in the sales cycle, rates, points, and fees are not discussed. The immediate objective is for the Account Executive to get to know the client and look for points of common interest. Use first names with clients as it facilitates a friendly, helpful tone."

If clients proved to be uninterested, the script provided ways for sales representatives to be more persuasive. Account executives encountering prospective customers who said their mortgage had been paid off, for instance, were advised to ask about a home equity loan. "Don't you want the equity in your home to work for you?" the script said. "You can use your equity for your advantage and pay bills or get cash out. How does that sound?"

Other documents from the subprime unit also show that Countrywide was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses. A different manual states that loans could be written for borrowers even if, in a family of four, they had just $1,000 in disposable income after paying their mortgage bill. A loan to a single borrower could be made even if the person had just $550 left each month to live on, the manual said.

Independent brokers who have worked with Countrywide also say the company does not provide records of their compensation to the Internal Revenue Service on a Form 1099, as the law requires. These brokers say that all other home lenders they have worked with submitted 1099s disclosing income earned from their associations.

One broker who worked with Countrywide for seven years said she never got a 1099.

"When I got ready to do my first year's taxes I had received 1099s from everybody but Countrywide," she said. "I called my rep and he said, 'We're too big. There's too many. We don't do it.' "

A different broker supplied an e-mail message from a Countrywide official stating that it was not company practice to submit 1099s. It is unclear why Countrywide apparently chooses not to provide the documents. Countrywide boasts that it is the No. 1 lender to minorities, providing those borrowers with their piece of the American homeownership dream. But it has run into problems with state regulators in New York, who contended that the company overcharged such borrowers for loans. Last December, Countrywide struck an agreement with Eliot Spitzer,

then the state attorney general, to compensate black and Latino borrowers to whom it had improperly given high-cost loans in 2004. Under the agreement, Countrywide, which cooperated with the attorney general, agreed to improve its fair-lending monitoring activities and set up a $3 million consumer education program.

But few borrowers of any sort, even the most creditworthy, appear to escape Countrywide's fee machine. When borrowers close on their loans, they pay fees for flood and tax certifications, appraisals, document preparation, even charges associated with e-mailing documents or using FedEx to send or receive paperwork, according to Countrywide documents. It's a big business: During the last 12 months, Countrywide did 3.5 million flood certifications, conducted 10.8 million credit checks and 1.3 million appraisals, its filings show. Many of the fees go to its loan closing services subsidiary, LandSafe Inc.

According to dozens of loan documents, LandSafe routinely charges tax service fees of $60, far above what other lenders charge, for information about any outstanding tax obligations of the borrowers. Credit checks can cost $36 at LandSafe, double what others levy. Some Countrywide loans even included fees of $100 to e-mail documents or $45 to ship them overnight. LandSafe also charges borrowers $26 for flood certifications, for which other companies typically charge $12 to $14, according to sales representatives and brokers familiar with the fees.

LAST April, Countrywide customers in Los Angeles filed suit against the company in California state court, contending that it overcharged borrowers by collecting unearned fees in relation to tax service fees and flood certification charges. These markups were not disclosed to borrowers, the lawsuit said.

Appraisals are another profit center for Countrywide, brokers said, because it often requires more than one appraisal on properties, especially if borrowers initially choose not to use the company's own internal firm. Appraisal fees at Countrywide totaled $137 million in 2006, up from $110 million in the previous year. Credit report fees were $74 million last year, down slightly from 2005.

All of those fees may soon be part of what Countrywide comes to consider the good old days. The mortgage market has cooled, and so have the company's fortunes. Mr. Mozilo remains undaunted, however.

In an interview with CNBC on Thursday, he conceded that Countrywide's balance sheet had to be strengthened. "But at the end of the day we could be doing very substantial volumes for high-quality loans," he said, "because there is nobody else in town."

