# Exhibit GG

F ILED

1  WILLIAM F. SALLE (#124498)
2  LAW OFFICES OF WILLIAM F. SALLE
   425 E. Colorado St., Suite 755
3  Glendale, CA 91205
   Telephone:   (818) 543-1900
4  Facsimile:    (818) 543-1550
   wfslaw@yahoo.com
5
6  Attorneys for Plaintiff Claude A. Reese

7              UNITED STATES DISTRICT COURT
8              CENTRAL DISTRICT OF CALIFORNIA

9  CLAUDE A. REESE, Individually and On      No. **CV07-01635** JFW (VBKx)
   Behalf of All Others Similarly Situated,
10
11                      Plaintiff,           BREACH OF FIDUCIARY DUTY AND
                                             CLASS ACTION COMPLAINT
12             v.                            FOR VIOLATIONS OF FEDERAL
                                             SECURITIES LAWS
13 INDYMAC FINANCIAL, INC., RICHARD
14 H. WOHL and SCOTT KEYS,
                                             **JURY TRIAL DEMANDED**
15                      Defendants.

16                       SUMMARY OF ACTION
17
        1.      This is a breach of fiduciary duty and securities class action on behalf of all
18
19 persons who purchased or otherwise acquired the common stock of IndyMac Bancorp, Inc.
20 ("IndyMac" or the "Company") between May 4, 2006 and March 1, 2007 (the "Class Period"),
21 against IndyMac and certain of its officers and/or directors for violations of the Securities
22 Exchange Act of 1934 ("1934 Act").
23
        2.      IndyMac Bancorp, Inc. operates as the holding company for IndyMac Bank,
24
25 F.S.B., a thrift/mortgage bank, which provides mortgage products and services, including
26 adjustable-rate mortgages, fixed-rate mortgages, construction or permanent loans, subprime
27 mortgages, and reverse mortgages.
28

DOCKETED ON CM

MAR 19 2007

ORIGINAL

3.       During the Class Period, defendants issued materially false and misleading statements concerning the Company's business and financial results. As a result of defendants' failure to fully disclose problems with the Company's internal controls and loan loss provisions, IndyMac stock traded at artificially inflated prices during the Class Period, reaching a high of $50.11 per share in May 2006.

4.       Throughout the Class Period, defendants issued public statements which touted the Company's business and financial performance, but which failed to fully disclose problems with the Company's internal controls and underwriting practices and that the Company maintained inadequate provisions for loan losses. These partial disclosures only hinted at the Company's problems, and had the effect of maintaining IndyMac's stock price at inflated levels during the Class Period. At the end of the Class Period, as the news of the Company's problems seeped into the market, IndyMac's share price dropped following each revelation.

5.       On March 1, 2007, IndyMac issued a press release in which a "Letter to Shareholders" acknowledged, among other thing, problems with the Company's underwriting practices and loan delinquencies. The press release stated in relevant part as follows:

Dear Shareholders:

2006 was a challenging year in the mortgage banking industry. Industry loan volumes of $2.5 trillion were 34 percent below 2003's historic high level and 17 percent lower than in 2005. Mortgage banking revenue margins declined further after sharp declines in 2005, and net interest margins continued to compress, as the yield curve inverted with the average spread between the 10-year Treasury yield and the 1-month LIBOR declining from 89 basis points in 2005 to negative 31 basis points in 2006. To cap it off, the housing industry slowed down significantly, increasing loan delinquencies and non-performing assets and driving up credit costs for all mortgage lenders.

Yet, despite these challenges, IndyMac again reached new performance heights in 2006, achieving:

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

1
2    -- Record mortgage loan production of $90 billion, a 48 percent increase over
     2005;

3    -- Record mortgage market share of 3.58 percent, a 78 percent gain over the 2.01
4    percent share we had in 2005;

5    -- Record net revenues of $1.3 billion, a 22 percent increase over 2005;

6    -- Record earnings-per-share (EPS) of $4.82, a 9 percent gain;

7    -- Record growth in total assets, which increased by $8 billion, or 37 percent, to
8    $29.5 billion;

9    -- Record growth in our portfolio of loans serviced for others, which increased by
     $55 billion, or 65 percent, to $140 billion;
10
11   -- Strong return on equity (ROE) of 19 percent, slightly lower than last year's 21
     percent level.
12
13   Notwithstanding our solid results for the year in the face of challenging market
     conditions, our year ended on a disappointing note. Our fourth quarter EPS
14   declined both sequentially and versus the fourth quarter of 2005, and we fell short
     of EPS expectations for the quarter. Also, our ROE of 14.6 percent for the quarter,
15   while solid, was at the lowest level in 23 quarters. While I am disappointed with
     how we finished 2006 and with our outlook for 2007, where EPS will likely be
16   down from 2006 given tough conditions in the mortgage market, I believe we will
     emerge from this difficult mortgage environment a stronger and more competitive
17   company.

18   We remain fundamentally committed to our hybrid thrift/mortgage banking
19   business model and our strategies inasmuch as we are outperforming most of our
     mortgage banking and thrift peers, are earning a solid return on our shareholders'
20   capital (at what we hope is the low point of our cyclical business) and believe
     strongly in the long-term opportunities presented in the housing and mortgage
21   markets. Nonetheless, in our constant drive to improve our business, we have
     taken a fresh look at our hybrid model and decided to fine tune it in ways we feel
22   will make us stronger.

23   Hybrid Thrift/Mortgage Banking Business Model - Updated for the New Market
24   Reality

25   As you know, our hybrid business model balances our mortgage production and
26   servicing businesses with thrift investing. On the mortgage banking side, we

27
     _____
28             BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT
                                                                          Page 3

generate earnings largely by originating, securitizing and selling loans and securities at a profit and by servicing loans for others. On the thrift side, we generate core spread income from our investment portfolio of prime SFR mortgages, home equity loans, consumer and builder construction loans and mortgage-backed securities (MBS). The combination of mortgage banking and thrift investing has proven to be a powerful business model for Indymac, and, given our strong execution in the past, we have been able to outperform our peers and produce both strong and relatively stable returns on our shareholders' equity.

An important tool in understanding our strong financial performance has been our detailed segment reporting, where we allocate capital to different segments of our business, calculate ROEs for each segment every quarter and then adjust our capital allocations according to where we can earn the best returns for our shareholders. In the fourth quarter of 2006, we saw a fairly dramatic decrease in the ROE in our thrift segment, mostly caused by net interest margin erosion in our whole loan and MBS portfolios. Of greatest concern to me is that I see this as part of a broader trend, the continuation of which is inevitable. Let me explain.

First, there is fierce competition for consumer deposits, particularly as Wall Street firms and other non-bank entities have over the years made significant inroads in attracting deposits away from banks and thrifts by paying high rates on money market funds. In addition, consumers, assisted by the Internet and deposit insurance, are getting more savvy and efficient with their deposit funds, moving them to the highest yielding options. Both of these factors are driving up deposit costs relative to market funding sources and reducing the funding advantage and net interest margins of depository institutions. Second, spreads to Treasury securities on financial assets that can be securitized (home loans and most other consumer loan types) continue to tighten given the efficiency of the secondary market, reducing asset yields and further compressing net interest margins for depository institutions. While there may be temporary periods where asset spreads widen in the secondary market - such as what we are experiencing as I write this letter - the long-term inevitable trend is toward continued increases in market efficiency and generally tighter asset spreads. Third, the regulatory capital requirements for holding these assets (mortgage and home equity loans, in particular) generally exceed those of the secondary market.

As a result of the above, we have seen the ROEs we are earning on our whole loan and MBS portfolios decline, and even fall below our cost of capital at times for some assets, such that it does not make economic sense for us to grow these portfolios to the extent that we had previously planned. Frankly, we have also not received the price/earnings multiple increase we had expected from growing our investment portfolio and building more "stable, core" spread income into our overall earnings picture. Accordingly, our capital deployment and profit growth

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

1  will be more focused in the future on the two broad segments of our mortgage
2  banking business:

3  -- Mortgage Production - our core business where, as the 9th largest originator and
   2nd largest independent mortgage banker in the nation, we have strong focus,
4  industry leading expertise, operational scale and consistently earn very strong
5  ROEs; and

6  -- Mortgage Servicing - where, with a portfolio of loans serviced for others now
   exceeding $140 billion, we have achieved strong economics of scale and earn
7  solid ROEs. Importantly, unlike our other business segments, servicing is not
8  subject to the competitive margin pressures and credit risks that come with the
   housing and mortgage production cycles.
9
   While we will continue to maintain some level of investments in our whole loan
10 and MBS portfolios, going forward, the growth of these portfolios will be based
   on the extent to which (1) their ROEs exceed our cost of both core and risk-based
11 capital or (2) they are needed to support our core mortgage banking investments in
12 mortgage servicing rights and residual and non-investment grade securities, if
   their ROEs are below our cost of capital.
13
   These changes in our business model and strategy represent fine-tuning more than
14 a major strategic shift. The new reality of narrowing net interest margins actually
15 favors Indymac from a competitive standpoint in that, unlike many other
   depository institutions, we already have a relatively high, market-based cost of
16 funds and have learned, through trading assets and loans in the secondary market,
   how to earn strong overall ROEs despite that fact. Other financial institutions rely
17 on their low cost of funds to achieve the same or lower ROEs as Indymac, and, as
18 their cost of funds advantage erodes, I believe they will struggle to sustain their
   performance levels. At Indymac, understanding the nuances of the capital
19 requirements for assets both on-balance-sheet and in the secondary market and
   knowing how to effectively trade assets into the secondary market gives us a
20 competitive advantage that should not be underestimated.
21
   With these adjustments to our business model, the real question is, what is the
22 outlook for Indymac long and short term?

23 Long-term Outlook
24
   Everyone knows that the housing and mortgage industries are cyclical and can
25 produce volatile economic results. But, as I have said many times before, the
   market for mortgages is huge, and long-term, mortgage lending is a great business
26 with U.S. mortgage debt outstanding growing by eight to 10 percent per year. And
27

28

over the long-term Indymac has produced great results, with the bottom line being that, over the fourteen years through December 31, 2006 since the current management team has been in place, Indymac has delivered a compounded annual rate of return to its shareholders of 23 percent versus 12 percent for the Dow Jones Industrial Average and 11 percent for the S&P 500. We can accept some short-term earnings volatility with long-term performance like what we have achieved, and in this respect I like to quote Warren Buffet when he says, "Charlie (Munger) and I would much rather earn a lumpy 15 percent over time than a smooth 12 percent."

Over the long run I have confidence in our business model, our strategic plans, our management team and our ability to execute on our plans and adapt as necessary to continue performing for shareholders. In this respect, based on our long-term experience over the housing and mortgage cycles, during the trough periods such as what we are currently experiencing, I would expect Indymac to be able to achieve, roughly speaking, an ROE in the 10 percent to 15 percent range, similar to what traditional thrifts achieve over the long term. When the mortgage and housing markets stabilize, I would expect that Indymac's ROE could improve to the 15 percent to 20 percent level, and during boom times for our business, our ROEs could exceed 20 percent.

Short-Term Game Plan

While we run Indymac with a vision for the long-term, I am acutely aware that we must also deliver results short-term, especially in today's environment, where many shareholders own our stock for relatively brief time periods and, overall, our shares turn over six times per year. Given that reality, here is what we will do to improve performance for our shareholders right now:

*1. Manage our credit risks by being smart and prudent in adjusting our mortgage underwriting guidelines, setting our risk-based pricing, making decisions as to what assets go into our investment portfolio and/or distributing our risk into the secondary market, and executing on best in class loss prevention and loss mitigation practices.* [Emphasis added.]

2. Control our costs with our current hiring freeze on non-revenue-generating personnel, base salary freeze company-wide, significant variable compensation tied to revenue and EPS growth, and goals to significantly increase outsourcing of our workforce by year-end and cut our non-labor expenses from our fourth quarter run rate; in general, get more out of the infrastructure we have built up in the last several years as we continue to grow our business. With respect to the hiring freeze, given our normal employee attrition rate of roughly 20 percent per year, we expect to be able to reduce our administrative headcount and overhead while still

being able to stick to our stated goal of avoiding mass layoffs except under the most extreme circumstances. Our estimate is that all these measures combined could produce up to $60 million in pre-tax cost savings annually.

3. Focus our capital expenditures and the activities of our new business incubator and M&A group on investments that have lower execution risk and produce both attractive short- and long-term paybacks. For example, in support of our production growth/market share strategy, we will pursue "make sense" acquisitions of mortgage operations, such as our recently announced purchase of the retail mortgage platform of the New York Mortgage Co., LLC.

4. Continue to profitably grow mortgage production and gain market share by taking advantage of the difficulties experienced by our competitors and aggressively growing our sales force with top producers.

5. Spur on our production growth by having healthy, internal competition within our sales forces, leading to better penetration of our existing wholesale and correspondent customers, both with increased volume of products they currently deliver to us and new volume of products they do not currently deliver to us, i.e., reverse mortgages and certain other specialty products.

6. Support our shareholders by working extremely hard to return to higher levels of profitability. Maintain our dividend at its current level, in all but the most extreme circumstances, which results in a current annual yield in excess of five percent. Explore issuing non-cumulative perpetual preferred stock and repurchasing our common stock to enhance EPS, although this strategy could change based on the market for our preferred stock as well as investment opportunities that present themselves other than buying back our own stock.

Even with these measures, 2007 will likely be a down year for our EPS, although our ROE should still be solid, in a broad range of 10 percent to 15 percent. Factored into this forecast is a continuation of tough conditions for loan originations, credit performance and in the secondary market. Our more detailed internal forecast shows that our ROEs for the early quarters of the year will be at the low end of the range above; however, during the second half of the year, if we execute on our plans as we expect, and with a little luck, our ROEs could be at or even somewhat above the high end of the range. With all of that said, if market conditions deteriorate significantly from what we are forecasting today ... which is always a possibility ... there could be some downside to the above ROE range.

* * *

Michael W. Perry
Chairman and Chief Executive Officer

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

6.    That same day, March 1, 2007, as a result of this news, IndyMac's stock dropped from $34.33 to a close of $32.16 per share, on volume of more than 9.6 million shares, four times the average three-month volume.

7.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company lacked requisite internal controls, and, as a result, the Company's projections and reported results issued during the Class Period were based upon defective assumptions about loan delinquencies and the Company's loan loss provisions;

(b)    The Company's financial statements were materially misstated due to its failure to properly account for its delinquent loans;

(c)    Given the deterioration and the increased volatility in the subprime market, the Company would be forced to increase it loan loss provisions and tighten its underwriting guidelines which would have a direct material negative impact on its loan production going forward; and

(d)    Given the increased volatility in the lending market generally, and the subprime market specifically, the Company's financial projections issued during the Class Period were at a minimum reckless.

8.    As a result of defendants' false statements, IndyMac's stock price traded at inflated levels during the Class Period. However, after the above revelations were disclosed to the market, the Company's stock was hammered by massive sales of the Company's stock sending the share price down more than 60% from its Class Period high.

## JURISDICTION AND VENUE

9.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

10.    (a) Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

(b) IndyMac's principal executive offices are situated in this Judicial District  at 888 East Walnut Street Pasadena, California 91101.

## PARTIES

11.    Plaintiff Claude A. Reese purchased IndyMac common stock as described in  the attached certification and was damaged thereby.

12.    Defendant IndyMac Bancorp, Inc. operates as the holding company for IndyMac Bank, F.S.B., a thrift/mortgage bank, which provides mortgage products and services in Los Angeles County. The bank operates through two segments: Mortgage Banking and Thrift. The Mortgage Banking segment offers various products, such as adjustable-rate mortgages, fixed-rate mortgages, construction-to-permanent loans, subprime mortgages, and reverse mortgages. It originates or purchases mortgage loans through its relationships with mortgage brokers, mortgage bankers, and financial institutions. This segment offers its products to consumers through direct mail, Internet leads, online advertising, affinity relationships, and real estate professionals, as well as through its southern California retail banking branches. The Thrift segment principally invests in single-family residential mortgage loans; construction financing for single-family residences or lots provided directly to individual consumers; builder construction financing facilities for larger residential subdivision loans; home equity lines of credit; and mortgage-backed securities. It also provides short-term revolving warehouse lending facilities to

1    small-to-medium size mortgage bankers and brokers to finance mortgage loans. IndyMac is

2    headquartered in Pasadena, California.

3         13.     Defendant Michael W. Perry ("Perry") is Chairman of the Board of Directors and

4    Chief Executive Officer of Indymac and IndyMac Bank, F.S.B., a wholly owned subsidiary of

5    Indymac ("Indymac Bank"). He has been a director of Indymac since October 1997 and served as

6    Vice Chairman of the Board of Directors of Indymac and Indymac Bank from March 2000 until

7    February 2003 when he was appointed Chairman of the Board of Directors of Indymac and

8    Indymac Bank.  During the Class Period, Perry was responsible for the Company's false

9    financial statements.

10        14.     Defendant Scott Keys ("Keys") is Executive Vice President, Chief Financial

11   Officer of Indymac and Indymac Bank. Keys is responsible for financial and managerial

12   accounting, financial reporting, strategic and financial planning, investor relations and tax.

13   During the Class Period, Keys was responsible for the Company's false financial statements.

14        15.     Defendant Richard H. Wohl ("Wohl") is President of Indymac Bank. He became a

15   director of Indymac Bank in July 2005. Wohl oversees the primary business divisions of Indymac

16   Bank in both its thrift and mortgage banking segments. He previously served Indymac in several

17   capacities, including as Chief Executive Officer of Indymac Mortgage Bank from February 2000

18   to July 2005, Chief Operating Officer in charge of various financial and administrative functions

19   from February 1999 to February 2000, and as general counsel and secretary from April 1994 to

20   February 1999.

21        16.     Defendants Perry, Wohl and Keys (collectively, the "Individual Defendants"),

22   because of their positions with the Company, possessed the power and authority to control the

1    contents of IndyMac's quarterly reports, press releases and presentations to securities analysts,

2    money and portfolio managers and institutional investors, *i.e.*, the market. They were provided

3    with copies of the Company's reports and press releases alleged herein to be misleading prior to

4

5    or shortly after their issuance and had the ability and opportunity to prevent their issuance or

6    cause them to be corrected. Because of their positions with the Company, and their access to

7    material non-public information available to them but not to the public, Hartman, Anderson and

8    Metz knew that the adverse facts specified herein had not been disclosed to and were being

9
     concealed from the public and that the positive representations being made were then materially
10
     false and misleading. Hartman, Anderson and Metz are liable for the false statements pleaded
11

12    herein.

13                    **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

14           17.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose

15    adverse facts known to them about IndyMac. Defendants' fraudulent scheme and course of

16
      business that operated as a fraud or deceit on purchasers of IndyMac common stock was a
17

18    success, as it: (i) deceived the investing public regarding IndyMac's business, prospects and

19    financial performance; (ii) artificially inflated the price of IndyMac's common stock; and (iii)

20    caused plaintiff and other members of the Class to purchase IndyMac common stock at inflated

21    prices.

22                           **SUBSTANTIVE ALLEGATIONS**
23
      **Background**
24

25           18.     IndyMac Bancorp, Inc. operates as the holding company for IndyMac Bank,

26    F.S.B., a thrift/mortgage bank, which provides mortgage products and services. The bank

27
     _____
28                  BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

operates through two segments: Mortgage Banking and Thrift. The Mortgage Banking segment offers various products, such as adjustable-rate mortgages, fixed-rate mortgages, construction-to-permanent loans, subprime mortgages, and reverse mortgages. It originates or purchases mortgage loans through its relationships with mortgage brokers, mortgage bankers, and financial institutions. This segment offers its products to consumers through direct mail, Internet leads, online advertising, affinity relationships, and real estate professionals, as well as through its southern California retail banking branches. The Thrift segment principally invests in single-family residential mortgage loans; construction financing for single-family residences or lots provided directly to individual consumers; builder construction financing facilities for larger residential subdivision loans; home equity lines of credit; and mortgage-backed securities. It also provides short-term revolving warehouse lending facilities to small-to-medium size mortgage bankers and brokers to finance mortgage loans. IndyMac is headquartered in Pasadena, California.

**Defendants' False and Misleading Statements Issued During the Class Period**

19.    On January 26, 2006, IndyMac issued a press release entitled "Indymac Announces FY 2005 EPS of $4.54, Up 34% and Fourth Quarter EPS of $1.09, Up 20%," announcing the Company's results of operations and financial condition for the full year and quarter ended December 31, 2005. The press release stated in part:

> PASADENA, Calif.--(BUSINESS WIRE)--Jan. 26, 2006--IndyMac Bancorp, Inc. (NYSE:NDE):
>
> -- Record Quarterly Mortgage Production of $18.0 Billion Drives 72% Growth in Market Share to 2.85%
>
> -- Board of Directors Increases Quarterly Cash Dividend to $0.44,

1    up 22%

2    IndyMac Bancorp, Inc. (NYSE:NDE) ("IndyMac" or the "Company"), the holding
3    company for IndyMac Bank(R) F.S.B. ("IndyMac Bank"), today reported earnings
     of $300.2 million or $4.54 per share for full year 2005. This represents increases
4    of 42 percent and 34 percent, respectively, compared with pro forma net earnings
     of $211.3 million or $3.40 per share for the full year of 2004. On a GAAP basis,
5    Indymac earned $170.5 million or $2.74 per share in 2004 (a reconciliation
6    between GAAP and pro forma results is found at the end of this release).

7    "Indymac delivered outstanding results in 2005. This performance was achieved
8    despite less than favorable conditions for mortgage lenders including the flat yield
     curve and industry volumes and declining profit margins," said Michael W. Perry,
9    Indymac's Chairman and Chief Executive Officer. "Indymac set all time records in
     virtually all of its key financial metrics including earnings per share and mortgage
10   production and market share. Two milestones were particularly noteworthy as
     annual revenues surpassed $1 billion for the first time in the Company's history
11   and we became one of the nation's top ten mortgage lenders. These results
12   demonstrate the soundness of Indymac's hybrid thrift/mortgage banking model,
     and even more importantly, strong execution and dedication by Indymac's
13   employees."

14   Indymac also reported earnings of $72.3 million, or $1.09 per share in the fourth
15   quarter of 2005 representing increases of 24 percent and 20 percent over pro forma
     forma earnings of $58 million, or $0.91 per share in the fourth quarter of 2004.
16   GAAP earnings in the fourth quarter of 2004 were $56 million, or $0.87 per share.

17   The fourth quarter 2005 earnings exclude economic earnings of $9.7 million or
18   $0.09 per share due to the impact of financial accounting standards that require
     mortgage servicing rights (MSRs) to be valued at the lower of cost or market
19   value. Absent this impact, earnings per share would have been $1.18 for the fourth
     quarter. The Financial Accounting Standards Board has issued an exposure draft
20   providing an option to account for mortgage servicing rights at fair value.
21   Although still not in final form, Indymac supports the proposed standard, which is
     expected to become effective in the first quarter of 2006, eliminating the potential
22   for a similar impact on future earnings, and allowing our economic and
     accounting results to be in synch.
23
24   Indymac has filed a Form 8-K with the Securities and Exchange Commission
     which is intended to provide similar review and analysis of Indymac's financial
25   position and results of operations to the information generally provided in
     Indymac's quarterly Form 10-Q filings. The Form 8-K is available on Indymac's
26   Website at www.indymacbank.com.

27
     _____
28

1

Quarterly Cash Dividend Increased

2

3    Based on Indymac's strong operating performance and financial position,
     including earnings, capital and liquidity, and its commitment to shareholder value,
4    Indymac's Board of Directors increased the cash dividend to $0.44 per share. This
     represents a rise of 22 percent from the dividend declared and paid in the first
5    quarter last year, and is Indymac's eleventh consecutive increase in the quarterly
     dividend. The cash dividend is payable March 9, 2006 to shareholders of record
6    on February 9, 2006.

7        Highlights of the Full Year 2005 Compared with 2004 Pro forma

8        -- Record net revenues of $1.1 billion, up 35 percent.

9
         -- Record net earnings of $300.2 million, up 42 percent.
10

11       -- Record average earning assets for the year of $19.6 billion,
            up 27 percent.
12

13       -- Record ROE of 22 percent for 2005, up 20 percent.

14       -- Record mortgage loan production of $60.8 billion, up 60
            percent.
15

16       -- Record mortgage market share of 2.18 percent for the full
            year, up 59 percent based on the Mortgage Bankers Association
17          (MBA)'s January 2006 Mortgage Finance Forecast.

