# Exhibit NN

**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Fitch subprime downgrades hit Barclays, Merrill

Wed, Aug 1 2007

NEW YORK (Reuters) - Subprime bonds sold by Barclays Plc, Merrill Lynch & Co. and Credit Suisse drew the first downgrades among some of the worst performing deals in an unfolding review, Fitch Ratings said on Wednesday.

The ratings company cut $2.4 billion in bonds and affirmed designations on another $20 billion as it started delivering results from an analysis of 170 deals, it said in a statement. The deals acted on on Wednesday were "some of the most poorly performing deals" from the list created on July 12, it said.

Fitch's actions extend a dizzying list of downgrades from rating companies that last month sent subprime bond indexes to record lows and caused seizures in markets for new securities that are dominated by Wall Street firms. While investment banks such as Barclays (BARC.L: Quote, Profile, Research, Stock Buzz) have been instrumental in providing credit for home loans by making bonds, they are now being blamed for lax underwriting standards that are leading to a surge in defaults and a budding credit crunch.

Half of the downgrades were on mortgage bonds issued by Barclays' Structured Asset Backed Receivables (SABR) LLC Trust, Fitch said. Those deals were dominated by loans made by Fremont General Corp. FMT.N and WMC Mortgage, a unit of General Electric Co. (GE.N: Quote, Profile, Research, Stock Buzz)

Fitch, which also affirmed ratings on $6.2 billion in SABR bonds, in a separate statement urged analysts to note that higher-rated subprime securities are still sound. Deals reviewed for Wednesday from Wells Fargo & Co. (WFC.N: Quote, Profile, Research, Stock Buzz) and Goldman Sachs Group Inc. (GS.N: Quote, Profile, Research, Stock Buzz) received only affirmations.

"The fundamental soundness of highly rated securities is evidenced by the ability of these securities to withstand substantially higher loss levels than forecasted," Glenn Costello, co-head of Fitch's residential mortgage bond group, said in a statement.

Reviews follow a move to strengthen criteria for rating mortgages, Fitch said. The changes include the rating company increasing assumptions for default on subprime loans whose monthly payments can surge after an initial period, creating "payment shock" to the homeowner.

In other transactions, Fitch lowered ratings on $448 million of subprime bonds from Merrill Lynch's MER.N First Franklin. The First Franklin deals under review also drew $5.6 billion in affirmations, Fitch said.

Cuts on $395.1 million from Credit Suisse's (CSGN.VX: Quote, Profile, Research, Stock Buzz) Home Equity Asset Trust (HEAT) deals under review compared with $3.28 billion in affirmations, Fitch said. Downgrades and affirmations on Aegis Mortgage Corp.'s subprime deals totaled $312 million and $1 billion, respectively, it said.

The rating company also lowered ratings on $18.3 million in subprime debt sold by Carrington Mortgage Loan Trust as it affirmed $2.58 billion from the same transactions.

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Exhibit OO

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):                    February 7, 2007

# New Century Financial Corporation

(Exact name of registrant as specified in its charter)

| Maryland | 001-32314 | 56-2451736 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

18400 Von Karman Avenue, Suite 1000, Irvine, California                                      92612

(Address of principal executive offices)                                                        (Zip Code)

Registrant's telephone number, including area code:                    (949) 440-7030

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

<u>Top of the Form</u>

**Item 2.02 Results of Operations and Financial Condition.**

On February 7, 2007, the registrant issued a press release containing the discussion of the restatement described in Item 4.02 below and disclosing certain information relating to each of the four quarters of 2006 and the year ended December 31, 2006. A copy of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K. References to the registrant's Web site in the press release do not incorporate by reference the information on the registrant's Web site into this Current Report on Form 8-K and the registrant disclaims any such incorporation by reference.

The press release attached hereto as Exhibit 99.1 and the information contained therein shall not be deemed to be "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that Section. The press release shall not be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressl y set forth by specific reference in such a filing.

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On February 7, 2007, the registrant's Board of Directors concluded, based upon the recommendation of management, that the registrant's previously filed financial statements for the quarters ended March 31, June 30 and September 30, 2006 should be restated to correct errors the registrant discovered in its application of generally accepted accounting principles regarding the registrant's allowance for loan repurchase losses. As a result, the registrant's previously issued consolidated financial statements for these quarters, as well as all earnings-related press releases for those quarters, should no longer be relied upon.

Although the registrant's full review of the legal, accounting and tax impact of the restatements is ongoing, at this time the registrant expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced.

Revised financial statements for the periods referenced above will be included in amended Qua rterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006. The registrant expects to file the amended Quarterly Reports on Form 10-Q as soon as practicable and prior to the filing of the registrant's Annual Report on Form 10-K for the year ended December 31, 2006.

The registrant establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by the registrant due to the potential repurchase of loans resulting from early payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans. When the registrant repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values. During the second and third quarters of 2006, the registrant's accounting p olicies incorrectly applied Statement of Financial Accounting Standards No. 140 – Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities. Specifically, the registrant did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses.

In addition, the registrant's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase requests.

The registrant is evaluating the impact of this matter on its internal control over financial reporting and disclosure controls and procedures for the applicable periods. The registra nt expects to conclude that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006. However, the registrant has taken significant steps to remediate these weaknesses and anticipates remediating them as soon as practicable. A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

The registrant's management and the registrant's Board of Directors and its Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K with KPMG LLP, the registrant's independent registered public accounting firm.

Certain statements contained in this Current Report on Form 8-K may be deemed to be forward-looking statements under federal securities laws and the registrant intends that suc h forward-looking statements be subject to the safe-harbor created thereby. Such forward-looking statements include, but are not limited to: (i) the registrant's expectation that, once restated, its net earnings for each of the three quarters of 2006 will be reduced; (ii) the registrant's expectation that it will file amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006 as soon as practicable; (iii) the registrant's expectation that the errors leading to the restatements constitute material weaknesses in the registrant's internal control over financial reporting for the year ended December 31, 2006; and (iv) the registrant's expectation that it will remediate the material weaknesses in its internal control over financial reporting as soon as practicable. The registrant cautions that these statements are qualified by important factors that could cause actual results to differ materially from those reflected by the forward-l ooking statements. Such factors include, but are not limited to: (i) the outcome of the registrant's full review of the legal, accounting and tax impact of the pending restatements; (ii) the condition of the U.S. economy and financial system; (iii) the interest rate environment; (iv) the effect of increasing

competition in the registrant's sector; (v) the condition of the markets for whole loans and mortgage-backed securities; (vi) the stability of residential property values; (vii) the registrant's ability to comply with the requirements applicable to REITs; (viii) the impact of more vigorous and aggressive enforcement actions by federal or state regulators; (ix) the registrant's ability to grow its loan portfolio and the performance of the loans in the registrant's loan portfolio; (x) the registrant's ability to continue to maintain low loan acquisition costs; (xi) the potential effect of new state or federal laws and regulations; (xii) the registrant's abi lity to maintain adequate credit facilities to finance its business; (xiii) the outcome of litigation or regulatory actions pending against the registrant; (xiv) the registrant's ability to adequately hedge its residual values, cash flows and fair values; (xv) the accuracy of the assumptions regarding the registrant's repurchase allowance and residual valuations, prepayment speeds and loan loss allowance; (xvi) the assumptions underlying the registrant's risk management practices; (xvii) the ability of the servicing platform to maintain high performance standards; and (xviii) the execution of its forward loan sales commitments. Additional information on these and other factors is contained in the registrant's Annual Report on Form 10-K for the year ended December 31, 2005 and the other periodic filings of the registrant with the Securities and Exchange Commission. The registrant assumes no, and hereby disclaims any, obligation to update the forward-looking statements contained in this Current Report on Form 8-K.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

99.1 Press Release dated February 7, 2007, issued by New Century Financial Corporation.

Top of the Form

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

New Century Financial Corporation

*February 7, 2007*

By:   */s/ Brad A. Morrice*

*Name: Brad A. Morrice*
*Title: President and Chief Executive Officer*

**Top of the Form**

Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release dated February 7, 2007, issued by New Century Financial Corporation. |

**EXHIBIT 99.1**

# News Release

<u>**FOR IMMEDIATE RELEASE**</u>

**FOR ADDITIONAL INFORMATION CONTACT:**

| New Century Financial Corporation | Investor Relations | |
|---|---|---|
| 18400 Von Karman, Suite 1000 | Patti Dodge, Executive Vice President | (949) 224-5719 |
| Irvine, CA 92612 | Carrie Marrelli, Vice President | (949) 224-5745 |
| (800) 967-7623 | Amanda Fowler, Assistant Vice President (949) 862-7647 | |
| (949) 440-7030 | | |
| www.ncen.com | **Media Relations** | |
| | Laura Oberhelman, Director | (949) 255-6716 |

## NEW CENTURY FINANCIAL CORPORATION TO RESTATE FINANCIAL STATEMENTS FOR THE QUARTERS ENDED MARCH 31, JUNE 30 AND SEPTEMBER 30, 2006

**Irvine, Calif., February 7, 2007,** New Century Financial Corporation (NYSE: NEW), a real estate investment trust (REIT), today announced that it will restate its consolidated financial results for the quarters ended March 31, June 30 and September 30, 2006 to correct errors the company discovered in its application of generally accepted accounting principles regarding the company's allowance for loan repurchase losses.

The company establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by the company due to the potential repurchase of loans resulting from early-payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans. When the company repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values. During the second and third quarters of 2006, the company's accounting policies incorrectly applied Statement of Financial Accounting Standards No. 140 – Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities. Specifically, the company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses.

In addition, the company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request.

Importantly, the foregoing adjustments are generally non-cash in nature. Moreover, the company had cash and liquidity in excess of $350 million at December 31, 2006.

Although the company's full review of the legal, accounting and tax impact of the restatements is ongoing, at this time the company expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced.

In light of the pending restatements, the company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 and all earnings-related press releases for those periods should no longer be relied upon. The company expects to file amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006 as soon as practicable, with a goal to file by March 1, 2007. The company also expects that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006. However, the company has taken significant steps to remediate these weaknesses and anticipates remediating them as soon as practicable.

The company's fourth quarter and full-year 2006 earnings announcement, originally scheduled for February 8, 2007, has been postponed to an undetermined future date, which will follow the company's filing of its amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006.

### Fourth Quarter 2006 Developments

The increasing industry trend of early-payment defaults and, consequently, loan repurchases intensified in the fourth quarter of 2006. The company continued to observe this increased trend in its early-payment default experience in the fourth quarter, and the volume of repurchased loans and repurchase claims remains high.

In addition, the company currently expects to record a fair value adjustment to its residual interests to reflect revised prepayment, loss and discount rate assumptions with respect to the loans underlying these residual interests, based on indicative market data. While the company is still

determining the magnitude of these adjustments to its fourth quarter 2006 results, the company expects the combined impact of the foregoing to result in a net loss for that period.

**Today's Conference Call and Webcast Information**

The company will host a listen-only conference call today at 3:00 p.m. PST to review this announcement. To listen to the call, dial (800) 573-4840 or (617) 224-4326 and use passcode 20268145. A replay of the call will be available from 8:00 p.m. PST today through 12:00 p.m. PST on February 21, 2007. The replay number is (888) 286-8010 or (617) 801-6888 and the passcode is 57729403. Additionally, the call will be webcast live and archived on the Investor Relations section of the company's Web site at www.ncen.com.

**About New Century Financial Corporation**

Founded in 1995 and headquartered in Irvine, California, New Century Financial Corporation is a real estate investment trust, providing mortgage products to borrowers nationwide through its operating subsidiaries, New Century Mortgage Corporation and Home123 Corporation. The company offers a broad range of mortgage products designed to meet the needs of all borrowers. New Century is committed to serving the communities in which it operates with fair and responsible lending practices. To find out more about New Century, please visit .

### Safe Harbor Regarding Forward-Looking Statements

Certain statements contained in this press release may be deemed to be forward-looking statements under federal securities laws and the company intends that such forward-looking statements be subject to the safe-harbor created thereby. Such forward-looking statements include, but are not limited to: (i) the company's expectation that, once restated, its net earnings for each of the three quarters of 2006 will be reduced; (ii) the company's expectation that it will file amended Quarterly Reports of Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006 as soon as practicable; (iii) the company's expectation that the errors leading to the restatements constitute material weaknesses in the company's internal control over financial reporting for the year ended December 31, 2006; (iv) the company's expectation that it will remediate the material weaknesses in its internal control over financial reporting as soon as practicable; (v) the company's current expectation to record a fair value adjustment to its residual interests to reflect revised prepayment, loss and discount rate assumptions with respect to the loans underlying these residual assets, based on indicative market data; and (vi) the company's expectation that the impact of the increased trend in its early-payment default experience in the fourth quarter and the company's fair value adjustment to its residual interests will result in a net loss for the fourth quarter of 2006. The company cautions that these statements are qualified by important factors that could cause actual results to differ materially from those reflected by the forward-looking statements. Such factors include, but are not limited to: (i) the outcome of the company's full review of the legal, accounting and tax impact of the pending restatements; (ii) the condition of the U.S. economy and financial system; (iii) the interest rate environment; (iv) the effect of increasing competition in the company's sector; (v) the condition of the markets for whole loans and mortgage-backed securities; (vi) the stability of residential property values; (vii) the company's ability to comply with the requirements applicable to REITs; (viii) the impact of more vigorous and aggressive enforcement actions by federal or state regulators; (ix) the company's ability to grow its loan portfolio and the performance of the loans in the company's loan portfolio; (x) the company's ability to continue to maintain low loan acquisition costs; (xi) the potential effect of new state or federal laws and regulations; (xii) the company's ability to maintain adequate credit facilities to finance its business; (xiii) the outcome of litigation or regulatory actions pending against the company; (xiv) the company's ability to adequately hedge its residual values, cash flows and fair values; (xv) the accuracy of the assumptions regarding the company's repurchase allowance and residual valuations, prepayment speeds and loan loss allowance; (xvi) the assumptions underlying the company's risk management practices; (xvii) the ability of the servicing platform to maintain high performance standards; and (xviii) the execution of its forward loan sales commitments. Additional information on these and other factors is contained in the company's Annual Report on Form 10-K for the year ended December 31, 2005 and the other periodic filings of the company with the Securities and Exchange Commission. The company assumes no, and hereby disclaims any, obligation to update the forward-looking statements contained in this press release.

# # #

# Exhibit PP

1  LIONEL Z. GLANCY
2  PETER A. BINKOW
   MICHAEL GOLDBERG
3  GLANCY BINKOW & GOLDBERG LLP
4  1801 Avenue of the Stars, #311
   Los Angeles, CA 90067
5  Telephone:   (310) 201-9150
6  Facsimile:   (310) 201-9160
7  E-mail:      info@glancylaw.com

8  NANCY KABOOLIAN
9  ABBEY SPANIER RODD ABRAMS & PARADIS, LLP
   212 East 39th Street
10 New York, New York 10016
11 Telephone:   (212) 889-3700
   Facsimile:   (212) 684-5191
12 E-mail:      nkaboolian@abbeyspanier.com
13
14 Attorneys for Plaintiff Avi Gold
   [Additional Counsel on Signature Page]
15
16          **UNITED STATES DISTRICT COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
17

18
19 AVI GOLD, Individually                    CIVIL ACTION
   and on Behalf of All Others Similarly
20 Situated,                                 CASE NUMBER _____
21              Plaintiff,                   CLASS ACTION COMPLAINT
22                                           FOR VIOLATION OF FEDERAL
23        vs.                                SECURITIES LAWS
24 BRAD A. MORRICE, TAJ S. BINDRA,
25 ROBERT K. COLE, PATTI M. DODGE,
26 NEW CENTURY FINANCIAL CORP.,
27              Defendants.                  JURY TRIAL DEMANDED
28

                          1

1    Plaintiff, by and through his attorneys, alleges the following upon
2  information and belief, except as to those allegations concerning Plaintiff, which
3  are alleged upon personal knowledge.  Plaintiff's information and belief are based
4  upon, among other things, his counsel's investigation, which includes without
5  limitation: (a) review and analysis of regulatory filings made by New Century
6  Financial Corporation ("New Century Financial" or the "Company") with the
7  United States Securities and Exchange Commission ("SEC"); (b) review and
8  analysis of securities analysts' reports concerning; (c) review and analysis of press
9  releases and media reports issued by and disseminated by New Century Financial;
10  and (d) review of other publicly available information concerning New Century
11  Financial.

12    1.    This is a class action against New Century Financial and certain of its
13  officers and directors for violation of the federal securities laws.  Plaintiff brings
14  this action on behalf of himself and all other persons or entities, except for
15  Defendants and certain of their related parties as described below, who purchased
16  New Century Financial securities (the "Class") during the period May 4, 2006
17  through February 7, 2007, inclusive (the "Class Period").

18                    **JURISDICTION AND VENUE**

19    2.    This Court has jurisdiction over the subject matter of this action
20  pursuant to 28 U.S.C. §§ 1331, and 1367, and Section 27 of the Securities
21  Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa).

22    3.    This action arises under Sections 10(b) and 20(a) of the Exchange Act
23  (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b)
24  (17 C.F.R. § 240.10b-5).

25    4.    Venue is proper in this District pursuant to Section 27 of the
26  Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  Substantial
27  acts in furtherance of the alleged fraud and/or its effects have occurred within this
28  District, and the Company maintains its principal executive offices in this District.

2

1      5.    In connection with the acts and omissions alleged in this Complaint,

2 Defendants, directly or indirectly, used the means and instrumentalities of

3 interstate commerce, including, but not limited to, the mails, interstate telephone

4 communications, and the facilities of the national securities markets.

5 **PARTIES**

6      6.    Plaintiff Avi Gold purchased New Century Financial common stock

7 during the Class Period, as set forth in the certification attached hereto.

