UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
FEDERAL HOUSING FINANCE AGENCY, etc.,     :
                        Plaintiff,        :
            -v-                           :   11 Civ. 5201 (DLC)
                                          :
UBS AMERICAS, INC., et al.,               :   OPINION & ORDER
                        Defendants.       :
                                          :
------------------------------------------X

APPEARANCES:

For the plaintiff:
Philippe Z. Selendy
Kathleen M. Sullivan
Adam M. Abensohn
Manisha M. Sheth
Jordan A. Goldstein
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601

For defendants:
Jay B. Kasner
Scott D. Musoff
Robert A. Fumerton
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036

DENISE COTE, District Judge:

        This is one of seventeen actions brought by the Federal

Housing Finance Agency ("FHFA" or "the Agency"), as conservator

of the Federal National Mortgage Association ("Fannie Mae") and

the Federal Home Loan Mortgage Corporation ("Freddie Mac")

(collectively, the "Government Sponsored Enterprises" or

"GSEs"), against various financial institutions involved in the packaging, marketing and sale of residential mortgage-backed securities that the GSEs purchased in the period from 2005 to 2007.  Fifteen of the actions filed in New York courts -- both state and federal -- are currently concentrated before this Court for coordinated pretrial proceedings.[1]

FHFA brought this case against USB Americas, Inc. ("UBS Americas") and various affiliated entities and individuals[2] on July 27, 2011.  The Agency's Second Amended Complaint ("SAC"), filed on December 21, 2011, asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, $l$(a)(2), o; the Virginia Securities Act, VA Code Ann.

---

[1] See Federal Housing Finance Agency ("FHFA") v. UBS Americas, Inc., et al., 11 Civ. 5201 (DLC); FHFA v. JPMorgan Chase & Co., et al., 11 Civ. 6188 (DLC); FHFA v. HSBC North America Holdings, Inc., et al., 11 Civ. 6189 (DLC); FHFA v. Barclays Bank PLC, et al., 11 Civ 6190 (DLC); FHFA v. Deutsche Bank AG, et al., 11 Civ. 6192 (DLC); FHFA v. First Horizon National Corp., et al., 11 Civ 6193 (DLC); FHFA v. Bank of America Corp., et al., 11 Civ. 6195 (DLC); FHFA v. Citigroup Inc., et al., 11 Civ. 6196 (DLC); FHFA v. Goldman, Sachs & Co., et al., 11 Civ. 6198 (DLC); FHFA v. Credit Suisse Holdings (USA), Inc., et al., 11 Civ. 6200 (DLC); FHFA v. Nomura Holding America, Inc., et al., 11 Civ. 6201 (DLC); FHFA v. Merrill Lynch & Co., Inc., et al., 11 Civ. 6202 (DLC); FHFA v. SG Americas, Inc., et al., 11 Civ. 6203 (DLC); FHFA v. Morgan Stanley, et al., 11 Civ. 6739 (DLC); FHFA v. Ally Financial Inc., et al., 11 Civ. 7010 (DLC).

[2] The defendants are UBS Americas, UBS Real Estate Securities, Inc. ("UBS Real Estate"), UBS Securities, LLC ("UBS Securities"), Mortgage Asset Securitization Transactions, Inc. ("MASTR"), David Martin, Per Dyrvik, Hugh Corcoran, and Peter Slagowitz.

2

§ 13.1-522(A)(ii), (C); the District of Columbia Securities Act, D.C. Code § 31-5606.05(a)(1)(B), (c); and the common law tort of negligent misrepresentation.  On January 20, 2012, defendants filed a motion to dismiss the SAC.  The motion was fully submitted on February 24.  For the reasons that follow, the motion is granted in part.

BACKGROUND

On July 30, 2008, in the midst of a housing crisis, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA").  See Pub. L. No. 110-289, 122 Stat. 2654 (2008).  As part of the Act, Congress established FHFA as the regulator of Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  See id. § 1101.  HERA included a provision authorizing the Director of FHFA to place the GSEs into conservatorship under the Agency's authority "for the purpose of reorganizing, rehabilitating, or winding up [their] affairs."  Id. § 1367(a)(3).  On September 6, 2008, FHFA Director James B. Lockhart III invoked this authority and appointed the Agency as conservator of both GSEs, giving FHFA the right to assert legal claims on their behalf.

The SAC can be briefly summarized.  Plaintiff contends that Fannie Mae and Freddie Mac purchased over $6.4 billion in residential mortgage-backed securities ("RMBS") sponsored or

underwritten by UBS entities during the period between September 2005 and August 2007.  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans that are held by a trust.  For each of the securities at issue here, the offering process began with a "sponsor," which acquired or originated the mortgage loans that were to be included in the offering.[3]  The sponsor transferred a portfolio of loans to a trust that was created specifically for that securitization; this task was accomplished through the involvement of an intermediary known as a "depositor."[4]  The trust then issued Certificates to an underwriter, in this case UBS Securities, which in turn, sold them to the GSEs.  The Certificates were backed by the underlying mortgages.  Thus, their value depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.

Each of the Certificates implicated in this case was issued pursuant to one of seven Shelf Registration Statements filed

---

[3] The mortgage originators in this case, none of whom are parties to the action, include Wells Fargo Bank, N.A.; Countrywide Home Loans; American Home Mortgage Corp.; Fremont Investment & Loan; WMC Mortgage Corp.; IndyMac Bank, F.S.B.; and New Century Mortgage Corp.

[4] For 16 of the 22 securitizations at issue in this case, defendant UBS Real Estate acted as the sponsor and defendant MASTR acted as the depositor.

with the Securities and Exchange Commission ("SEC").  Each

individual defendant signed one or more of the two Shelf

Registration Statements that pertained to the securitizations

for which MASTR acted as depositor.  The Registration Statement,

together with the relevant prospectus and prospectus supplement

constitute the "offering documents" for each security.

Generally, FHFA asserts that the offering documents for the

twenty-two securitizations identified in the complaint

"contained materially false statements and omissions."[5]  More

---

[5] The twenty-two securitizations at issue are: Argent Securities
Inc. Trust, Series 2006-W3 ("ARSI 2006-W3"); Fremont Home Loan
Trust, Series 2006-B ("FHLT 2006-B");  Home Equity Mortgage Loan
Asset-Backed Trust, Series INABS 2005-C ("INABS 2005-C"); Home
Equity Mortgage Loan Asset-Backed Trust, Series INABS 2005-
D("INABS 2005-D"); Home Equity Mortgage Loan Asset-Backed Trust,
Series INABS 2006-D ("INABS 2006-D"); Home Equity Mortgage Loan
Asset-Backed Trust, Series INABS 2007-A ("INABS 2007-A"); MASTR
Asset Backed Securities Trust, Series 2005-WF1 ("MABS 2005-
WF1"); MASTR Asset Backed Securities Trust, Series 2005-FRE1
("MABS 2005-FRE1"); MASTR Asset Backed Securities Trust, Series
2005-HE2 ("MABS 2005-HE2"); MASTR Adjustable Rate Mortgages
Trust, Series 2005-8 ("MARM 2005-8"); MASTR Adjustable Rate
Mortgages Trust, Series 2006-2 ("MARM 2006-2"); MASTR Adjustable
Rate Mortgages Trust, Series 2006-OA1 ("MARM 2006-OA1"); MASTR
Asset Backed Securities Trust, Series 2006-FRE2 ("MABS 2006-
FRE2); MASTR Asset Backed Securities, Series 2006-WMC2 ("MABS
2006-WMC2"); MASTR Asset Backed Securities Trust, Series 2006-
WMC3 ("MABS 2006-WMC3"); MASTR Asset Backed Securities Trust,
Series 2006-NC2 ("MABS 2006-NC2"); MASTR Asset Backed
Securities, Series 2006-WMC4 ("MABS 2006-WMC4"); MASTR Asset
Backed Securities Trust, Series 2006-NC3 ("MABS 2006-NC3");
MASTR Adjustable Rate Mortgages Trust, Series 2007-1 ("MARM
2007-1"); MASTR Asset Backed Securities Trust, Series 2007-WMCI
("MABS 2007-WMC1"); MASTR Adjustable Rate Mortgages Trust,
Series 2007-3 ("MARM 2007-3"); and MASTR Asset Backed Securities
Trust 2007-HE2 ("MABS 2007-HE2").

particularly, the SAC alleges that "[d]efendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans."  The offering documents are also alleged to have contained representations regarding "the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges" that were both false and materially incomplete.  Plaintiff asserts that "the false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer billions of dollars in damages," because "[t]he mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statement."

