*Amended*
~~Confidential—Subject to Court Order~~

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,   :
v.   :
UBS AMERICAS, INC., et al.,   :
Defendants.   :
  :
  :
  :

: **DEFENDANTS' SUBMISSION**
: **FOR JULY 31, 2012 HEARING**

11 Civ. 5201 (DLC)

------------------------------------------------------------------ x

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,   :
v.   :
JPMORGAN CHASE & CO., et al.,   :
Defendants.   :
  :
  :
  :

11 Civ. 6188 (DLC)

------------------------------------------------------------------ x

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,   :
v.   :
HSBC NORTH AMERICA HOLDINGS, INC., et al.,   :
Defendants.   :
  :
  :
  :
  :

11 Civ. 6189 (DLC)

------------------------------------------------------------------ x

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,   :
v.   :
BARCLAYS BANK PLC, et al.,   :
Defendants.   :
  :
  :
  :
  :

11 Civ. 6190 (DLC)

------------------------------------------------------------------ x

---------------------------------------------------------------- x
         :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,          :
v.          :   11 Civ. 6192 (DLC)
DEUTSCHE BANK AG, et al.,          :
Defendants.          :
         :
         :
         :
         :

---------------------------------------------------------------- x
         :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,          :
v.          :   11 Civ. 6193 (DLC)
FIRST HORIZON NATIONAL CORP., et al.,   :
Defendants.          :
         :
         :
         :
         :

---------------------------------------------------------------- x
         :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,          :
v.          :   11 Civ. 6195 (DLC)
BANK OF AMERICA CORP., et al.,          :
Defendants.          :
         :
         :
         :
         :

---------------------------------------------------------------- x
         :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,          :
v.          :   11 Civ. 6196 (DLC)
CITIGROUP INC., et al.,          :
Defendants.          :
         :
         :
         :
         :

---------------------------------------------------------------- x

------------------------------------------------------------- x
                :
FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,             :
v.                :   11 Civ. 6198 (DLC)
GOLDMAN, SACHS & CO., et al.,     :
Defendants.          :
                :
                :
                :
                :
------------------------------------------------------------- x
                :
FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,             :
v.                :   11 Civ. 6200 (DLC)
CREDIT SUISSE HOLDINGS (USA), INC., et al.,   :
Defendants.          :
                :
                :
                :
                :
------------------------------------------------------------- x
                :
FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,             :
v.                :   11 Civ. 6201 (DLC)
NOMURA HOLDING AMERICA, INC., et al.,   :
Defendants.          :
                :
                :
                :
                :
------------------------------------------------------------- x
                :
FEDERAL HOUSING FINANCE AGENCY, etc.,   :
Plaintiff,             :
v.                :   11 Civ. 6202 (DLC)
MERRILL LYNCH & CO., INC., et al.,    :
Defendants.          :
                :
                :
                :
                :
------------------------------------------------------------- x

-------------------------------------------------------------------- x
                                                                    :
FEDERAL HOUSING FINANCE AGENCY, etc.,                               :
Plaintiff,                                                          :
v.                                                                  :   11 Civ. 6203 (DLC)
SG AMERICAS, INC., et al.,                                          :
Defendants.                                                         :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
-------------------------------------------------------------------- x
                                                                    :
FEDERAL HOUSING FINANCE AGENCY, etc.,                               :
Plaintiff,                                                          :
v.                                                                  :   11 Civ. 6739 (DLC)
MORGAN STANLEY, et al.,                                             :
Defendants.                                                         :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
-------------------------------------------------------------------- x
                                                                    :
FEDERAL HOUSING FINANCE AGENCY, etc.,                               :
Plaintiff,                                                          :
v.                                                                  :   11 Civ. 7010 (DLC)
ALLY FINANCIAL INC., et al.,                                        :
Defendants.                                                         :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
-------------------------------------------------------------------- x
                                                                    :
FEDERAL HOUSING FINANCE AGENCY, etc.,                               :
Plaintiff,                                                          :
v.                                                                  :   11 Civ. 7048 (DLC)
GENERAL ELECTRIC COMPANY, et al.,                                   :
Defendants.                                                         :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
-------------------------------------------------------------------- x

Plaintiff has attempted to prevent discovery of relevant information, including through its refusal to testify about most topics in Defendants' June 28 Rule 30(b)(6) notice (the "Notice"). Despite having agreed to early Rule 30(b)(6) depositions for the purpose of identifying appropriate ESI custodians (*see* June 7 Rule 26(f) Report at 6) and despite the absence of burden, Plaintiff indicated that it would seek a protective order rather than provide even the *identities* of certain individuals and the responsibility of groups other than the "private label" or "non-agency" departments of the GSEs (collectively, "PLS") with knowledge concerning, *inter alia*, the same loan originators (the "Originators") involved in the securitizations at issue (the "Securitizations"). Similarly, Plaintiff refuses to respond to Defendants' Interrogatory No. 3, which seeks the identity of employees responsible for the GSEs' direct relationships and dealings with the Originators.

Significantly, Plaintiff concedes that information concerning the Originators is discoverable—regardless of whether it pertains directly to the Securitizations—*if* it was communicated to the GSEs' PLS personnel. Plaintiff contends, however, that "the knowledge possessed by people other than (1) the specific individuals at the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation to provide information to those individuals concerning the transactions in issue, is irrelevant."[1]

Fraud claimants and plaintiffs alleging D.C. blue sky claims must prove not just that a certain decision maker relied on an alleged misstatement but that the claimant's reliance was justifiable—which depends on institutional knowledge, institutional resources, and other factors. *See, e.g.*, *HSH Nordbank AG* v. *UBS AG*, 941 N.Y.S.2d 59, 66–67 (1st Dep't 2012); *Davidson Pipe Co.* v. *Laventhol & Horwath*, 120 F.R.D. 455, 460 (S.D.N.Y. 1988). The necessary inquiries into whether Plaintiff was on notice of its claims prior to September 2007, whether it can discharge its burden of demonstrating that any alleged misstatement is material, and whether a Section 11 or 12(a)(2) or Blue Sky claimant traded without knowledge of an alleged material misstatement, among others, also turn on what was known to the claimant's personnel. *N.J. Carpenters Health Fund* v. *RALI Series 2006-QO1 Trust*, 2012 WL 1481519, at *2 (2d Cir. Apr. 30, 2012) (summary order); *see also Fed. Hous. Fin. Agency* v. *UBS Americas, Inc.*, 2012 WL 1570856, at *8 (S.D.N.Y. May 4, 2012).[2]

To limit discovery to what a subset of personnel knew based on what other personnel had a duty to report to that subset, Plaintiff relies entirely on one decision predicated on one provision of the Restatement (Second) of Agency, which says that knowledge of an agent is not imputed unless the "agent has a duty to disclose to the principal." *AIG Global Sec. Lending Corp.* v. *Bank of Am. Secs. LLC*, 2006 WL 1206333, at *1 (S.D.N.Y. May 2, 2006) (Pitman, M.J.) (quoting Restatement (Second) of Agency § 275 (1958)). The Restatement (Second) was superseded by the Restatement (Third) of Agency, however, which reversed the test on which the *AIG* decision relied, stating that the knowledge of an agent or employee is imputed to the principal

---

[1]     Plaintiff's Amended Objections and Responses to Defendants' Notice of Rule 30(b)(6) Deposition at 9, 18, 25, 29, 32, 33. This same restriction pervades Plaintiff's responses to Defendants' discovery requests, including Defendants' Interrogatories and Document Requests. A list of these and other outstanding discovery disputes accompanies this submission.

[2]     Defendants would be pleased to brief the substantive law that makes GSE knowledge central to the claims and defenses in these actions, including the extensive appellate and other authority addressing these issues.

unless the agent "is subject to a <u>duty to another not to disclose</u> the fact to the principal."
RESTATEMENT (THIRD) OF AGENCY § 5.03.  As Comment c explains, "the fact that an organization
has structured itself internally into separate departments or divisions does not defeat imputation."
*Id.* § 5.03 cmt. c (2006); *accord George* v. *Equifax Mortg. Servs.*, 375 F. App'x 76, 78 (2d Cir.
2010) (knowledge acquired by employee and imputed to corporation is imputed "*to all of its*
*departments*").  For example, under Illustration 9, where an employee in the credit department of a
bank learns of a restrictive covenant applicable to a borrower but "does not communicate" that
information to the loan department, which makes a loan to the borrower in violation of the
covenant, "knowledge [of the covenant] will be imputed" to the bank.  *Id.* § 5.03 illus. 9.  Thus,
whether information known by one employee was actually communicated to another employee – a
condition FHFA unilaterally imposes on defendants' right to discovery – is irrelevant.

        Defendants recognize that in some cases a duty to maintain walls or other facts may
bear on whether an institution had certain knowledge or intent.  Here, however, Plaintiff has
presented no rationale for its position other than that some "walls" aimed to limit some
information flow between the GSEs' PLS and Single Family Mortgage Businesses ("Single
Family").  Those so-called "walls" were not designed to block information flow and should not
cut off discovery about that information.  Accompanying this submission is an initial collection of
documents, mostly statements by the GSEs themselves, reflecting that each GSE operated its lines
of business on an "integrated," "complementary" basis, under common leadership, risk
management and regulatory scrutiny.  (Tabs 6 (FNM), 2, 4 (FRE).)  Fannie Mae, for example,
launched a "One Fannie Mae" initiative aimed at promoting "a cross-functional approach to risk
management and controls."  (Tabs 5 (FNM), 6 (FRE).)

REDACTED

Freddie Mac likewise "established the
Enterprise Risk Management Committee" "to permit management from various business areas, as
well as the risk function, to meet regularly . . . specifically to monitor and oversee credit approval
processes, market practices, market trends and credit risk being taken on by the Company."  (Tab
4 (FRE).)  In addition, as Cynthia Simantel (a former Countrywide executive) states in her
declaration, the GSEs' whole loan and PLS businesses conducted coordinated reviews of
originators and servicers.  (Tab 9 (FNM).)[3]

        Accordingly, Defendants respectfully request that the Court compel Plaintiff to
testify as to each of the topics contained on Defendants' Notice; identify personnel responsible for
dealings and relationships with Originators, in response to Interrogatory No. 3; and produce
documents and information relating to GSE institutional knowledge.

--------

[3]      "It is well-settled within this Circuit that [Rule 26(b)(1)] will be satisfied if there is 'any possibility' that the
information sought may be relevant to the subject matter of the action."  *Lyondell-Citgo Ref., LP v. Petroleos de
Venez., S.A.*, 2004 WL 2698218, at *2 (S.D.N.Y. Nov. 19, 2004) (citations omitted).  This well-established rule
applies with even greater force here, where the GSEs systematically destroyed ESI throughout the relevant time
period, as described in Tabs 1-9 (Document Retention).  Plaintiff has refused to confirm that any of the custodians
whose files it proposes to search even possess any ESI, and has refused to provide Defendants with information
concerning the scope of any litigation holds that were issued during the relevant time period.

/s/  Matthew Solum
Matthew Solum
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

Robert J. Kopecky
Devon M. Largio
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Jeffrey S. Powell
Patrick M. Bryan
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005
(202) 879-5000

*Attorneys for Ally Securities, LLC*

/s/ Thomas C. Rice
Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw com)
Alan C. Turner (aturner@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017-3954

*Attorneys for Defendants Deutsche Bank AG,
Taunus Corporation, Deutsche Bank Securities
Inc , DB Structured Products, Inc., Ace
Securities Corp., Mortgage IT Securities Corp.*

/s/ Robert F. Serio
Robert F. Serio (RSerio@gibsondunn.com)
Aric H. Wu (AWu@gibsondunn.com)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166

*Attorneys for Citigroup Inc., Citigroup
Mortgage Loan Trust Inc., Citigroup Global
Markets Realty Corp., Citigroup Global
Markets Inc., Susan Mills, Randall Costa, Scott
Freidenrich, Richard A. Isenberg, Mark I.
Tsesarsky, Peter Patricola, Jeffrey Perlowitz
and Evelyn Echevarria*

/s/ Richard A. Spehr
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY  10019

*Attorneys for Defendants HSBC North America
Holdings Inc., HSBC USA Inc., HSBC Markets
(USA) Inc., HSBC Bank USA, NA., HSI Asset
Securitization Corporation*

/s/ Jay B. Kasner
Jay B. Kasner (jay.kasner@skadden.com)
Thomas J. Nolan (thomas.nolan@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
Robert A. Fumerton
(robert.fumerton@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036

*Attorneys for Defendants UBS Americas Inc.,
UBS Real Estate Securities Inc., UBS Securities
LLC, Mortgage Asset Securitization
Transactions, Inc., David Martin, Per Dyrvik,
Hugh Corcoran and Peter Slagowitz*

/s/ James P. Rouhandeh
James P. Rouhandeh
Brian S. Weinstein
Daniel L. Schwartz
Nicholas N. George
Jane M. Morril
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley & Co. Incorporated (n/k/a
Morgan Stanley & Co. LLC), Morgan Stanley
Mortgage Capital Holdings LLC (successor-in-
interest to Morgan Stanley Mortgage Capital
Inc.), Morgan Stanley ABS Capital I Inc.,
Morgan Stanley Capital I Inc., Saxon Capital,
Inc., Saxon Funding Management LLC, Saxon
Asset Securities Company, Gail P. McDonnell,
Howard Hubler, Craig S. Phillips, Alexander C.
Frank, David R. Warren, John E. Westerfield,
and Steven S. Stern*

/s/ Brad S. Karp
Brad S. Karp (bkarp@paulweiss.com)
Susanna M. Buergel (sbuergel@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

*Attorneys for Citigroup Inc., Citigroup
Mortgage Loan Trust Inc., Citigroup Global
Markets Realty Corp., Citigroup Global
Markets Inc., Susan Mills, Randall Costa, Scott
Freidenrich, Richard A. Isenberg, Mark I.
Tsesarsky, Peter Patricola, Jeffrey Perlowitz
and Evelyn Echevarria*

/s/ Penny Shane
Penny Shane (shanep@sullcrom.com)
Sharon L. Nelles (nelless@sullcrom.com)
Jonathan M. Sedlak (sedlakj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

*Attorneys for Defendants JPMorgan Chase &
Co., JPMorgan Chase Bank, N.A., J.P. Morgan
Mortgage Acquisition Corporation, J.P.
Morgan Securities LLC, J.P. Morgan
Acceptance Corporation I, Bear Stearns & Co.,
Inc., EMC Mortgage LLC, Structured Asset
Mortgage Investments II Inc., Bear Stearns
Asset Backed Securities I LLC, WaMu Asset
Acceptance Corporation, WaMu Capital
Corporation, Washington Mutual Mortgage
Securities Corporation, Long Beach Securities
Corporation and certain of the Individual
Defendants*

/s/ Bruce Clark
Bruce Clark (clarkb@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

Amanda F. Davidoff (davidoffa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006

*Attorneys for Defendants First Horizon
National Corporation, First Tennessee Bank
National Association, FTN Financial Securities
Corporation, First Horizon Asset Securities,
Inc., Gerald L. Baker, Peter F. Makowiecki,
Charles G. Burkett, and Thomas J. Wageman*

/s/ David H. Braff
David H. Braff (braffd@sullcrom.com)
Brian T. Frawley (frawleyb@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Joshua Fritsch (fritschj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

*Attorneys for Barclays Capital Inc., Barclays
Bank PLC, Securitized Asset Backed
Receivables LLC, Paul Menefee, John Carroll,
and Michael Wade*

/s/ David Blatt
David Blatt (dblatt@wc.com)
John McNichols (jmcnichols@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005

*Attorneys for Bank of America Corporation;
Bank of America, N.A.; Asset Backed Funding
Corp.; Banc of America Funding Corp.; Merrill
Lynch & Co., Inc., Merrill Lynch Mortgage
Lending, Inc., Merrill Lynch Mortgage Capital
Inc., First Franklin Financial Corp., Merrill
Lynch Mortgage Investors, Inc., Merrill Lynch
Government Securities, Inc., Merrill Lynch,
Pierce, Fenner & Smith Inc.*

/s/ Richard W. Clary
Richard W. Clary (rclary@cravath.com)
Michael T. Reynolds (mreynolds@cravath.com)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019

*Attorneys for Credit Suisse Securities (USA)
LLC, Credit Suisse Holdings (USA), Inc., Credit
Suisse (USA), Inc., DLJ Mortgage Capital, Inc.,
Credit Suisse First Boston Mortgage Securities
Corporation, Asset Backed Securities
Corporation, Credit Suisse First Boston
Mortgage Acceptance Corporation, Andrew A.
Kimura, Jeffrey A. Altabef, Eveleyn Echevarria,
Michael A. Marriott, Zev Kindler, John P.
Graham, Thomas E. Siegler, Thomas Zingalli,
Carlos Onis, Steven L. Kantor, Joseph M.
Donovan, Juliana Johnson, and Greg Richter*

/s/ Richard H. Klapper
Richard H. Klapper (klapperr@sullcrom.com)
Theodore Edelman (edelmant@sullcrom.com)
Michael T. Tomaino, Jr.
(tomainom@sullcrom.com)
Jordan T. Razza (razzaj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

*Attorneys for Goldman, Sachs & Co, GS
Mortgage Securities Corp., Goldman Sachs
Mortgage Company, The Goldman Sachs
Group, Inc., Goldman Sachs Real Estate
Funding Corp., Peter C. Aberg, Howard S.
Altarescu, Robert J. Christie, Kevin Gasvoda,
Michelle Gill, David J. Rosenblum, Jonathan S.
Sobel, Daniel L. Sparks, Mark Weiss*

/s/ Bruce Clark
Bruce Clark (clarkb@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

Amanda F. Davidoff (davidoffa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006

*Attorneys for Defendants Nomura Securities
International, Inc., Nomura Holding America
Inc., Nomura Asset Acceptance Corporation,
Nomura Home Equity Loan, Inc., Nomura
Credit & Capital, Inc., David Findlay, John
McCarthy, John P. Graham, Nathan Gorin, and
N. Dante LaRocca*

/s/ Jay B. Kasner
Jay B. Kasner (jay.kasner@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
George Zimmerman
(george.zimmerman@skadden.com)
Robert A. Fumerton
(robert.fumerton@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036

*Attorneys for SG Americas, Inc., SG Americas
Securities Holdings, LLC, SG Americas
Securities, LLC, SG Mortgage Finance Corp.,
and SG Mortgage Securities, LLC, Arnaud
Denis, Abner Figueroa, Tony Tusi, and Orlando
Figueroa*

/s/ Vernon Broderick
Greg A. Danilow (greg.danilow@weil.com)
Vernon Broderick
(vernon.broderick@weil.com)
WEIL, GOTSHAL, & MANGES LLP
767 Fifth Avenue, 25th Fl.
New York, NY  10153

*Attorneys for General Electric Company,
General Electric Capital Services, Inc., GE
Mortgage Holding, LLC, GE-WMC Securities,
LLC*

/s/ Richard A. Spehr
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY  10019

*Attorneys for Ally Financial Inc. and GMAC
Mortgage Group, Inc.*

/s/ Sandra D. Hauser
Sandra D. Hauser
(sandra.hauser@ snrdenton.com)
SNR DENTON US LLP
1221 Avenue of the Americas
New York, New York 10020

*Attorneys for Matthew Perkins*

/s/ Daniel C. Zinman

Daniel C. Zinman (dzinman@rkollp.com)
Neil S. Binder (nbinder@rkollp.com)
RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, NY  10281

*Attorneys for George C. Carp, Robert Caruso,*
*George E. Ellison, Adam D. Glassner, Daniel B.*
*Goodwin, Juliana Johnson, Michael J. Kula,*
*William L. Maxwell, Mark I. Ryan, and Antoine*
*Schetritt; Matthew Whalen; Brian Sullivan;*
*Michael McGovern; Donald Puglisi; Paul Park,*
*and Donald Han*

/s/ Thomas C. Rice

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Alan Turner (aturner@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017

*Attorneys for Defendant RBS Securities Inc.*

/s/ Joel C. Haims

Joel C. Haims (jhaims@mofo.com)
LaShann M. DeArcy (ldearcy@mofo.com)
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

*Attorneys for Tom Marano and Michael*
*Nierenberg*

/s/ Dani R. James

Dani R. James (djames@kramerlevin.com)
Jade A. Burns (jburns@kramerlevin.com)
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
1177 Avenue of the Americas
New York, New York 10036

*Attorneys for Defendant Jeffrey L. Verschleiser*

/s/ Ronald D. Lefton

Richard A. Edlin (edlinr@gtlaw.com)
Ronald D. Lefton (leftonr@gtlaw.com)
Candace Camarata (camaratac@gtlaw.com)
GREENBERG TRAURIG, LLP
200 Park Avenue,
New York, NY 10166
Phone: 212-801-9200

*Attorneys for Defendant Jeffrey Mayer*

/s/ Pamela Rogers Chepiga

Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
Josephine A. Cheatham
(allie.cheatham@allenovery.com)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

*Attorneys for Samuel L. Molinaro, Jr.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FEDERAL HOUSING FINANCE AGENCY  :
AS CONSERVATOR FOR THE FEDERAL  :
NATIONAL MORTGAGE ASSOCIATION  :          11 CIV 5201 (DLC)
AND THE FEDERAL HOME LOAN  :
MORTGAGE CORPORATION,  :          **ECF Case**
                                        :
                        Plaintiff,  :
                                        :
            v.                          :
                                        :
UBS AMERICAS INC., UBS REAL ESTATE :
SECURITIES INC., UBS SECURITIES, LLC, :
MORTGAGE ASSET SECURITIZATION  :
TRANSACTIONS, INC., DAVID MARTIN,  :
PER DYRVIK, HUGH CORCORAN, and  :
PETER SLAGOWITZ,  :
                                        :
                        Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## [PROPOSED] ORDER

WHEREAS, during the July 19, 2012 teleconference, Plaintiff represented that it would provide Defendants with a list of loans that constitute the sample upon which Plaintiff intends to rely in identifying purportedly defective loans in the above-captioned action ("Plaintiff's Sample" or the "Sample") by the end of the week of July 23, 2012;

WHEREAS, during the July 19, 2012 teleconference, the parties were ordered to meet-and-confer to discuss a schedule for (i) Plaintiff to identify the loans included in its Sample that it contends are defective, and the manner in which each such loan is alleged to be defective; and (ii) Defendants' response to any purported defects identified by Plaintiff, on a loan-by-loan basis;

WHEREAS, on July 24, 2012, Defendants sent a proposed schedule to Plaintiff, which is attached hereto as Exhibit A, and made such proposal with full reservation of rights,

including but not limited to, the right to challenge Plaintiff's sampling methodology at trial and all of the other rights described in Defendants' Submission Regarding Sampling Protocols dated June 6, 2012;

WHEREAS, on July 25, 2012, Plaintiff sent a counter-proposal to Defendants, which is attached hereto as Exhibit B;

WHEREAS, on July 26, 2012, the parties met-and-conferred to discuss their respective proposals but were unable to reach an agreement; and

WHEREAS, on July 27, 2012, Plaintiff provided Defendants a list of 2200 loans that constitute Plaintiff's Sample, more than double the number of loans Plaintiff represented would constitute its Sample in its June 7, 2012 Supplemental Submission in Support of Its Proposed Sampling Protocol.

IT IS NOW HEREBY ORDERED as follows:

1. Each party shall produce all underwriting guidelines in its possession, custody or control that may apply to the loans in Plaintiff's Sample by August 17, 2012.

2. Plaintiff shall identify those loans included in its Sample which it contends are defective, and provide a particularized description of the manner in which each such loan is defective, on a rolling basis, as soon as each such determination has been made.

3. Notwithstanding the provisions in the preceding paragraph, the deadline for Plaintiff to complete the disclosures described in the preceding paragraph shall be the earlier of (i) 45 days from the date Plaintiff has in its possession, custody or control, all of the loan files in its Sample and the underwriting guidelines necessary to re-underwrite the loans; or (ii) September 30, 2012, the deadline established by the Court for the substantial completion of document discovery.  Notwithstanding the foregoing, if, by September 30, 2012, Plaintiff has duly

requested but not received some loan files or underwriting guidelines for loans in its Sample,

Plaintiff shall (a) on September 30, 2012, provide Defendants a list of all such loan files it has

not received, the date it requested such loan files, the status of the requests, and the date upon

which Plaintiff anticipates production of such loan files; and (b) identify any alleged defects for

such loans within 30 days of the production date.

        4.   Defendants shall respond to the alleged defects, on a loan-by-loan basis, within

90 days from the date Plaintiff has identified all loans it claims to be defective and has provided

a particularized description of the purported manner in which each such loan is defective;

provided, however, Defendants may seek relief from this deadline in the event that Plaintiff does

not identify the purported defects on a rolling basis.

SO ORDERED:

_____
Honorable Denise L. Cote
United States District Judge

Dated: July __, 2012

# Exhibit A

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
(212) 735-3902
DIRECT FAX
(917) 777-3902
EMAIL ADDRESS
ROBERT.FUMERTON@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

July 24, 2012

**BY EMAIL**

Christine H. Chung, Esq.
Quinn Emanuel Urquhart &
   Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

RE:    FHFA v. UBS Americas Inc., No. 11-cv-5201 (DLC)

Dear Christine:

On behalf of defendants in the above-referenced action (the "UBS Defendants"), and pursuant to the Court's directive during the July 19 teleconference, we write to propose the following schedule for (i) Plaintiff to identify all loans, by loan number, which it intends to use as part of any sampling protocol to prove its claims, (ii) Plaintiff to identify those loans included in its sampling protocol that it contends are defective and the manner in which each such loan is defective, and (iii) the UBS Defendants to respond to the alleged defects, on a loan-by-loan basis.

First, during the July 19 teleconference, Plaintiff represented that it would identify this week all loans, by loan number, that it intends to use as part of its sampling protocol in this action. Please inform us of when this week we will receive this information. The UBS Defendants also propose that each party produce all underwriting guidelines in its possession, custody or control that may apply to the loans in FHFA's sampling protocol (including, for FHFA, underwriting guidelines maintained by the GSEs' "single family" unit or any other GSE group) by August 10, 2012.

Christine H. Chung, Esq.
July 24, 2012
Page 2

        Second, the UBS Defendants propose that Plaintiff identify those loans included in its sampling protocol that it contends are defective, and identify, with particularity, the manner in which Plaintiff claims each such loan is defective, on a rolling basis as soon as each such determination has been made.  The UBS Defendants propose that the deadline for the completion of Plaintiff's identifications in the UBS Action shall be the earlier of (i) 45 days from the date it has in its possession, custody or control all of the loan files to be included in its sample and the underwriting guidelines necessary to reunderwrite the loans, or (ii) September 30, 2012, the deadline established by the Court for the substantial completion of document discovery.[1]

        Third, the UBS Defendants propose that their deadline for responding to the alleged defects, on a loan-by-loan basis, shall be 90 days from the date Plaintiff has identified all of the loans it claims to be defective and has provided a particularized description of the purported manner in which each such loan is defective.

        The UBS Defendants make this proposal with full reservation of rights, including but not limited to, the right to challenge Plaintiff's sampling methodology at trial and all of the other rights described in Defendants' Submission Regarding Sampling Protocols dated June 6, 2012.

        We are available to meet-and-confer about this proposal and suggest Wednesday, July 25, at 3:00 pm.  Please let us know if that time works for Plaintiff.

        Sincerely,

        Robert A. Fumerton

---

[1] If the latter deadline applies, and if on that date Plaintiff has duly requested but not received some loan files or underwriting guidelines for loans in its sample it intends to examine for possible defects, Defendants propose that (i) Plaintiff provide on that date a list of all such loans, the date of request, the status of response, and the anticipated production date; and (ii) Plaintiff identify the alleged defects for such loans within 30 days of the production date.

# Exhibit B

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL: (212) 849-7000 FAX: (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7243**

WRITER'S INTERNET ADDRESS
**christinechung@quinnemanuel.com**

July 25, 2012

**VIA ELECTRONIC MAIL**

Robert A. Fumerton, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036

Re:     FHFA Actions, No. 11 Civ. 05201 (DLC) *et al.*

Dear Mr. Fumerton:

        We write in response to your letter of July 24, 2012, and pursuant to the Court's directive during the conference on July 19, 2012, that the parties propose and discuss a schedule for an early exchange of expert reports relating to sampling.

        You propose in your letter that FHFA identify *both* all loans in its samples *and* as to those loans, all violations of underwriting guidelines, either before or at the close of document discovery on September 30, 2012.  As previously discussed, this is not feasible.  The first step in assessing the universe of loans for review is the designation of an appropriate sample, and the analysis of the loans in that sample is a time-consuming process that obviously cannot be completed until after all of the pertinent loan files are produced to FHFA.  To date, of all the Defendants, it appears it appears that only JPMorgan has even begun to produce loan files.  It is possible to have efficient expert discovery prior to the completion of that review, however, by first addressing the sampling protocols by one or both parties.  Therefore, FHFA proposes the following schedule for exchanging expert reports on sampling methodology and identifying any samples the parties intend to use in the litigation, identifying agreement or disagreement

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400 FAX (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia  20004-2400 | TEL (202) 538-8000 FAX (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 20 7653 2000 FAX +44 20 7653 2100
TOKYO | NBF Hibiya Building, 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711 FAX +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | TEL +49 621 43298 6000 FAX +49 621 43298 6100
MOSCOW | Voentorg Building, 3rd Floor, 10 Vozdvizhenka Street, Moscow 125009, Russia | TEL +7 495 797 3666 FAX +7 495 797 3667
HAMBURG | An der Alster 3, 20099 Hamburg, Germany | TEL +49 40 89728 7000 FAX +49 40 89728 7100

regarding sampling methodology (including any *Daubert* challenges),[1] and subsequently exchanging expert reports addressed to the results of each side's reunderwriting of loan files, again taking into account that all loan files may not be fully available until September 30, 2012, or sometime thereafter.[2]

Deadlines for parties to exchange expert reports on sampling methodology and identify any samples to be used in the litigation:[3]

| | |
|---|---|
| For *UBS* action | August 9, 2012 |
| For Tranche 2 (*JPMorgan* and *Merrill Lynch*) actions | August 23, 2012 |
| For Tranche 3 (*Goldman Sachs*, *Credit Suisse*, and *Deutsche Bank*) actions | September 13, 2012 |
| For Tranche 4 actions | September 30, 2012 |

Deadlines for parties to *UBS* action to file rebuttal reports on sampling methodology and/or raise any *Daubert* challenges:

| | |
|---|---|
| Rebuttal reports on sampling methodology (including objections and *Daubert* challenges) | August 31, 2012 |
| Responses to any objections and challenges | September 13, 2012 |
| Status conference to address objections and challenges | As early as September 20, 2012 |

Deadlines for parties in non-*UBS* actions to file rebuttal reports on sampling methodology and/or raise any *Daubert* challenges:

| | |
|---|---|
| Rebuttal reports on sampling methodology (including objections and *Daubert* challenges) | October 23, 2012 |
| Responses to any objections and challenges | November 6, 2012 |
| Status conference to address objections and challenges | As early as November 13, 2012 |

---

[1]   Defendants expressly reserved the right to challenge sampling, including on *Daubert* grounds. *See* Defs.' Submission Regarding Sampling Protocols (Dkt. No. 99) at 1; Defs.' Proposed Topics for Meet and Confer re: Sampling Protocol (Dkt. No. 95-1) at 6-7.

[2]   Expert reports relating to damages or other issues are not governed by this schedule and are beyond the scope of this proposal.

[3]   This schedule is contingent on Defendants' production of complete loan tape and originator information.  With respect to *FHFA v. Ally Financial, Inc. et al*, No. 11 Civ. 7010 (DLC),  the schedule is contingent on: (i) the Bankruptcy Court granting FHFA's application for the production of loan files, or (ii) FHFA otherwise obtaining the loan files to be sampled.

Deadlines for expert reports on reunderwriting/analysis of *UBS* samples:[4]

| Parties serve expert reports on reunderwriting/analysis | March 15, 2013 |
| Parties serve rebuttal reports | April 30, 2013 |
| Deadline for completion of expert discovery | June 14, 2013 |

Deadlines for expert reports on reunderwriting/analysis of Tranche 2, 3 and 4 actions:[5]

| Parties serve expert reports on reunderwriting/analysis | August 15, 2013 |
| Parties serve rebuttal reports | November 7, 2013 |
| Deadline for completion of expert discovery | December 6, 2013 |

The above proposal meets a number of objectives in discovery.

*First,* the schedule satisfies Defendants' request that FHFA provide sampling protocols and identify samples promptly and on a rolling basis, depending on trial tranche. Our proposal provides for a simultaneous exchange of sampling protocols and samples because if Defendants intend to sample, FHFA will (like Defendants) need time to review any "loan-by-loan analysis" conducted by Defendants. This is especially important given Defendants' stated intention to use sample sizes that are much larger than that proposed by FHFA. A simultaneous exchange of protocols and samples will also allow the parties to plan and carry out loan file reunderwriting with full knowledge of the sample(s) upon which the party's adversary intends to rely, which is both fair and efficient.

*Second,* exchanging samples and expert reports on sampling in the near term will enable the parties to identify areas of disagreement, including *Daubert* objections, and areas of agreement on acceptable sampling methodology, as we discussed at the status conference on June 13, 2012. It is efficient to use the time in document discovery during which loan files are being produced to explore the potential to agree on samples or at least on aspects of sampling methodology, and to obtain rulings, if necessary on any motion disputing the admissibility of sampling under *Daubert*.

*Third,* the schedule proposes that expert reports regarding the results of reunderwriting be produced well in advance of the close of expert discovery, while leaving time for the parties (and

---

[4]   This schedule is contingent on Defendants' timely producing loan files and originator underwriting guidelines. With respect to *FHFA v. Ally Financial, Inc. et al*, No. 11 Civ. 7010 (DLC), the schedule is contingent on: (i) the Bankruptcy Court granting FHFA's application for the production of loan files, or (ii) FHFA otherwise obtaining the loan files to be sampled.

[5]   This schedule is contingent on Defendants' timely producing loan files and originator guidelines. The *UBS* Defendants' request for "all underwriting guidelines" of FHFA or the GSEs in their July 24 letter is irrelevant to reunderwriting the mortgage loans underlying the Securitizations at issue, which were not underwritten pursuant to any such guidelines. FHFA will therefore not produce any FHFA or GSE guidelines on any accelerated schedule.

their experts) to carry out their reunderwriting and analysis of the reunderwriting results, after obtaining the loan files themselves during the document discovery phase.

We are available to discuss with you the parties' respective proposals at a mutually convenient time.

Very truly yours,

| /s/ Christine H. Chung | /s/ Michael Hanin |
| --- | --- |
| Christine H. Chung | Michael Hanin |
| (christinechung@quinnemanuel.com) | (mhanin@kasowitz.com ) |
| QUINN EMANUEL URQUHART & | KASOWITZ, BENSON, TORRES & |
| SULLIVAN, LLP | FRIEDMAN LLP |
| 51 Madison Avenue, 22nd Floor | 1633 Broadway |
| New York, New York 100 10 | New York, New York 10019 |
| (212) 849-7000 | (212) 506-1700 |
| | |
| *Attorney for Plaintiff Federal Housing Finance Agency* | *Attorney for Plaintiff Federal Housing Finance Agency* |

cc:     All Defense Counsel of Record (via e-mail)

4

# FHFA Actions, 11-cv-5201, et al.
## Materials for July 31, 2012 Conference
(Submitted July 30, 2012)

| Tabs | 30(b)(6) Notice |
|---|---|
| 1 | Defendants' Notice of Rule 30(b)(6) Deposition, dated June 28, 2012 |
| 2 | Plaintiff's Second Amended Objections and Responses to Defendants' Notice of Rule 30(b)(6) Deposition |
| 3 | Letter from E. Bennett to C. Chung, dated July 26, 2012 |

# Freddie Mac

| Tabs | Illustrative Documents Concerning Integrated Business Segments |
|---|---|
| 1 | Freddie Mac Organizational Charts, FHFA00000134 |
| 2 | Freddie Mac 2005 Annual Report (excerpts) |
| 3 | E-mail from Merritt Connell (Freddie Mac) to David Beck (WaMu) and Gary Kain (Freddie Mac), dated December 6, 2006 |
| 4 | Report of the Special Litigation Committee of the Federal Home Loan Mortgage Corporation, February 25, 2011, attached to Freddie Mac's Memorandum In Support of Motion for Voluntary Dismissal Without Prejudice, *In re Federal Home Loan Mortgage Corp. Deriv. Litig.*, No. 1:08-cv-773 (E.D. Va.) |
| 5 | Complaint, *SEC* v. *Syron*, 11-Civ-9201 (filed December 16, 2011) |
| 6 | Declaration of Cynthia Simantel, subscribed to on July 26, 2012 |
| **Tabs** | **Illustrative Documents Concerning the GSEs' Knowledge** |
| 7 | Mortgage Markets and the Enterprises in 2005, OFHEO (Sept. 2006) (excerpts) |
| 8 | Letter from James Lockhart (former Director of FHFA) to Wendy Edelberg (FCIC), dated June 30, 2010 |
| **Tabs** | **Illustrative Documents Concerning Information Flow** |
| 9 | E-mail from Chad Levrini (Freddie Mac) to Hiram Matthews (Barclays), Ray Vohra (Barclays), Roopali Gupta (Barclays) and Kwaw deGraft-Johnson (Barclays), dated March 29, 2006 |
| 10 | E-mail from James Jeffery (Freddie Mac) to Todd Kaufman (WaMu), dated May 23, 2007 (without attachments) |

# Fannie Mae

| Tabs | Illustrative Documents Concerning Integrated Business Segments |
|------|----------------------------------------------------------------|
| 1 | Fannie Mae Organizational Charts |
| 2 | Fannie Mae Strategic Plan 2007-2011 (excerpts) |
| 3 | Private Label Securities Risk Policy Corporate Level Policy Version 1.00 (Effective August 16, 2006) (excerpts) |
| 4 | Private Label Securities Risk Policy Corporate Level Policy Version 1.04 (Effective June 27, 2007) |
| 5 | *Fannie Mae: Meetings With Management Highlight Progress Rebuilding Operations*, Bear, Stearns & Co. Inc. U.S. Equity Research (Feb. 7, 2007) |
| 6 | Fannie Mae Form 10-K for December 31, 2005 (filed May 2, 2007) |
| 7 | E-mail from Chaka Long (Fannie Mae) to Fran Sheridan (WaMu), dated June 7, 2007 |
| 8 | Complaint, *SEC* v. *Mudd*, 11-cv-09202 (Dec. 16, 2011) |
| 9 | Declaration of Cynthia Simantel, subscribed to on July 26, 2012 |
| **Tabs** | **Illustrative Documents Concerning the GSEs' Knowledge** |
| 10 | Email from Cindy Workman (Fannie Mae), to David Clifford (Barclays), dated June 26, 2006 |
| 11 | Mortgage Markets and the Enterprises in 2005, OFHEO (Sept. 2006) (excerpts) |
| 12 | Email from Tony Holmes (Fannie Mae) to Marc Simpson (J.P. Morgan Securities), dated March 13, 2008 |
| 13 | Letter from James Lockhart (former Director of FHFA) to Wendy Edelberg (FCIC), dated June 30, 2010 |
| **Tabs** | **Illustrative Documents Concerning Information Flow** |
| 14 | Fannie Mae Information Barrier Policy v. 1.01 (March 15, 2007), FHFA00000921 (excerpts) |
| 15 | Information Barrier Procedures (Sept. 15, 2007), FHFA00000938 (excerpts) |

# Document Retention

| Tabs | Correspondence Concerning Document Retention |
|------|----------------------------------------------|
| 1 | Letter from J. Kasner to Hon. D. Cote, dated July 2, 2012 |
| 2 | Letter from C. Chung to Hon. D. Cote, dated July 3, 2012 |
| 3 | Letter from D. Woll to A. Abensohn & M. Sheth, dated July 5, 2012 |
| 4 | Letter from P. Shane to M. Sheth & K. Leung, dated July 12, 2012 |
| 5 | Transcript, Deposition of Richard Kehoe (July 20, 2012) |
| 6 | Freddie Mac Corporate Policy Number 7-800, FHFA00000236 (excerpts) |
| 7 | Letter from D. Woll to J. Corey, dated July 24, 2012 |
| 8 | Letter from J. Corey to D. Woll, dated July 24, 2012 |
| 9 | Letter from D. Woll to J. Corey, dated July 27, 2012 |

# Other Documents

| Tabs | Other Relevant Documents |
|------|--------------------------|
| 1 | Open Issues |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
FEDERAL HOUSING FINANCE AGENCY, :
etc., :
                             :   11 Civ. 5201 (DLC)
            Plaintiff, :
                             :
                             :
                 v.            :
                             :   **NOTICE OF RULE 30(B)(6)**
UBS AMERICAS INC., et al., :   **DEPOSITION**
                             :
           Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
Other Cases Brought By This Plaintiff: :
                             :
11 Civ. 6188 (DLC) :
11 Civ. 6189 (DLC) :
11 Civ. 6190 (DLC) :
11 Civ. 6192 (DLC) :
11 Civ. 6193 (DLC) :
11 Civ. 6195 (DLC) :
11 Civ. 6196 (DLC) :
11 Civ. 6198 (DLC) :
11 Civ. 6200 (DLC) :
11 Civ. 6201 (DLC) :
11 Civ. 6202 (DLC) :
11 Civ. 6203 (DLC) :
11 Civ. 6739 (DLC) :
11 Civ. 7010 (DLC) :
11 Civ. 7048 (DLC) :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

       **PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Defendants will take the deposition upon oral examination of Plaintiff Federal

Housing Finance Agency, at  9:00 am on Thursday, July 12, 2012, at the offices of Skadden,

Arps, Slate, Meagher & Flom LLP, through the officer(s), director(s), agent(s), or such other

person(s) with the most knowledge concerning the topics listed in Schedule A hereto.

**PLEASE TAKE FURTHER NOTICE** that the deposition will take place before a notary public or other officer authorized to administer oaths and record testimony pursuant to Rule 28 of the Federal Rules of Civil Procedure, and will be recorded by stenographic means and videotape.  The deposition will continue from day to day until complete, excluding Saturdays, Sundays and holidays.

Date:  June 28, 2012

_____/s/_____
Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw com)
Alan C. Turner (aturner@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017-3954

*Attorneys for Defendants Deutsche Bank AG,
Taunus Corporation, Deutsche Bank Securities
Inc , DB Structured Products, Inc., Ace
Securities Corp., Mortgage IT Securities Corp.*

_____/s/_____
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY  10019

*Attorneys for Defendants HSBC North America
Holdings Inc., HSBC USA Inc., HSBC Markets
(USA) Inc., HSBC Bank USA, NA., HSI Asset
Securitization Corporation, HSBC Securities
(USA) Inc., Neal Leonard, Gerard Mattia, Todd
White, Norman Chaleff, and Jon Voigtman*

_____/s/_____
Jay B. Kasner (jay.kasner@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
Robert A. Fumerton
(robert.fumerton@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036

*Attorneys for Defendants UBS Americas Inc.,
UBS Real Estate Securities Inc., UBS Securities
LLC, Mortgage Asset Securitization
Transactions, Inc., David Martin, Per Dyrvik,
Hugh Corcoran and Peter Slagowitz*

_____/s/_____
Brad S. Karp (bkarp@paulweiss.com)
Susanna M. Buergel (sbuergel@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

*Attorneys for Citigroup Inc., Citigroup
Mortgage Loan Trust Inc., Citigroup Global
Markets Realty Corp., Citigroup Global
Markets Inc., Susan Mills, Randall Costa, Scott
Freidenrich, Richard A. Isenberg, Mark I.
Tsesarsky, Peter Patricola, Jeffrey Perlowitz
and Evelyn Echevarria*

_____/s/_____
James P. Rouhandeh
Brian S. Weinstein
Daniel J. Schwartz
Nicholas N. George
Jane M. Morril
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley & Co. Incorporated (n/k/a
Morgan Stanley & Co. LLC), Morgan Stanley
Mortgage Capital Holdings LLC (successor-in-
interest to Morgan Stanley Mortgage Capital
Inc.), Morgan Stanley ABS Capital I Inc.,
Morgan Stanley Capital I Inc., Saxon Capital,
Inc., Saxon Funding Management LLC, Saxon
Asset Securities Company, Gail P. McDonnell,
Howard Hubler, Craig S. Phillips, Alexander C.
Frank, David R. Warren, John E. Westerfield,
and Steven S. Stern*

_____/s/_____
Penny Shane (shanep@sullcrom.com)
Sharon L. Nelles (nelless@sullcrom.com)
Jonathan M. Sedlak (sedlakj@sullcrom.com)
David A. Castleman
(castlemand@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Attorneys for Defendants JPMorgan Chase &
Co., JPMorgan Chase Bank, N.A., J.P. Morgan
Mortgage Acquisition Corporation, J.P.
Morgan Securities LLC, J.P. Morgan
Acceptance Corporation I, Bear Stearns & Co.,
Inc., EMC Mortgage LLC, Structured Asset
Mortgage Investments II Inc., Bear Stearns
Asset Backed Securities I LLC, WaMu Asset
Acceptance Corporation, WaMu Capital
Corporation, Washington Mutual Mortgage
Securities Corporation, Long Beach Securities
Corporation and certain of the Individual
Defendants*

_____/s/_____
Bruce Clark (clarkb@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Amanda F. Davidoff (davidoffa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

*Attorneys for Defendants First Horizon
National Corporation, First Tennessee Bank
National Association, FTN Financial Securities
Corporation, First Horizon Asset Securities,
Inc., Gerald L. Baker, Peter F. Makowiecki,
Charles G. Burkett, and Thomas J. Wageman*

_____/s/_____
David H. Braff (braffd@sullcrom.com)
Brian T. Frawley (frawleyb@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Joshua Fritsch (fritschj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Attorneys for Barclays Capital Inc., Barclays
Bank PLC, Securitized Asset Backed
Receivables LLC, Paul Menefee, John Carroll,
and Michael Wade*

3

_____/s/_____
David Blatt (dblatt@wc.com)
John McNichols (jmcnichols@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

*Attorneys for Bank of America Corporation;
Bank of America, N.A.; Asset Backed Funding
Corp.; Banc of America Funding Corp.; Merrill
Lynch & Co., Inc., Merrill Lynch Mortgage
Lending, Inc., Merrill Lynch Mortgage Capital
Inc., First Franklin Financial Corp., Merrill
Lynch Mortgage Investors, Inc., Merrill Lynch
Government Securities, Inc., Merrill Lynch,
Pierce, Fenner & Smith Inc.*

_____/s/_____
Richard H. Klapper (klapperr@sullcrom.com)
Theodore Edelman (edelmant@sullcrom.com)
Michael T. Tomaino, Jr.
(tomainom@sullcrom.com)
Jordan T. Razza (razzaj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Attorneys for Goldman, Sachs & Co, GS
Mortgage Securities Corp., Goldman Sachs
Mortgage Company, The Goldman Sachs
Group, Inc., Goldman Sachs Real Estate
Funding Corp., Peter C. Aberg, Howard S.
Altarescu, Robert J. Christie, Kevin Gasvoda,
Michelle Gill, David J. Rosenblum, Jonathan S.
Sobel, Daniel L. Sparks, Mark Weiss*

_____/s/_____
Richard W. Clary (rclary@cravath.com)
Michael T. Reynolds (mreynolds@cravath.com)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

*Attorneys for Credit Suisse Securities (USA)
LLC, Credit Suisse Holdings (USA), Inc., Credit
Suisse (USA), Inc., DLJ Mortgage Capital, Inc.,
Credit Suisse First Boston Mortgage Securities
Corporation, Asset Backed Securities
Corporation, Credit Suisse First Boston
Mortgage Acceptance Corporation, Andrew A.
Kimura, Jeffrey A. Altabef, Eveleyn Echevarria,
Michael A. Marriott, Zev Kindler, John P.
Graham, Thomas E. Siegler, Thomas Zingalli,
Carlos Onis, Steven L. Kantor, Joseph M.
Donovan, Juliana Johnson, and Greg Richter*

_____/s/_____
Bruce E. Clark (clarkb@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Amanda F. Davidoff (davidoffa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

*Attorneys for Defendants Nomura Securities
International, Inc., Nomura Holding America
Inc., Nomura Asset Acceptance Corporation,
Nomura Home Equity Loan, Inc., Nomura
Credit & Capital, Inc., David Findlay, John
McCarthy, John P. Graham, Nathan Gorin, and
N. Dante Larocca*

4

| /s/ | /s/ |
|---|---|
| Jay B. Kasner (jay.kasner@skadden.com)<br>Scott Musoff (scott.musoff@skadden.com)<br>George Zimmerman<br>(george.zimmerman@skadden.com)<br>Robert A. Fumerton<br>(robert.fumerton@skadden.com)<br>SKADDEN, ARPS, SLATE, MEAGHER &<br>FLOM LLP<br>Four Times Square<br>New York, NY  10036 | Greg A. Danilow (greg.danilow@weil.com)<br>Vernon Broderick<br>(vernon.broderick@weil.com)<br>WEIL, GOTSHAL, & MANGES LLP<br>767 Fifth Avenue, 25th Fl.<br>New York, NY  10153 |

*Attorneys for SG Americas, Inc., SG Americas Securities Holdings, LLC, SG Americas Securities, LLC, SG Mortgage Finance Corp., and SG Mortgage Securities, LLC, Arnaud Denis, Abner Figueroa, Tony Tusi, and Orlando Figueroa*

*Attorneys for General Electric Company, General Electric Capital Services, Inc., GE Mortgage Holding, LLC, GE-WMC Securities, LLC*

| /s/ | /s/ |
|---|---|
| David Potter (dpotter@lpgllp.com)<br>LAZARE, POTTER & GIACOVAS LLP<br>950 Third Avenue<br>New York, New  York  10022 | Sandra D. Hauser<br>(sandra.hauser@snrdenton.com)<br>Patrick Fitzmaurice<br>(patrick.fitzmaurice@snrdenton.com) |

Jeffrey A. Lipps (lipps@carpenterlipps.com)
Jennifer A.L. Battle
(battle@carpenterlipps.com)
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 N. High Street
Columbus, Ohio  43215

SNR DENTON US LLP
1221 Avenue of the Americas
New York, New York 10020

*Attorneys for Defendants Ally Securities, LLC*

*Attorneys for Matthew Perkins*

_____/s/_____
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY  10019

*Attorneys for Ally Financial Inc. and GMAC
Mortgage Group, Inc.*

_____/s/_____
Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Alan Turner (aturner@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017

*Attorneys for Defendant RBS Securities Inc.*

_____/s/_____
Joel C. Haims (jhaims@mofo.com)
LaShann M. DeArcy (ldearcy@mofo.com)
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104

*Attorneys for Tom Marano and Michael
Nierenberg*

_____/s/_____
Dani R. James
Jade A. Burns
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
1177 Avenue of the Americas
New York, New York 10036

*Attorneys for Defendant Jeffrey L. Verschleiser*

_____/s/_____
Robert F. Serio (RSerio@gibsondunn.com)
Aric H. Wu (AWu@gibsondunn.com)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166

*Attorneys for Citigroup Global Markets, Inc.,
Deutsche Bank Securities Inc., RBS Securities
Inc. and UBS Securities LLC*

_____/s/_____
Pamela Rogers Chepiga
(pamela.chepiga@allenovery.com)
Josephine A. Cheatham
(allie.cheatham@allenovery.com)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Attorneys for Defendant Samuel L. Molinaro, Jr*

_____/s/_____
Daniel C. Zinman (dzinman@rkollp.com)
Neil S. Binder (nbinder@rkollp.com)
RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, NY 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

*Attorneys for Defendants George C. Carp,
Robert J. Caruso, George E. Ellison, Adam D.
Glassner, Daniel B. Goodwin, Juliana Johnson,
Michael J. Kula, William L. Maxwell, Mark I.
Ryan, Antoine Schetritt, Donald Han, Michael
M. McGovern, Paul Park, Donald J. Puglisi,
Brian T. Sullivan, and Matthew Whalen*

## SCHEDULE A

1.  Any systematic deletion and/or destruction of potentially relevant documents by Freddie Mac or Fannie Mae at any time from January 1, 2004 through the present, including but not limited to the implementation of auto-deletion policies, the overwriting of back-up tapes, and the destruction of custodial files following an employee's departure from the GSEs.

2.  Any document preservation memos that were issued by Freddie Mac or Fannie Mae in connection with any litigation, investigation or regulatory proceeding concerning mortgage loans or residential mortgage-backed securities ("RMBS") at any time from January 1, 2004 through the present, including any steps taken to preserve potentially relevant documents.

3.  The organizational structure of Fannie Mae and Freddie Mac, including but not limited to the respective individuals, positions, departments, committees or other groups at Fannie Mae or Freddie Mac that had a role in each Securitization in the above-captioned Actions ("Securitization"), or that had a role in Your purchase of mortgage loans or Your securitizations of mortgage loans, including but not limited to those individuals, positions, departments, committees or other groups who had responsibility for, involvement in or knowledge of:

    (i)     Your assessment of the potential risks and benefits of non-agency mortgage backed securities;

    (ii)    approval of Your purchase of non-agency mortgage backed securities and/or in development of any limits or setting of any goals concerning such purchases;

    (iii)   any pre- or post-purchase credit analyses, due diligence processes, pricing analysis and/or other tools or analyses used by You to assess Your investments or potential investments in non-agency mortgage backed securities;

    (iv)    any assessments or analyses concerning underwriting standards or methods employed in connection with the underlying loans supporting the Securitizations;

    (v)     any assessments or analyses concerning any rating agency ratings relating to the Securitizations; and

    (vi)    communications with any third parties regarding the Certificates or Your investment in them.

As to each such individual, position, department, committee or other group, the organizational relationships between and among them; the names and Composition of any groups or other bodies that were responsible for overseeing or supporting more than one of them; and a description of the tools employed in the ordinary course of business to carry out communication and coordination between and among them.

4.  The Composition of each group responsible for any aspect of Your purchase of mortgage loans, including Your due diligence, Your communications with mortgage loan originators, Your pricing decisions, Your monitoring of the performance of the mortgage loans, and Your communications with any third parties, including but not limited to any operational reviews of third parties in connection with the mortgage loans or Your purchase of them from the time period beginning January 1, 2004 through September 6, 2007.

5.  The Composition of each group responsible for any aspect of Your securitizations of mortgage loans, including Your due diligence, Your communications with potential investors in Your securitizations, Your pricing decisions, Your monitoring of the performance of the securitizations, and Your communications with any third parties regarding the securitizations from the time period beginning January 1, 2004 through September 6, 2007.

6.  The Composition of each group responsible for any aspect of Your economic modeling relating to the housing or mortgage markets, housing or mortgage industry trends, the Certificates or the Securitizations, Your own securitizations, and mortgage loans You purchased from the time period beginning January 1, 2004 through the present.

7.  The Composition of each group responsible for the development or application of any intellectual property or other tools used to detect appraisal bias from the time period beginning January 1, 2004 through the present.

8.  The Composition of each group responsible for or having knowledge of the effectiveness and limitations of automated valuation modeling from the time period beginning January 1, 2004 through the present.

9.  For each Securitization, the identities of any external due diligence firms that assisted Fannie Mae or Freddie Mac.

10.  The systems through which Fannie Mae and Freddie Mac maintain hard-copy files in the ordinary course that are relevant to each Securitization, private label RMBS investments generally, and the subject of discovery requests in this Action.

11.  The systems through which Fannie Mae and Freddie Mac maintain electronic files in the ordinary course that are relevant to each Securitization, private label RMBS investments generally, and the subject of discovery requests in this Action.

12.  The Composition of each group responsible for the decision to file the Actions.

9

## DEFINITIONS

1.      The Uniform Definitions for Discovery Requests and rules of construction shall apply. *See* S.D.N.Y. Local Civil Rule 26.3.

2.      The term "Actions" means the above-captioned civil actions pending in the United States District Court for the Southern District of New York.

3.      The term "Complaints" means the operative complaints in the Actions, individually and collectively, and all exhibits and appendices thereto.

4.      The term "Securitizations" refers to each and every securitization, individually and collectively, referred to in the Complaints.

5.      The term "Certificates" means the particular Certificates, individually and collectively, that You purchased in the Securitizations.

6.      The term "Composition" includes the identity of each employee, the number of employees, and the organizational structure of the identified group.

7.      The term "include," or any variant thereof, means including without limitation.

8.      The terms "relating to," "concerning," "regarding," and "reflecting," and any variant thereof, mean relating to, regarding, concerning, referring to, with respect to, reflecting, describing, involving, evidencing, pertaining to, containing, setting forth, showing, disclosing, or constituting.

9.      The terms "You" and "Your" refer to Plaintiff Federal Housing Finance Agency, all of its predecessor agencies or entities, including the Office of Federal Housing Enterprise Oversight and the Federal Housing Finance Board, and all entities for which it is the purported conservator, including the Federal National Mortgage Association and the Federal Home Loan

10

Mortgage Corporation, and all persons and entities acting or purporting to act on behalf of each of the foregoing entities, individually and collectively.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                     :

FEDERAL HOUSING FINANCE AGENCY, etc.,   : **PLAINTIFF'S SECOND**
                     : **AMENDED OBJECTIONS**
            Plaintiff,    : **AND RESPONSES TO**
                     : **DEFENDANTS' NOTICE OF**
           v.          : **RULE 30(B)(6) DEPOSITION**
                     :

UBS AMERICAS, INC., et al.,           :
                     :
            Defendants.   : 11 Civ. 5201 (DLC)

-------------------------------------------------------------------- x
                     :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
                     : 11 Civ. 6188 (DLC)
            Plaintiff,    :
           v.          :

JPMORGAN CHASE & CO., et al.,       :
                     :
            Defendants.   :

-------------------------------------------------------------------- x
                     :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
                     : 11 Civ. 6189 (DLC)
            Plaintiff,    :
           v.          :

HSBC NORTH AMERICA HOLDINGS, INC., et  :
al.,                       :
            Defendants.   :
                     :

-------------------------------------------------------------------- x
                     :

FEDERAL HOUSING FINANCE AGENCY, etc.,   :
                     : 11 Civ. 6190 (DLC)
            Plaintiff,    :
           v.          :

BARCLAYS BANK PLC, et al.,           :
                     :
            Defendants.   :
                     :

-------------------------------------------------------------------- x

```
-------------------------------------------------------------------- x
                                                     :
                                                     :
FEDERAL HOUSING FINANCE AGENCY, etc.,                :
                                                     :   11 Civ. 6192 (DLC)
                                   Plaintiff,        :
                      v.                             :
                                                     :
DEUTSCHE BANK AG, et al.,                            :
                                                     :
                                   Defendants.       :
                                                     :
-------------------------------------------------------------------- x
                                                     :
                                                     :
FEDERAL HOUSING FINANCE AGENCY, etc.,                :
                                                     :   11 Civ. 6193 (DLC)
                                   Plaintiff,        :
                      v.                             :
                                                     :
FIRST HORIZON NATIONAL CORP., et al.,                :
                                                     :
                                   Defendants.       :
                                                     :
-------------------------------------------------------------------- x
                                                     :
                                                     :
FEDERAL HOUSING FINANCE AGENCY, etc.,                :
                                                     :   11 Civ. 6195 (DLC)
                                   Plaintiff,        :
                      v.                             :
                                                     :
BANK OF AMERICA CORP., et al.,                       :
                                                     :
                                   Defendants.       :
                                                     :
-------------------------------------------------------------------- x
                                                     :
                                                     :
FEDERAL HOUSING FINANCE AGENCY, etc.,                :
                                                     :   11 Civ. 6196 (DLC)
                                   Plaintiff,        :
                      v.                             :
                                                     :
CITIGROUP INC., et al.,                              :
                                                     :
                                   Defendants.       :
                                                     :
-------------------------------------------------------------------- x
```

```
----------------------------------------------------------------- x
                                                 :
                                                 :
FEDERAL HOUSING FINANCE AGENCY, etc.,            :
                                                 :
                Plaintiff,                       :   11 Civ. 6198 (DLC)
           v.                                    :
                                                 :
GOLDMAN, SACHS & CO., et al.,                    :
                                                 :
                Defendants.                      :
                                                 :
----------------------------------------------------------------- x
                                                 :
                                                 :
FEDERAL HOUSING FINANCE AGENCY, etc.,            :
                                                 :
                Plaintiff,                       :   11 Civ. 6200 (DLC)
           v.                                    :
                                                 :
CREDIT SUISSE HOLDINGS (USA), INC., et al.,      :
                                                 :
                Defendants.                      :
                                                 :
----------------------------------------------------------------- x
                                                 :
                                                 :
FEDERAL HOUSING FINANCE AGENCY, etc.,            :
                                                 :
                Plaintiff,                       :   11 Civ. 6201 (DLC)
           v.                                    :
                                                 :
NOMURA HOLDING AMERICA, INC., et al.,            :
                                                 :
                Defendants.                      :
                                                 :
----------------------------------------------------------------- x
                                                 :
                                                 :
FEDERAL HOUSING FINANCE AGENCY, etc.,            :
                                                 :
                Plaintiff,                       :   11 Civ. 6202 (DLC)
           v.                                    :
                                                 :
MERRILL LYNCH & CO., INC., et al.,               :
                                                 :
                Defendants.                      :
                                                 :
----------------------------------------------------------------- x
```

```
----------------------------------------------------------------- x
                                                        :
                                                        :
FEDERAL HOUSING FINANCE AGENCY, etc.,                   :
                                                        :   11 Civ. 6203 (DLC)
                                     Plaintiff,         :
                         v.                             :
                                                        :
SG AMERICAS, INC., et al.,                              :
                                                        :
                                     Defendants.        :
                                                        :
----------------------------------------------------------------- x
                                                        :
                                                        :
FEDERAL HOUSING FINANCE AGENCY, etc.,                   :
                                                        :   11 Civ. 6739 (DLC)
                                     Plaintiff,         :
                         v.                             :
                                                        :
MORGAN STANLEY, et al.,                                 :
                                                        :
                                     Defendants.        :
                                                        :
----------------------------------------------------------------- x
                                                        :
                                                        :
FEDERAL HOUSING FINANCE AGENCY, etc.,                   :
                                                        :   11 Civ. 7010 (DLC)
                                     Plaintiff,         :
                         v.                             :
                                                        :
ALLY FINANCIAL INC., et al.,                            :
                                                        :
                                     Defendants.        :
                                                        :
----------------------------------------------------------------- x
                                                        :
                                                        :
FEDERAL HOUSING FINANCE AGENCY, etc.,                   :   11 Civ. 7048 (DLC)
                                                        :
                                     Plaintiff,         :
                         v.                             :
                                                        :
GENERAL ELECTRIC COMPANY, et al.,                       :
                                                        :
                                     Defendants.        :
                                                        :
                                                        :
----------------------------------------------------------------- x
```

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal

National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively,

the "GSEs"), hereby responds and objects to Defendants' Notice of Rule 30(b)(6) Deposition to

Plaintiff FHFA, served on June 28, 2012, and to each topic, definition, and instruction therein

(the "Notice"):[1]

## GENERAL OBJECTIONS

1.      FHFA objects to the Notice and the Topics contained in the Notice (collectively

the "Topics") on the grounds that they are overbroad, unduly burdensome, vague and harassing.

The Topics fail to describe with reasonable particularity the matters on which examination is

requested and, on their face, call for vast, undefined categories of information, spanning various

unreasonably long time periods, that would potentially require many witnesses to address.

2.      FHFA objects to the Notice and Topics on the ground and to the extent that they

are vague and ambiguous, seek information that is not relevant to the claim or defense of any

party to the above-captioned actions (the "Actions"), are not reasonably calculated to lead to the

discovery of evidence admissible in these Actions, are unduly burdensome or seek information

available from a more convenient source, or are otherwise beyond the scope of permissible

discovery in the Actions.

3.      FHFA objects to the Notice and Topics on the ground that the scope of the Topics

is beyond the scope agreed to by the parties in the Rule 26(f) report, which states:

> The Parties agree that some 30(b)(6) depositions limited to the identity of witnesses
> with knowledge of information relevant to the subject matter of the Actions and the
> existence, custodian, location and general description of relevant documents and
> other physical evidence, or information of a similar nature; relevant electronic

---

[1]   The information herein is based upon FHFA's present understanding of the relevant
facts.  FHFA reserves the right to supplement this document based upon its continuing factual
investigation.

systems used in the ordinary course of each party's business; and other topics to be reasonably agreed by the Parties or ordered by the Court, may occur prior to the completion of document discovery.

4.     FHFA objects to the Notice and Topics on the ground and to the extent they improperly attempt to expand, alter, or modify the scope of permissible discovery under the Federal Rules of Civil Procedure, the Southern District of New York ("S.D.N.Y.") Local Rules, or any other applicable law or rule.  Subject to and without waiver of any Objections, FHFA will construe the Notice and Topics consistently with the applicable rules.

5.     FHFA objects to the Notice and Topics on the ground and to the extent they seek information not known or reasonably available to FHFA.

6.     FHFA objects to the Notice and Topics to the extent they seek the disclosure of information subject to the attorney-client privilege, the work product doctrine, bank examination privilege, the deliberative process privilege or any other applicable privilege or immunity. FHFA does not waive or intend to waive, but rather preserves and intends to preserve, any applicable privilege or immunity.

7.     FHFA objects to the Notice and Topics on the ground and to the extent they seek the disclosure of information relating to mortgage loans other than those in the collateral pools backing the particular Certificates (the "GSE Certificates") that the GSEs purchased in the securitizations (the "Securitizations") at issue in the Actions.  Terms used in these objections have the same definitions as in the operative complaint applicable in each of the Actions.

8.     FHFA objects to the Notice and Topics on the ground and to the extent they seek the disclosure of information containing confidential commercial, business, financial, governmental, proprietary or competitively sensitive information, or documents that are subject to non-disclosure agreements or confidentiality undertakings.  FHFA will produce witness or witnesses in response to the Notice subject to the Protective Order entered in the Actions on May

4

30, 2012, and only to the extent permitted by law or under the terms of any applicable disclosure agreements or confidentiality undertakings.

9.      FHFA objects to the time period specified for the Topics on the ground it is overly broad, unduly burdensome, oppressive and is not reasonably calculated to lead to the discovery of evidence admissible in these Actions, or is otherwise beyond the scope of permissible discovery in the Actions.  Unless otherwise noted, FHFA will limit the relevant time period to the period beginning 60 days prior to the first Securitization and ending upon the commencement of the Actions.

10.      FHFA objects to the Notice and Topics on the ground and to the extent the Definitions provided therein are inconsistent with or more expansive than the definitions set forth in S.D.N.Y. Local Rule 26.3(c)(3).

11.      FHFA objects to the Definition of "you," "your," and "Plaintiff" in Definition No. 9 as overly broad and unduly burdensome to the extent it includes persons other than FHFA as conservator, Fannie Mae, Freddie Mac, and any of their employees.  FHFA further objects to the Definition of "you," "your," and "Plaintiff" to the extent that it purports to include the Office of Federal Housing Enterprise Oversight ("OFHEO"), the Federal Housing Finance Board, counsel, and agents acting on behalf of FHFA and its predecessors, Fannie Mae, or Freddie Mac. OFHEO, which regulated the GSEs, was succeeded by FHFA, which was created on July 30, 2008, and is a party to this action solely in its role as conservator to the GSEs.  OFHEO is not a party to this action and has never served as conservator to the GSEs, and any information held solely in its capacity as a regulatory agency is not relevant to this action and subject to privilege.

12.     FHFA objects to the Definition of "Composition" in Definition No. 6 as overly broad, and on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report .

13.     FHFA's investigation is ongoing and FHFA reserves the right to supplement or modify its Objections to the Notice and Topics at any time.  Irrespective of whether FHFA produces a witness, FHFA reserves the right to amend, revise, correct or supplement these objections and to object to further discovery in the Actions.  FHFA's response reflects only the current state of its knowledge or information regarding the Topics Defendants have listed in their Schedule A.

14.     FHFA responds to the Notice and Topics without waiving or intending to waive, but rather preserving and intending to preserve, its right to object to any other discovery request.

15.     FHFA objects to the time and place for the deposition specified in the Notice, which was set unilaterally by noticing counsel.  FHFA will, consistent with S.D.N.Y. Local Rule 26.4(a), meet and confer to determine a reasonable, convenient and mutually agreed date and location for any deposition.

## SPECIFIC RESPONSES AND OBJECTIONS

**TOPIC NO. 1:**

Any systematic deletion and/or destruction of potentially relevant documents by Freddie Mac or Fannie Mae at any time from January 1, 2004 through the present, including but not limited to the implementation of auto-deletion policies, the overwriting of back-up tapes, and the destruction of custodial files following an employee's departure from the GSEs.

**RESPONSE TO TOPIC NO. 1:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 1 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic

No. 1 on the ground that it fails to describe with reasonable particularity the matters on which

examination is requested.  FHFA objects to Topic No. 1 on the ground that it seeks information

that is not relevant to any party's claim or defense or reasonably calculated to lead to the

discovery of admissible evidence.  FHFA objects to the time period specified for Topic No. 1 on

the ground that it is overly broad, unduly burdensome, oppressive and is not reasonably

calculated to lead to the discovery of evidence admissible in these Actions, or is otherwise

beyond the scope of permissible discovery in the Actions.  FHFA further objects to Topic No. 1

on the ground that it calls for a legal conclusion and is argumentative.

Subject to and without waiving the foregoing objections, FHFA will produce a witness or

witnesses to testify regarding the Fannie Mae document-retention policies and practices as they

applied to the groups and individuals responsible for the Securitizations.  Richard Kehoe has

already testified on this subject regarding Freddie Mac.


**TOPIC NO. 2:**

Any document preservation memos that were issued by Freddie Mac or Fannie Mae in
connection with any litigation, investigation or regulatory proceeding concerning mortgage loans
or residential mortgage-backed securities ("RMBS") at any time from January 1, 2004 through
the present, including any steps taken to preserve potentially relevant documents.

**RESPONSE TO TOPIC NO. 2:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 2 to the extent that it calls for the disclosure of information

protected by the attorney-client privilege and work product doctrine.  FHFA objects to Topic No.

2 on the ground and to the extent that it seeks information that is beyond the scope agreed to by

the parties in the Rule 26(f) report.  FHFA objects to Topic No. 2 on the ground that it seeks

information that is not relevant to any party's claim or defense or reasonably calculated to lead to

the discovery of admissible evidence.  FHFA objects to the time period specified for Topic No. 2

on the ground it is overly broad, unduly burdensome, oppressive and is not reasonably calculated

to lead to the discovery of evidence admissible in these Actions, or is otherwise beyond the

scope of permissible discovery in the Actions.   FHFA further objects to Topic No. 2 on the

ground that the document preservation memos themselves are the best evidence of their content.

       Subject to and without waiving the foregoing objections, FHFA will produce a witness or

witnesses to testify regarding the Fannie Mae document-retention policies and practices as they

applied to the groups and individuals responsible for the Securitizations.  Richard Kehoe has

already testified on this subject regarding Freddie Mac.

**TOPIC NO. 3:**

       The organizational structure of Fannie Mae and Freddie Mac, including but not limited to
the respective individuals, positions, departments, committees or other groups at Fannie Mae or
Freddie Mac that had a role in each Securitization in the above-captioned Actions
("Securitization"), or that had a role in Your purchase of mortgage loans or Your securitizations
of mortgage loans, including but not limited to those individuals, positions, departments,
committees or other groups who had responsibility for, involvement in or knowledge of:

    (i)     Your assessment of the potential risks and benefits of non-agency mortgage-
backed securities;

    (ii)    approval of Your purchase of non-agency mortgage-backed securities and/or in
development of any limits or setting of any goals concerning such purchases;

    (iii)   any pre- or post-purchase credit analyses, due diligence processes, pricing
analysis and/or other tools or analyses used by You to assess Your investments or
potential investments in non-agency mortgage-backed securities;

    (iv)   any assessments or analyses concerning underwriting standards or methods
employed in connection with the underlying loans supporting the Securitizations;

    (v)    any assessments or analyses concerning any rating agency ratings relating to the
Securitizations; and

    (vi)   communications with any third parties regarding the Certificates or Your
investment in them.

As to each such individual, position, department, committee or other group, the organizational relationships between and among them; the names and Composition of any groups or other bodies that were responsible for overseeing or supporting more than one of them; and a description of the tools employed in the ordinary course of business to carry out communication and coordination between and among them.

## RESPONSE TO TOPIC NO. 3:

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 3 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic No. 3 on the ground that it seeks information that is not relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence.  FHFA also objects to Topic No. 3 on relevance grounds to the extent it requests the identity of individuals, departments, committees or other groups other than those discussed below.  Under case law within the Second Circuit, the knowledge possessed by people other than (1) the specific individuals at the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation to provide information to those individuals concerning the transactions in issue, is irrelevant.  *See AIG Global Sec. Lending Corp. v. Bank of Am. Secs. LLC*, 2006 WL 1206333 (S.D.N.Y. May 2, 2006).  Moreover, policies in place at both GSEs restricted certain information available to the individuals in Capital Markets who purchased the Securitizations.  For example, pursuant to Fannie Mae's MBS Trading Firewall Policy, private label securities ("PLS") traders who purchased the Securitizations were prohibited from accessing loan-level and pool-specific information.  *See, e.g.*, Fannie Mae MBS Firewall Policy (Mar. 17, 2004) at 1-2 ("Access to loan level and pool-specific information is restricted to Fannie Mae employees who have a specific 'need to know' of such information."  "Mortgage Portfolio traders will not have access to FSIM [Financial Management Information Systems] Data Warehouse databases."  (which did not have

PLS loan information, but agency collateral) "Mortgage Portfolio traders and members of the

Investor Channel/Customer Transaction Group will not have access to the Early Funding and

Asset Acquisition & Custody Systems"); Private Label Securities Risk Policy v. 1.00 (Aug. 16,

2006) at 14 ("Fannie Mae's information sharing policies restrict the flow of information to

mortgage portfolio traders."); Fannie Mae Information Barrier Policy v. 1.01 (Mar. 15, 2007) at

8-9 (noting that barriers were in place "to ensure that Mortgage Assets Traders do not receive

Inside Information or Loan Information that Fannie Mae obtains during credit or operational

reviews."); Freddie Mac Policy 7-115 (Information Wall) at IV (Sept. 1, 2006) ("You should not

provide updated loan level information to Restricted Persons on these pools until the data are

released to the public without first receiving guidance from a Compliance Officer.").

      FHFA objects to Topic No. 3 on the grounds that it is overbroad and unduly burdensome.

FHFA objects to the time period specified for Topic No. 3 on the ground that it is overly broad,

unduly burdensome, oppressive and is not reasonably calculated to lead to the discovery of

evidence admissible in these Actions, or is otherwise beyond the scope of permissible discovery

in the Actions; FHFA will limit the identifications provided below to those holding relevant

positions at the GSEs beginning 60 days prior to the first GSE Certificate purchased by the

respective GSE and extending until 30 days following the purchase of the last GSE Certificate by

the respective GSE.  FHFA further objects to Topic No. 3 on the ground that it fails to describe

with reasonable particularity the matters on which examination is requested.  FHFA further

objects to Topic No. 3 on the grounds that it is vague and ambiguous, and compound.

      Subject to and without waiving the foregoing objections, FHFA responds below to this

Topic, consistent with Federal Rule of Civil Procedure 31(a).  FHFA makes these responses after

a reasonable investigation and to the best of its current understanding.  FHFA reserves the right

to amend and supplement these responses as appropriate.  The policies cited and being produced to Defendants are not exhaustive, but illustrative.  A **bolded** name indicates that FHFA has designated that individual a production custodian.

## Fannie Mae

Topic 3(i).  Departments, committees or other groups involved in assessing the potential risks and benefits of non-agency mortgage-backed securities during the relevant time period included the Private Label Advisory Team ("PLAT"), Capital Markets Mortgage Assets, Capital Markets Strategy, Single Family Counterparty Risk Management ("SF CPRM"), Capital Markets Risk Management, Legal, Chief Risk Officer, Credit Risk Committee, and Market Risk Committee (and their predecessors, the Risk Policy Committee and Corporate Risk Management Committee).  Individuals and positions involved in assessing the potential risks and benefits of non-agency mortgage-backed securities during the relevant time period are described below.

Fannie Mae's purchase and monitoring of the Securitizations during the relevant time period was governed by its Private Label Securities Risk Policy ("PLS Risk Policy"), which was designed to identify risks associated with PLS; to provide a framework for managing the risks; to assign roles and responsibilities for risk management; and to outline measures and limits for the risks.  The relevant versions of those policies are being produced concurrently and are incorporated by reference.[2]

Pursuant to the PLS Risk Policy, the PLAT managed and governed the risks associated with private label securities.  The PLAT comprised officer level members (or designees) from Capital Markets Mortgage Assets, Capital Markets Strategy, Capital Markets Structured Transactions, Single Family Mortgage Business (specifically SF CPRM), and Capital Markets

---

[2]  The PLS Risk Policy formerly was titled "Private Label Securities Credit Policies, Procedures and Delegated Authorities."

Risk Management, with observers from the Chief Risk Office, Legal and other areas.  The main role of the PLAT was to hold cross-functional meetings as necessary to promote communication across functions and discuss matters related to PLS purchases and wraps.  PLAT Members are identified in Appendix 6.2.1 to the PLS Risk Policy v. 1.04 (June 27, 2007), which is incorporated herein by reference.  **David Cook** was the PLAT Coordinator during the time when Fannie Mae purchased the GSE Certificates.

As set forth in Fannie Mae's PLS Risk Policy, different individuals or their designees were responsible for managing the PLS portfolio.

Fannie Mae's Executive Vice President of Capital Markets was responsible for the overall risk and return of the PLS portfolio, reviewing decisions to hold PLS, and resolving conflicts between groups responsible for different aspects of PLS.  Fannie Mae's Executive Vice President of Capital Markets when Fannie Mae purchased the GSE Certificates was **Peter Niculescu**.  FHFA has produced organizational charts identifying officers in Capital Markets. FHFA also has produced organizational charts that identify individuals in Capital Markets Mortgage Assets (the trading group) and Capital Markets Strategy (which housed the PLS Analytics and PLS Surveillance business units).  Those groups, including officers responsible for PLS related issues, are described below.  During the relevant period, Capital Markets Strategy was moved from Capital Markets to the Enterprise Risk Management organization and became Capital Markets Risk Management.

Fannie Mae's Senior Vice President for Capital Markets Mortgage Assets, or his designee, was responsible for various activities related to the purchase of PLS, including adhering to corporate policies restricting the use of loan-level, pool-specific, material, non-public information.  Fannie Mae's Senior Vice President for Capital Markets Mortgage Assets during

12

the time when Fannie Mae purchased the GSE Certificates was **Ramon De Castro**.[3]  FHFA has produced an organizational chart for Capital Markets Mortgage Assets, which is incorporated herein by reference.  Individuals who worked in this group during the relevant time period, in descending order of seniority, included (1) **Pei-Chung** "**Steve" Shen** (Director then Vice President, Capital Markets Mortgage Assets, Mortgage Trading); (2) **Joseph Paul Norris** (Director, Capital Markets Mortgage Assets, Securities Trading); (3) **Ashley Dyson** (Account Manager IV, Capital Markets Mortgage Assets); and (4) **Shayan Salahuddin** (Account Manager IV, Capital Markets Mortgage Assets).

Fannie Mae's Senior Vice President for Capital Markets Strategy was responsible for certain pre-purchase analytics and post-purchase surveillance related to PLS.  Capital Markets Strategy was a separate business unit from Capital Markets Mortgage Assets.  Neither business unit had oversight for the other.  The Senior Vice President for Strategy when Fannie Mae purchased the GSE Certificates was **William Quinn**.  FHFA has produced a number of organizational charts for Capital Markets Strategy, which are incorporated herein by reference. Individuals who worked in Capital Markets Strategy during the relevant time period included (1) **Kieran Gifford** (Vice President, Capital Markets, Credit Policy and Vice President, Private Label Securities); (2) **David Gussmann** (Vice President, Capital Markets Strategy); (3) **Kin Chung** (Director, PLS Surveillance); (4) **Caijiao "C.J." Zhao** (Director, PLS Analytics); (5) **Francisco Gonzalez-Rey** (PLS Analytics); and (6) **Lin Cao** (PLS Surveillance).  Although not included in these organizational charts, FHFA has previously identified **Kent Willard**, who worked in Capital Markets Strategy on PLS-related issues in late-2005 and early-2006.  In

---

[3]  Capital Market Mortgage Assets was called Portfolio Transactions prior to 2006.  **Mr. De Castro** was the Vice President for Portfolio Transactions prior to becoming the Senior Vice President for Capital Market Mortgage Assets.

addition, FHFA has produced an organizational chart of the Credit Risk Management organization when it moved outside of Capital Markets in 2009, which is incorporated herein by reference.[4]

Fannie Mae's Vice President of Single Family Counterparty Risk Management ("SF CPRM") was responsible for, among other things, the review and approval of issuers, originators, master servicers, and servicers.  In addition, the Vice President of SF CPRM was responsible for distributing the list of all reviewed and approved issuers, originators, master servicers to the PLAT and for reporting material concerns or issues with counterparties to the PLAT.  Pursuant to the PLS Risk Policy, the Vice President of SF CPRM also was responsible for "[e]nsur[ing] that whole loan purchase counterparty reviews are performed independently from PLS counterparty reviews to avoid information sharing risk."  Private Label Securities Risk Policy v. 1.00 (Aug. 16, 2006) at 7; *see also* Fannie Mae Information Barrier Procedure (Sept. 17, 2007) at 5 ("Counterparty Risk Oversight shall consult with the Vice President and Deputy General Counsel (or his designee) to ensure that Mortgage Portfolio Traders do not receive Inside Information or Loan Information that Fannie Mae obtains during credit or operational reviews.").

SF CPRM was in a separate division from Capital Markets.  **Pam Johnson** was the Senior Vice President, Single Family Risk Officer during the time when Fannie Mae purchased the GSE Certificates.  She left the company in 2007.  **Lesia Bates Moss** was Vice President of SF CPRM from October 2005 through 2007.  Prior to October 2005, **Christopher Haspel**

---

[4]   In addition, **Scott Blackley**, the Chief Financial Officer of Capital Markets beginning in 2007, was involved in impairment decisions related to the Securitizations.  Fannie Mae's pricing group, which included Lynda Maggio and Scott Sheppard, provided post-purchase pricing information on the Certificates.

(Director of Customer Account Management, SF CPRM) was responsible for PLS counterparty reviews.

Individuals who oversaw or performed PLS operational reviews and/or counterparty reviews during the relevant time period included (1) **Lynda Susan Ernest** (Manager of Operational Review and Compliance Group and Manager and Senior Business Manager); (2) **Gregory P. Johnson** (Senior Risk Manger then Senior Business Manager); (3) Ramona O'Bannon (Director); (4) Sid Kizziar (Senior Underwriting Consultant); (5) Allen Price (Senior Business Manager); (6) Sidney Vince Credle (Director, Credit Risk then Director, PO Management then Vice President for Business Transformation Office); (7) Devin Parent (Senior Underwriting Consultant); (8) Robert Vignato (Senior Underwriting Consultant then Senior Risk Manager); (9) Hermond Palmer (Customer Account Manager then Senior Business Manager); and (10) Richard Bauerband (Director, Servicing Risk Strategy).  Fannie Mae also used Clayton to conduct certain counterparty reviews.

Fannie Mae's Director of Capital Markets Credit Management was responsible for, among other things, setting up counterparties in the RiskNet system (Fannie Mae's counterparty credit risk management system) and reporting material concerns or issues with counterparties to the PLAT.  **Walter Hill** was the Director of Capital Markets Credit Management during the time when Fannie Mae purchased the GSE Certificates.

Pursuant to the PLS Risk Policy, Fannie Mae's Senior Vice President of Legal, or his designee, was responsible for, among other things, providing information and reviews related to Fannie Mae's anti-predatory lending policies.  **John M. Ingram** was the lawyer chiefly responsible for anti-predatory reviews during the time when Fannie Mae purchased the GSE Certificates.  Lawyers and legal assistants who also were involved in anti-predatory reviews

during the relevant time period included (1) Philip Bohi  (Associate General Counsel); (2) Ken

Scott (Associate General Counsel); (3) Carissa M. Verbeski (Consultant, Legal); (4) Christina L.

Baldwin (Senior Business Analyst, Legal); and (5) Cynthia D. Workman (Senior Business

Analyst, Legal).  FHFA has identified files containing reviews conducted by Mr. Ingram and his

team and will produce non-privileged documents related to these reviews.

Pursuant to the PLS Risk Policy, the Chief Risk Officer ("CRO"), or his designee, is

responsible for observing certain PLS-related meetings; reviewing regular reports on the status of

the PLS portfolio; and monitoring compliance with decisions concerning the PLS portfolio.  The

CRO reports directly to the Chief Executive Officer of Fannie Mae about credit issues affecting

the entire company, including PLS.  **Adolfo Marzol** was Fannie Mae's Interim Chief Risk

Officer in 2005.  **Enrico Dallavecchia** was Fannie Mae's Executive Vice President and Chief

Risk Officer from 2006-2009.  **Michael Shaw** (Senior Vice President, Credit Risk Oversight)

was the CRO's designee on the PLAT and **Ben Perlman** (Vice President, Credit Risk Oversight)

attended meetings during the period when Fannie Mae purchased the GSE Certificates.[5]  As

stated in the PLS Risk Policy, the Credit Risk Committee and Market Risk Committee (or their

predecessors, the Risk Policy Committee and Corporate Risk Management Committee) also

reviewed reports on the status of PLS and revisions and exceptions to the PLS Risk Policy.

FHFA has located a SharePoint site containing Credit and Market Risk Committee Material and

will produce such material to the extent it relates to the GSE Certificates.

Topic 3(ii). Departments involved in the purchase of non-agency mortgage-backed

securities and/or in development of any limits or setting of any goals concerning such purchases

---

[5]   In addition, Clinton Lively, Senior Vice President of Market Risk from approximately
2006 through 2007, was involved in setting PLS risk policy during the relevant time period.

during the relevant time period included Capital Markets Mortgage Assets, Capital Markets Strategy, the Chief Risk Office, and the PLAT.

Capital Markets Mortgage Assets, Capital Markets Strategy, the Chief Risk Office, and the PLAT are discussed in response to Topic 3(i), above.

Topic 3(iii). Departments involved in pre- or post-purchase credit analyses, due diligence processes, pricing analysis and/or other tools or analyses to assess investments or potential investments in non-agency mortgage-backed securities during the relevant time period included Capital Markets Mortgage Assets, Capital Markets Strategy, and SF CPRM and Legal, which are discussed in response to Topic 3(i), above.

Topic 3(iv).  Departments involved in assessments or analyses concerning underwriting standards or methods employed in connection with the underlying loans supporting the Securitizations during the relevant time period included Capital Markets Strategy and SF CPRM. Capital Markets Strategy and SF CPRM are discussed in response to Topic 3(i), above.

Topic 3(v).  Departments involved in assessments or analyses concerning any rating agency ratings relating to the Securitizations during the relevant time period included Capital Markets Mortgage Assets and Capital Markets Strategy.

Capital Markets Mortgage Assets and Capital Markets Strategy are discussed in response to Topic 3(i), above.

Topic 3(vi).  Fannie Mae did not retain any third-party due diligence firms to conduct pre-purchase due diligence in connection with their decision to purchase the GSE Certificates. Fannie Mae relied upon the issuers and underwriters of the GSE Certificates to perform this due diligence.

Additional Information.   During meet and confer sessions, plaintiff agreed to inform defendants of the names of PLS supervisors who may have received some information related to the Single Family business.  PLAT members and Capital Markets officers identified above in their supervisory capacity may have received some information related to the Single Family business.  All of these individuals are designated custodians.  However, unless any such information was provided to (1) the specific individuals at the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation to provide information to those individuals concerning the transactions in issue, it is irrelevant.  *See AIG Global Sec. Lending Corp. v. Bank of Am. Secs. LLC*, 2006 WL 1206333.

Moreover, pursuant to Fannie Mae's MBS Firewall Policy and the Information Barrier Policy that followed it, individuals responsible for the purchase of the GSE Certificates were prohibited from accessing loan-level and pool-specific information concerning the GSE Certificates and from using that information to make purchase decisions.  *See, e.g.*, Fannie Mae MBS Firewall Policy (Mar. 17, 2004) at 1-2 ("Access to loan level and pool-specific information is restricted to Fannie Mae employees who have a specific 'need to know' of such information." "Mortgage Portfolio traders will not have access to FSIM Data Warehouse databases." "Mortgage Portfolio traders and members of the Investor Channel/Customer Transaction Group will not have access to the Early Funding and Asset Acquisition & Custody Systems"); Private Label Securities Risk Policy v. 1.00 (Aug. 16, 2006) at 14 ("Fannie Mae's information sharing policies restrict the flow of information to mortgage portfolio traders."); Fannie Mae Information Barrier Policy v. 1.01 (Mar. 15, 2007) at 8-9 (noting that barriers were in place "to ensure that Mortgage Assets Traders do not receive Inside Information or Loan Information that Fannie Mae obtains during credit or operational reviews.").  In addition, to the extent originator counterparty

reviews were completed simultaneously for the PLS and Single Family sides of Fannie Mae's business, all Single Family information was *removed* from any counterparty reports prepared for the PLS side.

For additional information regarding the organizational relationships of the individuals and groups discussed above, FHFA refers Defendants to various organizational charts that it produced with Bates-numbers FHFA00000001-FHFA00000132.

## Freddie Mac

Topic 3(i).  Departments, committees or other groups involved in assessing the potential risks and benefits of non-agency mortgage-backed securities during the relevant time period included the Mortgage Investments & Structuring Division ("MIS"), which later became the Investment & Capital Markets Division ("ICM"); Credit Policy & Portfolio Management, which later became Counterparty Credit Risk Management ("CCRM"); Enterprise Risk Oversight Management ("EORM"), which later become Enterprise Risk Management; Legal; and Mission Oversight and Development.  Individuals and positions involved in assessing the potential risks and benefits of non-agency mortgage-backed securities during the relevant time period are described below.

The Senior Vice President of Mortgage Investments & Structuring was responsible for the overall risk and return of Freddie Mac's retained portfolio, reviewing decisions to hold PLS and ensuring compliance with Freddie Mac's Charter.  Freddie Mac's Senior Vice President at the time Freddie Mac purchased the GSE Certificates was **Gary Kain**.  Gary Kain reported to Chief Business Officer **Patti Cook**.  FHFA has produced organizational charts identifying officers in MIS/ICM, including MIS/ICM individuals in the Non-Agency Portfolio Management business unit, which is discussed below.  *See* FHFA000000032-FHFA00000076.

19

The Vice President for Non-Agency Portfolio Management, or his designee, was responsible for various activities related to the purchase and sale of Non-Agency PLS, including adhering to corporate policies and procedures.   Freddie Mac's Vice President for Non-Agency Portfolio Management during the time when Freddie Mac purchased the GSE Certificates was **Mike Aneiro**.  The organizational chart for MIS produced by FHFA reflects the structure of Non-Agency Portfolio Management and individuals who worked in the group during the relevant time period, including (1) **Scott Haymore** (Director, Portfolio Management); (2) **John Dimitri** (Director, Portfolio Management); (3) **David Hackney** (Director, Portfolio Management), (4) **Lori Geftic** (Portfolio Manager), (5) **Chad Levrini** (Senior Risk Analyst), and (6) **Xiang Xie** (Portfolio Manager/Credit Analyst).

Non-Agency Portfolio Management was supported by the following business units/groups within Freddie Mac:  (i) Business Engineering, Ops. & Tech., MIS Operations (for assessing HUD Goals counting); (ii) Financial Engineering (for assessing pre-purchase bond level risk); (iii) Market Credit Risk (using models to assess Freddie Mac's pre-purchase credit risk tolerance relating to the underlying collateral); and (iv) Models and Methods subgroup within the Enterprise Risk Oversight Division.  Individuals who worked in the Business Engineering group during the relevant time period included **Noel Torres**, **Steve Pionke**, and **Howard Mason**, all of whom were Business Analysts responsible for conducting pre-purchase analysis of loans solely to determine whether the bonds met HUD housing goals.  Individuals who worked in the Credit Risk Oversight group during the relevant time period included **Kevin Palmer** (Risk Director) and **Aaron Pas** (Senior Portfolio Analyst/Portfolio Management Director).

Freddie Mac's Senior Vice-President for Enterprise Risk Oversight ("ERO") was responsible for post-purchase surveillance related to PLS.  ERO was a separate business unit from MIS.  Neither business unit had oversight for the other.  The Senior Vice-President for ERO when Freddie Mac purchased the GSE Certificates was **Anurag Saksena**.  Currently, the business unit responsible for Freddie Mac's post-purchase surveillance of PLS investments is Enterprise Risk Management ("ERM").  **Paige Wisdom** is the Executive Vice President of ERM.  Individuals who work or worked in the group include  **Kieran Gifford** (Vice President, Risk Policy & Private Label Securities, since November 2009) and **Courtney Sapp** (Portfolio Credit Risk Mgmt Director).

During the relevant time period, the Models and Methods subgroup within ERO developed models used by PLS traders as a tool in their purchase decisions.  The SVP of the Financial Research & Engineering and Senior Economist at the time was custodian **Jan Luytjes**. **Jonathan Veum** and **Ryan Henning** participated in the development of the models.

Freddie Mac's Senior Vice President of the Credit Policy & Portfolio Management Division ("CPPM") was responsible for, among other things, the review and approval of issuers, originators, master servicers, and servicers.  During the relevant time period, **Don Bisenius** was Senior Vice President of Credit Policy & Portfolio Management.  FHFA has produced organizational charts showing the structure and individuals who worked in CPPM.  *See* FHFA00000077-FHFA00000124.

CPPM included Counterparty Credit Risk Management.  During the relevant time period, **Ronald Ratcliffe** was Vice-President of CCRM.   Individuals within CCRM included (a) **Pam Williams** (Director, Counterparty Management); custodian **Melissa Crabtree** (Director, Primary Markets); (b) **Jim Feenick** (Director, Credit Quality); (c) **Stacey Kenneweg** (Director,

Counterparty Credit Risk); and (d) **Bruce Wood** (Director, Counterparty Credit Risk).  **Ray Romano** (EVP, Credit Risk Oversight) had supervisory authority over the operations of CCRM.

MIS/ICM also conducted post-purchase analysis of Securitizations.  Individuals within MIS/ICM who were involved in such analyses include **Aaron Pas** (Senior Portfolio Analyst/Portfolio Management Director), **Adama Kah** (VP, Distressed Asset Management), **Chris Kuehl** (VP, Agency Portfolio Management), and **Donna Corley** (Senior Director, Portfolio Management).

Freddie Mac's Legal Division was responsible for, among other things, providing information and reviews related to Freddie Mac's anti-predatory lending policies.  Lawyers and legal assistants who also were involved in anti-predatory reviews during the relevant time period included (1) Lenore Stanton Kelly (Associate General Counsel); (2) Wendall Chamblis (Associate General Counsel); (3) Henry Azar (Associate General Counsel); (4) Teresa Molisko (paralegal); and (5) Beth Ryan (paralegal).

The Mission Oversight and Development Division analyzed whether Freddie Mac's investments in non-agency mortgage-backed securities met applicable housing goals.  **Robert Tsien** was the Senior Vice President of Mission Oversight and Development during the relevant time.  **Tom Raby** was the Director of the Strategy, Planning and Reporting group within Mission Oversight.

In addition, **Thomas Flynn** in the Business Engineering, Mortgage Investments & Structuring Division reviewed and analyzed trades concerning the retained portfolio.  He also coordinated processing of loan-level files pre- and post-purchase of asset-backed securities for purposes of determining whether they complied with the Freddie Mac charter and furthered

HUD goals.  Individuals who worked with Thomas Flynn included **Rick Olek** (Director), **Doug Jeffrey** (Analyst), and **Chad Levrini** (Analyst).

Topic 3(ii). Departments involved in the purchase of non-agency mortgage-backed securities and/or in development of any limits or setting of any goals concerning such purchases during the relevant time period included ICM, MIS, the Business Engineering group, and the Mission, Oversight and Development Division.  These departments are discussed in response to Topic 3(i), above.

Topic 3(iii). Departments involved in pre- or post-purchase credit analyses, due diligence processes, pricing analysis and/or other tools or analyses to assess investments or potential investments in non-agency mortgage-backed securities during the relevant time period included MIS, Finance Valuation Control within the Finance Group (and later ERM), CCRM, and the Portfolio Management group within EROM and ERM.  These departments are discussed in response to Topic 3(i), above.

ICM also conducted post-purchase analysis of non-agency mortgage-backed securities. **Peter Federico** was the Executive Vice President of ICM and was involved in overseeing the operation of the loss mitigation division.  Other members of ICM involved in this process were **Aaron Pas**, **Doc Ghose**, **Adama Kah**, **Steve Pionke**, **Masato Nakagawa**, **James Douglas Jeffrey**, **Terin Vivian**, **Donna Corley**, and **Kevin Palmer**.  **Aaron Pas** and **Adama Kah** were also involved in conducting pricing analyses for non-agency mortgage-backed securities.  **Jack Myers**, currently the Controller of ICM, conducted internal audits of private-label securities, along with **Mener Tatang** (VP, Portfolio Analytics & Strategy) and **Howard Mason** (Mid-Office Trading Support).

During the relevant time period, the Finance Division (and later ERM) performed analytics to determine whether the bond prices were reasonable.  The Vice President for Financial Valuation Control within Finance was **Michael Lynch**.  In August 2007, this function led by Lynch moved to the ERM Division. In 2004, the Financial Valuation Control subgroup was formed within the Finance Division.

Topic 3(iv). Departments involved in assessments or analyses concerning underwriting standards or methods employed in connection with the underlying loans supporting the Securitizations during the relevant time period included Alternative Markets Operations (AMO), External Operations Risk Management (EORM), Modeling, Business Engineering, and Mission.

AMO and EORM, respectively, were responsible for conducting examinations of approved originators of Capital Markets securities and of Single Family mortgage loans to be purchased by Freddie Mac.  **Bob Cope**, a member of EORM, reviewed servicer performance. **Ron Feigles** of AMO reviewed originators' performance.

Topic 3(v). Concerning any rating agency ratings relating to the Securitizations during the relevant time period, Freddie Mac assessed the level of credit support for the Securitizations. These assessments were performed by Credit Risk Oversight within MIS.  **Kevin Palmer** (Risk Director, Credit Risk Oversight) of MIS performed validation analyses to validate credit ratings.

Topic 3(vi).  Freddie Mac did not retain any third-party due diligence firms to conduct pre-purchase due diligence in connection with their decision to purchase the GSE Certificates. Freddie Mac relied upon the issuers and underwriters of the GSE Certificates to perform this due diligence.

Additional Information. During meet and confer sessions, plaintiff agreed to inform defendants of the names of the PLS supervisors who may have received some information

related to the Single Family business: To date, Freddie Mac has identified:  (1) **Gary Kain** (Investments & Capital Markets, EDP); (2) **Melissa Crabtree** (CCRM, Risk Analysis Director); (3) **Stacey Kenneweg** (CCRM, Credit Risk Director); (4) **Ron Ratcliffe** (CCRM, Credit Risk Vice President); (5) **Ray Romano** (CCRM, Credit Risk Oversight Executive Vice President); (6) **Patricia Cook** (EVP & CBO, ICM); (7) **Donald Bisenius** (Senior Vice President of Credit Policy & Portfolio Management); and (8) **Anurag Saksena** (Senior Vice-President for ERO). However, unless any such information was provided to (1) the specific individuals at the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation to provide information to those individuals concerning the transactions in issue, it is irrelevant.  *See AIG Global Sec. Lending Corp. v. Bank of Am. Secs. LLC*, 2006 WL 1206333.

Moreover, individuals responsible for making purchasing or sales decisions regarding private-label securities were restricted from receiving certain information regarding single-family loan originators pursuant to Freddie Mac's information wall policy.  *See* Freddie Mac Policy 7-115 (Information Wall) at IV (Sept. 1, 2006) ("You should not provide updated loan level information to Restricted Persons on these pools until the data are released to the public without first receiving guidance from a Compliance Officer."); *see also* Rough Deposition Trans. (Rick Kehoe), 7/20/2012, 68:2 – 71:3 ("There is a system in place where if somebody in business area A wants to access business area B's data, they have to go into the system, request access, it has to go through a whole approval process before they would be granted access to area B's data.").  **Gail Vance**, the Vice President of the Compliance Division, had responsibility during the relevant time period for enforcing the information walls around traders in PLS.  Relevant copies of this policy are being produced and are incorporated by reference.

For additional information regarding the organizational relationships of the individuals and groups discussed above, FHFA refers Defendants to various organizational charts for the years 2005-2008 that it produced with Bates-numbers FHFA00000001-FHFA00000132.

## FHFA/OFHEO

During meet and confer sessions, plaintiff agreed to inform defendants of the names of personnel at OFHEO or FHFA who communicated with anyone at the GSEs about the Securitizations to the extent those communications concerned (a) specific originators who sold at least 10 percent of the loans into that Securitizations, (b) the purchase of the GSE Certificates, or (c) the performance of the underlying loan pools.

Those individuals and their respective relevant titles follow:  Christopher Dickerson, who held the title of Deputy Director of the Division of Enterprise Regulation; John Kerr, who held the title of Examiner in Charge; Deirdre Kvartunas, who held the title of Manager, Office of Market Risk; Phillip Millman, who held the titles of Principal Market Risk Examiner and Market Examiner Specialist; Jeffrey Spohn, who held the title of Examiner in Charge; and Lawrence Stauffer, who held the title of Principal Account Examiner, Office of the Chief Accountant.

Plaintiff also agreed to identify personnel at OFHEO or FHFA who communicated with personnel at the GSEs responsible for working on PLS, or supervising people who worked on PLS, about any originator who contributed more than 10 percent of the underlying loans to any Securitization, within the period starting 60 days before the purchase of the relevant GSE Certificate and ending 30 days after the purchase.

Phillip Millman, who held the titles of Principal Market Risk Examiner and Market Examiner Specialist, has been identified as responsive to this question.

Plaintiff further agreed to identify the FHFA personnel directly responsible for receiving information from the GSEs and communicating internally within FHFA, post-conservatorship, concerning (a) the purchase the GSE Certificates or (b) the performance of the underlying loan pools.

Those individuals and their respective relevant titles follow:  Christopher Dickerson, who held the title of Deputy Director of the Division of Enterprise Regulation; Austin Kelly, who held the title of Examiner, Office of Model Risk; John Kerr, who held the title of Examiner in Charge; Deirdre Kvartunas, who held the title of Manager, Office of Market Risk; Phillip Millman, who held the titles of Principal Market Risk Examiner and Market Examiner Specialist; Jeffrey Spohn, who held the title of Examiner in Charge; and Lawrence Stauffer, who held the title of Principal Account Examiner, Office of the Chief Accountant.

## TOPIC NO. 4:

The Composition of each group responsible for any aspect of Your purchase of mortgage loans, including Your due diligence, Your communications with mortgage loan originators, Your pricing decisions, Your monitoring of the performance of the mortgage loans, and Your communications with any third parties, including but not limited to any operational reviews of third parties in connection with the mortgage loans or Your purchase of them from the time period beginning January 1, 2004 through September 6, 2007.

## RESPONSE TO TOPIC NO. 4:

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 4 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic No. 4 on the ground that it seeks information that is not relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence.  FHFA objects to Topic No. 4 on the grounds that it is overbroad and unduly burdensome.  FHFA objects to the time

period specified for Topic No. 4 on the ground that it is overly broad, unduly burdensome,

oppressive and is not reasonably calculated to lead to the discovery of evidence admissible in

these Actions, or is otherwise beyond the scope of permissible discovery in the Actions; FHFA

will limit the custodians provided below to those holding relevant positions at the GSEs

beginning 60 days prior to the first GSE Certificate purchased by the respective GSE and

extending until 30 days following the purchase of the last GSE Certificate by the respective GSE.

FHFA objects to Topic No. 4 on the ground that it fails to describe with reasonable particularity

the matters on which examination is requested.  FHFA further objects to Topic No. 4 on the

grounds that it is vague and ambiguous.


**TOPIC NO. 5:**

       The Composition of each group responsible for any aspect of Your securitizations of
mortgage loans, including Your due diligence, Your communications with potential investors in
Your securitizations, Your pricing decisions, Your monitoring of the performance of the
securitizations, and Your communications with any third parties regarding the securitizations
from the time period beginning January 1, 2004 through September 6, 2007.

**RESPONSE TO TOPIC NO. 5:**

       FHFA incorporates by reference its General Objections as if fully set forth herein.

       FHFA objects to Topic No. 5 on the ground and to the extent that it seeks information

that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic

No. 5 on the ground that it seeks information that is not relevant to any party's claim or defense

or reasonably calculated to lead to the discovery of admissible evidence.  FHFA objects to Topic

No. 5 on the grounds that it is overbroad and unduly burdensome.  FHFA objects to the time

period specified for Topic No. 5 on the ground that it is overly broad, unduly burdensome,

oppressive and is not reasonably calculated to lead to the discovery of evidence admissible in

these Actions, or is otherwise beyond the scope of permissible discovery in the Actions; FHFA

will limit the custodians provided below to those holding relevant positions at the GSEs

beginning 60 days prior to the first GSE Certificate purchased by the respective GSE and

extending until 30 days following the purchase of the last GSE Certificate by the respective GSE.

FHFA objects to Topic No. 5 on the ground that it fails to describe with reasonable particularity

the matters on which examination is requested.  FHFA further objects to Topic No. 5 on the

grounds it is vague and ambiguous.

**TOPIC NO. 6:**

      The Composition of each group responsible for any aspect of Your economic modeling relating to the housing or mortgage markets, housing or mortgage industry trends, the Certificates or the Securitizations, Your own securitizations, and mortgage loans You purchased from the time period beginning January 1, 2004 through the present.

**RESPONSE TO TOPIC NO. 6:**

      FHFA incorporates by reference its General Objections as if fully set forth herein.

      FHFA objects to Topic No. 6 on the ground and to the extent that it seeks information

that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic

No. 6 on the ground that it seeks information that is not relevant to any party's claim or defense

or reasonably calculated to lead to the discovery of admissible evidence.  FHFA also objects to

Topic No. 6 on relevance grounds to the extent it requests the identity of individuals,

departments, committees or other groups besides those discussed below.  Under case law within

the Second Circuit, the knowledge possessed by people other than (1) the specific individuals at

the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation

to provide information to those individuals concerning the transactions in issue, is irrelevant.  *See*

*AIG Global Sec. Lending Corp. v. Bank of Am. Secs. LLC*, 2006 WL 1206333.  Moreover,

policies in place at both GSEs restricted certain information available to the individuals in

Capital Markets who purchased the Securitizations.  For example, pursuant to Fannie Mae's

MBS Trading Firewall Policy, PLS traders who purchased the Securitizations were prohibited

from accessing loan-level and pool-specific information.  *See, e.g.*, Fannie Mae MBS Firewall

Policy (Mar. 17, 2004) at 1-2 ("Access to loan level and pool-specific information is restricted to

Fannie Mae employees who have a specific 'need to know' of such information."  "Mortgage

Portfolio traders will not have access to FSIM Data Warehouse databases."  "Mortgage Portfolio

traders and members of the Investor Channel/Customer Transaction Group will not have access

to the Early Funding and Asset Acquisition & Custody Systems"); Private Label Securities Risk

Policy v. 1.00 (Aug. 16, 2006) at 14 ("Fannie Mae's information sharing policies restrict the

flow of information to mortgage portfolio traders."); Fannie Mae Information Barrier Policy v.

1.01 (Mar. 15, 2007) at 8-9 (noting that barriers were in place "to ensure that Mortgage Assets

Traders do not receive Inside Information or Loan Information that Fannie Mae obtains during

credit or operational reviews."); Freddie Mac Policy 7-115 (Information Wall) at IV (Sept. 1,

2006) ("You should not provide updated loan level information to Restricted Persons on these

pools until the data are released to the public without first receiving guidance from a Compliance

Officer.").

FHFA objects to Topic No. 6 on the grounds that it is overbroad and unduly burdensome.

FHFA objects to Topic No. 6 on the grounds that the phrase "economic modeling" is overly

broad, vague and ambiguous.  FHFA objects to Topic No. 6 on the ground that it fails to describe

with reasonable particularity the matters on which examination is requested.  FHFA further

objects to Topic No. 6 on the ground that it seeks the disclosure of information containing

confidential commercial, business, financial, governmental, proprietary or competitively

sensitive information, or documents that are subject to non-disclosure agreements or confidentiality undertakings.

Subject to and without waiving the foregoing objections, FHFA responds below to this Topic, consistent with Federal Rule of Civil Procedure 31(a).  FHFA makes these responses after a reasonable investigation and to the best of its current understanding.  FHFA reserves the right to amend and supplement these responses as appropriate.  The policies cited and being produced to Defendants are not exhaustive, but illustrative.  A **bolded** name indicates that FHFA has designated that individual a production custodian.

### Fannie Mae

The following individuals in Capital Markets Strategy were responsible for economic modeling used to evaluate potential purchases of the Securitizations:  **David Gussmann**; **Kin Chung**; **Caijiao "C.J." Zhao**; and **Francisco Gonzales-Rey**.

### Freddie Mac

The following individuals in Investments and Capital Markets were responsible for economic modeling used to evaluate potential purchases of Securitizations: **Masato Nakagawa**, **Kevin Palmer**, **Frank Vetrano**, and **Jan Luytjes**, **Ryan Henning**, and **Jonathan Veum**.


## TOPIC NO. 7:

The Composition of each group responsible for the development or application of any intellectual property or other tools used to detect appraisal bias from the time period beginning January 1, 2004 through the present.


## RESPONSE TO TOPIC NO. 7:

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 7 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic No. 7 on the ground that it seeks information that is not relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence.  FHFA also objects to Topic No. 7 on relevance grounds.  Under case law within the Second Circuit, the knowledge possessed by people other than (1) the specific individuals at the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation to provide information to those individuals concerning the transactions in issue, is irrelevant.  *See, e.g.*, Fannie Mae MBS Firewall Policy (Mar. 17, 2004) at 1-2 ("Access to loan level and pool-specific information is restricted to Fannie Mae employees who have a specific 'need to know' of such information." "Mortgage Portfolio traders will not have access to FSIM Data Warehouse databases." "Mortgage Portfolio traders and members of the Investor Channel/Customer Transaction Group will not have access to the Early Funding and Asset Acquisition & Custody Systems"); Private Label Securities Risk Policy v. 1.00 (Aug. 16, 2006) at 14 ("Fannie Mae's information sharing policies restrict the flow of information to mortgage portfolio traders."); Fannie Mae Information Barrier Policy v. 1.01 (Mar. 15, 2007) at 8-9 (noting that barriers were in place "to ensure that Mortgage Assets Traders do not receive Inside Information or Loan Information that Fannie Mae obtains during credit or operational reviews."); Freddie Mac Policy 7-115 (Information Wall) at IV (Sept. 1, 2006) ("You should not provide updated loan level information to Restricted Persons on these pools until the data are released to the public without first receiving guidance from a Compliance Officer.").

FHFA objects to Topic No. 7 on the grounds that it is overbroad and unduly burdensome.  FHFA objects to Topic No. 7 on the ground that it fails to describe with reasonable particularity

the matters on which examination is requested.  FHFA objects to Topic No. 7 on the ground that

it seeks the disclosure of information containing confidential commercial, business, financial,

governmental, proprietary or competitively sensitive information, or documents that are subject

to non-disclosure agreements or confidentiality undertakings.   FHFA further objects to Topic

No. 7 on the grounds that it is vague and ambiguous.

**TOPIC NO. 8:**

The Composition of each group responsible for or having knowledge of the effectiveness
and limitations of automated valuation modeling from the time period beginning January 1, 2004
through the present.

**RESPONSE TO TOPIC NO. 8:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 8 on the ground and to the extent that it seeks information

that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic

No. 8 on the ground that it seeks information that is not relevant to any party's claim or defense

or reasonably calculated to lead to the discovery of admissible evidence.  Under case law within

the Second Circuit, the knowledge possessed by people other than (1) the specific individuals at

the GSEs who were involved in the Securitizations, or (2) any employees who had an obligation

to provide information to those individuals concerning the transactions in issue, is irrelevant.

*See, e.g.*, Fannie Mae MBS Firewall Policy (Mar. 17, 2004) at 1-2 ("Access to loan level and

pool-specific information is restricted to Fannie Mae employees who have a specific 'need to

know' of such information."  "Mortgage Portfolio traders will not have access to FSIM Data

Warehouse databases."  "Mortgage Portfolio traders and members of the Investor

Channel/Customer Transaction Group will not have access to the Early Funding and Asset

Acquisition & Custody Systems"); Private Label Securities Risk Policy v. 1.00 (Aug. 16, 2006)

at 14 ("Fannie Mae's information sharing policies restrict the flow of information to mortgage

portfolio traders."); Fannie Mae Information Barrier Policy v. 1.01 (Mar. 15, 2007) at 8-9 (noting

that barriers were in place "to ensure that Mortgage Assets Traders do not receive Inside

Information or Loan Information that Fannie Mae obtains during credit or operational reviews.");

Freddie Mac Policy 7-115 (Information Wall) at IV (Sept. 1, 2006) ("You should not provide

updated loan level information to Restricted Persons on these pools until the data are released to

the public without first receiving guidance from a Compliance Officer.").

FHFA objects to Topic No. 8 on the grounds that it is overbroad and unduly burdensome.

FHFA objects to Topic No. 8 on the ground that it seeks the disclosure of information containing

confidential commercial, business, financial, governmental, proprietary or competitively

sensitive information, or documents that are subject to non-disclosure agreements or

confidentiality undertakings.  FHFA objects to Topic No. 8 on the ground that it fails to describe

with reasonable particularity the matters on which examination is requested.  FHFA further

objects to Topic No. 8 on the grounds that the phrase "having knowledge of the effectiveness and

limitations" is overly broad, vague and ambiguous.


**TOPIC NO. 9:**

For each Securitization, the identities of any external due diligence firms that assisted
Fannie Mae or Freddie Mac.

**RESPONSE TO TOPIC NO. 9:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 9 to the extent that it calls for the disclosure of information

protected by the attorney-client privilege and work product doctrine.  FHFA objects to Topic No.

9 on the ground and to the extent that it seeks information that is beyond the scope agreed to by

the parties in the Rule 26(f) report.  FHFA objects to Topic No. 9 on the ground that it seeks

information that is not relevant to any party's claim or defense or reasonably calculated to lead to

the discovery of admissible evidence.  FHFA objects to Topic No. 9 on the grounds that the word

"assisted" is overly broad, vague and ambiguous.  FHFA further objects to Topic No. 9 on the

ground that it assumes disputed facts or legal conclusions.

Subject to and without waiving the foregoing objections, FHFA responds below to this

Topic, consistent with Federal Rule of Civil Procedure 31(a). FHFA makes these responses after

a reasonable investigation and to the best of its current understanding. FHFA reserves the right to

amend and supplement these responses as appropriate.

### Fannie Mae

Fannie Mae did not retain any third-party due diligence firms in connection with its

decision to purchase the GSE Certificates.  Fannie Mae relied upon the issuers and underwriters

of the GSE Certificates to perform this due diligence.

### Freddie Mac

Freddie Mac did not retain any third-party due diligence firms in connection with their

decision to purchase the GSE Certificates.  Freddie Mac relied upon the issuers and underwriters

of the GSE Certificates to perform this due diligence.


**TOPIC NO. 10:**

The systems through which Fannie Mae and Freddie Mac maintain hard-copy files in the
ordinary course that are relevant to each Securitization, private label RMBS investments
generally, and the subject of discovery requests in this Action.

35

**RESPONSE TO TOPIC NO. 10:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 10 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic No. 10 on the ground that it fails to describe with reasonable particularity the matters on which examination is requested.  FHFA objects to Topic No. 10 on the ground that it seeks information that is not relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence.  FHFA objects to Topic No. 10 on the ground that it seeks the disclosure of information containing confidential commercial, business, financial, governmental, proprietary or competitively sensitive information, or documents that are subject to non-disclosure agreements or confidentiality undertakings.  FHFA further objects to Topic No. 10 on the grounds that it is vague and ambiguous.

Subject to and without waiving the foregoing objections, FHFA will produce a witness or witnesses to testify regarding the systems through which Fannie Mae maintained hard-copy files in the ordinary course that are relevant to each Securitization and to private label RMBS investments.  Richard Kehoe has already testified on this subject regarding Freddie Mac.

**TOPIC NO. 11:**

The systems through which Fannie Mae and Freddie Mac maintain electronic files in the ordinary course that are relevant to each Securitization, private label RMBS investments generally, and the subject of discovery requests in this Action.

**RESPONSE TO TOPIC NO. 11:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 11 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic No. 11 on the ground that it fails to describe with reasonable particularity the matters on which examination is requested.  FHFA objects to Topic No. 11 on the ground that it seeks information that is not relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence.  FHFA objects to Topic No. 11 on the ground that it seeks the disclosure of information containing confidential commercial, business, financial, governmental, proprietary or competitively sensitive information, or documents that are subject to non-disclosure agreements or confidentiality undertakings.  FHFA further objects to Topic No. 11 on the grounds that it is vague and ambiguous.

Subject to and without waiving the foregoing objections, FHFA will produce a witness or witnesses to testify regarding the systems through which Fannie Mae maintained electronic files in the ordinary course that are relevant to each Securitization and  to private label RMBS investments.  Richard Kehoe has already testified on this subject regarding Freddie Mac.

**TOPIC NO. 12:**

The Composition of each group responsible for the decision to file the Actions.

**RESPONSE TO TOPIC NO. 12:**

FHFA incorporates by reference its General Objections as if fully set forth herein.

FHFA objects to Topic No. 12 on the ground and to the extent that it seeks information that is beyond the scope agreed to by the parties in the Rule 26(f) report.  FHFA objects to Topic No. 12 on the ground that it seeks information that is not relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence.  FHFA objects to Topic

No. 12 on the ground that it calls for the disclosure of information protected by the attorney-client privilege and work product doctrine.

Dated: July 27, 2012
     New York, New York


/s/ Philippe Z. Selendy
Philippe Z. Selendy
(philippeselendy@quinnemanuel.com)
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance
Agency in FHFA v. UBS Americas, Inc., FHFA
v. JPMorgan Chase & Co., FHFA v. Deutsche
Bank AG, FHFA v. Citigroup Inc., and FHFA v.
Goldman, Sachs & Co.*

/s/ Marc E. Kasowitz
Marc E. Kasowitz (mkasowitz@kasowitz.com )
Hector Torres (htorres@kasowitz.com)
Christopher P. Johnson
(cjohnson@kasowitz.com)
Michael Hanin (mhanin@kasowitz.com )
Kanchana Wangkeo Leung
(kleung@kasowitz.com)
KASOWITZ, BENSON, TORRES &
    FRIEDMAN LLP
1633 Broadway
New York, New York 10019

*Attorneys for Plaintiff Federal Housing Finance
Agency in FHFA v. Ally Financial Inc., FHFA
v. General Electric Company, FHFA v. Morgan
Stanley, and FHFA v. SG Americas, Inc.*


/s/ Christine H. Chung
Christine H. Chung
(christinechung@quinnemanuel.com)
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorneys for Plaintiff Federal Housing Finance
Agency in FHFA v. First Horizon National
Corp., FHFA v. Bank of America Corp., and
FHFA v. Credit Suisse Holdings (USA), Inc.*

/s/ Manisha M. Sheth
Manisha M. Sheth
(manishasheth@quinnemanuel.com)
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorneys for Plaintiff Federal Housing Finance
Agency in FHFA v. UBS Americas, Inc., FHFA
v. JPMorgan Chase & Co., FHFA v. Barclays
Bank PLC, FHFA v. Citigroup Inc., and FHFA
v. Merrill Lynch & Co., Inc.*

/s/ Richard A. Schirtzer
Richard A. Schirtzer
(richardschirtzer@quinnemanuel.com)
Adam Abensohn
(adamabensohn@quinnemanuel.com)
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorneys for Plaintiff Federal Housing Finance*
*Agency in FHFA v. HSBC North America Holdings, Inc.*
*and FHFA v. Nomura Holding America, Inc.*

BRENDAN V. SULLIVAN, JR.
RICHARD M. COOPER
JERRY L. SHULMAN
ROBERT B. BARNETT
DAVID E. KENDALL
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON
KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
DAVID D. AUFHAUSER
BRUCE R. GENDERSON
F. LANE HEARD III
STEVEN R. KUNEY
PAUL MOGIN
MARK S. LEVINSTEIN
DANIEL F. KATZ
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
HEIDI K. HUBBARD

GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
DAVID S. BLATT
ARI S. ZYMELMAN
DANE H. BUTSWINKAS
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
CHARLES D. NIEMEIER
PAUL K. DUEFFERT
R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
CRAIG D. SINGER
JAMES L. TANNER, JR.
J. ANDREW KEYES
M. ELAINE HORN
ENU MAINIGI
MICHAEL F. O'CONNOR

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

www.wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 26, 2012

PAUL T. HOURIHAN
WILLIAM J. BACHMAN
MARGARET A. KEELEY
EDWARD J. BENNETT
TOBIN J. ROMERO
BETH A. LEVENE
THOMAS G. WARD
WILLIAM T. BURKE
LISA M. DUGGAN
JOHN E. JOINER
NICHOLAS J. BOYLE
ADAM L. PERLMAN
ANDREW W. RUDGE
DENEEN C. HOWELL
ALEX G. ROMAIN
DAVID A. FORKNER
JONATHAN M. LANDY
CHRISTOPHER N. MANNING
RYAN T. SCARBOROUGH
JENNIFER G. WICHT
STEPHEN D. ANDREWS
KANNON K. SHANMUGAM
MALACHI B. JONES
THOMAS H. L. SELBY
KEVIN HARDY
EDWARD C. BARNIDGE
JOSEPH M. TERRY
AARON P. MAURER
JON R. FETTEROLF
STEPHEN P. SORENSEN
F. GREG BOWMAN

ANA C. REYES
JONATHAN B. PITT
DAVID I. BERL
ELLEN E. OBERWETTER
EDWARD C. REDDINGTON
DANIEL P. SHANAHAN
VIDYA ATRE MIRMIRA
JESSAMYN S. BERNIKER
RICHMOND T. MOORE
KENNETH J. BROWN
LUBA SHUR
PATRICK H. KIM
WILLIAM P. ASHWORTH
LANCE A. WADE
CHARLES DAVANT, IV
DOV P. GROSSMAN
HOLLY M. CONLEY
MATTHEW V. JOHNSON
CARL R. METZ
JOHN McNICHOLS

—————
OF COUNSEL
PAUL MARTIN WOLFF
WILLIAM E. McDANIELS
JOHN W. VARDAMAN
JEREMIAH C. COLLINS
DAVID POVICH
JOHN G. KESTER
ROBERT P. WATKINS
CAROLYN H. WILLIAMS
GERSON A. ZWEIFACH

Via Electronic Mail (christinechung@quinnemanuel.com)

Christine H. Chung
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, New York 10010

Re:   *FHFA v. Bank of America Corp. et al.*, 11 Civ 6195 (S.D.N.Y.)
      *FHFA v. Merrill Lynch & Co., Inc. et al.*, 11 Civ 6202 (S.D.N.Y.)

Dear Christine:

We received FHFA's July 24 Amended Objections and Responses to the Rule 30(b)(6) deposition notice ("Amended Objections"). They raise more questions than they answer, however, and underscore the immediate need for the Rule 30(b)(6) deposition that defendants noticed a month ago.

FHFA's description of the PLAT and addition of custodians from the SF CPRM group confirm our understanding that information from within the GSEs' whole loan businesses played a part in the GSEs' decisions regarding PLS. The information provided in the Amended Objections reflects that persons at Fannie who were members of or communicated with the PLAT regarding the Securitizations or the Originators during the relevant period, as well as persons at Freddie in AMO, CCRM and EORM, are highly relevant persons. At a minimum, these persons include: (1) persons working under Pam Johnson (Fannie), including persons listed under her on FHFA00000008; (2) persons working under Ron Feigles (Freddie) and persons in EORM and CCRM who reviewed originator performance; and (3) persons who we know to have audited or assessed Originators – specifically, Michael Sobczak (Fannie), Karen King (Fannie), Mary Meyers (Freddie), and Pam Padget (Freddie). Please add these persons as custodians. FHFA's Amended Objections also make clear the valuable role that the single-

WILLIAMS & CONNOLLY LLP

Christine H. Chung
July 26, 2012
Page 2

family function had in PLAT's "cross-functional" mission and we, therefore, reiterate
defendants' request that FHFA add Tom Lund, former head of Fannie's single family business,
who was involved in alerting Fannie to risks associated with single family and PLS. FHFA's
Amended Objections also list several GSE Chief Risk Officers as custodians, but noticeably
absent is David Andrukonis, Freddie Mac's CRO during the early months of the relevant period.
Please add him to your custodian list.

An immediate and complete 30(b)(6) deposition continues to be essential to defendants'
identification of relevant GSE custodians. The Amended Objections strongly suggest that many
persons played indisputably critical roles, but remain missing from FHFA's custodian list.
Merely by way of example,

- In its Amended Objections, FHFA lists certain persons but omits other persons
  who we understand performed the same or similar critical functions as the listed
  persons, or who worked within the same business unit or group. For example,
  Andrew Bonsalle is identified as Senior Vice President – Capital Markets
  Mortgage Assets (FHFA00000008), a position FHFA identified in its Amended
  Objections as having responsibility for "various activities related to the purchase
  of PLS." Yet, Mr. Bonsalle is not listed in the Amended Objections nor is he
  identified as a custodian. Other such persons include Jim Cotton, Manoj Singh,
  Jim Berkovec, Gareth Davies, Shelley Poland, Bob Ryan, Peter Zorn, Chris
  Morris, Andrew Gillmer, Martin Young, Jorge Reis, Glenn Errigo, and Indy
  Weerasinghe. FHFA's Amended Objections do not disclose whether there are
  other persons who held analogous positions to those whom FHFA has identified
  but have not been designated as custodians.

- FHFA's Amended Objections list the following persons as members of relevant
  groups — including Lynda Maggio, Scott Sheppard, Clinton Lively, Ramona
  O'Bannon, Sid Kizziar, Allen Price, Sidney Vince Credle, Devin Parent, Robert
  Vignato, Hermond Palmer, and Richard Bauerband — and yet these persons are
  not identified as custodians. The Amended Objections also do not disclose
  whether there are other employees in these relevant groups who are also not
  designated as custodians.

- The organizational charts you provided reflect certain personnel in Freddie's Non-
  Agency PLS group involved in "Bulk Transactions," "Bulk Pricing," and
  "Structured Transactions." It is unclear what these employees did and why they
  were not included in your custodian list. By way of example, we understand that
  Freddie's Bulk Transactions Director, Sally Williamson (n/k/a Sally Baker), was a
  direct point of contact for communications between Freddie and sponsors

WILLIAMS & CONNOLLY LLP
Christine H. Chung
July 26, 2012
Page 3

concerning Freddie's selection of loans to be included in pools backing GSE Certificates. Yet, she is not designated as a custodian.

- FHFA mentions on p. 11 of its Amended Objections that Custodian Kent Willard is not listed on the organizational chart FHFA produced. Defendants should be provided with any organizational charts depicting his position, as well as the names of other present or former GSE personnel who dealt with the Originators or Securitizations but who are not listed on the organizational charts provided.

- With respect to so-called information barriers, the Amended Objections suggest that it is FHFA's position that the GSEs' purported restrictions on the dissemination of "loan level" and "pool specific" information precluded dissemination of any and all information regarding originators' policies, practices, performance, and procedures. Defendants are entitled to question a knowledgeable person about any such restrictions and see any documentation relating thereto, including any documentation to support FHFA's suggestion that the MBS Trading Firewall policy applied to PLS (as opposed to only agency MBS), and any inconsistent or contrary writings or practices.

- Please send us the periodic organization charts for each of the Fannie and Freddie departments described in FHFA's Amended Objections, as you did for Mike Aneiro's and Ron Ratcliffe's organizations. We have been significantly hampered in our preparation of the Rule 30(b)(6) deposition and in our review of your proposed custodian list by the fact that we have received departmental organization charts during the relevant time period for only two of the relevant departments. We cannot determine whether there are additional employees about whom to ask questions without being able to review these charts.

These are just a handful of the questions FHFA's Amended Objections leave unanswered. Of course, we have many other questions. We look forward to the efficient discovery of all relevant information concerning custodians through the Rule 30(b)(6) process, which is the most efficient vehicle for obtaining information regarding potential custodians and the other areas described in our notice. We reserve all rights to amend or supplement our requests.

Finally, following up on your July 12 letter regarding date ranges for searches, and reserving all rights to insist on a more inclusive date range, could you please confirm that FHFA intends to search all documents in the date range for all custodians, even when a custodian held multiple positions during his or her tenure? Freddie's Aaron Pas is a good example — even though Mr. Pas worked in Non-Agency PLS, he is described elsewhere in your response. We

WILLIAMS & CONNOLLY LLP
Christine H. Chung
July 26, 2012
Page 4


want to be sure that these employees' documents will be searched throughout the date range regardless of the position they held at the time.

Thank you for your prompt attention to these matters.

Sincerely,

*Ted Bennett* /by smc

Edward Bennett


cc:   Counsel of Record (via e-mail)

**This document has been redacted.**



**2005** Annual Report

CONTINUING
# Progress



We make home possible®

*This Information Statement and Annual Report includes forward-looking statements, which may include expectations and objectives for our operating results, financial condition, business, and trends and other matters that could affect our business. You should not unduly rely on our forward-looking statements. Actual results might differ significantly from our forecasts and expectations due to several factors that involve risks and uncertainties, including those described in "BUSINESS," "RISK FACTORS" and "FORWARD-LOOKING STATEMENTS." These forward-looking statements are made as of the date of this Information Statement and we undertake no obligation to publicly update any forward-looking statement to reflect events or circumstances after the date of this Information Statement, or to reflect the occurrence of unanticipated events.*

## BUSINESS

### Overview

Freddie Mac is a stockholder-owned company chartered by Congress in 1970 to stabilize the nation's residential mortgage markets and expand opportunities for homeownership and affordable rental housing. We are one of the largest purchasers of mortgage loans in the U.S. We bring innovation and efficiency to the mortgage lending process.

Our mission is to provide liquidity, stability and affordability to the U.S. housing market. We fulfill our mission by purchasing residential mortgages and mortgage-related securities in the secondary mortgage market. We purchase mortgages that meet our underwriting and product standards, then bundle them into mortgage-related securities that can be sold to investors. We can use the proceeds to purchase additional mortgages from primary market mortgage lenders, thus providing them with a continuous flow of funds. We also purchase mortgage loans and mortgage-related securities for our investment portfolio, which we finance primarily by issuing a variety of debt instruments in the capital markets.

Though we are chartered by Congress, our business is funded completely with private capital. We are responsible for making payments on our securities. Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities and other obligations.

### Our Charter and Mission

The Federal Home Loan Mortgage Corporation Act, which we refer to as our charter, forms the framework for our business activities, shapes the products we bring to market, and drives the services we provide to the nation's residential housing and mortgage industries. Our charter also prescribes the terms and principal amounts of mortgage loans that we are permitted to purchase, as described in "Business Activities — *Types of Mortgages We Purchase.*"

Our statutory purposes, as stated in our charter, are:

- to provide stability in the secondary market for residential mortgages;
- to respond appropriately to the private capital market;
- to provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and
- to promote access to mortgage credit throughout the U.S. (including central cities, rural areas and other underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

To facilitate our statutory purposes, our charter provides us with special attributes including:

- exemption from the registration and reporting requirements of the Securities Act and the Exchange Act (we are subject to the general antifraud provisions of the federal securities laws and have committed to the voluntary registration of our common stock with the Securities and Exchange Commission under the Exchange Act);
- favorable treatment of our securities under various investment laws and other regulations;
- discretionary authority of the Secretary of the Treasury to purchase up to $2.25 billion of our securities; and
- exemption from state and local taxes, except for taxes on real property that we own.

Our activities in the secondary mortgage market benefit consumers by providing lenders a steady flow of low-cost mortgage funding. This flow of funds helps moderate cyclical swings in the housing market, equalizes the flow of mortgage funds regionally throughout the U.S. and provides for the availability of mortgage funds in a variety of economic conditions. In addition, the supply of cash made available to lenders through this process drives down mortgage rates on loans within the dollar limits set under our charter. These lower rates help make homeownership affordable for more families and individuals than would be possible without our participation in the secondary mortgage market.

*Freddie Mac*

### Residential Mortgage Debt Market

We compete in the large and growing U.S. residential mortgage debt market. This market consists of a primary mortgage market that links homebuyers and lenders, and a secondary mortgage market that links lenders and investors. At December 31, 2005, our Total mortgage portfolio was $1.7 trillion, while the total U.S. residential mortgage debt outstanding was estimated to be approximately $9.9 trillion.

The residential mortgage market has grown substantially in recent years, as low interest rates and a strong housing market have resulted in record levels of mortgage loan originations, including refinancings of existing residential mortgage debt. As interest rates have increased, refinancings have declined. Throughout 2005, short-term interest rates increased significantly as a result of the actions of the Board of Governors of the Federal Reserve System, or the Federal Reserve, which regulates the supply of money and credit in the U.S.; however, the Federal Reserve's actions had less of an impact on long-term interest rates. Consequently, the slope of the "yield curve" — or the spread between short-term and long-term interest rates — continued to flatten throughout the year. Despite the rise in interest rates, mortgage rates remained low by historical standards and continued to contribute to demand in the residential mortgage market.

As indicated in Table 1, house prices appreciated nationwide at a rate of approximately 13 percent in 2005 with some regional variation. However, this appreciation rate is expected to moderate. Total residential mortgage debt outstanding in the U.S. grew at an estimated annual rate of 14 percent in both 2005 and 2004. We expect the amount of total residential mortgage debt outstanding will continue to rise in 2006, though at a slower rate than in the past few years.

### Table 1 — Mortgage Market Indicators

| | Year-Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| Home sale units (in thousands)[1] | 7,462 | 7,162 | 6,529 |
| House price appreciation | 13% | 12% | 8% |
| Single-family mortgage originations (in billions) | $2,828 | $2,911 | $3,860 |
| ARM share of single-family mortgage originations | 31% | 34% | 19% |
| Refinancing share of single-family mortgage originations | 44% | 46% | 65% |
| U.S. residential mortgage debt outstanding (in billions)[2] | $9,851 | $8,642 | $7,581 |

(1) Includes sales of new and existing detached single-family homes in the U.S. and excludes condos/co-ops. Source: National Association of Realtors news release dated May 25, 2006 (sales of existing homes) and U.S. Census Bureau news release dated May 24, 2006 (sales of new homes).
(2) Debt outstanding at year-end, not seasonally-adjusted. Source: Federal Reserve Flow of Funds Accounts of the United States dated June 8, 2006.

Growth in the U.S. residential mortgage debt market is affected by several factors, including changes in interest rates, employment rates in various regions of the country, home ownership rates, house price appreciation, and borrower preferences concerning the portion of his or her home's value to finance with mortgage debt. The amount of residential mortgage debt available for us to purchase and the mix of available loan products are also affected by several factors, including the volume of single-family mortgages within the loan limits imposed under our charter and the purchase and securitization activity of other financial institutions. See "RISK FACTORS."

#### Primary Mortgage Market — Our Customers

Our customers are predominantly lenders in the primary mortgage market that originate mortgages for homebuyers. These lenders include mortgage banking companies, commercial banks, savings banks, community banks, credit unions, state and local housing finance agencies, and savings and loan associations. A lender that originates a mortgage can either hold the mortgage in its own portfolio, securitize the mortgage or sell the mortgage to a secondary mortgage market investor, such as Freddie Mac.

We buy a significant portion of our mortgages from several large mortgage lenders. During 2005, three mortgage lenders each accounted for 10 percent or more of our mortgage purchase volume and in the aggregate they accounted for approximately 47 percent of this volume. These three lenders are among the largest mortgage loan originators in the United States. We have contracts with a number of mortgage lenders, including some large lenders, that include a commitment by the lender to sell us a minimum percentage or dollar amount of its mortgage origination volume. These contracts typically last for one year. If a mortgage lender fails to meet its contractual commitment, we have a variety of contractual remedies, including the right to assess certain fees. As the mortgage industry has been consolidating, we, as well as our competitors, have been seeking business from a decreasing number of key lenders. See "RISK FACTORS — Competitive and Market Risks." We are working to diversify our customer base and thus reduce the risk of losing a key customer.

#### Secondary Mortgage Market

We participate in the secondary mortgage market generally by buying whole loans (i.e., mortgage loans that have not been securitized) and mortgage-related securities for our Retained portfolio and by issuing guaranteed mortgage-related securities. We do not lend money directly to homebuyers. Our principal competitors are the Federal National Mortgage Association, or Fannie Mae, a similarly chartered government-sponsored enterprise, or GSE, the Federal Home Loan Banks,

and other financial institutions that retain or securitize mortgages, such as banks, dealers and thrift institutions. We compete primarily on the basis of price, products, structure and service.

The dramatic increases in housing prices over the last few years have resulted in the origination of a greater proportion of alternative mortgage products, including initial interest-only loans and option adjustable-rate mortgage loans, or Option ARMs. We have historically purchased limited amounts of these alternative products through our securitization programs. However, recently we have increased our purchases of these products consistent with the increase in their prevalence in the market. We are continuing to explore ways in which we can become more involved with these products and we expect our participation in these products to grow over the coming years. See "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS, or MD&A — RISK MANAGE-MENT — Credit Risks — *Mortgage Credit Risk* — Mortgage Credit Risk Management Strategies." In addition, we believe the recent rise in short-term interest rates relative to long-term interest rates will increase the proportion of 30-year fixed-rate mortgages originated.

**Business Activities**

We generate income primarily through two business activities — portfolio investment activities and credit guarantee activities — operating in one business segment. For a summary and description of our financial performance and financial condition, see "MD&A" and "CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA" and the accompanying notes to our consolidated financial statements. At December 31, 2005, we had total assets of $806.2 billion, and total stockholders' equity of $27.2 billion, and for the year ended December 31, 2005, we reported net income of $2.1 billion. At June 1, 2006, we had 4,905 full-time and 133 part-time employees. Our principal offices are located in McLean, Virginia.

### Types of Mortgages We Purchase

Our charter establishes general parameters for the terms and principal amounts of the mortgages we may purchase, as described below. We also purchase mortgage-related securities that are backed by single-family or multifamily mortgages. Within our charter parameters, the residential mortgage loans we purchase or that underlie mortgage-related securities we purchase generally fall into one of two categories:

- *Single-Family Mortgages.*   Single-family mortgages are secured by one- to four-family properties. The types of single-family mortgages we purchase include 30-year, 20-year, 15-year and 10-year fixed-rate mortgages, interest-only mortgages, ARMs, and balloon/reset mortgages.

- *Multifamily Mortgages.*   Multifamily mortgages are secured by structures with five or more residential rental units. These mortgages have terms generally ranging from five to thirty years. Our multifamily mortgage products, services and initiatives are designed primarily to finance affordable rental housing for low- and moderate-income families.

*Conforming Loan Limits.*   Our charter places a dollar amount cap, called the "conforming loan limit," on the size of the original principal balance of single-family mortgage loans we purchase. This limit is established annually pursuant to a methodology prescribed by our safety and soundness regulator, the Office of Federal Housing Enterprise Oversight, or OFHEO, based on year-to-year changes in the national average price of a one-family residence, as surveyed by the Federal Housing Finance Board each October. For 2006, 2005 and 2004, the conforming loan limits for a one-family residence were set at $417,000, $359,650 and $333,700, respectively. Higher limits apply to two- to four-family residences. The conforming loan limits are also 50 percent higher for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands. No comparable limits apply to our purchases of multifamily mortgages.

*Loan-to-Value Ratios and Mortgage Insurance.*   Under our charter, mortgages that are not guaranteed or insured by any agency or instrumentality of the U.S. government are referred to as "conventional mortgages." Our charter requires that we have additional credit protection if the unpaid principal balance of a conventional single-family mortgage that we purchase exceeds 80 percent of the value of the property securing the mortgage. See "MD&A — RISK MANAGE-MENT — Credit Risks — *Mortgage Credit Risks* — Mortgage Credit Risk Management Strategies — *Credit Enhance-ments*" for more information regarding the credit enhancements and other credit protections we obtain.

*Loan Quality.*   Under our charter, our mortgage purchases are limited, so far as practicable, to mortgages we deem to be of a quality, type and class that generally meet the purchase standards of private institutional mortgage investors.

To manage credit risks with respect to our mortgage purchases, we have developed internal credit policies and appraisal, underwriting and other purchase policies and guidelines set forth in our Single-family Seller/Servicer Guide and our Multifamily Seller/Servicer Guide. We design mortgage loan underwriting guidelines to assess the creditworthiness of the borrower and the borrower's capacity to fulfill the obligations of the mortgage. We continuously review these guidelines in an effort to ensure their effectiveness and to address the needs of the changing marketplace — including the needs of minorities, low- and moderate-income borrowers and other borrowers who are underserved by the traditional housing finance

system. See "MD&A — RISK MANAGEMENT — Credit Risks — *Mortgage Credit Risks* — Mortgage Credit Risk Management Strategies — *Underwriting Requirements and Quality Control Standards*" for additional information.

### Investment and Funding Activities

We purchase mortgage loans and mortgage-related securities and hold them in our Retained portfolio for investment purposes. We invest in mortgage-related securities issued by GSEs or government agencies, referred to as agency securities. We also invest in non-agency mortgage-related securities. Our portfolio purchases replenish the capital available for mortgage lending. We face competition from other financial institutions that are aggressively buying mortgage-related securities backed by both GSE and non-agency issuers.

We manage our Retained portfolio through a strategy of long-term capital deployment. We apply our expertise in mortgage markets and mortgage assets to support attractive and timely asset selection while managing our interest-rate risk. We issue short-, medium- and long-term debt securities, subordinated debt securities and equity securities to finance purchases of mortgages and mortgage-related securities and other business activities. Our debt funding program is designed to offer liquid securities to the global capital markets in a transparent and predictable manner. By diversifying our investor base and the types of debt securities we offer, we believe we enhance our ability to maintain continuous access to the debt markets under a variety of conditions. We manage our debt funding costs by issuing debt of various maturities that is either callable (*i.e.*, redeemable at our option at one or more times before its scheduled maturity) or non-callable. Recently, our funding costs compared to the London Interbank Offered Rate, or LIBOR, have improved. Our funding mix also helps us manage our interest-rate risk by closely matching the interest obligations on our debt with the expected cash inflows from our mortgage-related investments. To further manage interest-rate risks, we use a variety of derivatives. We also use Structured Securities, described below, to restructure cash flows from mortgage-related securities, retaining a portion of these restructured cash flows. See "MD&A — RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for more information.

Because of our GSE status and the special attributes granted to us under our charter, noted above in "Our Charter and Mission," our debt securities and those of other GSE issuers trade in the so-called "agency sector" of the debt markets. This highly liquid market segment exhibits its own yield curve reflecting our ability to borrow at lower rates than many other corporate debt issuers. As a result, we mainly compete for funds in the debt issuance markets with Fannie Mae and the Federal Home Loan Banks, who issue debt securities of comparable quality and ratings. The demand for, and liquidity of, our debt securities, and those of other GSEs, also benefit from their status as permitted investments for banks, investment companies and other financial institutions under their regulatory framework. Other investors also finance portfolio investments in mortgage assets. Competition for funding with these entities can vary with economic, financial market and regulatory environments.

For additional information about our debt securities, see "MD&A — LIQUIDITY AND CAPITAL RE-SOURCES — Liquidity — *Debt Securities*."

### Credit Guarantee Activities

We guarantee the payment of principal and interest on mortgage-related securities in exchange for a fee, which we refer to as a guarantee fee. The types of mortgage-related securities we guarantee include the following:

- mortgage Participation Certificates, or PCs, we issue;
- single-class and multi-class Structured Securities we issue; and
- securities related to tax-exempt multifamily housing revenue bonds.

We have recently increased our share of the GSE securitization market by improving our customer service, diversifying our customer base, tailoring securities to a broader group of global investors, expanding the types of mortgages that we guarantee and introducing program enhancements, new forms of Structured Securities, such as the Reference REMIC[SM] securities, and through other initiatives.

We support our credit guarantee business volume by adjusting our guarantee fee or other transaction fees. For example, if the price performance of, and demand for, our PCs is not comparable to Fannie Mae's securities on future mortgage deliveries by sellers, we may use market-adjusted pricing where we provide guarantee fee or other transaction fee price adjustments to partially offset weaknesses in prevailing security prices. We believe these price-adjustment features increase the competitiveness of our credit guarantee business. The use of such market-adjusted pricing could have a material adverse effect on the profitability of our new credit guarantee business over its life.

*Guarantees of PCs.*   We issue single-class mortgage-related securities that represent undivided interests in pools of mortgages we have purchased. We refer to these mortgage-related securities as PCs. We guarantee the payment of principal and interest on all of our PCs. We issue most of our PCs in transactions in which our customers sell us mortgage loans in

exchange for PCs. Investors in PCs may include the lenders that sold us the underlying mortgages, as well as pension funds, insurance companies, securities dealers and other fixed-income investors. Investors may choose to hold these PCs in their portfolios or sell them to others. Our guarantee increases the marketability of our PCs, providing additional liquidity to the mortgage market.

*Guarantees of Structured Securities.*   We also issue securities representing beneficial interests in pools of PCs and certain other types of mortgage-related assets. We refer to these mortgage-related securities as Structured Securities. We guarantee the payment of principal and interest on most of the Structured Securities we issue. By issuing Structured Securities, we seek to provide liquidity to alternative segments of the mortgage market. We issue many of our Structured Securities in transactions in which securities dealers or investors sell us the mortgage-related assets underlying the Structured Securities in exchange for the Structured Securities. We also sell Structured Securities to securities dealers or investors in exchange for cash.

We issue single-class Structured Securities and multi-class Structured Securities. Single-class Structured Securities pass through the cash flows on the underlying mortgage-related assets. Multi-class Structured Securities divide the cash flows of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors. Our principal multi-class Structured Securities qualify for tax treatment as Real Estate Mortgage Investment Conduits, or REMICs. For purposes of this Information Statement, multi-class Structured Securities include Structured Securities backed by non-agency mortgage-related securities.

*Guarantees Related to Tax-Exempt Multifamily Housing Revenue Bonds.*   We guarantee the payment of principal and interest on tax-exempt multifamily housing revenue bonds that support pass-through certificates issued by third parties. These housing revenue bonds are collateralized by mortgage loans on low- and moderate-income multifamily housing projects. In addition, we guarantee the payment of principal and interest related to low- and moderate-income multifamily mortgage loans underlying tax-exempt multifamily housing revenue bonds.

*PC and Structured Securities Support Activities.*   We support the liquidity and depth of the market for PCs through a variety of activities, including educating dealers and investors about the merits of trading and investing in PCs, and introducing new mortgage-related securities products and initiatives. We support the price performance of our PCs through a variety of strategies, including the issuance of Structured Securities and the purchase and sale by our Retained portfolio of PCs and other agency securities, including Fannie Mae securities. While some purchases of PCs may result in a return on equity substantially below our normal thresholds, this strategy is not expected to have a material effect on the long-term value of the company. Depending upon market conditions, including the relative prices, supply of, and demand for PCs and comparable Fannie Mae securities, there may be substantial variability in any period in the total amount of securities we purchase or sell for our Retained portfolio in accordance with this strategy. We may increase, reduce or discontinue these or other related activities at any time, which could affect the liquidity and depth of the market for PCs.

In the fourth quarter of 2004, as part of our effort to realign our activities around our mission and core business, we ceased our PC market making and support activities accomplished through our Securities Sales & Trading Group, or SS&TG, and our external Money Manager program. For more information, see "MD&A — CONSOLIDATED RESULTS OF OPERATIONS — Net Interest Income."

*The To Be Announced Market.*   In connection with our credit guarantee activities, we issue PCs that represent pools of mortgages with similar characteristics. Because these PCs are homogeneous and are issued in high volume, they are highly liquid and trade with similar securities on a "generic" basis, also referred to as trading in the To Be Announced, or TBA, market. A TBA trade in Freddie Mac securities represents a contract for the purchase or sale of PCs to be delivered at a future date; however, the specific PCs that will be delivered to fulfill the trade obligation, and thus the specific characteristics of the mortgages underlying those PCs, are not known (*i.e.*, "announced") at the time of the trade, but only shortly before the trade is settled. During 2005, we issued approximately $282.0 billion of PCs backed by single-family mortgage loans that were eligible to be delivered to settle TBA trades, representing approximately 71 percent of our total guaranteed PC and Structured Security issuances. The use of the TBA market increases the liquidity of mortgage investments and improves the distribution of investment capital available for residential mortgage financing, thereby helping us to accomplish our statutory mission.

**Available Information**

Our Information Statements, Supplements and other financial disclosure documents are available free of charge on our website at www.FreddieMac.com. (We do not intend this internet address to be an active link and are not using references to this internet address here or elsewhere in this Information Statement to incorporate additional information into this Information Statement.) Our corporate governance guidelines, Codes of Conduct for employees and members of the board of directors (and any amendments or waivers that would be required to be disclosed), and the charters of the board's five standing committees (the Audit; Finance and Capital Deployment; Mission and Sourcing; Governance, Nominating and

Risk Oversight; and Compensation and Human Resources Committees) are also available on our website. Printed copies of these documents may be obtained upon request from our Investor Relations department.

## REGULATION AND SUPERVISION

### Department of Housing and Urban Development

The U.S. Department of Housing and Urban Development, or HUD, has general regulatory power over Freddie Mac, including power over new programs, affordable housing goals and fair lending.

#### Housing Goals

We are subject to affordable housing goals set by HUD. The goals, which are set as a percentage of the total number of dwelling units underlying our total mortgage purchases, have risen steadily since they became permanent in 1995. The goals are intended to expand housing opportunities for low- and moderate-income families, low-income families living in low-income areas and very low-income families, and families living in HUD-defined underserved areas. The goal relating to low-income families living in low-income areas and very low-income families is referred to as the "special affordable" housing goal. This special affordable housing goal also includes a multifamily subgoal that sets an annual minimum dollar volume of qualifying multifamily mortgage purchases.

Effective January 1, 2005, HUD:

- established new and increasing affordable housing goal levels for the years 2005 through 2008;

- established three new subgoals for mortgages that count towards the goals and that finance purchases of single-family, owner-occupied properties located in metropolitan areas;

- increased the multifamily special affordable volume target to $3.92 billion, based on HUD's established formula; and

- required the certification of information provided in Freddie Mac's Annual Mortgage Report and Annual Housing Activities Report submitted to HUD.

In total, beginning in 2005 and continuing through 2008, we are required to achieve six different and increasing HUD goals and subgoals and a higher multifamily special affordable volume target, as summarized in Table 2 below.

### Table 2 — Housing Goals and Home Purchase Subgoals for 2005 through 2008[1]

| | Housing Goals | | | |
|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 |
| Low- and moderate-income goal | 56% | 55% | 53% | 52% |
| Underserved areas goal | 39 | 38 | 38 | 37 |
| Special affordable goal | 27 | 25 | 23 | 22 |
| Multifamily special affordable volume target (dollars in billions) | $3.92 | $3.92 | $3.92 | $3.92 |

| | Home Purchase Subgoals[2] | | | |
|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 |
| Low- and moderate-income goal | 47% | 47% | 46% | 45% |
| Underserved areas goal | 34 | 33 | 33 | 32 |
| Special affordable goal | 18 | 18 | 17 | 17 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages will be determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.

(2) These home purchase subgoals are expressed as percentages of the total number of mortgages we purchased that finance the purchase of single-family, owner-occupied properties located in metropolitan areas.

Meeting these goals and subgoals in future years will be challenging and there can be no assurance that we will do so. See "RISK FACTORS — Legal and Regulatory Risks." However, we view the purchase of mortgage loans benefiting low-and moderate-income families and neighborhoods as a principal part of our mission and business, and we are committed to fulfilling the needs of these borrowers and markets.

We have reported to HUD that we achieved each of the affordable housing goals and subgoals as applicable to 2005, 2004 and 2003. HUD has determined that we met the goals for 2004 and 2003, and is evaluating our performance with

respect to the goals and subgoals for 2005. Our performance with respect to the goals and subgoals, as reported to HUD, is set forth in Table 3 below.

**Table 3 — Housing Goals and Home Purchase Subgoals and Reported Results**[1]

*Housing Goals and Reported Results*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2005** | | **2004** | | **2003** | |
| | **Goal** | **Result** | **Goal** | **Result**[2] | **Goal** | **Result**[2] |
| Low- and moderate-income goal | 52% | 54.1% | 50% | 51.6% | 50% | 51.2% |
| Underserved areas goal | 37 | 42.2 | 31 | 32.3 | 31 | 32.7 |
| Special affordable goal | 22 | 24.5 | 20 | 22.7 | 20 | 21.4 |
| Multifamily special affordable volume target (dollars in billions) | $3.92 | $11.41 | $2.11 | $7.77 | $2.11 | $8.79 |

*Home Purchase Subgoals and Reported Results*

| | Year Ended December 31, 2005 | |
|---|---|---|
| | **Subgoal** | **Result** |
| Low- and moderate-income subgoal | 45% | 46.9% |
| Underserved areas subgoal | 32 | 35.4 |
| Special affordable subgoal | 17 | 17.8 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages and each of our percentage results is determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.
(2) The 2004 and 2003 results reflected in this table have been revised from the numbers reflected in our Information Statement dated June 14, 2005 to reflect adjustments and corrections to the information we originally reported to HUD for those years.

We are engaged in ongoing discussions with HUD regarding interpretive issues relating to the purchase and counting of mortgages for purposes of housing goals performance for 2005. If the Secretary of HUD were to find that we failed, or that there was a substantial probability that we would fail, to meet a housing goal and that achievement of the housing goal was feasible, the Secretary could require us to submit a housing plan. The housing plan would describe the actions we would take to achieve the goal in the future. HUD also has the authority to take enforcement actions against us, including issuing a cease and desist order or assessing civil money penalties, if we: (a) fail to submit a required housing plan or fail to make a good faith effort to comply with a plan approved by HUD; or (b) fail to submit certain data relating to our mortgage purchases, information or reports required by law.

### Fair Lending

Our mortgage purchase activities are subject to federal anti-discrimination laws. In addition, the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, or the GSE Act, prohibits discriminatory practices in our mortgage purchase activities, requires us to submit data to HUD to assist it in its fair lending investigations of primary market lenders, and requires us to undertake remedial actions against lenders found to have engaged in discriminatory lending practices. In addition, HUD periodically reviews and comments on our underwriting and appraisal guidelines for consistency with the Fair Housing Act and the GSE Act.

### Predatory Lending

A core component of our mission is to facilitate the financing of affordable housing for low- and moderate-income families. Predatory lending is in direct opposition to our mission, our goals and our practices. Since 2000, we have taken a number of voluntary steps to combat predatory lending and support responsible lending. We have instituted anti-predatory lending policies intended to prevent the purchase or assignment of mortgage loans with unacceptable terms or conditions or resulting from unacceptable practices. In accordance with these policies, we will not purchase:

- mortgages originated with single-premium credit insurance;
- mortgages with terms that exceed either the annual percentage rate or the points and fees threshold under the Home Ownership and Equity Protection Act of 1994;
- subprime mortgages with prepayment penalty terms that exceed three years; or
- subprime mortgages originated on or after August 1, 2004 with mandatory arbitration clauses.

In addition to the purchase policies we have instituted, we promote consumer education and financial literacy efforts to help borrowers avoid abusive lending practices and we provide competitive mortgage products to reputable mortgage originators so that borrowers have a greater choice of financing options.

We also require our servicers to report all borrower credit information, including monthly mortgage payments. Several states have enacted laws aimed at curbing predatory lending practices, generally with regard to loans exceeding thresholds based on annual percentage rates or financing costs. These loans are typically referred to as "high-cost home loans." The high-cost home loan thresholds trigger state law liabilities for subsequent purchasers or assignees of such loans that may be

counterparties for these derivatives were to have defaulted simultaneously on December 31, 2005, our maximum loss for accounting purposes would have been approximately $190 million. Our economic loss, as measured by our potential additional uncollateralized exposure, may be higher than the uncollateralized exposure of our derivatives if we were not able to replace the defaulted derivatives in a timely fashion. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps will increase under certain adverse market conditions by performing daily market stress tests. These tests evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties assuming changes in the level and implied volatility of interest rates and changes in foreign-currency exchange rates over a brief time period.

To date, we have not incurred any credit losses on OTC derivative counterparties or set aside specific reserves for institutional credit risk exposure. We do not believe such reserves are necessary, given our counterparty credit risk management policies and collateral requirements.

*OTC Forward Purchase and Sale Commitments Treated as Derivatives.* Since the typical maturity for our OTC commitments is less than one year, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of our OTC commitments counterparties on an ongoing basis to ensure that they continue to meet our internal risk-management standards. As indicated in Table 35, the exposure to OTC commitments counterparties of $35 million and $40 million at December 31, 2005 and 2004, respectively, was uncollateralized.

## Credit Risks

Our credit guarantee portfolio is subject primarily to two types of credit risk — mortgage credit risk and institutional credit risk. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage or security we own or guarantee. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. See "Table 46 — Total Mortgage Portfolio and Total Guaranteed PCs and Structured Securities Issued Based on Unpaid Principal Balances" for more information on the composition of our Total mortgage portfolio.

### Mortgage Credit Risk

**Mortgage Credit Risk Management Strategies.**   Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and by the general economy, especially the movement of house prices. To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation, and the use of credit enhancements and credit risk transfers. While we have historically focused on obtaining credit enhancements at the time of mortgage purchase, we are continuing to expand our capabilities in this area to allow more active and ongoing credit portfolio rebalancing and risk transfers.

***Underwriting Requirements and Quality Control Standards.***   All mortgages that we purchase or guarantee have an inherent risk of default. We seek to manage the underlying risk in a given mortgage we securitize or purchase for our Retained portfolio by adequately pricing for the risk we assume using our underwriting and quality control processes. We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, we provide originators with a series of mortgage underwriting guidelines and they represent and warrant to us that the mortgages sold to us meet these guidelines. We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our underwriting standards, we may require the seller/servicer to repurchase that mortgage or make us whole in the event of a default. We provide originators with written standards and/or automated underwriting software tools, such as Loan Prospector® and other quantitative credit risk management tools that are designed to evaluate single-family mortgages and monitor the related mortgage credit risk for loans we may purchase. Loan Prospector® generates a credit risk classification by evaluating information on significant indicators of mortgage default risk, such as loan-to-value ratios, credit scores and other mortgage and borrower characteristics. These statistically-based risk assessment tools increase our ability to distinguish among single-family loans based on their expected risk, return and importance to our mission. We may allow seller/servicers to underwrite mortgages for sale to us using other automated underwriting systems and agreed-upon underwriting standards that differ from our normal standards.

The percentage of our single-family mortgage purchase volume evaluated using Loan Prospector® prior to purchase has declined over the last three years. As part of our post-purchase quality control review process, we use Loan Prospector® to evaluate the credit quality of virtually all single-family mortgages that were not evaluated by Loan Prospector® prior to purchase. Loan Prospector® risk classifications influence both the price we charge to guarantee loans and the loans we review in quality control.

We have been expanding the share of mortgages we purchase that were underwritten and originated using alternative automated underwriting systems, which could increase our credit risk. We regularly monitor the performance of mortgages purchased using these systems and if they underperform mortgages originated using Loan Prospector we may seek additional compensation for guaranteeing such mortgages in the future.

For multifamily mortgage loans, unless the mortgage loans have significant credit enhancements, we use an intensive pre-purchase underwriting process for the mortgages we purchase. Our underwriting process includes assessments of the local market, the borrower, the property manager, the property's historical and projected financial performance and the property's physical condition, which may include a physical inspection of the property. In addition to our own inspections, we rely on third-party appraisals and environmental and engineering reports.

***Credit Enhancements.***   Our charter requires that single-family mortgages with loan-to-value ratios above 80 percent at the time of purchase must be covered by one or more of the following: (a) primary mortgage insurance; (b) a seller's agreement to repurchase or replace any mortgage in default (for such period and under such circumstances as we may require); or (c) retention by the seller of at least a ten percent participation interest in the mortgages. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. In many cases, the lender's or third party's risk is limited to a specific level of losses at the time the credit enhancement becomes effective. At December 31, 2005 and 2004, credit-enhanced single-family mortgages and mortgage-related securities represented approximately 17 percent and 19 percent of the $1,395 billion and $1,267 billion, respectively, unpaid principal balance of the Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of issued Structured Securities that is backed by Ginnie Mae Certificates. We exclude non-Freddie Mac mortgage-related securities because they expose us primarily to institutional credit risk. We exclude that portion of Structured Securities backed by Ginnie Mae Certificates because the incremental credit risk to which we are exposed is considered de minimis. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 17 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for additional information about our non-Freddie Mac mortgage-related securities. Our ability and desire to expand the portion of our Total mortgage portfolio with credit enhancements will depend on our evaluation of the credit quality of new business purchase opportunities, the risk profile of our portfolio and the future availability of effective credit enhancements at prices that permit an attractive return. While the use of credit enhancements reduces our exposure to mortgage credit risk, it increases our exposure to institutional credit risk.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our Total mortgage portfolio and is typically provided on a loan-level basis for certain single-family mortgages. Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage to a third-party insurer. The amount of insurance we obtain on any mortgage depends on our requirements, which depend on our assessment of risk. We may from time to time agree with the insurer to reduce the amount of coverage that is in excess of our charter's minimum requirement and may also furnish certain services to the insurer in exchange for fees paid by the insurer. As is the case with credit enhancement agreements generally, these agreements often improve the overall value of purchased mortgages and thus may allow us to offer lower guarantee fees to sellers.

After primary mortgage insurance, the most prevalent type of credit enhancement that we use is pool insurance. With pool insurance, a mortgage insurer provides insurance on a pool of loans up to a stated aggregate loss limit. In addition to a pool-level loss coverage limit, some pool insurance contracts may have limits on coverage at the loan level. For pool insurance contracts that expire before the completion of the contractual term of the mortgage loan, we seek to ensure that the contracts cover the period of time during which we believe the mortgage loans are most likely to default.

Other forms of credit enhancements on single-family mortgage loans include indemnification agreements (under which we may require a lender to reimburse us for credit losses realized on mortgages), government guarantees, collateral (including cash or high-quality marketable securities) pledged by a lender and subordinated security structures.

For multifamily mortgages, we occasionally use credit enhancements to mitigate risk. The types of credit enhancements used for multifamily mortgage loans include recourse, third-party guarantees or letters of credit, cash escrows, subordinated participations in mortgage loans or structured pools, and cross-default and cross-collateralization provisions. Cross-default and cross-collateralization provisions typically work in tandem. With a cross-default provision, if the loan on a property goes into default, we have the right to declare specified other mortgage loans of the same borrower or certain of its affiliates to be in default and to foreclose those other mortgages. In cases where the borrower agrees to cross-collateralization, we have the additional right to apply excess proceeds from the foreclosure of one mortgage to amounts owed to us by the same borrower or its specified affiliates relating to other multifamily mortgage loans we own. For information about our maximum coverage in regards to these credit enhancements, see "NOTE 4: FINANCIAL GUARANTEES" to our consolidated financial statements. We also receive similar credit enhancements for multifamily PC Guarantor Swaps; for tax-exempt multifamily

housing revenue bonds that support pass-through certificates issued by third parties for which we provide our guarantee of the payment of principal and interest; for Freddie Mac pass-through certificates that are backed by tax-exempt multifamily housing revenue bonds and related taxable bonds and/or loans; and for multifamily mortgage loans that are originated and held by the state and municipal agencies to support tax-exempt multifamily housing revenue bonds for which we provide our guarantee of the payment of principal and interest.

*Portfolio Diversification.*   A key characteristic of our credit risk portfolio is diversification along a number of critical risk dimensions. We continually monitor a variety of mortgage loan characteristics such as product mix, loan-to-value ratios and geographic concentration, which may affect the default experience on our overall mortgage portfolio. As part of our risk management practices, we have adopted a set of limits on our purchases and holdings of certain types of loans that are deemed to have higher risks, including interest-only loans, Option ARMs, loans with high loan-to-value ratios, and mortgages originated with limited or no underwriting documentation.

Table 36 provides the distribution of our Total mortgage portfolio.

### Table 36 — Total Mortgage Portfolio Distribution[1][2]

| | December 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| | (dollars in millions) | |
| **Balances related to:** | | |
| Guaranteed PCs and Structured Securities: | | |
| Single-family | $1,294,521 | $1,173,847 |
| Multifamily | 14,503 | 15,546 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities | 26,500 | 19,575 |
| Mortgage loans in the Retained Portfolio: | | |
| Single-Family | 20,396 | 23,389 |
| Multifamily | 41,085 | 37,971 |
| Total Unpaid Principal Balance | $1,397,005 | $1,270,328 |
| **Product Distribution** | | |
| *Single-family* | | |
| 30-year fixed | 59% | 56% |
| 15-year fixed | 23 | 28 |
| ARMS/Variable-rate | 8 | 8 |
| Option ARMS[3] | 1 | — |
| Interest only[4] | 2 | — |
| Balloon/Resets | 2 | 3 |
| Other[5] | 1 | 1 |
| *Total single-family* | 96 | 96 |
| *Multifamily* | 4 | 4 |
| **Total** | 100% | 100% |

(1) Based on unpaid principal balances.
(2) Excludes non-Freddie Mac mortgage-related securities other than those that underlie Structured Securities.
(3) Represents loans that may expose the borrower to future increases in the loan obligation in excess of increases that result solely from contractual interest-rate adjustments. Includes mortgage loans we purchased that underlie the guaranteed portion of whole-loan REMICs and that portion of alternative collateral deals that are backed by negative amortization loans.
(4) Represents loans where the borrower pays only interest for a period of time before the loan begins to amortize.
(5) Represents alternative collateral deals that include Structured Securities backed by non-agency securities, which were backed by FHA/VA and subprime mortgage loans primarily, and Structured Securities backed by Ginnie Mae securities.

Product mix affects the credit risk profile of our Total mortgage portfolio. In general, 15-year fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. The next lowest rate of default is associated with 30-year fixed-rate mortgages. Balloon/reset mortgages and ARMs typically default at a higher rate than fixed-rate mortgages, although default rates for different types of ARMs may vary. While ARMs are typically originated with interest rates that are initially lower than those available for fixed-rate mortgages, their interest rates also change over time based on changes in an index or reference interest rate. As a result, the borrower's payments may rise or fall, within limits, as interest rates change. As payment amounts increase, the risk of default also increases. In the low interest rate environment experienced during 2005, 2004 and 2003, this trend was reversed with ARMs exhibiting lower default rates than fixed-rate mortgages.

During 2005 and 2004, there was a rapid proliferation of alternative product types designed to address a variety of borrower needs, including issues of affordability and lack of income documentation. While each of these products has been on the market for some time, their prevalence increased in 2005 and 2004. We expect each of these products to default more often than traditional products and we consider this when determining our guarantee fee. Our purchases of interest-only and Option ARM mortgage products increased in 2005, representing approximately 11 percent of our Total mortgage portfolio purchases as compared to 2 percent in 2004, and we expect this trend to continue in 2006. Despite this recent

increase in purchases, these products represent a small percentage of the unpaid principal balance of our Total mortgage portfolio. At December 31, 2005 and 2004, interest-only and option ARMs collectively represented approximately 3 percent and less than 1 percent, respectively, of the unpaid principal balance of the Total mortgage portfolio. We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.

We also hold securities issued by third parties where the underlying collateral may include interest-only and Option ARM mortgage products. We generally mitigate credit risk inherent in these securities through a guarantee from the third party issuer or the underlying structure of the security. For additional information about the credit quality and credit risk management of non-Freddie Mac securities we hold see "*Institutional Credit Risk* — Non-Freddie Mac Mortgage-Related Securities" and "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Retained Portfolio."

The subprime segment of the mortgage market primarily serves borrowers with lower quality credit payment histories. Our participation in this market helps reduce barriers to homeownership for these borrowers by increasing the availability of mortgage credit and reducing the costs of homeownership. We participate in the subprime market segment primarily in two ways. First, our Retained portfolio makes investments in non-Freddie Mac mortgage-related securities that were originated in this market segment. Substantially all of these securities were rated "AAA" by one or more rating agencies at the time of purchase. Second, we guarantee securities backed by subprime mortgages, which comprise a portion of the "alternative collateral deals" we purchase. These securities have previously been credit enhanced and at the time of our purchase most were "shadow rated" at least "BBB" (based on the S&P rating scale) by at least one nationally recognized credit rating agency which assessed the credit risks of the securities without regard to the benefits of our guarantee. At December 31, 2005 and 2004, we guaranteed $2.3 billion and $4.5 billion of securities backed by subprime mortgages which constituted less than one percent of our Total mortgage portfolio, respectively. In addition to the non-Freddie Mac mortgage-related securities discussed above, we make investments through our Retained portfolio in some of the Structured Securities we issue with underlying collateral that is subprime.

The distribution of the single-family loans underlying our Total mortgage portfolio by original and estimated current loan-to-value ratio, credit scores, loan purpose, property type and occupancy type is shown in Table 37.

**Table 37 — Characteristics of Single-Family Total Mortgage Portfolio**[1]

| Original Loan-to-Value, or LTV, Ratio Range[2] | Purchases During the Year Ended December 31, | | | Ending Balance December 31, | | |
|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2005** | **2004** | **2003** |
| Less than 60% | 21% | 23% | 29% | 25% | 26% | 26% |
| Above 60% to 70% | 16 | 16 | 19 | 17 | 17 | 17 |
| Above 70% to 80% | 50 | 46 | 40 | 44 | 42 | 41 |
| Above 80% to 90% | 7 | 8 | 7 | 8 | 9 | 9 |
| Above 90% to 95% | 4 | 6 | 4 | 5 | 5 | 6 |
| Above 95% | 2 | 1 | 1 | 1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original loan-to-value ratio | 71% | 71% | 68% | 70% | 70% | 70% |
| **Estimated Current LTV Ratio Range[3]** | | | | | | |
| Less than 60% | | | | 57% | 53% | 44% |
| Above 60% to 70% | | | | 17 | 19 | 20 |
| Above 70% to 80% | | | | 18 | 18 | 23 |
| Above 80% to 90% | | | | 6 | 7 | 9 |
| Above 90% to 95% | | | | 1 | 2 | 3 |
| Above 95% | | | | 1 | 1 | 1 |
| Total | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | 55% | 57% | 61% |
| **Credit Score[4]** | | | | | | |
| 740 and above | 44% | 41% | 49% | 45% | 44% | 44% |
| 700 to 739 | 23 | 24 | 23 | 23 | 23 | 23 |
| 660 to 699 | 19 | 20 | 17 | 18 | 18 | 17 |
| 620 to 659 | 10 | 11 | 8 | 9 | 9 | 9 |
| Less than 620 | 4 | 4 | 3 | 4 | 4 | 4 |
| Not Available | — | — | — | 1 | 2 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score | 722 | 719 | 729 | 725 | 723 | 723 |
| **Loan Purpose** | | | | | | |
| Purchase | 44% | 40% | 19% | 32% | 28% | 25% |
| Cash-out refinance | 35 | 27 | 26 | 29 | 27 | 26 |
| Other refinance | 21 | 33 | 55 | 39 | 45 | 49 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| 1 unit | 97% | 97% | 98% | 97% | 97% | 97% |
| 2-4 units | 3 | 3 | 2 | 3 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 91% | 92% | 95% | 93% | 94% | 94% |
| Second/vacation home | 5 | 4 | 3 | 4 | 3 | 3 |
| Investment | 4 | 4 | 2 | 3 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the unpaid principal balance of the single-family mortgage portfolio (excluding non-Freddie Mac mortgage-related securities, alternative collateral deals that are not backed by prime mortgage loans and that portion of Structured Securities that is backed by Ginnie Mae Certificates). Such purchases totaled $396 billion, $360 billion and $701 billion at December 31, 2005, 2004 and 2003, respectively. Such ending balances totaled $1,333 billion, $1,203 billion and $1,151 billion at December 31, 2005, 2004 and 2003, respectively.

(2) Our charter requires that mortgage loans purchased with loan-to-value ratios above 80 percent be covered by mortgage insurance or other credit enhancements.

(3) Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of house prices since origination. Estimated current LTV excludes alternative collateral deals and Option ARMs. Estimated current LTV ratio range is not applicable to purchases made during the year.

(4) Credit score data are as of mortgage loan origination.

*Loan-to-Value Ratios.* Our principal safeguard against credit losses for mortgage loans in our single-family, non-credit-enhanced portfolio is provided by the borrowers' equity in the underlying properties. Mortgage loans with higher loan-to-value ratios (and therefore lower levels of borrower equity) at the time of purchase are also protected by credit enhancements, since our charter requires that loans with loan-to-value ratios above 80 percent at the time of purchase be covered by mortgage insurance or certain other credit protections.

The likelihood of single-family mortgage default depends not only on the initial credit quality of the loan, but also on events that occur after origination. Accordingly, we monitor changes in house prices across the country and the impact of these house price changes on the underlying loan-to-value ratio of mortgages in our portfolio. House prices have risen significantly over the last 10 years, and have grown very dramatically over the last four years. This house price appreciation

has increased the values of properties underlying the mortgages in our portfolio. We monitor regional geographic markets for changes in these trends, particularly with respect to new loans originated in regional markets that have had significant house price appreciation, and may seek to reinsure a portion of this risk should we determine that the possibility of such changes warrants action. Historical experience has shown that defaults are less likely to occur on mortgages with lower estimated current loan-to-value ratios. Furthermore, in the event of a default, increases in house prices generally reduce the total amount of loss, thereby mitigating credit losses.

*Credit Score.*  Credit scores are a useful measure for assessing the credit quality of a borrower. Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record and predict the likelihood that a borrower will repay future obligations as expected. FICO® scores, developed by Fair, Isaac and Co., Inc., are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points. Statistically, consumers with higher credit scores are more likely to repay their debts as expected than those with lower scores. The weighted average credit score for the Total mortgage portfolio (based on the credit score at origination) remained high at 725 at December 31, 2005 and 723 at both December 31, 2004 and 2003, indicating borrowers with strong credit quality.

*Loan Purpose.*  Mortgage loan purpose indicates how the borrower intends to use the funds from a mortgage loan. The three general categories are: purchase, cash-out refinance, or other refinance. In a purchase transaction, funds are used to acquire a property. In a cash-out refinance transaction, in addition to paying off an existing first mortgage lien, the borrower obtains additional funds that may be used for other purposes, including paying off subordinate mortgage liens and providing unrestricted cash proceeds to the borrower. In other refinance transactions, the funds are used to pay off an existing first mortgage lien and may be used in limited amounts for certain specified purposes; such refinances are generally referred to as "no cash-out" or "rate and term" refinances. Other refinance transactions also include refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction. Given similar loan characteristics (*e.g.*, loan-to-value ratios), purchase transactions have the lowest likelihood of default followed by no-cash out refinances and then cash out refinances. As a practical matter, however, no-cash out refinances tend to have lower loan-to-value ratios and borrowers with higher credit scores than purchase transactions and as such, have better overall performance than purchase transactions.

*Property Type.*  Single-family mortgage loans are defined as mortgages secured by housing with up to four living units. Mortgages on one-unit properties tend to have lower credit risk than mortgages on multiple-unit properties.

*Occupancy Type.*  Borrowers may purchase a home as a primary residence, second/vacation home or investment property that is typically a rental property. Mortgage loans on properties occupied by the borrower as a primary or secondary residence tend to have a lower credit risk than mortgages on investment properties.

*Geographic Concentration.*  Since our business involves purchasing mortgages from every geographic region in the U.S., we maintain a geographically diverse mortgage portfolio. This diversification generally mitigates credit risks arising from changing local economic conditions. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for more information concerning the distribution of our Total mortgage portfolio by geographic region. Our Total mortgage portfolio's geographic distribution was relatively stable from 2003 to 2005, and remains broadly diversified across these regions.

**Loss Mitigation Activities.**  Within our Total mortgage portfolio, we expect and price for some mortgage loans to become non-performing due to changes in general economic conditions, changes in the financial status of individual borrowers or other factors. Table 38 summarizes our non-performing assets. The increase in our non-performing assets from 2001 through 2003 was primarily driven by higher delinquencies associated with our alternative collateral deals. While these delinquencies result in higher levels of non-performing assets, we have limited loss exposure due to the credit enhancements associated with these securities. The increase in our troubled debt restructurings from 2004 to 2005 was primarily related to multifamily loans impacted by Hurricane Katrina. At December 31, 2005, troubled debt restructurings as shown in Table 38 included multifamily loans affected by Hurricane Katrina with unpaid principal balances totaling approximately $210 million.

Table 42 and Table 43 provide detail by region for two credit performance statistics, REO activity and charge-offs. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

## Table 42 — REO Activity By Region[1]

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | (number of properties) | | |
| **REO Inventory** | | | |
| Beginning property inventory, at January 1 | 9,604 | 9,170 | 7,222 |
| Properties acquired by region: | | | |
| Northeast | 1,306 | 1,500 | 1,600 |
| Southeast | 4,504 | 5,499 | 5,378 |
| North central | 5,790 | 5,787 | 4,643 |
| Southwest | 3,412 | 3,926 | 3,503 |
| West | 849 | 1,777 | 2,626 |
| Total properties acquired | 15,861 | 18,489 | 17,750 |
| Properties disposed by region: | | | |
| Northeast | (1,384) | (1,562) | (1,674) |
| Southeast | (5,221) | (5,596) | (4,476) |
| North central | (5,715) | (5,111) | (3,908) |
| Southwest | (3,820) | (3,605) | (3,018) |
| West | (1,255) | (2,181) | (2,726) |
| Total properties disposed | (17,395) | (18,055) | (15,802) |
| Ending property inventory, at December 31 | 8,070 | 9,604 | 9,170 |

(1) See "Table 39 — Single-Family — Delinquency Rates-By Region" for a description of these regions.

## Table 43 — Single-Family Charge-offs and Recoveries By Region[1][2]

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | | | 2004 | | | 2003 | | |
| | Charge-offs, gross | Recoveries | Charge-offs, net | Charge-offs, gross | Recoveries | Charge-offs, net | Charge-offs, gross | Recoveries | Charge-offs, net |
| | (in millions) | | | | | | | | |
| Northeast | $ 21 | $ (10) | $ 11 | $ 24 | $ (10) | $ 14 | $ 21 | $ (10) | $11 |
| Southeast | 76 | (54) | 22 | 84 | (49) | 35 | 62 | (44) | 18 |
| North central | 102 | (66) | 36 | 92 | (49) | 43 | 54 | (35) | 19 |
| Southwest | 68 | (44) | 24 | 66 | (35) | 31 | 43 | (32) | 11 |
| West | 19 | (11) | 8 | 34 | (17) | 17 | 36 | (23) | 13 |
| Total | $286 | $(185) | $101 | $300 | $(160) | $140 | $216 | $(144) | $72 |

(1) See "Table 39 — Single-Family — Delinquency Rates-By Region" for a description of these regions.
(2) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.

Table 44 summarizes our loan loss reserves activity.

**Table 44 — Loan Loss Reserves Activity**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| | (dollars in millions) | | | | |
| Total loan loss reserves[1]: | | | | | |
| Beginning balance ......................................... | $ 264 | $ 299 | $ 265 | $ 224 | $ 229 |
| Provision for credit losses ................................. | 251 | 143 | (5) | 122 | 33 |
| Charge-offs, gross ........................................ | (294) | (300) | (224) | (171) | (129) |
| Recoveries[2] ............................................ | 185 | 160 | 145 | 99 | 101 |
| Charge-offs, net ......................................... | (109) | (140) | (79) | (72) | (28) |
| Adjustment for change in accounting[3] .................... | — | — | 110 | — | — |
| Transfers-out during the period[4] ........................ | (11) | (20) | (11) | (9) | (10) |
| Other transfers, net, during the period[5] ................. | 19 | (18) | 19 | — | — |
| Ending balance .......................................... | $ 414 | $ 264 | $ 299 | $ 265 | $ 224 |
| Charge-offs, net to Total mortgage portfolio[6] ............ | 0.8bp | 1.1bp | 0.7bp | 0.7bp | 0.3bp |
| Coverage ratio (reserves to charge-offs, net) ............... | 3.8 | 1.9 | 3.8 | 3.7 | 8.0 |

(1) Includes Reserves for loans held-for-investment in the Retained portfolio and Reserves for guarantee losses on Participation Certificates. See "NOTE 6: LOAN LOSS RESERVES" to the consolidated financial statements for more details.

(2) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers or third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.

(3) On January 1, 2003, $110 million of recognized Guarantee obligation attributable to estimated incurred losses on outstanding PCs or Structured Securities was reclassified to Reserve for guarantee losses on Participation Certificates.

(4) Represents the reclassification of the reserve amount attributable to uncollectible interest on outstanding PCs and Structured Securities, which is included as an offset to the related receivable balance within Accounts and other receivables, net on the consolidated balance sheets.

(5) Represents the portion of the Guarantee obligation recognized upon the sale of PCs or Structured Securities that correspond to incurred credit losses reclassified to Reserve for guarantee losses on Participation Certificates upon initial recognition of a Guarantee obligation. In addition, the amount includes an increase (reduction) of loan loss reserves of $9 million and $(31) million in 2005 and 2004, respectively, related to prior period adjustments for which the related income was recorded in Other income.

(6) Calculated using the average Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

We maintain two loan loss reserves — Reserve for losses on mortgage loans held-for-investment and Reserve for guarantee losses on Participation Certificates — at levels we deem adequate to absorb probable incurred losses on mortgage loans held-for-investment in the Retained portfolio and certain mortgages underlying PCs held by third parties. In certain circumstances, incurred losses related to PCs we hold in the Retained portfolio are captured as part of mark-to-market adjustments that are recognized in connection with PC residuals, which represent the portion of the fair value of the PCs related to the Guarantee asset and Guarantee obligation. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Credit Losses" and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to the consolidated financial statements for further information.

As shown in "Table 44 — Loan Loss Reserves Activity," total loan loss reserves increased in 2005. The increase in loan loss reserves in 2005 is primarily related to our estimate of our incurred losses as a result of Hurricane Katrina. The 2005 provision also includes additions related to the single-family portfolio as we anticipate an increase in the severity of losses on a per-property basis driven, in part, by the expectation of low or slower home price appreciation in certain areas and increased incurred losses as delinquencies occur for loans that are experiencing higher default rates based on their year of origination.

*Credit Risk Sensitivity.* Our credit risk sensitivity analysis assesses the assumed increase in the present value of expected single-family mortgage portfolio losses over ten years as the result of an estimated immediate five percent decline in house prices nationwide, followed by a return to more normal growth in house prices based on historical experience. We use an internally developed Monte Carlo simulation-based model to generate our credit risk sensitivity analyses. The Monte Carlo model uses a simulation program to generate numerous potential interest-rate paths that, in conjunction with a prepayment model, are used to estimate mortgage cash flows along each path. In the credit rate sensitivity analysis, we adjust the house-price assumption used in the base case to estimate the level and sensitivity of potential credit costs resulting from a sudden decline in house prices.

The credit risk sensitivity results at December 31, 2005 and 2004 are shown in Table 45. Credit risk sensitivity results at the end of each quarter in 2005 and the fourth quarter of 2004 are presented in "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS."

### Table 45 — Credit Risk Sensitivity — Estimated Increase in Net Present Value, or NPV, of Credit Losses[1]

| | Before Receipt of Credit Enhancements[2] | | After Receipt of Credit Enhancements[3] | |
| | NPV | NPV Ratio[4] | NPV | NPV Ratio[4] |
| | | (dollars in millions, except ratios) | | |
|---|---|---|---|---|
| At: | | | | |
| December 31, 2005 ................................... | $873 | 6.5bps | $564 | 4.2bps |
| December 31, 2004 ................................... | $794 | 6.5bps | $463 | 3.8bps |

(1) Based on single-family Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.
(2) Assumes that none of the credit enhancements currently covering our single-family mortgages has any mitigating impact on our credit losses.
(3) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(4) Calculated as the ratio of net present value of increase in credit losses to the single-family Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

### Institutional Credit Risk

Our primary institutional credit risk exposure, other than counterparty credit risk exposure relating to derivatives, arises from agreements with the following entities: mortgage loan insurers; mortgage seller/servicers; issuers, guarantors or third party providers of credit enhancements on non-Freddie Mac mortgage-related securities held in our Retained portfolio; mortgage investors and originators; and issuers, guarantors and insurers of investments held in our Cash and investments portfolio. See "Interest-Rate Risk and Other Market Risks — *Derivative-Related Risks* — Derivative Counterparty Credit Risk" for information concerning counterparty credit risk exposure relating to derivatives.

**Mortgage Loan Insurers.** We bear institutional credit risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. We manage this risk by establishing eligibility standards for mortgage insurers and by regularly monitoring our exposure to individual mortgage insurers. We also monitor the mortgage insurers' credit ratings, as provided by nationally recognized credit rating agencies and we periodically review the methods used by the credit rating agencies. We also perform periodic on-site reviews of mortgage insurers to confirm compliance with our eligibility requirements and to evaluate their management and control practices. In addition, state insurance authorities regulate mortgage insurers. Substantially all mortgage insurers providing primary mortgage insurance and pool insurance coverage on single-family mortgages we purchased during 2005 were rated "AA" or better by S&P. At December 31, 2005, there were seven mortgage insurers (the largest being Mortgage Guarantee Insurance Corporation) that each provided more than seven percent of our Total mortgage insurance coverage (including primary mortgage insurance and pool insurance) and together accounted for approximately 99 percent of our overall coverage.

**Mortgage Seller/Servicers.** We are exposed to institutional credit risk arising from the insolvency of or non-performance by our mortgage seller/servicers, including performance of their repurchase obligations arising from the representations and warranties made to us for loans they underwrote and sold to us. The servicing fee charged by mortgage servicers varies by mortgage product. We generally require our single-family servicers to retain a minimum percentage fee for mortgages serviced on our behalf, typically 0.25 percent of the unpaid principal balance of the mortgage loans. However, on an exception basis, we allow a lower or no minimum servicing amount. The credit risk associated with servicing fees relates to whether we could transfer the servicing to an alternate servicer without a loss in the event the current servicer is unable to fulfill its responsibilities.

In order to manage the credit risk associated with our mortgage seller/servicers, we require them to meet minimum financial capacity standards, insurance and other eligibility requirements. We institute remedial actions against seller/servicers that fail to comply with our standards. These actions may include transferring mortgage servicing to other qualified servicers or terminating our relationship with the seller/servicer. We conduct periodic operational reviews of our single-family mortgage seller/servicers to help us better understand their control environment and its impact on the quality of loans sold to us. We use this information to determine the terms of business we conduct with a particular seller/servicer.

We manage the credit risk associated with our multifamily seller/servicers by establishing eligibility requirements for participation in our multifamily programs. These seller/servicers must also meet our standards for originating and servicing multifamily loans. We conduct regular quality control reviews of our multifamily mortgage seller/servicers to determine whether they remain in compliance with our standards.

**Non-Freddie Mac Mortgage-Related Securities.** Investments for our Retained portfolio expose us to institutional credit risk on non-Freddie Mac mortgage-related securities to the extent that servicers, issuers, guarantors, or third parties

providing credit enhancements become insolvent or do not perform. See "Table 17 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for more information concerning our Retained portfolio.

Our non-Freddie Mac mortgage-related securities portfolio consists of both agency and non-agency mortgage securities. Agency mortgage-related securities, which are securities issued or guaranteed by Fannie Mae or Ginnie Mae, present minimal institutional credit risk due to the high credit quality of Fannie Mae and Ginnie Mae. Agency mortgage-related securities are generally not separately rated by credit rating agencies, but are viewed as having a level of credit quality at least equivalent to non-agency mortgage securities rated AAA (based on the S&P rating scale or an equivalent rating from other nationally recognized credit rating agencies). At December 31, 2005, we held approximately $45 billion of agency securities, representing approximately 3 percent of our Total mortgage portfolio.

Non-agency mortgage-related securities expose us to institutional credit risk if the nature of the credit enhancement relies on a third party to cover potential losses. However, most of our non-agency mortgage-related securities rely primarily on subordinated tranches to provide credit loss protection and therefore expose us to limited counterparty risk. In those instances where we desire further protection, we may choose to mitigate our exposure with bond insurance or by purchasing additional subordination. Bond insurance exposes us to the risks related to the bond insurer's ability to satisfy claims. At December 31, 2005, substantially all of the bond insurers providing coverage for non-agency mortgage-related securities held by us were rated AAA or equivalent by at least one nationally recognized credit rating agency. At December 31, 2005, we held approximately $243 billion of non-agency mortgage-related securities. Of this amount, 97.8 percent were rated AAA or equivalent.

We manage institutional credit risk on non-Freddie Mac mortgage-related securities by only purchasing securities that meet our investment guidelines and performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. To assess the creditworthiness of these entities, we may perform additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures. In addition, we regularly evaluate our investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both.

**Mortgage Investors and Originators.**   We are exposed to pre-settlement risk through the purchase, sale and financing of mortgage loans and mortgage-related securities with mortgage investors and originators. The probability of such a default is generally remote over the short time horizon between the trade and settlement date. We manage this risk by evaluating the creditworthiness of our counterparties and monitoring and managing our exposures. In some instances, we may require these counterparties to post collateral.

**Cash and Investments Portfolio.**   Institutional credit risk also arises from the potential insolvency or non-performance of issuers or guarantors of investments held in our Cash and investments portfolio. Instruments in this portfolio are investment grade at the time of purchase and primarily short-term in nature, thereby substantially mitigating institutional credit risk in this portfolio. We regularly evaluate these investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both.

# OFF-BALANCE SHEET ARRANGEMENTS

**Off-Balance Sheet Transactions**

Financial instruments created through our business transactions may be recorded on our consolidated balance sheets at their fair value or on a cost basis, or not recorded, as appropriate. A transaction's contractual or notional amount usually does not equal the related fair value or carrying amount. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Issuances and Transfers of PCs and Structured Securities" for more discussion of off-balance sheet arrangements.

*Guarantee of PCs and Structured Securities*

As discussed in "BUSINESS — *Credit Guarantee Activities*," we participate in the secondary mortgage market in part by issuing PCs and Structured Securities to third party investors. We guarantee the payment of principal and interest on issued PCs or Structured Securities. In these transactions, mortgage-related assets that back PCs and Structured Securities held by third parties are not reflected as our assets, unless we retained an interest in PCs that back Structured Securities that were issued as part of a sale transaction.

We assume the mortgage credit risk on the mortgages underlying PCs and Structured Securities by guaranteeing the payment of principal and interest to holders of these securities. We manage this risk carefully, sharing the risk in some cases with third parties through the use of primary loan-level mortgage insurance, pool insurance and other credit enhancements. "NOTE 4: FINANCIAL GUARANTEES" to the consolidated financial statements provides information about our guarantees, including details related to credit protections and maximum coverages that we obtain through credit enhancements in our credit guarantee activities. Also, see "RISK MANAGEMENT — Credit Risks" for more information.

Most of our credit guarantee activity occurs through the Guarantor Swap program in the form of mortgage swap transactions. In a mortgage swap transaction, a mortgage lender delivers mortgages to us in exchange for PCs that represent undivided interests in those same mortgages. We receive various forms of consideration in exchange for providing our guarantee on issued PCs, including (i) the contractual right to receive a management and guarantee fee, (ii) delivery or credit fees for higher-risk mortgages and (iii) other forms of credit enhancements received from counterparties or mortgage loan insurers.

Most of the remaining credit guarantee activity occurs through our Cash Window or our MultiLender Swap program. Single-family mortgage loans we purchase for cash through the Cash Window are typically either retained by us in our Retained portfolio or pooled together with other single-family mortgage loans we purchase in connection with PC swap-based transactions in our MultiLender Program executed with various lenders. We may issue such PCs to these lenders in exchange for the mortgage loans we purchase from them or, to the extent these loans are pooled with loans purchased for cash, we may sell them to third parties for cash consideration through an auction.

In addition to the issuance and transfer of PCs to third parties, we also sell PCs from our Retained portfolio in resecuritized form. More specifically, we issue single- and multi-class Structured Securities that are backed by securities held in our Retained portfolio and subsequently transfer such Structured Securities to third parties in exchange for cash, or for PCs and other mortgage-related securities delivered to us by third party dealers who sell such Structured Securities to mortgage security investors. We generally earn resecuritization fees in connection with the creation of Structured Securities and can earn an ongoing management and guarantee fee for certain issued Structured Securities. Our principal exposure on Structured Securities relates only to that portion of resecuritized assets that is represented by non-Freddie Mac mortgage-related securities. Our outstanding PCs and Structured Securities also include securities issued by third parties that we guarantee. See "NOTE 4: FINANCIAL GUARANTEES" for more information about these guarantees. For information about our purchase and securitization activity, see "PORTFOLIO BALANCES AND ACTIVITIES."

The accounting policies and fair value estimation methodologies we apply to our credit guarantee activities significantly affect the volatility of our reported earnings through the initial recognition of the fair value of the Guarantee asset and Guarantee obligation in connection with sales of PCs and Structured Securities, the recognition of subsequent gains or losses from the change in fair value of the Guarantee asset and PC residuals generated from such sales and the repurchase and sale of PCs into and out of our Retained portfolio. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss)" for an analysis of management and guarantee income and other affected consolidated statements of income captions related to our credit guarantee activities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS" for discussion of our Guarantee asset and Guarantee obligation. The accounting for our securitization transactions (including gains and losses on transfers of PCs and Structured Securities that are accounted for as sales and periodic cash flows on transfers of securitized interests and corresponding retained interests) and the significant assumptions used to determine the gains or losses from such transfers that are accounted for as sales are discussed in "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to the consolidated financial statements.

**Other**

We extend other guarantees and provide indemnification to counterparties for breaches of standard representations and warranties in contracts entered into in the normal course of business based on an assessment that the risk of loss would be remote. See "NOTE 4: FINANCIAL GUARANTEES" to the consolidated financial statements for additional information.

We are a party to numerous entities that are considered to be variable interest entities in accordance with FASB Interpretation No. 46 (Revised December 2003), "Consolidation of Variable Interest Entities", or FIN 46(R). These variable interest entities include low-income multifamily housing tax credit partnerships, certain Structured Securities trusts (T-Series transactions or alternative collateral deals), and certain asset-backed investment entities. See "NOTE 3: VARIABLE INTEREST ENTITIES" to the consolidated financial statements for additional information related to our significant variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. A portion of these commitments are accounted for as derivatives, with their fair value reported as either Derivative assets, at fair value or Derivative liabilities, at fair value on the consolidated balance sheets. See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for further information. Certain non-derivative commitments are related to commitments arising from mortgage swap transactions and commitments to purchase certain multifamily mortgage loans that will be classified as held-for-investment. These non-derivative commitments totaled $178.8 billion and $182.9 billion at December 31, 2005 and 2004, respectively. Such commitments were not accounted for as derivatives and were not recorded on our consolidated balance sheets.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Certain of our accounting policies, as well as estimates we make, are critical to the presentation of our financial condition and results of operations since they are particularly sensitive to our judgment and are highly complex in nature. Some of these policies and estimates relate to matters that are inherently uncertain. Actual results could differ from our estimates and it is possible that such differences could have a material impact on our consolidated financial statements. The accounting policies discussed in this section are particularly critical to understanding our consolidated financial statements. For additional information about these and other accounting policies, including recently issued accounting pronouncements, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements. We have discussed each of these critical accounting policies and the significant related estimates with the Audit Committee of the board of directors.

**Fair Value Measurement**

The measurement of fair value is fundamental to the presentation of our financial condition and results of operations in our consolidated financial statements. Fair value is defined as the amount at which an asset or liability could be exchanged between willing parties, other than in a forced or liquidation sale. We record many of our financial instruments at fair value in our consolidated balance sheets, with changes in these fair values recognized as gains and losses in our consolidated statements of income or deferred, net of tax, in AOCI. We also disclose fair value-based consolidated balance sheets, which present our financial assets and liabilities at fair value (including instruments such as debt, which are presented at amortized cost in our consolidated financial statements). Our consolidated fair value balance sheets satisfy our disclosure requirements under SFAS No. 107, "Disclosures about Fair Value of Financial Instruments," or SFAS 107, and are a tool to communicate our financial position and results on a fair value basis. See "CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS" and "NOTE 16: FAIR VALUE DISCLOSURES" to our consolidated financial statements for more information.

Fair value affects our earnings in a variety of ways. For certain financial instruments that are carried at fair value (such as securities and PC residuals classified as trading, derivatives in fair value hedge accounting relationships, derivatives with no hedge designation and the Guarantee asset), changes in fair value are recognized in current period earnings. These changes are classified in several captions on our consolidated statements of income, including Gains (losses) on investment activity, Derivative gains (losses) and Gains (losses) on Guarantee asset. For certain other financial instruments that are carried at fair value (such as securities and PC residuals classified as available-for-sale and derivatives in cash flow hedge relationships), changes in fair value are generally deferred, net of tax, in AOCI, a component of Stockholders' equity. The deferred gains and losses in AOCI, initially measured at fair value, are recognized in earnings over time, including through amortization, sale of securities from the available-for-sale category or impairment recognition. In addition, impairments of mortgage loans classified as held-for-sale are recognized in earnings through lower-of-cost-or-market valuation adjustments. Finally, certain other amounts (such as the Guarantee obligation) are initially measured at fair value, but are not remeasured at fair value on a periodic basis. These amounts affect earnings over time through the amortization of these

| | |
|---|---|
| **From:** | Merritt Connell <merritt_connell@freddiemac.com> |
| **Sent:** | Wednesday, December 6, 2006 1:26 PM |
| **To:** | David Beck <david.beck@wamu.net>; Gary_Kain@freddiemac.com |
| **Cc:** | Todd Kaufman <todd.kaufman@wamu.net> |
| **Subject:** | Re: If we don't connect |

Maybe there's a way to do a WL sale in 2006, then we return the collateral to WM and get a security at a later date. Todd is also checking, he thinks we may have carved out some Goals loans from the latest deal, too.

Thanks.
-------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: "Beck, David" [david.beck@wamu.net]
Sent: 12/06/2006 01:12 PM
To: "Merritt Connell" <merritt_connell@freddiemac.com>
Cc: "Governara, Patricia A." <patricia.governara@wamu.net>
Subject: RE: If we don't connect

Got it.  The last LB deal is in the market today and  you are taking a
400+ mm chunck (thanks for that).

I've got warehouse loans in conduit we could sell you though I don't
think we will do another deal this year.

-----Original Message-----
From: Merritt Connell [mailto:merritt_connell@freddiemac.com]
Sent: Wednesday, December 06, 2006 1:02 PM
To: Beck, David
Cc: Governara, Patricia A.
Subject: If we don't connect
Importance: High


My cell is in a bad zone, the reason I asked to speak w/ you urgently:
Freddie may be light in 1 of the subgoals' categories. Gary + I spoke, I
said I would inquire to see if there might be any subprime deals in
pipe,
be it an LBMLT or WMABS new issue. Or any other creative offering that
WM
could consider.
Before I reach out to Peter, or Todd K or John D, I wanted to check in
w/
you to say that any support is most appreciated. Patti is the 1 trying
to
ensure FH meets this goal, Gary and I said we'd check in with you to

ensure
that we convey this is a critical FH need.
Thanks in advance, there may be nothing WM can do to help us but we
appreciate the consideration.
--------------------------
Sent from my BlackBerry Wireless Handheld

**Report of the Special Litigation Committee of the Federal Home**

**Loan Mortgage Corporation**

February 25, 2011

## I.   **EXECUTIVE SUMMARY**

This is the report of the Special Litigation Committee of the Board of Directors of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company"). Pursuant to the Virginia Stock Corporation Act, the Board of Directors of Freddie Mac (the "Board") appointed a special litigation committee (the "Committee") of independent and disinterested directors to review and evaluate the allegations in shareholder demand letters received by the Company and to determine whether pursuing the claims is in the best interests of the Company.  Under Virginia law, this requires determining, among other things, whether the current and former officers and directors of Freddie Mac named in the demand letters and complaints engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or an act from which they derived an improper personal benefit.  Subsequent to Freddie Mac's being placed into conservatorship on September 6, 2008, the Committee was reconstituted by the Federal Housing Finance Agency ("FHFA"), the Company's conservator, made up of four experienced FHFA attorneys.

Having conducted a review and evaluation, adequately informed in the circumstances, of the allegations made in certain derivative demand letters and complaints, the Committee has determined that maintenance of the derivative proceedings is not in the best interests of the Company.  This report is the Committee's "short and concise statement of the reasons for its determination," as provided for in Va. Code § 13.1-672.4.

The derivative allegations that have been investigated by the Committee were made in response to the Company's November 20, 2007, report of a net loss of $2.0 billion for the third quarter of 2007, compared to a net loss of $715 million for the same period in 2006.  On the same day, the price of Freddie Mac's common stock fell from $36.30 to $25.89, a drop of approximately 28.7 percent.

On November 21, 2007, the day after the Company's earnings release, the Company received the first of three shareholder demand letters (collectively, the "Demand Letters").  Other letters were received on December 6, 2007 and March 26, 2008.  These letters alleged generally that the Company's third-quarter losses were caused by, among other things, a "systemic failure of risk management and lax credit standards during the last several years at the Board level and within senior management."  By mid-2008, the purported shareholders who sent these letters, as well as one additional purported shareholder, had filed shareholder derivative complaints in federal court on behalf of Freddie Mac (collectively, the "Complaints") against certain of Freddie Mac's current and former officers and directors and certain third parties that had advised or conducted business with Freddie Mac.

The Committee found a substantial number of mistaken judgments or questionable decisions, many examples of which are noted in this report.  The Committee, however, found no evidence that any individuals had engaged in willful misconduct or otherwise engaged in conduct that would make maintenance of derivative proceedings against the named individuals in the best interests of the

Company.  Notably, officers and directors are provided full indemnification by Freddie Mac for claims against them, except for willful misconduct, a transaction from which the director or officer derived an improper personal benefit, or a knowing violation of the criminal law or of any federal or state securities law.

For this and other reasons, the Committee finds that it is not in the Company's best interests to pursue the derivative claims.  In reaching this conclusion, the Committee found that:

- While Freddie Mac's senior management and the Board decided, beginning in 2004, to accept greater amounts of credit risk than Freddie Mac had accepted in the past, including subprime and other non-traditional mortgage products, Freddie Mac's decision to participate more actively in these non-traditional markets was not driven by a desire to harm the Company, to increase executive compensation or to achieve any other inappropriate end.  Rather, the evidence obtained indicates that Freddie Mac's decision was driven by a desire to maintain and increase the Company's market share, to generate a reasonable return for the Company's shareholders and to attempt to satisfy the housing goals set for the Company by the United States Department of Housing and Urban Development ("HUD").

- Freddie Mac's senior management and Board did not expand the Company's credit appetite without discussing and considering the costs and benefits.  The Company's decision to expand its credit appetite was, in some instances, against the recommendation of certain risk oversight officers.  But even those officers have stated that the Company's final decision was a defensible business judgment reached after appropriate deliberation.

- The Company had little or no experience with many non-traditional mortgage products, which rendered its credit and other models less useful.  The Company's senior management and Board, however, were well aware of these deficiencies and attempted to compensate for them.

- The Committee found no evidence that senior management or the Board failed to undertake in good faith to understand the kinds of new products the Company was purchasing and the increased credit risks that accompanied those products.

- The Committee found that, during the relevant time period, the Company disclosed information regarding the volume and quality of the loans it was purchasing.

- Much of the Company's losses was a result of the nationwide decline in house prices, which was not foreseen by Company management.

- As the housing market began to deteriorate, Freddie Mac attempted to take steps to reduce its participation in riskier mortgage products. Management believed it was limited in its ability to do so, however, because of its statutory mission to provide market liquidity as well as the long-term nature of its contracts with many of its customers.

- As essentially a monoline insurer of mortgages, when house prices fell in 2007 and through 2008, Freddie Mac's performance necessarily suffered. Notably, however, Freddie Mac's mortgage portfolio suffered less than the portfolios of almost every other large participant in the mortgage market, including Fannie Mae. Despite accepting greater credit risk from 2004 to 2007, Freddie Mac's purchases were still relatively conservative compared to the market as a whole.

In conclusion, the Committee uncovered no evidence sufficient to demonstrate that any of the Company's current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or any acts from which they derived improper personal benefit, including in connection with the Company's acceptance and management of credit risk from 2004 through 2007. In addition, the Committee has concluded that the cost, which would include full indemnification of officers and directors for non-willful acts, and the distraction of pursuing litigation against certain current or former officers and directors would outweigh any benefits that could be obtained from such actions. Finally, the Committee concludes that it is not in the best interests of the Company to pursue as part of this derivative proceeding the claims alleged against unrelated third parties that are set out in the Demand Letters and Complaints. Indeed, the Company already has pursued claims against various third parties and obtained substantial recoveries. Future actions deemed appropriate can be pursued outside of the derivative setting.

For these reasons, the Committee recommends that the Complaints be dismissed without prejudice.[1]

## II. THE COMMITTEE'S REVIEW

### A. The Company's Third-Quarter Results

In a press release dated November 20, 2007, Freddie Mac announced its financial results for the third quarter of 2007. These results included:

- a net loss of $2.0 billion compared to a net loss of $715 million for the same period in 2006;

- provision for "credit losses" of $1.2 billion;

- total "GAAP mark-to-market losses" of $3.6 billion; and

- a decrease in "fair value" of approximately $8.1 billion.

On the day before the Company issued its earnings release, its common stock closed at a price of $36.30 per share on the New York Stock Exchange. On November 20, 2007, the day of the earnings release, the stock closed at a price of $25.89 per share, a one-day drop of approximately 28.7 percent.

### B.    The Shareholder Demand Letters

Shortly after the Company's earnings release, it received several demand letters from purported shareholders. Those letters generally accused the Company of accumulating an inappropriate and dangerous level of exposure to subprime mortgage securities, allegedly facilitated by, among other things, weak controls and lack of supervision of the Company's policies and operations. These letters demanded that the Company take action to recover damages caused by the alleged mismanagement and institute improved controls. Several of the Demand Letters also asserted that various third parties, including the Company's auditor, participated in the asserted wrongdoing and contributed to the Company's losses.

One of the Demand Letters also claimed that certain of the Company's officers and directors "sold stock on the basis of material non-public information, specifically [on the basis of the non-public information] that the Company was taking on staggering amounts of sub-prime mortgages."

### C.    The Shareholder Derivative Complaints

Following receipt of the demand letters, four purported shareholders filed derivative complaints on behalf of the Company. The allegations in the complaints generally tracked the allegations in the Demand Letters. The Complaints alleged, among other things, that certain officers and directors of Freddie Mac: (i) failed to manage appropriately the Company's credit risk; (ii) failed to ensure the use of appropriate underwriting standards; (iii) misled the Company's shareholders with regard to, among other things, the Company's exposure to the subprime market and the adequacy of the Company's internal controls; and (iv) traded Company stock on the basis of material, non-public information. Of these categories, only the allegations of insider trading in the Bassman Complaint were alleged to have been done "knowingly."

Based on these allegations, the Complaints asserted causes of action against certain of the Company's officers and directors for breach of fiduciary duty, indemnification, abuse of control, gross mismanagement, corporate waste, negligence, unjust enrichment, violations of the Sarbanes-Oxley Act, and violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. One of the Complaints also asserted causes of action against certain third parties for breach of contract, breach of warranty, conspiracy to deceive and defraud, and reckless provision of information for the guidance of others.[2]

4

III.    **THE COMMITTEE**

A.    **Governing Law**

As authorized by federal regulations, the Company has elected to be governed by the substantive corporate law of Virginia, to the extent not inconsistent with federal law.  Virginia law, in turn, authorizes corporate boards of directors to appoint a special litigation committee to investigate and evaluate allegations made in a derivative demand letter or complaint.  If the special litigation committee conducts an informed investigation and determines in good faith that the maintenance of the derivative proceeding is not in the best interests of the corporation, stating the reasons for such finding in a "short and concise statement," the derivative complaint "shall be dismissed on motion by the corporation."  Va. Code § 13.1-672.4.

B.    **The Formation of the Committee**

On January 31, 2008, the Board, by resolution and pursuant to Va. Code § 13.1-672.4, created the Committee.  The resolution granted the Committee plenary authority to review and evaluate the allegations and claims set forth in the Demand Letters and to determine whether it was in Freddie Mac's best interests to take any action with respect to those allegations and claims.[3]

The Board appointed directors Michelle Engler, Robert A. Glauber, and Nicolas P. Retsinas to the Committee, with Ms. Engler to serve as Chairperson.  After interviewing representatives of several law firms, the Committee retained the law firm of Hunton & Williams LLP ("Special Counsel") to assist it in conducting its review and evaluation.[4]  With guidance from its Special Counsel, the Committee determined that its members were sufficiently disinterested to conduct an adequate review and to evaluate the allegations in the Demand Letters in good faith.

C.    **The Committee's Review:  Phase I**

The Committee authorized an investigative work plan and requested and received pertinent documents from the Company.  The Committee met with its Special Counsel telephonically and in person on eleven occasions to discuss the review and evaluation.  The Committee received periodic updates from its Special Counsel in between these meetings.  The Committee also met in September 2008 with representatives of counsel for several of the plaintiff shareholders to obtain any information they or their clients had to support the allegations in the Demand Letters or Complaints.

The Committee or its Special Counsel conducted interviews with twenty-four individuals, including present and former directors, officers, and employees of the Company, believed to have knowledge pertinent to the allegations in the Demand Letters or the Complaints.[5]  The Committee also received advice from its Special Counsel regarding various legal issues, including advice on its duties under Virginia law.

D.     **The Committee's Review:  Phase II**

The Committee's review was interrupted by an unexpected turn of events that culminated in the placement of Freddie Mac into conservatorship.  Specifically, on July 30, 2008, President George W. Bush signed into law the Housing and Economic Recovery Act of 2008 ("HERA").[6]  One component of HERA was the Federal Housing Finance Regulatory Reform Act of 2008 (the "Act"), in which FHFA was named as the successor regulatory agency to the Office of Federal Housing Enterprise Oversight ("OFHEO").[7]  The Act provided authority to the Director of FHFA to appoint FHFA as the receiver or conservator of Freddie Mac and certain other regulated entities "for the purpose of reorganizing, rehabilitating, or winding up the affairs of [the] regulated entity."[8]

On September 6, 2008, the Director of FHFA exercised this authority and appointed FHFA as conservator for Freddie Mac.  As conservator, FHFA "immediately succeed[ed] to . . . all rights, titles, powers, and privileges of the regulated entity [i.e., Freddie Mac], and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity."[9]  FHFA became entitled to and did "operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity."[10]  A significant aspect of FHFA's responsibility as conservator is to "preserve and conserve the assets and property of the regulated entity."[11]

Because FHFA succeeded to the powers of the Board, it necessarily succeeded to the powers of the Committee, which was in the midst of its review and evaluation.[12]  Standing in the shoes of the Committee, FHFA asked Special Counsel to complete the work that Special Counsel and the Committee as originally constituted had begun.[13]

The newly constituted Committee had access to the entire universe of Company documents in the possession of Special Counsel in connection with Phase I of the Committee's investigation.  The Committee was also briefed on the contents of these documents by Special Counsel on numerous occasions by both in-person meetings and telephonic meetings.

By the end of its review, the Committee or its Special Counsel had reviewed approximately 52.4 million pages of documents.  These documents consisted of, among many other things, minutes of meetings of the Board and Board committees and related materials, minutes of meetings of various management committees and related materials, Company policies, internal audit reports, internal financial reports, and internal e-mail communications.  In addition to these documents produced by the Company, the Committee or its Special Counsel reviewed, among many other things, the Demand Letters, the Complaints, the Company's press releases, annual reports and filings with the U.S. Securities and Exchange Commission, reports by OFHEO, and transcripts of pertinent Congressional testimony.  Moreover, up through the date of this Report, the Committee has continued to review developments and information that has become available.

In addition to the interviews previously conducted and described above, the substance of which was shared with the newly constituted Committee, the Committee or its Special Counsel conducted additional interviews with 22 individuals believed to have knowledge pertinent to the allegations in the Demand Letters or the Complaints, many of whom were not interviewed in Phase I of the investigation.[14]  A member of the Committee participated, in person or telephonically, in 20 of these interviews.  The Committee or its Special Counsel also made requests to interview several executives no longer employed by the Company, but those requests were denied by those former executives in light of ongoing government investigations.[15]

The newly constituted Committee and some or all of its members met in person and telephonically with Special Counsel on numerous occasions to discuss its review and evaluation.  The Committee also received advice from Special Counsel regarding various legal issues, including advice on its duties under Virginia law.

## IV.   LEGAL STANDARDS

The Committee's conclusions were made based on application of Virginia law to the facts it adduced in its investigation.  Freddie Mac is a federally chartered entity established under the Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451 - 1459.  In accordance with 12 C.F.R. § 1710.10, Freddie Mac's corporate governance practices and procedures shall comply with its chartering act and other federal law, rules, and regulations.  To the extent not inconsistent with such, Freddie Mac designated in its bylaws that it would follow the corporate governance practices and procedures of Virginia.  Accordingly, before discussing the Committee's factual findings and conclusions, it is important to understand the applicable standards of Virginia law against which the findings of fact are measured for purposes of Va. Code § 13.1-672.  Specifically, this discussion will focus on the applicable standards of conduct, limitations on liability, and circumstances of mandatory indemnification necessary to make a determination whether litigation would result in any recovery to the Company, which is a significant factor considered by the Committee in making its determination as to whether maintenance of this litigation is in the best interests of the Company.

### A.   Standard of Conduct for Officers and Directors

The Virginia Stock Corporation Act (the "Act") provides that "[a]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors."  Va. Code § 13.1-673.B.  The Act further states that "[a] director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with [§ 13.1-690]."  Va. Code § 13.1-690.C.  Section 13.1-690 provides that:

> A.  A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his <u>good faith business judgment</u> of the best interests of the corporation.

Va. Code § 13.1-690.A (emphasis added).

In discharging his or her duties, a director is entitled to rely on the company's officers, employees, outside advisors, and board committees.  Specifically, Section 13.1-690.B provides that:

> B.  Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:
>
> > 1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;
> >
> > 2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or
> >
> > 3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.

Va. Code § 13.1-690.B.

Section 13.1-690 "provides a 'safe harbor' that shields a director from liability for any action taken as a director, and for failure to take action." <u>Willard v. Moneta Bldg. Supply, Inc.</u>, 258 Va. 140, 151, 515 S.E.2d 277, 284 (1999) (quoting <u>Commonwealth Transp. Comm'r v. Matyiko</u>, 253 Va. 1, 6, 481 S.E.2d 468, 470 (1997)).  A "person alleging a violation of [Section 13.1-690] has the burden of proving the violation."  Va. Code § 13.1-690.D.

The Virginia Supreme Court has held that "the objective reasonableness of a director's decision or conduct is not a relevant inquiry under § 13.1-690." <u>Willard</u>, 258 Va. at 153 n.12, 515 S.E.2d at 286 n.12 (1999).  Put differently, under Virginia law "a director's discharge of duties is not measured by what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision."  <u>Id.</u> at 151, 284.  Rather, a director "must act in accordance with his/her good faith business judgment of what is in the best interests of the corporation."  <u>Id.</u>; <u>accord</u> <u>WLR Foods, Inc. v. Tyson Foods, Inc.</u>, 65 F.3d 1172, 1185 (4th Cir. 1995) ("Whether a different person would have come to a different conclusion given the information that a director had before him is simply irrelevant to the determination of whether a director in Virginia has acted in good

8

faith in fulfilling his corporate duties."); id. ("Directors' actions in Virginia are not to be judged for their reasonableness. . . ."). This is consistent with the Joint Bar Committee Commentary (Revised 1999) to Section 13.1-690, which states that "[t]he term 'reasonable' is intentionally not used" and "eliminates comparison of the conduct in question with the idealized [reasonable person] standard."

The Act does not define the term "good faith" other than to indicate that a director's business judgment must be made in the "best interests of the corporation." Va. Code § 13.1-690.A. "Absent some form of self-dealing or evidence of sustained lack of diligence, it should not be easy to establish a failure to act in good faith." Allen C. Goolsby, Goolsby on Virginia Corporations § 9.7 at 154 (3d ed. 2008).

Section 13.1-690 does not abrogate the common law fiduciary duties of directors, which are generally recognized as the duties of care and loyalty. The Virginia Supreme Court has held, however, that Section 13.1-690.A does "set the standard by which a director is to discharge those [common law] duties." Willard, 258 Va. at 151, 515 S.E.2d at 284. It has further observed that Section 13.1-690 "makes no distinction between duties of care and loyalty." Simmons v. Miller, 261 Va. 561, 577, 544 S.E.2d 666, 676 (2001). Thus, common law fiduciary duties would be relevant to a director's potential liability only if he or she failed to exercise his or her "good faith business judgment" under Section 13.1-690.A, subject to the limitations on liability discussed below.

Section 13.1-690 applies by its terms only to corporate directors. Va. Code § 13.1-690; see also Simmons, 261 Va. at 576 n.3, 554 S.E.2d at 676 n.3 ("'[t]he General Assembly elected not to enact a statutory standard of conduct for officers. . . . As a result, development of the standard of conduct for officers will be left to the courts.'") (quoting Allen C. Goolsby, Virginia Corporation Law and Practice § 9.7 n. 62). It is likely, however, that the duties of officers under Virginia law are similar to the duties of directors.[16] In addition, "presumably any officer would get the benefit of the common law business judgment rule." Goolsby § 9.11 at 194.

### B.     Limitation of Liability

The Act permits a corporation to limit or eliminate the liability of the corporation's officers and directors to the corporation and its shareholders in certain circumstances. Specifically, Section 13.1-692.1 of the Act provides that:

> A.  In any proceeding brought by or in the right of a corporation or brought by or on behalf of shareholders of the corporation, the damages assessed against an officer or director arising out of a single transaction, occurrence or course of conduct shall not exceed the lesser of:
>
> 1.  The monetary amount, including the elimination of liability, specified in the articles of incorporation or, if approved by the shareholders, in the bylaws as a limitation on or elimination of the liability of the officer or director; or

2.  The greater of (i) $100,000 or (ii) the amount of cash compensation received by the officer or director from the corporation during the twelve months immediately preceding the act or omission for which liability was imposed.

B.  The liability of an officer or director shall not be limited as provided in this section if the officer or director engaged in <u>willful misconduct</u> or a <u>knowing violation of the criminal law or of any federal or state securities law</u>, including, without limitation, any claim of unlawful insider trading or manipulation of the market for any security.

C.  No limitation on or elimination of liability adopted pursuant to this section may be affected by any amendment of the articles of incorporation or bylaws with respect to any act or omission occurring before such amendment.

Va. Code § 13.1-692.1 (emphases added).  The protections of such a provision would apply even if a director was not shielded from liability under the safe harbor in Section 13.1-690.C.

Freddie Mac has included such a provision contemplated by Section 13.1-692.1.A.1 in its Bylaws.  Specifically, its Bylaws provide that:

No monetary damages or monetary liability of any kind may be assessed against an officer or director in any proceeding brought by or in the right of the Corporation or brought by or on behalf of the stockholders of the Corporation; provided, however, that this elimination of liability shall not be applicable if the officer or director engaged in willful misconduct, a transaction from which the director or officer derived an improper personal benefit, or a knowing violation of the criminal law or of any federal or state securities law, including, without limitation, any claim of unlawful insider trading or the manipulation of the market for any security.

Bylaws of the Federal Home Loan Mortgage Corporation ("Bylaws") § 8.05 (as amended and restated on July 15, 2005).  Moreover, this provision of the Company's Bylaws is "deemed" by the Bylaws "to constitute [a] provision[] of the [Company's] 'articles of incorporation' for all purposes of the Virginia Stock Corporation Act."  <u>Id.</u> § 11.3(b).

The Act does not define the terms "willful misconduct" or "knowing violation."  Va. Code § 13.1-692.1.B.  It has been noted, though, that "[t]he intent of the drafters was that each term should be construed literally." <u>Goolsby</u> § 10.1 at 201.  "In the case of willful misconduct the perpetrator not only must have intentionally acted or failed to act, but also must have done so knowing that what he or she was doing was wrong." <u>Id.</u> Similarly, "to establish a knowing violation of criminal law it will be necessary to show

that the defendant knew what action was being taken and that the action taken was a crime." Id. § 10.1 at 201-02.

This treatise notes further that "[t]he willful misconduct and knowing violation exceptions to the safe harbor of the Virginia statute are narrower than those found in most states." Id. § 10.1 at 201. This includes Delaware, which "prohibits exculpation of violations of the duty of loyalty as well as any knowing violation of law, any act or omission not in good faith and any transaction from which the director derived an improper personal benefit." Id. (citing 8 Del. Code § 102(b)(7)).

A literal interpretation of the terms "willful misconduct" and "knowing violation" finds substantial support in the approach of the Virginia Supreme Court to statutory interpretation. In Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 639 S.E.2d 174 (2007), for example, the Court held that "[w]hen the language of a statute is unambiguous, we are bound by the plain meaning of that language." Id. at 104, 178. "Furthermore," the Court continued, "we must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity." Id.; see also Dodge v. Tr. of Randolph-Macon Woman's College, 276 Va. 10, 15, 661 S.E.2d 805, 808 (2008) ("Where the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed.") (internal quotation marks omitted).

Accordingly, for purposes of the Committee's analysis, current or former officers or directors of Freddie Mac could be liable to the Company only if they engaged in: (i) willful misconduct; (ii) a knowing violation of criminal law or of any federal or state securities law, including, without limitation, any claim of unlawful insider trading or manipulation of the market for any security; or (iii) an act from which they derived an improper personal benefit. With respect to this latter category, even if a current or former officer or director had engaged in such an act, his liability to the Company arising out of that act would be capped at the "greater of (i) $100,000 or (ii) the amount of cash compensation received by the officer or director from the corporation during the twelve months immediately preceding the act or omission for which liability was imposed." Va. Code § 13.1-692.1.A.2.

As explained in detail below, following its investigation, the Committee concludes that there were evident deficiencies in various aspects of the Company's operations and strategic decisions. But the Committee found no evidence upon which to conclude that the officer and director defendants committed willful acts, knowingly violated criminal or securities laws, or derived improper personal benefit. Thus, it is not in the best interests of the Company to pursue the claims set out in the Complaints and Demand Letters, as the likelihood of actual recovery from any current or former officers or directors is virtually non-existent, due to legally required indemnification by Freddie Mac. The Committee therefore recommends that the Complaints be dismissed.

## V.    ANALYSIS OF THE PLAINTIFFS' ALLEGATIONS

### A.    The Merits of Plaintiffs' Allegations

#### 1.    Subprime Exposure

The three Demand Letters and the four Complaints allege that certain of Freddie Mac's current and former officers and directors breached fiduciary duties by causing the Company to incur financial exposure to the subprime mortgage market.  The Demand Letter on behalf of the the the Esther Sadowsky Testamentary Trust and others (the "Sadowsky Letter"), for example, claims that Freddie Mac "accumulat[ed] an astounding $120 billion exposure to AAA subprime mortgage securities in the midst of a crumbling credit market."  The Sadowsky Letter claims further that this exposure violated the Company's "stated mission," its "Congressional Charter" and the "safety and soundness requirements" imposed by the Company's regulator.  The Sadowsky Letter also claims that the Company's exposure to subprime loans was caused by the Board's alleged "active[] engage[ment] in reckless conduct" and alleged failure to "adequately oversee the operations and internal controls of the Company."  The Demand Letter on behalf of the Adams Family Trust and Kevin Tashijian (the "Adams Letter") makes similar allegations.

Similarly, the Complaint filed by Mr. Bassman on March 10, 2008 (the "Bassman Complaint") focuses almost exclusively on the Company's subprime exposure, alleging that "Freddie Mac's reckless investment and participation in the subprime financing described herein . . . cost Freddie Mac billions of dollars" and that "Freddie Mac's Board of Directors and senior management failed to have in place and/or implement sufficient risk management controls to protect the Company from guaranteeing billions of dollars worth of subprime mortgages sold to others."  According to the Bassman Complaint, Freddie Mac's management and Board should have "known that the probability of default is many times higher for a sub-prime loan than for a prime loan" and should have "responded to market signals by pulling back" in 2006 and 2007 on "ownership of mortgage-backed securities that included sub-prime loans."  The Bassman Complaint further accuses Freddie Mac's management and Board of falsely "assur[ing] [Freddie Mac's] shareholders and the public generally that Freddie Mac did not have significant sub-prime exposure."  The Bassman Complaint blames the Company's losses in the third and fourth quarters of 2007 on "[t]he concealed and systematic failure of risk management and lax credit standards in the Company's activities in subprime financing."  The Complaints filed by the Adams Family Trust (the "Adams Complaint") and by the Louisiana Municipal Police Employees Retirement System (the "Louisiana Complaint") make allegations similar to those in the Bassman Complaint.

Although the Demand Letters and Complaints assert claims that sound in breach of fiduciary duty, they do not allege any particular facts suggesting that any current or former officer or director of Freddie Mac engaged in willful misconduct or knowingly violated a criminal or state securities law in connection with the Company's exposure to the subprime mortgage market.  Nor do they allege, with the exception of the allegations of insider trading in the Adams Demand Letter and Complaint, that any current or former

officer of Freddie Mac knowingly violated a federal securities law or engaged in an act from which he or she derived an improper personal benefit in connection with the Company's exposure to the subprime mortgage market.  Cf. Va. Code § 13.1-692.1. Rather, with respect to the Company's involvement in the subprime market, the Demand Letters and Complaints essentially allege either:  (i) that senior management and the Board made, allowed or approved unreasonable, negligent, grossly negligent or reckless business decisions; or (ii) that the Board failed to discharge appropriately its oversight responsibilities, a claim that has come to be known as a "Caremark" claim, after the decision of the Delaware Court of Chancery in In re Caremark Int'l, Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996).  See also Stone v. Ritter, 911 A.2d 362 (Del. 2006).

As a matter of Virginia law, claims that corporate officers or directors acted unreasonably, negligently, grossly negligently or recklessly cannot lead to liability.[17] Rather, to hold an individual liable for such acts, a plaintiff has to establish that he or she acted in a manner not in accordance with his or her subjective good faith business judgment of the best interests of the corporation.  Va. Code § 13.1-690.A, C; Willard, 258 Va. 140.  Accordingly, claims in the first category noted above have no chance of succeeding.

With respect to the second category, so-called "Caremark" claims, the Committee is aware of no Virginia court that has addressed the viability of such a claim. Indeed, given the subjective good faith standard codified in Va. Code § 13.1-690, it is unclear how a claim against a corporate director based solely on a failure of oversight, even a gross or utter failure, could succeed, absent additional proof that the director was not acting in his or her subjective good faith business judgment of the best interests of the corporation.[18]

Moreover, even under the law of Delaware, courts have noted that "director liability based on the duty of oversight 'is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"  In re Citigroup S'holder Deriv. Litig., 964 A.2d 106, 125 (Del. Ch. 2009) (quoting Caremark, 698 A.2d at 967).  Such liability requires a showing that:

> the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.

Stone, 911 A.2d at 370.  The Demand Letters and Complaints contain no allegations suggesting that this legal test can be satisfied.

Moving beyond the allegations of the Demand Letters and Complaints, the Committee has found no evidence that in purchasing AAA-rated securities backed by

subprime mortgages, the officers and directors of Freddie Mac acted willfully such that they would not be entitled to indemnification by Freddie Mac.

Freddie Mac was created by Congress as a private corporation, but also was entrusted by Congress with a public mission. That mission, expressed in the Federal Home Loan Mortgage Corporation Act of 1970, also known as the Company's "Charter," is, among other things, designed to stabilize the nation's residential mortgage markets and expand opportunities for homeownership among low and moderate income borrowers and in underserved geographic areas, and affordable rental housing. As reflected in the Charter, Freddie Mac's statutory mission is "to provide liquidity, stability and affordability to the U.S. housing market." Because it is charged with a statutory mission, Freddie Mac at times takes actions that a purely private entity might not. For example, Freddie Mac disclosed in 2007 that it might "purchase mortgage loans and mortgage-related securities with less attractive investment returns as part of [its] efforts to achieve [the] affordable housing goals and subgoals" set by its regulators.[19]

In December 2003, Freddie Mac announced that it had hired Richard Syron to serve as its Chairman and CEO. Over the next several months, Mr. Syron terminated many of the Company's long-time officers and assembled a new leadership team, including Patti Cook as Chief Business Officer and Eugene McQuade as President and Chief Operating Officer. Messrs. Syron and McQuade and Ms. Cook set about attempting to change the culture of Freddie Mac, which they generally perceived as complacent, unnecessarily risk-averse and not focused sufficiently on the Company's mission.

Several current and former officers have stated that there was often considerable tension between Mr. Syron and his new hires, on the one hand, and officers that remained from the prior era, on the other. These hold-over officers included David Andrukonis, the Chief Enterprise Risk Officer, and Marty Baumann, the Chief Financial Officer, although Mr. Baumann had only been with the Company since April 2003.

Early in his tenure, Mr. Syron discussed his impressions of Freddie Mac with the Board. In a letter to the Board dated September 3, 2004, Mr. Syron noted that he sought to "transform[ ] [Freddie Mac's] culture, whose risk-aversion had long been a strength but now threatens [its] ability to succeed in a more competitive environment." Mr. Syron questioned the "immediate instinct . . . to avoid rather than manage risk." Mr. Syron also sought to change the Company's culture to become more "customer focused" and to focus more on the Company's mission.

As the Syron era began in 2004 and into 2005, Freddie Mac's view of the market and its business prospects was shaped primarily by five things: (i) the need to return to timely financial reporting; (ii) the Company's mission and HUD's housing goals; (iii) concerns about declining market share; (iv) the proliferation of non-traditional mortgage products; and (v) exceptionally low credit losses.

Freddie Mac's subprime purchases were a major part of the Company's efforts to address several of these business goals and requirements. The Company used

subprime acquisitions to help it achieve market share, which it had been losing both to Fannie Mae and to Wall Street firms, and to satisfy its housing goals.

As to its market share, as of December 2004, the Company was losing market share to competing banks and to Fannie Mae. Faced with these declines, Freddie Mac's officers and directors perceived the threat of being "marginalized" – or becoming "irrelevant" – as the Company's primary strategic threat. Specifically, if the Company could not increase its market share vis-à-vis Fannie Mae, the mortgage-backed securities the Company issued would become less liquid and thus less valuable to its customers. Freddie Mac would also lose the benefit of certain economies of scale. And if the Company could not increase its market share vis-à-vis commercial banks, senior management was worried that the Company might not survive. The Board was aware of these concerns and that steps were being taken to address them.

As for the Company's mission, in the final rule promulgating Freddie Mac's housing goals for 2005 to 2008, HUD acknowledged that the Company (referred to as a "GSE," meaning Government Sponsored Enterprise) may need to enter the subprime market in order to meet those goals:

- "[b]oth GSEs indicated that they would need to increase their purchase of subprime loans to meet the higher goals";

- Freddie Mac "claimed that, to meet the higher housing goals, it might not have the option in the future of turning away subprime loans that have less desirable loan terms than the subprime business it currently purchases";[20] and

- Freddie Mac cautioned that the struggle to meet high goals for low-income groups could cause the GSEs to relax underwriting standards and/or extend loans to people who are unprepared.

Despite this, HUD concluded that "[t]he GSEs' presence in the subprime mortgage market benefits many low-income and minority borrowers whose risk profiles differ markedly from borrowers who qualify for prime mortgage products."[21] It noted further that "[i]f the GSEs reach deeper into the subprime market, more borrowers will benefit from the advantages that greater stability and standardization create."[22] In sum, far from being in violation of its mission, as the Sadowsky Letter asserts, Freddie Mac's purchases of subprime-backed mortgage securities often were made in an effort to fulfill that mission.

During the same time period as the Company was experiencing both reduced market share and increasing housing goals, the market experienced a significant growth in non-traditional mortgage products. As one measurement of this, the subprime and Alt-A shares of the market quadrupled between 2001 and 2006. Specifically, the subprime share of the mortgage market rose from 5 percent in 2001 to 20 percent in 2006. Non-traditional mortgage products, including subprime, were becoming mainstream. This shift in the product mix of the mortgage market benefited private

banks, which fed back into Freddie Mac's concerns about losing market share to private competitors.

Freddie Mac's credit losses were exceptionally low at the start of the Syron era. In 2003, 2004 and 2005, Freddie Mac suffered credit losses, respectively, of 0.8, 1.1 and 1.1 basis points of its average total mortgage portfolio.[23] Given this run of exceptionally low level of credit losses, credit risk was not a major focus for the Company at the time. The possibility of meaningful credit losses was also discounted market-wide. In addition to historically low credit losses, house price appreciation decreased the average loan-to-value ratio of the Company's single family portfolio, which was in addition to approximately $40 billion in mortgage insurance and other credit enhancements.

Faced with this environment of increasing housing goals, declining market share due in part to the proliferation of non-traditional mortgage products, and low credit losses, Freddie Mac's management and the Board decided over the course of time to pursue a more aggressive credit strategy and expand its participation in non-traditional markets. This decision was also prompted by, among other things, the complaints of Freddie Mac's larger customers that Freddie Mac was too conservative in its credit approach vis-à-vis both Fannie Mae and the non-GSE market.

The Company's new credit approach was referred to internally at various times as "expanding the Company's credit box," "credit envelope" or "credit appetite," "buying the market," "following the market" and adopting a "compliance model." The Company ultimately referred to portions of this approach using the moniker "Touch More Loans," although that moniker also encompassed additional strategies as well. One of those additional strategies was to dispose of unwanted credit risks through the capital markets after acquisition of loans. While the Company was unable to develop the capability to lay off risks, witnesses told the Committee that the Company did not acquire mortgages with risk the Company was not comfortable retaining in any event.

As a result of Freddie Mac's increasing credit appetite, the Company's purchase of subprime and other non-traditional mortgage products increased relatively steadily from 2004 through the end of 2006 and well into 2007.

Freddie Mac's senior management and Board understood that subprime mortgages had a higher probability of default than prime mortgages. As Freddie Mac stated in its 2005 Annual Report, "[t]he subprime segment of the mortgage market primarily serves borrowers with lower quality credit payment histories."[24]

Freddie Mac participated in the subprime market segment in two ways. First, its retained portfolio business invested in non-Freddie Mac mortgage-related securities that were originated in this market segment.[25] Second, the Company's credit guarantee business guaranteed securities backed by subprime mortgages.

Although Freddie Mac had been involved in the subprime market prior to Mr. Syron's joining the Company, and even prior to 2000, the senior management under Mr.

Syron increased the Company's involvement in that market. At December 31, 2004, 2005, 2006 and 2007, Freddie Mac held approximately $75 billion, $139 billion, $124 billion and $101 billion, respectively, of non-agency mortgage-related securities backed by subprime loans.[26] As another measure of Freddie Mac's increased involvement in this market, Freddie Mac's total subprime-backed securities portfolio as of September 30, 2007, had a value of approximately $105.4 billion. Freddie Mac purchased $2.6 billion of these securities in 2004 and prior, $27.8 billion in 2005, $44 billion in 2006 and $31 billion in 2007. Several current and former officers have stated that Freddie Mac purchased these subprime-backed securities primarily to meet housing goals.

In addition to its participation in the market for non-agency subprime-backed securities, Freddie Mac purchased and guaranteed payments on subprime whole loans. At December 31, 2004, 2005, 2006 and 2007, Freddie Mac guaranteed approximately $4.5 billion, $2.3 billion, $3 billion and $6 billion, respectively, of securities backed by subprime mortgages.[27]

Freddie Mac disclosed this business in its 2005 Annual Report, noting that its "participation in th[e] [subprime] market helps reduce barriers to homeownership for these borrowers by increasing the availability of mortgage credit and reducing the costs of homeownership."[28] Freddie Mac largely restricted its participation in the subprime market to AAA-rated securities. Indeed, at December 31, 2006, "more than 99.9 percent [of the $124 billion in subprime-backed securities held by Freddie Mac] were rated AAA."[29] Such securities were at the time considered very secure.

Although recent history has demonstrated that AAA-rated securities are not as secure as the market once thought, no one interviewed believed they presented a material credit risk when purchased. In the words of one officer, such securities were believed to be "nuclear-proof." That is, the prevailing internal attitude on the Company's involvement in the subprime market was that the Company's purchases of subprime products were so highly rated and so subordinated that they would never incur losses. The Committee has uncovered no evidence that the belief by senior management and the Board in the relatively low credit risk associated with these securities was contradicted by information available to the Company.

Finally, Freddie Mac's involvement in the subprime mortgage market was not an oversight or something that resulted from inadequate internal controls. Rather, Freddie Mac's subprime investments were monitored by senior management, communicated to and discussed by the Board, and disclosed to the public.

Freddie Mac's subprime strategy was discussed often at the senior management level. Moreover, at various times, the Company retained as outside consultants the Berkshire Group, L.P., and Mercer Oliver Wyman, to advise it on its subprime mortgage strategy. At the Board level, the Company's subprime exposure was also discussed and considered. Former Board members have stated that from 2004 onward, they understood that Freddie Mac's subprime exposure was almost exclusively confined to AAA-rated securities, securities that they believed at the time to present little credit risk.

Freddie Mac also disclosed publicly its participation in the subprime market in its public filings and other public statements such as speeches.  For example, in its 2005 Annual Report, Freddie Mac stated that:

> We participate in the subprime market segment primarily in two ways.  First, our Retained portfolio makes investments in non-Freddie Mac mortgage-related securities that were originated in this market segment. . . .  Second, we guarantee securities backed by subprime mortgages, which comprise a portion of the "alternative collateral deals'" we purchase.[30]

Similarly, in a public speech at the Citigroup Financial Services Conference in February 2006, Mr. McQuade stated that:

> [W]e continue to see attractive growth opportunities in nonagency mortgage securities.  The private label security market has grown quite a bit with a high percentage of subprime mortgage securities.  <u>We generated most of our retained portfolio growth last year in that sector.</u>[31]

Public statements such as these undermine the claims in the Complaints that Freddie Mac falsely assured its shareholders and the public generally that it did not have significant subprime exposure or otherwise made misleading statements regarding the Company's exposure to the subprime mortgage market.  Such statements also undermine the claims in the Demand Letters and Complaints that the Company essentially stumbled into the subprime market due to inadequate controls.

In addition to the disclosures described above, Freddie Mac also disclosed, in detail, information about the quality and quantity of its purchases.  Freddie Mac included in each of its annual reports a chart entitled "Characteristics of Single-Family Mortgage Portfolio" that categorized purchases during the prior three years by, among other things, original LTV range, credit score and occupancy type.  Freddie Mac also issued each month a publicly available document titled "Monthly Volume Summary," which disclosed, among other things, the delinquency rates on loans in the Company's single-family guarantee portfolio.

Moreover, the Committee found no credible evidence that the Board or management was motivated by personal gain to enter into the subprime segment.  For example, executive compensation was not tied directly to decisions to enter or expand the Company's exposure to the subprime market.  During the relevant period, the Company had many other priorities besides expanding its credit appetite.  These priorities were reflected in the Company's executive compensation process.  Each year, the Company established a compensation "scorecard" reflecting corporate priorities, the meeting of which would affect executives' compensation.  Those priorities included numerous areas such as financial remediation, mission, controls, operations, shareholder value, market share, implementation of "touch more loans," enhancing the Company's reputation, employee engagement, improving efficiency and lowering costs,

meeting HUD goals, and risk management. While several of those factors may have been affected by the decisions to enter or expand the Company's exposure to subprime loans, no single measure directly affected executives' compensation. Additionally, the metrics on the scorecard were sometimes in tension with one another. Absent direct evidence that increasing the Company's exposure to the subprime market was linked to executive compensation, there is no basis to sustain the allegation that the Board or management was motivated by personal gain.

In conclusion, the Committee has found no evidence that by involving Freddie Mac in the subprime mortgage market as alleged in the Demand Letters and Complaints, Freddie Mac's officers and directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or an act from which they derived an improper personal benefit.

### 2. Systemic Failure of Risk Management

#### a. The Allegations

The Demand Letters and Complaints focus to varying degrees on the Company's exposure to the subprime market. But they also allege more generally that the Company's officers and directors failed to implement and maintain sufficient controls to avoid acquiring, and to manage post-acquisition, mortgage products with non-traditional features generally. For example, the Demand Letter sent on behalf of Robert Bassman (the "Bassman Letter") claims that the Company's losses in the third quarter of 2007 were attributable to a "systemic failure of risk management and lax credit standards." Similarly, the Adams Letter claims that the Company's officers and directors breached their fiduciary duties by "failing to implement sufficient risk management controls to protect the Company from acquiring billions of dollars worth of mortgages with lax or non-existent underwriting standards." The Adams Complaint makes the same allegation.

The Louisiana Complaint states that "[t]he internal controls . . . adopted by Defendants at Freddie Mac were completely incapable of managing, identifying, and guarding against massive losses in the Company's investments and its guarantee exposure." The Louisiana Complaint alleges further that "Freddie Mac was a company that was caused to lack any meaningful system of internal procedures or controls with respect to its subprime mortgage exposure" and that the defendants "consciously failed to implement an effective system of internal controls over losses in its portfolios of mortgages and/or consciously failed to oversee the operations of such control systems."

Similarly, the Complaint filed by the Esther Sadowsky Testamentary Trust (the "Sadowsky Complaint") alleges that the Company's directors breached their fiduciary duties by "caus[ing] Freddie Mac to operate in an unsafe and unsound manner by lowering, contrary to the dictates of its Charter, its credit and underwriting standards."[32]

Like the allegations pertaining to the subprime market discussed above, these allegations appear to involve claims either that: (i) senior management and the Board

made, allowed or approved unreasonable, negligent, grossly negligent or reckless business decisions; or (ii) the Board failed to discharge appropriately its oversight responsibilities. As described above, such claims are subject to significant legal obstacles. With regard to the former category of allegation, it is unclear how the alleged application of "lax credit standards," for example, standing alone, could give rise to a claim for breach of fiduciary duty under Virginia law. Absent allegations, not present here, that such standards were not established in good faith, there can be no liability. Moreover, the Committee found no evidence that any failures of risk management were the result of willful misconduct or constituted a knowing violation of criminal or securities laws.

With respect to the latter allegation, the "Caremark" claim, the Demand Letters and Complaints contain no non-conclusory allegations suggesting that the Company's directors "knew that they were not discharging their fiduciary obligations" with regard to their oversight responsibilities. Stone, 911 A.2d at 370. Merely affixing the words "consciously" or "knowingly" to an otherwise general allegation of wrongdoing is insufficient to overcome the legal obstacles discussed above. In any event, as described below, the Committee found no evidence of a conscious or knowing disregard of duties.

b.    Controls

Moreover, the Committee has found no evidence that there was a "systemic failure of risk management" at Freddie Mac that was driven by a "sustained or systemic failure of the board to exercise oversight - such as an utter failure to attempt to assure a reasonable information and reporting system exists." Caremark, 698 A.2d at 971.

There is no doubt that Freddie Mac had material weaknesses and significant deficiencies in its internal controls over financial reporting during the pertinent time period. Indeed, Freddie Mac reported in its 2004, 2005 and 2006 Annual Reports that it had numerous unresolved material weaknesses and significant deficiencies in its internal controls. Based on these weaknesses and deficiencies, the Company's CEO and COO stated in each of these annual reports that the Company's "internal control over financial reporting was not effective at December 31, [2004, 2005 and 2006, respectively]."[33] Some of these internal control issues affected the Company's ability to manage various kinds of risk. Such issues included deficiencies in the Company's new product implementation process and "governance over [the Company's] risk management processes, where [it] need[ed] to strengthen the resources engaged in this oversight role and [its] ability to aggregate risks across our organization."[34]

Even apart from what the Company and its independent auditor labeled as weaknesses and deficiencies in the technical accounting sense, the Committee is aware that there were other issues with the Company's risk management processes. These issues included the Credit Risk Oversight ("CRO") division's lack of veto authority over credit terms of business prior to 2007 as well as the sense among personnel in the Enterprise Risk Oversight ("ERO") and CRO divisions that their views were not accorded sufficient weight by senior management.

In 2003, Freddie Mac established the ERO division as one of its internal divisions. ERO was responsible for the independent oversight of credit, market and operational risk management across the company. ERO had the authority and responsibility to identify key business risks, monitor compliance with risk limits, report exceptions and recommend the suspension of business practices detrimental to the firm. ERO was headed by the Company's Chief Enterprise Risk Officer, who had a direct reporting line to the CEO. He also reported directly to the appropriate Board committee.

In 2006, the Company, with advice and input from Mercer Oliver Wyman, retained as a consultant, enhanced the role of the enterprise risk management ("ERM") function to reflect the changing nature of the business that the Company was doing. As part of this enhanced role ERM was empowered to approve business area credit standards, methods, policies and procedures necessary to implement this Policy as opposed to playing an advisory role only.

Freddie Mac's CRO division was responsible for the independent oversight of credit risk management, including mortgage default risk, servicing risk, model risk and counterparty credit risk. CRO initially played an advisory role only. But Freddie Mac provided CRO with decisionmaking authority in 2007 to veto business decisions it felt were not appropriate.

In addition, in 2005, the Company established the Enterprise Risk Management Committee ("ERMC") to permit management from various business areas, as well as the risk function, to meet regularly and discuss issues of risk. The ERMC's meetings were described to the Committee as being frank, fulsome, and comprehensive.

Moreover, the Credit Risk Subcommittee of the ERMC met specifically to monitor and oversee credit approval processes, market practices, market trends, and credit risk being taken on by the Company.

The Company's acquisition of non-traditional mortgages did not occur as a result of controls weaknesses. Rather, such mortgages were acquired as part of a considered business strategy to expand the Company's market share, to satisfy the Company's housing goals and to generate a reasonable return for the Company's shareholders. As described below, Freddie Mac discussed and monitored its participation in non-traditional markets, established position limits for certain non-traditional products and attempted to price appropriately for credit risk.

>    c.    The Company's Decisions to Participate in the Non-
>            Traditional Mortgage Market

The shareholders behind the Demand Letters and Complaints, operating with the benefit of hindsight, clearly believe that the Company's strategy was unwise. But bad business decisions alone are not actionable under Virginia law.

Freddie Mac's decision in 2004 to continue its involvement in the Stated Income, Stated Asset ("SISA") and No Income, No Asset ("NINA") markets demonstrates the

deliberative process that generally characterized the Company's credit decisions.  As discussed above, there was a robust internal debate among senior management.  Ultimately the Company decided to continue its participation in the SISA and NINA markets, but it did so only after considering the costs and benefits.  It also complied with the Company's "VIU" process applied to "visible, high-impact, or unique" products, which ensured that important issues such as these were brought to the attention of the Board.

Every officer the Committee interviewed, including David Andrukonis and others who had concerns about the SISA and NINA markets, believed that the Company's decision to continue participating in the SISA and NINA mortgage markets was the result of an appropriate decision-making process in which opposing viewpoints were discussed and considered.  Exiting the reduced documentation market could have had negative implications on the Company's satisfaction of its affordability goals, on the Company's market share and relationships with its customers.  The Committee found statements to this effect from the Company's current and former credit risk oversight personnel especially credible, given that those individuals would have had every reason to "point fingers" at the Company's former senior management.[35]

These debates over SISA and NINA products in 2004 are representative of the debates over the next several years as the Company increased its involvement in both the subprime and other non-traditional mortgage markets.  There was discussion and debate.  In the words of one former officer, the discussion was not a "Polyanna" or "one-sided" discussion.  Rather, costs and benefits were weighed and the more aggressive credit risk strategy generally – but not always – was selected.  The Company's senior management "wrestled" with the appropriate standards for mortgage underwriting given competing pressures on the Company.

Several current and former officers have told the Committee that they disagreed, sometimes strongly, with the Company's ultimate decisions concerning whether to begin or maintain involvement in certain corners of the non-traditional mortgage market.  None of those officers, however, has opined that the Company's decisions were anything other than good faith business judgments.  One officer did opine that Mr. Syron and Ms. Cook did not have an adequate understanding of the Company's credit risks, stated further that, as a general matter, senior management weighed all of the facts before making decisions, including decisions pertaining to credit risk.

        d.    Conclusion

To the extent that the Demand Letters and Complaints allege that Freddie Mac's officers and directors breached their fiduciary duties due to the weaknesses in controls themselves, the Committee found that those weaknesses, all of which were either acknowledged in the Company's public filings or previously identified by the Company's regulator in its public reports, do not meet the standards required to establish the willful misconduct or knowing violation of the criminal or securities laws necessary for liability that excludes complete indemnity for the accused officers and directors.  Indeed, the Company was focused on improving its controls.  This was described as a massive

undertaking given the size of the Company and the complexity of its business. Nevertheless, various members of senior management told the Committee that senior management and the Board had determined that remediation of the controls weaknesses was a key priority of the Company. Moreover, several witnesses stated that, with various workarounds, these weaknesses did not cause the Company to issue inaccurate financial statements. In addition, to the extent that controls weaknesses adversely impacted the Company's credit risk management function, the Committee found no evidence that these weaknesses or any adverse results therefrom were caused by actions that rose to the standards necessary to establish liability for which Company indemnification would not be available.

To the extent the Demand Letters and Complaints allege that Freddie Mac's officers and directors breached their fiduciary duties not by allowing the Company to acquire non-traditional mortgages in the first instance, but by failing to manage properly the risk of those mortgages post-acquisition, the Committee has concluded that it is not in the Company's best interests to pursue those claims. Facts reviewed by the Committee fail to establish that any of the Company's current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or an act from which they derived an improper personal benefit for which indemnification would not be available. Rather, Freddie Mac took significant steps to manage the risks posed by the non-traditional mortgages in its portfolio in various ways.

First, Freddie Mac maintained the ERO division, of which CRO was a subdivision. The head of ERO, the Chief Enterprise Risk Officer, reported not only to the Company's CEO, but also to the Audit Committee, the Finance and Capital Deployment Committee or the Governance, Nominating and Risk Oversight Committee ("GNROC"), depending on the time period. In fact, during most of the pertinent time period the Chief Enterprise Risk Officer had a direct reporting line to the GNROC, which the General Auditor described as the most powerful Board committee.

In addition to this ERO/CRO structure, the ERMC met monthly and included among its active membership many of the Company's senior officers, including the CEO and COO. The ERMC tracked and analyzed the Company's exposure to credit risk, including credit risks associated with non-traditional mortgage products. ERCM members received a detailed standard monthly reporting package that included a chart titled "Current Risk Concerns" that displayed each of the Company's major risks by risk category, specific risk issue, risk level, risk trend and related mitigation actions. The ERMC materials were described to the Committee as being blunt, candid statements of risk.

Second, Freddie Mac's Board and Board Committees monitored the Company's credit risk. As an example, during most of the relevant time period, the Finance and Capital Deployment Committee was provided with detailed information regarding the Company's mortgage credit risk, including default costs for the prior year and comparing that figure both to the year-to-date default costs and the annual target for default costs. The Capital Deployment Committee also was provided with information measuring the

Company's "concentration risk" in terms of the Company's investments in categories of assets for which the Company had established position limits.  These categories included non-agency mortgage-backed securities ("MBS"), a significant portion of which consisted of the Company's subprime investments.  The Capital Deployment Committee also received information regarding "Credit Portfolio Risk Limits" in terms of both expected default costs and risk-based capital as well as the Company's "Single Family Portfolio Composition" reflected in, among other things, "purchase activity by product" year-to-date and "portfolio composition by product."

The information provided to the GNROC and the Finance and Capital Deployment Committees is representative of the type of information received by the Board and other Board committees.  These topics, in addition to others such as credit outlook, analytical capabilities with respect to non-traditional products, and house price appreciation, were also discussed regularly at Board and Board Committee meetings.

In 2006, the Company altered its Board committee structure with the intent of improving the Board's ability to oversee the Company's enterprise risk management activities.  Specifically, the Company's Chief Enterprise Risk Officer recommended to the Audit Committee and the Governance and Nominating Committees that oversight responsibilities for enterprise risk management be shifted to the Governance and Nominating Committee, with the other committees maintaining responsibilities for various specific risks pertinent to their focus.  This recommendation was accepted, which resulted in changing the Governance and Nominating Committee to the Governance, Nominating and Risk Oversight Committee.

Third, with respect to those non-traditional products that the Company categorized as "untested mortgage products" ("UMPs"), the Company recognized that its models could not forecast potential credit losses with any reasonable degree of accuracy because of the Company's lack of historical experience with such products.  In response to this inability, however, the Company established capital limits to control the Company's exposure to these products.  The Committee uncovered no evidence to suggest that the use, or setting of dollar values for UMPs meets the standard required to establish liability for which indemnity would not apply.

Fourth, Freddie Mac established and adhered to a robust transaction approval process.  This process was codified in the Company's single-family transaction approval authority matrix that included a requirement for approval by the Board, or by Mr. Syron or Mr. McQuade for transactions over a certain size.  When the requirement for pre-approval shifted from the Board level to the senior management level in 2005, senior management was still required to deliver – and did deliver – regular reports to the Mission and Sourcing Committee detailing recently approved transactions.

Fifth, the Company's senior management believed that it was pricing appropriately for the credit risks it was accepting.  When the market began to turn in 2007, the Company's pricing personnel realized that the Company's prices were no longer appropriate, but the Company was restricted in its ability to alter those prices immediately due to, among other things, the long-term nature of its flow contracts.

Finally, the Company began to craft its Corporate Credit Policy in 2006, which policy was ultimately implemented in November 2007. The implementation of the Corporate Credit Policy coincided with a general increase in the authority accorded to the CRO division. Indeed, in August 2007, Mr. Romano, the head of CRO, instituted an operational protocol that required Freddie Mac's business divisions to remain, at most, in a "credit-neutral" position with Freddie Mac's customers. Where possible, the business units were required to tighten customer credit terms. While there was some dissatisfaction and resistance by at least one officer on the business side, the Company's business units complied materially with requirements from CRO.

### 3. Insider Trading

The Adams Letter claims that certain of the Company's officers and directors "sold stock on the basis of material non-public information, specifically that the Company was taking on staggering amounts of sub-prime mortgages." In particular, the Adams Letter identifies Ms. Cook and Messrs. Syron, Bostrom, Die, George, May, McLoughlin, Mullings, Egan, Piszel, Saksena, Weiss, Boyd, McQuade, Poe, Smialowski and Tsien as individuals who allegedly engaged in insider trading. For each of these individuals, the Adams Letter identifies numerous specific stock transactions between March 2006 and December 2007. The Adams Complaint does the same.

More specifically, the Adams Letter and Complaint identify a number of stock transactions executed by various members of Company management. The Committee notes the only specific piece of allegedly inside information identified by the Adams Letter – that the Company was investing in subprime-backed mortgage securities – was publicly disclosed.[36]

With regard to the particular individuals and transactions identified in the Adams Letter and Complaint, it does not appear that there was any meaningful reason for singling out those particular individuals and transactions. Rather, it appears that the authors of the Adams Letter and Complaint simply listed in rote format, without exception, every stock disposed of by the seventeen named officers and directors during 2006 and 2007. Notably, neither the Adams Letter nor Complaint mentioned the numerous acquisitions of stock by the listed individuals during that period.[37]

In conclusion, the Committee has found no evidence that Freddie Mac's officers and directors engaged in unlawful insider trading with respect to the identified transactions based on their alleged knowledge that the Company "was taking on staggering amounts of sub-prime mortgages."

### 4. Reckless Application of Loan Prospector

The Bassman Letter claims that a significant portion of the Company's losses was caused by the Company's "reckless application" of "Loan Prospector," which the Bassman Letter defines as an "automated underwriting service used purportedly to 'assess' loans for purchase by Freddie Mac every '15 to 20 seconds.'" The Bassman Letter claims further that "the Company's failure to have in place more deliberate and

careful underwriting of [the] underlying loans or insist upon it from loan originators greatly contributed to its [losses in the third quarter of 2007]." Finally, the Bassman Letter claims that the Board and "senior management w[ere] aware of or should have been aware of the consequences to the Company of using the financial engineering provided by Loan Prospector and the damages it was likely to cause Freddie Mac." The Bassman Complaint makes similar claims.

Similarly, the Adams Letter claims that Freddie Mac's officers and directors breached their fiduciary duties "through the application of "Loan Prospector" to accept high-risk mortgages." The Adams Complaint makes similar claims.

These claims appear to be based on a misunderstanding of Loan Prospector ("LP") and automated underwriting generally. LP's ability to assess a mortgage loan in fifteen to twenty seconds is not evidence that Freddie Mac's loan purchase decisions were not "deliberate and careful." LP is essentially a computer program. It does not involve "financial engineering." Rather, it generates a score based on a set of inputs entered by a loan originator. Whether LP selects or rejects a given loan depends on the underwriting standards set by the Company and entered into LP, not on the amount of time LP takes to crunch the numbers entered by a user.

In conclusion, the Committee has found no evidence that Freddie Mac's officers and directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or an act from which they derived an improper personal benefit in connection with the Company's use of LP.

## 5. Failure to Implement or Maintain Adequate Controls Over Financial Reporting

The Demand Letters and Complaints allege that Freddie Mac failed to implement and maintain adequate internal controls over financial reporting. The Adams Complaint, for example, alleges that the individual defendants "knowingly fail[ed] to implement and/or maintain adequate financial reporting controls." The Louisiana Complaint makes a similar allegation. The Bassman Complaint adds a disclosure allegation, claiming that the Company "falsely assured the Company's stockholders and the public that . . . any weaknesses of the Company's risk management and internal controls were minor and being remedied."

As noted above, Freddie Mac had a number of material weaknesses and significant deficiencies in its internal controls over financial reporting. A quick review of its annual reports demonstrates as much. The Company's 2004 Annual Report disclosed that "[t]hroughout 2004, there were a number of material weaknesses and other control deficiencies in our internal controls over financial reporting that required our attention."[38] The Company then listed ten such weaknesses and deficiencies:

- "significant integration issues among numerous core business, accounting and external service provider operations and over-reliance on end-user computing systems for certain major activities";

- "inadequate controls over data input and systems limitations in financial processes";

- "inadequate supervisory review of the preparation of journal entries in certain accounting units";

- "end-user computing solutions with both insufficient documentation and change controls";

- "inadequate staffing and systems to support the appropriate scope of independent price verification of financial instruments used in the preparation of financial statements";

- "lack of formal change management and oversight processes over certain models used to support financial reporting";

- "insufficient monitoring controls within financial operations and related reporting functions";

- "insufficient documentation controls regarding roles and responsibilities related to certain data correction activities";

- "technology implementation control deficiencies, including changes in management processes that allow access to production environments by developers"; and

- "access by some business end-users to production databases."[39]

The Company noted further in its 2004 Annual Report that "[i]n order to compensate for these material weaknesses we have had to perform extensive verification and validation procedures to ensure our financial statements are fairly presented in accordance with GAAP."[40] Moreover, in performing those procedures, the Company had "identified additional material weaknesses in [its] controls design."[41]

In its 2005 Annual Report, the Company noted that "[m]any of the material weaknesses and other control deficiencies identified in prior years persisted throughout 2005 and continue to present challenges for us in 2006."[42] The Company noted further that it had "determined that some previously identified deficiencies were more serious than originally assessed."[43] The Company stated that although it "believed that [it] had made progress in the remediation of certain material weaknesses and other control deficiencies that have been identified, these will continue to pose significant risks to our financial reporting process until fully remediated."[44] The Company then identified six broad categories of material weaknesses and stated that "[i]n addition to these material weaknesses, a number of significant deficiencies in our internal control[s] were apparent that, although not determined to be material at this time, still present[ed] risks of error in our financial reporting."[45]

The Company noted that "[t]he material weaknesses and significant deficiencies in our internal control over financial reporting adversely affect our ability to record, process, summarize and report financial data in a timely manner."[46] "Based on the continued existence of material weaknesses at December 31, 2005, our Chief Executive Officer and President and Chief Operating Officer have concluded that our internal control over financial reporting was not effective at December 31, 2005."[47]

The Company's 2006 Annual Report made similar disclosures to shareholders and the public. After listing six categories of continuing material weaknesses as well as "a number of significant deficiencies," the Company noted once again that "[t]he material weaknesses and significant deficiencies in our internal control over financial reporting adversely affect our ability to record, process, summarize and report financial data in a timely manner."[48] "Based on the continued existence of material weaknesses at December 31, 2006, our Chief Executive Officer and Chief Financial Officer have concluded that our internal control over financial reporting was not effective at December 31, 2006."[49]

These disclosures rebut the allegation in the Bassman Complaint that the Company "falsely assured" investors that the Company's internal control issues "were minor and being remedied."[50] These disclosures signify, however, that the Company's internal controls environment was flawed. This gives some credence to the allegations in the Demand Letters and Complaints that the Company failed to establish and maintain adequate internal controls over financial reporting.

Under Virginia law, however, a flawed internal control environment is not actionable as a breach of fiduciary duty unless it is the result of a lack of subjective good faith business judgment. In Freddie Mac's case, the Committee uncovered no evidence that it was. Following the Company's restatement in 2003, the Company's financial reporting infrastructure was in disarray. In addition, in the words of the Company's former CFO, the prior management regime had not bequeathed a culture that placed a premium on the integrity of financial reporting. Given the size and complexity of the Company's business and its lingering "cultural" issues, remediating the weaknesses and deficiencies that existed in the wake of the restatement was a Herculean undertaking. In acknowledgment of the magnitude and importance of this task, the Company allocated a tremendous amount of resources to accomplishing it. Among other efforts, the Company tied seventy percent of senior management's compensation for the first half of 2004 to the issuance of timely financial results.

The Company's CFO and other finance personnel discussed the Company's internal control issues with the Audit Committee and the Board on a regular basis. For example, at a special meeting of the Audit Committee on August 18, 2005, Mr. Baumann and several other officers reviewed at length the work performed by management in documenting, testing and evaluating the Company's internal controls over financial reporting. On December 20, 2005, the Audit Committee received an update concerning management's ongoing efforts to remediate or mitigate material weaknesses and significant deficiencies in internal controls. Finance personnel stated that management would provide a further update at a future meeting concerning

progress in completing the ongoing controls work and in developing comprehensive plans for continuing to enhance the Company's control environment in 2006.

After Mr. Baumann left Freddie Mac in 2006 and Mr. McQuade assumed the role of CFO, Mr. McQuade sent a seven-page memorandum to the Board providing an update on "controls remediation" and efforts to ensure "timely financial reporting." Mr. McQuade noted that he had "determined that the Company needs to focus on recruiting more leadership and subject matter experts to successfully complete all of the activities necessary to return to timely financial reporting." He "estimate[d] the need for approximately 100 new people, including 25 leaders." Mr. McQuade noted further that "given the lack of progress on some of the [controls] remediation," he had: (i) "instructed a team to perform [a] root cause analysis on our substantial errors and various post-close, pre-release adjustments to our financial statements"; and (ii) "determined that Freddie Mac must conduct a thorough end-to-end analysis of the design of the internal control environment supporting financial reporting." In summary, Mr. McQuade noted that:

> [a]s is apparent from this discussion, we have a tremendous amount of work left to do on our transformation toward timely financial reporting and operational excellence. And most of this work is complex and interdependent. While we are doing all we can to deliver the results, I believe it is appropriate to share with you my concerns about the high risk associated with achieving our objectives at this point. I will keep you updated on our progress.

Notably, the weaknesses and deficiencies in Freddie Mac's internal controls did not mean that Freddie Mac was incapable of issuing accurate financial statements. Rather, as the Company disclosed, it meant that Freddie Mac had to perform additional procedures to ensure that those statements were accurate, procedures that would not have been necessary had the Company's control problems been fully remediated.

The Company's CFO also discussed these issues with PricewaterhouseCoopers, LLP ("PwC"), the Company's independent auditor. PwC provided a clean audit opinion in Freddie Mac's 2007 Annual Report, stating that "the accompanying consolidated balance sheets and the related consolidated statements of income, of cash flows, and of stockholders' equity present fairly, in all material respects, the financial position of Freddie Mac, a stockholder-owned government-sponsored enterprise and its subsidiaries . . . at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States."

In addition, PwC informed the Company's Audit Committee that PwC had addressed the inherent risks and impact of the recent market disruptions in connection with its audit of the Company's 2007 consolidated financial statements. PwC had concluded that management had adequate documentation to support its judgments, including having appropriately obtained relevant third party information to help support

the critical accounting judgments made and that the judgments made by management were reasonable.

With regard to the Company's financial statements and its public disclosures more generally, the Company's current and former officers and directors have stated uniformly that they neither had concerns nor heard of others in the Company having concerns about the accuracy of those disclosures.

### 6.    Suits Against Third Parties

The Bassman Letter, the Adams Letter and the Bassman Complaint demand that the Board commence a lawsuit against various third parties alleged to have aided and abetted the wrongs allegedly committed by Freddie Mac's officers and directors. Specifically, these two letters and the Bassman Complaint demand that Freddie Mac sue Washington Mutual, Inc., PwC, First American Corporation, eAppraiseIT LLC, First American eAppraiseIT, Countrywide Financial Corporation, Countrywide Home Equity Loan Trust, Countrywide Bank, FSB, Countrywide Home Loans, Inc., Landsafe, Inc., Kerry K. Killinger, Anthony R. Merlo, Jr. and Angelo R. Mozilo.

The Bassman Complaint alleges that "[m]ortgage lenders such as defendant Washington Mutual, Inc. . . . , Countrywide Financial Corporation and its affiliates. . . assisted by defendants First American Corporation . . . and First American eAppraiseIT. . . and their respective senior officers, defendants Mozilo, Killinger and Merlo, using false and inflated appraisals, took advantage of Freddie Mac's lax or non-existent loan underwriting standards and funneled into the Company billions of dollars of questionable and/or otherwise high-risk mortgages which they knew or should have known would lead to defaults."

Freddie Mac has meaningful contractual recourse against these third parties.  As discussed above, Freddie Mac relied on a system of delegated underwriting.  As a remedy for the purchase of any loans discovered to be non-compliant with Freddie Mac's underwriting requirements, it retained the contractual right to force the repurchase of those loans or to make the Company whole in the event of a default. Freddie Mac has actively pursued those remedies against third parties.  In 2008 alone, Freddie Mac recovered more than one billion dollars in repurchase demands.  Indeed, as recently as December 31, 2010, Bank of America paid the Company $1.28 billion related to loans acquired by the Company from Countrywide Financial Corp.  Further, when Freddie Mac's interests in outstanding repurchase demands were threatened by the bankruptcy of the pertinent counterparty, Freddie Mac took steps to protect its interests.  For example, when Washington Mutual filed for bankruptcy, Freddie Mac filed a claim in the bankruptcy proceeding.

The Committee does not believe that it is in the best interests of Freddie Mac to use this derivative suit as a vehicle in which to bring suit against the identified third parties.  Rather, the Committee concludes that suits against the third parties should not proceed here, but that the Company can enforce any rights it may have against viable third parties, as well as others, in more direct and appropriate ways.

### 7.    The Company's Losses

Despite its own losses, Freddie Mac's delinquency rates have been and continue to be low relative to the mortgage industry.  For example, in the fourth quarter of 2007, Freddie Mac's total single-family 90-day or more delinquencies amounted to 65 basis points, compared to an industry average for prime conventional mortgages of 167 basis points.  Similarly, for 2008, Freddie Mac's total single-family 90-day or more delinquencies amounted to 172 basis points, compared to an industry average of 374 basis points.[51]

As another measure of the relative quality of Freddie Mac's portfolio, as of September 30, 2009, Freddie Mac held approximately 23 percent of all mortgages, Fannie Mae 34 percent and Wall Street (private-label) only 12 percent.  Despite this, Wall Street held approximately 33 percent of seriously delinquent first mortgages. Fannie Mae held approximately 18.3 percent and Freddie Mac held only 9 percent.[52]

As of December 31, 2008, the percentage of loans in Freddie Mac's single-family credit guarantee portfolio of $1.85 trillion that were seriously delinquent (delinquent by 90 or more days) was only 1.83 percent

The consensus among the current and former officers and directors of Freddie Mac interviewed by the Committee was that the primary cause of the Company's recent losses was an "exogenous macro-economic event[ ]"; namely, the unprecedented decline in the housing market.  Specifically, between 2006 and May 2008, house prices fell nationwide by approximately twenty-five percent.  This is the largest, and only, nationwide decline in house prices since the Great Depression.[53]

These individuals generally have stated that while Freddie Mac's credit stance had an impact on the margins, there is nothing that Freddie Mac could have done to avoid material losses other than:  (i) closing its doors; or (ii) violating GAAP by reserving for hypothetical scenarios that nobody thought were plausible at the time.

Other than the collapse in the housing market, these individuals identified several other factors that contributed to Freddie Mac's losses.  These factors included the Company's Alt-A portfolio, which has delivered a large component of the Company's losses.  At the same time, however, one senior officer stated that "it is not clear that Freddie Mac would have been better off had it made different credit decisions."  A narrower credit box could have affected adversely the price of Freddie Mac's security, which also could have driven the Company out of business.  It could have driven the Company's market share down to five percent.  Each of these outcomes could have ended up causing greater losses.

With regard to the Company's portfolio of subprime-backed securities, several officers identified mark-to-market accounting as a significant component of the Company's losses.  One senior officer explained that Freddie Mac was still receiving cash flows on these securities but was required by GAAP to mark them down beyond what the Company ultimately expected to lose.

## B.     Other Considerations

In addition to their lack of legal merit allowing no recovery to benefit Freddie Mac, which the Committee finds dispositive, pursuit of the claims suggested in the Demand Letters and Complaints would be exceptionally costly to the Company and distract from ongoing efforts to stabilize the Company and, by implication, the housing market.

With regard to costs, the Committee notes that while civil litigation generally is expensive, pursuing the litigation initiated by the Complaints would be extremely expensive. The various third parties would raise numerous defenses and perhaps counter-claims. The Company's current and former officers and directors would also raise numerous defenses, many of which would presumably be based on the factual record discussed above. Moreover, the Company's Bylaws state that current and former officers and directors "shall have the right to be paid by the Corporation the expenses reasonably incurred or suffered in defending any proceeding in advance of its final disposition."[54] The Committee has weighed both these expenses and the ultimate obligation to indemnify current and former officers and directors for all acts that are not found to be willful misconduct or knowing violations of the criminal or securities laws against the prospect of recovering any material portion of the alleged billions of dollars in losses. The Committee has concluded that the probability of recovery is exceedingly low.

With respect to distraction to current management, the Committee notes that five of the individuals named in the Demand Letters and Complaints remain officers of Freddie Mac.[55] Two of the individuals named in the Demand Letters and Complaints remain directors of Freddie Mac.[56] The prosecution of derivative claims against these individuals would be tremendously distracting to the Company at a time when it can ill afford distraction, especially since the claims have no legal merit.

## VI.     CONCLUSION

Having completed its investigation of the claims set forth in the Demand Letters and the Complaints, the Committee has determined in good faith that it is not in the best interests of the Company to pursue those claims.

---

[1] There may be material information or developments to which the Committee has not had access, including information adduced in the securities litigation involving the Company, any ongoing investigations being conducted by other government agencies, including the Securities and Exchange Commission, or interviews or statements by Dick Syron, Buddy Piszel, or Patti Cook. The Committee is also aware that some current or former officers have received Wells Notices issued by the Securities Exchange Commission (the "SEC"). It is possible that one or more additional executives may receive similar Notices. The Committee has not been provided access to the Wells Notice, nor to any interview memoranda or other factual or legal analysis performed by the SEC or any other regulator. The

Committee reserves the right to revisit any and all of its conclusions should such information become available to it. Access to information not presently available, if any, could change the Committee's findings and conclusions.

[2] The third parties named as defendants in the complaint brought by R.S. Bassman (the "Bassman Complaint") are Washington Mutual, Inc., PriceWaterhouseCoopers, LLP, Kerry K. Killinger, Anthony R. Merlo, Jr., First American Corporation, First American Eappraiseit, Countrywide Financial Corporation, Countrywide Home Equity Loan Trust, Countrywide Bank, FSB, Countrywide Home Loans, Inc., Landsafe, Inc. and Angelo R. Mozilo.

[3] The Committee has made no conclusions as to the Company's safety and soundness as that is a regulatory standard upon which no challenge could be made by shareholders.

[4] Hunton & Williams LLP has never represented the Company, nor has Hunton & Williams LLP ever represented any of the individual officers or directors named in the Complaints. Hunton & Williams LLP was retained on February 9, 2004 to provide independent legal counsel to a prior special litigation committee of the Board of Directors of Freddie Mac in connection with its independent review and evaluation of certain derivative demand letters and derivative actions. That special litigation committee did not recommend dismissal of the shareholder claims and did not conclude that maintenance of those claims was not in the best interests of the Company. Rather, it recommended that the Company agree to a comprehensive settlement of claims. As part of that settlement process, Hunton & Williams LLP also advised the Governance, Nominating and Risk Oversight Committee of the Board of Directors of Freddie Mac regarding its duty to indemnify certain former officers of Freddie Mac.

[5] The SLC or its Special Counsel interviewed: (1) Tim Armstrong, Accounting, Risk & Control; (2) Jim Berkovec, Vice President, Modeling & Methods; (3) Pierre Brenneman, Customer Credit Risk Analytics; (4) Ralph Boyd, Executive Vice President, Community Relations; (5) Connie Ferran, Vice President, Customer Credit Management; (6) Paul George, Executive Vice President, Human Resources; (7) Sherry Harris, Director of Remedy Management; (8) Scott Haymore, CFO, Single Family Division; (9) Jim Larkin, Vice-President, Internal Controls; (10) Rob Mailloux, Vice President, Corporate Financial Accounting; (11) Tracy Mooney, Vice President, Single Family Credit Management; (12) Grace Martindell, Vice President, Transaction Accounting; (13) Tricia McClung, Vice President, Customer Outreach & Offerings Development; (14) Michael McRoberts, Vice President, Multifamily Underwriting and Credit; (15) Mary Ann Morgan, Quality Control Director for Regional and Community Lending; (16) Matthew Pachman, Vice President, Compliance, Ethics and Business Practices; (17) Pam Padgett, Director, National Underwriting and Quality Control; (18) Shelly Poland, Vice President, Mortgage Credit Risk Management; (19) Ray Romano, Senior Vice President, Credit Risk Oversight; (20) Deborah Rose, Director of Enterprise Model Control; (21) Mollie Roy, Associate General Counsel and Assistant Corporate Secretary; (22) Lyn Sala, Operations; (23) John Straka, Vice President, Customer Facing Models & Analytics; and (24) Brian Surette, Modeling & Methods.

[6] Pub. L. 110-289, 122 Stat. 2654.

[7] 12 U.S.C. § 4511(a).

[8] 12 U.S.C. § 4617(a)(2).

[9] 12 U.S.C. 4617(b)(2)(A)(i).

[10] 12 U.S.C. 4617(b)(2)(B)(i).

[11] 12 U.S.C. 4617(b)(2)(B)(iv).

[12] 12 U.S.C. 4617(b)(2)(A)(i), (B)(i), (B)(iv).

[13] Four attorneys from FHFA's Office of General Counsel served as representatives of FHFA as Conservator in its capacity as the Committee.

[14] These individuals included: (1) David Andrukonis, former Chief Enterprise Risk Officer; (2) Marty Baumann, former Chief Financial Officer; (3) Don Bisenius, Executive Vice President, Single Family Credit Guarantee; (4) Kirk Die, Senior Vice President and General Auditor; (5) Richard Goeltz, former Director and former Chair of the Audit Committee; (6) Mark Hanson, Vice President, Mortgage Funding; (7) Gary Lanzara, former Vice President, Office of the Chairman; (8) Jan Luytjes, Senior Vice President, Risk Management and Capital Strategy; (9) Peter Mahoney, Vice President, National Lending; (10) Mike May, Senior Vice President, Multifamily Sourcing; (11) Hollis McLoughlin, Senior Vice President, External Relations; (12) Gene McQuade, former President and Chief Operating Officer; (13) Tracy Mooney, Vice President, Single Family Credit Risk Management (for the second time); (14) Paul Mullings, Senior Vice President, Single Family Sourcing; (15) Ronald Poe, former Director and former Chair of the Mission,

Sourcing and Technology Committee; (16) Mike Perlman, Executive Vice President, Operations and Technology; (17) Shelley Poland (for the second time), Vice President, Mortgage Credit Risk Management; (18) Ray Romano (for the second time), Senior Vice President and Chief Credit Officer; (19) Bob Ryan (twice), Vice President, Portfolio Management and Pricing; (20) Anurag Saksena, Senior Vice President and Chief Enterprise Risk Officer; (21) Robert Tsein, Senior Vice President, Mission Oversight and Development; and (22) Kathleen Zadarewky, Vice President, Customer Terms of Business.

[15] These individuals were Richard Syron, Patricia Cook, Gary Kain and Anthony "Buddy" Piszel. FHFA and its Special Counsel also scheduled an interview with David Kellerman, the Company's Chief Financial Officer, but Mr. Kellerman passed away before the interview was conducted.

[16] See e.g., Am-Cor.com, Inc. v. Stevens, 56 Va. Cir. 245, 249 (2001) ("As directors and officers of Am-Cor, the Stevenses had a fiduciary duty to the Am-Cor corporation to act in good faith in the best interest of the corporation."); Lake Holiday Country Club, Inc. v. Summit Golf Club, Inc., 50 Va. Cir. 254, 262 (1999) ("The significance of imposing fiduciary duties upon an agent, such as a corporate officer, is that it restricts the permissible range of the agent's actions and requires that the agent act solely in the interests of his principal, which is the corporation.").

[17] All of these claims should be analyzed under the standard set forth in Sections 13.1-690.C and 13.1-692.1.B. Cf. In re Citigroup Inc. S'holder Deriv. Litig., 964 A.2d 106, 114 n.6 (Del. Ch. 2009) ("Delaware law does not recognize an independent cause of action against corporate directors and officers for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty."). It also bears noting that Virginia courts have generally treated recklessness as a type of negligence. See, e.g., Cowan v. Hospice Support Care, Inc., 268 Va. 482, 487, 603 S.E.2d 916, 918 (2004) (defining "willful and wanton negligence" as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another"); see also Hailey v. Johnson, 201 Va. 775, 778, 113 S.E.2d 664, 666 (1960) ("Gross negligence is wanton or reckless conduct; it is 'an utter disregard of prudence.'") (internal citation omitted). This comports with Delaware law, which treats allegations of reckless conduct as constituting a breach of the duty of care rather than a non-exculpable breach of the duty of loyalty. See McPadden v. Sidhu, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason."); In re Lear Corp. S'holder Litig., 967 A.2d 640, 652 n.45 (Del. Ch. 2008) (stating that liability for breach of the duty of care is predicated on "gross negligence," which "imports the concept of recklessness"); Tomczak v. Morton Thiokol, Inc., CIV. A. No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("[G]ross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.") (internal quotations omitted).

[18] As noted below, following the decision of the Delaware Supreme Court in Stone v. Ritter in 2006, a plaintiff cannot succeed on a duty of oversight claim under Delaware law without showing that the defendant directors knew that they were not discharging their fiduciary obligations, which effectively amounts to a showing of a lack of subjective good faith.

[19] 2006 Annual Report at 4; see also id. at 13 ("We are making significant adjustments to our mortgage sourcing and purchase strategies in an effort to meet our housing goals and subgoals, including changes to our underwriting guidelines and the expanded use of targeted initiatives to reach underserved populations. For example, we are purchasing loans and mortgage-related securities that offer lower expected returns on our investment and increase our exposure to credit losses. In addition, in order to meet future housing goals and subgoals, our purchases of goal-eligible loans need to increase as a percentage of total new mortgage purchases, which is causing us to forego other purchase opportunities that we would expect to be more profitable.").

[20] 69 Fed. Reg. 63580-01, at 63600 (Nov. 2, 2004).

[21] Id. at 63601 (Nov. 2, 2004).

[22] Id.

[23] OFHEO 2005 Annual Report to Congress at 3 (Jun. 15, 2005) ("Credit losses for Freddie Mac . . . remained very low at $137 million in 2004, up from $86 million the year before . . . ."); 2005 Annual Report at 21; OFHEO, "Mortgage Markets and the Enterprises in 2004" at 26 (Aug. 23, 2005); see also Transcript, Testimony of James Lockhart to the Senate Banking Committee, at 7 (Feb. 7, 2008) ("The Enterprises were then reporting credit losses of 1 to 2 basis points, a third of normal levels . . . .").

[24] 2005 Annual Report at 66.

[25] The Company's "Retained Portfolio" consisted of those mortgage investments that were acquired by the Company and held by the Company in its own investment portfolio rather than for resale to investors.

[26] 2005 Annual Report at 66; 2006 Annual Report at 69; 2007 Annual Report at 94.

[27] 2005 Annual Report at 66; 2007 Annual Report at 94.

[28] 2005 Annual Report at 66.

[29] 2006 Annual Report at 69.

[30] 2005 Annual Report at 66.

[31] Transcript, Freddie Mac at Citigroup Financial Services Conference, at 4 (Feb. 15, 2006) (emphasis added).

[32] The safety and soundness standard relied upon by the Sadowsky Complaint is a regulatory standard.

[33] 2005 Annual Report at 551; 2006 Annual Report at 59; 2004 Annual Report at 97.

[34] 2005 Annual Report at 55.

[35] The Committee is well aware of the New York Times article in which it is reported that Mr. Andrukonis warned Mr. Syron that "the firm was financing questionable loans that threatened its financial health." Charles Duhigg, "At Freddie Mac, Chief Discarded Warning Signs," The New York Times, August 5, 2008. The Committee questioned Mr. Andrukonis at length about the content of this article. Mr. Andrukonis repeatedly stated that, while he disagreed with some of the decisions made by senior management, he believes that management weighed the costs and benefits and made what they thought was the best business decision for the Company.

[36] Moreover, as is demonstrated by the various Form 4 filings by the Company identifying stock transactions by its officers and directors, the majority of the transactions were executed on a regular basis and reflected stock awards from the Company as well as sales to pay taxes on those awards. The Committee inquired of witnesses conducting transactions outside of this pattern, and found no evidence that such transactions were made based on inside information.

[37] See generally Form 4 filings by the Company identifying stock transactions by its officers and directors.

[38] 2004 Annual Report at 97.

[39] Id. at 97-98.

[40] Id. at 98.

[41] Id.

[42] 2005 Annual Report at 54.

[43] Id.

[44] Id.

[45] Id. at 55.

[46] Id. at 56.

[47] Id.

[48] 2006 Annual Report at 59.

[49] Id.

[50] Bassman Complaint ¶ 4(f).

[51] The performance of loans in later years is a reflection of the quality of the purchases in previous years.

[52] F. Nothaft, Mortgage Market Update - 2010 International Builders Show, at 14 (Jan. 19, 2010) (the remaining mortgages were held by FHA and VA, Bank and Thrift portfolios and "Other"); id. at 10; Prepared Remarks for R. Syron, Freddie Mac Annual Stockholders' Meeting, at 8-9 (Jun. 6, 2008) ("[O]ur overall asset quality continues to be among the best in the industry with a mortgage portfolio, which, compared to our competitors' is low in loan-to-value ratios, low in holdings of exotic mortgages, and high in regional diversification and high in credit quality.").

[53] The Company regularly conducted stress tests on its portfolio to determine the effect of declines in house prices. For example, in 2008, the Company estimated that a nation-wide instantaneous house price decline of 10%, which was believed to be extreme at the time, would result in a loss of $1 billion, or 4 percent of fair value of common equity.

[54] Freddie Mac Bylaws, § 8.01(h).

[55] These individuals still serving as officers are Mr. Bostrom, the current Executive Vice President and General Counsel, Mr. Boyd, the current Executive Vice President of Community Relations and President and CEO of the Freddie Mac Foundation, Mr. May, the current Executive Vice President of Multifamily, Mr. McLoughlin, the current Senior Vice President of External Relations, and Mr. Weiss, the current

Executive Vice President, Chief Administrative Officer and Chief Compliance Officer.  <u>See</u> Adams Complaint.

[56] These individuals still serving as directors include Robert R. Glauber and Nicolas P. Retsinas.



## 11 CIV 9201

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 11-cv-_____ |
| Plaintiff, | ECF CASE |
| v. | (Jury Trial Demanded) |
| RICHARD F. SYRON, PATRICIA L. COOK, and DONALD J. BISENIUS, | |
| Defendants. | |

### COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows:

### SUMMARY OF ALLEGATIONS

1.     This action arises out of a series of materially false and misleading public disclosures by the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") and certain of its senior executives relating to the exposure of Freddie Mac's largest business segment – Single Family Guarantee – to subprime mortgage loans.

2.     Between March 23, 2007, and August 6, 2008 (the "Relevant Period"), a period of heightened investor interest in the credit risks associated with subprime loans, Freddie Mac and defendants Richard F. Syron ("Syron"), Patricia L. Cook ("Cook"), and Donald J. Bisenius ("Bisenius") misled investors into believing that the Company had far less exposure to these riskier mortgages than in fact existed. To that end, at various times, each made or substantially assisted Freddie Mac and each other in making materially false and misleading statements that

claimed in substance that Freddie Mac had little or no exposure to subprime loans in its Single Family Guarantee business.

3.    While Freddie Mac disclosed during the Relevant Period that the exposure of its Single Family Guarantee business to subprime loans was between $2 billion and $6 billion, or between 0.1 percent and 0.2 percent, of Freddie Mac's Single Family Guarantee portfolio – its exposure to subprime was materially greater.  As of December 31, 2006, Freddie Mac's Single Family Guarantee business was exposed to approximately $141 billion (or 10 percent of the portfolio) in loans the Company internally referred to as "subprime," "otherwise subprime" or "subprime-like" and its exposure grew to approximately $244 billion (or 14 percent of the portfolio) by June 30, 2008, as the Company sought to win back lost market share by increasing its acquisition of such loans.

4.    Syron had ultimate authority over the subprime disclosures in Freddie Mac's Information Statements and supplements to the Information Statements published between March 23, 2007 and May 14, 2008, and in its Form 10-Q filed with the Commission on August 6, 2008, and also in speeches he gave or public statements he made in 2007 and 2008.  Cook spoke at an investor conference on May 17, 2007, in which she told investors that Freddie Mac had "basically no subprime exposure" and she provided substantial assistance to Syron and Freddie Mac in making subprime disclosures in the Information Statements and supplements and a Form 10-Q by certifying to the accuracy of the disclosures, which related to her area of responsibility.  Bisenius also certified to the accuracy of the subprime disclosures in certain Information Statements and supplements published during the Relevant Period and the Form 10-Q and thus substantially assisted Syron and Freddie Mac in making the misleading statements in these documents; he also substantially assisted Syron and Cook in making oral misstatements

2

about subprime by failing to correct statements in their prepared speeches that he knew misstated the Company's subprime exposure. Each defendant made, or substantially assisted others in the making of, these misleading subprime disclosures at a time when each knew, or was reckless in not knowing, that the Company was increasing its acquisition of higher-risk loans that it internally referred to as "subprime," "otherwise subprime" or "subprime-like."

5.    By this conduct, Syron and Cook violated, and Syron, Cook and Bisenius aided and abetted violations of, the antifraud and reporting provisions of the federal securities laws.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

7.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

8.    In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Syron, Cook and Bisenius have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## RELEVANT ENTITY

9.    **Freddie Mac** was, at all times relevant to this Complaint, a shareholder-owned Government Sponsored Enterprise ("GSE") established by the U.S. Congress on July 24, 1970, with the passage of the Federal Home Loan Mortgage Corporation Act (the "FHLMC Act"), to provide a continuous flow of funds for residential mortgages. Freddie Mac performed this function by buying and guaranteeing residential mortgage loans and mortgage-related securities, which it financed by issuing mortgage-related securities, debt securities and equity securities. Under the FHLMC Act, the Company's securities were "exempt securities," meaning they were exempt from the registration and disclosure requirements of the federal securities laws. On July 18, 2008, Freddie Mac voluntarily registered its common and preferred stock under Section 12(g) of the Exchange Act by filing a Form 10 registration statement with the Commission. Prior to July 18, 2008, Freddie Mac publicly disseminated annual and quarterly reports of its financial condition and results of operations in Information Statements and Information Statement Supplements, which were virtually identical in presentation to annual and quarterly reports filed with the Commission by registrants. Since July 18, 2008, Freddie Mac has been subject to the reporting requirements of the federal securities laws. During the Relevant Period, Freddie Mac's common stock was actively traded on the New York Stock Exchange under the ticker symbol "FRE." Its principal place of business was, and is, in McLean, Virginia.

10.    Freddie Mac manages its business through three reportable segments: (i) Single Family Guarantee ("Single Family"), (ii) Investments, and (iii) Multifamily.

11.    Single Family is Freddie Mac's primary business segment. During the Relevant Period, Freddie Mac reported that the size of its Single Family business was $1.4 trillion as of December 31, 2006, $1.7 trillion as of December 31, 2007 and $1.8 trillion as of June 30, 2008.

4

12.     Through its Single Family business, Freddie Mac purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them as Freddie Mac mortgage-backed securities, known as Participation Certificates ("PCs"). Freddie Mac guarantees the payment of principal and interest on the mortgage loans that underlie these PCs in exchange for guarantee fees.

13.     During the Relevant Period, Freddie Mac completed at least four preferred stock offerings, raising approximately $7.5 billion: (i) pursuant to an Offering Circular dated April 10, 2007, it issued $500 million worth of 5.66 percent non-cumulative perpetual preferred stock, (ii) pursuant to an Offering Circulated dated July 17, 2007, it issued $500 million worth of 6.02 percent non-cumulative perpetual preferred stock, (iii) pursuant to an Offering Circular dated September 25, 2007, it issued $500 million of 6.55 percent non-cumulative perpetual preferred stock and (iv) pursuant to an Offering Circular dated November 29, 2007, it issued $6 billion fixed-to-floating rate non-cumulative perpetual preferred stock. Additionally, in mid-2008, Freddie Mac executives attempted to make at least one additional preferred stock offering in the amount of $5.5 billion. Throughout the Relevant Period, Freddie Mac also routinely issued debt securities.

14.     On September 6, 2008, following mounting losses, Freddie Mac's primary regulator, the FHFA, placed it into conservatorship. On September 7, 2008, FHFA, as conservator, adopted a resolution eliminating the par value of Freddie Mac's common stock, increasing the number of shares of Freddie Mac common stock authorized for issuance to four billion, preventing Freddie Mac from making any payment to purchase or redeem its capital stock or pay any dividends to holders of Freddie Mac's common stock, and limiting the voting rights of holders of Freddie Mac's common stock.

5

## **DEFENDANTS**

15.     **Richard F. Syron**, age 68, was Chairman of the Board of Directors ("Chairman") and Chief Executive Officer ("CEO") of Freddie Mac from December 2003 until September 7, 2008, when Freddie Mac's regulator, the Federal Housing Finance Agency ("FHFA"), placed it into conservatorship. Syron's compensation grew from approximately $14.7 million in 2006 to $18.3 million in 2007 – tied, in part, to the "Touch More Loans" initiative discussed further below in Paragraph 45 and to quarterly financial reporting. Syron formally ceased to be an employee of Freddie Mac on November 7, 2008, and was deemed to have resigned from the Board of Directors, effective as of that date. Syron is a resident of Massachusetts.

16.     As Chairman and CEO of Freddie Mac, Syron oversaw all three of Freddie Mac's reportable segments, including Single Family. As Chairman, Syron was a regular attendee at Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings. As CEO, he chaired a team that he personally selected from the upper echelons of executive management called the "SET" or "Senior Executive Team," which met periodically to consider Freddie Mac's strategic direction. Syron also regularly attended monthly meetings of the Enterprise Risk Management Committee (the "ERMC"), which was a committee comprised of executives and senior management from Freddie Mac's three reportable segments that considered the status of credit, market and operational risks, among others, to the Freddie Mac enterprise. Syron received monthly materials from the ERMC that apprised him of the credit, market and operational risks, among others, to the Freddie Mac enterprise. Syron also attended meetings of the ERMC.

17.     Syron had extensive knowledge and experience in housing market-related issues. He wrote a dissertation about the housing market and served in various leadership positions at

6

both the Federal Reserve Bank of Boston and the Federal Home Loan Bank of Boston, including President and CEO. Syron was knowledgeable about the housing market and mortgage-related risks, and familiar with the views held by other market participants.

18. Syron regularly received and reviewed drafts of the Freddie Mac Information Statements and Annual Reports to Stockholders ("Information Statements") and supplements to the Information Statements ("Information Statement Supplements") and, once Freddie Mac became an SEC-reporting company, drafts of Freddie Mac's first Form 10-Q. Syron certified Freddie Mac's Information Statements and Supplements published between March 23, 2007 and May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008.

19. **Patricia L. Cook**, age 58, was an officer of Freddie Mac and held several titles, including Executive Vice President ("EVP") of Investments and Capital Markets and Chief Business Officer ("CBO"), from August 2004 through September 26, 2008. Cook's compensation was $4.9 million in 2006 and $4.8 million in 2007 – tied, in part, to the Touch More Loans strategy discussed below in Paragraph 45 and to quarterly financial reporting. Cook formally ceased to be an employee of the Company on November 17, 2008, approximately two months after the Company announced certain management and organizational changes, including the elimination of her position. Cook is a resident of Washington, D.C.

20. As EVP of Investments and Capital Markets and as CBO, Cook oversaw Single Family. Cook attended Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings. Cook was one of the senior executives who served on Syron's SET. She also attended or, on occasion, sent representatives on her behalf, to the monthly ERMC meetings. She received materials from the ERMC that apprised her of the credit, market and operational risks, among others, to the Freddie Mac enterprise. As

7

the senior executive in charge of the Single Family business, Cook was knowledgeable about Freddie Mac's acquisitions and the performance of Freddie Mac's high risk loan portfolio, including certain loans the Company internally considered to be subprime.

21.    The Touch More Loans strategy, discussed below in Paragraph 45, also played a role in Cook's compensation. In 2006, Cook's target bonus was $2 million and her target long-term equity award for performance was $2.4 million. Cook received a bonus of $2.3 million, or $300,000 in excess of her target, and a long-term equity award equating to $2.763 million, or $363,000 greater than her target, in part due to Cook's Touch More Loans strategy. In 2007, Cook received a bonus of $1.4 million dollars plus a supplemental bonus of $200,000 with a three-year vesting schedule, again in part because of Touch More Loans.

22.    Cook was responsible for ensuring that Single Family's public disclosures were accurate. Cook was considered an expert on credit risk within Freddie Mac. Furthermore, during the Relevant Period, the Disclosure Committee consulted Cook at least once regarding the Company's public disclosures concerning subprime.

23.    Cook signed sub-certifications directed to Syron and other senior executives for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007 and May 14, 2008, and for Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008. Each of Cook's sub-certifications covered the Company's subprime disclosures.

24.    **Donald J. Bisenius**, age 53, was employed by Freddie Mac from 1992 through April 1, 2011, and held a number of titles, including Senior Vice President ("SVP") of Credit Policy and Portfolio Management from November 2003 to April 2008, SVP of Single Family

Credit Guarantee from May 2008 to May 2009 and, most recently, EVP of Single Family Credit Guarantee. Bisenius is a resident of Virginia.

25.    In 2007 and 2008, Bisenius reported directly to Cook and was the senior-most officer for credit risk in Single Family during the periods covered by the Information Statement and Information Statement Supplements for the periods ended December 31, 2006, March 31 and June 30, 2007, the Information Statement Supplement for the period ended March 31, 2008, and the Form 10-Q for the period ended June 30, 2008. As the senior-most officer for credit risk in Single Family, Bisenius was recognized within Freddie Mac as an expert on single-family mortgages and on credit risk and was responsible for developing credit policies for Freddie Mac's guarantee of loans.

26.    Between approximately March 2007 and April 2008, Bisenius also focused on certain "special projects," including a "Model Subprime Offering" discussed below in Paragraph 61, aimed at borrowers previously serviced by lenders who self-identified as subprime originators.

27.    Bisenius signed sub-certifications for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007, and August 30, 2007, Freddie Mac's Information Statement Supplement published on May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008. Each of Bisenius' sub-certifications covered the Company's subprime disclosures. Bisenius also served on the Disclosure Committee that considered Freddie Mac's Information Statement Supplement for the period ended March 31, 2008, and its Form 10-Q for the period ended June 30, 2008.

## *Background*

28.     As described below, in or about June 2006, Freddie Mac began to quantify in its public disclosures the approximate amount of exposure to subprime loans in the Single Family guarantee business. During the Relevant Period, Freddie Mac provided various such estimates – ranging between $2 and $6 billion, or 0.1 to 0.2 percent of its Single Family guarantee business. In fact, during this period, Single Family had exposure to between approximately $140 billion and $244 billion of loans that Freddie Mac internally recognized were "subprime," "otherwise subprime" or "subprime-like." The misleading statements identified herein all relate to attempts by Freddie Mac and its senior executives, including defendants, to minimize and mislead investors concerning the exposure of Freddie Mac's Single Family guarantee business to subprime loans.

29.     Beginning with its Information Statement for the fiscal year ended December 31, 2003 (the "2003 Information Statement"), and continuing through the Relevant Period, Freddie Mac published tables of credit risk characteristics for Single Family loans (the "Credit Risk Tables"). Those Credit Risk Tables contain information describing risk characteristics such as original loan-to-value ("LTV") ratio bands, product type, property type, occupancy type, FICO credit score bands, loan purpose, geographic concentration, and origination year. The Credit Risk Tables did not quantify or otherwise provide estimates of Freddie Mac's exposure to subprime loans.

30.     In or about March 2007, as investor interest in the credit risk associated with subprime loans continued to increase, Freddie Mac began to provide narrative disclosure describing and estimating the exposure of its Single Family guarantee business to subprime

loans. These disclosures contained blatantly false and misleading statements for the reasons described below.

### Since the 1990s, Freddie Mac Internally Categorized Loans As Subprime Or Subprime-Like As Part Of Its Loan Acquisition Programs And In Connection With Monitoring The Risk Of Its Portfolios

31.    As part of its loan acquisition and securitization process in the Single Family credit guarantee portfolio, Freddie Mac provided mortgage loan originators with a series of mortgage underwriting standards and/or automated underwriting software tools, including, since at least 1995, its proprietary automated underwriting system ("AUS") called "Loan Prospector."

32.    Loan Prospector generated a credit risk classification for each loan and was used to determine the terms on which a loan could be sold to Freddie Mac, including whether a loan could be sold to Freddie Mac without certain representations and warranties or without additional cost.

33.    During the Relevant Period, Loan Prospector generated a score that estimated the risk of default for each loan. The scores, in turn, were grouped into six bands or "grades," which roughly corresponded to the level of anticipated risk: A+, A1, A2, A3, C1 or C2. These grades were visible to Freddie Mac but not to mortgage loan originators or the public. Loans falling into the first four grades (A+, A1, A2 and A3) were designated "Accept Loans." Loans falling into the bottom two grades (C1 and C2) were designated "Caution Loans."

34.    A loan designated as an Accept Loan permitted automated underwriting, reduced documentation and generally did not require originators to make special representations and warranties regarding the credit quality of the loan because Loan Prospector had already determined the loan was creditworthy.

35.    By contrast, Loan Prospector's designation of a loan as a Caution Loan meant that the system had identified concerns about the loan's creditworthiness. Originators were required

11

manually to underwrite Caution Loans, produce additional documentation regarding the borrower's creditworthiness, and make special representations and warranties regarding the credit quality of the loan. Caution Loans had multiple higher risk characteristics, such as high LTV ratios, borrowers with lower FICO scores, unusual property types or high debt-to-income ratios, and were recognized within Freddie Mac as loans that had a high risk of default relative to Accept Loans. Internally at Freddie Mac, Caution Loans were considered to be equivalent to subprime.

36. On October 8, 1997, Freddie Mac publicly announced the roll-out of its "A-minus Program" at the Mortgage Bankers Association's annual meeting in New York. "A-minus" was a term commonly used in the marketplace to refer to subprime loans. The next day, the *American Banker* published an article reporting on Freddie Mac's announcement and observed that "Freddie Mac is diving into subprime lending, ending months of speculation over how deeply the agency would go into the burgeoning market." Under the A-minus Program, Caution Loans that received a score of C1 in Loan Prospector could be sold to Freddie Mac on the same terms as an Accept Loan with the payment of an additional fee by the seller. As noted by the *American Banker* article, the A-minus Program was publicly perceived as expanding Freddie Mac's exposure to subprime loans.

37. Sales and marketing materials prepared for Single Family as part of the roll-out of the A-minus Program advised the Company's sales force that "Freddie Mac is expanding the range of loans it will purchase, including many loans in the A-minus sector of the market. Now lenders can use Loan Prospector to provide less costly, more efficient financing to borrowers with weaker credit." In describing the A-minus sector of the housing market, the sales and

12

marketing materials stated that "A-minus loans account for approximately 50 percent of subprime loans."

38.    In or about November 1998, in connection with the A-minus Program, Freddie Mac revised its Credit Policy Book as it related to the broader credit risk parameters and processes under which Freddie Mac was willing to guarantee loans in Single Family.  The memorandum authorizing these revisions described mortgages eligible for the A-minus Program as "[m]ortgages that generally comprise the first and second tier of subprime lender risk grades" and "mortgages generally includ[ing] 54% to 56% of the subprime market."  Mortgage loans that received a C1 rating in Loan Prospector were described as having a credit quality of "A-minus," and those that received a C2 rating in Loan Prospector were described as having a credit quality of "subprime."  Bisenius signed and approved the revisions to the Credit Policy Book.

39.    In or about 1999, at the request of Bisenius, Freddie Mac developed an econometric model called "Segmentor," which enhanced Loan Prospector's ability to identify subprime loans prior to Freddie Mac guaranteeing those loans.  The model scored mortgage loans on a variety of credit risk characteristics, such as debt ratio, FICOs, and time since most recent foreclosure, and generated a "subprime score."  If the Segmentor "subprime score" fell below certain thresholds or had certain characteristics such as a high debt-to-income ratio, the loan received an automatic rating of C1 or C2 in Loan Prospector.

40.    Loan Prospector developed and evolved over time, but, the internal view that Caution Loans (C1 and C2) were synonymous with subprime or were "subprime-like" did not change.

41.    Freddie Mac's exposure to Caution Loans up through the Relevant Period steadily rose.  As of the end of 2004, Freddie Mac guaranteed the principal and interest on Caution Loans

13

in the amount of approximately $70 billion. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to Caution Loans from approximately $73 billion to $233 billion, with the largest annual increase between the fourth quarter of 2006 (approximately $138 billion) and the fourth quarter of 2007 (approximately $216 billion). While Caution Loans were internally referred to as subprime, they were not disclosed publicly as part of the Company's Single Family subprime exposure.

### *Freddie Mac Acquires Increasingly Risky Loans to Maintain Market Share*

42.    In or about the early 2000s, Freddie Mac and the Federal National Mortgage Association ("Fannie Mae") began to lose market share in mortgage loan securitizations to new competitors, including Wall Street banks. Mortgage originations had shifted from traditional fixed-rate loans to higher risk loan products with features such as adjustable rates ("ARMs"), interest-only payments, and reduced documentation requirements.

43.    By 2005, the Freddie Mac and Fannie Mae combined share of the market for mortgage securitizations had fallen to approximately 42 percent from a high of nearly 60 percent in 2000. Within that shrinking GSE share of the market, Freddie Mac also had been steadily losing market share to Fannie Mae. Freddie Mac responded to this loss of market share by broadening its credit risk parameters to purchase and guarantee increasingly risky mortgages in its Single Family guarantee portfolio between approximately 2004 and 2007.

44.    For example, in or about late 2004, despite contrary advice from the Company's senior credit risk experts, Syron authorized Freddie Mac's continued purchases of a particularly risky type of mortgage commonly referred to in the industry as a "No Income, No Asset" loan or "NINA." NINAs were widely considered to be particularly risky because they did not require any verification of a borrower's income or assets. Freddie Mac's senior credit risk officers

14

advocated to Syron that the Company stop guaranteeing NINA mortgages, in part, because of the high risk of default associated with such mortgages within their first year and because of perceived reputation risk to the Company. Syron rejected the advice, in part due to his desire to improve Freddie Mac's market share.

45.     Another example of increased risk taking occurred in or about 2005, when the Company embarked on a business strategy called Touch More Loans. Touch More Loans was designed to gain back lost market share by granting exceptions to Freddie Mac's existing credit policy to permit the acquisition and guarantee of riskier loans that were being originated in the marketplace. Cook led the Touch More Loans strategy.

46.     Coinciding with the introduction of Touch More Loans, the Company embarked on two additional initiatives to expand market share:

a.     First, in February 2005, Freddie Mac introduced a new residential mortgage product called Home Possible, which was geared to low-to-moderate income borrowers (such as teachers, law enforcement personnel, healthcare workers and the military) and permitted lower down payments or higher loan-to-value ratios, among other higher credit risk characteristics, than had previously been allowed. Loans acquired through Home Possible were internally considered to be "subprime-like."

b.     Second, on August 17, 2005, Freddie Mac internally issued a policy statement authorizing increased guarantees of a Fannie Mae proprietary product called "Expanded Approval" (or "EA") loans. As of December 2004, Freddie Mac guaranteed the principal and interest on EA loans in the approximate amount of $69 million. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to EA loans from approximately $1 billion to $11 billion (with the largest increase of

approximately $8 billion coming between the fourth quarter of 2006 and the fourth quarter of 2007).  EA loans were considered to have, at best, credit risk equivalent to A-minus loans and were internally described in this policy statement as (1) "appear[ing] to be subprime in nature[;]" and (2) "high risk . . . since performance compares to subprime products."  In fact, on August 20, 2007, in an email that was sent to Cook and others, Bisenius described EA loans as "clearly subprime."

47.     From 2005 forward, Freddie Mac also substantially increased its exposure to loans from a subprime lending division of Countrywide Financial Corporation ("Countrywide") known as Full Spectrum Lending.  Between 1999 and 2004, Freddie Mac acquired loans from Countrywide's Full Spectrum Lending division in the aggregate amount of approximately $279 million.  From 2005 through 2008, Freddie Mac acquired approximately $12 billion of Full Spectrum Lending loans (with the largest increase between 2006 (approximately $3 billion) and 2007 (approximately $6 billion)).

48.     The approximate aggregate amount (in billions of U.S. dollars), measured by unpaid principal balance, of C1, C2 and EA loans in Single Family at the end of the following periods was as follows:

| Single-Family Guarantee Portfolio | | | | | | | |
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1Q05 | $1 | $39 | $35 | $74 | $75 | $1,220 | 6% |

16

| Single-Family Guarantee Portfolio | | | | | | |
|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 2Q05 | $1 | $42 | $37 | $79 | $80 | $1,244 | 6% |
| 3Q05 | $1 | $47 | $39 | $86 | $87 | $1,274 | 7% |
| 4Q05 | $2 | $53 | $42 | $95 | $97 | $1,318 | 7% |
| 1Q06 | $2 | $60 | $47 | $107 | $109 | $1,360 | 8% |
| 2Q06 | $2 | $64 | $50 | $114 | $116 | $1,387 | 8% |
| 3Q06 | $2 | $71 | $54 | $125 | $127 | $1,428 | 9% |
| 4Q06 | $3 | $78 | $60 | $138 | $141 | $1,467 | 10% |
| 1Q07 | $4 | $89 | $67 | $156 | $160 | $1,528 | 10% |
| 2Q07 | $6 | $100 | $77 | $177 | $183 | $1,586 | 12% |
| 3Q07 | $8 | $110 | $88 | $198 | $206 | $1,642 | 13% |
| 4Q07 | $11 | $118 | $98 | $216 | $227 | $1,692 | 13% |
| 1Q08 | $11 | $123 | $104 | $227 | $238 | $1,739 | 14% |
| 2Q08 | $11 | $127 | $106 | $233 | $244 | $1,784 | 14% |

17

### *Freddie Mac's Acquisition and Guarantee Of*
### <u>*Loans From Other AUSs Increases its Subprime Exposure*</u>

49.     Beginning in or about 2004, in addition to purchasing and guaranteeing the payment of principal and interest on loans that had been underwritten using Loan Prospector, Freddie Mac increasingly purchased and guaranteed mortgage loans underwritten through other proprietary AUSs.   For example, Freddie Mac purchased and guaranteed mortgage loans underwritten using AUSs such as Fannie Mae's Desktop Underwriter and Countrywide's CLUES.

50.     To assess the relative risk of mortgages underwritten through other AUSs, Freddie Mac used an internal modeling system called LP Emulator to approximate how the loans would have scored under Loan Prospector.   LP Emulator used the same scoring metric as Loan Prospector – Accept Loans (A+, A1, A2 and A3) and Caution Loans (C1 and C2) – but, LP Emulator was run on a loan after Freddie Mac had agreed to guarantee the loan.   Using LP Emulator, Freddie Mac could identify a loan that would have been designated as a Caution Loan if underwritten through Loan Prospector, but had instead been guaranteed on terms equivalent to an Accept Loan after being underwritten through another AUS.   Loans falling into this category were deemed to have a "defect."   Beginning in 2004, Freddie Mac tracked the "defect rate" of loans acquired through other AUSs.

51.     In the second quarter of 2003, before Freddie Mac increased its purchases through AUSs other than Loan Prospector, Freddie Mac's aggregate defect rate was approximately 1 percent.   Freddie Mac's purchase and guarantee of mortgages underwritten through other AUSs increased to the point where it was acquiring fewer loans through Loan Prospector (approximately 27 percent) than through Fannie Mae's Desktop Underwriter (approximately 31 percent).   The defect rate rose dramatically, and in August 2007, the aggregate defect rate

18

reached a historical high of approximately 22 percent. Approximately 22 percent of the loans Freddie Mac purchased and guaranteed that were underwritten through other AUSs therefore met the Freddie Mac internal definition of subprime.

### *Defendants Were Aware of Subprime Exposure in Single Family*

52. On May 25, 2006, Cook attended a meeting of the Board's Finance and Capital Deployment Committee. Prior to that meeting, she received a memorandum authored by the Company's then-Chief Enterprise Risk Officer, highlighting for her and the other attendees that "[t]he credit parameters of new single-family purchases continue to decline. In order to support our business strategies to increase customer focus, build market share and meet affordable goals, we continue to expand credit policies and increase purchases of higher-risk products."

53. Six days later, on May 31, 2006, Syron and Cook attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was highlighted that the Touch More Loans strategy had resulted in significantly greater credit risk to the Company. Specifically, a presentation made by a senior credit risk officer stated that, pursuant to Touch More Loans, Freddie Mac was "expanding our appetite" for, among other things, risk layering of lower FICOs, higher LTV's, other AUSs, and other high-risk loans. To the extent it was not already clear to them prior to the meeting, Syron and Cook also were informed that the Company was loosening its underwriting standards through its implementation of the Touch More Loans strategy by, among other things, increasing exceptions to the Company's existing credit policy – exceptions that had almost tripled between 2004 and 2005, from 286 in 2004 to 770 in 2005.

54. On November 30, 2006, Bisenius' staff informed him that loans sold to Freddie Mac through Fannie Mae's Desktop Underwriter were contributing disproportionately to the Company's increasing defect rate and included loans that were equivalent to subprime. Specifically, Bisenius' staff told him and others that loans from Fannie Mae's Desktop

Underwriter "have a much higher percent of defect loans, loans that are subprime-like, loans that have very low FICOs" in referring to loans that contributed to the increasing "defect rate" at the Company.

55.    On December 7, 2006, Syron and Cook attended a meeting of the Mission, Sourcing and Technology Committee of the Board of Directors.   Attached to a presentation prepared for that meeting was a glossary of terms, the purpose of which was to inform the Board of how management used certain terms.  The glossary defined "Subprime Mortgages" as follows:

> There is no longer a clear-cut distinction between prime and subprime mortgages as the mortgage market has evolved to provide for mortgage credit to a full range of borrowers with a variety of products and processes.  Subprime mortgages generally are mortgages that involve elevated credit risk.  Whereas prime loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who have a blemished or weak credit history and/or a weaker capacity to repay.

Ultimately, during the Relevant Period, the Company's public subprime disclosures were inconsistent with how management characterized its use of the term "subprime" for its own Board members.

56.    Beginning on or about January 18, 2007, Freddie Mac's ERMC began to report on Freddie Mac's exposure to subprime loans.  Attendees of the January 18 ERMC meeting – including Syron and Cook – were told that "[l]oan level risk grades are blurred as capital retreats in [the] subprime market, increasing the likelihood that we are already purchasing subprime loans under existing acquisition programs."   Accordingly, this presentation reinforced to attendees of this meeting that it was likely that Freddie Mac already was purchasing loans with credit risk characteristics similar to loans originated by self-identified subprime originators, and that market participants would consider to be subprime loans.  The ERMC met monthly after this

and Syron and Cook generally attended ERMC meetings.  Going forward, the ERMC reports consistently contained this same warning.  Syron typically received the ERMC reports in advance of the meetings and generally reviewed them prior to the meetings.

57.    On February 6 and 7, 2007, Syron gathered his Senior Executive Team for a two-day offsite planning meeting in Florida to discuss Freddie Mac's strategic direction.  Cook attended as a member of the SET, as did Bisenius (who was invited even though he was not formally a member of the SET).  At least one presentation was devoted to Freddie Mac's role in the subprime market.  That presentation highlighted for attendees the following regarding Freddie Mac's exposure to subprime:

- Freddie Mac "already purchase[s] subprime-like loans . . . but with considerably lower fees[,]" which attendees generally understood meant that Freddie Mac was purchasing loans with credit risk and expected default rates similar to the loans originated by a small handful of institutions that self-identified as subprime originators.

- The "[w]orst 10% of [the Single Family] Flow Business" – which comprised approximately 70 percent of Single Family purchases in 2006 – were "subprime-like loans."

- Freddie Mac was purchasing greater percentages of "risk layer[ed]" loans, defined as loans consisting of total LTV greater than 90 percent and FICO scores less than 680, which was "leading to more 'Cautions'" and a higher "[d]efect rate."

- "'Caution' loans have greater default costs . . . resulting in higher expected losses[.]"

21

58. On February 17, 2007, Syron received and responded to an email from Bisenius regarding a new "Subprime Project." Bisenius told Syron and others that an expanded role in the subprime market only made sense if Freddie Mac was adequately compensated for the risk, and reminded Syron and others that there were certain categories of loans, including "free cautions," that the Company already purchased and did not receive adequate compensation for the risk.

59. On March 2 and 3, 2007, Syron, Cook and Bisenius attended a two-day Board of Directors meeting, a significant portion of which was dedicated to the Company's strategic direction in subprime. Cook was one of the presenters at the Board meeting and she, along with the then-Chief Operating Officer, presented similar information to the Board as contained in the February 6 and 7 offsite meeting. Specifically, Cook and the then-Chief Operating Officer led a discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow Business" was listed as an example of "subprime-like loans" the Company already purchased, and in which they conveyed:

- "We already purchase subprime-like loans to help achieve our HUD goals . . . [b]ut we receive considerably lower fees than subprime loans would fetch in the market."

- "Some of our current purchases have subprime-like risk[.]"

- "[F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, with returns five to six times as great, not universal for all subprime."

60. In addition to receiving at least the SET and Board materials referred to above in Paragraphs 57 and 59 which highlighted, among other things, that a material portion of the Single Family business was "subprime-like," and monthly ERMC reports which repeatedly warned of the increasing risk that Freddie Mac was buying subprime loans (and showed data