C7VAAFEDC1                    Conference

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x      11 Civ. 5201 (DLC)
                                          11 Civ. 6188 (DLC)
 3   FEDERAL HOUSING FINANCE AGENCY,      11 Civ. 6189 (DLC)
                                          11 Civ. 6190 (DLC)
 4                    Plaintiff,          11 Civ. 6192 (DLC)
                                          11 Civ. 6193 (DLC)
 5              v.                        11 Civ. 6195 (DLC)
                                          11 Civ. 6196 (DLC)
 6   UBS AMERICAS INC., et al.,           11 Civ. 6198 (DLC)
                                          11 Civ. 6200 (DLC)
 7                    Defendants,         11 Civ. 6201 (DLC)
                                          11 Civ. 6202 (DLC)
 8   and other FHFA cases.                11 Civ. 6203 (DLC)
                                          11 Civ. 6739 (DLC)
 9   ------------------------------x      11 Civ. 7010 (DLC)
                                          11 Civ. 7048 (DLC)
10
                                          New York, N.Y.
11                                        July 31, 2012
                                          3:00 p.m.
12
     Before:
13
               HON. DENISE COTE
14
                                          District Judge
15

16
               APPEARANCES
17


18
     QUINN EMANUEL URQUHART & SULLIVAN LLP
19        Attorneys for Plaintiff
     BY:  PHILIPPE SELENDY
20        RICHARD SCHIRTZER
          JON COREY
21        CHRISTINE H. CHUNG
          JULIA GUARAGNA
22        JORDAN GOLDSTEIN

23
     KASOWITZ BENSON TORRES & FRIEDMAN LLP
24        Attorneys for Plaintiff
     BY:  MARC E. KASOWITZ
25        KANCHANA LEUNG
          MICHAEL HANIN
```

C7VAAFEDC1                      Conference

                   APPEARANCES


STEPHEN HART
     Managing Associate General Counsel FHFA


SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for Defendants UBS Americas Inc. and affiliated
     entities and individuals; and SG Americas, Inc. and
     affiliated entities and individuals
BY:  JAY KASNER
     SCOTT MUSOFF
     JOSEPH SACCA
     ROBERT FUMERTON


SULLIVAN & CROMWELL LLP
     Attorneys for Defendant JPMorgan Chase & Co. and
     affiliated entities, and certain individuals
BY:  PENNY SHANE
     SHARON NELLES
     JONATHAN NEDLAK


SULLIVAN & CROMWELL LLP
     Attorneys for Defendant Goldman Sachs & Co. and affiliated
     entities and individuals
BY:  RICHARD KLAPPER
     THEODORE EDELMAN
     MICHAEL TOMAINO


SULLIVAN & CROMWELL LLP
     Attorneys for Defendant Barclays Bank PLC and affiliated
     entities and individuals
BY:  DAVID BRAFF
     JEFFREY SCOTT


SULLIVAN & CROMWELL LLP
     Attorneys for Defendants First Horizon National
     Corporation and affiliated entities and individuals; and
     Nomura Holding America, Inc. and affiliated entities and
     individuals
BY:  BRUCE CLARK
     AMANDA DAVIDOFF

C7VAAFEDC1                        Conference

 1              APPEARANCES

 2

 3     PAUL WEISS RIFKIND WHARTON GARRISON LLP
            Attorneys for Defendants CitiGroup Global Markets, Inc.;
            CitiGroup, Inc. and affiliated entities and individuals
 4     BY:  CAITLIN GRUSAUSKAS
            BRUCE BIRENBOIM
 5          SUSANNA BUERGEL

 6

 7     CRAVATH SWAINE & MOORE LLP
            Attorneys for Defendant Credit Suisse Securities (USA) LLC
            and affiliated entities and individuals
 8     BY:  RICHARD CLARY
            MICHAEL REYNOLDS

 9

10     SIMPSON THACHER & BARTLETT LLP
            Attorneys for Defendants RBS Securities Inc.; and Deutsche
11          Bank AG and affiliated entities
       BY:  THOMAS RICE
12          DAVID WOLL

13

14     BOIES SCHILLER & FLEXNER LLP
            Attorneys for Defendant HSBC North America Holdings and
            affiliated entities and individuals
15     BY:  ANDREW MICHAELSON

16

17     MAYER BROWN LLP
            Attorneys for Defendant HSBC North America Holdings and
            affiliated entities and individuals
18     BY:  MICHAEL WARE
            JOHN CONLON

19

20     MAYER BROWN LLP
            Attorneys for Defendants Ally Financial Inc. and GMAC
21          Mortgage Group, Inc.
       BY:  CATHERINE BERNARD
22          REGINALD GOEKE
            MICHAEL O. WARE

23

24     KIRKLAND & ELLIS LLP
            Attorneys for Defendant Ally Securities, LLC
25     BY:  ROBERT J. KOPECKY

C7VAAFEDC1                        Conference

 1                   APPEARANCES

 2

 3    CARPENTER LIPPS & LELAND LLP
           Attorneys for Defendant Ally Securities, LLC
      BY:  JEFFREY A. LIPPS
 4         JENNIFER A.L. BATTLE

 5

 6    WILLIAMS & CONNOLLY LLP
           Attorneys for Defendants Bank of America Corporation and
           affiliated entities; and Merrill Lynch and affiliated
 7         entities
      BY:  EDWARD J. BENNETT
 8         PHIL SECHLER
           BETH A. STEWART

 9

10    DAVIS POLK & WARDWELL LLP
           Attorneys for Defendant Morgan Stanley and affiliated
11         entities and individuals
      BY:  JAMES ROUHANDEH
12         BRIAN WEINSTEIN
           DANIEL SCHWARTZ
13         NICHOLAS GEORGE

14

15    WEIL GOTSHAL & MANGES LLP
           Attorneys for Defendant General Electric Company and
           affiliated entities
16    BY:  VERNON BRODERICK
           SETH GOODCHILD

17

18    RICHARDS KIBBE & ORBE LLP
           Attorneys for Individual Defendants Carp, Caruso, Ellison
19         Goodsin, Johnson, Kula, Maxwell, Ryan, Schetritt,
           Glassner, Whalen, Publisi and Park
20    BY:  NEIL BINDER
           DANIEL ZINMAN

21

22    ALLEN & OVERY LLP
           Attorneys for Individual Defendant Molinaro
23    BY:  PAMELA CHEPIGA
           JOSEPHINE A. CHEATHAM

24

25

C7VAAFEDC1                    Conference

1                    APPEARANCES

2

3    KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Individual Defendant Verschleiser
     BY:  DANI R. JAMES

4

5    MORRISON & FOERSTER LLP
          Attorneys for Individual Defendants Marano and Nierenberg
6    BY:  JOEL HAIMS

7

8    GREENBERG TRAURIG LLP
          Attorneys for Individual Defendant Mayer
     BY:  RONALD D. LEFTON

9

10   SNR DENTON US LLP
          Attorneys for Individual Defendant Perkins
11   BY:  SANDRA HAUSER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C7VAAFEDC1                     Conference

1           (Case called)

2           THE COURT:  Thank you, everyone.  Appreciate your

3    appearance here today.  We have a number of matters to address.

4    So let me list the issues that I am aware of.  We're going to

5    talk about a schedule for expert discovery, what I'll refer to

6    at this stage for expert discovery.  We're going to talk about

7    discovery of the plaintiff and its constituent entities beyond

8    the PLS divisions or branches within those agencies.

9           I am going to ask Ms. Shane for a status report on how

10   we're doing with predictive codeine.  I am hoping that a meet

11   and confer process has resolved any disputes concerning

12   discovery related to ResCap, but we'll see.

13          I know I have been given two documents.  I haven't had

14   a chance to look at them.  I want to say my two page letter

15   limit had a good impact on attorney's time but has failed

16   adequately to address the paralegal time issues but I made a

17   good stab at getting through materials.  I am not sure I've'

18   focused on precisely the passages you wanted me to but I've

19   looked at a lot of material you've submitted.  And counsel, of

20   course, may have other issues they want to address today as

21   well.

22          I have good news and bad news for everybody.  So

23   depending on the issue, you will be happy or disappointed.  So

24   maybe I'll just start with some preliminary rulings on an issue

25   and then give a chance to the disappointed parties to be heard

C7VAAFEDC1                      Conference

1    and, if necessary, we'll have a more extensive discussion.

2              Why don't I start by disappointing FHFA and I'll move

3    on to the defendants.

4              So let's talk about the staging of expert discovery.

5    At our June 13 conference at page 14 I briefly outlined how I

6    thought disclosures might proceed.  Based on the materials that

7    had been presented to me in advance of that conference which I

8    noted at the time were very helpful to me, I came to the

9    conclusions that the defendants would not agree to restricting

10   discovery in this case to a sample of loan files.  And that,

11   indeed, the plaintiff wanted to reserve its rights as well

12   potentially as affirmative defenses were played out to look

13   beyond any initially designated sample of loan files.

14             So as much as I was disappointed by that conclusion I

15   shared that with you all on June 13th and outlined how I

16   thought we might proceed with respect to expert discovery.  And

17   I know that the plaintiff is already on its way to making

18   disclosures of samples and individual cases and it began that

19   in the UBS case because that's our first tranche trial.

20             And I think the defendants are right that the next

21   thing that has to happen is for the plaintiff to make a

22   disclosure of how it feels the misrepresentations and one, two

23   or all three categories are playing out when you look at that

24   sample.

25             And then the next stage would be for the defendants to

C7VAAFEDC1                      Conference

1    respond and it's possible that defendants will respond with a

2    disagreement about the content of the plaintiff's sample and

3    it's analysis of the extent to which misrepresentations appear

4    in that sample or they may do their own sample of a larger or I

5    suppose potentially smaller or just an intersecting group,

6    different sample all together or they might not do any sample

7    and that may change from case to case.

8         It may change from misrepresentation to

9    misrepresentation.  And I don't think that's something I could

10   control or would seek to control even if I could.  And I feel

11   as if the plaintiff wants to use this request to require the

12   defendants to disclose a sample before they know what the

13   plaintiff's position is with respect to the misrepresentations

14   and the extent to which misrepresentations appear in the

15   plaintiff sample.

16        It's sort of way of managing discovery and of managing

17   the litigation and that had been my hope but as I explained on

18   June 13th I don't think that is going to fly for all the

19   reasons I described then.  So I think what we're left with is

20   setting out a schedule, hopefully, one that we could agree to

21   in the UBS case and that could be used as a model for the other

22   tranches.  So I am not saying that -- it would just be a model.

23   The parties would have an opportunity to agree or disagree in a

24   particular case that the model worked.  But so I think what

25   should happen is what has already begun in the UBS case and

C7VAAFEDC1                    Conference

1    that is the plaintiff has identified -- I think was last Friday

2    the 27th of July -- the sample it's going to use in the UBS

3    case.  It's made a commitment to identify the extent and nature

4    of the breaches within that sample to UBS within 45 days of

5    getting custody, complete custody of the loan files as I

6    understand it.  Counsel will be able to correct me to the

7    extent I've misunderstood anything.  And then there's a period

8    of time after that and I know the defendants asked for 90 days

9    but I think we're going to have to talk about that for a bit,

10   for the defendants to respond with their own expert analysis

11   which could take any number of forms.  If the defendants are

12   going to use their own different sample I think their response

13   would have to identify that along with their analysis of what

14   that sample showed or didn't show.

15          If the defendants were going to instead just attack

16   the plaintiff's sample and its conclusions in that analysis,

17   then that's what it would have to do and then the plaintiff

18   would have a chance to reply.  It could change its sample,

19   broaden it, respond in any number of ways that seemed

20   appropriate and that's when the issues would be joined.

21          The plaintiff suggests that it might be useful to have

22   Daubert motion practice at this stage.  If we did do that all

23   we'd have is a Daubert motion addressed to the methodology the

24   plaintiff used to create its sample.  I don't know if the

25   plaintiff wants that, given what I am outlining.  Because it

1   had envisioned Daubert practice addressed to sampling

2   protocols.

3          I, personally, think it might be useful for everyone

4   to have a statement of how I would read a Daubert challenge to

5   the plaintiff's sampling protocol in the UBS case and I think

6   it would be useful for all of us to have that statement of the

7   law and analysis as we move forward.  But, and folks may prove

8   me wrong here, I sort of think it unlikely that any methodology

9   is ultimately going to be rejected by a Daubert analysis.  I

10  think what will probably happen is that the lines of attack

11  will be more clearly fleshed out through such motion practice.

12  And it may inform the development of different sampling

13  protocols by both the plaintiff and the defendants as we move

14  forward.  Even though I am not sure the motion could be

15  granted, I am happy to receive such a motion if the parties

16  think it would be useful.

17         I am interested in learning what the state of play is

18  with respect to production of the loan files.  I had assumed

19  that they would have been produced by now or largely produced

20  by now.  I thought we were engaged in an effort to get the

21  ResCap files which had its own separate issues.

22         So, I don't know, Mr. Selendy, I know you have been

23  anxious to speak.  I don't know if you want to speak or you

24  want Ms. Chung to address this issue.

25         MR. SELENDY:  I would be glad to address this issue,

C7VAAFEDC1                    Conference

1    your Honor.  And let me begin by saying we are committed to

2    having a disciplined, efficient and rigorous process to deal

3    with sample and re-underwriting.  But there is a fundamental

4    problem that we have with the schedule that you've proposed and

5    I think it goes in part to your belief that FHFA had accepted

6    what was, in fact, a UBS proposal that we think is impossible

7    to meet.  And if I could step back a little bit --

8             THE COURT:  I don't think you accepted any UBS

9    proposal.

10            MR. SELENDY:  Just to be clear about it, when we talk

11   about the sampling, that is something that can be set forth on

12   a basis regardless of any results, obviously, of the

13   re-underwriting exercise.  That's a statistical matter.  It can

14   be done on a clear methodology with well-settled guidelines and

15   we, therefore, propose in a movement that, actually, went

16   significantly toward the defendants.  We proposed a broader set

17   of samples which would allow extrapolation on a deal by deal

18   basis at a 95 percent confidence interval with a margin of

19   error of plus or minus ten percent.

20            In order to come up with a sample we did require the

21   loan tapes.  And just to refresh your Honor's recollection, the

22   loan tapes are the disclosed characteristics of loans and

23   borrowers that are essentially equivalent to the mortgage loan

24   schedule as part of the prospectus supplement.  It is the basis

25   on which the underwriters and sponsors are making

C7VAAFEDC1                    Conference

1   representations and warranties about the loans in each

2   portfolio.

3            The loan tapes are very different than the loan files.

4   The files contain the application, plus the work product of the

5   loan underwriters as they attempt to assess whether the loan is

6   consistent or not with the underwriting guidelines and then

7   state the various attributes of loan borrower which,

8   ultimately, end up in the loan tapes.

9            The process of choosing a sample is relatively

10  efficient as we've previously informed your Honor.  That can be

11  done in a matter of weeks.  Once we have the loan tapes and,

12  indeed, we've provided, as you mentioned, a sample for the UBS

13  case which is completely random.  It's a random sample across

14  the securitizations in that case that stratifies according to

15  FICO scores.  So the purpose of stratification is to increase

16  the precision of the estimate and reduce the margin of error.

17  It's still a 95 percent confidence interval but it's better

18  than a pure random sample.

19           The truly laborious part of this work, however, is not

20  in the sampling but in the re-underwriting exercise that is,

21  essentially, taking each one of the loan filings which

22  defendant previously represented to be, approximately, 300

23  pages per file and going through that.  And it's not just to

24  test whether the data in the loan file is correctly described

25  in the loan tape but it's also to test whether the

C7VAAFEDC1                    Conference

1    representations in the application are truthful, whether the

2    appraised value is as represented, if the appraised value is

3    false, the loan devalue ratio will be false, whether, in fact,

4    it's a primary residence or not.  If it's not a primary

5    residence the owner occupancy ratios may be false.  Whether the

6    loan and borrower characteristics comply not only with the

7    stated fines but also with federal law and regulation, there

8    are compliance requirements and other requirements.  Indeed,

9    there is a check list of probably more than 50 attributes for

10   every single loan that needs to be tested and that is the truly

11   burdensome part of the exercise.

12           As you may recall, the proposed sample initially put

13   forward by defendant UBS would have involved re-underwriting,

14   approximately, 50 or 55 percent of the entire population.  A

15   totally unworkable proposal.

16           We have proposed various ways of designing a sample

17   that would still give the Court confidence in the results and

18   in any extrapolation but would significantly reduce the

19   numbers.  Our current proposal for UBS if applied across all

20   securitizations would be, approximately, $44,900.  The maximum

21   capacity that we have currently would be to review,

22   approximately, four to five thousand loans per month but that's

23   just the review.  We also need in order to develop a

24   particularized assessment of breach on a loan by loan basis we

25   need the guidelines.  We need to map the guidelines and the

C7VAAFEDC1                    Conference

1   reps and warranties in every single securitization so that when

2   the loans are re-underwritten we can test for each loan in the

3   sample whether or not the loan is eligible, whether or not the

4   representations and warranties have been truthfully made or if

5   instead they are materially in error.

6           And then we need to aggregate the results of that

7   assessment, have our testifying expert review them across the

8   entire population and combine them into a report.  So the

9   proposal to come forward with a -- the results on a

10  particularized basis loan by loan is nothing less than a

11  proposal to present our final expert report on re-underwriting.

12  And we have already been working with the Court's very

13  accelerated service discovery schedule for document discovery.

14  If we were to produce that now it's, essentially, saying that

15  rather than the June 2013 date for expert disclosures on

16  re-underwriting we would need to produce that within 45 days

17  and that's simply not possible, your Honor.

18          THE COURT:  Let me ask you about two numbers.  I just

19  want to make sure I've captured them correctly.

20          MR. SELENDY:  Yes.

21          THE COURT:  For the UBS sample, are you saying that

22  your sample resulted in a selection of 44,000, roughly, loans?

23          MR. SELENDY:  No.  That's across all of the

24  securitizations in all of the cases.  We have, approximately, a

25  million loan files across all of the cases before your Honor.

C7VAAFEDC1                    Conference

1   And if we use our sampling method we can bring that sample down

2   to 44,900.  In the UBS case that would be, approximately, 2200

3   loans.  And our belief is that once we actually get production

4   of loan files -- and I'll note that FHFA has produced more of

5   the UBS loan files to UBS than we've received from UBS to date.

6   Once we actually get the loan files and the guidelines, we then

7   need to do the mapping exercise, build the protocol for the

8   re-underwriting and assuming the sample is acceptable we can

9   re-underwrite those 2200 loans for the UBS case.

