```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x   11 CV 5201 (DLC)
                                             11 CV 6188 (DLC)
 3   FEDERAL HOUSING FINANCE AGENCY,         11 CV 6189 (DLC)
                                             11 CV 6190 (DLC)
 4                  Plaintiff,               11 CV 6192 (DLC)
                                             11 CV 6193 (DLC)
 5            v.                             11 CV 6195 (DLC)
                                             11 CV 6196 (DLC)
 6   JPMORGAN CHASE & CO., INC., et al.,     11 CV 6198 (DLC)
                                             11 CV 6200 (DLC)
 7                  Defendants;             11 CV 6201 (DLC)
                                             11 CV 6202 (DLC)
 8                                           11 CV 6739 (DLC)
                                             11 CV 6203 (DLC)
 9   And other FHFA cases.                   11 CV 6739 (DLC)
                                             11 CV 7010 (DLC)
10                                           11 CV 7048 (DLC)
     ------------------------------------x
11
                                             New York, N.Y.
12                                           October 15, 2012
                                             2:30 p.m.
13
     Before:
14
                          HON. DENISE COTE,
15
                                             District Judge
16

17

18

19

20

21

22

23

24

25
```

```
 1                            APPEARANCES

 2   QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Plaintiff
 3        Federal Housing Finance Agency
     BY:  PHILIPPE Z. SELENDY, ESQ.
 4        MANISHA M. SHETH, ESQ.
          CHRISTINE H. CHUNG, ESQ.
 5        SASCHA RAND, ESQ.
          JULIA GUARAGNA BESKIN, ESQ.
 6        ADAM M. ABENSOHN, ESQ.

 7   FEDERAL HOUSING FINANCE AGENCY
     BY:  STEPHEN E. HART, ESQ.
 8        Managing Associate General Counsel

 9   KASOWITZ BENSON TORRES & FRIEDMAN LLP
          Attorneys for Plaintiff
10        Federal Housing Finance Agency
     BY:  KANCHANA WANGKEO LEUNG, ESQ.
11        CHRISTOPHER P. JOHNSON, ESQ.
          MICHAEL HANIN, ESQ.
12        ANDREW K. GLENN, ESQ.

13   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Attorneys for Defendants UBS Americas Inc.,
14        SG Americas, Inc., and
          affiliated entities and individuals
15   BY:  ROBERT A. FUMERTON, ESQ.
          JAY B. KASNER, ESQ.
16        SCOTT D. MUSOFF, ESQ.
          JOSEPH N. SACCA, ESQ.
17
     SPEARS & IMES LLP
18        Attorneys for Defendants UBS Americas Inc.,
     BY:  DAVID SPEARS, ESQ.
19        MONICA P. FOLCH, ESQ.

20   SULLIVAN & CROMWELL LLP
          Attorneys for Defendant JP Morgan Chase
21        and affiliated entities, and certain individuals
     BY:  PENNY SHANE, ESQ.
22        SHARON L. NELLES, ESQ.
          JONATHAN M. SEDLAK, ESQ.
23

24

25
```

```
 1   APPEARANCES (Cont'd)

 2   SULLIVAN & CROMWELL LLP
          Attorneys for Defendant Goldman Sachs
 3        and affiliated entities and individuals
     BY:  RICHARD H. KLAPPER, ESQ.
 4        THEODORE EDELMAN, ESQ.
          W. RUDOLPH KLEYSTEUBER IV, ESQ.
 5        BRADLEY A. HARSCH, ESQ.

 6   SULLIVAN & CROMWELL LLP
          Attorneys for Defendant Barclays Bank
 7        and affiliated entities and individuals
     BY:  DAVID H. BRAFF, ESQ.
 8        BRIAN T. FRAWLEY, ESQ.

 9   SULLIVAN & CROMWELL LLP
          Attorneys for Defendant First Horizon,
10        Nomura Holding, and affiliated entities
     BY:  BRUCE E. CLARK, ESQ.
11        AMANDA F. DAVIDOFF, ESQ.

12   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for Defendant Citigroup
13        and affiliated entities and individuals
     BY:  SUSANNA M. BUERGEL, ESQ.
14        CAITLIN E. GRUSAUSKAS, ESQ.
          BRUCE BIRENBOIM, ESQ.
15
     CRAVATH, SWAINE & MOORE LLP
16        Attorneys for Defendant Credit Suisse
          and affiliated entities and individuals
17   BY:  RICHARD W. CLARY, ESQ.
          LAUREN A. MOSKOWITZ, ESQ.
18
     DEWEY PEGNO & KRAMARSY LLP
19        Attorneys for for Credit Suisse
     BY:  KEARA A. BERGIN, ESQ.
20
     SIMPSON THACHER & BARTLETT LLP
21        Attorneys for Defendants RBS Securities,
          Deutsche Bank, and affiliated entities
22   BY:  DAVID J. WOLL, ESQ.
          THOMAS C. RICE, ESQ.
23

24

25
```

```
1    APPEARANCES (Cont'd)

2    MAYER BROWN LLP
          Attorneys for Defendant HSBC North America Holdings
3         and affiliated entities and individuals
     BY:  JOHN M. CONLON, ESQ.
4         MICHAEL O. WARE, ESQ.
          ALLISON J. ZOLOT, ESQ.
5         JENNIFER M. ROSA, ESQ.

6    MAYER BROWN LLP
          Attorneys for Defendants Ally Financial
7         and GMAC Mortgage Group, Inc.
     BY:  REGINALD R. GOEKE, ESQ.
8         MICHAEL O. WARE, ESQ.
          CATHERINE A. BERNARD, ESQ.
9
     KIRKLAND & ELLIS LLP
10        Attorneys for Defendant Ally Securities
     BY:  ROBERT J. KOPECKY, ESQ.
11
     WILLIAMS & CONNOLLY, LLP
12        Attorneys for Defendants Bank of America Corporation,
          Merrill Lynch, and affiliated entities
13   BY:  BETH A. STEWART, ESQ.
          EDWARD J. BENNETT, ESQ.
14        LAUREN K. COLLOGAN, ESQ.

15   DAVIS POLK & WARDWELL LLP
          Attorneys for Defendant Morgan Stanley
16        and affiliated entities and individuals
     BY:  JAMES P. ROUHANDEH, ESQ.
17        BRIAN S. WEINSTEIN, ESQ.
          DANIEL J. SCHWARTZ, ESQ.
18
     WEIL, GOTSHAL & MANGES LLP
19        Attorneys for Defendant General Electric
          and affiliated entities
20   BY:  GREG A. DANILOW, ESQ.
          VERNON S. BRODERICK, ESQ.
21        SETH GOODCHILD, ESQ.

22   RICHARDS KIBBE & ORBE, LLP
          Attorneys for Numerous Individual Defendants
23   BY:  DANIEL ZINMAN, ESQ.

24   ALLEN & OVERY LLP
          Attorneys for Defendant Molinaro
25   BY:  JOSEPHINE A. CHEATHAM, ESQ.
```

```
 1   APPEARANCES (Cont'd)

 2   GREENBERG TRAURIG, LLP
          Attorneys for Defendant Mayer
 3   BY:  RONALD D. LEFTON, ESQ.

 4   MORRISON & FOERSTER LLP
          Attorneys for Defendants Marano & Nierenberg
 5   BY:  JOEL C. HAIMS, ESQ.

 6   SNR DENTON US LLP
          Attorneys for Defendant Perkins
 7   BY:  PATRICK E. FITZMAURICE, ESQ.

 8   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
          Attorneys for Defendant Verschleiser
 9   BY:  DANI R. JAMES, ESQ.

10

11             (In open court)

12             THE CLERK:  In the matter of Federal Housing Finance

13   Agency v. UBS Americas Inc. and others, and other FHFA cases,

14   for plaintiff Federal Housing Finance Agency, are you ready to

15   proceed?

16             MR. SELENDY:  Yes, we are.  Thank you.

17             THE CLERK:  Please state your name for the record.

18             MR. SELENDY:  Philippe Selendy, Quinn Emanuel, for

19   FHFA.

20             MS. CHUNG:  Christine Chung with Quinn Emanuel for

21   FHFA.  Good afternoon, your Honor.

22             MS. SHETH:  Good afternoon.  Manisha Sheth for FHFA.

23             MR. RAND:  Good afternoon, your Honor.  Sascha Rand,

24   Quinn Emanuel, for FHFA.

25             MR. ABENSOHN:  Good afternoon, your Honor, Adam
```

1    Abensohn for FHFA.

2          MR. HART:  Good afternoon, your Honor.  Steve Hart

3    with FHFA.

4          MS. LEUNG:  Good afternoon, your Honor.  Kanchana

5    Leung with Kasowitz Benson for FHFA.

6          MR. GLENN:  Andrew Glenn,  Kasowitz Benson, on behalf

7    of FHFA.

8          MR. JOHNSON:  Christopher Johnson from Kasowitz Benson
for FHFA.

9

10          MR. HANIN:  Michael Hanin, Kasowitz Benson, for FHFA.

11          THE CLERK:  Counsel, just to make sure your names are

12    included on the appearance sheet.

13          THE COURT:  One minute, Ms. Rojas.

14          THE CLERK:  For defendants UBS Americas Inc. and SG

15    America, please state your name for the record.

16          MR. KASNER:  Your Honor, good afternoon.  Jay Kasner,

17    Robert Fumerton, and Scott Musoff from Skadden Arps.

18          MR. SPEARS:  And, your Honor, David Spears and Monica

19    Folch are working with Skadden Arps on behalf of UBS on these

20    matters.

21          THE CLERK:  For defendant JP Morgan Chase & Co.

22          MS. SHANE:  Good afternoon, your Honor.  Penny Shane,

23    Sullivan & Cromwell, with Sharon Nelles and Jonathan Sedlak,

24    also from Sullivan & Cromwell.

25          THE CLERK:  For defendant Goldman Sachs.

```
1              MR. KLAPPER:  Good afternoon, your Honor.  Richard

2    Klapper from Sullivan & Cromwell, along with my partner,

3    Theodore Edelman.

4              THE CLERK:  For defendant Barclays Bank.

5              MR. BRAFF:  Good afternoon.  David Braff from Sullivan

6    & Cromwell with Brian Frawley, also of Sullivan & Cromwell.

7              THE CLERK:  For defendants First Horizon National

8    Corp. and Nomura Holding America.

9              MR. CLARK:  Good afternoon, your Honor.  Bruce Clark

10   and Amanda Davidoff, Sullivan & Cromwell.

11             THE CLERK:  For defendant Citigroup Global.

12             MR. BIRENBOIM:  Good afternoon, your Honor.  Bruce

13   Birenboim, Susanna Buergel, and Caitlin Grusauskas from Paul

14   Weiss for the Citigroup defendants.

15             THE CLERK:  For defendant Credit Suisse Securities.

16             MR. CLARY:  Good afternoon, your Honor.  Richard Clary

17   and Lauren Moskowitz from Cravath Swaine & Moore.

18             MS. BERGIN:  Keara Bergin, Dewey Pegno & Kramarsky,

19   also for Credit Suisse.

20             THE CLERK:  For defendant RBS Securities and Deutsche

21   Bank.

22             MR. WOLL:  Good afternoon, your Honor.  David Woll and

23   Tom Rice from Simpson Thacher.

24             THE CLERK:  For defendant HSBC North America Holdings.

25             MR. CONLON:  Good afternoon, your Honor.  John Conlon
```

1  and Michael Ware of Mayer Brown.

2         THE CLERK:  For defendants Ally Financial and GMAC

3  Mortgage Group.

4         MR. GOEKE:  Good afternoon, your Honor.  Reginald

5  Goeke, Michael Ware, and Catherine Bernard of Mayer Brown.

6         THE CLERK:  For defendant Ally Securities LLC.

7         MR. KOPECKY:  Good afternoon, your Honor.  Robert

8  Kopecky, Kirkland Ellis.

9         THE CLERK:  For defendants Bank of America and Merrill

10  Lynch.

11         MS. STEWART:  Good afternoon, your Honor.  Beth

12  Stewart from William & Connolly, and with me today are Ted

13  Bennett and Lauren Collogan.

14         THE CLERK:  For defendants Morgan Stanley.

15         MR. ROUHANDEH:  Good afternoon, your Honor.  Jim

16  Rouhandeh, Brian Weinstein, and Daniel Schwartz from Davis

17  Polk.

18         THE CLERK:  For defendants General Electric.

19         MR. DANILOW:  Good afternoon, your Honor.  Greg

20  Danilow, Vernon Broderick, and Seth Goodchild from Weil

21  Gotshal.

22         THE CLERK:  For the individual defendants including

23  George C. Carp.

24         MR. ZINMAN:  Good afternoon, your Honor.  Daniel

25  Zinman from Richards Kibbe & Orbe.

```
 1              THE CLERK:  For the individual defendant Jeffrey

 2    Mayer.

 3              MR. LEFTON:  Ronald Lefton from Greenberg Traurig.

 4              THE CLERK:  For the defendant individual Samuel

 5    Molinaro Jr.

 6              MS. CHEATHAM:  Good afternoon, your Honor.  Josephine

 7    Cheatham from Allen & Overy.

 8              THE CLERK:  For the individual defendants Thomas

 9    Marano.

10              MR. HAIMS:  Good afternoon, your Honor.  Bill Haims,

11    Morrison & Foerster.

12              THE CLERK:  For the defendant individual Matthew

13    Perkins.

14              MR. MORRIS:  Good afternoon, your Honor.  Patrick

15    Fitzmaurice, SNR Denton.

16              THE CLERK:  And for the individual defendant Jeffrey

17    Verschleiser.

18              MR. JAMES:  Good afternoon, your Honor.  Dani James

19    from Kramer Levin.

20              THE COURT:  Thank you.

21              Welcome, everyone.  And I appreciate your cooperation

22    in being here on such short notice.  It just seemed to me,

23    given the letters I received late last week, that it would be

24    impossible for me to work through all the items that were

25    raised by that exchange of correspondence through a telephone
```

1     conference, or at least difficult to accomplish.

2            So let me tell you what I have on our agenda today,

3     and counsel may have additional issues.  I want to address the

4     issues raised to those three sets of letters.  I want to talk

5     about the *Daubert* motion practice.  I want to see if we can fit

6     in some summary judgment motion schedule dates in the UBS case.

7     I want to talk about the coordination in the RBS case, Royal

8     Bank of Scotland, with the Connecticut action.  I want to

9     address the ResCap loan file production issue.  I want to talk

10    about the schedule for reports by the plaintiff and the

11    defendants on reunderwriting in the UBS action and potentially

12    in other actions.

13           I want to talk about loan file production from true

14    third parties.  This comes up, obviously, in the sets of the

15    three letters, but whether we're moving towards the point where

16    motions to compel are necessary or appropriate with respect to

17    any of those subpoenas that have been issued.

