UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :   11 Civ. 5201 (DLC)
                                        :   11 Civ. 6188 (DLC)
FEDERAL HOUSING FINANCE AGENCY,         :   11 Civ. 6189 (DLC)
                                        :   11 Civ. 6190 (DLC)
                    Plaintiff,          :   11 Civ. 6192 (DLC)
                                        :   11 Civ. 6193 (DLC)
        -v-                             :   11 Civ. 6195 (DLC)
                                        :   11 Civ. 6198 (DLC)
                                        :   11 Civ. 6200 (DLC)
UBS AMERICAS INC., et al.,              :   11 Civ. 6201 (DLC)
                                        :   11 Civ. 6202 (DLC)
                    Defendants;         :   11 Civ. 6203 (DLC)
                                        :   11 Civ. 6739 (DLC)
And other FHFA cases.                   :   11 Civ. 7010 (DLC)
                                        :
                                        :   OPINION & ORDER
----------------------------------------X
APPEARANCES:

For the plaintiff:
Philippe Z. Selendy
Richard A. Schirtzer
Adam M. Abensohn
Andrew R. Dunlap
David B. Schwartz
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601

Marc E. Kasowitz
Christopher P. Johnson
Michael A. Hanin
Kanchana Wangkeo Leung
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019

For Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A.,
J.P. Morgan Mortgage Acquisition Corporation, J.P. Morgan
Securities LLC, J.P. Morgan Acceptance Corporation I, Bear
Stearns & Co., Inc., EMC Mortgage LLC, Structured Asset Mortgage
Investments II Inc., Bear Stearns Asset Backed Securities I LLC,
WaMu Asset Acceptance Corporation, WaMu Capital Corporation,

Washington Mutual Mortgage Securities Corporation, Long Beach
Securities Corporation and certain of the Individual Defendants:

Penny Shane
Sharon L. Nelles
Jonathan M. Sedlak
Yavar Bathaee
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

For Defendants UBS Americas Inc., UBS Real Estate Securities
Inc., UBS Securities LLC, Mortgage Asset Securitization
Transactions, Inc., David Martin, Per Dyrvik, Hugh Corcoran and
Peter Slagowitz:

Jay B. Kasner
Thomas J. Nolan
Scott Musoff
Robert A. Fumerton
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

For Defendants Barclays Capital Inc., Barclays Bank PLC,
Securitized Asset Backed Receivables LLC, Paul Menefee, John
Carroll, and Michael Wade:

David H. Braff
Brian T. Frawley
Jeffrey T. Scott
Joshua Fritsch
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

For Defendants Credit Suisse Securities (USA) LLC, Credit Suisse
Holdings (USA), Inc., Credit Suisse (USA), Inc., DLJ Mortgage
Capital, Inc., Credit Suisse First Boston Mortgage Securities
Corporation, Asset Backed Securities Corporation, Credit Suisse
First Boston Mortgage Acceptance Corporation, Andrew A. Kimura,
Jeffrey A. Altabef, Evelyn Echevarria, Michael A. Marriott, Zev
Kindler, Thomas E. Siegler, Thomas Zingalli, Carlos Onis, Steven
L. Kantor, Joseph M. Donovan, Juliana Johnson, and Greg Richter:

Richard W. Clary
Richard J. Stark
Michael T. Reynolds
Lauren A. Moskowitz
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

For Defendants Goldman, Sachs & Co., GS Mortgage Securities
Corp., Goldman Sachs Mortgage Company, The Goldman Sachs Group,
Inc., Goldman Sachs Real Estate Funding Corp., Peter C. Aberg,
Howard S. Altarescu, Robert J. Christie, Kevin Gasvoda, Michelle
Gill, David J. Rosenblum, Jonathan S. Sobel, Daniel L. Sparks,
and Mark Weiss:

Richard H. Klapper
Theodore Edelman
Michael T. Tomaino, Jr.
Tracy Richelle High
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

For Defendants HSBC North America Holdings Inc., HSBC USA Inc.,
HSBC Markets (USA) Inc., HSBC Bank USA, NA., HSI Asset
Securitization Corporation:

John M. Conlon
Mark S. Hanchet
Michael O. Ware
MAYER BROWN LLP
1675 Broadway
New York, NY 10019

For Defendants Deutsche Bank AG, Taunus Corporation, Deutsche
Bank Securities Inc., DB Structured Products, Inc., Ace
Securities Corp., Mortgage IT Securities Corp.:

Thomas C. Rice
David J. Woll
Alan C. Turner
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954

3

For Defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Alan Turner
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017

For Defendants Morgan Stanley, Morgan Stanley & Co. Incorporated
(n/k/a Morgan Stanley & Co. LLC), Morgan Stanley Mortgage
Capital Holdings LLC (successor-in-interest to Morgan Stanley
Mortgage Capital Inc.), Morgan Stanley ABS Capital I Inc.,
Morgan Stanley Capital I Inc., Saxon Capital, Inc., Saxon
Funding Management LLC, Saxon Asset Securities Company, Gail P.
McDonnell, Howard Hubler, David R. Warren, and Steven S. Stern:

James P. Rouhandeh
Brian S. Weinstein
Daniel J. Schwartz
Nicholas N. George
Jane M. Morril
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017

For Defendants First Horizon National Corporation, First
Tennessee Bank National Association, FTN Financial Securities
Corporation, First Horizon Asset Securities, Inc., Gerald L.
Baker, Peter F. Makowiecki, Charles G. Burkett, and Thomas J.
Wageman:

Bruce Clark
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Amanda F. Davidoff
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

For Defendants Nomura Securities International, Inc., Nomura
Holding America Inc., Nomura Asset Acceptance Corporation,
Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc.,

David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and
N. Dante LaRocca:

Bruce Clark
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Amanda F. Davidoff
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

For Defendants SG Americas, Inc., SG Americas Securities
Holdings, LLC, SG Americas Securities, LLC, SG Mortgage Finance
Corp., and SG Mortgage Securities, LLC, Arnaud Denis, Abner
Figueroa, Tony Tusi, and Orlando Figueroa:

Jay B. Kasner
Scott Musoff
George Zimmerman
Robert A. Fumerton
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

For Defendants Ally Financial Inc. and GMAC
Mortgage Group, Inc.

Reginald R. Goeke
Catherine M. Bernard
MAYER BROWN LLP
1999 K St., N.W.
Washington, D.C. 20006

Michael O. Ware
MAYER BROWN LLP
1675 Broadway
New York, NY 10019

For Defendant Ally Securities, LLC:

Matthew Solum
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Robert J. Kopecky
Devon M. Largio
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

Jeffrey S. Powell
Patrick M. Bryan
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

For Defendants Bank of America Corporation; Bank of America,
N.A.; Asset Backed Funding Corp.; Banc of America Funding Corp.;
Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Lending,
Inc., Merrill Lynch Mortgage Capital Inc., First Franklin
Financial Corp., Merrill Lynch Mortgage Investors, Inc.,
Merrill Lynch Government Securities, Inc., Merrill Lynch,
Pierce, Fenner & Smith Inc.:

David Blatt
John McNichols
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

For Defendant Jeffrey Mayer:

Richard A. Edlin
Ronald D. Lefton
Candace Camarata
GREENBERG TRAURIG, LLP
200 Park Avenue,
New York, NY 10166

For Defendant Jeffrey L. Verschleiser:

Dani R. James
Jade A. Burns
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036

For Defendant Matthew Perkins:

Sandra D. Hauser
SNR DENTON US LLP
1221 Avenue of the Americas
New York, New York 10020

For Defendant Samuel L. Molinaro, Jr.

Pamela Rogers Chepiga
Josephine A. Cheatham
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

For Defendants Tom Marano and Michael Nierenberg:

Joel C. Haims
LaShann M. DeArcy
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

For Defendants George C. Carp, Robert Caruso, George E. Ellison,
Adam D. Glassner, Daniel B. Goodwin, Juliana Johnson, Michael J.
Kula, William L. Maxwell, Mark I. Ryan, and Antoine Schetritt;
Matthew Whalen; Brian Sullivan; Michael McGovern; Donald
Puglisi; Paul Park, and Donald Han:

Daniel C. Zinman
Matthew M. Riccardi
RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, NY 10281

For Defendants Keith Johnson, Kim Lutthans and John Robinson:

David Elbaum
Theresa Trzaskoma
Brune & Richard LLP
One Battery Park Plaza
New York, NY 10004

DENISE COTE, District Judge:

Before the Court are defendants' memoranda of law regarding applicable legal standards and the appropriate standards for discovery in light of the applicable legal standards.  The defendants have suggested over the course of this litigation that the Court's discovery rulings have been premised on a faulty definition of the "knowledge" defense that is available to them under Section 11 of the Securities Act of 1933 ("Securities Act").  In this briefing they address the legal standard for their affirmative defense that the plaintiff actually knew of the alleged misrepresentations in the Prospectus Supplements that governed its securities purchases. The defendants have taken this opportunity to address as well the legal standards for several of the elements and other defenses of the Securities Act claims in this litigation and to argue that the application of incorrect legal standards has deprived them of certain discovery from a portion of the plaintiff's business described below:  the Single Family business.  For the reasons stated below, the Court concludes that its previous discovery rulings have been made under the correct legal standards and need not be revisited.