URL: http://www.nytimes.com

GRAPHIC: PHOTOS: A Countrywide branch in Los Angeles. (PHOTOGRAPH BY KEVORK DJANSEZIAN/ASSOCIATED PRESS)(pg. 8)
Angelo R. Mozilo, chief executive of the Countrywide Financial Corporation, remains undaunted as the mortgage market has cooled. (PHOTOGRAPH BY LUCAS JACKSON/REUTERS)(pg. 9) DRAWING (DRAWING BY DANIEL VASCONCELLOS) CHART: "A Loan Giant Hits a Wall" Countrywide became the nation's No. 1 mortgage lender by catering to borrowers with less than perfect credit, minorities and first-time home buyers. Now its borrowers are falling behind on their loans and the company is in the midst of a credit crunch. (Source: Securities and Exchange Commission filings (revenue, net income and stock sales)(pg. 8) Bar chart shows Countrywide Financial's figures from 1970 to the present time.

LOAD-DATE: August 26, 2007

# Exhibit FF

# Bloomberg

## Schumer Urges Countrywide to Help Refinance Loans (Update4)

By Alison Vekshin - Aug 29, 2007

Aug. 29 (Bloomberg) -- U.S. Senator Charles Schumer called on Countrywide Financial Corp. to waive prepayment penalties, refinance loans and eliminate ``above-market fees'' to help homeowners struggling to make payments on subprime mortgages.

Countrywide, the biggest U.S. mortgage lender, should stop paying higher commissions to brokers who steer borrowers to high-cost loans that ``are designed to fail,'' Schumer told reporters in Washington today.

``I am calling on Countrywide, as our nation's largest lender, to bury its bad business practices and reverse some of the damage it has already inflicted on our housing market,'' the New York Democrat said.

Schumer, a member of the Senate Banking Committee, has been among the most vocal lawmakers seeking tighter restrictions on mortgage brokers. He introduced legislation in May to set U.S. standards for brokers, including requiring them to assess a borrower's ability to repay at a loan's highest interest rate.

``Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower,'' Schumer said. The company's brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans, the senator said.

Countrywide's Rebuttal

Schumer's criticism was rebutted by Countrywide, which said in a statement released today that it forbids employees to steer borrowers who qualify for prime loans into subprime loans.

``The majority of consumers who come through Countrywide's retail subprime channel receive a prime loan,'' the lender said in the e-mailed statement.

The company also said it doesn't pay loan officers higher commissions for subprime loans with prepayment penalties and has helped 35,000 borrowers stay out of foreclosure this year.

The Calabasas, California-based lender got a $2 billion infusion of capital last week from Bank of America Corp. to allow it to keep funding loans after being shut out of short- term debt markets. At least 90 U.S. mortgage companies have halted operations or sought buyers since the start of 2006, according to Bloomberg data.

Schumer cited an Aug. 26 New York Times article that featured interviews with former Countrywide employees who said potential borrowers were promised ``the best loan possible'' and then steered into high-cost and sometimes unfavorable loans that resulted in higher commissions for the company's sales force.

`Numerous Inaccuracies'

Countrywide, in its statement today, said the article contained ``numerous inaccuracies'' intended ``to place Countrywide in the worst possible light.''

U.S. Senator Barack Obama, an Illinois Democrat who is seeking his party's presidential nomination, called for reining in ``unlicensed, unregulated, fly-by-night'' mortgage brokers in a column in today's Financial Times.

In recent months, Democrats in Congress have amplified their concerns about the soaring rate of foreclosures among subprime borrowers, those with weak credit or high debt. Senator Hillary Clinton, a New York Democrat and presidential candidate, said this month she planned to introduce legislation that would ban penalties for people who pay off mortgages early and require federal registration of mortgage brokers.

Senate Banking Committee Chairman Christopher Dodd, a Connecticut Democrat also running for president, and House Financial Services Committee Chairman Barney Frank, a Massachusetts Democrat, have used hearings to prod regulators to write new rules restricting deceptive lending practices.

Countrywide rose 50 cents, or 2.6 percent, to $19.81 at 4:17 p.m. in New York Stock Exchange composite trading. The stock has fallen 53 percent this year.

To contact the reporter on this story: Alison Vekshin in Washington at avekshin@bloomberg.net.

To contact the editor responsible for this story: Erik Schatzker at eschatzker@bloomberg.net.

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.