18       -- Efficiency ratio improved to 54 percent from 57 percent and
            operating expenses to loan production improved to 96 basis
19          points from 120 basis points.

20   Highlights of the Fourth Quarter of 2005 Compared with Fourth Quarter 2004 Pro
     forma
21

22       -- Net revenues of $281.0 million, up 21 percent.

23       -- Net earnings of $72.3 million, up 24 percent.

24       -- EPS of $1.09, up 20 percent.
25

26       -- ROE of 19 percent.

27

28

---

**BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT**

-- Record total assets of $21.5 billion, up 27 percent.

-- Record mortgage loan production of $18.0 billion, up 60 percent.

-- Indymac's mortgage market share of 2.85 percent is up approximately 72 percent based on the MBA's January 2006 Mortgage Finance Forecast.

-- Indymac's pipeline of mortgage loans in process totaled a record $9.2 billion at Dec. 31, 2005, up 46 percent.

-- Indymac's portfolio of loans serviced for others increased 68 percent to $84 billion at Dec. 31, 2005.

-- Strong credit performance with non-performing assets down 41 percent and representing 0.34 percent of total assets compared with 0.73 percent of total assets at Dec. 31, 2004.

-- Efficiency ratio improved to 57 percent from 58 percent and operating expenses to loan production improved to 86 basis points from 117 basis points.

"The 2005 fourth quarter results clearly demonstrated the power of our hybrid thrift/mortgage bank business model. Of our $1.5 billion of average capital during the fourth quarter, we allocated 34 percent to our mortgage production divisions, 20 percent to our MSR division and 45 percent to our Thrift segment with each providing strong returns on equity in line with our established targets. Our Thrift segment and MSR division are structured through our interest rate risk management practices to provide stable returns on equity in a variety of interest rate environments. These two combined utilized 65 percent of our average capital and provided a ROE of 22 percent in the fourth quarter of 2005 up from 19 percent in the fourth quarter of 2004. Remarkably, our mortgage production divisions, which are expected to have higher but more volatile returns, produced very stable ROEs of 48 percent and 49 percent, in the fourth quarters of 2005 and 2004, respectively, in an industry environment where volumes were down 6 percent, profit margins declined substantially and the yield curve reflected nearly 200 basis points of flattening. I am incredibly proud of the performance of our Indymac team for the results produced in this environment," commented Perry.

"With respect to our mortgage production divisions, we were able to deploy more capital and maintain a consistently strong ROE as a result of the following key items," said Richard Wohl, Indymac Bank's President. "First, we grew our loan

production 60 percent in the fourth quarter of 2005 from the fourth quarter of 2004. Our strong performance in mortgage production and market share continues to be driven by our strategies to offer a broad and diverse product mix and to expand our sales force and geographic presence, with an emphasis on building relationships with mortgage professionals across the country that are experts in marketing loans to consumers. Some of this production growth was driven by our conduit and correspondent channels which have lower revenue margins. However these channels also have correspondingly lower costs and therefore provide strong returns on capital. In addition, our reverse mortgage subsidiary, Financial Freedom, grew its loan production 86 percent as its commanding market presence and the strong demographics for its product continue to drive results. Second, the operating costs in our mortgage production divisions relative to mortgage loans produced declined 32 percent to 44 basis points in the fourth quarter of 2005 from 65 basis points in the fourth quarter of 2004. As noted a portion of this decline is attributed to the growth in our correspondent and conduit channels and the remainder was achieved by further scaling our core business. Finally, we increased the velocity at which we sell our mortgage production to more efficiently utilize our capital. The average number of days we held a loan declined 22 percent in the fourth quarter of 2005 to an average hold period of 43 days from 55 days in the fourth quarter of 2004," concluded Wohl.

Commenting on the Company's outlook for 2006, Chief Financial Officer Scott Keys noted, "We currently expect EPS to range from $4.50 to $5.20 per share, which includes the implementation of Statement of Financial Accounting Standards (SFAS) No. 123R (revised 2004), Share-Based Payment, requiring the expensing of stock options. We estimate that the implementation of SFAS No. 123R will reduce EPS by approximately $0.10 in 2006. Had SFAS No. 123R been effective in 2005, reported EPS of $4.54 would have been reduced by $0.12 to $4.42. The underlying assumptions imbedded in our EPS outlook for 2006 include the MBA's forecast of $2.2 trillion for industry-wide mortgage volumes, mortgage banking revenue margins of 115 to 125 basis points, average earning assets of approximately $25 billion, an average 10 year Treasury rate of approximately 4.8 percent, and an average 1-month LIBOR of approximately 4.6 percent. This forecast assumes that we will deploy $1.7 billion of capital on average in 2006, with 70 percent of the capital deployed in the relatively stable Thrift segment and MSR division at an expected combined ROE of 20 percent and 30 percent of the capital deployed in the mortgage production divisions at an expected ROE of 46 percent. Overall ROE including corporate overhead is expected to be approximately 21 percent, versus 22 percent ROE in 2005. This EPS forecast is considered our best estimation in light of current market expectations for interest rates and industry volumes in 2006. However, the economy, interest rates and our industry remain volatile and as a result, our actual results could vary significantly from this forecast," said Keys.

20.    On April 25, 2006, IndyMac issued a press release entitled "IndyMac Bancorp Announces Quarterly EPS of $1.18, up 20%," announcing the Company's results of operations and financial condition for the first quarter of 2006. The press release stated in part:

PASADENA, Calif., Apr 25, 2006 (BUSINESS WIRE) -- IndyMac Bancorp, Inc. (NYSE:NDE):

-- Record Quarterly Mortgage Production of $20 Billion Drives Doubling of Market Share to 3.89%

-- Board of Directors Increases Quarterly Cash Dividend 21% to $0.46

IndyMac Bancorp, Inc. (NYSE:NDE) ("Indymac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("Indymac Bank(R)"), today reported net earnings of $80 million, or $1.18 per share, for the first quarter of 2006, compared with net earnings of $63 million, or $0.98 per share, in the first quarter of 2005, representing increases of 26 percent in net earnings and 20 percent in earnings per share. The 2005 amounts have been retrospectively adjusted for Statement of Financial Accounting Standard 123(R), Share-Based Payments (a table reporting the impact of this accounting change is located at the end of this release). Indymac has also filed its Form 10-Q for the first quarter with the Securities and Exchange Commission. The Form 10-Q is available on Indymac's Website at www.indymacbank.com.

"The first quarter demonstrated the dynamism and resiliency of Indymac's hybrid thrift/mortgage banking business model," commented Michael W. Perry, Indymac's Chairman and Chief Executive Officer. "Several factors negatively impacted our industry this quarter: mortgage industry volume was 17 percent lower than both Q4 05 and the first quarter of last year(1), and mortgage banking profit margins declined significantly across the industry. Additionally, the Federal Reserve continued to raise short-term rates, resulting in an even flatter yield curve. Despite these negative trends, Indymac grew its EPS by 20 percent over Q1 05 and 11 percent on a sequential quarterly basis to $1.18. We accomplished these results by: (1) growing mortgage production 72 percent over Q1 05 to an all-time record of $20 billion, (2) growing our average interest earning assets 41 percent, (3) profitably deploying $505 million more in capital, a 55 percent increase, and reducing our undeployed capital from $346 million to $169 million, and (4) leveraging our overhead areas, with combined overhead increasing by 11 percent, considerably lower than the percentage gains we achieved in volume, assets and revenue.

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

Page 17

"We are constantly examining how we are deploying our capital and the returns we earn by business segment," continued Perry. "In the first quarter, we deployed a total of $509 million of our capital in our mortgage production divisions, an 83 percent increase over last year. However, given mortgage industry margin pressures and our lower-margin conduit operations comprising a higher percentage of our production volume, the ROE on this capital declined from 97 percent last year to 51 percent this quarter, still a strong return on our capital. We deployed a total of $640 million in our thrift segment, a 39 percent increase over last year. This segment continued to earn a solid, stable ROE, earning 25 percent for the quarter.

"Finally, we deployed 15 percent of our capital, or $237 million, in MSRs and other retained assets, up from 12 percent one year ago. This division saw a strong increase in ROE from 17 percent to 29 percent, which we believe to be a more normal rate of return for this business, as we have been able to achieve significant scale in our mortgage servicing operations and improved effectiveness at hedging this asset, including the use of 'Value-at-Risk' (VAR) modeling, which we implemented last year. Importantly, the ROE improvement in MSRs and retained assets was not achieved simply by writing up the value of the MSRs. The weighted average multiple on the MSR asset remained relatively stable at 3.82 this quarter and 3.64 a year ago.

"With respect to scaling this business, the average cost per loan serviced declined to $83 in the first quarter from $99 a year ago, while average ancillary income per loan serviced rose to $99 in the first quarter from $96 a year ago. Importantly, our marginal servicing cost per loan is approximately $39, resulting in approximately $60 of incremental pre-tax profit per loan serviced, on average, before taking into consideration the servicing strip revenue," concluded Perry.

Quarterly Cash Dividend Increased

Based on Indymac's strong operating performance and financial position -- including earnings, capital and liquidity -- and its commitment to shareholder value, Indymac's Board of Directors increased the cash dividend to $0.46 per share. This represents an increase of 21 percent from the dividend declared and paid in the second quarter last year. The cash dividend is payable June 8, 2006 to shareholders of record on May 11, 2006.

Highlights of the First Quarter of 2006 Compared with First Quarter 2005

-- Record net revenues of $304.5 million, up 20 percent.

-- Net earnings of $79.8 million, up 26 percent.

1    -- EPS of $1.18, up 20 percent.

2    -- ROE of 20 percent, consistent with last year.

3    -- Record total assets of $24 billion, up 35 percent.

4    -- Record mortgage loan production of $20 billion, up 72 percent.

5

6    -- Record mortgage market share of 3.89 percent, up approximately 108 percent
     based on the MBA's April 2006 Mortgage Finance Long-Term Forecast.

7

8    -- Record pipeline of mortgage loans in process of $10.4 billion at March 31,
     2006, up 39 percent.

9

10   -- Record portfolio of loans serviced for others of $96.5 billion at March 31, 2006,
     up 72 percent.

11   -- Record total number of consumer customers of 635,850, up 44 percent.

12

13   -- Strong credit performance, with non-performing assets of $103 million,
     compared to $96 million a year ago, representing 0.43 percent of total assets,
     compared to 0.54 percent of total assets last year, and net charge-offs of $1.7

14   million, the second-lowest quarterly amount in six years.

15   -- Efficiency ratio of 56 percent, improving from 58 percent, and total expenses to

16   loan production of 84 basis points, improving from 124 basis points.

17   "We are pleased with our mortgage production gains, which enabled us to more

18   than double our market share, from 1.87 percent in Q1 last year to 3.89 percent in
     Q1 this year," noted Richard H. Wohl, Indymac Bank's President. "This was

19   accomplished through our continued drive to leverage our mortgage banking
     platform, as year-over-year, we increased our regional mortgage centers from 10

20   to 13, our sales staff by 27% to 811 and our active customers in the mortgage
     professionals divisions by 33% to 7,174.

21

22   "However, our goal is to grow our profits and maximize returns on capital",
     continued Wohl, "but for the quarter, net income for our production divisions was

23   down 3 percent year-over-year, and ROE, while still strong at 51 percent, declined
     from 97 percent in Q1 05. This was primarily the result of narrowing mortgage

24   banking revenue margins in the industry, and, indeed, our revenue margin, which
     was also impacted by our conduit volumes increasing from 22 percent of total

25   volume to 31 percent, declined by 39 percent year-over-year. Nonetheless, we

26   believe that the financial results for our production divisions for the quarter will

27

28   **BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT**

compare favorably to our competitors as a result of three key factors: the breadth that we have in our mortgage origination channels, the resiliency of our specialty niche products and the efficiencies we have gained as we have leveraged our mortgage banking platform."

\* \* \*

"Four of our five production divisions showed year-over-year improvements in their net income performance," continued Wohl. "Short term, we have allocated more of our capital to our conduit and correspondent divisions and will continue to do so. While the ROEs for these divisions declined year-over-year and are lower than for wholesale, they are above our threshold ROE, and these divisions produce earnings growth which is also accretive to the Company's EPS. The wholesale division's net income is down year-over-year, as this division has been most impacted by industry margin compression, but its ROE of 82% still must be considered very strong. This business is critical to our long-term strategy, and we are confident we can return it to solid earnings growth while maintaining strong ROEs, as we continue to capture market share and leverage our infrastructure more fully and as margins stabilize and improve. Finally, we are very pleased with both the 90 percent net income growth and 72 percent ROE improvement at Financial Freedom. Given the growth prospects for the reverse mortgage market and our industry-leading position, we are very excited about the future of this business."

Regarding the implementation of SFAS 156, Accounting for Mortgage Servicing Rights at Fair Value, Scott Keys, IndyMac's Chief Financial Officer, stated, "We made a one-time election to account for all mortgage servicing rights at fair value. This election resulted in a $17.6 million increase to MSRs as of January 1, 2006, an increase in deferred tax liability of $7.0 million and an increase in beginning retained earnings for the first quarter of 2006 of $10.6 million, on an after-tax basis. IndyMac's first quarter income statement reflects changes in the fair market value of the mortgage servicing rights from January 1, 2006, to March 31, 2006. We believe applying fair value accounting to the mortgage servicing rights aligns the economic performance of this asset more closely with our GAAP results and thereby reduces volatility in earnings as our hedge has always been focused on protecting the economic value of the MSRs.

"Looking ahead, four key factors will continue to drive our earnings growth," added Keys. "First, we will continue to leverage our mortgage banking platform, growing production and gaining market share. Second, we will increase the velocity of our loan sales. This quarter we only sold 84 percent of our loan production as compared to our 87 percent historical average. Speeding up our turnover will increase our ROEs in this business and also make room on the

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

balance sheet for the third part of the strategy, which is to opportunistically grow the thrift investment portfolio, where we are confident we can earn solid and stable returns on capital. Finally, our production growth will lead to continued growth in the servicing portfolio, where, again, we will continue to realize scale economies and ROEs similar to the 29% achieved this quarter.

"In light of our strong performance in the first quarter of 2006 and the outlook for the remainder of the year, we are raising our earnings guidance for the year to a range between $5.00 and $5.40 per share, up from our prior range of $4.50 to $5.20. This EPS forecast is considered our best estimation in light of current market expectations for interest rates and industry volumes in 2006. However, the economy, interest rates and our industry remain volatile and, as a result, our actual results could vary significantly from this forecast."

* * *

21. Also on April 25, 2007, the Company filed its Form 10-Q for the ended March 31, 2006, which included the Company's previously reported financial results. The Form 10-Q was signed by defendants Perry and Keys, who also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and certifications pursuant to 18 U.S.C. Section 1350 stating that they reviewed the Form 10-Q, that the report did not contain any untrue statements of material fact, and that the financial statements presented in all material respects the financial condition, results or operations and cash flows of the Company.

22. On June 13, 2006, the Company issued a press release entitled "IndyMac Bancorp Ranked Seventh Largest Mortgage Originator in the Nation." The press release stated in part:

PASADENA, Calif.--(BUSINESS WIRE)--June 13, 2006--IndyMac Bancorp, Inc. (NYSE:NDE) ("Indymac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("Indymac Bank(R)"), today announced that, based on its mortgage loan production of $20 billion for the first quarter of 2006, it has been ranked the seventh largest mortgage originator in the nation, according to the quarterly rankings published by the National Mortgage News. Indymac's production was up 72 percent from the first quarter of 2005, when the publication ranked the Company 13th.

"We broke into the top 10 in the third quarter of last year, and this quarter's #7 ranking puts us well on the way to our goal of being a top six originator by 2010," commented Michael W. Perry, Indymac's Chairman and Chief Executive Officer. "While we consider this a significant achievement, given the tight band of production for those ranked seventh through 10th, we are well aware that we could move down before we move up further. Our real focus is not on whether we are ranked seventh or 10th, but on how we can profitably get to sixth sooner than 2010. It's a big leap to sixth--originations totaled over $35 billion for the sixth largest originator compared to our $20 billion last quarter. With that said, it is gratifying to think we started Indymac with four employees in 1993, and we are now successfully competing in the mortgage business with the largest financial institutions in the USA," added Perry.

Of the top 25 mortgage lenders in the National Mortgage News survey, Indymac was one of only three companies that achieved sequential quarterly growth, growing its production 11 percent from the fourth quarter of 2005 to the first quarter of 2006. Commenting on this, Richard Wohl, Indymac's President, noted, "The primary factors driving Indymac's growth in production volumes and market share are the following:

    1. Continued leveraging of our mortgage lending platform through geographic expansion of our regional centers and sales force growth;

    2. Improved marketing, sales and operational execution with our existing products and channels;

    3. New product development. We have had significant success in entering the option arm market and enhancing that product line, as well as entering the reverse mortgage business through the acquisition of Financial Freedom two years ago. We continue to have substantial room for growth through product expansion, particularly given that conforming and government lending products are as yet a relatively small component of our production volumes; and

    4. The continued growth of our conduit and correspondent divisions, which contributed significantly to our attainment of the #7 ranking. This expansion has served us well in the near term; however, longer-term, we will need to drive stronger growth in our wholesale and retail channels to move up in the rankings."

    23.    Defendants knew or recklessly disregarded that the June 13, 2006, press release was materially misleading because it failed to disclose the Company inadequate internal controls or that IndyMac's underwriting guidelines and loss provisions were inadequate to manage the

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

risk of loan delinquencies.

24.     On July 27, 2006, the Company issued a press release entitled "IndyMac Bancorp Announces Record Quarterly EPS of $1.49, Up 20%, " announcing the Company's results of operations and financial condition for second quarter 2006. The press release stated in part:

> PASADENA, Calif.--(BUSINESS WIRE)--July 27, 2006--IndyMac Bancorp, Inc. (NYSE:NDE):
>
> * Company Reports Record Quarterly Mortgage Production of $20.1 Billion
> * Board of Directors Increases Quarterly Cash Dividend 20% to $0.48
>
> IndyMac Bancorp, Inc. (NYSE:NDE) ("Indymac®" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("Indymac Bank®"), today reported net earnings of $105 million or $1.49 per share for the second quarter of 2006, compared with net earnings of $82 million, or $1.24 per share in the second quarter of 2005, representing increases of 28 percent in net earnings and 20 percent in earnings per share. The 2005 amounts have been retrospectively adjusted to reflect stock option expenses due to the adoption of Statement of Financial Accounting Standards No. 123 ®, Share-Based Payment. Indymac has also filed its quarterly report on Form 10-Q for the second quarter with the Securities and Exchange Commission. The Form 10-Q is available on Indymac's Website at www.indymacbank.com.
>
> Highlights of the Second Quarter 2006 Compared with Second Quarter 2005
>
> * Record net revenues of $377.1 million, up 31 percent.
> * Record net earnings of $104.7 million, up 28 percent.
> * Record EPS of $1.49, up 20 percent.
> * ROE of 24 percent, compared to 25 percent last year.
> * Total assets of $23.8 billion, up 22 percent.
> * Record mortgage loan production of $20.1 billion, up 41 percent.
> * Mortgage market share of 2.96 percent, up approximately 64 percent based on the MBA's July 2006 Mortgage Finance Forecast.
> * Record pipeline of mortgage loans in process of $12.5 billion at June 30, 2006, up 29 percent.
> * Record portfolio of loans serviced for others of $110 billion at June 30, 2006, up 73 percent.
> * Record total number of consumer customers of 702,000, up 46 percent.
> * Non-performing assets as a percent of total assets of 0.49 percent compared to

0.38 percent a year ago, and net charge-offs of $1.6 million, down from $1.8 million last year.
    * Efficiency ratio of 54 percent, compared to 53 percent a year ago, and total expenses to loan production of 99 basis points, improving from 104 basis points last year.

"We are very pleased to have achieved a number of records this quarter, particularly in relation to the second quarter of 2005, given that over the last year the operating environment has become more challenging for mortgage lenders as the Federal Reserve has raised short-term rates 200 basis points and mortgage rates climbed to their highest level since 2002. Our ability to achieve record results despite these adverse trends again demonstrates the strength of our hybrid thrift/mortgage banking business model and our ability to execute on it," said Michael W. Perry, Indymac's Chairman and Chief Executive Officer.

"The key to our success has been our ability to grow production and assets with accretive deployment of capital, principally from retained earnings and excess capital. Over the last year we deployed an additional $557 million of capital into our profit generating businesses, a 53 percent increase in comparison with the second quarter of last year, from $1.05 billion to $1.61 billion. This generated a strong return on equity of 24 percent," stated Perry.

"While our mortgage volumes were at a record level for the ninth consecutive quarter, they were essentially flat compared with the first quarter and we are redoubling our efforts to profitably gain market share," noted Richard Wohl, Indymac's President. "In keeping with this goal, our mortgage pipeline was at an all-time record level of $12.5 billion as of June 30, up 7 percent from the first quarter of 2006 and up 29 percent year over year, boding well for our mortgage production volumes and profits for the third quarter."

With respect to 2006 earnings guidance, Indymac's Chief Financial Officer Scott Keys added, "In light of our continued strong performance this quarter, we are reiterating our previously issued forecast of earnings of $5.00 to $5.40 per share, although we feel more confident that we will finish the year above the mid-point of this range."

Quarterly Cash Dividend Increased

Based on Indymac's strong operating performance and financial position - including earnings, capital and liquidity - and its commitment to shareholder value, Indymac's Board of Directors increased the cash dividend to $0.48 per share. This represents an increase of 20 percent from the dividend declared and paid in the third quarter last year. The cash dividend is payable Sept. 7, 2006, to

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

1   shareholders of record on Aug. 10, 2006.

2      25.   Also on July 27, 2006, the Company filed its Form 10-Q for the quarterly period

3

4   ended June 30, 2006, which included the Company's previously reported financial results. The

5   Form 10-Q was signed by defendants Perry and Keys, who also signed certifications pursuant to

6   Section 302 of the Sarbanes-Oxley Act of 2002 and certifications pursuant to 18 U.S.C. Section

7   1350 stating that they reviews the Form 10-Q, that the report did not contain any untrue

8   statements of material fact, and that the financial statements presented in all material respects the

9   financial condition, results or operations and cash flows of the Company.

10

11      26.   On November 2, 2006, the Company issued a press release entitled "IndyMac

12   Bancorp Announces Third Quarter EPS of $1.19, up 3%," announcing the Company's results of

13   operations and financial condition for third quarter 2006. The press release stated in part:

14      Company Reports Record Quarterly Mortgage Production of $24 Billion; Market
        Share Increases to 3.87%

15

16      PASADENA, Calif.--(BUSINESS WIRE)--Nov. 2, 2006--IndyMac Bancorp, Inc.
        (NYSE:NDE) ("Indymac(R)" or the "Company"), the holding company for

17      IndyMac Bank, F.S.B. ("Indymac Bank(R)"), today reported net earnings of $86
        million, or $1.19 per share, for the third quarter of 2006, compared with net

18      earnings of $78 million, or $1.16 per share, in the third quarter of 2005,

19      representing increases of 11 percent in net earnings and three percent in earnings
        per share. The 2005 amounts have been retrospectively adjusted to reflect stock

20      option expenses due to the adoption of Statement of Financial Accounting
        Standards No. 123R, Share-Based Payment. Indymac has also filed its quarterly

21      report on Form 10-Q for the third quarter with the Securities and Exchange

22      Commission. The Form 10-Q is available on Indymac's Website at
        www.indymacbank.com.

23

24      Highlights of the Third Quarter 2006 Compared with Third Quarter 2005

25      -- Net revenues of $345.6 million, up 22 percent.

26      -- Net earnings of $86.1 million, up 11 percent.

27   _____

28

-- EPS of $1.19, up 3 percent

-- $1.6 billion in capital deployed in operating segments, up $448 million, or 39 percent, representing 86 percent of total capital versus 82 percent in the third quarter of 2005.

-- ROE of 18 percent, compared to 22 percent.

-- Record total assets of $27.4 billion, up 40 percent.

-- Record mortgage loan production of $24 billion, up 41 percent.

-- Record mortgage market share of 3.87 percent based on the MBA's October 2006 Mortgage Finance Forecast, up 98 percent from 1.95 percent in the third quarter of 2005.