8      7.    Defendant New Century Financial was founded in 1995 and

9 headquartered in Irvine, California.  New Century Financial is a real estate

10 investment trust (REIT) and one of the nation's premier mortgage finance

11 companies, providing mortgage products to borrowers nationwide through its

12 operating subsidiaries, New Century Mortgage Corporation and Home123

13 Corporation. The company offers a broad range of mortgage products designed to

14 meet the needs of all borrowers

15      8.    Brad A. Morrice was at all times relevant President and Chief

16 Executive Officer and Director of New Century Financial.

17      9.    Defendant Taj S. Bindra, Executive Vice President and Chief

18 Financial Officer of New Century Financial.

19      10.    Defendant Robert K. Cole was at all times relevant Chairman of the

20 Board from December 1995 through December 2006 of New Century Financial.

21      11.    Defendant Patti M Dodge was the Company's Chief Financial Officer

22 until August 2006.

23      12.    By virtue of their high level positions with the Company, defendants

24 directly participated in the management of the Company, and were directly

25 involved in the day-to-day operations of the Company at the highest levels, and

26 was privy to confidential proprietary information concerning the Company and its

27 business, operations, products, growth, financial statements, and financial

28 condition, as alleged herein.  Defendants were involved in drafting, producing,

3

1    reviewing and/or disseminating the false and misleading statements and
2    information alleged herein, were aware or deliberately disregarded that the false
3    and misleading statements were being issued regarding the Company, and
4    approved or ratified these statements in violation of the federal securities laws.

5          13.    As officers and directors and controlling persons of a publicly held
6    company whose common stock was, and is, registered with the SEC pursuant to
7    the Exchange Act, traded on the New York Stock Exchange, and governed by the
8    provisions of the federal securities laws, the Defendants had a duty to disseminate
9    promptly accurate and truthful information with respect to the Company's financial
10   condition and performance, growth, operations, financial statements, business,
11   products, markets, management, earnings, and present and future business
12   prospects, and to correct any previously issued statements that had become
13   materially misleading or untrue, so that the market price of the Company's
14   common stock would be based upon truthful and accurate information.
15   Defendant's misrepresentations and omissions during the Class Period violated
16   these specific requirements and obligations.

17         14.    Defendants participated in the drafting, preparation and/or approval of
18   the various public, shareholder and investor reports and other communications
19   complained of herein, and were aware of, or deliberately disregarded, the
20   misstatements contained therein and omissions therefrom, and were aware of their
21   materially false and misleading nature.  Defendants had access to the adverse,
22   undisclosed information about the Company's operations, the financial condition
23   and performance of the Company as particularized herein and knew (or
24   deliberately disregarded) that these adverse facts rendered the positive
25   representations made by or about New Century Financial and its business issued or
26   adopted by the Company materially false and misleading.

27         15.    Defendants were able to and did control the content of the various
28   SEC filings, press releases and other public statements pertaining to the Company

1    during the Class Period.  Defendants were provided with copies of the documents
2    alleged herein to be misleading prior to or shortly after their issuance and/or had
3    the ability and/or opportunity to prevent their issuance or cause them to be
4    corrected.  Accordingly, Defendants are responsible for the accuracy of the public
5    reports and releases detailed herein and are therefore primarily liable for the
6    representations contained therein.

7        16.    Defendants are liable as a participant in a wrongful scheme and course
8    of business that operated as a fraud or deceit on those who purchased or otherwise
9    acquired New Century Financial common stock during the Class Period by
10   disseminating materially false and misleading statements and/or concealing
11   material adverse facts.  The scheme deceived the investing public regarding New
12   Century Financial business, operations, and the intrinsic value of the Company's
13   common stock, and caused plaintiff and other members of the Class to purchase
14   New Century Financial common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17       17.    Plaintiff brings this as a class action pursuant to Federal Rule of Civil
     Procedure 23(a) and (b)(3) on behalf of all persons who purchased New Century
18   Financial securities during the Class Period.   Excluded from the Class are
19   Defendants, officers and directors of the Company, members of the immediate
20   families of the Defendant New Century Financial and their legal representatives,
21   heirs, successors or assigns and any entity in which any he has or has had a
22   controlling interest.

23       18.    This action is properly maintainable as a class action because:

24           a.    the members of the proposed Class in this action are dispersed
25   throughout the United States and are so numerous that joinder of all Class
26   members is impracticable. While the exact number of Class members is unknown
27   to Plaintiff at this time and can only be ascertained through appropriate discovery,
28   Plaintiff believes that Class members number in the thousands.  Millions of New

1  Century Financial shares were traded publicly on the New York Stock Exchange
2  under the symbol "NEW".  As of October 31, 2006 had 55,470,607 shares of
3  common stock outstanding.

4          b.      Plaintiff's claims are typical of those of all members of the
5  Class because all have been similarly affected by Defendants' actionable conduct
6  in violation of federal securities laws as alleged herein;

7          c.      Plaintiff will fairly and adequately protect the interests of the
8  Class and has retained counsel competent and experienced in class action
9  litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class
10 that Plaintiff seeks to represent;

11         d.      A class action is superior to other available methods for the fair
12 and efficient adjudication of the claims asserted herein because joinder of all
13 members is impracticable.   Furthermore, because the damages suffered by
14 individual members of the Class may be relatively small, the expense and burden
15 of individual litigation make it virtually impossible for Class members to redress
16 the wrongs done to them.  The likelihood of individual Class members prosecuting
17 separate claims is remote;

18         e.      Plaintiff anticipates no unusual difficulties in the management
19 of this action as a class action; and

20         f.      the questions of law and fact common to the members of the
21 Class predominates over any questions affecting individual members of the Class.

22         Among the questions of law and fact common to the Class are:

23                 i.      whether Defendants' acts and/or omissions as alleged
24 herein violated the federal securities laws;

25                 ii.     whether the Company's Class Period public statements
26 and filings misrepresented and/or omitted material facts;

27                 iii.    whether Defendants acted with knowledge or with
28 reckless disregard for the truth in misrepresenting and/or omitting material facts;

6

1             iv.     whether Defendants participated in and pursued the

2 common course of conduct complained of herein;

3             v.     whether the market price of New Century Financial

4 securities was inflated artificially as a result of Defendants' material

5 misrepresentations and/or omissions during the Class Period; and

6             vi.     to what extent the members of the Class have sustained

7 damages and the proper measure of damages.

8 <u>**SUBSTANTIVE ALLEGATIONS COMMON TO ALL COUNTS**</u>

9     19.     On April 7, 2006 New Century Financial announced total loan

10 production for the first quarter 2006 and provided the date for its first quarter 2006

11 results announcement. The press release stated in part as follows:

12     We are off to a strong start this year with $13.4 billion in total loan

13     production for the first quarter of 2006. We are particularly pleased to

14     have achieved a 31 percent increase in total loan production over the

15     first quarter of 2005, with approximately 14 percent coming from

16     organic growth in our non- prime division. While the weighted

17     average coupon on our non-prime product decreased modestly to 8.4

18     percent for March 2006 compared with the previous month, we are on

19     track to meet our profit margin target due in part to tighter credit

20     spreads and lower loan acquisition costs," said Robert K. Cole,

21     Chairman of the Board and Chief Executive Officer. "We are pleased

22     to see signs of a more favorable secondary market for our loans, as we

23     have successfully entered into forward-sale commitments through

24     June 2006 with gain-on-sale executions above 102.

25

26     20.     On May 4, 2006, New Century Financial reported its financial

27 results for the three months ended March 31, 2006. The May 4, 2006 press

28 release stated in part as follows:

First Quarter 2006 Highlights

Earnings-per-share (EPS) of $1.79

REIT taxable income(1) of $1.78 per share fully covered the corresponding dividend of $1.75 per share

After-tax return on equity(2) was 19.5 percent

Securitized $1.7 billion of mortgage loans at the REIT

Total loan production was $13.4 billion in the first quarter 2006 and $4.7 billion in April 2006

Maintained non-prime loan acquisition costs (LAC) at 1.66 percent

Reaffirms 2006 dividend guidance of $7.30 per share

Financial Results

"We achieved strong first quarter 2006 results highlighted by 21 percent growth in EPS, a 17 percent increase in REIT taxable income, and 31 percent growth in mortgage loan production compared with the same period last year," said Robert K. Cole, Chairman and Chief Executive Officer. "We are also pleased to have maintained low loan acquisition costs, achieved our targeted net operating margin range for the quarter, and added mortgage loans to our REIT portfolio, which will contribute to our ability to pay our projected dividend of $7.30 per share for 2006."  The company reported net earnings of $103.7 million, or $1.79 per share, for the first quarter of 2006, compared with $84.8 million, or $1.48 per share, for the same period in 2005. The year-over-year increase in net earnings was primarily attributable to the growth in mortgage loan production volume and greater contributions to net earnings from the company's REIT portfolio.

Mortgage Loan Portfolios

During the first quarter of 2006, the company completed two securitizations structured as financings totaling $1.7 billion in mortgage loans at the REIT, including one securitization consisting solely of $0.3 billion of second lien collateral. Substantially all of the collateral in the $0.3 billion securitization represents second mortgage loans originated in connection with the company's 80/20-mortgage product. "We believe the securitization of second trust deeds allowed us to capture the full economic value of that particular pool of loans," said Kevin M. Cloyd, President of NC Capital Corporation, the company's secondary marketing subsidiary. "The remaining $1.4 billion of mortgage loans securitized was representative of our core non-prime mortgage loan production and received favorable credit enhancement from rating agencies as a result of lower loss coverage requirements."

At March 31, 2006, the balance of the REIT mortgage loan portfolio was $14.1 billion and the balance of the taxable REIT subsidiary (TRS) mortgage loan portfolio was $2.1 billion. The allowance for losses on loans held for investment was $186.0 million and $23.8 million for the REIT and TRS portfolios, respectively, representing 1.32 percent and 1.14 percent of the unpaid principal balance of the respective portfolios. This compares with 1.23 percent and 1.22 percent of the unpaid principal balance of the respective portfolios at December 31, 2005. Delinquency rates as of March 31, 2006 and actual losses to date in the company's REIT and TRS portfolios continue to be significantly lower than historical experience. The company's 60-plus day delinquency rates as of March 31, 2006 were 4.46 percent at the REIT and 4.78 percent at the TRS. While actual

losses to date have been significantly lower than the company's expectations, the company continues to build its allowances for loan losses based on various factors, which include seasoning of the portfolios, as well as overall economic and market conditions.

Mortgage Loan Production by Channel – Non-Prime, Prime and Alt-A The company originates and purchases mortgage loans through two channels -- Wholesale and Retail. The Wholesale channel originates and purchases mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its Account Executives. The company's Retail channel originates mortgage loans directly through its 240 branch offices and its central telemarketing unit, as well as through relationships that are referred or solicited through builders and realtors.

Total Mortgage Loan Production

Total mortgage loan production for the first quarter of 2006 was $13.4 billion, a 31 percent increase over the same period a year ago. "Our key objectives this year include maximizing the capabilities of the prime and Alt-A platform we acquired in 2005 for future growth and utilizing that acquisition as a catalyst for expanding the mortgage products we offer through each of our delivery channels," said Brad A. Morrice, Vice Chairman, President and Chief Operating Officer. "This quarter's mortgage loan production results were enhanced by $1.9 billion in prime and Alt-A originations and we expect to see even stronger results as we continue the expansion of our product lines across all channels."

Total mortgage loan production for April 2006 was approximately $4.7 billion, or $0.235 billion in average daily volume, including $4.0 billion of Wholesale mortgage loan production and $0.7 billion of

10

Retail mortgage loan production. This compares with $4.5 billion, or $0.214 in average daily volume, for April 2005. The weighted average coupon for non-prime production in April 2006 was 8.5 percent.

"Earlier this week, we announced that Anthony T. (Tony) Meola has joined the company as Executive Vice President, Loan Production. Tony will be responsible for managing and expanding our production franchise, broadening our product menu and increasing productivity. He brings with him a breadth and depth of knowledge of the mortgage industry and a passion for constant improvement. We look forward to his contribution to our continued growth and success," said Mr. Morrice.

Wholesale Channel

In the first quarter of 2006, the company originated $11.4 billion in loans through its Wholesale channel, representing a 25 percent increase over the first quarter of 2005. "The growth in Wholesale mortgage loan production was the result of the superior efforts of our top-tier Account Executives. As a result, I'm proud to report that our Wholesale business ranked as the #1 non-prime wholesale lender and #4 wholesale lender in the overall mortgage market in 2005," said Mr. Morrice.

In February 2006, the company purchased Access Lending Corporation's platform that provides warehouse lines of credit to middle-market residential-mortgage bankers. "This acquisition enables us to offer warehouse lending services to our Wholesale customers. We are excited about entering this growing market," said Mr. Cloyd.

Retail Channel

11

The company's Retail channel originated approximately $2.0 billion in loans in the first quarter of 2006, compared with $1.2 billion in the year ago quarter. The 75 percent increase in Retail mortgage loan production was primarily the result of the addition of the origination platform that the company acquired from RBC Mortgage in September 2005.

TRS Operating Results -- Non-Prime Gain-on-Sale

In the first quarter of 2006, the company sold $11.2 billion of non-prime loans at a gain-on-sale of 1.67 percent. Gain-on-sale decreased four basis points from 1.71 percent for the fourth quarter of 2005 as a result of loans sold in the first quarter of 2006 pursuant to forward-sale commitments entered into during the fourth quarter of 2005, when the secondary market was very weak. However, gain-on-sale progressively improved during each of the months in the first quarter of 2006. Continuing this trend, the company expects non-prime gain-on-sale to improve in future quarters of 2006 based on stronger secondary market demand for its product and forward-sale commitments extending into the third quarter of 2006.

LAC

First quarter 2006 LAC of 1.66 percent was effectively unchanged compared with the fourth quarter of 2005 despite the seasonal decrease in mortgage loan production volume. The operating expense component of LAC increased nine basis points and was offset by an eight basis point decrease in the points and fees component. "We are particularly pleased that we were able to maintain our loan acquisition costs at this low level given the decrease in mortgage loan production that typically occurs in the first quarter of the year," said Patti M. Dodge, Executive Vice President and Chief Financial Officer.

Net Operating Margin

"Our net operating margin was 50 basis points for the first quarter of 2006, which was in-line with our previously announced guidance range. Given our forward-sale commitments and focus on maintaining low loan acquisition costs, we expect our net operating margin will improve in the second quarter of 2006 to a range of 60 to 75 basis points," said Ms. Dodge.

TRS Operating Results -- Prime and Alt-A

In the first quarter of 2006, the company closed $2.0 billion in loans through the prime and Alt-A mortgage loan origination platform and acted as a broker for an additional $0.3 billion to third parties. The results from this platform were a $0.8 million loss for the quarter, which is a significant improvement over the $4.3 million loss in the previous quarter. "We are pleased to see such progress as we fully integrate this mortgage loan origination platform and we continue to believe this business is well positioned to be accretive to EPS in 2006," continued Mr. Morrice.

The company has provided the gain-on-sale, LAC and net operating margin of these operations in tables set forth later in this press release.

2006 Outlook

"Our strategic objectives for 2006 include achieving consistently strong operating performance in both our REIT and TRS, broadening the mortgage products and services available through each of our delivery channels, and lowering costs while increasing productivity," said Mr. Morrice. "We are already making great progress toward achieving each of these objectives.

21.    On May 10, 2006, New Century Financial filed with the SEC its Form 10-Q for the first quarter ending March 31, 2006. Defendants Cole, Morrice and

1  Dodge each signed certifications pursuant to Securities Exchange Act Rule 13A –
2  14 and 15D – 14 Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of
3  2002, and Certification Pursuant to 18 U.S.C Section 1350, falsely certifying that
4  they reviewed the Form 10-Q; that the report did not contain any untrue statements
5  of material fact; and that the financial statements fairly presented in all material
6  respects the financial condition, results or operations and cash flows of the
7  Company

8        22.    The Company's press release and Form 10-Q for the first quarter
9  ended March 31, 2006 was materially false and misleading because New Century
10 Financial did not properly account for some of the home loans it had to buy back.
11 Like many mortgage lenders, New Century Financial does not keep its loans; it
12 sells the loans to banks and investors. The deals normally have clauses allowing
13 investors to force New Century Financial to buy back a loan if the borrower misses
14 an early payment. Defendants knew but failed to properly account for the home
15 loans the Company had to buy back.  Defendants knew that more investors would
16 sell back loans because loan repurchases surged throughout 2006 amid payment
17 defaults

18       23.    On July 6, 2006, New Century Financial announced that defendant
19 Morrice had transitioned to the role of Chief Executive Officer effective July 1,
20 2006 and will continue to serve as Vice Chairman and President of the company.
21 New Century announced this transition in February 2006. Defendant Morrice
22 succeeds defendant Cole, who will continue to serve the company as Chairman of
23 the Board of Directors.

24       24.    On July 10, 2006, New Century announced second quarter 2006 total
25 loan production of $16.2 billion, representing a 21 percent increase over the same
26 period a year ago. The July 10, 2006 press release stated in part as follows:

27            June 2006 total loan production of $6.0 billion increased 9 percent
28            compared with May 2006 and brought second quarter total loan

14

production to $16.2 billion," said Brad A. Morrice, Vice Chairman, President and Chief Executive Officer, who transitioned into this new role on July 1, 2006. "The weighted average coupon for our June non-prime production was 8.4 percent, which reflects an increased amount of higher credit grade non-prime production. Additionally, we have raised the coupon on our non-prime loans by 15 basis points over the past few weeks.

We expect that our continued cost reductions and enhanced secondary marketing execution during the second quarter have improved our non-prime net operating margin over the first quarter of 2006. As such, we expect our non-prime net operating margin to be within the recently increased guidance range of 75 basis points to 85 basis points for the second quarter of 2006," concluded Mr. Morrice.