DISCUSSION

I.  FHFA's Claims are Not Barred by the Securities Act's Statute of Repose.

Defendants' chief argument in favor of dismissal is that this action is untimely because "all of Plaintiff's claims were

extinguished no later than August 30, 2010 -- nearly one full year before the original complaint was filed on July 27, 2011." Defendants argue that this action is governed by Section 13 of the Securities Act, which sets forth the time limitations that generally apply to claims under Section 11 or Section 12(a)(2). Titled "Limitation of Actions," Section 13 provides:

> <u>No action shall be maintained</u> to enforce any liability created under section 77k [Section 11] or 77l(a)(2) [Section 12(a)(2)] of this title <u>unless brought within one year after the discovery of the untrue statement or the omission</u>, or after such discovery should have been made by the exercise of reasonable diligence . . . . <u>In no event shall any such action be brought</u> to enforce a liability created under section 77k or 77l(a)(2) of this title <u>more than three years after the security was bona fide offered to the public</u>, or under section 77l(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m (emphasis added). Thus, under Section 13, a suit alleging that a defendant violated either Section 11 or Section 12(a)(2) must be filed (a) within one year of the date that the plaintiff discovered the violation, or (b) within three years of the date that the security was offered to the public, whichever is earlier. Courts sometimes refer to the former period as a "statute of limitations" and the latter period as a "statute of repose." See <u>P. Stoltz Family Partnership L.P. v. Daum</u>, 355 F.3d 92, 102 (2d Cir. 2004).

As noted above, FHFA's claims pertain to securities offerings that occurred between September 2005 and August 2007.

7

Because these offerings occurred more than three years before July 27, 2011, when this suit was filed, under normal circumstances Section 13 would bar FHFA's Securities Act claims, irrespective of when the Agency "discovered" the violations that it alleges.  FHFA does not dispute that this is so.  It argues, however, that the timeliness of its claims is governed not by Section 13 but rather by HERA, which the Agency argues establishes superseding rules governing the timeliness of any action in which FHFA is a plaintiff.

In particular, FHFA relies on HERA § 1367(b)(12), which provides:

> (A) In general -- Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Agency as conservator or receiver shall be--
>      (i) in the case of any contract claim, the longer of--
>           (I) the 6-year period beginning on the date on which the claim accrues; or
>           (II) the period applicable under State law; and
>      (ii) in the case of any tort claim, the longer of--
>           (I) the 3-year period beginning on the date on which the claim accrues; or
>           (II) the period applicable under State law.
> (B) Determination of the date on which a claim accrues -- For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of--
>      (i) the date of the appointment of the Agency as conservator or receiver; or

(ii) the date on which the cause of action
accrues.

12 U.S.C. § 4617(b)(12) (emphasis added).  In the Agency's view,
HERA governs the timeliness of its Securities Act claims, to the
exclusion of Section 13 entirely.  For the claims at issue in
this case, which accrued prior to the conservatorship and sound
in tort, the Agency maintains that the only relevant timeliness
concern is the three-year statute of limitations dictated by
HERA.  Thus, because FHFA was appointed conservator of the GSEs
on September 6, 2008, it had until September 6, 2011 to bring
this case, making it timely when filed on July 27, 2011.

Defendants dispute this reading of HERA.  They argue that,
to the extent it applies to federal claims at all, the statute's
only effect with regard to the Securities Act was to relieve
FHFA of the requirement that it file suit within one year of
discovering the misrepresentations for which it seeks to
recover; the three-year post-offering deadline remains in place.
But this argument cannot be squared with HERA's text or purpose.

A.  "Statutes of Limitations" and "Statutes of Repose"

Because the parties' disagreement turns on the meaning of
HERA, a federal statute, we must "begin with the language
employed by Congress and the assumption that the ordinary
meaning of that language accurately expresses the legislative
purpose."  Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt.

Dist., 541 U.S. 246, 252 (2004) (citation omitted).  If a statute's language is unambiguous, "the sole function of the courts is to enforce it according to its terms."  Katzman v. Essex Waterfront Owners LLC, 660 F.3d 565, 568 (2d Cir. 2011) (citation omitted).  As the Supreme Court has recently reminded us, however, when it comes to the meaning of a particular statutory phrase, "context matters."  Carco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 132 S. Ct. 1670, 1681 (2012); see also id. n.6 (citing FCC v. AT&T Inc., 131 S. Ct. 1177, 1181-85 (2011), for the proposition that a proposed definition should be rejected where "it [does] not always hold in ordinary usage and the statutory context suggest[s] it [does] not apply").  Thus, when interpreting a statute, courts are not to "construe each phrase literally or in isolation."  Pettus v. Morgenthau, 554 F.3d 293, 297 (2d Cir. 2009).  Rather, they must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole."  Id.

In contending that HERA does not affect Section 13's three-year deadline for claims under the Securities Act, defendants rely heavily on the semantic distinction between "statutes of limitations" and "statutes of repose."  Although closely related, the two terms are, at least in theory, conceptually distinct:

10

> "[S]tatutes of limitations bear on the availability of
> remedies and, as such, are subject to equitable
> defenses, the various forms of tolling, and the
> potential application of the discovery rule.   In
> contrast, statutes of repose affect the availability
> of the underlying right: That right is no longer
> available on the expiration of the specified period of
> time.   In theory, at least, the legislative bar to
> subsequent action is absolute, subject to
> legislatively created exceptions set forth in the
> statute of repose."

Stoltz, 355 F.3d at 102 (quoting Calvin W. Corman, Limitation of
Actions, § 1.1, at 4-5 (1991)).

Relying on this distinction, defendants argue that because
HERA addresses only "statutes of limitations" and makes no
mention of "statutes of repose," it cannot have altered the
three-year post-offering bar that Section 13 imposes on claims
under the Securities Act.  But, as is apparent even from the
title of the treatise on which the Stoltz Court relied, in
ordinary usage, the semantic distinction between "statutes of
repose" and "statutes of limitations" is not as clear as
defendants would have us believe.

Indeed, Congress, the courts and learned commentators
regularly use the term "limitations" to encompass both types of
timeliness provision.  As FHFA notes, Section 13 itself is
entitled "Limitations on Actions," and nowhere uses the term
"repose."  See 15 U.S.C. § 77m.  Even more tellingly, in 2002,
Congress modified the repose period applicable to claims under

the Securities Exchange Act of 1934, the Securities Act's cousin statute, in a provision entitled "Statute of limitations for securities fraud."  Sarbanes-Oxley Act, Pub. K. No. 107-204, § 804, 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658(b)) (emphasis added); see Stoltz, 355 F.3d at 104 (acknowledging that this provision "extend[ed] the effective date of the statute of repose from three years to five years").  This Court and others in this District, well versed in the law of securities, have likewise used the term "statute of limitations" to invoke the three-year repose period on which the defendants rely here.  See In re WorldCom, Inc. Sec. Litig., Nos. 02 Civ. 3288 (DLC), 03 Civ. 9499 (DLC), 2004 WL 1435356, at *3 (S.D.N.Y. June 28, 2004) (referencing "the three year statute of limitations contained in the Securities Act"); id. at *6 ("Prior to the enactment of Sarbanes-Oxley, the statute of limitations for Exchange Act claims was a one-year/three-year regime.");  In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 522 (S.D.N.Y. 2005) ("The Court need not address the three-year statute of limitations under section 13 of the Securities Act"); In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 198 (S.D.N.Y. 2003) (Lynch, J.) (discussing "the one-year/three-year statute of limitations set forth in 15 U.S.C. § 77m"); Griffin v. PaineWebber Inc., 84 F. Supp. 2d 508, 512 n.1 (S.D.N.Y. 2000)

(addressing the "3-year statute of limitations" applicable to claims under Section 12(a)(2) of the Securities Act).

Using the term "statute of limitations" to encompass both the narrow meaning intended by Stoltz as well as any repose period makes sense, because, conceptually, a "statute of repose" must be understood in relation to the "statute of limitations" that it acts upon -- that is as a limitation on the plaintiff's ability to argue that the regular time limit for bringing a claim should be tolled or that it began to run at some later-than-expected point. Indeed, when the only timeliness provision in a statute is one that is not subject to equitable defenses and is therefore absolute -- in the terminology of Stoltz, when the claim is governed only by a "statute of repose" -- the law generally refers to the timeliness provision not as a "statute of repose" but as a "statute of limitations" that is "jurisdictional" in nature. See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-34 (2008).[6]

As should be apparent from this discussion, the definition of "statute of limitations" proposed by the defendants does not

---

[6] Admittedly, there is a formal distinction between Soltz's notion of a "statue of repose," which is envisioned as a substantive bar to recovery, and a jurisdictional statute of limitations, which bars the Court from acting on the plaintiff's claim but, in theory, does not alter her substantive rights. This difference is largely theoretical, however. What matters from the perspective of the "reasonable reader," Pettus, 554 F.3d at 297, is that the claim is categorically barred.

always "hold in ordinary usage."  <u>Novo</u> <u>Nordisk</u>, 132 S. Ct. at
1681 n.6.  Moreover, the statutory context strongly suggests
that defendants' proposed definition of "statute of limitations"
does not apply here.