10          My best estimate right now is that we could complete

11  that in, approximately, four months.  We're working to shorten

12  the time for re-underwriting but the reason that we sought to

13  stage this so we had either an agreement with defendants as is

14  common in many cases --

15          THE COURT:  You won't get one here.

16          MR. SELENDY:  I understand that.  Or whatever

17  challenges.  We don't know, frankly, the basis of defendant's

18  objections, whether they're opposed to idea of sampling, if

19  they have particular problems or not, we don't know what those

20  issues are.  We had thought if there were legitimate issues

21  they should be framed up on an early basis for the Court to

22  consider and for us to address it so that before the tremendous

23  expense of re-underwriting is undertaken we can at least have

24  the mathematical issues of the sample resolved.

25          THE COURT:  So you want the Daubert motion.

C7VAAFEDC1                    Conference

1              MR. SELENDY:  Frankly, your Honor, we that I think

2     that the proposal that we suggest for sampling is

3     incontestable.  But if there are objections we think they

4     should be framed early before the re-underwriting exercise is

5     undertaken so that no one wastes time and money re-underwriting

6     loan files that either may be outside the samples or if the

7     sample size is not big enough, let's resolve that first and

8     then we can put the huge teams to work in actually going

9     through the loan files.  The sampling exercise, in other words,

10    is a much simpler mathematical exercise.  The re-underwriting

11    exercise is very complicated and, indeed, involves going

12    through all those loans.

13             I have to say, your Honor, there is more than a little

14    irony here in defendant's trying to force us to a 45 day period

15    to re-underwrite 2200 loans because the entire reason we're

16    here, we submit, the entire reason is that we had this reckless

17    dramatic origination of loans and systematic disregard of

18    guidelines at an incredible pace, rather than the proper

19    re-underwriting according to guidelines.  And we do not propose

20    to do as defendants did when they first originated the loans.

21    We want to re-underwrite these responsibly and present them in

22    the context of an expert report, as we do in other cases.

23             THE COURT:  I had thought when I had those submissions

24    before the June conference that your expert wanted to at least

25    consider a different sampling methodology for different cases

C7VAAFEDC1                    Conference

1    depending on the characteristics of the securitizations.

2              MR. SELENDY:  Yes.  Your Honor, the issue there is

3    that for certain of the cases, specifically the Tranche Two

4    cases, JP Morgan and Merrill, the volume is very high.  In

5    terms of the number of securitizations and our expert wanted to

6    be able to frame up a further efficiency measure whether it's

7    clustering or some other form of aggregating deals with the

8    same underwriter, the same originator and the same vintage so

9    that you could develop results for a cluster of deals within

10   the sample.  That issue only arises in these cases where we

11   have such a huge volume.  For most of the cases they will be

12   like UBS.  And we're prepared do the re-underwriting on a

13   securitization by a securitization basis at a 95 percent

14   confidence interval, plus or minus ten percent in the margin of

15   error.

16             And that would be, I believe, a similar process.  It

17   still has to be confirmed once we see the loan tapes.  And I

18   don't want to speak ahead of our expert but once we go through

19   the loan tapes for all the securitizations it's my belief that

20   we will be able to do a simple stratified random sample as

21   we're proposing for UBS for virtually all the other cases.

22             And, indeed, we may be able to do that for JP Morgan

23   and Merrill Lynch depending upon the timing of the

24   re-underwriting it's the expense associated with the volume

25   there that's driving us to see if we can find a further

C7VAAFEDC1                    Conference

1   efficiency measure.

2           THE COURT:  So you proposal is to produce an expert

3   report by August 9th on your sampling protocol for the UBS

4   case?

5           MR. SELENDY:  That's correct.  We had proposed -- and

6   the reason we had proposed a simultaneous exchange is that if

7   defendants don't want to work with us from the same sample but

8   instead are generating their own sample, we'll have the same

9   difficulty in understanding re-underwriting what they put in

10  their sample.

11          And, indeed, if they don't want to use the settled

12  protocol that we're advancing, we would like an opportunity to

13  review that and respond to it.  So if they have a different

14  sample for their affirmative defenses, we don't see why it's

15  necessary but if they do, we would like to have a simultaneous

16  exchange on that date.

17          THE COURT:  Okay.  I am not going to order a

18  simultaneous exchange but I understand you want to produce your

19  expert report with respect to your sampling protocol on August

20  9.

21          MR. SELENDY:  That's correct.

22          MR. KASOWITZ:  And you propose August 31s for any

23  motion, a Daubert motion challenging that protocol and then

24  you'd respond on September 13.

25          MR. SELENDY:  That's correct.

C7VAAFEDC1                       Conference

1          THE COURT:  Okay.  Any objection to that schedule,

2    Mr. Kasner?

3          MR. KASOWITZ:  Your Honor, I am going to defer to

4    Mr. Fumerton who is going to object, not only to the schedule

5    but to much of what my colleague in a very measured tone has

6    explained to the Court because we have a very different view of

7    what's going on here.  But if it would please the Court,

8    Mr. Fumerton will present that position.

9          THE COURT:  Well, I'll turn to you, Mr. Fumerton, in a

10   second.  I thought I was asking an easy question.

11         MR. KASNER:  We do not consent, your Honor, to that

12   schedule because we object to what is being advanced now.  And

13   what I had understood at least your Honor preliminary seemed

14   disinclined to allow.

15         THE COURT:  Okay.  Mr. Selendy, I want to let you

16   finish your presentation.

17         MR. SELENDY:  The only further point is that we had

18   proposed consistent with the Court's prior schedule that we

19   produce our expert report reflecting the re-underwriting

20   analysis March 15, 2013.  The results of that analysis will

21   take into account information learned from discovery as well as

22   information from the course of third-party subpoenas and the

23   like.  That can't be done until fact discovery is complete.

24   That's part of what goes into the re-underwriting assessment

25   and it's part of why we can't present a loan by loan

C7VAAFEDC1                     Conference

1    particularized assessment as my colleague, Mr. Kasner, has

2    asked in our view a, frankly, completely untenable request.  We

3    can't to that, nor should we.  This is not even a standard and

4    fraud case.  It's a loan by loan early expert report at the

5    conclusion of document discovery.

6          This re-underwriting exercise in other cases and,

7    logically, should follow from the collection of all the

8    relevant evidence, the application of that to the loans in the

9    sample and the generation of the expert report which would

10   contain the loan by loan breakdown together with the mapping --

11   and warranties for every single securitization in dispute and

12   together with the expert's justification.

13         THE COURT:  So if you are suggesting March 15th for

14   expert report with respect to the misrepresentation notice UBS

15   case, what are the dates for the reports in the other cases?

16         MR. SELENDY:  We had proposed, your Honor, that for

17   each of the other tranches we serve expert reports on August

18   15th and that would allow us to have rebuttal reports from the

19   other defendants November 7th and in time for the completion of

20   expert discovery according to your Honor's schedule by December

21   6th of 2013.

22         THE COURT:  So, that would --

23         MR. SELENDY:  If I may, your Honor?

24         THE COURT:  Okay.  I had thought I understood that you

25   might, depending on what the defendant's response was in a

C7VAAFEDC1                     Conference

1    particular case, to revise your sampling protocol.

2           MR. SELENDY:  Well, ideally, your Honor, any revision

3    of sampling protocol would come long before that date.  That's

4    why we had proposed the exchange in August of this year on the

5    sampling protocol, so that if there are any modifications based

6    on Daubert or other challenges those can be resolved promptly

7    this fall before the re-underwriting exercise is undertaken.

8    And we would expect that any challenges that any of the

9    defendants may have could be presented at the same time as the

10   UBS challenge.  We doubt there will be issues that vary that

11   much in other cases.

12          And the last point I wanted to mention, your Honor, is

13   that the schedule that we've proposed, the sampling first

14   followed by the re-underwriting exercise is consistent, for

15   example, with the MBIA versus Countrywide case.  In that matter

16   there was a general review by the court, a sampling and the

17   re-underwriting exercise just as we proposed here was submitted

18   in the ordinary course, together with other expert reports.

19   Thank you, your Honor.

20          THE COURT:  And, Mr. Selendy, what's the status of the

21   production of the loan files?

22          MR. SELENDY:  Okay.  With respect to the loan files we

23   understand that JP Morgan has produced most, if not all, of the

24   loan files.  UBS, as I mentioned, has produced according to our

25   count 2200 of the loan files, a very small subset of the loan

C7VAAFEDC1                    Conference

1    files in that case.  We have actually produced to UBS 2700 loan

2    files relating to UBS securitizations.  Those consist of files

3    that we had obtained and, of course, leading up to the filing

4    of complaint and therefore.

5         As far as I know we have little or no files produced

6    yet by any other defendant.  I may be surprised but based on

7    our own analysis I don't believe we have any significant

8    production of loan files from other defendants

9         THE COURT:  Let me hear from Mr. Fumerton.

10        MR. SELENDY:  Thank you.

11        THE COURT:  Mr. Fumerton, do you have any objection to

12   the schedule for a Daubert motion addressed to the sampling

13   protocol and the UBS case.

14        MR. FUMERTON:  We do, your Honor.  Robert Fumerton, on

15   behalf of UBS.

16        We can't be in a position to evaluate plaintiff's

17   proposed sample in the abstract.  We need the benefit of

18   factual discovery, of deposition discovery, of full factual

19   record before we can determine even whether their sampling

20   methodology is adequate.

21        If I could give your Honor an example, Mr. Selendy

22   claims that the 2200 loans that he's provided UBS would have a

23   margin of error of ten percent.  Now, defendants, certainly,

24   disagree with that and we've set forth in detailed position

25   back in June.  But how can defendants be in a position to take

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C7VAAFEDC1                    Conference

1    a position on whether ten percent margin of error is

2    sufficiently precise when we have no idea of what the defect

3    rate they're claiming in these cases.  Obviously, if the defect

4    rate that they identified came in under ten percent, defendants

5    couldn't be in a position sign-off or make a determination on a

6    Daubert motion before we have that information.  What we need

7    is fundamental factual basis for plaintiff's claims.

8              Defendants are not seeking early expert discovery.

9    All we're asking and we appreciate that Mr. Selendy provided us

10   with the sample upon which he intends to reply, provides us

11   those 2200 loans by loan ID.  But what we need now is which

12   loans are defective and why?  What is the basis for those

13   claims?  And if we get that information that will help narrowly

14   tailor the rest of discovery.  For example, if they're claiming

15   that a specific loan has an inflated appraisal defendants may

16   want to take a third party deposition of that appraiser to

17   determine whether, in fact, the value was inflated.

18             Mr. Selendy's proposal is, essentially, give us until

19   March 15th after deposition discovery, three months before the

20   close of all fact and expert discovery, give us till March 15th

21   before we have to identify a single defective loan or the

22   manner in which that loan was defective would completely

23   deprive defendants of their due process rights to develop their

24   defenses to take discovery and third party discovery to respond

25   to the basis of plaintiff's claims.

C7VAAFEDC1                    Conference

1          THE COURT:  Good.  Why has the UBS production of loan

2     files not been completed?

3          MR. FUMERTON:  Your Honor, UBS does not maintain loan

4     files in the ordinary course.  UBS has produced every single

5     loan file in its possession, custody or control, approximately,

6     2400.  We have been asking since May 22nd for all of the UBS

7     loan files in plaintiff's possession, custody or control.

8     Plaintiff has had a huge start here.  Plaintiff alleged in the

9     UBS complaint that it conducted a forensic review of,

10    approximately, 1300 loans.  They alleged that in the complaint

11    to survive the motion to dismiss.

12         What we've learned since Friday now that we the 2200

13    loans in the sample, is that there is actually considerable

14    overlap between the loans they've reviewed for the forensic

15    review and loans the in the sample.  In fact, approximately, 20

16    percent of the loans for three originators that they allege in

17    the complaint are the exact same loans in the sample.  This is

18    work they've already done.

19         And I'd like to return to this issue of materials

20    related to the forensic review after we've finished this.  But

21    UBS has produced all of the loan files it has in its

22    possession, custody or control.  Plaintiff has not done the

23    same.  We've asked plaintiff since May 22nd to produce

24    everything you have.  It's in a discrete place.  They haven't

25    produced it.

C7VAAFEDC1                    Conference

1          What UBS has done, your Honor, is gone out and

2     subpoenaed, issued third party subpoenas to servicers, to

3     originators, to trustees, to get all of the loan files in our

4     case and we're working to get those loan files as quickly as

5     possible and that's why we've set a deadline for plaintiff's

6     identification that teed up off of the date the plaintiff has

7     all these loan files.  We don't know what loan files they have.

8     Assuming Mr. Selendy's representation that they don't have all

9     of these 2200, we're working with them to get those loan files.

10         THE COURT:  Okay.  So on what date did you produce the

11    loan files in UBS's custody or control?

12         MR. FUMERTON:  We've produced them last week, your

13    Honor.

14         THE COURT:  And when did you serve the subpoenas on

15    the third parties to get the remainder of the loan files?

16         MR. FUMERTON:  We served the third party subpoenas.  I

17    don't have the exact date but it was shortly after the

18    commencement of fact discovery, so back in June, I believe.

19         THE COURT:  And so those files then should have been

20    produced in July.

21         MR. FUMERTON:  We are actively working to try to, with

22    the third parties, with the servicers, with the originators,

23    with the trustees to try to get all of these loan files.  One

24    of the things we asked plaintiff for was to identify the sample

25    of 2200 loans.  Now, back in June plaintiff identified a sample

C7VAAFEDC1                        Conference

1    of a thousand loans, 1060 to be precise, that it claimed would

2    be the UBS proposal.  They have now doubled that, which is

3    fine.  We told Mr. Selendy and his colleagues, if you give us

4    the sample by loan ID then we can go out and prioritize the

5    production of those loan files from third party so we can go to

6    third party servicers and say, hey, you have these specific

7    loan numbers that are part of the 2200 that plaintiff wants to

8    rely on for their sample.

9              THE COURT:  Excuse me just one second.

10             (Pause)

11             MR. FUMERTON:  Your Honor, if I could add one --

12             THE COURT:  So do you think it might be helpful if we

13   chose an afternoon the last week in August for anyone, any

14   third party who hasn't completed production of their loan files

15   to show up in court here and explain why the production has not

16   yet been completed?  Do you think that might assist you,

17   Mr. Fumerton?

18             MR. FUMERTON:  Yeah, we think that would be a

19   productive idea, your Honor.  If I could just add one point

20   that I neglected to make earlier.  When we served our request,

21   document requests for all the loan files in plaintiff's

22   possession, we served that on May 22nd.  Over the next two

23   months we repeatedly asked plaintiff, what's taking so as long?

24   Why can't we get these loan files?  And what we learned from

25   plaintiff is that there were all sorts of third party

C7VAAFEDC1                    Conference

1    consent -- and maybe Mr. Selendy can address this in more

2    detail -- but plaintiff needed to obtain consent from third

3    partys to produce the loan files.  But what we also learned

4    from plaintiff is that they didn't even notify those third

5    parties for months after our document requests.

6              So, again, what I think would also accelerate this

7    process is if plaintiff is ordered once and for all to produce

8    all of the UBS loan files it has in its custody, possession or

9    control.  So at least we know what we have to get from third

10   partys

11             THE COURT:  Well, you have to get them from third

12   partys -- I am sorry -- if FHFA produces them or not.  I assume

13   that's how it normally works.  One file may be more or less

14   complete than another.  I don't know.

15             Mr. Selendy.

16             MR. SELENDY:  We also agree.  It would be a very good

17   idea, I think, to bring in the third parties that have not

18   produced files at the end of August.  I think that would be

19   highly effective.

20             Just one point with respect to the notion of burden

21   for the defendants and re-underwriting using our sample.  On

22   the schedule that we propose they would have, approximately,

23   eight months to do the re-underwriting exercise with the sample

24   that we provided to them last week, that's far beyond the 45

25   days that they thought was sufficient for FHFA.

C7VAAFEDC1                    Conference

1          THE COURT:  So, Mr. Selendy, you identified the sample

2     to UBS last Friday?

3          MR. SELENDY:  Yes.

4          THE COURT:  And you're planning to use the same

5     protocol across the board and the 16 lawsuits with, perhaps,

6     two exceptions.

7          MR. SELENDY:  Yes.  And subject to our expert's review

8     of the loan tapes for each deal, there is effort to ensure

9     depending upon variability and securitizations that the

10    proposal would work.  But we have some high degree of

11    confidence that a simple random stratification as we've done

12    here according to FICO scores may well work for virtually all

13    of the deals.

14         In any way case the proposed confidence interval 95

15    percent with a margin of error plus or minus ten percent is the

16    target that we're shooting for for virtually all the cases.

17         THE COURT:  And what is your proposal then with

18    respect to the disclosure in the other actions of the precise

19    loans that would constitute the samples in those cases?

20         MR. SELENDY:  Right.  We are proposing -- and this is

21    reflected in Exhibit A to my letter to the Court -- we are

22    proposing that for the other cases we would provide for Tranche

23    Two the sampling protocol on August 23rd of this year and then

24    for Tranche 3, September 13, and Tranche 4, September 30.  So,

25    again, all of those would be done very quickly over the next

C7VAAFEDC1                    Conference

1   few months.

2                THE COURT:  Thank you very much.  And do you want to

3   address the status of the disclosure of the loan files in

4   FHFA's possession?

5                MR. SELENDY:  Right.  My colleague, Mr. Schirtzer, I

6   think will address that together with other production issues.

7   It is my upstanding we're working to make all of that

8   available.

9                THE COURT:  Mr. Schirtzer?  Ms. Chung.

10               MS. CHUNG:  I think it was two weeks ago that we

11  produced most of the loan files that we this in our possession

12  relating to UBS securitization.  The ones that we have compared

13  to the universe of loans is a small number.  It would never get

14  us the entire sample.  It would never get us to the 44,000

15  loans that are issued in the UBS case.  But there is a

16  remainder left and we could produce those this week.  That's

17  not a problem.

18               As your Honor pointed out, the real issue though is

19  that would never get us to even the sample loans and so we will

20  have to turn to the third party.  UBS in a case for which third

21  parties hold the lion's share of the loans.  In many of the

22  other cases that's not the case.  So the fact that we only

23  have –– JP Morgan, UBS and I think yesterday we got loan file

24  productions from First Horizon.  That means that we're still

25  well behind the ball in terms of getting the loan file that

C7VAAFEDC1                    Conference

1    will allow us to do the underwriting.

2            THE COURT:  So, Ms. Chung, how did FHFA get the loan

3    files that it has?

4            MS. CHUNG:  Yes, your Honor.  Thank you.

5            We got -- some of the loan files were subpoenaed from

6    servicers or trustees.  So FHFA had gotten these loan files

7    under their own civil investigative powers for purposes

8    including, but not limited to this litigation in the lead-up to

9    litigation.  And as Mr. Fumerton mentioned, in some of those

10   cases we have confidentiality agreements for notification

11   duties to the third parties from whom we obtained the files.