18           Good.  So that's my list, and I want to thank counsel

19    for the reports that you exchanged this morning.  I haven't

20    looked at them in detail, but I did look at them a bit.

21           I thought we might start by talking about some of the

22    issues raised in the letters.  The plaintiff's letter was

23    labeled "Loan File Production."  The first specific issue it

24    raised was loan numbers for loans that were reviewed as part of

25    the defendants' due diligence and are referred to by the

1   plaintiff with the term "due diligence samples."  And I think

2   there were least five issues raised in that letter and its

3   responsive letter.

4        For many of the issues that came to me through these

5   three sets of letters, the defendants indicated there was a

6   need for further opportunity to meet and confer, and I issued

7   an order requiring the parties to do that.  So for some of the

8   issues raised in this first set of letters, I realize you may

9   have made some progress and the issues may be a little

10  different now than was presented to me.  So why don't I take a

11  report with respect to these issues and then we'll resolve

12  hopefully any outstanding disputes.

13       MR. SELENDY:  OK.  Your Honor, Philippe Selendy for

14  FHFA.  Would you like me to address all the issues in that

15  letter or just focus on the due diligence question?

16       THE COURT:  Well, so many of these issues are

17  interrelated.  Whatever you think is the most efficient way to

18  do it.

19       MR. SELENDY:  OK.  Well, I can report that progress

20  has been made on some of the issues.  In particular, as your

21  Honor will recall, we had sought to request defendants to

22  prioritize the production of loans that fall within the samples

23  designated by Dr.~Cowan.  And it is my understanding that the

24  defendants, notwithstanding the submission originally from UBS,

25  they have now agreed to prioritize those samples.  And I think

1    that is an agreement that efforts will be made to secure the

2    production from third parties of loans in the sample population

3    and to ensure prioritization from defendants themselves.

4          That's not the case with respect to the defendants'

5    due diligence files.  And so your Honor is clear, those are the

6    files that we understand defendants assert they reviewed not

7    for the purposes of a full underwriting but for various tests,

8    whether it was sent out to third parties or otherwise, in the

9    course of underwriting the transactions.  And we have sought to

10   request defendants to, first of all, identify what those loans

11   are out of the populations of the securitizations, and secondly

12   to similarly prioritize the production.

13         In the letter that came in from Skadden Arps on

14   October 11, they asserted that we had never raised this issue

15   before.  But your Honor will see from Exhibit 2 to our letter,

16   this very issue was stated, among other times, in the September

17   5th letter that we presented to them, asking them to prioritize

18   due diligence files and also, in footnote 1, page 2 of that

19   exhibit, to identify the loan numbers of those loans so that

20   the population is clear.

21         The reason for this is that we understand defendants

22   are intending to rely upon that population as a key part of

23   their defense of adequate underwriting, and just as with the

24   sample populations that we have selected for purposes of

25   demonstrating representativeness across all populations, we

1    would like the opportunity to be able to reunderwrite those

2    loans and determine whether in fact they demonstrated

3    compliance with the various representations or not.  So we are

4    at an impasse on that point.

5         THE COURT:  Let me interrupt, sorry, and ask a

6    question.  Is it helpful to think about loan files as falling

7    within three categories: loan files that the defendants possess

8    as defendants, loan files that the defendants possess as third

9    parties, and loan files that true third parties possess?

10        With respect to the first two categories, I think the

11   report I got suggests that all the loan files that defendants

12   have, either as parties or as third parties, have already been

13   produced or will be produced shortly.  And I want to put aside

14   for one moment the 100,000 files for JP Morgan Chase in

15   Louisiana.  Let's just put those aside.  They're a separate

16   issue.

17        So with respect to true third parties which have -- I

18   don't know, I'm getting slightly different numbers -- but maybe

19   half a million loan files in the possession of true third

20   parties -- and these are people who have subpoenas, many of

21   them which require production be complete in August, not every

22   one, but many.  But let's talk about one of those true third

23   parties.  And I'm glad we have some people who are deeply

24   involved in loan production pursuant to subpoena in this

25   courtroom.  I wonder if it really makes sense to prioritize

1    production of loan files, either the FHFA samples or the due

2    diligence loans.  It seemed to me that some of the subpoenas

3    that were served, and the fundamental argument presented by

4    FHFA, was that besides requesting loan files, the subpoenas

5    requested, for instance, e-discovery, communications with FHFA

6    or concerning FHFA.  And if a party receiving the subpoena had

7    many tasks to perform besides production of loan files, they

8    may be delayed in their production because they had to, in

9    their mind, fulfill all those tasks.  I don't know the answer

10   to this question, but if we ultimately are going to want all

11   the loan files from a party and all their underwriting

12   guidelines, don't we want to prioritize the loan files and

13   underwriting guidelines, and the rest of the issues, about

14   electronic discovery, e-mail searches, about relevant

15   communications, that could come in a second production, as

16   opposed to having piecemeal production and searching for and

17   production of loan files?  I hope my question is clear enough.

18           MR. SELENDY:  OK.  So let me take the last issue that

19   you raised first, your Honor.  We do agree, the most important

20   category of information from third parties will be the loan

21   files as well as the guidelines that relate to those loans.

22   And it does make sense to prioritize them as a category.  We

23   had, for example, issues with defendants seeking single

24   family-related information from those third parties and

25   increasing the burden on frankly irrelevant areas or areas that

1    this Court already ruled were not appropriate for discovery.  I

2    think we've reached some agreement on curtailing that, as well

3    as, I believe, on prioritization of loan files and guidelines.

4    And that is critical.

5        To date, in fact, we have had limited reports of what

6    information has come from the third parties until this morning.

7    We had understood that only 14 of these third parties had

8    actually produced loan files.

9        In the joint letter that was submitted this morning,

10   it looks as if a much greater volume has been produced, but

11   that has not yet made it across to us.

12       THE COURT:  Excuse me one second.  (Pause)

13       MR. SELENDY:  OK.  Just to continue, there is, we

14   understand, for certain of these third-party entities -- and

15   this is based on our own communications with originators and

16   others -- there are burden issues such as it may be simpler to

17   produce on a timely basis a subset of all the loan files.  I

18   think that varies according to how the files are maintained.

19   And we have made efforts to identify both the specific loans in

20   the samples and the categories of due diligence to the extent

21   that will facilitate a faster production.

22       So I think, in answer to your question, it may vary

23   entity by entity as to whether, for that entity, it is an

24   easier pathway to produce all the loan files and guidelines or

25   to sort within them and produce a subset.

 1          In terms of the requirements for us in ultimately

 2   getting to the reunderwriting of loans, the most important

 3   category of those in the samples and the due diligence

 4   populations.

 5          THE COURT:  I ordered on September 4 that the parties

 6   meet and confer at least every two weeks on the status of loan

 7   file production.  Have you been having those meetings on that

 8   regular basis?

 9          MR. SELENDY:  That's why I referred your Honor to the

10   September 5th letter in which we requested the biweekly

11   meetings of defendants.  The stay then came in the way of that.

12   And no defendant was willing to meet with us during the

13   pendency of the stay.  We have resumed discussions with

14   defendants in this regard.  And we remain very willing to

15   identify any mechanism to simplify the collection of files.

16          To date, our concern is that notwithstanding the

17   volume of subpoenas that defendants have served, a very small

18   percentage of those files have actually made their way back to

19   FHFA.  It's an immediate concern, a pressing one.  We can't

20   satisfy the strict deadlines that we have here for trials, much

21   less the reunderwriting, unless those files come in.  And

22   that's why we sought the assistance of the Court.

23          THE COURT:  OK.  So you just got this report at 10 or

24   so this morning.  I don't expect you to have analyzed it with

25   care, much less met and conferred with the defendants about it.

I'll hear from defense counsel in a moment, but assuming that

defendants agree that with respect to any third-party subpoenas

that have been served they are willing to prioritize the

production of loan files and underwriting guidelines even if

they have sought additional categories of information, and for

institutions that have received subpoenas where they would find

it possible to prioritize further the production of the FHFA

samples and the due diligence samples, that the defendants are

willing to make that request as well, and that the parties will

regularly, the plaintiff and defendants will regularly confer

about the status of those productions, and if any party thinks

that someone is not sufficiently focused on the need to get

these materials, the loans and underwriting guidelines,

produced, that they discuss with each other whether or not it

is now ripe for a motion to compel and whether or not they have

agreement on that they will feel free to come to me and talk

about whether it is now ripe for a motion to compel.  Obviously

if the subpoenaed is someone that I have control of within the

Southern District of New York, that simplifies it.  That's one.

I'll hear from the defendants if we have agreement on that.

But that sounds like it would meet the requirements of the

plaintiff.

          MR. SELENDY:  Your Honor, depending upon the timing --

and just to give your Honor some perspective of that -- as of

today, if we look at the numbers, in the, for example, in the

1   Goldman Sachs deals in the supporting loan groups, there are

2   82,000 loan files.  I believe to date we received 547 loan

3   files.  If we look at Credit Suisse, there are 100 --

4           THE COURT:  I'm sorry.  You're looking at Exhibit A to

5   the defendants' report.

6           MR. SELENDY:  Yes, that's correct.

7           THE COURT:  And so what did you just say?

8           MR. SELENDY:  I said if you look at Goldman Sachs, for

9   example, 547 loan files have been produced, out of 82,000 loan

10  files in the supporting loan groups.  If you look at Credit

11  Suisse, they've only --

12          THE COURT:  Wait one minute.  OK.  Well --

13          MR. SELENDY:  My point is that the timing of this is

14  critical, and if in fact efforts are made and agreements are

15  reached with third parties to produce files within a matter of

16  weeks as opposed to months or several months, that is very

17  useful to us.  We've not been a part of the discussion between

18  defendants and those third parties, and we are looking for that

19  confirmation.

20          It also matters how those files are produced.  To date

21  defendants have not been willing to, for example, Bates-stamp

22  the productions, even by electronic file, a single Bates number

23  for the whole file.  Nor have they been willing, for the most

24  part, to identify which loans correspond to which

25  securitizations so they can be readily tracked and processed by

1    us.  When you're dealing with volumes in the hundreds of

2    millions, it's essential to do that.  And in fact FHFA has done

3    that for its entire production.

4              THE COURT:  Excuse me, counsel.  Could you be seated.

5              MS. STEWART:  Sorry, your Honor.

6              MR. SELENDY:  So it needs to be done as part of a

7    comprehensive effort in which there's a timely production

8    properly categorized, Bates-stamped, and made just as FHFA has

9    made that production to defendants.  If we have agreement from

10   defendants on that, then I think that would address this part

11   as to the sampling, although we still have due diligence files.

12             THE COURT:  Mr. Selendy, I outlined -- and I hope the

13   defendants are going to agree to it, but I will give them an

14   opportunity to be heard.  So the issue is whether or not, right

15   now, the plaintiff agrees, OK.  So I understand you to be

16   agreeing with what I outlined.

17             MR. SELENDY:  That's correct.

18             THE COURT:  OK.  And so this is going to put a burden

19   on the plaintiff to be in daily communication with defense

20   counsel, now you have this report, identifying where the

21   problems lie with what I'll call these true third parties

22   talking about what's being done, whether more needs to be done,

23   including applications to this Court.  OK.

24             You moved on to another topic, which was fine, which

25   was the Bates-stamping and, as I think you described it, the

1   manifests.  And you saw in today's submission of October 15th

2   the defendants' report on loan file production.  Their position

3   with respect to the manifests, which was that you had, sadly,

4   only a draft stipulation, which I take it was never finalized,

5   but no agreement with respect to, as I understand it from the

6   defendants' report today, no agreement with respect to the form

7   in which these loan files would be produced other than what

8   might be reflected in this, I guess the latest draft was

9   October 5th.

10          So as I understand it, you now want, in addition to

11   what the parties had agreed to as of October 5th,

12   identification by loan, by securitization, and with Bates

13   numbers.

14          MR. SELENDY:  Yes, your Honor.  And to be clear, it

15   has been our understanding throughout that all parties would

16   produce loan files in a way that identified to which

17   securitizations they corresponded, and to indicate in the

18   production where the loan file begins and ends.  That's not

19   something that can be determined if you have, for example, 50

20   million pages.  You can't determine which pages correspond to

21   which loan files and which loan files go to which

22   securitizations in all instances.  Sometimes there are

23   inconsistencies between the same pages for the same loan file.

24   Sometimes they're missing pages.  And sometimes we can't

25   identify which securitization a loan ultimately went into.

1          So that's information that is available to defendants

2     and should be made part of the production.

3          THE COURT:  OK.  Well, let's talk about that.  Again,

4     looking at loan files in these three categories: loan files

5     that a defendant is producing as a defendant, loan files where

6     the defendant is producing as a third party but from its own

7     files or those of its affiliates, and loan files produced from

8     true third parties pursuant to subpoena.  Now, are you

9     representing to me that you had agreement with the defendants

10    with respect to these production issues for any of those three

11    categories?

12         MR. SELENDY:  Clearly we did not.  We were operating

13    under an understanding that loan files would be produced as I

14    have outlined, and clearly we have not had agreement.  And

15    that, as we have looked at the production and as we have

16    requested these steps, we've been rebuffed, and it's perfectly

17    apparent there is no agreement on that.

18         THE COURT:  OK.  So with respect to productions from

19    true third parties who have not yet made a production, it seems

20    to me, since by and large these are the defendants' subpoenas,

21    to the extent that they could request production in a certain

22    way that would not burden the producing party, that's something

23    you can talk about with the defendants.  With respect to the

24    production by the defendants themselves of loan files that are

25    under their custody and control, either as parties or as third

1   parties, it seems to me that's a different conversation.  It

2   seems to me that everybody is going to need to have

3   Bates-stamped copies, at least of the file, so people can refer

4   to it and manage it.  And did you have a meet-and-confer about

5   this and have you exhausted that process?

6        MR. SELENDY:  My colleague, Ms. Sheth, will address

7   the meet-and-confer.

8        MS. SHETH:  Yes, your Honor.  With regard to the party

9   production of loan file documents, the answer is yes.  And that

10  was the extensive negotiations that occurred with regard to the

11  draft loan files stipulation or the discovery.  And part of

12  that discussion involved whether or not those files should be

13  Bates-stamped, whether there should be a beginning and an end

14  Bates number that identified the beginning and end of each

15  Bates number, and also various either metadata or field data

16  that would accompany the loan file production so that we could

17  identify among other things the securitization.  But

18  unfortunately that was never resolved and the discussions of

19  that loan file stipulation have gone on many months without

20  resolution.

21        THE COURT:  So you have no agreement with the

22  defendants with respect -- have you exhausted the

23  meet-and-confer process with respect to this issue, for all

24  three categories of loan files?