BACKGROUND

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "GSEs"), filed seventeen actions in this district against various financial institutions involved in the packaging, marketing, and sale of residential mortgage-backed securities purchased by the GSEs between 2005 and 2007.[1]  The defendants requested that there be "substantial coordination" of this litigation, and the judges to whom the seventeen cases were assigned agreed to assign them to a single judge.[2]  Having received this coordinated litigation on November 16, 2011, this Court stayed all discovery pending a decision on

---

[1] One action was transferred to the Central District of California as related to defendant Countrywide's bankruptcy proceedings in that district.  FHFA v. Countrywide Financial Corp., et al., No. 11 Civ. 6916 (DLC) (S.D.N.Y. Feb. 8, 2012) (transfer order).  Two others have been dismissed as settled between the parties: FHFA v. General Electric Co., et al., No. 11 Civ. 7048 (DLC), and FHFA v. Citigroup Inc., et al., 11 Civ. 6196 (DLC).  The latter was resolved recently and dismissed on May 29, 2013.  Discovery in one additional related action pending in the District of Connecticut, FHFA v. The Royal Bank of Scotland Group PLC, et al., 3:11-cv-1383 (AWT), is being coordinated with the cases pending in this Court.

[2] Following the customary practice in this district, judges were offered this coordinated litigation in the order of the docket numbers of the seventeen cases, which had been randomly assigned to the district's judges.

a motion to dismiss in the first-filed case, FHFA v. UBS
Americas Inc., et al., No. 11 Civ. 5201 (DLC).[3]

Following the issuance of the decision on the UBS motion to
dismiss, 858 F. Supp. 2d 306 (S.D.N.Y. May 4, 2012), the stay of
discovery in each of the sixteen actions remaining before this
Court was lifted.  After a conference on May 14, 2012, the
parties reached agreement on many of the protocols that govern
the coordinated discovery in these actions.  The Court addressed
the remaining disputes in a conference on June 13, and Order of
June 14.  In these early rulings, the Court divided the cases
into four trial tranches and set the close of fact and expert
discovery for June 14, 2013 in FHFA v. UBS and for December 6,
2013 in the remaining cases.  The close of fact discovery in UBS
is currently set for September 6, 2013.

As discovery commenced in earnest, the parties followed the
protocol for disputes applied in the Southern District of New
York and by this Court.  If they had a dispute regarding

---

[3] At the initial conference with the parties, the defendants were
offered the opportunity to simultaneously brief a motion to
dismiss in a case that included a fraud claim since the UBS case
includes only strict liability claims.  The defendants declined
that opportunity.  Following the denial of the UBS motion to
dismiss, the remaining fifteen cases briefed their motions to
dismiss in two waves.  The first wave addressed the motions in
the six cases containing fraud claims; the second wave addressed
the motions in the remaining cases.  Decisions on these motions
to dismiss were issued between November 5 and December 19, 2012.

discovery, they were required to attempt to resolve it by meeting and conferring with their adversary.  Disputes that remained unresolved after this process were brought to the Court's attention by a letter no longer than two pages. Conferences were held to address many unresolved disputes.  To date, there have been twenty-two conferences to address the schedule and scope of discovery and the parties' disputes.

Almost immediately, the parties indicated that a dispute had arisen with regard to discovery of the "Single Family" side of the GSEs' businesses.[4]  In a telephone conference on July 19, 2012, in the context of a dispute regarding a Rule 30(b)(6) notice issued by the defendants, counsel for FHFA explained that the parties had a fundamental disagreement regarding "whether information that was used or possessed on the Single Family side of [the GSEs] that was not provided or considered by people purchasing these securitizations is, nevertheless, relevant." The Court scheduled a conference to discuss the issue further.

On July 30, in anticipation of a July 31 conference, the parties submitted letters with extensive exhibits detailing the dispute regarding Single Family discovery, which had already

---

[4] The securities at issue in this case were purchased by the "Private Label Securities" (or "PLS") side of the GSEs' businesses, while the GSEs purchased whole loans through their "Single Family" businesses.

manifested itself in disagreements over both Rule 30(b)(6) depositions and document custodians.  In their joint letter and in oral presentations at the conference, defendants questioned FHFA's representations that information from the Single Family side was walled off from the PLS traders who purchased the securities at issue in these actions, and listed several types of documents they felt were relevant to many of the claims and defenses and that may have been shared widely within the GSEs. These included reviews of Originators[5] and information from "high-level committees" that were "designed to be bridges between the PLS business and the single family business." Defendants ultimately sought an order from the Court compelling FHFA to provide a Rule 30(b)(6) witness in response to an interrogatory that sought, among other things, the identities of "individuals, positions, departments, committees or other groups at [the GSEs] . . . that had a role in [the GSEs'] purchase of mortgage loans or [the GSEs'] securitizations of mortgage loans."

Counsel for FHFA explained that FHFA had provided a written response in lieu of a witness in the interest of efficiency, and argued that the deposition notice was part of defendants' effort

---

[5] "Originators," when capitalized, will be used to refer to those Originators who were responsible for the loans underlying the securities at issue in these cases.

to add numerous additional document custodians to the 86 that
had already been designated by FHFA at that point.  Reaching the
substance of the underlying dispute, FHFA explained that much of
the material defendants sought from the Single Family side would
be provided: "defendants are going to get everything about
originators that made it over to the PLS side and was considered
in connection with the decisions to purchase or not purchase
these particular securitizations," regardless of whether the
documents were produced by the Single Family side.  FHFA also
argued that its designation of custodians from high-level risk
committees with both Single Family and PLS responsibilities at
each GSE -- the Private Label Advisory Team at Fannie Mae and
the Enterprise Risk Management Committee at Freddie Mac -- would
capture much of the material defendants sought.  FHFA further
explained that the true dispute was over whether defendants were
entitled to "documents that were considered only on the Single
Family side and related only to the Single Family business,"
including "custodians who were cabined on the Single Family
side."  For example, counsel explained, "if Option One [an
Originator] is disapproved as a seller servicer, that list goes
to the PLS people.  Counter-party risk reports on Option One at
Countrywide go to PLS and get considered in connection with the
purchasers.  And they're going to get all of that."

Recognizing that one of the key bases for defendants'
stated need for Single Family discovery was to establish their
knowledge defense, the Court inquired as to whether the
defendants wished to submit briefing on the applicable legal
standard.  The Court had previously flagged the issue with the
parties in a conference of May 14, 2012.  Upon being told that
UBS intended to raise a knowledge defense in a summary judgment
brief, the Court had asked whether "there's any dispute among
the parties with respect to the knowledge defense."  "[I]f there
is," the Court continued,

> you might want to think about teeing that up for a
> motion . . . so that everybody's operating under the
> same legal standard [as to] what kind of knowledge
> [the GSEs] had to have, how specifically attached to
> the securitizations that are being sued upon it must
> be to be a winning argument.

In the context of the Single Family disputes on July 31, the
Court again asked whether "the defendants or at least UBS has
decided at this point that it would like to brief the
substantive law with respect to knowledge."  As they had on May
14, defendants again responded that they preferred to wait for a
more developed factual record before briefing the issue.

The Court denied defendants' requested Rule 30(b)(6)
deposition, and explained that because FHFA had designated
document custodians from high level risk committees that
included personnel from the Single Family businesses and had

14

agreed to provide information about Originators that was
considered by PLS personnel in connection with the purchase of a
security, there was no basis to "fear . . . that the document
production that is being undertaken by the plaintiffs will be
inadequate to capture information principally about originators
that was shared with the PLS side."  The Court expressed
confidence that FHFA's production would capture any "tying
together of the Single Family and PLS function within [the GSEs]
and substantial information sharing between the two sides of the
businesses" that in fact existed, and instructed defendants to
notify it if FHFA's production was not capturing this material.
Finally, the Court observed that defendants had not made a
pinpointed, concrete request for more custodians, having
mentioned in the course of the conference only one person who in
their view should have been included as a custodian and was not.

On August 14, the Merrill Lynch defendants wrote to the
Court seeking reconsideration of the ruling made at the July 31
conference.  Merrill explained that it sought documents "that
evidence the GSEs' familiarity with the lending practices of
originators at issue in the cases and originators' adherence (or
not) to their underwriting guidelines" and attached a proposed
memorandum of law in support of its position.  The other
defendants responded on August 15 that they did not view the

15

Court as having made a final ruling on this subject at the July
31 conference and preferred to address it after receiving the
discovery FHFA had agreed to provide.  FHFA, in its own letter
of August 15, agreed with Merrill Lynch that the Court had made
a final ruling.  FHFA explained that it was producing three
categories of documents from the Single Family side: (1)
"documents considered in connection with the purchases at
issue," (2) "documents held by custodians who were required to
give the PLS traders such information," and (3) "documents that
went to the GSEs' risk management committees with supervisory
responsibility over the PLS trading."  FHFA restated its
position that "documents that never went from the Single or
Multi-Family side to the PLS side do not need to be produced."
In response to this set of letters, the Court issued an Order on
August 28 observing that Merrill's proposed memorandum of law
reiterated arguments made in the defendants' July 30 submissions
and at the July 31 conference, and denying Merrill's request for
reconsideration.

On November 5 the Court received another round of letters
concerning Single Family discovery.  Defendants referenced the
Court's July 31 statement that FHFA would be producing documents
that showed a "tying together" or "information sharing" between
the PLS and Single Family sides of the GSEs.  Defendants

16

indicated that FHFA's production had thus far confirmed that there had been substantial sharing of information between the two divisions, even including Single Family personnel helping choose loans for the securitizations at issue.  Defendants did not, however, argue that FHFA was not producing any of this material.  Their point was, rather, that this material supported their need for further discovery of the Single Family side. Defendants attached a memorandum of law in support of a motion to compel in which they sought discovery of "relevant documents from any business unit substantially involved in assessing the originators, the mortgage loans, the securitizations, the potential or actual collateral, or the risks associated with any of them."