-- Record pipeline of mortgage loans in process of $14.6 billion at Sept. 30, 2006, up 41 percent.

-- Record portfolio of loans serviced for others of $124 billion at Sept. 30, 2006, up 69 percent.

-- Record total number of consumer customers of 763,000, up 44 percent.

-- Non-performing assets as a percent of total assets of 51 basis points compared to 36 basis points a year ago, and net charge-offs of $1.9 million, down from $2.1 million.

-- Efficiency ratio of 58 percent, compared to 54 percent a year ago, and total expenses to loan production of 83 basis points, compared to 88 basis points.

Strong Net Income and EPS Performance Despite Loan Sales Percentage Being Well Below Historical Average

"We are very pleased to have again achieved a number of records this quarter," said Michael W. Perry, Indymac's Chairman and Chief Executive Officer. "Even though mortgage industry loan volumes were down 29 percent this quarter versus one year ago and the industry faced narrower revenue margins, Indymac was able to achieve the third highest EPS in our history and a solid 18 percent ROE. These results were even more impressive given the fact that we sold only 81 percent of third quarter loan production. As a result, we grew our balance sheet to a record

$27.4 billion, a 15 percent increase over the previous quarter and 40 percent over last year, and we delayed substantial loan sales and gain-on-sale revenue to the fourth quarter. Had we sold a more normal 92 percent of our production at the same margins as the product we did sell, EPS would have been $0.17 higher than reported, or $1.36, the second best quarter in our history and up 17 percent year-over-year, and ROE would have been a strong 20 percent."

\* \* \*

"Once again, our results demonstrate the strength of our hybrid thrift/mortgage banking business model, strong execution of our strategy related to it, and the power and stability of the earnings this produces," continued Perry.

Capital Allocations and Performance by Business Segment

"Underlying our strong third quarter performance, we fired on all three cylinders with respect to our main business segments - mortgage production, mortgage servicing rights, and the thrift - deploying significantly more capital in each year-over-year and earning strong returns on this capital," continued Perry.

Mortgage Production

Mortgage production earned $69 million, up six percent over 2005. "The ROE from mortgage production was a strong 53 percent, although this was down from 65 percent last quarter and 62 percent one year ago," noted Richard Wohl, Indymac Bank's President. "The ROE declined because we sold only 81 percent of the quarter's production and our mortgage banking revenue margin declined from 122 basis points to 103 basis points year-over-year, primarily due to the lower margin conduit channel providing a higher percentage of total mortgage volume than one year ago. Although conduit production has lower revenue margins than other channels, this division produced net income of $17.3 million, up almost four-fold year-over-year, and a strong 46 percent ROE, its highest ever."

"While mortgage industry volumes continued to decline, our mortgage production hit a record level for the eleventh consecutive quarter, growing 19 percent over the prior quarter," continued Wohl. "As a result, our market share nearly doubled over last year to an estimated 3.87 percent, an all-time high for Indymac, demonstrating strong progress in our core strategy of leveraging our mortgage banking infrastructure."

Financial Freedom, the Company's reverse mortgage subsidiary, made a strong contribution to the mortgage production segment's performance, with record earnings of $16.3 million, more than double one year ago, and a 56 percent ROE.

"While we had a great quarter, our earnings were positively impacted by unusually high revenue margins - 4.52 percent this quarter versus 2.90 percent one year ago - which we believe are not sustainable going forward given increased competition in this business," stated James Mahoney, Chairman and co-CEO of Financial Freedom. "However, as the reverse mortgage industry leader with a market share greater than 50 percent in this rapidly growing business, we see strong future volume growth and, as we continue to scale our operations, strong earnings growth and ROEs long-term."

Mortgage Servicing Rights (MSR)

The Company more than doubled the capital deployed in MSRs and other retained assets year-over-year to $402 million in the third quarter. This segment earned a strong ROE of 30 percent versus 20 percent one year ago, with the result that net income tripled to $30 million. "We have been able to achieve significant scale in this business by growing our servicing portfolio 180 percent over the last two years, from $45 billion to $124 billion today," noted John Olinski, EVP in charge of Secondary Marketing and Retained Assets. "Importantly, our hedge performance for the MSR asset was outstanding during a quarter when interest rates declined and portfolio run-off was substantial. Valuation losses of $134 million were offset by hedge gains of $138 million during the quarter, enabling the strong growth in earnings and ROE brought on by the growth of this portfolio."

Thrift Portfolio

Net income for the thrift portfolio, which consists of single family residential mortgage loans, consumer and subdivision construction loans, and mortgage backed securities, was down $1 million year-over-year to $35 million, even though the Company deployed 26 percent more in capital in this segment. While the ROE was a solid 20 percent, it declined from 26 percent one year ago. "The thrift continues to be a solid performer for Indymac despite the inverted yield curve that has developed as the Fed has increased rates by 150 basis points to 5.25 percent year-over-year," stated Blair Abernathy, EVP and Chief Investment Officer. "While the spread between the 10-year Treasury rate and the Fed Funds rate has gone from a positive 58 basis points to a negative 62 basis points during this period, we have achieved a remarkably stable consolidated thrift net interest margin during this period - hovering near the 2.01 percent level achieved during the last quarter. Nonetheless, the thrift segment ROE declined year-over-year, as the year-ago quarter was positively impacted by a non-recurring gain-on-sale of loans, and the current quarter segment-level net interest margin was negatively impacted by increased intercompany premium amortization due to the decline in rates during the quarter. Heading into the fourth quarter, this portfolio - including

$10 billion in loans held for investment and $4 billion in securities - is at a record high level and should produce a growing earnings stream and ROEs consistent with our targeted level of 20 to 25 percent based on our current forecasts of interest rates and credit losses."

Non-performing Assets Increase from Historic Low Levels. Net Charge-offs Remain Low.

Industry data shows that the housing market has been slowing and mortgage loan delinquencies have been on the rise. Consistent with these trends, Indymac's non-performing assets (NPAs) as a percentage of total assets increased to 51 basis points during the quarter, from 49 basis points last quarter and 36 basis points a year ago. "Our increase in NPAs was anticipated, as credit performance metrics in the industry had reached a level that was clearly unsustainable in the long-term," stated Indymac's Chief Financial Officer, Scott Keys. "Our NPA ratio continues to be well below historical levels; this ratio reached as high as 3.50 percent in 1999, and we expect to see continued increases from the current level as the credit cycle evolves.

"Net charge-offs remained low at $1.9 million for the quarter, or 1.31 percent of pre-tax income, down from $2.1 million, or 1.60 percent of pre-tax income, last year," continued Keys. "However, we do anticipate that charge-offs will increase substantially from these low levels, with the result that our full year loan loss provision for 2006 is forecasted to be $16 million, up from $10 million in 2005, and is forecasted to more than double in 2007 to $35 million. Notwithstanding this, 94 percent of the balance sheet consists of low credit risk assets (cash and FHLB stock, investment grade MBS securities, mortgage loans held for sale, mortgage loans held for investment, MSRs and consumer construction loans). In addition, our single-family mortgage held-for-investment loan portfolio is of strong credit quality, with original average combined loan-to-value ratios (CLTVs) of 73 percent, current average CLTV ratios estimated to be 59 percent, and an average FICO score of 716."

Operating Expenses

Operating expenses grow by 32 percent year-over-year, driven by growth in the Company's three business segments and the continued build-out of the nationwide network of mortgage production centers. "We were able to grow our mortgage production volumes, servicing portfolio and thrift assets more rapidly than our expenses, and this was key to our being able to continue to grow earnings in the face of considerably narrower mortgage banking revenue margins," stated Keys. "This was particularly the case in comparing this quarter with last, as loan volume and assets grew by 19 percent and 15 percent, respectively, while operating

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

expenses remained flat. Aiding with this was a hiring freeze on all non revenue-generating personnel that was instituted at the beginning of the quarter and continues today. Looking ahead, it will be important for us to focus on reaping more operating leverage from our infrastructure and growing revenues more rapidly than expenses in order to continue growing our EPS."

Future Outlook

With respect to 2006 earnings guidance, Keys added, "We now expect full year 2006 earnings per share in an approximate range of $5.16 to $5.26, reflecting continued strength in our production operations and the growth and stable returns in our thrift and servicing segments. Looking ahead to 2007, the MBA is projecting that industry volume will fall a further 14 percent to $2.1 trillion before stabilizing in 2008. In addition, while interest rates remain low, there is considerable concern over competition and the impact of a slowing housing market. Given the above, combined with the fact that in our industry - which has significant operating leverage - actual earnings and future prospects can change rapidly, predicting future earnings is a challenge. That said, given our hybrid thrift/mortgage banking business model and the dynamic allocation of capital to our three business segments, as well as our past track record of growing net income and EPS in the face of declining market conditions, we expect to again achieve record EPS in 2007 and currently forecast that EPS will be within a range of 10 percent to 15 percent higher than in 2006."

Quarterly Cash Dividend Increased

Based on Indymac's strong operating performance and financial position - including earnings, capital and liquidity - and its commitment to shareholder value, Indymac's Board of Directors increased the cash dividend to $0.50 per share. This represents an increase of 19 percent from the dividend declared and paid in the fourth quarter last year. The cash dividend is payable Dec. 7, 2006, to shareholders of record on Nov. 9, 2006.

27.    Also on November 2, 2006, the Company filed its Form 10-Q for the quarterly period ended September 30, 2006, which included the Company's previously reported financial results. The Form 10-Q was signed by defendants Perry and Keys, who also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and certifications pursuant to 18 U.S.C. Section 1350 stating that they reviews the Form 10-Q, that the report did not contain any

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

1   untrue statements of material fact, and that the financial statements presented in all material

2   respects the financial condition, results or operations and cash flows of the Company.

3   **Disclosures at the End of the Class Period**

4
5       28.    On January 16, 2007, the Company issued a press release entitled "IndyMac

6   Provides Update on 2006 Results." The press release stated in part:

7   PASADENA, Calif.--(BUSINESS WIRE)--Jan. 16, 2007--The following is a
8   letter to shareholders of Indymac and other Indymac stakeholders from Michael
    W. Perry, Chairman and Chief Executive Officer:

9
    Dear Shareholders and other Indymac Stakeholders:
10
11  Unfortunately, we are starting the year off with some bad news.

12  Based on the earnings forecast we provided after the end of last quarter, we
    anticipated that our EPS for the fourth quarter would be $1.35 (in a range of $1.30
13  to $1.40). However, last week, as we began to complete our quarterly accounting
    "roll-up," it became clear that our Q4 earnings would be substantially below our
14  forecast. While our internal quarterly accounting certification process is not yet
15  complete and adjustments could still be made as we finalize our accounting, we
    now expect to report approximately $0.97 EPS for the quarter when we release
16  earnings as scheduled on January 25th.

17  This shortfall reflects the challenging times being faced by the mortgage and
18  housing industries and the difficult nature of forecasting earnings in our business.
    I have stated many times before that Indymac is not immune to deteriorating
19  mortgage industry conditions, and it is clear now that during the fourth quarter
    industry conditions continued to erode. While we have not yet completed our
20  detailed analysis of all of the variances, our assessment as of today is that the main
    differences between our prior forecast of $1.35 and what looks to be our earnings
21  of $0.97 are the following:

22
    *1. An increase in credit costs related to the loan loss provision, secondary*
23  *market reserve, and marking-to-market delinquent loans held-for-sale and*
    *residuals and non-investment grade securities;*
24
25  *2. A reduction in net interest margin related to loans held-for-sale and the thrift*
    *investment portfolio due to yield curve inversion and the fact that our loan*
26  *production mix shifted more toward fixed rate and intermediate term fixed rate*

27
    _____
28      BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

                                                              Page 31

*loans;*

3. A decline of the servicing/interest-only securities portfolio return on equity (ROE) from a high level of 30 percent last quarter to a more normalized level, in addition to a forecasted sale of some securities (at a gain) that did not occur; and

4. As an offset to the above shortfalls, a tax benefit, reflecting the reduction of our annual effective tax rate from 39.5 percent to 39.1 percent. The effective rate declined as a result of doing more business in lower tax-rate states than in California.

While I and the rest of Indymac's management team are clearly disappointed with our shortfall from expectations, stepping back from this situation ... if we do report EPS of $0.97 for the quarter, this would represent a 14.6 percent ROE ... in a very challenging market for housing and the mortgage business. This ROE would still be significantly better than the average ROE reported for the third quarter for the top ten thrifts, excluding Indymac, of 10.3 percent, while at the same time many mortgage companies and mortgage divisions of major financial institutions reported losses.

In addition, if we report $0.97 for the fourth quarter as now anticipated, we would still earn an all-time record $4.82 for 2006, representing a 19.1 percent ROE and a 9 percent increase from 2005 ... in a year where industry volumes were down 17 percent, the third year in a row of down industry volumes. In comparison, our research indicates that a majority of the top ten thrifts will report EPS declines for 2006, while only Indymac and a few others will grow EPS for the year.

Despite our solid performance in a tough market, I understand that Indymac's reputation has been hurt by this earnings miss, and I take full responsibility for this situation. While our internal forecasting processes have been generally predictive of actual earnings in the past and we have had few earnings surprises prior to this quarter, as we have stated in past press releases, in our industry - which has significant operating leverage - actual earnings and future prospects can change rapidly, making it a challenge to forecast future earnings. Nonetheless, we feel strongly that management has a responsibility to provide earnings forecasts to its shareholders to the best of its ability. Accordingly, we will have an updated 2007 forecast when we formally release earnings on January 25th, and, at that time, we will present an action plan of key steps we will take to improve our prospects and continue to outperform our peers in the current market environment. As one of these steps, I will be recommending to our board of directors that we not increase our quarterly dividend but maintain it at the current level of $0.50 per share for this quarter. We also plan to explore stock repurchases, a step we have successfully used in the past, as a way to enhance shareholder value.

1    Thank you again for the trust and confidence you have placed in Indymac and its
2    team. We will continue to work tirelessly to ensure that your trust and confidence
     are justified.
3
     Very truly yours,
4
5    Michael W. Perry
     Chairman and Chief Executive Officer
6
                                                    * * *
7
8    29.      Defendants knew or recklessly disregarded that the January 16, 2007,

9    press release did not fully disclose problems with the Company's inadequate internal controls

10   and the failure of the Company's underwriting guidelines to adequately manage the risk of loan

11   delinquencies.

12   30.      Approximately one week later, on January 25, 2007, the Company issued a press
13
     release entitled "IndyMac Bancorp Announces Fourth Quarter EPS of $0.97, Down 8%,"
14
15   announcing the Company's results of operations and financial condition for fourth quarter 2006.

16   The press release stated in part:

17        -- Company Reports Record Quarterly Mortgage Production of $26 Billion and
          Record Quarterly Mortgage Market Share of 4.51%, Up 80% --
18
19        -- 2006 EPS at All-Time Record of $4.82, up 9% Over 2005 --

20        -- Board of Directors Declares Quarterly Cash Dividend of $0.50 --

21        PASADENA, Calif.--(BUSINESS WIRE)--Jan. 25, 2007--IndyMac Bancorp, Inc.
          (NYSE:NDE) ("Indymac(R)" or the "Company"), the holding company for
22        IndyMac Bank, F.S.B. ("Indymac Bank(R)"), today reported net earnings of $72
          million, or $0.97 per share, for the fourth quarter of 2006, compared with net
23        earnings of $70 million, or $1.06 per share, in the fourth quarter of 2005,
          representing a 3 percent increase in net earnings and an 8 percent decrease in
24        earnings per share (EPS). The 2005 amounts have been retrospectively adjusted to
25        reflect stock option expenses due to the adoption of Statement of Financial
          Accounting Standards No. 123R, Share-Based Payment. Indymac has filed a Form
26
27
28   _____
          **BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT**
                                                                    Page 33

8-K with the Securities and Exchange Commission, which is intended to provide review and analysis of Indymac's financial position and results of operations similar to the information generally provided in Indymac's quarterly Form 10-Q filings. The Form 8-K is available on Indymac's Website at www.indymacbank.com.

Highlights of Fourth Quarter 2006 Compared with Fourth Quarter 2005

-- Net revenues of $319.5 million, up 14 percent.

-- Net earnings of $72 million, up from $70 million.

-- EPS of $0.97, down 8 percent.

-- $1.8 billion in capital deployed in operating segments, up $561 million, or 44 percent, representing 93 percent of total capital versus 84 percent in the fourth quarter of 2005.

-- ROE of 15 percent, compared to 19 percent.

-- Record total assets of $29.5 billion, up 37 percent.

-- Record mortgage loan production of $26 billion, up 44 percent.

-- Record mortgage market share(1) of 4.51 percent based on the MBA's January 2007 Mortgage Finance Forecast, up 80 percent from 2.51 percent in the fourth quarter of 2005.

-- Pipeline of mortgage loans in process of $11.8 billion at Dec. 31, 2006, up 13 percent.

-- Record portfolio of mortgage loans serviced for others of $140 billion at Dec. 31, 2006, up 65 percent.

-- Record total number of consumer customers of 829,000, up 43 percent.

-- Efficiency ratio of 64 percent, compared to 58 percent one year ago, and total expenses to loan production of 80 basis points, compared to 88 basis points one year ago.

Highlights of Full Year 2006 Compared with Full Year 2005

-- Record net revenues of $1.3 billion, up 22 percent.

-- Record net earnings of $343 million, up 17 percent.

-- Record EPS of $4.82, up 9 percent.

-- ROE of 19 percent, compared to 21 percent.

-- Record average earning assets of $26 billion, up 32 percent.

-- Record mortgage loan production of $90 billion, up 48 percent.

-- Record mortgage market share(1) of 3.59 percent based on the MBA's January 2007 Mortgage Finance Forecast, up 79 percent from 2.01 percent last year.

-- Efficiency ratio of 58 percent, compared to 55 percent a year ago, and total expenses to loan production of 86 basis points, compared to 99 basis points.

Solid Fourth Quarter and Full Year 2006 Results in the Face of Challenging Times

"For the quarter, we earned $72 million, or $0.97 per share, which represents a solid 14.6 percent ROE, in a challenging market for housing and the mortgage business," commented Michael W. Perry, Indymac's Chairman and Chief Executive Officer. "However, I and the rest of Indymac's management team are clearly disappointed with these results because they were considerably below our normal earnings growth and ROE levels and fell far short of what we had forecasted for the quarter. In response, I want to assure our shareholders that we are redoubling our efforts to both improve our earnings and tighten up our forecasting processes.

"Notwithstanding our earnings shortfall for the fourth quarter," continued Perry, "for the full year 2006, we achieved record mortgage loan production, net income and EPS and earned a strong 19 percent ROE, reflecting the strength of our hybrid thrift/mortgage banking business model and solid execution against our strategic plan.

"Tough times, like what we are now facing, are when companies like Indymac can gain ground on the competition - and that is exactly what we are doing. We had a strong quarter for loan production, with $26 billion in total loans produced, up 8 percent over the prior quarter and 44 percent over Q4-05. With these production gains, we grew our estimated market share(1) to 4.51 percent in the fourth quarter versus 3.83 percent in the third quarter and 2.51 percent one year ago.

"At the same time, we maintained reasonable and prudent credit quality in our

mortgage loan production. Our fourth quarter production consisted of 97 percent prime loans and 3 percent subprime. The $22 billion of our loan production that we were able to evaluate using S&P's LEVELS model had an estimated lifetime loss percentage of 84 basis points, average FICO of 703 and average combined loan-to-value (CLTV) ratio of 81 percent, as compared to 82 basis points lifetime loss, 702 FICO and 81 percent CLTV in the prior quarter, and 74 basis points lifetime loss, 700 FICO and 78 percent CLTV in Q4-05. Also, our mortgage production segment was solidly profitable for the quarter, earning $71 million, up slightly over the prior quarter and up 17 percent over the fourth quarter of 2005.

"Bottom line, we are gaining market share, maintaining reasonable credit quality in our mortgage production and earning solid profits, while the mortgage industry, as a whole, is struggling. While no one knows for sure how long the current downturn will last and how severe it will get, when the mortgage business does turns around, I am confident that Indymac will come out of this down cycle stronger than ever."

Capital Allocations and Performance by Business Segment

"We deployed a record $1.8 billion in capital during the quarter in our main business segments - mortgage production, mortgage servicing rights, and the thrift," continued Perry. "While for the third quarter I reported that 'we fired on all three cylinders' with respect to these segments, this quarter saw erosion in the ROEs of each, given the challenging market conditions which have resulted in increased credit costs and narrower net interest and mortgage banking revenue margins."

Mortgage Production

"While we achieved records for loan production and market share, we are not happy with the fact that earnings from the mortgage production segment did not grow this quarter versus last," commented Richard Wohl, Indymac Bank's President. "Our mortgage banking revenue margin declined to 91 basis points during the fourth quarter from 103 basis points in the prior quarter and 110 basis points in Q4-05. Market conditions contributed to the margin erosion in the form of a shift in our production mix from higher margin ARM loans to lower margin fixed rate loans and increased credit costs related to marking-to-market delinquent loans held for sale and increasing our secondary marketing loan repurchase reserve. In addition, our less predictable Conduit business accounted for 39 percent of our production volume during the quarter versus 31 percent one year ago. While the Conduit may have lower profit margins, it earned a solid 29 percent ROE for the quarter on net earnings of $17 million, up 56 percent from one year ago. Contributing strongly again was Financial Freedom, the Company's

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

1
2
3
4
5

reverse mortgage subsidiary, which had record net earnings of $18.7 million, up 15 percent from the prior quarter and more than double Q4-05, and achieved an ROE of 58 percent. Overall, the mortgage production segment earned a 42 percent ROE, which was down from 53 percent in the third quarter and 54 percent in Q4-05. Looking ahead, there will likely be further erosion in mortgage banking revenue margins and overall profitability before the current down cycle eventually turns up."

6

Mortgage Loan Servicing

7
8
9
10

The Company's portfolio of loans serviced for others increased to $140 billion in the fourth quarter, up 12 percent over the third quarter and 65 percent year over year. However, net earnings for the segment were $14.8 million, down 26 percent from the prior quarter and 5 percent from the same quarter last year. The ROE was also down, to 20 percent for the fourth quarter from 30 percent in the third quarter and 38 percent one year ago.

11
12
13
14
15
16
17

Commenting on the earnings and ROE declines, John Olinski, EVP in charge of Secondary Marketing and Retained Assets, stated, "While we hedge the servicing asset very well, hedging is not a perfect science, and the imprecision associated with hedging can cause a certain level of quarterly earnings volatility. For the fourth quarter the ROE fell to 20 percent, which is a more realistic level than the outsized and unsustainable ROE levels we achieved in the third quarter and one year ago. Over time we have managed the interest rate risk of the servicing asset well, as illustrated by our year over year performance. For all of 2006, a year which had considerable interest rate risk and volatility, we had strong performance, earning $66 million, up 120% from 2005, and achieving a 26 percent ROE versus a 22 percent ROE in 2005.

18
19
20
21
22
23

"While we will likely see continued quarterly earnings volatility from the servicing asset going forward, we should be able to achieve stable earnings growth over time if we hedge this asset correctly. Growth will come from continued strong growth in the servicing portfolio as we continue to grow our production volumes. Stability will come from the fact that, unlike our other business segments, servicing is not subject to the competitive margin pressures and credit risks that come with the housing and mortgage production cycles. Over time we expect our ROEs from the servicing asset to be in the range of 18 percent to 23 percent."

24

Residuals and Non-Investment Grade Securities

25
26

This asset class, which totaled $331 million as of December 31, 2006 and 1.1 percent of the Company's total assets, includes prime and subprime mortgage

27
28

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

Page 37

residuals and non-investment grade securities, as well as HELOC and lot loan residuals which are accounted for in the Thrift segment.

The combined net earnings for this portfolio were $1.7 million for the fourth quarter, down 85 percent from the prior quarter and 76 percent from the same quarter last year. These earnings translated into an ROE of 3.6 percent for the quarter, down from 24 percent in the third quarter and 23 percent one year ago.

"We are clearly not satisfied with the performance of these portfolios during the quarter, but we feel that this quarter's performance was an aberration that will likely not recur in the future," continued Olinski. "Two main factors drove the earnings decline. First, we implemented a new, more refined prepayment model for our residual securities that resulted in a one-time downward valuation adjustment of $5 million. Going forward the new model will enable us to hedge these assets more effectively, improving our performance. Second, HELOC residual securities from 2004 incurred a $6.5 million write-down for credit impairment required by GAAP accounting that we feel does not reflect the true economics of these securities. These securities are callable over the next 4-24 months, and, accordingly, we expect to book gains during this time period more than offsetting the fourth quarter write-downs, such that we expect strong overall returns on our 2004 HELOC residual securities over their lives.