25.     On August 3, 2006, New Century Financial reported results for the three and six months ended June 30, 2006.

Second Quarter 2006 Results and Highlights

Earnings-per-share (EPS) of $1.81

REIT taxable income(1) per share of $1.40

Total mortgage loan production of $16.2 billion; total loan production for July 2006 of approximately $5.3 billion

Non-prime net operating margin increased to 1.01 percent

Non-prime loan acquisition costs (LAC) decreased to 1.51 percent

Prime/Alt-A platform achieved profitability

After-tax return on equity(2) was 19.8 percent

Board declared third quarter dividend of $1.85 per share

Reaffirmed 2006 dividend guidance of $7.30 per share

1  Chief Financial Officer Patti M. Dodge to transition to newly created
2  executive role when successor is in place
3  "Our second quarter results are evidence of the strength and stability
4  of our franchise," said Brad A. Morrice, President and Chief
5  Executive Officer. "We achieved the second highest quarterly loan
6  production volume in our history, while substantially improving our
7  operating margin over the first quarter in a challenging environment.
8  As a result, our second quarter net earnings were $105.5 million, or
9  $1.81 per share, an 11 percent increase in net earnings compared with
10 the second quarter of 2005. These results are particularly impressive
11 considering that we only sold or securitized 82 percent of the loans we
12 originated in the second quarter, increasing loans held for sale by $3.0
13 billion. These loans are covered by forward sales commitments with
14 premiums in excess of 102, so we expect to realize the related
15 earnings in the third quarter."

16 Mortgage Loan Portfolios

17 During the second quarter of 2006, the company completed $1.7
18 billion in securitizations structured as financings at the REIT level,
19 including the company's first Alt-A loan securitization of $0.5 billion
20 and a $1.2 billion securitization of non-prime product. "The Alt-A
21 transaction enhanced our secondary market execution and diversified
22 our REIT portfolio of mortgage loans with a new asset class," said
23 Kevin M. Cloyd, President of NC Capital Corporation, the company's
24 secondary marketing subsidiary.

25 At June 30, 2006, the balance of the mortgage loan portfolio was
26 $16.0 billion. The allowance for losses on loans held for investment
27 was $209.9 million, representing 1.31 percent of the unpaid principal
28 balance of the portfolio. This compares with 0.79 percent of the

16

unpaid principal balance of the portfolio at June 30, 2005 and 1.30 percent of the portfolio at March 31, 2006. Delinquency rates as of June 30, 2006 in the company's portfolio continue to be significantly lower than historical experience. The company's 60-plus day delinquency rate as of June 30, 2006 was 4.61 percent compared with 4.50 percent in the previous quarter. The company's 2005 and 2006 vintages are experiencing more normalized delinquency trends than the 2003 and 2004 vintages, which have performed exceptionally well when compared with historical experience. "We are comfortable with our current loan loss reserve levels, which take into consideration not only normal portfolio seasoning but also our higher cumulative loss expectations for the newer vintages," said Patti M. Dodge, Executive Vice President and Chief Financial Officer.

REIT portfolio income declined to $52.0 million in the second quarter of 2006 compared with $83.3 million in the first quarter. REIT portfolio income was $79.2 million in the second quarter of 2005. The sequential decrease in REIT portfolio income is primarily the result of a lower return-on-assets ("ROA") in the second quarter when compared to the first quarter. ROA declined to 1.49 percent in the second quarter from 2.34 percent in the first quarter as a result of a decrease in interest spread attributable to portfolio seasoning and the expected spread compression that comes with such seasoning. In addition, the company's shift in 2006 to embedding swaps in its securitization transactions, which results in a more level yield over the life of the transaction, also led to a decrease in interest spread. Lower prepayment income, hedge re-balancing gains and income from hedge ineffectiveness and other derivative instruments also had a significant impact on ROA.

Mortgage Loan Production by Channel -- Non-Prime, Prime and Alt-A

The company originates and purchases mortgage loans through two channels - Wholesale and Retail. The Wholesale channel originates and purchases mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its Account Executives. The company's Retail channel originates mortgage loans directly through its 246 branch offices and its central telemarketing unit, as well as through relationships that are referred or solicited through builders and realtors.

Total Mortgage Loan Production

Total mortgage loan production for the second quarter of 2006 was $16.2 billion, a 20 percent increase over the same period a year ago and a 21 percent increase over the first quarter of 2006. Excluding the prime and Alt- A loan origination platform that was acquired in the third quarter of 2005, second quarter loan production increased 5 percent year-over-year. For the quarter, the company's Wholesale channel originated $13.8 billion of mortgage loans and the Retail channel originated $2.4 billion. "We are pleased with the second quarter's strong loan production volume, which resulted from modest growth in our core non-prime product coupled with the addition of our Prime and Alt-A products," said Mr. Morrice. "Additionally, we introduced a new credit grade during the quarter that serves borrowers with qualifications between Alt-A and non-prime. We believe this AAA credit grade is rapidly gaining acceptance in the market place."

Total mortgage loan production for July 2006 was approximately $5.3 billion, including $4.6 billion of Wholesale mortgage loan production

and $0.7 billion of Retail mortgage loan production. This compares with $4.6 billion for July 2005.

TRS Operating Results -- Non-Prime Gain-on-Sale

In the second quarter of 2006, the company sold $10.3 billion of non-prime loans, or 73 percent of the quarter's non-prime production, at a gross premium of 2.31 percent and a net gain-on-sale of 2.10 percent. Second quarter net gain-on-sale increased by 43 basis points compared with 1.67 percent for the first quarter as a result of improved secondary market execution, which was primarily driven by a higher weighted average coupon on the company's loans, a more favorable product mix and stronger secondary market appetite, partly offset by increases in swap rates that outpaced coupon growth. Additionally, second quarter net gain-on-sale included 9 basis points of unanticipated hedging gains.

Loan Acquisition Costs (LAC)

Second quarter 2006 LAC was 1.51 percent compared with 1.66 percent in the previous quarter. The 15 basis point decline was primarily a result of the operating expense component of LAC declining 17 basis points, slightly offset by a modest increase in the points and fees component.

"In the current environment, we believe it is becoming increasingly important to be a low-cost originator," continued Ms. Dodge. "Our record low LAC of 1.51 percent is evidence of our ability to use our size and scale to increase efficiencies and leverage fixed costs, which we believe is a distinct competitive advantage. I'm pleased that during a quarter in which loan production increased 22 percent, our cost controls kept expense growth to only 11 percent compared with the first quarter of 2006."

Net Operating Margin

The company's net operating margin for its non-prime loans improved to 1.01 percent in the second quarter of 2006 from 50 basis points in the first quarter of 2006. "We are proud to have made such a significant improvement in our non-prime net operating margin this quarter," said Ms. Dodge. "We will continue to focus on reducing our LAC, but expect our operating margins to be negatively impacted on a go-forward basis by as much as 10 basis points as a result of the recent Standard and Poor's ABS model changes."

TRS Operating Results -- Prime and Alt-A

In the second quarter of 2006, the company closed $2.1 billion in loans through its prime and Alt-A mortgage loan origination platform and acted as a broker for an additional $0.2 billion to third parties. The company has provided the gain-on-sale, LAC and net operating margin of these operations in tables set forth later in this press release. "Consistent with our projections, our prime and Alt-A business became profitable in the second quarter and reported a net operating margin of 53 basis points," said Mr. Morrice. "This quarter's net operating margin was higher than we anticipated as a result of hedging gains and pair-off fees. A more typical net operating margin for our prime and Alt-A platform is expected to be in the range of 15 to 20 basis points."

26.    On August 9, 2006, New Century Financial filed with the SEC its Form 10-Q for the Second quarter ending June 30, 2006.  Defendants Cole, Morrice and Dodge each signed certifications pursuant to Securities Exchange Act Rule 13A – 14 and 15D – 14 Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, and Certification Pursuant to 18 U.S.C Section 1350, falsely certifying that they reviewed the Form 10-Q; that the report did not contain any

20

untrue statements of material fact; and that the financial statements fairly presented in all material respects the financial condition, results or operations and cash flows of the Company.

27. The Company's press release and Form 10-Q for the second quarter ended June 30, 2006 was materially false and misleading because New Century Financial did not properly account for some of the home loans it had to buy back. Like many mortgage lenders, New Century Financial does not keep its loans; it sells the loans to banks and investors. The deals normally have clauses allowing investors to force New Century Financial to buy back a loan if the borrower misses an early payment. Defendants knew but failed to properly account for the home loans the Company had to buy back. Defendants knew that more investors would sell back loans because loan repurchases surged throughout 2006 amid payment defaults

28. On August 16, 2006, New Century announced that it has priced a public offering of 2 million shares of 9.75% Series B Cumulative Redeemable Preferred Stock at $25 per share. The net proceeds from the offering will be used for general corporate purposes, including, without limitation, repurchases of the company's common stock under its stock repurchase program and investments in the company's on-balance sheet portfolio of mortgage assets.

29. On September 13, 2007, New Century Financial announced that the Company has completed a $50 million private placement of trust preferred securities through its wholly-owned subsidiary, New Century Capital Trust I. The proceeds from the private placement will be used for general corporate purposes, including, without limitation, repurchases of the company's common stock under its stock repurchase program and investments in the company's on-balance sheet portfolio of mortgage assets. The $50 million of trust preferred securities have an approximate 30-year term ending September 30, 2036.

21

30.     On November 2, 2006, New Century Financial reported its financial results for the three and nine months ended September 30, 2006.

Highlights

Earnings-per-share (EPS) was $1.12

REIT taxable income(1) per share was $0.84

Total mortgage loan production was $15.8 billion

Non-prime net operating margin was 0.52 percent

Record low non-prime loan acquisition costs (LAC) of 1.49 percent

After-tax return-on-equity(2) was 12.7 percent

Announces acquisition of Irwin Mortgage Corporation's servicing operations

Raised $107 million in gross proceeds of perpetual preferred and trust preferred capital

Declared fourth quarter dividend of $1.90 per share; results in total 2006 dividends of $7.30 per share

Appointed Taj S. Bindra as Executive Vice President and Chief Financial Officer

Announces updated financial and secondary market strategy

Expects to distribute $400 million or more to stockholders in 2007 through a combination of dividends and common stock repurchases

Third Quarter 2006 Results

"Current conditions in our industry are clearly challenging," said Brad A. Morrice, President and Chief Executive Officer. "In this context,

22

while our $1.12 quarterly EPS reflects a year-over-year and sequential decline, it is important to point out that a significant item negatively impacting our EPS was a $0.75 per share reduction from marking-to-market our derivatives not qualifying for hedge accounting treatment. Notwithstanding the current quarter's impact, we believe our hedging strategies are effective on an economic basis.

"Excluding the hedging-related accounting charges, our operating results were solid. As expected, we maintained loan production volume at a level comparable to the previous quarter, achieved record low loan acquisition costs, and improved portfolio interest spread before the impact of hedging during the third quarter. Partially offsetting these positive trends, gain-on-sale declined as a result of increased rating agency credit enhancement levels and higher loan repurchases and discounted loan sales," said Mr. Morrice.

Gain-on-Sale

Loan Sales - In the third quarter of 2006, the company sold $13.9 billion of non-prime loans at a gross premium of 2.25 percent compared with $9.9 billion at a gross premium of 2.33 percent in the second quarter of 2006. Additionally, the company sold $410.0 million of non-prime mortgage loans during the third quarter of 2006 at an average discount of 12.9 percent of their outstanding principal balances compared with $415.1 million for the second quarter of 2006 at an average discount of 5.0 percent. While the total volume of discounted loans sales decreased slightly, the severity of the discount increased due to the inclusion of a higher percentage of non-performing assets in these sales and a lower average price for loans with minor defects. Higher loan repurchases and discounted mortgage loan sales reduced the gain-on-sale margin by 48 basis points.

23

"We expect the volume of discounted loan sales and the severity of the discount to continue to challenge originators in this industry," said Mr. Cloyd. "Loan buyers have become more vigilant, increasing the number of loan files reviewed in their due diligence process and decreasing the percentage of loans they ultimately purchase. In addition, loan repurchases have increased as a result of higher early payment defaults. While we expect this industry trend to continue in the near-term, we believe our additional underwriting guidelines and continual focus on process improvement will help mitigate this trend."

Impact of Forward Sale Commitments and Rate Locks –

The accounting impact of the value of the company's forward sale commitments and interest rate locks, which are treated as derivative instruments for accounting purposes but do not currently qualify for hedge accounting, reduced gain-on-sale by an additional 18 basis points for a net gain-on-sale of 1.59 percent. Because these derivatives do not qualify for hedge accounting, the current accounting rules require that the company mark-to-market forward sale commitments without a corresponding offset to its mortgage loans or pipeline. Such marks can be positive or negative to earnings depending on interest rates outstanding at the end of the quarter. These mark-to-market adjustments reverse in the period in which the sale settles.

Loan Acquisition Costs (LAC)

Third quarter 2006 LAC was 1.49 percent of non-prime production volume, which is a record low for the company and compares with 1.51 percent of non- prime production volume in the second quarter of 2006. "We are pleased with our success in managing our costs on a dollar basis and as a percentage of loans originated," said Patti M. Dodge, Executive Vice President and Chief Financial Officer. "We

24

1    have kept corporate and support headcount relatively flat since the
2    beginning of 2005, and as a result, do not expect any across- the-board
3    headcount reductions. However, we will continue to manage
4    headcount in accordance with our productivity metrics. We will also
5    continue our other cost reduction efforts, which we believe can lead to
6    significant further cost reductions. In the current environment, low
7    loan acquisition costs are one of the keys to profitable operations and
8    we have among the lowest costs in the non-prime sector."
9

10   31.   On November 9, 2006, New Century Financial filed with the SEC its
11   Form 10-Q for the third quarter ending September 30, 2006.  Defendants Cole,
12   Morrice and Dodge each signed certifications pursuant to Securities Exchange Act
13   Rule 13A – 14 and 15D – 14 Adopted Pursuant to Section 302 of the Sarbanes-
14   Oxley Act of 2002, and Certification Pursuant to 18 U.S.C Section 1350, falsely
15   certifying that they reviewed the Form 10-Q; that the report did not contain any
16   untrue statements of material fact; and that the financial statements fairly presented
17   in all material respects the financial condition, results or operations and cash flows
18   of the Company.

19   32.   The Company's press release and Form 10-Q for the third quarter
20   ended September 30, 2006 was materially false and misleading because New
21   Century Financial did not properly account for some of the home loans it had to
22   buy back. Like many mortgage lenders, New Century Financial does not keep its
23   loans; it sells the loans to banks and investors. The deals normally have clauses
24   allowing investors to force New Century Financial to buy back a loan if the
25   borrower misses an early payment. Defendants knew but failed to properly account
26   for the home loans the Company had to buy back.  Defendants knew that more
27   investors would sell back loans because loan repurchases surged throughout 2006
28   amid payment defaults

25

33.     On November 17, 2006, New Century Financial reported that the Company has completed a $35 million private placement of trust preferred securities through its wholly-owned subsidiary, New Century Capital Trust II. The proceeds from the private placement will be used for general corporate purposes, including, without limitation, repurchases of the company's common stock under its stock repurchase program and investments in the company's on-balance sheet portfolio of mortgage assets.

34.     On January 8, 2007, New Century Financial announced that total mortgage loan production for 2006 reached a new record high of $59.8 billion, which is 6.6 percent higher than the $56.1 billion originated in 2005. Additionally, loan production for December 2006 was $4.8 billion, representing a 9.4 percent decrease compared with December 2005 and a 6.7 percent increase compared with November 2006. The weighted average coupon for the company's non-prime loan production remained at 8.3 percent for December 2006, unchanged from the prior month.

35.     Defendant Morrice was quoted as stating"

> We are pleased to have delivered another year of record loan production and profitable market share growth given the turbulent market environment. Our solid results for the year reflect a modest decline in our non-prime production, offset by the expansion of prime and Alt-A originations. For 2007, we expect our overall mortgage loan production to be relatively flat compared with 2006 as we anticipate a decline in market volume and the impact of our tighter underwriting guidelines to be offset by the continued roll-out of our Alt-A and prime products and additional market share growth for our non-prime products.

36.     On February 7, 2007 New Century Financial announced that it will restate its consolidated financial results for the quarters ended March 31, June 30

1 and September 30, 2006 to correct errors the company discovered in its application
2 of generally accepted accounting principles regarding the company's allowance for
3 loan repurchase losses.  The Press Release stated as follows:

4 The company establishes an allowance for repurchase losses on loans
5 sold, which is a reserve for expenses and losses that may be incurred
6 by the company due to the potential repurchase of loans resulting
7 from early-payment defaults by the underlying borrowers or based on
8 alleged violations of representations and warranties in connection with
9 the sale of these loans. When the company repurchases loans, it adds
10 the repurchased loans to its balance sheet as mortgage loans held for
11 sale at their estimated fair values, and reduces the repurchase reserve
12 by the amount the repurchase prices exceed the fair values. During the
13 second and third quarters of 2006, the company's accounting policies
14 incorrectly applied Statement of Financial Accounting Standards No.
15 140 - Accounting for Transfers and Servicing of Financial Assets and
16 Extinguishment of Liabilities. Specifically, the company did not
17 include the expected discount upon disposition of loans when
18 estimating its allowance for loan repurchase losses.

19 In addition, the company's methodology for estimating the volume of
20 repurchase claims to be included in the repurchase reserve calculation
21 did not properly consider, in each of the first three quarters of 2006,
22 the growing volume of repurchase claims outstanding that resulted
23 from the increasing pace of repurchase requests that occurred in 2006,
24 compounded by the increasing length of time between the whole loan
25 sales and the receipt and processing of the repurchase request.
26 Importantly, the foregoing adjustments are generally non-cash in
27 nature. Moreover, the company had cash and liquidity in excess of
28 $350 million at December 31, 2006.