Passed by the Senate during a special weekend session and
signed by the President only days later, HERA is emergency
legislation aimed at addressing some of the most pressing
problems of the housing crisis -- chief among them the
questionable financial security of the GSEs.  Consistent with
this goal, Congress gave FHFA the power to appoint itself
conservator of the GSEs and "take such action as may be -- (i)
necessary to put the [GSEs] in a sound and solvent condition;
and (ii) appropriate to carry on the business of the [GSEs] and
preserve and conserve [their] assets and property,"  12 U.S.C.
§ 4617(b)(2)(D).  In addressing the Agency's powers as
conservator, Congress specifically referenced the "collect[ion
of] all obligations and money due to the [GSEs]."  <u>Id.</u>
§ 4617(b)(2)(B)(ii).  In order to facilitate these functions,
HERA specified a "statute of limitations with regard to <u>any</u>
<u>action</u> brought by the Agency as conservator" that, in the case
of claims such as these, entitles the Agency to three years from
the onset of the conservatorship to bring suit.  As another
court has recognized, the purpose of this provision was

14

unambiguously to give FHFA "more time to decide whether and how to pursue any claims it inherited as [the GSEs'] newly-appointed conservator."  In re Fed. Nat. Mortg. Ass'n Sec., Deriv., ERISA Litig., 725 F. Supp. 2d 169, 177-78 (D.D.C. 2010), reversed on other grounds by Kellmer v. Raines, 674 F.3d 848 (D.C. Cir. 2012).[7]

Reading HERA's reference to "statute of limitations" in the narrow fashion that defendants propose would undermine the congressional purpose of a statute whose overriding objective was to maximize the ability of FHFA to "put the [GSEs] in a sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D).  The

---

[7] Defendants contend that while this may have been Congress's intent with respect to statutes of limitations, Congress could not have intended to affect statutes of repose for another reason as well.  The argument turns on defendants' characterization of statutes of limitations as "procedural" and statutes of repose as "substantive."  Defendants assert that because "a federal statute cannot re-write state substantive law," HERA could not, as a matter of federal power, displace state statutes of repose.  Accordingly, they conclude that HERA's limitations provision must be read to apply only to statutes of limitations at both the state and federal levels.

Defendants' argument fails on two fronts.  First, they have the legal doctrine backwards: state sovereignty principles primarily limit Congress's ability to affect state-court procedure, not its ability to modify state substantive law.  See Jinks v. Richland County, 538 U.S. 456, 464 (2003).  Second, the Supreme Court has rejected defendants' argument that state statutes of limitation should be considered "procedural" for purposes of federalism analysis.  Indeed, in Jinks itself, the Court recognized that federal legislation purporting to toll state statutes of limitations "falls on the 'substantive' side of the line" and is therefore within the federal power. Id. at 465.

more natural reading of the provision, the one that is both in-line with everyday usage and consistent with the objectives of the statute overall, is that by including in HERA a provision explicitly setting out the "staute[s] of limitations" applicable to claims by FHFA, Congress intended to prescribe comprehensive time limitations for "any action" that the Agency might bring as conservator, including claims to which a statute of repose generally attaches.[8]

B.  HERA's Statute of Limitations Provision Applies to Both
Federal and State Claims.

Defendants next argue that HERA's limitations provision applies only to state statutes of limitations and, consequently, has no relevance to federal-law claims such as those that plaintiff brings under the Securities Act.  In support of this argument, defendants point out chiefly that while HERA § 1367(b)(12) anticipates cases in which state tort and contract

---

[8] Defendants argue that in order to conclude that Section 13's three-year statute of repose does not apply to FHFA's claims, the Court would be required to conclude that HERA impliedly repealed that provision of the Securities Act.  They are wrong. Even on the construction suggested by the plaintiff, Section 13 continues to apply with full force to the vast majority of litigants; HERA creates an exception for a single, privileged plaintiff -- FHFA.  Moreover, because, as explained above, HERA's reference to the "statute of limitations" encompasses not only the narrower use of the term advocated by defendants but also what defendants refer to as "statutes of repose," HERA no more impliedly repealed the latter than it did the former.  And even defendants agree that, to the extent it applies to federal claims, HERA constitutes a valid extension of Section 13's one-year limitation period.

16

law might afford a statute of limitations longer than the three-
and six-year periods specified, it makes no similar provision
for federal statutes, such as the Racketeer Influenced and
Corrupt Organizations Act, that carry a longer limitations
period.

This argument fails in the face of the limitations
provision's plain language, which states in unambiguous terms
that it shall apply to "any action brought by the Agency as
conservator," 12 U.S.C. § 4617(b)(12)(A) (emphasis added).
Defendants' interpretation is also inconsistent with HERA's
objective, discussed at length above, of facilitating FHFA's
mission to "to put the [GSEs] in a sound and solvent condition"
by, among other things, "collect[ing on] all obligations and
money due to [them]." Id. § 4617(b)(2)(D), 4617(b)(2)(B)(ii).[9]

Although it may be the case, as defendants contend, that
Congress could have been clearer about HERA's applicability to
claims under federal law, "the mere possibility of clearer
phrasing cannot defeat the most natural reading of a statute; if
it could (with all due respect to Congress), we would interpret
a great many statutes differently than we do." Novo Nordisk
A/S, 132 S. Ct. at 1682. In this case, for the reasons that

---

[9] For the same reasons the Court rejects defendants' argument,
made in a footnote, that HERA does not apply to statutory
claims.

have been discussed at length in this Opinion, the most natural reading of Section 1367(b)(12) is that it affords FHFA three years from the date of conservatorship to bring suit on its Securities Act claims, irrespective of any other provision of law.

## II. The GSEs' Claims Were Open When FHFA's Conservatorship Began.

Defendants also contend that, even if HERA governs the timeliness of Securities Act claims in general, plaintiff's particular claims were barred by Section 13's one-year statute of limitations before the relevant provision of the HERA took effect.  As defendants note, HERA explicitly provides that the statute does not revive claims for which the statute of limitations had expired prior to the conservatorship unless the claim arose from "fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the regulated entity."  12 U.S.C. § 4617(b)(13).

In order to show that plaintiff's Securities Act claims accrued and expired prior to the conservatorship, defendants cite a series of news accounts, lawsuits and other reports that they assert placed the GSEs on "inquiry notice" of the potential that the offering materials for these securities contained material misstatements or omissions.  In focusing their

arguments around when the GSEs had "inquiry notice," defendants
rely on Second Circuit authority that plaintiff argues has been
abrogated by the Supreme Court's decision in <u>Merck & Co. v.</u>
<u>Reynolds</u>, 130 S. Ct. 1784 (2010).  Thus, before analyzing
defendants' specific claims, some discussion of the accrual
standard under the Securities Act is warranted.

A. Accrual of Claims Under the Securities Act

     As noted, Section 13 of the Securities Act sets out the
accrual standards and time limitations that apply to actions
brought under Sections 11 or 12(a)(2).  As relevant here,
Section 13 provides:

> No action shall be maintained to enforce any liability
> created under section 77k or 77l(a)(2) of this title
> unless brought within one year after the <u>discovery</u> of
> the untrue statement or the omission, <u>or after such</u>
> <u>discovery should have been made by the exercise of</u>
> <u>reasonable diligence</u> . . . .

15 U.S.C. § 77m (emphasis added).  The equivalent provision
governing claims under the Exchange Act reads, in relevant part:

> [A] private right of action that involves a claim of
> fraud, deceit, manipulation, or contrivance in
> contravention of a regulatory requirement concerning
> the securities laws, as defined in section 3(a)(47) of
> the Securities Exchange Act of 1934, may be brought
> not later than . . . 2 years after the <u>discovery</u> of
> the facts constituting the violation . . . .

28 U.S.C. § 1658 (emphasis added).

Unlike Section 13, the Exchange Act provision omits any reference to circumstances in which discovery of the basis for the claim "should have been made by the exercise of reasonable diligence." Nonetheless, prior to Merck, the law in this Circuit was that the accrual standards under the two statutes were identical. See Dodds v. Cigna Secs., Inc., 12 F.3d 346, 349-50 (2d Cir. 1993).[10] Thus, a potential plaintiff under either the Securities Act or the Exchange Act was deemed to have "discover[ed]" an untrue statement or omission upon obtaining "actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992). Moreover, the prevailing view in this Circuit became that the two statutes "impose[d] a duty of inquiry," that was triggered when "the circumstances [were] such as to suggest to a

---

[10] Although the Sarbanes-Oxley Act of 2002 ("SOX"), Pub. L. No. 107-204, 116 Stat. 745, lengthened the limitations periods available to Exchange Act plaintiffs, the key accrual language was left unchanged. Before SOX, claims under Section 10(b) of the Exchange Act were governed by the statute of limitations applicable to private claims of market manipulation under Section 9(e) of the original Act. That provision read, in part:
> No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.
See Dodds, 12 F.3d at 350 n.2 (quoting 15 U.S.C. § 78i(e) (1988)).

person of ordinary intelligence the probability" that she had a cause of action.  Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 701 (2d Cir. 1994) (emphasis added) (citation omitted).

In Merck, the Supreme Court rejected the Second Circuit's "inquiry notice" standard as applied to the accrual of claims under the Exchange Act.  As the Court explained, "the 'discovery' of facts that put a plaintiff on 'inquiry' notice does not automatically begin the running of the limitations period."  130 S. Ct. at 1798.  "If the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'"  Id. at 1797.