12   So there was a process of notifying those entities that we were

13   about to produce the files in this case.  Now that process is

14   complete or nearly complete.  But we have turned back to the

15   defendant's.  Some of loan files that we have and we have every

16   intention to turn back the remainder of those loan files very

17   promptly.

18           There is a misimpression though that somehow we have

19   all the loan files that relate to those securitizations.  The

20   loan files that we have were not gathered just for this

21   litigation and they're only a fraction of what are at issue in

22   the 15 actions that we have here.

23           THE COURT:  So consents on loan files, it may be moot

24   now but I would have been happy to issue an order requiring any

25   objection to be made in writing to me within two weeks with the

C7VAAFEDC1                    Conference

1    understanding that the files would be produced, you know, two

2    weeks and one day hence.  So if there is any similar problem

3    with production think of me as a resource.

4                MS. CHUNG:  Thank you, your Honor.  We appreciate

5    that.

6                THE COURT:  Okay.  So in all actions before me I will

7    expect the loan files to be produced in their entirety by

8    August 29th.  To the extent they are not, I'd like a report on

9    August 29th.  And I'd like, I will hold a conference on August

10   30th.  I'll issue an order to show cause for any entity that

11   has failed to produce all of the loan files in its possession

12   by August 29th to appear on August 30th at three o'clock and

13   explain why it has not completed production.

14               So I would like every party before me, plaintiff and

15   defendants, to provide me with a list by tomorrow of all the

16   parties who have possession of loan files and who need to be

17   subject to my order.

18               Do I have jurisdiction to order production out of

19   state?  How many of the loan file -- I might have to ask for

20   some help from some colleagues in other districts here.

21               Ms. Shane.

22               MS. SHANE:  Yes, your Honor.  Thank you for the

23   afternoon to be heard.

24               JP Morgan, as your Honor may recall, is both a

25   defendant in an action in which it is physically producing loan

C7VAAFEDC1                    Conference

1    files for purposes of the use in that action.  It also has

2    possession of loan files that may be relevant to other actions

3    including, for example, in the UBS action.  So JP Morgan is in

4    a particular position of producing madly loan files for all

5    different purposes in its different capacities in that regard.

6            As we discussed last week, J.P. Morgan has already

7    produced 66 million pages of loan files and is continuing to

8    produce as fast as it possibly can.  J.P. Morgan understood

9    that the document production deadline in this case was

10   September 30th.  It is a date that we discussed every hour of

11   everyday with respect to many pads of document production and

12   will continue to proceed as quickly as we can in order to meet.

13           This order that your Honor is entering moves that up

14   by a whole month where it was already going to be extremely

15   tight, as I understand it.  Or if it does not and gives us an

16   opportunity to be heard as to our particular circumstance and

17   why it is that this would be enormously difficult, if not

18   actually impossible for an entity it in this situation to meet

19   despite its best efforts, we would appreciate that opportunity

20   to be heard.  We don't want to wait until August 29 to bring

21   that to your Honor's attention.

22           We are aware from the issuance of nonparty subpoenas,

23   not only for ourselves but to a host of other entities, most of

24   which are not here and are not here in any capacity, not

25   represented, not parties, not anything that they are in many

C7VAAFEDC1                    Conference

1   jurisdictions.  And that the process of working with those

2   entities to bring about their compliance with those subpoenas

3   is one that has been proceeding with a good deal of attention

4   and intensity on behalf of all defendants and the plaintiff may

5   be making efforts of their own.

6               It is not as easy as it sounds, your Honor.  Loan

7   files in cases of that age are, themselves, quite old.  There

8   are multiple versions, as your Honor alluded to, in different

9   depositories, in different forms, with different levels of

10  completeness.  Many are not electronically maintained.  And

11  even the identification of which loan file one is talking about

12  requires a fair amount of matching exercises that can consume

13  some time on the part of people who are most familiar with

14  those files and the ways in which they retract from institution

15  to institution but for purpose one versus purpose two.

16              So I don't in any way mean to suggest that it won't

17  happen, that all these things will be collected but August 30th

18  would be very, very difficult at least for those entities like

19  JPM that are in possession of the large quantities of them and

20  are trying to prioritize.

21              THE COURT:  Thank you, Ms. Shane.

22              Am I right that these loan files were gathered

23  together in one location for a particular securitization or

24  not?

25              MS. SHANE:  Not necessarily, your Honor.  It would

C7VAAFEDC1                    Conference

1    depend on the securitization.  Some of these securitizations

2    were backed by loans that were almost entirely or in some

3    instances entirely originated by an institution.  There were

4    processes that had to be undertaken, including due diligence,

5    for example, that would have required some entity or number of

6    entities to review the loan files in some form in connection

7    with a securitizations.  And at the close of that process, once

8    the securitization happened, loan files could be and were, as I

9    understand it, sent to any number of different additional

10   places.  Servicers, who would have the responsibilities to

11   maintain the loans over time, could end up having most of them.

12   Servicers changed over time and what would be relayed from one

13   to the next for the next purpose, again, could be some or all

14   of the file.  And they would not necessarily all travel

15   together because different supporting loan groups and different

16   tranches could have different groups of loans that require

17   different forms of attention.

18          Some loans would get paid and paid early.  Some would

19   get defaulted on.  And those would all go in different

20   directions depending on what path the actual underlying

21   financial transaction was taking.  So assembling them back

22   together again is a challenge.  It will happen and people are

23   working very hard on having it happen.  Sometimes it's an easy

24   repository which is why we have been able to get to 66 million

25   in the very short period of time so far since your Honor had

1    ordered that it happen, but the next couple hundred million or

2    more will be more challenging.

3           THE COURT:  Well, those are talking about pages, the

4    66 million.  How many loan files does that represent?

5           MS. SHANE:  The number is in the tens of thousands and

6    we have tens of thousands to go, at least.

7           THE COURT:  So, one, I don't have authority over who's

8    not here or at least in New York State present to command their

9    appearance.  I don't have a sense of how many, at least, I

10   don't think I do.  I don't have a sense of where the problems

11   in production lie.

12          Ms. Chung.

13          MS. CHUNG:  Your Honor, as to your original

14   suggestions to have the parties -- both sides have issued

15   subpoenas to entities that have possession of loan files and

16   we're promptly doing it.  The requests are all out there.  If

17   it will be helpful to the Court to have the list of those

18   entities, where they are and which districts they're in, we

19   could, certainly, do that.  That would be a starting point.

20          THE COURT:  The September date, September 30th, I

21   think, whatever date it was in the order is for substantial

22   completion of document production.  It's not, and nobody's

23   treated it as such, as the date on which production is to be

24   made.  Parties are making it on a rolling basis and there's no

25   way it could be substantially complete on September 30th unless

C7VAAFEDC1                    Conference

1    people were making an ongoing effort.

2              So, Ms. Chung, give me a sense -- and you know what,

3    we may take a break here so that the parties have a chance to

4    talk -- what would and could be accomplished by a late August

5    conference?  I don't want to have one -- there are too many

6    people in this courtroom now -- unless it's going to be, serve

7    a useful purpose.  So we'll address that again after we take a

8    break.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C7vrfed2

1          Returning to our schedule, Mr. Fumerton argued, as I

2     understood it, that it is premature to have a Daubert motion

3     addressed to the sampling protocol that the plaintiff intends

4     to use until one knows the defect rate.  I'm not sure I find

5     that persuasive.  Indeed, a motion with margin of error plus or

6     minus 10 percent, someone could say that that is insufficient

7     in and of itself.  Indeed, I think the expert for the

8     defendants took that position in the June submissions.

9          A lot of work is going to be invested by the parties,

10    not just the FHFA but each of the defendants, in addressing the

11    loans selected through the plaintiff's sampling protocol.  It

12    seems to me that it would behoove everyone to know whether or

13    not it is going to be the basis of the receipt of admissible

14    evidence at trial.

15         I think the briefing should proceed on roughly the

16    schedule suggested by the plaintiff.  I know we are in August

17    and therefore it may affect -- I don't know who is going to be

18    the principal brief writer -- vacation schedules, so I'm not

19    wedded to specific dates.  But I think a fully submitted motion

20    sometime in September, mid September, would be great.

21         I think it should run across all the actions before

22    me.  I think UBS can write the principal brief, but everyone

23    should have an opportunity to make any additional arguments.

24    If UBS wants to cede the principal brief writing

25    responsibilities to the defendants in another case, that's

C7vrfed2

1    fine, as long as everyone understands they have an opportunity

2    to be heard.

3           I'll expect the plaintiffs to present their expert

4    report on August 9th.  I'm adopting their date.  I'm going to

5    ask you, Mr. Kasner, to coordinate a briefing schedule that

6    accommodates everyone's scheduling needs in consultation with

7    Mr. Selendy and advise me later this week what the proposed

8    schedule is so that I have something fully submitted in roughly

9    mid September.

10          MR. KASNER:  We will do that, your Honor.  With the

11   utmost respect, your Honor, I just would state that for UBS we

12   vigorously object to being required to address Daubert expert

13   issues in the absence of a complete factual record prior to the

14   time that basically any document discovery has been provided,

15   prior to the time that any deposition discovery has been taken.

16   I note that, your Honor.  Obviously, we will do what your Honor

17   orders, but do I place our vigorous, vigorous objection to this

18   procedure on the record.

19          THE COURT:  Thank you, Mr. Kasner.

20          Ms. Shane.

21          MS. SHANE:  Yes, your Honor, I'm sorry if I'm

22   confused, but it seems as though the schedule for the plaintiff

23   to announce what its planned sampling protocol would be in the

24   other cases extends so far into September that those in the

25   other cases, especially tranche 4, which wouldn't receive word

C7vrfed2

1    of what is being proposed until September 30th, would be in no

2    position whatsoever to meaningfully participate in the motion

3    practice.

4              The proposed date that I understand Mr. Selendy to be

5    advancing for tranche 2, which is what JPM and Merrill Lynch

6    are in, is August 23rd, which is certainly better than

7    September 30th.  But if we are expected to participate

8    meaningfully in a motion directed to the sufficiency of a

9    sample that, by Mr. Selendy's account, differs markedly from

10   what has been proposed with respect to UBS, we may very well

11   need more time to assess whatever it is we learn at that time.

12             We would echo Mr. Kasner's concern about the process

13   here but would suggest, your Honor, that it could usefully be

14   customized so that what we are addressing is the sampling

15   proposal in its abstract form, and only the sampling proposal

16   in its abstract form, so that all other potential objections,

17   that is, with respect to its application or with respect to

18   what in the reasonable exercise of professional judgment a

19   statistician would learn as he went and would expect to do as

20   he went, those kinds of objections and Daubert challenges we

21   would expect to be able to make to your Honor at such time as

22   they became ripe, which they couldn't possibly have done by mid

23   September.

24             With that, we would also think it could begin to solve

25   some of the problems your Honor is wrestling with regarding

1    loan file production.  To the extent that, having preserved all

2    of defendants' rights regarding that sample, the plaintiff at

3    least has a basis on which to focus its efforts to get

4    particular loan files, then perhaps we are not talking about

5    the need to have those loan files come in by September.  They

6    have to come in eventually, because none of us are giving up

7    the right to go beyond the samples, but they don't have to come

8    in as fast.  We can concentrate on the ones that are in the

9    samples.

10           THE COURT:  Thank you, Ms. Shane.  Very helpful.

11   Obviously, as to any further objections that defendants might

12   have to the admissibility of the plaintiff's expert testimony

13   that couldn't fairly be made with respect to the August 9th

14   report, your rights are preserved.  You can only meet the

15   objections that would be appropriate with respect to the August

16   9th report and not anything more.

17           Mr. Selendy, I think Ms. Shane has a very good point.

18   Are you committing yourself now to using the same sampling

19   protocol for all of the cases before me?

20           MR. SELENDY:  I, as I say, don't wish to get ahead of

21   our expert on this.  The objective is to be as similar as

22   possible to the protocol we have advanced for UBS.  What I

23   would suggest is a way that is analogous to what your Honor did

24   on the motion to dismiss briefing.

25           To the extent any defendant has objections to the

C7vrfed2

1    proposal that is set forth in UBS, those can be done on a

2    coordinated basis.  To the extent there are any differences

3    introduced in the tranche 2 matters in particular or

4    potentially in other cases, as your Honor suggested, objections

5    can be reserved and advanced as soon as we roll those out.

6           Our strong effort is to provide a unified and common

7    approach across all these cases.  We just need to confirm the

8    feasibility of that with our expert as we continue to process

9    loan tapes in the later tranches.

10          THE COURT:  Will you know by August 9th whether you're

11   using the same protocol with respect to all the cases or not?

12          MR. SELENDY:  We will try, your Honor.  I think it may

13   take us another week or possibly two weeks after that.  We will

14   do our level best to see if we can get that done.  I think

15   there is a fair amount of processing.  My understanding is that

16   the schedule we have provided to your Honor is as fast as we

17   can do it to issue the actual samples, but it may be that we

18   can run various tests on the data that's in the loan tapes to

19   confirm similarity.

20          THE COURT:  I don't think it is efficient to have this

21   briefing before each of the defendants knows what protocol they

22   are facing in their case.  No defendant has standing to object

23   to the protocol you're using in the UBS case except the UBS

24   defendants.  Only if there was one protocol that was going to

25   be applied across the board and that was known on August 9th

C7vrfed2

1    does it make sense for all the defendants in the 16 cases to be

2    heard.

3              Mr. Selendy, I'm going to ask you to work with Mr.

4    Kasner, who will coordinate for the defendants -- I won't

5    necessarily expect a motion on August 9th -- when you have your

6    expert report on the sampling protocol with potential

7    variations across the 16 cases.  I think it might be

8    informative to the defendants to see the variations.  They may

9    say that that is an additional argument for the insufficiency

10   in the UBS case, that there is a dramatically different

11   protocol used in the Merrill Lynch case.

12             MR. SELENDY:  Just so I understand, your Honor, are

13   you proposing that what we do is a single report that will

14   address all of the cases and will note variability where it

15   exists?

16             THE COURT:  Yes.

17             MR. SELENDY:  Then I will work with Mr. Kasner and our

18   expert to determine the earliest date on which we could do

19   that.  Thank you.

20             THE COURT:  Good.  Ms. Shane?

21             MS. SHANE:  Your Honor, may I ask that the level of

22   specificity in that report, whenever it may come, be as

23   detailed as it was for UBS in the sense that we start to have

24   identification of the actual loans that will be at issue?  That

25   would permit us to start going out after loan files in a much

C7vrfed2

1      more targeted way.

2              THE COURT:  I think the identification of the

3      individual loan files is a separate issue, an important issue

4      but a separate issue from the methodology.  I'm not going to

5      urge the identification to be done on a faster schedule than

6      Mr. Selendy has now outlined.

7              MR. KASNER:  Your Honor?

8              THE COURT:  Mr. Kasner.

9              MR. KASNER:  If it please the Court, I had two

10     questions for the Court, one of which I believe my colleague

11     Mr. Fumerton will raise, with respect to the forensic review,

12     which I understood ordered on the telephonic conference that I

13     was not able to make that day, be deferred in relation

14     potentially to expert discovery which we seem to be

15     transitioning into.  I will leave that to Mr. Fumerton, who was

16     on that call, if it would please the Court.

17             I would however inquire of the Court the following.

18     As Mr. Fumerton explained, the nature of a potential Daubert

19     challenge in theory to plaintiff's expert's methodology will

20     vary depending upon the nature of the breach, the severity of

21     the breach, precisely what it is they are claiming is breached.

22     A margin of error of 10 percent either way, as my friend from

23     Fumerton explained to the Court, will impact review potentially

24     under Daubert.

25             I understood from Mr. Selendy to the Court earlier

C7vrfed2

1    that it will take him until March of 2013 to reunderwrite the

2    loans notwithstanding that there is at least a 20 percent

3    overlap between the loans that were in the forensic review and

4    the loans that are in the sample.  Presumably at least that is

5    the 20 percent of the loans.  They have a sense of what the

6    breach is that they are contending exists here.

7                I would encourage the Court to please rethink whether

8    it is appropriate for us to respond in a Daubert context

9    without at least knowing what are the breaches that the

10   plaintiff is contending, as opposed to addressing hypothetical

11   methodologies under Daubert that in a particular factual

12   context may or may not be appropriate in terms of your Honor's

13   gatekeeping function.

14                THE COURT:  Thank you, Mr. Kasner.  I'm going to just

15   assume everyone thinks the objections made by Mr. Fumerton and

16   Mr. Kasner are precisely what they would like to say.

17                MR. BENNETT:  I have a question actually as well, your

18   Honor.  Ed Bennett from Williams & Connolly for Bank of America

19   and Merrill Lynch.  Is the intention here, your Honor, to issue

20   an advisory opinion so they can adjust fire going forward and

21   change their expert opinions or expert methodologies after the

22   Court rules, or, if the Court rules upon these motions that

23   they don't pass the muster of Daubert, are they done?

24                THE COURT:  No, they are not done.

25                MR. BENNETT:  We would object to that as well, your

C7vrfed2

1    Honor, under the federal rules and the constitutional issues we

2    briefed earlier in December.

3            THE COURT:  Good.  No, I don't issue advisory

4    opinions.

5            MR. CLARY:  May I ask a question, your Honor?

6            THE COURT:  Yes.

7            MR. CLARY:  Richard Clary from Cravath for Credit

8    Suisse.  As I understood what your Honor said most recently --

9            THE COURT:  As opposed to?

10           MR. CLARY:  Earlier in this hearing.

11           THE COURT:  Yes, or in June.

12           MR. CLARY:  At the very end of your discussion with

13   Ms. Shane, if I understood correctly, your Honor, those of us,

14   for instance, in Credit Suisse we may or may not have the

15   actual identification of the loans in the sample at the time we

16   are supposed to be raising a Daubert challenge.  We have the

17   methodology in the abstract of how we would pick them.  I'm

18   assuming that would mean we would know how many loans would be

19   picked but we wouldn't know which loans.

20           Does that mean, your Honor, that subsequently we will

21   have follow-on Daubert motions if we conclude that the loans

22   identified by the plaintiff don't actually meet the criteria

23   that they say they are going to meet if they haven't already

24   picked them?  Do you understand my question?  Perhaps I was not

25   clear.

C7vrfed2

1          THE COURT:  Will there be follow-on Daubert motion

2    practice?  No doubt there will.  There are motions in limine

3    scheduled for each tranche, if I remember correctly.  Thank

4    you.