25        MS. SHETH:  I don't believe that we have with regard

1    to the parties' productions.  I know that there were still

2    ongoing communications on that front.  As to the third-party

3    production, that has been as a separate carve-out from the loan

4    file stipulation.

5           THE COURT:  And have you exhausted that

6    meet-and-confer process?

7           MS. SHETH:  No, your Honor, we have not.

8           THE COURT:  OK.  So this issue is not ripe for me

9    today.  I would like you to exhaust that meet-and-confer

10   process this week.  And I'll get you some time.  I'm available

11   hopefully on Thursday for any unresolved issue on that score.

12          MR. SELENDY:  Thank you, your Honor.

13          THE COURT:  I'm not sure I have a sufficient

14   understanding of what the status is from the plaintiff's point

15   of view of the identification of the due diligence loans by

16   loan number.  Has that been involved in a meet-and-confer

17   process?

18          MR. SELENDY:  I believe it has, your Honor.  My

19   understanding is that defendants have not agreed to identify

20   the loan numbers of the due diligence samples or to make a

21   prioritized production.  There may be one or two exceptions,

22   but in general that is the case.

23          THE COURT:  OK.  Let's turn to -- well, let's put

24   aside, then, on this -- I think the last issue I haven't heard

25   from plaintiffs on is the hundred thousand files in Louisiana.

1    And we'll just address those separately.

2            So who wants to be heard first among the defendants on

3    the issues I've just discussed with plaintiff's counsel?

4            Ms. Shane.

5            MS. SHANE:  Thank you very much, your Honor.  Penny

6    Shane.  The status of meet-and-confer discussions on these

7    topics, I think your Honor had rightly perceived, was unduly

8    truncated and there is ground to be covered still with respect

9    to production.  And it is very helpful to think about the

10   issues and the categories your Honor described, where loan

11   files are being produced as party, as non-party, and then as

12   true non-parties, because JPM is producing both as parties and

13   as non-parties and has had some dealings with true non-parties.

14   We do have a sense of the practicalities that your Honor has

15   started touching on with respect to whether prioritizing

16   certain loan numbers out of other loan numbers actually saves

17   anybody anything in the way of time, and the meet-and-confer

18   discussions that we've been having with the plaintiffs have

19   helped to bring everybody along on that topic, the need to be

20   practical.  And so we have reached a very helpful, I think,

21   agreement that we are fleshing out still about outreach to

22   non-parties in ways that will take account of their practical

23   constraints.  In responding to the subpoenas, if loan file

24   numbers can be prioritized by them in way that saves them time

25   and trouble, we're more than happy to do that.  We're more than

1    happy to do that with respect to the samples that FHFA recently

2    provided to us.  For most defendants those sample numbers came

3    in last week.  So it's a list that is fairly fresh for all of

4    us, but we're pleased to attach it to a communication to true

5    non-parties and suggest to them that if it would be helpful for

6    them to focus theirs, we're more than pleased to have them do

7    that as well.  And that agreement would be one that I think

8    would resolve many of the issues before your Honor.

9            With respect to the due diligence loan numbers, it is

10   far more complicated, again simply as a practical matter.

11   While Mr. Selendy sites to a September 5 letter in which

12   plaintiff put some priority on the due diligence samples as a

13   production matter, and we responded immediately by trying to

14   gather those together, generating a list of those loan numbers

15   is a different exercise.  True, the documents will be

16   sufficient to show it, and the documents are rapidly being

17   assembled by many of us.  And different defendants are

18   differently situated, your Honor, with respect to the level of

19   difficulty associated with extracting those numbers.  I know it

20   sounds easy.  But depending on whether the due diligence files

21   resided and how they did or didn't match up to the actual

22   supporting loans of the securitization, there was not always

23   perfect matching.  The extraction process is one that can be a

24   challenge.  Some defendants may be better situated, and others

25   will need to do what is essentially an extraction from

1    documents to be produced.  I know of no defendant that isn't

2    planning promptly to complete its production of the documents

3    sufficient to generate an assessment of what those loan file

4    numbers would be and to work with plaintiff in attaching those

5    as well to a communication to the two non-parties indicating,

6    because plaintiff would like to see them first, that if they

7    can prioritize practically speaking and it won't slow them down

8    to have these numbers in hand in making priorities, that also

9    is fine with defendants.

10          So we have very little in the way of disagreement with

11   respect to communications of non-parties and how to speed them

12   along.  What is remaining is an underlying disagreement about

13   who has the task of extracting due diligence loan file numbers

14   from documents that are being shared with FHFA, where some

15   judgment may be required about what that final universe looks

16   like.

17          THE COURT:  So are defendants not planning to have a

18   due diligence defense in these cases?

19          MS. SHANE:  We are, your Honor.

20          THE COURT:  So you are actually going to want to know

21   what you did with respect to your due diligence.

22          MS. SHANE:  Absolutely, your Honor.  And we intend to

23   collect all loan files, as we have all along.  So the

24   prioritization again, we're perfectly pleased to join in it and

25   we're pleased to have this set receive that level of attention,

                1    if it makes sense for the non-parties.  We are in no way

                2    resisting that.  It's only a question of getting the

                3    information collected and out through those non-parties.

                4            THE COURT:  So it seems to me then that the defendant

                5    should have the burden of identifying by loan number the files

                6    on which their due diligence defense is going to rely.  So I'll

                7    just ask you to pull that into your meet-and-confer process,

                8    the date by which you can get, individually each defendant can

                9    get those numbers to the plaintiffs.

               10            And, again, counsel, I'm here.  You have to do the

               11    meet-and-confer work.  You have to bring issues to my

               12    attention.  I can't do more than that.  If there is an

               13    individual defendant in one of these cases that is not relying

               14    on a due diligence defense, then that's just fine.  I won't

               15    impose that burden on them, and just tell the plaintiff that

               16    and they can make a decision whether or not they will extract

               17    the files and otherwise pursue a showing at trial with respect

               18    to the due diligence defense.

               19            So I take it, Ms. Shane, you are in agreement with the

               20    plaintiff that the meet-and-confer process with respect to

               21    Bates-stamping and manifests and identifying which loan belongs

               22    in which securitization, that that meet-and-confer process is

               23    not exhausted yet.

               24            MS. SHANE:  I think there could still be benefit to

               25    our meeting and conferring further with each other on those

1    topics, especially trying to keep it straight, which are the

2    ones that pertain to true non-parties productions and whether

3    the parties then have an obligation to do something to those

4    non-parties' productions, as opposed to the ones that have to

5    do with the ways that the parties are producing.

6            Your Honor, with respect to that latter category, it

7    has not been identified to us which defendants are not

8    producing in accordance with the agreement that's nearly an

9    agreement that we all have been relying on and seeking to

10   produce pursuant to with respect to our own production.  We

11   have asked plaintiff, Who is not providing you with the linkage

12   information as contemplated by the agreement?  It seems to have

13   taken on a new name or a new life form in recent letters.  But

14   for JPM at least and to our knowledge other defendants, we have

15   been relying on the specifications that plaintiffs put out

16   there and we negotiated in what has been produced in thousands

17   of loan files all of this time, in accordance with what we

18   understood to be our obligations, and we understand that other

19   defendants have too.  We have asked the question, who is not

20   doing it, where is the dispute coming from.  And we have not

21   received an answer to that.

22           THE COURT:  Well, what I understood Ms. Sheth to be

23   saying is -- and Mr. Selendy too -- is that actually there has

24   been no agreement and this is a new request for more detailed

25   specification.  And that request for additional information on

1    the files needs to be the subject of a meet-and confer process.

2    Did I misunderstand you, Ms. Sheth?

3          MS. SHETH:  No, your Honor.  I think your Honor is

4    correct.  I think the distinction is between party productions

5    of loan files versus third-party productions of loan files.

6          THE COURT:  Sorry.  I think there are three

7    categories.  So just so I'm clear -- I'm sure you all

8    understand what you're talking about.  But to assist me, what

9    distinction are you making?

10         MS. SHETH:  As to the loan file stipulation, that was

11   intend to govern party production, so the defendants' and

12   FHFA's production of loan files.

13         THE COURT:  Defendants as defendants or defendants as

14   defendants and as third parties?

15         MS. SHETH:  I don't know if that was actually

16   specified in this stipulation with that level of specificity.

17         THE COURT:  OK.  So you have no quarrel with the way

18   the defendants have produced their loan files either as

19   defendants or as third-party producers?

20         MS. SHETH:  Based on the information that we have at

21   present, that is correct.  There was one issue --

22         THE COURT:  So the request you have is that the

23   defendants make requests of the third parties, the true third

24   parties, for production in a particular way that would be of

25   assistance to you.

1      MS. SHETH:  That is correct.  And FHFA has done the

2  same with regard to the third-party production it has received.

3      THE COURT:  OK.  And that is what you're going to have

4  a meet-and-confer with the defendants about.

5      MS. SHETH:  Yes, your Honor.

6      THE COURT:  And obviously that request would have to

7  be framed in a way that would not be overly burdensome on these

8  true third parties.

9      MS. SHETH:  That is correct, your Honor.

10     THE COURT:  So if there is a way they can produce the

11 documents with minimal burden but in a way that would greatly

12 assist you folks, all the parties in this litigation, you want

13 defendants to make that request of the true third parties.

14     MS. SHETH:  That is correct, your Honor.

15     THE COURT:  OK.  So you'll meet and confer with the

16 defendants about that.  You'll have agreement or not.

17     MS. SHETH:  Yes.  And there is one issue I can take

18 off the table, which was our dispute about JP Morgan's

19 hard-copy loan origination files.  We have met and conferred

20 about that issue and we understand that JP Morgan has agreed to

21 image those files, so that is no longer an issue.

22     THE COURT:  Ah, Louisiana.  Good.

23     So with respect to the letters which I call the due

24 diligence samples letters, because that's the first items

25 raised, I think everything is resolved, either by agreement by

1    the parties or by my ruling today except for one issue, which

2    is going to be subject to a further meet-and-confer, and that

3    is the request that the plaintiffs would like the defendants to

4    make of true third parties about the way they should make

5    production of their loan files.  They're going to meet and

6    confer about that.  If you can't resolve it, you'll come back

7    to me.

8            MS. SHANE:  Your Honor, if I may, defendants offered

9    already and renew the offer to make the request of third

10   parties that they go ahead and Bates-stamp their productions as

11   a way of resolving this dispute.  Defendants have no problem

12   with including that request in its communications to third

13   parties.

14           THE COURT:  Great.  So you'll meet and confer.  If you

15   have agreement, that's off the table and I never need to hear

16   about this again.

17           MS. SHANE:  Thank you.

18           THE COURT:  I thought the next set of letters we might

19   turn to.

20           MR. FUMERTON:  Your Honor.

21           THE COURT:  I'm sorry.

22           MR. FUMERTON:  Robert Fumerton on behalf of UBS.

23           THE COURT:  Yes, Mr. Fumerton.

24           MR. FUMERTON:  If I may raise one issue before we

25   leave the loan file set of letters.

1          THE COURT:  Yes.

2          MR. FUMERTON:  Defendants have affirmatively requested

3    that the Court order the plaintiff here to bear its equitable

4    share of the costs associated with obtaining loan files from

5    third parties.  As your Honor may recall, back in December of

6    last year, we informed the Court that many defendants,

7    including my client, UBS, simply do not maintain loan files in

8    the ordinary course of business.  Literally a few short weeks

9    after the motion to dismiss was decided, defendants, including

10   the UBS defendants, went out and subpoenaed servicers,

11   trustees, originators of these loan files.  We served a

12   comprehensive set of requests back in June.  And that's the

13   reason why we've been able to obtain in the UBS action or will

14   be obtaining by October 22nd the vast majority of loan files.

15         Since early June, we've asked plaintiff to participate

16   in this process.  No one can dispute here that plaintiff is

17   seeking all of the loan files.  They have served a document

18   request for all the loan files.  This morning they provided

19   your Honor a chart of 379 subpoenas for loan files that they

20   have served.  We ask plaintiff to participate in this process

21   and let's share the costs.  Plaintiff refused to do so.  Again,

22   after your Honor ordered the parties to meet and confer this

23   past week end on Friday we again raised the issue.  Plaintiff

24   refused.

25         Plaintiff offers two justifications for refusing to

1    participate in the production of materials it claims it needs

2    to prosecute its claims here.  One is sheer delay.  Plaintiff

3    told us, look, unlike defendants that served their third-party

4    subpoenas right away, plaintiff waited until August to serve a

5    single subpoena.  And the chart they served this morning, they

6    served 200 subpoenas just last week, months after defendants

7    served these subpoenas.  So plaintiff's reaction is, look,

8    because defendants were diligent in prosecuting these

9    subpoenas, because defendants went first, defendants should

10   bear the full cost.  We have a tremendous difficulty explaining

11   to our client why defendants are bearing this burden all by

12   themselves.  Plaintiff is the party that has the burden of

13   proof here.  Plaintiff is requesting these loan files.

14          THE COURT:  Mr. Fumerton, I have great confidence in

15   you.  I think you could explain that to your clients, since it

16   was their strategy that has gotten us to this point.

17          MR. FUMERTON:  As your Honor recognized in the June

18   13th conference, plaintiff reserved the right to seek loan

19   files outside of the sample from the very beginning and

20   plaintiff --

21          THE COURT:  And why did they do that?

22          MR. FUMERTON:  Why did plaintiff reserve that right?

23          THE COURT:  Yes .

24          MR. FUMERTON:  Presumably because they weren't

25   confident enough to rely on a more limited subset.

1              THE COURT:  Well, you weren't, as I remember the state

2    of play here, the plaintiff proposed to the defendants that we

3    have a sample of files that we all agree that this case, all

4    these cases would rise or fall based on the sample of files.

5    They wanted to talk to you about a protocol for creating the

6    sample and get agreement on that.  They wanted that sample

7    universe to govern basically all the decisions in this case and

8    substantially reduce the burden of discovery.  And as I

9    remember it, the defendants were unable or unwilling to do so

10   for reasons that I accepted.

11             Based on the fact that the defendants required

12   production of all loan files so they could go into the entire

13   universe of loan files in this case, over a million, over I

14   think a million point 1, the plaintiffs came back and said,

15   well, look, if we're going to meet a case in which the

16   defendants are picking out loans from hither and yon beyond our

17   sample, we of course reserve the right to similarly go beyond

18   our sample.

19             Now, that seemed eminently reasonable to me as well.

20   So your clients made a decision.  And I'm not saying it's the

21   wrong one.  But it was an expensive one.  They made a very

22   expensive decision here about how to litigate these cases.

23   Absolutely within their rights.  And as a result, in the June

24   13th conference, I caved.  I had made my request clear in our

25   prior conferences that I wanted the parties to agree on some

sampling protocol and some percentage, small percentage of

loans on which these cases could be litigated.  But I

acknowledged the defendants' right not to reach that agreement.