FHFA's own November 5 submission repeated its view that defendants were not entitled to discovery of Single Family material outside the three categories it was already providing. FHFA also provided five examples of documents emanating from the Single Family side that were being produced.  These included, for example, a report entitled "Counterparty Approval Report," which listed entities and provided, under columns entitled "PLS Originator Status," "PLS Issuer Status," "PLS Servicer Status," "SF Non-Traditional Seller Status," and "SF Non-Traditional Servicer Status," a designation of "approved," "not approved,"

"suspended," or "caution," along with the dates of the last review and last status change.  As an example of how this type of information might have been shared within the GSEs, FHFA also attached an email indicating that Single Family Counterparty Risk Management had changed the classification of a particular originator from "Approved" to "Caution" for purposes of the "Private Label Securities Policy," which meant that "incremental purchases" would require special approval.  Also attached were a document entitled "Subprime Servicer Stress Analysis," which provided detailed calculations with respect to particular servicers, and a document entitled "Collateral Summary Report," which detailed appraisals of various types of collateral using different methods of assessment.

These submissions were discussed at a conference held the next day, November 6.  The Court denied defendants' request for unlimited discovery of the Single Family side, while noting repeatedly that defendants could still make "targeted, specific" requests for Single Family discovery.  The Court explained at length the reasoning behind its ruling, noting that Rules 1 and 26(b)(2)(C) require proportionality in discovery.  While there might be "interesting information on the Single Family side of the business," the Court elaborated, defendants were not entitled to discovery of it in light of the substantial

18

discovery FHFA was already providing from the Single Family side, which was targeted to capture information that was most relevant to the claims and defenses at issue.

The Court also explained its view that the requested material would be of limited relevance in supporting defendants' knowledge defense.  That defense, the Court explained, would require the defendants to show that the GSEs had "actual knowledge of the falsity of representations with respect to the securitization they bought. . . . Generalized knowledge about problems with the originator or in the industry isn't going to do it."  The Court again invited defendants to submit briefs on the applicable legal standard to the extent they disagreed with this articulation.  The Court then provided its basic understanding of the legal standards applicable to inquiry notice, reliance, materiality, and due diligence.

Later in the conference, the defendants did in fact present a targeted, specific request: the addition of ten new document custodians, several of them involved principally with the Single Family side.  The Court instructed defendants to make their requests in order of importance, starting with the custodian they viewed as most relevant.  Defendants began with Rick Sorkin, who was the head of Fannie Mae's Structured Transactions department during the relevant time period.  In that capacity,

19

defendants explained, Sorkin oversaw a process by which Fannie Mae re-securitized (or "wrapped") the Certificates that it purchased from the defendants, which involved a very detailed, loan-level review of the collateral.  So while Sorkin was not involved in pricing, evaluation, or purchase of PLS, defendants argued that his documents were relevant because his loan-level analysis of the collateral was often conducted both before and after the PLS was purchased.  In response, counsel for FHFA represented that "all wrap documents regarding these securitizations" were being produced.  Counsel for FHFA also indicated that, while Sorkin was a member of the Private Label Advisory Team (or "PLAT"), every member of that team other than Sorkin had already been designated as custodians, meaning that the relevant documents were being produced.  The Court thus denied the request to add Sorkin as a custodian.

Defendants next asked that the head of the Single Family business at Fannie Mae, Tom Lund, be added as a custodian. Defendants acknowledged that Lund was chiefly concerned with Single Family, but cited two key documents he had produced as evidence of his involvement in helping to shape Fannie Mae's PLS strategy and exposure.  FHFA responded that the documents defendants cited had been produced by FHFA in discovery, proving that "to the extent that Mr. Lund interacted with PLS and had an

input into the issues that are germane to this case, then those documents are going to be captured by other custodians and will be produced." The Court declined to add Mr. Lund as a custodian.

On December 7, defendants submitted a series of targeted requests for documents from the Single Family side, per the Court's instructions at the November 6 conference. Defendants' December 7 letter identified five types of documents to which they believed they were entitled, "regardless of the business segment in which they reside." Much of this information pertained to individual loans that were considered and rejected by the Single Family side, purchased by the defendants, and then sold to the PLS side as part of the Supporting Loan Groups for the securitizations at issue. Information defendants sought about such loans included reports of due diligence performed on them, analyses performed by the GSEs' proprietary automated underwriting tools (Desktop Underwriter and Loan Prospector), and information produced by automated valuation models that were used to estimate the value of the mortgaged properties. Defendants also sought evaluations of the Originators, beyond the categories FHFA had already agreed to produce, which included, for Fannie Mae, only Originator reviews that were considered in approving a PLS transaction with a "suspended"

originator and, for Freddie Mac, only those that marked the
Originators as "marginal" or "poor."  Finally, defendants sought
reports concerning mortgage fraud the GSEs were required to
provide to OFHEO.  FHFA submitted a response to this letter on
December 13, and defendants replied on December 14.

A conference was held on December 14 to address these
requests, among others, and the parties provided detailed oral
presentations regarding the various categories of non-PLS
information that was being sought.  With regard to the
categories of information relating to loans that were offered
for sale to the Single Family side, rejected, and later
purchased as part of a securitization, the Court observed at the
outset that there was a fundamental weakness with respect to
defendants' assertions of the relevance of this material: the
Single Family side had different standards by which loans were
judged, to the point that the prospectus supplements at issue
explicitly pointed out that the loans in the Supporting Loan
Groups (or "SLGs") had been underwritten to less stringent
guidelines than those that would be acceptable to the GSEs'
Single Family businesses.  Furthermore, the prospectus
supplements made representations about the characteristics of
pools of loans, while the Single Family side would have been
rejecting individual loans.  Nor, defendants admitted, did a

22

decision by the Single Family side to pass on a loan necessarily indicate that there were problems with that loan; "[i]t may mean that . . . they didn't meet the criteria of the GSEs for things they wanted to securitize; it could mean something else entirely."  The Court thus pointed out that the asserted relevance of this material rested on "an extraordinary chain of inferences."  Defendants agreed with this characterization but nonetheless argued that the differences between the two standards being applied would be "interesting."

Counsel for FHFA argued that there would be an "astronomical" burden associated with the task of "trying to match up every loan in the [SLGs] with a loan that might once upon a time have been submitted to [the GSEs] for purchase to see what information resides on the Single Family side of the house with respect to that loan."  Based on this burden, and the correspondingly low relevance of material reflecting evaluations of individual loans that applied different standards than those later used in the securitizations at issue, the Court denied defendants' request for the various types of material concerning loans offered to and rejected by the Single Family business.

With regard to Originator reports, however, the Court granted the defendants' request for documents showing problems with the Originators, particularly appraisal bias, and ordered

FHFA to locate and produce documents created by the Single
Family side that reflect appraisal bias associated with
particular Originators during the relevant period.  Defendants
also requested due diligence conducted on the securitizations at
issue before they were purchased by the PLS side, regardless of
whether those reports could be found in PLS files.  FHFA
represented that these reports were being produced, and the
Court told defendants to raise the issue again if they did not
feel they were being provided with this material.  As for the
requested Single Family reviews of Originators that resulted in
positive marks, the Court instructed FHFA to find out how
burdensome their production would be.  Finally, after counsel
for FHFA indicated that "PLS-related mortgage fraud reports"
were being produced, the Court denied the request for reports on
mortgage fraud from Single Family, in light of the fact that the
requested reports related to individual borrower fraud rather
than the securitizations or underwriting practices generally.

The conference continued three days later, on December 17,
at which point the parties addressed additional requests for
Single Family discovery made by defendants in a letter of
December 12.  Defendants sought discovery of four categories of
documents: (1) documents showing "pull-through," "defect," and
"waiver" rates for pools of loans purchased by the Single Family

24

business from the Originators, which allegedly showed the degree
to which the GSEs purchased loans that were flagged by third
party due diligence firms as not adhering to underwriting
standards; (2) documents showing the GSEs' own analyses of the
causes of the losses suffered on pools of mortgage loans or
residential mortgage backed securities beyond those at issue;
(3) documents regarding the GSEs' due diligence policies; and
(4) documents showing the volume of business the Single Family
side conducted with the Originators.

Counsel for FHFA represented that compliance with these
requests would be "a massive undertaking on the part of the
GSEs" and would require a significant expansion of the list of
FHFA document custodians, which at that time stood at more than
112.  With regard to the first request, the Court observed that
documents reflecting defect rates for pools of conforming loans
would not have much relevance, as different standards were
applied for the predominantly subprime and Alt-A loans in the
SLGs for the securitizations sold by the defendants to the GSEs.
Nevertheless, the Court instructed counsel for FHFA to determine
whether reports concerning subprime and Alt-A loans could be
located easily such that producing them would not require the
designation of additional document custodians.

25

With regard to documents showing the GSEs' own analysis of loss causation, counsel for FHFA confirmed that it would be producing all such analyses regarding the securitizations at issue, even if they also included analyses of the Single Family side.  Defendants sought, in addition, the production of any such analyses that were performed by Single Family personnel concerning the performance of securitizations backed by loans purchased on the Single Family side.  The Court declined to order a new search of the Single Family side for such documents, in light of the fact that defendants were already receiving "documents that talk about the losses experienced by the GSEs at a very high level with respect to both sets of securitizations," including "when FHFA is purchasing a loan and . . . securitizing those loans itself."