"Looking at the portfolio of residuals and non-investment grade securities over a longer time period, our performance has been strong. ROEs for 2004 and 2005 were 27 percent and 26 percent, respectively, and 2006's full year ROE of 17 percent was significantly impacted by the fourth quarter's poor performance. In coming quarters, we expect the ROE will return to a more normal range of 15 percent to 20 percent."

Thrift Portfolio

Net earnings for the thrift portfolio, which consists of single-family residential mortgage loans (whole loans), consumer and subdivision construction loans, and mortgage backed securities (MBS), were $25 million, down 30 percent from the third quarter and 23 percent from one year ago. "Even though we increased our average earning assets in the thrift investment portfolio, our net interest margin declined substantially in the fourth quarter from 2.02 percent both in the third quarter and one year ago," noted Blair Abernathy, Indymac's Chief Investment Officer. "The compression in net interest margin was due primarily to an increased cost of funds for our whole loan and MBS portfolios. Longer term, fixed-rate funding for these portfolios of approximately $1.5 billion at roughly a 2.95 percent cost of funds matured during the quarter and was replaced at a significantly higher funding cost. This has resulted in a more permanent shift in

our net interest margin, such that the 1.64 percent margin realized during the quarter is likely what we can expect going forward. In retrospect, we should have more properly planned for this happening.

"Net earnings for the fourth quarter were also negatively impacted by a GAAP $6.5 million credit-related valuation write-down on HELOC residual securities (noted above) and an increase in the loan loss provision to $9 million from $5 million in the prior quarter and $1.6 million in Q4-05. As a result of the earnings decline, the thrift portfolio produced an ROE of 14 percent, below our expectations, versus 20 percent in the prior quarter and 22 percent one year ago. Going forward, we believe the ROE for this portfolio should be in a range of 15 percent to 20 percent. We are clearly not happy about the fact that the fourth quarter's performance fell below this range, and we will provide updates on steps we are taking to improve performance as the year progresses."

Non-performing Assets and Charge-offs Increase from Historic Low Levels

*Non-performing assets to total assets increased to 63 basis points during the quarter from 51 basis points in the third quarter and 34 basis points in Q4-05. Net charge-offs increased to $7.6 million during the quarter from $1.9 million both in the prior quarter and one year ago. "We have previously noted that the historically low NPAs and charge-offs we have experienced over the last few years were unsustainable, and, indeed, we saw erosion in our credit metrics during the fourth quarter. In light of this, we are increasing our provision for loan losses," commented Scott Keys, Indymac's Chief Financial Officer. "We expect current credit conditions to worsen further in 2007 in connection with the housing market cycle and therefore are planning for significant increases in loan loss provisions and charge-offs in 2007 versus 2006. Nonetheless, we believe that our credit losses will remain manageable inasmuch as 94 percent of our assets consists of low credit risk assets (cash and FHLB stock, investment grade MBS securities, mortgage loans held-for-sale, mortgage loans held-for-investment, MSRs and consumer construction loans). In addition, our $6.5 billion single-family mortgage held-for-investment loan portfolio is of prime credit quality, with original average combined loan-to-value ratios (CLTVs) of 73 percent, current average CLTV ratios estimated to be 61 percent, and an average FICO score of 716."*

Operating Expenses

Total operating expenses of $211 million were up 4 percent over the third quarter and 29 percent year over year. "Operating expenses were driven by continued growth in the Company's three business segments and the continued build-out of the nationwide network of mortgage production centers," continued Keys. "While

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

our ratios of expenses to total loan production, to the loan servicing portfolio and to average earning assets all improved, erosion in our revenue margins led to a worsening of the efficiency ratio to 64 percent versus 58 percent both in the prior quarter and in the fourth quarter of 2005. This ratio is disappointing, and we will be taking a number of steps to remedy this situation in 2007."

Action Plan for 2007 and Future Outlook

In response to the current market environment, the Company has developed an action plan to improve its efficiency and operating performance that includes the following elements:

1. Control over labor costs

-- Continue the hiring freeze on non-revenue generating personnel
-- Freeze base salaries company-wide
-- Continue to employ significant variable compensation tied to revenue and EPS growth, which automatically reduces compensation expense as revenue and EPS decline
-- Increase outsourcing from 9 percent of workforce to 13.5 percent by 2007 year-end

2. Control over non-labor costs - initial goal to cut expenses 5 percent from Q4-06

3. Incubator initiatives

-- Reprioritize Incubator initiatives to ideas with immediate payback opportunities
-- Establish "SWAT" team to help improve existing business execution

"Notwithstanding our plan to improve our overall efficiency and performance, we anticipate that 2007 will be a very challenging year," stated Perry. "The MBA is forecasting a 5 percent decline in industry mortgage originations to $2.4 trillion, following 2006's 17 percent decline. While we expect to continue to capture market share, we also believe that competition will be fierce and the housing market will be challenging. As a result, we believe that in 2007 our revenue margins will remain under pressure and credit quality will likely worsen to more normalized levels. We are working on an updated forecast for 2007, but this is not yet completed to our new, more rigorous standards. At this point we are only comfortable giving broad guidance. With this caveat, we anticipate that our ROE for 2007 will range from 12.5 percent to 17.5 percent, with a base case of 15 percent, equating to EPS of roughly $4.15. As the operating environment for our business becomes clearer and we complete our more rigorous forecasting process, we plan to provide updated guidance during the year. Finally, I want to reiterate

that neither I nor the rest of Indymac's management team are happy with our fourth quarter performance. We are also not pleased with our earnings guidance for 2007, and I can assure you that we will be doing everything possible to improve our results going forward."

\* \* \*

31.     Defendants knew or recklessly disregarded that the January 25, 2007 press release was materially misleading because it failed to fully disclose IndyMac's problems with loan delinquencies and its inadequate loan loss provisions. Nevertheless, this partial disclosure drove IndyMac's share price downward, to close that same day at $31.71, or 7.35% below the previous day's closing price of $40.70 per share.

32.     Finally, on March 1, 2007, the Company issued a press release entitled "IndyMac Issues 2006 Annual Shareholder Letter, Updating 2007 Forecast." The press release stated in part:

PASADENA, Calif.--(BUSINESS WIRE)--March 1, 2007--IndyMac Bancorp, Inc. (NYSE: NDE) ("Indymac(R)" or the "Company"), the holding company for IndyMac Bank, F.S.B. ("Indymac Bank(R)"), today released its annual letter to shareholders from Chairman and CEO Michael W. Perry, that will be contained in the Company's annual report, which will be issued as scheduled at the end of March. The purpose of releasing the letter today is to provide an update on the Company to shareholders in light of the current volatile conditions in the mortgage market. Indymac has also filed a Form 8-K containing the annual shareholder letter with the Securities and Exchange Commission. The Form 8-K is available on Indymac's Website at www.indymacbank.com. The text of the letter is contained below.

Dear Shareholders:

2006 was a challenging year in the mortgage banking industry. Industry loan volumes of $2.5 trillion were 34 percent below 2003's historic high level and 17 percent lower than in 2005. Mortgage banking revenue margins declined further after sharp declines in 2005, and net interest margins continued to compress, as the yield curve inverted with the average spread between the 10-year Treasury yield and the 1-month LIBOR declining from 89 basis points in 2005 to negative

31 basis points in 2006. To cap it off, the housing industry slowed down significantly, increasing loan delinquencies and non-performing assets and driving up credit costs for all mortgage lenders.

Yet, despite these challenges, Indymac again reached new performance heights in 2006, achieving:

-- Record mortgage loan production of $90 billion, a 48 percent increase over 2005;

-- Record mortgage market share of 3.58 percent, a 78 percent gain over the 2.01 percent share we had in 2005;

-- Record net revenues of $1.3 billion, a 22 percent increase over 2005;

-- Record earnings-per-share (EPS) of $4.82, a 9 percent gain;

-- Record growth in total assets, which increased by $8 billion, or 37 percent, to $29.5 billion;

-- Record growth in our portfolio of loans serviced for others, which increased by $55 billion, or 65 percent, to $140 billion;

-- Strong return on equity (ROE) of 19 percent, slightly lower than last year's 21 percent level.

Notwithstanding our solid results for the year in the face of challenging market conditions, our year ended on a disappointing note. Our fourth quarter EPS declined both sequentially and versus the fourth quarter of 2005, and we fell short of EPS expectations for the quarter. Also, our ROE of 14.6 percent for the quarter, while solid, was at the lowest level in 23 quarters. While I am disappointed with how we finished 2006 and with our outlook for 2007, where EPS will likely be down from 2006 given tough conditions in the mortgage market, I believe we will emerge from this difficult mortgage environment a stronger and more competitive company.

We remain fundamentally committed to our hybrid thrift/mortgage banking business model and our strategies inasmuch as we are outperforming most of our mortgage banking and thrift peers, are earning a solid return on our shareholders' capital (at what we hope is the low point of our cyclical business) and believe strongly in the long-term opportunities presented in the housing and mortgage markets. Nonetheless, in our constant drive to improve our business, we have taken a fresh look at our hybrid model and decided to fine tune it in ways we feel

1    will make us stronger.

2    Hybrid Thrift/Mortgage Banking Business Model - Updated for the New Market
3    Reality

4    As you know, our hybrid business model balances our mortgage production and
     servicing businesses with thrift investing. On the mortgage banking side, we
5    generate earnings largely by originating, securitizing and selling loans and
6    securities at a profit and by servicing loans for others. On the thrift side, we
     generate core spread income from our investment portfolio of prime SFR
7    mortgages, home equity loans, consumer and builder construction loans and
8    mortgage-backed securities (MBS). The combination of mortgage banking and
     thrift investing has proven to be a powerful business model for Indymac, and,
9    given our strong execution in the past, we have been able to outperform our peers
     and produce both strong and relatively stable returns on our shareholders' equity.
10

11   An important tool in understanding our strong financial performance has been our
     detailed segment reporting, where we allocate capital to different segments of our
12   business, calculate ROEs for each segment every quarter and then adjust our
     capital allocations according to where we can earn the best returns for our
13   shareholders. In the fourth quarter of 2006, we saw a fairly dramatic decrease in
     the ROE in our thrift segment, mostly caused by net interest margin erosion in our
14   whole loan and MBS portfolios. Of greatest concern to me is that I see this as part
15   of a broader trend, the continuation of which is inevitable. Let me explain.

16   First, there is fierce competition for consumer deposits, particularly as Wall Street
     firms and other non-bank entities have over the years made significant inroads in
17   attracting deposits away from banks and thrifts by paying high rates on money
18   market funds. In addition, consumers, assisted by the Internet and deposit
     insurance, are getting more savvy and efficient with their deposit funds, moving
19   them to the highest yielding options. Both of these factors are driving up deposit
     costs relative to market funding sources and reducing the funding advantage and
20   net interest margins of depository institutions. Second, spreads to Treasury
21   securities on financial assets that can be securitized (home loans and most other
     consumer loan types) continue to tighten given the efficiency of the secondary
22   market, reducing asset yields and further compressing net interest margins for
     depository institutions. While there may be temporary periods where asset spreads
23   widen in the secondary market - such as what we are experiencing as I write this
     letter - the long-term inevitable trend is toward continued increases in market
24   efficiency and generally tighter asset spreads. Third, the regulatory capital
25   requirements for holding these assets (mortgage and home equity loans, in
     particular) generally exceed those of the secondary market.

26

27

28   **BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT**

As a result of the above, we have seen the ROEs we are earning on our whole loan and MBS portfolios decline, and even fall below our cost of capital at times for some assets, such that it does not make economic sense for us to grow these portfolios to the extent that we had previously planned. Frankly, we have also not received the price/earnings multiple increase we had expected from growing our investment portfolio and building more "stable, core" spread income into our overall earnings picture. Accordingly, our capital deployment and profit growth will be more focused in the future on the two broad segments of our mortgage banking business:

-- Mortgage Production - our core business where, as the 9th largest originator and 2nd largest independent mortgage banker in the nation, we have strong focus, industry leading expertise, operational scale and consistently earn very strong ROEs; and

-- Mortgage Servicing - where, with a portfolio of loans serviced for others now exceeding $140 billion, we have achieved strong economies of scale and earn solid ROEs. Importantly, unlike our other business segments, servicing is not subject to the competitive margin pressures and credit risks that come with the housing and mortgage production cycles.

While we will continue to maintain some level of investments in our whole loan and MBS portfolios, going forward, the growth of these portfolios will be based on the extent to which (1) their ROEs exceed our cost of both core and risk-based capital or (2) they are needed to support our core mortgage banking investments in mortgage servicing rights and residual and non-investment grade securities, if their ROEs are below our cost of capital.

These changes in our business model and strategy represent fine-tuning more than a major strategic shift. The new reality of narrowing net interest margins actually favors Indymac from a competitive standpoint in that, unlike many other depository institutions, we already have a relatively high, market-based cost of funds and have learned, through trading assets and loans in the secondary market, how to earn strong overall ROEs despite that fact. Other financial institutions rely on their low cost of funds to achieve the same or lower ROEs as Indymac, and, as their cost of funds advantage erodes, I believe they will struggle to sustain their performance levels. At Indymac, understanding the nuances of the capital requirements for assets both on-balance-sheet and in the secondary market and knowing how to effectively trade assets into the secondary market gives us a competitive advantage that should not be underestimated.

With these adjustments to our business model, the real question is, what is the outlook for Indymac long and short term?

---

**BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT**

Long-term Outlook

Everyone knows that the housing and mortgage industries are cyclical and can produce volatile economic results. But, as I have said many times before, the market for mortgages is huge, and long-term, mortgage lending is a great business with U.S. mortgage debt outstanding growing by eight to 10 percent per year. And over the long-term Indymac has produced great results, with the bottom line being that, over the fourteen years through December 31, 2006 since the current management team has been in place, Indymac has delivered a compounded annual rate of return to its shareholders of 23 percent versus 12 percent for the Dow Jones Industrial Average and 11 percent for the S&P 500. We can accept some short-term earnings volatility with long-term performance like what we have achieved, and in this respect I like to quote Warren Buffet when he says, "Charlie (Munger) and I would much rather earn a lumpy 15 percent over time than a smooth 12 percent."

Over the long run I have confidence in our business model, our strategic plans, our management team and our ability to execute on our plans and adapt as necessary to continue performing for shareholders. In this respect, based on our long-term experience over the housing and mortgage cycles, during the trough periods such as what we are currently experiencing, I would expect Indymac to be able to achieve, roughly speaking, an ROE in the 10 percent to 15 percent range, similar to what traditional thrifts achieve over the long term. When the mortgage and housing markets stabilize, I would expect that Indymac's ROE could improve to the 15 percent to 20 percent level, and during boom times for our business, our ROEs could exceed 20 percent.

Short-Term Game Plan

While we run Indymac with a vision for the long-term, I am acutely aware that we must also deliver results short-term, especially in today's environment, where many shareholders own our stock for relatively brief time periods and, overall, our shares turn over six times per year. Given that reality, here is what we will do to improve performance for our shareholders right now:

1. *Manage our credit risks by being smart and prudent in adjusting our mortgage underwriting guidelines, setting our risk-based pricing, making decisions as to what assets go into our investment portfolio and/or distributing our risk into the secondary market, and executing on best in class loss prevention and loss mitigation practices.* [Emphasis added.]

2. Control our costs with our current hiring freeze on non-revenue-generating personnel, base salary freeze company-wide, significant variable compensation

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

tied to revenue and EPS growth, and goals to significantly increase outsourcing of our workforce by year-end and cut our non-labor expenses from our fourth quarter run rate; in general, get more out of the infrastructure we have built up in the last several years as we continue to grow our business. With respect to the hiring freeze, given our normal employee attrition rate of roughly 20 percent per year, we expect to be able to reduce our administrative headcount and overhead while still being able to stick to our stated goal of avoiding mass layoffs except under the most extreme circumstances. Our estimate is that all these measures combined could produce up to $60 million in pre-tax cost savings annually.

3. Focus our capital expenditures and the activities of our new business incubator and M&A group on investments that have lower execution risk and produce both attractive short- and long-term paybacks. For example, in support of our production growth/market share strategy, we will pursue "make sense" acquisitions of mortgage operations, such as our recently announced purchase of the retail mortgage platform of the New York Mortgage Co., LLC.

4. Continue to profitably grow mortgage production and gain market share by taking advantage of the difficulties experienced by our competitors and aggressively growing our sales force with top producers.

5. Spur on our production growth by having healthy, internal competition within our sales forces, leading to better penetration of our existing wholesale and correspondent customers, both with increased volume of products they currently deliver to us and new volume of products they do not currently deliver to us, i.e., reverse mortgages and certain other specialty products.

6. Support our shareholders by working extremely hard to return to higher levels of profitability. Maintain our dividend at its current level, in all but the most extreme circumstances, which results in a current annual yield in excess of five percent. Explore issuing non-cumulative perpetual preferred stock and repurchasing our common stock to enhance EPS, although this strategy could change based on the market for our preferred stock as well as investment opportunities that present themselves other than buying back our own stock.

Even with these measures, 2007 will likely be a down year for our EPS, although our ROE should still be solid, in a broad range of 10 percent to 15 percent. Factored into this forecast is a continuation of tough conditions for loan originations, credit performance and in the secondary market. Our more detailed internal forecast shows that our ROEs for the early quarters of the year will be at the low end of the range above; however, during the second half of the year, if we execute on our plans as we expect, and with a little luck, our ROEs could be at or even somewhat above the high end of the range. With all of that said, if market

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

conditions deteriorate significantly from what we are forecasting today ... which is always a possibility ... there could be some downside to the above ROE range.

In addition to tough market conditions, mortgage lenders will also be facing scrutiny from Congress and regulators on "non-traditional" mortgage products, so let me say a few words about that.

Non-traditional Mortgage Products - The Current Climate

Our industry has come into some criticism recently, some warranted and some not, over the proliferation of "non-traditional" mortgage products, such as Option ARMs and Interest-Only mortgages, as well as limited documentation underwriting. While these loans do contain more risk for lender and borrower alike, when they are offered by lenders and used by consumers responsibly, they bring great value to both. We believe we are a prudent and responsible lender with these products and also believe that they have been a key contributor to the increase in the homeownership rate in America from 64 percent to 69 percent in the last twelve years. The increase in the homeownership rate alone has allowed six million additional Americans to make the dream of homeownership a reality in the last twelve years, significantly increasing their personal wealth as home values have increased, as well as strengthening communities and stimulating the national and local economies.

Our industry needs to do a much better job of telling the story of the benefits that innovative mortgage products have brought to the country, and later on in this report we address this issue in greater depth, including a number of profiles of customers whom we have helped with our array of mortgage products. Certainly, mortgage foreclosures and credit losses will increase in the current environment, and the percentage increases will look extremely high and get headlines in the press. But, we need to remember that foreclosures and credit losses are increasing off of record and unsustainably low levels and are returning to more normal levels now. As long as we have properly priced for credit risk and prudently distributed the risk into the secondary market - both of which we feel we have largely done, although not perfectly - our credit costs will continue to be manageable. The bottom line is that we need to be more forceful in standing up for ourselves as an industry. For Indymac in particular, we also need to dispel any misperceptions in the market that we are a subprime lender when, in fact, subprime loans make up only roughly 4 percent of our overall production.

Welcome Aboard

As we continue to build the capabilities of our team, I am pleased to welcome Gabrielle E. Greene to the Board of Directors of Indymac Bank. Her experience

on both sides of a public company -- as a chief financial officer and a director, as well as an investment manager -- will bring a broad and valuable perspective to the Bank's Board. Ms. Greene is a General Partner of Rustic Canyon/Fontis Partners, a private equity fund based in Pasadena, California, and also serves on the boards of Bright Horizons, where she serves on the audit committee, and Whole Foods, where she is chairman of the audit committee and a member of the compensation committee.

In Closing ...

The current environment makes this a really good time to step back and take stock of the mortgage banking industry and of Indymac Bank. We know our industry is cyclical. During boom times, almost everyone makes money, and it is very difficult to distinguish good management teams from bad. In fact, my view is that weaker management teams can often outperform stronger teams in terms of short-term earnings during boom times precisely because they are undisciplined, cut corners and loosen controls in order to drive revenue in the door. Over the long term, these same firms can suffer losses and reversals, causing many of them to close their doors, unfortunately tainting the entire mortgage industry.

*Given the robust housing market and highly liquid secondary markets (for even the "riskiest loans") - both of which persisted for years longer than anticipated - and given strong competition in a declining overall mortgage market, Indymac, in order to compete and grow, also loosened its lending standards, though in a much more responsible way.* That we did not do this to the same extent as many other lenders is evidenced by the fact that our mortgage production in 2006 had an average FICO of 701 and average combined loan-to-value (CLTV) ratio of 80 percent as compared to an average FICO of 702 and average CLTV of 76 percent in 2005. *Though we suffered increased credit losses in the fourth quarter even after we began tightening our lending standards early in 2006, these losses in no way threaten the viability of our company.* With the benefit of hindsight, if I had to do it over again, I would not do anything materially different for two important reasons: (1) Indymac's competitive position in the industry has been significantly enhanced for the long-term by the market share we have gained and will hold and grow as a result of our product innovation and reasonable risk-taking, and (2) you don't just lose short-term profits if you do not meet the competitive tactics of your major long-term competitors ... you lose customers and you lose your sales force (to your competitors) ... which would, in my view, have impaired Indymac more than the credit losses we will suffer over the next few years. [Emphasis added.]

However, for many of our competitors in the mortgage and thrift industries who took on too much risk, it is now time to "pay the piper," and now you can clearly

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

see the distinction between the strong and the weak management teams. While there are low barriers to entry in the mortgage business, today's tough environment clearly illustrates that there are many demanding requirements to succeed and survive over the cycles. Long-term success in our business requires competence in many, many areas ... product development; risk-based pricing; marketing and sales management; scaling operations; automation, standardization and outsourcing; interest rate, credit and liquidity risk management; talent recruitment and management; detailed profitability analysis by business segment, product and customer; management accountability systems and capital optimization ... to name a few. Mastering all of these requires discipline and hard work. And given the complexity of the mortgage business, it also helps immensely to have laser-like focus. For Indymac, unlike some of our key competitors which are divisions of much larger companies, our focus on home lending and mortgage banking is undiluted, which I believe is an important and sustainable competitive advantage.

Once again, I'd like to thank all our customers, employees, shareholders and business partners for their continuing support of Indymac. The difficult market environment we are facing - though unpleasant now, particularly in its negative impact on our stock price - will have longer term benefits as it separates the weak from the strong, weeds out some of the more reckless competitors and causes us to get better and better at everything we do. I am confident that we will emerge from this environment in a stronger competitive position than ever before, which makes me very optimistic about our future.

Michael W. Perry
Chairman and Chief Executive Officer

33.     On this news, IndyMac's stock immediately collapsed to close on March 1, 2007 at $32.16 per share, down from $34.33 per share the prior day, on extremely heavy trading volume.

34.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company lacked requisite internal controls, and, as a result, the Company's projections and reported results issued during the Class Period were based upon defective assumptions about loan delinquencies and the Company's loan loss provisions;

(b)     The Company's financial statements were materially misstated due to its failure to maintain adequate loan loss provisions;

(c)     Given the deterioration and the increased volatility in the subprime market, the Company would be forced to increase it loan loss provisions and tighten its underwriting guidelines which would have a direct material negative impact on its loan production going forward; and

(d)     Given the increased volatility in the lending market generally, and the subprime market specifically, the Company's financial projections issued during the Class Period were at a minimum reckless.

### LOSS CAUSATION

35.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

36.     During the Class Period, Plaintiff and the Class purchased or otherwise acquired IndyMac securities at artificially inflated prices and were damaged thereby.  The price of IndyMac common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### COUNT I

### Breach of Fiduciary Duty
### Against All Defendants

37.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

---

38.     Defendants owed a fiduciary duty to the Class, as purchasers and owners of IndyMac stock.

39.     Defendants, by means of their making the foregoing false and misleading statements, breached their fiduciary duty to the Class.

## COUNT II

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

40.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of IndyMac common stock during the Class Period.