27

Although the company's full review of the legal, accounting and tax impact of the restatements is ongoing, at this time the company expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced.

In light of the pending restatements, the company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 and all earnings-related press releases for those periods should no longer be relied upon. The company expects to file amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006 as soon as practicable, with a goal to file by March 1, 2007. The company also expects that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006. However, the company has taken significant steps to remediate these weaknesses and anticipates remediating them as soon as practicable.

The company's fourth quarter and full-year 2006 earnings announcement, originally scheduled for February 8, 2007, has been postponed to an undetermined future date, which will follow the company's filing of its amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006.

Fourth Quarter 2006 Developments

The increasing industry trend of early-payment defaults and, consequently, loan repurchases intensified in the fourth quarter of 2006. The company continued to observe this increased trend in its early-payment default experience in the fourth quarter, and the volume of repurchased loans and repurchase claims remains high.

28

1  In addition, the company currently expects to record a fair value
2  adjustment to its residual interests to reflect revised prepayment, loss
3  and discount rate assumptions with respect to the loans underlying
4  these residual interests, based on indicative market data. While the
5  company is still determining the magnitude of these adjustments to its
6  fourth quarter 2006 results, the company expects the combined impact
7  of the foregoing to result in a net loss for that period.

8
9  37.    On this news Shares of New Century Financial plummeted 35
10 percent to closed at $19.28 with 25 million shares traded.
11 38.    New Century Financial did not properly account for some of the
12 home loans it had to buy back. Like many mortgage lenders, New Century
13 Financial does not keep its loans; it sells the loans to banks and investors. The
14 deals normally have clauses allowing investors to force New Century Financial to
15 buy back a loan if the borrower misses an early payment. Defendants knew but
16 failed to properly account for the home loans the Company had to buy back.
17 Defendants knew that more investors would sell back loans because loan
18 repurchases surged throughout 2006 amid payment defaults.
19 39.    In addition, defendants knew that any repurchased loans would be
20 less valuable. Loan repurchases are bad for mortgage lenders because few
21 investors would sell back a loan unless it lost value. Piper Jaffray analyst Robert
22 Napoli said a repurchased loan has typically lost 15 percent to 20 percent of its
23 value.

24      **Applicability Of Presumption Of**
25      **Reliance: Fraud-On-The-Market Doctrine**

26 35.    The market for New Century Financial securities was open, well-
27 developed and efficient at all relevant times. As a result of these materially false
28 and misleading statements and failures to disclose, New Century Financial
   securities traded at artificially inflated prices during the Class Period. Plaintiff and

29

other members of the Class purchased or otherwise acquired New Century Financial securities relying upon the integrity of the market price of New Century Financial securities and market information relating to New Century Financial, and have been damaged thereby.

36.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of New Century Financial securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about New Century Financial's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of New Century Financial and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein

38.    At all relevant times, the market for New Century Financial securities was an efficient market for the following reasons, among others:

(a)    on the NYSE, a highly efficient and automated market;

1    (b) As a regulated issuer, New Century Financial filed periodic

2 public reports with the SEC and the NYSE;

3    (c) New Century Financial regularly communicated with public

4 investors via established market communication mechanisms, including through

5 regular disseminations of press releases on the national circuits of major newswire

6 services and through other wide-ranging public disclosures, such as

7 communications with the financial press and other similar reporting services; and

8    (d) New Century Financial was followed by several securities

9 analysts employed by major brokerage firms who wrote reports, which were

10 distributed to the sales force and certain customers of their respective brokerage

11 firms. Each of these reports was publicly available and entered the public

12 marketplace.

13  39. As a result of the foregoing, the market for New Century Financial's

14 securities promptly digested current information regarding New Century Financial

15 from all publicly available sources and reflected such information in New Century

16 Financial's stock price. Under these circumstances, all purchasers of New Century

17 Financial's securities during the Class Period suffered similar injury through their

18 purchase of New Century Financial's securities at artificially inflated prices and a

19 presumption of reliance applies.

20        **COUNT I**

21     **For Violations of Sections 10(b) of**

22   **The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder**

23  40. Plaintiff repeats and realleges paragraphs 1 through 30, as if set forth

24 fully herein.

25  41. In connection with the sale of New Century Financial securities

26 throughout the Class Period, Defendants participated, directly or by acquiescence,

27 despite a duty to act, in the preparation and/or issuance of materially false and

28 misleading statements and omissions.

42.    Defendants knew, or were reckless in not knowing, that the statements contained in New Century Financial public filings were materially false and misleading.  Plaintiff and the Class relied, directly or indirectly by reliance on the integrity of the market, on Defendants' misstatements and/or omissions and were damaged as a result.  But for Defendants' misrepresentations and/or omissions, Plaintiff and the Class would not have purchased New Century Financial securities or would have purchased them at non-artificially inflated prices.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act
### (Against the Section 20(a) Defendants, as defined below)

43.    Plaintiff repeats and realleges each of the preceding paragraphs 1 through 33 as if fully set forth herein.

44.    This claim is brought against Defendant New Century Financial.

45.    The Section 20(a) Defendants were control persons within the meaning of the Exchange Act.

46.    As set forth above, Defendant New Century Financial violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this complaint.  By virtue of his positions as control persons, the Section 20(a) Defendant New Century Financial violated Section 10(b) and Rule 10b-5, are liable pursuant to Section 20(a) of the Exchange Act.

47.    As a direct and proximate result of the Section 20(a) Defendant New Century Financial wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## NO SAFE HARBOR

48.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of New Century Financial who knew that the statement was false when made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other Class members, prays for judgment as follows:

A.    A determination that this action is a proper class action and a certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

1           B.    An award of compensatory damages in favor of Plaintiff and

2    the other Class members against all Defendants for damages sustained as a result

3    of Defendants' wrongdoing, including interest thereon;

4           C.    An award to Plaintiff and the Class of their reasonable costs and

5    expenses incurred in this action, including counsel fees, expert fees and other

6    disbursements; and

7           D.    A grant of such other relief as the Court may deem just and

8    proper.

9                       **JURY DEMAND**

10      Plaintiff demands a trial by jury.

11

12   Dated:      February 8, 2007

13

14                       **GLANCY BINKOW & GOLDBERG LLP**

15

16

17                                    LIONEL Z. GLANCY #134180

18                                    MICHAEL GOLDBERG #188669

19                                    1801 Avenue of the Stars, Suite 311

20                                    Los Angeles, California 90067

21                                    Telephone:  (310) 201-9150

22                                    **ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**

23                                    Nancy Kaboolian,

24                                    212 East 39th Street

25                                    New York, New York 10016

26                                    Tele:  (212) 889-3700

27                                    Fax:  (212) 684-5191

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PASKOWITZ & ASSOICATES**
Laurence D. Paskowitz, Esq.
Roy L. Jacobs, Esq
60 East 42nd Street, 46th Floor
New York, New York 10016
Tel: (212) 685-0969
Fax: (212) 685-2306

**Attorneys for Plaintiff Avi Gold**

# Exhibit QQ



**The New York Times**
nytimes.com

SUNDANCE

March 5, 2007

# Mortgage Crisis Spirals, and Casualties Mount

By JULIE CRESWELL and VIKAS BAJAJ

Even in affluent Orange County, Calif., the growing wealth of executives and brokers in the booming mortgage industry was hard to miss.

For Kal Elsayed, a former executive at New Century Financial, a large lender based in Irvine, driving a red convertible Ferrari to work at a company that provided home loans to people with low incomes and weak credit might have appeared ostentatious, he now acknowledges. But, he says, that was nothing compared with the private jets that executives at other companies had.

"You just lost touch with reality after a while because that's just how people were living," said Mr. Elsayed, 42, who spent nine years at New Century before leaving to start his own mortgage firm in 2005. "We made so much money you couldn't believe it. And you didn't have to do anything. You just had to show up."

Just as the technology boom of the late 1990s turned twenty-something programmers into dot-com billionaires, and leveraged buyouts a decade earlier turned Wall Street bankers into Masters of the Universe, the explosive growth in subprime lending turned mortgage bankers and brokers into multimillionaires seemingly overnight.

Now an escalating crisis in the market, which seemed to reach a new crescendo late last week, is threatening a wide band of people. Foremost are the poor and minority homeowners who used easy credit to buy houses that are turning out to be too expensive for them now that mortgage rates are going up, but the pain is also being felt widely throughout the business world.

Large companies that bought subprime lenders during the boom, like H&R Block and HSBC, are now scrambling to sell them or scale back their exposure. Many investors are also likely to suffer: Wall Street firms made billions in fees, commissions and trading revenue from packaging and selling subprime mortgages to them as bonds.

New Century has emerged as a poster child for the lenders that rode that boom to the top and are now in free fall. The company disclosed on Friday that federal prosecutors and securities regulators were investigating stock sales and accounting errors. The latter could jeopardize billions of dollars in financing for the company, which issued $39.4 billion in subprime loans in the first nine months of last year.

Case 1:11-cv-05201-DLC   Document 53-8   Filed 01/20/12   Page 49 of 107

Weakening home prices and rising default rates have rocked the subprime business. But for those who cashed out before the market turned, the ride up was particularly sweet. The three founders of New Century, for example, together made more than $40.5 million in profits from selling shares in the company from 2004 to 2006, according to an analysis by Thomson Financial. They collected millions of dollars more in dividends, salaries, bonuses and perks.

The company said in a statement yesterday that the founders were "still significant shareholders," noting that they collectively owned about 7 percent of the company at the end of last year.

New Century's stock price, which seemed to mirror the trajectory of the subprime business, peaked at nearly $66 a share in December of 2004 and traded in the $40s most of last year; on Friday, it was trading at $11 a share after the market closed. In a series of sales from August to November, two of the company's founders sold shares for an average price of about $40 a share, for a total profit of $21.4 million.

It is not known whether the stock sales by the founders are among the sales being examined by federal investigators. Some of them had been part of scheduled stock sales that are often used by executives to diversify their portfolios. But some of the sales occurred on the same day that the executives entered the plans. A New Century spokeswoman, Laura Oberhelman, said that executives declined further comment.

The founders' stock also rose in the social circles of southern California, the epicenter of the boom in subprime. Five of the 10 biggest providers of subprime mortgages last year had their headquarters in the region.

Robert K. Cole, 60, a co-founder who retired as chairman and chief executive last year, lives in a 6,100-square-foot oceanfront home in Laguna Beach that is valued at tens of millions of dollars and was once owned by the chief executive of Pimco Advisors, the giant bond trading and management firm. Edward F. Gotschall, 52, another co-founder who is vice chairman of the board, donated $3 million for an expanded trauma center at Mission Hospital that will be named for him and his wife Susan.

The executives from New Century are by no means alone in cashing in on the bonanza, and they do not appear to have scored the biggest profits. That title may be claimed by Angelo R. Mozilo, the chief executive of Countrywide Financial, the nation's largest stand-alone mortgage company and one of the largest subprime lenders last year. He reaped more than $270 million in profits from sales of stock and the exercise of stock options from 2004 to the start of this year, according to the Thompson analysis.

Of course, most of the 500,000 people who work in the mortgage industry did not cash in so grandly. The wealth was concentrated among executives, loan officers and brokers, because the greatest rewards were meted out in the form of commissions, bonuses and stock awards.

"In the hot times, it was not unusual to see a broker make a million bucks," said Guy Cecala, publisher of Inside Mortgage Finance, a trade publication. "You can carry that up further to people who ran the companies. The whole business revolves around personal compensation."

The hot times are clearly over.

New Century's disclosure of the federal investigations on Friday was the most serious in a string of shocks to have rocked the industry in the last three months.

A handful of lenders have sought bankruptcy protection, several have been acquired and a few have been shut down. Also on Friday, Fremont General, a top-five lender, said it planned to leave the business.

Industry officials say they are seeing an exodus of executives and salespeople as companies fold, cut jobs and push out early leaders.

"Everyone has run for the hills," said William D. Dallas, whose company, Ownit Mortgage, filed for bankruptcy protection in December after it lost financing from Merrill Lynch and other banks.

For the borrowers of these mortgages, it may become more difficult to refinance if lending standards are tightened significantly. Many are already facing the prospect of payment shock when low, fixed-interest mortgage rates adjust to higher, variable rates.

On Wall Street, big investment banks could lose a significant source of revenue if the appetite for bonds backed by mortgages dries up.

In the last two years many skeptics began warning that the red-hot housing market and adjustable-rate loans would blend into a toxic brew. Last year, subprime loans totaled $600 billion, or about 20 percent of all mortgages, up from $120 billion and 5 percent in 2001, according to Inside Mortgage Finance. More than half of subprime loans have adjustable rates.

Many of the problems that have surfaced thus far are not tied to the resetting of rates. Rather, they stem from a sharp and early spike in the default rates among loans issued last year.

For example, about 13.8 percent of the loans in a group of mortgages New Century sold to investors in April were behind in payments or in foreclosure by January. By comparison, only 6 percent of loans in a pool sold to investors in March 2005 had met that same fate by January 2006.

Investors and regulators fear that the problems will only worsen as so many borrowers have fallen behind so quickly, especially at a time when the overall economy is healthy. The phenomenon suggests that lending standards were significantly weakened last year and that lenders were not as watchful for fraudulent transactions.

Case 1:11-cv-05201-DLC   Document 53-8   Filed 01/20/12   Page 51 of 107

For New Century, the early payment defaults pose significant financial problems. In the first nine months of last year, Wall Street banks and investors that it does business with forced it to buy back $469 million in loans it had sold to them, up from $240 million for the same period in 2005.

The company was able to sell back about half of those loans at a discount of 26.5 percent. How it handled the remainder — about $227 million — is now under scrutiny. According to accounting rules the company should have valued the loans on its books for what they were worth today, not their previous face value. But it did not.

If it had, the company would have seen its earnings fall by about $60 million before taxes, wiping out most of its profit in the third quarter, according to Zach Gast, an analyst at the Center for Financial Research and Analysis, a forensic accounting firm.

This is important, because the company's financing agreements require that it not lose money for any rolling six-month period. On Friday, New Century said it did not expect to make a profit in the six months that ended in December and that it was negotiating with lenders to waive the requirement but has only secured six of 11 waivers it needs.

"They had losses sitting on their balance sheets," Mr. Gast said.

In August, the company's chief financial officer, Patti M. Dodge, announced she was stepping down from her post to oversee investor relations, a department that typically reports to the chief financial officer. Taj S. Bindra, a former executive at Washington Mutual, replaced her in November.

For the second time in a decade, New Century finds itself fighting to survive. The firm's roots were planted at Plaza Home Mortgage Bank where the three founders of New Century — Mr. Cole, a longtime mortgage executive; Mr. Gotschall; and a lawyer named Bradley A. Morrice — worked together. The three formed New Century in 1995 after Plaza was sold to Fleet Mortgage Group, now a part of Washington Mutual.

In the late 1990s, New Century narrowly survived accounting concerns and a scare in the bond market after Russia' s default in 1998. It pulled through thanks to an investment by U.S. Bancorp, a bank based in Minneapolis.

With interest rates at historic lows, it quickly grabbed a big share of the fast-growing subprime market during the housing boom.

"They walked into a niche industry at a time when everything was lining up perfectly for what they did," said W. Scott Simon, a managing director at Pimco Advisors. "In 2001, 2002 and 2003 the subprime business was just phenomenally profitable. Home prices kept appreciating and it seemed that no loans ever went bad."

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map |

# Exhibit RR



1 of 1 DOCUMENT

Copyright 2007 HT Media Ltd.
All Rights Reserved
US States News

March 28, 2007 Wednesday 3:05 AM EST

**LENGTH:** 356 words

**HEADLINE:** NEW CENTURY FINANCIAL CORPORATION, ATTORNEY GENERAL DANN AGREE UPON STIPULATED PRELIMINARY INJUNCTION

**BYLINE:** US States News

**DATELINE:** CLEVELAND

**BODY:**

The Ohio Attorney General issued the following news release:

To protect consumers from unconscionable acts and potential foreclosures, New Century Financial Corporation has agreed to stop all foreclosures pending a review by the Ohio Attorney General's Office and the Department of Commerce's Division of Financial Institutions. The injunction allows the Attorney General to review all of New Century's pending foreclosure actions and delinquent loans to determine whether the loans violate Ohio law.

"New Century has taken a good faith step by agreeing to let us review its documents before any further foreclosures are acted upon in Ohio," Attorney General Dann said. "The time has come to stop the rampant disregard for Ohio's consumer laws. I want to make sure consumers are in a mortgage loan they can afford and not one agreed to under false pretenses."

During the review process, each foreclosure will be examined for evidence of predatory lending practices. If bad business practices are discovered, New Century will be obligated to honor a stay for that consumer's loan until the company makes corrective measures that are approved by the State. One option might be reworking the original loan to make it affordable for the consumer.

Per the stipulated agreement:

"Both parties agreed that all borrowers with loans originated or serviced by New Century who desire to bring their loan current to avoid foreclosure sale should continue to make all mortgage payments and that all borrowers with loans originated or serviced by New Century which are not delinquent should continue to make all mortgage payments. Borrowers, or any person authorized to assist the borrower, should contact New Century at 1-888-477-0193, to discuss a solution to their foreclosure case."

NEW CENTURY FINANCIAL CORPORATION, ATTORNEY GENERAL DANN AGREE UPON STIPULATED PRELIMINARY INJUNCTION US States News March 28, 2007 Wednesday 3:05 AM EST

The injunction was filed in Cuyahoga County Common Pleas Court.

Consumers can file complaints with the Attorney General Dann's Consumer Protection Section online at www.ag.state.oh.us or by calling 1-800-282-0515.