The Court acknowledged, however, that, "'discovery' in respect to statutes of limitations for fraud has long been understood to include discoveries a reasonably diligent plaintiff would make."  Id. at 1795.  Accordingly it declined to fashion a rule that would require an Exchange Act plaintiff, in all cases, to possess actual knowledge of the facts constituting the violation before the statute of limitations could begin to run.  Rather, the Court concluded that the limitations period

under the Exchange Act begins to run upon discovery of, or when "a reasonably diligent plaintiff would have discovered, the facts constituting the violation." Id. at 1798 (quoting 28 U.S.C. § 1658(b)(1)).  Following Merck, the Second Circuit has held that a fact is not "discovered" for the purposes of Exchange Act claims until "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

The Second Circuit has yet to rule on whether Merck's holding extends beyond the context of the Exchange Act to claims under the Securities Act.  But the majority of district courts that have considered the matter have concluded that it does. See In re Bear Stearns Mortgage Pass-Through Certificates Litig., No. 08 Civ. 8093 (LTS)(KNF), 2012 WL 1076216, at *12 (S.D.N.Y. Mar. 30, 2012); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 370-71 & n.39 (S.D.N.Y. 2011); Brecher v. Citigroup Inc., 797 F. Supp. 2d 354, 367 (S.D.N.Y. 2011); New Jersey Carpenters Health Fund v. Residential Capital, LLC, Nos. 08 CV 8781 (HB), 08 CV 5093 (HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011); but see In re IndyMac Mortgage-Backed Securities Litig., 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011).

The majority position makes good sense.  Both statutes use the plaintiff's "discover[y]" of the factual predicate of the claim as the triggering date for the statute of limitations. Although the Securities Act includes the qualification that the limitations period may also begin to run "after such discovery should have been made by the exercise of reasonable diligence," 15 U.S.C. § 77m, the Merck Court interpreted the use of the term "discover" in the context of the Exchange Act to embrace an essentially identical diligence requirement and nonetheless concluded that the inquiry standard that defendants advocate in this case was excessively broad.

Given that the Supreme Court has interpreted the Exchange Act's "discovery" standard to imply the diligence requirement that the Securities Act makes explicit, there appears to be no principled reason to depart from the precedents of this Circuit holding that the accrual standards under the two statutes are to be interpreted identically.  See Dodds, 12 F.3d at 349-50. Indeed, the Merck Court itself described with approval the long-standing practice of adopting the Securities Act's explicit "reasonable diligence" standard for the Exchange Act accrual date, despite "the omission of an explicit provision to that effect."  Merck, 130 S. Ct. at 1795.  Accordingly, the Court concludes that the statute of limitations for FHFA's Securities

23

Act claims did not begin to run until "a reasonably diligent plaintiff" in the GSEs' position would have had "sufficient information about [a given misstatement or omission] to adequately plead it in a complaint."  City of Pontiac, 637 F.3d at 175.

B.  The GSEs' Discovery of Defendants' Alleged Misstatements

Applying the accrual standard set out in Merck and City of Pontiac, the Court has little trouble concluding that FHFA's Securities Act claims were open at the time the time the GSEs were placed into conservatorship.  As discussed in greater detail below, the essence of the Agency's case is that the offering materials for the securitizations at issue here included materially false or misleading information regarding: (1) the value of the underlying mortgage properties; (2) the percentage of underlying properties that were owner occupied; and (3) the degree to which the underlying mortgage loans were underwritten in accordance with certain risk guidelines.  To support these allegations, the SAC relies principally on FHFA's own survey of loan-level data for a sample of mortgage loans in each securitization, which the Agency argues, reveals that the offering materials contained material inaccuracies with regard to each of the three categories of information.  To support the allegation that defendants failed to act diligently to ensure

that loans included in the securitizations had been underwritten in accordance with the risk guidelines set out in the offering materials, the SAC also cites a series of government and private reports that have revealed systematic underwriting failures by many of the mortgage originators whose loans were included in the Securitizations.

Defendants seize on this last point, noting that a myriad of legal complaints, government investigations, news articles and statements by the GSEs' own representatives makes clear that the originators' questionable loan practices were widely known as early as September 2007.  From this fact, defendants conclude that "Fannie Mae and Freddie Mac . . . were on notice of the misrepresentations and omissions about which they complain" more than a year before September 6, 2008, when they were placed into conservatorship.  As noted above, however, under Merck the relevant question in assessing the timeliness of these claims is not when the GSEs were put "on notice" of the potential that the prospectuses included material misstatements or omissions, but rather when they, or a reasonably diligent plaintiff in their position, could have "discovered" that this was so with sufficient particularity to plead a Securities Act claim that would survive a motion to dismiss.

To the extent defendants contend this standard was met as early as September 2007, that claim is significantly undercut by the assertion elsewhere in their motion to dismiss that FHFA has, even now, failed to allege facts sufficient to support a claim under the Securities Act.  Recognizing this tension in their argument, defendants attempt to turn the tables on the plaintiff -- asserting that "either the information in the SAC is insufficient to plead its claims, or Plaintiff had enough information to plead its claims prior to September 2007."  But defendants pose a false dichotomy.  Between 2007 and the filing of this complaint an important event occurred that caused the GSEs to discover that the loans included in the securitizations they bought from defendants were not as advertised: the securities were downgraded from investment grade to near-junk status.  The earliest of those downgrades occurred on February 15, 2008 for Freddie Mac, and March 3, 2008, for Fannie Mae -- less than a year before September 6, 2008, when the GSEs were placed into conservatorship.

The truth of the matter is that when the GSEs learned of the loan originators' dubious underwriting practices says little about when they discovered the facts that form the basis of this complaint.  FHFA's claim here is not that the originators failed to scrutinize loan applicants adequately in general; it is that

defendants failed to act diligently to ensure that, consistent
with the representations in the offering materials, the
originators' questionable practices did not lead to the
inclusion of non-conforming loans in the particular
securitizations sold to the GSEs.  The downgrade of the
securities' credit ratings and the results of the loan audit
that FHFA undertook in response to that action are crucial to
the Agency's claim in this regard, since they are the only facts
that connect the originators' general practices to particular
securities that the GSEs bought from defendants.  Accord In re
Bear Stearns Mortg. Pass-Through Certs. Litig., No. 08 Civ.
8093(LTS)(KNF), 2012 WL 1076216, at *14 ("[A]bsent a decline in
the Certificates' ratings (or some other indicator of a steep
decline in the Certificates' value), it is difficult to see how
a plaintiff could have plausibly pled that the epidemic of
indiscretions in the MBS industry had infected his or her
Certificates.").  Indeed, several courts in this district have
concluded that, even under the pre-Merck, duty-of-inquiry
standard for accrual, generalized reports like those relied upon
by defendants are insufficient to trigger the statute of
limitations.  See, e.g., Pub. Emples. Ret. Sys. v. Merrill Lynch
& Co., 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010).

27

The 2007 reports, lawsuits and investigations regarding loan origination practices cited by defendants may have signaled a potential for problems in the RMBS market generally -- and may, as plaintiff suggests, have triggered a duty on the part of <u>defendants</u> to scrutinize the loans included in their securitizations more closely -- but such reports were insufficient to trigger the Securities Act's statute of limitations.  Until such time they did or with diligence should have "discovered" otherwise, the GSEs were entitled to rely on defendants' assertion that the loans that underlay these particular securities complied with the guidelines set out in the offering materials.[11]  The public reporting discussed in the SAC is relevant to plaintiff's claims only insofar as it negates any effort by defendants to maintain that they exercised due diligence or reasonable care to ensure that the loans included in the securitizations were as described.  See <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 359 n.7 (2d Cir. 2010) (recognizing that "section 11 provides several due diligence defenses available to non-issuer defendants, <u>see</u> 15

---

[11] For this reason, the fact that, in August 2007, Freddie Mac sued American Home Mortgage ("AHM"), one of the originators at issue here, asserting that AHM had sold it loans "determined to be of non-investment quality" is not sufficient to show that the claims at issue here had accrued as of that date.  The GSEs were entitled to assume that defendants had made diligent efforts to ensure that the originators' dubious lending practices did not infect the particular loans included in these securitizations.

U.S.C. § 77k(b), and section 12(a)(2) contains a 'reasonable care' defense, id. § 77l (a)(2).").  Whatever questions the GSEs might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have "discovered" that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies in early 2008.  The claims were therefore open in September 2008 when FHFA's conservatorship began.

III.  FHFA Has Standing to Bring This Action.

HERA provides that during the period beginning with the creation of FHFA and "ending on the date on which the [FHFA] Director is appointed and confirmed, the person serving as the Director of the Office of Federal Housing Enterprise Oversight [OFHEO] of the Department of Housing and Urban Development . . . shall act for all purposes as, and with the full powers of, the Director."  12 U.S.C. § 4512(b)(5).  Consistent with this provision, James Lockhart, the President-appointed and Senate-confirmed Director of OFHEO, led FHFA from the time of its creation until the President designated Edward Demarco as Acting Director of FHFA on August 25, 2009.