5          MR. FUMERTON:  Your Honor, may I be heard?

6          THE COURT:  Mr. Fumerton.

7          MR. FUMERTON:  On behalf of UBS, we are still

8    operating in the dark here.  It's been three months.  Plaintiff

9    hasn't identified a single loan.  What we would ask is that

10   with respect to --

11         THE COURT:  Wait one minute.  They last Friday

12   identified something like 2200 loans, I think.

13         MR. FUMERTON:  That's correct, loans that will

14   constitute the sample.  But they still haven't identified a

15   single loan they claim is defective or the manner in which it

16   is defective.

17         Now we know there is an overlap.  This is an overlap.

18   They have alleged the forensic review in the complaint of over

19   a thousand loans.  We know there is an overlap with respect to

20   three securitizations of approximately 20 percent.  They have

21   that information.  Mr. Selendy says they need to go reunder-

22   write a loan.  They already reunderwrote that loan.  They have

23   alleged it in the complaint.

24         We think the plaintiff should, at a minimum, be

25   ordered with respect to those overlapping loans to disclose the

C7vrfed2

loans they claim are defective and the manner in which they are

defective separate and apart from the overlap.  We still think

we are entitled to the results of the forensic review alleged

in the complaint.  We think we are entitled to discover the

methodologies that plaintiff used in that forensic review to

survive a threshold motion practice.

Now that we know that there is an overlap, that

information is even more relevant.  Imagine if in one of the

overlapping loans plaintiff flip-flopped, so for purposes of

forensic review in the amended complaint they allege it was

defective, now they allege it's not, or vice versa.  This is

all fertile information for cross-examination.  They have

either waived the privilege or not.  We think it is clear under

applicable case law that by putting it at issue in the

complaint, they have waived it.  We are aware of no authority

which would enable them to sit on that information which

plainly discoverable in this case.

THE COURT:  Thank you, Mr. Fumerton.

MR. FUMERTON:  Thank you.

THE COURT:  Let's talk a little bit about the schedule

here.  Mr. Selendy, I understood you to be saying that when you

had the underwriting guidelines which I'm going to assume are

being gathered now and certainly would be produced by September

30th, and the loan files, that you could begin your reunder-

writing process, that you could do that, in terms of staffing,

C7vrfed2

1   roughly at a rate of 4 to 5,000 loans per month, and that there

2   are 2,200 loans in the UBS case that your sampling protocol has

3   identified.  Do I understand that correctly?

4          MR. SELENDY:  That's correct, your Honor.  As I

5   mentioned, because of the project of mapping guidelines against

6   the loans, I can't take the 4 to 5,000 rate and say it would

7   only be two weeks for UBS.  What I understand from talking with

8   our experts is that it will take approximately three to four

9   months, once we have an agreed-upon sample and the guidelines

10  and the loan files to build the process, to reunderwrite all

11  the loans, to write up the results, have them validated by our

12  testifying expert, and have them available in a report.  In

13  other words, if we have an agreed-upon sample that has survived

14  whatever challenges defendants may raise and we have the

15  applicable guidelines and loan files, from that point forward

16  we would estimate somewhere between three and four months.

17         We had suggested March 15th because that was

18  consistent with the Court's prior schedule for expert reports

19  in the UBS action.

20         THE COURT:  I would like you to talk to Mr. Fumerton

21  or Mr. Kasner, whoever is the lead attorney on this, about a

22  schedule for that portion of the process and the exchange of

23  expert reports.  What I'm thinking about is a Daubert decision.

24  Hopefully, I'm going to have briefing complete sometime in

25  September.  It might not happen, I understand that.

C7vrfed2

```
1          I'm thinking about after I rule on the Daubert
2     motion -- again, counsel should talk about this with each
3     other -- something like two months for the UBS expert report
4     and something like six weeks for their responsive report.  I
5     want you to have a discussion with each other because you
6     understand this in a way that I don't, obviously.
7          MR. KASNER:  Thank you, your Honor.  We will talk to
8     Mr. Selendy, of course.
9          By way of example and with respect to illustrating the
10    difficulties we believe in what your Honor is proposing -- I
11    know I have beaten a dead horse about the early Daubert motion.
12    Now I'm going to shift gears a little bit to the difficulty of
13    not having complete fact discovery to provide an expert report
14    to address what they put in.
15         If your Honor contemplates a Daubert decision,
16    quote-unquote, hypothetically in October, just
17    hypothetically -- and I wouldn't presume to suggest what the
18    Court intends by way of the schedule -- November, December, we
19    get an expert report in December, the FHFA identifies the bases
20    I guess finally in December, the bases on which they are
21    contending this loan was breached for that reason, and this
22    breaches that representation, we then need to sit down and have
23    Mr. Fumerton explain to the Court and decide what are the
24    nature of the breaches and what discovery do we need to take.
25         If they don't give that to us until December and then
```

C7vrfed2

 1    your Honor contemplates six weeks, we have to determine if

 2    there is additional document discovery that we need, we have to

 3    depose people that may be relevant for the expert to evaluate

 4    it.  We are entitled under the rules for our expert to have an

 5    opportunity to consider the discovery record that we are

 6    making.  It really is putting UBS in an impossible, impossible

 7    position in a way that it cannot adequately defend itself.

 8            I would urge the Court to consider a schedule where

 9    the FHFA puts their expert report in whenever they say they are

10    ready to do it, with reasonable time for us to take fact

11    discovery.  Then, as in every other case, once fact discovery

12    is concluded, we have an opportunity to do expert discovery and

13    expert reports in the orderly course.

14            Your Honor, that is the nature of scheduling that the

15    Court is familiar with in garden variety breach of contract

16    cases which barely make the threshold for diversity in this

17    court.  We are facing a multibillion dollar exposure in this

18    case.

19            Your Honor heard, and your Honor will hear a lot over

20    the course of the next months, I promise you, there is an

21    effort on the part of the Fannie and Freddie to run the clock

22    on the discovery schedule.  By that I mean everything gets

23    backloaded, nothing happens quickly, in the hopes that by the

24    end of the year we're done.  So, on the issue of the notice,

25    your Honor --

C7vrfed2

1          THE COURT:  Mr. Kasner, if I was going to point

2    fingers in that direction, I wouldn't be pointing my fingers at

3    the first table.

4          MR. KASNER:  Your Honor, with respect, we are moving

5    heaven and earth.  If your Honor wishes to come to 4 Times

6    Square, I assure you day and night we are working round the

7    clock to produce whatever we have.  I advised the Court at the

8    beginning of this case, when your Honor selected the UBS

9    case --

10         THE COURT:  Mr. Kasner, we have so much to do.

11         MR. KASNER:  I know.  But we weren't the loan

12   originator, your Honor.  We have given over everything we have.

13   The government -- Fannie, Freddie -- GSE, excuse me, waited

14   months knowing that they needed consents on loan files to send

15   out those consents.  It was only after we had to pressure them

16   to do it.

17         I apologize, your Honor.  But really, with all due

18   respect, we are entitled to be able to defend the expert report

19   on a fully developed factual record.  Six weeks simply isn't

20   enough.

21         THE COURT:  Actually, I'm not quite sure that that's

22   what is at stake here.  To the extent that you're attacking the

23   findings on the application of the sampling protocol concerning

24   the misrepresentations, I'm not sure you need fact discovery

25   for that.  No doubt you're going to have expert reports on many

C7vrfed2

1    different topics, some of which are more responsive to the fact
2    record as it gets developed in January and February.
3          In any event, I know you're going to talk with Mr.
4    Selendy about the schedule and make a proposal.
5          MR. KASNER:  Thank you, your Honor.
6          MR. SELENDY:  May I, your Honor, very briefly?  I
7    don't want to presume to tell Mr. Kasner how to defend his
8    case, but in other cases, once the sample is identified, it
9    would be incredible to me if defendants were not working to
10   examine those loans and do any reunderwriting they wished to do
11   before our expert puts in his report on that.  Mr. Kasner will
12   have eight months to do that.
13         MR. KASNER:  Your Honor, for the record, we don't have
14   the loan files.  We can't do a reunderwriting.  We don't have
15   all the loan files, your Honor.
16         THE COURT:  Thank you.
17         Since I have clearly not achieved my goal of giving
18   happy news to the defendants on the first topic, let's turn to
19   another one and see how we do.  I have submissions about
20   whether or not the defendants should be able to get discovery
21   from the plaintiff and its constituent parts of document
22   custodians in the single- and multifamily business portion of
23   their enterprises.
24         Right now I understand that consultation among the
25   parties has resulted in an agreement that FHFA will produce

C7vrfed2

1   documents from 81 document custodians, and the issue is whether

2   or not they produce documents from an additional 164

3   custodians.  The plaintiff represents that it will be

4   producing, quote, upwards of 1.7 million, closed quote,

5   documents.

6          The parties presented me with a lot of attachments to

7   their letters, and these included policy statements from Fannie

8   Mae or Freddie Mac, internal investigation report, documents

9   more in the nature of an annual report, documents from this

10  litigation and that litigation, emails, lots of different kinds

11  of documents.  The defendant had highlighted certain pages and

12  portions of these materials.

13         Preliminarily, before I give defense counsel an

14  opportunity to be heard, I am not going to require that the

15  plaintiff produce electronic discovery from the additional

16  custodians, 164, in these other lines of business.  I have many

17  reasons for that decision.  I don't know if, Mr. Kasner, you

18  wanted to be heard on this or someone else from your team.

19         MR. KASNER:  If it please the Court, my partner Joe

20  Sacca would present arguments as to why we disagree with the

21  Court's tentative conclusion.

22         MR. SACCA:  Your Honor, Joseph Sacca from Skadden Arps

23  for UBS.

24         First of all, let me say that I think perhaps there is

25  a misunderstanding about the number of custodians that has been

C7vrfed2

1      bandied about and whether they are tied directly to the issue

2      of discovery into areas outside of the particular

3      securitizations at issue in this case.

4              Across the 17 cases, your Honor, defendants have

5      proposed a number of additional custodians to the FHFA.  Many

6      of those are people that we know were directly involved in the

7      securitizations at issue on our case.  For example, for UBS, we

8      asked the FHFA to add a number of custodians who dealt with UBS

9      on these particular securitizations.  They have declined in

10     many instances.  They have given us, quite frankly, no reasoned

11     explanation for why we can't have the files of people that

12     dealt with us on this particular securitization search.

13             Your Honor, the question is not if we are allowed to

14     inquire outside the particular people who dealt with these

15     securitizations, will that require 164 additional custodians.

16     That is not the case, your Honor.

17             Let me be absolutely clear here.  We are interested in

18     the quality of the discovery we get, not the quantity of the

19     discovery we get.  We are not interested in increasing the

20     number of custodians.  We are interested in making sure we are

21     looking in the files of the appropriate people, people who will

22     have information that will allow us to defend ourselves in this

23     case.

24             We are not interested in the strict number of

25     documents the FHFA produces.  If they produce 1.7 million

C7vrfed2

1    documents to us, your Honor, or 17 million documents to us, if

2    those documents don't contain the facts that we need to defend

3    ourselves, they are useless to us.

4         What we did here, your Honor, as the parties had

5    agreed back at the time we put in our rule 26 report, we served

6    a 30(b)(6) notice on the FHFA.  What we wanted to do was take

7    discovery of them to find out how their different groups worked

8    together, how they were integrated, what information was shared

9    with whom.  We were met with objections.

10        I will note, your Honor, for the record that late last

11   week the FHFA served UBS with a 30(b)(6) notice seeking the

12   same type of information that they are now saying we are not

13   entitled to from them.  If I might, your Honor, this is just an

14   example.

15        Topic 17 of the 30(b)(6) notice they served on us

16   asked for the sources of your, and "your" is each UBS

17   defendant, sources of your knowledge prior to each

18   securitization concerning the underwriting practices, policies,

19   and procedures of the originators of the mortgage loans to be

20   included in that securitization, including but not limited to

21   prior business relationships or deals with the originator and

22   the identity of your employees who communicated with the

23   originators.

24        Your Honor, they are asking us for information about

25   what UBS knew about the originators who originated loans in our

C7vrfed2

securitizations but not the particular loans in our

securitizations.  That is much of what we want from them, your

Honor.  In the mortgage industry, aside from the originators

themselves, Fannie and Freddie knew more and were more deeply

involved with loan originators than anybody.

Mr. Selendy mentioned earlier today, and it's all over

their complaint, this contention they have that loan

originators systemically abandoned their origination guidelines

not with respect to the particular loans in our case, but in

general systemically abandoned their guidelines.

We know Fannie and Freddie, your Honor, conducted

operational reviews of loan originators.  We know Fannie and

Freddie created documents called originator scorecards, where

they graded, as we understand it, how originators were doing

complying with their guidelines.

Under the FHFA's position here, if they conducted an

operational review of an originator who had loans in one of the

UBS securitizations, if they took the results of that

operational review, and let's say it concluded that this

particular originator had abandoned its origination guidelines,

we know that Fannie and Freddie each had high-level committees

that were designated, designed to be bridges between the PLS

business and the single-family business to facilitate the flow

of information back and forth, including information, for

example, about originators.

C7vrfed2

1          Hypothetically, if Fannie conducted an operational

2    review of an originator and that originator had loans in the

3    UBS securitizations, Fannie concluded that that originator had

4    systemically abandoned its origination guidelines, that report

5    gets communicated to the Fannie private label advisory team

6    which had on it a representative of the single-family business.

7    We will never seen that unless that report happened to get

8    passed on and ends up in the email of the trader who bought the

9    particular UBS Securities.

10          We think that is far, far, far too narrow a construct

11   of discovery and will prevent us from raising important issues

12   in this case, such as what knowledge triggered the running of

13   the statute of limitations.

14          There are fraud defendants who I know would like to

15   speak with your Honor and block out some particular documents

16   who have reasonable reliance issues that they need to explore.

17   There is the issue of the knowledge defense under section 11

18   and the plaintiff's affirmative need to prove an absence of

19   knowledge under their section 12.  There are issues of what was

20   material to the FHFA, your Honor, that all relate to issues

21   like what did they know about loan originations.  We are going

22   to be, under their objection, deprived of all of that

23   information.

24          Your Honor, I'd like to take a step back to what

25   brought us here today, which is our 30(b)(6) notice.  What we

C7vrfed2

         wanted to do and accomplish through our 30(b)(6) deposition was

         to build a factual record that would demonstrate how

         information flowed, where it went, what the nature of the

         information was.  The FHFA refused to give us that.

                We served our 30(b)(6) notice on June 28th seeking a

         deposition on July 12th.  We received objections.  Then, about

         a month after we had served our 30(b)(6) notice, we got a

         written response to our 30(b)(6) notice.  We got a narrative

         response, which is something that FHFA decided unilaterally

         they were going to provide.  They didn't want a witness.  They

         said, we are going to give you a writing and in that writing we

         are going to explain to you how we were structured and how

         information flowed.

                Your Honor, quite frankly, that writing raises more

         questions than it answers.  The effort that went into educating

         the lawyers to create this narrative could easily have gone

         into educating a witness to sit for a deposition.  That would

         have allowed us to build the kind of factual record we think we

         need to put before your Honor before you can properly rule on

         the scope of permissible discovery in this case, which is

         something we are very much anxious to do.

                Your Honor, I'd like to highlight a couple of things

         from this written response and the information that we have

         been able to develop outside of the formal discovery process

         which we think at minimum warrants our ability to take a

C7vrfed2

30(b)(6) deposition to further inquire into some of these very, very, very important issues to us.

Your Honor, I alluded to it before.  Both Fannie and Freddie had senior-level committees that were designed to bridge their single-family and PLS businesses.  We submitted a small packet of demonstratives to you.  I think we also shared it with FHFA's counsel earlier.

I'd like to draw your attention, your Honor, to the third one, which is a little chart here, which illustrates graphically the input that the Fannie Mae single-family business had on the private label advisory team, which then in turn both received from and provided information to the capital markets group, which is the group that was responsible for making these investments.

What we do know, your Honor, from what the FHFA has told us is that information flowed from single-family to capital markets.  What they haven't disclosed yet and what we very much need to see is what the nature of that information was.  They have said that they had some policies in place that prevented information flow, but they were not absolute.  We know that.

The policies appeared to us to be quite limited to loan-level information and pool-level information primarily that couldn't be shared between single-family and the PLS business.  But that does not mean, for example, that

C7vrfed2

1    information gathered during an operational review of an

2    originator couldn't be shared.  We think that in fact could be

3    shared.

4           Your Honor, on the Freddie side, page 9 of the handout

5    that you have --

6           THE COURT:  Excuse me.  With respect to page 3, I'm

7    trying to understand from the source, is this demonstrative

8    something that you prepared from narrative information?

9           MR. SACCA:  Yes, your Honor.  I'm sorry.  I should

10   have called your attention to that before.  There is a note on

11   the bottom right corner of the page that tells you what the

12   source of this is.  It's information that they gave us in the

13   narrative response to the 30(b)(6) and one document, private

14   label security's risk policy, which is in the binder of

15   information that we submitted to your Honor.

16          THE COURT:  You created the diagram based on that

17   description?

18          MR. SACCA:  Yes.

19          THE COURT:  Thank you.

20          MR. SACCA:  I'm sorry, your Honor.  The quotes are

21   Fannie's language.

22          THE COURT:  Yes.

23          MR. SACCA:  But the diagram was created by the defense

24   side.  Your Honor, page 9 are some selected quotes of Freddie

25   Mac's special litigation committee in a derivative litigation

C7vrfed2

against the company that talks about the company's enterprise

risk management committee, which is apparently an analog to the

private label advisory team on the Fannie Mae side.  This, in

terms of Freddie's business, you will see from the quote, was

created for the purpose of the different business areas meeting

to share information with each other.  Your Honor, what we need

to know, of course, is the precise nature of that.

But we do know that the highest levels of the company

were sharing information across the private label securities

business and the single-family business, and this information

was obviously making its way somehow into the decisions of what

securities to purchase.

I'd like to call your attention to two brief issues,

and this is just by way of example of things that are in the

FHFA's narrative that certainly warrant further inquiry, seem

inaccurate to us, your Honor, and we certainly need the

opportunity to look into further.

Page 14 of the FHFA's second amended objections and

responses to our Rule 30(b)(6) notice, which I hope your Honor

will be able to find in the packet of documents we gave you,

behind tab number 2 under the larger tab 30(b)(6).

THE COURT:  I'm not sure I'm in the right binder.  I

have a Freddie Mac portion and a Fannie Mae.

MR. SACCA:  Before the Freddie Mac portion, your

Honor, I think is a smaller 30(b)(6) portion.

C7vrfed2

1          MR. KASNER:  If it please the Court, I can provide one

2     to your Honor.