Therefore, we are in this very expensive, burdensome

document production, which has enormous ramifications for your

clients, the defendants, the plaintiff, and now third parties.

And the defendants will bear the cost of that.

MR. FUMERTON:  Your Honor, if I may respond.  From the

initial proposal on sampling, plaintiff reserved the right to

go outside or redraw a sample.  In the UBS case alone, it has

doubled its sample from the summer, the initial sample it had

proposed.

Your Honor, plaintiff refuses even to participate in

the cost sharing for the loan files as part of their sample.

Even accepting your Honor's premise that the defendants are

somehow to blame here, how can defendants bear the cost of the

loan files in plaintiff's own sample which plaintiff claims it

needs to prosecute its claims?

What defense is requesting, your Honor, is the

opportunity to brief this issue.  We have reached out to

plaintiff, met and conferred with them.  They agreed on a

briefing schedule.  We could brief them at the end of the week.

THE COURT:  I don't need a brief on this.  And I

think, as I understood those early discussions, the plaintiff

was reserving the right since when we were having these

```
 1    discussions was in the spring to keep modifying their protocol
 2    until they were comfortable that they have properly designed
 3    their sample.  And they were willing to rely on their initial
 4    numbers that they gave to me as estimates because they wanted
 5    further time to work with their expert.
 6            So, counsel, we don't need a brief.  I appreciate the
 7    briefing you've given me, everyone, on the motions to dismiss.
 8    I'm enjoying working through those motions.  If I feel I need
 9    to have briefs on anything, I'll make sure to tell you.
10            MR. FUMERTON:  And your Honor, just for clarification,
11    that will then apply also to the loan files in plaintiff's own
12    sample; defendants have to bear the cost of guesting those loan
13    files as well?
14            THE COURT:  Yes, Mr. Fumerton.
15            MR. FUMERTON:  Thank you, your Honor.
16            THE COURT:  Thank you.
17            OK.  The protective order.
18            So the series of letters that I've labeled the
19    protective order, the plaintiff has labeled -- I'm sure this is
20    helpful to you that I've renamed it -- "Defendants' Improper
21    Third-Party Requests," and it ends with a request by FHFA for a
22    protective order.
23            So I personally thought this was very related to the
24    discussion we just had about prioritization.  And in my view if
25    we prioritize the production of the loan files and the
```

1    underwriting guidelines, then we're doing what we really need

2    to do for this litigation, for everybody, the plaintiff and

3    defendants.  And if the defendants want additional discovery

4    from third parties, those third parties have a right to come in

5    here and seek protective orders.  If they do, I'll hear them,

6    give everybody an opportunity to be heard.  But the rulings I

7    made with respect to production between the parties before me

8    were in the context of those issues as they arose, not binding

9    or preventing someone from seeking third-party discovery.

10           So I'll let the plaintiffs be heard here, but I think

11   that pretty much -- so long as we're able to prioritize the

12   production of loan files and underwriting guidelines from the

13   third parties, the fact that the defendants are seeking

14   additional documents which may slow down and delay production,

15   I think, is an issue I don't need to concern myself with right

16   now.

17           Do the plaintiffs want to be heard about anything in

18   that letter?

19           MS. SHETH:  Yes, your Honor.  Manisha Sheth on behalf

20   of FHFA.  We actually did meet and confer with the defendants

21   on this precise issue over the course of Friday as well as this

22   past weekend.  And we're happy to report that as a result of

23   that meet-and-confer process, we have reached an agreement with

24   defendants to narrow the scope of their subpoena and decline to

25   enforce certain of the requests in the subpoena which we found

1    to be very broad in relating to the single-family side.  What

2    we did on, I believe it was Saturday, we identified a specific

3    request in the originator subpoenas.  As your Honor will

4    recall, the defendants issued subpoenas to various categories

5    of third parties.  One of those categories was originators.

6    Another was credit-rating agencies, due-diligence firms.  There

7    were also some law firms and consultants involved as well.

8         As to the originator subpoenas, we have reached an

9    agreement that certain requests, namely, requests 1 through 5

10   and request no. 9 of the form originator subpoena, will be

11   included as is, subject to a few modifications as to the term

12   securitization, and remaining subpoena requests 6, 7, and 8

13   will not be pursued for enforcement by the defendants.

14        In addition, defendants have agreed to provide a

15   letter to the third parties notifying them of that agreement.

16        In addition, as part of that letter, the defendants

17   have agreed to request the third parties to prioritize the loan

18   files as well as underwriting guidelines over these custodial

19   or e-mail-type documents.

20        We have recently also reached an agreement as to

21   timing this morning where defendants have agreed that the

22   production of loan files by the third parties and underwriting

23   guidelines should be a rolling production to commence October

24   29 and to be completed by November 16.  So that will help us in

25   our reunderwriting review of those documents.

```
 1              THE COURT:  I'm sorry.  Which files are being produced
 2   over that roughly two-week period?
 3              MS. SHETH:  The loan files and the underwriting
 4   guidelines.
 5              THE COURT:  From?
 6              MS. SHETH:  For the FHFA samples.
 7              THE COURT:  From?
 8              MS. SHETH:  From third parties.
 9              THE COURT:  From the true third parties.
10              MS. SHETH:  From the true third parties, correct.
11              THE COURT:  Nice.
12              MS. SHETH:  In addition, what we thought would also
13   make sense is if the parties were to draft a proposed
14   stipulation order for the Court's approval.  And we are looking
15   on that.  We should have something exchanged today or tomorrow,
16   and submit that for the Court's approval so that that can also
17   go to the third parties so that they receive comfort as to the
18   subpoena, the modified subpoena.
19              That is the process as to the originator subpoenas.
20   As to the credit-rating agency subpoenas, due diligence
21   subpoenas, and other remaining subpoenas, we will engage in a
22   similar process using the same principles.
23              THE COURT:  Great.  So from the plaintiff's point of
24   view, is there anything else you need to bring to my attention
25   for the series of letters which I've labeled the protective
```

1    order letters?

2            MS. SHETH:  No, your Honor.

3            THE COURT:  Do the defendants have anything they wish

4    to raise with respect to the protective order letters.

5            MS. STEWART:  Yes, your Honor.  I just want to clarify

6    something.  First of all, apologies for standing earlier.

7            THE COURT:  Your name?

8            MS. STEWART:  Beth Stewart from Williams & Connolly.

9    I realize I'm tall and probably needlessly distracted you.

10           In any event, what Ms. Sheth has said is basically

11   correct.  We have had a long and fruitful weekend of working

12   together.  We appreciate your Honor's comments about how the

13   prior rulings had effect or not on the scope of discovery we

14   are entitled to.  But one thing I just wanted to clarify is a

15   letter we had proposed to send and which I think Ms. Sheth

16   agreed would tell third parties that if they cannot confirm to

17   us by a certain date, which I think was October 25, that they

18   will be unable to produce loan files and underwriting

19   guidelines by a second date, which I think our most recent

20   discussion was that day November 15, but Ms. Sheth will please

21   correct me if I'm wrong, then we reserve the right to enforce

22   decision with the Court.

23           So I just didn't want to be overrepresented that all

24   these parties have as of now committed to make that production

25   by the 16th.  It's rather that we share plaintiff's goal of

1  making sure there is a prompt and orderly production of all of

2  the remaining third-party discovery.  And we wanted to have in

3  place with them a schedule so that they would be aware of what

4  we expected of them and what steps we might take otherwise.

5          THE COURT:  Thank you.

6          MS. STEWART:  Thank you.

7          THE COURT:  Can I ask you --

8          MS. STEWART:  Yes, ma'am.

9          THE COURT:  As far as you know, did any defendant

10  during the period of the stay tell third parties not to keep

11  working on these issues?

12          MS. STEWART:  What defendants did -- and plaintiff was

13  aware, I think plaintiff actually did the same thing, we

14  provided notice to all third parties that a stay had been

15  entered.  We did not tell them what they should do about them,

16  but we did provide them notice that the stay had been lifted

17  once the stay had been lifted, and I believe plaintiff did the

18  exact same thing that we did.

19          THE COURT:  Thank you so much.

20          Let's move to the third set of letters.  I've labeled

21  these "Compel Discovery From 12 Defendants."

22          So I think I need to ask you if you've made progress

23  in narrowing the issues in dispute as a result of the

24  meet-and-confer process.

25          MS. CHUNG:  Good afternoon, your Honor.  Christine

1    Chung for FHFA.  Your Honor, the issues that are live and on

2    which the parties have reached an impasse are, first, to

3    identify the letters.  So what we call the post-closing

4    originator search date range issue, there is a slight wrinkle

5    in that JP Morgan is somewhat differently situated.  So I think

6    they're on the side now.  But we have revisited this issue

7    during a lengthy meet-and-confer on Friday and I think it's

8    fair to say that we have an impasse on this as to most

9    defendants if not all.

10         The second issue identified in the letter is the issue

11   of the date ranges and how they're being run in the pre-closing

12   period.  This is all related to how the originator terms are

13   being served in the pre-closing period.  That issue is also at

14   an impasse.

15         THE COURT:  I'm sorry.  I thought you were just

16   addressing that issue.  So what is the distinction between the

17   two issues?

18         MS. CHUNG:  In both cases, your Honor, it involves the

19   extent to which the originator terms, the originator searches,

20   so searches about references to originators, particularly

21   departures from the guidelines etc., repurchase requests,

22   basically they're originator base searches, so you will be

23   looking in the e-mails for mentions of originators with

24   specific reference to the purchasing guidelines.  The two

25   different issues, one is the extent to which the defendants are

1   running those searches in the post-closing period, so

2   effectively since 2007.

3        The second issued is that some of the defendants are

4   limiting their date ranges for those searches even in the

5   pre-closing period.  Your Honor, colloquially we've called it

6   amongst the parties "the bubble issue" because the defendants

7   are using a four-month window.  They're applying a four-month

8   window around each securitization and searching in the

9   pre-closing period on a per-securitization basis only the

10  originators who were involved in that securitization.  So those

11  are the two different -- the originator term is common to both.

12  They're both date range issues.  But one is pre-closing, one is

13  post-closing.  On those I think it's safe to say we have

14  impasse.

15       On the last issue, which was raised in our letter,

16  which was the searches that the requests, the document requests

17  that we made for, in the first instance, deposition

18  transcripts, witness statements, things that were previously

19  produced in government investigations or other RMBS litigation,

20  I think what I would describe there is, I'm reluctant to say

21  that there is an impasse.  We have been talking about this

22  issue for a very long time and came up at the conference the

23  last time we were here with a version of this.  I don't think

24  we're at a stage where there is agreement, but I think that

25  it's not something that is ripe for the Court at this time.

1    But I welcome different views.

2              THE COURT:  Ms. Chung, couple questions.  Have the

3    plaintiffs sought and been given lists of litigations and

4    investigations regarding private-label securitizations?

5              MS. CHUNG:  Your Honor, we have.  And in fact, there

6    is one easy list that we referred the defendants to in the last

7    meet-and-confer, which is that the complaints themselves, as

8    your Honor knows, contain many references to PLS litigation,

9    RMBS litigation, government investigations, CIC reports, SEC

10   investigations that we have already identified that in our

11   view, in the complaints, are relevant because we have alleged

12   systematic violations of the underwriting guidelines.  We asked

13   the defendants on Friday to start with that as the starting

14   point and say, identify if you have claims -- and some of them

15   have had claims -- that these litigations are simply not

16   relevant, then can you identify which ones you're claiming are

17   relevant and not relevant.  And we haven't heard back on that.

18   But that is a very obvious starting point.

19             To answer your Honor's -- a different thing that you

20   might be referring to, your Honor, we also had proposed at one

21   point, FHFA, to -- because this issue has been under discussion

22   for a very long time -- to try to jump-start it, we offered,

23   could we at least exchange lists, because they've made similar

24   requests of FHFA, of which litigations each party believes that

25   they think are in play in response to these document requests.

1   And effectively there, your Honor, we had at least -- I'm going

2   to limit my comment, I think, to UBS.  There are some others

3   who have taken dispute along the way, but I think it's most

4   crystallized with UBS.  Their view was, if your list is going

5   to exclude single-family information, then we're not going to

6   have reciprocal agreement.  And it's ultimately in our

7   position, your Honor, and this will be consistent with what

8   Mr. Schirtzer told you last time, if there is an investigation

9   out there involving GSE that is partly single-family and partly

10  private-label securitization, we're willing to consider that

11  investigation in play and would be willing to consider perusing

12  documents from that production.  But it seemed that we were at

13  an impasse with UBS because they're of a view that we should

14  still be producing even things that were wholly single family.

15          From our side, we feel that the list idea did not

16  work, that we've made very clear from the very moment we filed

17  the cases which litigations we thought were relevant to this

18  suit.  And it is now, you know, months of meet-and-confers

19  later, and as I say I don't want to back away from the idea

20  that I think there could be more discussions, but I also don't

21  want to lead the Court to believe that things are in a

22  different place than they are.

23          THE COURT:  So, Ms. Chung, do I understand that there

24  was a formal written document demand for the list of the

25  litigations and investigations?

1          MS. CHUNG:  No, your Honor.  No.  No.  There was no

2     document requests for lists.  We made the document requests for

3     the documents.

4          THE COURT:  OK.  And you have not gotten a list.

5          MS. CHUNG:  What we did ask for is for them to take

6     the lists that would be the cases and investigation of our

7     complaints and to list back to us, well, which ones do you

8     think are not in play here, because we thought maybe that would

9     get us a little bit down the road.

10         THE COURT:  Do you feel that the plaintiff -- when I

11    was thinking about this, it just seemed to me -- and I

12    understand, a document request is for the documents, not for a

13    party to create a list that doesn't otherwise exist.  But it

14    just seemed to me, in terms of making any dispute concrete and

15    seeing whether or not the parties could reach agreement about,

16    yes, we all agree that a production with respect to this

17    universe is appropriate, we have a dispute about these other

18    cases, that it would be helpful to have a list of litigations,

19    a list of investigations, and start production with respect to

20    those who have agreement about.

21         MS. CHUNG:  As part of the meet-and-confer process,

22    your Honor, we did ask to exchange those lists.  We have done

23    that.  And not only was there a single-family issue; at

24    different points we had heard, well, we're not going to

25    consider something a relevant investigation or civil litigation

1    if it doesn't involve the very same securitizations at issue in

2    that case.  That's another issue at which we have impasse.  We

3    would never adopt that view.

4         But that being said, the last idea that was exchanged

5    was indeed maybe a variation of what your Honor is pursuing

6    here, which is, can we at least look at the complaint and

7    figure out which ones you agree and don't agree with because

8    then maybe it will crystallize what the areas of disagreement

9    are.