Moving on to the defendants' request for documents showing the GSEs' due diligence policies for loan purchases on the Single Family side, the Court expressed its view that while due diligence was subject to an objective standard, the size of the GSEs' role in the industry made their procedures relevant in establishing what industry practice was.  The Court therefore recognized that it would be necessary to "give the defendants access to that [material] in a meaningful way that is nonburdensome."  Counsel agreed to meet and confer and determine

the best way to achieve this goal.  Finally, with regard to defendants' request for reports showing the volume of business conducted with the Originators, counsel for FHFA again agreed to determine whether such reports could be easily located and produced, and counsel for defendants agreed to restrict the request to the top Originators in terms of volume of business.

In a letter of January 10, counsel for FHFA responded to the questions posed by the Court regarding various types of documents at the December 14 and 17 conferences.  First, regarding reports of appraisal bias on the part of Originators, FHFA reported that while Freddie Mac did not produce such reports, Fannie Mae did create quarterly reports assessing appraisal bias for roughly 25 large lenders based on refinance loans acquired by the Single Family side.  FHFA indicated that it would produce these reports if they were given to certain custodians or if they discussed the Originators at issue in these cases.  Second, FHFA reported it was producing positive or neutral reviews of Originators generated by the Single Family side, despite its continued objection to the relevance of this material.  Finally, FHFA confirmed, at the Court's request, that it was producing in unredacted form documents containing the GSEs' analyses of loss causation for both Private Label and Single Family securitizations.

Several of these discovery disputes relating to the Single Family side that had been discussed at the December 14 and 17 conferences resurfaced in February.  In two letters of February 4, defendants again sought production by FHFA of documents relating to defect, waiver, and pull-through rates relating to the due diligence the GSEs performed on loans purchased by Single Family.  Defendants also sought documents showing the GSEs' analysis of loss causation for pools of loans other than those at issue.  FHFA responded on February 6, and a conference was held to discuss these issues on February 14.

At the conference, the parties began by addressing defendants' request for summaries of the due diligence performed on loans being considered for purchase by the Single Family side.  Defense counsel explained that this material was relevant to both the materiality of the alleged misstatements and to defendants' due diligence defense.  Defendants' basic argument was that the requested documents would show similarities between the due diligence performed by the GSEs as purchasers of whole loans and by the defendants.  Defendants suggested that this would constitute an admission on the part of the GSEs that the defendants' due diligence had been reasonable, and that it would undercut the materiality of the alleged misrepresentations, by demonstrating that the GSEs' due diligence led to the rejection

28

of only minimal percentages of loans from particular
Originators, where SLGs containing loans from those same
Originators were alleged in the complaints to contain up to 90%
defective loans.

Counsel for FHFA pointed out that the Court had already
made a ruling on this request at the December 17 conference,
instructing FHFA to determine whether such documents could be
located easily and produced without naming additional document
custodians.  FHFA now reported that the information requested
was not readily accessible, and indicated that in making this
determination it had looked into the precise manner in which the
GSEs performed due diligence on whole loan purchases and could
now provide a detailed explanation of why such diligence would
not be relevant.  At the December 17 conference, the Court had
observed that information concerning the GSEs' due diligence
would be relevant in establishing what might constitute
objectively reasonable diligence in the industry, since the GSEs
were such large players.  FHFA now argued that this was not
true, because the GSEs only commissioned third party due
diligence of a kind similar to that used by the defendants for a
very small subset of their whole loan purchases.[6]  Furthermore,

---

[6] The GSEs purchased whole loans in "flow" (where loans were
purchased in a continuous stream) and "bulk" (where pools of
loans were purchased in groups).  Third party due diligence was

the activity of the GSEs was dwarfed by that of the defendants
when it came to purchases of subprime loans.[7]

FHFA also took issue with defendants' comparison of the
defect rates alleged in the complaints and the defect rates
shown by the GSEs' due diligence.  The reunderwriting process by
which it hopes to prove the falsity of the statements at issue,
FHFA explained, involves comparing the statements made
concerning the Supporting Loan Groups with the actual
characteristics of the underlying collateral in reality.
Diligence of the type performed by third party vendors involved
simply comparing the loan tape with information contained in the
loan file.  Furthermore, FHFA explained that rates at which
third party vendors marked loans as having a "defect" or rates
at which loans marked defective were "waived" or "pulled
through" are often misleading, and not easily compared with
similar figures from defendants' due diligence, since the GSEs
often asked vendors to flag loans with certain characteristics

only conducted on bulk purchases, which represented about 20% of
Single Family purchases as of 2007.  Furthermore, such due
diligence was not performed on purchases of prime loans (nor on
Alt-A loans, in the case of Fannie Mae), which represented the
majority of the loans purchased by the GSEs' Single Family
businesses.

[7] For instance, between 2005 and 2006, Fannie Mae purchased $3.6
billion in subprime whole loans, while defendant Goldman Sachs
alone securitized $29.5 billion.

as "defective" so that they could be individually reviewed.
While defendants argued that they too flagged loans for
individual review and later "waived" them into a pool, the
defendants' criteria for selecting loans in this manner were not
necessarily the same,[8] further undermining the usefulness of
comparing numbers like waiver rates as a way of demonstrating
the adequacy of defendants' diligence.

The Court reviewed the December 17 transcript and denied
defendants' request at a conference on February 21.  Since the
December 17 conference at which the issue was first discussed,
the Court observed, FHFA had confirmed that the requested
material could not be easily located and produced, and had
provided further information supporting its original position
that the material was of limited relevance.

The parties also addressed at the February 21 conference
defendants' renewed request for documents showing the GSEs'
analyses of loss causation, other than those that mentioned PLS
losses (which were already being produced).  Again the Court
observed that this request had been addressed in detail in
December, and that since that time FHFA had determined that such

---

[8] For instance, FHFA pointed out that in one report, loans had
been flagged and later waived because they used an outdated
Freddie Mac loan application form.

31

documents were not readily accessible, giving the Court no reason to revisit its prior ruling.

Moving on, the Court heard argument from the parties on another renewed request regarding due diligence performed by the GSEs' Single Family businesses, this time for documents showing GSE policies and practices with respect to diligence performed on purchases of prime, subprime, and Alt-A loans. Again the Court observed that because the GSEs conducted relatively little third party due diligence on bulk purchases of subprime, Alt-A, and option ARM loans compared with the defendants, their policies and practices would not be particularly relevant in establishing an industry standard for due diligence at trial.[9] The Court denied the request, explaining that the defendants sought to compare "two different programs with two different standards, with different implications in the field." Ultimately, the Court concluded that the limited relevance of the material did not justify the additional burden that would be involved in searching for and producing it.

Defendants' final request addressed at the February 21 conference, also raised in a February 13 letter, was for reviews

---

[9] Elaborating on previous presentations, FHFA explained that due diligence of flow purchases -- about 80 percent of the whole loans the GSEs purchased -- involved only a comparison of the loan with GSE guidelines, not with the originator's underwriting guidelines.

and assessments of third party diligence firms conducted by the GSEs. Defendants pointed out that many of the reviews were of the same diligence firms they employed, and sought discovery of such reviews, including reviews produced by the Single Family side. The Court denied this request, explaining that the relevance of the material would be limited for the same reasons that had already been discussed in connection with the defendants' many requests for discovery of material related to Single Family due diligence. The Court also observed that granting the request would impose an additional burden on FHFA, which had reported in its February 20 letter on the issue that it was not clear that such reports even existed, and determining whether they did and where they might be found would require interviewing Single Family employees.

At the close of the February 21 conference, the series of discovery disputes that implicated the Single Family side had been largely resolved, with rulings that allowed discovery of significant quantities of material produced by the Single Family side, while denying defendants' myriad requests for unbridled Single Family discovery. It is worth providing a somewhat detailed overview of the total quantum of discovery defendants have so far received from the GSEs' Single Family businesses and from the GSEs generally.

33

FHFA has provided several categories of documents regarding Originators.  These include documents that discuss risk associated with an Originator, an Originator's underwriting guidelines, or an Originator's adherence to its underwriting guidelines if those documents were provided to or accessible to PLS traders, their supervisors, or senior risk custodians, regardless of whether the documents actually pertained to PLS. FHFA has also produced operational reviews of Originators conducted by Single Family, regardless of whether they were provided to PLS traders, their supervisors, or senior risk custodians.  FHFA has also produced reports or studies generated by Single Family that show appraisal bias on the part of Originators, again regardless of whether PLS traders, supervisors, or senior risk custodians received them.  Finally, FHFA has produced any documents relating to Originators that the PLS businesses actually used, including Alternative Market Operations ("AMO") reviews and Counterparty and Credit Risk Management group scorecards from Freddie Mac and Counterparty Credit Reviews, Private Label Securities Counterparty Approval Reports, and daily surveillance reports from Fannie Mae.

FHFA has also provided documents from sources that span both the Single Family and PLS sides, including documents from committees and particular custodians.  From Freddie Mac, FHFA

has produced documents from the Enterprise Risk Management
Committee, the Credit Risk Subcommittee, the Market Risk
Subcommittee, and Asset/Liability Management Committee.  From
Fannie Mae, FHFA has produced documents from the Private Label
Advisory Team, the Credit Risk Committee, the Market Risk
Committee, and the Risk Policy and Capital Committee.  FHFA has
also produced documents from twenty-five custodians who had some
Single Family responsibilities, including nine who were directly
involved in counterparty reviews.  FHFA has produced
approximately 130,000 documents from these custodians.  FHFA now
estimates that it has produced roughly 456,306 documents
relating to five of the principal Originators at issue and
roughly 88,000 documents containing the terms "single family,"
"whole loan," or "seller/servicer."[10]  In toto, FHFA has produced
1.54 million documents from 113 custodians.