43.     Plaintiff and the Class have suffered damages in that, in reliance on the

1   integrity of the market, they paid artificially inflated prices for IndyMac common stock. Plaintiff

2   and the Class would not have purchased IndyMac common stock at the prices they paid, or at all,

3   if they had been aware that the market prices had been artificially and falsely inflated by

4

5   defendants' misleading statements.

6                                    **COUNT II**

7                          **For Violation of §20(a) of the 1934 Act**
                                  **Against All Defendants**
8

9          44.     Plaintiff repeats and realleges each and every allegation contained above as if fully

10  set forth herein.

11         45.     The Individual Defendants acted as controlling persons of IndyMac within the

12  meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their

13  ownership of IndyMac stock, the Individual Defendants had the power and authority to cause

14
    IndyMac to engage in the wrongful conduct complained of herein. IndyMac controlled the
15

16  Individual Defendants and all of its employees. By reason of such conduct, defendants are liable

17  pursuant to §20(a) of the 1934 Act.

18                            **CLASS ACTION ALLEGATIONS**

19         46.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal
20
    Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired IndyMac
21

22  common stock during the Class Period (the "Class"). Excluded from the Class are defendants.

23         47.     The members of the Class are so numerous that joinder of all members is

24  impracticable. The disposition of their claims in a class action will provide substantial benefits to

25
    the parties and the Court. As of February 16, 2007, IndyMac had more than 72 million shares of
26

27

28

stock outstanding, owned by hundreds if not thousands of persons.

48.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of IndyMac's common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

49.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

50.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

51.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.  Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.  Awarding plaintiff and the members of the Class damages, including interest;

C.  Awarding plaintiff's reasonable costs and attorneys' fees; and

D.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2007

LAW OFFICES OF WILLIAM F. SALLE

By: _____
        William F. Salle (#124498)
        425 E. Colorado St., Suite 755
        Glendale, CA 91205
        Telephone:    (818) 543-1900
        Facsimile:     (818) 543-1550

*Attorneys for Plaintiff*

---

BREACH OF FIDUCIARY DUTY AND CLASS ACTION COMPLAINT

# Exhibit HH

IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUL 3 1 2007 ★

LONG ISLAND OFFICE

**CV-07 3152**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — x

ELLIOT GREENBERG, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

vs.

AMERICAN HOME MORTGAGE
INVESTMENT CORP., MICHAEL
STRAUSS and STEPHEN A. HOZIE,

Defendants.

— — — — — — — — — — — — — — — — — — — x

Civil Action No.

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

PLATT, L

BOYLE, M.

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by American Home Mortgage Investment Corp. ("American Home Mortgage" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the securities of American Home Mortgage between July 26, 2006 and July 27, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Elliot Greenberg, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of American Home Mortgage at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant American Home Mortgage is a real estate investment trust (REIT), which engages in the investment and origination of residential mortgage loans in the United States.  The Company is based in Melville, NY.

8.      (a)      Defendant Michael Strauss ("Strauss") served as American Home Mortgage's Chairman, Chief Executive Officer ("CEO") and President during the Class Period.  Defendant Strauss is also a founder of American Home Mortgage.

(b)      Defendant Stephen A. Hozie ("Hozie") served as American Home Mortgage's Chief Financial Officer ("CFO") and Principal Accounting Officer during the Class Period.

(c)      Defendants Strauss and Hozie are collectively referred to herein as the "Individual Defendants."

9.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of American Home Mortgage, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.   Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with American Home Mortgage, each of the Individual Defendants had access to the adverse undisclosed information about American Home Mortgage's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about American Home Mortgage and its business issued or adopted by the Company materially false and misleading.

13.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of American Home Mortgage common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding American Home Mortgage's business, operations, management and the intrinsic value of American Home Mortgage common

- 4 -

stock; and (ii) caused plaintiff and other members of the Class to purchase American Home
Mortgage common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities
of American Home Mortgage during the Class Period, inclusive (the "Class") and who were
damaged thereby.  Excluded from the Class are defendants, the officers and directors of the
Company, at all relevant times, members of their immediate families and their legal representatives,
heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is
impracticable.  Throughout the Class Period, American Home Mortgage common shares were
actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at
this time and can only be ascertained through appropriate discovery, plaintiff believes that there are
hundreds or thousands of members in the proposed Class.  Record owners and other members of the
Class may be identified from records maintained by American Home Mortgage or its transfer agent
and may be notified of the pendency of this action by mail, using the form of notice similar to that
customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members
of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is
complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class
and has retained counsel competent and experienced in class and securities litigation.

- 5 -

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of American Home Mortgage; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.     Defendant American Home Mortgage is a real estate investment trust (REIT), which engages in the investment and origination of residential mortgage loans in the United States.  The Company primarily originates and sells securitized adjustable-rate mortgage loans, as well as engages in the sale of mortgage loans to institutional investors and servicing mortgage loans owned by others.

22.     The Class Period commences on July 26, 2006.  On that date, American Home Mortgage issued a press release announcing its financial results for the second quarter of 2006, the

- 6 -

period ending June 30, 2006.  The Company reported revenues of $276.8 million and income of $72.4 million.  Defendant Strauss commented on the results stating in pertinent part as follows:

> The second quarter of 2006 was highly successful for our company. During the quarter, our portfolio net interest income reached a record $33.9 million, while our production business experienced record originations, record market share, a strong gain on sale margin and improved warehouse income. During the quarter, we continued to execute our strategy of retaining a portion of our loan production for our investment portfolio, by adding $1.2 billion of loans to our portfolio at quarter-end. These loans are carried at cost, and are expected to enhance our future portfolio earnings. We also continued to adhere to our core risk mitigation strategies including targeting a duration-neutral "matched book," and purchasing mortgage insurance to protect against credit losses. Today approximately half of the loans we hold are insured, either through borrower or lender-paid mortgage insurance. In addition to these core risk mitigation strategies, we recently began hedging the value of our mortgage servicing assets against the possibility of declining interest rates.

> Our company is again reaffirming our annual earnings guidance of $4.85 to $5.15 per diluted share. Our earnings guidance is based on, among other factors, annual loan originations of $55 billion to $60 billion. I am very pleased to report that, based on our company's performance and prospects, the Board of Directors has again voted to increase the dividend policy for our common stockholders. The new policy is $1.01 per share per quarter, or $4.04 per share on an annualized basis. The increased dividend is expected to become effective for the dividend expected to be paid in October 2006.

23.     On October 26, 2006, American Home Mortgage issued a press release announcing its financial results for the third quarter of 2006, the period ending September 30, 2006.  The Company reported revenue of $258.9 million and net earnings of $72 million.  Defendant Strauss commented on the results stating in pertinent part as follows:

> I am pleased by our company's results during the third quarter. In particular, earnings per share were strong at $1.36, while dividends and book value per share continued to advance from second quarter levels. Our company's third quarter results were accomplished during a period that was particularly difficult for our industry; a period that included the adverse impacts of an inverted yield curve, falling national housing prices, reduced national loan originations, and servicing write-downs due to lower interest rates. These difficult conditions are reflected in American Home's third quarter results which include a significant mortgage servicing asset write-down, a lower although still constructive gain-on-sale margin, high credit expense for reserving necessitated by sharply higher delinquencies and loan repurchases, and finally, lower warehouse net interest due to a narrower spread between new loan yields and funding yields. These factors were offset in our company's third quarter

results however, by record portfolio net interest income, record loan production and record servicing and ancillary fee income, as well as by lower expenses in our loan production business. In addition, our company did not experience a loss in its mortgage-backed securities portfolio as had been the case in several of the previous quarters, but instead had a net portfolio gain of $3.4 million. I believe our company's strong results in this challenging environment illustrate the underlying earnings power of our businesses.

During the quarter, our company added $906.8 million of newly originated loans to its portfolio of loans held for investment. These loans are carried at their cost, have an unrecognized fair value in excess of cost of $15.5 million, and are projected to yield 7.01% over their estimated life. As investors know, one of our company's core strategies is to grow ongoing portfolio net interest income by increasing our holdings of self-originated loans benefited by a low cost basis.

Based on our third quarter results and our outlook for the fourth quarter, our company is reaffirming its 2006 earnings guidance of $4.85 to $5.15 per share, and its guidance for annual loan originations of $55 billion to $60 billion.

24.     On January 25, 2007, American Home Mortgage issued a press release announcing its financial results for the fourth quarter of 2006, the period ending December 30, 2006. The Company reported revenues of $257.7 million and net earnings of $64.7 million.   Defendant Strauss commented on the results stating in pertinent part as follows:

The fourth quarter was highly successful for our company with earnings of $1.21 per diluted share. During the quarter, we added $1.0 billion of recently originated loans to our portfolio, which are carried at cost. Loan origination volume was a record $15.5 billion due to our company achieving a record market share of 2.48% of national originations. Net interest income was stable while our servicing portfolio produced record revenues. During the quarter, our company did however experience its highest delinquency related charges to date, which reduced our quarterly earnings.

The fourth quarter concluded a very successful year for our company, with earnings per diluted share reaching a record $4.96. By comparison, diluted earnings per share were $3.97 in 2005, $3.74 in 2004, $4.07 in 2003 and $2.65 in 2002*. A key financial goal for our company in 2007 is to continue our multi-year growth trend in earnings per share. During 2006, our company's return on average common equity was 22.7%, which surpassed our target of 20%, and compares favorably to 2005 when our adjusted return on average common equity was 19.7%. Also during 2006 our company originated $58.9 billion of loans compared to $45.3 billion in 2005. Finally, during 2006, our company reached a milestone as, for the first time; its revenues exceeded $1.0 billion.

In this earnings release, our company is providing 2007 earnings guidance of $5.40 to $5.70 per fully diluted share with the earnings per diluted share for each quarter in 2007 projected to be approximately 9% to 15% higher than for the comparable quarter in 2006. Our earnings guidance is based on stable net interest margins applied to a growing portfolio of loans held for investment, loan production of $68 billion to $74 billion, and a reduction in gain on sale margins of approximately 12 basis points. Lower gain on sale margins are expected in part because delinquency losses on loans held for sale, including losses due to repurchases, are projected to continue at high levels throughout 2007. Projections for continued high losses are based on our company's view that while there are signs that housing prices are starting to stabilize, future abatements in foreclosure activity will lag a recovery in the housing market. As a result, our 2007 earnings guidance anticipates a highly stressed credit environment.

Not included in our earnings guidance are potential benefits from new strategies that offer the possibility of higher portfolio income, increased loan production and reduced income tax expense. Our company will keep investors apprised if material benefits from these strategies become likely.

I am very pleased to announce that based on our company's results and prospects, our Board of Directors has voted to increase our company's dividend policy by $0.06 to $1.12 per share per quarter or $4.48 per share on an annualized basis. The new dividend policy is expected to take effect with our April dividend payment. Please note, however, that our company is not obligated to pay dividends until such dividends are declared by our Board of Directors, and our Board of Directors may change our company's dividend policy at any time without prior notice.

25.     On March 6, 2007, American Home Mortgage issued a press release which purported to provide supplemental information on its loan portfolio.  The Company purported to provide a chart detailing certain characteristics of its loan portfolio including product type regarding the FICO credit scores, the loan to value ratios and mortgage insurance for both its holdings and originations.

26.     The statements referenced above in ¶¶22-25 were each materially false and misleading when made as they misrepresented the following material adverse facts which were known to the Defendants or recklessly disregarded by them:

(a)     that the Company was experiencing an increasing level of loan delinquencies which was depressing its earnings;

- 9 -

(b)      that the Company was experiencing increasing difficulties in selling its loans and, therefore, was required to decrease prices, thereby reducing margins and profits; and

(c)      as a result of the foregoing, the Company was overstating its financial results by failing to write-down the value of certain of the loans in its portfolio as these loans had declined substantially in value.

27.      On April 6, 2007, American Home Mortgage issued a press release announcing that it expects lower income in the first quarter and full year 2007 than previously forecasted due to conditions in the secondary mortgage and mortgage-backed securities markets.  Defendant Strauss commented on the announcement stating in pertinent part as follows:

> During March, conditions in the secondary mortgage and mortgage securities markets changed sharply. In particular, these markets were characterized by far few buyers offering materially lower prices, both for loan pools and for "AA", "A", "BBB" and residual mortgage securities. These changes had a significant, adverse impact on our Company's first quarter results, reducing our gain on sale revenue and causing mark-to-market losses in our portfolio. While the market may recover, and while we will attempt to restore our gain on sale margins by raising interest rates charged to consumers, our working assumption must be that current market conditions will persist and that our gain on sale margins will not recover through the balance of the year. Consequently, I am disappointed to report that our Company is lowering its full year earnings guidance and its dividend policy.

The Company also reported that "first quarter results will be adversely affected by lower gain on sale margins.  As March progressed, loan pools offered for sale by the Company received relatively few bids at lower than expected prices.  As a result, those loans originated by the Company in late February and during March earned lower gain on sale revenues than were anticipated" and "first quarter results will also be adversely affected by write-downs of its portfolio of low investment grade and residual securities.  In particular, the Company's approximately $484 million of securities rated "AA", "A" or "BBB" will be written down to account for an unusually large widening in the first quarter of the spread over LIBOR at which these securities trade."  Finally, the Company

reported that it was experiencing "high delinquency related charges due to the Company establishing additional reserves for increases in non-performing loans."

28.     On April 9, 2007, in response to the announcement, the price of American Home Mortgage common stock declined from $25.84 per share to $21.92 per share on extremely heavy trading volume and continued to decline to $19.55 per share on April 10, 2007. Defendants, however, continued to conceal the scope of the problems that the Company was having with its portfolio of subprime loans and was failing to disclose the full extent of its exposure to the subprime market.

29.     On April 30, 2007, American Home Mortgage issued a press release announcing that it had sold 4,000,000 shares at $23.10 per share in a public offering. In connection with the offering, on May 2, 2007, American Home Mortgage filed a prospectus supplement (the "Prospectus") relating to the offering. The Prospectus failed to disclose the full extent of the financial difficulties facing the Company.

30.     On June 28, 2007, American Home Mortgage issued a press release announcing that it will take "substantial charges for credit-related expenses in the second quarter." The Company reported that the increase in losses was related to its practice of extending a three month timely payment warranty that the Company granted to loan buyers who purchased stated income loans. Defendant Strauss commented on the announcement stating in pertinent part as follows:

> Our company's goal is to put the impact from the discontinued products behind us. A benefit of the substantial reserves we are establishing in the second quarter is that the discontinued product's impact on our future financial results is likely to diminish. As we put the impact from the discontinued products behind us, the positive contributions from our portfolio, mortgage origination franchise and loan servicing business will again drive our results. Altogether, the second quarter will be a period of "clean-up" as the impact from the discontinued products continues to wind down.

The Company further revealed that the charges to its second earnings will be "substantial" stating in pertinent part as follows:

> The Company's delinquency-related charges in the second quarter will be substantial. In addition, the Company expects that it will reclassify a portion of its other comprehensive loss. The reclassification will be charged to current quarter earnings, but will reduce other comprehensive loss by a like amount, and consequently will not affect the Company's equity. Altogether, the total amount of loss in the second quarter is expected to be contained. Specifically, the Company expects that its total stockholder's equity will actually be higher at the end of the second quarter compared to the first quarter of 2007.

31.    In response to this announcement, the price of American Home Mortgage stock declined from $20.91 per share to $18.38 per share on extremely heavy trading volume. Yet, Defendants continued to conceal the financial deterioration of the Company and its lack of liquidity.

32.    Starting around July 19, 2007, the price of American Home Mortgage stock began to decline in response to market speculation that the Company was close to losing its financing. American Home Mortgage stock declined from $13.59 per share on July 18, 2007, to $10.63 per share on July 19, 2007. In response to these rumors, American Home Mortgage's spokesperson Mary Feder publicly stated that "No warehouse lines have been pulled."

33.    Then, on July 27, 2007, after the close of the market, American Home Mortgage issued a press release announcing that its Board of Directors had determined to delay paying its dividend stating in pertinent part as follows:

> . . . its Board of Directors has decided to delay payment of its quarterly cash dividend on the Company's common stock and anticipates delaying payment of its quarterly cash dividends on its Series A Cumulative Redeemable Preferred Stock and Series B Cumulative Redeemable Preferred Stock in order to preserve liquidity until it obtains a better understanding of the impact that current market conditions in the mortgage industry and the broader credit market will have on the Company's balance sheet and overall liquidity. The disruption in the credit markets in the past few weeks has been unprecedented in the Company's experience and has caused major write-downs of its loan and security portfolios and consequently has caused significant margin calls with respect to its credit facilities.

34.    In response to this announcement, on July 30, 2007, the NYSE halted trading in American Home Mortgage stock before the market opened.  In pre-market trading, the price of American Home Mortgage stock declined to approximately $6.39 per share from $10.47 per share.

35.    The market for American Home Mortgage's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, American Home Mortgage's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired American Home Mortgage common stock relying upon the integrity of the market price of American Home Mortgage's common stock and market information relating to American Home Mortgage, and have been damaged thereby.

36.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of American Home Mortgage's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about American Home Mortgage's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of American Home Mortgage and its business, prospects and operations, thus

- 13 -

causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

38.     As alleged herein, Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding American Home Mortgage, their control over, and/or receipt and/or modification of American Home Mortgage's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning American Home Mortgage, participated in the fraudulent scheme alleged herein.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

39.     At all relevant times, the market for American Home Mortgage's common stock was an efficient market for the following reasons, among others:

(a)     American Home Mortgage stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, American Home Mortgage filed periodic public reports with the SEC and the NYSE;

- 14 -

(c)      American Home Mortgage regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      American Home Mortgage was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

40.      As a result of the foregoing, the market for American Home Mortgage's common stock promptly digested current information regarding American Home Mortgage from all publicly available sources and reflected such information in American Home Mortgage's stock price. Under these circumstances, all purchasers of American Home Mortgage's common stock during the Class Period suffered similar injury through their purchase of American Home Mortgage's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

41.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking

- 15 -

statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of American Home Mortgage who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

42.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

45.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for American Home Mortgage common stock. Plaintiff and the Class would not have purchased American Home Mortgage common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

46.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of American Home Mortgage common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     The Individual Defendants acted as controlling persons of American Home Mortgage within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of American Home Mortgage, and their ownership of American Home Mortgage stock, the Individual Defendants had the power and authority to cause American Home Mortgage to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

- 17 -

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 31, 2007        LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID ROSENFELD (DR-7564)

               SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158

Attorneys for Plaintiff

I:\American Home Mortgage\Pleadings\CPT073107.doc

- 18 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

**I, ELLIOT GREENBERG,** hereby certify as follows:

1.      I have reviewed the proposed complaint to be filed on my behalf in the United States District Court for the Eastern District of New York, concerning American Home Mortgage Investment Corp. brought under the federal securities laws, and have authorized the filing of same.

2.      Plaintiff did not purchase, or otherwise acquire, the securities of American Home Mortgage Investment Corp. that are the subject of this action, at the direction of plaintiff's counsel, or in order to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, and will provide testimony at a deposition and/or at trial, if necessary.

4.      Plaintiff's transactions in the securities that are the subject of this litigation during the class period set forth in the complaint are, as follows:

a) Plaintiff purchased 1200 shares of American Home Mortgage Investment Corp. common stock on April 17, 2007 at $ 21.90 per share.

b) Plaintiff still holds these shares.

5.      During the three years prior to the date hereof, plaintiff has not filed an action in which he has sought to serve, or has served, as a representative party for a class in any action filed under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond his pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost

wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this _26_ day of July , 2007 at Smithtown,  New York.


**ELLIOT GREENBERG**

Case 2:07-cv-03152-TCP-ETB   Document 1-2   Filed 07/31/07   Page 1 of 1 PageID #: 21

**CV-07 3152**

JS 44   (Rev. 1/04)   **CIVIL COVER SHEET**

BOYLE

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ELLIOT GREENBERG, Individually and On Behalf of All Others Similarly Situated, | AMERICAN HOME MORTGAGE INVESTMENT CORP., MICHAEL STRAUSS and STEPHEN A. HOZIE, |

**(b)** County of Residence of First Listed Plaintiff   Suffolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

LONG ISLAND OFFICE

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Lerach Coughlin, 58 South Service Road, Suite 200, Melville, NY 11747
(631) 367-7100

Attorneys (If Known)

PLATT, J.

BOYLE M.

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|---|

(For Diversity Cases Only)

| | | | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| | | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
10(b) and 20(a) of the Exchange Act [15 U.S.C. Sections 78j(b) and 78t(a)]; Rule 10b-5
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE
DOCKET NUMBER

DATE   July 31, 2007
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

## ARBITRATION CERTIFICATION

I, Samuel H. Rudman _____, counsel for Plaintiffs _____ _____ do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of my knowledge and belief the damages recoverable in the above captioned civil action exceed the sum of $150,000 exclusive of interest and costs.

_____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:
N/A _____

Did the cause arise in Nassau or Suffolk County? Yes _____

If answered yes, please indicate which county. Suffolk _____

County of residence of plaintiff(s)   (1) Suffolk _____
                                       (2) _____
                                       (3) _____

County of residence of defendant(s)   (1) Suffolk _____
                                        (2) _____
                                        (3) _____

**I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.**

Yes___✓___                              No_____

**Are you currently the subject of any disciplinary action(s) in this or any other state or federal court?**

Yes_____ (If yes, please explain)     No___✓___

Please provide your E-MAIL Address and bar code below. Your bar code consists of the initials of your first and last name and the last four digits of your social security number or any other four digit number registered by the attorney with the Clerk of Court.
(This information must be provided pursuant to local rule 11.1(b) of the civil rules).
**ATTORNEY BAR CODE:** SR 7957 _____

**E-MAIL Address:** SRudman@lerachlaw.com; e_file_ny@lerachlaw.com _____

I consent to the use of electronic filing procedures adopted by the Court in Administrative Order No. 97-12, "In re Electronic Filing Procedures(EFP)", and consent to the electronic service of all papers.

Signature: _____

# Exhibit II

Official Form 1 (04/07)

| United States Bankruptcy Court<br>**DISTRICT OF DELAWARE** | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>American Home Mortgage Holdings, Inc. | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more than one,<br>state all):<br>13-4066303 | Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more than<br>one, state all): |
| Street Address of Debtor (No. and Street, City, and State):<br>538 Broadhollow Road<br>Melville, NY                              ZIP CODE   11747 | Street Address of Joint Debtor (No. and Street, City, and State):<br><br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>Suffolk, NY | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br><br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br><br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above): | ZIP CODE |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11<br>U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other | ☐ Chapter 7          ☐ Chapter 15 Petition for<br>☐ Chapter 9              Recognition of a Foreign<br>☒ Chapter 11            Main Proceeding<br>☐ Chapter 12         ☐ Chapter 15 Petition for<br>☐ Chapter 13            Recognition of a Foreign<br>                              Nonmain Proceeding |

| | Tax-Exempt Entity<br>(Check box, if applicable.)<br>☐ Debtor is a tax-exempt organization under<br>Title 26 of the United States Code (the<br>Internal Revenue Code). | Nature of Debts<br>(Check one box.)<br>☐ Debts are primarily consumer    ☒ Debts are<br>debts, defined in 11 U.S.C.          primarily<br>§ 101(8) as "incurred by an          business debts.<br>individual primarily for a<br>personal, family, or house-hold<br>purpose." |
|---|---|---|

| Filing Fee (Check one box.) | Chapter 11 Debtors |
|---|---|
| ☒ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach<br>signed application for the court's consideration certifying that the debtor is unable<br>to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | **Check one box:**<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>**Check if:**<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed<br>to insiders or affiliates) are less than $2,190,000.<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>**Check all applicable boxes:**<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more<br>classes of creditors, in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR COURT<br>USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br><br>☐ Debtor estimates that, after any exempt property is excluded and administrative<br>expenses paid, there will be no funds available for distribution to unsecured creditors. | |

Estimated Number of Creditors*

| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | Over<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Assets*

| ☐ $0 to<br>$10,000 | ☐ $10,000 to<br>$100,000 | ☐ $100,000 to<br>$1 million | ☐ $1 million to<br>$100 million | ☒ More than $100 million |
|---|---|---|---|---|

Estimated Liabilities*

| ☐ $0 to<br>$50,000 | ☐ $50,000 to<br>$100,000 | ☐ $100,000 to<br>$1 million | ☐ $1 million to<br>$100 million | ☒ More than $100 million |
|---|---|---|---|---|

\* The estimated number of creditors, assets and liabilities is on a consolidated basis.