Stipulated Preliminary Injunction: http://www.ag.state.oh.us/press/07/03/pr070328.pdf.

Contact: Jennifer Brindisi, 614728-5418, 614/989-3627.

**LOAD-DATE:** March 29, 2007

# Exhibit SS

# Bloomberg

# New Century, Biggest Subprime Casualty, Goes Bankrupt (Update4)

By Bradley Keoun and Steven Church - Apr 02, 2007

April 2 (Bloomberg) -- New Century Financial Corp., overwhelmed by rising defaults from borrowers with poor credit records, became the largest subprime mortgage lender ever to fail as it filed for bankruptcy today.

New Century plans to sell most of its assets within 45 days, said the Chapter 11 filing in federal court in Wilmington, Delaware. About 3,200 people, more than half the workforce at the Irvine, California-based company, will be fired. New Century said it already agreed to sell its mortgage billing and collections unit to Carrington Capital Management LLC for $139 million.

The company rode the U.S. housing boom to become the largest independent mortgage lender to subprime borrowers, only to collapse as interest rates rose and home prices fell. New Century's market value soared to more than $3.5 billion in December 2004, and last year it made about $60 billion in loans. Like rival firms, the company lowered its lending standards to keep business flowing after demand slumped.

``They're clearly going to be the poster child for bad practices in the mortgage industry,'' said Matthew Howlett, an analyst at Fox-Pitt Kelton in New York. ``When all is said and done, the management team will be to blame.''

The court filing protects the company's assets from creditors. They include many of the Wall Street firms that financed its mortgage loans, such as Morgan Stanley, Goldman Sachs Group Inc. and Credit Suisse Group.

Shares Fall

The company's shares fell 14.5 cents, or 14 percent, to 91.5 cents at 3:59 p.m. New York time in over-the-counter trading. They've fallen 97 percent this year.

Late payments on U.S. subprime mortgages reached a four-year high in last year's final quarter, the Mortgage Bankers Association reported. At least 30 home lenders halted operations or sought

buyers in the past 12 months, including four that went bankrupt since last November, according to Bloomberg data.

New Century ranked second only to London-based HSBC Holdings Plc last year in total U.S. subprime mortgages granted. HSBC said last week it's planning to slash subprime lending operations.

The California company said in a statement it obtained $150 million in financing from CIT Group Inc. and Royal Bank of Scotland Group Plc's Greenwich Capital unit. Lazard Ltd., New Century's investment banker, has been shopping the remaining businesses to potential buyers. The loan agreement requires the bankruptcy court to approve procedures for selling New Century's assets by April 10.

New Century also agreed to sell Greenwich a portfolio of loans and interests in mortgage-backed securities for $50 million.

Quick Sales

Quick asset sales may be the only means of ``maximizing returns for stakeholders,'' Holly Etlin, a managing director from AlixPartners LLP, New Century's financial adviser, said in an affidavit filed with the bankruptcy court.

In addition to the billing and collections unit, New Century's largest assets include its lending platform. That business consists of a network of 57,000 independent mortgage brokers who locate borrowers and the employee loan officers who handle applications and approvals.

The platform also includes computer software and equipment used to analyze applications, as well as 262 retail branches and 34 regional operations centers in 20 states.

``They have an enormous platform, so it wouldn't be a surprise me to see someone come in and take this over,'' Fox-Pitt Kelton's Howlett said. ``You could realize value down the road when market conditions improve.''

Help Wanted

The job cuts aim to ``better align the company's cost structure with the current operating environment and to properly size these businesses in preparation for possible sale,'' New Century said in the statement. The company employed about 7,200 people at the end of 2005.

For the lending platform to attract an offer, New Century will need to keep as many of the loan officers as possible, said Ron Greenspan, a financial adviser to the creditors of three other subprime mortgage lenders that filed for Chapter 11.

``The value is absolutely contingent on them being able to maintain the key employees,'' said Greenspan, senior managing director in FTI Consulting's Los Angeles office.

New Century said in court papers it created a bonus plan that may pay 1,300 employees in the lending unit $7.34 million to stick with the company, and asked permission to pay $15 million owed to workers for regular wages by April 6.

``It is essential that the human beings who are maintaining these businesses for sale have the resources to keep them operating,'' the company said in court papers.

Liquidation

Harvey Miller, a partner at the Weil, Gotshal & Manges law firm in New York, said New Century likely will be liquidated.

``Finance companies just do not do well in Chapter 11,'' he said, adding that at New Century, ``there isn't much to reorganize around.''

Ownit Mortgage Solutions Inc. of Agoura Hills, California; Mortgage Lenders Network USA Inc. of Middletown, Connecticut; ResMae Mortgage Corp. of Brea, California; and People's Choice Financial Corp. of Irvine are among rival companies that filed for bankruptcy.

The Wall Street firms that backed New Century probably will have limited losses, Miller said, because their loans were secured by the company's loans and other assets.

``The major institutional holders have said they're over- collateralized,'' he said. Stockholders and junior creditors may be wiped out, he said.

Criminal Probe

U.S. prosecutors opened a criminal probe of accounting errors and trading in securities at New Century, the company said March 2 in a filing with the U.S. Securities and Exchange Commission. Since then, more than a dozen states have told the company to halt operations, citing complaints from borrowers that their loans weren't being funded.

Subprime mortgages are made to people with blemished credit records or heavy debts. The loans typically charge 2 to 3 percentage points more than those to people with less-risky credit profiles, and often carry adjustable interest rates that can cause payments to jump in later years.

Securities firms and banks financed New Century and other mortgage lenders to create a steady flow of mortgages they could package into bonds. With delinquent home loans rising nationwide, those firms have cut back credit to mortgage lenders.

The Wall Street firms that provided about $17.4 billion in credit lines to New Century after March 2 demanded that the company post $150 million in cash as additional collateral. The company had to halt new loans after it failed to make the payment and couldn't persuade the Wall Street firms to keep the credit lines open.

A Survivor

New Century was founded in 1995 by a trio of former managers at Option One Mortgage -- now a unit of H&R Block Inc. -- including current Chief Executive Officer Brad Morrice. In the late 1990s the company survived an industry shakeout that led to the bankruptcies of bigger rivals including United Cos.

Since then its growth had surpassed that of all other subprime underwriters. In the past two years, New Century underwrote about $120 billion of loans, or more than half the total since its inception. Subprime loans accounted for 86 percent of all New Century loans last year, the company said in today's court filings.

Morrice, 50, praised the subprime mortgage industry in New Century's statement today and said he was proud of the company's legacy. Since inception, employees have made about 1.4 million loans totaling more than $225 billion, the statement said.

``These loans have helped millions of Americans, many who might not otherwise have been able to access credit or to realize the benefits of home ownership,'' Morrice said in the statement.

Lower Standards

New Century may have compounded its losses by lowering underwriting standards to keep business flowing in 2005 and 2006 as interest rates rose and home sales slumped.

``As a management team, they were just probably a little too focused on pleasing the market with growth, introducing more and more new products and hiring more people when in reality they should have been tightening,'' Howlett said.

``They were trying to correct themselves toward the end,'' he said, ``but it was just too late.''

The case is New Century TRS Holdings Inc., 07-10416, U.S. Bankruptcy Court, Wilmington, Delaware.

To contact the reporter on this story: Bradley Keoun in New York at bkeoun@bloomberg.net; and Steven Church in Wilmington, Delaware, at schurch3@bloomberg.net.

To contact the editor responsible for this story: Patrick Oster at poster@bloomberg.net and; Erik Schatzker at eschatzker@bloomberg.net.

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# Exhibit TT



1 of 1 DOCUMENT

Copyright 2007 The Washington Post
All Rights Reserved

# The Washington Post

# washingtonpost.com

The Washington Post

May 7, 2007 Monday
Met 2 Edition

**SECTION:** A-SECTION; Pg. A01

**DISTRIBUTION:** Virginia

**LENGTH:** 2192 words

**HEADLINE:** Pressure at Mortgage Firm Led To Mass Approval of Bad Loans

**BYLINE:** David Cho; Washington Post Staff Writer

**BODY:**

Maggie Hardiman cringed as she heard the salesmen knocking the sides of desks with a baseball bat as they walked through her office. Bang! Bang!

" 'You cut my [expletive] deal!' " she recalls one man yelling at her. " 'You can't do that.' " Bang! The bat whacked the top of her desk. As an appraiser for a company called New Century Financial, Hardiman was supposed to weed out bad mortgage applications. Most of the mortgage applications Hardiman reviewed had problems, she said.

But "you didn't want to turn away a loan because all hell would break loose," she recounted in interviews. When she did, her bosses often overruled her and found another appraiser to sign off on it.

Hardiman's account is one of several from former employees of New Century that shed fresh light on an unfolding disaster in the mortgage industry, one that could cost as many as 2 million American families their homes and threatens to spill over into the broader economy.

New Century has become the premier example of a group of companies that grew rapidly during the housing boom,

selling working-class Americans with questionable credit huge numbers of "subprime" loans with "teaser" rates that typically rose after the first two years. This business transformed the once-tiny New Century into a lending powerhouse that was held up as a model of the mortgage industry's success.

But now, with home values falling and adjustable loan rates rising, record numbers of homeowners are failing to make their payments. And a detailed inquiry into the situation at New Century and other subprime lenders suggests that in the feeding frenzy for housing loans, basic quality controls were ignored in the mortgage business, while the big Wall Street investment banks that backed these firms looked the other way.

New Century, which filed for bankruptcy protection last month, has admitted that it underreported the number of bad loans it made in its financial reports for the first three quarters of 2006. Hardiman and other former employees of New Century interviewed said there was intense pressure from bosses to approve loans, even those with obviously inflated housing appraisals or exaggerated homeowner incomes.

"The stress in that place was ungodly. It was like selling your soul," said Hardiman, who worked for New Century in 2004 and 2005. "There was instant notification to everyone as soon as you rejected a loan. And you dreaded doing it because you paid for it. Two guys would come with a bat, and they were all [ticked] off because you cut their deals."

New Century officials would not publicly respond to the ex-employees' allegations. A senior executive, who spoke on condition of anonymity because of state and federal investigations into the company, acknowledged that the atmosphere in some branches might have been intense at times. But he said the firm had safeguards to make sure workers did not feel pressure to approve questionable loans.

Hearing what Hardiman went through, he said, was "upsetting" and "not representative of our offices."

"In an organization with this size . . . I'm not naive to think that [such behavior] didn't happen," the executive said. "But I find it highly implausible over the last 10 years that something systemic was going on and somehow it was disguised. . . . There were pressures, especially in a declining market, and those pressures became more robust. But we turned up our controls and our vigilance at the very same time."

As Industry Grew, Standards Loosened

Once a little-used lending tool, subprime loans made up 20 percent, or about $600 billion, of all mortgages issued in the country last year. These loans carry a high risk of default because they generally are made to home buyers with questionable credit. But because they require borrowers to pay high interest rates, they have been a gold mine for lenders in recent years, accounting for 30 percent of all profits made in the mortgage business, according to Mercer Oliver Wyman, a consulting firm.

Lenders also made a fortune selling subprime loans to Wall Street. Investment banks charged huge fees for packaging them into massive bonds called mortgage-backed securities. Investors received high returns for buying and selling these bonds.

But there is growing evidence that along this chain, the filters that were supposed to catch bad loans did not work.

Salespeople were supposed to be the "first line of defense" against fraud and bad loans, said Steve Krystofiak, president of the Mortgage Broker Association for Responsible Lending, a group that is trying to retool practices in the industry.

But salespeople worked on commission -- meaning the more loans they sold, the more bonus money they received. "That's a bad business model. It's absolutely contradictory," Krystofiak said, adding that he has witnessed salespeople tweak numbers in mortgage applications to ensure that the loans would be approved.

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans The Washington Post May 7, 2007 Monday

Automated underwriting software that searches for irregularities and possible fraud was also supposed to stop bad loans. But industry professionals say such programs were easily manipulated. Meanwhile, some appraisers and underwriters, who examine housing values and other claims made on loan applications, say they felt pressure from bosses to let questionable loans through.

New Century and other lenders sold their mortgages through auctions to investment banks. Once a bid was accepted, the investment banks performed their own detailed review and could return any loans deemed questionable without paying for them.

Several investment banks, including Merrill Lynch, Morgan Stanley and Goldman Sachs said they rigorously examined the subprime mortgages they had bid on. Morgan Stanley, for instance, said it reviewed every loan appraisal and the credit histories of about 25 percent of borrowers.

Traders familiar with the bidding process said competition for mortgages from New Century began to heat up in 2005. Mortgage-backed securities based on New Century loans had been performing better for investors than those from other subprime lenders, in some cases producing two or three times the return of a U.S. Treasury bond. Many banks felt they had to loosen their standards and agree to return fewer bad loans in order to win the auctions, the traders said.

The head of a large Wall Street bank's mortgage group contended that his firm regularly lost out on New Century's business because its due diligence process was stringent and it had been returning a high number of loans. New Century wanted the bank to ease its standards, and the issue became a source of friction between the companies.

"The entire industry, over time, became more lax," he said, speaking on condition of anonymity because he was not authorized to talk about his company's inner workings. "The more [loans] you accepted, the better relationship and the better price you would have. The name of the game was definitely volume."

A New Century spokeswoman said negotiating with banks to reduce both their due diligence and the number of loans they returned was a "generally accepted practice" that was "always a matter of discussion."

There was little downside for banks to push paper through the pipeline, said Kevin Beyers, a forensic accountant at Parkside Associates in Atlanta who specializes in the mortgage industry. Besides returning loans, these firms could require a lender to buy back loans that had cleared the banks' reviews but later turned out to be bad.

"Loose underwriting was not a secret," Beyers said. "[Investment] banks had to have known what was going on. They just have too much information and sophistication at their fingertips. And they knew the lenders pretty well."

Firm Unravels With Market's Slump

To address the problem of bad loans, New Century said since 2000 it has been reducing the compensation of branch managers if they approved loans that were later determined to bad. Underwriters have always been paid on the quality of their work rather than the volume of loans approved. New Century said it always had monitored the performance of employees and last year implemented a statistical program that tracked whether they were approving a high number of bad loans.

A spokeswoman said these moves helped the firm reject or reduce the appraisal value of 20 percent of the loan applications it received in the Northeast last year.

The firm's comments are difficult to square with accounts from rank-and-file workers. These employees worked at five different branches that handled subprime loans all over the country. All except Hardiman spoke on condition of anonymity, citing recent e-mails from the firm telling them not to comment publicly, although the company said that is standard corporate media policy. Hardiman said she was fired for refusing to approve weak loans. Others said they left because they were pressured to pump loans through the system. A few were interviewed while they were worked at

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans The Washington Post May 7, 2007 Monday

New Century but then lost their jobs after the firm filed for bankruptcy.

Although there were variations in their descriptions of the atmosphere in their offices, most said they were pushed to approve questionable loans. Several of the interviewed employees said they faced "unofficial quotas" of loans that had to be approved each day. The pressure to meet these expectations was so unrelenting that a worker in Foxboro, Mass., collapsed from stress and was taken to the hospital, two employees said. In the firm's Long Island branch, the atmosphere resembled a fraternity, largely because the average age was 23, an appraiser there said.

A veteran appraiser who worked in Pearl River, N.Y., said he joined New Century because he had heard the pay was good. That turned out to be true, but he quickly discovered that the place was a pressure cooker. He said he often was encouraged "to make loans work." His boss generally supported him when he wanted to reject a questionable loan, he said. But other office managers "were all about the numbers just so they got their bonuses."

Still, the veteran appraiser didn't blame them.

"They were pressured to make loans, that's how you do business," said the man. "They were trying to do more and more business. That's essentially what Wall Street wanted."

For years, the volume strategy worked.

Shares in the Irvine, Calif., company rose from $5 in early 2001 to $66 at the end of 2004, cementing its status as a Wall Street favorite. Last year it issued $51.6 billion in loans, more than any other specialized subprime mortgage lender.

When times were good, the company showered lavish gifts on its salespeople, treating them to vacations in Europe and Caribbean cruises hosted by sports celebrities. As recently as March, a few weeks before it filed for bankruptcy, the company had a trip to Ireland scheduled, employees said.

The boom continued for New Century until 2006, when mortgage payment default rates spiked. That happened because homeowners who bought houses last year generally saw their values drop. And, in a declining housing market, many homeowners, especially those who are poor, choose to let their mortgages fall into delinquency rather than try to keep up with the payments, analysts said.

At first, it appeared the cumulative effect of these defaults would have only a moderate effect on New Century's earnings. Then, in February, the company said it would need to revise its financial results for the first three quarters of 2006. A few weeks later, it acknowledged that federal investigators had launched probes into the timing of the stock sales of some of its executives. The company declined to comment on the investigations.

The announcements rattled the markets because the firm was so well regarded. The stock price plummeted 90 percent, and the firm was delisted from the New York Stock Exchange. (Shares now trade under a dollar on an obscure exchange.) New Century filed for bankruptcy April 2 but said current customers would be unaffected and could continue making their mortgage payments.

The appraiser in the Pearl River branch said he considered himself a loyal employee and planned to stick by the company through its struggles. But he was fired the day after the bankruptcy filing, along with 3,200 employees, or half the firm's workforce. Most of those interviewed said they were offered two weeks of pay at rates lower than their salary. A few said they did not receive any severance.

New Century announced Thursday that it is laying off 2,000 more associates. The firm is left with about 750 employees, a company spokeswoman said.

Hardiman, the former New Century appraiser, said she was not surprised by the company's downfall. Few at the

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans The Washington Post May 7, 2007 Monday

company seemed to be thinking long-term when she was there. The message she heard constantly from headquarters, which was broadcast at work conferences and in e-mails, was to approve more loans.