Defendants contend that Section 4512(b)(5) violates the Appointments Clause of the Constitution, which provides, as relevant here, that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Defendants maintain that because Lockhart, an inferior officer, was not separately nominated and confirmed to lead FHFA, his directorship was an unconstitutional congressional appointment and that, consequently, the actions that he took as Acting Director -- including placing Fannie Mae and Freddie Mac into conservatorship -- were invalid under the Appointments Clause. They further argue that because Lockhart never validly served as Director of FHFA, his resignation could not trigger the provision under which DeMarco was appointed, so that the constitutional defect in Lockhart's appointment infects DeMarco's tenure as Acting Director as well.  These claims are meritless.

It is well established that Congress may confer on validly appointed officers "additional duties, germane to the offices already held by them . . . without thereby rendering it necessary that the incumbent should be again nominated and appointed."  Shoemaker v. United States, 147 U.S. 282, 301

(1893); accord Weiss v. United States, 510 U.S. 163, 171-75
(1994); Lo Duca v. United States, 93 F.3d 1100, 1110 (2d Cir.
1996).  Defendants do not seriously contend that the functions
that HERA assigned to the Director of FHFA were not germane to
those that Lockhart was already performing as the Director of
OFHEO.  HERA transferred the "functions, personnel, and
property" of OFHEO from the Department of Housing and Urban
Development to the newly created FHFA, which, like OFHEO, was
tasked primarily with overseeing the operations of the GSEs.
See HERA, tit. III, 122 Stat. 2794-2799 (codified at 12 U.S.C. §
4511 note).  The powers that HERA assigned to FHFA beyond those
previously enjoyed by OFHEO were intended to further this common
mission and thus entirely germane to Lockhart's previous
function.[12]  Defendants' Appointments Clause challenge therefore
fails.

III.  FHFA Has Adequately Pled Violations of the Securities Act.

    Defendants also maintain that FHFA has failed to plead
sufficient facts to state a claim under the Securities Act.
Because FHFA does not allege that the defendants engaged in
fraud, its pleadings are governed by Federal Rule of Civil

---

[12]  To the extent this conclusion is inconsistent with Olympic
Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision,
732 F. Supp. 1183, 1193 (D.D.C. 1990), the Court respectfully
disagrees with that decision.

31

Procedure 8(a)(2), which requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although this rule "does not require detailed factual allegations, . . . a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  Id. (citation omitted).

The SAC asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act.  Section 11 provides a private cause of action against the issuers and other signatories of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a).  A fact is material for the purposes of Section 11 if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (citation omitted).  Section 12(a)(2) imposes liability under similar circumstances with respect to prospectuses and oral communications, 15 U.S.C.

§ 77*l*(a)(2).  Neither provision requires allegations of scienter, reliance, or loss causation in order to state a claim. Fait v. Regions Fin. Corp., 655 F.3d 105, 109 (2d Cir. 2011). Section 15 extends "control person" liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Section 11] or [Section 12]." 15 U.S.C. § 77o.

As noted above, FHFA identifies three principal categories of what it argues is misleading or false information in the offering materials that accompanied the RMBS at issue here. First, the Agency asserts that the prospectus supplements understated the loan-to-value (LTV) ratio of the underlying mortgage pools.  Second, it contends that the offering materials overstated the percentage of properties in the supporting loan groups that were owner occupied.  Finally, FHFA maintains that the offering materials represented that the underlying mortgage loans were underwritten according to certain risk guidelines when, in fact, "there were pervasive and systematic breaches of those guidelines."  Defendants contend that the SAC fails to state a claim with respect to any of the three categories of statements.[13]

---

[13] In a footnote, defendants also maintain that, in addition to failing adequately to allege conduct violative of the Securities Act, the SAC does not assert that MASTR was a "statutory

A. LTV Ratio

The offering materials for each securitization included group-level representations regarding the LTV ratios of the underlying mortgages.  For any given mortgage, the LTV ratio is determined by computing the balance of the loan as a percentage of the value of the property that secures it, often determined on the basis of an appraisal.  LTV ratio is a measure of credit risk.  The higher the ratio, the less equity the homeowner has in the property, and the more likely she is to default. Mortgages with an LTV ratio in excess of 100% are "underwater," and are highly susceptible to default, because the homeowner has little financial incentive to continue making payments in the event her financial circumstances change or the value of her home further declines.  Such mortgages are highly risky for note holders, because the value of the property is insufficient to cover the balance of the loan in the event of a default.

---

seller," a necessary condition for establishing liability under Section 12.  This argument is easily rejected.  A person is a "statutory seller" -- and therefore a proper Section 12(a)(2) defendant -- if he "successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 359 (citation omitted).  Consistent with this definition, the SAC alleges that MASTR "actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit itself."

Just as LTV ratio is a measure of the riskiness of an
individual home loan, so too is it an indicator of the
investment-worthiness of a security backed by the income from
many such loans.  Each Prospectus Supplement that defendants
signed in connection with these offerings included statistics
regarding the distribution of LTV ratios across the underlying
loan pool.  For example, the Prospectus Supplement prepared
regarding the MABS 2007-WMC1 Securitization, cited in the
complaint, represented that none of the mortgages in the
supporting loan group had an LTV ratio in excess of 100% and
that "approximately 29.24% of the Group I Mortgage Loans [whose
certificates the GSEs purchased] had loan-to-value ratios
. . . in excess of 80.00%."

FHFA alleges that these figures, and similar LTV
information reported in the offering materials for the other
twenty-one issuances, were material to the GSEs in deciding
whether to invest in the securities.  It further alleges these
data were false and therefore actionable under Sections 11 and
12(a).  In support of the latter assertion, the Agency cites the
results of its own review of loan-level data for a sampling of
mortgage loans included in each securitization.  The data
review, which used an automated valuation model to estimate the
property value at the time of origination for each loan sampled,

35

revealed that, for each securitization at issue here, the Prospectus Supplement significantly understated the percentage of loans with an LTV ratio in excess of 80%. Moreover, although the Prospectus Supplements indicated that the securitizations included no loans that were underwater, the Agency found that, with regard to seventeen of the securitizations, underwater loans accounted for 10% or more of the sample. In the case of the MABS 2007-WMC1 Securitization, for example, the Agency found that while the prospectus supplement indicated that only about 29.24% of the relevant loans had LTV ratios above 80%, the actual number was 61.97%. The data review also determined that 18.55% of the loans sampled in the MABS 2007-WMC1 Securitization had LTV ratios in excess of 100%.

Defendants counter that the LTV ratios and the housing appraisals that underlie them are statements of opinion that cannot give rise to liability under Sections 11 and 12(a)(2). They note that appraisal value is a subjective determination that is largely a function of the particular methods and assumptions employed by the appraiser, and that claims under the Securities Act generally lie only when there has been an "untrue statement of a material fact," 15 U.S.C. § 77k(a) (emphasis added). In support of their position, defendants cite a series of cases from this District, which they claim, hold that LTV

ratios are, at root, opinion statements and therefore non-actionable under the Securities Act.  Defendants misstate the holdings of these cases and the law in this area.

1. Opinion Liability Under the Securities Act

It is true, as defendants note, that Sections 11 and 12(a)(2) of the Securities Act impose liability only for an omission or "untrue statement of a material fact." 15 U.S.C. §§ 77k(a), 77l(a)(2) (emphasis).  But "matters of belief and opinion are not beyond the purview of these provisions." Fait, 655 F.3d at 110.  In Fait, the Second Circuit concluded that statements in the offering materials for certain securities that purported to convey management's estimates of goodwill in an acquired company, despite "depend[ing] on management's determination of the 'fair value' of assets acquired and liabilities assumed, which are not matters of objective fact," could nevertheless give rise to liability under the Securities Act, provided the plaintiff could show that the estimates were both objectively false and disbelieved by the speaker when made ("subjectively false").  See id. at 113.

Defendants and FHFA agree that the statements regarding LTV ratios at issue in this case depend on appraisers' estimates regarding the values of the underlying properties and that because those values "are not matters of objective fact," Fait

37

governs plaintiff's claims in this respect.  They disagree only about the identity of the "speaker" whose disbelief in the statements plaintiff must plead.  Plaintiff contends that it is sufficient under Fait that the SAC alleges that the appraisers, who are not defendants in this case, did not believe that the valuations they assigned to the underlying properties were accurate.  Defendants counter that in order to state a claim adequately under Fait, plaintiff must assert that the statement upon which it seeks to predicate liability "was both objectively false and disbelieved by the defendant at the time it was expressed."  Fait, 655 F.3d at 110 (emphasis added).  Although, admittedly, there is dictum in Fait that superficially supports defendants' claim, upon closer examination of that decision and its reasoning, the Court is convinced that plaintiff has the better of the argument.