3          THE COURT:  No, I have this.  Thank you, Mr. Kasner.

4     Which tab?

5          MR. SACCA:  Tab 2 behind the 30(b)(6) tab.

6          THE COURT:  Yes.

7          MR. SACCA:  Is plaintiff's second amended objection

8     and responses to our 30(b)(6) notice.  On page 14 of that, your

9     Honor, the first full paragraph speaks about the single-family

10    counterparty risk management department within Fannie Mae.

11    That was the department that was represented, that single-

12    family representative on the advisory team.

13         There is a sentence here, the third sentence of the

14    paragraph, which says, "Pursuant to the PLS risk policy, the

15    vice president of single-family counterparty risk management

16    also was responsible for ensuring that the whole-loan purchase

17    counterparty reviews are performed independently from PLS

18    counterparty reviews to avoid information sharing risk."

19         As best we understand it, your Honor, what they are

20    describing there are these operational reviews of loan

21    originators.  What they have told us here is that the single-

22    family's operational reviews were somehow maintained separate

23    and distinct from the private label securities operational

24    reviews.  But, your Honor, we have strong reason to believe

25    that that is not true, at least in all cases.

C7vrfed2

1          If you look behind the Freddie Mac tab, your Honor, at

2     tab 6, there is a declaration of Cynthia Simantel.

3          THE COURT:  S-I-M-A-N-T-E-L.

4          MR. SACCA:  Yes.  Ms. Simantel was a Countrywide

5     executive, a loan originating executive.  In here, and I'm

6     particularly looking at paragraph 4, your Honor.

7          MR. SCHIRTZER:  Your Honor, if I may interrupt, when

8     we received the documents last night, we did not get the

9     Simantel declaration.  Is there a copy perhaps?

10          THE COURT:  I think the same declaration is in the

11     Fannie Mae section, too.

12          MR. SCHIRTZER:  I don't think we got it there either,

13     your Honor.

14          MR. SACCA:  Your Honor, paragraph 4 of that

15     declaration talks about these annual audits conducted by the

16     GSEs and at least one instance where Fannie Mae was trying to

17     simultaneously and in close proximity schedule an audit by

18     their single-family side and an audit by their private label

19     side, and at Countrywide's request combined them.

20          If you look at Exhibit A to Ms. Simantel's

21     declaration, there is an email from Patricia Wolf at Fannie Mae

22     to Ms. Simantel and others at Countrywide where she says,

23     "Cindy, these reviews are related and should be tied together.

24     Thanks."  So we know, your Honor, that at least on this one

25     occasion, I wouldn't be surprised if there were more, but at

C7vrfed2

1    least on this one occasion the PLS and single-family originator

2    reviews were said by Fannie Mae to be related to each other and

3    tied together.

4             Looking back now, your Honor, at the responses to the

5    30(b)(6) deposition, on page 25, and this is addressing the

6    Freddie Mac side now, your Honor, there is a description of a

7    Freddie Mac information request.  What it says here is that

8    individuals responsible for making purchasing or sales

9    decisions regarding private label securities were restricted

10   from receiving certain information regarding single-family loan

11   originators pursuant to Freddie Mac's information wall policy.

12   There is a citation to policy 7-115.

13            That document, your Honor, was submitted by the FHFA.

14   It is at tab 11 of their submission.  That submission, your

15   Honor, at least reading it on its face, appears applicable only

16   to Freddie Mac employees trading in Freddie Mac's own

17   securities, not to traders in private label securities.  So,

18   this does not appear to support what we were told in the

19   narrative response to our 30(b)(6) deposition that this

20   information policy prevented Freddie Mac from --

21            THE COURT:  I have Exhibit 11 before me.  If you could

22   repeat the statement you just made.

23            MR. SACCA:  Certainly, your Honor.  It is titled

24   "Information Wall Policy."  You can look in a couple of places,

25   but at the tail end of the first paragraph, it says, "This

C7vrfed2

policy prohibits using or the possibility that others may

perceive that we are using material nonpublic information

regarding Freddie Mac's mortgage and the purchase and sale of

those securities and secondary market transactions."

        On the second page, under Roman numeral II, "Who are

restricted persons and how can I be sure I know the current

list?  A restricted person is defined as someone whose job

responsibilities include purchasing and selling Freddie Mac's

mortgage securities in the secondary market."  So this policy

does not appear, at least on its face, applicable to private

label securities transactions.

        All to the point, your Honor, that we have reason to

believe, based on the information we put before you -- I know

others want to address this, and I don't want to take that

opportunity from them -- that there was substantial information

shared within both Fannie and Freddie of information between

the single-family side of the business that bought loans from

loan originators and therefore dealt with loan originators

literally many times a day, and the private label securities

side of the business that was buying securities backed by loans

issued by many of those same originators.

        We have strong reason to believe that the information

that was exchanged included information about those

originators, how they were doing with regard to their

origination practices, and that information we think

C7vrfed2

1    necessarily would have had to factor into the decisions to

2    invest in private label securities.

3            That is why we wanted to take the 30(b)(6) deposition,

4    your Honor, so that we could develop that record for you more

5    fully, to come before you at the appropriate time to argue

6    about what the proper scope of discovery is in this case.  We

7    believe that it is manifestly proper to take discovery beyond

8    that of the particular people involved in these particular

9    securitizations because we think they were getting information,

10   at least their superiors were getting very relevant

11   information, from outside the PLS business, from the single-

12   family business.  But we need to develop that better for you.

13           We have done, I think, the best we can with the

14   limited public record available to us.  The best source of this

15   information would be from the FHFA itself.  I think they have

16   already sort of conceded that by giving us this narrative.  The

17   problem is that the narrative is not subject to cross-

18   examination, it is as yet unsworn, and it really answers

19   questions that they chose to pose.

20           We chose not to, your Honor, serve a deposition on

21   written questions or interrogatories.  We chose to serve a

22   30(b)(6) deposition because we think from prior conferences

23   your Honor is in agreement with us that that is the most

24   efficient way to get at information like this.

25           THE COURT:  I have an application on July 30th from

C7vrfed2

1    the plaintiff that the defendants not be able to redepose, as I

2    understood it, a 30(b)(6) deponent on topics 1, 2, 10, and 11.

3    That's it.

4              MR. SCHIRTZER:  That is a different issue, your Honor.

5              THE COURT:  OK.

6              MR. SACCA:  Your Honor, topics 1, 2, 10, and 11 dealt

7    with document preservation or destruction policies and document

8    maintenance, not this issue.

9              THE COURT:  With respect to this issue, I understood

10   it was not a 30(b)(6) issue, it was an identification of the

11   document custodians and whether or not the defendants would be

12   able to obtain electronic discovery from document custodians in

13   the single- and multifamily business portion of the GSEs.

14             MR. SCHIRTZER:  Your Honor, it is all three issues.

15   It is in part an issue of whether we have designated the proper

16   custodians, it is in part an issue of the scope of documents to

17   be produced and specifically whether documents that were purely

18   or solely on single-family and multifamily side need to be

19   produced.  Then there is the issue of the defendants' request

20   for 30(b)(6) witnesses to go into custodial issues.  So is all

21   three issues, your Honor.

22             THE COURT:  This is Mr. Schirtzer speaking.

23             MR. SCHIRTZER:  Yes, your Honor.

24             THE COURT:  Before I hear from the plaintiff, is there

25   any other defense witness who has some additional point to make

C7vrfed2

1    on these topics, or defense attorney?

2              MS. SHANE:  Thank you, your Honor, very much.  I'll be

3    brief.

4              I think Mr. Sacca rightly expressed the actual

5    procedural posture we are in.  There has been an exchange of

6    requests both ways for additional custodians for various

7    reasons.  The defense has added as many custodians or more than

8    the plaintiff has.  We have much bigger numbers of custodians

9    than they have.  That is what we were trying to get at with the

10   30(b)(6) and with other modest discovery devices, among other

11   things.

12             But it is correct that the 30(b)(6) is what we most

13   feel we need in order to properly streamline discovery, your

14   Honor, not to expand it, but to direct it at the places where

15   we most likely will find a very critical crossover kind of

16   information.

17             The comments that we have put in front of you, the

18   ones we have been able to amass, and some of the helpful

19   answers that have been given in response to the 30(b)(6),

20   albeit in written form, have pointed us to some very low-

21   hanging fruit.  There were these committees.  They had minutes.

22   They received reports.  They met monthly.  From what we are

23   able to tell so far, all of that would be extremely easy

24   material to produce.

25             What scares us, your Honor, and the reason we feel we

C7vrfed2

1    need to further develop this, is because what the plaintiff

2    keeps articulating as the standard by which it will judge not

3    just the naming of custodians but the production of information

4    and documents, the provision of names of people at the agencies

5    or entities that dealt with the originators, it's all according

6    to this filter that if it didn't make it to the person who

7    decided to invest in the particular securitizations at issue,

8    persons we haven't yet had identified to us, but that small

9    subset, or the subset of people who happened to report to those

10   people, not to whom those people reported, then we will never

11   see that information.

12        The relevance standard both for purposes of

13   identifying these people and for answering interrogatories and

14   for producing documents someday is one in which only the very

15   lowest level of information appears to be coming our way.

16        They have now named as custodians some of these cross-

17   over people at higher levels, not nearly as many as we would

18   expect to see.  There are people who have responsibility for

19   both divisions who still aren't on their list and who were in

20   this critical risk management function who still aren't on

21   their list.

22        We understand that even if they get named as

23   custodians, we have this relevance fight that has to do with

24   whether it made it to the decision-maker or someone who

25   reported to that decision-maker.  That is what causes us to

C7vrfed2

1    continue to feel that it is very, very important that we all

2    understand what the information is, how it flowed, and

3    therefore what would be reasonable ways to cut off the

4    discovery.

5         I will add that in addition to low-hanging fruit,

6    there are pieces of paper that we have found that suggest that

7    there were lower-level communications that we might well need

8    to try to find a way to efficiently explore, your Honor, in the

9    packet of demonstratives that your Honor has.  They are in

10   addition to the joint reviews.  We also have some email that

11   may be a little bit hard to decipher.  This is number 6 in your

12   packet.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

C7VAAFEDC3                    Conference

1          MS. SHANE:  But it reads -- I am sorry.  It's from a

2    Tony Holmes at Fannie Mae who we believe to be on the Single

3    Family side to a Chase representative who was dealing in whole

4    loans at the time.  But what Fannie's person said was:

5          As I mentioned earlier, we have an axe for this

6    product as either whole loans or securities.  Our whole loan

7    bid reflects our intercoupon spread multiples, depending on

8    your internal excess servicing multiples you may find an MBS

9    execution superior.  If so, we're interested in bidding on your

10   pools once more.  Please keep us in mind if you choose to

11   securitize this product.

12         So the same loan pools could have been taken by Fannie

13   and Fannie was interested in taking them either as whole loan

14   purchases on the Single Family side or in a PLS product that

15   ultimately becomes at issue in this litigation.  And so we

16   would hope to be able to develop again by way of 30(B)(6) in

17   the first instance a way to get at those people who were on the

18   Single Family side who did, in fact, look at products or whole

19   loan opportunities for purposes of both whole loan and PLS and

20   may therefore have gotten even down to the whole level reviews,

21   your Honor, that could be sufficient to put the GSEs on notice

22   with respect to the particular defects.

23         There are documents in your packet, your Honor, that

24   reflect that they were doing loan level reviews of those

25   portfolios so that it would not necessarily only lead to the

C7VAAFEDC3                    Conference

1  idea that they had a cleared idea that certain originators

2  might not have been performing under to their own standards and

3  have made them frivolous.  But even the particular loans in the

4  pools did not need one verification or other and they were

5  getting to that level.

6          Thank you, your Honor.

7          MR. BENNETT:  Ted Bennett, from Williams & Connolly,

8  for Bank of America and Merrill Lynch.

9          Hopefully, not to repeat anything that was covered by

10 the able presentation by counsel for UBS and for J.P. Morgan,

11 but I think it's important to emphasize that it's clearly

12 premature for the Court to rule at this point that we should be

13 foreclosed from taking this discovery for a couple of reasons.

14         First of all, although FIFA has provided us with

15 certain organizational charts for Fannie and Freddie, there are

16 a couple of drawbacks to those charts.  First of all, they

17 don't cover the entire relevant period.  But more particularly,

18 they don't cover all of the relevant areas.  We've asked

19 several times for new charts.  They have not been forthcoming.

20         And secondly, your Honor, although FIFA has provided

21 certain policies relating to the sharing of information across

22 functions, what they call a cross functional sharing or cross

23 functional processes, those too are mostly dated 2006/2007, the

24 latter half of relevant period.  We simply don't have the

25 policies that were in effect at the beginning and prior to the

C7VAAFEDC3                    Conference

1   relevant period.

2           But more to the point, your Honor, it's important to

3   understand that the intimate relationship that Fannie and

4   Freddie had with the originators, the very originators who are

5   at issue in this case and who plaintiffs claim had utterly

6   abandoned their underwriting guidelines.

7           Taking just one originator who is at issues in several

8   of the cases, Countrywide, Countrywide sold Fannie and Freddie

9   during the relevant period 11.1 trillion dollars -- trillion

10  with a "T" -- worth of mortgages.  In fact, during that period

11  Fannie originated more than five thousand of its own securities

12  that were 100 percent made up of Countrywide originated loans.

13  Fannie and Freddie had people who were on campus at Countrywide

14  daily.

15          I commend your Honor to the declaration of

16  Ms. Simentel who was referenced earlier.  She's a long time

17  Countrywide employee.  She goes into some detail in her

18  declaration about these meetings, annual reviews, where they

19  came in for to and a half days and GSEs and looked at loan

20  levels, looked at performance, looked at procedure, looked not

21  just at policies that were in place but, actually, looked to

22  see how Countrywide was doing.  And we know they did it not

23  just to Countrywide because if your Honor looks into the e-mail

24  that was referenced earlier attached to Ms. Simentel's

25  declaration, you'll see that just on that single trip they were

C7VAAFEDC3                    Conference

1     also visiting other originators on the West coast who are at

2     issue in this case and some originators on the East coast who

3     are also at issue in the case.  We know further from the

4     documents that have been introduced in the last few weeks, last

5     few days, rather, by FIFA, that Fannie and Freddie were

6     required by policy to do reviews of originators to whom the GSE

7     has had certain levels of exposure.  So we know they were doing

8     these review.  We know further from Ms. Simentel's recounting

9     of it how closely involved these reviews were with the very

10    practices that FIFA now complains about.

11            For example, your Honor, she mentions in her

12    declaration that they would look at loans that had been

13    purchased by Fannie or Freddie either as whole loans or as part

14    of securitizations.  And at times they discovered that the

15    occupant didn't actually occupy the property and that led to a

16    discussion with Fannie and Freddie's representatives about

17    whether the loan had, nonetheless, been prudently underwritten

18    because at the time the originators and Fannie and Freddie had

19    an understanding that if the originator had done a pretty good

20    job of following the practice in the industry at the time that

21    the loan was prudently underwritten and it didn't need to

22    repurchase the loan from Fannie and Freddie even if it was an

23    occupancy misrep.

24            Also mentioned in Ms. Simentel's declaration are

25    issues relating to LTD and issues relating to how the

C7VAAFEDC3                    Conference

1    underwriting guidelines were being practiced.  So it's not

2    hypothetical exercise of maybe Fannie and Freddie knew those

3    things.  We know they knew these things.  And we know they knew

4    them not just on whole loan side but on the private label side.

5    And we know that they shared information across either through

6    the PLAT at Fannie or through Freddie's Enterprise Risk

7    Management Committee.

8              We know all those things.  And we know that they

9    spotted issues with some of the originators.  But we don't know

10   because FIFA refuses to give us the discovery is what is in the

11   files of people who did those reviews.  Now FIFA argues --

12             THE COURT:  What do you mean?  Which people who did

13   what reviews?

14             MR. BENNETT:  The people at Fannie who did the reviews

15   of the originator.

16             THE COURT:  On the Single Family side?

17             MR. BENNETT:  Yes, your Honor.  I'm not sure we have

18   it from the people who did it on the PLS side as well.

19   Certainly, the people who are mentioned in Ms. Simentel's

20   declaration mentioned in the e-mail, a couple of those are

21   custodians.  The vast majority are not.  We simply don't know

22   whether we'll ever see those people's documents.

23             But, your Honor, imagine a document in the files of a

24   whole loan person at Fannie that says Option One is a den of

25   thieves.  Nobody should ever buy a mortgage from Option One.

C7VAAFEDC3                    Conference

1   According to the way FIFA sees it we should never get that

2   document.  Even if it flowed to the PLS but didn't somehow end

3   up -- PLAT, even if it flowed to the PLAT but didn't somehow

4   end up in the files of one of the few custodians they've named

5   at Fannie.  So we know that if it ended up in the files of

6   someone at Freddie that there's a very good chance that it was

7   destroyed because they have a random document destruction issue

8   at Freddie.  So what we need to do is cast a wider net to go

9   look at the files of people on the Whole Loan side and see what

10  documents are there because we simply can't trust the

11  production on just the PLS side to pick all of those documents

12  out, even the ones that were communicated.

13          Now, your Honor I have been framing this all on terms

14  on the way FIFA argues the law --

15          THE COURT:  You don't need to address that.

16          MR. BENNETT:  You'd like me not to address the law,

17  your Honor?

18          THE COURT:  Mr. Williams, thank you.  I said you

19  didn't need to address that.

20          MR. BENNETT:  Case.  Would you like me to address

21  other causes we've cited, your Honor?  We've cited the Norbank

22  case and also the Davison Pike case which are also extremely

23  informative on the issue of justifiable reliance which of

24  course is the burden of the plaintiffs to prove.  And these

25  documents even if they weren't in the hands of people who made

C7VAAFEDC3                    Conference

1   the decisions on the loans are critical to the issues of

2   justifiable reliance which is the plaintiff's to prove.  I'd be

3   happy to address that, your Honor, if your Honor would like.

4           THE COURT:  I don't think I need that right this

5   month.  Thank you so much, Mr. Williams, for that offer.

6           MR. BENNETT:  The last thing I would venture, your

7   Honor, there's been a number of years that have passed, more

8   than eight years have passed since these loans are originated.

9   We heard today about how the loan files have gone many

10  different places.  Well, there's been tremendous turnover

11  within the GSEs as well.  There's been turnover.  There's been

12  document destruction for a number of years.  We would urge the

13  Court in light of those facts to cast as broad a net for

14  discovery as possible, at least to allow us the 30(B)(6) we

15  need to identify the custodians and beyond that to allow us to

16  explore these documents that are relevant for not just the

17  knowledge defendants under Section 11 and plaintiff's burden of

18  proving knowledge, no knowledge under Section 12 or also

19  justifiable reliance under the D.C. Blue Sky law and the

20  plaintiff's broad claims to bring against a number of the

21  defendant's here, your Honor.  Thank you.