10        THE COURT:  OK.  Is there someone from the defense

11   side that would like to address this issue?

12        Mr. Fumerton.

13        MR. FUMERTON:  Your Honor, I could address the latter

14   issue in terms of the regulatory investigations in other

15   proceedings.  We are in the process of meeting and conferring

16   with the plaintiff.  We're hopeful we can reach an agreement.

17   We had the discussions as of late Friday.  Plaintiff indicated

18   it was focused on the exchange of testimony, both written and

19   oral testimony, that had been given in other RMBS actions.

20   It's important to stress, defendants are situated very

21   differently here, have different views.  Speaking on behalf of

22   UBS only, I hope you do think it's a productive idea to have an

23   exchange of testimony from actions, RMBS actions and actions

24   relating to allegations in the complaint.  We'll meet and

25   confer with plaintiff and hope we can reach an agreement on

```
1    that issue.

2              THE COURT:  Thank you.

3              MR. FUMERTON:  Thank you, your Honor.

4              THE COURT:  Any other defense counsel wish to be

5    heard?

6              Ms. Shane.

7              MS. SHANE:  I would only underscore what Mr. Fumerton

8    said, which is that this is a very defendant-specific issue,

9    and for JPM, over the course of the weekend, it looked to us as

10   if we have an agreement governing testimony with the plaintiff,

11   and so we don't think that it would be accurate to think that

12   these folks can't resolve these issues.  We have experience

13   that they have.

14             THE COURT:  Ms. Shane, are you making a distinction,

15   when you say testimony, between deposition transcripts,

16   affidavits, and declarations, or are you including all three

17   categories?

18             MS. SHANE:  The way that the parties have been talking

19   about testimony has included witness statements, which would

20   appear to me to potentially include those that had previously

21   been written down, but we have not used the vocabulary your

22   Honor used.  I'm sure we will hash that out once we get back to

23   the document and what we've agreed.

24             THE COURT:  And Ms. Shane, has there been any

25   distinction in these discussions between litigation that's been
```

1    filed in court and therefore part of the public database, so to

2    speak, and investigations that may not yet be public?  Was that

3    then a subject of discussion?

4             MS. SHANE:  The issue has arisen, yes, your Honor, and

5    it does raise very different kinds of issues for different

6    defendants.  But it has come up in our discussions with

7    plaintiffs well as well.  And Ms. Chung indicated, the focus at

8    this time, because it does look like there's a substantial

9    likelihood of agreement, has been on the proceedings, whether

10   regulatory or litigation-oriented, that plaintiff already has

11   identified in their complaint as relevant ones, and that we can

12   all at least get out of the way as ones where we can reach

13   agreement by ourselves.

14            THE COURT:  OK.

15            MS. CHUNG:  Could I make a proposal, your Honor?

16            THE COURT:  Yes, Ms. Chung.

17            MS. CHUNG:  I did want to clarify one thing, which is,

18   we certainly intended our requests to apply to the different

19   categories that your Honor identifies, the deposition

20   transcripts, etc., etc.  We also specifically raised with the

21   defendants throughout the meet-and-confers that, to us, any

22   deposition testimony should include exhibits, that that would

23   be considered part of the deposition.

24            I think on this issue, as on the first issue we

25   discussed -- and you know this, your Honor, that's one of our

1    overriding considerations, is the overall time schedule.  We've

2    been talking about this issue for a very long time.  I think it

3    would be useful if we were -- maybe I'm volunteering for

4    something -- I think we should be reporting to the Court, as we

5    are in the first issue, in short order on whether we have been

6    able to make progress.

7           THE COURT:  Yes.  Well, I have Thursday afternoon

8    free.  So I think we have to get this issue with respect to

9    prior cases and investigations teed up for Thursday.  Hopefully

10   the meet-and-confer process between the parties will mean it

11   doesn't have to be on the agenda for Thursday afternoon.  But I

12   think it has to be defendant by defendant, since some

13   defendants may have no quarrel with the production or have

14   concerns about certain aspects of it.

15          So I'm going to need a chart from plaintiff's counsel

16   about where the problems lie defendant by defendant.  I think

17   that the parties need to produce to each other, to the extent

18   they've made requests for documents from each other -- and I

19   understand the defendants have made requests from the

20   plaintiff.  I think it's almost impossible to get our hands

21   around this without a list of the lawsuits or regulatory

22   actions that have been filed and are part of the public record,

23   and there shouldn't be any problem with creating such a list

24   since it is a matter of public record.

25          With respect to investigations that are not a matter

1    of public record, I think that should be a subject of the

2    meet-and-confer process.  There may be less need for that if we

3    have fulsome discovery with respect to actions that are filed

4    and publicly available.

5          So I'm going to expect with respect to these prior

6    cases and investigations that the meet-and-confer process will

7    continue this week and to the extent there isn't agreement with

8    any particular plaintiff and defendant, of the plaintiff with

9    any particular defendant, I'll get a schedule or list from FHFA

10   and they will be on the agenda for Thursday afternoon.

11         Which defense counsel wants to address the issue about

12   the date ranges?

13         MR. WOLL:  Your Honor, David Woll.  I'll do that if I

14   may.  As defense counsel noted, FHFA has raised this issue in

15   12 of the 16 cases.  As I understand there are meet-and-confers

16   with the other four cases with this issue still being

17   discussed.  In fact we were meeting and conferring with FHFA in

18   the 12 cases when the letters to the Court were sent.  And as

19   counsel also pointed out, there are two timing issues.  One is

20   the request for e-mails up to the date of the complaint, and

21   the other one is the bubble issue.

22         So firstly with respect to the e-mails up to the date

23   of the complaint:  Prior to raising the requests to the Court

24   that all custodians, all e-mails for all custodians be searched

25   up to the date of the complaint, FHFA had not requested that

1    from any of the defendants.  What FHFA had requested was that

2    defendants consider providing e-mails or searching for e-mails

3    for limited groups of custodians who had post-securitization

4    responsibility, which was a part of the negotiations to be

5    hammered out, and in fact some defendants have agreed to

6    provide post-securitization e-mails up to the date of the

7    complaint for some groups of custodians.  Deutsche Bank, for

8    instance, has agreed to provide e-mails with respect to

9    repurchase claims, which counsel mentioned was one of the

10   things that they were interested in.  Other counsel have either

11   agreed to provide either e-mails or search central files for

12   those types of documents.  But the request that all custodians

13   and all e-mails up to the date of the complaint be searched and

14   produced was made for the first time in the October 9th letter

15   to your Honor.  That in fact is not even what FHFA itself is

16   doing.  As FHFA noted in that letter, it has certain custodians

17   which it believed had post-securitization responsibilities.

18   And for those custodians, about half of the custodians it said

19   in the letter, it is doing searches up to the date of the

20   complaint, but not for the rest of the FHFA custodians.  So as

21   the record currently stands, FHFA is asking defendants to do

22   something that it has not agreed to do itself.

23            THE COURT:  Do I understand correctly, then, that some

24   of the defendants have agreed to custodian searches up until

25   the date of the complaint -- I guess that's September 2,

1    2011 -- who had post-securitization responsibilities, and other

2    defendants have not?

3         MR. WOLL:  Correct, your Honor.  And this is, again,

4    this is a defendant-by-defendant specific issue, and when

5    plaintiff in their letter requested leave to brief this as a

6    motion to compel, I think the defendants envisioned that each

7    of them have particular issues to raise in response to the

8    negotiations that have gone on with the plaintiff in that

9    particular situation.  Deutsche Bank, for instance, as I said,

10   on the repurchase point, has designated people who were

11   involved in that activity, that they had such people, and is

12   providing e-mails for that category.  Not everybody has people

13   involved in the activities that the plaintiff has designated.

14        So I think there are two problems with the plaintiff's

15   request.  First of all, there is no need to search for e-mails

16   that postdate the transactions at issue by as many as five

17   years.  The documents that plaintiff is searching for are

18   likely not going to be relevant at all to the issue in dispute.

19   And if I can identify the four things that FHFA mentions in its

20   letter that it wants these e-mails for and then talk about them

21   a little bit, one of them is repurchase requests.  As I said,

22   some defendants have already agreed to provide information

23   about that.  The other issue that they identify is

24   securitization and loan performance, i.e. downgrades, defaults,

25   delinquencies, and delinquency.  Well, that's all a matter of

1    either public record or easily accessible record.  I don't

2    think FHFA would tell you that they don't have access to

3    information about the performance of the securitization or that

4    they can't through Intex or APS or some other system get access

5    to performance information on securitizations or loans.  So the

6    parties don't have to greatly expand the scope of their e-mail

7    production.  And I assume if this were done it would be done on

8    a reciprocal basis so that all the FHFA custodians and all the

9    defendant custodians would have to be searched for this

10   additional five-year period, which would generate obviously

11   millions of additional e-mails.  I don't think we have to go

12   through that exercise just to figure out how the transaction

13   was performed because I think there are other more readily

14   accessible sources of that.

15          The other category that FHFA identified in its letter

16   to the Court were poor underwriting practices.  First of all,

17   the issuance so far as the claims against defendant are

18   concerned is not whether the originators underwriting practices

19   were poor, but, rather, the extent to which the loans and the

20   securitizations departed from underwriting guidelines with the

21   disclosures concerning LPDs and owner occupancies assistance.

22   By contrast, I would note that HFA's knowledge post

23   securitization is a lot more relevant to this case due to the

24   statute of limitations on this issue if not other things.

25          But insofar as information to be derived from the

1    defendants' e-mails is concerned, the question of whether loans

2    complied with the underwriting guidelines or representations

3    can be deduced by looking at the contemporaneous e-mails around

4    the transaction.  There's no need to go searching far and wide

5    for years after the transaction to see if there's some e-mail

6    where somebody in 2009 said, you know, I remember back in 2006

7    this originator wasn't complying with this particular guideline

8    in place at the time.  Is it possible that a potentially

9    relevant e-mail could be found if we looked at all the e-mails

10   for that five-year period?  Sure.  Is it worth it?  We submit,

11   no.

12          And obviously with respect to the fraud issues, or

13   those who have fraud claims against them, anything that

14   happened after the transaction is completely irrelevant to

15   dates' state of mind vis-a-vis the fraud issue.

16          The other thing that the plaintiffs say they need the

17   information for is defendants' retrospective realizations of

18   risks created by poor underwriting practices.  Frankly I'm not

19   exactly sure what that means.  But, again, to the extent it

20   means that defendants' knowledge post securitization is somehow

21   relevant to their state of mind at the time of the

22   transactions, that's just simply not the case.

23          So if I may, let me just talk about the bubble issue

24   next.

25          THE COURT:  Well --

```
 1              MR. WOLL:  Well --

 2              THE COURT:  Or not.  I just want to make sure,

 3    Mr. Woll, that I've captured what you've just told me.

 4              MR. WOLL:  Yes.

 5              THE COURT:  For those defendants who agreed to what,

 6    we'll call it the five-year search, for custodians who have

 7    post-securitization responsibilities, are you saying that you

 8    want to further limit the search of those custodians on these

 9    four topics?  Or -- I'm not quite sure how these four topics

10    intersect with those custodians.

11              MR. WOLL:  Again, each defendant is situated

12    differently.  But what we did on the repurchase issue was, we

13    agreed that there are certain individuals who were identified

14    in repurchase activities.  Your Honor knows what the repurchase

15    claims are.  So what we propose to do is to run terms designed

16    to obtain information about those repurchase claims.  We know

17    what loans and what securitization repurchase claims were made

18    for.  So we have terms doe signed to identify documents

19    relating to repurchase claims.

20              I think other defendants may have agreed to do

21    something after 2007 for some custodians, maybe not all the way

22    up to the date of the complaint.  It really varies defendant by

23    defendant, so I don't want to misrepresent it.

24              THE COURT:  So even for defendants who have agreed

25    that certain custodians who have post-securitization
```

responsibilities, that their e-mails may be searched for this

five-year period, even in those circumstances, they're asking

that the searches be narrowed to what they believe are relevant

topics.

MR. WOLL:  Well, your Honor, again, just speaking for

Deutsche Bank, what we did, because these were repurchase

custodians, is, we thought it made sense to look for repurchase

documents.  If plaintiff prefers instead we do the originator

search term for those custodians, I think frankly the

repurchase search terms are going to pull up as many if not

more than the originator search terms for these particular

individuals.  But I don't know that.  I have to run that test.

But it's not a limiting exercise that we were doing.  It was

more a question of trying to focus in on what people actually

did and what information we were trying to get from them.

THE COURT:  As I hear this, one of your concerns --

this should be a concern, no doubt is a concern -- on behalf of

plaintiff and all defendants -- is that you would get an

extraordinary volume of e-mail with the burden of searching

that if you extend the search for all custodians who are

relevant during the period of the securitizations and move it

forward five years.

MR. WOLL:  Yes, your Honor.

THE COURT:  So if we had an identification of a subset

of custodians and did a narrow search, or somewhat narrow

1    search, of a reduced group of custodians for the five-year

2    period, could that be the basis of an agreement, do you think?

3    I know you can't speak on behalf of anyone else but your

4    client.

5            MR. WOLL:  Your Honor, I think it could.  We reached

6    agreement with respect to the repurchase issue.  We didn't hear

7    back from plaintiff specifically with respect to other

8    custodians on our list that they thought this would make sense

9    with.  But the concept that there are limited categories of

10   relevant information post securitization we agree with, as I

11   imagine other defendants do too.  It's doing the

12   across-the-board all-custodian thing that we think is just

13   frankly abnormal.

14           THE COURT:  I interrupted you.  You wanted to go on to

15   something else.

16           MR. WOLL:  Your Honor, I'm sorry, I was just going to

17   talk about this bubble issue that counsel mentioned, which is

18   that some defendants -- and Deutsche Bank is one -- for the

19   period from 2005 to 2007 when the securitizations were being

20   done, have taken what we've been calling the bubble approach so

21   that for each securitization a period of three months before

22   the securitization until one month after the securitization has

23   been searched, all custodians' e-mail have been searched for

24   that period.  And the idea behind that search is that

25   originators who were involved in those securitizations, e-mails

1    relating to those originators and whether the specific loans

2    underlying those securitizations complied with underlying

3    writing guidelines, etc., that that search would capture those

4    e-mails.

5           Now, in practice what happens with an originator that

6    hasn't been involved in multiple securitizations is, over the

7    course of that period, their e-mails would be captured over a

8    much larger period of time.  So, for instance, we have one

9    originator that, for example, American Home, where the bubble

10   overlaps because they were involved in so many securitizations.

11   So essentially e-mails for the entire period from July '05 to

12   August '07 are provided that mention American home.

13          So as I said, it's designed to capture e-mails that

14   relate to securitization, including e-mails that focus on this

15   specific issue of whether the loans at issue complied with the

16   guidelines.