On April 26, after continued discovery disputes that to one
degree or another turned on the relevance of Single Family
material and therefore the knowledge standard, the Court again
restated its view that proving a knowledge defense under Section
11 would require the defendants to show that the GSEs "had
actual knowledge of the falsity of representations with respect

---

[10] "Seller servicer" or "seller/servicer" is the term the GSEs
use to refer to the counterparties who sold whole loans to the
Single Family business, including originators.

to the securitization they bought."  The Court again asked the defendants to submit briefing if they disagreed with this standard and indicated that a schedule would be set.  Counsel for UBS indicated a preference for addressing the issue in the context of summary judgment practice, explaining that "the Court would benefit from having those issues addressed not as a theoretical legal matter but as applied to the factual record." The Court responded that it would therefore continue to make discovery rulings on the basis of its previously articulated understanding of the knowledge standard.  Counsel for JPMorgan Chase, on the other hand, expressed a desire to brief knowledge, as well as certain other legal issues.

On April 30, the Court issued an Order setting a schedule for any briefing the defendants chose to submit "regarding knowledge and other legal standards in this case in advance of summary judgment practice."  On May 8, defendants submitted a brief regarding legal standards applicable to discovery.  FHFA's opposition was served on May 20, and defendants' reply was served on May 30.  On June 10, FHFA served its sur-reply, which included an affidavit from counsel detailing the discovery that had been provided from the Single Family side.  Defendants were given an opportunity to submit a response to the sur-reply, which was served on June 20.

DISCUSSION

The defendants' briefing on May 8 accepted the Court's invitation to finally resolve whether the Court had erred in its articulation of the knowledge standard for Securities Act claims, but also took the opportunity to address the legal standards that apply to other elements of those claims and to argue that the Court's discovery rulings regarding material from the Single Family side of the GSEs' businesses have been incorrect in light of the applicable legal standards.  The discussion that follows therefore begins with a description of the principles that have guided this Court's rulings on the scope of discovery.  That will be followed by an analysis of the legal standards the defendants discuss in their briefing and their applicability to the discovery rulings at issue, including knowledge, inquiry notice, reliance, falsity, materiality, due diligence, and fraud.

I.  Principles applicable to discovery

In making rulings on the scope of discovery, a court "must limit the frequency or extent of discovery otherwise allowed by these rules" if

> (i) the discovery sought is unreasonably cumulative or
> duplicative, or can be obtained from some other source
> that is more convenient, less burdensome, or less
> expensive;

37

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C); See also S.E.C. v. Rajaratnam, 622 F.3d 159, 180 (2d Cir. 2010); In re Agent Orange Product Liability Litig., 517 F.3d 76, 103 (2d Cir. 2008).

Rule 1 likewise provides that the Rules be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Similarly, Rule 26(c) provides that a court may make "any order which justice requires to protect a party or person from . . . undue burden or expense." See In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 69 (2d Cir. 2003). A district court therefore "has wide latitude to determine the scope of discovery," and "abuses its discretion only when the discovery is so limited as to affect a party's substantial rights." Agent Orange, 517 F.3d at 103 (citation omitted); cf. Dennis Friedman, 350 F.3d at 70 ("[A]lthough a party seeking a deposition need not demonstrate the propriety of its request, judges may prevent the proposed

deposition when the facts and circumstances are such that it creates an inappropriate burden or hardship.").

The Advisory Committee notes show that Rule 26 has several times been amended with the aim of giving judges the discretion to limit discovery in the interest of conserving resources, and of encouraging judges to use that discretion.  In 1983, the Advisory Committee noted that it was motivated by a desire "to encourage judges to be more aggressive in identifying and discouraging discovery overuse."  Fed. R. Civ. P. 26 advisory committee's note, 1983 amendment, subdivision (b).  When Rule 26 was amended again in 1993, the Advisory Committee observed that it wanted "to enable the court to keep tighter rein on the extent of discovery" in the face of "[t]he information explosion of recent decades," which "greatly increased both the potential cost of wide-ranging discovery and the potential for discovery to be used as an instrument for delay or oppression."  Id., 1993 amendment.  In 2000, Rule 26(b)(1) was amended to add a redundant cross-reference to the proportionality provisions of Rule 26(b)(2), which the Advisory Committee explained was necessary "to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery."  Id., 2000 amendment.

The Sedona Conference[11] has also espoused the balancing provided in Rule 26(b)(2)(C), and has published a set of principles to be used in the analysis, including a discussion of how to weigh the likely benefit of discovery that has not been produced.  The Sedona Conference Commentary on Proportionality in Electronic Discovery, 11 Sedona Conf. J. 289, 300 (2010). Among other factors, the Sedona Conference recommends considering "the parties' opinions regarding the likely importance of the requested information" and "whether discovery already produced permits an inference that the requested information is likely to be important."  Id.  The Rules and sound policy thus require that a court not simply allow discovery of all potentially relevant material, but weigh the likely benefit of the requested discovery against its anticipated burden, and limit the scope of discovery, and the burden of litigation, accordingly.

---

[11] The Sedona Conference is a nonprofit organization "dedicated to the advanced study of law and policy in the areas of antitrust law, complex litigation, and intellectual property rights."  The Conference has established working groups to address particular legal problems, one of which is the Working Group on Electronic Document Retention & Production.  See The Sedona Conference, About Us, http://www.sedonaconference.org/aboutus (last visited June 13, 2013).

II.  The Securities Act's legal framework

Section 11 of the Securities Act "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  Herman & MacLean v. Huddleston, 459 U.S. 375, 381–82 (1983).  To this end, Section 11 provides a private cause of action against the issuers and other signatories of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 12(a)(2), which has "roughly parallel elements," In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010), imposes liability with respect to prospectuses and oral communications.  15 U.S.C. § 77$l$(a)(2).[12]  To prevail on a claim under either section, "a plaintiff must show that the relevant communication either misstated or omitted a material fact."  Iowa Pub. Emps'. Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 141 (2d Cir. 2010).  A fact is material for the purposes of Section 11 if "there is a substantial likelihood that a

_____

[12] Section 15 extends "control person" liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Section 11] or [Section 12]."  15 U.S.C. § 77o.

41

reasonable shareholder would consider it important in deciding how to act." Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (citation omitted).

While Section 11 therefore provides purchasers with a form of strict liability for material misstatements or omissions, see In re Lehman Bros. Mortgage-Backed Securities Litig., 650 F.3d 167, 175 (2d Cir. 2011), it also affords certain affirmative defenses. Section 11 absolves defendants of liability for misstatements or omissions if "it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission." 15 U.S.C. § 77k(a). A plaintiff's knowledge is therefore an affirmative defense under Section 11. In re Initial Pub. Offering Sec. Litig., 483 F.3d 70, 73 n.1 (2d Cir. 2006). Section 12(a)(2) similarly imposes liability for untruths or omissions only where the purchaser did not know "of such untruth of omission." 15 U.S.C. § 77*l*(a)(2). Section 12 thus requires a plaintiff to prove "that he had no knowledge of the untruth or omission." Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 617 (2d Cir. 1991).

A defendant may also defeat liability under Sections 11 and 12(a)(2) by showing that the loss suffered by the plaintiff was not caused by the defendant's misleading statements. In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir.

2009).  Specifically, Section 11 provides that "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, . . . such portion of or all such damages shall not be recoverable."  15 U.S.C. § 77k(e).  The Securities Act provides an affirmative defense to liability under Section 12(a)(2) in nearly identical terms.  15 U.S.C. § 77*l*(e).

Finally, defendants other than issuers may also defeat liability by establishing due diligence.  This defense requires that the defendant show, for purposes of Section 11, that "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective that the statements therein were true."  15 U.S.C. § 77k(b)(3)(A); see also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208 (1976).  Section 12(a)(2) similarly creates a defense if a defendant "sustain[s] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission."  15 U.S.C. § 77*l*(a)(2).

To make out its case in chief under Sections 11 and 12(a)(2), the plaintiff will therefore have the not

43

inconsiderable burden in this litigation of proving that
representations in the prospectus supplements regarding the
quality of the Supporting Loan Groups for each Certificate that
the GSEs purchased were false.  To assist it in doing so it has
identified a sample for each SLG of approximately 100 loans.
The parties have gathered or are attempting to gather the
underlying loan files for the designated samples[13] and their
associated guidelines in order to examine whether the statements
in the prospectus supplements were false, and if so, the extent
to which they inaccurately described the characteristics of the
SLGs.

     While the defendants have each denied that the prospectus
supplements contained false statements, they have also indicated
that in the event that the plaintiff can prove each of the
elements of the Securities Act claims, they will rely on their
statutory defenses, including the due diligence and knowledge
defenses.  Defendants thus wish to present to the jury evidence
that they "after reasonable investigation" did not know of the

_____

[13] The defendants in these actions rejected litigating the issues
in these cases on the basis of the FHFA's samples and have
undertaken the herculean task of gathering all of the loan files
and their underwriting guidelines for all of the SLGs, which
include close to 1.1 million loans.  To date, however, it
appears that none of the defendants will be relying on a sample
different from that identified by FHFA for the purpose of
performing the task of re-underwriting.

misstatements while also presenting to the jury evidence that
the GSEs knew of the false statements.  As a practical matter
this means that at trial, the defendants will be taking the
position that they did not know of the false statements in their
prospectus supplements despite their performance of due
diligence but that the purchaser of the securities nonetheless
had knowledge of the false statements.