Official Form 1 (04/07)                                                                                      Form B1, Page 2

| **Voluntary Petition** *(This page must be completed and filed in every case.)* | Name of Debtor(s): American Home Mortgage Holdings, Inc. |
|---|---|

**All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet.)

| Location Where Filed: Not Applicable | Case Number: | Date Filed: |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |

**Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet.)

| Name of Debtor: See Attached Schedule 1 | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐  Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br>Signature of Attorney for Debtor(s)        (Date) |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐  Yes, and Exhibit C is attached and made a part of this petition.

☒  No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐  Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐  Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☒  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐  Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐  Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

066585.1001

Official Form 1 (04/07)

Form B1, Page 3

| Voluntary Petition<br>*(This page must be completed and filed in every case.)* | Name of Debtor(s):  American Home Mortgage Holdings, Inc. |
|---|---|

**Signatures**

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br><br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>   Signature of Debtor<br><br>X _____<br>   Signature of Joint Debtor<br><br>   _____<br>   Telephone Number (if not represented by attorney)<br><br>   _____<br>   Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br><br>☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br>   (Signature of Foreign Representative)<br><br>   _____<br>   (Printed Name of Foreign Representative)<br><br>   _____<br>   Date |

| Signature of Attorney | Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|---|
| X *Pauline K. Morgan*<br>   Signature of Attorney for Debtor(s)<br><br>   James L. Patton, Jr., Esq.<br>   Pauline K. Morgan, Esq.<br>   Young Conaway Stargatt & Taylor, LLP<br>   The Brandywine Building<br>   1000 West Street, 17th Floor<br>   Wilmington, Delaware 19801<br>   Telephone (302) 571-6600 and Facsimile (302) 571-1253<br><br>   *8-6-07*<br>   Date | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>   _____<br>   Printed Name and title, if any, of Bankruptcy Petition Preparer |

| Signature of Debtor (Corporation/Partnership) | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X *Michael Strauss*<br>   Signature of Authorized Individual<br><br>   Michael Strauss<br>   Printed Name of Authorized Individual<br><br>   Chief Executive Officer<br>   Title of Authorized Individual<br>   *8/6/07*<br>   Date | Social Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>   Address<br>   _____<br><br>X _____<br><br>   _____<br>   Date<br><br>Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social Security number is provided above.<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156. |

# SCHEDULE 1

Including the debtor in this chapter 11 case, the following affiliated debtors simultaneously have filed voluntary chapter 11 petitions in this Court. Contemporaneously with the filing of these petitions, such entities filed a motion requesting that their chapter 11 cases be consolidated for procedural purposes only and jointly administered.

American Home Mortgage Acceptance, Inc.
American Home Mortgage Corp.
American Home Mortgage Holdings, Inc.
American Home Mortgage Investment Corp.
American Home Mortgage Servicing, Inc.
American Home Mortgage Ventures LLC
Great Oak Abstract Corp.
Homegate Settlement Services, Inc.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| **AMERICAN HOME MORTGAGE HOLDINGS, INC.,** a Delaware corporation, et al. | Case No. 07-[____] (__) |
| Debtors. | Jointly Administered |

## CONSOLIDATED LIST OF CREDITORS HOLDING 40 LARGEST UNSECURED CLAIMS

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, the "Debtors"),[1] filed a voluntary petition in this Court for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. This list of creditors holding the 40 largest unsecured claims (the "Top 40 List") has been prepared on a consolidated basis, from the Debtors' books and records as of August 3, 2007. The Top 40 List was prepared in accordance with rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in the Debtors' chapter 11 cases. The Top 40 List does not include: (1) persons who come within the definition of an "insider" set forth in 11 U.S.C. § 101(31); or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 40 largest unsecured claims. The information presented in the Top 40 List shall not constitute an admission by, nor is it binding on, the Debtors. The information presented herein, including, without limitation (a) the failure of the Debtors to list any claim as contingent, unliquidated, disputed or subject to a setoff or (b) the listing of any claim as unsecured, does not constitute an admission by the Debtors that the secured lenders listed hold any deficiency claims, nor does it constitute a waiver of the Debtors' rights to contest the validity, priority, nature, characterization and/or amount of any claim.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

| Rank | Name of creditor | Telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff[1] | | | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|---|---|---|
| | | | | CONTINGENT | UNLIQUIDATED | DISPUTED | |
| 1 | Deutsche Bank | 31 West 52nd Street 3rd Floor NYC01-0304 New York, NY 10019 Tel: (212) 250-7675 Fax: (212) 797-0521 | Loan Repurchase Request | | X | | Unliquidated |
| 2 | Wilmington Trust Company, as Debenture Trustee | Rodney Square North, 100 North Market Street, Wilmington, Delaware 19890 Telecopy: (302) 636-4140 Telephone: (302) 651-1000 Attention: Corporate Capital Markets - AHM Capital Trust I | Convertible Trust Preferred - AHM Capital Trust I | | X | | Unliquidated |
| 3 | JPMorgan Chase Bank, NA | 194 Wood Avenue South Floor 3 Iselin, NJ 08830 Tel: (732) 452-8781 Fax: (732) 352-7511 | Loan Repurchase Request | | X | | Unliquidated |
| 4 | Countrywide Capital | 20 N. Acoma Blvd. Lake Havasu City, AZ 86403 Tel: (928) 505-1628 Fax: (928) 505-4466 | Loan Repurchase Request | | X | | Unliquidated |
| 5 | Wilmington Trust Company, as Trustee | Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001 Attn: Corporate Capital Markets | Trust Preferred - Baylis Trust III | | X | | Unliquidated |
| 6 | Bank of America, N.A. | 901 Main Street, 66th Fl. Dallas, TX 75202 Tel: (214) 209-9170 Fax: (214) 209-0338 | Loan Repurchase Request | | X | | Unliquidated |
| 7 | JPMorgan Chase Bank, National Association, as Trustee | 600 Travis, 50th Floor Houston, Texas 77019 Attn: Institutional Trust Services - Baylis Trust I | Trust Preferred - Baylis Trust I | | X | | Unliquidated |
| 8 | JPMorgan Chase Bank, National Association, as Trustee | 600 Travis, 50th Floor, Houston, Texas 77019 Attn: Institutional Trust Services - Baylis Trust II | Trust Preferred - Baylis Trust II | | X | | Unliquidated |

---

[1] As noted above, the Debtors reserve their rights to dispute the claims on this schedule on any basis.

| Rank | Name of creditor | Telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | CONTINGENT | UNLIQUIDATED | DISPUTED | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|---|---|---|
| 9 | JPMorgan Chase Bank, National Association, as Trustee | 600 Travis, 50th Floor, Houston, Texas 77019 Attn: Institutional Trust Services - Baylis Trust IV | Trust Preferred - Baylis Trust IV | | X | | Unliquidated |
| 10 | JPMorgan Chase Bank, National Association, as Trustee | 600 Travis, 50th Floor, Houston, Texas 77002, Attn: Baylis Trust V, Madassir Mohamed tel: (713) 216-2826 | Trust Preferred - Baylis Trust V | | X | | Unliquidated |
| 11 | Citigroup | 390 Greenwich Street, 6th Fl. New York, NY 10013 Tel: 212-733-6353 Fax: 212-723-8613 | Loan Repurchase Request | | X | | Unliquidated |
| 12 | Countrywide Capital | 20 N. Acoma Blvd. Lake Havasu City, AZ 86403 Tel: (928) 505-1628 Fax: (928) 505-4466 | Loan Repurchase Request | | X | | Unliquidated |
| 13 | Morgan Stanley | 1585 Broadway New York, NY 10036 Tel: (212) 761-4000 Fax: (212) 507 4622 | Loan Repurchase Request | | X | | Unliquidated |
| 14 | Wells Fargo Bank, N.A., as Trustee | 919 North Market Street Suite 700 Wilmington, Delaware 19801 Attn: Corporate Trust Department - Baylis Trust VIII | Trust Preferred - Baylis Trust VIII | | X | | Unliquidated |
| 15 | SunTrust Asset Funding, LLC | Mail Code 3950 303 Peachtree Street, 23rd Floor Atlanta, Georgia 30308 Attn: Tony D. Atkins Tel: (404) 813-5244 Fax: (404) 813-5000 with a copy to: SunTrust Banks, Inc. 303 Peachtree Street, 36th Floor Atlanta, Georgia 30308 Attn: Woodruff A. Polk Tel: (404) 813-7094 Fax: (404) 581-1637 | Loan Repurchase Request | | X | | Unliquidated |
| 16 | Impac Funding Corporation | 1401 Dove Street, Suite 100, Newport Beach, CA 92660, Attn: Client Administration Tel: (800) 597-4101 Fax: (949) 260-4504 | Loan Repurchase Request | | X | | Unliquidated |

| Rank | Name of creditor | Telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff[1] | | | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|---|---|---|
| | | | | CONTINGENT | UNLIQUIDATED | DISPUTED | |
| 17 | Wilmington Trust Company, as Trustee | Rodney Square North 1100 North Market Street Wilmington, Delaware 19890-0001 Attn:  Corporate Capital Markets | Trust preferred - Baylis Trust VI | | X | | Unliquidated |
| 18 | Bear, Stearns & Co. Inc. | Government Operations 1 Metrotech Center North 7th Floor Brooklyn, New York 11201-3859 Attn: Sr. Managing Director Tel: (212) 272-1203 | Master Repurchase Agreement | | X | | Unliquidated |
| 19 | Bank of America, N.A. | Agency Management Mail Code:  CA5-701-05-19 1455 Market Street, 5th Floor San Francisco, CA 94103 Attention: Anthea Del Bianco   Vice President Telephone No.: (415) 436-2776 Facsimile No.: (415) 503-5101  Bank of America, N.A. Portfolio Management Mail Code:  TX1-492-66-01 901 Main Street, 66th Floor Dallas, TX 75202-3714 Attention: Elizabeth Kurilecz Senior Vice President Telephone No.: (214) 209-0975 Facsimile No.: (214) 209-1027 | Warehouse Facility | | X | | Unliquidated |
| 20 | Citigroup Global Markets Realty Corp | 390 Greenwich Street, 6th Floor New York, New York 10013 Attn: Peter Steinmetz | Loan Repurchase Request | | X | | Unliquidated |

| Rank | Name of creditor | Telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff[1] | | | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|---|---|---|
| | | | | CONTINGENT | UNLIQUIDATED | DISPUTED | |
| 21 | Bank of America, N.A. | Sears Tower 233 South Wacker Drive, Suite 2800 Chicago, IL 60606 Attention: Swap Operations Facsimile No.: 312-453-2787 Bank of America, N.A., 1133 Avenue of the Americas, 17th Floor New York, NY 10036 Attn: Ronald Jost Tel: 646-216-5311 Fax: 646-733-4090 | Swap Counterparty (Commercial Paper Facility) | | X | | Unliquidated |
| 22 | Wilmington Trust Company, as Trustee | Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attn: Corporate Capital Markets | Trust preferred - Baylis Trust VII | | X | | Unliquidated |
| 23 | Wells Fargo | 420 Montgomery Street San Francisco, CA 94104 | Loan Repurchase Request | | X | | Unliquidated |
| 24 | Countrywide Capital | 20 N. Acoma Blvd. Lake Havasu City, AZ 86403 Tel: (928) 505-1628 Fax: (928) 505-4466 | Loan Repurchase Request | | X | | Unliquidated |
| 25 | Nomura Credit & Capital, Inc. | 2 World Financial Center, Building B, 21st Floor, New York, New York 10281, Attn: Dante LaRocca, Managing Director; with a copy to NCCI Legal, 18th Floor Fax: (212) 667-1024 | Loan Repurchase Request | | X | | Unliquidated |

| Rank | Name of creditor | Telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff[1] | | | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|---|---|---|
| | | | | CONTINGENT | UNLIQUIDATED | DISPUTED | |
| 26 | Liquid Funding, Ltd. | Canon's Court 22 Victoria Street Hamilton HM 12 Bermuda Attn: Corporate Secretary With a copy in all cases to: Bear Stearns Bank plc, Investment Manager of Liquid Funding, Ltd., Block 8, Harcourt Centre Charlotte Way Dublin 2, Ireland Attn: Jerome Schneider / Patrick Phelan Tel: (353-1) 402-6358, Fax: (353-1) 402-6308 | Master Repurchase Agreement | | X | | Unliquidated |
| 27 | EMC | 383 Madison Avenue New York, NY Tel: 212) 272-6458 Fax: (212) 272-7382 | Loan Repurchase Request | | X | | Unliquidated |
| 28 | Greenwich Capital Financial Products, Inc. | 600 Steamboat Road Greenwich, Connecticut 06830 Attn: Mortgage Finance With copies to: Greenwich Capital Financial Products, Inc. 600 Steamboat Road Greenwich, Connecticut 06830 Attn: Legal and to: Greenwich Capital Financial Products, Inc., 600 Steamboat Road Tel: (203) 625-2700 | Loan Repurchase Request | | X | | Unliquidated |
| 29 | Lehman Brothers Inc. and Lehman Commercial Paper Inc. | 745 Seventh Avenue 28th Floor New York, New York 10019 Attn: Robert Guglielmo, Senior Vice President Transaction Management Tel: (212) 526-7121 Fax: (212) 526-7672 | Master Repurchase Agreement | | X | | Unliquidated |
| 30 | HSBC Bank | 452 Fifth Avenue, 10th Fl. New York, NY 10018 Tel: (212) 525-5040 Fax: (646) 366-3826 | Loan Repurchase Request | | X | | Unliquidated |

| Rank | Name of creditor | Telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | | | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|---|---|---|
| | | | | CONTINGENT | UNLIQUIDATED | DISPUTED | |
| 31 | UBS | 1251 Avenue of the Americas New York, NY 10019 Tel: (212) 713-3734 Fax: (212) 882-3597 | Loan Repurchase Request | | X | | Unliquidated |
| 32 | Lehman Brothers Special Financing, Inc | c/o Lehman Brothers Transaction Management 745 Seventh Avenue, 28th Floor New York, NY 10019 Attn: Documentation Manager Tel: 212-526-7187 Fax: 212-526-7672 | Derivative Transaction (Swap) | | X | | Unliquidated |
| 33 | FNMA | 3900 Wisconsin Avenue, NW Washington, DC 20016-2892 Tel: (202) 752-7000 | Loan Repurchase Request | | X | | Unliquidated |
| 34 | Washington Mutual Bank, FA | 3200 Southwest Freeway Houston, TX 77027 Tel: (713) 543-6141 Fax: (713) 543-6727 | Loan Repurchase Request | | X | | Unliquidated |
| 35 | Luminent Mtg (Barclays) | Suite 1350 101 California St. San Francisco CA 94111 Tel: (415) 217-4500 | Loan Repurchase Request | | X | | Unliquidated |
| 37 | IndyMac Bank, F.S.B. | 3465 East Foothill Boulevard, Pasadena, California 91107 | Loan Repurchase Request | | X | | Unliquidated |
| 38 | Morgan Stanley Capital Services Inc. | Transaction Management Group 1585 Broadway New York, NY 10036-8293 Attn: Chief Legal Officer Fax: (212) 507 4622 | Derivative Transaction (Swap) | | X | | Unliquidated |
| 39 | Credit Suisse First Boston | Eleven Madison Avenue New York, NY 10010 Tel: (212) 325-2000 Fax : (212) 325-6665 | Loan Repurchase Request | | X | | Unliquidated |
| 40 | GMAC | 600 Galleria Parkway, 15th Fl Atlanta, GA 30339 Tel: (678) 324-2146 Fax: (770) 859-0148 | Loan Repurchase Request | | X | | Unliquidated |

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al. | Case No. 07-[____] (___) |
| Debtors. | Jointly Administered |

### DECLARATION CONCERNING THE DEBTORS' CONSOLIDATED LIST OF CREDITORS HOLDING THE 40 LARGEST UNSECURED CLAIMS

I, Michael Strauss, Chief Executive Officer of American Home Mortgage Holdings, Inc., a Delaware corporation, and the entity named as the debtor in this case, declare under penalty of perjury under the laws of the United States of America that I have reviewed the foregoing Consolidated List of Creditors holding the 40 Largest Unsecured Claims submitted herewith and that the information contained therein is true and correct to the best of my information and belief.

Date: August 6 2007

Michael Strauss
Chief Executive Officer

-3-

**ACTION BY WRITTEN CONSENT**
**OF THE**
**SOLE DIRECTOR**
**OF**
**AMERICAN HOME MORTGAGE HOLDINGS, INC.**

(Adopted by the Sole Director on August 5, 2007)

The undersigned, being the sole director (the "Director") of American Home Mortgage Holdings, Inc. (the "Company"), a Delaware corporation, acting pursuant to applicable law, hereby consents to the adoption of the following recitals and resolutions and to the actions set forth herein as of the date set forth above:

WHEREAS, the Director has reviewed and considered the financial and operational condition of the Company and the Company's business on the date hereof, including the historical performance of the Company, the assets of the Company, the current and long-term liabilities of the Company, the market for the Company's products and services, and mortgage industry and credit market conditions;

WHEREAS, the Director has received, reviewed and considered the recommendations of the senior management of the Company and the Company's legal, financial and other advisors as to the relative risks and benefits of pursuing a bankruptcy proceeding under the provisions of Chapter 11 of Title 11 of the United States Code ("Chapter 11");

NOW, THEREFORE, BE IT RESOLVED that, in the judgment of the Director, it is desirable and in the best interests of the Company, its creditors, stockholders and other interested parties, that a voluntary petition be filed by the Company under the provisions of Chapter 11;

RESOLVED FURTHER that the officers of the Company be, and they hereby are, authorized to execute and file on behalf of the Company all petitions, schedules, lists and other papers or documents, and to take any and all action which they deem necessary or proper to obtain such relief;

RESOLVED FURTHER that the officers of the Company be, and they hereby are, authorized and directed to employ the law firm of Young Conaway Stargatt & Taylor, LLP as general bankruptcy counsel, to the Company to represent and assist the Company in carrying out its duties under Title 11 of the United States Code (the "Bankruptcy Code"), and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Chapter 11 proceeding, and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 case, and to cause to be filed appropriate applications for authority to retain the services of Young Conaway Stargatt & Taylor, LLP;

RESOLVED FURTHER that the officers of the Company be, and they hereby are, authorized and directed to enter into that certain management services agreement between Kroll Zolfo Cooper LLC and the Company, and pursuant thereto and hereto, Stephen F. Cooper

and Kevin Nystrom, of Kroll Zolfo Cooper LLC, be and hereby are, authorized, empowered and directed to represent the Company, as its Chief Restructuring Officer and Director of Restructuring, respectively, in connection with any case commenced by it under the Bankruptcy Code;

RESOLVED FURTHER, that the officers of the Company be, and they hereby are, authorized and directed to employ Milestone Advisors, LLC, as investment banker, with regard to the Chapter 11 proceeding, and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 case, and to cause to be filed an appropriate application for authority to retain the services of Milestone Advisors, LLC;

RESOLVED FURTHER, that the officers of the Company be, and they hereby are, authorized and directed to employ Phoenix Capital, Inc., as investment banker, with regard to the Chapter 11 proceeding, and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 case, and to cause to be filed an appropriate application for authority to retain the services of Phoenix Capital, Inc.;

RESOLVED FURTHER that the officers of the Company be, and they hereby are, authorized and directed to employ any other individual and/or firm as professionals or consultants or financial advisors to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Chapter 11 case, and to cause to be filed an appropriate application for authority to retain the services of such firms;

RESOLVED FURTHER that the officers of the Company be, and they hereby are, authorized and empowered to obtain post-petition financing according to terms negotiated, or to be negotiated, by management of the Company, including under debtor-in-possession credit facilities or relating to the use of cash collateral; and to enter into any guarantees and to pledge and grant liens on its assets as may be contemplated by or required under the terms of such post-petition financing or cash collateral agreements; and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate loan agreements, cash collateral agreements and related ancillary documents;

RESOLVED FURTHER that the officers of the Company be, and they hereby are, authorized and empowered for, in the name of, and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his or her discretion, may deem necessary or advisable in order to carry out the purpose and intent of the foregoing resolutions; and

RESOLVED FURTHER that all of the acts and transactions relating to matters contemplated by the foregoing resolutions of management and the Director of the Company, in the name and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved and ratified.

IN WITNESS WHEREOF, the undersigned, being the sole Director of the Company, has hereto signed his name and adopted the above resolutions as of the above date and hereby directs a fully signed copy of this Action by Written Consent of the Sole Director to be filed with the minutes of proceedings of the Board of Directors of the Company.

Michael Strauss
Sole Director and
Chief Executive Officer

# Exhibit JJ

**Don't Run Out of Money in Retirement**

If you have a $500,000 portfolio, download the guide by *Forbes* columnist Ken Fisher's firm. Even if you're not sure how to start rebuilding your portfolio or who to turn to for help, this must-read guide includes research and analysis you can use right now. Don't miss it!    Click Here to Download Your Guide!    FISHER INVESTMENTS™



Market Scan
# AHM Infected By Subprime Problems
Ruthie Ackerman, 07.26.07, 5:15 PM ET

The tentacles of the subprime mortgage debacle have now reached even further. American Home Mortgage Investment, which specializes in both prime and "Alt-A" loans, which are riskier than prime loans but safer than subprime loans, is laying off 500 employees nationwide Thursday.

The Melville, N.Y.-based company is one of the largest mortgage bankers, with a market capitalization of $577 million and more than 7,000 employees nationwide. In 2006 American Home Mortgage funded $58.9 billion dollars in loans.

A senior staffer at AHM, who only agreed to speak anonymously, told Forbes.com that in their office, which only has 100 employees, 25 positions are being cut. "The company is calling this 'the largest lay-off in AHM company history' and a necessary reaction to market trends," the employee said. "Unless volume increases in the next 60 to 90 days, most feel these lay-offs are only the beginning and additional lay-offs seem inevitable."

On July 11, *Newsday*, a Long Island, N.Y.-based newspaper, reported that American Home had laid off hundreds of workers without notice from their Melville headquarters.

Shares of the company plunged 6.5%, or 74 cents, to $10.65 at the close on Thursday.

American Home Mortgage makes loans to home buyers with less-than-sterling credit histories and/or little or no documentation. American Home sells bundles of these mortgages converted into securities. In the second quarter, the company reported a high number of defaults on loans, which forced it to repurchase some of the loans, leading to huge losses. (See "Roof Caves In For American Home Mortgage")

On June 29, the company reported that defaults on loans would push the company to a second-quarter loss. (See "AHM Plummets On Pulled Guidance") At the time, Chief Executive Michael Strauss said he expected the company's repurchases would trend lower in the third and fourth quarters because it stopped making riskier loans with higher default rates.

Rising default rates on subprime mortgage loans have been causing pain in the markets this year. Recently, Bear Stearns revealed that two hedge funds that invested in subprime mortgage-backed securities were virtually worthless. (See "Bear Scare") Even though American Home isn't a subprime mortgage lender, fallout in the market impacted its business. The week of June 19, a rumor began circulating that Lehman Brothers had yanked the company's credit line, sending the stock tumbling. (See "AHM Plunges On Rumor Credit Line Yanked") Bose George, an analyst at Keefe, Bruyette & Woods, said American Home doesn't receive a credit line from Lehman Brothers and that American Home's Chief Financial Officer Stephen Hozie had also denied the rumor. A Lehman Brothers spokesperson declined to comment.

But the next day it looked like American Home Mortgage was bouncing back when RBC Capital Markets analyst James Ackor put out a research note on June 20 saying the stock had tumbled well below its value. Shares of the company soared 19%, or $2.04, to $12.80 at the close on June 20 after falling 21% to finish at $10.76 the previous day. The stock closed at $13.59 the day before the rumor began circulating. (See "American Home Mortgage Back On Track?")

# Exhibit KK

Print

**FNMA.OB msg # 146335   8/29/2007 3:25:34 AM**
**By: foobarX**

**Ex-American Home Mortgage manager going to prison**

Starting with the little guys...


# Ex-American Home Mortgage manager going to prison

BY DANIEL WAGNER | daniel.wagner@newsday.com
        5:56 PM EDT, August 28, 2007

A former American Home Mortgage branch manager in Alaska who had fled overseas to escape arrest was sentenced Monday to serve more than two years in prison.