"We were constantly told, 'If you look the other way and let an additional three to four loans in a day that would mean millions more in revenue for New Century over the course of the week,' " Hardiman said. She added that it seemed "no one, from the top levels down to the lower levels of the office, didn't want those loans to go through."

**LOAD-DATE:** May 7, 2007

# Exhibit UU

**FILED**

OCT 2 7 2006

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| CITIMORTGAGE, INC., a New York corporation, | ) ) ) | Case No. |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| vs. | ) ) | 4  06CV01586CAS |
| MILA, INC., a Washington Corporation, | ) ) | |
| Defendant. | ) ) ) | |

### COMPLAINT

For its complaint, CitiMortgage, Inc. ("CMI"), on its own behalf and as the

successor-in-interest to CitiFinancial Mortgage Company ("CFMC"), states and alleges

as follows:

### STATEMENT OF THE CASE

1.      At all times relevant to this complaint, CMI and CFMC were in the business of,

among others, purchasing, re-selling and servicing residential mortgage loans on the

secondary mortgage market.  MILA, Inc. ("MILA") was engaged in the business of

originating residential mortgage loans.

2.      MILA has sold loans to CFMC since 2000.  CFMC's and MILA's relationship was

governed by a September 25, 2000 Master Agreement for the Sale and Purchase of

Mortgages (the "CFMC Agreement").

3.      CFMC merged into CMI in July 2006, and CMI is the successor entity.

4.     MILA has been selling loans to CMI since 2005.  CMI's and MILA's relationship is governed by the Correspondent Agreement Form 200 dated as of May 13, 2005 (the "CMI Agreement").

5.     At various times during 2005 and 2006, MILA sold loans to CFMC and CMI that did not meet – or as to which MILA did not meet – various requirements under the loan purchase agreements.  These unmet requirements include, but are not necessarily limited to, delivering loans:  (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, MILA, MILA's directors, officers, employees, agents, independent contractors and/or affiliates;  (b) where CMI has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; (c) subject to first payment defaults; or (d) have turned out to be otherwise defective or not in compliance with the CMI manual or trade confirmation.

6.     CFMC and CMI demanded that MILA meet the requirements contained in the loan purchase agreements.  Despite these notices, MILA failed to cure the defects in the specified loans.

7.     The loan purchase agreements provide CFMC and CMI with the unilateral right to demand that MILA repurchase those loans.  Because MILA has now failed to cure the defects and comply with its repurchase obligations, it is in breach of the loan purchase agreements.

2

8.      MILA now owes CFMC and CMI fees on account of repurchase in the amount of

$3,751,165.95.  CMI brings this action to recover those damages as well as its

attorneys' fees, interest and any further actual and consequential damages resulting

from MILA's breaches of the loan purchase agreements.

## PARTIES

9.      CMI is a New York corporation with its principal place of business located in St.

Louis, Missouri.

10.     CFMC was a New York corporation with its principal place of business located in

Irving, Texas.

11.     CMI is a successor by merger to CFMC as of July 1, 2006.

12.     At the time CFMC and MILA entered into the CFMC Agreement, CFMC

maintained an office in Tampa, Florida.  CFMC, through the Tampa office, entered into

the CFMC agreement with MILA.  CMI no longer maintains or operates the Tampa

office.

13.     MILA is a Washington corporation with its principal place of business in

Washington.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1332(a)(1) and

(c)(1) because there is complete diversity between CMI and MILA.  CMI is incorporated

and maintains its principal place of business in a different state than MILA.  The amount

in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over MILA because MILA consented to that jurisdiction when it signed the CMI Agreement and under Missouri's long-arm statute, V.A.M.S. § 506.500, because:  (a) MILA transacted business in Missouri; and/or (b) entered into the CMI Agreement in Missouri.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because  CMI resides in this District and because MILA consented to personal jurisdiction in this District when it signed the CMI Agreement, which provides that any suits arising out of either party's performance under that agreement shall be in brought in this Court.

17.     Venue is also proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to CMI's claims occurred in this District.

18.     CMI acknowledges that the CFMC Agreement's forum selection clause specifies that "any controversy, argument or claim arising out of or relating to this Agreement, or any breach thereof" was subject to the exclusive jurisdiction of Florida's state and federal courts and is to be governed and construed in accordance with Florida law.

19.     As a matter of judicial economy, CMI brings its claim based upon the CFMC Agreement in this Court because MILA is already subject to this Court's jurisdiction and because CMI believes the only reason the CFMC Agreement specified Florida courts was because CFMC wished to litigate any and all disputes that arose under that agreement in its home forum.  Now that CMI has succeeded CFMC's rights under that

4

agreement, CMI believes it is more efficient to resolve both claims via one Missouri lawsuit, rather than separate ones in Missouri and one in Florida where no party maintains its principal place of business.

## STATEMENT OF FACTS

### A.    The CFMC Agreement

20.    On September 25, 2000, CFMC and MILA entered into the CFMC Agreement. CMI, successor-in-interest to CFMC, attaches a true and correct copy of the CFMC Agreement as Exhibit 1 to this Complaint.

21.    Section 4.02 of the CFMC Agreement provides a series of representations and warranties that were material inducements for CFMC to enter into the purchase of each of the disputed loans. Specifically, in Section 4.02.03 of that agreement, MILA represented and warranted that, as to each loan MILA sold to CFMC, that the loan would conform "to all applicable provisions of [CFMC's] policy and procedure guidelines and/or manuals . . . ."

22.    The two loans that CFMC purchased from MILA under the CFMC Agreement and that are the subject of CMI's claim under that agreement did not conform to all applicable provisions of CFMC/CMI's policy and procedure guidelines and/or manuals.

23.    Section 5.01 of the CFMC Agreement provides that, following a 30-day period in which MILA could cure the loan defects, CFMC, in its sole discretion, had the right to direct MILA to repurchase any loan for which MILA had not cured the breach.

24.     Section 5.03(4) of the CFMC Agreement provides that the Buy-Back Price due to

CFMC from MILA includes, but is not limited to, CFMC's reasonable and necessary

expenses, including its reasonable attorneys' fees.

25.     Similarly, Section 6.04 of that agreement provides that in any action:

> between the parties in relation to this Agreement, or any Loan or other instrument
> or agreement required to be purchased or sold hereunder, the non-prevailing
> party shall be required to pay the prevailing party, in addition to any other sums
> owed under this Agreement or awarded in the action, all costs and expenses of
> such action, including reasonable attorney fees.

Exh. 1, § 6.04.

26.     On May 15, 2006, CFMC notified MILA that two of the loans that CFMC

purchased under the CFMC Agreement were in breach of Section 4.02.

27.     MILA failed to cure those identified breaches during the 30-day cure  period.

28.     CMI has the right to tender for repurchase the entire amount of those loans (which

currently have a total repurchase price of approximately $208,357). On June 15, 2006,

CMI issued repurchase letters on both non-compliant loans to MILA.

29.     MILA has not honored its obligations to repurchase those defective loans.

30.     MILA's breaches of the CFMC Agreement with respect to the fees set forth in

paragraph 24, 25 and 28 have resulted in total amounts due to CFMC that CMI

estimates currently total approximately $208,357, excluding interest, attorneys' fees,

costs and other expenses that MILA owes CFMC.

**B.     The CMI Agreement**

31.     On May 13, 2005  CMI and MILA entered into the CMI Agreement.  CMI attaches

a true and correct copy of the CMI Agreement as Exhibit 2 to this Complaint.

32.     In Section 2(g) of the CMI Agreement, MILA agreed to promptly obtain and review

the CitiMortgage Manual and to comply with all of its terms, conditions, requirements and

procedures.

33.     In Section 10 of the CMI Agreement, MILA agreed to "indemnify and hold

CitiMortgage harmless from any and all claims, actions and costs, including reasonable

attorneys' fees arising from (i) [MILA's] performance or failure to perform under the

terms, conditions or obligations of this Agreement or the CitiMortgage Manual . . . ."

34.     Section 11 of the CMI Agreement, as amended, provides, in relevant part:

> If CMI, in its sole and exclusive discretion, determines any Loan purchased
> pursuant to this Agreement:
>
> > (i)     was underwritten and/or originated in violation of any term,
> > condition, requirement or procedure contained in this Agreement or the
> > CMI Manual in effect as of the date CMI purchased such loan;
> >
> > (ii)     was underwritten and/or originated based upon materially inaccurate
> > information or on material misrepresentation made by the borrower, [MILA],
> > [MILA's] directors, officers, employees, agents, independent contractors
> > and/or affiliates, or any other party providing information relating to said
> > loan;
> >
> > (v)     was subject to an Early Payment Default (as defined in the trade
> > confirmation), an early Payoff (as defined in the trade confirmation) or any
> > other payment related defect (as defined in the trade confirmation)

CMI has the right to, upon notification, demand that MILA cure any loan defects to CMI's full and complete satisfaction. If MILA is unwilling or unable to cure the defect, CMI may demand the MILA repurchase the loan at the specified Repurchase Price.

35.     These "representations and warranties" in Section 11 were material inducements for CMI to enter into the CMI Agreement and to purchase each of the disputed loans. MILA's failure to honor any one of those representations and warranties constitutes MILA's material breach of the CMI Agreement.

36.     MILA sold CMI at least 52 separate loans: (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, MILA, MILA's directors, officers, employees, agents, independent contractors and/or affiliates;  (b) where CMI has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; (c) subject to first payment defaults; and/or (d) have turned out to be otherwise defective or not in compliance with the CMI Manual or trade confirmation.

37.     CMI sent notices of these defects and demands to cure to MILA for each of those 52 loans.

38.     MILA did not cure the defects in these loans.

39.     As a result, CMI issued a repurchase letter for each one of the 52 defective loans. CMI demanded that MILA repurchase the entire amount of those loans (which loans currently have a total repurchase price of approximately $3,542,809).

8

40.     MILA's breaches of the CMI Agreements with respect to the fees set forth in

paragraphs 33 and 39 have resulted in total amounts due to CMI that CMI estimates

currently total approximately $3,542,809, excluding interest, attorneys' fees, costs and

other expenses that MILA owes CMI.

### FIRST CLAIM FOR RELIEF
#### (Breach of Contract – CFMC Agreement)

41.     CMI realleges and incorporates by this reference the allegations contained in

paragraphs 1 through 40 of this Complaint.

42.     As set forth in greater detail in paragraphs 20 to 30 above, MILA breached the

CFMC Agreement when it delivered loans that failed to conform to the terms of the

CFMC Agreement, and subsequently refused to cure or repurchase those loans.

43.     As a result of MILA's breaches of the CFMC Agreement, CMI has been damaged

in an amount of approximately $208,357, the exact total amount of which actual and

consequential damages CMI will prove at trial.

44.     All conditions precedent, concurrent or subsequent to CMI's rights and ability to

bring this claim have taken place, have otherwise been met, have been waived or have

otherwise been excused.

### SECOND CLAIM FOR RELIEF
#### (Breach of Contract – CMI Agreement)

45.     CMI realleges and incorporates by this reference the allegations contained in

paragraphs 1 through 44 of this Complaint.

46.     As set forth in greater detail in paragraphs 31 to 40 above, MILA breached the
CMI Agreement when it delivered loans that failed to conform to the terms of the CMI
Agreement, and subsequently refused to cure or repurchase those loans.

47.     As a result of MILA's breaches of the CMI Agreement, CMI has been damaged in
an amount of approximately $3,542,809, the exact total amount of which actual and
consequential damages CMI will prove at trial.

48.     All conditions precedent, concurrent or subsequent to CMI's rights and ability to
bring this claim have taken place, have otherwise been met, have been waived or have
otherwise been excused.

        WHEREFORE, CMI prays for judgment awarding CMI:

        A.      Its actual and consequential damages incurred as a result of MILA's
                breaches of contract, in the amounts CMI will prove at trial;

        B.      Pre-judgment interest measured at the higher of: (1) the statutory
                prejudgment interest rate; or (2) moratory interest measured by the benefit
                to MILA from withholding the money due CMI;

        C.      Post-judgment interest as provided by law;

        D.      CMI's attorneys' fees and costs (including its expert witness fees and
                costs) incurred in enforcing its rights under the CFMC Agreement and the
                CMI Agreement, and in filing and prosecuting this Complaint; and

        E.      Such other and further relief that this Court deems just and proper.

10

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff CitiMortgage, Inc., for itself and as the successor-in-interest to CitiFinancial Mortgage Company, demands a trial by jury of all issues properly triable to a jury.

DATED:  October 27, 2006.

Respectfully submitted,

Foley & Mansfield P.L.L.P.

By: _____
     Robert Brummond (Bar # 2728)
     William C. Foote (Bar #23818)
     1001 Highlands Plaza Drive West
     Suite 400
     St. Louis, Missouri  63110
     Phone: 314-645-7788
     Fax:  314-645-9945
     rbrummond@foleymansfield.com
     wfoote@foleymansfield.com

Attorneys for Plaintiff CitiMortgage, Inc.

11

# Exhibit VV

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CITIMORTGAGE, INC., a New York corporation, | ) ) ) | Case No. |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| vs. | ) ) ) | |
| MILA, INC., a Washington corporation, | ) ) | |
| Defendant. | ) ) ) | |

**COMPLAINT**

For its complaint, CitiMortgage, Inc. ("CMI") states and alleges as follows:

**STATEMENT OF THE CASE**

1.      At all times relevant to this complaint, CMI was in the business of, among others, purchasing, re-selling and servicing residential mortgage loans on the secondary mortgage market.  MILA, Inc. ("MILA") was engaged in the business of originating residential mortgage loans.

2.      MILA has been selling loans to CMI since 2005.  CMI's and MILA's relationship is governed by the Correspondent Agreement Form 200 dated as of May 13, 2005 (the "CMI Agreement").

3.      At various times during 2005 and 2006, MILA sold no fewer than 35 loans to CMI that did not meet – or as to which MILA did not meet – various requirements under the CMI Agreement.  The requirements MILA or the loans it sold did not meet

–1–

include, but are not necessarily limited to, delivering loans: (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, MILA, MILA's directors, officers, employees, agents, independent contractors and/or affiliates; (b) where CMI has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; or (c) have turned out to be otherwise defective or not in compliance with the CMI manual or trade confirmation.

4.      MILA failed to cure the defect or defects in all 35 of these loans during the cure period CMI provided.

5.      The CMI Agreement provides CMI with the unilateral right to demand that MILA repurchase these 35 defective loans if MILA could not cure the defects. Following MILA's failure to cure the defects, CMI's provided MILA with the Repurchase Prices, as the CMI Agreement required CMI to do. Despite this, MILA did not timely repurchase any of the 35 loans as the CMI Agreement required it to do.

6.      MILA now owes not less than $2,736,072.84.

7.      CMI brings this action to recover those damages as well as its attorneys' fees, interest, and any further actual and consequential damages resulting from MILA's breaches of the CMI Agreement.

## PARTIES

8.      CMI is a New York corporation with its principal place of business located in St. Louis, Missouri.

9.     MILA is a Washington corporation with its principal place of business in Mountlake Terrace, Washington.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1332(a)(1) and (c)(1) because there is complete diversity between CMI and MILA.  CMI is incorporated and maintains its principal place of business in a different state than MILA. The amount in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     This Court has personal jurisdiction over MILA because MILA consented to this Court's jurisdiction over it when MILA signed the CMI Agreement.  This Court also has personal jurisdiction over MILA under Missouri's long-arm statute, V.A.M.S. § 506.500, because:  (a) MILA transacted business in Missouri; and (b) entered into the CMI Agreement in Missouri.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because CMI resides in this District and because MILA consented to personal jurisdiction in this District when it signed the CMI Agreement, which provides that any suits arising out of either party's performance under that agreement shall be in brought in this Court.

13.     Venue is also proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to CMI's claims occurred in this District.

## STATEMENT OF FACTS

14.     On May 13, 2005, CMI and MILA entered into the CMI Agreement.  CMI attaches a true and correct copy of the CMI Agreement as Exhibit 1 to this Complaint.

15.     In Section 2(g) of the CMI Agreement, MILA agreed to promptly obtain and review the CitiMortgage Manual and to comply with all of its terms, conditions, requirements and procedures.

16.     In Section 10 of the CMI Agreement, MILA agreed to "indemnify and hold CitiMortgage harmless from any and all claims, actions and costs, including reasonable attorneys' fees arising from (i) [MILA's] performance or failure to perform under the terms, conditions or obligations of this Agreement or the CitiMortgage Manual . . . ."

17.     Section 11 of the CMI Agreement, as amended, provides, in relevant part:

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

      (i)     was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such loan;

      (ii)     was underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, [MILA], [MILA's] directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said loan;

      (v)     was subject to an Early Payment Default (as defined in the trade confirmation), an early Payoff (as defined in the trade confirmation) or any other payment related defect (as defined in the trade confirmation)

CMI has the right to, upon notification, demand that MILA cure any loan defects to CMI's full and complete satisfaction. If MILA is unwilling or unable to cure the defect, CMI may demand the MILA repurchase the loan at the specified Repurchase Price.

18.    These "representations and warranties" in Section 11 were material inducements for CMI to enter into the CMI Agreement and to purchase each of the disputed loans. MILA's failure to honor any one of those representations and warranties constitutes MILA's material breach of the CMI Agreement.

**A.    The 2006 Lawsuit**

19.    On October 27, 2006, CMI filed a lawsuit against MILA in the Eastern District of Missouri, captioned CitiMortgage, Inc. v. MILA, Inc., Case No. 06-cv-1586-CAS (the "2006 lawsuit"). The 2006 lawsuit involved MILA's failure to cure defective loans and subsequent failure to repurchase those loans.