The confusion surrounding whom Fait requires to have disbelieved an opinion statement in order for it to be actionable under the Securities Act can be explained largely by the fact that, in the majority of cases, the opinion upon which the plaintiff seeks to rely is an opinion first articulated by one or more of the Securities Act defendants.  In Fait itself, for example, Regions Financial Corporation was both a defendant in the Securities Act case and the originator of the goodwill

38

estimates that the plaintiffs alleged were materially false.
Id. at 110-12; see also In re Gen. Elec. Co. Sec. Litig., No. 09
Civ. 1951 (DLC), 2012 WL 1371016, at *9 (S.D.N.Y. Apr. 18, 2012)
(analyzing officer-defendant's statement that "in the recent
market volatility, we continue to successfully meet our
commercial paper needs.")  Fait, therefore, did not require the
Second Circuit to address the issue that the parties pose here:
how to treat opinions that the offering materials attribute to
someone other than a defendant.  Fait's reasoning is, however,
helpful in addressing this question.  It points squarely in
favor of plaintiff's position, imposing upon the plaintiff the
duty to plead that the person who formed the opinion did not
believe the opinion when she expressed it.

    As noted above, Fait recognized a narrow set of
circumstances under which statements of opinion may constitute
an "untrue statement of a material fact," 15 U.S.C. §§ 77k(a),
77*l*(a)(2), and therefore support liability under the Securities
Act.  In reaching this outcome, the Second Circuit relied
heavily on the Supreme Court's analysis in Virginia Bankshares,
Inc. v. Sandberg, which recognized that statements of opinion or
belief "are factual in two senses: as statements that [the
person to whom the belief is ascribed] . . . hold[s] the belief

39

stated and as statements about the subject matter of the . . . belief expressed."  501 U.S. 1083, 1092 (1991).

In order to understand the Court's reasoning, it is helpful to analyze it in the context of this case.  Here, for example, the Prospectus Supplement for the MABS 2007-WMC1 Securitization represented that 29.24% of the loans in the relevant group had LTV ratios above 80%.  This representation is equivalent to a claim that, for the remaining 70.76% of loans, an appraiser subjectively valued the mortgage security at or above 125% of the relevant loan amount.

The valuations are, of course, the subjective judgments of the appraisers.  See In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) (Lynch, J.) ("[V]aluation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions.").  But although the appraisals are matters of opinion in one sense, they also constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property.  Fait holds that, under the Securities Act, liability may attach to this implied assertion -- that the originator of the opinion sincerely holds the belief reported -- where the assertion is shown to be false.  Applied to this case,

40

the plaintiff alleges that the appraisers did not accurately communicate their subjective views regarding the value of the properties at issue.  To put it bluntly, the plaintiff asserts that the appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth.

Plaintiff is therefore correct that the "subjective falsity" that Fait requires in order to impose Securities Act liability based on a statement of opinion is falsity on the part of the originator of the opinion, who may or may not be a Securities Act defendant.  This conclusion is confirmed by the practice in federal court with respect to opinion-based Securities Act claims in multi-defendant cases.  The Securities Act does not require a defendant-specific showing of subjective falsity in order to impose liability for opinion statements, nor do defendants argue that such a requirement exists.  Indeed, in Fait the Second Circuit seemed to assume that if the complaint had alleged that the company's representations regarding goodwill "falsely represented the speakers' beliefs at the time they were made," 655 F.3d at 107, such an allegation would be sufficient to state a claim against not only the company, but also against the individuals, underwriters and accounting firm named in the complaint.  Defendants have articulated no legal

principle that would distinguish their position in this case from that of an underwriter that is subjected to Securities Act liability based on insincere statements of opinion by its issuer co-defendant.

Indeed, the fact that Fait requires a showing of "subjective falsity" only on the part of the originator of an opinion statement serves to clarify the relationship between "subjective falsity" and scienter in the context of claims under the Exchange Act.  Although the Fait Court was careful to emphasize that the concepts are different, see 655 F.3d at 112 n.5, courts have struggled to distinguish these two lines of inquiry, in part because, where the originator of the opinion is a defendant, "proving the falsity of the statement 'I believe this investment is sound' is the same as proving scienter." Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004).  Once it is acknowledged that the "subjective falsity" inquiry is directed at determining the truth of the statement, "I believe," rather than the fraudulent intent of any defendant who later reports that claim, the distinction becomes clearer.  And, of course, while a plaintiff must plead scienter for each Exchange Act defendant, under the Securities Act the plaintiff need only allege subjective falsity as to the originator of the opinion expressed in the offering documents.

Although they are not dispositive of the issue, policy considerations also make plain that this interpretation of Fait's "subjective falsity" requirement is the correct one. A statement of opinion included in a registration statement or other offering document is material from the perspective of the reasonable investor only to the extent that the person to whom the opinion is attributed has particular expertise with regard to the matter about which the opinion is rendered. In other words, what makes the opinion statement relevant and worthy of inclusion in the offering materials is that it purports to represent the view of an individual whose judgment matters. As noted, this person will often be an agent, director, or underwriter of the company issuing the securities, but it need not necessarily be. For instance, in this case representations regarding LTV ratios -- and the property value estimates that underlay them -- were material to investors precisely because they believed that these figures represented the sincere judgments of professional appraisers with experience making these sorts of assessments. Without a doubt it is as important to investors that the appraisers truly believed the estimates on which the LTV ratios were built as it is that defendants -- who tabulated and reported appraisal values following the completion

of their due diligence inquiry -- believed that this information was correct.

Finally, this reading of Virginia Bankshares and Fait is entirely consistent with the Structure of the Securities Act and the affirmative defenses that it makes available to defendants under Sections 11 and 12(a)(2).  Where a non-issuer defendant can show that he conducted a "reasonable investigation" and concluded that the statements contained in the registration statement were true, he can avoid liability under Section 11. See 15 U.S.C. § 77k(b)(3)(A); In re WorldCom, Inc. Secs. Litig., 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).  Section 12(a)(2) likewise permits a defendant to avoid liability by making an affirmative showing that he exercised "reasonable care" to avoid any untruth or omission.  See 15 U.S.C. § 77l(a)(2). "Underwriters function as the first line of defense with respect to material misrepresentations and omissions in registration statements," WorldCom, 346 F. Supp. 2d at 662, and it is entirely appropriate to impose on them the obligation to vet the accuracy of opinion statements attributed to third parties.  But the availability of these defenses gives some comfort that Securities Act defendants will not be held liable for inaccuracies that they truly could not have prevented.

2. Application

In light of the forgoing analysis, FHFA has alleged actionable misrepresentations with regard to the LTV ratios that defendants reported in their offering materials.  Since the materiality of this information is undisputed, the only issue is whether the Agency has adequately alleged that the property appraisals -- as presented through the LTV ratios -- "were both false and not honestly believed when made."  Fait, 655 F.3d at 113.

The loan-sampling results reported in the SAC are sufficiently suggestive of widespread inaccuracies in appraisal value to render plausible the Agency's claim that the LTV information reported in the offering materials was "objectively false."  As discussed above, FHFA's analysis of the loan data suggests that the Prospectus Supplement for the MABS 2007-WMC1 Securitization overstated the percentage of loans with an LTV ratio at or below 80% by over 30%.  The Agency reports similar findings with respect to the other twenty-one securitizations at issue here.

The allegations in the SAC likewise satisfy Fait's "subjective falsity" requirement.  The SAC asserts that "appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no

45

reasonable relationship to the actual value of the underlying property."  To support this claim, the SAC cites a series of news stories, lawsuits and government investigations that have revealed instances in which appraisers connected to some of the mortgage originators at issue here were found to have systematically and knowingly overstated the value of homes in order to allow borrowers to obtain larger loans than they could afford.  The SAC also alleges that the LTV data reported in the offering materials deviates so significantly from the results of plaintiff's loan-loan level analysis as to raise a plausible inference that the appraisers knowingly inflated their valuations.

B.  Owner-Occupancy Rates

Defendants next attack FHFA's allegation that the offering materials overstated the percentage of properties in the supporting loan group for each securitization that were owner occupied.  The prospectus supplement for each securitization provided a break-down of the mortgages in the supporting loan group based on whether the property that secured the loan was owner occupied, a second home, or an investment property.  Staying with the example of the MABS 2007-WMC1 Securitization, the prospectus supplement reported that, for the Group I certificates that the GSEs purchased, 1,810 (or 98.32%) of the

1,841 underlying properties were owner occupied.  This information was material to investors, because a borrower whose primary residence is the mortgaged property is less likely to default than one who uses it as a second home or as an investment.

FHFA contends that the owner-occupancy information in the prospectus supplement for the MABS 2007-WMC1 Securitization, as well similar information reported for the other twenty-one securitizations at issue here, was false.  As part of its survey of the loan group supporting each securitization, FHFA used a number of tests in an effort to determine whether the owner-occupancy information reported in the prospectus supplements was accurate.  Specifically it examined whether (1) a borrower's property tax bill was being mailed to the mortgaged property six months after the loan closed; (2) whether the borrower claimed an owner-occupied tax exemption on the mortgaged property; and (3) whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records. The survey revealed that 13.11% of the loans in the supporting loan group for the MABS 2007-WMC1 Securitization failed two or more of these tests, indicating that in all likelihood these properties were not owner occupied.  The Agency contends that the 11.62% difference between its own findings and the owner-

47

occupancy numbers reported in the prospectus supplement is a strong indicator that the reported data was materially false at the time of origination.  Its survey reveals similar discrepancies with regard to the other securitizations at issue in this case.