22          THE COURT:  Is it, Mr. Sacca?

23          MR. SACCA:  Yes, your Honor.

24          THE COURT:  Mr. Sacca, I just am still trying to

25  figure out the precise issues that you need a decision on

C7VAAFEDC3                    Conference

1    today.  And I had spent some time with the parties' submissions

2    which through my fault entirely were limited in number of

3    pages.  You want a 30(B)(6) deposition?

4            MR. SACCA:  I think, your Honor, the crucial issue

5    that we would like resolved today is whether we are entitled to

6    a 30(B)(6) to inquire further into these issues of what

7    information -- your Honor, just begging your indulgence, page

8    10 in the slides I think will give your Honor maybe a better

9    sense than I did initially of exactly how all of this works.

10   This is a blow-up, your Honor, of a Freddie Mac organization

11   chart that is in whole in the binder.  But what we're trying to

12   intend to show you by this part that we've pulled out and

13   highlighted the reporting lines on, your Honor, is that both of

14   these businesses, Single Family and PLS, are in the same

15   reporting -- to an executive one below Freddie Mac's chairman

16   and CEO.

17           Your Honor, these businesses both reported to the

18   same -- executive.  It was executives at the highest levels of

19   these companies that were both making the decisions to invest

20   in private label securities and that were responsible for the

21   Single Family side of the business.  Information we know from

22   both of those businesses went to those people who are sharing.

23   What we need to look into and what we want the 30(B)(6) for is

24   to figure out exactly what that information was so that we

25   could come to your Honor on a more fully developed record to

C7VAAFEDC3                    Conference

 1    talk about the appropriate scope of which custodians we should

 2    search and for what.

 3            I'm sorry, your Honor.  I know that was a very long

 4    answer to you are question.

 5            THE COURT:  And with respect to the 30(B)(6) request,

 6    which once of the 30(B)(6) were you denied -- I know there have

 7    been 30(B)(6) depositions.

 8            MR. SACCA:  Yes.

 9            THE COURT:  So which specific items that are subject

10    to your 30(B)(6) demand do you want to take a deposition for?

11            MR. SACCA:  Items three -- three is probably the

12    principle one, your Honor.  That's the one that we have the

13    narrative and response to.  I think -- right -- all of the

14    topics I guess, your Honor, the easiest way to say it is I

15    guess all of the topics except one, two, ten and 11 which

16    they've already provided testimony.  And they all relate, your

17    Honor, in one way or the other to this issue of flow of

18    information and the information coming in to Fannie and

19    Freddie.

20            THE COURT:  So with respect to FHFA's July 30th letter

21    in which they ask that there be no redeposition of a 30(B)(6)

22    witness on topics one, two, ten and 11, you're consenting to

23    that?

24            MR. SACCA:  No, your Honor, we're not.  But that's no

25    this issue, I guess is the way I would answer that.  And

C7VAAFEDC3                    Conference

 1   Mr. Woll I think is prepared to address that separate and
 2   distinct issue, okay.
 3          THE COURT:  OK.  Then I'll just put that aside.  Your
 4   principally interested in Item Three.
 5          MR. SACCA:  Three I think is maybe the most
 6   significant of the topics.
 7          THE COURT:  Let me read that.  It's on page 6 at
 8   Exhibit 2?
 9          (Pause)
10          MR. SACCA:  You are reading -- I am sorry, your Honor.
11   It's Exhibit One to our submission is the 30(B)(6) notice
12   itself.
13          THE COURT:  I am reading the plaintiff's objections
14   and responses to Defendant's Notice of Rule 30(B)(6)
15   deposition.  Let me see if I can get a date for you.  Dated
16   July 10th.
17          MR. SACCA:  That would, I think, restate the topic,
18   your Honor.
19          THE COURT:  Okay.  Thank you very much.  That's
20   helpful.
21          Mr. Schirtzer.
22          MR. SCHIRTZER:  Your Honor, because the nature of
23   defense presentation a lot of different points of information
24   were thrown out, I am going to rather than try to respond point
25   by point, try to put some structure on my response.  And I am

C7VAAFEDC3                    Conference

1    glad we finally, actually, got to a specific discovery request

2    because the reason that we have objected is because of the

3    nature of the specific discovery request that have been thrown

4    at us which I'm going to address in a moment.

5          But just as a place holder, a very substantial amount

6    of what you heard from defense is simply based on the belief

7    that we have not adequately done the job that we are required

8    to do as counsel and that our client is required to do under

9    the rules to identify proper custodians and that is manifestly

10   false as I hope to demonstrate, your Honor.

11         So let's talk about the discovery requests themselves

12   and there's a short little history here.  This all started with

13   the interrogatories that defendant served before they served

14   any 30(B)(6) notice.  And what they wanted in Interrogatory No.

15   3 was the identity of all persons employed by you or acting on

16   your behalf who participated in, were involved in, approved or

17   were responsible in any way for the GSE's relationships

18   including his purchaser of loans with any mortgage are

19   originator disclosed in the prospectus supplement for the

20   securitizations.  Please, specify which person had

21   responsibility for which originators.

22         As I am sure your Honor understands, the fact that the

23   originators were part of the securitization was not a limit on

24   what they were asking for on Interrogatory No. 3.  So, for

25   example, if Countrywide was an originator on one of the

C7VAAFEDC3                    Conference

1    securitizations or Option was an originator one of the

2    securitizations, then they literally wanted every person who

3    ever interacted with Countrywide or with Option One including

4    what responsibility they had with respect to Countrywide or

5    Option One.

6            We said to them in enumerable meet and confers, this

7    is way too broad.  This is essentially our entire organization,

8    however many thousands of people work at Freddie Mac and Fannie

9    Mae other than the back office people and even some of them all

10   have some kind of dealing with originators, the business we are

11   in.  So we asked them to narrow that interrogatory.  And we

12   told them that if they narrow that interrogatory we would be

13   happy to answer.  They refused to narrow the interrogatory.

14   Instead, what they did was serve the 30(B)(6) notice.  The

15   30(B)(6) notice was not much of an improvement on the

16   interrogatory.  Your Honor has already looked at Topic Three of

17   the 30(B)(6) notice which has multiple subparts and,

18   essentially, asks for much of the same information in

19   Interrogatory No. 3.

20           Let's look at, if we may, Topic Four and Five of the

21   30(B)(6) notice which, if your Honor is still looking at the

22   objections and responses, Topic Four is on page 25, the

23   composition of each group.

24           THE COURT:  Well, I have page 7 so.

25           MR. SCHIRTZER:  I believe you are now looking at the

C7VAAFEDC3                        Conference

1    30(B)(6) notice themselves.  So if you have Topic Four that's

2    fine.  The deposition of each group responsible for any aspect

3    of your purchase or mortgage loans including your due

4    diligence --

5              THE COURT:  Slow down.

6              MR. SCHIRTZER:  Your communications with mortgage loan

7    originators, your pricing decisions, your monitoring of the

8    performance of mortgage loans and your communications with any

9    third parties including but not limited to operational reviews

10   of third party in connection with a mortgage loans or your

11   purchase of them from the time period January 2004 to September

12   2007.

13             And I won't read the entirety of Topic Five but it is

14   similarly broad and similarly infirmed.  And so we said to them

15   again in innumerable meet and confer sessions that in essence

16   what you are asking for is an identification of almost

17   everybody who has any operational responsibilities at Freddie

18   Mac or Fannie.  And we have and we will identify the custodians

19   who in any way touched on the what we call the private label

20   securities business.  And if they happen to be Single Family

21   people who touched on the private label securities business, we

22   will identify them as well and indeed we have.

23             Now we come to the misunderstanding part of

24   defendant's presentation.  I heard repeated references to the

25   fact that there is a PLAT at Fannie Mae, a high level committee

C7VAAFEDC3                    Conference

1    and there is a corollary committee at Freddie Mac.  Your Honor,

2    we have designated as custodians 11 members of the PLAT and

3    members of enterprise risk management at Freddie Mac.  We have

4    also identified -- and this is the handout that I've provided

5    to the Court at the beginning of the day.  We've given the

6    identity, the title, the business unit and the responsibilities

7    as they relate to PLS of the 82 custodians we have named.

8    These custodians, your Honor -- and I assure you because I was

9    very much involved in the process of identifying them -- these

10   custodians cover the field of business responsibilities.  They

11   cover the field of the documents that the plaintiffs claim they

12   ought to be getting, and indeed, many of which they will be

13   getting, although, they don't seem to believe that.

14          Let me add two features that are particularly germane

15   to why no more custodian -- let me take a step back.

16          So the reason we provided a written response to the

17   30(B)(6) notice as opposed to producing a witness was because

18   it was a monumental effort on our part to try to gather all of

19   the information just to respond to Topic No. 3 and to make sure

20   it was accurate.  It involved the efforts of many people of

21   Quinn Emmanuel and many people the client end, phone calls,

22   checks of computer records.  It was a very substantial

23   undertaking.  And as I said to defendants again in meet and

24   confers before we provided a written response, the written

25   response, frankly, contained far more information than any

C7VAAFEDC3                        Conference

1   witness I could have put in a chair would have been able to
2   offer on the subject of custodians.  But at the end of the day
3   the important thing to understand is that the 30(B)(6) topics
4   on which they now seek to compel a witness are solely to
5   identify additional custodians.  That is why they want to take
6   these 30(B)(6) depos because they believe the 81 custodians we
7   have named to date are not enough and they want more of their
8   list of 164 custodians to be added to the list.

9         And, your Honor, we submitted as part of our
10   submission the various letters that we got from defendants as
11   to the reasons why these additional 164 custodians were
12   supposedly proper.

13         Let's talk about UBS since their counsel stood up.  In
14   many instances what UBS told us with respect to their proposed
15   additional custodians was, essentially, that they had looked at
16   our organizational chart and that these custodians corresponded
17   to a functional bucket that they believed would have relevant
18   information.

19         Notwithstanding, the paucity of that justification for
20   additional custodians, we took each and every name and fully
21   vetted them with the client, with in-house counsel, with the
22   people working in the business units to identify whether these
23   people were or were not proper custodians.  And as a result we
24   have added an additional 17 custodians and we are still
25   considering adding more custodians because some of these

C7VAAFEDC3                      Conference

1    letters came in quite recently.  But the bottom line, your

2    Honor, is that as I hope the handout I've provided

3    demonstrates, the custodians we have named do cover every

4    essential function, including the functions that defendants

5    were talking about just moments ago.  The PLAT is covered.

6    Enterprise Risk Management is covered.  The operational --

7    sorry -- the reviews of seller services.  The people who sat

8    above that task are covered.

9         Indeed, your Honor, there's another fact which

10   defendants don't seem to have taken from our written response

11   which is critically important and it has to do with the way

12   documents are maintained at Freddie and Fannie Mae.  At Freddie

13   Mac people have access to directories.  And depending upon what

14   business unit you're in, you have access to directories in that

15   unit.  But the higher up the chain you go, the more directories

16   you have access to.

17        So when we designate for them Don Bisenius who is a

18   very senior executive.

19        THE COURT:  Can you spell that?

20        MR. SCHIRTZER:  B-I-S-E-N-I-U-S.  He was the Senior

21   Vice President of Credit Policy and Portfolio Management.

22        He had as a result of his position, access to

23   everything in Single Family control and Single Family credit

24   and the entire counter-party credit risk directory.  We name

25   Patty Cook, also a very senior executive.  She had access to an

C7VAAFEDC3                    Conference

1    extraordinary amount of information.  So when I say that these

2    custodians covered the field, they will, in fact, capture all

3    of the types of documents that defendants say they know are out

4    there and demand to see.

5         And just as an example, I asked the clients to provide

6    me with a list of the sorts of documents that are already being

7    captured.  I am sorry.  Let me go back.  Fannie Mae has a

8    different system.  Fannie Mae has a system of shared drives

9    that people different people have access to.  And the client

10   has identified for me something like 25 different shared drives

11   which we are in the process of reviewing for documentation.

12   And the kinds of documents we're going to see in those share

13   drives are PLS counter-party annual reports, PLS credit trend

14   reports, risk analysis reports, credit risk committee minutes,

15   credit risk committee presentations, PLAT meeting minutes, the

16   very thing the defendants were talking about, PLAT risk

17   policies and there's about 20 other things on this list and,

18   similarly, at Freddie Mac the kinds of documents that are our

19   existing custodians are going to capture our report on site

20   visits and originating evaluations, counter-party credit risk

21   reports, letters, proof seller lists, the kinds of things that

22   they claim they need.

23        Let me correct another misunderstanding on the part of

24   defendants.  They seem to think that the only documents they're

25   going to get are the documents that were given to the traders

1    or the people who work for Lota.  That is a misimpression on

2    the part of defendants.  What we said in our submission and I

3    thought it was clear but let me make it clear is that

4    defendants are going to get the documents that were considered

5    in connection with the PLS purchases, the purchases at issue in

6    this litigation.  Those will be the documents in the possession

7    of the traders but it will also be the documents that people

8    who were required to give those traders information had in

9    their possession.  And so if a supervisor of the traders had in

10   his possession a document which showed hypothetically that

11   Option One was not an approved originator, that document will

12   also be produced.

13           So between the combination of the very elaborate and

14   fulsome custodians that we have identified and the documents

15   that those custodians have access to, defendants are going to

16   get everything about originators that made it over to the PLS

17   side and was considered in connection with the decisions to

18   purchase or not purchase these particular securitizations.

19           Now, I don't want to suggest that there isn't any

20   fundamental issue between us because there is at the end of the

21   day a fundamental issue.  What they're not going to get is the

22   documents that were considered only on the Single Family side

23   and related only for the Single Family business.  And we are

24   not giving them custodians who were cabined on the Single

25   Family side.  And the reason we're not doing that is, actually,

C7VAAFEDC3                    Conference

1    stems from your Honor's earlier order in connection with the

2    statute of limitations.

3            As your Honor rightly pointed out there, this is not a

4    case about whether the originators had dubious underwriting

5    practices generally.  This is a case about whether the

6    defendants failed to act diligently to ensure consistent with

7    the representations in the offering materials that the

8    originators' questionable practices did not lead to the

9    inclusion of nonconforming loans in the particular

10   securitizations sold to GSEs.  So if documents pertain solely

11   to Single Family originations and, for example, that could

12   include every repurchased demand ever issued by Freddie Mac or

13   Fannie Mae on any loan every sold to them by any originators

14   who happens to be an originator on securitization, at that

15   level of granularity, no, they're not going to get those

16   documents.  They are not entitled to those documents.  Those

17   documents are not relevant to what is in dispute here.

18           But if Option One is disapproved as a seller servicer,

19   that list goes to the PLS people.  Counter-party risk reports

20   on Option One at Countrywide go to PLS and get considered in

21   connection with the purchasers.  And they're going to get all

22   of that.

23           So now let's first circle back to the need for a

24   30(B)(6) deposition on this.

25           If the defendants would, actually, look at the list of

C7VAAFEDC3                    Conference

1    custodians that we have already designated, as I say we are

2    still considering more and understand their functions as we had

3    explained it to them in the written response, and now with the

4    additional understanding of the scope of documents that these

5    custodians had, they will understand that, in fact, adding

6    additional custodians in the same departments will not garner

7    them any additional documents, that adding custodians who

8    worked solely on the Single Family side had nothing to do with

9    the PLS side will not produce relevant -- and consequently if

10   what they want the 30(B)(6) deposition for is to confirm the

11   effort that we undertook to put this document together, all I

12   can say, your Honor, is that no witness that I could prepare

13   will have more information than we were able to garner and put

14   into the written response.  What I expect is the case is that

15   they really want the 30(B)(6) deposition to try to get

16   information that always remained on the Single Family side and

17   was germane to the Single Family side, well, then that'

18   information that they're simply not entitled to, your Honor,

19   and this a fundamental dispute that's going to run across

20   interrogatories, 30(B)(6) depositions and document requests.

21            THE COURT:  Thank you for your presentation.

22            Let me ask you about this phrase, a document

23   considered in connection with PLS purchases.  If the document

24   came before the risk committee at one of the two GSEs how do

25   you know it was considered in connection with PLS purchases?

C7VAAFEDC3                  Conference

1          MR. SCHIRTZER:  Well, because there are a number of

2    PLS people on that risk committee.  So if a document, for

3    example, in one of these PLS site audits at Countrywide, those

4    documents would have made their way up to one of the risk

5    committees.  They would have necessarily been considered in

6    connection with the PLS purchases and we're going to produce

7    them.

8          THE COURT:  Okay.  So if the document itself doesn't

9    have to indicate that it's prepared for the purpose of being

10   considered on the PLS side if it came before the Risk Committee

11   which had shared membership and discussed the performance of

12   originator, it will be turned over.

13         MR. SCHIRTZER:  There is one exception, your Honor,

14   and that is the -- there was a reference before to site visits

15   and I think this is at Fannie May.  And they did -- it is true

16   that they did them in close proximity so there would be a

17   Single Family audit, then a PLS audit.  But, in fact, in one of

18   policies that were submitted to your Honor to explain the

19   information laws, in fact, the information regarding the Single

20   Family site visit was not shared with the PLS.  In fact, it was

21   not shared pursuant to policy.

22         THE COURT:  So it didn't make it to the risk

23   committee?

24         MR. SCHIRTZER:  Doesn't make it to the PLS side.

25         THE COURT:  So it's at the Risk Committee but it's not

C7VAAFEDC3                      Conference

1    shared with the PLS members of the Risk Committee?

2             MR. SCHIRTZER:  Your Honor, I understand the question

3    and I don't know the answer, so I don't want to misrepresent.

4             THE COURT:  So good.  Why don't we flag that as an

5    issue.

6             MR. SCHIRTZER:  Now, your Honor --

7             THE COURT:  When are you making your document

8    production?

9             MR. SCHIRTZER:  That's a question I need to ask

10   Ms. Chung.

11            MS. CHUNG:  Well, your Honor, the review is all

12   underway and we are on target as I think everyone in this room

13   is to produce by the end of September.  Certainly, we

14   anticipate making productions up to that date.

15            THE COURT:  When do you think you will make a

16   substantial production with respect to these custodians that

17   we're talking about today?

18            MS. CHUNG:  Well, your Honor, there we started with a

19   quarter list and in response to considering the defendant's

20   proposals we've expanded that list considerably.  So some of

21   those custodians are being loaded into new process as we seek.

22   So I can't say it's going to be that they get all of these cuss

23   custodians at the front end of the role in process.  I think it

24   will be some custodians come out and then others come out and

25   we're on track to get it all done by the end of September.