17          We all know that these guidelines changed on a very

18   frequent basis and that a comment about what allegation

19   originator is doing in 2007 is not necessarily relevant to

20   whether that originator's loans complied with guidelines in

21   2005.

22          So that's why we thought the approach made sense.  It

23   would get at the relevant documents and frankly would allow us

24   to complete the e-mail review that we need to complete on a

25   fairly compressed schedule, especially those of us who have

```
1    relatively big case.  We have 42 securitizations in our case.

2                We told the plaintiff that we were doing this back on

3    June 11.  And since then there have been at least three or four

4    letters exchanged where Deutsche Bank at least says this is

5    what we're doing and defendant and the plaintiff says, we know

6    that you're doing this.  And then they raised other issues.

7    But, again, they didn't raise this bubble issue until they

8    wrote to the Court.

9                THE COURT:  And I didn't even see it in the letter.

10   So...

11               MR. WOLL:  OK.  See, they snuck it right in there.

12   So, your Honor, we think the bubble approach for our documents

13   gets at the relevant documents.  Again, is it possible that

14   some relevant document might be missed with the bubble

15   approach?  It's possible.  But we doesn't think it's, frankly,

16   very likely.  And we think that, given the inordinate amount of

17   documents that all the defendants are going to be producing,

18   FHFA is going to have more than enough relevant documents to

19   look at.  So far, the defendants have searched e-mails from

20   over 600 custodians and collectively produced over 2.4 million

21   documents comprised of over 33 million pains.  It's a lot to

22   read.  We're producing a lot of documents.  And we took the

23   approach that we've taken and some of the other bubble

24   defendants have taken.

25               THE COURT:  And Mr. Woll, those numbers that you just
```

1   gave me, are you talking about the defendants collectively?

2              MR. WOLL:  Yes.

3              THE COURT:  Thank you.

4              MR. WOLL:  I'm sorry, your Honor.  Excluding loan

5   files.

6              THE COURT:  So Ms. Chung, is it helpful to think about

7   the post-closing period for a reduced number of custodians,

8   searches during the five-year period for a limited number of

9   custodians of each institution?

10             MS. CHUNG:  Your Honor, we did propose that along the

11  way.  We would like to argue this, your Honor, with your

12  permission.  I want to address particularly two things that

13  your Honor just heard.  One, these are really the most

14  important documents in the case.  It was later in the time

15  period, especially after the mortgage crisis hit, that people

16  began talking about -- and saw public and privately that the

17  performance was failing -- that people began writing e-mails

18  about what the problems in origination process had been.  So I

19  think it's exactly understating the importance of this category

20  of documents to say, well, it's limited to these subsets so

21  this is really not a big deal, you have enough documents.  So I

22  want to address the relevant particularly, but also what your

23  Honor had proposed, which is, doesn't it seem logical that some

24  subset would do.  And I embrace that, your Honor.  The letter

25  that they attach as Exhibit B to their letter to your Honor was

1    a proposal that we made in July saying, here's a proposal from

2    us, since we've been talking about time frames, we don't seem

3    to be making much progress, let's consider a post-closing world

4    and a pre-closing world.  And in the three months since then,

5    your Honor, what's happened is, FHFA has 111 custodians, and

6    our post-closing world is 66 custodians.  We are now reviewing

7    2.8 million documents just in the post-closing period.  And

8    why?  Because I can't stand in front of your Honor and say that

9    it's not relevant.  It's relevant.  You've heard them make the

10   arguments about GSEs came to these realizations.  We need to

11   know what they know.  Well, we agree with that.  So we're

12   searching seriously in this post-closing period.  Their

13   numbers, when Mr. Woll says, well, we have subsets, seven of

14   the defendants have nominated one or zero custodians in the

15   time period.  So whatever searches they're doing, they're

16   reaching -- and their custodian numbers overall are much lower

17   than ours, with the exception of JP Morgan and UBS -- I want to

18   be careful to make some distinctions.  They have significant

19   numbers of custodians.  But we're talking about almost all

20   defendants have less than 50 custodians to begin with.  And the

21   range of post-closing custodians they're searching is from 0 to

22   15.

23          So, your Honor, when we proposed that we could think

24   about, let's think about this, let's split the world, and then

25   we had multiple meet-and-confers about what that world would

1    look like, what we found is, we're getting dribs and drabs on

2    specific topics, exactly the ones Mr. Woll mentioned.  So

3    repurchases, some, not all defendants have agreed to nominate

4    repurchase custodians.  This is critical information, because

5    as the banks got repurchased and evaluated them -- so these are

6    loans that are being put back because somebody realizes there

7    is something wrong with them -- when they write e-mails about

8    those repurchases or they're applying standards about whether

9    the guidelines meet them and what they are going to agree

10   that's a properly repurchased loan, that is a whole -- that's

11   everything on what they believe the guidelines mean.  And so,

12   yes, we're looking for that information.

13          And we're getting from some defendants, we'll give you

14   one or two people on that.  We don't have a good way to get

15   behind what the nominations are.  But we've also had defendants

16   tell us, we don't have anybody who did any of these things, we

17   don't have anybody who did monitoring of the performance, not

18   just the public monitoring but the reaction to the public

19   monitoring -- gee, do you see what that bond is doing, that's

20   something that we never expected would happen, what do we think

21   is going on.  And we know from the media reports and

22   allegations in the complaint that what's going on there is, you

23   will see e-mail traffic of people saying, well, we knew that

24   they were doing things they shouldn't be doing.

25          But I want to be clear, it's not just about knowledge

1    of falsity.  All of this information goes to falsity.

2    Departures from the underwriting guidelines are the heart of

3    the case.  And the search terms that we're talking about are

4    things like the name of the underwriter, plus "abandon," plus

5    "departure," plus "guidelines."  So if you're not running that

6    search any time past 2007, which is what half of the defendants

7    are doing, then it's giving FHFA a null set.  OK.  In that

8    period, the meaning of a repurchase -- repurchase didn't start

9    going seriously until 2009.  So saying that you're going to do

10    your searches up to 2007 or 2008 is offering FHFA exactly zero.

11    It's a false offer.

12            So, your Honor, what we have done is, in this long

13    process, I think -- and this is why I started with, I agree

14    that some of the defendants are -- they're not all perfectly

15    situated, but I think also there's just not a meeting of the

16    minds on this idea that -- we're not talking about one or two

17    people.  You have to seriously go and look at who worked on

18    repurchases.  Not a single defendant has offered anything on

19    this category that Mr. Wilson can understand, which is the

20    retrospective reviews.

21            Another thing that happened after the mortgage crisis

22    hit is that all these banks, the GSEs, everybody, took a step

23    back and many of their risk committees, the very highest

24    echelons of these banks and entities said, why did this go

25    wrong, where did we abandon our risk policies, and anybody who

1    was in these litigations knows that the parties on all sides

2    have these reports.  These may not be ordinary custodians.

3    This is not going to be the trader.  This is going to be some

4    special theater or the highest people who were looking at risk

5    in the institution.  And so it takes some diligence to figure

6    out who these people are.  And what we found in our

7    meet-and-confers was that diligence was not being exercised.

8    When we are told there's nobody in the post-closing period that

9    is relevant, that is very, very difficult for us to accept even

10   if it's also hard for to us attack.

11           And so, your Honor, I think what we ultimately

12   defaulted to, because we just found that we were not making

13   headway on this, is, OK -- no one is saying, by the way, during

14   these meet-and-confers, nobody said this was not relevant.  I

15   think we all understand it's relevant.  What we're hearing is,

16   it's burdensome, OK.  So as I explained, FHFA has taken on the

17   burden.  Our view is, only one or two defendants gave us

18   figures on burden.  Those figures are AA.  I mean, when

19   somebody tells me, I got 2 million hits, well, you know, we got

20   2 million hits, but that means there are relevant things.  It

21   may take a while to go through it, but it's there.  So our

22   option was, you know what, if this is where we are, run the

23   terms, run the terms on everybody.  If certain people are

24   completely irrelevant, you won't have any hits on them.  So

25   that shouldn't be the issue.  And this is the way that we're

1   going to find what is some very, very meaty information that is

2   highly relevant to the case.

3          Given that we proposed this idea of the pre-closing

4   and post-closing world, I think, your Honor, certainly one

5   thing that we had a lot of problems with, in addition -- it

6   sort of layers onto this problem -- is, we've made many

7   requests.  FHFA two months ago supplied a list of defendants of

8   all 111 custodians, what their title is, what their department

9   is, what their role is.  And you can imagine that many of these

10  meet-and-confers in order to test the adequacy of the custodian

11  list and to test the adequacy of the custodian list for the

12  post-closing period, we're seeking information about what these

13  people did.  We asked the defendants for reciprocal

14  information.  And in many cases we didn't get it.  I had a

15  demonstrative, which unfortunately I can't show your Honor, but

16  what we depict is, we sent Credit Suisse, for example -- we

17  were on a meet-and-confer and they said, you know, well, what

18  information do you want, so what information don't you have.

19  We actually made a chart with 30 rows or so with all the

20  custodians, the name -- we filled in what we had.  And we left

21  question marks in the boxes we didn't have.  And we asked for a

22  limited description of the role so we would see what these

23  people are doing.  And what we got back was a partial amount of

24  that list in which the last column had been deleted, the

25  description of what the person does.

1          OK.  That in a nutshell is kind of the problem that

2     we've been having in probing the adequacy of the post-closing

3     period.  I want to be clear, the number that we have just don't

4     add up.  There is not a way that you don't have a single person

5     in the organization, just one person.  But if we were to go to

6     one system where we are denominating people, then I think at a

7     minimum what FHFA would need is more information to tell what

8     the list is because we have applied that backup route and it

9     also has not really worked.

10         I'm kind of reluctant to hand around a demonstrative

11    because they came in during the period and defendants haven't

12    had a chance to see them.  But I think that describes kind of

13    where we've been.

14         I would like to just answer -- the negotiating history

15    obviously is relevant.  The defense has raised it.  And as I

16    say, I raised the idea that we originally proposed pre- and

17    post-closing world.  We did raise with the defendants, I just

18    want to answer this, certainly in the meet-and-confers that I

19    was involved in, we raised with the defendants that we were

20    producing, because of this law enforcement negotiation for lack

21    of progress, that they just run all the custodian terms for

22    everybody.  And that is indeed, for example, in the instance

23    where we got numbers back on what the number of hits would be,

24    that is what the defendant did to try to demonstrate this, and

25    this is going to return a lot of documents, maybe not a

 1   shocking proposition to begin with.  But it's not true that

 2   this was first raised with defendants in the letter.

 3       Your Honor, I just would say a few things about the

 4   data so that your Honor has the full picture.  We have a few

 5   defendants who have offered a few repurchase custodians, which

 6   is not adequate.  We have some defendants who have offered

 7   nobody.  We have no defendant who has offered any custodian on

 8   these retrospective reviews.  And on performance or monitoring

 9   of performance, I would say, I think maybe half of defendants

10   have offered between zero and eight people on this topic.

11       THE COURT:  Mr. Woll.

12       MR. WOLL:  Can I just be heard on a couple of things,

13   your Honor.  First of all, on the repurchase documents, I just

14   wanted to mention this, FHFA has taken the position that all of

15   its internal repurchase documents are privileged, so they're

16   not going to be producing, as I understand it, any internal

17   repurchase documents.  And just as a point of clarification,

18   repurchase claims involve lots of things.  They don't just

19   involve the purchase and underwriting guidelines.  And so there

20   could be repurchase documents that we come up with that have

21   nothing do with underwriting guidelines.

22       In terms of relevance and the argument that it's not

23   just the state of mind but it's compliance with guidelines,

24   this information after the fact, well, the whole point of this

25   sample that the plaintiff has proposed where this

```
 1    reunderwriting exercise has been discussed is, that's going to
 2    be a lot of focus on loans to determine whether they in fact
 3    complied with underwriting guidelines or not.  So, again, to do
 4    a huge e-mail review to see if somebody said something three
 5    years after fact about compliance with the date of the
 6    transaction I don't think is a particularly efficient way to
 7    go.
 8              And then finally, just with respect to details about
 9    the custodians, as far as I know, and I could stand to be
10    corrected, I don't think we got detailed information about the
11    FHFA custodians in terms of which ones they've decided have had
12    post-securitization responsibilities or how they made that
13    decision.
14              THE COURT:  Thank you.
15              So to the extent that -- most of these cases are
16    non-fraud cases.  There are only six of the 16, I think, that
17    have fraud claims in them.  And even the fraud claims, of
18    course, are enormously impacted by the Section 11 claims, the
19    straight misrepresentation claims.  And statements that the
20    defendants make which the plaintiffs would argue would be
21    admissions that there was a noncompliance with underwriting
22    guidelines or underwriting practices would take some of the
23    disputes potentially off the table here.  So I can certainly
24    understand the importance of having a meaty production for the
25    post-closing period.
```

1            And with respect to these four categories of topics

2     outlined in the plaintiff's letters and which Mr. Woll

3     addressed, it seems to me each of them is an appropriate ground

4     for post-closing discovery.  It remains unclear to me, though,

5     whether we need all custodians searched.  But I think the

6     burden would be on the defendants to make a showing that a more

7     limited search would be sufficiently productive.  It seems to

8     me if executives, people with management responsibilities,

9     people who are members of special committees and make reports

10    for the institution with fact finding about what happened, in a

11    way that could be binding on the defendants at trial or

12    certainly highly relevant to a jury's analysis of the defenses

13    that are being put forward at trial, they have to be searched.

14    So if a defendant doesn't want all the custodians searched for

15    the five-year period, then I think they have a responsibility

16    to create a custodian list that identifies the custodians by

17    title and role and with a sufficiently detailed description of

18    their jobs and responsibilities to make a showing that a search

19    of their e-mails for the post-closing period won't be likely to

20    produce or isn't sufficiently likely to produce productive

21    materials.

22            It seems to me in the post-closing period what we're

23    talking about would be -- and, Ms. Chung, I'm happy to hear

24    from you on this -- but I think what we're talking about in the

25    post-closing period is people with a high-enough responsibility

within the organization that their knowledge and observations

about these historical practices bear some weight, and that

some of the more junior-level people, that would have highly

relevant information during the periods of securitizations

themselves, their stray comments or thoughts might be of less

interest or importance in the post-closing period.  One could

argue the other way.  But I think that defendants need to get

to the plaintiff by the close of business tomorrow a list of

their custodians by title and role and indicating which

custodians they do not believe there should a search for for

the post-closing period, so that there can be an adequate

meet-and-confer on that topic on Wednesday between the parties

and so Thursday afternoon I can address any areas of

disagreement.