III.  Knowledge

An examination of the text of the statute and the
applicable case law reveals two key characteristics of the
knowledge that constitutes a defense to Section 11 liability.[14]
First, the knowledge required must be specific knowledge of the
falsity of the particular statements at issue.  The word "such"
in the knowledge defense compels this understanding, as it
indicates that knowledge on the part of the purchaser must be
knowledge of the untruth or omission on which a claim of
liability is based.  See DeMaria v. Andersen, 318 F.3d 170, 175
(2d Cir. 2003) (section 11 allows recovery on the basis of "a
materially false registration statement unless the purchaser
knew about the false statement at the time of acquisition").

_____

[14] Defendants do not suggest that a different standard applies to
the knowledge element of Section 12(a)(2) claims.

Second, the purchaser must have actual knowledge of the misstatements at issue.  The statutory text creates a defense only where the purchaser "knew" of the untruth, meaning that the "[a]vailability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus." Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956).  The Second Circuit has more recently rejected the idea that "merely available, as opposed to widely known, public information" could establish a plaintiff's knowledge, as Section 11's affirmative defense requires that "the defendant . . . prove actual knowledge." New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., 709 F.3d 109, 127 n.12 (2d Cir. 2013).

Defendants no longer dispute these aspects of the knowledge standard or of the Court's description of that standard.  First, defendants argue that establishing a plaintiff's knowledge of the falsity of statements does not require proving the plaintiff's knowledge of the truth.  See In re Livent Noteholders Litig., 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001). This principle does not call into question the rule that the knowledge defense requires showing actual, as opposed to generalized, knowledge of the falsity of the statements at issue.  The Court has never intimated that defendants would be

46

required to show that the GSEs were aware of the truth in order
to establish a knowledge defense.

Defendants next suggest that generalized knowledge on the
part of the GSEs is relevant as circumstantial evidence of the
specific knowledge necessary to defeat liability under Section
11.  The Court has never suggested that defendants are not
entitled to discovery of material that is relevant as
circumstantial evidence.  It is of course well-established that
circumstantial evidence can be as probative as direct evidence,
Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (citing
Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 508 n.17 (1957)),
and the defendants have not pointed to any statement by the
Court that is inconsistent with this principle.

On the other hand, there is no authority for the
proposition that evidence of generalized knowledge necessarily
qualifies as circumstantial evidence of particularized, actual
knowledge.  Defendants rely on In re Initial Public Offerings
Securities Litigation, 471 F.3d 24 (2d Cir. 2006), for the
proposition that "knowledge of general practices" can create an
inference of particularized knowledge.  The court in that case,
however, merely observed, in the context of class certification,
that if securities purchasers knew of particular aftermarket
purchase requirements, it would be reasonable to infer that such

47

requirements would artificially inflate securities prices.  Id. at 44 n.14.  This reasoning does not apply with equal force here, as there is no reason to think that the GSEs would necessarily infer the falsity of the particular representations in the offering documents based on their knowledge of general practices on the part of Originators.  This is particularly true in light of the precise nature of the representations at issue, as will be shown below.

Defendants also argue that "public information [may] constitute circumstantial evidence of purchaser knowledge."  New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Trust, 477 Fed. App'x 809, 813 (2d Cir. 2012) (summary order).[15]  Evidence of publicly available information may be circumstantial evidence that an individual was aware of that information, but generalized pubic information does not necessarily create an inference of particular knowledge.[16]

Finally, defendants suggest in passing that actual knowledge may be established by evidence of "willful blindness."  Defendants do not, however, cite any authority for this

---

[15] It is the rule in this Circuit that summary orders of the Court of Appeals for the Second Circuit do not have precedential effect.  Local Rule 32.1.1.

[16] Of course, defendants will not need to take additional discovery of the GSEs' Single Family businesses to show the existence of publicly available information.

48

proposition in the Securities Act context, and indeed such a rule would run afoul of the basic scheme of the statute by "presuming that the plaintiff _should_ have known the relevant information rather than requiring the defendant to prove actual knowledge."  N.J. Carpenters, 709 F.3d at 127 n.12 (emphasis in original).

Defendants rely on Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 110 & n.16 (2d Cir. 2010), but that case dealt with the issue of knowledge in the trademark context, and the court was applying a doctrine that creates liability where a defendant "knows or has reason to know" of infringement by a third party using its services.  Id. at 106 (citing Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854 (1982)).  The Securities Act's knowledge defenses contain no similar "reason to know" language, and indeed create a defense only where the plaintiff "knew" of the misstatements at issue.

Woodman v. WWOR-TV, Inc., 411 F.3d 69 (2d Cir. 2005), on which defendants also rely, applied the Age Discrimination in Employment Act and imported from the criminal context the notion that knowledge can be shown through "conscious avoidance" because a defendant's efforts to "see no evil and hear no evil do not somehow magically invest him with the ability to do no evil."  Id. at 84 n.14 (citing United States v. Adeniji, 31 F.3d

49

58, 62 (2d Cir. 1994)).   "This principle translates easily to discrimination cases," the court observed, because antidiscrimination law "does not tolerate a person shutting his eyes to a fact . . . <u>after</u> realizing its high probability in order to deny that he acted with the requisite knowledge and intent to discriminate." <u>Id</u>. (emphasis in original).   The Securities Act and its strict liability provisions do not create a similar incentive on the part of purchasers to remain ignorant as to the true quality of the collateral underlying Certificates they are purchasing, and again, such an interpretation would be inconsistent with the text and purpose of the statute.   In any event, defendants have not shown that the discovery they have received from the Single Family side -- and from the GSEs generally -- would be insufficient to show that the GSEs were willfully blind to the falsity of the statements in the prospectus supplements, nor do defendants point to a type of document they have sought in discovery that would tend to show willful blindness.

Defendants have therefore not shown that the Court's longstanding articulation of the knowledge standard, that it requires actual knowledge of the falsity of representations with respect to the Certificates the GSEs purchased, is incorrect. Defendants have also not established -- indeed, have not even

argued -- that any particular discovery ruling the Court has
made was based on legal error and should be revisited for that
reason.  Rather, defendants rely on the assertions about the
knowledge standard discussed above to argue that they should be
entitled as a general matter to presumably unlimited discovery
from the Single Family side.  An examination of the alleged
misstatements at issue shows why this argument fails.

FHFA's complaints allege that the prospectus supplements
made three types of misstatements with regard to the Supporting
Loan Groups that underlie the Certificates the GSEs purchased:
(1) that certain percentages of the loans had Loan-to-Value
("LTV") ratios of 80% (and that none had LTV ratios of 100%),
(2) that certain percentages of the loans were for owner-
occupied properties, and (3) that the loans were generally
underwritten in accordance with applicable underwriting
guidelines.  The specific and concrete nature of these
representations demands a correspondingly specific degree of
knowledge.

An example helps shed light on what actual knowledge of
these misrepresentations might entail.  The prospectus
supplement for the MABS 2007-WMC1 securitization, at issue in
the UBS case, contained the following statements alleged to be
materially misleading.  First, the prospectus supplement

represented that 70.76% of the loans in the Supporting Loan
Group had LTV ratios of 80% or lower, and that none had an LTV
ratio of greater than 100%.  Second, the prospectus supplement
reported that 98.32% of the loans were for owner-occupied
properties.  And finally, the prospectus supplement explained
that the loans had been "originated generally in accordance with
the underwriting guidelines."  Thus, to show that the GSEs knew
these statements were false, defendants would presumably be
required to show that, given the particular pool of loans that
formed the Supporting Loan Group, the GSEs were aware that it
was not in fact true that 70.76% of those loans had 80% or lower
LTV ratios, or that 98.32% were for owner-occupied properties,
or that the SLG's loans were generally originated in accordance
with the originator's underwriting guidelines.

Defendants seek discovery of Single Family material that
they believe will show awareness on the part of the GSEs of
shoddy underwriting practices on the part of Originators.  Of
course, as the discussion of the series of discovery rulings on
this subject has demonstrated, defendants have in fact been
given discovery of much of this material.  With respect to
Originators in particular, FHFA has produced operational reviews
and reports or studies conducted by Single Family that show
appraisal bias, regardless of whether they were provided to PLS

traders, supervisors, or senior risk custodians.  FHFA has produced an even broader swath of Single Family documents related to Originators if they were provided to PLS personnel, including documents that discuss risk associated with an Originator, an Originator's underwriting guidelines or its adherence to them, AMO reviews, scorecards from the Counterparty and Credit Risk Management group at Freddie Mac, and Counterparty Credit Reviews, Private Label Securities Counterparty Approval Reports, and daily surveillance reports from Fannie Mae.  Defendants have thus been given broad discovery of material regarding the GSEs' awareness of problems with Originators from sources where that material is most likely to be found.

Indeed, defendants point to certain documentary evidence they have received in discovery that illustrates awareness on the part of Single Family employees of problems with certain Originators, including appraisal bias, substantial deviations from underwriting guidelines, and fraud.  This material has been discoverable despite its limited relevance, given the particularity of the knowledge on the part of the GSEs the defendants will have to establish at trial.  The representations in the prospectus supplements were about pools of loans, meaning that awareness of problems with a particular loan or Originator

does not necessarily translate into awareness that a particular percentage of the loans in a specific pool was inaccurately described as owner-occupied properties, for example.

Furthermore, the statements in the offering documents were made by the defendants, not Originators.  Various defendant entities purchased loans from Originators or third parties, conducted diligence on those loans, and removed particular loans from a pool before the loans were securitized, which often involved dividing them into Supporting Loan Groups with different characteristics.  See FHFA v. UBS, 858 F. Supp. 2d at 312; FHFA v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 486-87 (S.D.N.Y. 2012).  For purposes of Section 11, the GSEs were entitled to rely on the representations made in the offering documents and to believe that the work done by defendants and their diligence firms made the resulting Supporting Loan Group stronger than the general set of loans being sold by a particular Originator.  There is, in other words, no necessary equivalence between a Supporting Loan Group containing loans from an Originator and the general universe of loans being offered for sale to the Single Family side by that same Originator.  Establishing that the Single Family side knew of problems with an Originator will not establish that the GSEs had actual knowledge that the specific representations in the

prospectus supplements issued by the defendants were false. Nonetheless, defendants have been given significant access to the most likely sources of this material.