The former manager, Kourosh Partow, was also ordered to pay a $50,000 fine and $190,000 in restitution for wire fraud after he falsified documentation to secure "stated income" mortgage loans from Melville-based American Home and Countrywide Financial.

But in a document submitted before the sentencing, his lawyer argued that the highly troubled companies -- American Home now in bankruptcy and Countrywide facing large financial pressures -- had competitive cultures that encouraged "a blind eye mentality."


Judge H. Russel Holland heard the case at U.S. District Court in Anchorage.

Partow was fired from Countrywide in June 2006 after FBI scrutiny of his loans provoked an internal audit. American Home immediately hired him to be a loan officer and branch manager of its Anchorage office, court records show.

After federal authorities executed a search warrant on his American Home office in Oct. 2006, Partow withdrew the equity from his house and sent it oversees, then fled to France and Iran.

But he returned to the United States and on April 20, he pleaded guilty to two counts of wire fraud, one at each bank, in exchange for other charges being dropped.

In the American Home case, Partow, 41, of Chugiak, helped a client refinance his home in 2006. Despite the client having provided accurate information about his income, Partow listed the income as $20,000 per month -- "an amount that significantly overstated \[the client's\] true income," according to Partow's plea agreement.

In the Countrywide case, he admitted to knowingly overstating an applicant's income to qualify the client for a loan in April 2004.

Stated income mortgages, a type Alt-A loan, allow loan officers to list borrowers' incomes on mortgage applications but do not require documentary verification of those figures.

By misstating applicants' financial statuses, Partow enabled them to qualify for loans they might not otherwise have gotten.

The indictment against Partow listed 14 loans or fraudulent applications and charged him with eight counts of wire fraud related to $2.2 million in American Home loans and a $156,000 loan from Countrywide.

In addition to overstating borrowers' incomes, it was alleged that Partow engaged in a scheme to generate paperwork showing falsely that borrowers had made 20-percent down payments on their properties by engaging in "an unwritten side agreement to have the seller repay the borrower the alleged down payment amount."

Such tactics often involve the complicity of an appraiser who overstates the value of the property, mortgage experts said.

A document written by Partow's lawyer said he was compensated "most importantly" by commissions based on branch profitability, and that he "had authority ... to accept loans otherwise not strictly complying with the loan criteria.

The document said he was one of "a fair number" of employees hired by American Home after Countrywide fired them in connection with the FBI probe.

"In order to stay competitive, and increase sales, the companies also encouraged what could be characterized as manipulation," it reads.

An attached Nov. 2006 email purportedly from American Home's senior vice president for product and sales support in the Western Region, reads, "At AHM we pride ourslves on having a loan for virtually any borrowers, regardless of whether or not they have the ability to verify their Income, Assets or Employment history."

Another purported company email, from Oct. 2006, instructs loan officers to "play around with the loan all they want ... as long as it has NOT been released to processing."

There were no court papers available indicating that American Home took any action against Partow. An American Home spokesman would not comment on the case.

A Countrywide spokesman offered a statement released before the sentencing, saying that Countrywide was a victim of Partow's operation and had cooperated with federal officials during the prosecution.

Print

# Exhibit LL

J. Brian McTigue (Cal. Bar No. 87224)
Gregory Y. Porter (D.C. Bar No. 458603)
McTigue & Porter LLP
5301 Wisconsin Ave., N.W., Suite 350
Washington, D.C. 20015
Tel: 202-364-6900
Fax: 202-364-9960
bmctigue@mctiguelaw.com
gporter@mctiguelaw.com

*Attorneys for Plaintiffs Evelyn McCoy and all others similarly situated*

COPY

FILED

2007 APR 24  PM 2:50
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV07-02693 FMC (CFMX)

| | |
|---|---|
| Evelyn McCoy, and all others similarly situated | Case No.: |
| Plaintiffs, | Complaint For: |
| vs. | |
| Plan Committee, Fremont General Corporation, Fremont General Corporation Board of Directors, James A. McIntyre, Louis J. Rampino, Wayne R. Bailey, Thomas W. Hayes, Robert F. Lewis, Russell K. Mayerfeld, Dickinson C. Ross, Patrick E. Lamb, Raymond G. Meyers, Does 1-20 | 1. Violation of §406 of ERISA<br>2. Violation of §404 of ERISA |
| Defendants | |

## COMPLAINT

This action involves two pension plans sponsored by Fremont General Corporation ("Fremont"):  the Fremont General Corporation Employee Stock Ownership Plan ("ESOP") and the Fremont General Corporation and Affiliated Companies Investment Incentive Plan ("Investment Plan").  Plaintiff Evelyn McCoy alleges the following based on information and belief and an investigation by her counsel, which included a review of certain: Forms 5500 ("Form 5500") for the ESOP and Investment Plan (collectively, the "Plans") filed with the United States Department of Labor ("DOL"); Forms 10-K and 11-K filed by Fremont with the Securities and Exchange Commission ("SEC"); and documents describing the Plans provided to Plaintiff.

## I.    NATURE OF THE ACTION

1.    This is a civil enforcement action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.*, and in particular under ERISA §409, 29 U.S.C. §1109, for losses to the Plans as a result of defendants' breaches of fiduciary duty from January 1, 2003 to the present (the "Class Period").

2.    The Plans are retirement plans established and sponsored by Fremont to provide retirement income benefits for Fremont's employees and employees of certain other participating employers (all affiliates of Fremont).

3.    The Plans have lost millions of dollars by investing in Fremont General Corporation Common Stock ("Company Stock").

4.    Plaintiff's claims arise from the failure of the defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans and from the defendants' failure to exercise the required care, skill, prudence and diligence in administering the Plans and investing the assets of the Plans.  Plaintiff alleges that the fiduciaries of the Plans, including the Plan Committee, Fremont, and Fremont's Board of Directors ("Board") violated their fiduciary duties to the Plans under §§404, 405, and 406 of ERISA, 29 U.S.C. §§1104, 1105, and 1106, by, among other things: (1) failing to prudently and loyally manage the assets of the Plans by offering

Company Stock as an investment option for the Plans; (2) causing or allowing the Plans to acquire and hold Common Stock when such investments were imprudent; (3) failing to properly monitor and inform co-fiduciaries, thereby causing or allowing co-fiduciaries to breach their duties in connection with the Plans' investments in Company Stock; and (4) causing or allowing the Investment Plan to acquire Company Stock from Fremont in violation of ERISA's prohibitions on transactions between fiduciaries and employee benefit plans.

## II.   JURISDICTION AND VENUE

5.      ERISA provides for exclusive federal jurisdiction over these claims.  The Plans are "employee benefit plans" within the meaning of §3(3) of ERISA, 29 U.S.C. §1002(3), and Plaintiffs are "participants" within the meaning of §3(7) of ERISA, 29 U.S.C. §1002(7), who are authorized pursuant to §502(a)(2) and (3) of ERISA, 29 U.S.C. §1132(a)(2) and (3) to bring the present action on behalf of the participants and beneficiaries of the Investment Plan to obtain appropriate relief under §§502 and 409 of ERISA, 29 U.S.C. §§1132 and 1109.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

7.      This Court has personal jurisdiction over the Defendants because the Court has subject matter jurisdiction under ERISA.

8.      Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2) because the Plan Committee and Fremont General Corporation are located at 2425 Olympic Blvd., Santa Monica, California.

## III.   PARTIES

### A. Plaintiff.

9.    **Plaintiff Evelyn McCoy ("McCoy").**  McCoy participated in the Investment Plan during the Class Period.  She lives in Meridian, Idaho.  McCoy's account in the Investment Plan was invested in Company Stock During the Class Period.

### B. Defendants.

10.    **Defendant Plan Committee ("Plan Committee")**. The Plan Committee has full and complete power to administer the Plans and also has overall responsibility for selecting the investment options offered by the Plans. The Plan Committee and its members are Named Fiduciaries of the Plans.  The following individual defendants (collectively referred to as "Plan Committee Members") serve on the Plan Committee:

a.    **Louis J. Rampino ("Rampino").** Defendant Rampino is a member of the Plan Committee and Fremont General Corporation Board of Directors ("Board"). He has served as Fremont's President since 1995 and as Fremont's Chief Executive Officer since 2004.  As a member of the Plan Committee, Rampino has full and complete power to administer the Plans and also has overall responsibility for selecting the investment options offered by the Plans.

b.    **Wayne R. Bailey ("Bailey").** Defendant Bailey is a member of the Plan Committee and the Board.  He also serves as Fremont's Executive President and Chief Operating Officer.  As a member of the Plan Committee, Bailey has full and complete power to administer the Plans and also has overall responsibility for selecting the investment options offered by the Plans.

c.    **Patrick E. Lamb ("Lamb").** Defendant Lamb is a member of the Plan Committee.  He also serves as Fremont's Senior Vice President, Treasurer, Chief Financial Officer, and Chief Accounting Officer.  As a member of the Plan Committee, Lamb has full and complete power to administer the Plans and also has overall responsibility for selecting the investment options offered by the Plans.

3

d.     **Raymond G. Meyers ("Meyers")**. Defendant Meyers is a member of the Plan Committee. He also serves as Fremont's Senior Vice President and Chief Administrative Officer. As a member of the Plan Committee, Bailey has full and complete power to administer the Plans and also has overall responsibility for selecting the investment options offered by the Plans.

11.     **Defendant Fremont General Corporation ("Fremont")**. Fremont is the Plan Administrator and a Named Fiduciary for the Plans. It has the sole and exclusive authority to appoint a committee, the Plan Committee, and delegate fiduciary powers and duties to the Plan Committee.

12.     **Defendant Fremont General Corporation Board of Directors ("Board")**. Fremont acts through the Board. Thus, the Board exercises authority to select, monitor, retain, and remove members of the Plan Committee by virtue of its power to appoint the Plan Committee. The following individual defendants (collectively referred to as "Board Members") serve on the Board.

e.     **James A. McIntyre ("McIntyre")**. Defendant McIntyre is Chairman of the Board and has served as Chairman since 1989. From 1989 to 2004, McIntyre also served as the Chief Executive Officer of Fremont. As a member of the Board, McIntrye exercised authority to select, monitor, retain, and remove the members of the Plan Committee by virtue of the Board's power to appoint the Plan Committee.

f.     **Louis J. Rampino ("Rampino")**. Defendant Rampino is a member of the Board. He has served as Fremont's President since 1995 and as Fremont's Chief Executive Officer since 2004. As a member of the Board, Rampino exercised authority to select, monitor, retain, and remove the members of the Plan Committee by virtue of Board's power to appoint the Plan Committee.

g.     **Wayne R. Bailey ("Bailey")**. Defendant Bailey is a member of the Board. He also serves as Fremont's Executive President and Chief Operating Officer. As a member of the Board, Bailey exercised authority to select, monitor, retain, and

4

remove the members of the Plan Committee by virtue of Board's power to appoint the Plan Committee.

h. **Thomas W. Hayes ("Hayes")**. Defendant Hayes is a member of the Board. As a member of the Board, Hayes exercised authority to select, monitor, retain, and remove the members of the Plan Committee by virtue of Board's power to appoint the Plan Committee.

i. **Robert F. Lewis ("Lewis")**. Defendant Lewis is a member of the Board. As a member of the Board, Lewis exercised authority to select, monitor, retain, and remove the members of the Plan Committee by virtue of Board's power to appoint the Plan Committee.

j. **Russell K. Mayerfeld ("Mayerfeld")**. Defendant Mayerfeld is a member of the Board. As a member of the Board, Mayerfeld exercised authority to select, monitor, retain, and remove the members of the Plan Committee by virtue of Board's power to appoint the Plan Committee.

k. **Dickinson C. Ross ("Ross")**. Defendant Ross is a member of the Board. As a member of the Board, Ross exercised authority to select, monitor, retain, and remove the members of the Plan Committee by virtue of Board's power to appoint the Plan Committee.

13.    Defendants McIntyre, Rampino, Bailey, Lamb, and Meyers are the executive officers of Fremont, collectively referred to as "Insider Defendants". Defendants Hayes, Lewis, Mayerfeld and Ross are outside directors, collectively referred to as "Outsider Defendants".

14.    **Defendants DOES 1-20** are fiduciaries of the Plans, whose exact identities will be ascertained through discovery.

5

# IV.   FACTUAL BACKGROUND

A.   **The Plans.**

    1.   ***The Fremont General Corporation and Affiliated Companies Investment Incentive Program.***

15.    The Investment Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Pursuant to ERISA, the relief requested in this action is for the benefit of the Investment Plan.

16.    Fremont is the sponsor, Plan Administrator, and a Named Fiduciary of the Investment Plan.

17.    As Plan Administrator and a Named Fiduciary for the Investment Plan, Fremont has discretion to appoint a Plan Committee to carry out any or all of Fremont's fiduciary duties to the Investment Plan.

18.    Fremont, acting through the Board, has appointed a Plan Committee.

19.    The Plan Committee has full and complete power to administer the Investment Plan and also has overall responsibility for selecting, monitoring, evaluating, and removing the investments offered by the Investment Plan.

20.    The Investment Plan offers several investment options, including the "Company Stock Investment Option," which invests in Company Stock.

21.    Subject to Internal Revenue Service limitations, participants in the Investment Plan are permitted to contribute a percentage of their salary to the Investment Plan.

22.    Fremont also makes matching and discretionary contributions to the Investment Plan on behalf of participants.

23.    Fremont's matching and discretionary contributions were made directly in Company Stock or in cash.  When Fremont contributed cash, the Plan Committee caused the Investment Plan to use the cash to purchase Company Stock from Fremont.

24.    Contributions to the Investment Plan by and on behalf of the participants are held in trust by the Trustee of the Investment Plan, Merrill Lynch Trust Company

("Merrill") and invested by the Trustee in the investment options offered by the Investment Plan.

### 2.  *The Fremont General Corporation ESOP.*

25.  The ESOP is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Pursuant to ERISA, the relief requested in this action is for the benefit of the ESOP.

26.  Fremont is the sponsor, Plan Administrator, and a Named Fiduciary of the ESOP.

27.  As Plan Administrator and Named Fiduciary for the ESOP, Fremont has discretion to appoint a Plan Committee to carry out any or all of Fremont's fiduciary duties to the ESOP.

28.  Fremont, acting through the Board, has appointed a Plan Committee.

29.  The Plan Committee has full and complete power to administer the ESOP and also has overall responsibility for selecting, monitoring, evaluating, and removing the ESOP's investments.

30.  The ESOP invests almost exclusively in Company Stock.

### B.  The Fiduciaries of the Plans Named as Defendants.

31.  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1002(21)(A).

32.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other persons who in fact perform fiduciary functions.  ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (stating that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . ..").

33.  Each of the defendants is a fiduciary to the Plans and owes fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the documents governing the Plans, through their conduct, and under ERISA.

34.     Defendant Fremont is the Administrator of the Plans pursuant to ERISA §3(16)(A), 29 U.S.C. §1002(16)(A), and a Named Fiduciary under ERISA §402(a)(2), 29 U.S.C. §1029(a)(2), and the documents governing the Plans.  Fremont exercised broad responsibility for management and administration of the Plans and, among its other duties, is responsible for overseeing the Plans' investments, policies, and the performance, as well as overseeing other fiduciaries to the Plans, including appointing and monitoring the Plan Committee.

35.     As Plan Administrator, Fremont exercises certain powers for the Plans, including the power to establish a funding policy, select alternative investment funds, receive and review reports on the financial condition of the Plans and on the receipts and disbursements from the Plans, appoint one or more investment managers to manage any or all of the assets of the Plans, and appoint one or more persons to act as a Plan Committee to discharge the duties of the Plan Administrator.

36.     Fremont, acting through its Board, appointed a Plan Committee to discharge its some or all of its duties to the Plans.  The members of the Plan Committee are Named Fiduciaries for the Plans.

37.     The Plan Committee has full and complete power to administer the Plans and also has overall responsibility for selecting the investments available under the Plans.

38.     Defendants McIntyre, Rampino, Bailey, Hayes, Lewis, Mayerfeld, and Ross are Board Members.  The Board and Board Members exercised the authority to select, monitor, retain, and remove the Plan Committee and, accordingly, exercised authority and oversight over the Plan Committee, who reported to the Board and Board Members regarding the Plans.

39.     Defendants Rampino, Bailey, Lamb, and Meyers are Plan Committee Members.  The Plan Committee and Plan Committee Members exercised the authority to select, monitor, and remove the Plans investments, including the discretion and authority to liquidate the Plans' investments in Company Stock and stop new investments by the Plans in Company Stock.

8

**C.    The Defendants Breached Their Fiduciary Duties Of Prudence And Loyalty To The Plans By Causing Or Allowing The Plans To Invest In Company Stock When They Knew Or Should Have Known That Company Stock Was Not A Prudent Investment.**

40.    Fremont is a financial services holding company which is engaged in brokered subprime mortgage lending, commercial real estate construction lending nationwide, and residential loan servicing, primarily through its wholly-owned subsidiary, Fremont Investment & Loan ("FIL").

41.    Some time on or before January 1, 2003, the defendants developed and implemented a plan to engage in unsafe and unsound banking practices through Fremont and FIL in an effort to lift the price of Company Stock.

42.    Under this plan, defendants operated FIL with management whose policies and practices were detrimental to FIL.

43.    Under this plan, defendants operated FIL without effective risk management policies and procedures in place in relation to FIL's primary line of business of brokered subprime mortgage lending.

44.    Under this plan, defendants operated FIL without effective risk management policies and procedures in place in relation to FIL's other primary line of business of commercial real estate construction lending.

45.    Under this plan, defendants operated FIL with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by FIL.

46.    Under this plan, defendants operated FIL without an accurate, rigorous and properly documented Allowance for Loan and Lease Loss Methodology.

47.    Under this plan, defendants operated FIL with a large volume of poor quality loans.

48.    Under this plan, defendants caused FIL to engage in unsatisfactory lending practices.

49.    Under this plan, defendants caused FIL to operate without an adequate strategic plan in relation to the volatility of FIL's business lines and the kind and quality of assets held by FIL.

50.    Under this plan, defendants caused FIL to operate with inadequate capital in relation to the kind and quality of assets held by FIL.

51.    Under this plan, defendants caused FIL to operate in such a manner as to produce low and unsustainable earnings.

52.    Under this plan, defendants caused FIL to operate with inadequate provisions for liquidity in relation to the volatility of FIL's business lines and the kind and quality of assets held by the FIL.

53.    Under this plan, defendants caused FIL to market and extend adjustable-rate mortgage ("ARM") products to subprime borrowers in an unsafe and unsound manner that greatly increased the risk that borrowers will default on the loans or otherwise cause losses to FIL, including ARM products with one or more of the following characteristics:

(i) qualifying borrowers for loans with low initial payments based on an introductory or "start" rate that will expire after an initial period, without an adequate analysis of the borrower's ability to repay the debt at the fully-indexed rate;

(ii) approving borrowers without considering appropriate documentation and/or verification of their income;

(iii) containing product features likely to require frequent refinancing to maintain an affordable monthly payment and/or to avoid foreclosure;

(iv) including substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period;

(v) providing borrowers with inadequate and/or confusing information relative to product choices, material loan terms and product risks, prepayment penalties, and the borrower's obligations for property taxes and insurance;

(vi) approving borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses; and/or (vii) approving loans or "piggyback" loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral.

54.     Under this plan, defendants caused FIL to make mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms.

55.     Under this plan, defendants caused FIL to operate in violation of section 23B of the Federal Reserve Act, 12 U.S.C. §371c-l, made applicable to state nonmember insured institutions by section 18(j)(1) of the Act, 12 U.S.C. §1828(j)(1), in that FIL engaged in transactions with its affiliates on terms and under circumstances that in good faith would not be offered to, or would not apply to, nonaffiliated companies.

56.     Under this plan, defendants caused FIL to operate inconsistently with the FDIC's Interagency Advisory on Mortgage Banking and Interagency Expanded Guidance for Subprime Lending Programs.

57.     By operating in this manner on or before 2003 to the present, FIL (and Fremont) was able to generate and report a large volume of subprime business that it would not have been able to generate and report had defendants operated FIL consistent with sound underwriting, risk management, and lending practices.

58.     As a consequence of causing FIL to operate inconsistent with sound underwriting, risk management, and lending practices, the price of Company Stock increased from the beginning of 2003 until early 2007 when defendants' plan to engage in unsafe and unsound banking practices in an effort to lift the price of Company Stock began to unravel as, predictably, subprime borrowers began to default on loans in large numbers.

59.     As the extent of the consequences of FIL's unsound underwriting, risk management, and lending practices became known, Company Stock declined dramatically, losing approximately fifty percent of its value since January 1, 2007.

60.     Defendants knew or should have known about FIL's unsound underwriting, risk management, and lending practices and the impact of such practices on Company Stock because defendants are all insiders, directors, or senior executives at Fremont as well as fiduciaries for the Plans.

61.     During the Class Period (January 1, 2003 to the present), the Investment Plan and ESOP collectively invested, that is acquired and/or held, in any given year between $150 million and $210 million in Company Stock.

62.     Defendants caused or allowed the Plans to purchase and maintain multi-million dollar investments in Company Stock during the Class Period even though they knew or should have known that Company Stock was an imprudent investment because of FIL's unsound underwriting, risk management, and lending practices.

63.     Although defendants caused or allowed the Plans to acquire millions of dollars in Company Stock during the Class Period at great loss to the Plans, defendants were far more prudent with their own investments in Company Stock. For example, since August 2006, defendant McIntyre (as trustee and fiduciary) of his family trust) has sold over $11 million worth of Company Stock. And defendants Bailey, Lamb, Rampino and Meyers (all Plan Committee Members) during 2007 have sold, respectively, $1.9 million, $571 thousand, $2.4 million, and $635 thousand worth of Company Stock.

64.     By causing or allowing the Plans to purchase and maintain multi-million dollar investments in Company Stock during the Class Period, defendants caused the Plans to lose millions of dollars on the Plans' investments in Company Stock.

12

**D.   The Defendants Breached Their Fiduciary Duties Of Prudence And Loyalty To The Investment Plan By Causing The Investment Plan To Purchase Company Stock Directly From Fremont When Such Purchases Were Prohibited Transactions.**

65.   During the Class Period, defendants caused or allowed the Investment Plan to acquire at least $37 million in Company Stock from Fremont, which acquisitions were not transactions on a national securities exchange.

66.   Fremont, as employer and plan sponsor, is a party in interest under ERISA. Fremont, as Plan Administrator and a Named Fiduciary, is a fiduciary under ERISA.

67.   ERISA prohibits fiduciaries from causing plans to purchase securities issued by the employer or plan sponsor.

68.   By causing the Investment Plan to acquire at least $37 million in Company Stock from Fremont during the Class Period, defendants violated ERISA §406, 29 U.S.C. §1106.

## V.   ERISA'S FIDUCIARY STANDARDS & PROHIBITED TRANSACTIONS

69.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the defendants as fiduciaries of the Plan.   ERISA §404(a), 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and —
>
> (A)   for the exclusive purpose of
>
>> (i)   providing benefits to participants and their
>> beneficiaries; and
>>
>> (ii)   defraying reasonable expenses of administering the
>> plan;
>
> (B)   with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a

like capacity and familiar with such matters would use in the

conduct of an enterprise of like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize

the risk of large losses, unless under the circumstances it is

clearly prudent not to do so; and

(D)    in accordance with the documents and instruments governing

the plan insofar as such documents and instruments are

consistent with the provisions of this title and Title IV.

70.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.
ERISA §405, 29 U.S.C. §1105, states, in relevant part, that:

In addition to any liability which he may have under any other

provision of this part, a fiduciary with respect to a plan shall be

liable for a breach of fiduciary responsibility of another fiduciary

with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to

conceal, an act or omission of such other fiduciary, knowing

such act or omission is a breach; or

(2)    if, by his failure to comply with section 404(a)(1) in the

administration of his specific responsibilities which give rise

to his status as a fiduciary, he has enabled such other

fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary,

unless he makes reasonable efforts under the circumstances to

remedy the breach.

71.    Under ERISA, fiduciaries that exercise discretionary authority or control
over the selection of plan investments and the selection of plan service providers must act
prudently and solely in the interest of participants in the plan when selecting investments.

72.     A fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result, or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(d), 29 U.S.C. §1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by a plan to do so.

73.     Under ERISA, a monitoring fiduciary must ensure that the other fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the other fiduciaries with accurate information in their possession that they know or reasonably should know that the other fiduciaries must have in order to prudently manage the plan and the plan assets.