20.    None of the loans involved in the 2006 lawsuit are among the 35 loans on which CMI brings this lawsuit.

21.    On or about December 21, 2006, CMI and MILA entered into a settlement agreement (the "2006 settlement") that resolved only those claims asserted in the 2006 lawsuit.

22.    Following both parties' performance of the 2006 settlement, CMI moved to dismiss the 2006 lawsuit on April 24, 2007. The Court dismissed the 2006 lawsuit on April 26, 2007.

**B.    CMI Brings This Lawsuit Based On Claims Not at Issue in the 2006 Lawsuit**

23.    Following CMI's filing of the 2006 lawsuit, CMI discovered that MILA sold CMI at least 35 additional loans:  (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, MILA, MILA's directors, officers, employees, agents, independent contractors and/or affiliates;  (b) where CMI has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; and/or (c) have turned out to be otherwise defective or not in compliance with the CMI Manual or trade confirmation.

24.    CMI did not add these claims to the 2006 lawsuit and the 2006 settlement specifically excluded those defective loans of which CMI was aware when its entered the 2006 settlement.

25.    As CMI became aware that these loans suffered from defects, it timely notified MILA of the defects and requested that MILA perform according to the CMI Agreement by either curing these defects and repurchasing the defective loans if MILA could not affect cure.

26.    Because CMI needed to file the 2006 lawsuit in order to force MILA to honor its obligations, CMI demanded assurances that MILA would comply with the terms of the CMI Agreement when it notified MILA about the defects in these additional loans.

27.    MILA failed to provide any assurances that it would comply with the terms to which it agreed, and on which basis CMI had agreed to enter the CMI Agreement with MILA.

28.     Despite those notices and demands, MILA did not cure any of the defects in any of the loans for which CMI notified MILA.

29.     On March 20, 2007, instead of offering assurances that it could and would continue to perform under the terms of the agreement, MILA offered CMI another proposed settlement regarding MILA's failures to cure and/or repurchase all of the loans about which CMI had – as of that date – discovered defects and notified MILA.  As part of that offer, MILA informed CMI that MILA could not or would not comply with the CMI Agreement, and, by that act, repudiated the CMI Agreement.

30.     After CMI received that offer, CMI became aware of defects in additional loans and notified MILA of those defects, as the CMI Agreement required CMI to do.

31.     In total, CMI notified MILA of 35 loans that contain defects and for which CMI requested that MILA either cure or repurchase.

32.     MILA did not cure the defects in these loans.

33.     On May 1, 2007, CMI provided MILA with the "Repurchase Price" for each of the 35 loans, as the CMI Agreement defines that term and required CMI to do.

34.     As a result, MILA owes CMI the Repurchase Price for each of the 35 defective loans.  CMI demanded that MILA repurchase the entire amount of those loans (which loans currently have a total repurchase price of not less than $2,736,072.84).

35.     MILA did not repurchase any of the 35 loans.

36.     MILA's breach of the CMI Agreement with respect to the fees set forth in paragraph 34 have resulted in total amounts due to CMI that CMI estimates currently

total approximately $2,736,072.84, excluding interest, attorneys' fees, costs and other expenses that MILA owes CMI.

37.     Because MILA has failed to cure the defects, comply with its repurchase obligations to the detriment of CMI and has taken actions to affirmatively repudiate the CMI Agreement, MILA is in breach of that agreement.

### CLAIM FOR RELIEF
(Breach of Contract – CMI Agreement)

38.     CMI realleges and incorporates by this reference the allegations contained in paragraphs 1 through 37 of this Complaint.

39.     As set forth in greater detail in paragraphs 23 to 37 above, MILA breached the CMI Agreement when it delivered loans that failed to conform to the terms of the CMI Agreement, and subsequently refused to cure or repurchase those loans.

40.     As a result of MILA's breaches of the CMI Agreement, CMI has been damaged in an amount of approximately $2,736,072.84, the exact total amount of which actual and consequential damages CMI will prove at trial.

41.     All conditions precedent, concurrent or subsequent to CMI's rights and ability to bring this claim have taken place, have otherwise been met, have been waived or have otherwise been excused.

WHEREFORE, CMI prays for judgment awarding CMI:

A.      Its actual and consequential damages incurred as a result of MILA's

breaches of contract, in the amounts CMI will prove at trial;

B.     Pre-judgment interest measured at the higher of: (1) the statutory prejudgment interest rate; or (2) moratory interest measured by the benefit to MILA from withholding the money due CMI;

C.     Post-judgment interest as provided by law;

D.     CMI's attorneys' fees and costs (including its expert witness fees and costs) incurred in enforcing its rights under the CMI Agreement, and in filing and prosecuting this Complaint; and

E.     Such other and further relief that this Court deems just and proper.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff CitiMortgage, Inc. demands a trial by jury of all issues properly triable to a jury.

DATED: May 17, 2007.

Respectfully submitted,

By: _William C. Foote_

William C. Foote (Bar #23818)
Foley & Mansfield PLLP
1001 Highlands Plaza Drive West
Suite 400
St. Louis, Missouri 63110
Phone: 314-645-7788
Fax: 314-645-9945
rbrummond@foleymansfield.com
wfoote@foleymansfield.com

Attorney for Plaintiff CitiMortgage, Inc.

CORRESPONDENT
AGREEMENT
FORM 200

This Correspondent Loan Purchase Agreement ("Agreement"), dated the ___*13th*___ day of
___*May*___, 200*6*, by and between CitiMortgage, Inc. ("CMI"), for itself and on
behalf of Citibank, FSB, Citibank (West), FSB, and Citibank, N.A., and;

___*MILA, Inc.,*___ ("Correspondent").

In consideration of the terms contained in this Agreement, CMI and Correspondent agree as follows:

### 1.   PURCHASE AND SALE OF MORTGAGE LOANS

From time to time, Correspondent may sell to CMI and CMI may purchase from Correspondent one
or more residential mortgage, home equity or other loans ("Loan(s)") in accordance with the terms,
conditions, requirements, procedures, representations and warranties set forth in the "CitiMortgage,
Inc. Correspondent Manual" and all amendments, bulletins, program requirements and
supplements to such Manual (collectively hereinafter referred to as the "CMI Manual"), and this
Agreement. CMI and Correspondent agree that the CMI Manual is incorporated by reference herein
and is part of this Agreement. Further, CMI and Correspondent agree that Citibank, FSB; Citibank
(West), FSB; and Citibank, N.A. are intended third party beneficiaries of this Agreement.

For each Loan offered for sale by Correspondent to CMI, Correspondent will deliver Loan
documentation to CMI in accordance with the applicable terms, conditions, requirements,
procedures, representations and warranties set forth in the CMI Manual. CMI may purchase Loans
with or without conducting a complete review of the Loan documentation. CMI's review of, or failure
to review, all or any portion of the Loan documentation shall not affect CMI's rights to demand
repurchase of a Loan or any other CMI right or remedy provided by this Agreement.

For each Loan CMI agrees to purchase, CMI shall pay the amount agreed upon by CMI and
Correspondent ("Purchase Price") in accordance with the applicable provisions of the CMI Manual.
CMI may offset against the Purchase Price any outstanding fees or other amounts owing from
Correspondent to CMI in connection with the particular purchase or other transactions.

As of the date CMI purchases each Loan, Correspondent will (i) transfer to CMI all of its right, title
and interest in and to each Loan, including without limitation all documents held or subsequently
acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to
transfer such right, title and interest to CMI.

### 2.   REPRESENTATIONS AND WARRANTIES

Correspondent represents, warrants and covenants throughout the term of this Agreement as
follows:

(a)   That it is duly organized, validly existing, in good standing, qualified and authorized to do
business in each jurisdiction where it originate Loans or where e property securing any of its
Loans is located; that all corporate or other actions and approvals necessary for the execution
and performance of this Agreement have been taken and/or received; and that no consent
from any third party is required for the execution and performance of this Agreement.

(b)   That it (i) holds and shall maintain in good standing throughout the term of this Agreement all
applicable license(s) and/or registration(s) in each jurisdiction that is/are necessary for
Correspondent's Loan origination, purchase and sale activities under this Agreement and (ii) is
in full compliance with all laws in each jurisdiction which govern Correspondent's activities
under this Agreement. Correspondent agrees to promptly provide CMI with copies of all such
license(s) and/or registration(s) upon request by CMI.

(c)   That it will allow CMI to periodically investigate the financial (including but not limited to
obtaining corporate and/or individual credit reports) and other status of Correspondent and, if
necessary, the financial and other status of Correspondent's directors, officers and/or
employees. If necessary, Correspondent shall cooperate with CMI to obtain the written
consent of one or more of Correspondent's directors, officers and/or employees to such
periodic investigation. Correspondent agrees that the failure to obtain such consent may result
in the termination of this Agreement in accordance with the provisions of Sec. 7.



EXHIBIT
1

(03/04)

CORRESPONDENT
AGREEMENT
FORM 200

(d) That it is thoroughly familiar with and will comply with all applicable federal (including but not limited to the Real Estate Settlement Procedures Act, Truth-in-Lending Act, Equal Credit Opportunity Act and federal fair lending laws), state and, if necessary, local laws and regulations directly or indirectly relating to its activities under this Agreement (including but not limited to involvement in such activities of individuals convicted of crimes involving dishonesty or breach of trust).

(e) That Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac, and/or is a FHA-, VA- and/or HUD-approved mortgagee ; that Correspondent is duly qualified, licensed, registered and otherwise authorized under all applicable laws and regulations and is in good standing to (i) originate, sell, endorse and assign Loans and, if applicable, the related Loan collateral to CMI, (ii) service Loans in the jurisdiction(s) where, if applicable, the properties securing such Loans are located for Fannie Mae, Freddie Mac, FHA or VA, and (iii) no event has occurred that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, FHA, VA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, FHA or VA or HUD.

(f) That it does not believe, nor does it have any reason or cause to believe, it cannot perform every covenant contained in this Agreement or continue to carry on its business substantially as now conducted; that it is solvent and the sale of Loans will not cause it to become insolvent; that no action, suit, proceeding or investigation pending or threatened against Correspondent, either alone or in the aggregate, may result in its inability to carry on its business substantially as now conducted; and that the sale of Loans under this Agreement is not undertaken with the intent to hinder, delay or defraud any of its creditors.

(g) That it has obtained and reviewed or will, upon execution of this Agreement, promptly obtain and review the CMI Manual and will fully comply with its terms, conditions, requirements and procedures.

(h) That it does not currently and will not in the future employ any entity or individual on the Freddie Mac exclusionary list.

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading. The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

(j) That the documentation for each Loan sold to CMI (i) shall be duly executed by the borrower(s), (ii) shall create a valid and legally binding obligation of the borrowers(s) and (iii), if applicable, shall create a fully enforceable first or subordinate lien on the property securing repayment of the Loan.

(k) That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

(l) That any third-party originators referring, or in any way involved with, any Loan shall be, at a minimum, approved by Correspondent according to Fannie Mae, Freddie Mac, FHA, VA and/or HUD guidelines for approving third-party originators as described in the CMI Manual.

(m) That it will immediately notify CMI if it (i) fails to maintain any license or registration in violation of Sec. 2(b) above and/or (ii) becomes subject to any enforcement and/or investigative

CORRESPONDENT
AGREEMENT
FORM 200

proceeding by any licensing or regulatory authority or agency and/or (iii) is named as a party or becomes involved in any material litigation.

(n)   That it will immediately notify CMI if (i) Correspondent and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding, (ii) Correspondent and/or any of its principal director(s) or owner(s) requests the appointment of a receiver and/or (iii) Correspondent and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition.

(o)   That it will immediately notify CMI of any material change in ownership and/or management.

(p)   That it will promptly respond to or otherwise comply with CMI's reasonable request(s) for periodic financial statements of Correspondent and/or any of its principal director(s) or owners and any other documentation required by CMI in connection with the recertification of Correspondent.

(q)   That it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual.

(r)   That all representations, warranties and covenants contained in this Agreement and the CMI Manual shall survive the expiration and termination of this Agreement.

3.   COSTS

Correspondent shall pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to this Agreement, including but not limited to mortgage Loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent's attorneys' fees.

4.   CORRESPONDENT ADVERTISING; NON-SOLICITATION AND CUSTOMER PRIVACY

Correspondent may advertise to the public the availability of various Loan programs, but Correspondent may not, in any way, directly or indirectly identify CMI in all such advertising unless (i) required by applicable law or (ii) CMI has, in advance, approved use of CMI's name in such advertising.

Correspondent agrees that the borrower(s) on all Loans shall, at the time of purchase by CMI, become the exclusive customers of CMI for all Loan-related purposes. During the first twelve (12) months after the date any Loan is purchased by CMI, Correspondent represents and warrants that Correspondent, Correspondent's directors, officers, employees, agents or affiliates will not, without the prior consent of CMI, (i) use targeted advertising, solicit or otherwise directly encourage or incent the Loan borrower(s) to refinance or prepay the Loan that was purchased by CMI, (ii) prepare, sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such borrower(s) or (iii) use any such customer list to solicit, promote, or allow any other entity to solicit or promote, the sale of financial services or products to any such borrower(s). CMI and Correspondent agree that nothing contained herein shall prohibit advertising or solicitation by Correspondent that is directed to the general public in the area where the Loan borrower(s) reside(s).

Correspondent acknowledges that it has received a copy of the Citigroup Privacy Promise and/or Citigroup Privacy Policy and, to the extent necessary, shall comply with all applicable provisions of such Promise and/or Policy. Correspondent also agrees that it shall comply with all applicable federal or state laws related to the use and/or retention of the non-public personal and/or financial information associated with all Loans and the related Loan borrower(s).

5.   TERM

This Agreement is for an initial one-year term and shall automatically renew for successive one-year terms, unless terminated pursuant to Section 7 of this Agreement.

(03/04)

CORRESPONDENT
AGREEMENT
FORM 200

#### 6.   RELATIONSHIP BETWEEN CMI AND CORRESPONDENT

This Agreement will not create any agency between Correspondent and CMI. Correspondent shall conduct its business under this Agreement as an independent contractor and shall have the rights and responsibilities of an independent contractor.

CMI shall not be responsible for any actions or omissions by Correspondent. Correspondent agrees it will not represent, orally, in writing, by implication or otherwise, that it can act in any capacity on behalf of CMI.

CMI is prescribing no marketing plan for Correspondent and exercises no control over the methods, operations and practices of Correspondent except as provided in this Agreement and the CMI Manual.

Correspondent acknowledges it is not selling or distributing CMI's services, and CMI has made no promise, representation or warranty regarding the profitability of any arrangement with Correspondent.

Correspondent and CMI acknowledge that each will be providing the other party with valuable proprietary information ("Confidential Information"), including but not limited to information regarding CMI's or Correspondent's products, programs, underwriting policies, procedures and customers. Except as necessary to perform its obligations under this Agreement or as required by law, each party will not disclose any Confidential Information to any person outside that party's organization and will limit access to this information within its organization on a strict "need to know" basis. Each party agrees to notify all of its directors, officers, employees and other agents of its obligations regarding Confidential Information and will cause such directors, officers, employees and other agents to comply with such obligations.

#### 7.   TERMINATION

CMI may immediately terminate this Agreement without notice and CMI then will have no further obligations under this Agreement upon:  (1) the failure of Correspondent to perform or abide by any term, condition, covenant or obligation contained in this Agreement or the CMI Manual; (2) the finding by CMI that any representation or warranty made by Correspondent is false or incorrect in any material respect; (3) commencement by or against Correspondent of any bankruptcy, insolvency or similar proceedings; (4) CMI's determination that Correspondent's actions contravene the terms and conditions of this Agreement or could adversely impact CMI's activities or reputation; or (5) the failure of loans sold by Correspondent to CMI pursuant to this Agreement to satisfy CMI's expectations regarding loan quality and/or performance.

Either party may terminate this Agreement for any other reason upon thirty (30) calendar days prior notice to the other. In the event of termination, Correspondent shall fully cooperate with and assist CMI in obtaining the documentation necessary to complete the processing and full resolution of all matters (including but not limited to the delivery of all application and/or closed loan documents and, if applicable, all Loan Insuring documentation) relating to all Loans purchased by CMI.

#### 8.   ASSIGNMENT

Correspondent may not assign this Agreement or any of its responsibilities under this Agreement. This Agreement and all rights, obligations and responsibilities hereunder may be assigned by CitiMortgage, Inc., without consent of the Correspondent, to any corporation or bank more than 50% of the voting stock of which is, directly or indirectly, owned by Citigroup, Inc.

#### 9.   NON-EXCLUSIVE AGREEMENT

Correspondent's rights under this Agreement are on a non-exclusive basis. CMI shall be free to market its products and services to, and to contract with, other parties and customers as it deems appropriate.

(03/04)

CORRESPONDENT
AGREEMENT
FORM 200

10.  INDEMNIFICATION

Correspondent agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) Correspondent's performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement or the CMI Manual and/or (iii) Correspondent's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of Correspondent and shall survive the expiration and termination of this Agreement.

11.  CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

(ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

(iii) was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-In-Lending Act) or state law or regulation;

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

(v) was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

CORRESPONDENT
AGREEMENT
FORM 200

12. GOVERNING LAW; VENUE

This Agreement shall be governed by the laws of the State of Missouri and applicable federal law.

CMI and Correspondent agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in St. Louis County Circuit Court or the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of either forum and waives the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in such state or federal court and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in either forum.

13. NOTICE

All notices to CMI shall be sent in accordance with the applicable provisions of the CMI Manual and shall be addressed according to such provisions.

Prior to or at the time Correspondent executes this Agreement, it shall provide CMI with one or more procedures and addresses for delivering notices pursuant to this Agreement. In addition to these procedures and addresses, Correspondent agrees and acknowledges that CMI may deliver all notices required by this Agreement in writing to Correspondent at the address listed on the last page of this Agreement.