Defendants do not dispute that the SAC adequately alleges that the reported rates of owner occupancy were material.  They maintain instead that, because the prospectus supplements for sixteen of the twenty-two securitizations included a disclaimer that owner-occupancy statistics were "as reported by the mortgagor at the time of origination," the SAC was required to allege that the representations incorporated into the offering materials were not in fact made by the borrowers at the time of origination.  As plaintiff notes, by its own terms, defendants' argument does not apply to six of the twenty-two securitizations cited in the SAC.  In any case, as outlined below, defendants' contention that the Agency was required to allege falsity on the part of the underlying borrowers is without merit.

1. Securities Act Liability for Third-Party Statements of Fact

As noted, liability under the Securities Act is strict liability.  Section 11 of the Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration

48

statement . . . contained an untrue statement of a material fact
or omitted to state a material fact." 15 U.S.C. § 77k(a).
Section 12(a)(2) likewise imposes liability on "any person . . .
who offers or sells a security by means of a prospectus or oral
communication, which includes an untrue statement of a material
fact or omits to state a material fact."  15 U.S.C. § 77l(a)(2).

     As the Supreme Court has recognized with regard to Section
11, these provisions are designed "to assure compliance with the
disclosure provisions of the [Securities] Act by imposing a
stringent standard of liability on the parties who play a direct
role in a registered offering."  Herman & MacLean v. Huddleston,
459 U.S. 375, 381-82 (1983).  If defendants were correct that a
party could transform the Securities Act's strict liability
regime into one that required scienter simply by attributing
factual information in the offering materials to a non-defendant
third-party, this purpose would be significantly undermined.

     Defendants' position is also inconsistent with the
structure of statute.  Although the liability of issuers under
Section 11 is "virtually absolute," In re Morgan Stanley Info.
Fund. Sec. Litig., 592 F.3d at 359 (citation omitted), Section
11 provides an affirmative defense of "due diligence" that is
available to defendants other than the issuer of the security.
See 15 U.S.C. § 77k(b)(3); WorldCom, 346 F. Supp. 2d at 659,

662-64 (S.D.N.Y. 2004).  As is true of all affirmative defenses, a Securities Act defendant generally bears the burden of demonstrating his due diligence, and, for that reason, due diligence cannot be asserted as a basis for dismissal pursuant to Rule 12(b)(6).  In re Morgan Stanley Info. Fund. Sec. Litig., 592 F.3d at 359 n.7.

For present purposes, the precise contours of the due diligence defense are less important than the fact that, in setting out the defense, the Securities Act specifically contemplates circumstances in which a plaintiff's prima facie case is founded on a factual assertions in the registration statement "purporting to be a copy of or extract from a report or valuation of [a third-party] expert," or "purporting to be a statement made by an official person."  15 U.S.C. § 77k(b)(3)(B)-(D).  These provisions discuss in detail the "due diligence" showing required to avoid liability for such an assertion and nowhere suggest that the plaintiff's prima facie case is somehow undermined by the attribution of the information to a third-party.  It is thus plain from the statutory structure itself that a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials.

2.  Application

Turning to plaintiff's specific claim that the offering
documents for these securitizations contained material
misstatements regarding owner-occupancy, the SAC adequately
states a claim for relief under the Securities Act.  As
discussed above, defendants do not dispute that the SAC
adequately alleges that the reported rates of owner occupancy
were material to a reasonable investor's decision whether to buy
the securities.  Nor do they challenge the Agency's finding that
borrowers' credit reports and lien records provide a plausible
basis for inferring that the true rates of owner occupancy were
substantially lower than those reported in the offering
materials.  Moreover, as set forth above, the Securities Act
does not condition liability on a showing that defendants
themselves inaccurately represented the data that they received
from the borrowers.

Defendants only remaining argument is that the Agency's
survey, which examined, among other things, where borrowers'
property tax bills were being mailed six-months after the loan
closed, does not establish that at the time of origination
owner-occupancy rates differed from those reported in the
offering materials.  Whether or not defendants are correct with
regard to the proof that would be required at trial, at the very

51

least, the Agency's survey results render plausible its claim
that the owner-occupancy rates reported in the offering
materials were materially false.  That is all that is required
at this stage of the litigation.

C. Compliance With Underwriting Standards

The prospectus and prospectus supplement for each of the
securitizations at issue in this case described the underwriting
guidelines that were said to govern the origination of mortgages
with whose income the securitization was backed.  The MABS 2007-
WMC1 Securitization, already discussed in the context of FHFA's
other claims, provides a useful example.

MABS 2007-WMC1 was assembled from mortgages originated by
WMC Mortgage Corp., a mortgage banking company incorporated in
California.  Defendant MASTR acted as the depositor for the
securitization; defendant UBS Real Estate was the sponsor and
seller; and defendant UBS Securities was the underwriter.  The
prospectus supplement for the MABS 2007-WMC1 Securitization
included the following representations:

- Underwriting Standards. The mortgage loans have been
  either (i) originated generally in accordance with
  the underwriting guidelines established by [WMC
  Mortgage Corp.] (collectively, the "Underwriting
  Guidelines") or (ii) purchased by WMCMC or GE Money
  Bank after re-underwriting the mortgage loans
  generally in accordance with the Underwriting
  Guidelines.

- The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults.

- Under the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines.

- Under the Underwriting Guidelines, various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan.  These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies.

- The Underwriting Guidelines permit mortgage loans with LTVs . . . of up to 100% (which is subject to reduction depending upon credit-grade, loan amount and property type).

- The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of

53

> such appraisal by a WMC-approved appraiser or by
> WMC's in-house collateral auditors (who may be
> licensed appraisers) and such audit may in certain
> circumstances consist of a second appraisal, a field
> review, a desk review or an automated valuation
> model.

(emphasis added).  The prospectus supplements for the other

twenty-one securitizations contained similar representations.

The MABS 2007-WMC1 Securitization did, however, contain the

following clause:

> On a case-by-case basis [the originator] may determine
> that, based upon compensating factors, a prospective
> mortgagor not strictly qualifying under the
> underwriting risk category or other guidelines
> described below warrants an underwriting exception.
> Compensating factors may include, but are not limited
> to, low debt-to-income ratio ("Debt Ratio"), good
> mortgage payment history, an abundance of cash
> reserves, excess disposable income, stable employment
> and time in residence at the applicant's current
> address.  It is expected that a substantial number of
> the mortgage loans to be included in the trust will
> represent such underwriting exceptions.

(emphasis added).  Similar cautionary language was included in

the prospectus supplements for six of the other twenty-one

securitizations.

FHFA alleges that the originators of the loans underlying

the securitizations systematically disregarded these

underwriting guidelines in order to increase production and

profits derived from their mortgage lending businesses.

Defendants counter that the SAC fails to state a plausible claim

that the statements regarding the underwriting standards were

false.  They argue that plaintiff's claims impermissibly rely on
a forensic analysis of too few loans and on statistics about
loan performance years after registration.  They also argue that
plaintiff has ignored warnings in the offering materials that
there were "exceptions" to the stated guidelines and, in some
cases, that a "substantial number" of the underlying loans
deviated from those guidelines.

The SAC has plausibly alleged that the offering materials
contained false statements regarding originators' compliance
with the underwriting standards.  In support of this claim, the
SAC relies primarily on the results of FHFA's forensic review of
individual loan files, which found, for example, that out of 996
randomly selected loans included in the MABS 2007-WMC1 and MABS
2006-WMC2 securitizations, approximately 78% were not
underwritten in accord with the applicable underwriting
guidelines.  The claim is further supported by: investigations
by government and private agencies that revealed underwriting
failures by originators that contributed loans to the
securitizations at issue here, confidential witness accounts,
and, ultimately, the surge in defaults on the underlying
mortgages and collapse of the certificates' credit ratings.
Taken together, these allegations are sufficient to render

plausible FHFA's assertion that the mortgage originators serially deviated from their mortgage underwriting standards.

This conclusion is unaltered by statements in the offering materials that the standards were only "generally" followed. Such limiting language does not assist a Securities Act defendant faced with a plausible assertion that as few as 1/4 of the mortgages in a given loan pool conformed to the underwriting standards. Nor are plaintiff's claims defeated by the disclosure in seven of the prospectus supplements that a "substantial" number of the loans deviated from the underwriting standards. These prospectus supplements also represented that any deviations would be warranted based on "compensating factors." By plausibly alleging a widespread failure to conduct any underwriting, the plaintiff has adequately pleaded the falsity of this representation as well.

Finally, defendants cite Item 1111 of SEC Regulation AB, 17 C.F.R. § 229.1111(a)(3), for the proposition that they may be held liable only for failing to disclose deviations from the underwriting guidelines that were known to them. This is another meritless attempt by the defendants to alter the plaintiff's pleading burden by grafting a scienter requirement onto Securities Act claims.