C7VAAFEDC3                    Conference

1          THE COURT:  So we're about to move into August.  Will

2     the defendants get some of this production in August?

3          MS. CHUNG:  I think so, your Honor.  I don't want to

4     represent that it's going to be a significant amount but I

5     think that everyone is finding it a challenge.  So most of it

6     will be through September.  But there is material now in the

7     pipeline being used and being sent out so, yes, we will make

8     some production.  I don't want to overstate the situation

9     because I think that there is -- we have a considerable number

10    of documents to review.  We are undertaking to do it the old

11    fashioned way on our side and so we need to get through those

12    and produce them and I do think very much of it will be in

13    September, not in August.

14         THE COURT:  I have one more question for you,

15    Mr. --oh, I'm sorry.

16         MR. SCHIRTZER:  Your Honor, I was just standing to

17    address the question.

18         THE COURT:  No.  It was for Mr. Sacca.

19         MR. SCHIRTZER:  Did I do it again?

20         THE COURT:  Yes.  I wanted to know if the defendants

21    or at least UBS has decided at this point that it would like to

22    brief the substantive law with respect to knowledge with

23    respect to Section 11.  And I ask that question because of

24    Footnote Two on the defendants' submission for the July 31st

25    hearing and an undated letter that I think I got on the 30th.

C7VAAFEDC3                    Conference

1    And this was a topic that we talked about at the May 14th

2    conference and at pages 25 to 26 in which I offered to have

3    early motion practice on the standard for knowledge for Section

4    11 claim.  And at that time the thinking, as I understood it,

5    on the defense side was, no, it'd be too fact intensive a

6    question and would not be meaningful, helpful in the way that

7    I'd anticipated to have that legal discussion now.

8              Have the defendants changed their mind?

9              MR. SACCA:  Your Honor, we have not.  I think we still

10   would welcome the opportunity to brief that after we have had

11   the chance to develop a more full record for your Honor, part

12   of which would be the 30(B)(6) deposition, part of which would

13   probably be documents we get in production after that.

14             Your Honor, to respond very briefly to what

15   Mr. Schirtzer said, we saw the 30(B)(6) depositions.  The

16   partys are agreed on that.  We did for a reason, your Honor.  A

17   narrative is all well and good for whatever limited purposes

18   but I can't cross-examine a narrative.  I can't ask the

19   follow-up questions of a narrative and I can't ask clarifying

20   questions of a narrative.  And we've seen plenty today to tell

21   us that we shouldn't take everything that's in this narrative

22   at face value.  Mr. Schirtzer just said that where there were

23   counter-party reviews done by Single Family and done by PLS

24   they made an effort to strip out information.  We've seen an

25   e-mail though that said that they did this review together at

C7VAAFEDC3                    Conference

1    Freddie's choice to put the Single Family and the PLS review of

2    Countrywide together where, obviously, both sides were going to

3    hear whatever Countrywide had to say.

4            Now, your Honor, I also will note that many of the

5    Fannie people on that very e-mail about the Countrywide

6    operational review are not on the custodian.  Also missing from

7    the custodian's list, your Honor, Freddie's CEO, Mr. Syron.

8    Freddie Exhibit 4 in the binder in front of you which I made

9    reference to before the Special Litigation Committee's report

10   says on pages 16 to 17, although Freddie Mac had been involved

11   in the subprime market prior to Mr. Syron's joining the company

12   and even prior to 2000, the senior management under Mr. Syron

13   increased the company's involvement in that market.  The person

14   responsible for Freddie's decision to take on more subprime

15   securities largely through PLS isn't on the custodian list.

16           So, your Honor, again, we're not after more, per se.

17   We're after the right ones.  And we have been deprived up till

18   now of the opportunity to ask questions that we think are

19   necessary to decide who the right ones are.  Your Honor has

20   raised some very good questions that we would like answers to

21   about if certain information reached the Private Label advisory

22   team.  Do they consider to have been passed on or not?  We

23   think this they have the amputation standard on its head.  We

24   think under the third restatement of agency information is

25   imputed unless there's a duty to share it.

C7VAAFEDC3                    Conference

1          But, your Honor --

2          THE COURT:  Let me ask you, on this ten page list of

3    the document custodians, are there people who you think should

4    not be on that list?

5          MR. SACCA:  We don't know yet entirely, your Honor.  I

6    am not -- it is possible that there are people that we after we

7    learn a little more would think are not necessary.  Like I

8    said, judge, I can't stress this enough, we're not out simply

9    to increase the number of custodians.  We want to make sure we

10   have the right ones.

11         THE COURT:  Okay.  Thanks.

12         MR. SCHIRTZER:  Actually, your Honor, the example that

13   was just offered is almost too telling.  They want Dick Syron,

14   the former CEO and chairman of Freddie Mac.  And their basis

15   for wanting him is a couple of SEC complaints that claim that

16   he essentially led Freddie Mac into an overconcentration of

17   subprime and didn't disclose it was the gist of the SEC

18   complaint.

19         What they don't say is that Don Bisenius and Patty

20   Cook, the operational executive vice presidents or whatever

21   titles were immediately below him, were also defendants in that

22   same case and they're both custodians on our list which proves

23   the point I am trying to make, that we have gone to the top

24   levels of the company, the people who had access to directories

25   that will encompass all sorts of information.  And we've put

C7VAAFEDC3                        Conference

1    those people on custodian lists.  To say that we need a

2    30(B)(6) deposition to identify an apexed opponent that's -- it

3    is what it is, your Honor.

4              THE COURT:  Okay.  Thank you.  We're going to take a

5    brief recess.  I want counsel to talk about the late August

6    date and whether an order in connection with that would be

7    helpful and whether or not reports, status reports on document

8    production late August before such a conference would be

9    helpful.  I need the parties' guidance and if you could discuss

10   that together.  We'll take a ten minute recess.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

C7vrfed4

1              THE COURT:  Mr. Bennett, I understand I kept calling

2       you Mr. Williams.

3              MR. BENNETT:  Yes, your Honor.

4              THE COURT:  I apologize.

5              MR. BENNETT:  That's quite all right, your Honor.  The

6       "Edward Bennett" gets people confused all the time.

7              THE COURT:  Someone earlier today mentioned that I was

8       going backwards.  I'm going to do that again.  I'm going to

9       revisit our first topic.

10             I think we should keep it simple.  We should have the

11      Daubert motion addressed just to the protocol in the UBS case,

12      briefed by FHFA and UBS on roughly the schedule that the

13      plaintiffs proposed -- august 9th, August 31st, September

14      13th -- understanding that counsel will discuss the appropriate

15      schedule with each other that accommodates vacations and other

16      personal needs and get me a letter describing what schedule

17      they would like me to endorse.  Then, any other defendant who

18      wishes to bring a similar Daubert motion based upon the

19      plaintiff's sampling protocol in their case may during the fall

20      talk with Mr. Selendy about a schedule.  Write me and let me

21      know what your desires are.

22             Again UBS gets the great honor and privilege of being

23      the stalking-horse on the issue for everyone.

24             MR. KASNER:  I would say thank you, your Honor, but

25      given my vehemence in reaction, I will sit mute.

C7vrfed4

1          THE COURT:  I appreciate Mr. Sacca helping me focus on

2     precisely what relief is being sought with respect to the most

3     recent issue we have been discussing.  To the extent the

4     request is for a 30(b)(6) deposition on item 3, that request is

5     denied.

6          I think that I can make a couple of observations here

7     beyond simply saying that request is denied that may have

8     broader implications and, hopefully, helpful guidance for the

9     parties.  I think that specific request was just one of a

10     constellation of issues about the adequacy of FHFA's document

11     production and the number of custodians and the identity of the

12     custodians.

13          Let's step back and ask what this discovery of the

14     plaintiff is all about.  To some extent I'm going to share

15     these thoughts because if you think I see things incorrectly, I

16     think it is important that you hear the way I'm thinking so you

17     can correct my thinking.  Mr. Bennett, that even means pointing

18     out some law to me on occasion.

19          I don't think a defendant can proceed to trial here

20     unless a defendant believes they can successfully defend the

21     section 11 claim.  I know there are these other issues in the

22     case, other claims of federal securities law violations and

23     fraud claims, but I think it is hard for a defendant to proceed

24     to trial unless they think they have a good defense on the

25     section 11 case.

C7vrfed4

1            The role of knowledge in a section 11 claim is a

2     limited one.  Over and over again the arguments by defense

3     counsel to me this afternoon have talked about how information

4     from the single-family side of the enterprise was necessarily

5     shared with the PLS side and therefore necessarily appropriate

6     for discovery in this case.

7            The theme of the defense arguments has not been that

8     information held solely within the single-family side of the

9     business should be discoverable.  The fear is that the document

10    production that is being undertaken by the plaintiffs will be

11    inadequate to capture information principally about originators

12    that was shared with the PLS side.  I don't find any basis to

13    believe that that is a realistic fear.

14           First of all, the FHFA is making a massive production

15    here.  As its description of the roles of the various

16    custodians that it has already agreed to make shows, they

17    represent many different functions within the GSEs, including

18    on the risk committees that were so much the focus of

19    discussion with me today.

20           If there was, as the defendants argue, a tying

21    together of the single-family and PLS function within these

22    organizations and substantial information sharing between the

23    two sides of the businesses within these organizations, and I

24    think I'm capturing the precise terms used this afternoon,

25    those documents are going to be captured in this document

C7vrfed4

1    production.  If they aren't, come on back to me.

2            There is no basis to argue now or to fear now that

3    they won't be produced.  And that is before I even get to the

4    level of analysis that rule 1 would require me to undertake and

5    a proportionality analysis, weighing the role that a knowledge

6    defense is going to have in this case with the kind of

7    intensive undertaking that FHFA is making and that the

8    defendants are each going to be burden by.

9            I think Mr. Sacca had a good point.  He said it's not

10   the number, it's the quality.  And that's true.  Everybody has

11   to spend money looking at whatever is produced.

12           I find that FHFA's production of a written response

13   was to be commended.  It was a much more reliable presentation

14   of extremely complex matters, more reliable and more detailed

15   than could have been received in any 30(b)(6) deposition under

16   any time frame that could have been considered reasonable.

17           I don't have a request from the defendants that is

18   pinpointed.  There has been only one name mentioned here of a

19   custodian that should have been included and wasn't.  I take

20   that as a tribute to both sides here and the meet and confer

21   process, and also in recognition that FHFA is taking its

22   responsibilities seriously, that when it needs to reconsider a

23   particular custodian, it's thinking about that and keeps adding

24   when it finds it's appropriate to do so.

25           These are layers of reasons which support each other

C7vrfed4

1    for my ruling.

2              MR. BENNETT:  Your Honor?

3              THE COURT:  Yes?

4              MR. BENNETT:  I wasn't clear.  We certainly are

5    arguing that documents that never went, if there are any, never

6    went from the home loan side to the PLS side are relevant, for

7    a number of reasons.

8              THE COURT:  We have finished argument on that issue.

9    It's late.  Thank you so much, but those documents I will not

10   order produced for all the reasons I have just described.

11   Thank you.

12             MR. BENNETT:  Thank you, your Honor.

13             THE COURT:  Counsel, the two exhibits that you gave to

14   me today, I want to make sure that all the materials that we

15   have considered this afternoon in addition to these two

16   handouts -- one, the custodian list, and the other the

17   collection of documents that begins with an excerpt from a Form

18   10-K -- if you could give me another set so I can make sure

19   that everything is appropriately filed.

20             MR. KASNER:  Your Honor?

21             THE COURT:  Yes, Mr. Kasner?

22             MR. KASNER:  I'm not here to reargue, I assure the

23   Court.  I just wish to place on the record so your Honor knows

24   that the issues as to which discovery was being sought that we

25   discussed today do not relate solely to the issues of actual

C7vrfed4

1    knowledge.

2            I understand why your Honor focused on the section 11

3    claim, which perhaps may impact the component of knowledge a

4    bit differently than the affirmative element in a section 12

5    claim, for example.  However, there are other aspects of the

6    defendants' defenses I wish to advise the Court to which this

7    discovery relates.  I assure the Court I'm not here to reargue

8    your Honor's ruling.

9            Issues of materiality are impacted by what is in the

10   files that we were seeking, in the 30(b)(6) information that we

11   were seeking, information with respect to reliance for those

12   fraud defendants -- I am not one.

13           THE COURT:  Yes.

14           MR. KASNER:  -- and issues related to inquiry notice

15   with respect to the statute of limitations we believe will all

16   be impacted by those issues, your Honor, not simply actual

17   knowledge.

18           THE COURT:  Yes, I understand that.  I hope you

19   weren't misled by my frank sharing of an analysis which was

20   just one and not a necessary component to my ruling.

21           MR. KASNER:  I understood, your Honor.

22           THE COURT:  I would have ruled the same way without

23   any reference to the knowledge component of the section 11

24   claim.

25           MR. KASNER:  I understood that, your Honor.  Your

C7vrfed4

Honor had indicated that that was your Honor's belief about the

centrality of that component to our defenses.  I just thought

it was important to make plain on the record it's not just that

issue.  I understand what the Court is saying.

THE COURT:  The third paragraph in your submission of

I believe July 30th lists a number of those other elements or

the way knowledge relates to elements of a variety of claims

and defenses.  I did read that with care and I am well aware of

it.

MR. KASNER:  Thank you, your Honor.

THE COURT:  I have what I thought was the 30(b)(6)

issue in a set of letters raised in the first instance I think

by FHFA with respect to four separate questions and a request

that the 30(b)(6) witness not be redeposed.  I believe someone

wished to address that for the defendants.

MR. WOLL:  Yes, thank you, your Honor.  David Woll for

the defendants.  As you noted, the plaintiff raised with the

Court issues we had with the adequacy of two witnesses that

were produced to testify with respect to, generally speaking,

document retention issues.  We submitted something this morning

in response to that.

We do have issues with respect to the adequacy of the

30(b)(6) testimony on the document retention issues, but the

fundamental issue I want to focus on is the Freddie Mac

document destruction issue because I think it impacts really

C7vrfed4

1    everything we have been talking about today in terms of

2    custodians and scheduling.

3            To briefly summarize, and I know it's late, the

4    plaintiffs originally brought to our attention that Freddie Mac

5    employed an automatic deletion protocol originally described to

6    us as having been in place at least from January 2004 to

7    September 2008.  They told us during the week of June 29th,

8    when we were talking about document custodians, that as a

9    result of that protocol, basically any email that wasn't

10   affirmatively saved for an employee prior to September 2008

11   didn't exist anymore and any emails to an employee who left

12   prior to 2008, those emails also wouldn't exist anymore, even

13   if they had been affirmatively saved, because they would have

14   been affirmatively discarded at the time of departure.

15           Obviously, it is pretty fruitless to talk about

16   document custodians if they don't have any documents.  We

17   thought it important to bring this to the Court's attention

18   right away, which we did in a letter from Mr. Kasner on July

19   2nd.  Counsel for the plaintiff responded, noted that they had

20   brought this to our attention because it was relevant to

21   document custodians and discovery, and said in that letter,

22   quote, "FHFA will continue to work in good faith to resolve any

23   outstanding issues regarding e-discovery and to exchange

24   information with defendants that bears on that effort."  That

25   sounded pretty good.

C7vrfed4

1            We wrote a letter to the plaintiff on July 5th.  I

2      wrote that letter.  Other letters followed on July 12th.

3      Suffice it to say there were numerous requests to plaintiff to

4      try and get to the bottom of this issue, which fundamentally is

5      to what extent are there large gaps in the emails available for

6      relevant custodians for the relevant period.  We didn't get any

7      answers, unfortunately, to those letters.

8            We did make it part of our 30(b)(6) notice, which is

9      why it comes up in this context now.  One of the topics in our

10     30(b)(6) notice, topic 1, was about the systematic deletion of

11     potentially relevant documents pursuant to this protocol.  The

12     plaintiffs did produce a witness, on July 20th I believe, to

13     testify with respect to topics 1, 2, 10 and 11 in the notice,

14     all of which are document retention topics.  His name was Rick

15     Keogh.  Mr. Keogh was not able to tell us anything about what

16     custodians proposed either by the plaintiff or by the

17     defendants had electronic documents remaining.

18            We showed him the list of custodians that were

19     proposed by the plaintiff at that point.  We showed him some

20     lists.  We asked him, do you know what's available from any of

21     the plaintiffs?  He said no.  The plaintiffs have taken the

22     position that that is beyond the scope of the notice.

23            It is certainly not beyond the scope of the notice as

24     it was originally framed by us.  We also don't think it is

25     beyond the scope of the notice as they agreed to produce the

C7vrfed4

1      witness Mr. Keogh to testify about document retention policies

2      and practices, quote, as they applied to the groups and

3      individuals responsible for the securitizations.

4              It certainly wasn't a surprise to the plaintiff that

5      we were keenly interested in this, because we had written to

6      them, we had written to the Court, and they said they were

7      going to provide this information.  But Mr. Keogh couldn't

8      provide that.

9              The other thing that troubled us, and still troubles

10     us, and why I think we need to get to the bottom of this, is

11     the description of this automatic deletion protocol has changed

12     over time.  The plaintiff, through counsel originally,

13     represented what I just described, referring to January 4th of

14     2008.  Mr. Keogh submitted a declaration, which I cited in one

15     of my letters, which was referenced in the letter to the Court,

16     in another federal action where he said that documents prior to

17     October 2007 had been automatically deleted, but then in

18     October 2007 they ceased the recycling of backup tapes.

19             Then, at his deposition Mr. Keogh said and plaintiff

20     produced some information saying, hold on a second, we have

21     lots of backup tapes for emails prior to October 2007, which

22     was directly contrary to what it said in Mr. Keogh's

23     declaration in this other federal action.  We followed up with

24     some more correspondence.  We asked some more questions.

25             In their letter to the Court yesterday, the plaintiff

C7vrfed4

told you that, quote, "FHFA has advised defendants that each

agreed Freddie Mac custodian has significant amounts of

electronic information, including email, for the relevant

period."  They advised us at the same time they sent the letter

to your Honor.  We got a separate letter that included the same

statement.

          Respectfully, I don't think that that statement, given

what we know or have heard about the Freddie Mac auto deletion

policy, really answers the question of whether there are large

gaps in the emails that were apparently subject to some type of

auto deletion policy.

          We don't know what are on the backup tapes that Mr.

Keogh identified for the first time at his deposition.  If

there are substantial emails from custodians, I don't know

exactly what that means.  For instance, if somebody worked on

deals in 2005 and I have emails for 2007, that's not going to

help us very much.