With respect to the bubble --

MS. CHUNG:  Your Honor, I didn't really address that.

I don't know -- I could do it briefly.

THE COURT:  Ms. Chung.

MS. CHUNG:  It is a version of the same argument

because -- on this one I want to be clear, there's a clear

split in defendants.  I want to give credit; a lot of

defendants are not using this bubble approach.  For FHFA it was

never an issue because on our side, and one of the reasons --

it was funny when you said I didn't see it in the letter.  On

our side we don't have a bubble because we just ran all our

```
1    custodians pre-period for all deals and all originator terms.
2    Most of our employees worked on the same deal so it didn't make
3    a difference.  So our eye was not really on the idea that you
4    would ever try to separate the originator terms by deal.  And
5    so when defendants started doing that, and there's been some
6    the movement in it but now I think it's clear there's sort of
7    two camps.  One camp is searching it all the way through.  And
8    another camp has said, no, we're always going to associate an
9    the individual originator with the deal that they were welded
10   to.  And the problem with that, your Honor, again, is the
11   arbitrary cutoff of relevance.  It may be, you know, there are,
12   for example, there is an example in the -- I think it's Merrill
13   Lynch, where during the time period the deals are being done --
14   that's information that comes about in different RBS case
15   that's public because there has been motion practice about it,
16   so, oh, gee, this originator, looks a little weird, let's start
17   doing some quality control on this.  OK.  If that kind of thing
18   happens and they're looking for quality control in the
19   origination of the loans, that's not going to happen in a
20   four-month window.  So that's the logic, that it's just -- I
21   think it's hard to say that it's burdensome if the plaintiffs
22   are doing it and then there's this kind of arbitrary three
23   months before, one month after that we don't think bears any
24   relation to the relevance of the documents.
25            THE COURT:  Ms. Chung, with respect to that division
```

1    between pre-closing and post-closing, where is that line drawn,

2    in your view?

3              MS. CHUNG:  In terms of what, your Honor?

4              THE COURT:  An individual defendant.

5              MS. CHUNG:  Well, I guess the distinction we drew,

6    your Honor, is, we're not insisting -- we put the bubbles

7    around what we've been calling the deal terms.  So there have

8    been two sets of searches.  One is geared off of the actual

9    securitization names and the CUSIPs and things like that.  That

10   to us is debatable.  Frankly, we could have asked this as well,

11   I think, but we didn't.  We said, OK, if you want to run the

12   deal terms in bubbles, that makes some sense because you expect

13   there to be higher volume about the deal when it's being

14   arranged.  But to us the originator information is not like

15   that.  There can be e-mail chatter about the originators and

16   their practices and perhaps the falsity of their

17   representations in the offering materials to the extent they're

18   talking about departures from the guidelines at any point in

19   time.  And so I guess what I'm saying is, much of the argument

20   for us is the same.

21             THE COURT:  But then you made the proposal of a pre-

22   and post-closing search and a distinction between the two.  For

23   any individual defendant, what is the demarcation for it?

24             MS. CHUNG:  Your Honor, it depended on what duties

25   they had.  So we were saying -- it's not unlike what your Honor

1   was just saying.  If you can give us enough information that

2   they only would have had e-mail traffic in an earlier period,

3   so this might be people who are doing the arranging of the

4   deal, so all they're doing is picking the loans that are going

5   to go into the deal, that could have some logic to it, there's

6   no need to go up to the date of the complaint from

7   post-closing.  But that was exactly the kind of information

8   that we found it difficult to get.

9           I think the key thing was what your Honor identified,

10  which is -- because I think most of the defendants have already

11  staked out the position that if they're on the custodian list

12  and they haven't already been designated by them as a

13  post-closing custodian, that those people do not have duties

14  that would implicate those fewer areas.

15          I think what we're -- so we're very interested in the

16  first part of what your Honor ordered, which is, can you

17  identify people in these four buckets who -- have you

18  identified those people, if they are the higher-level people

19  that's fine -- who did have responsibility for these things.  I

20  think that's really what we've been missing.

21          THE COURT:  Do you agree that with respect to that

22  five-year period -- I'll call it the post-closing period --

23  that what is most important to the plaintiff are things that

24  could be thought of as admissions, that they are basically

25  things that were said to, heard by, or articulated by people in

1    managerial or executive positions with respect the

2    organization?

3         MS. CHUNG:  Yes.  Your Honor, I think we could make a

4    broader argument.  It depends.  For example, on repurchases,

5    many of these entities had, when repurchases started coming in

6    in big volumes, they would form committees where there would be

7    standards set.  There would even be things like, you know, I've

8    seen a policy that said to employees, if you can find ways to

9    turn down these repurchases, you'll get incentive-based pay.

10        So there can be a range of things that e-mail traffic

11   and -- you know, it can be at a committee level.  It can be at

12   the executives' level.  I understand what your Honor is saying

13   about having the importance to bind the company.  But I think

14   in many ways -- I mean, this is an argument defendants have

15   made -- that, you know, you're an employee and you're there and

16   that's still relevant information if you're talking about the

17   business and the aspects of the business that are relevant to

18   the case.

19        But I hasten to say, I think that a big issue has been

20   for us so far just identifying any people that relate to those

21   four buckets.  That's what the big hurdle has been so far.

22        THE COURT:  Mr. Woll.

23        MR. WOLL:  Yes.  Your Honor, I just wanted to add that

24   you instructed defendants to provide information about their

25   custodians and ones that are not appropriate for post-

```
 1        securitization search, and I would ask that the plaintiffs be
 2        asked to do the same thing.
 3              THE COURT:  I thought Ms. Chung gave you a chart like
 4        that.  She was describing what she provided, FHFA provided to
 5        the defendants, with title and duties.  Did I misunderstand
 6        you, Ms. Chung?
 7              MS. CHUNG:  No, your Honor.  I have copies.  Yes, we
 8        have turned over a full list of our 111 custodians with their
 9        functions and the time frames to the defense.
10              MR. WOLL:  And the defendants did too, at least
11        Deutsche Bank, we provided a list of custodians and what their
12        titles were.  But if we are to justify why people should not be
13        subject to a post-securitization search, that's additional
14        information we would ask the plaintiffs also to provide,
15        because understandably the title may not tell the whole story
16        and since that's what we've been provided, it doesn't
17        necessarily show why they're not doing it on the other half of
18        their custodians.
19              THE COURT:  Ms. Chung.
20              MS. CHUNG:  Your Honor, I don't think we're similarly
21        situated on this.  On defensive discovery, there have been
22        enormous amounts of discussion about our custodians and we
23        have, as a result of that, designated 111 people.  And we have
24        provided the information about who they are and what they do
25        and the time periods.  It's this information we haven't been
```

1    able to get from defendants.  But more fundamentally, we have

2    put forward literally scores of people, and the issue that

3    we're having on their side is, it's not being reciprocated.  I

4    think seriously -- I've been a part of these conversations --

5    we have said a lot of things, including in meet-and-confers, to

6    drill down on who the people are and why they're being added or

7    not.

8            THE COURT:  So, Mr. Woll, I am happy if you don't

9    reach agreement with the plaintiffs and we're together again on

10   Thursday afternoon, I am happy to look at the chart you gave to

11   the plaintiffs in the past all those custodian identifications,

12   and am happy to look at the chart you will produce tomorrow by

13   5 for the plaintiffs and be able to observe whether or not the

14   information you gave in the past was really fulsome enough.  So

15   I'd be happy to look at it now if you have a copy, but there is

16   no expectation you would have brought it to court.

17           MR. WOLL:  I'm not sure I do, your Honor.

18           THE COURT:  Yes.

19           MR. WOLL:  And with respect to the plaintiffs, can you

20   also look at their chart and see whether it provides

21   information?

22           THE COURT:  I'd be happy to.  I'd be happy to.

23   Everybody should bring their charts.

24           MR. WOLL:  Thank you.

25           THE COURT:  So on this third letter, I think nothing

```
 1    is resolved.  I think everything remains open to a
 2    meet-and-confer process this week.  And it's on the agenda for
 3    Thursday.
 4            MS. SHANE:  Your Honor, I'm sorry, if I may just a
 5    moment confirm that our understanding, which we had with the
 6    plaintiff before we came here and which I believe was mentioned
 7    at the start of this conversation, is that this JPM defendant
 8    and the plaintiff had an agreement resolving this issue as to
 9    JPM.
10            MS. CHUNG:  Yes, your Honor.  We set aside JP -- I
11    think I did in this conversation.
12            MS. SHANE:  Thank you.
13            THE COURT:  Thank you.
14            MR. HANIN:  Excuse me, your Honor.  Michael Hanin on
15    behalf of FHFA.  With respect to the four cases that were not
16    the subject of the letter you received last week, we had not --
17            THE COURT:  What four cases?
18            MR. HANIN:  Well, the letter you received from FHFA
19    related to 12 of the 16 cases coordinated before you.  We
20    suspect that in the four cases that our firm is handling, we
21    would continue to meet and confer on the very same issues that
22    the other 12 defendants were dealing with.  And we actually had
23    meet-and-confers on each of those cases scheduled for tomorrow
24    and Wednesday.  And so I just wanted to make sure of two
25    things: one, that we would also receive from the defendants the
```

```
 1   same list of custodians who they believe are appropriate for

 2   post-securitization searches by 5 p.m. tomorrow, and, two, that

 3   with your Honor's permission, we could in the course of these

 4   meet-and-confers, in which we have requested all the same

 5   searches that FHFA requested in all of the cases, get on the

 6   same timetable such that to the extent there are any

 7   outstanding issues by the close of business Wednesday we can

 8   address them with your Honor on Thursday.

 9            THE COURT:  Yes.

10            MR. HANIN:  Thank you.

11            THE COURT:  Sadly I thought there were four cases that

12   were moving along without any need for intervention.  OK.

13            Let's talk about the RBS litigation.

14            Thank you very much for your submissions to Judge

15   Thompson and myself.  And, Mr. Woll, I'm glad you're here.

16            MR. WOLL:  And I'm glad my partner, Tom Rice, is here.

17            THE COURT:  I had spoken with Judge Thompson months

18   ago and again last week and again today, and I'm very aware

19   that he is the judge responsible for the Royal Bank of Scotland

20   case filed in Connecticut.  And I have enough on my plate and

21   that's just fine.  But I think what I have in mind with respect

22   to the coordination order is something that is, I think, pretty

23   common in litigation across districts.  And it's agreements

24   along these lines, that no deponent will be deposed twice, that

25   documents produced in the litigation before me will be produced
```

1    in Connecticut and vice versa to the extent that that's

2    relevant.  So I expect that that's extraordinarily standard and

3    desired by one and all.  I may be wrong about that.  So I think

4    the next layer of issues potentially for agreement or

5    disagreement is whether or not the 20-deposition limit that's

6    imposed in the 16 actions here, of all defendants vis-a-vis

7    FHFA and FHFA vis-a-vis any corporate family, whether or not

8    that will be deemed to be imposed with respect to the

9    Connecticut litigation as well.  And of course Judge Thompson

10   will speak for himself.  But RBS, at least one of the

11   defendants in the RBS family who is a defendant in the

12   Connecticut litigation is present before me in four cases, and

13   I think two or three of those are fraud cases, not that they're

14   defendants on fraud counts, but -- I have my chart.  But

15   anyway, so it's my understanding that Judge Thompson believes

16   that that 20-deposition limit should apply with equal force to

17   the Connecticut action.  Therefore Royal Bank of Scotland, that

18   family of corporations, will be involved in taking the no more

19   than 20 depositions of the FHFA that binds all the defendants

20   before me.  And similarly, the plaintiff and any co-defendants

21   should expect a 20-deposition limit of the Royal Bank of

22   Scotland family of companies, whether they are named in the

23   four actions here or the Connecticut action.  So Royal Bank of

24   Scotland, as a family of companies, is only going to face 20

25   depositions, whether those depositions are taken as part of my

1    four cases or the Connecticut case.

2          Now, with respect to the Connecticut action, I think

3    Judge Thompson would like to treat this -- and again, he will

4    speak for himself as presumptive and give Royal Bank of

5    Scotland and FHFA an opportunity to be further heard before him

6    if and when they feel they feel there is a need for relief.

7    But of course that applies here as well.

8          So with respect to the plaintiff's proposal that we be

9    scheduling a trial date in the Royal Bank of Scotland case, I

10   think I will leave summary judgment practice and trial dates to

11   Judge Thompson and it doesn't need to be part of a coordination

12   order.

13         Similarly with respect to document production in the

14   Connecticut case and a substantial complete date or a cutoff

15   with fact and expert discovery, I think Judge Thompson and I

16   will meet and confer about that more.  But I think

17   fundamentally that's for Judge Thompson to decide.  The issue

18   is to what extent it will impact the management jointly of

19   these 17 cases.

20         So I hope that gives you enough -- I wanted to respond

21   as promptly as I could on behalf of both of us since you are

22   before me today and it does affect your life going forward,

23   because that means that Royal Bank of Scotland is going to have

24   to be prepared to begin deposition discovery of FHFA in January

25   of this year.  It of course knows that for my four cases, but

1    it has to know that for the Connecticut case as well.

2        I think that there should be continuing consultation

3    between the plaintiff and the RBS defendants, indeed all the

4    defendants in the Connecticut case, document production issues

5    and the scheduling of the RBS depositions.  Those do connect

6    with issues before me, but I don't want to say anything

7    further.  I think Judge Thompson and I would like joint

8    proposals on that detail.  So what I would like is a proposed

9    coordination order that provides for no deponent being deposed

10   twice, documents produced in one of the 17 litigations being

11   produced in all, the 20-deposition limit being deposed.  And I

12   think then the other things which are customary in coordination

13   orders -- and I don't understand there is any dispute about

14   it -- which is signing on the confidentiality agreement and the

15   other stipulations that have governed document production and

16   otherwise helped you all manage your lives in this case that

17   are customary.

18       Mr. Rice.

19       MR. RICE:  Yes, your Honor.  If I may just approach.

20       THE COURT:  Sure.

21       MR. RICE:  Thank you.  And I don't propose to speak

22   very long, your Honor.  I just don't want to speak from the

23   back of the room.

24       THE COURT:  Sure.

25       MR. RICE:  First of all, thank you, your Honor.  And

1    just to be clear, first, we do appreciate your Honor's efforts

2    here and we appreciate your communicating what Judge Thompson's

3    view of the case is.  We have asked Judge Thompson today in a

4    letter to him when we sent him a courtesy copy of the papers we

5    filed Friday, we asked him to please set a conference as soon

6    as possible so we can talk to him about these issues.  We want

7    to proceed in a way that's sensible but that protects my

8    client's rights at the same time.  And I'm concerned, your

9    Honor, that some of the things you've said today are perfectly

10   fine and some of them really are a problem in terms of the

11   substantive rights of the RBS defendants and the Connecticut

12   defendants.