This reasoning applies not just with respect to the representations regarding percentages of loans with particular LTV ratios or owner occupancy status, but also to representations that the loans were generally underwritten in accordance with an Originator's particular underwriting guidelines.  Defendants, seizing on language in FHFA's complaints that there was "widespread abandonment" of underwriting guidelines, argue that they should be entitled to broad Single Family discovery in an effort to show the GSEs' awareness of widespread abandonment of underwriting guidelines on the part of certain Originators generally.  Again, the actionable statements under Section 11 are those made in offering documents, and in this case the GSEs have sued based on representations made with respect to the Supporting Loan Groups, not the general practices of an Originator.  See FHFA v. UBS, 858 F. Supp. 2d at 321.

To establish falsity at trial, FHFA will have to show that the representation that the loans in a particular Supporting Loan Group were generally underwritten in accordance with the guidelines applicable at the time was not true.  Showing

"widespread abandonment" of underwriting guidelines on the part of an Originator, without reference to a particular Supporting Loan Group, will not suffice to make out a case in chief.[17] Thus, to defend against a Section 11 claim and establish that the GSEs had actual knowledge of these misstatements, defendants would have to show that the GSEs knew that a particular Supporting Loan Group was not generally underwritten in accordance with the guidelines; establishing knowledge of an Originator's lack of adherence to its own guidelines generally would not be sufficient because there is no necessary connection between an Originator's general way of doing business and the characteristics of a particular group of loans that have been examined and assembled into a securitization by a defendant entity.

It is also worth repeating that the Court has never simply adopted the position FHFA took early in this litigation, that material from the Single Family side that did not reach the PLS units in one way or another is per se not discoverable. Rather, the Court has considered every request for such discovery in detail, including in numerous conferences at which counsel made

---

[17] As the Court explained during the April 26, 2013 conference, widespread abandonment is "not a misrepresentation alleged in the complaint. . . . I don't think anyone will be charging the jury on that."

lengthy oral presentations and offered detailed analyses of how
relevant each category of requested material might be.
Ultimately it is of course possible that there exists relevant
evidence from the Single Family side that FHFA has not been
required to produce.  As noted above, it is a court's duty not
simply to allow discovery of all material that may have some
chance of yielding relevant evidence, but to weigh "the burden
or expense of the proposed discovery" against "its likely
benefit."  Fed. R. Civ. P. 26(b)(2)(C).  In light of this
obligation, the Court will not order expanded Single Family
discovery for the purpose of establishing knowledge.  Defendants
are already receiving a substantial quantity of documents from
the Single Family side, and there is no reason to suspect that
the low marginal value of wide-ranging additional discovery
would outweigh by the substantial burden it would entail.

       Closely related to the question of what type of knowledge
may constitute a defense under Section 11 is the issue of
whether knowledge on the part of particular employees may be
imputed to an organization as a whole.  In their briefing, and
particularly in their response to FHFA's sur-reply, defendants
argue that under the Restatement (Third) of Agency and
applicable case law, the knowledge of any GSE employee may be
imputed to the GSEs as entities, and therefore to FHFA as the

plaintiff.  Marshalling scores of documents produced in discovery, defendants take issue with FHFA's early representations that certain types of information were kept from PLS traders at the GSEs as a matter of policy.  FHFA has, the defendants observe, recently changed its characterization of those policies in certain respects, and the parties' ongoing review of documents continues to provide an increasingly nuanced view of how information was shared within the GSEs.  The Court is therefore loath to address the complex legal issue of imputation on this shifting factual record, particularly because it does not view imputation as critical to the discovery rulings that have been issued in the course of this litigation.  As the narrative above demonstrates, the Court has made these discovery rulings on the basis of relevance and burden, and has never denied the defendants access to potentially relevant information based solely on the idea that such information cannot be imputed to the GSEs or to the GSEs' PLS units as a matter of law.

Even assuming that the "knowledge" of any employee in a GSE may be imputed to the GSE, any discovery of the GSEs would still be bounded by Rules 1 and 26.  The defendants have never argued that any employee in the Single Family business would be likely to have actual knowledge of the falsity of the highly specific representations about the quality of the pool of loans in the

SLGs that underlie the defendants' securitizations.   Indeed, it appears from the parties' submissions thus far that Single Family personnel principally had information about conforming whole loans, not the pools of subprime loans supporting the Certificates.   To the extent that the Single Family businesses have created documents concerning particular Originators, many of those have been provided to the defendants, as their recent submissions amply illustrate.[18]

IV.  Inquiry notice

Defendants argue in a general way that they are entitled to discovery of material from the Single Family side to support their statute of limitations defense.   Under the Securities Act, a fact is deemed "discovered," and the statute of limitations begins to run, when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."   City of Pontiac General Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011); FHFA v. UBS, 858 F. Supp. 2d at 320.

---

[18] These include, as noted above, documents relating to Originators that were provided to PLS traders, their supervisors, or senior risk custodians, as well as operational reviews of Originators and reports or studies showing appraisal bias on the part of Originators, regardless of whether they were provided to these individuals.

Defendants do not take issue with the Court's previous articulation of the applicable legal standard.  Rather, they argue that discovery from the Single Family side will be relevant in establishing that the GSEs had sufficient information before September 6, 2007, about the claims at issue to adequately plead them in a complaint.  In making this argument, defendants point to certain categories of information that reside on the Single Family side, chiefly information about Originators and the performance of collateral.  Of course, defendants have already received substantial discovery from the Single Family side concerning Originators, and do not explain why further Single Family discovery is likely to produce material that is more relevant to the question of inquiry notice than what has already been produced.

More importantly, however, defendants' argument concerning inquiry notice again ignores the specificity with which the claims in this case were pled.  As the Court has previously observed,

> FHFA's claim here is not that the <u>originators</u> failed to scrutinize loan applicants adequately <u>in general</u>; it is that <u>defendants</u> failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the <u>particular</u> securitizations sold to the GSEs.

FHFA v. UBS, 858 F. Supp. 2d at 321 (emphasis in original).
Thus, "when the GSEs learned of the loan originators' dubious
underwriting practices says little about when they discovered
the facts that form the basis of this complaint." Id.

Defendants argue that in denying their motions to dismiss,
the Court has relied on "highly generalized allegations" in the
complaints, making equally generalized information from the
Single Family side relevant in establishing when the GSEs had
sufficient information to make out their complaints.  This
argument mischaracterizes the Court's Opinions.  Defendants
again rely heavily on the allegation of "systematic abandonment"
of underwriting guidelines, but in denying defendants' motions
to dismiss, the Court stressed the importance of FHFA's forensic
review of individual loan files, which found, in the UBS case,
that of 996 randomly selected loans from two securitizations,
78% were not underwritten in accordance with applicable
guidelines.  Id. at 332.  There is no reason to think that
generalized awareness of an Originator's sloppy underwriting,
say, would give the GSEs sufficient information to plead facts
in a complaint with this level of specificity.  Indeed,
defendants do not point to a particular type of document or
discovery request that is likely to turn up this type of
information, and of course substantial amounts of Originator

information from the GSEs' Single Family businesses is in fact being produced.

Defendants also argue that the Court sustained complaints as to particular securitizations or defendants even though no forensic review was conducted.  Since generalized allegations were sufficient to save these complaints, defendants argue, generalized awareness of problems with Originators should be discoverable as relevant to inquiry notice.  Again, the Court's Opinions on defendants' motions to dismiss stressed the importance of particularized information in rendering the complaints sufficiently detailed to survive motions to dismiss. For instance, the Court observed that "defendants are correct that the descriptions . . . of government and private investigations are insufficient, alone, to permit a claim to be brought on any individual certificate."  FHFA v. JPMorgan Chase, 902 F. Supp. 2d at 488.  Rather, "[t]he linkage to individual certificates is provided by other sections of the pleading, principally the loan performance and credit-rating histories of the certificates."  Id.  At no point has the Court held that generalized allegations about, for instance, Originators' underwriting practices are by themselves sufficient to render a complaint adequately pled.  See id. at 490 n.14.

V.  Reliance

Defendants also seek expanded Single Family discovery on the theory that it may produce evidence relevant to the GSEs' reliance on defendants' misrepresentations.  The Second Circuit has repeatedly affirmed the idea that reliance is simply not an element of a Section 11 claim.  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 156 (2d Cir. 2012) ("Neither scienter, reliance, nor loss causation is an element of a § 11 or § 12(a)(2) claim."); Fait v. Regions Fin. Corp., 655 F.3d 105, 109 (2d Cir. 2011) ("Claims under sections 11 and 12 do not require allegations of scienter, reliance, or loss causation.").

Defendants concede that a Securities Act plaintiff need not plead or prove reliance, and suggest that reliance is more properly seen as a presumption that can be rebutted by a defendant.  See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 634 (S.D.N.Y. 2007).[19]  Defendants therefore argue that they are entitled to discovery of all "lock-up" agreements between the GSEs and Originators, under which, according to defendants,

---

[19] The Court has already considered and rejected defendants' argument, relying on Refco and APA Excelsior III LP v. Premiere Technologies, Inc., 476 F.3d 1261, 1272-77 (11th Cir. 2007), that "Section 11 contains an implicit reliance requirement." FHFA v. Bank of Am. Corp., No. 11 Civ. 6195 (DLC), 2012 WL 6592251, at *3-4 & n.7 (S.D.N.Y. Dec. 18, 2012).

the GSEs agreed to buy groups of loans before they were assembled into a securitization, and therefore could not have relied on the representations in the offering documents in deciding to purchase the resulting Certificates.  Setting aside this legal argument, FHFA has indicated that the parties have not met and conferred regarding production of these documents, and no dispute regarding their production has ever been brought before the Court.  Defendants therefore do not argue that any discovery request has been denied on the basis of an erroneous understanding of reliance.