74.     The general duties of loyalty and prudence imposed by §404 of ERISA are supplemented by a detailed list of transactions that are expressly prohibited by §406 of ERISA, 29 U.S.C. §1106, and are considered "per se" violations because they entail a high potential for abuse. More specifically, section 406 prohibits fiduciaries from purchasing employer stock, using plan assets for the fiduciaries' benefit, and acting for the benefit of another in any transaction involving the plan.  ERISA's prohibited transaction provisions, thus prohibit fiduciaries from causing plans to engage in transactions with the plan sponsor/employer, including causing a plan to invest in employer securities.  Although ERISA provides certain exemptions from prohibited transactions, such exemptions are affirmative defenses.

15

# VI.   CLASS ALLEGATIONS

75.    Representative Plaintiff McCoy bring this action on behalf of a class defined as:

> All participants in the Fremont General Corporation Employee Stock Ownership Plan ("ESOP") and the Fremont General Corporation and Affiliated Companies Investment Incentive Plan ("Investment Plan") (collectively the "Plans").

76.    Class certification is appropriate under Fed.R.Civ.P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

77.    The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.  The Investment Plan has approximately 3,300 participants.  The ESOP has approximately 1,700 participants.  The number of class members is so large that joinder of all its members is impracticable.

78.    Common questions of law and fact include:

A.    Whether defendants were fiduciaries responsible for selecting, evaluating, and monitoring the investments of the Plans, including Company Stock;

B.    Whether Fremont and the Board Members were fiduciaries responsible for appointing, monitoring, and communicating with Plan Committee Members;

C.    Whether defendants caused or allowed the Plans to invest in Company Stock;

D.    Whether defendants knew or should have known that Company Stock was an imprudent investment for the Plans because of Fremont's and FIL's unsound underwriting, risk management, and lending practices defendants;

E.    Whether defendants breached their fiduciary duties to the Plans and engaged in prohibited transactions by causing the Plans to invest in Company Stock;

16

F.      Whether defendants should have liquidated the Plans' investments in Company Stock;

G.      Whether defendants should have stopped new investments in Company Stock during the Class Period;

H.      Whether defendants can prove the affirmative defense that the Plans' investments in Company Stock were exempt from ERISA provisions prohibiting transactions between a plan and the plan sponsor and plan fiduciaries; and

I.      Whether the Plans and participants suffered losses as a result of defendants' fiduciary breaches.

79.     Plaintiff's claims are typical of the claims of the Class. She has no interests that are antagonistic to the claims of the Class. She understands that this matter cannot be settled without the Court's approval. Plaintiff is not aware of another suit pending against defendants arising from the same circumstances.

80.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous representation of the Class. Plaintiff's counsel, McTigue & Porter LLP, are experienced in class action and ERISA litigation. Counsel have agreed to advance the costs of the litigation contingent upon the outcome. Counsel are aware that no fee can be awarded without the Court's approval.

81.     A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. Moreover, the defendants, as fiduciaries of the Plans, were obligated to treat all Class members similarly as Plan participants under written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. Plaintiff is unaware of any difficulty in the management of this action as a class action.

82.     This Class may be certified under Rule 23(b).

A.      23(b)(1). As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.      23(b)(2). This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

C.      23(b)(3). This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

## VII.   CLAIMS FOR RELIEF

## COUNT I

**Breach of Duties of Loyalty and Prudence by Causing the Plans to**

**Invest in Company Stock When Defendants Knew or Should Have Known that**

**Company Stock was an Imprudent Investment.**

**(Violation of §404 of ERISA, 29 U.S.C. §1104 by Defendants)**

83.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

84.   At all relevant times, defendants acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A), by exercising authority and control with respect to the management of the Plans and the Plans' assets.

85.   Defendants, by their actions and omissions in authorizing or causing the Plans to invest in Company Stock when they knew or should have known that Company Stock was an imprudent investment.  Thus, defendants breached their duties of prudence and loyalty to the Plans under ERISA §404(a)(1)(A), (B), 29 U.S.C. §§1104(a)(1)(A), (B).

86.   As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost millions of dollars when the value of Company Stock declined precipitously in 2007.

87.   Pursuant to ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. §1109(a), defendants are liable to restore all losses to the Plans resulting from their breaches of duty.

## COUNT II

### Engaging in Prohibited Transactions by Causing the Plans to

### Acquire Company Stock from Fremont

### (Violation of §406 of ERISA, 29 U.S.C. §1106 by Defendants)

88.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

89.     At all relevant times, defendants acted as fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C.§1002(21)(A), by exercising authority and control with respect to the management of the Plans and the Plans' assets.

90.     Defendants, by their actions and omissions in authorizing or causing the Plans to acquire Company Stock from Fremont caused the Plans to engage in transactions that defendants knew or should have known constituted acquisitions of employer securities, dealing with the Plans' assets for Fremont's and other defendants' benefit, and acting for Fremont in a transaction with the Plans. sales of exchanges of property between the Plans and parties in interest, the furnishing of services by parties in interest to the Plans, and transactions with fiduciaries in violation of §§406(a)(1)(E), and 406(b)(1), (2), 29 U.S.C. §§1106(a)(1)(E), and 29 U.S.C. §§1106(b)(1), (2).

91.     As a direct and proximate result of these prohibited transaction violations, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, invested millions of dollars in Company Stock in violation of ERISA.

92.     Pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2) and 29 U.S.C. §1109(a), defendants are liable to restore all losses to the Plans resulting from defendants' violations of §§406, 29 U.S.C. §§1106.

## COUNT III

**Claim for Relief Against all Defendants for Breach of Co-Fiduciary Duties**

**(Violation of §405 of ERISA, 29 U.S.C. §1105 by defendants)**

93.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

94.     This Count is brought against all defendants.

95.     By virtue of the facts and events alleged herein, defendants to this count, by failing to comply with their specific fiduciary responsibilities under ERISA 404(a)(1), enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of these breaches, participated jointly with the other fiduciaries in their breaches, and failed to make reasonable efforts to remedy the breaches.  Accordingly, the Plans' fiduciaries are each liable for the others' violations pursuant to ERISA §405(a)(2) and (3), 29 U.S.C. §1105(a)(2) and (3).

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     Declare that the defendants, and each of them, have violated ERISA's prohibited transactions provisions and breached their duties under ERISA;

2.     Issue an order certifying a class under Fed. R. Civ. P. 23;

3.     Issue an order compelling defendants to restore all losses suffered by the Plans resulting from the Plans' investments in Company Stock;

4.     Order equitable restitution and other appropriate equitable monetary relief against defendants;

5.     Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to administer the Plans;

6.     Enjoin defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

21

7.     Award Plaintiff her attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

8.     Award such other and further relief as the Court deems equitable and just.


Dated this 23d day of April, 2007


McTigue & Porter LLP


By: _____

J. Brian McTigue (Cal. Bar No. 87224)
Gregory Y. Porter (D.C. Bar No. 458603)
McTigue & Porter LLP
5301 Wisconsin Ave., N.W.
Washington, D.C. 20015
Tel: 202-364-6900
Fax: 202-364-9960
bmctigue@mctiguelaw.com
gporter@mctiguelaw.com

22

# Exhibit MM

FOR THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

AURORA LOAN SERVICES LLC f/k/a AURORA LOAN SERVICES, INC. as Master
Servicer or Loan Administrator and on behalf of STRUCTURED ASSET SECURITIES
CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2006-BC2,
STRUCTURED ASSET SECURITIES CORPORATION MORTGAGE PASS-THROUGH
CERTIFICATES SERIES 2005-S3, STRUCTURED ASSET SECURITIES CORPORATION
MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2005-S4, STRUCTURED ASSET
SECURITIES CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES SERIES
2005-S5, LEHMAN BROTHERS HOLDINGS, INC., and LEHMAN BROTHERS BANK, FSB

        Plaintiff,

v.

FREMONT INVESTMENT & LOAN CORPORATION

        Defendant

---

## COMPLAINT

---

## <u>INTRODUCTION</u>

On March 7, 2007, the Federal Deposit Insurance Corporation ("FDIC") issued a cease

and desist order against the defendant in this case, Fremont Investment & Loan Corporation

("Fremont"), as well as its parent corporations, Fremont General Corporation and Fremont

General Credit Corporation. Fremont consented to the order. The FDIC found Fremont was

operating without effective risk management policies and procedures in place in relation to its

subprime mortgage and commercial real estate lending operations.

The FDIC determined, among other things, that Fremont had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss. The cease and desist order requires Fremont to correct its lending practices, including a requirement that it underwrite future subprime loans with an analysis of the borrower's ability to repay at the fully indexed rate and provide borrowers with clear information about the benefits and risks of the products.

Upon information and belief, the large number of questionable Fremont loans at issue in this case, for which Plaintiffs seek repurchase or damages from Fremont, result from Fremont's inadequate underwriting practices and questionable marketing practices, as cited by the FDIC.

## NATURE OF ACTION

Fremont breached one or more representations and/or warranties made to Lehman Brothers Bank, FSB ("LBB") regarding certain mortgage loans sold by Fremont to LBB, and which were subsequently included in mortgage-backed securitization transactions and deposited into the securitized trusts identified in the caption (collectively "Trusts"). LBB assigned its rights regarding these loans to Lehman Brothers Holdings, Inc. ("LBHI") which, in turn, assigned the loans to the Trusts, including all rights and remedies relating to Fremont's breach of its representations and/or warranties. Consequently, Aurora Loan Services LLC f/k/a Aurora Loan Services, Inc. ("Plaintiff"), as Master Servicer or Loan Administrator of the subject mortgage loans, hereby commences this action to enforce rights and remedies against Fremont.

Certain other mortgage loans sold to LBB by Fremont ultimately proved ineligible for deposit, sale, transfer, and/or assignment to mortgage-backed securitizations, also due to

Fremont's breach one or more representations and/or warranties concerning these loans and, as a result, these loans are currently held by LBB or LBHI. With regard to these loans, Plaintiff as Master Servicer or Loan Administrator of the mortgage loans, hereby commences this action to enforce rights and remedies against Fremont. As Master Servicer or Loan Administrator, Plaintiff has the right to bring this action on behalf of the Trusts, LBB, and LBHI.

## PARTIES

1.       Plaintiff is a Delaware limited liability company with a business address of 10350 Park Meadows Drive, Littleton, Colorado 80124.

2.       Plaintiff is a wholly owned subsidiary of LBB.

3.       LBB is a federal savings bank operating under Federal Stock Charter 6947, which designates Wilmington, Delaware as LBB's home office.

4.       LBB is a wholly owned subsidiary of LBHI.

5.       LBHI is a Delaware corporation with a business address of 745 7th Avenue, New York, N.Y. 10019.

6.       Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2006-BC2 is a New York common law trust.

7.       Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2005-S3 is a New York common law trust.

8.       Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2005-S4 is a New York common law trust.

9.       Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2005-S5 is a New York common law trust.

10.     Fremont is a California company with a business address of 2727 Imperial Highway, Brea, California 92821.

11.     Fremont is authorized to conduct business in Colorado and is subject to personal jurisdiction in Colorado.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper herein pursuant to 28 U.S.C § 1332. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332. Specifically, as set forth elsewhere herein, this case involves numerous mortgage loans, each of which is in excess of $100,000.00. Consequently, the amount in controversy far exceeds $75,000.00. Additionally, pursuant to 28 U.S.C. § 1332(c)(1), this dispute is between citizens of different states as Plaintiff is a citizen of Delaware and Colorado, and Fremont is a citizen of California.

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) and (c).

14.     All conditions precedent to this action on the part of Plaintiff, if any, have been satisfied, waived, are futile or have been prevented by Fremont.

## GENERAL ALLEGATIONS

15.     Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

16.     LBB and LBHI engage in the purchase and sale of mortgage loans.

17.     Fremont engages in mortgage lending, as well as the sale of mortgage loans on the secondary market to investors such as LBB and LBHI.

18.     On or about March 25, 2004, Fremont entered into that certain Flow Mortgage Purchase and Warranties Agreement with LBB ("Agreement").

19.   Fremont sold a number of mortgage loans to LBB under the Agreement, including but not limited to those mortgage loans identified on **Exhibit A**, attached hereto and incorporated herein by reference ("Mortgage Loans").

20.   A majority of the Mortgage Loans have been assigned, sold, and/or transferred into the Trusts, along with attendant rights, remedies, obligations, representations, and/or warranties made by Fremont under the Agreement.

21.   Certain of the Mortgage Loans ultimately proved ineligible for deposit, sale, assignment, and/or transfer to mortgage-backed securitizations due to Fremont's breach of one or more representations and/or warranties concerning those loans and, as a result, those loans are currently held by LBB or LBHI.

22.   Plaintiff is Master Servicer or Loan Administrator of the Mortgage Loans, and is also the authorized agent of the respective trustees of the Trusts, LBB, and LBHI with respect to the Mortgage Loans.

23.   Pursuant to these servicing and/or agency relationships, Plaintiff is exclusively authorized and directed to enforce obligations owed the Trusts, LBB, and/or LBHI, including but not limited to repurchase and/or indemnity obligations owed by Fremont under the Agreement.

24.   Fremont made a number of representations and/or warranties under the Agreement concerning the Mortgage Loans including, without limitation:

      a.   The validity of all Mortgage Loan documentation;

      b.   The accuracy and integrity of all information and documentation regarding borrower identity, income, employment, credit, assets, and liabilities used to originate the Mortgage Loans;

    c. Borrower occupancy of the property securing the Mortgage Loans;

    d. The ownership, nature, condition, and value of the real property securing the respective Mortgage Loans; and

    e. The conformance of the Mortgage Loans with applicable underwriting guidelines and loan program requirements.

25.    Fremont also represented and/or warranted that no error, omission, misrepresentation, negligence, fraud, or similar occurrence took place with respect to the Mortgage Loans on the part of any person involved in the origination of the Mortgage Loans, and that no predatory or deceptive lending practices were used in the origination of the Mortgage Loans.

26.    Fremont acknowledged the Mortgage Loans were subprime loans, and represented and/or warranted that it had no knowledge of circumstances or conditions with respect to the Mortgage Loans, the property securing the Mortgage Loans, or borrower credit that could reasonably be expected to adversely affect the value or marketability of the Mortgage Loans as compared to other mortgage loans in Fremont's portfolio meeting the terms of the Agreement.

27.    After the Mortgage Loans were sold by Fremont, Plaintiff was notified of various issues concerning the Mortgage Loans by certain servicers and/or third parties. Plaintiff conducted further due diligence, which ultimately confirmed that Fremont breached one or more representations and/or warranties under the Agreement concerning the Mortgage Loans, including but not limited to those set forth in Paragraph 24 above.

28.    Fremont was provided with written notice of these breaches.

29.    Pursuant to the Agreement, Fremont is required to repurchase the Mortgage Loans at the Repurchase Price and under the terms and conditions set forth in the Agreement.

30. Pursuant to the Agreement, Fremont is further required to indemnify Plaintiff for all losses sustained as a result of breach by Fremont of any representation and/or warranty concerning the Mortgage Loans.

31. Fremont has refused or otherwise failed to repurchase the Mortgage Loans or, alternatively, to indemnify Plaintiff relating thereto.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract—Damages)**

32. Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

33. The Agreement is a valid contract that is binding upon Fremont.

34. As set forth herein, Fremont has breached the Agreement by, among other things, refusing or otherwise failing to repurchase the Mortgage Loans or meet its indemnity obligations relating to the Mortgage Loans.

35. Fremont's prior and continuing breaches have caused and continue to cause substantial damages recoverable by Aurora under the Agreement.

**SECOND CLAIM FOR RELIEF**
**(Specific Performance—Repurchase)**

36. Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

37. In the alternative, and with respect to those unliquidated Mortgage Loans that may qualify, Plaintiff seeks specific performance.

38. The Agreement is a valid contract that is binding upon Fremont.

39.     As set forth herein, Fremont has breached the Agreement, by, among other things, refusing or otherwise failing to repurchase the Mortgage Loans.

40.     Conversely, LBB substantially performed its obligations under the Agreement.

41.     Fremont is capable of repurchasing the unliquidated Mortgage Loans at issue herein.

42.     Due to the unique and specific nature of mortgage loans intended for securitization and the real property securing the Mortgage Loans, Plaintiff has no adequate remedy at law for redress of Fremont's breaches of the representations and/or warranties concerning the Mortgage Loans under the Agreement.

43.     Plaintiff is therefore entitled to an Order of this Court requiring specific performance by Fremont of its repurchase obligations under the Agreement.

### THIRD CLAIM FOR RELIEF
#### (Unjust Enrichment)

44.     Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

45.     Plaintiff has conferred a benefit on Fremont with the reasonable expectation of receiving the full value thereof.

46.     Fremont was enriched at Plaintiff's expense and the circumstances are such that equity and good conscience require Fremont to return the full value of the benefit to Plaintiff.

### FOURTH CLAIM FOR RELIEF
#### (Declaratory Judgment)

47.     Plaintiff hereby incorporates by reference the allegations set forth above as though fully set forth herein.

48.     The Agreement is a valid contract that is binding upon Fremont.

49. Plaintiff and Fremont are interested parties under the Agreement.

50. There is an actual controversy between Plaintiff and Fremont regarding, among other things, whether: (a) Fremont is required to repurchase the unliquidated Mortgage Loans; and (b) Fremont is required to indemnify Plaintiff for all losses arising from or relating to the Mortgage Loans, including but not limited to all attorneys fees and costs relating thereto.

51. The declaratory judgment or decree of this Court establishing the respective rights and responsibilities of the parties will serve to terminate the uncertainty and/or controversy as to the duties of the parties under the Agreement.

52. Pursuant to FED.R.CIV.P. 57 and 28 U.S.C. § 2201 *et. seq.*, Plaintiff requests an Order of this Court declaring that:

    a. Fremont is required to repurchase immediately from Plaintiff the unliquidated Mortgage Loans as set forth in the Agreement;

    b. Fremont is required to indemnify Plaintiff for all losses arising from or relating to the Mortgage Loans, including but not limited to all attorneys fees and costs relating thereto.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor and against Defendant, as follows:

1. For all damages arising from or relating to Defendant's breach of contract, in an amount to be proved at trial;

2. For a decree of specific performance requiring Defendant to immediately repurchase all unliquidated Mortgage Loans pursuant to the Agreement;

3.      For the imposition of a constructive trust on the full amount of the benefit wrongfully retained by Defendants and an Order of this Court directing that the full value thereof be immediately conveyed to Plaintiff;

4.      For an Order of this Court declaring that:

      a.    Defendant is required to repurchase immediately from Plaintiff the unliquidated Mortgage Loans as set forth in the Agreement;

      b.    Defendant is required to indemnify Plaintiff for all losses arising from or relating to the Mortgage Loans, including but not limited to all attorneys fees and costs relating thereto;

5.      For recoverable interest;

6.      For the costs and expenses of suit incurred by Plaintiff herein, including attorneys fees and costs and expert witness fees; and

7.      For such other relief as this Court deems just and proper.

Respectfully submitted this 18th day of June, 2007.

FOSTER GRAHAM MILSTEIN & CALISHER, LLP

*s/ Daniel K. Calisher*

Daniel K. Calisher
Cynthia Treadwell-Miller
621 Seventeenth Street, 19th Floor
Denver, Colorado 80293
Telephone (303) 333-9810
FAX: (303) 333-9786
E-mail: calisher@fostergraham.com
ctm@fostergraham.com

Attorneys for Plaintiffs

JACOBS CHASE FRICK KLEINKOPF & KELLEY, LLC

*s/ Jeffrey A. Chase*

Jeffrey A. Chase
N. Reid Neureiter
1050 Seventeenth Street, Suite 1500
Denver, Colorado 80265
Telephone (303) 685-4800
FAX: (303) 685-4869
E-mail: jchase@jcfkk.com
meureiter@jcfkk.com

Attorneys for Plaintiffs

## EXHIBIT A
### Mortgage Loans By Loan Number
### Aurora Loan Services LLC v. Fremont Investment & Loan

| | |
|---|---|
| 120713797 | 120705249 |
| 120722822 | 120708201 |
| 120706726 | 120720925 |
| 120706593 | 120705447 |
| 120711056 | 120717764 |
| 120715669 | 120708987 |
| 120715164 | 120709282 |
| 120716535 | 120710694 |
| 120705553 | 120716857 |
| 120716543 | 120713821 |
| 120714936 | 120713730 |
| 120716675 | 120711676 |
| 120721436 | 120719869 |
| 120722434 | 120707013 |
| 120717988 | 120718994 |
| 120710819 | 120715982 |
| 120723259 | 120714373 |
| 120714654 | 120706031 |
| 120715883 | 120720016 |
| 120720677 | 120720685 |
| 120709183 | 120712807 |
| 120723374 | 120714571 |
| 120718341 | 120708367 |
| 120713151 | 120709043 |
| 120723390 | 120715305 |
| 120717780 | 120719703 |
| 120709845 | 120708243 |
| 120719729 | 120705355 |
| 120719810 | 120712815 |
| 120719497 | 120706213 |
| 120723424 | 120723648 |
| 120715024 | 120705595 |
| 120716816 | 120718218 |
| 120711692 | 120705603 |
| 120723242 | 120722681 |
| 120716436 | 120720156 |
| 120705819 | 120708813 |
| 120710983 | 120707781 |
| 120721303 | 120716204 |
| 120707922 | 114904899 |
| 120709258 | 114913379 |
| 120712831 | 116038571 |
| 116041179 | 116141656 |



EXHIBIT

A

≋JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

AURORA LOAN SERVICES LLC, ET AL.

## DEFENDANTS

FREMONT INVESTMENT & LOAN CORPORATION

**(b)** County of Residence of First Listed Plaintiff   Douglas County, CO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Orange County, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  *Daniel K. Calisher*
FOSTER, GRAHAM, MILSTEIN & CALISHER, LLP
621 Seventeenth Street
19th Floor
Denver, CO 80293   *303-333-9810*

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 2  U.S. Government
  Defendant
- ☐ 3  Federal Question
  (U.S. Government Not a Party)
- ☑ 4  Diversity
  (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment
  & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted
  Student Loans
  (Excl. Veterans)
- ☐ 153 Recovery of Overpayment
  of Veteran's Benefits
- ☑ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product
  Liability
- ☐ 320 Assault, Libel &
  Slander
- ☐ 330 Federal Employers'
  Liability
- ☐ 340 Marine
- ☐ 345 Marine Product
  Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle
  Product Liability
- ☐ 360 Other Personal
  Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury -
  Med. Malpractice
- ☐ 365 Personal Injury -
  Product Liability
- ☐ 368 Asbestos Personal
  Injury Product
  Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal
  Property Damage
- ☐ 385 Property Damage
  Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/
  Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities -
  Employment
- ☐ 446 Amer. w/Disabilities -
  Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate
  Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure
  of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational
  Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards
  Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting
  & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc.
  Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal
  28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff
  or Defendant)
- ☐ 871 IRS—Third Party
  26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and
  Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/
  Exchange
- ☐ 875 Customer Challenge
  12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information
  Act
- ☐ 900Appeal of Fee Determination
  Under Equal Access
  to Justice
- ☐ 950 Constitutionality of
  State Statutes

## V. ORIGIN  (Place an "X" in One Box Only)

- ☑ 1 Original
  Proceeding
- ☐ 2 Removed from
  State Court
- ☐ 3 Remanded from
  Appellate Court
- ☐ 4 Reinstated or
  Reopened
- ☐ 5 Transferred from
  another district
  (specify)
- ☐ 6 Multidistrict
  Litigation
- ☐ 7 Appeal to District
  Judge from
  Magistrate
  Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Breach of Contract / Declaratory Judgment

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☐ Yes  ☑ No

DATE
June 18, 2007

SIGNATURE OF ATTORNEY OF RECORD
s/ Daniel K. Calisher

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

```
Court Name: U.S. District Court, Colorad
o
Division: 1
Receipt Number: C0X002147
Cashier ID: sg
Transaction Date: 06/19/2007
Payer Name: FOSTER GRAHAM MILSTEIN
----------------------------------------
CIVIL FILING FEE
 For: FOSTER GRAHAM MILSTEIN
 Amount:       $350.00
----------------------------------------
CREDIT CARD
 Amt Tendered: $350.00
----------------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:    $0.00

07-CV-01284


A fee of $45.00 will be assessed on
any returned check.
```