14. MODIFICATION; MERGER; ENTIRE AGREEMENT; NO WAIVER OF RIGHTS

This Agreement may not be modified except by a document or record signed by both CMI and Correspondent. This Agreement (including the CMI Manual) contains the entire agreement of the parties and supersedes all previous agreements (including all amendments thereto) between the parties hereto. Any representations, promises or agreements not contained in this Agreement or the CMI Manual shall have no force or effect. The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

15. ON-SITE REVIEW AND DOCUMENT COLLECTION

Correspondent shall permit any officer, employee or designated representative of CMI, at any reasonable time during regular business hours and upon reasonable advance notice by CMI, to conduct an examination and audit on Correspondent's premises of any of the processes implemented and documents kept by Correspondent regarding any Loan purchased by CMI pursuant to this Agreement. If Correspondent fails to timely deliver, in accordance with the applicable terms and conditions specified in the CMI Manual, all documents and records associated with or related to any Loan purchased by CMI pursuant to this Agreement, Correspondent shall also give CMI and its officers, employees, or designated representatives reasonable access to Correspondent's premises in order to allow CMI to retrieve, prepare or otherwise obtain all such documents and records. Correspondent shall also make its officers, employees and/or designated representatives available to CMI and shall cooperate with CMI in all such examinations, audits and document and record collection activities.

16. AUTHORITY TO EXECUTE AGREEMENT

Correspondent represents and warrants that it has all requisite power, authority and capacity to enter into this Agreement and to perform all obligations required of it hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action(s). Correspondent shall, upon request by CMI, execute such supplemental resolutions, acknowledgments and/or certifications as may be reasonably necessary to evidence such power, authority and capacity.

(03/04)

## CORRESPONDENT AGREEMENT AMENDMENT

The Correspondent Loan Purchase Agreement (the "Agreement") was entered into on the _13_ day of May, 2005 by and between CitiMortgage, Inc. ("CMI"), whose principal office is at 1000 Technology, O'Fallon, Missouri 63304 and _MMA, Inc._ (the "Correspondent"), whose principal office is at _6021 - 244th St. SW, Mountlake Terrace, WA. 98043_

WHEREAS, Correspondent and CMI now wish to amend the Agreement (the "Amendment") on the terms described hereunder.

Therefore, the parties agree as follows:

1. The word "material" is added in the first sentence of Section 2(i) preceding the following word: "misrepresentation".

2. In Section 10 add a second paragraph as follows:

   > CMI agrees to indemnify and hold Correspondent harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) CMI's performance or failure to perform under the terms, conditions or obligations of this Agreement (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement and/or (iii) CMI's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of CMI and shall survive the expiration and termination of this Agreement.

3. In Section 11(v), delete all instances of "as defined in the CMI Manual" and replace with "as defined in the trade confirmation".

4. In Section 14, revise the second sentence to add ", trade confirmation" after "Agreement".

5. This Amendment and the Agreement constitute the entire Agreement between the parties with respect to its subject matter and any prior agreements, understandings, or other matters, whether oral or written, are hereby merged into and made a part hereof, and are of no further force or effect. All other terms and provisions of the Agreement shall remain in full force and effect.

# Exhibit WW

**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# GE's WMC Mortgage loans hit subprime ABX index

Fri, Mar 9 2007

By Al Yoon - Analysis

NEW YORK (Reuters) - General Electric Co.'s (GE.N: Quote, Profile, Research, Stock Buzz) subprime mortgage unit is responsible for some of the worst-performing loans in the benchmark index for the $575 billion market for home equity asset-backed securities, showing few lenders are immune to recent U.S. housing sector problems.

Losses on more than $2.6 billion in loans issued by WMC Mortgage, a Burbank, California-based unit of GE Money Bank, are expected to top 15 percent, the highest projected rate of any bond in the widely watched ABX derivative index of bonds issued in early 2006, a UBS Securities model showed.

The ABX-HE 06-2 index of subprime mortgage securities plunged as much as a third this year as concern that bonds and companies represented don't fully reflect potential losses created by loans to the riskiest borrowers.

The drop in the ABX index itself fueled a sell off in risky assets by investors who have been using the index as a leading indicator of sentiment in 2007.

WMC on Friday said that rising delinquencies on its loans would force it to fire 460 employees, or about 20 percent of its staff. The company closed two branches, said Mitch Freifeld, whose Clearwater, Florida-based Branch Management Solutions broker-service company has a relationship with WMC.

The credit problems in the subprime mortgage sector has emerging in the past few months as investors wary of the rapid rise in delinquencies put loans back to the issuers at a record pace, denting profit or creating losses.

More than two dozen lenders, including California based Fremont General Corp. FMT.N and New Century Financial Corp.NEW.N, have curtailed or stopped lending since February as Wall Street banks severed credit lines to the companies.

"Anything tainted with the subprime brush is being hammered no matter who you are," said Mirko Mikelic, a Grand Rapids, Michigan-based fund manager at Fifth-Third Asset Management, which has $22 billion under management.

Thirty-day delinquencies rose to 9.62 percent in February, from less than 2.0 percent six months ago, on WMC's loans backing one of the 20 bonds in the ABX 06-2 index, according to Morgan Stanley (MS.N: Quote, Profile, Research, Stock Buzz), whose Morgan Stanley ABS Capital I Trust packaged the loans into home equity ABS.

GE, the second-largest company in the world by market capitalization, purchased WMC Finance Co. in 2004, when it was the sixth-biggest subprime lender.

The foray into subprime and so-called Alt-A lending, loosely defined as loans to higher credit borrowers who otherwise fall short of the strictest documentation for a prime loan, was timely as the sectors' growth has outpaced that of prime mortgages.

Subprime loans grew to 13.6 percent of the total mortgage market last year from 2.4 percent in 2000, according to the Mortgage Bankers Association.

WMC issued $21.6 billion in loans last year, making it the ninth-biggest issuer, according to trade publication Inside B&C Lending. In 2003, WMC reportedly originated $8.2 billion.

WMC loans in Morgan Stanley's MSAC 2006-WMC2 bond carry characteristics of subprime issues that analysts have blamed for surging delinquencies.

More than half the loans have "stated" income documentation that don't require borrowers to prove their ability to repay the loan, data on Morgan Stanley's Web site showed.

First and second lien loans together cover more than 90 percent of the homes' values, making them riskier to investors since the homeowners have little equity at stake. Most lenders have been paring back on such loans, especially those with "piggyback" second mortgages that help finance 100 percent of the home.

WMC on Friday said it stopped making 100 percent loan-to-value mortgages, mirroring a move by Washington Mutual Inc.'s (WM.N: Quote, Profile, Research, Stock Buzz) Long Beach Mortgage subprime unit on Thursday, Freifeld said.

"The second-lien market and other highly levered loans are certainly history in the near term for less credit-worthy borrowers," New York-based Deutsche Bank AG analysts said in a note to clients this week.

WMC has "realigned our resources to be more consistent with today's market," said Brandie Young, a WMC spokeswoman. The company is not currently up for sale, unlike others such as Fremont, she said in an interview earlier this week.

Volatility in the ABX indexes administered by London-based Markit Group Ltd. has mesmerized financial markets as losses at subprime lenders became better known through fourth quarter earnings reports or failures to produce profit reports.

The "ABX-HE 06-2 BBB-" index that includes the MSAC issue fell sharply in December and the slide did not stop until investors saw "fair value' last week.

The projected losses on the MSAC deal are more than three percentage points above the 11.97 percent rate on Lehman Brothers Holdings Inc.'s LEH.N SAIL 2006-4 bond, and more than five times the 2.8 percent rate seen for Barclays Plc's (BARC.L: Quote, Profile, Research, Stock Buzz) SABR 2006-OP1 issue, according to the UBS model.

Analysts stress that the quality of bonds varies greatly from deal to deal, depending on loan attributes and the level of protection built in by bond underwriters.

Bonds sold by WMC's bond unit are seen among the safer ones in one struggling sector. Credit default swap spreads on "Baa3" rated WMC deals from 2006 this week widened 58 percent to 795 basis points in the past month, compared with a 122 percent increase for Fremont's issues to 1,245 basis points, Deutsche Bank data shows.

In 2006, GE Money represented 13.3 percent of the conglomerate's overall $163.39 billion in revenue and 13.3 percent of its $26.33 billion in segment profit.

But GE share prices have been relatively insulated from the fallout of other lenders that have issued disappointing earnings or failed.

GE stock this year has declined 7.0 percent amid concerns that the slowing U.S. economy would hurt earnings at the congolmerate.

Shares of Fremont and Countrywide Financial Corp. CFC.N, the largest U.S. mortgage lender, dove 52 percent and 15 percent, respectively.

(Additional reporting by Scott Malone in Boston)

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Exhibit XX



**The New York Times**
nytimes.com

From
ALEXANDER PAYNE
Director of
SIDEWAYS

March 22, 2007

# For Some Subprime Borrowers, Few Good Choices

By VIKAS BAJAJ

Myriam Philemond says she knew almost from the start that she and her husband could not afford the nearly $500,000 house they bought in South Boston more than a year ago.

After falling behind on payments in July, she is considering whether to turn the house over to her mortgage company because she cannot refinance and modifying her loan will not help. "We are stuck with a house that we can't afford," she said.

As problems with subprime mortgages have escalated, officials on Wall Street as well as in Washington have urged lenders and the government to step in and cushion the blow to troubled borrowers and find ways to enable them to remain in their homes.

That may not be possible in many cases.

Like Ms. Philemond, some will not be in a position to keep their homes because the properties they live in — bought during the boom in housing prices — are no longer worth what they paid. Some properties may be worth still less because the price was previously overstated. Many borrowers' incomes, which were often not verified, are insufficient to cover house payments, taxes, home insurance and other requirements.

"There is no way they can keep their homes," Lillie Searcy, executive director of the Mattapan Family Service Center, said about borrowers like Ms. Philemond, whom she has been helping. "It's impossible."

And in an unusual twist, the process of packaging and reselling home loans to investors — known as securitization, which has provided much of the cash that fueled subprime lending — has also made it harder to modify debts that go bad.

At the end of last year, more than 2.6 million home loans were either past due for more than 30 days or in foreclosure. About 40 percent of them were made to people with weak, or subprime, credit. Most economists predict that the number of troubled loans will continue to rise this year as more mortgages are adjusted to higher interest rates and home prices decline further.

Case 1:11-cv-05201-DLC   Document 53-8   Filed 01/20/12   Page 102 of 107

Last year, more than 37 percent of subprime loans were made without verification of borrowers' incomes, up from 15 percent in 2000, according to an analysis by JPMorgan Chase. Also, a third of borrowers took out a second mortgage, up from 6.8 percent in 2003, suggesting that they did not have enough money for a down payment.

For these borrowers, the best alternatives, according to some housing specialists, may include short sales, in which a lender accepts a sale for less than what is owed on the house, or a deed in lieu of foreclosure, where a lender takes ownership of a house instead of full payment of the mortgage.

Rising default rates have thus far had a modest impact on the overall economy, but economists fear that the problems could intensify if a broader range of borrowers, including those with stronger credit, start falling behind on payments. A big increase in the number of homes for sale, because of rising foreclosures, would put more pressure on prices and limit home buying and consumer spending.

The Senate Banking Committee will hold a hearing on problems in the subprime market today in Washington. Senator Christopher J. Dodd, Democrat of Connecticut and the committee's chairman, has suggested that the federal government may need to bail out homeowners in trouble, and some housing advocacy groups are calling for a moratorium on foreclosures.

Ms. Philemond, a receptionist, and her husband, who owns a sign business, have made several payments to try to catch up on past-due payments, but they are still thousands of dollars behind. She is unsure that they will be able to pay off the money overdue, let alone make the regular $3,800 monthly payments on two mortgages. The interest rate on her primary mortgage, now 6.99 percent, will become adjustable early in 2008, making the payments even higher.

Ms. Searcy said it appeared that the couple's income had been overstated on the mortgage application by brokers who had helped them buy the house and get a loan from WMC Mortgage, a unit of General Electric.

WMC said that it had granted Ms. Philemond the loan because the information on her application indicated that she and her husband had income of more than $100,000 a year, savings exceeding $60,000 and had a tenant.

This month, the company restricted the use of loans in which borrowers state their income without verification.

Case 1:11-cv-05201-DLC   Document 53-8   Filed 01/20/12   Page 103 of 107

A spokesman for General Electric's finance division, Robert J. Rendine, said, "The industry is becoming aware that because of the stresses that we are seeing, issues like this are being exposed."

Loss mitigation efforts by mortgage lenders and government subsides, to be clear, can help borrowers and limit losses. But experience thus far suggests that a more concerted and coordinated effort will be needed. It may also require a change in the policies governing what can be done with securitized loans.

To increase a borrower's chance of making required payments, lenders can do things like lowering interest rates on the loans, waiving past-due payments and fees, and extending the periods in which low teaser rates apply to loans.

But the options vary greatly, based on who owns the mortgages. Generally speaking, loans held by the banks that made them in the first place can be modified most easily. Loans that have been securitized are typically subject to greater restrictions, according to the terms on which they were sold to investors. Payments made by borrowers whose loans have been securitized are collected and processed by mortgage servicers.

According to a Bear Stearns analysis, half of all mortgage securities that make up a widely followed index allow the servicer to modify the interest rate, principal balance or maturity of a loan; 40 percent allow some modifications but require approval from a ratings agency if more than 5 percent of a pool of mortgages is changed, and 10 percent of loan pools allow no changes. About half of all modifications are successful at preventing foreclosures, according to the investment bank.

The restrictions are intended to protect investors against tampering with the cash flow generated by the loans. But in times of greater distress, investors prefer modifications that let them continue earning a return rather than having the property foreclosed, a costly process.

"You will see a greater willingness to work with borrowers," said Gyan Sinha, a senior analyst who follows the subprime market for Bear Stearns.

Much of the revamping will start occurring once investors sell off or write down the value of the loans to account for decreases in home prices and the delinquent status of the loans, said Stan Ross, chairman of the Lusk Center for Real Estate at the University of Southern California. Some borrowers may find that they can stay in their homes if the value is written down enough.

"You mark the asset down to current value," Mr. Ross said, "then you look at the borrower and say, 'Is this the borrower that will repay me?' "

But housing counselors and lawyers who have worked on behalf of borrowers say their experience suggests that is not yet happening.

They say that many servicers are unwilling to discuss modifications until loans are at least three months past due, a point when many borrowers are in deep financial trouble. Also, servicers are often unwilling or unable to make big enough changes to account for inflated appraisals and income levels that were used in underwriting the loans.

"Some of them take hundreds and hundreds of hours" of work and negotiations, said Diane Thompson, a lawyer at the Land of Lincoln Legal Assistance Foundation in East St. Louis, Ill. "It seems to me that is a terrible waste of our resources. It would be much better if the bad loans were never made, and if they were made, we would get people to accept responsibility for them."

Officials at some big mortgage servicers declined to discuss their practices, but an executive at Wells Fargo, which services the seventh-largest subprime loan portfolio, according to Inside Mortgage Finance, a trade publication, says it has taken an active approach.

Mary Coffin, executive vice president for servicing at Wells Fargo Home Mortgage, said the company repeatedly warns borrowers about coming interest rate changes, gives them access to loss-mitigation specialists before they are delinquent for 90 days, and refers them to financial counselors if they need such help.

"The sooner that we work with them, the more success we will have," Ms. Coffin said. She also asserted that the company did not make loans that allowed customers to put little or no money down, which she acknowledged were a lot harder to modify or refinance because the owners typically had no equity in their properties.

Consider Andrew D. Sobel, a 48-year-old in San Diego, who took out two mortgages to buy a $240,000 condominium in 2004 and is now facing its sale for $175,000. He could not afford higher monthly payments that took effect in September, when his loan was converted to a variable interest rate. Countrywide, which services his loan, would not agree to modify the loan but was willing to accept the short sale. He could not refinance because the home is worth less than what he owes on the property.

"There was never any effort to try to keep me in my home," he said.

More borrowers may find themselves in a similar situation in the next two years as the first interest rate adjustments take effect on loans in 2004 and 2005. Those who continue to have spotty credit and little equity in their homes will be at the greatest risk because many lenders are no longer offering no-money-down mortgages to people with weak credit.

"If someone calls and says they want do a 100 percent loan," said Jeff Jaye, a mortgage broker in San Jose, Calif., "my antenna goes up. My first question is 'What's your credit score?' "

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | **RSS** | First Look | Help | Contact Us | Work for Us | Site Map |

# Exhibit YY

**The New York Times**
nytimes.com

From
ALEXANDER PAYNE
Director of
SIDEWAYS



July 13, 2007

# General Electric to Sell WMC Mortgage, a Subprime Loan Unit

## By THE NEW YORK TIMES

General Electric will abandon the subprime mortgage market by selling the company's unit that makes loans to borrowers with weak credit histories. The decision to sell the unit, WMC Mortgage, was announced by the company yesterday in an e-mail message to employees, and confirmed by a person who had read it.

The current subprime market environment has had a negative impact on the business, Laurent Bossard, chief executive of unit, wrote in the memo.

Russell Wilkerson, a spokesman for the company declined, to comment on the memo or sale.

Defaults in the subprime market have exploded this year, causing more than 50 subprime lenders to shut their doors. General Electric entered the subprime market three years ago.

In the past year, WMC Mortgage laid off more than 1,200 workers, reducing its staff to about 700.

In the year's first quarter, the company announced that it had made just $3.4 billion in new loans, down from $9 billion in the preceding quarter.

The company has been aggressively selling loans on its books, decreasing its portfolio by $3 billion, and leaving the unit with less than $1.5 billion.

Analysts said that it was unlikely G.E. had already identified a buyer, but that the company had hired Morgan Stanley as advisers in the sale.

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map |