Item 1111 of Regulation AB requires that issuers of asset-backed securities disclose "the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden." 17 C.F.R. § 229.1111(a)(3) (emphasis added).  The regulation thus imposes on a Section 11 defendant the duty to disclose not only underwriting criteria for the assets that underlie the securities, but also, "to the extent" the issuer knows of them, any changes in those criteria and the extent to which those criteria "could be overridden."  Id. Indeed, this duty imposed by Item 1111 may have prompted the cautionary language recited above that was incorporated into the offering materials for seven of the securitizations.

Yet, plaintiff's claim with regard to loan-underwriting standards is not that defendants failed to report information about changes in the underwriting criteria of which the defendants were aware, but that they affirmatively misrepresented the standards that "generally" governed the underwriting of mortgages included in the supporting pools. Regulation AB's guidance with regard to what information must be included in the offering materials does nothing to call into question defendants' overriding obligation under the Securities

Act to avoid false statements in their offering materials.  In re Lehman Bros. Secs. and ERISA Litig., 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010).

D.  Section 15 Control Person Liability

UBS Americas, UBS Real Estate, and the individual defendants also contend that the SAC fails to allege that they exercised sufficient authority over the primary defendants to establish "control person" liability under Section 15.  As noted above, Section 15 extends liability under the Securities Act to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Section 11] or [Section 12]."  15 U.S.C. § 77o.  This Court has previously held that the act of signing a registration statement, as the individual defendants in this case are alleged to have done, is a manifestation of the signer's responsibility for the information contained in the document and, therefore, sufficient to establish "control person" status.  See In re. WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003).  With respect to the corporate defendants, the SAC alleges that UBS Real Estate was actively involved in coordinating the securitization process and determining the structure of each offering and that UBS Americas was not simply the corporate parent of UBS Securities and MASTR but, in practice, controlled

their actions in issuing and selling RMBS certificates.  These
allegations are sufficient to avoid dismissal of plaintiff's
Section 15 claims at this early stage of the litigation.

E.  MASTR is a Statutory Seller Under Section 12(a)(2).

     Finally, defendants maintain that MASTR is not a proper
defendant with respect to plaintiff's Section 12(a)(2) and
equivalent state-law claims.  While Section 11 is limited to
certain offering participants by its express terms, liability
under Section 12(a)(2) is governed by the "statutory seller"
requirement.

> An individual is a 'statutory seller' -- and therefore
> a potential section 12(a)(2) defendant -- if he: (1)
> passed title, or other interest in the security, to
> the buyer for value, or (2) successfully solicited the
> purchase of a security, motivated at least in part by
> a desire to serve his own financial interests or those
> of the securities' owner.

In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d at 359
(citation omitted).

     Defendants contend that the SAC does not allege that MASTR
is a "statutory seller" or include facts that would support such
a finding.  As plaintiff notes, however, SEC Rule 159A, provides
that "in a primary offering of securities," an issuer is a
statutory seller for the purposes of Section 12(a)(2)
"regardless of the underwriting method used to sell the issuer's
securities."  See 17 C.F.R. § 230.159A; accord Citiline

Holdings, Inc. v. iStar Financial Inc., 701 F. Supp. 2d 506, 512
(S.D.N.Y. 2010).  Moreover, the Securities Act provides that
"with respect to certificates of interest or shares in an
unincorporated investment trust not having a board of directors
. . . the term 'issuer' means the person or persons performing
the acts and assuming the duties of depositor."  15 U.S.C. §
77b(a)(4).  As noted, the securitizations at issue here were
structured as investments trusts, and, for sixteen of the
twenty-two of them, MASTR acted as depositor.  MASTR is
therefore a proper defendant under Section 12(a)(2).

Defendants resist this analysis by asserting that the
provision of the Securities Act equating an "issuer" with a
"depositor" does not apply to RMBS.  But this argument is
contradicted by Securities Act Rule 191, which provides that
"[t]he depositor for the asset-backed securities acting solely
in its capacity as depositor to the issuing entity is the
'issuer' for purposes of the asset-backed securities of that
issuing entity."   17 CFR § 230.191.  To the extent defendants
would argue that the Rule's reference to "asset-backed
securities" does not encompass RMBS, they are foreclosed from
doing so by their reliance elsewhere in their motion on
Regulation AB, which likewise governs "asset-backed securities"
and was adopted as part of the same rulemaking proceeding that

resulted in Rule 191.  See Asset-Backed Securities, SEC Release No. 8518, 84 S.E.C. Docket 1624, 2004 WL 2964659, at *9, *2012 (Dec. 22, 2004).

IV.  FHFA's Negligent Misrepresentation Claims Fail.

Although FHFA has adequately alleged violations of the securities laws, the Agency cannot sustain its negligent misrepresentation claims.  Under New York law, a plaintiff asserting a claim for negligent misrepresentation must allege, inter alia, that "the defendant had a duty, as a result of a special relationship, to give correct information."  Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citation omitted).  In a commercial context, liability does not attach as a matter of course for merely negligent statements; rather, it is imposed "only on those who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."  Kimmel v. Schaefer, 675 N.E.2d 450, 454 (1996).

The Agency cannot credibly allege that a "special relationship" existed between the GSEs and the defendants, nor has it seriously attempted to do so.  While it is true that "[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a

61

negligent misrepresentation is justified generally raises an issue of fact," id., courts regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a "special relationship."  See, e.g., Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC, 905 N.Y.S.2d 152, 152 (App. Div. 1st Dep't 2010); Sebastian Holdings, Inc. v. Deutsche Bank AG, 912 N.Y.S.2d 13, 15 (App. Div. 1st Dep't 2010); Silvers v. State, 893 N.Y.S.2d 12 (App. Div. 1st Dep't 2009).

MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 928 N.Y.S.2d 229 (App. Div. 1st Dep't 2010), is particularly instructive here.  MBIA, a provider of financial guarantee insurance, brought fraud and negligent misrepresentation claims against Countrywide, asserting that Countrywide entities had made material misrepresentations concerning the origination and quality of the mortgage loans that underlay mortgage-backed securities for which the plaintiff had written insurance policies.  While permitting the fraud claim to go forward, the New York State motion court dismissed the negligent misrepresentation claim as inadequately pled.  The Appellate Division affirmed, noting that in light of the fact that "[t]he transactions in question were conducted by two sophisticated commercial entities" operating at arms length, "[t]he claim that

62

Countrywide had superior knowledge of the particulars of its own business practices [was] insufficient to sustain the cause of action." Id. at 235-36.

So too here, FHFA cannot plausibly assert that the GSEs were so unequally situated vis-à-vis the defendants as to give rise to a claim for negligent misrepresentation. As defendants emphasize in their motion to dismiss, the GSEs were highly sophisticated players in the mortgage-backed securities market, which they participated in not only as purchasers but also as packagers and marketers of securities. As in MBIA, the fact that, with regard to the securities at issue in this case, the defendants had greater knowledge of the underlying loan files and the practices of third-party due diligence providers is not sufficient to establish a "special relationship."

The Agency seeks to avoid the "special relationship" requirement by arguing that its negligent misrepresentation claims are governed by the law of the District of Columbia, in the case of Fannie Mae, and Virginia, in the case of Freddie Mac. Unlike New York, these jurisdictions appear not to require that a plaintiff demonstrate a "special relationship" in order to sustain a negligent misrepresentation claim. Unfortunately for FHFA, however, its choice-of-law argument is meritless.

The Agency's common law claims are governed by New York choice-of-law principles pursuant to Klaxon co. v. Stentor Elec. Mfg. Co, 313 U.S. 487, 496-97 (1941).  New York has adopted the "interest analysis" approach to choice of law, which seeks "to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 158 (2d Cir. 2012) (citation omitted).  In the context of tort law, interest analysis distinguishes between conduct-regulating rules, which dictate appropriate standards of conduct, and loss-allocating rules, which "prohibit, assign, or limit liability after the tort occurs." Id. (citation omitted).  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." GlobalNet Fin. Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 384 (2d Cir. 2006) (citation omitted).

The parties agree that the duty to avoid negligent misrepresentations is a conduct-regulating rule and that, consequently, the law of the jurisdiction where the tort occurred should govern FHFA's claims.  They disagree only about

64

whether the alleged misrepresentations "occurred" in New York, where the defendants are based, or in the District of Columbia and Virginia, where Fannie Mae and Freddie Mac, respectively, were injured.  This dispute is easy to resolve.  As should be clear from the discussion above, interest analysis understands the jurisdiction where the tort occurred to be that in which the defendant engaged in the behavior that the conduct-regulating rule seeks to deter.  In this case, that jurisdiction is undisputedly New York, where the defendants prepared and disseminated the allegedly misleading offering materials that are at the center of this litigation.  Because New York is the jurisdiction with the most significant relationship to plaintiff's negligent misrepresentation claims and because, as noted above, plaintiff's pleadings are inadequate to state a claim under New York law, the negligent misrepresentation claims are dismissed.

CONCLUSION

Defendants' January 20 motion to dismiss is denied as to FHFA's securities law claims and granted as to the negligent misrepresentation claims.


SO ORDERED:

Dated:      New York, New York
            May 4, 2012

                              _____
                                       DENISE COTE
                              United States District Judge