          They have only identified that there are substantial

emails for the initial custodians they agreed to.  They had

initially agreed to, I think, 38 Freddie Mac custodians.  They

say they are going to add more.  I think it will bring them up

to like 51.  They say that should ameliorate our concerns.  But

we don't know if any of those extra custodians have any emails,

so it doesn't really ameliorate the concerns.

          I don't think we can wait until the end of the

C7vrfed4

1      discovery period to find out, oh, these custodians had large

2      gaps in their emails.  That's why we have been asking and why

3      we have asked the Court to instruct plaintiff to give us more

4      specific information about which custodians have emails for

5      which relevant periods and to identify whether there are

6      significant gaps.  If the plaintiffs need more time to do that,

7      that's one thing, but not responding to the letters and

8      narrowly construing the deposition notices is not the way to

9      go.

10             THE COURT:  With respect to your request, these are

11     topics 2 and 3, am I right?

12             MR. WOLL:  It's actually 1 and 2 primarily, your

13     Honor.

14             THE COURT:  I'm sorry.  1 and 2 primarily?

15             MR. WOLL:  Yes.

16             THE COURT:  Yes.  3 we just dealt with.

17             MR. WOLL:  Right.

18             THE COURT:  If I remember correctly, the plaintiff

19     principally responded that topics 1 and 2 didn't require the

20     employee-by-employee description that you are suggesting that

21     you would like now.

22             MR. WOLL:  That is the position they took, your Honor,

23     yes.

24             THE COURT:  Reading topics 1 and 2, I must agree.  So,

25     I don't find that the 30(b)(6) witness who was prepared to

C7vrfed4

answer topics 1 and 2 would have been inadequately prepared

because they were not able to answer information about a

specific individual.

    I would like Mr. Woll to handle this issue this way,

which is you will get your document production for the

custodians.  The plaintiff has represented and I have received

today a letter to you of July 30th that they are searching

backup tapes, that substantial amounts of email covering

relevant dates are being produced, etc.  I don't know if the

production is going to satisfy you or not, but you will get a

production.  If it doesn't satisfy you, please meet and confer

with plaintiff's counsel and, if necessary, come back to me.

    MR. WOLL:  Very good, your Honor.  Given the timing of

things, I thought it was important to raise this issue, since

by the time we get the documents and identify the gaps, it

might be September 30th.  I appreciate your Honor's

consideration.

    THE COURT:  Thank you, Mr. Woll.

    Ms. Shane, a quick report.  How is predictive coding

going?

    MS. SHANE:  Your Honor, we are working very hard at

predictive coding, as your Honor directed.  We meet every day

with the plaintiff to have a status report, get input, and do

the best we can to integrate that input.  It isn't always easy,

not just to carry out those functions but to work with the

C7vrfed4

1   plaintiff.  The suggestions we have had so far have been

2   unworkable and by and large would have swamped the project from

3   the outset and each day that a new suggestion gets made.  But

4   we do our best to explain that and keep moving forward.

5         We very much appreciate that your Honor has offered to

6   make herself available, and we would not be surprised if we

7   need to come to you with a dispute that hasn't been resolved by

8   moving forward or that seems sufficiently serious to put the

9   project at risk.  But that has not happened yet and we hope it

10  will not.

11        THE COURT:  Are you still on schedule?

12        MS. SHANE:  We are basically on schedule, yes.

13        THE COURT:  Thank you very much, Ms. Shane.

14        MS. CHUNG:  Your Honor, may we address predictive

15  coding for just a second?  We agree that the parties have been

16  working together very diligently.  There have been a series of

17  meet-and-confers.  One issue in terms of the benchmarks that

18  your Honor knows, we did resolve a major issue, which was the

19  layering of the predictive coding on top of search terms.

20  There was agreement over the weekend that the predictive coding

21  would be applied to the entire universe of documents.  That is

22  very helpful and very useful to us.  As you know, that was one

23  of our major objections.

24        We do feel that we are working toward the deadline

25  that your Honor has set to report to the Court.  We agree that

C7vrfed4

there are issues that may require your Honor's attention.  One

that has come up, and if another time is better, we can raise

it separately.  It has to do with the training of the coding.

There is the seed set that your Honor referred to in

conference.  That is the set of documents against which we try

to run the coding.

There is something called the enrichment set, which is

a set of documents that you put in to help train, to help do

the training.  Typically, in the enrichment set you would

include documents that you know are relevant.

One issue that we have discussed with defendants is

there have been requests from our side, document requests, for

deposition testimony and written statements that have been

given in other RMBS cases and also to governmental agencies or

inquiries or to Senate subcommittees where there have been

prior investigations of the defendants' RMBS origination

practices or their checking that loans were being originated in

accordance with underwriting guidelines.  This required culling

of the complaints, your Honor.

You know that there are references to complaints in

other litigations and also to the FCIC inquiries.  It is the

type of issues that are plainly relevant, such as whether the

defendants were waiving into loan pools loans they had been put

on notice were not in compliance with the underwriting

guidelines.  One of the things that we requested to be included

C7vrfed4

1    in this enrichment set are such documents.

2                 THE COURT:  What do you mean?  The depositions?

3                 MS. CHUNG:  It wouldn't be everything, your Honor, but

4    yes, documents that are depositions or written statements.

5    These are within the scope of documents requests that we made

6    that are from these other investigations or suits.  They

7    haven't been produced to us, so we don't know what they are.

8                 THE COURT:  Why would a document custodian and a bank

9    have a copy of a deposition?

10               MS. CHUNG:  Your Honor, these are, for example, in the

11   case of the FCIC, some of the defendants here have turned over

12   information to the financial commission, including giving

13   witness statements, on topics that are about practices that are

14   at issue in these cases.

15               THE COURT:  You have some affidavits from potential

16   document custodians or declarations?

17               MS. CHUNG:  We would expect there to be deposition

18   testimony.  There were interviews done by some of these

19   committees.  In the case of the FCIC, they did take I think it

20   was testimony.  I think it was sworn testimony.

21                    Now what we have been informed by the defense is they

22   consider these documents just not relevant.  It is not even

23   really an issue about predictive coding.  We would agree with

24   them that if the documents aren't relevant, there is no point

25   in using the documents in the enrichment set.  But we have a

C7vrfed4

1    dispute about what is relevant in terms of the scope of

2    documents that are relevant to the case.

3         I can stop there, your Honor, and we can raise it

4    separately.  But you can see why, in terms of all the

5    justifications that Ms. Shane gave on the conference call we

6    had with your Honor last Tuesday, if we are going to train the

7    system up right, we need to have the right things in the seed

8    set and in the enrichment set.  So there may be these kinds of

9    issues that arise.

10        THE COURT:  Good.  We will put those over for another

11   day.  I'm learning about predictive coding as we go.  But a

12   layperson's expectation, which may be very wrong, would be that

13   you should train your algorithm from the kinds of relevant

14   documents that you might actually uncover in a search.  Maybe

15   that's wrong and you will all educate me at some other time.

16        I expect, Ms. Shane, if a deposition was just shot out

17   of this e-discovery search, you would produce it.  Am I right?

18        MS. SHANE:  Absolutely, your Honor.  But your instinct

19   that what they are trying to train the system with are the

20   kinds of documents that would be found within the custodian

21   files as opposed to a batch of alien documents that will only

22   confuse the computer is exactly right.

23        THE COURT:  Good.

24        MS. SHANE:  You will get confirmation but not any

25   further education on that score.

C7vrfed4

1           THE COURT:  Here I'm hoping for a great report from

2      Ally.

3           MR. GOEKE:  Reginald Goeke from Mayer Brown.  From our

4      perspective, I think things are on track.  As we indicated, we

5      gave our responses and objections to the 30(b)(6) notice to the

6      FHFA on Monday.  We had a meet-and-confer with them.  We

7      believe that we are currently going down the process.  We are

8      going to provide them with a witness on the 9th to answer most

9      of the questions that they have identified in their 30(b)(6)

10     notice.

11          I don't know whether there are any other issues from

12     the defense side.

13          MS. LEUNG:  Thank you.  For the record, Kanchan Leung.

14     There is one issue that we would like to move on today.  It

15     became apparent from our meet-and-confer session yesterday that

16     the overarching dispute between the parties right now is

17     whether Ally has produced a witness that will be knowledgeable,

18     will have information that is reasonably available to it from

19     the debtors.  We think that they should be preparing their

20     witness and should put up a witness knowledgeable about the

21     documents in the possession of the debtors.

22          We are concerned that we are going to go down this

23     road, get a deposition, and at the end of the day still not

24     know whether documents are in the possession of the debtors.

25     This is putting aside the issue of control.  Ally seems to be

C7vrfed4

1    taking the position that they don't need to educate their

2    witness outside the four corners of Ally.  We don't think that

3    that is defensible.

4           The rule contemplates for 30(b)(6) that the witness be

5    educated not just from within the company but possibly from

6    documents, from former employees, and we think from the

7    subsidiaries.  They have a corporate relationship, their ResCap

8    is a domestic subsidiary; they have a contractual relationship.

9    I won't belabor the shared services agreement.  And Ally

10   continues to provide great financial support for the debtors in

11   bankruptcy.

12          We think as a practical matter that information is

13   available from the debtors and that they should be informing

14   the witness with that information.  It is our concern that at

15   the end of the day we are going to go through the deposition

16   process, it's not going to really advance this case any

17   further.

18          THE COURT:  When you say reasonably available from the

19   debtors, you mean in preparation for this deposition you would

20   like the 30(b)(6) witness to speak with representatives of the

21   debtor to inform themselves about the debtor's knowledge on

22   these issues?

23          MS. LEUNG:  Correct.

24          THE COURT:  Do you oppose that?

25          MR. GOEKE:  Yes, your Honor.

C7vrfed4

1              THE COURT:  Your application is granted.  In the best

2      of all possible worlds, that would happen, but these companies

3      are now in bankruptcy.  While the bankruptcy court may

4      certainly order their participation in discovery even though

5      there is a stay of litigation, I don't want in the first

6      instance to require that.  I think any application should go

7      before the bankruptcy court.  But I don't think it is necessary

8      for this 30(b)(6) witness, and I think the deposition should go

9      forward.  Thank you.

10             Is there anything else that we need to put on today's

11     agenda?

12             MR. BENNETT:  Your Honor, going back on one point very

13     briefly, I appreciate your Honor's comments about the

14     seminality of section 11 to the plaintiffs going forward.

15     There are six sections under which punitive damages have been

16     claimed.

17             THE COURT:  I looked at that.

18             MR. BENNETT:  We ask permission for your Honor to

19     brief the justifiable reliance issue we put briefly in our

20     letter.  We think if the fraud claims go forward, we need to be

21     able to address documents supporting or attacking justifiable

22     reliance.  Otherwise, the claims will be vastly overvalued by

23     the plaintiffs.

24             THE COURT:  I absolutely agree that the punitive

25     damage claim is very important for my consideration and for

C7vrfed4

1   everyone's consideration when they are facing that claim.  I'm

2   going to ask for your indulgence and trust me that I have

3   looked at that issue and noted in how many of the cases it

4   occurs.  I'm aware of the justifiable reliance element of

5   certain claims and the way all of the defenses in paragraph 3

6   of Mr. Kasner's letter -- I guess it's a joint letter from many

7   folks.

8           MR. KASNER:  Correct, your Honor.

9           THE COURT:  Yes.  I thought about all of those.  My

10   ruling with respect to the scope of discovery, e-discovery from

11   FHFA, would not change in any way given the fact that a

12   particular defendant is facing a fraud claim.

13           MR. BENNETT:  Thank you, your Honor.  Should the

14   parties anticipate a written ruling capturing today's order?

15           THE COURT:  We have a court reporter.

16           MR. BENNETT:  Thank you, your Honor.

17           THE COURT:  That is the great of great benefit to me

18   and to all of us.  Ms. Chung?

19           MS. CHUNG:  Your Honor, we were supposed to get back

20   to you about the idea of a late August conference.  I wanted to

21   address that.  This is about loan files that are in the hands

22   of third parties.  We would support your Honor's original idea

23   to have such a conference.  I do think it would serve a

24   purpose.

25           There is no doubt that there are jurisdictional

C7vrfed4

1   issues, but I think if we were to put together a list of where

2   these entities are and what jurisdictions they are subject to,

3   I think we could potentially work through the jurisdictional

4   issues.  It may require starting miscellaneous actions in other

5   jurisdictions, but we could do that.  This has been done in

6   other RMBS cases.  Sometimes you have to go to the other

7   jurisdictions to get either the files or the information that

8   gets worked into the reunderwriting.  The parties could draft

9   many of these documents for your Honor if that was helpful.

10          You can see from the discussion today, and your Honor

11  has also pointed it out, we are in a situation where, as you

12  put it, both sides are reserving their rights to go back to the

13  loan files, all of them.  Certainly nothing we have heard from

14  the defendants today is any concession of any agreement to do

15  anything less than that.

16          This is not where the plaintiff wanted to start, but

17  this is where we are today.  Given that that is the case and

18  that the loan files threaten to become a real bottleneck for

19  the reunderwriting on both sides, we think we should at least

20  explore what the possibilities are for having this conference.

21          I also think we shouldn't assume that the parties

22  won't participate in the conference, especially if it was by

23  telephone, even if they could make jurisdictional objections.

24  I think just knowing that the Court is putting the focus on

25  these requests could be very useful in getting people to

C7vrfed4

1    prioritize turning to the production of these loan files.

2           I agree with Ms. Shane, when you ask for these loan

3    files, it runs the gamut.  Sometimes you have entities who are

4    nonparties who have already produced these loan files for

5    resecuritizations in some other litigation, so it's just a

6    matter of pressing a button.  For others it is a matter of

7    going and finding the bits and pieces and putting them

8    together.  But certainly it couldn't hurt for them to know that

9    the Court is focused on this issue and we have our own schedule

10   that we appear.

11          THE COURT:  Would you be suggesting, Ms. Chung,

12   starting with a status report per case before me with a list of

13   the entities and jurisdictions with loan files for that case?

14          MS. CHUNG:  I think so, your Honor.  As your Honor

15   proposed, we could get the list together very quickly.  But

16   yes, we could go on a case-by-case basis and have a status

17   report.

18          THE COURT:  How long do you think you would need to do

19   that?

20          MS. CHUNG:  Here I need to say I think I

21   misremembered.  I misremembered what we had issued and what the

22   defendants have been issuing.  I may inadvertently have taken

23   too much credit for us.  I think the defendants have issued the

24   subpoenas that have gone to people who may have the loan files.

25   We may have some.  Our third-party subpoenas were directed at

C7vrfed4

1    due diligence firms and ratings agencies.  So much of the

2    information is actually in their hands.  I see Ms. Shane

3    standing, so maybe she could address this.

4              THE COURT:  Ms. Shane.

5              MS. SHANE:  Your Honor, we would welcome a status

6    conference in part to address the issue of where we stand with

7    respect to some very important third-party discovery initiative

8    which, Ms. Chung is correct, has mostly been undertaken by

9    defendants.  We think that could be productive.  I would

10   suggest a couple of interim steps to make it more productive,

11   including that the parties change information about what loan

12   files they have and therefore what loan files they need.

13             We would most welcome the conference to make sure we

14   are all on the same page on that and are being productive about

15   it, as well as party production issues.  As several of your

16   Honor's rulings today have turned on the idea that we will be

17   seeing fruits of production undertakings and representations

18   that have been made by the plaintiff, custodian searches, and

19   production of material from people whose emails have been

20   destroyed, a number of different issues where we need to see

21   the results, we would very much welcome the opportunity to have

22   your Honor help us to make sure that we are seeing production.

23             We have so far only seen 1,000 pages produced by the

24   plaintiff.  We have produced well over 800,000, excluding loan

25   files on the defense side.  We are worried we are going to get

C7vrfed4

1    whatever we get in September, when it is too late.  If we could

2    broaden the agenda, take a couple of steps with the parties

3    exchanging information about nonparty subpoena status and

4    requests for loans and waivers and the like, so that we lead up

5    to a conference and can very productively give your Honor

6    status reports and get your Honor's assistance in moving

7    forward, that would be very much welcome.

8          THE COURT:  Ms. Shane, do you think it's realistic for

9    me to get proposed orders for my signature and status reports,

10   let's say, a week from today, or is that too fast?

11         MS. SHANE:  I think it would probably make more sense

12   to have it be ten days from today so that we might have an

13   opportunity to see some of the production that has been

14   promised, or its absence, so that we can talk to plaintiff as

15   well about when they think we will see some documents.  You

16   have vacation, I believe, your Honor.  If it's more convenient

17   for the Court to have it in a week than in ten days, certainly

18   we can do it in a week.

19         THE COURT:  I'm talking about orders with respect to

20   production of the loan files, just that portion of the topic or

21   topics.  Can you and the plaintiff and the defendants and the

22   plaintiff do what they need to do in order to understand where

23   the outstanding production issues lie within a week, or not?

24         MS. SHANE:  I think that is too fast, your Honor,

25   given the enormity of the undertaking and the differences in

C7vrfed4

1    the situations people have.

2              THE COURT:  This is what I would very much appreciate.

3    I think August 9th is a Thursday.  I would like by August 9th a

4    proposed order or two and status letter so that I can review

5    them and give my input and, if necessary or appropriate, sign

6    them by August 10th and get a system set up for my absence for

7    a period of time the following week where more proposed orders

8    of a similar nature and status reports might come in.  Is that

9    doable, Ms. Shane?

10             MS. SHANE:  Yes, your Honor.

11             THE COURT:  Then we already have the date government

12   late August conference.  I'll get out a scheduling order.  My

13   chambers will be in touch with counsel.  If we don't have

14   unmarked courtesy copies of each of the submissions, we may

15   need another set so we can get that docketed.  We'll be in

16   touch with you on that.

17             Ms. Shane?

18             MS. SHANE:  Your Honor, it would be very helpful if in

19   advance of the 9th the plaintiff could provide us a list of the

20   loan files that they have and where they got them from so that

21   we can together work on crossing those off the list of those we

22   still have to go after.

23             MS. CHUNG:  Your Honor, we can to that.  To get all

24   the loan files in one place, it's not just us, it's the

25   defendants.  For some of them we have the information on

C7vrfed4

1    whether they have loan files or whether the loan files that are

2    at issue in their cases are coming from third parties.  I think

3    everyone needs to contribute to understand where all the loan

4    files are going to be coming from, what the entities are, where

5    they sit.  I agree with that.

6              THE COURT:  It sounds like everyone is in agreement.

7    Good.

8              MS. SHANE:  Right.

9              THE COURT:  Anything else we need to address?  Thanks

10   so much, counsel.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25