13         Sure, documents produced in all cases and depositions

14   taken in all cases can be used in all cases, there's no

15   question about that.  We have no issue with that.  We would

16   like, if it were feasible, to have a rule that says deponents

17   are only taken once in a case.  The problem with that is, given

18   where we are now, the RBS defendants on the 68 securitizations

19   that are at issue in Connecticut will not be ready to take

20   depositions in the first half of next year, which is when all

21   the depositions of the FHFA witnesses are going to take place,

22   so that we're going to have an issue there and we're going to

23   have a problem there.  And I hope your Honor will understand

24   that.  I hope equally that Judge Thompson will understand that.

25   And we would like to try to get before him on that.

1           And frankly, your Honor, I'd like to try to get before

2     him on that before we come to --

3           THE COURT:  Before January.

4           MR. RICE:  Well before January, your Honor, and

5     certainly before your Honor and Judge Thompson enter any kind

6     of coordination order.  I think certainly my client has a right

7     to be heard in Connecticut where the plaintiff brought this

8     case, where the case is going to be tried.  We have no, no

9     interest in trying to duplicate things.  But what your Honor

10    has outlined causes huge and, I would submit, with all respect,

11    unfair issues for the RBS clients.

12          THE COURT:  So, Mr. Rice, could I get your cooperation

13    to this degree; would you draft with FHFA a proposed

14    coordination order that reaches agreement where you can and has

15    competing paragraphs where there is no agreement so we can make

16    the differences concrete in one document and/or -- yes, that's

17    my request.  Would you be able to do that.

18          MR. RICE:  First of all, your Honor, I think you will

19    always be able to count on me to cooperate, and, yes, of course

20    we'll do that.  We'll certainly work with them on that.  I

21    think having a competing order already gives us a basis to come

22    up with something.  There are a couple of areas at least in

23    which we agree.  There is obviously much about which we don't

24    agree at this point.

25          THE COURT:  OK.  So I take it, though -- there are

```
 1   some things that I could say with respect to the 20-deposition
 2   limit.  But I very much appreciate that you have a separate
 3   right to be heard before Judge Thompson.  And I certainly won't
 4   be entering any order before he has an opportunity to grant
 5   your request for a conference before him and before he is ready
 6   to sign.  So I don't want to put any party in the uncomfortable
 7   position of wondering who is the person you should be obeying.
 8            MR. RICE:  Thank you.
 9            THE COURT:  So I think Judge Thompson and I agreed
10   from our very first conversation that we would try to work
11   cooperatively with each other.  But I do want to be very
12   respectful of his independent role over that 17-defendant case.
13            MR. RICE:  Thank you very much, your Honor.
14            THE COURT:  Yes.
15            MR. ABENSOHN:  Your Honor -- I apologize.
16            THE COURT:  Counsel.
17            MR. ABENSOHN:  Yes, your Honor.  Adam Abensohn for
18   FHFA.  And I'll be brief because we do certainly respect that
19   Judge Thompson will ultimately draw out the issues in the RBS
20   case.
21            THE COURT:  In one of the five RBS cases.
22            MR. ABENSOHN:  In one of the five RBS case, yes, of
23   course, your Honor.
24            The only thing I would say with respect to defendants'
25   opportunity to be heard by Judge Thompson is, to a large
```

extent, they have been heard by Judge Thompson, who ordered two

months ago that discovery begin, quote/unquote, promptly.  So

much of the complaint we hear today from RBS, in my view, is

self-created.  My understanding is that they've got to begin

document collection, they've got to begin document production.

They have yet to begin any of the process despite this order

outstanding for two months.  And our concern frankly is that

they are trying to create a scenario that makes it impossible

to get coordinated, that makes it impossible to spare witnesses

multiple depositions.  And that is then what we are trying to

prevent.  And again I understand your Honor's guidance and will

proceed on that basis.

THE COURT:  And when did you serve the document

demands in the Connecticut RBS case?

MR. ABENSOHN:  I believe the document demands went out

the day after the exchange of initial disclosures, so that

would have been, I think, on the order of a week to two weeks

ago.

THE COURT:  Thank you.

MR. ABENSOHN:  Thank you.

MR. RICE:  With your Honor's permission, I just can't

leave some of this unchallenged.

THE COURT:  I thought I asked the right questions.

MR. RICE:  You did, your Honor, and I appreciate is.

But there's something else your Honor doesn't know.  We were

1    before Judge Thompson in January of last year on a conference

2    that talked about discovery in these cases.  Mr. Abensohn was

3    there.  There wasn't a hint at that time that they were going

4    to seek to somehow cram us into a schedule that was here,

5    absolutely unfair, your Honor.  And again, we'll be heard

6    before Judge Thompson.

7             THE COURT:  Good.

8             I think we can move on.

9             MR. ABENSOHN:  OK.  Thank you, your Honor.

10            THE COURT:  Thank you so much.

11            I don't need to take much time.  You can write me a

12   letter.  I think we still have two dates in the UBS summary

13   judgment motion practice that you were going to meet and confer

14   about, and I'd love to get those down.  So if you could just

15   send me a letter with those two dates.

16            The issue about the *Daubert* challenges, I would like

17   the defendants, other than UBS, to advise the plaintiff by

18   October 19 whether or not they were they are making any *Daubert*

19   motion at this time to challenge the Cowan report.  If not, as

20   was true in the UBS case, their right to make a *Daubert* motion

21   to challenge his report is waived to the extent it could have

22   been made at this time.  So it is without prejudice to filing a

23   *Daubert* motion on additional opinions that may be expressed by

24   the plaintiff's expert.

25            Obviously this early *Daubert* motion practice has been

1    necessitated by the enormity of the task that confronts all of

2    us.  It's not just the plaintiffs who will be doing a

3    reunderwriting analysis of the sample.  I have no doubt that

4    the defendants will be doing that as well.  And the defendants

5    will be deciding whether or not they want to make a

6    counterproposal or look at additional files of everything.

7    Unless we have devastating e-mails that come in as straight

8    admissions with respect to the Section 11 violations, an

9    enormous amount of work by the plaintiff and defendants is

10   going to be driven by the plaintiff's protocol for choosing

11   this sample and by the identification of the individual loan

12   files.  All of you need to know now whether this sampling

13   protocol is so fatally flawed that it should be stricken on

14   *Daubert* grounds.  You all have the right, of course, to make

15   any arguments to a jury about weight at any time.  That

16   wouldn't be appropriate for a *Daubert* motion.  And of course

17   you can't make a *Daubert* motion with respect to something you

18   don't have.  So to the extent that there are additional

19   opinions and expert reports, you have all your rights to make

20   additional *Daubert* challenges at that time.

21          So by October 19th you'll advise the plaintiff in

22   writing whether or not you're making a *Daubert* challenge.  And

23   if you do, here is the briefing schedule:  Motion by the

24   defendants October 26, opposition November 9, reply November

25   16.  Two courtesy copies to the Court.

1          Counsel.

2          MS. DAVIDOFF:  Your Honor, Amanda Davidoff from

3    Sullivan & Cromwell.  We certainly agree that we can't make a

4    *Daubert* challenge based on information that we don't have yet.

5    And speaking on behalf of the nine UBS defendant, we did

6    receive our Cowan report last week.  What's missing from that

7    report -- that report includes a general methodology, it

8    includes a list of about 44,000 loan members that are included

9    in the sample plaintiffs said they drew.  What's missing is all

10   of the data one would need to evaluate whether the sample was

11   reliably drawn based on the methodology that plaintiff has

12   presented.

13          Now, it's quite a complicated process to adequately

14   draw a sample based on general methodology.  It's not take the

15   loan tapes, close your machine, the sample pops out.  The loan

16   tape have to be processed.  Dr. Cowan's report says that he

17   divided them into four side by side.  That's probably a lot of

18   calculation, copying and pasting Excel charts.  And Dr.~Cowan

19   had to choose a number generator.  That's going to usually

20   generate a number between 0 and 1, a series of random numbers

21   between 0 and 1.  You need a computer program that maps those

22   random numbers onto the loan numbers.  Dr. Cowan says that he

23   did a number of tests of representativeness.  We don't have any

24   of the backup data for those.  And then of course overall, we

25   do not have any discussion and information of how many times

they did this process, whether this was something they did once
and took a sample or whether it's something they did a thousand
times and took a thousand samples.

So we would submit, your Honor, a couple things in
response to their proposal.  We are more than happy to make a
determination of whether we're going to make a *Daubert* motion
on a relatively expedited basis.  But that can't be done until
we have this backup information.  We've asked for it, not only
what's automatically required under the rules; it's also the
subject of a document request.  We also asked for it in
response to the motions letter that we got from the plaintiff
last week.

So I would say that probably October 19 is too soon to
make a determination about whether the defendants are going to
make a *Daubert* motion.  Plaintiffs have had these loans tapes.
Your Honor's order had an outside date of June 8 for getting
the loan tapes.  There was a lot of back-and-forth on what the
right loan tape was for each securitization.  Plaintiffs
themselves have said that they had to supplement the loan tapes
with data for logic.  Defendants certainly had a right to
evaluate how that was done.  They took from June until October
to give us our sample numbers.  And the samples are, you know,
there are still a lot of numbers.  There were 44,000 loans,
there were a hundred loans for each securitization.  It's going
to take our experts some time to crunch those numbers once we

1    get the data that we need to evaluate a response to this

2    proposal.

3            Presumably, if that's the kind of early *Daubert* motion

4    your Honor has in mind in order to vet these numbers -- of

5    course let UBS speak for themselves.  They may want the same

6    discovery.  I'm not aware of whether they got it or not.  But I

7    don't think we can make a decision by October 19, given that

8    it's October 15 and we don't have this data.

9            I also don't realistically think we could put in a

10   motion on such a short time frame.  It's just so many loans and

11   there's some expert work to be done with these calculations.

12   That's why it has taken such a long time to do.

13           THE COURT:  Thank you so much.

14           MS. DAVIDOFF:  Thank you.

15           THE COURT:  The next topic will be the schedule for

16   the reports on reunderwriting.  As I understand it, to do the

17   reunderwriting, the plaintiff needs the sample loan files.  So

18   for any particular case, the reunderwriting process requires

19   that sample set to be complete.  And I had proposed, I believe,

20   at the July 31st conference the following schedule -- and just

21   proposed -- that two months after the plaintiff has the sample

22   loan files for a particular case and the underwriting

23   guidelines, that it would identify for the defendants the

24   results of its reunderwriting process to identify with some

25   specificity what it contended the individual misrepresentations

1    or failings were.  And I proposed that the defendants would

2    then respond within six weeks.

3              So I just want to remind counsel of that discussion

4    that we had on July 31 and ask you to fold that into your

5    meet-and-confer process and come up with a schedule so we don't

6    lose track of that.  Thank you.

7              And I think that takes me to the last issue on my

8    list, which is ResCap.  I have not had an opportunity to read

9    the entirety of Judge Glenn's decision.  But I have read

10   selected portions of it.  And believe me, I will read it all

11   with great interest as soon as I can.  But I think I got the

12   gist of it.  And so I'd like to give counsel before me, who

13   wish to be heard on this issue, and -- is it Mr. Goeke?

14             MR. GOEKE:  Yes, your Honor.

15             THE COURT:  Thank you.  I'm so glad you're here.

16   Anyone who wants to be heard on this issue, I want to give them

17   an opportunity.

18             So what I'm thinking is ordering the production of, I

19   think it's 2100 files, loan files now that FHFA has identified

20   and requiring Ally to pay ResCap for that production.  The

21   issue is whether I allow defendants to identify any additional

22   files beyond the 2100 and fold that in to my order.  For

23   instance, if the defendants could this week identify 500 or a

24   thousand additional files that they would like ResCap to

25   produce, I'd be happy to fold that in as well, if you think

1    that the set of 2100 is too small.

2            So that's going to be my proposal.  And Mr. Goeke, you

3    may wish to oppose that.

4            MR. GOEKE:  Yes, your Honor.

5            THE COURT:  I'll take any submission on Wednesday.

6    The FHFA I'll take any submission on Friday.  And Mr. Goeke,

7    any reply on Monday.

8            MR. GOEKE:  Thank you, your Honor.

9            THE COURT:  Thank you.

10           So, counsel, two and a half hours later, it's 5

11    o'clock.  And by the way, I want to thank everybody for always

12    being so prompt.  It's greatly appreciated.

13           Mr. Goeke.

14           MR. GOEKE:  Your Honor, I'm sorry to interrupt you.

15    May I just ask, if we are to address this on Wednesday, on what

16    authority are you actually ruling that we should be providing

17    the information given that Ally does not have any control over

18    this information?  Is it under the shared services agreement or

19    is it for some other reason?  Just so we can be addressing the

20    correct issue before your Honor.

21           THE COURT:  I think you should assume that I'm going

22    to act with every piece of authority I have at my command.  And

23    so that you should feel free to give me any and every argument

24    why I should not order this.

25           MR. GOEKE:  Thank you, your Honor.

1          THE COURT:  Thank you.

2          MS. CHUNG:  Your Honor, did you have some time in mind

3    for the Thursday?

4          THE COURT:  2 o'clock.

5          MS. SHANE:  Your Honor, is that in person or

6    telephonic?

7          THE COURT:  Well, it actually will depend upon the

8    length of the agenda.  I think this would have been impossible

9    to do by phone.  So either Ms. Shane and Mr. Kasner, the two of

10   you together, and Mr. Selendy, if you would notify my chambers

11   Thursday morning of the agenda items that have not been

12   resolved through the meet-and-confer process and your

13   recommendation, hopefully joint, as to whether or not this can

14   be done by phone or -- I have to say, anything longer than 45

15   minutes we're going to do in court.  If we're down to one or

16   two issues, fine.  But for me to give everybody a chance to be

17   heard and reflect on these and give you a ruling and perhaps to

18   look at charts -- I'm so anxious to see Mr. Woll's charts and

19   FHFA's charts -- document custodians, some of this, depending

20   on what the issue is, it may of necessity be an in-person

21   conference.

22         MR. KASNER:  Your Honor, Jay Kasner.  Good afternoon,

23   your Honor.  Just as a hypertechnical housekeeping matter, I

24   will be in the Second Circuit Thursday morning.  I will ask

25   Mr. Fumerton to take responsibility and Ms. Shane for

```
 1     contacting chambers if that's acceptable to the Court.
 2              THE COURT:  Thank you.  Is it a case I know about?
 3              MR. KASNER:  Your Honor, it is a case I'm not certain
 4     you know about but it will be of interest to the Court.  It
 5     involves an application of the same decision that your Honor
 6     discussed at our very first conference.
 7              THE COURT:  Thank you all.
 8                              o0o
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```