VI.  Falsity

Defendants argue that additional Single Family discovery would also be relevant to disprove the falsity of the representations at issue.  Citing FHFA's interim re-underwriting disclosures in the Tranche I and II cases,[20] defendants argue that FHFA will attempt to show not that an Originator failed to follow its underwriting guidelines, but rather that it failed to

---

[20] The defendants in the Tranche I and II cases requested that FHFA be required to disclose its initial findings of the ways in which each loan within its sample failed to meet an Originator's underwriting guidelines.  Over the plaintiff's objection, the Court required it to make those disclosures, which are being made on a rolling basis for every sample the plaintiff has drawn for every Certificate in each of the 197 securitizations in Tranche I and II.

follow "minimum industry standards for assessing a borrower's ability to repay."

Defendants argue that under this theory of falsity, Single Family discovery is relevant in establishing what constitutes "industry standards," because those industry standards should be defined by looking to the behavior of the GSEs' Single Family businesses.  This argument ignores the repeated observation that the GSEs principally bought whole loans under different standards and constraints than those that applied to PLS collateral.  Indeed, most of the Supporting Loan Groups at issue in this case were explicitly defined as composed of loans that did not meet the GSEs' underwriting guidelines.

Defendants also argue that evidence from the Single Family side would help show that loans from a particular Originator "generally did comply with underwriting guidelines."  This evidence would be of minimal relevance, for reasons similar to those discussed above.  The offering documents made representations about a specific collection of loans; they represented that the loans chosen for inclusion in the Supporting Loan Groups were generally underwritten in accordance with applicable guidelines, not that an Originator followed its guidelines in the general course of its business.  In light of the fact that the parties are in the midst of reunderwriting

65

those very loans after completing the costly and time-consuming process of gathering the loan files and guidelines, it is hard to see how an Originator's general adherence to its guidelines with respect to a universe of other loans would be useful in evaluating the falsity of the representations made regarding the specific pools of loans at issue here.

In making these arguments, defendants do not suggest that the Court's view of the legal standard applicable to falsity has been erroneous in any way, nor do they present an argument as to how the Court has erred in weighing the relevance of this evidence against the burden associated with obtaining it.  In any event, as described above, the defendants have received discovery from FHFA of many documents concerning the GSEs' evaluation of Originators' practices.

VII. Materiality

Defendants next argue that evidence from the Single Family side would be relevant to the question of whether the misrepresentations at issue were material.  Defendants do not dispute that materiality is an objective standard, see Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004), but argue that the magnitude of the GSEs' involvement in the market makes their individual views and practices relevant in establishing what an objective investor would view as material.  Again, defendants do

not suggest that the Court has misapprehended or misstated the materiality standard in any prior ruling.

Moreover, FHFA has produced much of the Single Family material defendants now argue is relevant to the issue of materiality.  For instance, defendants argue that the Single Family side's "conduct in acting on their intimate knowledge of originators" would shed light on whether that information was material.  FHFA has produced much of the Single Family side's "intimate knowledge" of Originators, including operational reviews and reports showing appraisal bias.  Furthermore, there is no reason to think that the types of (often non-public) information a Single Family employee would consider material in deciding whether to purchase a whole loan is illuminating in determining what a PLS trader would consider material in deciding whether to buy a security backed by a pool of loans. Indeed, FHFA has produced any information on Originators from the Single Family side that made its way to the GSEs' risk committees or that was used by the PLS side, which is almost by definition more relevant to the question of materiality.

VIII.  Due diligence

Defendants also argue that they are entitled to discovery of Single Family due diligence practices, which they argue are relevant in establishing that the diligence they performed on

the loans in the Supporting Loan Groups was adequate for purposes of their due diligence defense.  See, e.g., 15 U.S.C. § 77k (Section 11).  Again, defendants do not allege that the Court's prior rulings on this subject are infected by any legal error.  First, FHFA has produced all reports of due diligence conducted on the securitizations at issue, regardless of where they are found.  Second, counsel for FHFA has represented that the GSEs were not in fact major players in the type of diligence on which defendants intend to rely for their defense.  For instance, over a one-year period beginning in 2006, the diligence vendor Clayton reviewed 2,985 loans for Freddie Mac, and 111,999 loans for defendant Goldman Sachs alone.  The Court has therefore ruled that the GSEs' use of this type of diligence is not sufficiently relevant to justify the significant additional burden that would be entailed in producing it.

IX.  Fraud Claims

Finally, defendants argue that the Court has erred in applying a higher relevance threshold in considering discovery of material that would be relevant only to the fraud claims. The Court has explained to the parties its view that "when discovery is only relevant to the issues related to fraud claims, that discovery will have to . . . meet a higher threshold of relevance when it is burdensome to produce."  This

is because the Court has viewed it as unlikely that a "defendant faced with a fraud claim [will] proceed to trial unless it believes it can defeat the strict liability claims."  Defendants argue that there is but one standard for relevance in discovery and that the Court's rulings are thus legally erroneous, but, as discussed earlier, Rule 26 explicitly mandates precisely this kind of balancing analysis.

The Court's reference on December 17 to the balancing of burden and relevance in the context of the fraud claims that have been pleaded in six of the coordinated actions has had no impact whatsoever on the scope of discovery permitted in any action.  The reference was made in the course of presenting a list of principles that have guided the Court's oversight of discovery.  The defendants have not taken issue with any of those other principles.  Nor have they pointed to any particular category of document or requested discovery that would be particularly relevant to a fraud claim and has been denied them or argued that the discovery they have received is insufficient to defend against the fraud claims.  The defendants in the six fraud actions contend that they may choose to proceed to trial even if they can't mount a defense against the Securities Act's strict liability claims.  If they actually choose to do so, they

will be doing so armed with all the discovery from the GSEs to which they are entitled.

CONCLUSION

Defendants' briefing ultimately illustrates that there is broad consensus as to the legal standards applicable to the claims and defenses in these cases.  Particularly in the case of knowledge, defendants concede that establishing a defense under Section 11 will require showing that the GSEs had actual knowledge of the falsity of the particular representations at issue.  In making discovery rulings under this and other legal standards, the Court has followed its obligation to weigh the potential value of the desired discovery against the burden associated with its production.

In none of the discovery rulings issued to date has the Court applied an "admissibility" test.  Instead, the Court has endeavored to give parties access to all of the information that may reasonably be of use to them to prepare for trial, and of course to litigate the claims and defenses at trial. Nonetheless, a court must begin any analysis of a claim for discovery that an opponent resists with a firm grasp of the legal standards that the parties must meet at trial.  Any rulings on the scope of discovery must be sensitive as well to

70

the need to control the enormous expense and burden of this litigation in light of the commands of Rules 1 and 26.  With these principles in mind, the Court has permitted the defendants to obtain discovery of the Single Family businesses where it is appropriate.

As the record in this litigation demonstrates, the defendants have been given fulsome discovery of the GSEs, including of the PLS side of their business, of the management structure that oversaw their entire business, of the joint committees for the Single Family and PLS businesses, and where appropriate, targeted discovery of information held within the Single Family business.  Against this background, and given the frequent conferences in which the parties have been given many hours to describe their requests and the reasons supporting those requests, any new requests for more discovery at this late hour must be carefully analyzed.  This is particularly so because the parties are deeply immersed in depositions and the first trial in these actions is just six months away.  The parties' energies must be, of necessity, fully engaged with the current phase of pretrial work.

With one possible exception, defendants' briefing does not point to any specific prior request for information that was

71

rejected.[21]   Instead, it makes sweeping claims about truncated or severely limited discovery without grappling with the actual record of discovery production or the extensive litigation of discovery issues over the course of the preceding year.

Any request for document discovery at this stage of the litigation should be (a) targeted, (b) supported by a showing both that the request was timely made in 2012 and the dispute regarding the production of the material was promptly presented to the Court, (c) accompanied by an explanation of why the Court's denial of the specific request was in error, and finally (d) accompanied by an explanation of why it is timely to request that the Court revisit the ruling now.   Or, if it is a new request for discovery, then the party must explain why the request was not made during the period set aside for document discovery and must justify reopening document discovery at the very time that the parties are taking depositions and, in some cases, preparing expert reports.[22]

---

[21] The May 8 brief refers to the defendants' interest in seeing the findings from Andre Gao's team that support a report on appraisal bias that FHFA has apparently produced to them. Without a description from the defendants of the prior request to which this related, it is impossible to know when the information was requested and the reasons, if any, given by FHFA for rejecting that request, much less the basis for any court ruling that the defendants would like this Court to revisit.

[22] In a declaration accompanying the fifth and final brief in this series of briefs, the defendants identify additional

SO ORDERED:

Dated:    New York, New York
          June 28, 2013

                              _____
                                    DENISE COTE
                              United States District Judge

---

custodians and documents to which they wish access.  Should the
defendants wish to pursue any of these requests, they should
follow the customary procedure in this litigation.  If the
requests are not resolved after a meet and confer process with
the plaintiff, then the defendants may present the requests to
the Court accompanied by the showing outlined above.